# EXHIBIT C

```
 1                  UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                      WESTERN DIVISION
 4
 5    CORY SPENCER, an individual; ) Case No.
      DIANA MILENA REED, an        ) 2:16-cv-02129-SJO-RAO
 6    individual; and COASTAL      )
      PROTECTION RANGERS, INC., a   )
 7    California non-profit public  )
      benefit corporation,          )
 8                                  )
                      Plaintiffs,   )
 9                                  )
             v.                     )
10                                  )
      LUNADA BAY BOYS; THE          )
11    INDIVIDUAL MEMBERS OF THE     )
      LUNADA BAY BOYS, including    )
12    but not limited to SANG LEE,  )
      BRANT BLAKEMAN, ALAN JOHNSTON )
13    aka JALIAN JOHNSTON, MICHAEL  )
      RAE PAPAYANS, ANGELO FERRARA, )
14    FRANK FERRARA, CHARLIE        )
      FERRARA and N.F.; CITY OF     )
15    PALOS VERDES ESTATES;         )
      CHIEF OF POLICE JEFF KEPLEY,  )
16    in his representative         )
      capacity; and DOES 1-10,      )
17                                  )
                      Defendants.   )
18    _____)
19
20          Deposition of CORY ELDON SPENCER, taken
21    on behalf of defendants, at 777 South Figueroa Street,
22    Suite 4550, Los Angeles, California, beginning at
23    10:01 a.m. and ending at 6:35 p.m., on Tuesday,
24    October 11, 2016, before Carmen R. Sanchez,
25    Certified Shorthand Reporter No. 5060.
```

Page 2

```
 1     APPEARANCES:
 2     For the Plaintiffs:
 3             HANSON BRIDGETT LLP
               BY:  KURT A. FRANKLIN, ESQ.
 4             425 Market Street
               Twenty-sixth Floor
 5             San Francisco, California  94105
               Telephone:  (415) 777-3200
 6             Facsimile:  (415) 541-9366
               E-mail:  kfranklin@hansonbridgett.com
 7
               HANSON BRIDGETT LLP
 8             BY:  TYSON M. SHOWER, ESQ.
                   LANDON D. BAILEY, ESQ.
 9             500 Capitol Mall
               Suite 1500
10             Sacramento, California  95814
               Telephone:  (916) 442-3333
11             Facsimile:  (916) 442-2348
               E-mail:  tshower@hansonbridgett.com
12                      lbailey@hansonbridgett.com
               (NOT PRESENT)
13
               OTTEN LAW PC
14             BY:  VICTOR OTTEN, ESQ.
               3620 Pacific Coast Highway
15             Suite 100
               Torrance, California  90505
16             Telephone:  (310) 378-8533
               Facsimile:  (310) 347-4225
17             E-mail:  vic@ottenlawpc.com
               (TELEPHONIC APPEARANCE)
18
19
20
21                      Continued ....
22
23
24
25
```

Page 3

```
 1    APPEARANCES (CONTINUED):
 2    For the Defendants City of Palos Verdes Estates and
      Chief of Police Jeff Kepley:
 3
           KUTAK ROCK LLP
 4         BY:  ANTOINETTE P. HEWITT, ESQ.
           5 Park Plaza
 5         Suite 1500
           Irvine, California  92614-8595
 6         Telephone:  (949) 417-0999
           Facsimile:  (949) 417-5394
 7         E-mail:  Antoinette.Hewitt@KutakRock.com
 8    For the Defendant Brant Blakeman:
 9         VEATCH CARLSON, LLP
           BY:  JOHN P. WORGUL, ESQ.
10         1055 Wilshire Boulevard
           Eleventh Floor
11         Los Angeles, California  90017
           Telephone:  (213) 381-2861
12         Facsimile:  (213) 383-6370
           E-mail:  jworgul@veatchfirm.com
13
      For the Defendant Michael Rae Papayans:
14
           HAVEN LAW
15         BY:  PETER T. HAVEN, ESQ.
           1230 Rosecrans Avenue
16         Suite 300
           Manhattan Beach, California  90266
17         Telephone:  (310) 272-5353
           Facsimile:  (213) 477-2137
18         E-mail:  peter@havenlaw.com
19    For the Defendant Sang Lee:
20         LEWIS BRISBOIS BISGAARD & SMITH LLP
           BY:  TERA A. LUTZ, ESQ.
21         633 West 5th Street
           Suite 4000
22         Los Angeles, California  90071
           Telephone:  (213) 250-1800
23         Facsimile:  (213) 250-7900
           E-mail:  Tera.Lutz@lewisbrisbois.com
24
                         Continued ....
25
```

Page 4

Exhibit C, page 82

```
 1    APPEARANCES (CONTINUED):
 2    For the Defendant Sang Lee:
 3         BOOTH, MITCHEL & STRANGE
           BY:  DANIEL M. CROWLEY, ESQ.
 4         707 Wilshire Boulevard
           Suite 4450
 5         Los Angeles, California  90017
           Telephone:  (213) 738-0100
 6         Facsimile:  (213) 380-3308
           E-mail:  dmcrowley@boothmitchel.com
 7
      For the Defendants Angelo Ferrara; N.F.
 8    appearing through [Proposed] Guardian Ad Litem,
      Leonora Ferrara Attorney for Petitioner:
 9
           LAW OFFICES OF MARK C. FIELDS, APC
10         BY:  MARK C. FIELDS, ESQ.
           333 South Hope Street
11         Thirty-fifth Floor
           Los Angeles, California  90071
12         Telephone:  (213) 617-5225
           Facsimile:  (213) 629-4520
13         E-mail:  fields@markfieldslaw.com
           (TELEPHONIC APPEARANCE AND PERSONAL APPEARANCE)
14
      For the Defendants Frank Ferrara and Charlie Ferrara:
15
           BREMER WHYTE BROWN & O'MEARA
16         BY:  LAURA L. BELL, ESQ.
           21271 Burbank Boulevard
17         Suite 110
           Woodland Hills, California  91367
18         Telephone:  (818) 712-9800
           Facsimile:  (818) 712-9900
19         E-mail:  lbell@bremerwhyte.com
           (TELEPHONIC APPEARANCE)
20
21
22
23
24                     Continued ....
25

                                              Page 5
```

```
 1     APPEARANCES (CONTINUED):
 2     For the Defendant Brant Blakeman:
 3            BUCHALTER NEMER, APC
              BY:  ROBERT S. COOPER, ESQ.
 4            1000 Wilshire Boulevard
              Suite 1500
 5            Los Angeles, California  90017
              Telephone:  (213) 891-5230
 6            Facsimile:  (213) 896-0400
              E-mail:  rcooper@buchalter.com
 7            (TELEPHONIC APPEARANCE)
 8     For the Defendant Angelo Ferrara:
 9            THE PHILLIPS FIRM
              BY:  MATTHEW E. VOSS, ESQ.
10            800 Wilshire Boulevard
              Suite 1550
11            Los Angeles, California  90017
              Telephone:  (213) 244-9913
12            Facsimile:  (213) 244-9915
              E-mail:  mvoss@thephillipsfirm.com
13            (TELEPHONIC APPEARANCE)
14     For the Defendant Alan Johnston aka Jalian Johnston:
15            LAW OFFICES OF J. PATRICK CAREY
              BY:  J. PATRICK CAREY, ESQ.
16            1230 Rosecrans Avenue
              Suite 300
17            Manhattan Beach, California  90266
              Telephone:  (310) 526-2237
18            Facsimile:  (310) 526-2237
              E-mail:  pat@patcareylaw.com
19            (NOT PRESENT)
20
21
22
23
24
25

                                        Page 6
```

Exhibit C, page 84

```
 1                     I N D E X
 2    WITNESS
 3    CORY ELDON SPENCER
 4    Examination by:                                Page
 5    MS. HEWITT                         11, 305, 337
 6    MR. FIELDS                                      217
 7    MR. WORGUL              222, 306, 326, 343, 345
 8    MS. LUTZ                                        306
 9    MR. HAVEN                          321, 336, 343
10    MR. FRANKLIN                                    344
11
12                   E X H I B I T S
13    Defendants'                       Page        Page
      Exhibit        Description        Introduced  Marked
14
      Exhibit 40     Copy of a document
15                   entitled, "DEFENDANTS
                     CITY OF PALOS VERDES
16                   ESTATES AND CHIEF
                     OF POLICE JEFF
17                   KEPLEY'S NOTICE OF
                     DEPOSITION TO
18                   PLAINTIFF CORY
                     SPENCER"              21          21
19
      Exhibit 41     Copy of a document
20                   entitled, "CLASS
                     ACTION COMPLAINT
21                   AND JURY DEMAND"      29          29
22
23
24                   Continued ....
25

                                          Page 7
```

```
1                    I N D E X  (CONTINUED)
2
3                        E X H I B I T S
4    Defendants'                      Page        Page
     Exhibit         Description       Introduced   Marked
5
     Exhibit 42      Copy of an E-mail
6                    dated March 05,
                     2016, from
7                    Jeff Kepley to
                     Mark Velez;
8                    Bates-stamped
                     CITY1807              158         158
9
     Exhibit 43      Color copy of a
10                   photograph
                     taken at the
11                   deposition of
                     Cory Eldon
12                   Spencer depicting
                     his hand and scar    306         306
13
     Exhibit 44      Copy of a drawing
14                   made on yellow
                     legal pad paper
15                   by Mr. Worgul
                     during the
16                   deposition of
                     Cory Eldon
17                   Spencer              334         334
18
19
20
21
22
23
24                       Continued ....
25

                                             Page 8
```

