# EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT
 2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4    CORY SPENCER, an individual; DIANA )
      MILENA REED, an individual; and    )
 5    COASTAL PROTECTION RANGERS, INC., a)
      California non-profit public        )
 6    benefit corporation,               )
                                         )
 7                   Plaintiffs,          )
                                         )
 8        vs.                            ) Case No.: 2:16-cv-2129
                                         )
 9    LUNADA BAY BOYS; THE INDIVIDUAL     )
      MEMBERS OF THE LUNADA BAY BOYS,     )
10    including but not limited to SANG   )
      LEE, BRANT BLAKEMAN, ALAN JOHNSTON,)
11    AKA JALIAN JOHNSTON, MICHAEL RAE    )
      PAPAYANS, ANGELO FERRARA, FRANK     )
12    FERRARA, CHARLIE FERRARA AND CITY   )
      OF PALOS VERDES ESTATES; CHIEF OF   )
13    POLICE JEFF KEPLEY, in his          )
      representative capacity; and DOES   )
14    1-10,                              )
                                         )
15                   Defendants.          )
                                         )
16    _____)
      AND RELATED CROSS-ACTIONS          )
17    _____)
18
19            Deposition of Jeff Kepley, taken on behalf of
20    the Plaintiffs, before Kathy L. Pa'u, Certified
21    Shorthand Reporter 5684 and Registered Professional
22    Reporter for the State of California, commencing on
23    Monday, October 10, 2016, 9:00 a.m., at Veritext
24    National Litigation and Deposition Services, 20
25    Corporate Park, Irvine, California.
```

Page 2

Exhibit E, page 158

```
 1     APPEARANCES OF COUNSEL:
 2
 3          For the Plaintiffs:
 4
                 Law Offices of Hanson Bridgett
 5               BY:  SAMANTHA WOLF
                     ATTORNEY AT LAW
 6               425 Market Street, 26th Floor
                 San Francisco, California 94105
 7               415.777.3200
                 swolf@hansonbridgett.com
 8
 9
10          For the Defendants City of Palos Verdes and Chief
11     of Police Jeff Kepley:
12
                 Law Offices of Kutak Rock
13               BY:  EDWIN J. RICHARDS
                     ATTORNEY AT LAW
14               5 Park Plaza, Suite 1500
                 Irvine, California 92614-8595
15               949.417.0999
                 ed.richards@kutakrock.com
16
17
18          For the Defendant Brant Blakeman:
19
                 Law Offices of Veach Carlson
20               BY:  JOHN WORGUL
                     Attorney at Law
21               1055 Wilshire Boulevard, 11th Floor
                 Los Angeles, California 90017
22               213.381.2861
                 jworjul@veatchfirm.com
23
24
25
```

Page 3

```
 1          APPEARANCES CONTINUED:
 2
            For the Defendant Sang Lee:
 3
                Law Offices of Lewis Brisbois Bisgaard & Smith
 4              BY:  TERA LUTZ
                    Attorney at Law
 5              633 W. 5th Street, Suite 4000
                Los Angeles, California 90071
 6              213.580.3858
                tera.lutz@lewisbrisbois.com
 7
 8
            For the Defendant Sang Lee:
 9
                Law Offices of Booth, Mitchel & Strange
10              BY:  DANIEL M. CROWLEY
                    Attorney at Law
11              707 Wilshire Boulevard, Suite 4450
                Los Angeles, California 90017
12              213.738.0100
                dmcrowley@boothmitchel.com
13
14          For the Defendant Alan Johnston a/k/a Jalian Johnston:
15
                Law Offices of J. Patrick Carey
16              BY:  J. PATRICK CAREY
                    Attorney at Law
17              1230 Rosecrans Avenue, Suite 300
                ManhattanBeach, California 90266
18              310.526.2237
                pat@patcareylaw.com
19
20       For the Defendant Michael Ray Papayans:
21
                Haven Law
22              BY:  Peter T.Haven
                    Attorney at Law
23              1230 Rosecrans Avenue, Suite 300
                Manhattan Beach, California 90266
24              310.272.5353
                peter@havenlaw.com
25
```

Page 4

Exhibit E, page 160

```
1    APPEARANCES CONTINUED:
2
3    For the Plaintiffs:
4
             Otten Law
5            BY:  VICTOR OTTEN
                  Attorney at Law
6            3620 Pacific Coast Highway, Suite 100
             Torrance, California 90505
7            310.376.8533
             vic@ottenlawpc.com
8
9
10
         PRESENT BY TELEPHONE:
11
12       For the Defendant Angelo Ferrara and Defendant N.F.
         appearing through Guardian Ad Litem, Leonara Ferrara:
13
             Law Offices of Mark C. Fields
14           BY:  MARK C. FIELDS
                  Attorney at Law
15           333 South Hope Street, 35th Floor
             Los Angeles, California 90071
16           213.948.2349
             fields@markfieldslaw.com
17
18       For the Defendant Angelo Ferrara:
19           The Phillips Firm
             BY:  MARK RINGSMUTH
20                Attorney at Law
             800 Wilshire Boulevard, Suite 1550
21           Los Angeles, California 90017
             213.244.9913
22           mringsmuth@thephillipsfirm.com
23
24
25

                                                 Page 5
```

```
1          APPEARANCES CONTINUED:

2          For the Defendant Frank Ferrara and Charlie Ferrara:

3              Law Offices of Bremer, Whyte, Brown & O'Meara

               21271 Burbank Boulevard, Suite 110

4              Woodland Hills, California 91367

               818.712.9800

5              pau@bremerwhyte.com

6

7

8

9   The Videographer:  Jill Warren

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

Exhibit E, page 162

```
 1                  Monday, October 10, 2016; 9:00 a.m.

 2                        Irvine, California

 3                             ooOoo

 4

 5           THE VIDEOGRAPHER:  Good morning.  We are on the    09:06:25

 6      record at 9:06 a.m., on October 10, 2016.  This is the

 7      video recorded deposition of Chief Jeff Kepley.

 8           My name is Jill Warren, here with our court        09:06:35

 9      reporter, Kathy Pa'u.  We are here from Veritext Legal

10      Solutions at the request of counsel for plaintiffs.

11           This deposition is being held at 20 Corporate      09:06:46

12      Park, in Irvine, California.  The caption of this case

13      is Spencer, et al. versus Lunada Bay Boys, et al.  Case

14      No. 2:16-cv-021292 SJO RAOx before the United States

15      District Court, Central District of California.

16           Microphones are sensitive and may pick up          09:07:15

17      whispers, private conversations and cellular

18      interference.  Please note that audio and video

19      recording will take place unless all parties agree to go

20      off the record.

21           If there are any objections to proceeding,         09:07:28

22      please state them at the time of your appearance.

23      Beginning with the noticing attorney, please state your

24      appearance.

25           MS. WOLF:  Samantha Wolf from Hanson Bridgett       09:07:36
```

Page 10

Exhibit E, page 163

1    appearing on behalf of the plaintiffs.

2         MR. RICHARDS:  Ed Richards.  I am here on        09:07:46

3    behalf of Chief Kepley and on behalf of the defendant

4    City of Palos Verdes Estates.

5         MR. WORGUL:  John Worgul appearing on behalf of  09:07:56

6    the defendant Brant Blakeman.

7         MS. LUTZ:  Tera Lutz, Lewis Brisbois, appearing  09:08:02

8    on behalf of Sang Lee.

9         MR. CROWLEY:  Dan Crowley, Booth,Mitchel &       09:08:10

10   Strange also appearing on behalf of Sang Lee.

11        MR. CAREY:  Pat Carey on behalf of defendant     09:08:13

12   Alan Johnston.

13        MR. HAVEN:  Peter Haven on behalf of defendant   09:08:17

14   Michael Papayans.

15        THE VIDEOGRAPHER:  Counsel on the telephone?     09:08:22

16        MR. FIELDS:  Mark Fields for defendants

17   Angelo Ferrara and N.F.

18        MALE SPEAKER:  On the phone, on behalf of

19   Frank Ferrara and Charlie Ferrara.

20        MR. RINGSMUTH:  On the phone, Mark Ringsmuth

21   on behalf of Angelo Ferrara.

22        MS. HEWITT:  Antoinette Hewitt on behalf of

23   the city.

24        MR. OTTEN:  Vic Otten on behalf of plaintiffs.   09:08:53

25        THE VIDEOGRAPHER:  Okay.  Thank you.  The court  09:09:03

Page 11

```
 1    reporter will administer the oath.  Then counsel may

 2    begin the examination.

 3

 4                      JEFF KEPLEY was

 5    called as a witness by and on behalf of the Plaintiffs,

 6    and having been first duly sworn by the Certified

 7    Shorthand Reporter, was examined and testified as

 8    follows:

 9

10                      EXAMINATION

11

12    BY MS. WOLF                                       09:09:15

13       Q    Good morning, Chief.                      09:09:15

14       A    Good morning.                             09:09:17

15       Q    Can you please state and spell your full name   09:09:18

16    for the record?

17       A    My name is Jeff Kepley, K-E-P-L-E-Y.      09:09:21

18       Q    Thank you, sir.                           09:09:25

19            Have you ever had your deposition taken before?   09:09:25

20       A    Yes.                                      09:09:27

21       Q    And what type of case -- I'm sorry, how many   09:09:27

22    times?

23       A    Less than a half a dozen criminal cases.  09:09:31

24       Q    All in your capacity, your professional   09:09:34

25    capacity?
```

Page 12

Exhibit E, page 165

| | | | |
|---|---|---|---|
| 1 | Q | Was the interim police chief on any of those | 09:16:47 |
| 2 | panels? | | |
| 3 | A | No.  And the last interview was with the city | 09:16:52 |
| 4 | manager. | | |
| 5 | Q | Was the city council involved in any of those | 09:16:56 |
| 6 | interviews? | | |
| 7 | A | Not with me, directly. | 09:17:00 |
| 8 | Q | Did you know anyone in the Palos Verdes Estates | 09:17:06 |
| 9 | Police Department prior to becoming Chief? | | |
| 10 | A | Yes. | 09:17:13 |
| 11 | Q | Who was that? | 09:17:13 |
| 12 | A | A former lieutenant, who has been deceased for | 09:17:14 |
| 13 | many years. | | |
| 14 | Q | Anybody else? | 09:17:18 |
| 15 | A | No. | 09:17:19 |
| 16 | Q | Did you know anyone who worked for the City of | 09:17:19 |
| 17 | Palos Verdes Estates before you became Chief? | | |
| 18 | A | No. | 09:17:28 |
| 19 | Q | Did you know anyone who lives in Palos Verdes | 09:17:28 |
| 20 | Estates before you became Chief? | | |
| 21 | A | No. | 09:17:33 |
| 22 | Q | Have you ever lived in or near Palos Verdes | 09:17:34 |
| 23 | Estates? | | |
| 24 | A | No. | 09:17:37 |
| 25 | Q | Do you currently live in Palos Verdes Estates? | 09:17:38 |

Page 19

Exhibit E, page 166

| | | | |
|---|---|---|---|
| 1 | A | I do not. | 09:17:40 |
| 2 | Q | Are you familiar with the term localism as it | 09:17:40 |
| 3 | relates to surfing? | | |
| 4 | A | Yes. | 09:17:45 |
| 5 | Q | What do you understand it to mean? | 09:17:46 |
| 6 | A | Generally, I believe, it's a term referring to | 09:17:49 |
| 7 | locals, people who live in that area that dissuade | | |
| 8 | others from enjoying the surf in that area. | | |
| 9 | Q | And when you say dissuade others, how so? | 09:18:04 |
| 10 | A | Generally, it's broad in many, many different | 09:18:09 |
| 11 | ways. | | |
| 12 | Q | Does it include violence? | 09:18:11 |
| 13 | | MR. CROWLEY:  Objection; overbroad. | 09:18:18 |
| 14 | | MR. RICHARDS:  You're asking what his | 09:18:18 |
| 15 | definition is; correct? | | |
| 16 | | MS. WOLF:  Right. | 09:18:22 |
| 17 | | MR. RICHARDS:  Thanks. | 09:18:23 |
| 18 | BY MS. WOLF | | 09:18:24 |
| 19 | Q | Or can it include violence? | 09:18:25 |
| 20 | A | I think maybe, in the most extreme cases, it | 09:18:27 |
| 21 | could.  Generally speaking, I don't think people, when | | |
| 22 | speaking of localism, think about violence.  But that's | | |
| 23 | just my own definition. | | |
| 24 | Q | Can it also include harassment? | 09:18:38 |
| 25 | | MR. CROWLEY:  Incomplete hypothetical, lacks | 09:18:43 |

