EXHIBIT F

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                     WESTERN DIVISION

 4                        -  -  -

 5

 6   CORY SPENCER, AN INDIVIDUAL;    )
     DIANA MILENA REED, AN           )
 7   INDIVIDUAL; AND COASTAL         )
     PROTECTION RANGERS, INC.,       )
 8   A CALIFORNIA NON-PROFIT PUBLIC  )
     BENEFIT CORPORATION,            )
 9                                   )
                   Plaintiffs,       )
10                                   )
         vs.                         ) No.:  2:16-cv-02129-SJO(RAOx)
11                                   )
                                     )
12   LUNADA BAY BOYS; THE INDIVIDUAL )
     MEMBERS OF THE LUNADA BAY BOYS, )
13   INCLUDING BUT NOT LIMITED TO    )
     SANG LEE, B RANT BLAKEMAN, ALAN )
14   JOHNSTON, AKA JALIAN JOHNSTON,  )
     MICHAEL RAE PAPAYANS, ANGELO    )
15   FERRARA, FRANK FERRARA, CHARLIE )
     FERRARA, AND N.F.; CITY OF      )
16   PALOS VERDES ESTATES; CHIEF     )
     OF POLICE JEFF KEPLEY AND       )
17   DOES 1 - 10,                    )
                                     )
18                   Defendants.     )
     - - - - - - - - - - - - - - - - )
19

20            Deposition of ANTON DAHLERBRUCH, taken on

21   behalf of the Plaintiffs, at Premier Business Center,

22   One Park Plaza, Suite 600, Irvine, California, 92614,

23   commencing at 9:45 a.m., Friday, November 18, 2016,

24   before ANGELIQUE MELODY FERRIO, CSR No. 6979.

25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1                   A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         LAW OFFICES OF HANSON, BRIDGETT, LLP
           BY:   KURT A. FRANKLIN, ESQ.
 5         425 Market Street
           26th Floor
 6         San Francisco, California 94105

 7

 8         OTTEN LAW, P.C.
           BY:  VICTOR J. OTTEN, ESQ.
 9         3620 Pacific Coast Highway
           Suite 100
10         Torrance, California 90505

11

12    FOR THE DEFENDANT CITY OF PALOS VERDES:

13         KUTAK, ROCK, LLP
           BY:  EDWIN J. RICHARDS, ESQ.
14         5 Park Plaza
           Suite 500
15         Irvine, California 92614

16

17    FOR THE DEFENDANT MICHAEL PAPAYANS:

18         HAVEN LAW
           BY:  PETER T. HAVEN, ESQ.
19         1230 Rosecrans Avenue
           Suite 300
20         Manhattan Beach, California 90266

21

22    FOR THE DEFENDANT SANG LEE:

23         LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
           BY:  TERA A. LUTZ, ESQ.
24         633 West 5th Street
           Suite 4000
25         Los Angeles, California 90071
```

3

Exhibit F, page 243

Atkinson-Baker Court Reporters
www.depo.com

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE DEFENDANT BRANT BLAKEMAN:

 4         VEATCH CARLSON, LLP
           BY:  RICHARD P. DIEFFENBACH, ESQ.
 5         1055 Wilshire Boulevard
           11th Floor
 6         Los Angeles, California 90071

 7

 8    FOR THE DEFENDANT SANG LEE:

 9         LAW OFFICES OF BOOTH, MITCHEL & STRANGE, LLP
           BY:  JACKIE K. VU, ESQ.
10         707 Wilshire Boulevard
           Suite 3000
11         Los Angeles, California 90017

12

13    FOR THE DEFENDANT ANGELO FERRARA AND N.F.:

14         (BY TELEPHONE)

15         LAW OFFICES OF MARK C. FIELDS, APC
           BY:  MARK C. FIELDS, ESQ.
16         333 South Hope Street
           35th Floor
17         Los Angeles, California 90071

18

19    FOR THE DEFENDANTS FRANK AND CHARLIE FERRARA:

20         (BY TELEPHONE)

21         BREMER, WHYTE, BROWN & O'MEARA, LLP
           BY:  LAURA L. BELL, ESQ.
22         21271 Burbank Boulevard
           Suite 110
23         Woodland Hills, California 91367

24

25
```

4

Atkinson-Baker Court Reporters
www.depo.com

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE DEFENDANT BRANT BLAKEMAN:

 4        (BY TELEPHONE)

 5        BUCHALTER NEMER, APC
          BY:   ROBERT S. COOPER, ESQ.
 6        1000 Wilshire Boulevard, Suite 1500
          Los Angeles, California 90017
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Atkinson-Baker, Inc.
     Court Reporters
24   www.depo.com
     (800) 288-3376
25
```

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 245

Atkinson-Baker Court Reporters
www.depo.com

```
 1          IRVINE, CALIFORNIA, FRIDAY, NOVEMBER 18, 2016

 2                         9:45 A.M.

 3                          -OOO-

 4

 5          MR. FRANKLIN:  Let's have everyone make their

 6   appearances for the record, please.

 7          THE WITNESS:  Anton Dahlerbruch.

 8          MR. RICHARDS:  Ed Richards and I represent the

 9   City.

10          MS. LUTZ:  I'm Tera Lutz and I represent

11   Sang Lee.

12          MR. DIEFFENBACH:  Richard Dieffenbach for

13   Brant Blakeman.

14          MS. VU:  Jackie Vu representing Sang Lee.

15          MR. FRANKLIN:  Why don't we go to the phone

16   next.

