*Cory Spencer, etc., et al. v. Lunada Bay Boys, etc., et al.*

Case No. 2:16-cv-02129-SJO-RAO

**Exhibit 3**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

Cory Spencer, et al.,

        Plaintiffs,

      vs.              Case No.
                      2:16-CV-02129-SJO
Lunada Bay Boys, et al.,    (RAOx)

        Defendants.
_____

VIDEOTAPED DEPOSITION OF CHRISTOPHER TALOA

January 5, 2017

10:03 a.m.

1055 Wilshire Boulevard, 11th Floor

Los Angeles, California

REPORTED BY:

Angela M. Schubert

CSR No. 12027, CSR

Christopher Taloa
January 05, 2017

```
 1   APPEARANCES:

 2

 3              For Plaintiffs:

 4                   LAW OFFICE OF VICTOR OTTEN
                     VICTOR OTTEN
 5                   3620 Pacific Coast Highway
                     Suite 100
 6                   Torrance, California  90505
                     310.378.8533
 7                   310.347.4225  fax
                     Vic@OttenLawPC.com
 8

 9              For Defendant Brant Blakeman:

10                   VEATCH CARLSON
                     JOHN P. WORGUL
11                   1055 Wilshire Boulevard, 11th Floor
                     Los Angeles, California  90017
12                   213.381.2861
                     213.383.6370  fax
13                   JWorgul@VeatchFirm.com

14

15              For Defendant Sang Lee:

16                   BOOTH, MITCHEL & STRANGE
                     JACKIE K. VU
17                   707 Wilshire Boulevard, Suite 3000
                     Los Angeles, California  90017
18                   213.738.0100
                     213.380.3308 fax
19                   JKVu@BoothMitchel.com

20              For Defendant Angelo Ferrara and NF:

21                   LAW OFFICE OF MARK C. FIELDS
                     MARK C. FIELDS
22                   333 South Hope Street, 35th Floor
                     Los Angeles, California  90071
23                   213.617.5225
                     213.629.4520 fax
24                   Fields@MarkFieldsLaw.com

25
```

Christopher Taloa
January 05, 2017

```
 1   APPEARANCES: (Cont.)

 2

 3               For Defendant Sang Lee:

                     LEWIS, BRISBOIS, BISGAARD & SMITH
 4                   TERA A. LUTZ
                     633 West 5th Street, Suite 4000
 5                   Los Angeles, California  90071
                     213.680.5004
 6                   213.250.7900 fax
                     Tera.Lutz@LewisBrisbois.com
 7

 8               For Defendants Alan Johnston aka Jalian
                 Johnston:
 9
                     LAW OFFICE OF J. PATRICK CAREY
10                   J. PATRICK CAREY
                     1230 Rosecrans Avenue, Suite 300
11                   Manhattan Beach, California  90266
                     310.526.2237
12                   310.526.2237 fax
                     Pat@PatCareyLaw.com
13

14               For Defendants City of Palos Verdes
                 Estates and Chief of Police Jeff Kepley:
15
                     KUTAK ROCK, LLP
16                   JACOB SONG
                     5 Park Plaza, Suite 1500
17                   Irvine, California  92614
                     949.417.0999
18                   949.417.0979 fax
                     Jacob.Song@KutakRock.com
19

20               For Defendant Michael Ray Papayans:

21                   HAVEN LAW
                     PETER T. HAVEN
22                   1230 Rosecrans Avenue, Suite 300
                     Manhattan Beach, California  90266
23                   213.842.4617
                     213.477.2137  fax
24                   Peter@HavenLaw.com

25
```

Christopher Taloa
January 05, 2017

1      A.   Yeah.   It looks like me.

2      Q.   Okay.

3      A.   When did you get this?   It looks recent.   I

4  assume it was off the internet.

5      Q.   And on that page, this was the Facebook page

6  we were talking about earlier today; right?

7      A.   Yeah.

8      Q.   And we can see right at the top there's a blue

9  area that says Christopher Taloa added four new photos

10  to your Instagram.   Do you see what I'm talking about?

