# Exhibit F

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 16-02129 SJO (RAOx)     **DATE:** February 21, 2017

**TITLE:** Spencer et al. v. Lunada Bay Boys et al.

========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                         Not Present
Courtroom Clerk                          Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**      **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                              Not Present

========================================================================
**PROCEEDINGS (in chambers):    ORDER DENYING MOTION FOR CLASS ACTION
CERTIFICATION** [Docket No. 159]

This matter is before the Court on Plaintiffs Cory Spencer ("Spencer"), Diana Milena Reed
("Reed"), and Coastal Protection Rangers, Inc.'s ("CPRI") (together, "Plaintiffs") Motion for Class
Certification ("Motion"), filed December 29, 2016. Defendants Sang Lee ("Lee"), Brant Blakeman
("Blakeman"), Alan Johnston ("Johnston"), Michael Rae Papayans ("Papayans"), Angelo Ferrara
("Angelo"), Frank Ferrara ("Frank"), Charlie Ferrara ("Charlie"), N.F. (together, "Individual
Defendants"), the City of Palos Verdes Estates ("City") and Chief of Police Jeff Kepley ("Kepley")
(together, "City Defendants") individually and jointly opposed the Motion ("Opposition") on January
13, 2017. Plaintiffs replied ("Reply") on January 20, 2017. The Court found this matter suitable
for disposition without oral argument and vacated the hearing scheduled for February 21, 2017.
*See* Fed. R. Civ. P. 78(b). For the following reasons, the Court **DENIES** Plaintiffs' Motion.

I.     FACTUAL AND PROCEDURAL HISTORY

Riding the wave of the *Point Break* remake, Plaintiffs initiated this putative class action lawsuit on
March 29, 2016, alleging they and other would-be beach-goers have been unlawfully excluded
from parks, beaches, and ocean access in Palos Verdes Estates. (*See generally* Compl., ECF
No. 1.) In particular, Plaintiffs assert that Individual Defendants' long-standing history of
"localism," a "territorial practice whereby resident surfers attempt to exclude nonresident beach-
goers and surfers through threats, intimidation, and violence," at Palos Verdes Estates' infamous
"Lunada Bay" and City Defendants' nonchalance about such localism violate a bevy of federal and
state laws. (*See* Compl. ¶¶ 1-2, 17.) Throughout this case, Plaintiffs have referred to Individual
Defendants as members of the "Lunada Bay Boys" ("LBB"), and have asked the Court to declare
the LBB to be a criminal street gang under California Penal Code § 186.22(f) and an
unincorporated association within the meaning of California Corporations Code § 18035(a). (*See*
Compl. at 40.) Against this backdrop, the Court examines the evidence submitted by the parties
and then addresses the merits of Plaintiffs' Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  CV 16-02129 SJO (RAOx)          DATE: <u>February 21, 2017</u>

A.     <u>Factual Background</u>

1.     <u>History of Localism in Lunada Bay</u>

The City owns Lunada Bay, a public beach that is renowned for its natural beauty, scenic hiking, and excellent surfing conditions.  (*See* City Defs.' Responses in Opp'n to Separate Statement of Undisputed Facts ("City Defs.' Responses") ¶¶ 1, 5, ECF No. 189; *see also* Expert Decl. Peter Neushul in Supp. Mot ("Neushul Decl.") ¶ 13, ECF No. 159-8.)  Swells in Lunada Bay can reach as high as twenty (20) feet during peak season, making it one of the few big-wave surfing locations in Southern California.  (Neushal Decl. ¶ 17.)  Accordingly, Plaintiffs submit that Lunada Bay should be a popular destination for surfers and recreational beach-goers alike; but because of "concerted efforts" by members of the LBB, all of whom reside in Palos Verdes, to harass visitors, it is not.  (Mot. 3, 14, ECF No. 159; *see also* Neushal Decl. ¶ 13.)

Plaintiffs allege members of the LBB conspire to deter non-locals from both visiting and returning to Lunada Bay through various methods of harassment, including, but not limited to: (1) vandalizing visitors' cars (e.g., slashing tires, sprawling derogatory words in surf wax across windshields, and breaking taillights and mirrors); (2) stealing visitors' property (e.g., wallets, wetsuits, and surfboards); (3) physically assaulting visitors (e.g., throwing rocks, running people over with surfboards, and shoving, slapping, and punching visitors); (4) hurling obscenities at visitors; and (5) blocking visitors from catching waves while in the ocean.  (*See generally* Mot.; *see also* Compl. ¶ 18.)  Plaintiffs have submitted evidence suggesting similar localist practices have been occurring at Lunada Bay for decades.  (Decl. Victor Otten in Supp. Mot. ("Otten Decl.") ¶¶ 4, 12, Exs. 3, 11, ECF No. 159-3.)

2.     <u>Spencer and Reed Are Harassed at Lunada Bay by LBB</u>

Spencer and Reed, who seek to represent a class of desirous non-local beach-goers, claim to have experienced these forms of harassment when they attempted to surf at Lunada Bay in early 2016.  (*See* Compl. ¶¶ 21-27; *see also* Decl. Cory Spencer in Supp. Mot. ("Spencer Decl.") ¶¶ 11-12, ECF No. 159-4; Decl. Diana Milena Reed in Supp. Mot. ("Reed Decl.") ¶ 8, ECF No. 159-5.)  Although Spencer, a former police officer in nearby El Segundo, had wanted to surf Lunada Bay for decades, he avoided it because of its reputation for severe localism.  (Spencer Decl. ¶ 3-4.)  The first time he surfed Lunada Bay was in January 2016 when he and a handful of other surfers organized a group to surf at the bay.  (Spencer Decl. ¶¶ 8-11.)  Spencer declares that he even contacted the Palos Verdes Estates Police Department to request additional patrols, and that each of the surfers contributed $20 to hire a security guard to watch their cars while they surfed. (Spenced Decl. ¶¶ 9-10.)

Despite this preparation, Spencer submits that members of the LBB began harassing him and his group "[a]lmost instantly after we arrived at Lunada Bay the morning of January 29, 2016[.]" (Spencer Decl. ¶ 11.)  Spencer avers that members of the LBB (1) verbally harassed and

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

---

**CASE NO.:** CV 16-02129 SJO (RAOx)          **DATE:** <u>February 21, 2017</u>

---

intimidated him and others; (2) impeded his movement in the water; (3) prevented him from catching any waves; and (4) attempted to run him over and slicing open his right wrist, resulting in a half-inch scar. (Spencer Decl. ¶¶ 11-14, Ex. 1.) Spencer returned a week later and experienced similar harassment. (Spencer Decl. ¶¶ 21-23.)

Reed also visited Lunada Bay for the first time in January 2016. (Reed Decl. ¶ 7.) Like Spencer, she was verbally harassed and intimidated by Blakeman and other LBB members upon her arrival and while she surfed. (Reed Decl. ¶¶ 8-11.) Reed returned to Lunada Bay in February 2016 to take photos of her friends while they surfed, but was again harassed by Blakeman. (Reed Decl. ¶¶ 18-19.) Later that day, Blakeman and Johnston approached her in a hostile manner. (Reed Decl. ¶ 21.) Johnston, who was drinking beer and appeared drunk, made lewd comments about Reed and exposed himself to her while changing into his wetsuit. (Reed Decl. ¶ 24.)

### 3. Alleged Police Non-Intervention

Plaintiffs allege that the City's police department, and Chief Kepley in particular, not only are aware of the LBB's harassment of visitors, but also are complicit by allowing such harassment to continue unabated. (*See* Compl. ¶¶ 15, 23, 28; *see also* Mot. 9.) Due to Lunada Bay's reputation for localism, Spencer notified the City's police department of his intention to surf Lunada Bay prior to his visit in January 2016. (Spencer Decl. ¶ 17.) However, he observed no police officers near the shoreline when he arrived that day. (Spencer Decl. ¶ 17.) Despite being harassed and injured during this visit, no officers from the City's police department offered to prepare a report. (Spencer Decl. ¶¶ 17, 20.) Reed, on the other hand, reported incidents of harassment to police officers on both of her visits. (Reed Decl. ¶¶ 13, 27.) Reed avers that police officers witnessed the January 2016 incident but did not intervene. (Reed Decl. ¶¶ 11-12.) Although a police officer asked if she wanted to make a "citizen's arrest" on the aggressors, Reed submits that the officer dissuaded her from doing so because she could face potential civil liability as a result. (Reed Decl. ¶¶ 13-14.) After the February 2016 incident, Reed complained to the police, who took a written report from her. (Reed Decl. ¶¶ 27-29.) She was informed by one officer that she would be able to view a lineup of potential perpetrators, but was never contacted despite her repeated efforts to follow up. (Reed Decl. ¶¶ 29-30.) After retaining an attorney, Reed met with a City detective and identified Johnston in a picture lineup. (Reed Decl., Ex. 4.) A warrant issued for Johnston's arrest one week later. (Reed Decl., Ex. 4.)

After extensive media coverage, the City's police department became aware of its reputation for tacitly approving or condoning the behavior of the LBB. (Otten Decl., Ex. 13.) As a result, Kepley initiated extra patrols at the shoreline to discourage any local surfers from treating visitors in a hostile manner. (Otten Decl., Ex. 13.) Kepley and City Manager Anton Dahlerbruch ("Dahlerbruch") discussed this issue with California State Assembly Member David Hadley ("Hadley"). (Otten Decl., Ex. 14.) Kepley and Dahlerbruch advised Hadley that bringing the issue up in Sacramento would only bring more unwanted attention with little to no benefit. (Otten Decl.,

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

|  | Priority | ____ |
|---|---|---|
|  | Send | ____ |
|  | Enter | ____ |
|  | Closed | ____ |
|  | JS-5/JS-6 | ____ |
|  | Scan Only | ____ |

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>       **DATE:** <u>February 21, 2017</u>

Ex. 14.) In an effort to dissuade further harassment of non-locals (or perhaps because of the instant litigation and associated media attention), the City removed an un-permitted structure where the LBB had gathered, known as the "Rock Fort," from Lunada Bay in November of 2016. (Spencer Decl. ¶ 31.)

B.     <u>Procedural History</u>

Plaintiffs assert the following causes of action against Defendants: (1) violation of the Bane Act, California Civil Code § 52.1(b), against the LBB and Individual Defendants ("Bane Act Claim"); (2) public nuisance pursuant to California Civil Code §§ 3479 and 3480 against the LBB and Individual Defendants ("Public Nuisance Claim"); (3) violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983 ("Section 1983"), against City Defendants ("Equal Protection Claim"); (4) violation of the Privileges and Immunities Clause of Article IV of the United States Constitution, pursuant to § 1983, against City Defendants ("P&I Claim"); (5) violation of various provision of the California Coast Act against Defendants ("CCA claim") ; (6) assault against the LBB and Individual Defendants ("Assault Claim"); (7) battery against the LBB and Individual Defendants ("Battery Claim"); and (8) negligence against the LBB and Individual Defendants ("Negligence Claim"). (*See* Compl. ¶¶ 43-106.) On July 11, 2016, Plaintiffs' P&I and CCA Claims were dismissed with prejudice. (*See* Order Granting in Part & Den. in Part City Defs.' Mot. to Dismiss Compl., ECF No. 84.)

C.     <u>The Proposed Class</u>

Plaintiffs filed their Motion on December 29, 2016, seeking certification of the following class:

> All visiting beachgoers to Lunada Bay who do not live in Palos Verdes Estates, as well as those who have been **deterred** from visiting Lunada Bay because of the Bay Boys' actions, the Individual Defendants' actions, the City of PVE's actions and inaction, and Defendant Chief of Police Kepley's action and inaction, and **subsequently denied during the Liability Period**, and/or are **currently being denied**, on the basis of them living outside of the City of PVE, full and equal enjoyment of rights under the state and federal constitution, to services, facilities, privileges, advantages, and/or recreational opportunities at Lunada Bay. For purposes of this class, "visiting beachgoers" includes all persons who do not reside in the City of PVE, and who are not members of the Bay Boys, but want lawful, safe, and secure access to Lunada Bay to engage in recreational activities, including, but not limited to, surfers, boaters, sunbathers, fisherman, picnickers, kneeboarders, stand-up paddle boarders, boogie boarders, bodysurfers, windsurfers, kite surfers, kayakers, walkers, dog walkers, hikers, beachcombers, photographers, and sightseers.

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** __CV 16-02129 SJO (RAOx)__        **DATE:** __February 21, 2017__

(Mot. 12.)  Plaintiffs note they are "primarily seek[ing] equitable relief," but nevertheless contend that in addition to certification under Rule 23(b)(2), certification under Rule 23(b)(3) would also be proper such that the class would be entitled money damages.  (*See* Mot. 12, 18-19.)

Defendants respond that this proposed class definition is overbroad and actually consists of two separate classes:  (1) non-locals who have visited Lunada Bay and have been denied equal access to the beach; and (2) non-locals who have allegedly been deterred from visiting Lunada Bay because of the reputation of the LBB and City Defendants have earned concerning harassment and lax enforcement, respectively, at Lunada Bay.  (*See generally* City Defs.' Opp'n to Mot. ("City Opp'n."), ECF No. 187.)

II.    DISCUSSION

    A.    Legal Standards Governing Class Certification

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp., v. Behrend*, 133 S. Ct. 1426, 1432 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)).  "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23" of the Federal Rules of Civil Procedure ("Rule 23").  *Id.* (quoting *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350 (2011)).  "Rather, a party must not only 'be prepared to prove that there are **in fact** sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)."  *Id.* (emphasis in original) (quoting *Dukes*, 564 U.S. at 350).  "The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Id.*

A class action may only be certified if, "after a rigorous analysis," the trial court determines that the prerequisites of Rule 23(a) have been satisfied.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).  The Supreme Court has repeatedly emphasized that it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that the trial court's "analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'"  *Comcast*, 133 S. Ct. at 1432 (quoting *Dukes*, 564 U.S. at 351).

    B.    Related Motions and Evidentiary Objections

Defendants, individually and collectively, have lodged numerous procedural and evidentiary objections concerning declarations submitted by Plaintiffs' experts and by putative class members in support of the Motion.  (*See, e.g.*, Blakeman's Objection to Pls.' Evid. in Supp. Mot. ("Blakeman Obj."), ECF No. 196; City Defs.' Mot. to Strike Decl. of Philip King ("Mot. to Strike"), ECF No. 204.)  The Court addresses these objections in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.: **CV 16-02129 SJO (RAOx)**          DATE: **February 21, 2017**

1.     Procedural Objections

At the outset, the Court admonishes Plaintiffs for failing to file their opposition to City Defendants' Motion to Strike the Declaration of Philip King ("Strike Opposition") in compliance with Local Rule 7-9.  *See* L.R. 7-9 (requiring that opposing parties shall "not later than twenty-one (21) days before the date designated for the hearing of the motion" file their opposition papers).  City Defendants filed their Motion to Strike on January 20, 2017 with a hearing date set for February 21, 2017, (*see* Mot. to Strike), and therefore Plaintiffs were obligated to file any opposition on or before January 31, 2017, *see* L.R. 7-9.  Nevertheless, Plaintiffs waited to file their opposition until February 3, 2017.  (*See* Strike Opp'n, ECF No. 216.)  Having previously filed opposing papers in this case, Plaintiffs were fully aware of the requirements for timely filing.  Given the evidentiary clarification presented by Plaintiffs in their Strike Opposition, (*see* Suppl. Decl. Philip King in Supp. Strike Opp'n. ("King Supp'l Decl."), ECF No. 216-1), the Court is surprised that Plaintiffs would risk having their Strike Opposition stricken for violating the Local Rules.  Notwithstanding this procedural shortcoming, in light of the prejudice Plaintiffs would face if these papers were stricken, the Court considers the contents of these materials.

In their Motion to Strike, City Defendants object to the admission of the King Declaration on the ground that Plaintiffs failed to disclose the identity of Dr. King as a witness in their responses to the City's interrogatories and in accordance with Rule 26 of the Federal Rules of Civil Procedure.  (*See* Mot. to Strike.)  Plaintiffs respond that, at the time they submitted their responses to these interrogatories, they had not yet retained Dr. King as an expert witness.  Plaintiffs note that in their responses to the City's interrogatories, Plaintiffs produced a long list of potential fact witnesses, but were not required to identify expert witnesses.  The Court agrees.  First, the cited interrogatories do not request the disclosure of expert witnesses.  Moreover, because the Court did not set a deadline regarding the disclosure of expert witnesses in its August 29, 2016 scheduling order, (*see* Minutes of Scheduling Conference, ECF No. 120), the parties are not obligated to disclose their respective experts until "at least 90 days before the date set for trial," Fed. R. Civ. P. 26(a)(2)(D)(i).  Accordingly, the Court **DENIES** City Defendants' Motion to Strike on this basis.

2.     Evidentiary Objections

Defendants also raise numerous objections regarding the admissibility of the declarations submitted by Plaintiffs in support of their Motion.

a.     Expert Witness Declarations

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation, and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597(1993).  In serving this "gatekeeper" function, a district

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CIVIL MINUTES - GENERAL

**CASE NO.:** CV 16-02129 SJO (RAOx)          **DATE:** February 21, 2017

court performs a two-part analysis. *Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). First, a district court "must determine nothing less than whether the experts' testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharms.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995) (internal quotations and citations omitted). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Second, the court "must ensure that the proposed expert testimony is 'relevant to the task at hand' *i.e.*, that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315 (citation omitted). This evidentiary standard applies to expert testimony offered for the purpose of demonstrating that class certification is appropriate. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (noting that the trial court correctly applied the evidentiary standard set forth in *Daubert* at the certification stage); *see also Dukes*, 564 U.S. at 354 (doubting the trial court's conclusion that *Daubert*'s evidentiary standard does not apply at the certification stage).

When considering whether expert testimony is reliable, a trial court should consider the factors laid out by the United States Supreme Court in *Daubert*, 509 U.S. at 593-595, including: (1) "whether the theory or technique employed by the expert is generally accepted in the scientific community;" (2) whether "it's been subjected to peer review and publication;" (3) "whether it can be and has been tested;" and (4) "whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316-17 (citing *Daubert*, 509 U.S. at 593-595). The Supreme Court acknowledged in *Daubert* that the trial judge's reliability inquiry is "flexible," and therefore trial courts are encouraged to consider other factors not specifically mentioned by the Supreme Court in *Daubert*. *Daubert*, 509 U.S. at 594. To that end, trial courts have also considered other potentially relevant factors, including (1) "whether the expert is proposing to testify about matters growing directly out of independent research he or she has conducted or whether the opinion was developed expressly for the purposes of testifying;" (2) whether the expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion;" (3) "whether the expert has adequately accounted for obvious alternative explanations;" (4) "whether the expert is being as careful as he would be in his regular professional work;" and (5) "whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered." *In re Silicone Gel Breast Implants Litigation*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (citing Fed. R. Evid. 702 Advisory Committee's Notes). Trial courts have "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis*, 657 F.3d at 982.

Plaintiff submits declarations from two experts in support of its Motion: Dr. Philip King ("Dr. King") and Dr. Peter Neushul ("Dr. Neushul"). Defendants challenged the admissibility of both. (*See* Blakeman Obj.; Mot. to Strike.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  CV 16-02129 SJO (RAOx)          DATE: <u>February 21, 2017</u>

i.      <u>The Expert Declaration of Philip King</u>

Dr. King reaches two main conclusions in his declaration.  First, he opines that but for the harassment by the LBB, Lunada Bay would have about 20,000 to 25,000 annual surfers, compared to the current number of 1,460 to 2,920 annual surfers.  Second, he opines that the estimated recreational value of an individual surfing visit to Lunada Bay is between $50 and $80, resulting in a total lost surfing recreational value of $50,000,000 since 1970 due to harassment by the LBB.  (*See* Decl. Philip King in Supp. Mot. ("King Decl.") ¶¶ 17-19, ECF No. 159-7.)  Defendants ask the Court not to consider any portion of Dr. King's declaration because (1) he is not sufficiently qualified to offer these opinions; and (2) his opinions lack factual support, do not utilize a reliable methodology, and are speculative.  (*See* Mot. to Strike.)  The Court agrees in part with Defendants' contentions.

Dr. King received a Bachelor of Arts degree in and economics from Washington University and a Ph.D. in economics from Cornell University.  (King Decl. ¶ 2.)  He has, among other things, authored or co-authored a number of peer-reviewed papers performing economic analyses regarding the impact of climate change, erosion, and beach attendance on Southern California beaches.  (King Decl. ¶ 3.)  He avers that he has served as an expert economist in approximately 40 different legal matters on behalf of both plaintiffs and defendants.  (King Decl. ¶ 4.)  In light of these submissions, the Court rejects Defendants' argument that Dr. King is not qualified to offer opinions regarding the economic impact of beach attendance in California.

The Court now examines Dr. King's methodology and conclusions regarding the estimated annual number of surfers at Lunada Bay and the recreational value of these surf trips.  Dr. King's conclusion regarding the annual number of surfers that would visit Lunada Bay were it not for harassment by the LBB is based on an examination of the unique features of Lunada Bay that make it a desirable surf location and an analysis of a similarly desirable surf location in Southern California.  (King Decl. ¶¶ 15, 18.)  Dr. King describes a litany of features that make Lunada Bay among the most desirable surf locations in Southern California, including that it is home to a bay with deeper water and a shallow rock reef.  (King Decl. ¶ 15.)  To provide a comparison, he analyzes another well-known California surf location:  Trestles Beach in North San Diego County.  (King Decl. ¶ 15; King Suppl. Decl. ¶¶ 10, 15-16.)  Dr. King opines that Trestles Beach serves as a strong comparison because it offers the same level of world-class surfing.  (King Decl. ¶ 15.)

Even assuming Dr. King is correct that Lunada Bay and Trestles are similarly desirable surf locations, the Court has fundamental concerns about the reliability of Dr. King's "comparative analysis" as it pertains to the number of annual surf visits to the respective beaches.  First, Dr. King notes that Trestles actually consists of three beaches:  Lower Trestles, Upper Trestles, and Cotton's.  (King Decl. ¶ 15.)  Lunada Bay, by contrast, is one of many surf locations on the four-and-a-half miles of Palos Verdes' coastline, and itself spans less than half a mile.  (King Decl. ¶ 10.)  Yet Dr. King makes no effort to compare or explain these facially dissimilar qualities.