Exhibit C, page 86

```
 1                    Los Angeles, California

 2         Tuesday, October 11, 2016, 10:01 a.m. - 6:35 p.m.

 3

 4            THE REPORTER:  Pursuant to the Federal Rules of

 5    Civil Procedure, I am required to state the following:

 6                 My name is Carmen R. Sanchez, a

 7    certified court reporter with Hahn & Bowersock, A

 8    Veritext Company, located at 20 Corporate Park,

 9    Suite 350, Irvine, California.

10                 This is the deposition of

11    Cory Eldon Spencer, in the matter of Cory Spencer,

12    et al., vs. Lunada Bay Boys, et al., beginning at

13    10:01 a.m., on Tuesday, October 11, 2016.

14                 Counsel, will you please state your

15    appearances for the record.

16         MS. HEWITT:  Antoinette Hewitt for the city.

17         MR. WORGUL:  John Worgul for defendant

18    Brant Blakeman.

19         MR. HAVEN:  Peter Haven for defendant

20    Michael Papayans.

21         MR. CROWLEY:  Daniel Crowley with Booth,

22    Mitchel & Strange on behalf of Sang Lee.

23         MS. LUTZ:  Tera Lutz for defendant Sang Lee.

24         MR. COOPER:  Robert S. Cooper, Buchalter Nemer

25    for defendant Brant Blakeman telephonically.
```

                                                    Page 10

Exhibit C, page 87

```
 1            MR. FIELDS:  Mark Fields for Angelo Ferrara and
 2    N.F. telephonically.
 3            MS. BELL:  Laura Bell for Frank Ferrara and
 4    Charlie Ferrara appearing telephonically.
 5            MR. FRANKLIN:  Kurt Franklin on behalf of
 6    Mr. Spencer and the other plaintiffs in this matter.
 7    And if I can, just as a matter of housekeeping, the
 8    plaintiffs would request under FRCP 30, the ability to
 9    review the transcript within 30 days.
10
11                  CORY ELDON SPENCER,
12    called as a witness by and on behalf of the
13    defendants, and having been first duly sworn
14    by the Certified Shorthand Reporter, was examined and
15    testified as follows:
16
17                      EXAMINATION
18    BY MS. HEWITT:
19        Q      Would you please state and spell your
20    name for the record.
21        A      Cory Spencer.
22               This is a microphone?  Cory Spencer, C-o
23    -- Cory Eldon Spencer, C-o-r-y E-l-d-o-n S-p-e-n-c-e-r.
24        Q      Have you ever given a deposition before?
25        A      I have.
```

Page 11

Exhibit C, page 88

```
1            MR. FRANKLIN:  Vague and ambiguous.
2            THE WITNESS:  I don't know how to answer that
3    any other way than I already did.  When you drive up,
4    you -- because of the lure, the stories, you feel
5    fearful of, hey, is this real?  Is this -- is this
6    place really like they say it is?  Am I going to get my
7    property vandalized?  Am I going to get, you know, in
8    some type of confrontation?  That's a fear.
9            MS. HEWITT:  Okay.
10               Let's break that down then.  Of the four
11   to five times you went to Lunada Bay before you turned
12   20, looking at the first time you went, did you
13   experience any intimidation there?
14           MR. FRANKLIN:  Vague and ambiguous.
15           THE WITNESS:  No.  I was never, per se,
16   confronted by anybody; so I was -- I wasn't intimidated
17   by any individual.
18   BY MS. HEWITT:
19       Q    Okay.  That same time, did you
20   experience any vandalism?
21       A    No.
22       Q    Okay.
23            Did anything occur during that first
24   visit to Lunada Bay -- to Lunada Bay, excuse me, before
25   you turned 20, that caused you to later be fearful of
```

Page 60

```
 1    coming back to Lunada Bay?

 2         A    No.

 3         Q    Okay.

 4              During the second time you visited

 5    Lunada Bay before you turned 20, did you experience any

 6    intimidation?

 7         A    We're going time by time?

 8         Q    Yes.

 9         A    Let me just save you the, I guess, the

10    hassle of going through.  They were just every time you

11    would drive up the same way and just check it out, and

12    nothing that the line of questioning that we went

13    through happened in each one of those four to five

14    times.

15         Q    Okay.

16              During the four to five times?

17         A    Does that make sense?

18         Q    Sure.  Let me just restate it, and I

19    appreciate that.

20              During the four to five times you

21    visited Lunada Bay before you turned 20, you did not

22    experience any intimidation --

23         MR. FRANKLIN:  Vague and ambiguous.

24    BY MS. HEWITT:

25         Q    -- is that correct?
```

Page 61

```
 1    in January 2016?

 2         A    Well, there's safety in numbers.  You

 3    know, I work in a job where it's not safe all the time,

 4    and we're safer in numbers, and this movement kind of

 5    resonated with me because if you have a large number of

 6    people who want to go and enjoy the beach peacefully

 7    and safely, then, I thought that that would be probably

 8    No. 1, my -- my safest opportunity to go there, and

 9    they had a track record of doing it I think the year

10    prior.  And from what I understand, there was minor

11    incidents with that group but nothing to the extent of

12    the stories that I heard --

13         Q    Okay.

14         A    -- about fights and vandalism and stuff

15    like that so ...

16         Q    Okay.

17              Let me ask that this way.  Was it your

18    idea to go to Lunada Bay in January of 2016 unprompted

19    by anybody else?

20         A    On that time, yeah.  I called Chris or

21    texted him and said, "Hey, there's a swell coming.  I'm

22    Cory.  I'm Tom's friend.  Let's get some people

23    together and go surf."

24         Q    Okay.  And did he respond?

25         A    Yes.
```

Page 75

Exhibit C, page 91

```
 1          Q      And how?

 2          A      He got all excited and said, "I'll put

 3   the word out, and let's -- we'll get a few of our Aloha

 4   people and go have some good, peaceful, clean surfing,

 5   hopefully."

 6          Q      Okay.

 7                 Did you have, in your mind, how many

 8   people you wanted to go with in order to get up the

 9   nerve to go to Lunada Bay that day?

10          A      In my mind?

11          Q      Yes.

12          A      If it were a perfect scenario for me,

13   I'd like 100 -- at least 100 guys to go down there.

14          Q      Okay.  Bad question.

15                 If only Chris had gone with you, would

16   you have gone?

17          A      No.

18          Q      All right.

19                 So, eventually, you and Chris agreed to

20   go; correct?

21          A      Correct.

22          Q      Did he tell you how many other people

23   were going to come before you actually went?

24          A      No.

25          Q      Okay.
```

Page 76

```
 1              A       I was not aware.

 2              Q       Okay.  All right.

 3                      Did you -- oh, prior to the day you

 4      actually went in January of 2016, had you ever

 5      communicated with anybody at the City of Palos Verdes

 6      about any problems with Lunada Bay, including violence,

 7      intimidation, fear, anything like that?

 8              A       Yes.

 9              MR. FRANKLIN:  Vague and ambiguous.

10      BY MS. HEWITT:

11              Q       Okay.  On how many occasions?

12              A       Prior to going down there that day?

13              Q       Yes.

14              A       I think I contacted the chief first.  I

15      don't recall getting a response from him; and, then,

16      kind of reading their organizational chart, and I

17      believe I contacted a captain, and I don't recall his

18      name.

19              Q       Okay.  And what did you say -- or not

20      what did you say.  How did you contact him?

21              A       I don't know if the first time was

22      initially E-mail or a call.  It could have been either

23      one, and I just requested, "Hey, there's a group of us.

24      I'm sure you're aware of the group.  We're going down

25      there this date.  Can we get some extra patrol?"
```