Page 20

```
1    professionalism.  What did you mean by that?

2         A    Her comments are very informal.  And some of     09:28:45

3    the terminology she used, and the way she characterized

4    this issue, I just didn't think was professional.

5         Q    And what terminology, specifically, do you feel  09:28:56

6    was unprofessional?

7         A    Well, the way she describes a group of people    09:29:04

8    as infamous and pretty much grown men in little men's

9    mindset.  Those kinds of phrases are just

10   unprofessional.  Not what I would have expected a

11   representative of the police department to speak in that

12   tone or in that manner.

13        Q    Understood.  And in what way was this not the     09:29:22

14   message that you would have chosen?

15        A    Well, in many ways.  But probably most           09:29:31

16   importantly, it lacks compassion.  And it lacks a

17   statement that identifies the police department as being

18   willing to address this.

19        Q    Was any effort made to identify the people who   09:29:49

20   had harassed these reporters, allegedly?

21        A    I don't know.                                    09:30:00

22        Q    Did anyone follow up, with these reporters, to   09:30:06

23   obtain the footage of them being harassed?

24        A    I recall the detectives made an attempt to       09:30:12

25   contact the reporters to get the tape to investigate it.
```

                                                        Page 29

Exhibit E, page 168

```
 1      But as I recall, the organization who possessed the tape

 2      was unwilling to relinquish it.

 3          Q    But you had the copy of what had been already    09:30:25

 4      released online; correct?

 5          A    Yes.                                             09:30:28

 6          Q    And do you know if they followed up to do any    09:30:30

 7      investigation?

 8          A    On this part, I believe.                         09:30:34

 9          Q    And in your email, on the second page of this    09:30:36

10      CITY 1112, in bullet point No. 2, you say we are looking

11      into the crime of audio recording without permission,

12      too.  Did you -- so your department considered charging

13      the reporters with a crime for recording the video

14      without the dispatcher's permission?

15          A    No.  I just think it was interesting, to me, to  09:31:04

16      look into whether or not that was appropriate or a

17      criminal offense.  Or what the statutes were with

18      respect to audio recording the dispatcher.

19          Q    And were these reporters ever charged with a     09:31:16

20      crime?

21          A    No, they were not.                               09:31:20

22          Q    And why not?                                     09:31:22

23          A    I don't recall.  But I never received any        09:31:26

24      information that anything proceeded forward with that

25      issue.
```

Page 30

```
 1          Q    And you also state, in point three, that the      09:31:40

 2    patrol bureau will be initiating extra patrols in the

 3    next few weeks as a result of anyone responding to the

 4    article or, quote, locals acting up to protect their

 5    area, end quote.

 6               Why did you feel that extra patrols were          09:31:57

 7    necessary?

 8          A    Well, at that time, I was just fearful that       09:32:02

 9    media attention in that area would attract others to

10    come into the area, and would exacerbate -- if there is

11    any other preexisting conditions, exacerbate that

12    condition.

13               I was aware of some incidents in the past where   09:32:18

14    people came in and started causing problems.  And I just

15    wanted to be proactive and prevent that from happening.

16          Q    Is it fair to say that, at the time that you      09:32:31

17    sent this email, you believed that there were, at least,

18    some locals who perhaps felt Lunada Bay was their turf?

19               MR. WORGUL:  I will object as to vague and        09:32:43

20    ambiguous as to what locals are.

21               MS. LUTZ:  Join.                                  09:32:47

22               MR. RICHARDS:  If you understand, you can         09:32:49

23    answer.

24               THE WITNESS:  Solely based on the video          09:32:55

25    excerpt, I had concern.  Because I didn't know who the
```

Page 31

```
 1    participants were.  And it did look like there was some

 2    activity in that video, just causing concern.

 3    BY MS. WOLF                                        09:33:07

 4        Q    Okay.  Were extra patrols added?          09:33:08

 5        A    Yes.                                      09:33:13

 6        Q    Did you see an increase in incidents after this  09:33:15

 7    article and video were published online?

 8        A    No, not as I had feared or anticipated.   09:33:25

 9        Q    Do you recall how long you kept those extra  09:33:33

10    patrols going?

11        A    They are still going on.  Even today.     09:33:37

12        Q    And did they start immediately after this  09:33:42

13    incident?  So that was on May 20th, 2015.

14        A    Yes.                                      09:33:51

15             MS. WOLF:  Let's take a quick break.      09:34:00

16             THE VIDEOGRAPHER:  Off the record at 9:34 a.m.  09:34:02

17             (Recess taken.)                           09:39:30

18             THE VIDEOGRAPHER:  We are back on the record at  09:39:48

19    9:39 a.m.

20    BY MS. WOLF                                        09:39:52

21        Q    Okay.  Chief, turning your attention back to  09:39:54

22    this same exhibit, paragraph four of your email?

23        A    Uh-huh.                                   09:40:02

24        Q    You acknowledge that Palos Verdes Estates has,  09:40:03

25    quote, a reputation now of tacitly approving or
```

Page 32

1    condoning these, quote, surfer wars, unquote.

2            Did you not think that Palos Verdes Estates had    09:40:15

3    that reputation prior to this incident?

4        A    You know, I didn't know that to be the case or    09:40:21

5    to be true.  I hadn't been there that long.  But with

6    this videotape, I was concerned that some may perceive

7    that.  And it was just important, to me, to address that

8    and convey that to the captain.  So they can proactively

9    direct their people to overcome that perception and

10   resolve these matters.

11       Q    I'm sorry, did you say you did or did not know    09:40:46

12   that?

13       A    Well, I did not know that to be the case.    09:40:49

14       Q    Okay.    09:40:51

15       A    You know, the videotape and the timeline was    09:40:52

16   kind of the beginning of this Lunada Bay thing in my

17   time frame within Palos Verdes Estates.

18       Q    And how long have you been with the department    09:41:02

19   at that point?

20       A    Well, I joined the department in June of 2014.    09:41:07

21       Q    Okay.  So almost a year?    09:41:10

22       A    And we hadn't had many issues in Lunada Bay    09:41:12

23   that I was aware of.  Certainly, none that were high

24   profile or rose to this level.

25       Q    You state that, as a result, you discussed    09:41:23

Page 33

```
 1   making contact with the local surfers to let them know

 2   that, quote, we will not tolerate this, end quote.

 3        What were you referring to?                    09:41:37

 4        A    Which section are you referring to here in this  09:41:42

 5   document?

 6        Q    Paragraph four, the second sentence.       09:41:45

 7        A    So in this document, I'm describing and    09:42:02

 8   directing the captains to engage.  And part of that was

 9   to engage with those that were surfing down there, to

10   let them know what was going on, and to layout our

11   expectations, that it's a public beach.  And people are

12   expected to behave civilly.  And we are not going to

13   tolerate anything that we've seen in the video tape.

14        Q    Okay.  And you note that, at the same time --  09:42:31

15   or sorry, quote, at the same time, we do not want to

16   alienate many of our long-term residents, end quote.

17        Can you explain what you meant by that?          09:42:43

18        A    Yeah, I didn't want the captains to be so    09:42:46

19   overbearing and so aggressive as to cause a reaction by

20   anyone, particularly our residents.  I want our

21   residents to see us for what we are, the law enforcement

22   agency proactively addressing a public complaint.

23        We are there to ensure public safety.  And part  09:43:10

24   of that is to address any of those that might be

25   involved, to give them direction as to what we would
```

Page 34

Exhibit E, page 173

```
 1    expect out of them.

 2         Q    Why were you concerned that sending surfers the  09:43:19

 3    message that you wouldn't tolerate that type of conduct

 4    would alienate residents?

 5         A    Well, I don't know as I can articulate exactly  09:43:35

 6    what I was thinking when I wrote this email, back in, it

 7    appears to be, May 20th, 2015.  So I'm afraid I don't

 8    know as I can articulate that any further at this point

 9    in time.

10         Q    Okay.  So did anyone from the Palos Verdes      09:43:55

11    Estates Police Department make contact with local

12    surfers?

13         A    I believe they did.                             09:44:15

14         Q    Do you know who made that contact?              09:44:17

15         A    No.  Because it wasn't a singular contact.  It  09:44:20

16    was an ongoing effort.  I know the captains were active.

17    Many members of the staff were engaged down in Lunada

18    Bay and contacted as many people as we could.  I know it

19    wasn't just one contact, but many.

20         Q    When did this contact begin?                    09:44:40

21         A    Probably shortly following this email.          09:44:41

22         Q    Was there not regular contact with local        09:44:43

23    surfers before that?

24         A    I don't know.  I would characterize it as there 09:44:49

25    was contact.  But the degree to which it was considered
```

Page 35

Exhibit E, page 174

1  regular, I just don't know.

2       Q    Where did the contact generally occur?  Was it    09:45:03

3  at the beach or elsewhere in the community?

4       A    That, I don't know.  Beyond, I know that    09:45:10

5  efforts were made to contact surfers down there that

6  were surfing.  And when I say down there, I'm referring

7  to Lunada Bay.

8       Q    Sure.  Do you know what the content of the    09:45:26

9  conversation was?  In other words, did you have any

10 discussions with the people in your department who were

11 relaying this message to the surfers before they relayed

12 the message?

13      MR. RICHARDS:  That's a yes or no question.    09:45:43

14 Did you or did you not?

15      THE WITNESS:  Can you repeat that, please?    09:45:48

16 BY MS. WOLF                                               09:45:49

17      Q    Sure.  Do you know what the content of the    09:45:50

18 conversation was between the officers and the local

19 surfers?

20      A    No.                                            09:46:00

21      Q    Did you have any conversations with the    09:46:01

22 officers before they engaged with the local surfers?

23      A    Not all of the patrol officers.  But the    09:46:10

24 captains.

25      Q    And what were those conversations?  What did    09:46:13

Page 36

```
 1    you -- I'm sorry, let me start over.

 2          Did you give them any guidance as to what the      09:46:20

 3    conversations should be?

 4      A    I relayed my expectations, that I expect them      09:46:26

 5    to have their staff engage and address this.  I didn't

 6    go into extreme level of detail, because they are

 7    division commanders.  They know what's to take place.

 8    All I did was give them direction.

 9      Q    What was the direction?                            09:46:46

10      A    To have officers proactively engage in this       09:46:48

11    issue and attempt to resolve it by proactively engaging

12    with the surfers, the community, being present, and

13    extra patrols, et cetera.

14      Q    But you didn't tell them what the message          09:47:02

15    should be to the surfers?

16      A    I don't recall telling them what to say, no.       09:47:07

17      Q    Did you get any feedback on how the message was    09:47:14

18    received by the surfers?

19      A    Not that I recall.                                 09:47:19

20          MR. WORGUL:  Objection; vague and ambiguous as      09:47:22

21    to who the surfers are.

22    BY MS. WOLF                                               09:47:24

23      Q    Then in paragraph No. 5, it says, quote, I am      09:47:25

24    stepping up efforts to replace the boat.  What boat are

25    you referring to?
```

Page 37

```
 1    of using undercover officers in the area or in the water

 2    to further witness and investigate these matters.

 3         Do you know if any officers went with          09:50:40

 4    undercover in Lunada Bay following this incident?

 5    A    They did not, not that I am aware of.          09:50:45

 6    Q    Why is that?                                   09:50:48

 7    A    Well, logistics, for one, are a little bit     09:50:54

 8    difficult.  Because we are a small city, in the context,

 9    that many of our officers know the surfers and the

10    surfers know our officers.

11         So I would need to use officers from other     09:51:13

12    areas.  And that creates kind of a logistical challenge.

13    That -- so --

14    Q    Did you reach out to any other local           09:51:34

15    jurisdictions to ask for help in this regard?

16    A    I did.                                         09:51:40

17    Q    Which jurisdictions?                           09:51:40

18    A    City of Santa Monica.                          09:51:42

19    Q    Any others?                                    09:51:46

20    A    I actually extended the request to several     09:51:47

21    agencies.  And Santa Monica was the agency that

22    responded.

23    Q    No others responded?                           09:51:58

24    A    No.                                            09:52:00

25    Q    Sorry, was that a no?                          09:52:00
```

Page 40

Exhibit E, page 177

```
1        A     That was a no.                              09:52:02

2        Q     And what was the nature of your request?    09:52:06

3        A     Well, I asked for officers to go undercover as  09:52:10

4    surfers, or in some other way offer some support for

5    surveillance, or get some other additional resources to

6    police the Lunada Bay issue.

7        Q     And what was the City of Santa Monica's      09:52:24

8    response to your request?

9        A     It was favorable and helpful.  They provided  09:52:31

10   supervisory and line level officers in an undercover

11   capacity.

12       Q     Did they provide surfers?                    09:52:39

13       A     Officers that would pose as surfers, yes.    09:52:42

14       Q     So they did send undercover officers?        09:52:47

15       A     They offered those officers to us.           09:52:53

16       Q     But you didn't accept their offer?           09:52:56

17       A     We accepted, but had to cancel.              09:52:58

18       Q     Why is that?                                 09:53:01

19       A     Because the -- we categorize this as an      09:53:04

20   undercover operation, if you will, with a plan that

21   involved surveillance units, supervisory units and line

22   level officers posing as surfers to go into the bay.

23             But that operation was compromised.  And it  09:53:20

24   became known to other surfers in the area.  So as

25   typical, when that happens, the operation was canceled
```