17          MR. COOPER:  And I'm Robert Cooper for

18   Brant Blakeman.

19          MR. FIELDS:  Mark Fields for Angelo Ferrara and

20   N.F.

21          MS. BELL:  Laura Bell for Frank Ferrara and

22   Charlie Ferrara.

23          MR. HAVEN:  And I'm Peter Haven for Michael

24   Papayans.

25          MR. FRANKLIN:  Kurt Franklin on behalf of
```

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 246

```
 1   Plaintiffs Corey Spencer, Diana Milena Reed, and the
 2   Coastal Protection Rangers in the punitive class.
 3          Counsel, if I can just as a matter of
 4   housekeeping, I'll suggest that in terms of objections,
 5   I will stipulate if there's an objection that is made by
 6   all so that we don't need to join an objection.  If
 7   that's okay with everybody here, it might help us speed
 8   through the deposition.
 9          If it's a different objection, I'm okay, but if
10   it's simply joining, I think that might be more
11   efficient; are people okay with that?
12          MR. RICHARDS:  I'm fine with that.
13
14                    ANTON DAHLERBRUCH,
15              having first been duly sworn, was
16              examined and testified as follows:
17
18                       EXAMINATION
19
20   BY MR. FRANKLIN:
21      Q.  Everybody has joined.
22          And if you can on the phone, I'll try to be
23   slow, and just identify yourself so that the court
24   reporter can figure out who is talking.
25          We've marked as the first exhibit the Notice of
```

11

```
 1   asked for those documents, there should be documents of

 2   attendance?

 3       A.   Yes.

 4       Q.   Does the City have a no retaliation policy?

 5       A.   Can you clarify that for me, please.

 6       Q.   Well, I'll ask it in terms of if a resident or

 7   someone makes a complaint, is there a formal policy that

 8   the City shall not retaliate against somebody for making

 9   a complaint related to race or some other civil right?

10       A.   I'm not aware if we have a policy or not.

11       Q.   Does the City have anti-harassment policies?

12       A.   Yes.

13       Q.   Is there a person who is in charge of

14   overseeing to make sure that those policies are updated?

15       A.   It would also be out of the Human Resources

16   Office.

17       Q.   So, is the Palos Verdes Homes Association, do

18   they have oversight over restrictive covenants; is that

19   fair?

20       A.   Yes.

21       Q.   And then what is the, what is the, this is --

22   this is new to me in terms of my work in City

23   government.

24            How does the Art Jury work; they're a

25   sub-committee of the Home Association?
```

45

Anton Dahlerbruch
November 18, 2016

1    term first.

2    BY MR. FRANKLIN:

3        Q.   Do you think it was after 2014 or before?

4        A.   It was after, but I don't know exactly when it

5    came up.

6        Q.   What to your knowledge as the chief executive

7    and City Manager of Palos Verdes Estates research has

8    the City done on the concept of localism?

9        A.   What do you mean by research.

10       Q.   Have you asked anybody to conduct a study on

11   localism generally?

12       A.   Like write a report about it?

13       Q.   Yes, evaluate it?

14       A.   I'm not sure how to answer that question.  We

15   have not conducted a thesis-type study or a research

16   study about what is localism or how you define localism,

17   if that's what you mean.

18       Q.   Have you reached out to any other City Manager

19   of beach communities with respect to the issue of

20   localism?

21       A.   No.   What are you defining as localism?

22            MR. DIEFFENBACH:   I'll join with the objection,

23   vague and ambiguous.

24   BY MR. FRANKLIN:

25       Q.   Well, the City has on its web page, you can

61

Atkinson-Baker Court Reporters
www.depo.com

1    start there, and I can pull it up.  I think that we

2    printed it.  There's a web page done by the Wolcott

3    Company.

4            There's something along the lines of that we

5    don't tolerate localism.  I think that's the intent of

6    that web page.

7            Do you authorize -- are you the person that

8    authorizes the postings on the web page?

9        A.   Yeah, yes, I am, yes.

10       Q.   And in terms of public communication and

11   outreach, are you in charge of P.R. for Palos Verdes

12   Estates, if there is such a thing?

13       A.   I work with a team of staff to do that, yes.

14       Q.   And what is the team of staff that works on

15   public relations?

16       A.   It's a combination of the executive staff

17   depending on what the issue is.

18       Q.   What about the localism issue, who were the

19   executive staff that worked on it?

20       A.   Do you mean what is posted on the website?

21       Q.   Yes.

22       A.   Primarily, me, yeah, I think it's only me.

23       Q.   Just you, you said probably?

24       A.   It's a difficult question to answer defining

25   what you mean by localism.

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 250

1          In terms of what is on the website, I'm

2    involved.  Since Jackie was hired, Jackie Wu which I

3    spelled before, she has helped update our website.  And

4    she has been with us two months.  So, it has not been

5    very long.

6          Q.  How long has the Wolcott Company done work for

7    the City?

8          A.  Probably a year thereabouts or a year and a

9    half maybe.

10         Q.  How were they retained?

11         A.  They were retained -- do you mean what process

12   did we go through?

13         Q.  Was there a specific incident that caused you

14   to reach out to the Wolcott Company?

15         A.  Yeah.  Their job to us is to build our website

16   and to help us convert from what was our old website to

17   our new website.  And that was the purpose.

18         Q.  And were they hired related to any specific

19   incident?

20         A.  Only for building the website and actually

21   helping with creating our FaceBook account, presence,

22   not content, but for the actual creating the new web

23   page and associated links.

24         Q.  How much was that contract; do you know?

25         A.  Oh, I think that it's now at $50,000.  We

Exhibit F, page 251

Atkinson-Baker Court Reporters
www.depo.com

1    modified it at one point.  It started out at 17 or

2    something like that.

3        Q.   Who is your primary contact; Mr. Wolcott, is

4    that the primary contact?

5        A.   That's correct.

6        Q.   And how many employees does he have; do you

7    know?

8        A.   I don't know.

9        Q.   Was there an R.F.P. for that or how was he

10   hired?

11       A.   We did send out a request for proposals after,

12   to several companies.  And then we interviewed them and

13   then made a decision.

14       Q.   Is that a bidder type of proposal or is there

15   discretion in terms of that type of hire?

16       A.   It's not low bid, but they were the lowest.

17       Q.   And in terms of what the text that's on the

18   website related to localism, who was the primary author

19   of that?

20       A.   Me.

21       Q.   And before you wrote it, who did you consult

22   with?

23       A.   Well, I got input from staff, including

24   Mr. Wolcott, and typically, share information with the

25   City Council as appropriate.  I don't know if I did on

64

1   that one or not, but depending.

2        Q.   Do you remember what staff you got input on, on

3   that particular?

4        A.   I don't, sorry.

5        Q.   But that should be in your E-Mails in terms of

6   people you typically communicate with staff by E-Mail or

7   text?

8        A.   Not text.

9        Q.   E-Mail?

10       A.   E-Mail.  And sometimes we send it out to

11   everybody and everyone looks at it and they give us your

12   thoughts.  And other times it's let's sit down and talk

13   about it.

14       Q.   In terms of your E-Mail habits, do you

15   typically copy the City Clerk?

16       A.   No.

17       Q.   How do things get put into a file or do they in

18   terms of your E-Mails?

19       A.   They're saved through the system and others

20   lawsuit related.  I have to make sure they're put aside.

21   And then if it's correspondence with residents, I also

22   make a point of putting those aside so they don't get

23   lost.

24       Q.   Do you have an in-box or folders where you put

25   things?

65