11      A.   Yeah.

12      Q.   And so you understand that where we have these

13  blue words, Christopher Taloa, that's attributing to

14  something that you did on your Facebook page; right?

15      A.   Yeah.   The chicken hawk.

16      Q.   Just the fact that we have that blue text with

17  your icon next to it --

18      A.   That's my name.

19      Q.   -- you know that's something that you did;

20  right?

21      A.   That's my name.

22      Q.   I'm going to attach another exhibit as 194.

23          (Exhibit 194 marked)

24  BY MR. WORGUL:

25      Q.   Is that a true and correct copy of a photo

Christopher Taloa
January 05, 2017

```
 1    that you posted on Facebook?
 2         A.   Yeah.   That's me.
 3         Q.   And you wrote a caption next to it that says
 4    mine?
 5         A.   Yeah.   Yeah.
 6         Q.   What does that mean?
 7         A.   That was me drawing out the poison on a cliff.
 8         Q.   What do you mean when you say mine?
 9         A.   It means me trying to find out who the guys
10    are coming out on this cliff and I know they wouldn't
11    like me saying that.
12         Q.   So you wanted to provoke people from the area?
13         A.   Not provoke.   Draw the salve.   I'm a salve.
14    That's how I look at myself.
15         Q.   Mine is the word of possession?
16         A.   Yeah.   You cannot own a bay.   How are you
17    going to take that to heaven?
18         Q.   I don't know.   You posted a picture of your
19    face with the bay in the background and says mine?
20         A.   That's me.   I said that.   I'm not denying it
21    at all, but you know what the cause of that is and why
22    that is.
23         Q.   What is the cause of it?
24         A.   The cause is to bring these guys out so we can
25    see who they are.
```

Christopher Taloa
January 05, 2017

1    Q.   Okay.  And did this bring people out so you

2  could see who they were?

3    A.   It did.  It worked out in some sense.  They

4  keep showing themselves and doing things.  I can't say

5  but they keep bringing themselves out and it's been

6  working.  My whole internet, my Facebook posts, and

7  everything else like that, it's a game.

8    Q.   And your game is to try to provoke people to

9  respond to you?

10    A.   That's what you want to believe.

11    Q.   Well, what is the game?

12    A.   The game is to draw them out like a salve.  I

13  want to know who the gang members are.

14    Q.   Well, how are you drawing them out?

15    A.   When I go and say these kind of things, nobody

16  can own the bay.  I show up respectful, whatever.  I

17  see -- doesn't mean anything on this internet.  It's

18  just like dirty laundry.  I just go ahead and have fun

19  and just blab whatever and I enjoy people act and react

20  in all kinds of wild ways.  I already knew you guys

21  were going to go to my Facebook and look at all this

22  stuff but I enjoy myself with that thing and I don't

23  think I'm going to stop.  I just love watching the

24  reactions and seeing who does what and how people

25  believe in things.  It's like get being a general

Christopher Taloa
January 05, 2017

1   consensus of the mindsets going on.

2       Q.  That's another exhibit, Exhibit 195.

3          (Exhibit 195 marked)

4   BY MR. WORGUL:

5       Q.  Is that a true and correct copy of your

6   Facebook page?

7       A.  Yeah.  That's me.

8       Q.  Okay.  At the bottom, it shows a posting from

9   you.  It says "Jess Ka'ala Lundgren, they try to do

10  shit illegally on the sneak but I'm sneakier."

11      A.  Yeah.

12      Q.  You wrote that?

13      A.  Yeah.

14      Q.  What's that mean?

15      A.  That means that they try to do things to me.

16  I don't let them know what I'm doing such as your Man

17  O'Wars there and we keep throwing out misinformation to

18  find out who these people are and it's been working.

19  This has been my overall tool to get this place to open

20  up so people can go publicly to the beach without

21  issue.

22      Q.  And that's so you can -- like you said, bring

23  the bad blood out, bring the people out, so they will

24  respond to this?