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  **CV 16-02129 SJO (RAOx)**          DATE: <u>**February 21, 2017**</u>

Second, Dr. King relies on different metrics when comparing the annual number of "surf trips" at each location.  Dr. King measures the number of surf trips at Lunada Bay in "annual surfers." (King Decl. ¶¶ 17-19.)  Using this metric, and without explaining any aspect of his methodology or calculations, he concludes that Lunada Bay currently averages between 4 and 8 surfers per day, resulting in an annual average of between 1,460 and 2,920 surfers.  (King Decl. ¶¶ 17-19.)  Dr. King then concludes that Lunada Bay **should** have an average of between 60 and 75 surfers per day, for an annual average of between 20,000 and 25,000 surfers.  (King Decl. ¶¶ 17-19.)

Although Dr. King opines that these numbers are the result of a "comparative analysis" to Trestles, he does not provide comparable daily or annual figures regarding the number of surfers at Trestles.  Instead, he relies a different metric:  "surf trips per year."  Without defining a "surf trip per year" or explaining how he obtained his data, Dr. King concludes that Trestles averages about 330,000 surf trips per year.  (King Decl. ¶ 15.)  For the sake of argument, dividing 330,000 annual surf trips at Trestles by 365 results in a daily average of approximately 900 surfers; an exceedingly unlikely number of daily surfers at a single beach.  More fundamentally, Dr. King offers no explanation why 900 daily surfers at Trestles would lead one to expect 60-75 daily surfers at Lunada Bay in the absence of harassment by the LBB.  Because the Court cannot determine whether Dr. King's opinions result from the application of reliable principles and methodologies to sufficient data, the Court finds Dr. King's comparison to be an unreliable method for determining the number of "but for" surfers at Lunada Bay.  *See Ellis,* 657 F.3d at 982.

Dr. King's second conclusion—that harassment by the LBB has caused $50,000,000 in lost surfing recreational value over the past 45-plus years—is based on an estimated recreational value of $50 to $80 per person per surf visit during the high season (November to March), and approximately half that the rest of the year.  (King Decl. ¶ 19.)  These per-trip values are based on an economic research method called "benefits transfer."  (King Decl. ¶ 6.)  In essence, "benefits transfer" takes the value of individual surf trips at comparable surf-locations, determined using a more thorough technique called travel cost ("TC") method, and applies this value to surf-locations that have not yet been examined in detail.  (King Suppl. Decl. ¶¶ 3,5.)  According to Dr. King, other experts' TC method calculations revealed that a surf trip was worth between $80 and $140 at Trestles, and about $56 at Mavericks, another comparable California surf-location.  (King Suppl. Decl. ¶¶ 9-10.)  Using benefits transfer, Dr. King concludes that a surf trip at Lunada Bay is worth between $50 and $80.  (King Decl. ¶19.)

The Court does not find the benefits transfer and TC methodologies to be unreliable in a vacuum, it is troubled by the application of these methodologies to the data in this case.  Dr. King arrives at a total of $50,000,000 in lost surfing recreational value by multiplying the value of individual surf trips ($50-$80) by the estimated number of annual surfers at Lunada Bay but-for the LBB (20,000-25,000), extrapolated over fifty years.  There are three problems with this calculation.  First, it extrapolates the estimated recreational value of a 2017 surf trip at Lunada Bay over fifty years

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>     **DATE:** <u>February 21, 2017</u>

without taking into account any variable factors (for example, interest) that may have changed since the 1970s.  Second, the total lost surfing recreational value is based on an amount of would-be surfers that the Court has deemed unreliable.  Finally, this figure fails to take into account the relevant statutes of limitations that significantly minimize the damages exposure in this case.  *See* Section II(C)(2), *infra*.  For the foregoing reasons, the Court concludes that Dr. King's method of determining the total amount of lost surfing recreational value at Lunada Bay to be unreliable.

Although Dr. King is qualified to offer expert opinions regarding the economic impact of beach attendance in Southern California, the Court finds his conclusions regarding the number of "but for" surfers at Lunada Bay and the total amount of lost surfing recreational value at Lunada Bay attributable to the LBB to run afoul of Rule 702 and *Daubert*.  Accordingly, the Court **GRANTS IN PART** City Defendants' Motion to Strike and **STRIKES** paragraphs 17-20 of Dr. King's Declaration and the corresponding paragraphs of Dr. King's Supplemental Declaration.

### ii.     The Expert Declaration of Peter Neushul

City Defendants also object to the admissibility of Dr. Neushul's declaration on the grounds that he is not sufficiently qualified to provide expert testimony.  (*See* City Defs.' Evid. Obj. to Mot. ("City Obj."), ECF No. 188)  The Court rejects this argument.

Dr. Neushul earned both a bachelor's degree and a doctorate degree in history from the University of California, Santa Barbara ("UCSB").  (Neushul Decl. ¶ 3.)  Dr. Neushul was a visiting professor at UCSB for fifteen years and taught a course titled "The History of Surfing" during three of these years.  (Neushul Decl. ¶ 1.)  Dr. Neushul has written a book on the history of surfing and has published several articles related to surfing topics.  (Neushal Decl. ¶ 1.)  Furthermore, he claims to be an expert, both generally and in Southern California, on surf history, culture, and etiquette.  (Neushul Decl. ¶ 2.)  According to Dr. Neushul, this expertise extends to the culture of localism at Southern California beaches, including at Lunada Bay.  (Neushul Decl. ¶ 2.)  The Court finds that Dr. Neushul is sufficiently qualified to opine on the history of surfing and surf culture in Southern California, which encompasses localist practices in Lunada Bay.  The Court therefore **OVERRULES** City Defendants' objections to Dr. Neushul's declaration.

### b.     Putative Class Member Declarations

City Defendants also raise numerous evidentiary objections to the twenty-five declarations filed by putative class members in support of Plaintiffs' Motion.  (*See generally* City Obj.)  In the interest of judicial efficiency, these objections will be ruled upon generally.  *See Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (quotation omitted) (noting that "in motions . . . with numerous objections, it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised").  City Defendants object to these twenty-five declarations on the grounds that they are inadmissible

| | |
|---|---|
| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>　　　**DATE:** <u>February 21, 2017</u>

hearsay, irrelevant, and speculative.  (*See generally* City Obj.)  The Court finds, however, that each of these declarations either describes the declarant's personal experience of harassment while visiting Lunada Bay or includes a first-hand recounting of the harassment experienced by another person at Lunada Bay.  Accordingly, the Court finds these declarations to be admissible under the Federal Rules of Evidence, and further finds them to be relevant for the purposes of demonstrating whether the prerequisites of Rule 23 are met.  The Court therefore **OVERRULES** City Defendants' objections as to these declarations.

　　　　　3.　　<u>Judicial Notice</u>

Pursuant to Rule 201(b) of the Federal Rules of Evidence, the Court takes judicial notice of the following adjudicative documents:  (1) Complaint filed on March 14, 2014 in the matter *Eli Rubin v. Gabe Reed, et al.*, Case No. BC539383 (Cal. Super. Ct.); and, (2) a default judgment entered against Gabe Reed, Gabe Reed LLC, and Diana Reed in the amount of $445,727.62 in the above-mentioned case.  *See* Fed. R. Civ. P. 201(b) (providing that a court may take judicial notice of a fact "not subject to reasonable dispute" because it "can accurately and readily [be] determined from sources whose accuracy cannot be questioned").

　　　C.　　<u>Analysis of Plaintiffs' Motion for Class Certification</u>

As a threshold issue, several Defendants argue (1) that certain Plaintiffs lack standing to bring this action or have claims that are not ripe; and (2) that a substantial portion of Plaintiffs' claims are time-barred.  (*See, e.g.*, Def. Brant Blakeman Opp'n to Mot. ("Blakeman Opp'n."), ECF No. 190; Def. Sang Lee's Opp'n to Mot. ("Lee Opp'n"), ECF No. 192.)  The Court addresses these preliminary arguments before turning to the Rule 23 prerequisites.[1]

///

---

[1]  Defendant Blakeman and City Defendants further argue that the proposed class is an impermissible "fail-safe" class.  (Blakeman Opp'n 10; City Opp'n 4.)  This Court has previously declined an "invitation to deny certification on this ground alone" because the Ninth Circuit "has not expressly held that fail-safe classes are impermissible."  *Howard v. CVS Caremark Corp.*, No. CV 13-04748 SJO (PJWx), 2014 WL 11497793, at *3 (C.D. Cal. Dec. 19, 2014).  In light of other significant problems plaguing Plaintiffs' Motion, the Court again declines this invitation, but notes that Plaintiffs' inclusion of the terms "deterred" and "denied" in their proposed class definition raises another set of red flags.  *See Manual for Complex Litigation (Fourth)*, § 21.222 (2004) ("An identifiable class exists if its members can be ascertained by reference to objective criteria.  The order defining the class should avoid **subjective** standards (e.g., a plaintiff's state of mind) or terms that depend on **resolution of the merits** (e.g., persons who were discriminated against).").

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**   CV 16-02129 SJO (RAOx)          **DATE:** <u>February 21, 2017</u>

        1.    <u>Standing and Ripeness</u>

Defendants Blakeman and Lee raises several arguments regarding whether Plaintiffs have standing to bring their claims and whether their claims are ripe.  Lee first argues that the named Plaintiffs lack standing to bring a class action suit against him because neither of them have suffered any injury as a result of his actions.  (Lee Opp'n 6.)  In support of this argument, Lee attacks the merits of Plaintiffs' claim that he and others are "members" of the allegedly unincorporated association, the LBB.  (Lee Opp'n 3-5.)  Lee, however, cites no evidence in support of his argument that Plaintiffs will be unable to establish the LBB is an association.  In any event, this argument unpersuasively attempts to put the cart before the horse.  (*See* Lee Opp'n 4 [arguing that "Plaintiffs have not established that the [LBB] have meetings, are comprised of a group of unidentifiable members, have by-laws, or pay dues" and thus "have failed **to prove** the [LBB] are an unincorporated association . . . pursuant to Rule 23.2"].)  The Court rejects this merits-based challenge.  *See Kamar v. RadioShack Corp.*, 375 Fed. App'x 734, 736 (9th Cir. 2010) ("A district neither must, nor should, decide the merits of a dispute—legal or factual—before it grants class certification.")

Blakeman and Lee next contend that a large swath of absent class members lack standing to pursue their claims.  "In a class action, the plaintiff class bears the burden of showing that Article III standing exists."  *Ellis*, 657 F.3d at 978 (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007)).  "Standing requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision."  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiffs respond to this argument with the following quotation from *Bates v. United Parcel Service, Inc.*:  that "[i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements."  511 F.3d at 985 (citing *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001)).  This language is inapposite.  The Court agrees with the reasoning provided in *O'Shea v. Epson America, Inc.* that the Ninth Circuit did not announce a rule in *Bates* that absent class members need not have standing if one or more class representatives have standing.  No. CV 09-8063 PSG (CWx), 2011 WL 4352458 (C.D. Cal. Sept. 19, 2011).  Instead, other decisions, such as *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), *abrogated on other grounds by Comcast*, — U.S. —, 133 S. Ct. 1426, suggest that absent class members must **themselves** satisfy the requirements of Article III in order to pursue claims in federal court.  *O'Shea*, 2011 WL 4352458, at *9-*10; *see also Burdick v. Union Sec. Ins. Co.*, No. CV 07-4028 ABC (JCx), 2009 WL 4798873, at *3 (C.D. Cal. Dec. 9, 2009) (distinguishing *Bates* and excluding "those absent class members lacking justiciable claims under Article III").

Perhaps anticipating defeat on the above point, Plaintiffs next contend that all class members, including those who have never visited Lunada Bay, themselves satisfy the requirements of Article III because they have been "injured in fact" by their exclusion from Lunada Bay in light of their

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  CV 16-02129 SJO (RAOx)          **DATE:** <u>February 21, 2017</u>

present desire to safely visit the bay free from harassment. The Court disagrees. As a threshold matter, individuals who have never suffered actual or threatened physical harm at the hands of Individual Defendants do not have any existing tort claims against these individuals or against the LBB, and Plaintiffs have offered no evidence indicating there is a "real and immediate threat of repeated injury" to such individuals. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). Putative class members who have never visited Lunada Bay also have not suffered a "peculiar injury [that] entitles [them] to maintain a separate action for its abatement, or to recover damages therefor" that is "different in kind and not merely in degree from that suffered by the general public" and therefore lack standing to bring public nuisance claims. *See Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1137, 281 Cal. Rptr. 827 (1991) (quoting Cal. Civ. Code § 3493; *Brown v. Rea*, 150 Cal. 171, 174 (1907)).

Moreover, individuals who have not been denied access to Lunada Bay by the LBB or its alleged members do not have a claim against the LBB or its alleged members under the Bane Act, for the Act provides that "[a]ny individual **whose exercise or enjoyment** of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, **has been interfered with**, or **attempted to be interfered with**, as described in subdivision (a) . . ." can pursue a claim for relief in a trial court. Cal. Civ. Code § 52.1(b) (emphasis added); *see also Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998) (holding that, to prevail on a Bane Act claim, a plaintiff must demonstrate, *inter alia*, "intimidation, threats or coercion"); *Campbell v. Feld Entm't, Inc.*, 75 F. Supp. 3d 1193, 1211 (N.D. Cal. 2014) (requiring plaintiffs to prove (1) that defendants interfered with their rights; and (2) that such interference was accompanied by actual or attempted threats, intimidation, or coercion in order to succeed on Bane Act claim). Finally, persons who have never sought the protection of the Palos Verdes Police Department vis-a-vis the LBB do not have viable Equal Protection Claims against City Defendants, for they have not been denied "equal protection of the laws" by the City, its police department, or Kepley. Plaintiffs cite to no authority holding, much less suggesting, that the negative reputation of a person or a group has a "chilling" effect that is cognizable under the Fourteenth Amendment or the Bane Act. Even if such a case were to exist, the Court would nevertheless find that such speculative beach-goers lack standing here, for a bare assertion that one would surf Lunada Bay were it not for the LBB does not constitute a "concrete" and "particularized" harm as demanded by the Supreme Court in *Lujan*. *See* 504 U.S. at 564 (noting that "some day intentions—without any description of concrete plans, or indeed any specification of **when** the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require" (emphasis in original)). A handful of declarations with statements indicating the declarants (1) "would love to do a mass surf-in with 15 or 20 men at Lunada Bay," (Decl. Daniel Jongeward in Supp. Mot. ("Jongeward Decl.") ¶ 12, ECF No. 177); (2) "want to be able to visit Palos Verdes Estates beaches, specifically Lunada Bay, without being intimidated and to be safe in my person or property," (Decl. Ricardo G. Pastor in Supp. Mot. ("Pastor Decl.") ¶ 11, ECF No. 175); or (3) "would likely visit [Lunada Bay] at least two to three times per year" if it were "opened up to the public again," (Decl. Carl Marsch ("Marsch Decl.") in Supp. Mot. ¶ 6, ECF No. 179), are insufficient to satisfy Plaintiffs' burden of

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  **CV 16-02129 SJO (RAOx)**          DATE: **February 21, 2017**

proving absent class members who have not been denied access to Lunada Bay have Article III standing.

This final point merits closer attention, for it implicates a related Article III doctrine:  ripeness. Blakeman and Lee argue that putative class members who have never visited Lunada Bay do not have claims that are ripe.  (Lee Opp'n 7.)  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).  "That is so because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Id.* In this way, ripeness and standing are intertwined. *Id.* Moreover, "[a]s with standing, ripeness is determined on a claim-by-claim basis." *Burdick*, 2009 WL 4798873 at *3 (citations omitted).  Absent class members who have never visited Lunada Bay and who have not articulated an immediate desire to approach Lunada Bay do not have claims against Individual Defendants or City Defendants that are ripe.  *See Reno v. Catholic Servs., Inc.*, 509 U.S. 43, 66 (1993) (finding that "only those class member (if any) who were [actually harmed] have ripe claims over which the District Courts should exercise jurisdiction").

2.    Statutes of Limitations

Defendants also contend that many putative class members' claims are time barred (or "stale") because the injuries they allegedly sustained took place outside the applicable limitations period. (*See, e.g.*, Blakeman Opp'n 14.)  In California, the statute of limitations for assault, battery, and negligence claims is **two (2) years**.  Cal. Code of Civ. P. § 335.1.  For civil rights actions brought under § 1983, the Ninth Circuit applies the forum state's statute of limitations for personal injury actions.  *Jonas v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004).  Although California state and federal courts have applied different limitations periods to civil rights claims the two-year limitations period applies in this case because Plaintiffs' claims sound in tort.  *Fenters v. Yosemite Chevron*, 761 F. Supp. 2d 957, 996 (E.D. Cal 2010).  Therefore, the statute of limitations with respect to Plaintiffs' § 1983 claim is also **two (2) years**.[2]  Finally, the statute of limitations for public nuisance claims brought pursuant to California Civil Code §§ 3479 and 3480 is **three (3) years**.  *Mangini*, 230 Cal. App. 3d at 1144.  Plaintiffs have submitted evidence from a number of putative class members indicating they were harassed by individuals at Lunada Bay well outside the limitations period. (*See, e.g.*, Jongeward Decl. ¶¶ 3-4 [describing events that took place "[o]n a day in early 1980" and between 1980 and 1984, and averring that "[b]y the late 1980s, I chose not to surf at Lunada Bay anymore"]; Marsch Decl. ¶¶ 3-4 [describing an incident "in the winter of 1995" and averring he "ha[s] not returned to surf at Lunada Bay since the verbal assault in 1995"].)  Indeed, seven of the declarations submitted by Plaintiffs are from individuals who aver the last time they suffered

---

[2]    Analogous federal civil rights claims are also considered personal injury actions.  *See Wilson v. Garcia*, 471 U.S. 261, 277-280 (1985), *superseded by statute on other grounds*.

| | |
|---|---|
| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>        **DATE:** <u>February 21, 2017</u>

any injury at Lunada Bay was more than ten (10) years ago. (*See generally* ECF Nos. 161, 163-164, 170, 175, 177, 179.)

Plaintiffs respond by arguing that regardless of when the initial incident of harassment occurred, all putative class members' claims are timely claims because of their **present** desire to surf Lunada Bay free from harassment. (*See* Pls.' Reply to Individual Defs.' Opp'n ("Individual Reply"), ECF No. 206.) Plaintiffs cite no legal authority in support of this argument, and the Court concludes that putative class members who claim to have suffered tortious injuries at Lunada Bay more than two years prior to March 29, 2016, the date this action was commenced, are barred from bringing such claims. Similarly, no one in the proposed class can seek damages under a public nuisance theory for actions occurring more than three years prior to March 29, 2016.

        3.        Rule 23(a) Requirements

Courts have "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." *Armstrong*, 275 F.3d at 871 n. 28. A court need only form a "reasonable judgment" on each certification requirement "[b]ecause the early resolution of the class certification question requires some degree of speculation[.]" *Gable v. Land Rover N. Am., Inc.*, No. SACV 07-0376 AG (RNBx), 2011 WL 3563097, at *3 (C.D. Cal. 2011) (internal quotation marks omitted). Notwithstanding the above, courts are obligated to exercise their discretion within the framework provided by Rule 23 of the Federal Rules of Civil Procedure. *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001). Rule 23 permits a plaintiff to sue as a representative of a class if:

        (1)        the class is so numerous that joinder of all members is impracticable;
        (2)        there are questions or law or fact common to the class;
        (3)        the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
        (4)        the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Dukes*, 564 U.S. at 349. Courts refer to these requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation[.]" *Mazza v. Am. Honda Motor Co. Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). The Court addresses these four requirements in turn.

///
///
///
///

        a.        Numerosity

| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>          **DATE:** <u>**February 21, 2017**</u>

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964). "The numerosity requirement ensures that the class action device is used only where it would be inequitable and impracticable to require every member of the class to be joined individually." *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 548 (N.D. Cal. 2007). There is no numerical cutoff to determine whether a class is sufficiently numerous, though as a general rule, "classes of 20 are too small, class of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Gen. Tel. Co. of the Nw., Inc., v. EEOC*, 446 U.S. 318, 330 (1980).

In support of Plaintiffs' contention that the proposed class is sufficiently numerous, Plaintiffs rely exclusively on the Declaration of Phillip King. (*See* Mot. 13.) The Court has stricken paragraph 19 of Dr. King's declaration, however, and therefore Plaintiffs have no admissible evidence that "this beach-going class is minimally more than 20,000." (*Cf.* Mot. 13; King Decl. ¶ 19.) The Court agrees with Blakeman that this case is similar to *Celano v. Marriott International, Inc.*, in which the court found that:

> Plaintiffs' census data and statistics are **too ambiguous and speculative** to establish numerosity. Plaintiffs first ask the court to infer from them that many mobility impaired individuals who do not currently play golf, would like to. Then they ask the court to infer that many of the mobility impaired individuals who would like to play golf would play at the Marriott if carts were available, without providing any information about why this inference should be made given that Marriott represents very the high-end of golf courses when compared to public courses. More significantly, plaintiffs' data provides no insight into how many disabled people who would like to play golf, at Marriott courses, are deterred from doing so because of the absence of single-rider carts.

242 F.R.D. at 549. Similarly, Dr. King's declaration requires the Court to make far too many inferences and does not take into account important differences between Lunada Bay and other beaches in Southern California. (*See* King Decl. ¶ 10 [noting Lunada Bay is less than a half-mile of coastline]; Neushul Decl. ¶¶ 12-13 [noting poorly marked trails and poor signage to Lunada Bay, and that "[t]o access Lunada Bay, there are two main trails down cliffs that descend more than 100 feet" in a "steep" path].) Plaintiffs also fail to provide any evidence that Lunada Bay could support 20,000 beach-goers per year.