Page 78

Exhibit C, page 93

```
1          Q      Okay.

2                 And did you get a response?

3          A      Yes.  There was dialogue, and I don't

4    remember the exact -- I think it was mostly after that

5    through E-mail.  I don't recall ever speaking -- I

6    don't recall if I ever spoke to him on the phone or

7    not, but I know most was through E-mail.  That's my

8    best recollection right now.

9          Q      Okay.

10         A      Can I get a drink or --

11         Q      Sure.  You know what?  Why don't we take

12   a little break right now.  We're going a little while.

13         A      My mouth is dry.

14         MS. HEWITT:  I'll bet.

15                Let's go off the record.

16                (A recess was taken at 11:31 a.m.

17                until 11:45 a.m.)

18   BY MS. HEWITT:

19         Q      What city do you live in?

20         A      I live in the City of Norco.

21         Q      Okay.

22                Oh, that's quite a commute to

23   El Segundo.

24         A      Yes.

25         Q      Okay.
```

Page 79

Exhibit C, page 94

```
 1          Q     Okay.

 2                What are the three places that you surf

 3    at most often in any given year?

 4          A     Most often any given year, I would say

 5    El Porto in Manhattan Beach, Oceanside Harbor in

 6    San Diego County, and I would really like it to be

 7    Lunada in the winter if it was safe to go there, and I

 8    think that's what this claim is about; so, that's not

 9    one of them yet.  I could say Huntington in

10    Orange County.

11          Q     Okay.  Those are all fairly long drives

12    from Norco.  Do you often -- do you go directly from

13    home when you go surf at Manhattan Beach or Oceanside

14    or Huntington, or do you go to work first?

15          A     It just depends if I'm at work or home.

16    And when I have time to go, I'll usually have a board

17    stored at work; a board at home.

18          Q     Okay.

19                We were talking a little bit about

20    communications with the city prior to your actual visit

21    to Lunada Bay in January of 2016.  Let me go back a

22    little bit on that as well.

23                We went over fairly exhaustively before

24    the four to five times you went to Lunada Bay up until

25    the time you were 20; and, then, the four to five times
```

Page 82

```
 1    you went after that up until January 2016.  During any
 2    of those visits -- so, I guess it would be eight to ten
 3    times that you visited prior to January 2016 -- did you
 4    ever experience anything that you believed to be was
 5    localism?
 6            MR. FRANKLIN:  Vague and ambiguous.
 7            THE WITNESS:  I'm going to say when I was on my
 8    bike and you have a group of guys standing around kind
 9    of looking at who's coming and going near the bluff, I
10    would say that would be a group of guys at their local
11    spot being locals, you know.  Did they threaten;
12    intimidate me?  Not -- it was a little intimidating,
13    you know.  Did they vandalize any of my property?  No.
14    Did they get all up in my face?  No.  But they were
15    there and looking at who's coming and going.
16    BY MS. HEWITT:
17        Q      And they didn't speak to you; correct?
18        A      No.
19        Q      And they didn't approach you?
20        A      No.
21        Q      And have you seen groups of guys like
22    that at other beaches?
23        A      Like --
24        Q      Just like you described, a group of
25    guys?
```

Page 83

Exhibit C, page 96

```
 1         A      Yeah.  I -- you see guys hanging out at
 2    the parking lots and before they're going to get in the
 3    water or after they get out of the water.
 4         Q      Okay.
 5                So, talking a little bit about your
 6    communications, I think you said with Captain Velez.
 7         A      That's the name.
 8         Q      Okay.
 9                Did you -- actually, I don't know if you
10    said, "Velez."  Do you think it was Velez?
11         A      You just did, but you refreshed my
12    memory.  Thank you very much.
13         Q      Okay.  I didn't mean to.  Okay.  So, you
14    believe it was Captain Velez; all right.
15         A      Yes.
16         Q      And you had testified that there was
17    dialogue, and I'm not sure if you meant dialogue
18    through E-mail or something on the phone.  Can you
19    clarify that?
20                MR. FRANKLIN:  Asked and answered.
21                THE WITNESS:  Can I clarify it?
22                MS. HEWITT:  Yeah.
23                THE WITNESS:  I don't recall if I -- I don't
24    recall speaking to him, but I may have.  The speaking
25    and the E-mail dialogue -- I know I E-mailed him for
```

Page 84

Exhibit C, page 97

```
1            Q       You don't remember a name or anything
2      like that?
3            A       I don't remember a name.
4            Q       Okay.  Fair enough.
5                    All right.  So, the next sentence in the
6      complaint starting at the end of 17, sir, and going to
7      18 states (as read):
8                    "Upon arrival, members of the
9                    Defendant LUNADA BAY BOYS told him, 'you
10                   can't surf here kook.'"
11                   Okay.  About how long after you arrived
12     do you recall that occurred?
13           A       Almost instantaneously after you get
14     your boards; so, after we arrived, I would say,
15     approximately, within 20 to 30 minutes.
16           Q       Okay.
17                   Were you already getting ready to surf?
18           A       Yes.
19           Q       Okay.  All right.  And, then, I forgot
20     to ask you.  You said, "when we arrived."  Who was the
21     "we"?
22           A       Chris and security guard --
23           Q       Okay.
24           A       -- guy.
25           Q       So, in the end, it was just you two?  It
```

Page 98

```
 1    wasn't the six to eight?

 2          A      Not in the beginning, no.

 3          Q      Okay.  So, when you went down to prepare

 4    to surf, it was you and Chris and the security guard?

 5          MR. FRANKLIN:  Misstates testimony.

 6    BY MS. HEWITT:

 7          Q      Is that right?  Or if it's wrong, go

 8    ahead and tell me.

 9          A      Chris and I and the security guard.

10          Q      Okay.

11          A      Yes.

12          Q      And did the security guard stay by the

13    cars?

14          A      He stayed up with the cars.

15          Q      Okay.  All right.

16                 When you first got to the beach that day

17    and you're getting ready to surf, and you heard someone

18    say, "You can't surf here kook," were you able to

19    understand or were you able to identify who said that

20    to you?

21          A      No.

22          Q      Okay.

23                 Did you see a group of people from whom

24    it came from?

25          A      A group of people?
```

Page 99

```
 1              Q       Did you tell the direction where it came

 2       from or anything like that?

 3              A       To my north.

 4              Q       Okay.  But you couldn't tell who said

 5       it?

 6              A       No.

 7              Q       Oh, okay.  I see.

 8              A       It's -- it was kind of sunrisie, dawn.

 9              Q       Okay.

10                      When you first got down to the beach,

11       could you see any other people there?

12              A       There was a few people, and I'm assuming

13       members of the Bay Boys at the -- way out at the point

14       on the fort.

15              Q       About how many people -- I'm sorry.  Did

16       I interrupt you?

17              A       I couldn't recall a specific number but

18       just a few.

19              Q       More or less than five?

20              A       I would say right around five.

21              Q       Okay.  And about how far were you from

22       those -- those people when you heard the, "You can't

23       surf here kook"?

24              MR. FRANKLIN:  Assumes facts not in evidence.

25              THE WITNESS:  Yeah, I didn't first hear that up
```

Page 100

```
 1            Q      Okay.
 2                   Can you tell me what you did up until
 3     the point when you were on your second wave?
 4            MR. FRANKLIN:  Vague and ambiguous.
 5            THE WITNESS:  What do you mean?
 6     BY MS. HEWITT:
 7            Q      So you heard the statement, "kook"?
 8            A      Okay.
 9            Q      And you said you were going to ignore
10     them?
11            A      And several others.
12            Q      What were the other things that you
13     heard?
14            MR. FRANKLIN:  Calls for a narrative.
15            THE WITNESS:  Let's see.  Specifically, you
16     know, "How many other places did you pass to get here
17     to surf?"
18                   Can we say expletives or --
19            MS. HEWITT:  Sure.
20            THE WITNESS:  You want --
21            MS. HEWITT:  Sure.
22            THE WITNESS:  You know, why -- basically, "Why
23     don't you fucking go home, you fucking kook"; and I
24     mentioned already, "How many other good places did you
25     pass to come here?" Those are the ones that stand out.
```

Page 102

```
 1    BY MS. HEWITT:

 2          Q      Were there others?

 3          A      There may have been.

 4          Q      And did these all occur within those 20

 5    minutes?

 6          A      Yes.

 7          Q      Okay.

 8                 Did any --

 9          A      That's how it is when you go there.

10          Q      Okay.

11                 Did anything else occur in those first

12    20 minutes after you arrived at Lunada Bay that caused

13    fear?

14          MR. FRANKLIN:   Vague and ambiguous.

15          MS. HEWITT:   Well, actually, I'm going to

16    withdraw that.

17          Q      Did these statements cause fear for you?

18          A      Yeah.

19          Q      Okay.

20          A      Yes.  Sorry.

21          Q      Did anything else occur in the 20

22    minutes that caused fear for you?

23          A      Yes.

24          Q      What was that?

25          A      More -- more of the same statements by a
```