Page 41

Exhibit E, page 178

```
1    to protect the officers.

2         Q    When was the operation scheduled to commence?    09:53:34

3         A    I don't recall the date.                          09:53:39

4         Q    It was in 2015 or 2016?                           09:53:41

5         A    I believe it was January or February of 2016.    09:53:45

6         Q    And how long had it been planned?  In other      09:53:55

7    words, how long had your department been working with

8    Santa Monica to coordinate this?

9         A    I would estimate maybe a month.                   09:54:08

10        Q    And you said the operation was compromised, how   09:54:17

11   was it compromised?

12        A    It was brought to my attention that the city      09:54:25

13   manager had received a phone call from someone claiming

14   to be a surfer in Lunada Bay that was questioning why

15   the cops are coming out undercover tomorrow.

16             So the caller appeared to have information that   09:54:41

17   he knew that our operation was the following day.  And

18   that we would have an undercover operation that day.

19             So upon hearing that from the city manager, it    09:54:56

20   was clear, to me, the information had been leaked out to

21   the community somehow or to surfers, whoever that might

22   have been on the phone.  And to protect the officers, I

23   decided to cancel the operation.

24        Q    Did you follow up to investigate where that       09:55:11

25   leak might have occurred?
```

Page 42

Exhibit E, page 179

```
 1        A     Initially, no.  Because it was -- it could have   09:55:16

 2   come from anywhere.

 3        Q     Meaning anyone within your department?            09:55:23

 4        A     It could have been in my department, anyone in    09:55:27

 5   Santa Monica Police Department, or any other agency in

 6   L.A. County, who was at the chief's meeting when I asked

 7   for help.

 8        Q     And when was that chief's meeting?                09:55:38

 9        A     I don't recall the date.  But it preceded that    09:55:43

10   operation in January or February.  So it was probably

11   November or December, maybe, of 2015.

12        Q     Who in your department knew about this            09:56:02

13   undercover operation?

14        A     The captains, I believe the city manager.  And   09:56:08

15   beyond that, I don't know.  It may have been -- that

16   information may have been shared with the detective

17   sergeant.  And that would be typical.

18        Q     How many captains are there in your department?  09:56:29

19        A     Two.                                             09:56:33

20        Q     Mark Velez and Tony Best?                        09:56:33

21        A     That's correct.                                  09:56:36

22        Q     And is there one detective sergeant?             09:56:38

23        A     There is one.                                    09:56:41

24        Q     And who is that?                                 09:56:42

25        A     That is Luke Hellinga, H-E-L-L-I-N-G-A.          09:56:45
```

Page 43

Exhibit E, page 180

1    BY MS. WOLF                                        10:02:26

2        Q    Did the surfer, who said that he was aware of    10:02:35

3    the undercover operation, did he give any other details,

4    any other information about the operation?

5        A    Not that I recall.  He had a conversation with    10:02:48

6    the city manager.  Not much of that was relayed to me.

7        Q    Okay.  Just that the operation had been        10:02:54

8    compromised?

9        A    Yeah, the city manager was equally concerned    10:02:57

10   about the safety of the officers, and conveyed it to me,

11   that someone called me and they knew about it, what are

12   you going to do?  And I said, I'm going to cancel it.

13       Q    Do you know if the city manager ever followed    10:03:09

14   up to determine who the caller was?

15       A    I do not know.                             10:03:14

16       Q    Now, following the incident between the        10:03:31

17   dispatcher and the reporters from The Guardian, did you

18   ever communicate with your entire department that, for

19   instance, localism isn't condoned by your department?

20            MR. WORGUL:  I'll object; vague and ambiguous.    10:03:51

21   If we are going to Chief's definition of localism

22   throughout the rest of the deposition, so I don't have

23   to continue to make that objection --

24            MS. WOLF:  I'll let you know when we change      10:04:03

25   definitions.

                                                    Page 48

```
 1              MR. WORGUL:  Wonderful.                    10:04:07

 2              THE WITNESS:  I believe I communicated that in  10:04:08

 3    101 conversations with the staff and department

 4    individuals, throughout the course of the time from when

 5    The Guardian video aired to today.

 6              I may have communicated that globally through a  10:04:24

 7    department email.  I believe I did. I don't remember,

 8    specifically, when that might have been, though.

 9    BY MS. WOLF                                          10:04:33

10        Q    Okay.  Now, going back to the dispatcher's   10:04:33

11    comments, she said we know all of them.  What did she

12    mean by that, if you know?

13        A    I'm sorry, I don't know.                    10:04:58

14              MR. WORGUL:  Objection; calls for speculation.  10:05:00

15    BY MS. WOLF                                          10:05:01

16        Q    Did you ever ask her?                       10:05:02

17        A    I did not.                                  10:05:02

18        Q    Did anyone in your department ever ask her?  10:05:04

19        A    They may have because a supervisor was --    10:05:07

20              MR. RICHARDS:  Do you know?                 10:05:11

21              THE WITNESS:  I do not know.                10:05:11

22    BY MS. WOLF                                          10:05:12

23        Q    My question was:  Do you know if anyone ever  10:05:14

24    asked her?

25        A    And I don't know that.                      10:05:17

                                                          Page 49
```

Exhibit E, page 182

```
1        Q    Of course.  Take your time.                10:07:06

2        A    So I do not recall being interviewed for this    10:07:24

3   particular article.  But I did have many conversations

4   with its author, Garrett Therolf, from the L.A. Times,

5   some of which may be for this article.

6        Q    Okay.  If you turn to page two of the article,    10:07:40

7   the first full paragraph, you're quoted as saying,

8   quote, I'm not so naive to believe that we can solve

9   this instantly or overnight.  It took 50 years to get

10  here.  Hopefully, it won't take that long to resolve, I

11  think it's very important to get the word out as

12  aggressively and enthusiastically as we can that the

13  status quo is going to be mixed up around here.

14       Do you recall saying that?                   10:08:11

15       A    I recall making statements like that to him,    10:08:14

16  yes.

17       Q    Okay.  What did you mean when you said that the    10:08:16

18  status quo is going to be mixed up around here?

19       A    When this Guardian video came out, it caused a    10:08:33

20  quick steep learning curve for me to learn some of the

21  history.  And I had heard people from the community and

22  staff members, and all, tell me that there have been

23  conflicts and issues in the surfing culture for many,

24  many years, as many as 50 years or more.

25       And I just felt strongly that if that had been    10:09:07
```

Page 51

```
 1    the case for 50 years, I wasn't here then, but I'm here

 2    now, and we are going to protect those in the Lunada

 3    Bay.  And we will ensure that it's open to the public,

 4    and free of any kind of hazing or harassment that this

 5    article dealt with.

 6        Q    So were you unaware of this history before you   10:09:27

 7    became Chief?

 8        A    That's correct.                                  10:09:31

 9        Q    Do you believe that a certain level of localism  10:09:36

10    was tolerated before you became Chief?

11            MR. WORGUL:  I will object as vague and           10:09:45

12    ambiguous as to who tolerates localism.

13            THE WITNESS:  I think my understanding of         10:09:58

14    localism, as we have established my definition, I

15    believe occurs every where around the world where there

16    is surf and surfing.  And I believe that also occurred

17    in Lunada Bay as part of this surfing culture.  And so

18    that's what I was trying to address.

19    BY MS. WOLF                                               10:10:22

20        Q    Do you think it was tolerated by previous        10:10:22

21    chiefs and previous administration, city council and the

22    mayor?

23        A    No, I had heard that there was that perception.  10:10:33

24    But I was aware of the police department for many years

25    working very proactively to address and combat localism
```

Page 52

Exhibit E, page 184

```
 1    and ensure safety down in Lunada Bay.

 2        Q    So when you say that the status quo is going to   10:10:48

 3    be mixed up, if the status quo had been all ready to try

 4    and prevent that behavior, what exactly did you mean by

 5    that?

 6        A    I was speaking about the perception, the          10:11:02

 7    perception that maybe the police department or the city

 8    doesn't do anything about it.

 9        Q    And you wanted to change that perception?         10:11:09

10        A    Absolutely.                                       10:11:11

11        Q    But you thought the police had done something     10:11:13

12    about it in the past?

13        A    Well, I knew they had.  Because I had, you        10:11:17

14    know, seen files, and had talked to staff and learned as

15    much as I could after this video came out.  And so I

16    knew the police department had done some very good work

17    in the past on this.

18        Q    And you said you spoke with community members     10:11:35

19    and others in the department to learn the history about

20    the issue of localism at Lunada Bay; is that right?

21        A    Yes.                                              10:11:47

22        Q    Who did you speak with within your department?    10:11:48

23        A    So, as the Police Chief, I primarily interfaced   10:11:51

24    with the captains.  We have a chain of command.  Any and

25    all members can come talk to me, and I can talk to them.
```

Page 53

1    Typically, we worked through the chain of command.  So I

2    spent most of the time talking to the captains.

3         Q    Did you speak with anyone in the community?      10:12:35

4         A    I've had conversations with residents from time  10:12:43

5    to time.  But I can't tell you who or when.  Because

6    it's just part of a daily routine.

7         Q    Understood.                                       10:12:52

8              Let's see, the article also says that, in the    10:12:57

9    third paragraph down on the top of page two, the article

10   says, and Kepley said he hopes to make the first arrests

11   in years of one of the assailants.

12             Do you recall making a statement to that         10:13:16

13   affect?

14        A    I do.                                             10:13:19

15        Q    And why did you feel that it was important to    10:13:19

16   make an arrest?

17        A    Well, I thought it was more important to convey  10:13:27

18   my position that, if a criminal act occurred, that we

19   would act, that we would arrest, that we are there to

20   police and maintain public safety.

21             Because the perception was that we weren't.  So  10:13:41

22   my statement was more of a change statement, to change

23   perception, and tell the truth that, despite what people

24   may have heard or believed, the police department is

25   going to professionally police, and not condone, or

Page 54

```
 1    tacitly approve or turn a blind eye to any wrongdoing in

 2    the bay.

 3        Q    Did you intend to make an arrest?              10:14:04

 4        A    Not me, personally.  Because I don't personally  10:14:06

 5    police.  But the officers working that area, absolutely,

 6    if there is a criminal offense, and it was an arrestable

 7    offense and the circumstances were appropriate for an

 8    arrest, absolutely.

 9        Q    Has an arrest been made?                       10:14:22

10        A    Yes.                                           10:14:24

11        Q    How many?                                      10:14:24

12        A    One that I am aware of.                        10:14:25

13        Q    Who was that?                                  10:14:27

14        A    I don't recall the name.                       10:14:34

15        Q    If I said the name, would it ring a bell?      10:14:38

16        A    It may.                                        10:14:41

17        Q    David Melo or Alan Johnston?                   10:14:42

18        A    I'm sorry, I don't recall the arrestee or the  10:14:48

19    defendant's name.

20        Q    That's fine.                                   10:14:52

21        A    But it was with respect to Ms. Reed's          10:14:53

22    complaint.

23        Q    Okay.  And we can get into that in a little     10:15:02

24    bit.

25             Do you know if the arrest resulted in a        10:15:11
```

Page 55

Exhibit E, page 187

```
 1    conviction?

 2         A    It did not.                                    10:15:16

 3         Q    Why was that?                                  10:15:17

 4         A    The district attorney refused or declined to   10:15:17

 5    file charges or prosecute the case.

 6         Q    Do you know why the district attorney declined? 10:15:25

 7         A    It's my understanding that the totality of the 10:15:29

 8    information that was presented to the district attorney

 9    included some witness statements that refuted the

10    victim's account of the way in which incidents occurred

11    on that particular day.

12         Q    Okay.  Why do you think it is that no arrests   10:15:46

13    had been made in a number of years prior?

14              MR. WORGUL:  Objection; argument.               10:16:06

15              MR. CAREY:  Lack of foundation.                 10:16:07

16              MR. WORGUL:  Overbroad.                         10:16:10

17              MR. RICHARDS:  Los Angeles foundation.  And     10:16:12

18    it's calling for pure speculation.  As phrased, I'll

19    instruct him not to answer.

20              MS. WOLF:  On what grounds?                     10:16:19

21              MR. RICHARDS:  On the grounds that it's an      10:16:21

22    improper question.  There is no foundation for it.  It's

23    not reasonably calculated to lead to admissible

24    evidence.

25              MS. WOLF:  That is not an appropriate objection 10:16:29
```

Page 56

```
 1    make the first arrest in years of one of the assailants.

 2    And you said you recall making that statement; correct?

 3        A    I do.                                       10:17:40

 4             MR. RICHARDS:  I stand corrected.  You were  10:17:41

 5    right.

 6             MS. WOLF:  Thank you.                        10:17:43

 7             MR. RICHARDS:  Sure.                         10:17:44

 8    BY MS. WOLF                                           10:17:44

 9        Q    So why do you think it is, if you know, whether  10:17:45

10    -- sorry, let me say that again.

11             Why do you think it is, if you know, that no  10:17:53

12    arrests had been made in years?

13        A    Well, I don't know, if an arrest was not made,  10:18:01

14    why an arrest was not made.  I wouldn't know that.

15    Again, the context of my statements was referring to

16    public perception as it was conveyed to me that, you

17    know, for years, nothing's been done.

18             So I was trying to make a positive statement.  10:18:21

19    And I meant it, that this police department will

20    proactively police, and we will be present.  And if

21    there is criminal wrongdoing, we will make an arrest.

22        Q    You also said, kind of, in the fourth         10:18:43

23    paragraph, fourth line, I guess, down, quote, we'll make

24    an example of anyone who behaves criminally down there.

25             Do you recall making that statement?          10:18:55
```