```
 1          A.   It's not an in-box, but on the hard drive.
 2          Q.   So, there are separate folders that you've
 3    created for different topics?
 4          A.   Not by topics, but just moved into a folder.
 5          Q.   What type of organization do you use for your
 6    folders?
 7          A.   Do you mean what's the title of the folder?
 8          Q.   Yes.
 9          A.   I have one for, two folders that I save the
10    E-Mails in.  One is council correspondence and the other
11    one is staff correspondence.
12          Q.   And in terms of, do those automatically migrate
13    or do you drag them into it?
14          A.   I drag them into it.
15          Q.   And do you do that weekly, monthly, daily, when
16    you have time?
17          A.   As I send the E-Mail.
18          Q.   So, if you send it, you have a habit that you
19    send it and drag it afterwards and put it in the folder
20    so that it's saved?
21          A.   Right.
22          Q.   Have all of those been retained?
23          A.   Yes.
24          Q.   And before you wrote the E-Mail on localism,
25    did you take a historical look at any police reports
```

66

1   related to surfing incidents?

2       A.   No.   I did not look at specific police reports,

3   no.

4       Q.   Did you look at any data in terms of how many

5   incidents, beach-related incidents there may have been

6   prior to writing that report?

7       A.   I'm aware of it.   Did I look at specific

8   documents, it depends.   We have a variety of different

9   files that I make myself familiar with.

10      Q.   And what files did you make yourself familiar

11  with?

12      A.   Whatever is in the Police Department and with

13  the City Clerk.

14      Q.   And about how much time did you spend preparing

15  that?

16      A.   What is on the web page, I don't know offhand,

17  sorry.

18      Q.   More than a few hours?

19      A.   Yeah, it's hard to say.   It goes through, you

20  look at it and you go back and look at it and look again

21  and you tweak and you modify.   Sorry.   I didn't keep

22  track of how long it was.

23      Q.   Do you think it's fewer than ten hours?

24           I'm trying to get how serious that you took in

25  posting this on the web page and how long that you spent

67

Exhibit F, page 255

Atkinson-Baker Court Reporters
www.depo.com

1    on it.

2            MR. RICHARDS:  What's the question?

3    BY MR. FRANKLIN:

4        Q.  How long did you spend preparing the text of

5    localism on your web page?

6            MR. DIEFFENBACH:  Calls for speculation.

7            THE WITNESS:  I can't tell you.  I don't know

8    how long I spent.

9    BY MR. FRANKLIN:

10       Q.  And so that means, I'm not asking for specifics

11   in terms of I'm asking for your best estimate.  And I

12   didn't go through this.  I'm entitled to your best

13   estimate.

14           I'm not asking you to guess.  So, you think it

15   might have been, did you spend two days; was it a whole

16   weekend; was it a few hours?

17           MR. RICHARDS:  So, what's the question?

18   BY MR. FRANKLIN:

19       Q.  What is your best estimate in terms of how much

20   time that you spent preparing the text that is posted on

21   the City of Palos Verdes Estates website related to

22   localism?

23       A.  I'm sorry.  I'm not trying to be obstinate, but

24   I don't know really how to -- I don't remember and I

25   don't recall how long it took me.

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 256

1    I'll tell you that we took it very seriously

2  and it's important to us to make sure that everybody has

3  a clear understanding of our concern about the

4  situation.  And we wanted to make sure that it was

5  appropriately drafted.

6    Q.  Did you get the first draft from Mr. Wolcott?

7    A.  I don't remember.

8    Q.  Is it possible that you got the first draft

9  from Mr. Wolcott?

10    MR. DIEFFENBACH:  Speculation.

11    THE WITNESS:  No, well, it's possible, but not

12  for sure.

13  BY MR. FRANKLIN:

14    Q.  Okay.

15    A.  Because there are oftentimes that I would write

16  something and then just get feedback from people.

17    Q.  So, is it fair to say that you did not consult

18  any historians relating to the issue of localism prior

19  to writing that piece that is posted on the Palos Verdes

20  Estates web page?

21    A.  Remind me when it went up, please.

22    Q.  One second and I can do that.  I believe that

23  it went up in 2015.  So, does that help you, I mean, in

24  terms of --

25    A.  We spent a significant amount of time trying to

69

1    understand what the situation was and collected and had

2    meetings and collected information, collected verbal

3    information from people to have an understanding of what

4    the concerns are.

5          And I don't, and part of that may have been

6    before, during or after the website was updated.  And I

7    just don't remember the dates.

8          Q.   You said that you had meetings trying to

9    understand the issue, who did you have meetings with?

10         A.   First, it was with the Surf Rider Foundation.

11         Q.   Okay, keep going.  That was first?

12         A.   Yes.

13         Q.   What was second?

14         A.   The Heal The Bay, actually, it may have been

15   the Coastal Commission or one or the other.

16         Q.   Okay.  Anybody else?

17         A.   The Lunada Bay Homeowner's Association.

18         Q.   Anybody else?

19         A.   I can't think of anything offhand.

20         Q.   And in terms of when these might be, do you

21   keep an Outlook calendar?

22         A.   I do.

23         Q.   And do you, would you calendar such meetings on

24   your Outlook calendar?

25         A.   Yeah.

70

1      Q.   And so if we, if there was a production of your

2   Outlook calendar for the last few years, we would be

3   able to find that you attended or at least it was

4   scheduled?

5      A.   We can find the things if that's what you're

6   asking for.

7      Q.   Okay.   Do you calendar your own meetings or

8   does the City Clerk calendar your meetings?

9      A.   A number of people including me will calendar

10   meetings.

11      Q.   Who most frequently calendars your meetings,

12   yourself?

13      A.   Yes.

14      Q.   And prior to trying to understand the issue

15   with Surf Rider, the Coastal Commission, Heal The Bay,

16   and the Lunada Bay Homeowner's Association, have you

17   done any other independent investigation in terms of the

18   issue of localism?

19      A.   I have walked down there.

20      Q.   When did you walk down there after this in

21   terms of localism being an issue, when did you walk down

22   there?

23      A.   I don't have the dates.

24      Q.   Was it this year of 2016?

25      A.   I've been down there in 2016, yes.

1      Q.   Would those be on your calendar, too, in terms

2  of walking down there?

3      A.   I don't know that they would be.

4      Q.   In terms of trying to understand the issue, did

5  you go down and talk to any surfers down there or beach

6  goers?

7      A.   Yeah, I have.

8      Q.   Who did you talk to?

9      A.   I don't remember their names.

10      Q.   Do you remember -- you don't remember any of

11  their names?

12      A.   No.

13      Q.   Did you take any notes of who you talked to?

14      A.   No.

15      Q.   And what was the discussion that you had with

16  them?

17      A.   Just learning about or hearing about their

18  perception of what's going on.

19      Q.   And what was their perception?

20      A.   Their perceptions were that the space down at

21  the coastline is available for everybody.

22      Q.   Anything else?

23      A.   No.

24      Q.   Did you reach out to anybody; what did Surf

25  Rider Foundation tell you about the subject of localism?

72

Atkinson-Baker Court Reporters
www.depo.com