25      A.  To bring the gang out.  That's my goal.

Christopher Taloa
January 05, 2017

```
 1              MR. WORGUL:  Next exhibit is 213.

 2              (Exhibit 213 marked)

 3  BY MR. WORGUL:

 4      Q.  Is that a true and correct copy of your

 5  Facebook page?

 6      A.  Yeah.  That's me.

 7      Q.  Okay.  And the statements that are written by

 8  your name are they attributable to you?

 9      A.  Yes.  It is.

10      Q.  Okay.

11              MR. OTTEN:  Can we take a quick break?  I got

12  to use the rest room again.

13              (Recess)

14  BY MR. WORGUL:

15      Q.  So what I'm going to do is attach the next

16  exhibit as Exhibit 214.

17              (Exhibit 214 marked)

18  BY MR. WORGUL:

19      Q.  Is that a true and correct copy of your

20  Facebook page?

21      A.  Yes.

22      Q.  And you called the people that because the Bay

23  Boys are sissy bitches?

24      A.  Yeah.  I think so.  I'm not sure who the Bay

25  Boys are.  Like I said, I'm a salve and draw them out.
```

Christopher Taloa
January 05, 2017

1       Q.   Are the statements that are attributable to

2  Christopher Taloa on this page made by you?

3       A.   Yeah.

4       Q.   Next exhibit is 215.

5            (Exhibit 215 marked)

6  BY MR. WORGUL:

7       Q.   Is that a true and correct copy of your

8  Facebook page?   Mr. Taloa, while you're on the record

9  if you wouldn't mind, please don't wear your hat.

10      A.   Yes.   Yes.

11      Q.   And the statements on this page are

12  attributable to you?

13      A.   Yes.

14      Q.   Okay.

15      A.   The actual posts are emailed to Joe Mendoza.

16  I think I might have copied that because I don't type

17  like that.   That is just too nice.   I think it was a

18  copy or whatever, copy, paste.

19      Q.   You would have copied it and made it

20  attributable to yourself?

21      A.   Yeah, for people to see.

22      Q.   And you posted that; right?

23      A.   Yes.

24      Q.   Next exhibit is 216.

25           (Exhibit 216 marked)

Christopher Taloa
January 05, 2017

1    there.  Yeah.

2        Q.  It's seasonal; right?

3        A.  Yeah.

4        Q.  I'm not a surfer so I don't know.

5        A.  Yeah.  I only want to go there when it's

6    massive.

7        Q.  Okay.  I am done.  Thank you very much.

8        A.  Okay.  So you don't do Jui Jitsu.

9        Q.  No.  I --

10        MR. HAVEN:  Let's go off the record for a

11   second please.  Thank you very much.

12        (Recess)

13                    EXAMINATION

14   BY MR. HAVEN:

15        Q.  Mr. Papayans -- Mr. Taloa, please forgive me.

16   I represent Michael Papayans, Michael Ray Papayans.

17        A.  Junior or senior?

18        Q.  Junior.  I appreciate your time here today and

19   it's clear we're all getting a little bit tired so

20   thank you very much.

21        A.  It's all good, Brother.

22        Q.  I will try to be as brief as possible.  But as

23   you can imagine, I do have some questions here.

24        A.  Of course.  Of course.

25        Q.  In your declaration earlier, you have a copy

Christopher Taloa
January 05, 2017

```
1   in front of you, you indicated -- let's see, you

2   indicated on page seven in paragraph 15 up at the top

3   about lines two or three, you said, "I decided to use a

4   social media campaign to end localism at Lunada Bay."

5   And I believe this -- you know, according to your

6   declaration, this was after you had an interaction with

7   Borno and you were troubled by what he experienced if I

8   understand correctly.

9       A.  Okay.

10      Q.  Approximately when was it that you made this

11  decision to start this social media campaign?  Just

12  estimated?

13      A.  After I heard his voice on the recording, I

14  mean on the phone to me.

15      Q.  Okay.  And I'm not trying to pin you down with

16  pinpoint accuracy.

17      A.  Yeah.

18      Q.  I'm just trying to put semblance of these

19  events in chronological order.  This appears to have

20  been before the January Martin Luther King incident?

21      A.  The original yes.

22      Q.  And you know, the only date that precedes it

23  in your declaration appears to be a reference to

24  December 2012 or December 2013 if I understand

25  correctly.  So I'm just trying to get a sense of what
```

Christopher Taloa
January 05, 2017

1    may have been a one to two year period.