///

*Celano* also discussed in detail whether declarations submitted by the plaintiff could satisfy the numerosity requirement of Rule 23. The court noted that:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | |
|---|---|---|
| Priority | | ___ |
| Send | | ___ |
| Enter | | ___ |
| Closed | | ___ |
| JS-5/JS-6 | | ___ |
| Scan Only | | ___ |

**CASE NO.:**  CV 16-02129 SJO (RAOx)     **DATE:** <u>February 21, 2017</u>

> While the potential class is likely geographically diverse because Marriott has courses throughout the United States, and the class is not readily identifiable, plaintiffs have submitted **declarations of only 21 individuals** in support of numerosity. Assuming these declarations establish that these individuals attempted to play at the Marriott and could not, or wanted to play there but were deterred by the absence of single-rider carts, these facts are still limited to these 21 individuals. This is insufficient for class certification, as it would not be impracticable to join these individuals in suit.

242 F.R.D. at 549 (emphasis added).

Here, too, Plaintiffs have submitted declarations from several non-residents who have, at some point in their lives, attempted to recreate at Lunada Bay. But of the many percipient witness declarations submitted by Plaintiffs, only **nine (9)** are from non-residents who aver they surfed or attempted to surf Lunada Bay within the applicable limitations period but were prevented from doing so by the LBB and its alleged members. (*See generally* Spencer Decl.; Reed Decl.; Decl. Jordan Wright in Supp. Mot. ("Wright Decl."), ECF No. 159-9; Decl. Christopher Taloa in Supp. Mot. ("Taloa Decl."), ECF No. 159-10; Decl. John MacHarg in Supp. Mot. ("MacHarg Decl."), ECF No. 160; Decl. Kenneth Claypool in Supp. Mot. ("K. Claypool Decl."), ECF No. 166; Decl. Chris Claypool in Supp. Mot. ("C. Claypool Decl."), ECF No. 176; Decl. John Geoffrey Hagins in Supp. Mot. ("Hagins Decl."), ECF No. 178; Decl. Sef Krell in Supp. Mot. ("Krell Decl."), ECF No. 180.)[3] Moreover, two of these individuals, Spencer and Reed, are already named plaintiffs in this suit. A class comprised of nine members is not sufficiently numerous to make joinder impractical. The Court therefore concludes that Plaintiffs have not met their burden of demonstrating the proposed class is sufficiently numerous under Rule 23(a)(1).[4] Because "[f]ailure to prove any one of Rule

---

[3]  Although Mr. Hagins does not aver he attempted surfed or attempted to surf at Lunada Bay during the limitations period, he avers he "still receive[s] threats" from individuals who surf at Lunada Bay "[t]o this day," and the Court therefore considers him to be a possible class member. (Hagins Decl. ¶ 16.)

[4]  Even if the Court were to (impermissibly) overlook the statutes of limitations and consider each of the declarations submitted by Plaintiffs, it would nevertheless conclude that Plaintiffs have failed to meet their burden of demonstrating joinder would be impractical. Plaintiffs, after having the benefit of months of discovery and significant publicity, (*see* Decl. Richard P. Diefenbach in Supp. Blakeman Opp'n ¶¶ 2-6, ECF No. 190-2), could only muster **twenty-two (22) declarations** from individuals who claim to have been harmed by the actions of individuals at Lunada Bay over a forty-plus year span. Without additional evidence indicating why joinder of these identified individuals would be impractical, the Court cannot find the class sufficiently numerous.

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>          **DATE:** <u>February 21, 2017</u>

23's requirements destroys the alleged class action," the Court denies class certification on this basis alone. *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 675 (S.D. Cal. 1999). Nevertheless, the Court finds occasion to examine several other Rule 23 requirements.

>          b.    <u>Commonality</u>

"To show commonality, [p]laintiffs must demonstrate that there are questions of fact and law that are common to the class." *Ellis*, 657 F.3d at 981. However, not every question of law or fact must be common to class; rather, "all that Rule 23(a)(2) requires is a single **significant** question of law or fact." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 53 (2014) (internal quotation marks and citations omitted); *see also Mazza*, 666 F.3d at 589 (characterizing commonality as a "limited burden" and stating that it "only requires a single significant question of law or fact"). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common **answers** apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (citation omitted) (internal quotation marks omitted).

Plaintiffs contend all putative class members have "extensive" questions of law and fact in common; most notably, (1) whether the LBB or its alleged members unlawfully prevented them from accessing the beach at Lunada Bay; and (2) whether City Defendants acted with deliberate indifference toward their rights. (*See* Mot. 13-14.) Defendants respond by noting that Plaintiffs' own evidence indicates these two questions are not common to all of the members of the proposed class. (*See, e.g.*, City Defs.' Opp'n.) The Court agrees with Defendants.

First, the Court examines whether common questions of law or fact exist vis-a-vis the putative class members' claims against City Defendants. In order to prevail on a Section 1983 Equal Protection claim, a plaintiff must prove that (1) a state actor intentionally discriminated against him; (2) because of membership in a protected class; and (3) pursuant to a custom, policy, or practice of the entity. *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001); *Monell v. Dep't of Soc. Sers. of N.Y.C.*, 436 U.S. 658, 690 (1978). Plaintiffs allege City Defendants have "unlawfully excluded Plaintiffs, and persons like them, from their right to recreational opportunities at Palos Verdes Estates . . ." (Mot. 14). Yet Plaintiffs offer no explanation as to how this contention can be resolved on a class-wide basis. Indeed, the declarations submitted by Plaintiffs include a wide variety of assertions regarding the conduct of the City of PVE. For example, numerous declarants aver they did not contact the Palos Verdes police department, even informally, regarding their interactions with the LBB. (*See, e.g.*, Decl. Michael Alexander Gero in Supp. Mot. ("Gero Decl.") ¶ 12 [averring he "didn't inform the police of this incident because [he] had heard the police weren't effective . . . ."], ECF No. 170; Decl. Amin Akhavan in Supp. Mot. ("Akhavan Decl.") ¶ 14 ["I did not inform the police of this incident."], ECF No. 171.) One declarant, Christopher Taloa, even

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>　　　　**DATE:** <u>February 21, 2017</u>

testified at his deposition that the Palos Verdes police department "ha[s] been nothing but good to me. They have been there for us and I am so thankful and grateful on that aspect in that manner." (Decl. Edwin J. Richards Richards in Supp. City Opp'n ("Richards Decl.") ¶ 2, Ex. A at 6.) Thus, Plaintiffs' own evidence indicates no "common answer" can be elicited from the putative class members regarding their Equal Protection Claim.

The Court reaches a similar conclusion with respect to whether putative class members have significant common questions of law or fact with respect to their claims against the LBB and Individual Defendants. As discussed in Sections II(C)(1) and II(C)(2), *supra*, Plaintiffs' proposed class definition includes both individuals who have been harassed in some form by the LBB or its alleged members and those who have not. These divergent groups do not have "shared legal issues with divergent factual predicates" or "a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

For the foregoing reasons, the Court concludes that Plaintiffs have not failed to meet their burden of demonstrating significant questions of law or fact are common to the entire class.

　　　　c.　　<u>Typicality</u>

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under Rule 23(a)(3)'s "permissive standards, representative claims are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020 (quotation marks omitted). Typicality tests whether putative class members "have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Typicality refers to the nature of the claim or defense of the class representative, and not the specific facts from which it arose or the relief was sought." *Id.* The purpose of this requirement "is to assure that the interest of the named representative aligns with the interest of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (internal quotation marks omitted).

Defendants contend the named Plaintiffs' claims are not typical of those of the putative class members because (1) the class members who have come forth with evidence to support their claims were harmed in different ways by different individuals, and Plaintiffs have failed to demonstrate a conspiracy warranting group treatment, (*see* Lee Opp'n 2, 10-11; Blakeman Opp'n 18-19); (2) certain proposed class members either have moved to Palos Verdes or have affirmatively stated they are not treated poorly by City Defendants because of their non-local status; and (3) Reed and Spencer have claims that are not typical of putative class members who have been "deterred" from visited Lunada Bay. Although the Court disagrees with the first of these

| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:**  <u>CV 16-02129 SJO (RAOx)</u>          **DATE:** <u>February 21, 2017</u>

arguments because such an argument improperly presumes the ultimate merits of Plaintiffs' conspiracy claim, the Court agrees with City Defendants both that Spencer and Reed's claims are not typical of the large swath of putative class members who have never been to Lunada Bay and that Spencer and Reed's Equal Protection Claims against City Defendants are not typical of certain other putative class members.

Although it might be the case that the claims of named Plaintiffs Reed and Spencer are typical of the claims of putative class members who both were harassed at Lunada Bay by the LBB or its alleged members and had their calls for help to City Defendants fall on deaf ears, their claims are **not** typical of putative class members who do not claim to have suffered these injuries. Spencer and Reed allege they visited Lunada Bay and suffered injuries as a result of these visits. As such, they have very different claims from those putative class members who submit they have decided not to visit Lunada Bay due to City Defendants' alleged reputation for passivity. Because of this unique factual background, named Plaintiffs' interests do not "align[ ] with the interests of the class" in a manner that satisfies Rule 23's typicality requirement. *Wolin*, 617 F.3d at 1175.

Moreover, City Defendants point to evidence submitted by Plaintiffs revealing that Spencer and Reed have claims against City Defendants that are not typical of those of several proposed class members. For example, a number of declarants aver that they currently reside in Palos Verdes, and therefore do not share the same Equal Protection Claims that Plaintiffs are asserting. (*See* Neushul Decl. ¶ 6 ["About eight years ago, in 2008, I purchased a home in Palos Verdes Estates near the public library. I knew that Lunada Bay had a 'locals only' reputation but I wanted to surf there and my house was right around the corner from the ocean."]; Akhavan Decl. ¶ 1 ["Since 2001, I have resided in Palos Verdes Estates."]; Decl. Blake Will in Supp. Mot. ("Will Decl.") ["Despite growing up in Palos Verdes, I was not allowed to surf Lunada Bay."], ECF No. 163.) Moreover, Plaintiffs do not dispute that another proposed class member, Christopher Taloa, testified at his deposition that he did not "feel like [he] w[as] treated poorly because [he] was from North Hollywood or [he] w[as]n't from Palos Verdes by the police department[.]" (*See* City Opp'n 11-12.)[5] Plaintiffs argue in their reply that "[o]ne outlier does not dispel commonality" or "negate[ ] typicality," but the two cases they cite in support of this proposition are inapposite. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2009) ("The fact that some class members may have suffered no injury or different injuries . . . does not prevent the class from meeting the requirements of **Rule 23(b)(2)**."); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1094 (C.D. Cal. 2015) ("[I]nclusion of uninjured class members does not necessarily render a class **unascertainable**.").

---

[5]  The language City Defendants cite on pages 11 and 12 of their opposition does not appear in any of the pages of Mr. Taloa's deposition transcript that have been provided to the Court. (*See generally* Richards Decl., Ex. A.) That said, Plaintiffs do not dispute this testimony. (*See* Pls.' Reply to City Opp'n 2.)

MINUTES FORM 11
CIVIL GEN

__ : __
Initials of Preparer    VPC

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 16-02129 SJO (RAOx)          **DATE:** <u>February 21, 2017</u>

For the foregoing reasons, the Court concludes that Plaintiffs have not met their burden of demonstrating their claims are typical of those of members of the proposed class.

        **4.**    <u>Rule 23(b) Requirements</u>

"In addition to fulfilling the four prongs of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b)." *Spann v. J.C. Penney Corp.*, 307 F.R.D. 514 (C.D. Cal. 2015) (citing *Dukes*, 564 U.S. at 345). Where a plaintiff seeks certification under Rule 23(b)(2), she must demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory relief warranted—the notion that the conduct is such that it can be enjoined or declared only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). By contrast, where a plaintiff seeks certification under Rule 23(b)(3), the court must find "that questions of law or fact common to the class members **predominate** over any questions affecting only individual members, and that a class action is **superior** to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). Here, Plaintiffs seek certification under both Rule 23(b)(2) and 23(b)(3).

Plaintiffs have not met their burden of demonstrating three of the four requirements of Rule 23(a) have been satisfied, and therefore the Court need not reach a conclusion regarding whether certification under Rule 23(b)(2) or 23(b)(3) would be proper. Nevertheless, the Court finds occasion to address glaring flaws with Plaintiffs' request for certification under Rule 23(b)(3). First, the Court finds it exceedingly unlikely that Plaintiffs would be able to demonstrate that common questions of law or fact predominate over any questions affecting only individual members. *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 622-23 (1997). The predominance requirement aims to ensure that a class action achieves "economies of time, effort, and expense, and promote[s] . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* at 615. Moreover, the requirement "helps to ensure that certifying a Rule 23(b)(3) class leads to greater economy than conducting many individual actions." *Newberg on Class Actions* § 4:49. In evaluating predominance and superiority, courts must consider: "(1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

As previously discussed, Plaintiffs have failed to demonstrate that there are significant questions

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 16-02129 SJO (RAOx)</u>          **DATE:** <u>February 21, 2017</u>

of law or fact common to the entire class, and therefore have fallen far short of demonstrating that significant common questions of law or fact predominate over any other questions affecting individual members. Furthermore, where each class member would be forced to litigate numerous and substantial separate issues to establish his or her right to recovery, a class action is not a superior method of fairly and efficiently adjudicating the controversy at hand. *Zinser v. Accufix Research Inst. Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). Here, the facts surrounding each putative class member's claims for assault, battery, and negligence by the LBB and Individual Defendants present a wide array of separate issues necessary to establish liability, including, *inter alia*, determining (1) which Individual Defendant engaged in the challenged conduct; and (2) whether such conduct was tortious, which could require analyzing the class member's own conduct and the Individual Defendant's affirmative defenses.

Furthermore, Rule 23(b)(3) requires courts to consider "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3). Plaintiffs have submitted evidence that two putative class members, John Hagins and Michael Sisson, filed two separate lawsuits, both of which settled, against some of the alleged members of the LBB and the City of Palos Verdes Estates in 1995 and 2002, asserting similar causes of action to those at issue in this litigation. (*See* Hagins Decl. ¶ 11; Decl. Michael Sisson in Supp. Mot. ("Sisson Decl.") ¶¶ 6-7, Exs. 1-3, ECF No. 169.) There is accordingly at least some interest on the part of potential class members in bringing separate litigations.

Finally, even assuming Plaintiffs could establish liability on the part of Defendants, their proposed damage methodology runs afoul of the Ninth Circuit's holding that "a methodology for calculation of damages that could not produce a class-wide result was not sufficient to support certification." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) (citing *Comcast*, 133 S. Ct. at 1434-35). As this Court has recognized,

> While . . . the Court need not decide the precise method for calculating damages at this stage, plaintiffs must still offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the class. Without such a theory, the Court cannot certify plaintiffs' proposed class as to damages, even if such a class could be appropriately certified as to liability only.

*Vaccarino v. Midland Nat. Life Ins. Co.*, No. CV 11-5858 CAS (MANx), 2013 WL 3200500, at *14 (C.D. Cal. June 17, 2013). Here, Dr. King's damage methodology—which the Court has stricken as unreliable under Rule 702 and *Daubert*—is nothing more than an "estimate of the recreational value of the surfing at Lunada Bay" which he opines "is between $50 and $80 per person per visit during the high season (November to March) and approximately half of that during the rest of the year." (King Decl. ¶ 19.) Dr. King not only fails to offer any support as to how he arrived at these figures, but also fails to tie these numbers to the claims of the putative class members. For example, these figures apply only to the recreational value of **surfing**, but the proposed class

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  <u>CV 16-02129 SJO (RAOx)</u>          DATE: <u>February 21, 2017</u>

includes individuals who seek to engage in a number of activities other than surfing.  (*See, e.g.*, Mot. 12 [including "surfers, boaters, sunbathers, fisherman, picnickers, kneeboarders, stand-up paddle boarders, boogie boarders, bodysurfers, windsurfers, kite surfers, kayakers, walkers, dog walkers, hikers, beachcombers, photographers, and sightseers" in the proposed class definition]; *see also* Decl. Joseph Lanning in Supp. Mot. ("Lanning Decl.") ¶ 3 [describing his desire to hike and walk his dogs at Lunada Bay], ECF No. 172.)  Moreover, Plaintiffs and declarants allege an array of injuries at the hands of Individual Defendants, including those that have caused physical, emotional, and property damage.  Yet Dr. King's proposed damage calculation does not take any of these alleged injuries into account.  For all of these reasons, the Court would be unlikely to find certification under Rule 23(b)(3) appropriate.

III.    <u>RULING</u>

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Class Certification.

IT IS SO ORDERED.

# Exhibit G

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

**FILED**

MAY 18 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CORY SPENCER, an individual; et al., | No. 17-80033 |
| Plaintiffs-Petitioners, | D.C. No. |
| | 2:16-cv-02129-SJO-RAO |
| v. | Central District of California, |
| | Los Angeles |
| LUNADA BAY BOYS; et al., | |
| | ORDER |
| Defendants-Respondents. | |

Before: REINHARDT and NGUYEN, Circuit Judges.

The court, in its discretion, denies the petition for permission to appeal

(Docket Entry No. 1) the district court's February 21, 2017 order denying class

action certification. *See* Fed. R. Civ. P. 23(f); *Chamberlan v. Ford Motor Co.*, 402

F.3d 952 (9th Cir. 2005).

MAY 2 5 2017

# Exhibit H

HANSON BRIDGETT LLP
KURT A. FRANKLIN, SBN 172715
kfranklin@hansonbridgett.com
SAMANTHA WOLFF, SBN 240280
swolff@hansonbridgett.com
JENNIFER ANIKO FOLDVARY, SBN 292216
jfoldvary@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366

HANSON BRIDGETT LLP
TYSON M. SHOWER, SBN 190375
tshower@hansonbridgett.com
LANDON D. BAILEY, SBN 240236
lbailey@hansonbridgett.com
500 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone: (916) 442-3333
Facsimile:  (916) 442-2348

OTTEN LAW, PC
VICTOR OTTEN, SBN 165800
vic@ottenlawpc.com
KAVITA TEKCHANDANI, SBN 234873
kavita@ottenlawpc.com
3620 Pacific Coast Highway, #100
Torrance, California 90505
Telephone: (310) 378-8533
Facsimile:  (310) 347-4225

Attorneys for Plaintiffs
CORY SPENCER, DIANA MILENA
REED, and COASTAL PROTECTION
RANGERS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation,<br><br>Plaintiffs, | CASE NO. 2:16-cv-02129-SJO (RAOx)<br><br>**DECLARATION OF CORY SPENCER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. S. James Otero<br>Date:  February 21, 2017<br>Time:  10:00 a.m.<br>Crtrm.: 10C |

v.

LUNADA BAY BOYS; THE
INDIVIDUAL MEMBERS OF THE
LUNADA BAY BOYS, including but
not limited to SANG LEE, BRANT
BLAKEMAN, ALAN JOHNSTON
AKA JALIAN JOHNSTON,
MICHAEL RAE PAPAYANS,
ANGELO FERRARA, FRANK
FERRARA, CHARLIE FERRARA,
and N. F.; CITY OF PALOS
VERDES ESTATES; CHIEF OF
POLICE JEFF KEPLEY, in his
representative capacity; and DOES
1-10,

        Defendants.

I, Cory Spencer, declare as follows:

    1.    I currently live in the city of Norco, California.  I first moved to Norco in about 2009 and have lived in Southern California my entire life.  I have a bachelor's degree in criminal justice from Union Institute and University in Los Angeles, California.  I also attended the Los Angeles Police Department Police Officer Standard and Training Academy and graduated in approximately 1997.  I am currently employed by the City of El Segundo, California as a police officer.  I have held this position since March 13, 2000. Prior to working in El Segundo, I was a police officer with the Los Angeles Police Department (LAPD), where I worked from October 1996 to March 2000.  I have personal knowledge of the matters stated in this declaration and, if called as a witness, could and would testify competently as to its contents.

    2.    I grew up in La Mirada, which is located in southeast Los

DECL. SPENCER SUPP. PLS.' MOT. FOR CLASS CERTIFICATION

1  Angeles County – and more than 20 miles to the nearest surfing beach. I

2  began surfing when I was approximately 11 or 12 years old and instantly fell

3  in love with the sport. I have surfed consistently for over 30 years, am an

4  avid surfer and beachgoer, and I currently surf whenever conditions permit.

5  Through surfing, I am able to express myself, exercise, and enjoy nature. I

6  most often surf El Porto in Manhattan Beach, Oceanside Harbor in San

7  Diego County, and Huntington Beach in Orange County. From the City of El

8  Segundo, where I work, to the nearest edge of Palos Verdes Estates, it is

9  little more than a 10 mile drive. Lunada Bay is a little bit further south.

10      3.      I first became aware of Lunada Bay in Palos Verdes Estates

11  when I was in my mid-teens, probably about 14 or 15 years old. I remember

12  reading a Surfing Magazine that had a small article about the wintertime

13  swells at Lunada Bay and a photo of the surf. The article also made

14  reference to the fact that localism – a practice where local beachgoers

15  exclude nonresident, nonlocal beachgoers through threats, violence, and

16  intimidation – was prevalent at Lunada Bay. It said something to the effect

17  that Lunada Bay has one of the most perfect waves in California in the

18  wintertime but that few were able to enjoy it. The article made an

19  impression on me at the time. I have  wanted to surf Lunada Bay from the

20  day I saw that photo but was fearful because of the localism issue described

21  in the article. As an adult, Lunada Bay is unique beyond it being one of

22  Southern California's best big waves that breaks over a rock reef. Lunada

23  Bay is also a public treasure because it is in an unspoiled coastal area of

24  Los Angeles County that offers coastal bluff views, tide pooling and other

25  outdoor activities in the otherwise urbanized Southern California coast.

26      4.      Shortly after seeing the photo and reading the article about

27  Lunada Bay, while I was a teenager, I started asking around in the surfing

28  community about localism there. I heard stories from other surfers about

1  incidents of localism dating back decades.  I had heard about surfers getting
2  their tires slashed, windows egged, and property thrown into the ocean while
3  surfing.  I was told by other surfers, "oh, you can't go there."  Localism at
4  Lunada Bay was (and is) a widely known fact within the surfing community.
5  I was afraid to go to Lunada Bay.

6        5.      But it also bothered me that only a select few could enjoy it.  And
7  I wanted to see Lunada Bay for myself.  So I drove to Lunada Bay
8  approximately 8 to 10 times from the time I was a teenager until
9  approximately January of this year.  I usually brought my surfboards with me
10  though I never did surf on any of those occasions.  I was always afraid of
11  becoming a victim of localism at Lunada Bay.  I didn't want the stories I had
12  heard about localism to become true for me.