Page 103

```
 1    specific individual, who I could identify.  I don't
 2    know his name.  Same things.  It was more of a -- more
 3    of a closer, I guess, encounter with the same language
 4    all the way down the trail; jumping into the water;
 5    same individual just keep, you know, heckling.
 6          Q      And when you say you could identify them
 7    but you don't know their name, do you mean you can
 8    describe what they look like?
 9          A      This guy, I can describe what he looks
10    like.
11          Q      Okay.
12                 What did he look like?
13          A      He was a male white, probably 45 to 50
14    years old; around six foot; one -- probably 185; black
15    wetsuit and a hood and a colorful surfboard that was
16    attached to his arm -- meaning he was holding it,
17    yellow, orange, blue; and I saw him prior to that --
18    so, I saw that same figure, not knowing if it's
19    specifically him but on a good guess, with the same
20    board, that that guy was walking across the bluff is
21    when he first picked up on us, and he was fully
22    clothed, light-blue sweatshirt with a hood, blue jeans,
23    tennis shoes, and I don't recall if he had a hat or
24    not, but dark hair.
25          Q      Okay.  All right.
```

                                              Page 104

```
 1           A       -- basically, the time we got in the
 2    water.
 3           Q       Okay.
 4                   Anything else up until the time of your
 5    second wave?
 6           A       Same comments from the original guy I
 7    described, talking to -- they were talking to some guys
 8    on the point in the fort back and forth; and, then, a
 9    couple guys in the water, one of them being Blakeman
10    and I don't -- I just know they were talking to each
11    other.  They were -- it was like you could tell they
12    knew each other.
13           Q       Okay.
14           A       And that was, again, a little
15    unsettling.
16           Q       Okay.
17                   In the next sentence, it says, "Once in
18    the water ..." -- looking at your -- at the complaint
19    (as read):
20                   "Once in the water, on his
21               second wave at Lunada Bay, a member
22               of Defendant LUNADA BAY BOYS intentionally
23               ran Spencer over with his surfboard and
24               sliced open Spencer's hand."
25                   Is that true?
```

                                                      Page 106

```
1          A      Yes.

2          Q      All right.

3                 Which hand was that?

4          A      The right wrist.

5          Q      Okay.

6          A      With about a half-inch scar.

7          Q      Do you mind showing it to me?

8          A      Right there.

9          Q      Okay.  Okay.  Thank you.

10                MR. WORGUL:  Do you mind if I take a picture of

11         it?

12                THE WITNESS:  I'd have to refer to counsel.

13                MR. FRANKLIN:  That's fine.

14                THE WITNESS:  Go ahead.

15                MS. LUTZ:  Sorry.  Can I see?  Thank you.

16                MR. WORGUL:  Mr. Spencer, if you don't mind.

17         And could you just take the pen and just point to where

18         it is so we can know right where you're showing us?

19                     (Whereupon, the witness complies.)

20                MR. WORGUL:  Okay.  Thank you.

21                THE WITNESS:  Uh-huh.

22                MS. HEWITT:  Thank you, Mr. Spencer.

23                THE WITNESS:  Yep -- yes.

24                MS. HEWITT:  All right.

25         Q      How did you determine that somebody
```

                                        Page 107

```
 1    surfboard, a surfboard having three fins or scags on
 2    the bottom.  I don't know which of those three traveled
 3    over my right wrist and slit it open.
 4         Q     Okay.
 5               When -- right after that occurred, what
 6    was the next thing that you did?  Or, rather, what did
 7    you do?
 8         A     Well, I don't know how to -- we're not
 9    describing how I got to that point, though.
10         Q     No.  Right after your hand was cut, what
11    was the next -- what did you do?
12         A     After my hand was cut?
13         Q     Yes.
14         A     I continued paddling on my path to get
15    out to the lineup.
16         Q     Okay.  So this occurred --
17         A     With that individual who ran -- just ran
18    me over; start berating me with comments of, you know,
19    "What are you" -- "What are you fucking doing out here?
20    I told you to go home.  I should have ran you over.
21    Why are you paddling in the sun glare where I can't see
22    you?" And that's it.  "I should have ran you over."
23         Q     Did you get knocked off your surfboard?
24         A     So now we're backing up to the point --
25         Q     Correct, we are.
```

Page 109

1          A     Okay.  So once we locked eyes and I saw

2    him veer and steer his board in my direction to -- to

3    run over myself, I was paddling west out to the ocean.

4    He was coming in east towards the shore, and I rolled

5    off the left side of my board, and my hand was up --

6    left high up on top of my board, and that's when he ran

7    over the wrist.

8          Q     Okay.

9                Did you continue to surf after that

10   occurred?

11         A     Yes.

12         Q     Did you say anything to the person whose

13   surfboard cut your hand?

14         A     After he made the comment that, "I

15   should have ran you over," I says, "Well, you did," and

16   I held up my hand and showed him, and that's when he

17   said, you know, "Why are you paddling where I can't see

18   you?  You shouldn't paddle in the sunlight," stuff like

19   that.  Then I kept paddling off.

20         Q     Were you fearful of being further

21   injured after that point?

22         A     That's an understatement.

23         Q     So is the answer yes?

24         A     Yes.

25         Q     Okay.

Page 110

```
 1                Did you feel that what had occurred to

 2    you getting your hand cut and the way it happened was a

 3    crime?

 4         A      I know it was a crime.

 5         Q      Did you tell him it was a crime and that

 6    you were a police officer?

 7         A      I did not.

 8         Q      Why not?

 9         A      The way his explanation was going down

10    the road of, basically, avoiding taking any

11    responsibility for his actions; blaming it on the sun;

12    blaming, you know, me paddling where I'm not supposed

13    to be paddling -- I was paddling exactly where you're

14    supposed to paddle to avoid injury; to avoid conflict

15    with any other surfers.  I was paddling back to the

16    channel, which basically gets away from the critical

17    part of the wave, which is where he should have been

18    surfing when he redirected his path to run me over.

19                You know, in my opinion, yeah, it was a

20    crime.  Did I report it?  It's going to be with no

21    witnesses there; no police officers in the water, as

22    there could have been; no police officers down on the

23    beach, as there could have been; on the fort, as there

24    could have been; nothing to corroborate my story, it

25    would have been a "He said ..."; "He said ..." go
```

                                              Page 111

Exhibit C, page 108

```
 1    nowhere thing.
 2         Q       Do you feel that was the case even
 3    though you're a police officer?
 4         A       I don't get it.
 5         Q       Did you think that your -- your
 6    recitation of what had happened would carry more weight
 7    since you're a police officer?
 8         MR. FRANKLIN:  Calls for speculation.
 9         THE WITNESS:  You know, when I'm not on duty,
10    the best thing I can be is a good witness, and that's
11    how I've lived the last 20-some years.  I don't -- I
12    don't ever throw out off duty that I'm a police
13    officer; that you should treat me any different than
14    anybody else in the public because I'm a police
15    officer, and I didn't throw it out then.  I didn't see
16    a need to.  I didn't think that it would do any good
17    after the damage that was already done.  You know, in
18    retrospect, you know, I don't know.  It still would
19    have been a "He said ..."; "He said ..."; and I don't
20    see the need to engage that type of violent behavior
21    any more than it had already played itself out.  The
22    best thing I thought I could do is paddle out like I
23    did and just get away from him.
24         MS. HEWITT:  Okay.
25         Q       Did you, at that point, have any fear
```

Page 112

```
 1      and more and more started showing up on the fort.

 2      BY MS. HEWITT:

 3              Q       More and more what?

 4              A       Bay Boys.

 5              Q       Bay Boys?

 6              A       Yeah.

 7              Q       Okay.

 8                      How about the other people that were

 9      supposed to come with you that day?  Did they ever

10      appear?

11              A       So, after we got out of the water, there

12      were -- and Chris knows all these guys.  There was

13      probably maybe six more -- six more people up top that

14      were, you know, supposed to come out with us early, but

15      some guys have different ideas of early; so ...

16              Q       Okay.

17                      So after the second wave, you -- you and

18      Chris got out of the water; is that correct?

19              A       Third.  I caught one more.  I don't

20      know.  Chris caught a lot of waves.  Before I would say

21      maybe -- I don't know how many he got.  Probably double

22      what I got.  I got three; so, maybe he got more.  I

23      don't know.  But after my third one is when we got out.

24              Q       So after your hand was cut, how many

25      more waves did you surf?
```