                                                        Page 58

```
 1        A    I do.                                        10:18:56

 2        Q    And what did you mean by that?              10:18:56

 3        A    Well, again, I was looking to make a statement  10:19:00

 4   that I'm the Chief here, now.  And regardless of what

 5   you may think of what happened in the past, if someone

 6   commits an arrestable defense, we are going to make an

 7   arrest.  And we are going to prosecute a case.

 8        And that, you know, make an example of them.  I  10:19:18

 9   was going to publicize it.  And let that be a lesson to

10   anyone else who may, you know, do the same thing.  And

11   so that was my intent by making those statements.

12        Q    Why would you think that it would be important  10:19:32

13   to publicize any arrests?

14        A    Again, to address public perception.  Because I  10:19:40

15   knew that the way the reporter was questioning me that

16   there were folks out there -- and I knew this from my

17   conversations with others -- there were folks out there

18   that thought the police department wasn't doing enough.

19        And I knew that the police department was very  10:19:57

20   committed and very engaged.  So I wanted to convey that

21   to the viewing audience of this article, or any other

22   articles.

23        Q    And were you hoping that maybe there would also  10:20:09

24   be a deterrent effect?

25        A    Certainly.  And I had hoped that, had an arrest  10:20:14
```

Page 59

Exhibit E, page 190

```
1    been made, that would have been the same effect.

2        Q    Okay.  Now, you said that there has been an      10:20:21

3    arrest since this time.  Do you think that your

4    department has made an example out of that person who

5    was arrested?

6        A    No.  We have not.                                10:20:40

7        Q    And why is that?                                 10:20:44

8        A    Because, at the time that I could have made      10:20:47

9    that announcement, I had, at that point in time, already

10   been notified that the district attorney declined to

11   prosecute the case.

12       Q    At the time you made the arrest?                 10:21:00

13       A    No, at the time I would have announced the       10:21:01

14   arrest, I had been notified the DA refused or declined

15   to prosecute.

16       Q    What was the -- if you recall, what was the      10:21:11

17   time lapse between the time you made the arrest and

18   being notified that the district attorney was not going

19   to prosecute?

20       A    I don't recall.                                  10:21:20

21       Q    Was it a month or less?                          10:21:21

22       A    Probably, no more than a month, but probably     10:21:26

23   less.

24       Q    Okay.  And since making this statement that you  10:21:30

25   will make an example out of anyone who behaves
```

Page 60

1    criminally down there, do you think that your department

2    has made an example out of anyone who behaves criminally

3    down there?

4              MR. CAREY:  Objection; assumes facts not in        10:21:54

5    evidence, that someone has behaved criminally down

6    there.

7              MR. WORGUL:  Calls for speculation, vague and      10:22:00

8    ambiguous.

9              THE WITNESS:  No one particular example.           10:22:04

10   BY MS. WOLF                                                  10:22:07

11        Q    Meaning that it's happened on numerous            10:22:09

12   occasions that you've made an example?

13        A    Meaning that there was no example where we went   10:22:15

14   out to the media to announce an arrest or publicize

15   policing action at the bay.

16        Q    Okay.  Did you subsequently receive any           10:22:25

17   backlash from the Palos Verdes Estates community in

18   response to your statements in this article?

19        A    Yes.                                              10:22:36

20        Q    Is it fair to say that some Palos Verdes          10:22:38

21   Estates residents don't view localism at Lunada Bay as a

22   problem?

23        A    I don't know if I can define the quantity of      10:22:52

24   some.  But yes.

25        Q    More than one?                                    10:22:57

Page 61

```
 1      A    Yes.                                      10:22:58

 2      Q    Okay.  I'm going to show you a document that   10:23:17

 3   I'd like marked as Exhibit 4.

 4           (Exhibit 4    was marked for

 5           identification by the Certified Shorthand

 6           Reporter and a copy is attached hereto.)

 7   BY MS. WOLF                                       10:23:33

 8      Q    And this appears to be a message that you   10:23:36

 9   posted online through Next Door, on December 31st, 2015.

10   Did you write this post?

11      A    I did.                                     10:23:47

12           MR. FIELDS:  Excuse me, again, this is Mark   10:23:50

13   Fields.  Are there Bates stamped pages?

14           MS. WOLF:  Sorry, yes, there are.  It's Bates   10:23:56

15   stamped CITY 1082.

16           MR. FIELDS:  Can you give me that number again,   10:24:00

17   please?

18           MS. WOLF:  CITY 1082.                       10:24:02

19           THE WITNESS:  I did write this.  And this is   10:24:05

20   the article that I referred to in an earlier line of

21   questioning.

22   BY MS. WOLF                                        10:24:10

23      Q    Okay.  Was there anything that prompted you to   10:24:10

24   write this post?

25      A    Yes, I feel, as Police Chief, serving the   10:24:21
```

Page 62

Exhibit E, page 193

```
1        A    I've seen a lot of emails, as can you imagine.   10:39:17

2    If you would just give me a moment to peruse this.

3        Q    Take your time.                                   10:39:23

4        A    Yes, I remember reading that.                     10:40:07

5        Q    Okay.  And so he sent an email, which was page    10:40:08

6    two of this exhibit, CITY 1016.  His email went to the

7    city manager, the mayor, the city council.  And he said

8    that he is a life long Palos Verdes Estates resident and

9    was outraged by the recent events taken by our new, in

10   caps, Police Chief Kepley, end quote.

11            And he said that your statements to the media      10:40:37

12   about the local surf situation in the midst of a recent

13   crime spree are grounds for your termination.

14            Do you know what crime spree he is referring      10:40:49

15   to?

16       A    Yes.                                               10:40:51

17       Q    What is that?                                      10:40:51

18       A    In the last quarter of 2015, from mid August --   10:40:52

19   I'm sorry, mid October to the end of the year,

20   December 31st, we had, in the City of Palos Verdes

21   Estates, increase or had seen an increase in residential

22   burglaries.

23            We were inundated, if you will, with organized    10:41:08

24   criminal gangs or gang-affiliated criminal groups that

25   were coming up from south Los Angeles in teams of three
```

Page 71

```
 1    or four, very well dressed, driving nice cars.  And they

 2    were committing multiple residential burglaries per day

 3    in a city that generally sees between zero and three

 4    burglaries a month.  In December, we faced 25 or 30.

 5         So we were working very, very hard at trying to   10:41:38

 6    address this onslaught of burglaries within our

 7    community.  Some of the burglary victims were having

 8    losses of $200,000 or more.  And so it was a huge

 9    community issue.

10         One in which I was also publicly messaging,        10:41:58

11    attending meetings, educating crime prevention, all of

12    those things.  And so I think this gentleman was making

13    a judgment about my participation in the bay issue in

14    the midst of the crime issue.

15      Q    He also --                                        10:42:22

16      A    If I could just, I'm sorry --                     10:42:23

17      Q    Of course.                                        10:42:25

18      A    If I could just elaborate.  As the Police        10:42:25

19    Chief, I don't get to pick and choose.  I police

20    everything, no matter what comes our way.  And it was

21    just as important for me to become vigilant and public

22    and engaged and focused on the burglary problem as it

23    was to address the surfer program.

24      Q    Understood.  Thank you.                           10:42:45

25           He also accused you of, quote, railroading the    10:42:46
```

Page 72

```
 1    you be terminated?

 2        A    No.                                          10:47:20

 3        Q    Okay.  I'm going to ask that this document be  10:47:27

 4    marked as Exhibit 6.

 5             (Exhibit 6    was marked for

 6             identification by the Certified Shorthand

 7             Reporter and a copy is attached hereto.)

 8    BY MS. WOLF                                          10:47:31

 9        Q    Wait, I think I just lost my copy.          10:47:41

10             Thank you.                                   10:47:48

11             This is an email.  It's Bates marked CITY 996.  10:47:59

12    It's an email -- well, it's an email stringer.  And the

13    top email is from Anton Dahlerbruch to Michael Papayans.

14    The date is February 8th, 2016.  And you're cc'd on this

15    email.

16        A    Uh-huh.                                      10:48:22

17        Q    Turning to an email that Mr. Papayans sent.  10:48:25

18    It's page two of this exhibit.  It's Bates CITY 997.  He

19    starts out by -- he is writing to the mayor, mayor pro

20    tem, city council, and the city manager, on

21    February 7th, 2016.

22             And he says that he is writing this letter,   10:48:49

23    quote, to voice my disgust with the way our police

24    resources are being utilized by the current Police Chief

25    Kepley.  He states that he has lived and surfed in the
```

Page 76

Exhibit E, page 196

1    community for over 40 years, but is upset that there

2    were policing efforts aimed to curb localism.  He also

3    referenced other surfing communities that he believes

4    were adversely affected by outsiders.

5          Mr. Dahlerbruch responded, on page one of this    10:49:18

6    exhibit, in part, by saying that the attention on the

7    safety of Lunada Bay surfers has been fostered by the

8    media and interested individuals and the coastal

9    commission.

10          He also states that police patrols of the beach   10:49:35

11   may increase from time to time for safety.

12          Do you recall receiving these emails?            10:49:41

13   A    I do.                                               10:49:44

14   Q    Did you ever have a conversation, with anyone      10:49:45

15   from the city, about these emails?

16   A    I may have had a conversation with the city        10:49:51

17   manager.  But no one else in the city.

18   Q    Okay.                                               10:49:55

19   A    If I could just clarify.  No one else in the       10:49:59

20   city in a leadership role, like, the city council

21   members.  I may have had conversations with my staff

22   about these emails, but I never spoke directly with city

23   council about this.

24   Q    Did you ever have a conversation with              10:50:13

25   Mr. Papayans about his email?

Page 77

```
 1        A    I don't recall that, no.                    10:50:16

 2        Q    Are you aware that his son is a defendant in  10:50:17

 3   this case?

 4        A    No.                                          10:50:21

 5        Q    Okay.  And when you said you had a           10:50:21

 6   conversation, or you may have had a conversation, with

 7   the city manager about this, do you recall when that

 8   occurred?

 9        A    No.  And I say may, because I don't have any  10:50:31

10   specific recollection.  But we speak daily on a myriad

11   of issues.  And during this time, we were speaking a lot

12   about these matters.

13        Q    Do you agree with Mr. Dahlerbruch's response  10:50:43

14   that the attention on the safety of Lunada Bay surfers

15   has been fostered by the media and interested

16   individuals and the coastal commission?

17        A    I think, to some extent, there is some absolute  10:50:58

18   truth in that, that that was one of the reasons we were

19   doing what we were doing.  But that is secondary to just

20   the need to ensure public safety.

21        Q    He said that the police patrols of the beach  10:51:17

22   may increase from time to time for safety.  Has that

23   been the case?

24        A    Yes.  Patrols in the surfing areas increased  10:51:23

25   during peak surf season, and decline a little bit when
```

Page 78

Exhibit E, page 198

```
1    there is no surfers in the water, or no surfing

2    activity, or no other persons in that area to police.

3         Q    Okay.  I'm going to ask that this be marked as    10:51:42

4    Exhibit 7.

5              (Exhibit 7    was marked for

6              identification by the Certified Shorthand

7              Reporter and a copy is attached hereto.)

8    BY MS. WOLF                                                  10:52:00

9         Q    This is Bates stamped CITY 989.  It's an email    10:52:14

10   string and a letter.  And the first email is from Anton

11   Dahlerbruch to Bianca Santos.  You're cc'd as a

12   recipient.  And the date of the email is February 9th,

13   2016.

14             Do you want to take a second to look it over?     10:52:37

15        A    Thank you.  Okay.                                 10:52:40

16        Q    Do you recall receiving this email from           10:53:12

17   Mr. Dahlerbruch?

18        A    Yes.                                              10:53:15

19        Q    Did you ever read Ms. Santos's letter that's      10:53:17

20   referenced here?

21        A    I did.                                           10:53:21

22        Q    She says that she has lived in Palos Verdes       10:53:22

23   Estates her entire life.  And that her husband is

24   uncomfortable because of new police policies.  And that

25   he grew up surfing in and around Lunada Bay.
```

Page 79

Exhibit E, page 199

```
1              Did you ever have a conversation with         10:53:37

2    Ms. Santos or her husband after you received her letter?

3         A    I don't believe I spoke to them afterwards.   10:53:43

4    But I do recall speaking to him in Lunada Bay, which is

5    what her letter was about.

6         Q    You recall speaking with her husband?          10:53:54

7         A    Yes.                                            10:53:56

8         Q    What do you recall that conversation was about? 10:53:56

9         A    The conversation was community outreach.   It   10:54:02

10   was positive.  It was pleasant.  He was positive and

11   pleasant.  This letter is completely out of character to

12   what occurred there, fabrication.

13             There was no rudeness, no, as I'm described, as 10:54:15

14   annoyingly listening to a complaint.  I was very

15   interested in listening to a complaint and addressing

16   any concerns.

17             I may not recall specifically what was spoken   10:54:36

18   about, but I recall the conversation was pleasant.  It

19   was brief.  It was just one of outreach, support.  Hey,

20   if you know anything, let us know.  We are out here to

21   protect everyone.  If you see anything else, let us

22   know.  One of those kind of conversations.

23        Q    So is it accurate to say you were surprised by  10:54:55

24   her letter?

25        A    Very much so and offended.                      10:54:59
```