```
1         A.   Actually, not much.
2         Q.   Why do you say that?
3         A.   Well, I called them when there was an interest
4    gathering on the particular issue of surfing in the
5    area, we reached out or I reached out to them to
6    understand their perspective on it and how to work
7    together to try to address it.
8         Q.   And what did they tell you?
9         A.   Not much.
10        Q.   Did you ask them if they would be willing to
11   send their members down there as undercover?
12        A.   I asked them, we feel that the, that it is open
13   to the public.  Everybody does have access to it.  And
14   we wanted to validate that and asked them to go down and
15   experience it for themselves, to draw their own
16   conclusion.
17        Q.   And what did they tell you?
18        A.   No.
19        Q.   Didn't they tell you that they didn't want to
20   put their members in harm's way?
21        A.   They were concerned about their members.  I
22   don't remember the exact words.
23        Q.   But something like that?
24        A.   Yeah.
25        Q.   And did that resonate with you?
```

73

1       A.   No.

2            Q.   It didn't cause you any concern that the Surf

3       Rider Foundation was afraid to send people down there?

4            A.   No, because we feel that we've been doing

5       everything that we need to do to make sure that the area

6       is safe for everybody.

7            And there was not, there have not been, there

8       have been isolated incidents, not a preponderance of

9       incidents so.

10           Q.   When you say we feel that we have been doing

11      everything, who is we?

12           A.   I would say the City.  I represent the City.

13           Q.   Is there anyone specifically when you say we

14      feel?

15           A.   I represent the City.

16           Q.   And the Coastal Commission how many times, what

17      did the Coastal Commission, what do you recall of that

18      meeting and their interests and the issue of localism?

19           A.   They were interested in the patio structure.

20           Q.   Weren't they interested in the issue of

21      localism also?

22           A.   Their main focus is the patio structure.

23           Q.   I understand that, but I also understand that

24      they asked the City to address the issue of localism,

25      isn't it fair to say that they asked you to the evaluate

74

Atkinson-Baker Court Reporters
www.depo.com

1    Q.   Was it just one in-person meeting or was there

2    more than one in-person meeting?

3    A.   I know that there was one.  I don't recall if

4    there was another one or not.

5    Q.   Does that mean that there was not another one

6    or you don't remember either way?

7    A.   I don't remember another one.  I know that we

8    communicated after that.

9    Q.   And how did you communicate with Surf Rider

10   after the in-person meeting?

11   A.   We followed up, my recollection is that

12   inviting them again to get back to us about, you know,

13   we wanted them to come down and enjoy the community and

14   use the area.  And then they sent back a letter that you

15   referenced.

16   Q.   So, was the follow-up an E-Mail or a phone

17   message?

18   A.   I honestly don't recall.

19   Q.   Who would have been the person that followed up

20   with Mr. Cadwallader; would it have been you or someone

21   who works for you?

22   A.   It may have been both, but I just don't

23   remember.  Someone who works for me and me.

24   Q.   Who would have been the person that followed

25   up, other than you?

85