2        A.  No.  That wasn't like one to two years before

3    that.

4        Q.  So this decision that you made to embark on

5    this social media campaign do you recall how far in

6    advance of Martin Luther King Day it was?

7        A.  To do this?

8        Q.  To start this social media campaign?

9        A.  I probably did like --

10       Q.  And I'm just looking for estimates.

11       A.  Yeah.  I want to say it was pretty immediate.

12   Once I got that call with that stress --

13       Q.  When that call -- do you recall when that call

14   was approximately?

15       A.  I'm not sure.

16       Q.  Do you recall if it was in 2012 or 2013?

17       A.  It was before January of that time for sure.

18   You know, if you're saying was it like November that I

19   was trying to get up there to go surf and Martin Luther

20   King Junior holiday is in January I think.  Right.  So

21   it's probably like three, four weeks prior maybe.  I'm

22   not sure but something like that.

23       Q.  Okay.

24       A.  Yeah.

25       Q.  And the social media campaign that you

Christopher Taloa
January 05, 2017

1  embarked on, if I understand correctly, involved among

2  other things these attempts on social media to be I

3  think you described it as like a salve?

4      A.   Like a salve.

5      Q.   To draw people out if you will?

6      A.   Well, anybody who in my mind was like if I can

7  get these Bay Boys to come forward, we'll know who they

8  are.  And you know, if you're not a Bay Boy, you

9  shouldn't be insulted by the thing.  If you're a Bay

10  Boy, you're going to come out in force.

11      Q.   And why would these social media posts in your

12  mind cause the Bay Boys to come out in force as you

13  say?

14      A.   Because I know a lot of people and I thought,

15  hey, you know, we'll just actually go down there and

16  see what it's like.  If we're really going to get

17  harassed, I thought it was a joke.  I didn't think it

18  was really going to happen in this level.  You know,

19  this is a joke, dude.  You guys can't be serious that

20  is of this nature of how radical and powerful.

21  Although I have to tell you, I was scared because I

22  never did anything of the sort.  I never did a protest.

23  This was something totally new for me.

24      Q.   And what were the things that were causing you

25  to be scared?

Christopher Taloa
January 05, 2017

 1  that you described, this started after you embarked on

 2  your social media campaign?

 3      A.  I kind of got a little bit of it prior from

 4  Borno.  He said there's noway you're going out there

 5  with your boogie board.  You can't go out there with

 6  your boogie board even Gerald told me there's noway

 7  you're going out there with your boogie board.  They

 8  don't like boogie boards.  You're not going out like

 9  that.  You can't go out.  You have to get a surfboard

10  or else you're not surfing out there.

11      Q.  And Borno is the one if I understand correctly

12  who introduced you to and brought you to the senior

13  Papayans' house; is that correct?

14      A.  Yes, sir.

15      Q.  And if I understand correctly, you didn't feel

16  threatened when you were at the senior Papayans' home?

17      A.  I didn't feel -- I didn't feel threatened.

18  But at the same time, I didn't feel that we were on the

19  same level.

20      Q.  Okay.

21      A.  I felt as if there was already a foot on top

22  of my head.  I allowed that because in kind of a --

23  like a culture respect, he's older than me.  We call

24  those people like your elders.  It's a form of respect

25  but I didn't feel very respected in any sense but

Christopher Taloa
January 05, 2017

1   that's my personal, keep it to myself on that one, you

2   know.