13        6.      In approximately 2002 or 2003, my police chief at the time (in El
14  Segundo) was seeking volunteer officers to surf undercover at Lunada Bay
15  as part of a sting operation.  I eagerly volunteered for the assignment.  The
16  goal was to catch the Bay Boys in the act of engaging in unlawful activity
17  and make arrests and issue citations on the spot.  I was excited at the
18  prospect of this because I had wanted to surf there since I was 15 years old.
19  I knew it would be meaningful and satisfying to be part of the effort that
20  would finally hold the group of men accountable who had made this beach
21  off-limits to me and so many others for decades.  Unfortunately, the
22  operation was called off and nothing ever happened.  I was incredibly
23  disappointed.

24        7.      In or around 2014, I learned about a movement started by Chris
25  Taloa, a professional bodyboarder and actor.  He wanted to create a
26  peaceful movement to encourage visitors to surf Lunada Bay in large
27  numbers so that it would be safe.  On information and belief, I understand
28  that his movement started as a Facebook page named "Aloha Point," a term

DECL. SPENCER SUPP. PLS.' MOT. FOR CLASS CERTIFICATION

1 Mr. Taloa coined in reference to the "Aloha spirit" of welcoming
2 peacefulness. I was interested in his movement and supported his goals.
3 The movement resonated with me as a police officer, where my safety is
4 threatened daily, but where there is safety and strength in numbers. I
5 figured that supporting this movement through a strength-in-numbers
6 approach would be my best opportunity to peacefully surf at Lunada Bay.

7       8.    It wasn't until late January 2016 that I finally contacted Mr. Taloa
8 and suggested that we get a group of people together on January 29, 2016
9 to try and safely surf a swell that was coming to Lunada Bay. He was
10 enthusiastic and said he would organize a group of people to hopefully have
11 some good, peaceful, clean surfing. I understood that there would be about
12 6 to 8 surfers, which is the only reason I decided to attempt to surf at Lunada
13 Bay. Without a group of that size, I never would have tried to surf there.

14       9.    Before surfing Lunada Bay with Mr. Taloa and his acquaintances
15 on January 29, 2016, I decided to contact Palos Verdes Estates' Chief of
16 Police (Jeff Kepley) to request that additional patrols be present while we
17 surfed to ensure our safety. I don't recall receiving a response from him, so I
18 reviewed the Palos Verdes Estates Police Department's organizational chart
19 and contacted Captain Mark Velez. We engaged in a dialogue and he
20 thanked me for the request and assured me there would be extra patrols in
21 the area. Although the police were not present when we arrived the morning
22 of January 29, 2016, I did notice a group of officers present on the bluff top
23 after I got out of the water.

24       10.   In preparation for our outing to Lunada Bay, our group of visitors
25 decided to contribute $20 each so that we could hire a security guard to
26 watch our cars while we surfed. I had been told by many surfers that the
27 Bay Boys will vandalize your car while you surf, and I would not have felt
28 comfortable leaving my car that morning without someone present to stand

guard.  Before our arrival at Lunada Bay, Mr. Taloa and I recommitted ourselves to creating change through peace: we discussed that we would ignore any comments or glares from the Bay Boys – including taunts and threats – and instead would go about our business in order to safely surf. We knew the Bay Boys would try to provoke us into a fight and decided the best way to handle it was to simply ignore it.

11.    Almost instantly after we arrived at Lunada Bay the morning of January 29, 2016, we started getting harassed by Bay Boys.  We were told that we couldn't surf there and I was called a "kook," which is a derogatory surfing term.  I was also told: "why don't you fucking go home, you fucking kook" and asked "how many other good places did you pass to come here?" These taunts started while I was on the bluffs getting ready to surf.  One individual in particular continued to heckle Mr. Taloa and I on our way down to the beach and into the water.

12.    A man who I now know to be Defendant Brant Blakeman was already in the water and began paddling around Mr. Taloa and me in a tight circle – staying just a few feet away from us.  He impeded our movement in any direction and I believe that he was intentionally blocking us from catching any waves.  It was clear to me that he was not there to surf that morning.  Instead, his mission was to prevent us from surfing, and it felt like he had designated himself to keep us from enjoying our time in the water, the open space, the waves, and nature.  Indeed, in the approximately 90 minutes I was in the water that day, I never saw him attempt to catch a single wave.  Instead, he was focused on Mr. Taloa and me.  He never said a word, and just stared at us the entire time.  He would shadow our movements, and sit uncomfortably close.  I have never experienced anything like that before in my life.  It was bizarre but also incredibly frightening and disturbing.  It appeared to me that Mr. Blakeman was

coordinating with a group of guys who were standing in the Rock Fort, along with others in the water.  They were all talking to each other and it was clear they all knew each other.

13.    At one point while I was in the water, I was paddling west out to the ocean and I saw a man surfing, coming in east towards the shore.  We locked eyes and I watched as he maneuvered his surfboard directly toward me, intending to run me over.  I rolled off the left side of my surfboard and my right hand and wrist held onto the right side of my surfboard.  He ran over my hand/wrist that was holding my surfboard and one of the fins on his surfboard sliced open my right wrist.  I now have about a half-inch scar from where this man ran me over.  Attached as **Exhibit 1** is a true and correct copy of a photograph of my wrist taken during my deposition, with a pen pointing to my scar.

14.    As soon as he ran me over, he started berating me, saying things like "what are you fucking doing out here?  I told you to go home.  I should have ran you over.  Why are you paddling in the sun glare where I can't see you?"  He was pretending that he didn't see me but it was obvious that he saw me and intentionally ran me over.  I responded that he did run me over and showed him my wrist.  He said that I shouldn't paddle in the sunlight.  With over 30 years of surfing experience, I knew that this collision was intentional on his part.  I was fearful of being further injured at that point and I didn't want to get into an argument with him so I just paddled away.

15.    Mr. Taloa and I caught one more wave after that and then decided it was getting too dangerous to surf.  More men started showing up at the Rock Fort and we were growing increasingly fearful for our safety.  I was also bleeding and in pain.

16.    I believe that the man who ran me over with his surfboard was a Bay Boy, like Mr. Blakeman and the other men in the Rock Fort that

morning.  It was clear to me that they were all communicating with each other and that they all knew each other.  They were the only surfers who were not getting harassed (and who were doing all of the harassing).

17.    Although I had asked for extra police patrols prior to arriving at Lunada Bay, I did not see any police present along the shoreline, at the Rock Fort, or in the water.  Given my advance warning that a group of visitors intended to surf there that morning, the police should have been present where the conflicts were likely to arise – in and around the water.  And because there were no police present near the water, no one was there to witness the battery I had suffered.

18.     After we got out of the water, we made our way up the trail back to the blufftop.  The other visitors with the Aloha Point movement who were supposed to surf with Mr. Taloa and me were just arriving.  I recall that Diana Milena Reed, Kenny Claypool and Jordan Wright were among the surfers who had just arrived.  I remember showing my hand and describing what had happened to those present.

19.    Mr. Taloa and I then went back to our car and started changing out of our wetsuits.  A man approached us and started hassling Mr. Taloa in particular.  I have since learned that the man was Sang Lee.  He kept asking why we keep coming back and telling us that things will never change here, it's the way it's been for years.  He then described how he became a Bay Boy, how things work within their gang, how you work your way into their gang, and why they exclude outsiders from visiting or enjoying Lunada Bay.  Mr. Taloa kept trying to walk away, and said "hey, we'll talk another time," but Mr. Lee just kept coming at him and restating the same dialogue over and over.  The entire conversation lasted approximately 10 minutes.

20.    Shortly after we changed back into our clothes, I noticed a group of police officers standing to my south with what appeared to be another

group of newly-arrived Bay Boys. I walked over to the officers to thank them for showing up that morning, even though I had no way of knowing whether they were there as a result of my email request or not. I also told one of the officers what had happened to me in the water and I showed him my hand. The officer did not offer to take a report and he did not ask me to identify the aggressor.

21. I decided to return to Lunada Bay a week later, notwithstanding the assault, battery, intimidation and harassment I had suffered the week prior. Despite my fear in returning, I felt that I had to stand up to bullies like Brant Blakeman who were unlawfully keeping beachgoers away from Lunada Bay. So I planned an outing on February 5, 2016, with Chris Taloa, Kenny Claypool, Jordan Wright, and Diana Milena Reed. I did not intend to surf that day and instead agreed to stay on the bluffs to watch our cars while the others surfed. In advance of our arrival, I emailed Captain Velez to let him know that we were returning to surf.

22. Again, immediately upon my arrival on Paseo Del Mar – the street parking in front of Lunada Bay – I began getting harassed by Bay Boys. I was called a "kook" and asked what I was doing, why I was there, and was told to go home and not to surf there. Some men who I believe to be Bay Boys drove by very slowly in their trucks and cars while others stood watch on the bluffs. I noticed that as they passed by in their vehicles, they would get on their cell phones and then more and more men started to show up. It appeared to be a coordinated effort among members of a gang. I was concerned that the situation would escalate as more Bay Boys began showing up and I grew increasingly fearful for my safety. There were approximately two groups of 15 to 20 men each, stationed on either end of the bluffs – near the two trailheads to the shoreline below.

23. Defendant Blakeman was also present again. He stood on the

bluffs with his camera attached to a selfie stick and constantly circled around our group of visitors while sticking his camera in our faces.  He filmed us from the time we arrived and through the time Jordan and Chris got out of the water after they surfed.  It was such odd and harassing behavior and made me feel very threatened, intimidated, and uncomfortable.  I assume he was filming all of us to intimidate us, and so that he could show it to other Bay Boys to identify us.

24.    A small group of officers arrived later that morning while I was still there, including a sergeant I recognized from previously working together for the El Segundo Police Department.  I noticed several officers talked with a few members of the Bay Boys but I don't know what was said, or if any type of enforcement action was taken.  I did notice that even though officers were present, Brant Blakeman continued to film throughout the morning.

25.    Approximately a month later, on March 4, 2016, I wrote to Chief Kepley via email to provide a suggestion how to address the localism problem at Lunada Bay since it seemed he had been unable to effectively do so up to that point.  It was my intention to collaborate, cop-to-cop, in an effort to take care of the problem together.  I know we would not tolerate the Bay Boys' behavior in my jurisdiction and I wanted to lend a hand.  I encouraged him to plan an undercover operation at Lunada Bay and indicated that I believed the El Segundo Police Department would be willing to assist.  I also told him that while extra patrols at Lunada Bay are appreciated, officers standing along the bluffs cannot observe anything that goes on in the water, along the shore, or in the Rock Fort down below.  I was referencing the assaults, vandalism, batteries, drinking, and alleged drug abuse that has been alleged to run rampant at Lunada Bay for the past 30 or 40 years.  A true and correct copy of my email to Chief Kepley is attached as **Exhibit 2**

DECL. SPENCER SUPP. PLS.' MOT. FOR CLASS CERTIFICATION

1 and is Bates stamped CITY1807.  I received an email in reply, stating that

2 he had been to the Rock Fort on several occasions and talked with surfers

3 "in an effort to educate them on the position we are all in and what needs to

4 change in terms of acceptable behavior on their part."

5       26.    The incidents of bullying, intimidation, threats, assault, battery,

6 and harassment that I experienced at Lunada Bay have caused me to suffer

7 loss of sleep, emotional distress, and mental anguish.  I am deeply disturbed

8 and saddened by the Bay Boys' acts of exclusion in that I am not able to

9 enjoy a place that I have a right to enjoy without being harassed and

10 attacked.  I have lost sleep over the incident when Mr. Blakeman circled me

11 in the water and later, when my hand was cut open by a fellow Bay Boy.

12 The January 29, 2016 incident made me feel feeble, humiliated, and

13 intimidated.  I have been distressed by my feelings of anger and resentment

14 toward the Bay Boys, including Brant Blakeman, who have denied me

15 access to a public place.  They have no right to claim a public beach as their

16 turf and enjoy it to their exclusive benefit while denying others the same

17 enjoyment.

18       27.    I have been similarly disappointed and upset that the City of

19 Palos Verdes Estates and Chief Kepley have not taken the problem the Bay

20 Boys have created seriously, and have done nothing to remedy this

21 problem.  I believe that the City of Palos Verdes Estates and Chief Kepley

22 have turned a blind eye to the violence, intimidation, vandalism and

23 harassment that goes on at Lunada Bay, both on the bluff top and below on

24 the beach and in the water.  The City allowed an unpermitted Rock Fort to

25 exist along the shore knowing that is only accessible to a select few.  The

26 Lunada Bay Boys use this Rock Fort as a base of operations where they

27 congregate to drink, possibly use drugs, and coordinate their attacks on non-

28 locals.  The City and Police Chief Kepley have done little, if anything, to

DECL. SPENCER SUPP. PLS.' MOT. FOR CLASS CERTIFICATION

1  prevent this unlawful conduct from occurring and the Rock Fort's very
2  existence evidences the City's complicity in the Bay Boys' conduct.
3      28.    The City's complicity in the Bay Boys' exclusion of visitors is
4  further evidenced by their failure to make the area of Lunada Bay visible and
5  accessible to non-residents.  There are no signs alerting visitors that there is
6  a beautiful beach below the bluffs that is open to the public.  Making things
7  more dangerous, there are no signs marking the entrances to the two public
8  trailheads.  There is no information posted about what to do if a visitor
9  encounters a problem – including listing the local police department's direct
10  phone number.  The access to the beach is similarly non-existent.  The
11  "trail" is a steep, precarious, narrow path that should be better maintained by
12  the City so as to provide safe access to the beach.  Each of these factors
13  serves to further intentionally exclude non-residents from accessing Lunada
14  Bay.
15      29.    Further, I believe that Chief Kepley is similarly complicit in the
16  Bay Boys' unlawful exclusion of visitors.  He is the chief law enforcement
17  officer in Palos Verdes Estates but has failed to remedy or even
18  acknowledge and address a serious gang problem within his jurisdiction.  As
19  a fellow law enforcement officer, I am aware of the various tools available to
20  Chief Kepley to address the Bay Boys' unlawful conduct, including making
21  arrests and issuing citations.  But Chief Kepley fails to enforce laws,
22  including City ordinances that are designed specifically to prevent this
23  problem.  Proactive police work – including arresting and citing wrongdoers
24  for violating City ordinances and the California Penal Code – would be
25  effective to take care of a problem that has gone unaddressed for 30 to 40
26  years.  By making a proper arrest or issuing citations, it would send a
27  message to the others that the City does not tolerate a gang in the water
28  and on the beach.  Were this to actually happen, I am confident – based on

DECL. SPENCER SUPP. PLS.' MOT. FOR CLASS CERTIFICATION

1  my many years in law enforcement – that the problem would eventually go

2  away.

3    30.   But I also understand that Chief Kepley and the Palos Verdes

4  Estates Police Department have not engaged in this type of proactive

5  policing.  Instead, I understand that Chief Kepley has attempted to engage in

6  what he calls "community policing" – a system of allocating police officers to

7  particular areas so that they become familiar and friendly with the local

8  inhabitants in the hope of solving any problems that the police need to

9  address.  I understand that Chief Kepley met with members of the Bay Boys

10  and essentially asked them to behave better.  While community policing may

11  be effective for some problems, in my experience it is highly ineffective when

12  it comes to preventing gang violence.  You simply do not tell gang members

13  to behave better – all that means to them is you are going to allow them to

14  continue to operate in anonymity and to behave more secretively.  Instead,

15  in my training, gangs, including turf-based gangs like the Bay Boys, require

16  some type of specific deterrent effort.  It is baffling to me that a seasoned

17  law enforcement officer such as Chief Kepley would conduct himself this

18  way.

19    31.   Through this lawsuit, I hope to open Lunada Bay up to the public

20  so that all who wish to enjoy it can do so freely without illegal discrimination,

21  harassment, intimidation, violence and fear.  Because it is a public beach, all

22  should be able to enjoy Lunada Bay to express themselves and enjoy nature

23  at Lunada Bay.  And all should be able to visit Lunada Bay no matter where

24  they live, where they grew up, where they went to high school, or how much

25  money they make.  If someone is harassed or illegally excluded, I want the

26  police to protect them and their right to visit a public beach.   This is

27  particularly important to me, as someone who has spent his entire

28  professional career as a police officer ensuring the safety and security of

others.  With this lawsuit, I want the Court to oversee an injunction that would enjoin the individual Defendants and other Bay Boys who illegally exclude visitors from using the Lunada Bay for a period that is long enough to return Lunada Bay to the public.  While the City's post-Thanksgiving removal of the unpermitted Rock Fort that served as the base of operations for the Bay Boys may prove helpful, more is needed after decades of the Bay Boys' illegal activity.  Consistent with the California Coastal Act that also protects visitors from illegal discrimination, I would like to see an open and inviting space that includes trail improvements, signage marking existing trails, signage indicating Lunada Bay is a public beach, amenities to demonstrate Lunada Bay is a public beach (e.g., seating, binoculars, an appropriate parking), signage on how to report safety concerns to the City, interpretive signage regarding the activities available to the public at Lunada Bay, an internet map on City website to the two trails at Lunada Bay as well as other trails to Palos Verdes Estates beaches, an internet map on City's website identifying surfing and other recreational opportunities within the City, information on wheelchair accessibility to Palos Verdes Estates beaches, cameras on the blufftop parking areas to record license plates so that gang members cannot operate in anonymity, police wearing body cameras to record interaction with the public that would be downloaded at the end of each day,  the City training its police on gangs (including turf gangs), the City training its police on its local beach-related ordinances and access issues, the police fairly enforcing existing laws related to no-alcohol and beach access, and information on  the location of public restrooms..

32.    I am committed to ensuring all members of the public – no matter where they grew up, went to high school or currently live, their income level, race, color or other protected category – will have safe access to Lunada Bay and other Palos Verdes Estates' beaches.  I understand my obligation

1   as a representative for the plaintiff class to closely monitor this litigation,

2   keep abreast of the status of the proceedings, assist in the prosecution of

3   this case, and supervise my attorneys who are handling this matter on my

4   and the class' behalves.  To that end, I stay in close contact with my

5   attorneys to ensure that the case is on track and that our litigation position is

6   consistent with our goals of providing public access to Lunada Bay.  I ensure

7   that my attorneys' intentions are still pure in that regard and that we are

8   working together to stop the Lunada Bay Boys' culture of bullying and the

9   City of Palos Verdes Estates and Chief Kepley's complicity in the Bay Boys'

10   tactics.

11       33.   I also provided thorough comments to the draft complaint before

12   it was filed, which were incorporated into the final complaint.  I have been

13   extensively involved in preparing, reviewing, revising and finalizing pleadings

14   and discovery in this case, have reviewed deposition transcript(s), and have

15   provided my comments on those documents that I consider relevant.

16   To date, I have responded to multiple discovery requests, including

17   responding to 4 sets of interrogatories, 4 sets of requests for production of

18   documents, and 1 set of requests for admission.  I also appeared for

19   approximately seven hours deposition, on October 11, 2016 in Los Angeles,

20   California.

21

22       I declare under penalty of perjury under the laws of the United States

23   of America that the foregoing is true and correct.

24

25       Executed in El Segundo, California on December 26, 2016.

26

27

28   CORY SPENCER

# Exhibit 1



DEFENDANT'S EXHIBIT NO. 43
For Identification
Witness: C.E. Spencer
Date: 10/4/2016       Page No: 1
Carmen R. Sanchez, CSR No. 5060

Ex. 43

# Exhibit 2

**Mark Velez**

| From: | Jeff Kepley |
|---|---|
| Sent: | Saturday, March 05, 2016 9:11 AM |
| To: | Mark Velez |
| Subject: | Fwd: Lunada UC ops |

REDACTED

FYI.

Jeff Kepley

Begin forwarded message:

**From:**
**Date:** March 4, 2016 at 10:12:35 PM PST
**To:** jkepley@pvestates.org
**Subject: Lunada UC ops**

Sir, first of all, I'd like thank you and your dept. for the response in extra patrols down at Lunada Bay. I am active law enforcement (ESPD) and have been emailing Capt. Velez every time we (Aloha point Facebook group-a group of non-locals) venture out to the bay on a big swell day. He has been kind enough to respond, and we've been encouraged to see PV officers.

Anyway, several years ago (around 02' or 03') the then chief of PV asked several surrounding agencies to see if officers who surfed would be willing to paddle out "on duty-undercover."
I was approached along with a few more of our officers and we were excited to help out. For reasons unknown, nothing ever materialized. I think it would be worth another shot and be very effective. I'm sure my chief would assist in letting the few of us that do surf help out should you ever want to try something like that.

It really is too hard to observe anything that really goes on down there from the bluff. Although, I understand two younger officers actually made their way down to the fort and were actually able to finally witness/document a 415. You know, and I know, the DA will most likely reject it, but kudos to them for their descent from the bluff to the beach.

Thanks for reading, and possibly considering a UC operation as I've suggested. As a side issue, I have recently been made aware of, and feel a brotherly sense of duty, to make you aware of some upcoming legal actions in the works by a very large, non-profit foundation heavily invested in coastal matters (this is separate from the coastal commission thing). There are attorneys plotting strategies as we speak, to basically force the city (consent decree type) to make Lunada Bay very "public access." This could mean many things (signage, trail improvement, parking,etc...). Just wanted to give you a heads up so your not blindsided.

Again, thanks for the response.