Page 114

Exhibit C, page 110

```
 1              A      One.
 2              Q      After you got cut, how many more waves
 3      did Chris surf?
 4              A      I don't -- I don't know specifically.
 5      It wasn't many.  I couldn't give you a number.  I was
 6      kind of -- I was getting a little hypothermic.  I was
 7      bleeding.  I wanted to kind of stay in the cool water
 8      at least a little while longer to let the cold help
 9      with the cut.  I was getting a little frail mentally
10      'cause it was in my -- my fault was having a 10 to
11      12-year-old wetsuit in the middle of winter, and I got
12      cold; getting hypothermic.  Now I'm injured, and I was
13      worried about getting one more wave and getting out of
14      there.
15              Q      Did you tell Chris about your injury?
16              A      Yes.
17              Q      And when did you tell him that?
18              A      Shortly after it happened.
19              Q      All right.
20                     While you were still in the water?
21              A      Yes.
22              Q      And did Chris tell you whether or not he
23      saw the incident once your hand was cut?
24              A      I don't recall if he saw it or not.
25              Q      When you left the water, did you talk tc
```

Page 115

```
 1            Q      Okay.

 2                   Now, with regard to what occurred to

 3     you, any of the things that you described for that

 4     January 2016 visit to Lunada Bay, is it correct that

 5     you did not report that to the City of Palos Verdes

 6     Estates Police Department?

 7            MR. FRANKLIN:  Vague and ambiguous.

 8            THE WITNESS:  Are you talking about my hand?

 9     BY MS. HEWITT:

10            Q      Yes, or anything that happened to you

11     that day?

12            A      I did not request a formal police

13     report, no.  I did not.

14            Q      Okay.

15                   Did you communicate to anybody at the

16     City of Palos Verdes Estates Police Department with

17     regard to what occurred to you that day at Lunada Bay?

18            MR. FRANKLIN:  Vague and ambiguous.

19            THE WITNESS:  Yes.

20     BY MS. HEWITT:

21            Q      Okay.  When was that?

22            A      So, shortly after getting changed, I

23     noticed the group of police officers standing to my

24     south talking with what appeared to be another group of

25     newly-formed Bay Boys.
```

                                                Page 125

Exhibit C, page 112

```
 1                 So, the bay is a bay.  There's a north

 2   and a south end.  The south group had, you know, trucks

 3   and cars and guys standing kind of huddled around in a

 4   group of guys, and the police officers were kind of

 5   towards the south.  They weren't right up next to the

 6   group.  And I did notice that a couple of police

 7   officers appeared to be talking with a few members of

 8   the group; and, so, I made a point, because there was,

 9   in my opinion -- and I don't know if it was directed by

10   my contacts with the captain or whatnot, but I noticed

11   the group of police officers; so, I personally wanted

12   to go over and tell them, you know, "Hey, thanks for

13   showing up," you know.  "We appreciate it." You know,

14   and the one younger officer -- I don't know his name.

15   I didn't get any of their names.  I, basically, you

16   know, told him what happened to me down there, you

17   know; showed him my hand and -- and I told him, I says,

18   you know, "The guy is going to claim sun glare and

19   whatnot." I just didn't want to -- I knew where it was

20   going to go.  "He said ..."; "He said ..."; and, no, he

21   didn't offer to take a report.  You know, he didn't ask

22   me to point anybody out.  I know you're going to ask

23   all these questions; so, we'll just cut to the chase.

24        Q     He did not offer to take a report;

25   right?
```

Hahn & Bowersock, A Veritext Company
800.660.3187

```
 1          A      Right.

 2          Q      Okay.

 3          A      But, again, I thanked him for being down

 4     there, you know, for what I felt a response to my

 5     E-mail without knowing for sure.

 6          Q      Okay.  And you said that you didn't ask

 7     for a formal report; is that right?

 8          A      That's correct.

 9          Q      Okay.

10          A      Just as I stated several minutes ago, it

11     wasn't ...

12          Q      Did you ask for any sort of follow-up

13     action to be taken?

14          MR. FRANKLIN:  Vague and ambiguous.

15          THE WITNESS:  No, not that I can recall.

16     BY MS. HEWITT:

17          Q      And you said that you showed them your

18     hand, or you told them about your hand?

19          A      No, I showed them.  I showed a lot of

20     people my hand.

21          Q      You showed the police officers there

22     that day?

23          A      Like I showed all of you here, I showed.

24          Q      You showed the police officers?

25          A      Yes.
```

Page 127

Exhibit C, page 114

```
 1          Q      Did the police officers have any

 2     recommendations for you?

 3          A      No.

 4          Q      And I'm sorry.  Again, because I don't

 5     know these things, but is not requesting a formal

 6     report, is that the same thing as whether or not you

 7     pressed charges?

 8          A      Yes.

 9          Q      Okay.  So you didn't press charges?

10          A      The reason you want a police report

11     taken is because you have a criminal action done to you

12     and you want --

13          Q      Got it.

14          A      -- to have them criminally, you know,

15     prosecuted.

16          Q      Okay.

17          A      That's why we take police reports.

18          Q      Okay.

19                 Other than the officers you spoke to

20     that day, did you speak to any other

21     City of Palos Verdes Estates police officers about what

22     occurred on January 29, 2016?

23          MR. FRANKLIN:  Vague and ambiguous.

24     BY MS. HEWITT:

25          Q      Let's start -- we'll start with, like,
```

                                              Page 128

```
1              Los Angeles, California

2         Tuesday, October 11, 2016, 1:42 p.m.

3                    -oOo-

4

5         A F T E R N O O N   S E S S I O N

6

7         (All appearances remain as heretofore

8         noted in addition to Mark C. Fields, Esq.,

9         who has joined the proceedings.)

10

11            EXAMINATION (CONTINUED)

12   BY MS. HEWITT:

13        Q     Going back on the record, Mr. Spencer,

14   welcome back.

15        A     Thank you.

16        Q     We were talking about the January 29,

17   2016 visit to Lunada Bay, and the police presence that

18   you're describing.  I think -- I looked at the court

19   reporter's screen.  I think you said that there were

20   two to three police officers there, including a

21   sergeant; is that right?

22        A     Not in January.

23        Q     Not in January.  Okay.  Some other time.

24   Okay.  In January, can you describe to me -- can you

25   tell me how many Palos Verdes Estates police officers
```

                                              Page 130

```
 1    were there?

 2         A       I can't give you a for sure number, but

 3    it was over the -- over the three that we just talked

 4    about.  I would say up to five or six.

 5         Q       Okay.  And did you see any police cars?

 6         A       Yes.

 7         Q       Okay.

 8                 Did you see any other police-type

 9    vehicles?

10         A       Yes.

11         Q       What were those?

12         A       There was a motorcycle, and I don't know

13    what they call it, but it's equivalent to like we have

14    cadets; so and they -- I'm pretty sure they were in a

15    different color uniform.  They weren't officers.

16         Q       Like an explorer?

17         A       Either parking -- not explorer, but they

18    were either a cadet, a police service officer, or like

19    a parking -- I don't recall.

20         Q       Okay.  And were the police service/cadet

21    people, are those included in the three to five to six

22    that you saw?

23         A       Yes.

24         Q       Okay.

25                 How many police cars did you see?
```

Hahn & Bowersock, A Veritext Company
800.660.3187

Exhibit C, page 117

```
 1          A       Probably -- well, approximately, three
 2    cars that were actual black-and-whites.
 3          Q       Okay.
 4                  Did you see any other cars that you
 5    believe were PVE police that that were not
 6    black-and-whites?
 7          A       Motorcycles.
 8          Q       Okay.
 9                  How many motorcycles did you see?
10          A       Just one motorcycle.
11          Q       Okay.
12                  When you left that day in January of
13    2016, were the police personnel that you just described
14    to me still there?
15          A       Yes.
16          Q       Okay.
17                  When you left, did Chris Taloa leave at
18    the same time?
19          A       No.
20          Q       Okay.
21                  Do you recall if Diana Milena Reed
22    stayed after you left?
23          A       Yes.  I left before anyone else.
24          Q       Okay.  All right.
25                  Did you communicate to the
```

Page 132

```
 1        PVE Police Department about the January 29, 2016
 2    incident by phone to anybody?
 3            A       What incidents?
 4            Q       What occurred on January 29, 2016, any
 5    part of it?
 6            A       In regards to?
 7            Q       What occurred to you on that day.
 8            A       No.
 9            Q       Okay.
10                    How about with regard to -- how about by
11    E-mail?
12            A       I don't recall doing so, no.
13            Q       How about by letter, snail mail?
14            A       No.  I am advanced enough.  I don't
15    really send letters anymore.
16            Q       All right.
17                    Did you post on social media of any
18    type --
19            A       No.
20            Q       -- specifically with regard to that
21    date?  No?
22            A       No.
23            Q       Okay.  And I should have been a little
24    clearer -- go ahead.
25            A       No, social media, no.
```