Page 80

```
1        Q    What offended you about the letter?          10:55:01

2        A    Just the untruthfulness about it.            10:55:03

3        Q    Did you ever have a conversation, with anyone  10:55:08

4    from the city, about Ms. Santos's letter?

5        A    Well, same as before.  I may not recall      10:55:15

6    specifically a date and time I may have talked about

7    this issue.  But I, likely, talked about it with the

8    city manager and the two captains.

9        Q    Would it be fair to say that Ms. Santos was not  10:55:32

10   pleased with any efforts the city may have taken to

11   prevent surfing localism?

12       A    I don't know.  I suppose someone could make   10:55:45

13   that conclusion.

14       Q    Okay.  I'd like to have this marked as        10:55:48

15   Exhibit 8.

16            (Exhibit 8    was marked for

17             identification by the Certified Shorthand

18             Reporter and a copy is attached hereto.)

19   BY MS. WOLF                                            10:56:03

20       Q    This is Bates stamped CITY 323.  And it's a   10:56:11

21   letter from Paul S. to Tony Dahlerbruch.  Have you seen

22   this letter before?  Take a second to read it over.

23       A    Thank you.                                    10:56:27

24            Okay.  I recall seeing this.                  10:57:16

25       Q    Okay.  So it's from Paul S., a 45 year Lunada  10:57:17
```

Page 81

1    Bay resident, to the city manager.  He is complaining

2    that, quote, Chief Jeff Kepley and his bay boy vendetta

3    is undermining our tight knit Lunada Bay community, end

4    quote.  And that, quote, we are asking for his prompt

5    resignation.

6        He also complains about the expenditure of        10:57:40

7    police resources to patrol Lunada Bay.

8        Did you ever have a conversation with Paul S.     10:57:47

9    about this letter?

10   A    No.                                              10:57:49

11   Q    Did you ever have a conversation, with anyone    10:57:51

12   from the city, about this letter?

13   A    Perhaps the city manager and the two captains.   10:57:55

14   Q    Do you recall what the content of those          10:58:00

15   conversations was?

16   A    I recall, at a certain point in time, conveying  10:58:06

17   to the captains that there are people that are not happy

18   with what we're doing.  But we have to do the right

19   thing.  And we will police the bay.  And we will ensure

20   public safety.

21       We will be engaged.  And we will be visible.      10:58:23

22   And we will be criticized.  And it was a pep talk for

23   them to convey to their troops, to the officers, that

24   there are critics in our community.  It's a brightful,

25   beautiful community.

Page 82

```
 1              And most members of the community don't        10:58:38

 2      perceive it to have problems, or want problems, or have

 3      the city's business or name in the newspaper or the news

 4      or on the radio.

 5              It's a private, quiet little community.  And    10:58:49

 6      some residents, by letters like this during that time

 7      frame, expressed disagreement with the way in which I

 8      was publicly addressing the issue at hand.

 9      Q    And did you say you had that conversation with     10:59:05

10      the city manager or people within your department?

11      A    I had that conversation with the captains.  And   10:59:12

12      as these emails were coming from the city manager, being

13      copied to me, as he was replying to some of these

14      emails, we meet weekly.  And we talked about matters of

15      the day.

16              And I'm sure we discussed this.  And he too was 10:59:29

17      very supportive of what we were doing in terms of being

18      engaged, in being visible, and trying to ensure public

19      safety.

20      Q    Was the captain's response similar to that of      10:59:44

21      the city manager of being supportive?

22      A    Absolutely.                                        10:59:52

23      Q    I'd like to mark this document as Exhibit 9.       11:00:09

24              (Exhibit 9   was marked for

25              identification by the Certified Shorthand
```

Page 83

Exhibit E, page 203

```
 1              Reporter and a copy is attached hereto.)

 2    BY MS. WOLF                                        11:00:12

 3        Q    This is Bates stamped CITY 317.  It's a letter   11:00:23

 4    dated February 17, 2016 to the Palos Verdes Estates city

 5    council from Mr. and Mrs. White, John Robert White and

 6    Marilyn M. White.

 7              Have you ever seen this letter before?   11:00:41

 8        A    I do not recognize this.                  11:00:42

 9        Q    Do you want to take a quick second to read it   11:00:46

10    over?

11        A    Sure.  Thank you.                         11:00:51

12        Q    In this letter, these two Palos Verdes Estates'   11:00:59

13    residents state that, quote, our current Chief is

14    focused on something that has never been an issue, end

15    quote.  And, quote, as residents of Lunada Bay since

16    1960, we would like the city council to end this.

17              Did you ever have a conversation with Mr. or   11:01:18

18    Mrs. White after you received this letter?

19        A    No.                                       11:01:22

20        Q    Did you ever have a conversation, with anyone   11:01:23

21    from the city, about this letter?

22        A    No.                                       11:01:26

23        Q    Okay.  I'd like to have this marked as    11:01:27

24    Exhibit 10.

25              (Exhibit 10   was marked for
```

Page 84

```
 1        Q    Okay.  And do you, as you sit here now, do you    11:16:49

 2   believe that it can be dangerous if police officers

 3   establish more of a buddy relationship with the people

 4   they are trying to police?

 5            MR. WORGUL:  Objection; calls for speculation,    11:17:07

 6   incomplete hypothetical.

 7            THE WITNESS:  Based on my experience, it could    11:17:13

 8   represent an increased challenge for that officer to

 9   make an arrest if he had a buddy relationship.  So in

10   that context, yes.  But it's important to have those

11   relationships in place.

12   BY MS. WOLF                                                11:17:31

13        Q    And do you think -- do you have any concerns    11:17:32

14   that your officers have established a buddy relationship

15   with any of the surfers at Lunada Bay?

16        A    I don't have any information that suggests that  11:17:41

17   there is buddy relationships that would inhibit an

18   officer's ability to enforce the law.

19            MR. WORGUL:  I will interpose a late objection;   11:17:57

20   that it's vague and ambiguous as to what a buddy

21   relationship is.

22   BY MS. WOLF                                                11:18:07

23        Q    I'm going to ask that this email be marked       11:18:27

24   Exhibit 11.

25            (Exhibit 11   was marked for
```

Page 95

Exhibit E, page 205

```
 1              identification by the Certified Shorthand

 2              Reporter and a copy is attached hereto.)

 3    BY MS. WOLF                                    11:18:34

 4       Q    It's CITY 1402.  It's an email, or a string of   11:18:36

 5    emails, on February 8th, 2016, between you, Anton

 6    Dahlerbruch, Tony Best, Mark Velez, and it looks like

 7    Greg Robinson at the top.

 8       A    Uh-huh.                               11:19:12

 9       Q    This appears to be a statement sent from the   11:19:15

10    city manager to you, and several others, that he wanted

11    posted on the police department's website.  Have you

12    seen this statement before?

13       A    I have.                               11:19:25

14       Q    Did you have any input in drafting that   11:19:29

15    statement?

16       A    Yeah, I believe the city manager may have   11:19:34

17    performed a few edits, if you will, and then returned it

18    back to me to post.  I think I may have proposed it to

19    him, a statement to place on our website as part of our

20    public education campaign.

21              We did a similar methodology of some card we   11:19:54

22    gave to people surfing in the area, parking in the area.

23    So yeah, I think that was something the city manager

24    sent to me as a result of him looking at something I

25    sent to him.
```

Page 96

Exhibit E, page 206

```
 1        Q    Is it your position that you drafted this      11:20:08

 2   statement?

 3        A    I drafted a statement for the website.  And    11:20:10

 4   this looks like that statement that was returned to me.

 5        Q    Okay.  Do you know what his edits were; do you  11:20:20

 6   recall?

 7        A    No.                                            11:20:27

 8        Q    The statement references renewed attention on   11:20:31

 9   the safety of Palos Verdes Estates beaches.  And it says

10   that, quote, we want to ensure our residents and the

11   public can enjoy areas, such as Lunada Bay, in peace.

12   As such, police patrols of our beach areas may increase

13   from time to time.

14             Was anything else done in addition to          11:20:52

15   occasional police patrols to ensure the safety of Lunada

16   Bay?

17        A    Yes, but I don't want to minimize the benefit   11:21:08

18   or value of those extra patrols.  Because we have, over

19   500 times, a police officer has parked and stood over

20   and looked down the ledge to the surfers to provide

21   oversight and police the area, if you will.

22             And so we did that, and continue to do that.    11:21:29

23   And not just in Lunada Bay, but all of our coastline

24   surf areas.  We also produced a cardboard flier, if you

25   will, that encouraged surfers or others to feel
```

Page 97

1     comfortable and report crimes or incidents that may have

2     occurred in the surfing areas.

3          Q    Was there anything else?                    11:21:59

4          A    We parked a police car in the area of Lunada   11:22:04

5     Bay with the LED display message in the rear window that

6     displayed a similar localism message requesting anyone

7     with information, or had been victimized, or otherwise

8     had incidents occur to them, we encouraged them to

9     report it to the police department.

10          Again, we historically have had very few       11:22:29

11    reports.  Here, these things happen.  So we are trying

12    to encourage those to be reported so that we can

13    investigate them and ensure public safety.

14         Q    Okay.  Now, you said that you've had patrol   11:22:46

15    cars parked at the ledge.  And it's happened on

16    approximately 500 occasions.  What's the time frame for

17    that?

18         A    Well, in terms of time frame, can you just   11:23:03

19    clarify what you mean by that?

20         Q    I'm just following up.  When you say it's    11:23:11

21    happened about 500 times where the police officers have

22    gone out there and parked on the ledge and patrolled the

23    bluffs, I'm wondering, you said 500 times, what's the

24    time frame for that?

25         A    That would be since The Guardian video,     11:23:26

Page 98

```
1     whatever date that was, and this became an identified

2     issue for us today.  And further, with respect to time

3     frame, those occurred throughout each day.  Not once per

4     day.  Sometimes, multiple times per day.  Obviously,

5     during daytime hours, when there is some benefit to look

6     over the ledge and see who might be down below.  It's

7     not lighted at night.

8          Q    Do you know if the officers ever went down to   11:23:57

9     the beach on any of those occasions?

10         A    Yes.                                             11:24:03

11         Q    Do you know, approximately, how many times they  11:24:04

12    would do that?  Was it more typical for them to just

13    stand at the top?  Or would they go down every time?

14         A    It's more typical for them to stand at the top.  11:24:13

15    They have gone down to the beach.  I don't know how many

16    times.

17         Q    Now, you said that you also had officers         11:24:21

18    distributing cards to encourage surfers to report

19    crimes.  When did that happen?

20         A    About the same time that this became -- we       11:24:31

21    became aware of as a result of The Guardian video, we

22    formulated somewhat of a response plan.  And that was

23    included in that response plan.

24         Q    Do you know how many cards were distributed?     11:24:47

25         A    Hundreds.  But I don't know how many.            11:24:50
```

Page 99

```
1        Q    Do you know on how many occasions they were      11:24:52

2    distributed?

3        A    I do not.  Because they were distributed to the  11:24:56

4    police officers to pass out to folks in the community

5    when they were on their patrols and doing their bay

6    checks.  So I don't.  I never received a report of how

7    many per day or per month were passed out.

8        Q    Did you say Bates check?                          11:25:12

9        A    Bay checks.                                       11:25:15

10       Q    Sorry.                                            11:25:16

11       A    Lunada Bay checks.                                11:25:17

12       Q    Got it.  Are they still distributing the cards,   11:25:19

13   currently?

14       A    They still have them to distribute.  I don't     11:25:23

15   know how frequently they get distributed.

16       Q    And were they distributing them within the       11:25:32

17   community only?  Or was there any effort to distribute

18   these outside of the community?

19       A    There was no effort to distribute them outside   11:25:39

20   of the community.  It was primarily folks in the surfing

21   area where witnesses, or victims, or surfers that may be

22   engaged in any kind of issues would receive these cards.

23   And it was an educational outreach program.

24       Q    When you said that you had parked, I'm sorry,     11:25:56

25   an officer had parked a cruiser with the LED display,
```

Page 100

```
 1    reporting.  Because, when I looked into this, I was told

 2    by the captains that maybe there are more incidents than

 3    are being reported to us.

 4           So any time there are incidents where, maybe,    11:49:36

 5    there are crime victims that are victimized, that are

 6    not being brought to our attention so we can serve their

 7    needs and police our community, it's concerning to a

 8    police chief.

 9    Q    And you said, in the past, you had concerns of    11:49:50

10    perhaps that there were issues unreported.  Do you still

11    have that concern now?

12    A    I don't know for the time being.  Again, it's    11:49:57

13    cyclical.  It's seasonal.  And I don't believe there has

14    been any activity down there.  We've seen very, very low

15    attendance of any water recreational activities

16    throughout the summer.  I may have that concern as the

17    traffic picks up this next surf season.

18    Q    And the surf season in Lunada Bay is,             11:50:18

19    approximately, October to March; is that right?

20    A    Roughly.  It really picks up around December.    11:50:24

21    Q    You also referenced results of the patrol        11:50:35

22    checks as part of your belief that perhaps there is

23    media hype to this issue.  What were the results of the

24    patrol checks that led you to believe this?

25    A    Well, at some point in time, fairly recently,    11:50:51
```