```
 1    of context, and I'm repeating myself also maybe for
 2    them, but we had encouraged them to go down there
 3    because we felt that it was safe.
 4    BY MR. FRANKLIN:
 5        Q.   And the part that I'm asking you that you
 6    haven't answered yet is that you don't remember them
 7    being concerned about safety?
 8            MR. DIEFFENBACH:  Objection, asked and
 9    answered.  He answered the question.
10            THE WITNESS:  I need to see the letter.
11    BY MR. FRANKLIN:
12        Q.   So, you're unable to answer that question
13    without reviewing the letter?
14        A.   I'd like to look at the letter.
15        Q.   I know that you would like to, but you're
16    unable to answer the question without looking at the
17    letter?
18        A.   Yes.
19        Q.   Okay.  How about the -- and so what I have on
20    Surf Rider was their, did you initiate the call or was
21    it a call or an E-Mail to setup that meeting?
22        A.   I recall that I called them.
23        Q.   And so it was the South Bay chapter of Surf
24    Rider?
25        A.   That's correct.
```

91

```
 1   the follow-up, it's clear that there was not another

 2   in-person meeting with Surf Rider South Bay?

 3        A.   I don't recall one.

 4        Q.   And you cannot recall any specific phone calls

 5   with them afterwards?

 6        A.   No, no specific phone calls with them.

 7        Q.   And then in terms of, when did you first meet

 8   with -- strike that.

 9             When did the City first meet with the Coastal

10   Commission about the un-permitted structure at Lunada

11   Bay?

12        A.   I don't remember the date, but it was after

13   that meeting with Surf Rider.

14        Q.   Was it after -- when you met with the Coastal

15   Commission, had you already received correspondence from

16   them?