3        Q.   I understand and I thank you very much for

4   that.  We talked a little bit about this earlier.  But

5   do you -- as we sit here today, has it refreshed your

6   recollection as to approximately how long you were at

7   the Papayans' home?

8        A.   It wasn't very long.  It wasn't very long.

9        Q.   I apologize but can you specify?  10 minutes?

10  15 minutes?  20 minutes?  30 minutes?  Any estimate at

11  all as you sit here today?

12       A.   It's got to be under an hour.  Probably under

13  an hour.

14       Q.   Okay.

15       A.   I didn't feel too comfortable after he asked

16  me where I lived and I felt -- I didn't feel good to be

17  there.  I was just happy that he gave me the okay.

18       Q.   What did he do to say that you had the okay?

19       A.   He didn't say it.

20       Q.   And how did you feel that he gave you the

21  okay?

22       A.   When Borno started showing me where to park

23  and everything else.

24       Q.   Who else was at that meeting at the Papayans'

25  home that you recall?

Christopher Taloa
January 05, 2017

1      A.   Borno senior, Papayans senior, his wife was in

2   and out of the living room, kitchen area.  I think she

3   wasn't -- I don't think she heard very much and I think

4   she might have had a kid or she was going to have a kid

5   or something like that.  Yeah.

6      Q.   And how did you know that was his wife?

7      A.   I was told so.

8      Q.   By who?

9      A.   I think he told me that or maybe Borno told me

10   that, something of the sort.

11      Q.   Did you have anything to eat or drink while

12   you were there?

13      A.   I think I was so nervous I don't remember that

14   part, you know.  Like I was just nervous, man.

15      Q.   Okay.

16      A.   I never had to ask permission to touch the

17   water.  That was a weird thing to do.

18      Q.   And you know, I understand that that was your

19   perception of what you were going there to do but there

20   wasn't, if I understand correctly, any express

21   discussion of the permission for you to use the beach

22   or the water at this meeting?

23      A.   No.  He didn't say any of that sort.  My

24   objective was to go there and show face.  Show that I

25   was coming openly.  Nothing else.  But I told him like,

Christopher Taloa
January 05, 2017

```
 1    Hey, I'm getting old.  I want to be an old cow in the

 2    pasture.  I don't mind catching the little.  I don't

 3    need to catch.  I just want to paddle out here and

 4    enjoy this beautiful thing and roll out.  I'm not here

 5    to stake my flag and take your fort out or any of that.

 6         Q.  Okay.  I understand and I thank you for that.

 7         A.  Yeah.  Yeah.

 8         Q.  So this social media campaign and what sounds

 9    like a campaign in general to open up Lunada Bay for

10    lack of a better phrase, what other things did that

11    entail in addition to these social media posts?

12         A.  Telling people to go surf there, man.  Don't

13    be scared.  No one believed me that the cops weren't

14    going to arrest them or do anything bad to them.

15         Q.  And this was when, if I understand correctly,

16    you started -- at or about this time, you started the

17    Aloha Point Surf Club?

18         A.  I didn't start.  Somebody else started it for

19    me, a guy named Dan Biolec, and I don't know how to

20    spell his last name.

21         Q.  Thank you.

22         A.  Yeah.

23         Q.  Do you have any estimate as you sit here today

24    of approximately how many people are members of the

25    Aloha Point Surf Club?
```

Christopher Taloa
January 05, 2017

```
1        A.   Jesus, the last time I saw there was people

2   from all over the world, thousands.

3        Q.   Thousands from all over the world?

4        A.   It looked like it.  Yeah.

5        Q.   Do you consider yourself to be a member of

6   this Aloha Point Surf Club?

7        A.   I don't know if you want -- I don't know how

8   to put that.  Like a member?  I'd say I'm more like --

9   I don't know how to put that.  I use that page as a

10  tool to throw the opposition off so they wouldn't know

11  when I was going to go surfing.  So I could get out

12  there and get a couple before they figured it out and

13  it worked.  I was able to get some waves and that has

14  been the key to me getting a couple of big bombs before

15  I have to go home or before I have to retire to a

16  shoreline with nothing going on on it.

17       Q.   And I think you said this earlier but how many

18  times have you actually surfed at Lunada Bay?  How many

19  different days?

20       A.   Not a lot.  I don't need to go there all the

21  time.  I just want it when it's huge and I can be

22  respectful and wait my turn and the whole thing too but

23  I don't go there very often.  I just go when I know

24  that everywhere else is out of control and that place

25  holds the biggest surf around.
```