DEFENDANT'S EXHIBIT NO. 42
For Identification
Witness C. E. Spencer
Date 10/11/2018  Page No: 105
Carmen R. Sanchez, CSR No. 5060

1

42

CITY1807

# Exhibit I

1  HANSON BRIDGETT LLP
   KURT A. FRANKLIN, SBN 172715
2  kfranklin@hansonbridgett.com
   SAMANTHA WOLFF, SBN 240280
3  swolff@hansonbridgett.com
   JENNIFER ANIKO FOLDVARY, SBN 292216
4  jfoldvary@hansonbridgett.com
   425 Market Street, 26th Floor
5  San Francisco, California 94105
   Telephone: (415) 777-3200
6  Facsimile:  (415) 541-9366

7  HANSON BRIDGETT LLP
   TYSON M. SHOWER, SBN 190375
8  tshower@hansonbridgett.com
   LANDON D. BAILEY, SBN 240236
9  lbailey@hansonbridgett.com
   500 Capitol Mall, Suite 1500
10 Sacramento, California 95814
   Telephone: (916) 442-3333
11 Facsimile:  (916) 442-2348

12 OTTEN LAW, PC
   VICTOR OTTEN, SBN 165800
13 vic@ottenlawpc.com
   KAVITA TEKCHANDANI, SBN 234873
14 kavita@ottenlawpc.com
   3620 Pacific Coast Highway, #100
15 Torrance, California 90505
   Telephone: (310) 378-8533
16 Facsimile:  (310) 347-4225

17 Attorneys for Plaintiffs
   CORY SPENCER, DIANA MILENA
18 REED, and COASTAL PROTECTION
   RANGERS, INC.

19

20               **UNITED STATES DISTRICT COURT**

21        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

22

23 CORY SPENCER, an individual;          CASE NO. 2:16-cv-02129-SJO (RAOx)
   DIANA MILENA REED, an
24 individual; and COASTAL              **DECLARATION OF DIANA MILENA
   PROTECTION RANGERS, INC., a          REED IN SUPPORT OF PLAINTIFFS'
25 California non-profit public benefit  MOTION FOR CLASS
   corporation,                         CERTIFICATION**
26
                                        Judge: Hon. S. James Otero
27               Plaintiffs,            Date:  February 21, 2017
                                        Time:  10:00 a.m.
28                                      Crtrm.: 10C

                                    -1-                Case No. 2:16-cv-02129-SJO (RAOx)
12983922.1
          DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

v.

LUNADA BAY BOYS; THE
INDIVIDUAL MEMBERS OF THE
LUNADA BAY BOYS, including but
not limited to SANG LEE, BRANT
BLAKEMAN, ALAN JOHNSTON
AKA JALIAN JOHNSTON,
MICHAEL RAE PAPAYANS,
ANGELO FERRARA, FRANK
FERRARA, CHARLIE FERRARA,
and N. F.; CITY OF PALOS
VERDES ESTATES; CHIEF OF
POLICE JEFF KEPLEY, in his
representative capacity; and DOES
1-10,

Defendants.

I, Diana Milena Reed, declare as follows:

1.    I am an avid beachgoer and surfer and named Plaintiff in this matter.  I am currently a resident of Malibu, where I have lived for approximately five years.  I have personal knowledge of the matters set forth in this declaration and, if called as a witness, could and would testify competently as to its contents.

2.    I lived in Dallas, Texas, from the age of 10, until moving to Malibu approximately in 2011.

3.    I studied film production at the University of Southern California.  I have worked as a freelance photographer, occasional model, filmmaker, and a surf camp director.

4.    I have always loved the water and the ocean.  I grew up as a competitive swimmer and played many sports.  I took up paddle boarding while on a trip to Hawaii and really enjoyed it.  I bought a Surf Diva paddle

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

board from Focus SUP Hawaii and signed up for paddle boarding and stand up paddle surf lessons from Becker in Malibu. I decided to try surfing shortly after paddle boarding because it looked like fun, I had enjoyed paddle boarding immensely and wanted to try something more difficult and challenge myself further. I was inspired to surf after watching Titans of Mavericks on television, the acclaimed and legendary surf contest, pitting elite athletes against the world's most dangerous wave. It inspired me to try surfing and I knew that one day I wanted to surf big waves.

5.     I had my first surf lesson in approximately September 2014. I immediately fell in love with the sport. I signed up for private lessons with my coach and began surfing approximately three times a week. I continued taking three lessons per week, and as my skills improved, I began surfing about every day when conditions permitted. I enjoyed challenging myself and surfing bigger and bigger waves. I always went to surf at the beaches that had the biggest waves. I have surfed many different beaches along the California coast, including various spots throughout Orange County, San Clemente, Huntington Beach, Newport Beach, South Bay, Redondo Beach, Manhattan Beach, Venice Beach, Topanga, Malibu, Oxnard, Ventura, Santa Barbara, Morro Bay, Santa Cruz, and others.

6.     I am an aspiring big wave surfer, which means that it is a goal of mine to one day surf big wave spots such as the legendary surf spot Mavericks just off the coastline of Half Moon Bay, California. I practice and train as hard as I can and am constantly challenging myself to surf the biggest waves possible. As I became more focused on big wave surfing, I heard from various people in the surfing community that Lunada Bay was one of the best big wave surf locations and the only true deep water, big wave surf spot in Southern California. Since learning about Lunada Bay, it has been a goal of mine to surf there, and use Lunada Bay as a big wave

-3-

12983922.1    DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

1 training ground.  I had heard that localism was prevalent at Lunada Bay,
2 meaning that locals tried to deter nonlocal surfers from accessing the beach
3 through various means, including threats, intimidation, and violence.  If I
4 hadn't heard that localism was such a problem at Lunada Bay, I would have
5 surfed there frequently, and gone to train every day by myself.  But because
6 I was new to surfing and I had never experienced localism, I wasn't sure
7 what to expect.

8      7.     Finally, in or around January 6, 2016, I decided to visit the bluffs
9 at Lunada Bay.  This was my first trip to Lunada Bay.  I went there that day
10 to watch my friends, big wave surfer Jordan Wright and Hawaiian surfer
11 Preston Gazowsky, surf.  It was a stormy day and the conditions were
12 challenging.  The waves were too big for me to go surfing, and I took photos
13 instead.  No one was out surfing that day except Jordan and his friends.

14      8.     I returned to Lunada Bay on January 29, 2016 with Jordan
15 Wright.  I had intended to surf at Lunada Bay that day because the
16 conditions were good and I felt comfortable surfing.  Immediately after we
17 parked our car along the bluffs, the harassment began.  Several men drove
18 by and circled around our car.  One of the men yelled at us and called us
19 "kooks" and told us that we couldn't surf there.  We didn't say anything in
20 response but just got out of the car and prepared to go surfing.

21      9.     There was also a group of men, who I now believe to be Bay
22 Boys, standing along the bluffs.  These men told us that we couldn't surf
23 there and constantly harassed us.  One man who I believe to be Brant
24 Blakeman was recording us on land with his camera.  It was disturbing to me
25 and made me feel very uncomfortable.  The situation felt very tense.

26      10.    At some point while we were still on the bluffs and before we
27 made our way down the trail to the beach, I recall meeting Cory Spencer.  I
28 remember hearing – either directly from Cory or indirectly from another

-4-

12983922.1

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

surfer present along the bluffs that morning – that Cory is a police officer and that he had been run over in the water earlier that morning by another surfer who cut Cory's hand.  Hearing that a police officer from outside of the area was not safe in the water surprised me.  The conditions that day were good and I did not understand why the Bay Boys were so aggressive to outsiders.  Why couldn't everyone just get along and enjoy the waves? I decided to continue down to the beach despite the harassment and intimidation.  I had come a long way, the surf was good and the conditions were favorable, and it was a great day for me to go out and train and practice big wave surfing.  I had spent the past year training to surf big waves and I had my heart set on surfing Lunada Bay that morning.

11.    Jordan Wright and I walked down the steep trail carrying our surfboards and when we reached the beach, we were approached by a man, whom was later identified as David Mello, who began screaming at us.  I heard him yell what sounded like "whore."  I was petrified.  He walked away and I just stood there frozen.  He came back a few minutes later to continue his out-of-control rant.  He started yelling at us again, screaming profanities.  I was wearing a purple Roxy wetsuit, with a Patagonia big wave impact suit underneath.  He made fun of my wetsuit because it was purple, and impact suit.  Other Bay Boys watched along the coast, and one younger man told me to "watch out" and "be careful" and "don't smash your pretty little face on the rocks."  There are few women in the surf community, and even fewer women in the big wave surf community.  There were no other women surfing at Lunada Bay that day.  I felt that I was being singled out and harassed and intimidated due to the fact that I was a woman.  I had never been yelled at in a manner like that before and it terrified me.

12.    I could see Palos Verdes Estates Police officers present in the nearby Rock Fort at the north end of the beach.  They did not do anything to

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

Case No. 2:16-cv-02129-SJO (RAOx)

12983922.1

1 │ help me while I was being verbally assaulted, though they witnessed and

2 │ overheard the incident.

3 │       13.    After the man walked away, the police ended up coming over to

4 │ us.  They asked us what was going on.  I described what had happened and

5 │ they asked if we wanted to file a report.  I stated that I did want to file a

6 │ report, and the police asked us to accompany them back up the trail to the

7 │ bluff top.

8 │       14.    At the top of the bluff, a different, older policeman spoke to me.

9 │ The policeman told me I could make a citizen's arrest but that if I did, I would

10 │ be at risk of getting sued because people at Lunada Bay are wealthy and

11 │ can afford to hire good lawyers.  This policeman discouraged me from

12 │ making a citizen's arrest, told me it wasn't a good idea, and said I risked

13 │ subjecting myself to liability.  He said that he could just write a report

14 │ (without me pursuing a citizen's arrest) and that it would have the same

15 │ effect without the personal liability to me.  The police detained David Mello

16 │ for a short period, but did not end up arresting him.  The policeman at the

17 │ top of the bluff who took the report told me that he did not hear what David

18 │ Mello had said.  Because the police officer on top of the bluff who took the

19 │ report had not heard what Mello was saying, he said that he could not arrest

20 │ Mello.  But the two police officers who were on the shoreline had heard what

21 │ Mello was saying, and also could observe that Mello was behaving

22 │ erratically and harassing us.  In fact, these officers interceded after Mello

23 │ screamed at Jordan and I, and talked us into walking up the trail to make a

24 │ report.  Nonetheless, the older police officer refused to arrest Mello.  These

25 │ same officers who had observed Mello were also in the position to notice

26 │ that the locals in the Rock Fort had beer and were illegally drinking and

27 │ breaking other laws on the shoreline.

28 │       15.    I was frustrated that as a visitor, I was talked out of surfing and

-6-

12983922.1

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

1  that the police did nothing.  Also, I was scared so I changed out of my
2  wetsuit, back into my clothes, and left Lunada Bay without surfing.  Although
3  I had been excited to surf there that morning, I was completely shaken up by
4  this incident – both by the activity of the locals and police complicity – and
5  felt unsafe to go into the water.  I decided to go home.

6      16.    Several days later, on or about February 1, 2016, I broke my arm
7  while snowboarding.  Then, on February 5, 2016, Jordan Wright wanted to
8  attempt to surf at Lunada Bay and I decided to accompany him and
9  photograph him surfing.  I was unable to surf because my arm was in a cast
10  and I was still in a great deal of pain from the injury.  While I stood on the
11  beach taking photos of Jordan surfing, I encountered a photographer from
12  the L.A. Times.  We were both taking photos of the ocean and the beach
13  and we talked about photography and the conditions that day.  I may have
14  also mentioned that Jordan and I weren't locals and that I had experienced
15  harassment there the week prior and filed a police report.  I didn't realize it at
16  the time, but the photographer took pictures of me while I was facing the
17  ocean taking photos of Jordan.  He also spoke with Jordan after he finished
18  surfing, though I did not hear their conversation.

19      17.    On or around February 12, 2016, the L.A. Times published an
20  article entitled "'Bay Boys' surfer gang cannot block access to upscale
21  beach, Coastal Commission says.'"  The article included photographs of me
22  at the beach and in the Rock Fort.  One of the photo captions identified me
23  by name and stated that I " . . . filed a police report for harassment by the
24  Bay Boys."  The article was published online on February 12, 2016 and in
25  hard copy the following day, February 13, 2016.  A true and correct copy of
26  the February 12, 2016 online L.A. Times article and the referenced photo is
27  attached as **Exhibit 1**.

28      18.    I returned to Lunada Bay on February 13, 2016 with Jordan to

Case No. 2:16-cv-02129-SJO (RAOx)

12983922.1

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

watch him surf and take photographs.  Prior to our arrival, I contacted the
Palos Verdes Estates Police and requested an escort from the bluffs to the
beach.  I was concerned about my safety given the January 29, 2016
incident.  I was told that the police were unavailable and no officers were
present when we arrived.

19.    As we prepared to descend the trail from the bluffs, I remember
encountering a middle-aged man with blond hair and a teenage boy who
were filming us and attempting to block the pathway.  I now understand that
the man was Brant Blakeman.  Mr. Blakeman and the teenager told us that
we were "done" and were very hostile and threatening.

20.    We walked past them and continued down the trail.  When we
reached the beach, we encountered additional angry locals who were yelling
at us.  Everyone was incredibly hostile.  Jordan and I ignored the
harassment and he got into the water to surf and I made my way to the Rock
Fort where I planned to watch Jordan and photograph him.  At some point
while I was in the fort, a middle-aged, dark-haired man entered and engaged
me in conversation.  He started asking me a lot of questions made me feel
uncomfortable, as if he was interrogating me.  He wanted to know what my
"mission objective" was and why I was at the beach and what I wanted.  He
told me that no other outsiders ever come to Lunada Bay.  I was only there
to enjoy the beach and take photos so I didn't understand why he was so
interested in asking me questions.  As I was standing in the Rock Fort taking
photos, another woman arrived and entered the fort and began taking
photos.  I did not know her.  The man also engaged her in conversation.
She was visibly shaken and told us that she had been harassed on her way
down here.  She told me that she had been sitting on the beach and was
asked to leave by the bay boys that were changing into their wetsuits.  They
told her that her sitting there was like sitting in a men's locker room.  They

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

1 yelled at her and she replied that it was a public beach and she had a right
2 to sit wherever she wanted. They appeared surprised that she had the
3 bravery to stand up to their threats. She sat at the beach with her camera
4 before making her way into the fort. The dark haired man questioned her for
5 about 10-30 minutes before he finally left. I had a brief conversation with the
6 woman. Her name was Jen and she was at Lunada Bay taking photos of
7 our mutual friend David Sluys. She was a surf photographer.

8      21. Later that morning, Charlie Ferrara entered the fort and went to
9 go sit up on the roof. The woman and I continued taking photos. Suddenly,
10 two men rushed into the fort and ran towards us in a hostile and aggressive
11 manner. One was carrying a case of beer and appeared drunk, though it
12 was approximately 9:00 a.m. I later learned the man with the beer was Alan
13 Johnston. He was very loud, aggressive, and intimidating, saying things like
14 "fuck yeah!" and screaming "Woooooh!" and standing very close to me. I
15 was terrified. I recognized one of the men, Brant Blakeman, as the same
16 man who was filming me when I arrived at the bluffs that morning. He was
17 filming me again and, at times, held his camera right in my face. It felt very
18 intimidating and harassing and made me fear for my safety.

19      22. I asked why they were filming me because it made me feel
20 uncomfortable. Mr. Blakeman responded, "because I feel like it." Mr.
21 Johnston responded, "because you're hot. Because you're fucking sexy
22 baby, woooh!"

23      23. Mr. Johnston opened a can of beer in purposeful way so that it
24 sprayed my arm and my camera. He was chugging beer and throwing the
25 cans on the ground. Mr. Johnston then said "didn't I see you guys on the
26 cover of the fucking biggest periodical this morning?" In retrospect, I believe
27 he was referencing the L.A. Times article, but at the time I had not seen the
28 article and didn't even know that it would be published or that I would be

-9-

12983922.1

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

featured prominently in the photos. It appeared to me that Blakeman and Johnston were pretending to celebrate the L.A. Times article in a sarcastic manner and seemed upset about it. True and correct copies of video footage taken that day by Brant Blakeman is attached as **Exhibits 2** and **3** and are Bates labeled DFT.BB.000081.MTS and DFT.BB.000082.MTS.

24. Even worse, Defendant Johnston began acting in a sexually aggressive and suggestive manner. Johnston told me that he was "big enough to get the job done" and was making grunting noises and moaning as if to mimic an orgasm. He was simultaneously rubbing his torso with his hands in a sexually suggestive manner and thrusting his torso. He began changing into his wetsuit in front of me and although he had a towel wrapped around his waist, I believe that he intentionally removed his towel in order to expose his penis to me.

25. I was not able to exit the Rock Fort during this incident because Blakeman and Johnston were closest to the exit to the fort and I would have had to walk past them. I was fearful of what more they might do to me if I tried to leave. I was also frozen with fear.

26. Defendant Charlie Ferrara was also present during this incident. He was sitting on the roof of the Rock Fort and observed the entire incident and appeared to be complicit in Blakeman and Johnston's behavior. I tried to call the police on my cell phone during the incident but couldn't get any reception. The police were parked on the bluffs above the beach but they were unaware of what was going on right below them.

27. The entire incident with Blakeman, Johnston and Charlie Ferrara lasted between 10 and 20 minutes. After Blakeman and Johnston left the Rock Fort I finally felt that it would be safe for me to leave. I made it back up the trail to the bluff top to find the police and report the incident. When I approached the police officers, I was in tears – visibly shaken and upset. I

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

told them what had just happened.  They listened to my account and asked for descriptions.  The police were able to identify the man who was filming me as Brant Blakeman simply by my description.  They told me he was a local resident and owns a home in Palos Verdes Estates.

28.    A younger police officer then escorted me back down to the beach to try and identify the other individuals involved.  Both Blakeman and Johnston were gone by that time but Charlie Ferrara was still there.  The police clearly knew him because as they approached, they greeting him by saying, "Hi Charlie."  Also, they told me that they knew him.  Charlie Ferrara refused to cooperate and told the police that he didn't see anything, although he did apologize to me.  As the police stepped away, Charlie told me that he was "sorry" for what happened to me.  The police overheard Charlie and thought that it was strange that he was apologizing to me, and acknowledging what had occured, yet refusing to tell them anything about the incident.

29.    A younger police officer took a written report of the incident.  The officer also told me that they have "book containing driver's license photographs of all Lunada Bay Boys" gang members and that I could look through this book to identify the other men who were involved.  He said it wouldn't be a problem to identify the individuals because they know all the people who frequent the area.  He made me believe that it would be easy to identify the others.

30.    I left Lunada Bay that day feeling distraught, terrified, and shaken.  But I also hoped that the police would help identify the man who had poured beer on me, exposed himself to me, and acted in a sexually aggressive manner toward me.  Unfortunately, my hope was misplaced.  I was never contacted by the police to identify the other perpetrators.  Instead, after no follow up, I had to call the Palos Verdes Estates Police Department

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

1  several times in an effort to set up a time to identify these individuals.  It

2  seemed to me that they were completely disinterested in investigating this

3  incident.  In fact, during a phone call I had with Palos Verdes Estates police

4  detective Venegas, he said words to the effect of "Why would a woman want

5  to go to that beach and the Rock Fort anyways?  There are only rocks down

6  there."

7        31.    I finally felt that I had to consult with an attorney because the

8  police were not helping me.  It was not until I retained counsel, Mr. Otten,

9  who wrote a letter to Chief Kepley, before I was finally permitted to meet with

10  an officer regarding the February 13, 2016 incident.  This meeting occurred

11  on March 21, 2016.  Mr. Otten and I met with Police Chief Kepley and

12  Captain Tony Best.  Chief Kepley and Captain Best said that although they

13  had photographs of the Lunada Bay Boys members, they would not allow

14  me to review the photos – they claimed doing so might impede the

15  investigation or somehow violate the law.  They seemed unfamiliar with the

16  incident and said they would speak to the detective in charge of the

17  investigation.  Chief Kepley and Captain Best also encouraged me to take a

18  cell phone with me to the beach and to travel in large groups.  Further,

19  Captain Best said that there are judges and lawyers who surf there, implying

20  that it was a difficult situation to remedy.  I asked Chief Kepley if it was safe

21  for me to go down there and he replied along the lines that he wished it was

22  safe but it's not.  He said that he wouldn't even tell a man to go down there,

23  and that he viewed it as a long term problem.

24        32.    I learned after the incident from Jen, the woman who had been

25  standing in the Rock Fort at the same time as me, that there was a group

26  email circulated among the Bay Boys immediately after the incident.  I texted

27  with Jen and she referenced the Bay Boys' group email in our text

28  exchange.  Our text exchange is included in attachments to the police report

1  from the incident.  A true and correct copy of the police report detailing the

2  February 13, 2016 incident, including my text exchange which references

3  the Bay Boys' group email, is attached as **Exhibit 4** and is BATES stamped

4  CITY2061-CITY2087.

5      33.    On April 7, 2016, approximately a week after the complaint in

6  this lawsuit was filed, I went to the Palos Verdes Estates police station and

7  reviewed a photo line-up.  I positively identified Defendant Johnston as the

8  man with the beer who had exposed himself to me on February 13, 2016.

9      34.    I spoke to a psychiatrist at UCLA and discussed my loss of

10  sleep.

11      35.    Since the February 13, 2016 incident, I have returned to Lunada

12  Bay on several occasions.  I believe it is important to stand up to bullies and

13  do what is right.  If no one ever goes to Lunada Bay, nothing will ever

14  change.  I cannot allow the Bay Boys to continue their threats of intimidation,

15  sexual assault, harassment, and battery towards people whom they believe

16  are "outsiders."  Lunada Bay is a public beach and I refuse to allow a small

17  group of bullies to prevent the public from enjoying a beautiful natural

18  resource that should be available to all who want to enjoy it.  I want to make

19  a difference and help change things and make Lunada Bay available for all

20  people to enjoy.  During those visits, I was constantly photographed and

21  filmed on the bluff.  I was told by Bay Boys who were present at the time that

22  I shouldn't be there, that I should leave, that no one wanted me there, asking

23  me what I was doing there, calling me a "bitch," and insulting me.  I

24  responded that it is a beautiful public beach and I'm allowed to be there.

25      36.    On one occasion, I recall speaking with Charlie Ferrara after he

26  approached me.  I know it was Charlie Ferrara because I remembered him

27  from the incident on February 13, 2016, and the police identified him as

28  "Charlie" that day.  I have also subsequently looked at photographs of

1  Charlie and confirmed that it is the same person I spoke with.  I think he
2  might have felt badly about witnessing the February 13, 2016 incident but
3  not doing anything to stop Blakeman and Johnston.