Page 133

Exhibit C, page 119

```
 1              Q      Okay.

 2                     Did you post on any city-related sites

 3      Facebook posts?  I know you're not on Facebook, but any

 4      sort of tweeting at the city, anything like that,

 5      telling the city about what occurred on January 29,

 6      2016?

 7              A      No.

 8              Q      Okay.

 9                     Did you communicate with the city by any

10      other means that I did not go over?

11              A      No.

12              Q      Okay.  All right.

13                     If we go on in the complaint, still on

14      page 12, at the bottom, it says (as read):

15                     "In February, Spencer returned

16              a second time with Jordan Wright and

17              others to observe and watch the outsiders'

18              cars parked on the bluff."

19                     Is that correct?

20              A      That's correct.

21              Q      All right.

22                     So Jordan Wright, when was the first

23      time you met him?

24              A      January 29th.

25              Q      Okay.  And have you ever talked to
```

Page 134

```
 1      Lunada Bay?

 2              A       How did I decide?

 3              Q       Good point.  Bad question.

 4                      Why did you decide?

 5              A       I knew there was still swell in the

 6      water.  I knew that Chris still wanted to surf, and I

 7      wanted to go help in any way I could, as far as making

 8      it a peaceful endeavor and making sure that nothing was

 9      damaged, meaning the property and the cars; and I

10      decided to go to watch the property.

11              Q       How did you find out that Jordan and

12      these others were going?

13              A       I think through texting with Chris, just

14      saying, you know, who was going to be there and what

15      day they were going.

16              Q       From the outset, like when you decided

17      -- from the point that you decided to go in February,

18      was it always the case that you did not intend to surf?

19              A       Yes.

20              Q       Okay.  So you only intended to go and

21      watch the outsiders' cars parked on the --

22              A       I knew I wasn't going to surf that day.

23              Q       All right.

24                      Did you only intend to go to watch the

25      outsiders' cars parked on the bluff?
```

Page 137

Exhibit C, page 121

```
1              MR. FRANKLIN:  Vague and ambiguous.

2              THE WITNESS:  And be a witness if anything

3    happened; watch cars; just kind of -- not protect the

4    area but just, you know, be a witness in case something

5    happened.

6              MS. HEWITT:  Okay.

7         Q    At the time that you went in February of

8    2016, had you retained Mr. Franklin and Mr. Otten?

9         A    I'm sorry.  Repeat that.

10        Q    At the time that you went to Lunada Bay

11   in February of 2016, had you retained Mr. Franklin and

12   Mr. Otten?

13        A    No.

14        Q    At the time that you went in February of

15   2016, had you discussed filing a lawsuit with regard to

16   Lunada Bay with anybody other than your attorneys in

17   this matter?

18        A    No.

19        Q    Okay.  All right.

20             When you arrived at Lunada Bay --

21   withdraw.

22             Did you advise anybody at the

23   City of Palos Verdes Estates about your February 2016

24   visit to Lunada Bay before it took place?

25        A    Forgive me.  Repeat.
```

                                        Page 138

```
 1              Q      That's okay.

 2                     Before you went in February of 2016, did

 3      you tell anybody at the City of PVE that you were going

 4      to be there in February?

 5              A      Yes.  Sorry.  I interrupted.

 6              Q      That's okay.

 7              A      Yes, I believe I E-mailed the same

 8      Captain Velez and told him we'd be out there again.

 9              Q      Did you get a response?

10              A      Yes.  And I don't recall what it was.  I

11      think -- something to the effect of, "Thank you for

12      letting us know," type thing.

13              Q      Were you satisfied with the response at

14      the time?

15              MR. FRANKLIN:  Vague and ambiguous.

16              THE WITNESS:  At the time, it was adequate to

17      what I asked for; so, I'd have to answer yes.

18      BY MS. HEWITT:

19              Q      Do you recall feeling any need to follow

20      up with the captain?

21              MR. FRANKLIN:  Vague and ambiguous.

22              THE WITNESS:  Following -- at what point?

23      BY MS. HEWITT:

24              Q      Oh, at that time when you received the

25      first response.
```

Exhibit C, page 123

```
 1            A       No, I didn't feel a need to say anything

 2    else to him.

 3            Q       Okay.

 4                    Other than Captain Velez, is there

 5    anybody else that you communicated with at the city

 6    with regard to your impending visit to Lunada Bay in

 7    February of 2016?

 8            MR. FRANKLIN:  Vague and ambiguous.

 9            THE WITNESS:  At some -- at some point -- and I

10    don't recall when it was -- I had wrote the chief or

11    E-mailed the chief, and I don't know if it was on or

12    before that time you're speaking of.

13            MS. HEWITT:  Okay.

14            Q       When you went in February 2016, did you

15    go by yourself and meet people there?

16            A       Yes.  I met Chris and Jordan and Diana

17    and Kenny.

18            Q       Okay.

19                    What happened when you first got there?

20            A       We parked.

21            Q       And what was the next thing you did?

22            A       They got ready to go in the water.

23            Q       And who is "they"?

24            A       Chris, and I believe Jordan.  I don't --

25    I don't recall -- I know more went in the water that
```

Page 140

Exhibit C, page 124

1    assaulted down on the fort, and I can't remember what

2    day that was.

3            Q       Okay.  And you don't remember when she

4    told you that; right?

5            A       No, I don't.

6            Q       All right.

7                    When you went in February of 2016, did

8    anybody -- withdraw.

9                    Did you, in fact, watch the outsiders'

10   cars parked on the bluff?

11           A       Yes.

12           Q       Did anybody watch with you?

13           A       Not that I recall.  Like I say, I don't

14   -- there's a couple that stayed behind; so, I don't

15   know if they were -- I can only tell what I did.  I

16   don't know if a couple of the guys that were there with

17   the group either stayed behind, and I don't know what

18   they did, if they were watching; but I was specifically

19   there to watch everybody's cars so ...

20           Q       And what did you do in that regard?

21           A       Just sat on the side of the road and

22   watched our property.

23           Q       Okay.

24                   Were you harassed while you were

25   watching the property?

Page 142

```
 1            A      You could -- yes.  When people call you
 2    the same things they called on the first visit, "kook,"
 3    and, you know, "What are you doing?" Same stuff, that's
 4    harassment.  I feel I was harassed.
 5            Q      Okay.  Just to be -- I'm unclear.  Were
 6    you harassed?
 7            A      Yes.
 8            Q      Okay.
 9                   Tell me what happened?
10            A      Just name calling.
11            Q      And who called you names?
12            A      I don't know who they are.
13            Q      Where were they?
14            A      Just passersby real slow in their
15    trucks; in their cars; guys standing on the bluff.  I
16    recall on the February date, specifically,
17    Defendant Blakeman constantly circling us, everybody
18    who was out there to surf that was not from there;
19    that's not a Bay Boy; sticking his GoPro in our faces
20    for reasons we could only determine were to identify us
21    to their group so that they would know who we are.
22    I've never had that happen.  Bless you.  And, you know,
23    when you go to a beach and somebody is sticking a
24    camera in your face, is it to --
25            Q      When did --
```

Page 143

```
 1              A     Who knows?

 2              Q     When did that occur?  While you were

 3      watching the cars?

 4              A     While we were watching the cars; when we

 5      arrived; when they were getting out of the water,

 6      meaning Jordan and Chris; while we were standing at our

 7      cars.  It was just odd.

 8              Q     So he stuck a GoPro in your face?

 9              A     Yes.

10              Q     Okay.

11                    Can you tell me just -- you can

12      demonstrate -- how close the GoPro got to your face?

13              A     Not -- when I say, "in my face," just

14      kind of, you know, even from a distance of this far; so

15      five feet to, you know, 30, 40, 50 feet.  It's just

16      odd.

17              Q     Did you feel threatened by that

18      behavior?

19              A     Of course.

20              Q     So --

21              A     When you show up to a beach and someone

22      that you know is one of the little -- the local

23      controllers/harassers of that place sticking a camera

24      in your face, why is he doing that?  To intimidate you

25      and to make you feel uncomfortable.
```

Page 144

```
 1      considered to be the Bay Boys?

 2            MR. WORGUL:  Same objections.

 3            THE WITNESS:  In my opinion?

 4            MS. HEWITT:  Yes.

 5            THE WITNESS:  The ones that roll by slowly;

 6      that don't get called names themselves; that are doing

 7      the name calling --

 8            MS. HEWITT:  Yes.

 9            THE WITNESS:  -- are members of the Bay Boys.

10            MS. HEWITT:  Okay.

11            Q      Did you recognize any of them?

12            A      No.

13            Q      Okay.  And, then, you described Blakeman

14      holding out a GoPro on a selfie stick.  Did anything

15      else occur to you while you were watching the cars that

16      day in February?

17            A      Anything else?

18            Q      Any other harassment; violence?

19            A      No.

20            Q      Okay.

21                   Any other incidents of localism?

22            MR. FRANKLIN:  Vague and ambiguous.

23            THE WITNESS:  Well, you know, when they get on

24      their phones as they're passing by in their car; and,

25      then, more and more start to show up, you know, I guess
```