Page 109

Exhibit E, page 211

```
 1    within the last six months or so, I received a report

 2    that our patrol officers had checked the bay 400 times

 3    and have not had any, during those incidents, had not

 4    had one incident where they observed suspicious or

 5    criminal activity, or had anything reported to them,

 6    with the exception of the plaintiff's case, Ms. Reed's.

 7            They happened to be in the area that day, which   11:51:20

 8    I might add was one of the reasons we deployed it for

 9    high visibility and for proactive policing.

10       Q    So the report you received was discussing the    11:51:31

11    results of patrol checks from the prior six months?

12       A    Right.                                            11:51:40

13       Q    And when was the report -- when did you receive  11:51:41

14    the report?

15       A    I don't know the date.  And it was a verbal      11:51:44

16    report.  It wasn't anything official.  It was just the

17    captains and I meet weekly, and we talk about matters,

18    current events.  And it was just a conversation how

19    things are going, what's going on with the bay checks,

20    we've done 400 and nothing to report.

21       Q    Was that report given to you this month or       11:52:00

22    within the past couple of months?

23       A    It was sometime in the past six months.  And,    11:52:06

24    I'm sorry, I don't recall the date.

25       Q    Okay.  And they had checked the bay 400 times,   11:52:12
```

Page 110

```
 1   is that 400 times during that six-month reporting

 2   period?

 3        A    No, I believe it was a period prior to that.    11:52:22

 4   And I don't know what the date range was.  But it was

 5   given to me as a sense of measurement that, of the 400

 6   checks, they had not identified any criminal activity or

 7   had anybody come to report criminal activity.

 8        Q    During the patrols?                             11:52:42

 9        A    During the 400 times that the bay was checked.  11:52:44

10        Q    Is it part of the goal of the patrols to show a 11:52:48

11   presence and perhaps act as a deterrent?

12        A    Yes.                                            11:52:57

13        Q    And so is it surprising to you that they didn't 11:52:57

14   observe any incidents while they were present?

15        A    It's not shocking or surprising.  But it's     11:53:08

16   difficult to assert that is the reason there was no

17   criminal activity during that time.  Because the

18   officers are there providing that deterrent, or if there

19   was no criminal activity down there.

20        Q    But certainly, it's one of the goals of the    11:53:27

21   patrol, to be visible and patrol?

22        A    Absolutely.                                     11:53:33

23        Q    You previously worked with Palos Verdes Estates 11:53:43

24   interim police chief in La Habra; is that right?

25        A    No.  I did not ever work with him.             11:53:52
```

Page 111

Exhibit E, page 213

```
1        Q     Were you there at the same time?           11:53:56

2        A     No.                                         11:53:57

3        Q     Okay.   The interim police chief for Palos  11:53:58

4    Verdes Estates did work at La Habra prior to taking the

5    role as interim chief; is that right?

6        A     So the interim chief that you are referring to,  11:54:09

7    Dave Winneg, was the interim chief at La Habra before I

8    was hired at La Habra as a captain.  He had already

9    left.  And then he was the interim chief at Palos Verdes

10   Estates before I arrived.  We never worked together.

11       Q     Okay.  I'm going to show you a document that I  11:54:27

12   would like marked Exhibit 13.  There is no Bates number

13   on this Exhibit.

14             (Exhibit 13   was marked for

15             identification by the Certified Shorthand

16             Reporter and a copy is attached hereto.)

17   BY MS. WOLF                                           11:54:56

18       Q     This is something I printed off of your     11:54:57

19   website.  It's a message on the police department web

20   page regarding surfer localism.

21       A     Uh-huh.                                      11:55:06

22       Q     Does this appear to you to be an accurate    11:55:06

23   printout of the Palos Verdes Estates Police Department's

24   web page under the tab surfer localism?

25       A     Yes.                                         11:55:14
```

Page 112

Exhibit E, page 214

```
1        Q    Do you recall when this message was posted on    11:55:15

2    your department's website?

3        A    I don't.  But it was probably subsequent to the  11:55:22

4    previous emails we had just reviewed from Denis Wolcott

5    proposing language.

6        Q    So I believe the email from Denis Wolcott was     11:55:34

7    in February of 2016.  So was this posted sometime after

8    that?

9        A    It was about that time.                           11:55:44

10       Q    Okay.                                             11:55:45

11       A    I believe it was activated during the surf        11:55:47

12   season with the intent of having an affect for public

13   safety during the peak of the season.

14       Q    Okay.  Do you recall whose idea it was to post    11:55:57

15   this information to your department's website?

16       A    No.  It was -- I don't want to claim it as my     11:56:11

17   idea.  Because, quite frankly, it was a cumulative team

18   effort between the city manager, myself, and the

19   captains, and probably, at some point in time, Denis

20   Wolcott.

21       Q    Do you know who drafted this content?             11:56:29

22       A    I don't recognize it today.  But I know I         11:56:35

23   drafted some content and forwarded it to Greg Robinson,

24   who does our IT work in-house, to post it on the

25   website.
```

Page 113

Exhibit E, page 215

```
 1              So it may be my work product.  Or it may be the   11:56:49

 2    product that Denis Wolcott produced.

 3        Q    And Greg Robinson, you said, is he with the       11:56:54

 4    Palos Verdes Estates Police Department?

 5        A    He is a police corporal that is assigned to       11:56:59

 6    information technology right now.

 7        Q    Do you recall having any discussions with         11:57:07

 8    anyone at the Wolcott company before the content was

 9    drafted?

10        A    No.                                               11:57:13

11        Q    Do you recall having any conversations with       11:57:14

12    them regarding this content?

13        A    It's likely we -- Denis Wolcott, and I, and the   11:57:18

14    city manager discussed a message, a website posting and

15    the like.  But I don't have any specific recollection of

16    that.

17        Q    And I assume that you -- not to sound like a      11:57:30

18    political ad -- but I assume you approved this message?

19        A    Yeah, it is very timely.  Yes, I approved this    11:57:38

20    message.

21        Q    Has the city made any other efforts, aside from   11:57:44

22    posting this message, handing out the cards that we

23    discussed, to distribute the message regarding localism

24    and how it won't be tolerated at Palos Verdes Estates?

25        A    And the LED message board.                        11:58:01
```

Page 114

Exhibit E, page 216

1          Q     Yes.  Thank you.                          11:58:03

2          A     There may be other components of our public   11:58:05

3     outreach campaign.  Off the top of my head, that seems

4     to be most of them.  And I think, to me, it's

5     commensurate with the issue at hand.

6                Meaning that, with so few incidents occurring   11:58:19

7     down there, and with the burglary spree, and everything

8     else we were doing, I think our efforts were appropriate

9     and reasonable in scope and size.

10         Q     Do you believe that it targeted the right crowd   11:58:34

11    if the concern is the safety of, you know, outsiders who

12    come into the community to serve?

13         A     It's hard to say.  Because I don't know whether   11:58:49

14    it's an insider or outsider.  But a surfer who might

15    engage in this behavior may not take the time out of

16    this day to go look at our website.  But we are trying

17    to do everything we can to address this as best we can.

18         Q     Was there any effort to post this message on   11:59:12

19    any kind of social media, or surfer blogs, or anything

20    like that?

21         A     That was part of what Denis Wolcott would have   11:59:22

22    done.  I don't know if that was done or not.

23         Q     Okay.                                     11:59:27

24         A     We did have discussions about other means of   11:59:27

25    outreach, Facebook, and that sort of thing.

                                                Page 115

```
 1    it might be something out of the ordinary that's

 2    prompted by a captain to send it to my office.  But, no,

 3    I don't, as a matter of routine, review all reports of

 4    crime.

 5         Q    Okay.  How many full-time sworn officers are      12:07:37

 6    employed by your department?

 7         A    Twenty-five.                                      12:07:48

 8         Q    And do you have any reserve officers?            12:07:50

 9         A    We do.  But that number fluctuates and has been  12:07:52

10    decreasing recently with some retirements.

11         Q    And what is that number currently, if you can   12:07:59

12    estimate?

13         A    I would estimate six.                            12:08:03

14         Q    Do you have any non-sworn officers?              12:08:11

15         A    We do.                                           12:08:13

16         Q    How many?                                        12:08:15

17         A    I think 12 is the number.  And we refer to       12:08:17

18    those as police service officers.  And just for

19    clarification, it's kind of unique within our police

20    department, these are people who perform the combined

21    duties of a typical police dispatcher and a jailer.

22    Also are commonly referred to as a service officer.

23         Q    So the officers who are performing the patrols   12:08:47

24    in the community are either the reserve officers or the

25    full-time sworn officers?

                                                           Page 121
```

```
 1    done.  I'm just giving you my impression of it.  It's a

 2    large coast line occupied by a lot of folks, some of

 3    which, I'm sure, at some point in time, have had alcohol

 4    down there.  And I don't have any kind of tracking or

 5    outcome of enforcement action before me today.

 6        Q    And you're familiar with what's been referred    13:20:58

 7    to as the patio or the fort, down at the beach at Lunada

 8    Bay?

 9        A    Yes.                                              13:21:06

10        Q    And have you received reports of alcohol being   13:21:07

11    consumed in or around that structure?

12        A    I have.                                          13:21:18

13        Q    And have you given any direction, to any         13:21:21

14    officers, regarding enforcement of this ordinance as it

15    relates to any alcohol consumption on that structure?

16        A    I don't recall giving any, like, additional     13:21:33

17    direction, above and beyond what we normally expect them

18    to do, which is enforce the municipal code.

19        Q    Are you aware that in January of this year,      13:21:49

20    Mr. Dahlerbruch made an informal visit to Lunada Bay and

21    was offered a beer at that structure?

22        A    I am aware of that.                              13:21:59

23             MR. WORGUL:  Objection; vague as to time.        13:22:01

24             MS. LUTZ:  Join.                                 13:22:03

25
```

Page 143

```
 1        A    Yes, they are.                                13:36:29

 2        Q    And it sounds like they have familiarity with  13:36:30

 3   the bay boys.  And it says that they were able to

 4   recognize the names of individuals based on the victim's

 5   statements.  Would you agree?

 6        A    Based on this narrative, I would agree.        13:36:41

 7             MR. WORGUL:  I object; the document speaks for  13:36:44

 8   itself.

 9   BY MS. WOLF                                              13:36:48

10        Q    But, to your knowledge, the department doesn't 13:36:49

11   keep any sort of database or file on known or any known

12   suspects who are members of the bay boys?

13        A    That's correct.                                13:37:07

14        Q    Now, page 6 of this a supplement.  And it says  13:37:22

15   that, two days later, on the 27th, the officer contacted

16   the victims who said that they had a change of heart and

17   no longer desired to have the incident investigated.

18   And that based on those statements, the case would be

19   closed as unfounded.

20             So, again, is there really nothing else that   13:37:52

21   officers could have done here, given the victim's change

22   of heart?

23        A    Well, I'm reading a section in this paragraph   13:38:02

24   that says that the victims felt that, in retrospect, it

25   was a misunderstanding regarding surfing.  And so, you
```

Page 153

Exhibit E, page 220

```
 1      then subsequent to that briefing, at some point in time,

 2      Mr. Otten and Ms. Reed visited my office to discuss this

 3      matter.

 4          Q    Okay.  Does the department keep photos of      14:36:04

 5      suspected bay boys?

 6          A    If they're arrested, we have an arrest record.  14:36:11

 7      Otherwise, we don't have a photo collection, if you

 8      will.

 9          Q    Okay.  Are you familiar with any individuals   14:36:18

10      who have been identified as a suspected bay boy?

11          A    No.                                            14:36:29

12          Q    Are you aware that an officer told Ms. Reed    14:36:36

13      that the police department keeps photos of all the

14      members of the bay boys?

15          A    I think I had heard that.  And when I asked --  14:36:48

16      I was directly told by my captain that that was probably

17      an error, because it doesn't exist.

18          Q    Did anyone follow up with that officer, to     14:37:02

19      either clarify with him, what he meant by that

20      statement?

21          A    I don't know.  I did not.                      14:37:08

22          Q    Now, Ms. Reed asked the officer if she could   14:37:22

23      view photos to make a positive identification of the bay

24      boys who harassed her and was told no.  If the officer

25      had photos of suspects, do you know why she wasn't able
```