17        A.   I think so, but I'm not sure.

18        Q.   And when was the -- was it more than one

19   in-person meeting with the Coastal Commission regarding

20   Lunada Bay?

21        A.   Yes, there have been.

22        Q.   And how many meetings have there been?

23        A.   I believe two.

24        Q.   And who attended those meetings?

25        A.   The first one included the Police Chief, the
```

93

1  Planning & Building Director.

2       Q.   Is that the City Manager?

3       A.   Yes, that person, and me.

4       Q.   And how about on the Coastal Commission side,

5  who attended?

6       A.   I don't know all their names.

7       Q.   Was there more than one person?

8       A.   They had four or five people and someone on the

9  telephone, too.

10      Q.   Where was that first meeting with the Coastal

11  Commission?

12      A.   Their office.

13      Q.   Is that in Long Beach; where is their office

14  located?

15      A.   It's in Long Beach.

16      Q.   Do you know about how long that first meeting

17  was with the Coastal Commission?

18      A.   Probably about an hour or so.

19      Q.   Who setup that first meeting with the Coastal

20  Commission?

21      A.   Either I did or the Planning & Building

22  Director, slash, Deputy City Manager.  We asked for it

23  or I asked for it.

24      Q.   What was the purpose of you asking for that

25  meeting?

94

Atkinson-Baker Court Reporters
www.depo.com

1      A.   Similar to the other meetings that we had.  We

2   wanted to do fact-finding and understand their

3   perspective and concerns and issues and build a

4   relationship so we could mutually work together to

5   address the situation.

6      Q.   Did you have an agenda for that meeting, paper

7   agenda, a paper agenda, purpose driven?

8      A.   I don't recall one.

9      Q.   Did you take notes at that meeting?

10      A.   I did not.

11      Q.   Is it your habit not to take notes of meetings?

12           I'm just trying to understand what your

13   personal habits are in terms of notes; how do you

14   memorialize meetings that you've had?

15      A.   I do my best to remember.

16      Q.   Do you dictate?

17      A.   No.

18      Q.   Okay.  And so with a meeting like that, that's

19   not the type of meeting where you would make notes to

20   yourself?

21      A.   Correct.  And I was with other people and

22   collectively, you know, we have a recollection.

23      Q.   All right.  And did anybody on the City side

24   take notes?

25      A.   I don't know.

95

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 267

1      Q.   Have you asked?

2      A.   No.

3      Q.   Was there an E-Mail exchange following that

4   meeting, first meeting with the Coastal Commission?

5      A.   I don't know.

6      Q.   Did you have any telephone calls with the

7   Coastal Commission subsequent to that first in-person

8   meeting in Long Beach?

9      A.   No.

10     Q.   Did your staff have any telephone calls to your

11   knowledge with the Coastal Commission following that

12   first in-person meeting in Long Beach?

13     A.   I believe so.

14     Q.   Who?

15     A.   Ms. Repp-Loadsman.

16     Q.   Did she report to you on her interaction with

17   the Coastal Commission?

18     A.   Generally.

19     Q.   Was it in-person or by letter or memo or

20   E-Mail; how did she report to you?

21     A.   In-person.

22     Q.   What did she tell you?

23     A.   That she had talked with them to understand,

24   also, their concerns and to convey our interest in

25   working together to address the situation that we were

96

1  dealing with.

2      Q.   Okay.  And at that time what did you understand

3  the situation to be with respect to the Coastal

4  Commission?

5      A.   That we have an un-permitted structure.  And

6  either we have to obtain permits to maintain it or

7  remove it.

8      Q.  Was there anything else on the Coastal

9  Commission's mind that you know of that related to you?

10     A.  From that meeting, no, I think that was

11  primarily it.

12     Q.  Was there a second in-person meeting with the

13  Coastal Commission?

14     A.  Yes.

15     Q.  And when was the second in-person meeting?

16     A.  I don't know the date, sorry.

17     Q.  Do you remember the general time frame; was it

18  the summer of 2016?

19     A.  I don't know.

20     Q.  Where was that meeting, also in Long Beach?

21     A.  No.  That was actually at the site, at the

22  Lunada Bay site.

23     Q.  Who attended the second meeting at the Lunada

24  Bay site?

25     A.  From the City it was me, Ms. Repp-Loadsman, and

97

```
 1   the Police Chief.
 2        Q.   Did the Chief of Police attend that first
 3   meeting?
 4        A.   Yes.
 5        Q.   Why was he there?
 6        A.   Because he and his department are responsible
 7   for public safety.  And we felt that it would be
 8   valuable to have him as part of this conversation.
 9        Q.   Public safety was a topic at these meetings?
10        A.   No, but it was a matter of concern to us.  And
11   we wanted to make sure that everybody knew that we were
12   addressing it.
13        Q.   What was the specific public safety concern
14   that the City had at that point?
15        A.   So, what was the City's concern with public
16   safety?
17        Q.   Yes.
18        A.   The City wanted to reinforce that we're doing
19   everything that we could to maintain public access in a
20   safe environment for anyone who is visiting the
21   coastline.
22        Q.   And how was that conveyed to the Coastal
23   Commission?
24        A.   Just like that.
25        Q.   And was there a detailed plan or what were the
```

98

```
 1    specifics besides that statement?

 2         A.   You know, I don't recall from that particular

 3    meeting.

 4         Q.   Do you recall any specific plans in terms of

 5    the City's representation to the Coastal Commission

 6    related to safety and access?

 7         A.   At that meeting?

 8         Q.   At anytime.

 9         A.   Say that again, please.

10         Q.   Do you recall any specific plans with respect

11    to safety and access being communicated to the Coastal

12    Commission from the City of Palos Verdes Estates?

13         A.   I don't remember.  I don't know because we have

14    shared with many people our efforts to, and the police

15    have been active, the Police Chief has been active in

16    communicating and having his staff put out fliers and

17    communicate.  So, I just don't remember.

18         Q.   Was there follow-up in terms of the site

19    location, Lunada Bay site meeting, how many people from

20    the Coastal Commission attended?

21         A.   They may have had like four people.

22         Q.   Do you remember any of their names?

23         A.   Jordan Sanchez is one of them.  And I don't

24    remember the other ones.

25         Q.   Mr. Willis, does that sound familiar?
```

1    Coastal Commission, you made it to the fort and then

2    what happened?

3         A.   They had never seen it before.  They had never

4    been down there.  They had only looked from on top.  So,

5    they looked at it and inspected it and evaluated its

6    condition and talked about its removal and that was it.

7         Q.   Did the Coastal Commission say that it had to

8    be removed?

9         A.   They have consistently told us that the City

10   Council has the option of permitting it or removing it.

11        Q.   And if it was permitted, did they want other

12   things to happen as part of the permitting process?

13        A.   They have suggested in writing that if it was

14   permitted there may be other amenities that they feel

15   would enhance the area.

16        Q.   And so do you recall any of the amenities that

17   the Coastal Commission thought that might enhance the

18   area?

19        A.   They talked about benches and binoculars.

20        Q.   Signs?

21        A.   Signs, yeah.

22        Q.   Does the City consider that a beach to be used

23   by the public or that is an accessible beach or does the

24   City have some other in terms of storm runoff or that

25   type of thing, is that a usable beach for residents and