Christopher Taloa
January 05, 2017

1      Q.   Yeah.  I think you called it juice earlier?

2      A.   Oh, yeah.

3      Q.   What does that mean?

4      A.   That means it's got power.  It's got a lot of

5   energy, that peninsula.

6           MR. OTTEN:  Move to strike.  Yes or no answers

7   when he asks.

8           THE WITNESS:  Yeah.

9   BY MR. HAVEN:

10     Q.   Well, respectfully, I did ask him what that

11  meant and that is a descriptive phrase.

12     A.   Beautiful stuff.

13     Q.   Powerful wave, a challenging wave.  I think it

14  would be safe to say a dangerous wave?

15     A.   It could be dangerous.  Everywhere could be

16  dangerous but that place can be dangerous.  Yes.

17     Q.   Okay.  And just so I'm clear, precisely how

18  many times in terms of different days have you been to

19  Lunada Bay and actually surfed?

20          MR. OTTEN:  Objection.  Asked and answered

21  about four times now.  Let's move on.

22          MR. HAVEN:  It's a simple question.

23          MR. OTTEN:  Let's move on.

24          MR. HAVEN:  No.  I'm not moving on.

25          MR. OTTEN:  Well, I'm not going to let him

Christopher Taloa
January 05, 2017

1   Papayans, there was a police chief of some type.  I

2   don't know who he was or officer in command of the

3   group of the younger cops that I saw.  Tall, well put

4   together, clean cut white guy with glasses, and he

5   asked me all the questions that could get a man

6   arrested.  Did he block you?  Did he impede your path?

7   Did he do this?  Did he get in your way?  Michael

8   Papayans did not want me to surf and he was doing

9   everything he could to let me know that I wasn't going

10  to get any waves and he told me so in every single way

11  possible and I recorded it all and I sent the little

12  chip into the cops for them to take for their notes and

13  they sent the chip back to me in the mail and then I

14  posted up on the internet so people can see it and then

15  I deleted the chip.

16       Q.   Okay.  Thank you.  I want to talk more about

17  that.  Let's talk about this incident with Michael Ray

18  Papayans.  If I understand correctly, you were just

19  describing conversations that you had with the police

20  after the incident with Mr. Papayans.  They asked you

21  questions.

22       A.   Yeah.  That same day right there.

23       Q.   And they went through all the questions and

24  you answered them to the best of your ability?

25       A.   Best of my abilities, yes.

Christopher Taloa
January 05, 2017

1      Q.   And you indicated to them that you didn't want

2  to press charges?

3      A.   I didn't want to press charges.  I just want

4  them to leave me alone, dude.  I want them to know who

5  he is.  I want everyone to know who these guys are and

6  keep an eye on them because they're not being cool.

7      Q.   Now the day that you went to Lunada Bay and

8  you had this incident with Mr. Papayans Junior -- I'll

9  call him Michael Ray as you refer to him.

10     A.   Yeah.

11     Q.   At the time, you didn't know that was Michael

12 Ray Papayans?

13     A.   No.  Not at all.  I didn't know who he was.

14     Q.   To your knowledge, you've never seen him

15 before that day?

16     A.   That is the first time that I can strongly

17 say, yes, sir I know who he is now as a person.  Not by

18 name.

19     Q.   I'm sorry.

20     A.   The day that he confronted me and told me that

21 I'm surfing --

22     Q.   The day that you described that you captured

23 on videotape?