4         37.    Charlie Ferrara and I had a long conversation about why the Bay
5  Boys act the way they do.  He explained that it's a "fraternity," that they're
6  "family members," and that the Bay Boys will haze you before you're allowed
7  to join them and surf there.  He said that "they want to see how bad you
8  want it" and that they will "make you drink frickin' piss to see how bad you
9  want to be in this fraternity."  He also told me that you have to show respect
10 and that "it's all out of love."  Charlie said that "I can't tell you you can't go
11 surfing, but what I can do is make sure that you don't have fun out there."
12 He explained that it has worked this way for at least 30 years.  He also said
13 that his dad is a surfer who works on cars and has surfed at Lunada Bay
14 since he was a kid.  I understand, based on information and belief, that
15 Charlie Ferrara's father is Frank Ferrara and he is a named defendant in this
16 case.

17        38.    I recorded our conversation on my cell phone, which was sitting
18 face-up and in plain view on a table in the Rock Fort.  I believe Charlie knew
19 I was recording him and that he was simultaneously recording me.  I saw
20 him holding an audio recording device.  At one point during our
21 conversation, he pointed to my Canon camera and asked if I was recording
22 him using that camera.  I was not, and I told him as much.  A true and
23 correct recording of our conversation is attached as **Exhibit 5.**  Also
24 attached as **Exhibit 6** is a transcript of our conversation.

25        39.    I believe that the City of Palos Verdes Estates and Chief Kepley
26 have failed to create safe and public access to Lunada Bay.  My
27 experiences at Lunada Bay have shown me that the City and the Chief have
28 allowed the Bay Boys, including Brant Blakeman, Alan Johnston, Charlie

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

Case No. 2:16-cv-02129-SJO (RAOx)

12983922.1

Ferrara, and others to intimidate, sexually assault, threaten, harass, and batter people whom they believe are "outsiders." Drinking is part of the problem and the police simply do not enforce the no-drinking laws. The police also demonstrate no interest in actually enforcing the law to maintain a safe and secure public beach – and discourage complaints. Instead, if a visitor insists on complaining, they may write a police report to make it appear as if they are taking the complaint seriously, but then fail to follow-up or investigate the incident. These actions by the police allow the Bay Boys to illegally keep visitors away from Lunada Bay with acts of intimidation, and violence.

40.     People of all races, ethnicities, levels of income, backgrounds, locations, and genders should be able to go to Lunada Bay without fear of being harassed, frightened, intimidated, threatened, assaulted or battered. No one should be made to feel unwelcome at a public beach.

41.     The City should take steps to make it clear to everyone that Lunada Bay is a public beach accessible by all who seek to enjoy it. I believe that the City should also create a safe pathway down to the beach, a path down the cliff where you can go without fear of falling down. The City should install signs that clearly indicate that it is a public beach and where access trails are located. Adding seating, trash cans, and other similar improvements to the shoreline and bluff will also make it clear that it is a public beach open to visitors. The police should also take all complaints pertaining to beach access and violence seriously, including conducting follow-up investigations and holding the perpetrators accountable.

42.     I hope that one day Lunada Bay is a place where everyone can enjoy it for its beauty, amazing surf, and all that it has to offer.

43.     I understand my duties as a class representative, including my obligation to supervise my attorneys, monitor the case, communicate with

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

1   my attorneys on an ongoing basis, and stay actively involved in the
2   prosecution of this matter.  I remain in constant contact with my attorneys
3   through phone calls, text messages, emails, and in-person meetings.  The
4   purpose of these communications is to strategize regarding the case,
5   provide information relating to my claims, respond to discovery, and assist
6   any way I can in the litigation of this case.  I am actively engaged in this
7   litigation and have been at all times, and I act diligently to vigorously protect
8   the interests of all putative class members.

9       44.    In addition, I provided thorough and robust comments to the draft
10  complaint before it was filed, which my attorneys incorporated into the final
11  complaint.  I have been extensively involved in preparing, reviewing, revising
12  and finalizing pleadings and discovery in this case, have reviewed
13  deposition transcript(s), and have provided my comments on those
14  documents that I consider relevant.

15      45.    To date, I have responded to multiple discovery requests,
16  including responding to 5 sets of interrogatories, 4 sets of requests for
17  production of documents, and 1 set of requests for admission.

18      46.    I also appeared for two days of deposition, on October 24-25,
19  2016 in Santa Monica, California, while in my third trimester of pregnancy.
20

21      I declare under penalty of perjury under the laws of the United States
22  of America that the foregoing is true and correct.
23

24      Executed in Malibu, California on December 28, 2016.
25

26  *Diana Reed*
27  _____
28  DIANA MILENA REED

Case No. 2:16-cv-02129-SJO (RAOx)

12983922.1

DECL. REED SUPP. PLS.' MOT. FOR CLASS CERT.

# Exhibit 1

# 'Bay Boys' surfer gang cannot block access to upscale beach, Coastal Commission says



Visitors have said that a group of locals called the Bay Boys hold forth in this "fort" and discourage outsiders from surfing in Lunada Bay. (Allen J. Schaben / Los Angeles Times)

 By **Garrett Therolf**

FEBRUARY 12, 2016, 9:37 AM

For generations, a small group of locals in wealthy Palos Verdes Estates has maintained a reputation for keeping other surfers off Lunada Bay's well-shaped waves.

The so-called Bay Boys bombard outsiders with dirt clods, slash their car tires and assault them in the water — sometimes coordinating the attacks with walkie talkies — witnesses have said.

ADVERTISING


Replay

Surfers who say they have been victimized over the years have accused local authorities of complacency, cowardice and even complicity.

Now an unlikely new sheriff of sorts has ridden into town: the California Coastal Commission.

In a letter to Palos Verdes Estates officials, Jordan Sanchez, one of the agency's enforcement officers, wrote that the Bay Boys are so entrenched in this beautiful notch of California coastline that they are subject to the commission's watchdog regulations and permitting processes.

The letter says: "Precluding full public use of the coastline at Palos Verdes Estates, including the waters of Lunada Bay, whether through physical devices ... or impediments, such as threatening behavior intended to discourage public use of the coastline, represents a change of access to water, and, thus, constitutes development."

Sanchez's letter was followed by planning for a meeting with city leaders to discuss stepped-up plans for criminal and code enforcement needed to rid the coast of the Bay Boys' obstruction of access.

"I don't think we've ever seen this level of cooperation on this issue," said Andrew Willis, the commission's top enforcement agent in Southern California.

Willis said the commission has funds available to improve signage for public access and to make improvements to the treacherous pathways from the bluff down to shore where surfers say they are frequently pummeled with dirt clods — but he said that the city will need to take the lead.

"We are not in the position to do a sting operation like the police or tear down structures like a building and safety department," he said, a reference to a stone fort at the water's edge allegedly constructed by the group as a party spot and outpost for coordinating harassment of outsiders.

The fort features stone and cement masonry, and on one recent day it was outfitted with cooking utensils, lighter fluid, trash cans, cushions and an ice chest, as well as a paved step way, seating areas and a fire pit. At the table, someone had etched "Respect this place."

12/22/2016    Case 2:16-cv-02129-SJO-RAO    Document 39-15    Filed 02/24/16    Page 68 of 124    Page ID #:8895

Palos Verdes Estates City Manager Tony Dahlerbruch said he agreed with the commission that the fort — whose construction is said to have begun three decades ago — will now need to undergo the permitting process or come down.

"In the meantime, that structure must be available to be used by all," Dahlerbruch said.

"Lunada has some of the most powerful and perfect big wave spots in California," said Jordan Wright, 31. "It's the wave that is most like Hawaii in Southern California in terms of its strength, power and longevity."

Wright, who has surfed in 13 countries and on waves with 40-foot faces, has had to retreat each time he tried to surf Lunada Bay, even when he went with his father, a detective for the Los Angeles County Sheriff's Department.

"It's run like an organized crime or racketeering outfit," Wright said of the Bay Boys' grip on the slice of public coast.

Cory Spencer, a 44-year El Segundo police officer and surfer, said he has watched the dynamic play out since he was 14.

"I've driven by and looked at the spot probably 10 to 15 times just to see it, but never really took my board out of the car and just traveled on because of the fear, intimidation and vandalism," Spencer said.

In recent months, however, small groups of outsiders have decided to challenge the Bay Boys' grip, and Spencer said he was inspired by Wright to finally give it a try. "I worked South Central for the LAPD, but it took time to gain the courage to go down there," he said.

On his first outing in late January, Spencer said, "immediately, from the time we were on the rocks, we started getting the verbal heckling."

Wright said some of the Bay Boys yelled, "You can't surf here" and "Kooks."

After they paddled out, Spencer said, he caught a wave and locked eyes with one of the Bay Boys who had heckled him on the shore.

"He was 75 yards away on the wave behind me. We had plenty of space, but he tried to spear me with his board ... and he left a nice little slice in my hand," Spencer said. "That was a nice introduction to my second wave at Lunada."

Efforts to end the behavior have been largely ineffective. A former police chief installed a surveillance camera in 2002 to help keep an eye on the less-than-pacific bay. The City Council had it removed three months later.

This summer, a video shot surreptitiously by the Guardian showed local surfers intimidating journalists as they prepare to paddle out.

Jeff Kepley became Palos Verdes Estates' chief of police a year ago, shortly before the Guardian newspaper caught on tape one of his employees as she dismissed visitors who came to complain after capturing footage of being harassed at Lunada Bay.

------------

## FOR THE RECORD

**Feb. 11., 10:25 a.m.:** An earlier version of this article misidentified Jeff Kepley as Rancho Palos Verdes' chief of police. He is the police chief of Palos Verdes Estates.

------------

Kepley said he has sent patrols to the bluffs about 400 times and is determined to make an arrest during the current winter season when the waves and tensions are highest.

"It would not be hard," said Spencer, the El Segundo officer, "if they really wanted to take care of this problem. But they need to get out in the water instead of just looking down from the bluff."

For now, the Coastal Commission enforcement officers said, they are not preparing to fine anyone or take other punitive steps.

"If we work cooperatively," Willis said, "we don't need to think of enforcement mechanisms."

*garrett.therolf@latimes.com*

**Follow @gtherolf on Twitter.**

**ALSO**

**Fired California Coastal Commission director speaks out**

**Lawsuit contends the California bullet train project is violating state law**

**Why ex-L.A. Sheriff Lee Baca gets to keep his pension even if he goes to jail for lying**

Copyright © 2016, Los Angeles Times

---

**UPDATED**

9:37 a.m.: Updated with information about the Guardian video.

**This article is related to:** Law Enforcement

7 / 10



## Lunada Bay

(Allen J. Schaben / Los Angeles Times)

With police watching for trouble from the bluff top, outsider Diana Milena, 28, of Malibu, who filed a police report for harassment by the Bay Boys, stands in the locals' hangout fort.

  

SEE MORE GALLERIES ›



ADVERTISEMENT

# Exhibit 2

**Exhibit 2:** Video footage taken on February 13, 2016 by Brant Blakeman, Bates labeled DFT.BB.000081.MTS, Lodged with Court pursuant to Local Rule 11-5.1.  *See* Notice of Lodging filed herewith.

# Exhibit 3

**Exhibit 3:** Video footage taken on February 13, 2016 by Brant Blakeman, Bates labeled DFT.BB.000082.MTS, Lodged with Court pursuant to Local Rule 11-5.1.  *See* Notice of Lodging filed herewith.

# Exhibit 4



# PALOS VERDES ESTATES POLICE DEPARTMENT

Officer Report for Incident 16-02164

| | | |
|---|---|---|
| **Nature:** SURFING RELATED | | **Address:** LUNADA BAY |
| **Location:** | | |

**Offense Codes:**
**Received By:** C. Placek     **How Received:** O     **Agency:** PVEP
**Responding Officers:**
**Responsible Officers:** S. Crisfield     **Disposition:** ECA 07/07/16
**When Reported:** 10:17:15 02/13/16     **Occurred Between:** 09:40:00 02/13/16 and 10:00:00 02/13/16

**Assigned To:**     **Detail:**     **Date Assigned:** \*\*/\*\*/\*\*
**Status:**     **Status Date:** \*\*/\*\*/\*\*     **Due Date:** \*\*/\*\*/\*\*

**Complainant:**
**Last:**     **First:**     **Mid:**
**DOB:** \*\*/\*\*/\*\*     **Dr Lic:**     **Address:**
**Race:**     **Sex:**     **Phone:**     **City:** ,
Alert Codes:

## Offense Codes
**Reported:**     **Observed:**
**Additional Offense:** ASS8 242 Assault, Misdemeanor
**Additional Offense:** SEX5 314 Indecent Exposure

## Circumstances
DAY Day (6 a.m. - 6 p.m.)

**Responding Officers:**     **Unit :**
    S. Crisfield     7L11
    A. Belda     7L9

**Responsible Officer:** S. Crisfield     **Agency:** PVEP
**Received By:** C. Placek     **Last Radio Log:** 12:17:22 02/13/16 CMPLT
**How Received:** O Officer Report     **Clearance:** ICO Investigation Completed
**When Reported:** 10:17:15 02/13/16     **Disposition:** ECA **Date:** 07/07/16
**Judicial Status:** DONE     **Occurred between:** 09:40:00 02/13/16
**Misc Entry:** Gaunt     **and:** 10:00:00 02/13/16

11/10/16

CITY2061

| Modus Operandi: | Description : | Method : |
|---|---|---|

## Involvements

| Date | Type | Description | |
|---|---|---|---|
| 04/20/16 | Name | ███████████████ | Suspect |
| 03/09/16 | Name | █████████████ | Mentioned |
| 02/14/16 | Name | ██████████ | Victim |
| 02/14/16 | Name | ███████████████ | Witness |
| 02/13/16 | Cad Call | 10:17:15 02/13/16 SURFING RELATED | Initiating Call |

11/10/16

CITY2062

## Narrative

Palos Verdes Estates Police Department
Investigation Narrative

SOURCE: On Saturday, 02-13-2016, I (Officer Crisfield #745) was working uniformed patrol in marked police vehicle #726. At approximately 1015 hours, I was flagged down in the 2300 block of Paseo Del Mar (Lunada Bay) by R-P/████████ ████in reference to a surfing related incident.

M.O.: Unknown suspect pours beer on victim and her camera. Suspect then changes into a wetsuit at which time he purposely exposed his penis to the victim.

VICTIM'S STATEMENT: I met and spoke with the victim, ████████(DOB: ████████), and the following is a summary of her statement: On today's date, at approximately 0945 hours, ████and ████████ were taking pictures of the surf, from the Lunada Bay patio. While on the patio she was confronted by an unknown suspect who shook up a can of beer and opened it in her face, spraying her with its content. The suspect then took the opened beer and poured it on ████████left arm and camera, however, the camera was not damaged. The suspect then stated, "I saw you on the front page of the LA Times, now you're done." ████████asked the suspect multiple times to stop harassing her at which time he began to undress and change into his wetsuit. While changing into his wetsuit, the suspect stated, "It's easier to get into my wetsuit because you make me hard." The suspect then asked ████"you want to see it", and as she was turning around to see what he was talking about, she saw the suspect's exposed penis. ████████described the suspect's penis as a white, approximately 3" in length and flaccid at the time of the incident. During this incident, there was a second subject who was associated with the suspect, who was filming the entire incident. ████then became frightened and extremely uncomfortable at which time she walked up the trail back to the top of cliff of Lunada Bay (2300 PDM).████████ stated she would be able to positively identify the suspect if seen again and if identified, she is desirous of prosecution of the suspect for violation of 314.1 PC - Indecent Exposure and 242 PC - Battery.

████████described the suspect as:

Adult male, white, mid 20's, 5'9"-5'11", stocky build, medium length light blonde hair, light facial hair, possibly with tattoos on his chest or arms, wearing a black Rip Curl Flash Bomb wetsuit with a hood (NFD). The subject had a white short board style surfboard.

████████described the subject holding the video camera as:

Adult male, white, mid 50's, 5'7"-5'9", medium build, short blonde hair and clean shaven.

WITNESS STATEMENT: I contacted ████████via telephone ████████████, who stated she was on the patio with Reed and witnessed the incident, but was unwilling to provide a statement.

OFFICER'S STATEMENT: After obtaining the victim's statement, Officer Belda (#731),████████ and I went descended down to the Lunada Bay Patio in an attempt to locate the suspect but she did not recognize anyone. The Lunada Bay Patio is a man-made stone patio / platform located at the shoreline of the north-westernmost corner of Lunada Bay's crescent-shaped cove. While on the patio,████ observed a snapped white Ferrara surfboard that she believed was the

CITY2063

suspects surfboard. I asked the subjects on the patio if they knew who the surfboard belonged to and they were all unsure. I then provided ████ with a PVEPD card containing this report number.

EVIDENCE: None

ADDITIONAL INFORMATION: In the event the suspect is able to be identified, it is my recommendation this case be forwarded to the district Attorney's Office for filing.

Responsible LEO:

Approved by:

Date

11/10/16

CITY2064

## Supplement

```
CAD Call info/comments
==================================

11:28:45 02/13/2016 - C. Placek
UNITS ARE DOWN IN LUNADA BAY CANYON
11:44:43 02/13/2016 - C. Placek - From: A. Belda
CODE 4
12:16:55 02/13/2016 - C. Placek - From: S. Crisfield
SEE REPORT
```

CITY2065

## Supplement

Palos Verdes Estates Police Department

Supplemental Narrative

On 02/16/16, I (Detective Venegas / #733) was assigned to investigate this case.

On 02/17/16, I spoke with V▇▇▇ and she told me that she had photos of the suspect and the additional male subject that he was with. She told me that the photo of the suspect is from his backside and she was unable to get a photo of his face. However, the photo shows the face of the adult male that was recording the suspect. ▇▇▇▇ told me that she would send the photos to me along with text messages that she had with ▇▇▇▇" about the incident. Prior to ending the phone call, I informed ▇▇▇ to call the PVEPD if she sees the suspect again.

On the same day, 02/17/16, V▇▇▇ sent me the photos (See attached photos). While reviewing the photos, the male subject that was recording the suspect was identified as ▇▇▇▇▇▇(DOB:▇▇▇▇).

On 02/29/16, at approximately 1200 hours, Sgt. Barber (#714) spoke with ▇▇▇▇ at his residence. Sgt. Barber inquired about the incident and ▇▇▇▇told him that he did not wish to speak about it.

On 03/28/16, I was informed that Sgt. Barber (#714) had heard a rumor that the person responsible for the above mentioned crimes was ▇▇▇▇▇▇(DOB: ▇▇▇▇. I looked at a photo of ▇▇▇▇▇▇ and noticed that he seemed to match the description of the suspect that was provided by V/▇▇▇to Officer Crisfield. On 03/29/16, I created a 6-pack photo line-up containing a previous booking photo of ▇▇▇▇. I spoke with V▇▇▇on 03/30/16 and informed her of the 6-pack photo line-up and she agreed to meet with me on 04/05/16. V▇▇▇ informed me that her attorney was able to find out who the suspect was in the case. I told V▇▇▇that we would talk about that information after the 6-pack photo line-up was completed. On 04/05/16, V▇▇▇contacted me and we agreed to move our meeting to 04/07/16.

On 04/07/16, V▇▇▇met with Detective ▇▇▇(#736) and I at the PVEPD. Prior to showing her the photos, I read to her the Palos Verdes Estates PD Photo Line-up Admonition. I then showed her the photos and she identified picture #4 ▇▇▇▇ as the suspect. After the 6-pack photo line-up was completed, V▇▇▇ informed Detective Reed and I that her attorney had previously showed a picture of ▇▇▇▇▇▇ to her and she recognized him as the suspect.

On 04/13/16, I called the number listed in the report for ▇▇▇▇▇ and left her a voicemail to call me back.

On 04/14/16, the above information was presented to The Honorable Judge, Allen B. Honeycutt of the Torrance Courthouse and a Ramey Warrant was issued for Johnston's Arrest.

On 04/17/16, I was informed that▇▇▇▇ was arrested by Officer Belda (#731) on the aforementioned warrant. Officer Belda informed me that he had read ▇▇▇▇ his Miranda Rights. I then interviewed▇▇▇▇ and the following is a summary of his statement.

Prior to questioning ▇▇▇▇, I asked him if he recalled his Miranda Rights and he told me that he did. I asked him if I needed to read them to him again and he told me that I did not have to. I asked him what happened on the patio and told

11/10/16

CITY2066

me that he saw V█████and another female taking pictures. He wanted to congratulate V█████on the LA Times article and proceeded to grab a beer. He did not know the beer had been shaken up. When he opened the beer it exploded on him and he approximated that two drops of beer landed on V█████ He finished the beer and then threw it in the trash. I asked him if V█████said anything to him about the beer hitting her and he told me she did not; however, he sarcastically apologized for it. V█████then started asking him questions and said "how big is your stick?" █████told me that he was uncertain if she was referencing his surfboard or what is "in his pants." He told me their conversation continued and he then changed into his wetsuit. He told me that he had a towel covering him when he changed and he never exposed himself. After changing into his wetsuit he paddled out into the water. He estimated their interaction to be approximately 10-15 minutes. He told me that he believed that V█████made up the allegations against him.

I asked him if he told her "I saw you on the front of the LA Times, now you're done." and he responded with "no, absolutely not." I told him that she reported that he shook up a beer and sprayed it in her face and he said it wasn't true. I asked him if he poured beer on her left arm and camera and he said "no, absolutely not." He told me that there was only one beer explosion. I told him that it was reported that he exposed himself to her while changing and he told me that it was a lie and that he would never do that. He said he changed with a "giant blue towel" covering him. I asked him if he told her that "it's easier to change into my wetsuit because you make me hard" and asked "do you want to see it?" and he told me that he did not. He told me that while he was changing, she was facing him and was holding her camera at him. He asked her "you like watching men change?" and she turned around. He felt like she was trying to film him as he was changing. I asked him if he had any video or recordings of the incident and he said "I wish." I asked if █████ had any recordings and he told me that he was unsure but believed he was filming the surf that day and possibly filming V█████as she was filming them. █████told me that he feels like he █████ did not do anything wrong. I asked him if he knew who V█████ was prior to the incident and he told me that he knew of her from the LA Times article from the day before. He told me that he believed that she was being antagonistic by putting cameras in their face the next morning after the LA Times article came out. I asked him what else was said about the LA Times article and he jokingly told her that she was famous and was trying to get her to party with them and offered her a beer. He told me that incident was "totally innocent and totally harmless."