Page 146

```
1     that to you?

2            A      No, I don't.

3            MS. HEWITT:  Okay.  All right.  And, then,

4     let's look at this -- what's the next exhibit?

5            THE REPORTER:  Forty-two is your next exhibit.

6            MS. HEWITT:  Forty-two.  Okay.  Here is 42,

7     which is Bates-stamped CITY1807 for those of you on the

8     phone.

9                    (Defendants' Exhibit 42 was marked for

10    identification by the Certified Shorthand Reporter

11    and is enclosed herewith.)

12    BY MS. HEWITT:

13           Q      This is a one-page E-mail that was

14    produced by the city, I think, in response to a

15    Public Records Act request, and it was produced

16    redacted; so, this is how I got it too.

17                  Why don't you take a look at that,

18    Mr. Spencer, and tell me if you recognize what's said

19    in that E-mail.

20           A      Yeah, that's the E-mail I sent to him.

21           Q      Okay.

22                  The date matches up with what you told

23    us today.  So, let's go through this E-mail.  First of

24    all, the subject line that you chose, "Lunada UC ops,"

25    can you tell me if "UC" referred to undercover?
```

Page 158

```
 1              A      Yes.

 2              Q      And "ops" is operations?

 3              A      Yes.

 4              Q      Okay.  And the first sentence says

 5    (as read):

 6                     "Sir, first of all, I'd like

 7              to thank you and your dept. for the

 8              response in extra patrols down at

 9              Lunada Bay."

10              A      Correct.

11              Q      All right.

12                     Did you feel thankful for extra patrols

13    down at Lunada Bay?

14              A      Of course.

15              Q      All right.

16                     Next, you say (as read):

17                     "I am active law enforcement

18              (ESPD) and have been emailing

19              Capt. Velez every time we (Aloha point

20              Facebook group - a group of non-locals)

21              venture out to the bay on a big swell day."

22                     "ESPD," was that El Segundo Police

23    Department?

24              A      Yes.

25              Q      All right.  And was it correct that you
```

                                          Page 159

```
 1     had been E-mailing Captain Velez every time you were

 2     venturing out on a big swell day?

 3              A       On those two days, yes.

 4              Q       Okay.  So, you were referring to those

 5     two days, January and February of 2016?

 6              A       Correct.

 7              Q       All right.  So, each time you E-mailed

 8     them, is it correct that you witnessed extra patrols

 9     being provided?

10              A       Yes.  In my opinion, that's what they

11     were.  The officers were there because, hopefully, in

12     response to my E-mail.

13              Q       All right.

14                      You go on to write (as read):

15                      "He has been kind enough to

16              respond, and we've been encouraged to

17              see PV officers."

18                      Was that accurate?

19              A       Correct.

20              Q       The next paragraph states (as read):

21                      "Anyway, several years ago

22              (around 02' or 03') the then chief of

23              PV asked several surrounding agencies to

24              see if officers who surfed would be willing

25              to paddle out 'on duty-undercover.'"
```

Page 160

```
 1    on the board or something like that, and I don't know
 2    who that was.  From what I remember, I don't think they
 3    were currently a member of them, but they used to be.
 4    I don't remember who it was.
 5         Q     Okay.
 6               Put that right to the side because I'm
 7    going to ask you some more questions about this E-mail.
 8         A     Which one?
 9         Q     The one we just looked at.  Yeah, put
10    that off, because I'm going to come back to that.
11    Going back real briefly to the complaint on page 13,
12    following the February 2016 visit to Lunada Bay, did
13    you ever return to Lunada Bay and attempt to surf?
14         A     No.
15         Q     Did you ever return to Lunada Bay and --
16    at all after that time?
17         A     I have, yes.
18         Q     All right.
19               How many times?
20         A     Anywhere from three to five.
21         Q     Okay.
22               On each of those visits, did you go down
23    to the beach?
24         A     No.  Up on the bluff only.
25         Q     Okay.
```

                                            Page 170

```
 1                    Did you go in your car at any time
 2      because you were afraid?
 3              A       No.
 4              Q       All right.
 5                    At any time when you were watching the
 6      cars, were you in fear of violence?
 7              MR. FRANKLIN:  Vague and ambiguous.
 8              THE WITNESS:  It is, because you know -- you
 9      don't know what's going to happen when you see guys on
10      cell phones driving by real slow looking at you; and,
11      then, more guys show up.  So was I worried that there
12      could be violence?  Yes, there could have been.
13              MS. HEWITT:  Okay.
14              Q       Were you worried about bodily harm
15      occurring to yourself?
16              A       Yes.
17              Q       And what did you base that worry on?
18              A       Guys on cell phones driving by real slow
19      and more guys showing up after you see them on cell
20      phones.  Kind of crazy at a beach where violence is
21      documented for 40 years.  I based it on my own fear.
22              Q       And this is the fear based on the 30 to
23      40 years of documented violence?
24              A       All the stories and violence and what
25      goes on down there, yeah.
```

Page 173

```
 1              Q     Okay.

 2              A     It's crazy.

 3              Q     Is it based at all on your January 2016

 4      visit?

 5              A     I would say of course.  How can it not

 6      when you get your hand sliced open?

 7              Q     Okay.

 8                    Was it -- was it based on what or

 9      anything you experienced while you were watching the

10      cars other than what you've already told me?

11              A     Yes, the whole totality -- the whole

12      totality of the situation gives you fear.  But, at some

13      point, you got to stand up to people that are acting

14      like bullies and, you know, deal with it.

15              Q     Okay.  So, I'm just trying to write down

16      all these things here.  So, we talked about the 30 to

17      40 years of documented incidents; guys on cell phones

18      driving by and, then, more guys showing up; having your

19      hand cut in January.  Is there anything else that I've

20      missed?

21              MR. FRANKLIN:  Misstates prior testimony.

22              THE WITNESS:  Guys walking around a bluff

23      throwing GoPros in your face and guys knowing --

24      potentially knowing who you are from those pictures

25      that he shares with his buddies, yeah, all that.  You
```

Page 174

```
 1              A      I don't.

 2              Q      Was the last time that you E-mailed

 3     Captain Velez with regard to your February 2016 visit?

 4              A      Again, may or may not be.  I don't

 5     recall the last E-mail.

 6              Q      Okay.

 7                     Other than Captain Velez and

 8     Chief Kepley, have you communicated with any other

 9     City of Palos Verdes Estates Police Department

10     representatives?

11              A      Have I communicated with?

12              Q      Right.  Good point.  Let's go back.

13                     We talked about some that you spoke with

14     in your January 29th, 2016 visit.  At the February 2016

15     visit, were there any Palos Verdes Estates

16     Police Department representatives there?

17              A      Yes.

18              Q      Okay.  And how many did you identify --

19              A      I think there was only two patrolmen and

20     a sergeant that day; but if there were more, I didn't

21     see them or don't recall.

22              Q      Okay.

23                     Did you see any marked police cars in

24     February?

25              A      Yes.
```

Page 184

```
 1          Q       How many?

 2          A       Two or three.

 3          Q       Okay.

 4                  Did you see any motorcycles?

 5          A       I don't recall seeing a motorcycle in

 6   February.

 7          Q       All right.

 8                  Other than in January and February of

 9   2016, did you ever speak to any City of Palos Verdes

10   Estates Police Department representatives in person

11   with regard to Lunada Bay?

12          A       I don't -- I don't recall.  I don't

13   recall doing so.

14          Q       Okay.

15                  Other than E-mails with Captain Velez

16   and Chief Kepley, do you recall any other E-mail

17   communication with anybody from the City of Palos

18   Verdes Estates Police Department with regard to

19   Lunada Bay?

20          A       I do not.

21          Q       Okay.

22                  Do you recall any phone communications

23   with anybody at the PVE Police Department with regard

24   to Lunada Bay?

25          A       Again, I answered that before.  I don't
```