                                                        Page 183

```
 1        Q    Now, how many shifts are there in a given day?   14:41:42

 2        A    Two shifts.                                       14:41:46

 3        Q    What are the hours of the shifts?                14:41:47

 4        A    7:00 a.m. to 7:00 p.m.  And then, of course      14:41:49

 5   7:00 p.m. to 7:00 a.m.

 6        Q    How many officers work on each shift?            14:42:00

 7        A    Two patrol officers, one for each end or half    14:42:03

 8   of the city.  Then a field supervisor or a sergeant that

 9   provides functional supervision.

10        Q    So, generally speaking, at any one shift, there  14:42:19

11   would be three officers on duty?

12        A    Yes.                                             14:42:25

13        Q    If you were getting regular reports of           14:42:41

14   vandalism or harassment, battery or indecent exposure,

15   for instance, occurring at a different location, say, a

16   public elementary school, would you still say there was

17   little you could do to address the situation?

18             MR. WORGUL:  Vague and ambiguous, incomplete     14:43:03

19   hypothetical.

20             MR. RICHARDS:  I'm sorry, did you start your     14:43:05

21   question with if you received that?

22             MS. WOLF:  Yes.                                  14:43:10

23             MR. RICHARDS:  Thanks.                           14:43:11

24             THE WITNESS:  Let me just remind you of the      14:43:13

25   context.  When we are making statements about policing
```

Page 187

```
 1    Lunada Bay, it was at a period of time when we were

 2    dealing with a large burglary problem.  So our resources

 3    were a bit strained.

 4           So that being said, whether it's an elementary   14:43:30

 5    school, Lunada Bay or another location in our city, we

 6    would evaluate the need to redirect our resources and

 7    police that appropriately, the best we can, no matter

 8    the situation or the location.

 9    BY MS. WOLF                                             14:43:47

10         Q    Has the burglary problem resolved?           14:43:48

11         A    Yes.  Knock on wood, as of today and for quite   14:43:51

12    some time now, it's been resolved.  But those are also

13    cyclical and seasonal in nature.

14         Q    Sure.  Now, referencing the rash of burglaries   14:44:03

15    that we had discussed earlier, I think you said it was

16    around December of 2015, do you recall approximately

17    when that problem was resolved?

18         A    Well, statistically, it resolved in the middle   14:44:18

19    of January.  But dedicated resources weren't lightened

20    up until probably late March.

21         Q    Why is that?                                 14:44:28

22         A    Well, because the burglars were still active in   14:44:30

23    the area and adjacent cities.  And it was important that

24    we maintain high visibility in a deterrent effect and an

25    apprehension opportunity for a period of time.
```

Page 188

```
 1            Because you can never know when they are going    14:44:49

 2     to come back and do another burglary.

 3       Q    Is it your belief that it resolved because      14:44:54

 4     these particular individuals, who were committing these

 5     burglaries, moved onto a different area or because they

 6     were caught?

 7       A    I believe it was a combination.  But probably   14:45:05

 8     more of the latter.

 9       Q    That they were caught?                          14:45:08

10       A    Right.  Many of them were, were caught.  And my  14:45:10

11     detectives were very busy doing that, as well.  We

12     arrested many of them.  So I think that has an effect on

13     the crime spree.

14       Q    And I believe, during that meeting you and      14:45:33

15     Captain Best encouraged Ms. Reed to carry a cell phone

16     with her at Lunada Bay; is that right?

17       A    Yes.                                            14:45:41

18       Q    Is there cell phone coverage down there at the  14:45:42

19     beach?

20       A    Every time I've gone down there, I had cell     14:45:45

21     coverage.

22       Q    So, to your knowledge, cell phones do work down 14:45:49

23     there?

24       A    Sure.  I mean, there is multiple carriers.  And 14:45:52

25     I don't have an appraisal of each one.  But I believe
```

Page 189

Exhibit E, page 224

| | | |
|---|---|---|
| 1 | MR. WORGUL:  Is this regarding the 2/13 | 15:00:59 |
| 2 | incident or 2/29 incident? | |
| 3 | MS. WOLF:  Exhibit 24. | 15:01:05 |
| 4 | THE WITNESS:  Yes. | 15:01:06 |
| 5 | BY MS. WOLF | 15:01:06 |
| 6 | Q    Do you recall when that was? | 15:01:07 |
| 7 | A    No. | 15:01:08 |
| 8 | Q    And what changed, what enabled her to view a | 15:01:10 |
| 9 | photo lineup, at that point? | |
| 10 | A    Well, nothing changed. | 15:01:16 |
| 11 | MR. RICHARDS:  Object; to the form of the | 15:01:18 |
| 12 | question.  You are assuming that something changed. | |
| 13 | There is no evidence that something changed. | |
| 14 | MS. WOLF:  He testified, earlier, that she was | 15:01:24 |
| 15 | not given a photo lineup when she requested that. | |
| 16 | MR. RICHARDS:  No, I don't think he said that. | 15:01:29 |
| 17 | MS. WOLF:  I believe so. | 15:01:31 |
| 18 | MR. RICHARDS:  Go ahead. | 15:01:32 |
| 19 | THE WITNESS:  She was not given the opportunity | 15:01:33 |
| 20 | to look at the bay boys photo album.  Because it doesn't | |
| 21 | exist.  And the reason she wasn't able to view a lineup | |
| 22 | of pictures, one of which was a suspect, for her to | |
| 23 | identify the suspect, because the process just hadn't | |
| 24 | happened yet. | |
| 25 | And for her, and for maybe many others, they | 15:01:54 |

Page 200

```
 1    are accustomed to how fast things happen on TV and, you

 2    know, working with burglars and other things, detective

 3    resources are there.  But they are spent.  They are

 4    busy.

 5         So the case got to a detective.  What we call a   15:02:08

 6    six pack was produced.  And at the appropriate time, she

 7    was called in to view that.  There was no intentional

 8    built in delay.  And there wasn't anything significantly

 9    that changed.  It was the process had to take its course

10    of a normal criminal follow up investigation.

11         Q    Do you recall if she made a positive photo    15:02:30

12    identification?

13         A    I knew the answer to that when I was briefed.  15:02:36

14    But time has passed, and I would have to refresh my

15    recollection.  Right now, I don't remember if she

16    identified the correct suspect or not.

17         Q    Do you recall if anyone was arrested as a      15:02:47

18    result of her identification?

19         A    I believe there was an arrest in this case.    15:02:51

20         Q    Okay.  And do you recall if that was presented 15:02:54

21    to the DA for prosecution?

22         A    It was.  And this is the case, I believe, that 15:03:01

23    the district attorney declined to file charges based on

24    some discrediting information from a witness.

25         Q    Okay.  Now, looking back at all these -- are   15:03:14
```

Page 201

Exhibit E, page 226

1    attack and threaten surfers in the water?

2        A    No.                                              15:04:46

3        Q    Have you ever reached out to any beach          15:04:49

4    community to discuss best practices, or collaborate on

5    localism challenges, or surfing-related crimes?

6        A    Yes.                                             15:05:00

7        Q    And which communities are those?                15:05:00

8        A    Huntington Beach.  The beach areas around the   15:05:08

9    Palos Verdes Peninsula, via the Sheriff's Department,

10   Santa Monica.  There may be a few others.  I've talked

11   to various chiefs over a period of time as the

12   opportunity arises.

13       Q    Do they face similar problems with localism?    15:05:29

14            MR. WORGUL:  Objection; calls for speculation.   15:05:34

15            MS. LUTZ:  Join.                                 15:05:37

16            MR. CROWLEY:  Argumentative.                     15:05:40

17            THE WITNESS:  Most of the chiefs did not         15:05:43

18   believe they had a localism problem in their

19   jurisdictions, nor did they have any information for me

20   to consider best practices, if you will.

21   BY MS. WOLF                                              15:05:58

22       Q    So they weren't able to provide you with any    15:05:58

23   suggestions, or advice, on how to deal with any

24   surfing-related incidents?

25       A    Correct.                                         15:06:05

Page 203

```
 1   BY MS. WOLF                                      15:54:42

 2       Q    I believe, when we left off, we were looking at  15:54:43

 3   Exhibit 25.  It's a memorandum from you to the mayor and

 4   city council.  Did you write this memorandum?

 5       A    I did.                                   15:54:52

 6       Q    And the subject is localism in Lunada Bay.  Why  15:54:52

 7   did you write this memo?

 8       A    Just as a briefing to the council.       15:55:05

 9       Q    Was there any incident, in particular, that  15:55:07

10   spurred you to write this memo?

11       A    Let me just look at it a little further.  15:55:16

12       Q    Sure.  I don't know if I said this is Bates  15:55:20

13   numbered CITY 1113.

14       A    So this is just to brief the council about news  15:56:09

15   coverage.

16       Q    Okay.  Did anyone help you write this?    15:56:16

17       A    I don't think so.                         15:56:20

18       Q    Now, at the third paragraph, on that first  15:56:22

19   page, you acknowledge that the police department has

20   dealt with localism in the early '90s.  And you

21   described the complaints -- the types of complaints that

22   were received.

23            Looking at this paragraph, and the type of  15:56:42

24   complaints, do those seem similar to the complaints that

25   have been received more recently from your department?
```

Page 210

```
 1        A    Yes and no.  I made reference to letting the    15:57:16

 2   air out of the tires.  That wasn't a recent complaint.

 3   That was in the past.  But stealing property, no, but we

 4   did have property damage.  So similar, but not quite the

 5   same.

 6        Q    And you outline measures that the department    15:57:28

 7   has taken to address localism in Lunada Bay, including

 8   extra patrol on high surf days, using ATVs, having

 9   officers dress in plain clothes and interact with cliffs

10   and bluffs, undercover operations and boat patrols.

11        Are any of these measures currently employed by    15:57:47

12   your department to address localism?

13        A    No.  These -- these measures were in that    15:57:53

14   period of time.

15        Q    So none of these are currently employed?    15:57:59

16        A    Not this time of year.    15:58:03

17        Q    What about when the surf season begins, do you    15:58:04

18   plan on using any of these measures?

19        A    All of those would be considered as strategy at    15:58:10

20   that point in time, yes.

21        Q    Have you developed a strategy for the up coming    15:58:15

22   surf season?

23        A    Yes, it's being developed.  It's not completed.    15:58:19

24        Q    Who are you working with to develop the    15:58:22

25   strategy?
```

Page 211

| | | | |
|---|---|---|---|
| 1 | A | My staff. | 15:58:25 |
| 2 | Q | Who on your staff, specifically? | 15:58:26 |
| 3 | A | Captain Velez and Captain Best. | 15:58:28 |
| 4 | Q | Has your department ever attempted to address | 15:58:35 |
| 5 | | the issue of localism by leaving fliers on cars? | |
| 6 | A | Yes. | 15:58:43 |
| 7 | Q | Do you recall when that was? | 15:58:45 |
| 8 | A | My earlier testimony referred to the cards I | 15:58:53 |
| 9 | | produced.  Those were also left on cars. | |
| 10 | Q | So it's the same? | 15:58:58 |
| 11 | A | Yes. | 15:58:59 |
| 12 | Q | Do you know how many Palos Verdes Estates | 15:59:09 |
| 13 | | police officers surf? | |
| 14 | A | I do not. | 15:59:14 |
| 15 | | MR. WORGUL:  Objection; asked and answered. | 15:59:15 |
| 16 | | MS. LUTZ:  Join. | 15:59:19 |
| 17 | BY MS. WOLF | | 15:59:20 |
| 18 | Q | Do you know whether they surf at Lunada Bay? | 15:59:21 |
| 19 | A | I do not. | 15:59:24 |
| 20 | Q | Have you ever inquired whether any officers | 15:59:25 |
| 21 | | surf at Lunada Bay? | |
| 22 | A | No. | 15:59:30 |
| 23 | Q | Do you know if any of the officers socialize | 15:59:33 |
| 24 | | with men who have been considered bay boys? | |
| 25 | | MR. WORGUL:  Objection; vague and ambiguous, | 15:59:41 |

Page 212

Exhibit E, page 230

```
 1      would like to do.

 2              MR. CROWLEY:  We're done.                  17:38:00

 3              MR. RICHARDS:  I think I can take care of the   17:38:00

 4      chief.

 5              MR. WORGUL:  I'm going to do perfectly what's   17:38:03

 6      best for my client.

 7              MS. WOLF:  If know one wants to use the time,   17:38:07

 8      then I think we are done.

 9              THE VIDEOGRAPHER:  This concludes today's   17:38:15

10      deposition given by Chief Jeff Kepley.  The media will

11      be retained by Veritext Legal Solutions.  We are off the

12      record at 5:38 p.m.

13              (WHEREUPON, THE PROCEEDINGS ENDED AT 5:38

14      P.M.)

15              (DECLARATION OF PENALTY OF PERJURY ON THE

16      FOLLOWING PAGE, ATTACHED HERETO.)

17

18

19

20

21

22

23

24

25

                                                        Page 269
```

Exhibit E, page 231

```
 1                    REPORTER'S CERTIFICATE

 2              I, the undersigned, a Certified Shorthand

 3      Reporter of the State of California, do hereby

 4      certify:

 5              That the foregoing proceedings were taken

 6      before me at the time and place herein set forth;

 7      that any witnesses in the foregoing proceedings,

 8      prior to testifying, were administered an oath;

 9              That a record of the proceedings was made by

10      me using machine shorthand which was thereafter

11      transcribed under my direction;

12              That the foregoing transcript is

13      a true record of the testimony given.

14              Further, that if the foregoing pertains to

15      the original transcript of a deposition in a Federal

16      Case, before completion of the proceedings, review

17      of the transcript was not requested.

18              I further certify I am neither financially

19      interested in the action nor a relative or employee.

20              IN WITNESS WHEREOF, I have this date

21      subscribed my name.

22      Dated:   October 27, 2016

23

24                      Kathy L. Pa'u, CSR No. 5684

25


                                              Page 270
```

Exhibit E, page 232

Nextdoor Malaga Cove – 12/31/15



### PVE Surfing Localism In The Media This Week

Jeff Kepley from Malaga Cove

As PVE or area residents, you may have seen the recent LA Times or OC Register stories this week about the Lunada Bay surfing problems and my position to put an end to the surfer localism (Google "Surfer Localism" to learn more about it worldwide). Please allow me to make some comments about this local issue in our community:

This is an old story and one that I do not consider news or worthy of news coverage. This story got some attention and traction last year with an undercover reporter for The Guardian (online news source) secretly video recorded surfers hassling him in Lunada Bay, and then illegally recorded his later conversation with a PVEPD police dispatcher at the police lobby. This generated wide interest and caused many news organizations to re-report it. I never disputed their findings, and acknowledge we have work to do here with these bullies, and this has been going on intermittently for probably fifty years. Ever since the Guardian's story however, this trend has continued - meaning that, in this case, the LA Times did a story so now other media sources want to re-tread it and breathe new life into it as if it's new or newsworthy. I am not interested in keeping this alive, as it is not reflective of the character of our prideful community and does not, in my opinion, contribute the solution. I went on the radio talk show "Air Talk" a few months back and participated in a live radio broadcast with KPCC and other shows and news programs, which you may have heard. They are again trying to cover this story and I have declined to be interviewed several times this week.