```
 1   that going to start?
 2       A.   Monday.
 3       Q.   And do you know how long that it's supposed to
 4   take?
 5       A.   I would defer to the City Engineer to give you
 6   the specifics on that.
 7       Q.   Have you heard anything -- I've heard they're
 8   bringing a dumpster down there; is that how they're
 9   getting out that material?
10       A.   Again, the City Engineer is the most
11   knowledgeable on the process.  And there are options
12   available to the contractor to determine.
13       Q.   And then in terms of after that second on-site
14   meeting, do you recall any other communications with the
15   Coastal Commission?
16       A.   There has been an exchange of letters.
17       Q.   Other than the exchange of letters, any
18   additional calls or in-person meetings?
19       A.   No, not that I'm aware of.
20       Q.   Do you have any familiarity if the Coastal
21   Commission is doing a survey of the coastal beach goers
22   related to the Lunada Bay?
23       A.   I don't know.
24       Q.   In terms of the next meeting with Heal The Bay,
25   who negotiated the contact with Heal The Bay?
```

112

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.   I did.
 2        Q.   And about when did you first call Heal The Bay
 3    relating to the specifics of Lunada?
 4        A.   I really don't know when I initiated that.
 5        Q.   Would there be E-Mail communications relating
 6    to that?
 7        A.   Not that I'm aware of.
 8        Q.   And was that an in-person meeting or a
 9    telephone call?
10        A.   In-person.
11        Q.   Where was the meeting?
12        A.   Their office.
13        Q.   What City?
14        A.   Santa Monica.
15        Q.   Did you meet with Matt King?
16        A.   Yes, Matt King and a woman, and I don't
17    remember her name.
18        Q.   And how about on the City side, was there
19    someone beside yourself?
20        A.   The same two other people, the Police Chief and
21    the Planning Director, slash, Deputy City Manager.
22        Q.   And why was the Police Chief in attendance?
23        A.   We were all on a listening tour to understand
24    perspectives and information and history and perceptions
25    and facts that people had.
```

113

1           And it was important that all of us heard it
2      together, just like Surf Rider.
3           Q.   What did you learn from the Heal The Bay
4      meeting?
5           A.   They made suggestions about communicating with
6      the public and more from a public relation perspective
7      how we might illustrate to people through communications
8      that, you know, the space is accessible to everybody and
9      safe for everybody.
10          And that ended up being the primary point of
11     the discussion from their perspective.
12          Q.   Is that because Mr. King has a P.R. background
13     or what?
14          A.   No, because they're mostly a scientific
15     research oriented interest group for protecting the
16     quality of the water and beaches so they're again safe
17     for public use and in that way accessible for public
18     use.  So, that's where they're coming from.
19          Q.   And with the Heal The Bay meeting, how did it
20     end up with beach clean up day coming out of that, what
21     was the -- how did beach clean up equate to public
22     access?
23          A.   The City has had a long history of working with
24     Heal The Bay and doing a beach clean up.  So, I'm not
25     sure that there was a correlation between that meeting

114

Atkinson-Baker Court Reporters
www.depo.com

1        Q.   Who with the City met with the Homeowner's

2   Association?

3        A.   I recall that it was Ms. Repp-Loadsman and me.

4        Q.   Who from Lunada Bay Homeowner's Association

5   attended the meeting?

6        A.   There were probably half a dozen.  And I don't

7   remember who they all were.

8        Q.   Do you remember any of them of the half a dozen

9   people that you meet with?

10        A.   The President is a gentleman by the name of

11   Peter Bena, P-e-t-e-r, B-e-n-a.

12        Q.   And whom else do you remember meeting with?

13        A.   I'm not sure.

14        Q.   And what did the, as part of your listening

15   tour, what did the Lunada Bay Homeowner's Association

16   tell you; what did you gather from their sentiments?

17        A.   They were equally concerned about the behavior

18   in the area and wanted it changed.  They felt that the

19   area is open to the public and wanted it that way.  And

20   they conveyed that to us.

21             It's kind of the essence of what we were

22   talking about.

23        Q.   And what specific behavior did you understand

24   they were concerned with?

25        A.   What they were reading in the newspaper.

124

1     A.   Yes.

2     Q.   Did you ever hear that on Martin Luther King

3  Day paddle out that regular surfers and people who live

4  in Palos Verdes Estates who protested the protesters

5  paddled out in black face?

6     A.   No.

7     Q.   And if that had happened, would you expect that

8  to be written up in a police report?

9          MR. DIEFFENBACH:  Calls for speculation, no

10 foundation.

11         THE WITNESS:  I would be very concerned with

12 something like that, yes.

13 BY MR. FRANKLIN:

14    Q.   Are you aware that a person that paddled out in

15 black face on Martin Luther King Day and told Mr. Taloa

16 that you don't pay enough taxes to be here?

17    A.   No.  I'm not aware.

18    Q.   And is that as the City Manager, that would be

19 the type of thing that you would want investigated; is

20 that fair?

21    A.   I would defer to the Police Department for what

22 violation of law took place and they would handle it,

23 yes.