24     A.   Yes.  Yes, sir.

25     Q.   But at the time of that encounter, did you

Christopher Taloa
January 05, 2017

1    Q.  Now it does say who was harassing people

2  earlier this week.  Does that refresh your recollection

3  at all as to when this encounter with Michael Ray

4  Papayans occurred?

5    A.  Restate that question again.

6    Q.  You know, during --

7    A.  I want to do it right.

8    Q.  I appreciate it.  Sometimes during a

9  deposition, we talk about some things, we show people

10  some documents, and we say does that refresh your

11  recollection and I'm just asking if it does.  According

12  to this post, it says that this individual was

13  harassing people down at Lunada Bay earlier this week

14  and it appears that post date of March 7th, 2014.  Does

15  looking at that statement and that date refresh your

16  recollection at all as to when this encounter with

17  Mr. Papayans' occurred?

18    A.  No.  No.  It doesn't.

19    Q.  Okay.  So if this information is accurate, the

20  encounter occurred apparently at the very end of

21  February, perhaps March 1st, something like that.  And

22  as you sit here, you don't have any basis to disagree

23  with that statement that it occurred a week before

24  that?

25    A.  A week before?

Christopher Taloa
January 05, 2017

1          Q.   The March 7th, 2014 post date?

2          A.   I'm sorry, man.

3          Q.   That's all right.  As we sit here, you really

4    don't recall when that incident was?

5          A.   Yeah.

6          Q.   On page two of this, there appears to be a

7    statement and I've highlighted it here and it indicates

8    it's you.  And it says, "He didn't do anything to me.

9    I posted this so guys can see the bullshit is real and

10   lame.  And without excuse, I drew the heat for standing

11   ground against the bullies.  It's going to be that way

12   with me forever or not.  I posted so this guy could see

13   what he looks like."

14              Now is that a statement that you made, you put

15   that?

16         A.   Yeah.

17         Q.   And you said he didn't do anything to me?

18         A.   He didn't get physical with me.

19         Q.   Okay.  That's what you meant?  He didn't get

20   physical with you?

21         A.   He didn't get physical with me.  I can take

22   anything from anybody.  You touch me.  I have to go

23   call the cops immediately because I will go to jail.

24         Q.   And believe me, Mr. Taloa, I believe you and I

25   respect you for it.  I do.  Thank you very much.

Christopher Taloa
January 05, 2017

1     Q.  Okay.  All right.  And how long did you talk

2  to the police after this incident?

3     A.  I answered every single question that I could

4  from those guys.  Enough for them to find out whether

5  or not they could like -- if they were going to arrest

6  somebody or something like that.  I don't know how long

7  that was.  I just told them I hadn't gotten physically

8  assaulted.  I didn't get touched and I called you guys

9  because it was getting to that place where I got scared

10  that things were going to and I didn't want that.  I

11  don't want that.

12     Q.  And you weren't harmed?

13     A.  I wasn't harmed but I was very uncomfortable

14  so I said please come.

15     Q.  Okay.  Do you recall how many police came,

16  police officers?

17     A.  One, two.  I would say maybe three or four.

18     Q.  And one was Officer Gonzales?

19     A.  One was Officer Gonzales.  One was a slicked

20  out white dude.  Really, I mean that guy was classy.

21  He looked kind of like you.  More shaven, more clean.

22  He was classy.

23     Q.  Well --

24     A.  You look like Eric Bono.  This guy was classy.

25     Q.  I have gotten that before.  Thank you.

Christopher Taloa
January 05, 2017

1        A.   Skinnier.

2        Q.   Skinnier, better looking, I get it.

3        A.   I'll let you float with that one.  He was the

4   kind of cop.

5        Q.   Smarter, younger --

6        A.   He was legit.  He was the kind of cop that you

7   wouldn't expect him to be a cop.  Just like Cory, like

8   do I -- you wouldn't expect no cop because his demeanor

9   was so good.