I asked █████ again about what happened when he was changing and he said V█████ was approximately 15 feet away from him and could not tell if she was filming him with her camera. He told me that he had a towel around him when he was changing. I asked him when she asked him how big his stick was and he said she asked him that prior to him changing as he was waxing his surfboard, which was after he had opened the beer. I asked if she mentioned him exposing himself to her and he told me that she did not. He reiterated that he did not expose himself. He compared her being at the patio to being in a men's locker room because they all change down there. I asked if her statements were 100% false and told me they were. He told me that he has not had any contact with her since that day and is trying to stay as far away from her as possible. I asked if he had anything else to add and he told me that they are not a gang. He also told me that people have been down there antagonizing them with cameras.

On 04/18/16, I left an additional voicemail for █████ and she returned my call later the same day. The following is a summary of her statement:

CITY2067

She informed me that her name is ███████████ I asked her how she knew V/███ and she told me she met V/██ on the day of the incident on the patio. I asked her what happened that day and she told me that she is a surf photographer and she was down there taking pictures of the surf when she met V/███ She told me that she is not friends with V/███ or the local surfers. While they were on the patio, surfers began being rude to them. She told me that she was with V/███ the entire time they were on the patio with the surfers. I asked her about a surfer ████████ spraying beer on V/███ and she told me that one surfer ███████ was partially drinking beers and then throwing them into a nearby trashcan. She told me that beer may have hit V/███ but believes that it was probably done unintentionally. I asked her if a beer was purposely opened to spray in V/███ s face and she told me no. I asked if a beer was poured on V/███ arm and camera and she told me that it did not happen. I told her that it was reported that the same surfer exposed himself to V/███ and she told me that she was standing with ████ the entire time and it did not happen. She told me that the surfer did change into his wetsuit but he did not expose himself to either of them. She told me that after a while, she and V/███ felt uncomfortable being around the surfers so they decided to walk back up to the top of the cliff. I asked her if V/███ mentioned to her that the surfer exposed himself to her and she told me that she did not. She told me that the mentioned crimes did not occur because she would have seen them happen.

Prior to ending the conversation, ███████████ told me that she is a neutral party in this incident and does not favor either side; however, she believes that there is definitely an issue with local surfers harassing outsiders down on the beach and something needs to be done. She told me that everyone should be able to surf in the area without feeling intimidated.

On 04/19/16, I spoke with ███████████ again and asked about V/███ texting her in regards to the surfer exposing himself to V/███ She acknowledged that she received the text but the incident did not happen. She also reiterated that there is an issue with local surfers harassing outside surfers and that something should be done.

CITY2068

**Supplement**

11/10/16

CITY2069

## Name Involvements:



Witness : 99744
| | | |
|---|---|---|
| **Last:** ▮▮▮▮ | **First:** ▮▮▮▮ | **Mid:** ▮▮▮▮ |
| **DOB:** ▮▮▮▮ | **Dr Lic:** ▮▮▮▮ | **Address:** ▮▮▮▮ |
| **Race:**    **Sex:** F | **Phone:** ▮▮▮▮ | **City:** ▮▮▮▮ |

Mentioned : 7255
| | | |
|---|---|---|
| **Last:** ▮▮▮▮ | **First:** ▮▮▮▮ | **Mid:** ▮▮▮▮ |
| **DOB:** ▮▮▮▮ | **Dr Lic:** ▮▮▮▮ | **Address:** ▮▮▮▮ |
| **Race:** ▮▮▮▮ **Sex:** ▮▮▮▮ | **Phone:** ▮▮▮▮ | **City:** ▮▮▮▮ |

Victim : 96756
| | | |
|---|---|---|
| **Last:** ▮▮▮▮ | **First:** ▮▮▮▮ | **Mid:** ▮▮▮▮ |
| **DOB:** ▮▮▮▮ | **Dr Lic:** | **Address:** ▮▮▮▮ |
| **Race:** ▮▮▮▮ **Sex:** ▮▮▮▮ | **Phone:** ▮▮▮▮ | **City:** ▮▮▮▮ |

Suspect : 59217
| | | |
|---|---|---|
| **Last:** ▮▮▮▮ | **First:** ▮▮▮▮ | **Mid:** ▮▮▮▮ |
| **DOB:** ▮▮▮▮ | **Dr Lic:** ▮▮▮▮ | **Address:** ▮▮▮▮ |
| **Race:** ▮▮▮▮ **Sex:** ▮▮▮▮ | **Phone:** ▮▮▮▮ | **City:** ▮▮▮▮ |

11/10/16

CITY2070



My friend knows the names of those guys. I can probably get his name for you. He asked me if he was short and kind of fat and I would say yeah right about that guy do you think that's the same guy? There's already an email circulating about what happen today with your name in it. My friend just read me the group email and they're saying how they need to do something about these "bad" guys and get cops down closer to the water.



CITY2071

●●○○○ Sprint Wi-Fi 📶     12:34     44% ■ ˙

❮ Messages           Details



GoPro guy

That's all I have for pics of these assholes



CITY2072

•••○○ Sprint Wi-Fi 🛜      12:34      44% ◼

‹ Messages     ━━      Details



Beer guy

Saturday 2:46

Ok awesome!!

It will help.

If I'm able to get there names I'll let
you know. My friend knows the locals
there that aren't dicks. He had an

CITY2073



●○○○ Sprint Wi-Fi 🛜          12:34          43% ■ 

‹ Messages                              Details

If I'm able to get there names I'll let you know. My friend knows the locals there that aren't dicks. He had an email about what happen before I even got home, word gets out fast.

Ok lol

I told the cops about the beer guy

The GoPro video I hope is deleted but if not its all recorded. They should ask that guy for the footage. Dumbass recorded themselves harassing. Brilliant.

You have it recorded ?

No the old guy was recording

They couldn't find the guy with the camera or the younger guy

I wonder how hard they tried. They were there so....probably their friends covering for them. Did the cops actually walk down to the beach?

Saturday



CITY2074



•••○ Sprint Wi-Fi 🛜          12:34          43% ■

‹ Messages          ▬▬▬          Details

The GoPro video I hope is deleted but if not its all recorded. They should ask that guy for the footage. Dumbass recorded themselves harassing. Brilliant.

You have it recorded ?

No the old guy was recording

They couldn't find the guy with the camera or the younger guy

I wonder how hard they tried. They were there so....probably their friends covering for them. Did the cops actually walk down to the beach?

Saturday 16:59







CITY2075



 • Sprint Wi-Fi 📶      **12:35**                    43% ◼

‹ Messages            [redacted]                 Details

Omg. Wow.

> That was on the front page of the LA times today! I went down with the cops. Everyone was gone by then

What???!! Oh shit.

> The younger guy was there but he refused to cooperate as a witness. He denied anything.

How'd they get that on the front page so fast?

> It was an article from last time we were there

The photo is from today? So now you've been on the LA times twice?

> Anyway I gave the police your phone number so they might contact you. I told them that the guy spilled beer on me and my camera on purpose, and then eventually exposed himself as he was changing

> The photo in the la times is from last week



CITY2076



● ○○○○ Sprint Wi-Fi 🛜   12:35   43% ■

‹ Messages   Details

The photo is from today? So now you've been on the LA times twice?

Anyway I gave the police your phone number so they might contact you. I told them that the guy spilled beer on me and my camera on purpose, and then eventually exposed himself as he was changing

The photo in the la times is from last week

It's a coincidence that the article came out today and was featured on the front page.

Yeah that's crazy.

But the guys were talking about it, was it a diff article or this one?

You're famous 😁

Yes it was the article from today that they were talking about

Ohhhh ok. Was confused for a sec. Got it.

Did that pudgy little fuck actually



CITY2077



Ohhhh ok. Was confused for a sec.
Got it.

Did that pudgy little fuck actually
expose his wiener? I missed that.

Yes he did

Gross

Eeewwww!!!!

He was a disgusting bag of shit. My
friend said he sells crack to the
neighborhood kids

Really. Do you know his name?

I'm pretty sure my friend knows his
name. I think I can get it. My friend
has been busy all day but we'll talk
later today when he's done. He
knows the "good locals" there and is
the person who got the group email
about us as soon as it happen.

Whoa what did the group email say?

So your friend is a bay boy?

He read it to me but I don't remember



CITY2078



He read it to me but I don't remember exactly. I'll see if he'll forward it to me. It mentioned 2 girls being harassed and your name was in it and it was talking about how they need to stop these bully's. My friend told me his buddies already "took out" the worst one. I think they just mean they beat his ass.

My friend surfs there but not often but is good friends with guys that surf there all the time.

> That's so crazy

> Yeah get as much info as you can. See if he'll forward the email to you.

Ok

Saturday 2 · 5 · 3

> Hey any word from your friend ?

Saturday 2 · 5 · 3

> Hey did you hear back from your friend ?

Sunday 3 · 3 · 3



●●○○○ Sprint Wi-Fi 🛜     12:35     43% ▪

⟨ Messages      ▬▬      Details

> Hey did you hear back from your friend ?

Sunday

I haven't had the chance to ask him. He's had a lot going on.

Sunday

> Ok no worries

Yesterday

> Hey did you hear back from your friend ? Any way you can ask him to forward you that email? Hopefully we can figure out the name of the beer guy.

Yesterday

Ah I keep forgetting when we talk it's been rushed lately we've both been super busy. I'll try to get the guys name but not sure he'll want to send me the email, who knows.

> Ok. Yeah just ask him and see what he says.

> Thanks for your help. :)

CITY2080

To: (213) 447-7607, (213) 842-4935 & 7 more...

Forgot to tell you about that cops hangouts on their bong hit patio the place like some medium type not too low or not too high bring all the foam you have  tell your boys if anyone messes with them say the weasel knows where you live and we know him I   shanked one of the biggest boys 25 years ago still living off the rip There's an Asian guy he'll talk shit his name  is sang know some jujitsu but not really tough tell him to go get some heroin There's a fat thick short guy their toughest his name is grant ████████n tell him to go sell some crystal meth two kids  I heard ███████████ used to live with your boogie friend I used to chase that little bich around If you get the chance say you heard the whole ████████family is nothing but a

📷                                    Send

CITY2081

●●●○○ Verizon 🗢          1:39 PM          🗣 93% ▪️▪️▪️

❮ Messages          **Group MMS**          Details

To: (213) 447-7607, (213) 842-4935 & 7 more...

bich around if you get the chance say you heard the whole ███████family is nothing but a bunch of drug addict losers He's the main shaper and good surfer kids are losers and his brothers kids are all losers One of the ██████kids ████████████ in friends beat up a Persian liquor store guy up the street miners put guy in hos! pital getting them for hate crime One time the ██████████ kid talk shit to me one day I said I used to smoke crack with your dad ███████and dead uncle████ I have all the dirt from 1979 up I can make a movie find me somebody

Tell your bros to say even sells weed he lives on 10th Street in San Pedro he'll lose it Come up with all that shit those guys will freak out inside info

          Send

CITY2082



CITY2083



CITY2084



CITY2085



CITY2086

# SUPERIOR COURT OF CALIFORNIA
## County of Los Angeles



### ARREST WARRANT
**Probable Cause Arrest Warrant**
**Ramey Warrant**
[Penal Code § 817]

**THE PEOPLE OF THE STATE OF CALIFORNIA**
**To any California peace officer**

Warrant No. _____

**Arrestee's name:** _____, hereinafter "Arrestee"

**Declarant's name and agency:** *Detective Russell Venegas #733, hereinafter "Declarant"*

**ORDER:** Proof by Declaration of Probable Cause having been made to me on this date by Declarant, I find there is probable cause to believe that Arrestee committed the crime(s) listed below. You are therefore ordered to execute this warrant and bring Arrestee before any judge in this county pursuant to Penal Code §§ 821, 825, 826, and 848.

**Crime(s):** *242 PC – Battery*

*314.1 PC – Indecent Exposure*

**Bail:** ☐ No bail  ■ Bail is set at: $10,000.00

**Night service authorization** [required only for misdemeanors]

☐ Good cause for night service having been established in the supporting Declaration of Probable Cause, this misdemeanor warrant may be executed at any hour of the day or night.

4·14·16     9:06 am
_____
Date and time warrant issued

_____
Judge of the Superior Court

**ALAN B. HONEYCUTT**

---

### ◆ Arrestee Information ◆
*For identification purposes only*

Name: ██████████████

Sex: ██ **M**  Race: W  Height: 5'9"  Weight : 190  Color of hair: Blonde  Color of eyes: Green  CDL:██████

D.O.B.: ██████  CII:██████

Last known address(es): ██████████████████████

Vehicle(s) linked to Arrestee:

Other information:

**CITY2087**

# Exhibit 5

**Exhibit 5:** Audio recording of conversation with Charlie Ferrara, Bates labeled PLTF002027.MOV, Lodged with Court pursuant to Local Rule 11-5.1.  *See* Notice of Lodging filed herewith.

# Exhibit 6

| | |
|---|---|
| Man | That's why, that's why people want to come back and like, oh, let's get those fuckers. People take him to the extreme because they got shit for the older people.  Like you know, they wanted to prove themselves because they wanted a surfer, so they had to do things, you know, that were uncalled for, to like show they cared about stuff. |
| Woman | Yeah. |
| Man | Back in the day you could…back in the day, you could drink and drive.  Everyone, you know, things were cooler back the day.  You know, I'm just trying to give examples. |
| Woman | Yeah. |
| Man | The thing, you could get into a fight and not have to deal with the cops.  Now you say something to someone, the wrong words and you're getting sued.  That's all, I'm just trying to say, like, I don't know. |
| Woman | Yeah, you're saying it's not good to take photos of the waves and share 'em with people. |
| Man | Yeah, keep 'em.  I have photos all over my house. |
| Woman | Yeah. |
| Man | But it's in my house. |
| Woman | Believe me, I'm so lazy anyway that I'm like -- |
| Man | -- You seem super cool – you seem so cool – |
| Woman | -- I take photos of all kinds of stuff that I don't post. |
| Man | -- No, no, you seem so cool and it just sucks that like, you know, you got the wrong vibe from everybody.  That's what happens.  Everybody deals with that down here.  Everybody gets the wrong vibe, because that's the hazing, it's like a fraternity.  They're going to be a dick to you because they want to see how bad you want it.  You know what I mean, like a fraternity, they're going to make you drink frickin' piss to see how bad you want to be in this fraternity.  They're gonna make – you get what I'm saying, like? |
| Woman | Yeah. |
| Man | They're going to make you sit down here when it's all sunny or they're gonna make you walk up to a … to the liquor store to go get 'em ice for their beer and you're, you know, tired, but, "oh, you want a slurpy?  You gotta go do that."  You know, just like…it's just respect, and it teaches people respect  and how to be a man and like…they're all, it's all out of love. |
| Woman | But what if you're a girl? |
| Man | The rousting is all out of love. |

1

12823269.1

| | |
|---|---|
| Woman | So that you think they're rousting me out of love? |
| Man | No. |
| Woman | Cuz I don't think -- |
| Man | No, they're rousting you because you're a newcomer. |
| Woman | They're not rousting me out of love. |
| Man | They're rousting you because you're a newcomer.  You don't, you didn't know how to approach it. |
| Woman | Yeah. |
| Man | You didn't know how to approach it.  Did you paddle straight out? |
| Woman | I didn't even paddle out. |
| Man | Exactly. |
| Woman | Cuz I mean, I couldn't, like, I was just hassled so much that I just like had to leave.  And that was the day that like the cops were down here and like they saw the whole thing and like they, you know, they went up the hill and like I have to file the report. |
| Man | Well, I'll tell you what it is.  No one here will ever touch you.  They will never touch you.  Ever.  I don't care what they say, what they do, they will never touch you.  They're not like that.  They're family members. I promise you on that.  They're good people.  They just want -- |
| Woman | But I'm just saying it's scary being a girl. |
| Man | Well, sure it is. |
| Woman | I'm dealing with that, okay, like, yeah, if you're a guy. |
| Man | But it's also scary being a guy when you have guys barking at you, too, you know.  It's scary when you're a guy and you have fuckin' ten guys you know like, you know, gettin' gnarly on you. |
| Woman | Yeah. |
| Man | That's life.  It's not just here.  So many spots in this world you cannot even put your frickin' foot in the water.  So many spots.  Go up to Oregon – oh my gosh, they'll like – there are so many localized spots. |
| Woman | But I mean, do you think that's okay?  If it's like a public place, you know?  I mean, I guess I don't get that, you know. |
| Man | Listen, this is completely open to you.  This is completely open to you.  The surfing is different.  The surfing is…the water, you know, whatever, yeah.  I can't tell you you can't be down here.  I can't tell you that, you know.  I can't tell you you can't go |

12823269.1

surfing, but what I can do is make sure you don't have fun out there. You know what I mean? And then what's the point of that? You're going to come here when the surf's good everywhere else and get burned and have a bad day? That's, cuz that's, you know, that's what we're gonna keep on doing. They want to come out we're just gonna on burning them and make them have a bad session because we're going to stick together and like attack cuz we are. We're family. We're all family in this, like, it's really uncool what's going on, how we're getting, you know, the wrap. We don't go bother people. They come to us. And maybe, you know, if they came down and showed some respect when the surf's good without the board, and hung out and got to know people who surf here, know the routes, know the background of the people here, that's a start. That's a start. The ladder's way up here because, like I'm trying to say, this is all they have. Some people don't have families. I'm trying to explain that to you. This right here, that's their god.

| Woman | Wow. |
|---|---|

| Man | Just like how homeless people are homeless. You know, you go wow, that's crazy. This person's homeless and like, wow, isn't it crazy they love this place that much. Yeah, it is crazy, but that's how it is. They love it. It's their getaway. Life's not easy, you know. People go through gnarly things and this is their best outlet. |

| Woman | I thought everyone here though is like really, you know, wealthy and doesn't have any -- |

| Man | No, fuck, people here are…no, these people are, they're not wealthy; they just get by. My dad does pretty good. We live in PV, but we're just getting by. You know, my dad's a surfer. He works on cars. He works his ass off. Hey, and yes, it's a bummer to see waves go like that. It is a bummer. |

| Woman | That are unridden. |

| Man | It is. |

| Woman | Yeah, it's a real bummer. |

| Man | It's a fuckin' bummer. |

| Woman | You should be out there. |

| Man | I know, I just, I just got out. I just got out. And that's why I was calling people get down here. Get the frick out. We need people surfing. |

| Woman | Cuz that's the sad part is like to have such a great wave and then no one is ever -- |

| Man | But that's the thing, that's the thing, one day you see, you know, whoa, it's really good and no one's around, but you guys don't know how many people are tied into this spot. People up north that surfed here for 30 years back in the day that come down and surf, people that live in Torrance that have surfed here there whole life. People from all over, like they, you know and we're…everyone works, you know. So |

there's times where people aren't there because of certain things.  This place has enough people on it and for how…I mean, I don't know…how do I explain myself.

| | |
|---|---|
| Woman | I get it.  I guess my point is like why can't everyone just get along.  You know, why can't people --- |
| Man | The reason is, the reason is one person gets along – oh, they're cool – everyone gets along, and then it turns into Rincon and Malibu.  Oh, they got the sweet ticket…why didn't I get the golden ticket?  Trust me, it's how it goes. |
| Woman | But that's just part of dealing with the big city, isn't it?  It's like you have to deal with crowds. |
| Man | City?  No, I'm not doing the city or anything.  This is -- |
| Woman | Or, you know, LA. |
| Man | I'm not dealing with them.  I'm just dealing with…I'm not dealing with anybody.  I'm not dealing with anything.  I'm surfing.  I came down here and me and you are having a talk. |
| Woman | Yeah. |
| Man | I just came up here to look for my friend's phone.  That's what I came up here to do.  And that's you know, that's another thing. |
| Woman | But see, maybe if people were -- |
| Man | You know, I don't even know that you see, like are you recording?  I don't know. |
| Woman | No, I'm not recording. |
| Man | You know, like, see I don't know.  I don't know.  And like, and that's what, that's what's happened to other people.  They've been recorded and stuff while they're, you know, rousting them and get recorded and they get in trouble, but it's like… |
| Woman | Cuz maybe there's better ways of doing it.  I don't know.  I'm just saying there could be like more peaceful ways. |
| Man | Well that's why now we're not, you know, doing stuff, and now we're just burning people.  Yeah, Joel, yeah, fuck yeah, Joel. He's a very good surfer. |
| Woman | Yeah, he's great. |
| Man | And that guy surfs all year.  When the waves aren't good, everywhere else, because he … that guy has gotten so much shit, that guy right there who just got that barrel. |
| Woman | Okay, no one ever surfs there though.  No one ever surfs there. |
| Man | It's called truck drivers.  There's a reason why.  It's not the spot to sit, okay? |