Page 185

```
 1    off-duty weapon.

 2            Q       Okay.  That didn't sound smug at all.

 3            A       Okay.  I didn't want to.

 4            Q       Not at all.

 5            A       They always say, "revolver."  Yeah, we

 6    used to carry those back in the '70s.

 7            Q       I'm sure it's all TV.

 8                    All right.  With regard to the pain and

 9    suffering, lack of sleep, emotional distress, and

10    mental anguish, do you attribute any of those

11    specifically to the actions of Chief Kepley?

12            A       Yes.  I'm disappointed in him.  I'm

13    disappointed that him and his department are not taking

14    care of the problem, yes.

15            Q       And you're disappointed because

16    Chief Kepley has not eliminated the problem, or do you

17    mean something else by taking care of it?

18            A       Yes, eliminated the problem.

19            Q       All right.

20                    You would agree that extra patrols were

21    provided in January and in February of 2016 when you

22    asked for them; right?

23            A       Wholeheartedly agree.

24            MR. FRANKLIN:  Vague and ambiguous; calls for

25    speculation; move to strike.
```

Page 193

Exhibit C, page 137

```
 1              MS. HEWITT:  Did you move to strike, Counsel?

 2              MR. FRANKLIN:  I did.

 3              MS. HEWITT:  On what basis?

 4              MR. FRANKLIN:  Lack of foundation.  It was

 5     vague and ambiguous and calls for speculation.

 6              MS. HEWITT:  Okay.

 7         Q       So is it true that you believe that

 8     extra patrols were provided at the January 2016 visit

 9     to Lunada Bay?

10              MR. FRANKLIN:  Same objection.

11              THE WITNESS:  I believe extra patrol was sent

12     down there, yes.

13     BY MS. HEWITT:

14         Q       All right.  Same question for the

15     February 2016 visit.

16              MR. FRANKLIN:  Same objection.

17              THE WITNESS:  Yes.

18              MS. HEWITT:  Okay.

19         Q       All right.  With regard to your alleged

20     pain -- withdrawn.

21                   With regard to the pain and suffering,

22     loss of sleep, emotional distress, and mental anguish

23     that you've discussed here today, do you attribute any

24     of that to the City of Palos Verdes Estates?

25         A       In the sense of the city employs the
```

Page 194

Exhibit C, page 138

```
 1    me.
 2           Q      Have you ever advised someone on how to
 3    do a citizen's arrest?
 4           A      On how to do it?
 5           Q      Yes.
 6           A      Typically, what I advise somebody is
 7    when they state they want to make one or, say, a
 8    misdemeanor has been committed not in my presence, I
 9    just -- the phone.  I didn't know if that was something
10    coming up.
11                  I'll advise them that they can make the
12    citizen's arrest.  I will facilitate the arrest; take
13    that person into custody for them; either issue them a
14    citation, where it's warranted, or take the person to
15    jail if it's warranted.
16           Q      So, you have an understanding of how
17    that process works?
18           A      I -- I've done it several times; so, I
19    think so.
20           Q      Is there any reason that at any point in
21    time that you've had some sort of problem at
22    Lunada Bay, you have not effected a citizen's arrest?
23           A      Yes.
24           Q      What's the reason?
25           A      I didn't think it would go anywhere with
```

Page 279

```
 1    the DA.

 2            Q       Okay.

 3                    How would you know that unless you did

 4    it?

 5            A       I wouldn't.

 6            Q       But would I be correct in saying that

 7    you consciously knew you had the option to do it if you

 8    desired to do it whenever you were present at

 9    Lunada Bay, and there was other law enforcement

10    present?

11            A       Yes.

12            Q       And you chose not to; correct?

13            A       Well, I have that discretion.  I chose

14    not to.

15            Q       You said there's a channel at

16    Lunada Bay.  Where's the channel?

17            A       Well, a channel is a moving thing with

18    tide and positioning of the wave, depending on the

19    conditions; so, a "channel," again, in parenthesis --

20    sorry -- to describe a channel, is a place where the

21    wave is not breaking at a critical point, where you

22    would paddle out to and into the channel to get back

23    out to what's called the "lineup," where you sit and

24    wait for the waves.

25            Q       Do you know where the channel is at
```

Page 280

```
1              MR. WORGUL:  Okay.

2              MS. LUTZ:  Can we take a break for a second?

3     Just like two minutes.

4              MS. HEWITT:  Is that okay with you,

5     Mr. Spencer?

6              THE WITNESS:  Yes.

7                    (A recess was taken at 5:30 p.m.

8                    until 5:39 p.m.)

9                    (Whereupon, Mark C. Fields, Esq.,

10                   left the proceedings.)

11

12                  FURTHER EXAMINATION

13    BY MS. HEWITT:

14        Q      All right.  Counsel has kindly allowed

15    me to ask one question I forgot to ask earlier.

16        A      Okay.

17        Q      With regard to he asked you what a

18    "kook" meant, and I think you said something about not

19    being from around the area or such.  Did you -- were

20    you ever asked by anybody at the City of Palos Verdes

21    Police Department where you lived whenever you talked

22    to them about anything about Lunada Bay?

23        A      Not that I recall.

24        Q      Okay.  Thank you.

25             MR. WORGUL:  I'll want to attach it.
```

Page 305

```
1              MS. LUTZ:   Yes.

2              THE REPORTER:   Mr. Franklin, did you want a

3       certified transcript?

4              MR. FRANKLIN:   Yes.

5                   (Deposition proceedings concluded at

6       6:35 p.m.   Declaration under penalty of perjury on the

7       following page hereof.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 347
```

Exhibit C, page 142

```
 1

 2

 3

 4                              * * *

 5

 6          I do solemnly declare under penalty of

 7     perjury, under the laws of the State of California,

 8     that the foregoing is my deposition under oath; that

 9     these are the questions asked of me and my

10     answers thereto; that I have read same and have made

11     the necessary corrections, additions, or changes to

12     my answers that I deem necessary.

13          In witness thereof, I hereby subscribe my

14     name this _____ day of _____, 20_____.

15

16

17

18

19                         _____

20                              Witness Signature

21

22

23

24

25

                                           Page 348
```

Exhibit C, page 143

```
 1                 Certification of Court Reporter

 2                          Federal Jurat

 3

 4          I, the undersigned, a Certified Shorthand

 5     Reporter of the State of California do hereby certify:

 6          That the foregoing proceedings were taken

 7     before me at the time and place herein set forth;

 8     that any witnesses in the foregoing proceedings, prior

 9     to testifying, were placed under oath; that a verbatim

10     record of the proceedings was made by me using machine

11     shorthand which was thereafter transcribed under my

12     direction; further, that the foregoing is an accurate

13     transcription thereof.

14          That before completion of the deposition, a

15     review of the transcript [X] was [ ] was not requested.

16          I further certify that I am neither

17     financially interested in the action nor a relative or

18     employee of any attorney of any of the parties.

19          IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21     Dated:   October 21, 2016

22

23

24                    Carmen R. Sanchez

25                    CSR No. 5060

                                              Page 349
```

**Mark Velez**

| | |
|---|---|
| **From:** | Jeff Kepley |
| **Sent:** | Saturday, March 05, 2016 9:11 AM |
| **To:** | Mark Velez |
| **Subject:** | Fwd: Lunada UC ops |

REDACTED

FYI.

Jeff Kepley

Begin forwarded message:

**From:**
**Date:** March 4, 2016 at 10:12:35 PM PST
**To:** jkepley@pvestates.org
**Subject:** Lunada UC ops

Sir, first of all, I'd like thank you and your dept. for the response in extra patrols down at Lunada Bay. I am active law enforcement (ESPD) and have been emailing Capt. Velez every time we (Aloha point Facebook group-a group of non-locals) venture out to the bay on a big swell day. He has been kind enough to respond, and we've been encouraged to see PV officers.

Anyway, several years ago (around 02' or 03') the then chief of PV asked several surrounding agencies to see if officers who surfed would be willing to paddle out "on duty-undercover."
I was approached along with a few more of our officers and we were excited to help out. For reasons unknown, nothing ever materialized. I think it would be worth another shot and be very effective. I'm sure my chief would assist in letting the few of us that do surf help out should you ever want to try something like that.

It really is too hard to observe anything that really goes on down there from the bluff. Although, I understand two younger officers actually made their way down to the fort and were actually able to finally witness/document a 415. You know, and I know, the DA will most likely reject it, but kudos to them for their descent from the bluff to the beach.

Thanks for reading, and possibly considering a UC operation as I've suggested. As a side issue, I have recently been made aware of, and feel a brotherly sense of duty, to make you aware of some upcoming legal actions in the works by a very large, non-profit foundation heavily invested in coastal matters (this is separate from the coastal commission thing). There are attorneys plotting strategies as we speak, to basically force the city (consent decree type) to make Lunada Bay very "public access." This could mean many things (signage, trail improvement, parking,etc...). Just wanted to give you a heads up so your not blindsided.

Again, thanks for the response.

DEFENDANT'S EXHIBIT NO. 42
For Identification
Witness: C.E. Spencer
Date: 10/11/2016   Page No: 125
Carmen R. Sanchez, CSR No. 5060

1

42

Exhibit C, page C141807