Some media reports have given the impression that this community has a group of local PVE residents called the "Bay Boys" that is bullying outsiders, like an organized street gang. While there may be some truth to that and there may be or has been a loosely organized local group, our recent experience most often shows otherwise. In most cases, these are young men from other areas, who do not live here, but who surf here and do what surfers do everywhere - hog the waves and

1



Exhibit E, page 233

**CITY1082**

dissuade others from joining in. This is not unique to this community and in my opinion is only getting media attention due to the City's name, and for being a wealthy community. Surfing localism occurs everywhere surfers surf. While this police department has been criticized for not taking it seriously, we have over the years done much to address the problem before I took over as Chief. Likely not enough though.

In response to the current criticism that our PVE Police Department doesn't care and declines to become involved (as reasonably inferred from the Guardian's undercover video of the conversation with our dispatcher earlier this year), I have taken steps to improve safety and demonstrate a more accurate police department position and response:

Our police officers conduct several daily surfer safety checks along our coastline, mainly three spots; Malaga Cove, Bluff Cove, and Lunada Bay. The officers are required to get out of their patrol cars and walk to the bluff's edge (100 feet or more above the water) and visually monitor the surfers to ensure no assaults, disputes, or other localism behavior is occurring. This is also a visible deterrent that lets those in the water know that we are policing the area. The officers also patrol the parking area along Paseo Del Mar, the street commonly used by surfers to park their cars. The officers look for evidence of vandalism such as flattened tires, surf board wax applied to cars, etc., and assaults or disputes. They also greet surfers to educate and inform them of the situation by disseminating information cards which encourages localism victims to report any acts of localism to the PVE Police Department. To date, we have observed no actionable incidents on our daily surf checks and have had very few incidents reported, all minor. We have met with prosecutors from the Los Angeles District Attorney's Office to discuss prosecution of future offenders, including felony gang enhancements should the criminal behavior meet those legal definitions - let this be a warning to those involved.

All of this is taking precious time away from our police officers patrolling our streets during an unprecedented increase in residential burglary, which is our current main focus. While surfing safety is important and something we are engaged in daily, we have many other policing duties for a small police department with limited resources.

Our local residents, as far as I can tell, do not focus much attention on this surfer issue. A few have sent e-mails to me supporting my stance and reiterating the

2

Exhibit E, page 234

**CITY1083**

negative light shed upon our great little city by this coverage which they do not appreciate – they too believe there are more positive attributes about this community and do not want to be labeled as the place where there is a surfing problem. For the few that have shared with me that they know of and/or support the Bay Boys, as this City's Police Chief I will not condone or tacitly approve illegal conduct of any kind regardless of history, legacy, or residency.

Philosophically, I take great issue with those who engage in this surfer localism and have great distain for bullying behavior. I have vowed to stop it, arrest those vandalizing, harassing/assaulting, etc., and will issue a press release when those arrests are made. Our coastline is unique, beautiful and open to everyone – it is not a private playground for a few bullying surfers. I think our City and its coastline should be known as a beautiful, safe place where all people can recreate, surf, swim, scuba, boat, etc., free of harassment, intimidation, assault, etc. I want to support and protect our surfers too, both local and visiting. I am disturbed when I hear residents tell me that their children (some young, some old), who grew up here, cannot surf in Lunada Bay out of fear about bullies. I've heard this too often.

Some may be concerned that my enforcement position will result in our area becoming too well known and over occupied if everyone is allowed to come here - assuming the localism limits visits. Well, everyone is allowed now, as a matter of civil rights and freedoms. And, our PD will address any unlikely increases in visitors that cause problems. If the media attention is likely to draw more interest and visitors to our area, know that the only source of media attention now is the illegal behavior of surfer localism, not actions or inactions taken by this police department which if anything is a side issue to the main story.

Thank you for your support. I welcome your comments.

Jeff Kepley
PVE Police Chief

Exhibit E, page 235
CITY1084

From:           Jeff Kepley
Sent:           Monday, February 08, 2016 12:37 PM
To:             Greg Robinson
Cc:             Anton Dahlerbruch; Tony Best; Mark Velez
Subject:        FW: Statements

Greg, please post this on our PD web page today, in a conspicuous place, but also in the localism section. Jeff

---

From: Anton Dahlerbruch
Sent: Monday, February 08, 2016 12:30 PM
To: Jeff Kepley <jkepley@pvestates.org>; Vickie Kroneberger <Vkroneberger@pvestates.org>; Joe Mendoza <jmendoza@pvestates.org>
Cc: Sheri Repp <srepp@pvestates.org>; Denis Wolcott (denis@TheWolcottCompany.com) <denis@TheWolcottCompany.com>
Subject: FW: Statements

The following is for posting on the City's website and on the PD webpage.

Thanks, Tony

**Protecting all**

The City and its Police Department are committed to ensuring the safety and security of all. We are happy to report that a recent rash of burglaries have declined, and we believe this is due to the hard work of our police department and increased awareness among homeowners to ensure their residences are properly secured. Several arrests were made. Our police department continues to monitor the situation and will take the necessary steps should we experience a return of this activity.

In recent weeks, there has been renewed attention regarding the safety of our beaches, notably complaints that a few surfers are allegedly demonstrating intimidation tactics to "protect" the waters for local surfers. As with any complaint or concern about public safety, our Police Department investigates and evaluates the situation, and will take appropriate action. As with any public facility, we want to ensure our residents and the public can enjoy areas, such as Lunada Bay, in peace. As such, police patrols of our beach areas may increase from time to time. There also have been news media reports focusing attention on an unpermitted outdoor structure at Lunada Bay and whether this structure is a contributing factor to the complaints we have received. No decisions have been made about the structure, but the City and the Police Department are evaluating various options. Again, our goal is to ensure the safety of all.

We welcome your input and encourage an exchange of factual information. One of the ways that the City and Police Department communicate to residents on safety matters such as this is through the Neighborhood Watch program. Residents are encouraged to attend upcoming community outreach programs hosted by the Neighborhood Watch, that when scheduled are posted on www.pvenw.org. Questions about Neighborhood Watch, burglaries in the community or public safety along the coastline can be directed to Captain Mark Velez in the Police Department at 310.378.4211 (non-emergency business line).

Thank you.



# Surfer Localism



## A Message from the Chief of Police

"Localism," or sometimes referred to as territorialism, will not be tolerated in Palos Verdes Estates. This is occasionally reported as an act of intimidation or dissuasion on the part of locals targeting out-of-town surfers to prevent them from surfing local waters. Or, there may be acts of vandalism to vehicles, personal property, etc., for the purpose of driving out-of-area guests away from the coastal areas.

The beaches, shoreline, and surfing areas along the Palos Verdes Estates coastline are all open to the public. There are no private beaches. Therefore, if you or anyone with you experiences any form of harassment, intimidation, assault, vandalism, etc., you are strongly urged to contact the Palos Verdes Estates Police Department to immediately report the incident.

Our officers are committed to assuring beach access and recreational tranquility to all people accessing the Palos Verdes Estates coastline.

Report these incidents to 310-378-4211, or if life threatening call 9-1-1.

**Jeff Kepley, Police Chief**
City of Palos Verdes Estates Police Department



## City Comments on Surfer Issues:
**Protecting all**

The City and its Police Department are committed to ensuring the safety and security of all. We are happy to report that a recent rash of burglaries have declined, and we believe this is due to the hard work of our police department and increased awareness among homeowners to ensure their residences are properly secured. Several arrests were made. Our police department continues to monitor the situation and will take the necessary steps should we experience a return of this activity.

Exhibit E, page 237

In recent weeks, there has been renewed attention regarding the safety of our beaches, notably complaints that a few surfers are allegedly demonstrating intimidation tactics to "protect" the waters for local surfers. As with any complaint or concern about public safety, our Police Department investigates and evaluates the situation, and will take appropriate action. As with any public facility, we want to ensure our residents and the public can enjoy areas, such as Lunada Bay, in peace. As such, police patrols of our beach areas may increase from time to time. There also have been news media reports focusing attention on an unpermitted outdoor structure at Lunada Bay and whether this structure is a contributing factor to the complaints we have received. No decisions have been made about the structure, but the City and the Police Department are evaluating various options. Again, our goal is to ensure the safety of all.

We welcome your input and encourage an exchange of factual information. One of the ways that the City and Police Department communicate to residents on safety matters such as this is through the Neighborhood Watch program. Residents are encouraged to attend upcoming community outreach programs hosted by the Neighborhood Watch, that when scheduled are posted on www.pvenw.org. Questions about Neighborhood Watch, burglaries in the community or public safety along the coastline can be directed to Captain Mark Velez in the Police Department at 310.378.4211 (non-emergency business line).

Thank you.

Exhibit E, page 238



# MEMORANDUM

## POLICE DEPARTMENT

TO:          HONORABLE MAYOR AND CITY COUNCIL

FROM:      JEFF KEPLEY, POLICE CHIEF

SUBJECT:  LOCALISM IN LUNADA BAY

DATE:       MAY 21, 2015

Recently, an on-line story was published on LAlist.com regarding surfing localism and the associated conflicts in Lunada Bay. The story featured a hidden video which documented some of the attitudes and actions, of those believed to be locals, toward out-of-town surfers. This resulted in primetime news stories on the topic on K-Cal 9 and CBS2 news broadcasts on May 20, 2015.

During my tenure over the past year, I have heard of this issue and have been told stories of past incidents of vehicle tampering, etc. Although our Police Department does not receive surfing related complaints frequently, we do occasionally receive a call or complaint regarding harassment, intimidation, or vehicle tampering. According to our in-house police records, in 2014 officers filed three surfer-related reports. One was a report of someone letting the air out of the tires of a surfer's vehicle, while the other two were reports of verbal harassment. These complaints were direct calls from the victims and not as a result of news reports or third party callers. There have been no reports in 2015, but we have no way of knowing how many incidents may have occurred which were not reported.

As a historical perspective, the Police Department dealt with localism issues back in the early 1990s. During that time, our officers dealt with complaints of harassment wherein locals were "stealing" waves, letting air out of tires, and stealing personal property from out of town surfers. Perhaps the most significant incident occurred when one subject threw a rock at the head of another person during a fight. The subject who threw the rock was arrested, and the victim was hospitalized. A lawsuit was later filed by the victim against the aggressor, and the City. The City was later dropped from the lawsuit.

During the past several years, we have implemented several measures to address localism in the Lunada Bay area. These measures have included the following:

- Extra patrol with uniformed officers on high surf days
- Utilizing the ATVs to patrol the cliff's e



Exhibit E, page 239

CITY1113

- Having officers dress in plain clothes and drive unmarked vehicles to observe and interact with people along the cliffs and bluffs
- Undercover operations involving officers from our department and other agencies
- Boat patrols in Lunada Bay.

Our ocean patrol boat, which is dry docked and in need of replacement, would be useful to create a police present in the bay during the time surfers are in the water. Additionally, we expect to have our Parkland Rangers in place by summer which will be another resource to patrol and maintain a presence on the bluff trails, shoreline, etc.

Our police department's duty and mission is to respect the rights of all people, not just the local residents. Police employees are to encourage all people, regardless of their residency, to report incidents so that officers can keep the peace, dissuade illegal or inappropriate conduct and behavior, as well as to track and monitor these incidents and adjust our presence and enforcement as appropriate.

Exhibit E, page 240

CITY1114