24    Q.   Would it cause you concern?

25    A.   You know, it concerns me when there's

Exhibit F, page 277

Atkinson-Baker Court Reporters
www.depo.com

```
 1    intimation taking place.  We don't want that as a
 2    community.  And we take that very seriously and would
 3    respond to it.
 4        Q.  Showing up in black face on Martin Luther King
 5    Day, would you take that as intimidation?
 6        A.  I would refer to the Police Department to
 7    handle it as they would be responsible for doing.
 8        Q.  Have you ever heard that some of the regular
 9    surfers at Lunada Bay work for the Long Beach Police
10    Department?
11        A.  No.
12        Q.  Have you ever visited with the liquor store
13    owner related to an event that happened at his store, I
14    think, in 2015?
15            MR. DIEFFENBACH:  Vague, ambiguous,
16    unintelligible.
17            THE WITNESS:  Where is the store that you're
18    talking about?
19    BY MR. FRANKLIN:
20        Q.  There's a liquor store in Lunada Bay.  And it's
21    owned by an immigrant who is suing some of the same
22    individuals in this lawsuit; have you heard about that
23    lawsuit?
24        A.  From the newspaper.
25        Q.  Have you ever visited with the liquor store
```

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 278

1    Malibu.

2         Q.   Is it fair to say that you didn't have surfing

3    localism related conversations with either of those

4    people?

5         A.   It's a double negative.

6         Q.   Fair enough.

7              Did you seek -- did you talk to either of those

8    two City Managers about localism?

9         A.   I talked to the City Manager of Manhattan, I'm

10   sorry, Malibu about the patio structure and how they

11   dealt with anything similar in terms of public access.

12        Q.   Did they have something similar?

13        A.   No.

14        Q.   They have a different public access issue

15   there?

16        A.   Yes.

17        Q.   It has to do with gates?

18        A.   Yes.

19        Q.   Is there any employee designated to handle

20   complaints from visitors?

21        A.   Such as what?

22        Q.   Any type of complaint if it's a, if it relates

23   to police it goes to the police department and do

24   complaints go to anywhere else if someone calls in; how

25   does that work?

260

Atkinson-Baker Court Reporters
www.depo.com

1      A.   If someone is going to file a complaint with

2  the City, they can go on the website and there's a form

3  that they can fill in.  And it designates who they send

4  it to.

5           We also have a directory on the website that

6  allows people to send individual E-Mails to whoever they

7  feel should get their complaint.

8           Or sometimes people will just call the City and

9  the receptionist will determine where best to direct the

10  complaint.

11     Q.   Do you have an understanding of what a

12  citizen's arrest is?

13     A.   A little bit.

14     Q.   Do you have any understanding that there has

15  been an allegation in this lawsuit that Palos Verdes

16  Estates police officers have said, asking people do they

17  want to make a citizen's arrest rather than take a

18  report or do something else?

19           And the allegation is that they have been

20  discouraging outsiders from making reports or making a

21  citizen's arrest after that was suggested.

22           Words to the effect of, well, if you make a

23  citizen's arrest, these guys here are all wealthy.  And

24  you're going to take on civil liability.  And maybe you

25  don't want to do that; do you want to make a citizen's

261

Atkinson-Baker Court Reporters
www.depo.com

```
 1          MR. DIEFFENBACH:  Copy and rough draft, please.

 2          THE REPORTER:  Does any other Counsel want a

 3   rough draft?

 4          MS. VU:  Copy.

 5          MR. FIELDS:  Copy.

 6

 7

 8          (Whereupon, the deposition of

 9          ANTON DAHLERBRUCH commenced at

10          9:45 a.m. and concluded at

11          5:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

266

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 281

Atkinson-Baker Court Reporters
www.depo.com

```
 1 │ STATE OF CALIFORNIA   )
   │                       )
 2 │ COUNTY OF LOS ANGELES )
   │
 3 │
   │
 4 │
   │
 5 │
   │
 6 │         I, the undersigned, declare under penalty of
   │
 7 │ perjury that I have read the foregoing transcript, and I
   │
 8 │ have made any corrections, additions, or deletions that
   │
 9 │ I was desirous of making; that the foregoing is a true
   │
10 │ and correct transcript of my testimony contained
   │
11 │ therein.
   │
12 │
   │
13 │         EXECUTED this _____ day of _____,
   │
14 │ 20_____, at _____, _____.
   │
15 │                         (City)              (State)
   │
16 │
   │
17 │
   │
18 │
   │
19 │ _____
   │
20 │ ANTON DAHLERBRUCH
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

267

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 282

Atkinson-Baker Court Reporters
www.depo.com

```
1                      REPORTER'S CERTIFICATE

2

3            I, ANGELIQUE MELODY FERRIO, C.S.R. NO. 6979, a

4    Certified Shorthand Reporter, certify:

5            That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time the witness was put under oath by me;

8            That the testimony of the witness and all

9    objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12           That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14           I further certify that I am not a relative or

15   employee of any attorney or of any of the parties, nor

16   financially interested in the action.

17           I declare under penalty of perjury under the

18   law of the State of California that the foregoing is

19   true and correct.

20           Dated this 18th day of November, 2016.

21

22

23                       _____

24                       Angelique Melody Ferrio
                          CSR No. 6979
25
```

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 283

Atkinson-Baker Court Reporters
www.depo.com

1          REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4          I, ANGELIQUE MELODY FERRIO, CSR No. 6979, a

5   Certified Shorthand Reporter in the State of California,

6   certify that the foregoing pages are a true and correct

7   copy of the original deposition of ANTON DAHLERBRUCH,

8   taken on Friday, November 18, 2016.

9          I declare under penalty of perjury under the

10  laws of the State of California that the foregoing is

11  true and correct.

12          Dated this 18th day of November, 2016.

13

14

15

16

17                    _____

18                    Angelique Melody Ferrio
                      CSR No. 6979
19

20

21

22

23

24

25

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 284