10        Q.   And there was a third officer?

11        A.   There was a third officer there.  I think he

12   was like a pudgier white dude.  He wasn't too big.  He

13   didn't look like he was physically fit.  But when he

14   would stand back, he had quite a good barrel chest.

15   You could tell he could have a pretty good cardio and

16   keep it together.

17        Q.   And collectively, including three officers and

18   Officer Gonzales, they didn't discourage you from

19   pressing charges?

20        A.   No.  They were trying to find out what they

21   could to press charges.

22        Q.   Apparently, if I understand correctly, nothing

23   was presented to them?

24        A.   I wouldn't present.  I just didn't see it

25   to -- but I did get the impediment from me going to the

Christopher Taloa
January 05, 2017

1    beach that day for sure.

2       Q.   You told them everything you could recall and

3    remember about --

4       A.   Everything that I could recall and to

5    understand what was right and wrong and what I could at

6    the moment.

7       Q.   Okay.

8            MR. HAVEN:   I don't think I have any further

9    questions.

10           MR. WORGUL:   I've got a few or do you need a

11   break or are you okay?

12           THE WITNESS:   Let's kick this thing, dude.

13           MR. WORGUL:   Okay.

14           THE WITNESS:   You guys made me feel a lot more

15   comfortable from when I first came in here.

16           MR. WORGUL:   Timewise?

17           THE VIDEOGRAPHER:   Seven hours.

18           MR. HAVEN:   It's done.   Okay.   Let's conclude

19   the deposition then.

20           MR. WORGUL:   I am more than happy to

21   accommodate counsel and being reasonable.   If there's

22   some questions you want to ask, by all means, we would

23   like to hear them.

24           How many times have you surfed Lunada Bay?

25           THE WITNESS:   I'm unsure, man.

Christopher Taloa
January 05, 2017

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3         I, Christopher Taloa, do hereby certify under

 4    penalty of perjury that I have read the foregoing

 5    transcript of my deposition taken on January 5, 2017;

 6    that I have made such corrections as appear noted

 7    herein in ink, initialed by me; that my testimony as

 8    contained herein, as corrected, is true and correct.

 9

10         Dated this _____ day of _____,

11    2017, at _____,

12    California.

13

14

15

16

17    _____

18    Christopher Taloa

19

20

21

22

23

24

25
```

Christopher Taloa
January 05, 2017

```
1              DEPOSITION ERRATA SHEET

2    Page No._____ Line No. _____

3    Change:_____

4    Reason for change: _____

5    Page No._____ Line No. _____

6    Change:_____

7    Reason for change: _____

8    Page No._____ Line No. _____

9    Change:_____

10   Reason for change: _____

11   Page No._____ Line No. _____

12   Change:_____

13   Reason for change: _____

14   Page No._____ Line No. _____

15   Change:_____

16   Reason for change: _____

17   Page No._____ Line No. _____

18   Change:_____

19   Reason for change: _____

20   Page No._____ Line No. _____

21   Change:_____

22   Reason for change: _____

23

24   _____    _____

25   CHRISTOPHER TALOA              Dated
```

Christopher Taloa
January 05, 2017

```
 1                    REPORTER'S CERTIFICATE

 2            I, Angela Schubert, CSR No. 12027, Certified

 3    Shorthand Reporter, certify:

 4            That the foregoing proceedings were taken

 5    before me at the time and place therein set forth, at

 6    which time the witness was put under oath by me;

 7            That the testimony of the witness, the

 8    questions propounded, and all objections and statements

 9    made at the time of the examination were recorded

10    stenographically by me and were thereafter transcribed;

11            That a review of the transcript by the

12    deponent was required;

13            That the foregoing is a true and correct

14    transcript of my shorthand notes so taken.

15            I further certify that I am not a relative or

16    employee of any attorney of the parties, nor

17    financially interested in the action.

18            I declare under penalty of perjury under the

19    laws of California that the foregoing is true and

20    correct.

21

22    Dated this 9th day of 2017

23    Angela Schubert

24    _____

25    ANGELA SCHUBERT, CSR NO. 12027
```