12823269.1

| | |
|---|---|
| Woman | It's good sometimes though. |
| Man | You think you know that, but you know this wave.  I know the wave.  Very well. |
| Woman | All true.  That is true. |
| Man | Okay.  You surf that when it's high tide or deep, and there's reef all along here.  Trust me, people I go, oh, those guys are pussies.  They don't even fucking know.  We charge so hard.  We surf the pipeline.  We surf all the heavy waves.  It's just not a good spot. |
| Woman | Have you surfed pipeline? |
| Man | Yes, I have.  I've surfed pipeline third reef.  Massive. |
| Woman | How was it? |
| Man | As good as it gets.  Fucking insane.  My cousin, my cousin spent three years there.  He taught me a lot about respect.  About the lineup.  About who to stay away from, who to talk to, who to be cool with. |
| Woman | Yeah. |
| Man | You know.  It's all respect, and did you know that this bump was look wise before you came down here?  Did you know?  Be honest, cuz if you knew, then you knew what you were walking into and that was disrespectful.  And that's where you went wrong.  It's disrespectful. |
| Woman | To walk into a place? |
| Man | No.  To walk, to paddle out to what they worked so hard to keep how it is.  That's how they look at it. |
| Woman | Interesting. |
| Man | They cleaned all this shit.  The cleaned from here all the way around, all the trash.  It's called, I forget what they call it.  It's a certain day once a year.  They do a whole cleanup. |
| Woman | Yeah.  I was thinking of helping with that. |
| Man | People are so rude to, people are so rude to you down here you have no idea.  They're so cool.  Like I said, penman, their kids are sitting right here and cooking dogs for the kids.  We're surfing.  It's not…it's just, it is how it is. |
| Woman | Well, yeah, I know what you're saying.  It's that everyone is chilled here.  I just think. |
| Man | No, I'm not saying that.  I'm just saying -- |
| Woman | Well between each other-- |

| | |
|---|---|
| Man | What I'm saying is it is how it is for specific reasons. Like Rincon and Malibu. Guaranty you it will be like that. Indicator? There's a cliff there. I still see fifty people out. So did I get rid of your cliff theory? A little bit? A little bit? |
| Woman | I don't know, I mean, maybe, yeah. |
| Man | A lot of it? I did. Cuz anybody can walk on a cliff. It's not hard. It's really not hard. |
| Woman | I mean, I get your perspective. I just don't know why --- |
| Man | No, it's not, it's not my perspective. It's the way it's been here for-- |
| Woman | Forever here pretty much. |
| Man | --Forever. As long as, as long as my dad was a kid. My dad's 59 years old. For 59 years it's been like that. Who are you to come here and change something? Get me? |
| Woman | Yeah. |
| Man | I'm sorry to say it like that. I don't, I'm not rude, but that's how they're looking at it, you know, some newcomers come and screw up what we have going on here and, ach! You know, you could have gone about it right and you didn't and I don't know why-- |
| Woman | Well, I don't know, but it's not like I did it on purpose, like I didn't really know. |
| Man | I know, but like, now I don't know if people like, now if you come down without your board like you did right now which was super cool and you come down and like you come sit around here and people are here, I don't know if they're gonna want to talk to you. You know what I mean, because they're hurt, and I'll tell you what that wave back there does. It's only good if it's a deep one. If you're a surfer, man, it's only good if it's a deep one, 'kay, cuz there's the west bowl and the west bowl you won't be able to make it if you're back there. You got me? It's only good if it's a deep one. And there's not many, like only a rare deep one comes in. So this is the main local right here. This is the main local. |
| Woman | That's your buddy? |
| Man | Yup. This is the main local. |
| Woman | And he, is he chill or is he mean? |
| Man | He's pitched…Okay, so what I did was I had a kind talk with you guys and, um… |
| Woman | And I really appreciate it, you know, I've -- |
| Man | No, no, no, he's gonna, and now, I'm gonna get yelled at, okay? You see? |
| Woman | Do you want me to talk to him? |
| Man | No, don't worry about it. I'm just saying, I'm gonna get nailed. |

12823269.1

| | |
|---|---|
| Woman | Well then you should tell him that you know it's good you explained things to me because it's…my intention here is not to cause trouble, like I just, honestly, my intention is I just want to be able to come here and surf and like want everyone to be chill and have a good time. |
| Man | Yeah, I appreciate that. |
| Woman | And you know hopefully we can just all get along. That's all I want. |
| Man | I agree with you, but I don't know like I just, you know, I don't know how it's gonna work.  I'm sorry.  I can't do anything.  I didn't do it, you know. |
| Woman | Yeah. |
| Man | You seem really cool.  I don't know, I'm sorry. |
| Woman | What do they do with all the video that they get? Cuz they've taken a lot of videos of me. |
| Man | Oh, because you video them.  [inaudible] |
| Woman | All right, well if you want me to [inaudible] |
| Man | [inaudible] |
| Woman | All right. |
| Man | It really flames the tempers, huh. |
| Woman | What? |
| Man | It really flames the tempers, huh. |
| Woman | Yeah.  I know. |
| Man | That's the way to get somebody to [inaudible] |
| Woman | That's a really good one. |
| Man | 'kay, do it.  Nice. |

12823269.1

# Exhibit J

HANSON BRIDGETT LLP
KURT A. FRANKLIN, SBN 172715
kfranklin@hansonbridgett.com
SAMANTHA WOLFF, SBN 240280
swolff@hansonbridgett.com
CAROLINE LEE, SBN 293297
clee@hansonbridgett.com
JENNIFER ANIKO FOLDVARY, SBN 292216
jfoldvary@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366

HANSON BRIDGETT LLP
TYSON M. SHOWER, SBN 190375
tshower@hansonbridgett.com
LANDON D. BAILEY, SBN 240236
lbailey@hansonbridgett.com
500 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone: (916) 442-3333
Facsimile:  (916) 442-2348

OTTEN LAW, PC
VICTOR OTTEN, SBN 165800
vic@ottenlawpc.com
KAVITA TEKCHANDANI, SBN 234873
kavita@ottenlawpc.com
3620 Pacific Coast Highway, #100
Torrance, California 90505
Telephone: (310) 378-8533
Facsimile:  (310) 347-4225

Attorneys for Plaintiffs
CORY SPENCER, DIANA MILENA
REED, and COASTAL PROTECTION
RANGERS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation, | CASE NO. 2:16-cv-02129-SJO (RAOx) **DECLARATION OF MARK SLATTEN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** **Date**:  February 21, 2017 **Time**:  10:00 a.m. |

12966332.1

DECLARATION OF MARK SLATTEN  IN SUPPORT
OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

| | | |
|---|---|---|
| 1 | Plaintiffs, | **Judge**: Honorable S. James Otero<br>**Ctrm**.: 10C |
| 2 | v. | 1st Street Courthouse |
| 3 | LUNADA BAY BOYS; THE | |
| 4 | INDIVIDUAL MEMBERS OF THE | Complaint Filed: March 29, 2016<br>Trial Date: November 7, 2017 |
| 5 | LUNADA BAY BOYS, including but<br>not limited to SANG LEE, BRANT | |
| 6 | BLAKEMAN, ALAN JOHNSTON<br>AKA JALIAN JOHNSTON, | |
| 7 | MICHAEL RAE PAPAYANS, | |
| 8 | ANGELO FERRARA, FRANK<br>FERRARA, CHARLIE FERRARA, | |
| 9 | and N. F.; CITY OF PALOS | |
| 10 | VERDES ESTATES; CHIEF OF<br>POLICE JEFF KEPLEY, in his | |
| 11 | representative capacity; and DOES | |
| 12 | 1-10, | |
| 13 | Defendants. | |
| 14 | | |

15    I, Mark Slatten, declare as follows:

16    1.    I have personal knowledge of the facts set forth herein, except

17  as to those stated on information and belief and, as to those, I am informed

18  and believe them to be true.  If called as a witness, I could and would

19  competently testify to the matters stated herein.

20    2.    I am the President of Plaintiff, Coastal Protection Rangers, which

21  is a California non-profit public benefit corporation (hereafter "CPR"). Prior to

22  incorporation, CPR was an unincorporated membership association. This is

23  a completely volunteer position. I earn a living, however, as a licensed

24  geologist and own a company called Clean Soils Inc. My company is hired to

25  conducted investigations into property impacted by hazardous substances,

26  often chlorinated solvents, and implement systems to remediate the soil and

27  groundwater.

28  ///

3.     I grew up in Southern California. As a young boy, my family lived one block off Manhattan Beach, CA.  I spent most days at the beach bodysurfing and enjoying the ocean. In junior high school, we moved to Palos Verdes, and I learned to surf. This is back when the surfboards were long, big and heavy.  I heard through the "grapevine" to stay away from the southern side of the peninsula. I understood this to mean anything south of Bluff Cove. The "why" made no sense then, but it does now. The people who said to avoid those parts of the Peninsula were referring to the problem with localism.

4.     While attending the University of California, Los Angeles (UCLA) I lived in Hermosa Beach and worked in Redondo Beach. Today, I live with my wife -- about 20 miles from the beach at Carlsbad (San Diego County) and go there frequently. To me and CPR, the beach represents many things – it demonstrates the strength of nature, how small we are as humans, freedom, a place to explore, a venue to gather with friends and others, and a place where people can express themselves in activities like surfing.  In sum, the beach has always given me great joy.  It is a place where I can go to mediate and escape the stress of everyday life, relax and be happy. These are some of the reasons why the coastal areas must be protected from selfish, exclusion-oriented and otherwise mean people.

5.     From 1970-72, I studied the geology of the Santa Monica Mountains while attending Moorpark College. During that time, I become an avid hiker. This was sparked by my interest in geology. I have hiked and enjoyed the Coastal Mountain ranges all over the State of California. My love for the natural sciences led me obtain a Master's Degree in science in geology from University of California Riverside and Bachelor of Science, Geology with paleontology minor. I am a Professional Geologist and hold

DECLARATION OF MARK SLATTEN IN SUPPORT
OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    licenses in six states including. I am also a California Certified

2    Hydrogeologist.

3        6.     I decided to start CPR in 2014 after a long discussion with a

4    friend who is an environmental attorney. I was familiar with the Coastal Act

5    because of some work that I was doing related to the former Halaco refinery

6    that was built on coastal wetlands in the City of Oxnard. We discussed how

7    the private enforcement provisions of the Coastal Act could be used to

8    ensure existing beach access and open up beaches long denied to the

9    public, to stop illegal developments and to protect the coastal zone. We also

10   discussed how the California coast is one of the largest open spaces near

11   urban areas and how surfing and exposure to beach activities could be used

12   as a tool to help the poor generally, and specifically at-risk youths in

13   communities that have too little access to recreation, parks, nature and the

14   outdoors.

15        7.     In addition, several of CPR's board members and/or volunteers

16   of the organization are surfers and/or enjoy the beach and grew up in areas

17   near Palos Verdes Estates such as Redondo Beach, Rancho Palos Verdes,

18   Hermosa Beach and Torrance. They would have liked to have surfed, dived,

19   taken photographs, hiked, or even just enjoyed nature and the beach at

20   Lunada Bay but were afraid to because of the reputation that it had for

21   localism. For example, board member Dave Leuck grew up in Redondo

22   Beach. Having surfed since the age of 8, lived in Hawaii for two years, and

23   having spent six months surfing Mainland Mexico, he has the skill to surf

24   Lunada Bay on good days. Yet, he has never been able to surf there

25   because of the problem with localism. The same is true for Ian Stenehjem

26   who grew up in Rancho Palos Verdes just 2 miles from Lunada Bay and has

27   surfed his entire life. Ian is a pilot for a major airline and has surfed the best

28

DECLARATION OF MARK SLATTEN IN SUPPORT
OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

breaks in the world for the last 20 years but has never been able to surf the break closest to where he grew up because of the locals.

8.    Around December 2015, I read an article in The Los Angeles Times about a dispute the Coastal Commission was having with the City of Palos Verdes Estates regarding an illegal structure at Lunada Bay and the issue of localism. What was immediately apparent to me was the fact that the City seemed to be challenging the authority of the Coastal Commission. CPR's attorney and I researched bringing a private enforcement action. We looked at various things including past efforts to stop localism at Lunada Bay and other surfing spots in Palos Verdes Estates. Throughout the years, the South Bay Chapter of the Surfrider Foundation seemed dedicated to stopping localism. There are numerous articles showing the efforts made by their volunteers. Yet, the Surfrider Foundation had not been able to solve the problem.   Because beach access is central to CPR's mission, the board voted to become a plaintiff in this case.

9.    As part of the investigation in this matter, I have learned how the City of Palos Verdes Estates has not enforced laws against locals, such as the law prohibiting drinking alcohol on public beaches and laws that prohibit people from blocking access to the beach.  And, I learned about historic discrimination in Palos Verdes Estates, including: (a) the Palos Verdes Homes Association and Art Jury designed to "protect this utopian landscape and future property values" that was  established in 1923 as a "high-class residential suburb" limiting 90% of the property to single-family homes; (b) restrictive covenants forbade an owner to sell or rent a house to anyone not of white or Caucasian race and to not permit African-Americans on their property with the exception of chauffeurs, gardeners and domestic servants; (c) in 1960, Palos Verdes Peninsula voters voted to form a unified school district of their own, and not remain under the more diverse Los Angeles

1 Unified School District's rule (this avoided desegregation and bussing, which

2 came in later in the 1960's and 1970's); (d) in the 1980's, disproportionately

3 white and affluent communities persuaded the Southern California Rapid

4 Transit District (RTD) to end direct bus service between South Central and

5 beach-front communities to the west, increasing the amount of time it took to

6 reach the beach and effectively deterring people of color from going to the

7 beach at all because of the amount of time and hassle it took to get there,

8 and that RTD granted the request of Palos Verdes Peninsula cities that

9 buses from the inner city not climb the Palos Verdes Hill; (e) in 1991, the

10 cities of Palos Verdes Estates, Rancho Palos Verdes, and Rolling Hills

11 Estates formed their own small transit district called the Palos Verdes

12 Peninsula Transit Authority (PVPTA) that only operates Monday to Friday,

13 and does not stop at Palos Verdes Estates beaches like Lunada Bay; (f) on

14 September 11, 2015, defendant NF in this matter served as a lookout on a

15 crime that took place at the local liquor store where the Bay Boys buy beer,

16 and while the police reported it as a robbery gone awry by high school age

17 kids pulling a prank, the liquor store owner explained it as a hate crime

18 because it happened on 9/11, he is a Pakistani/Muslim immigrant and that

19 the boys swung a baseball bat at him breaking his arm, and the boys didn't

20 attempt to steal anything; (g) when coastal access advocates held a Martin

21 Luther King Day paddle out rally in 2014, several Bay Boys paddled out in

22 blackface in front of police and told the visitors, "you don't pay enough taxes

23 to be here"; (h) that when Plaintiff Diana Milena Reed complained about

24 being sexually harassed at the Rock Fort, that police officers responded with

25 words to the effect, "why would a woman want to visit a beach that only has

26 rocks?" and that the Bay Boy's called her "that Diana bitch" in their texts;

27 and (i) that numerous beachgoers have had the word "faggot" screamed at

28 them by locals as they attempt to visit Lunada Bay. These protected-

category overtones cause me and CPR grave concern, as all beachgoers, no matter their income level, race, color, religion, gender, sexual orientation or other protected category are entitled to coastal access.

10.   In September 2016, Gov. Jerry Brown signed legislation amending the Coastal Act which compliments CPRs core mission of open access to the coast for everyone by incorporating the concept of environmental justice into the law.   The Coastal Act now explicitly refers to the statutory definition of environmental justice. "Environmental justice" means the fair treatment of people of all races, cultures, and incomes with respect to environmental laws, regulations, and policies under Government Code Section 65040.12. The governor is now required to appoint a Commissioner experienced in and dedicated to environmental justice. Every Commissioner is required to comply with and enforce the cross-cutting equal justice laws. Finally, the Act explicitly refers to state civil rights law that guarantees equal access to publicly funded resources and prohibits discrimination based on race, color, national origin, and other factors, Government Code 11135. Section 11135 applies to all state agencies and recipients of state funding.

11.   The beaches, tide pools and surf on the Palos Verdes Peninsula and at Lunada Bay are truly unique and everyone should be able to enjoy them. On a low tide, you can see octopi, limpets, crabs, sea urchins and other aquatic life living in the tide pools. There are marine mammals such as seals that patrol the shores; occasionally, a whale can be spotted on the horizon. Standing on the bluff the kelp beds are visible- something totally unique to California. And if you grab a mask and snorkel, you will discover one of the most biologically diverse and productive zones on the planet. Exposing people to these ecological areas give life meaning and put things into perspective; everyone, especially the economically challenged and

1 people who live in poorer communities, should be able to have access to

2 this area of the coast without fearing for his or her safety. Specifically, CPR

3 and I believe that without intimidation, school children from poorer inland

4 communities should be able to take field trips to Lunada Bay for educational

5 purposes and to share these experiences with their parents, families, and

6 friends.  Everyone should be able to learn, exercise, enjoy the outdoors and

7 otherwise express themselves in their chosen activities at Lunada Bay.

8   12. CPR and I would like the public to be able to visit Lunada Bay

9 to surf without fear of physical and verbal attack or the hassle of dealing with

10 the Bay Boy bullies.  CPR and I would like the public to be able to visit the

11 Lunada Bay bluff, shoreline, and water to explore and surf without fear of

12 having their car vandalized.  CPR and I want the Bay Boys and other locals

13 to be barred from using this beach for sufficient time to change attitudes and

14 to give access to the beach back to the public.

15   13. CPR and I want the City of Palos Verdes Estates to enforce its

16 ordinances fairly and for it to provide signage so people will know Lunada

17 Bay is a public beach.  CPR and I want the City of Palos Verdes Estates to

18 improve amenities in a fashion that makes it safer, provides improved

19 access to all beachgoers, and is both consistent with this rural spot, the

20 California Coastal Act, and state and federal law.  For example, access trails

21 to the shoreline should be clearly marked to make it safer for people visiting

22 to navigate down to the shoreline.  And no person should be allowed to

23 block the access trails or to intimidate visitors on the bluff top, on the

24 shoreline, or in the water.  CPR and I want Palos Verdes Estates police to

25 be available to help when people are unlawfully excluded.  In short, CPR

26 and I want all to be able to visit Lunada Bay without being harassed.  And if

27 someone is harassed, we want the City of Palos Verdes Estates police to

28 take complaints seriously. Finally, we would like to see public transportation

1   that makes it easy for people of all walks of live to be able to experience

2   Lunada Bay.

3         I declare under penalty of perjury under the laws of the United States

4   of America that the foregoing is true and correct.

5         Executed on this 28th day of December, 2016, at _Murrieta_, California.

6

7                                              MARK SLATTEN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 20320 S.W. Birch Street, Second Floor, Newport Beach, California 92660.

On July 24, 2017, I served the within document(s) described as:

REQUEST FOR JUDICIAL NOTICE OF ADJUDICATIVE FACTS IN SUPPORT OF DEFENDANT CHARLIE FERRARA'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

on the interested parties in this action as stated on the attached mailing list.

[X]   (BY ELECTRONIC SERVICE) Complying with Code of Civil Procedure § 1010, I caused such document(s) to be Electronically Filed and Served through the _for the above-entitled case.  Upon completion of transmission of said document(s), a filing receipt is issued to the filing party acknowledging receipt, filing and service by 's system.  A copy of the [Email receipt System] filing receipt page will be maintained with the original document(s) in our office.

Executed on July 24, 2017, at Newport Beach, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| | |
|---|---|
| Hailey Williams | |
| (Type or print name) | (Signature) |

BREMER WHYTE BROWN &
O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

1

H:\1178\176\PROOF OF SERVICE.docx

<u>**Cory Spencer v. Lunada Bay Boys et al.,**</u>

**Case No. 2:16-cv-2129-SJO**

**BWB&O CLIENT:    Frank and Charlie Ferrara**
**BWB&O FILE NO.:   1178.176**

<u>**SERVICE LIST**</u>

| | | |
|---|---|---|
| Samantha Wolff, Esq.<br>**HANSON BRIDGETT**<br>425 Market Street<br>26th Floor<br>San Francisco, CA 94105<br>(415) 777-3200<br>(415) 541-9366 Fax<br>Attorneys For **PLAINTIFF**<br><br>swolff@hansonbridgett.com<br>kfranklin@hansonbridgett.com | Tyson M. Shower, Esq.<br>**HANSON BRIDGETT**<br>500 Capitol Mall<br>Suite 1500<br>Sacramento, CA 95814<br>(916) 442-3333<br>(916) 442-2348 Fax<br>Attorneys For **PLAINTIFFS**<br><br>tshower@hansonbridgett.com | Victor Otten, Esq.<br>**OTTEN LAW, PC**<br>3620 Pacific Coast Highway<br>Suite 100<br>Torrance, CA 90505<br>(310) 378-8533<br>(310) 347-4225 Fax<br>Attorneys For **PLAINTIFFS**<br><br>vic@ottenlawpc.com |
| Jacob Song, Esq.<br>**KUTAK ROCK LLP**<br>5 Park Plaza<br>Suite 1500<br>Irvine, CA 92614<br>(949) 417-0999<br>(949) 417-5639<br>Attorney For **CITY OF PALOS VERDES ESTATES and JEFF KEPLEY, in his representative capacity, serves as the Chief of Police Department of Defendant City of Palos Verdes Estates.**<br><br>jacob.song@kutakrock.com | J. Patrick Carey, Esq.<br>**LAW OFFICE OF PATRICK CAREY**<br>1230 Rosecrans Avenue<br>Suite 270<br>Manhattan Beach, CA 90266<br>(310) 526-2237<br>(310) 356-3671 Fax<br>Attorney For **ALAN JOHNSTON individual membeer of LUNADA BAY BOYS aka JALIAN JOHNSTON**<br><br>pat@patcareylaw.com | Aaron G. Miller, Esq.<br>**THE PHILIPS FIRM**<br>800 Wilshire Boulevard<br>Suite 1550<br>Los Angeles, CA 90017<br>(213) 244-9913<br>(213) 244-9915 Fax<br>Attorneys For **ANGELO FERRARA**<br><br><br>amiller@thephillipsfirm.com |
| Mark Fields, Esq.<br>**LAW OFFICES OF MARK C. FIELDS**<br>333 So. Hope Street<br>Suite 3500<br>Los Angeles, CA 90071<br>(213) 617-5225<br>(213) 629-2420 Fax<br>Attorney For **ANGELO FERRARA an individual member of LUNADA BAY BOYS and N.F. an individual member of LUNADA BAY BOYS**<br><br>fields@markfieldslaw.com | Peter R. Haven, Esq.<br>**HAVEN LAW**<br>1230 Rosecrans Avenue<br>Suite 300<br>Manhattan Beach, CA 90266<br>(310) 272-5353<br>(213) 477-2137 Fax<br>Attorneys For **MICHAEL RAY PAPAYANS**<br><br>peter@havenlaw.com | Dana Alden Fox, Esq.<br>**LEWIS BRISBOIS BISGAARD & SMITH, LLP**<br>633 W. 5th Street<br>Site 4000<br>Los Angeles, CA 90071<br>(213) 580-3858<br>(213) 250-7900 Fax<br>Attorneys For **SANG LEE**<br><br>Dana.Fox@lewisbrisbois.com |

BREMER WHYTE BROWN & O'MEARA LLP<br>20320 S.W. BIRCH STREET<br>SECOND FLOOR<br>NEWPORT BCH, CA  92660<br>(949) 221-1000

H:\1178\176\PROOF OF SERVICE.docx