1   Alison K. Hurley, State Bar No. 234042
    ahurley@bremerwhyte.com
2   Tiffany L. Bacon, State Bar No. 292426
    tbacon@bremerwhyte.com
3   BREMER WHYTE BROWN & O'MEARA LLP
    20320 S.W. Birch Street
4   Second Floor
    Newport Beach, California 92660
5   Telephone: (949) 221-1000
    Facsimile: (949) 221-1001
6
7   Attorneys for Defendants,
    FRANK FERRARA and CHARLIE FERRARA

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  CORY SPENCER, an individual; DIANA     ) Case No. 2:16-cv-2129
    MILENA REED, an individual; and        )
12  COASTAL PROTECTION RANGERS,            ) Judge:  Hon. S. James Otero
    INC., a California non-profit public   ) Dept:   Courtroom 10C
13  benefit corporation,                   )
                                           ) Magistrate Judge:
14              Plaintiff,                  ) Hon. Rozella A. Oliver
                                           )
15         vs.                             ) **DECLARATION OF TIFFANY**
                                           ) **BACON IN SUPPORT OF FRANK**
16  LUNADA BAY BOYS; THE                   ) **FERRARA'S MOTION FOR**
    INDIVIDUAL MEMBERS OF THE              ) **SUMMARY JUDGMENT OR, IN**
17  LUNADA BAY BOYS, including but not     ) **THE ALTERNATIVE, PARTIAL**
    limited to SANG LEE, BRANT             ) **SUMMARY JUDGMENT**
18  BLAKEMAN, ALAN JOHNSTON AKA            )
    JALIAN JOHNSTON, MICHAEL RAE           ) [*Filed concurrently with Notice of*
19  PAPAYANS, ANGELO FERRARA,              ) *Motion; Memorandum of Points and*
    FRANK FERRARA, CHARLIE                 ) *Authorities; Request for Judicial*
20  FERRARA; CITY OF PALOS VERDES          ) *Notice of Adjudicative Facts; Notices*
    ESTATES; CHIEF OF POLICE JEFF          ) *of Lodging; proposed Statement of*
21  KEPLEY, in his representative capacity;) *Uncontroverted Facts and Conclusions*
    and DOES 1-10,                         ) *of Law and [Proposed] Judgment*
22                                         ) *lodged herewith*]
                Defendants.                )
23  _____  ) Date: August 21, 2017
                                           ) Time: 10:00 a.m.
24                                         ) Dept: Courtroom 10C
25                                         Complaint Filed:  March 29, 2016
                                           Trial Date:       November 7, 2017
26

27

28

BREMER WHYTE BROWN &
O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA 92660
(949) 221-1000

I, Tiffany Bacon, declare as follows:

1. I am an attorney at law duly licensed to practice before the United States District Court for the Central District of California and am an associate with the law firm of Bremer Whyte Brown & O'Meara LLP, counsel of record for Defendant FRANK FERRARA (hereinafter "Frank Ferrara" or "Defendant") in this action. Except for those facts stated upon information and belief, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify to such facts under oath.

2. This declaration is made in support of Frank Ferrara's Motion for Summary Judgment against Plaintiffs, CORY SPENCER ("Spencer"), DIANA MILENA REED ("Reed") and COASTAL PROTECTION RANGERS, INC. ("CPR") (collectively, "Plaintiffs") or, in the alternative partial summary judgment.

3. On July 12, 2017, pursuant to Local Rule 7-3, I had a telephonic conference with Plaintiffs' counsel, Samantha Wolff, Esq.

4. A true and correct copy of excerpts from the deposition of Frank Ferrara is attached hereto as **Exhibit L** and incorporated herein by this reference.

5. A true and correct copy of the deposition of Plaintiff Spencer is attached hereto as **Exhibit M** and incorporated herein by this reference.

6. A true and correct, condensed copy of the deposition of Plaintiff Reed is attached hereto as **Exhibit N** and incorporated herein by this reference.

7. A true and correct copy of excerpts from the deposition of Ken Claypool is attached hereto as **Exhibit O** and incorporated herein by this reference.

8. A true and correct copy of the Declaration of Jim Russi is attached hereto as **Exhibit P** and incorporated herein by this reference.

9. True and correct copies of Plaintiff Spencer's and Plaintiff Reed's responses to Frank Ferrara's discovery requests, as produced by Plaintiffs, are attached hereto as **Exhibit Q** and incorporated herein by this reference.

BREMER WHYTE BROWN &
O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

2

1    10.    A true and correct copy of excerpts from the deposition of Charlie

2  Ferrara is attached hereto as **Exhibit R** and incorporated herein by this reference.

3    11.    A true and correct copy of excerpts from the deposition of Sang Lee is

4  attached hereto as **Exhibit S** and incorporated herein by this reference.

5    I declare under penalty of perjury under the laws of the United States of

6  America that the foregoing is true and correct.

7    Executed on this 24th day of July 2017, at Newport Beach, California.

8

9

10    Tiffany Bacon

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BREMER WHYTE BROWN &
O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

3

# Exhibit L

Atkinson-Baker Court Reporters
www.depo.com

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                          WESTERN DIVISION

4                              - - -

5    CORY SPENCER, AN INDIVIDUAL;    )
     DIANA MILENA REED, AN           )
6    INDIVIDUAL; AND COASTAL         )
     PROTECTION RANGERS, INC.,       )
7    A CALIFORNIA NON-PROFIT PUBLIC  )
     BENEFIT CORPORATION,            )
8                                    )
                    Plaintiffs,      )
9                                    )
         vs.                         ) No.:  2:16-cv-02129-SJO
10                                   )       (RAOx)
                                     )
11   LUNADA BAY BOYS; THE INDIVIDUAL )
     MEMBERS OF THE LUNADA BAY BOYS, )
12   INCLUDING BUT NOT LIMITED TO    )
     SANG LEE, BRANT BLAKEMAN, ALAN  )
13   JOHNSTON AKA JALIAN JOHNSTON,   )
     MICHAEL RAE PAPAYANS, ANGELO    )
14   FERRARA, FRANK FERRARA,         )
     CHARLIE FERRARA, ET AL.,        )
15                                   )
                    Defendants.      )
16   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

17                    VIDEOTAPED DEPOSITION OF

18                          FRANK FERRARA

19                       IRVINE, CALIFORNIA

20                         JULY 10, 2017

21   Atkinson-Baker, Inc.
     Court Reporters
22   www.depo.com
     (800) 288-3376
23

24   REPORTED BY:  ANGELIQUE MELODY FERRIO, CSR NO. 6979

25   FILE NO:      AB06A34

1

Atkinson-Baker Court Reporters
www.depo.com

```
 1              UNITED STATES DISTRICT

 2             COURT CENTRAL DISTRICT OF

 3            CALIFORNIA WESTERN DIVISION

 4                     - - -

 5

 6   CORY SPENCER, AN INDIVIDUAL;    )
     DIANA MILENA REED, AN           )
 7   INDIVIDUAL; AND COASTAL         )
     PROTECTION RANGERS, INC.,       )
 8   A CALIFORNIA NON-PROFIT PUBLIC  )
     BENEFIT CORPORATION,            )
 9                                   )
                  Plaintiffs,        )
10                                   )
         vs.                         ) No.:  2:16-cv-02129-SJO
11                                   )       (RAOx)
                                     )
12   LUNADA BAY BOYS; THE INDIVIDUAL )
     MEMBERS OF THE LUNADA BAY BOYS, )
13   INCLUDING BUT NOT LIMITED TO    )
     SANG LEE, BRANT BLAKEMAN, ALAN  )
14   JOHNSTON AKA JALIAN JOHNSTON,   )
     MICHAEL RAE PAPAYANS, ANGELO    )
15   FERRARA, FRANK FERRARA,         )
     CHARLIE FERRARA, ET AL.,        )
16                                   )
                  Defendants.        )
17   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

18

19

20          Videotaped deposition of FRANK FERRARA, taken

21   on behalf of the Plaintiffs, at Premier Business Center,

22   2600 Michelson Drive, Suite 1700, Irvine, California,

23   92612, commencing at 9:46 a.m., Monday, July 10, 2017,

24   before ANGELIQUE MELODY FERRIO, CSR No. 6979.

25
```

2

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1                 A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        OTTEN LAW, P.C.
          BY:  VICTOR J. OTTEN, ESQ.
 5        AND  CHRISTINA KIFLOM, Summer Intern
          3620 Pacific Coast Highway
 6        Suite 100
          Torrance, California 90505
 7

 8

 9   FOR DEFENDANTS FRANK FERRARA AND CHARLIE FERRARA:

10        BREMER, WHYTE, BROWN & O'MEARA, LLP
          BY:  TIFFANY BACON, ESQ.
11        20320 S.W. Birch Street
          Second Floor
12        Newport Beach, California 92660

13

14

15   FOR THE DEFENDANT SANG LEE:

16        LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
          BY:  TERA A. LUTZ, ESQ.
17        633 West 5th Street
          Suite 4000
18        Los Angeles, California 90071

19

20

21   FOR THE DEFENDANTS CITY OF PALOS VERDES
     AND CHIEF OF POLICE JEFF KEPLEY:
22
          KUTAK, ROCK, LLP
23        BY:  ANTOINETTE P. HEWITT, ESQ.
          5 Park Plaza
24        Suite 1500
          Irvine, California 92614
25
```

3

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR DEFENDANT SANG LEE:

 4       (BY TELEPHONE)
         BOOTH, MITCHEL & STRANGE, LLP
 5       BY:  JACKIE K. VU, ESQ.
         707 Wilshire Boulevard
 6       Suite 3000
         Los Angeles, California 90017
 7

 8

 9   FOR DEFENDANT BRANT BLAKEMAN:

10       (BY TELEPHONE)
         BUCHALTER, NEMER, APC
11       BY:  ROBERT S. COOPER, ESQ.
         1000 Wilshire Boulevard
12       Suite 1500
         Los Angeles, California 90017
13

14

15   FOR DEFENDANT MICHAEL RAY PAPAYANS:

16
         (BY TELEPHONE)
17       HAVEN LAW
         BY:  PETER T. HAVEN, ESQ.
18       1230 Avenue
         Suite 300
19       Manhattan Beach, California 90266

20

21   FOR THE DEFENDANT N.F.:

22       (BY TELEPHONE)
         LAW OFFICES OF MARK C. FIELDS, APC
23       BY:  MARK C. FIELDS, ESQ.
         333 South Hope Street
24       35th Floor
         Los Angeles, California 90071
25   VIDEOGRAPHER: ROBERT ADAMS
```

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
1                          INDEX

2

3    WITNESS:  FRANK FERRARA

4

5    EXAMINATION BY:                            PAGE

6        MR. OTTEN                                12

7

8

9    EXHIBITS

10   NUMBER              DESCRIPTION          PAGE

11    102      Xeroxed Colored Photograph       44
               Consisting of one page
12

13    108      Xeroxed Colored Photograph      234
               Consisting of one page
14

15    113      Xeroxed Colored Photograph       76
               Consisting of one page
16

17    114      Xeroxed Colored Photograph       88
               Consisting of one page
18

19    116      Xeroxed Colored Photograph      242
               Consisting of one page
20

21    119      Xeroxed Colored Photograph      232
               Consisting of one page
22

23    277      Xeroxed Black-And White          72
               Photograph
24             Consisting of one page

25
```

5

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
1              EXHIBITS CONTINUED:

2

3    278    Plaintiffs' Notice of Deposition      20
            of Defendant Frank Ferrara
4           Dated June 15, 2017
            Consisting of three pages
5

6

7    279    Xeroxed Black-And White              68
            Photograph
8           Consisting of one page

9

10   280    Xeroxed Black-And White              75
            Photograph
11          Consisting of one page

12

13   281    Xeroxed Colored Photograph           92
            Consisting of one page
14

15   282    Los Angeles Times                   117
            Article Collections
16          Consisting of two pages

17

18   283    Xeroxed Colored Photograph          129
            Consisting of one page
19

20   284    Xeroxed Colored Photograph          149
            Consisting of one page
21

22   285    Surf Magazine Article               149
            Consisting of one page
23

24   286    Teach The Children Well             169
            Don Boller, Long Beach
25          Consisting of one page
```

6

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1              EXHIBITS CONTINUED:

 2

 3    287    Today's Lesson:  Don't Be A Kook      174
             Frank Ferrara, Lunada Bay, Calif.
 4           Consisting of one page

 5

 6    288    Megan Barnes, Daily Breeze            212
             Posted 4/7/16, 7:50 p.m.
 7           Consisting of two pages

 8

 9    289    Xeroxed Colored Photograph            233
             Consisting of one page
10

11    290    Xeroxed Colored Photograph            237
             Consisting of one page
12

13    291    Xeroxed Colored Photograph            240
             Consisting of one page
14

15    292    Xeroxed Colored Photograph            244
             Consisting of one page
16

17    293    Xeroxed Colored Photograph            245
             Consisting of one page
18

19    294    Xeroxed Colored Photograph            246
             Consisting of one page
20

21    295    Xeroxed Colored Photograph            248
             Consisting of one page
22

23    296    Xeroxed Colored Photograph            249
             Consisting of one page
24

25
```

7

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1              EXHIBITS CONTINUED:

 2          .

 3     297    Xeroxed Colored Photograph        251
              Consisting of one page
 4

 5     298    Xeroxed Colored Photograph        253
              Consisting of one page
 6

 7     299    Xeroxed Colored Photograph        254
              Consisting of one page
 8

 9     300    Xeroxed Colored Photograph        254
              Consisting of one page
10

11     301    Xeroxed Colored Photograph        255
              Consisting of one page
12

13     302    Xeroxed Colored Photograph        257
              Consisting of one page
14

15     303    Xeroxed Colored Photograph        261
              Consisting of one page
16

17     304    Xeroxed Colored Photograph        262
              Consisting of one page
18

19     305    Xeroxed Colored Photograph        265
              Consisting of one page
20

21     306    Xeroxed Colored Photograph        266
              Consisting of one page
22

23     307    Xeroxed Colored Photograph        267
              Consisting of one page
24

25
```

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1              EXHIBITS CONTINUED:

 2

 3    308        Xeroxed Colored Photograph        267
                 Consisting of one page
 4

 5    309        Xeroxed Colored Photograph        269
                 Consisting of one page
 6

 7    310        Xeroxed Colored Photograph        270
                 Consisting of one page
 8

 9    311        Xeroxed Colored Photograph        271
                 Consisting of one page
10

11    312        Xeroxed Colored Photograph        273
                 Consisting of one page
12

13    313        Xeroxed Colored Photograph        274
                 Consisting of one page
14

15

16

17    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

18    PAGE       LINE

19    230           15

20    232            7

21    232           16

22

23

24

25
```

9

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1            IRVINE, CALIFORNIA, MONDAY, JULY 10, 2017
 2                       9:46 A.M.
 3                        -OOO-
 4                                                    09:46:23
 5            THE VIDEOGRAPHER:  Good morning, everyone.   09:46:23
 6   My name is Robert Adams.  I'm your videographer.  And  09:46:24
 7   I represent Atkinson-Baker, Incorporated in Glendale,  09:46:27
 8   California.                                           09:46:31
 9            I'm not financially interested in this action  09:46:31
10   nor am I a relative or employee of any attorney or    09:46:33
11   any of the parties.                                   09:46:36
12            Today's date is July 10th, 2017.  And the    09:46:37
13   time is 9:46 a.m.                                     09:46:40
14            And this deposition is taking place at        09:46:43
15   2600 Michelson Drive, Suite 1700, Irvine, California,  09:46:48
16   92612.                                                09:46:55
17            This is case number 2:16-cv-02129-SJO (RAOx)  09:46:55
18   entitled Spencer versus Lunada Bay Boys.  The         09:47:05
19   deponent is Frank Ferrara.                            09:47:08
20            This deposition is being taken on behalf      09:47:11
21   of the Plaintiffs.  And the court reporter is          09:47:14
22   Angelique Ferrio from Atkinson-Baker.                 09:47:16
23            Counsel will now please introduce themselves.  09:47:18
24   After all counsel present have introduced themselves,  09:47:20
25   the witness will be sworn in by the court reporter.   09:47:22
```

10

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | This is the beginning of D.V.D. Number One, | 09:47:25 |
| 2 | Volume One.  The D.V.D. is running and we are now on | 09:47:27 |
| 3 | the record. | 09:47:30 |
| 4 | MR. OTTEN:  My name is Vic Otten.  And I | 09:47:30 |
| 5 | represent the Plaintiffs. | 09:47:33 |
| 6 | MS. HEWITT:  Antoinette Hewitt for the City | 09:47:34 |
| 7 | and for the Chief Kepley. | 09:47:38 |
| 8 | MS. LUTZ:  Tera Lutz for the Defendant | 09:47:39 |
| 9 | Sang Lee. | 09:47:41 |
| 10 | MS. BACON:  Tiffany Bacon for Defendants | 09:47:41 |
| 11 | Frank Ferrara and Charlie Ferrara. | 09:47:44 |
| 12 | MR. HAVEN:  Peter Haven for Defendant | 09:47:47 |
| 13 | Michael Papayans. | 09:47:52 |
| 14 | MR. COOPER:  Robert Cooper of Buchalter for | 09:47:55 |
| 15 | Defendant Brant Blakeman. | 09:48:01 |
| 16 | MS. VU:  Jackie Vu for the Defendant | 09:48:03 |
| 17 | Sang Lee. | 09:48:06 |
| 18 | MR. FIELDS:  Mark Fields for Defendant | 09:48:06 |
| 19 | Angelo Ferrara and N.F. | 09:48:08 |
| 20 | | |
| 21 | FRANK FERRARA, | |
| 22 | having first been duly sworn, was | |
| 23 | examined and testified as follows: | |
| 24 | | |
| 25 | | |

Atkinson-Baker Court Reporters
www.depo.com

```
1                      EXAMINATION
2                                                  09:48:20
3    BY MR. OTTEN:                                 09:48:20
4         Q.  Can you state your full name for the record,   09:48:21
5    please.                                       09:48:23
6         A.  Frank Ferrara.                       09:48:23
7         Q.  Do you have a middle name?           09:48:25
8         A.  I don't use it.                      09:48:26
9         Q.  But do you have one?                 09:48:27
10        A.  I have one.                          09:48:29
11        Q.  What is it?                          09:48:30
12        A.  Joseph.                              09:48:31
13        Q.  Joseph?                              09:48:31
14        A.  Yes.                                 09:48:35
15        Q.  Mr. Ferrara, have you ever had your  09:48:35
16   deposition taken before?                      09:48:38
17        A.  Yes, I have.                         09:48:39
18        Q.  On how many occasions?               09:48:40
19        A.  Once.                                09:48:42
20        Q.  How long ago was that?               09:48:42
21        A.  Probably about ten years ago.        09:48:44
22        Q.  And just without getting into too much   09:48:46
23   detail, what was the nature of it; was it a civil   09:48:49
24   case?                                         09:48:52
25        A.  It was an insurance case which they, I guess,   09:48:52
```

12

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1           Any administrative type of actions, for      09:57:47
 2    example, labor board hearings or anything like that  09:57:51
 3    that you've been involved with?                      09:57:54
 4        A.  No.                                          09:57:56
 5        Q.  Okay.  Have you ever been convicted of a     09:57:56
 6    felony or anything like that?                        09:58:09
 7        A.  No.                                          09:58:11
 8        Q.  Okay.  Where were you born?                  09:58:11
 9        A.  Glendale, California.                        09:58:15
10        Q.  And what's your date of birth?              09:58:16
11        A.  October 21, 1956.                            09:58:18
12        Q.  Did you go to P.V. High School?             09:58:26
13        A.  Yes, I did.                                  09:58:29
14        Q.  What year did you graduate?                 09:58:29
15        A.  1974.                                        09:58:31
16        Q.  If I recall correctly, your mother is still 09:58:32
17    alive?                                               09:58:44
18        A.  Yes.                                         09:58:44
19        Q.  And what's your mother's name?             09:58:44
20        A.  Ramona.                                      09:58:47
21        Q.  And your father passed away?               09:58:48
22        A.  Yes.                                         09:58:51
23        Q.  And you have a brother Angelo; is that      09:58:51
24    correct?                                             09:58:55
25        A.  Yes.                                         09:58:55
```

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

| | | | |
|---|---|---|---|
| 1 | Q. | And a sister? | 09:58:55 |
| 2 | A. | Yes. | 09:59:01 |
| 3 | Q. | What's your sister's name? | 09:59:01 |
| 4 | A. | Phyllis. | 09:59:03 |
| 5 | Q. | What's her last name? | 09:59:04 |
| 6 | A. | Benner, B-e-n-n-e-r. | 09:59:07 |
| 7 | Q. | Does she have kids? | 09:59:14 |
| 8 | A. | Yes. | 09:59:15 |
| 9 | Q. | How many? | 09:59:16 |
| 10 | A. | Two. | 09:59:17 |
| 11 | Q. | And what are their names? | 09:59:18 |
| 12 | A. | Richie and Ramona. | 09:59:19 |
| 13 | Q. | Okay.  Does Richie surf Lunada Bay? | 09:59:23 |
| 14 | A. | Yes. | 09:59:28 |
| 15 | Q. | Do they call him Benner? | 09:59:28 |
| 16 | A. | They call him -- | 09:59:32 |
| 17 | | MS. BACON:  Calls for speculation. | 09:59:32 |
| 18 | BY MR. OTTEN: | | 09:59:33 |
| 19 | Q. | If you know? | 09:59:34 |
| 20 | A. | I don't. | 09:59:35 |
| 21 | Q. | How about your kids, you have children; is | 09:59:36 |
| 22 | that correct? | | 09:59:44 |
| 23 | A. | Yes. | 09:59:44 |
| 24 | Q. | How many? | 09:59:44 |
| 25 | A. | Three. | 09:59:45 |

22

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.  And can I get their names?              09:59:45

 2        A.  Sure, Charlie.                          09:59:47

 3        Q.  Okay.                                   09:59:48

 4        A.  Salvatore.                              09:59:49

 5        Q.  Okay.                                   09:59:53

 6        A.  And Filippa, F-i-l-i-p-p-a.             09:59:53

 7        Q.  How old is Filippa?                     09:59:59

 8        A.  She's 24.                               10:00:04

 9        Q.  Is she married to John Amundson?        10:00:05

10        A.  No.  She's married to John Amundson's son,  10:00:11

11   Josh.                                            10:00:16

12        Q.  That makes more sense.                  10:00:17

13        A.  Yeah.  John is one of my friends.       10:00:19

14        Q.  How long have you known John?          10:00:21

15        A.  I've known John probably 25 years.     10:00:23

16        Q.  He used to be really into kite boarding from  10:00:25

17   what I remember back --                          10:00:31

18        A.  Yeah, he still is.  He's a pro kiter,  10:00:32

19   A-m-u-n-d-s-o-n.                                 10:00:42

20        Q.  Do you know a guy named Alex Kiss or   10:00:42

21   something like that?                             10:00:48

22            He's a kite boarder, too, and he's from P.V.,  10:00:48

23   I'm just curious if you guys --                  10:00:52

24        A.  No.                                     10:00:54

25        Q.  Okay.  So, how long have they been married?  10:00:54
```

23

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | talk? | 15:36:01 |
| 2 | A.  By phone. | 15:36:01 |
| 3 | Q.  And how long did the telephone conversation | 15:36:02 |
| 4 | last? | 15:36:04 |
| 5 | A.  Probably 20 minutes, 20 to 30 minutes. | 15:36:04 |
| 6 | Q.  Okay.  Let's go through this a little bit and | 15:36:07 |
| 7 | find out what you think she got wrong. | 15:36:10 |
| 8 | A.  (Witness Nods). | 15:36:14 |
| 9 | Q.  So, if you go down to the third paragraph, he | 15:36:16 |
| 10 | said he has never been near Corey Spencer and Diana | 15:36:25 |
| 11 | Reed, the surfers who filed the lawsuit in Federal | 15:36:29 |
| 12 | Court last week against eight alleged members of the | 15:36:32 |
| 13 | Bay Boys, the City of Palos Verdes Estates and Police | 15:36:39 |
| 14 | Chief Jeff Kepley; is that true? | 15:36:41 |
| 15 | A.  Is what true? | 15:36:44 |
| 16 | Q.  Just that you have never been near Corey or | 15:36:45 |
| 17 | Diana? | 15:36:48 |
| 18 | A.  That's true. | 15:36:48 |
| 19 | Q.  Okay. | 15:36:50 |
| 20 | A.  I've never known them, met them or you. | 15:36:55 |
| 21 | Q.  Then go down to where, go down one, two, | 15:37:03 |
| 22 | three, four, five, six, seven, eight where it says, | 15:37:11 |
| 23 | Ferrara said many residents of the Hill surf Lunada | 15:37:16 |
| 24 | Bay's ideal winter break, but that no one even uses | 15:37:21 |
| 25 | the term Bay Boy; is that accurate -- | 15:37:24 |

213

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | BY MR. OTTEN: | 17:03:58 |
| 2 | Q. Okay. | 17:03:59 |
| 3 | A. I know they're family, maybe not. I see them | 17:04:01 |
| 4 | surfing the left. I think I've seen them surf the | 17:04:04 |
| 5 | Bay a couple of times, but he likes mostly surfing | 17:04:09 |
| 6 | the left. | 17:04:12 |
| 7 | Q. Okay. And do the other brothers that you | 17:04:13 |
| 8 | said surf? | 17:04:16 |
| 9 | A. They don't surf, but they're baseball | 17:04:17 |
| 10 | players. | 17:04:19 |
| 11 | Q. Give me a couple of minutes to look at my | 17:04:28 |
| 12 | notes. And I think that we're probably done -- | 17:04:31 |
| 13 | actually, not. | 17:04:38 |
| 14 | Let me refresh your recollection. This | 17:04:54 |
| 15 | lawsuit was filed, I think, March 29, 2016. | 17:04:57 |
| 16 | Do you recall a telephone conversation that | 17:05:04 |
| 17 | you had with Sang Lee on that day? | 17:05:06 |
| 18 | A. I don't know if it was that day, but we had a | 17:05:09 |
| 19 | couple of phone conversations. | 17:05:12 |
| 20 | Q. Let's talk about the first one which I'm | 17:05:14 |
| 21 | going to represent to you from Sang's phone records | 17:05:18 |
| 22 | that there was a conversation with you and a lot of | 17:05:23 |
| 23 | people, actually, on March 30th, right around that | 17:05:27 |
| 24 | time frame. | 17:05:31 |
| 25 | Do you remember what you talked about? | 17:05:32 |

275

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | A.  I think that we just talked a little bit | 17:05:33 |
| 2 | about the case a little bit, but I don't remember | 17:05:37 |
| 3 | exactly what we said to each other. | 17:05:40 |
| 4 | Q.  And have you ever spoken with Sang before | 17:05:41 |
| 5 | that -- | 17:05:49 |
| 6 | A.  Yes. | 17:05:49 |
| 7 | Q.  -- by telephone? | 17:05:50 |
| 8 | A.  Yeah.  We've talked and texted.  I tried to | 17:05:51 |
| 9 | help his mom out and buy a car for them. | 17:05:54 |
| 10 | Actually, from them, I was buying a car from | 17:06:12 |
| 11 | them. | 17:06:16 |
| 12 | Q.  And do you recall having another conversation | 17:06:16 |
| 13 | with him in July, just on the phone? | 17:06:18 |
| 14 | A.  I believe we did because he was asking me if | 17:06:25 |
| 15 | I had been served or not.  And I said that I wasn't | 17:06:29 |
| 16 | served. | 17:06:32 |
| 17 | Q.  Anything else that you guys? | 17:06:33 |
| 18 | A.  No. | 17:06:35 |
| 19 | Q.  Other than Sang Lee, what other Defendants | 17:06:35 |
| 20 | have you discussed the lawsuit with? | 17:06:38 |
| 21 | A.  None. | 17:06:40 |
| 22 | Q.  None? | 17:06:43 |
| 23 | A.  None. | 17:06:43 |
| 24 | Q.  Okay.  So, do you know if Charlie spoke to | 17:06:44 |
| 25 | Sang? | 17:06:50 |

276

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1

 2        .

 3                  (Whereupon, the deposition of

 4             FRANK FERRARA commenced at

 5             9:46 a.m. and concluded at

 6             5:16 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1   STATE OF CALIFORNIA    )
                            )
 2   COUNTY OF LOS ANGELES  )

 3

 4

 5

 6          I, the undersigned, declare under penalty of

 7   perjury that I have read the foregoing transcript, and I

 8   have made any corrections, additions, or deletions that

 9   I was desirous of making; that the foregoing is a true

10   and correct transcript of my testimony contained

11   therein.

12

13          EXECUTED this _____ day of _____,

14   20_____, at _____, _____.

15                        (City)              (State)

16

17

18

19   _____

20   FRANK FERRARA

21

22

23

24

25
```

284

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, ANGELIQUE MELODY FERRIO, C.S.R. NO. 6979, a

 4   Certified Shorthand Reporter, certify:

 5            That the foregoing proceedings were taken

 6   before me at the time and place therein set forth, at

 7   which time the witness was put under oath by me;

 8            That the testimony of the witness and all

 9   objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12            That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14            I further certify that I am not a relative or

15   employee of any attorney or of any of the parties, nor

16   financially interested in the action.

17            I declare under penalty of perjury under the

18   law of the State of California that the foregoing is

19   true and correct.

20            Dated this 10th day of July, 2017.

21

22

23            _____

24            Angelique Melody Ferrio
              CSR No. 6979

25
```

Frank Ferrara
July 10, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1            REPORTER'S CERTIFICATION OF CERTIFIED COPY

 2

 3

 4            I, ANGELIQUE MELODY FERRIO, CSR No. 6979, a

 5   Certified Shorthand Reporter in the State of California,

 6   certify that the foregoing pages are a true and correct

 7   copy of the original deposition of FRANK FERRARA, taken

 8   on Monday, July 10, 2017.

 9            I declare under penalty of perjury under the

10   laws of the State of California that the foregoing is

11   true and correct.

12            Dated this 10th day of July, 2017.

13

14

15

16

17                    _____

18                    Angelique Melody Ferrio
                       CSR No. 6979
19

20

21

22

23

24

25
```

Frank Ferrara
July 10, 2017

# Exhibit M

```
 1                UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
 3                     WESTERN DIVISION
 4
 5   CORY SPENCER, an individual;  ) Case No.
     DIANA MILENA REED, an         ) 2:16-cv-02129-SJO-RAO
 6   individual; and COASTAL       )
     PROTECTION RANGERS, INC., a    )
 7   California non-profit public   )
     benefit corporation,          )
 8                                  )
                     Plaintiffs,    )
 9                                  )
             v.                     )
10                                  )
     LUNADA BAY BOYS; THE          )
11   INDIVIDUAL MEMBERS OF THE      )
     LUNADA BAY BOYS, including     )
12   but not limited to SANG LEE,   )
     BRANT BLAKEMAN, ALAN JOHNSTON )
13   aka JALIAN JOHNSTON, MICHAEL   )
     RAE PAPAYANS, ANGELO FERRARA,  )
14   FRANK FERRARA, CHARLIE        )
     FERRARA and N.F.; CITY OF      )
15   PALOS VERDES ESTATES;          )
     CHIEF OF POLICE JEFF KEPLEY,   )
16   in his representative          )
     capacity; and DOES 1-10,       )
17                                  )
                     Defendants.    )
18   _____)
19           DEPOSITION OF CORY ELDON SPENCER
20               Los Angeles, California
21               Tuesday, October 11, 2016
22
23   Reported by:
24   Carmen R. Sanchez
25   CSR No. 5060
```

```
 1        UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA
 3              WESTERN DIVISION
 4
 5  CORY SPENCER, an individual;  )  Case No.
    DIANA MILENA REED, an         )  2:16-cv-02129-SJO-RAO
 6  individual; and COASTAL       )
    PROTECTION RANGERS, INC., a    )
 7  California non-profit public  )
    benefit corporation,          )
 8                                )
         Plaintiffs,              )
 9                                )
       v.                         )
10                                )
    LUNADA BAY BOYS; THE          )
11  INDIVIDUAL MEMBERS OF THE     )
    LUNADA BAY BOYS, including    )
12  but not limited to SANG LEE,  )
    BRANT BLAKEMAN, ALAN JOHNSTON )
13  aka JALIAN JOHNSTON, MICHAEL  )
    RAE PAPAYANS, ANGELO FERRARA, )
14  FRANK FERRARA, CHARLIE        )
    FERRARA and N.F.; CITY OF     )
15  PALOS VERDES ESTATES;         )
    CHIEF OF POLICE JEFF KEPLEY,  )
16  in his representative         )
    capacity; and DOES 1-10,      )
17                                )
         Defendants.              )
18  _____ )
19
20      Deposition of CORY ELDON SPENCER, taken
21  on behalf of defendants, at 777 South Figueroa Street,
22  Suite 4550, Los Angeles, California, beginning at
23  10:01 a.m. and ending at 6:35 p.m., on Tuesday,
24  October 11, 2016, before Carmen R. Sanchez,
25  Certified Shorthand Reporter No. 5060.
```
Page 2

```
 1  APPEARANCES:
 2  For the Plaintiffs:
 3      HANSON BRIDGETT LLP
        BY:  KURT A. FRANKLIN, ESQ.
 4      425 Market Street
        Twenty-sixth Floor
 5      San Francisco, California  94105
        Telephone:  (415) 777-3200
 6      Facsimile:  (415) 541-9366
        E-mail:  kfranklin@hansonbridgett.com
 7
        HANSON BRIDGETT LLP
 8      BY:  TYSON M. SHOWER, ESQ.
             LANDON D. BAILEY, ESQ.
 9      500 Capitol Mall
        Suite 1500
10      Sacramento, California  95814
        Telephone:  (916) 442-3333
11      Facsimile:  (916) 442-2348
        E-mail:  tshower@hansonbridgett.com
12               lbailey@hansonbridgett.com
        (NOT PRESENT)
13
        OTTEN LAW PC
14      BY:  VICTOR OTTEN, ESQ.
        3620 Pacific Coast Highway
15      Suite 100
        Torrance, California  90505
16      Telephone:  (310) 378-8533
        Facsimile:  (310) 347-4225
17      E-mail:  vic@ottenlawpc.com
        (TELEPHONIC APPEARANCE)
18
19
20
21              Continued ....
22
23
24
25
```
Page 3

```
 1  APPEARANCES (CONTINUED):
 2  For the Defendants City of Palos Verdes Estates and
    Chief of Police Jeff Kepley:
 3
        KUTAK ROCK LLP
 4      BY:  ANTOINETTE P. HEWITT, ESQ.
        5 Park Plaza
 5      Suite 1500
        Irvine, California  92614-8595
 6      Telephone:  (949) 417-0999
        Facsimile:  (949) 417-5394
 7      E-mail:  Antoinette.Hewitt@KutakRock.com
 8  For the Defendant Brant Blakeman:
 9      VEATCH CARLSON, LLP
        BY:  JOHN P. WORGUL, ESQ.
10      1055 Wilshire Boulevard
        Eleventh Floor
11      Los Angeles, California  90017
        Telephone:  (213) 381-2861
12      Facsimile:  (213) 383-6370
        E-mail:  jworgul@veatchfirm.com
13
        For the Defendant Michael Rae Papayans:
14
        HAVEN LAW
15      BY:  PETER T. HAVEN, ESQ.
        1230 Rosecrans Avenue
16      Suite 300
        Manhattan Beach, California  90266
17      Telephone:  (310) 272-5353
        Facsimile:  (213) 477-2137
18      E-mail:  peter@havenlaw.com
19  For the Defendant Sang Lee:
20      LEWIS BRISBOIS BISGAARD & SMITH LLP
        BY:  TERA A. LUTZ, ESQ.
21      633 West 5th Street
        Suite 4000
22      Los Angeles, California  90071
        Telephone:  (213) 250-1800
23      Facsimile:  (213) 250-7900
        E-mail:  Tera.Lutz@lewisbrisbois.com
24
                Continued ....
25
```
Page 4

```
 1  APPEARANCES (CONTINUED):
 2  For the Defendant Sang Lee:
 3      BOOTH, MITCHEL & STRANGE
        BY:  DANIEL M. CROWLEY, ESQ.
 4      707 Wilshire Boulevard
        Suite 4450
 5      Los Angeles, California  90017
        Telephone:  (213) 738-0100
 6      Facsimile:  (213) 380-3308
        E-mail:  dmcrowley@boothmitchel.com
 7
        For the Defendants Angelo Ferrara; N.F.
 8      appearing through [Proposed] Guardian Ad Litem,
        Leonora Ferrara Attorney for Petitioner:
 9
        LAW OFFICES OF MARK C. FIELDS, APC
10      BY:  MARK C. FIELDS, ESQ.
        333 South Hope Street
11      Thirty-fifth Floor
        Los Angeles, California  90071
12      Telephone:  (213) 617-5225
        Facsimile:  (213) 629-4520
13      E-mail:  fields@markfieldslaw.com
        (TELEPHONIC APPEARANCE AND PERSONAL APPEARANCE)
14
        For the Defendants Frank Ferrara and Charlie Ferrara:
15
        BREMER WHYTE BROWN & O'MEARA
16      BY:  LAURA L. BELL, ESQ.
        21271 Burbank Boulevard
17      Suite 110
        Woodland Hills, California  91367
18      Telephone:  (818) 712-9800
        Facsimile:  (818) 712-9900
19      E-mail:  lbell@bremerwhyte.com
        (TELEPHONIC APPEARANCE)
20
21
22
23
24              Continued ....
25
```
Page 5

2 (Pages 2 - 5)

**Page 6**

```
1  APPEARANCES (CONTINUED):
2  For the Defendant Brant Blakeman:
3     BUCHALTER NEMER, APC
       BY:  ROBERT S. COOPER, ESQ.
4     1000 Wilshire Boulevard
       Suite 1500
5     Los Angeles, California  90017
       Telephone:  (213) 891-5230
6     Facsimile:  (213) 896-0400
       E-mail:  rcooper@buchalter.com
7     (TELEPHONIC APPEARANCE)
8  For the Defendant Angelo Ferrara:
9     THE PHILLIPS FIRM
       BY:  MATTHEW E. VOSS, ESQ.
10    800 Wilshire Boulevard
       Suite 1550
11    Los Angeles, California  90017
       Telephone:  (213) 244-9913
12    Facsimile:  (213) 244-9915
       E-mail:  mvoss@thephillipsfirm.com
13    (TELEPHONIC APPEARANCE)
14  For the Defendant Alan Johnston aka Jalian Johnston:
15    LAW OFFICES OF J. PATRICK CAREY
       BY:  J. PATRICK CAREY, ESQ.
16    1230 Rosecrans Avenue
       Suite 300
17    Manhattan Beach, California  90266
       Telephone:  (310) 526-2237
18    Facsimile:  (310) 526-2237
       E-mail:  pat@patcareylaw.com
19    (NOT PRESENT)
20
21
22
23
24
25
```

**Page 8**

```
1        I N D E X (CONTINUED)
2
3        E X H I B I T S
4  Defendants'          Page      Page
   Exhibit   Description   Introduced  Marked
5
   Exhibit 42   Copy of an E-mail
6     dated March 05,
       2016, from
7     Jeff Kepley to
       Mark Velez;
8     Bates-stamped
       CITY1807        158      158
9
   Exhibit 43   Color copy of a
10    photograph
       taken at the
11    deposition of
       Cory Eldon
12    Spencer depicting
       his hand and scar   306      306
13
   Exhibit 44   Copy of a drawing
14    made on yellow
       legal pad paper
15    by Mr. Worgul
       during the
16    deposition of
       Cory Eldon
17    Spencer        334      334
18
19
20
21
22
23
24        Continued ....
25
```

**Page 7**

```
1        I N D E X
2  WITNESS
3  CORY ELDON SPENCER
4  Examination by:              Page
5  MS. HEWITT           11, 305, 337
6  MR. FIELDS              217
7  MR. WORGUL      222, 306, 326, 343, 345
8  MS. LUTZ              306
9  MR. HAVEN          321, 336, 343
10 MR. FRANKLIN            344
11
12       E X H I B I T S
13 Defendants'       Page      Page
   Exhibit   Description   Introduced  Marked
14
   Exhibit 40   Copy of a document
15    entitled, "DEFENDANTS
       CITY OF PALOS VERDES
16    ESTATES AND CHIEF
       OF POLICE JEFF
17    KEPLEY'S NOTICE OF
       DEPOSITION TO
18    PLAINTIFF CORY
       SPENCER"        21      21
19
   Exhibit 41   Copy of a document
20    entitled, "CLASS
       ACTION COMPLAINT
21    AND JURY DEMAND"     29      29
22
23
24        Continued ....
25
```

**Page 9**

```
1        I N D E X (CONTINUED)
2
3     (The following exhibit was previously
4     marked in a prior deposition and is attached
5     herewith for reference purposes):
6
7        E X H I B I T S
8  Defendants'             First Page
   Exhibit   Description      Referenced
9
   Exhibit 34   Copy of a document
10    entitled,
       "PLAINTIFFS'
11    SUPPLEMENTAL
       DISCLOSURES"         205
12
13
14
15 QUESTIONS THE WITNESS WAS INSTRUCTED NOT TO ANSWER
16    PAGE:  LINE:
17      32    25
        33    20
18     135    20
       223    10
19     273     7
20
21
22
23
24
25
```

3 (Pages 6 - 9)

| | |
|---|---|
| 1        Los Angeles, California | 1   Q   On how many occasions? |
| 2  Tuesday, October 11, 2016, 10:01 a.m. - 6:35 p.m. | 2   A   I believe just one. |
| 3 | 3   Q   All right.  And was that a civil matter? |
| 4     THE REPORTER:  Pursuant to the Federal Rules of | 4   A   I believe it was civil traffic. |
| 5  Civil Procedure, I am required to state the following: | 5   Q   Okay. |
| 6     My name is Carmen R. Sanchez, a | 6     In what capacity did you testify? |
| 7  certified court reporter with Hahn & Bowersock, A | 7   A   Police officer. |
| 8  Veritext Company, located at 20 Corporate Park, | 8   Q   Okay. |
| 9  Suite 350, Irvine, California. | 9     Was it a traffic ticket?  Someone |
| 10     This is the deposition of | 10  fighting a traffic ticket, something like that? |
| 11  Cory Eldon Spencer, in the matter of Cory Spencer, | 11   A   I don't recall specifically.  I don't |
| 12  et al., vs. Lunada Bay Boys, et al., beginning at | 12  recall.  It wasn't -- I think I was just a witness. |
| 13  10:01 a.m., on Tuesday, October 11, 2016. | 13   Q   Okay. |
| 14     Counsel, will you please state your | 14   Q   Have you ever testified in trial? |
| 15  appearances for the record. | 15   A   Yes. |
| 16     MS. HEWITT:  Antoinette Hewitt for the city. | 16   Q   On how many occasions? |
| 17     MR. WORGUL:  John Worgul for defendant | 17   A   I couldn't give you a number. |
| 18  Brant Blakeman. | 18   Q   All right.  And was that -- were those, |
| 19     MR. HAVEN:  Peter Haven for defendant | 19  also, in the capacity as a police officer? |
| 20  Michael Papayans. | 20   A   Yes. |
| 21     MR. CROWLEY:  Daniel Crowley with Booth, | 21   Q   Okay. |
| 22  Mitchel & Strange on behalf of Sang Lee. | 22     Have you ever testified in trial in |
| 23     MS. LUTZ:  Tera Lutz for defendant Sang Lee. | 23  another capacity, such as, as a party? |
| 24     MR. COOPER:  Robert S. Cooper, Buchalter Nemer | 24   A   I don't believe so. |
| 25  for defendant Brant Blakeman telephonically. | 25   Q   Okay. |
| Page 10 | Page 12 |
| 1     MR. FIELDS:  Mark Fields for Angelo Ferrara and | 1     We'll just quickly go over some of the |
| 2  N.F. telephonically. | 2  admonitions in this case.  Today, as you see, the court |
| 3     MS. BELL:  Laura Bell for Frank Ferrara and | 3  reporter is taking down everything you say.  It's very |
| 4  Charlie Ferrara appearing telephonically. | 4  important, because she's trying to take down everything |
| 5     MR. FRANKLIN:  Kurt Franklin on behalf of | 5  you say, that we not talk over each other; so, I'll do |
| 6  Mr. Spencer and the other plaintiffs in this matter. | 6  my best to make sure that you finish your answers |
| 7  And if I can, just as a matter of housekeeping, the | 7  completely before I ask another question, and I'll ask |
| 8  plaintiffs would request under FRCP 30, the ability to | 8  that you let me finish my question before you start to |
| 9  review the transcript within 30 days. | 9  answer. |
| 10 | 10     Also, because sometimes I talk kind of |
| 11     CORY ELDON SPENCER, | 11  fast, please feel free to tell me to restate or |
| 12  called as a witness by and on behalf of the | 12  rephrase a question if you do not understand it or hear |
| 13  defendants, and having been first duly sworn | 13  it; all right? |
| 14  by the Certified Shorthand Reporter, was examined and | 14   A   I will. |
| 15  testified as follows: | 15   Q   All right. |
| 16 | 16     Please make sure all your answers are |
| 17     EXAMINATION | 17  verbal.  You're doing a great job of that right now. |
| 18  BY MS. HEWITT: | 18  The court reporter can't interpret shakes of the head |
| 19   Q   Would you please state and spell your | 19  or nods or such; so, it's very important that answers |
| 20  name for the record. | 20  are verbal, just as you're doing now; all right? |
| 21   A   Cory Spencer. | 21   A   Yes. |
| 22     This is a microphone?  Cory Spencer, C-o | 22   Q   Okay. |
| 23  -- Cory Eldon Spencer, C-o-r-y E-l-d-o-n S-p-e-n-c-e-r. | 23     If during the deposition you want to |
| 24   Q   Have you ever given a deposition before? | 24  take a break, that's fine.  You just let us know.  I |
| 25   A   I have. | 25  might ask you to make estimates during the deposition. |
| Page 11 | Page 13 |

1    Do you know the difference between an estimate and a
2    guess?
3        A    An estimate is something that I would
4    estimate. A guess is just a plain guess.
5        Q    Something you pull out of thin air.
6        A    I would agree to that.
7        Q    Okay. All right.
8            Today we'll also be talking about events
9    that happened a little while ago; so, I'll be asking
10   you for some of your recollections. I'll ask that if
11   you don't recall something, that you tell me; but if
12   you do have some recollection, that you provide those
13   to me at the time; all right?
14       A    Yes.
15       Q    Okay.
16           You might hear some of the attorneys
17   here making objections to my question, as well as your
18   counsel, obviously. They're free to state those
19   objections, obviously; but unless your counsel
20   instructs you not to answer, I'm entitled to an answer;
21   all right?
22       A    Yes.
23       Q    Okay.
24           Have you taken any medication or
25   anything that you believe would affect your ability to

Page 14

1        A    Initial disclosures. That's all I can
2    recall.
3        Q    Okay.
4            Do you remember, approximately, how many
5    documents you reviewed?
6        A    I do not.
7        Q    Okay.
8            Did you meet with Mr. Franklin or
9    Mr. Otten prior to the deposition today?
10       A    Yes.
11       Q    Okay.
12           Can you tell me, approximately, for how
13   long you met with them?
14       A    I cannot.
15       Q    All right. It's its --
16       A    It's been several meetings. I can't
17   give you an approximation.
18       Q    Did you meet with them in preparation
19   specifically for today's deposition?
20       A    This, as well as other events.
21       Q    Okay.
22           Is it correct then, though, you're not
23   able to estimate for me how long you met with
24   Mr. Franklin in preparation for today's deposition?
25       A    Again, many meetings. I can't give you

Page 16

1    give your best testimony here today?
2        A    No.
3        Q    All right.
4            Mr. Franklin is representing you here
5    today; correct?
6        A    That's correct.
7        Q    All right.
8            Did you review any documents in
9    preparation for your --
10       A    I'd like to add.
11       Q    Sure.
12       A    Me, as well as the class.
13       Q    Thank you very much. All right.
14           Did you review any documents in
15   preparation for your deposition today?
16       A    Sure.
17       Q    All right.
18           Did any of those documents refresh your
19   recollection?
20       A    Yes.
21       Q    Okay.
22           Of those documents that refreshed your
23   recollection, can you describe them to me?
24       A    Well, I went over the complaint.
25       Q    Okay. Anything else?

Page 15

1    an estimation.
2        Q    Okay.
3            Can you give me an estimate of how many
4    meetings?
5        A    Four to five.
6        Q    Okay. Okay.
7            Other than your attorneys, did you speak
8    with anybody else in preparation for your deposition
9    today?
10       A    No.
11       Q    Okay.
12           Did you discuss your deposition with
13   anybody other than your attorneys?
14       A    Yes.
15       Q    And who would that be?
16       A    My wife.
17       Q    Okay.
18       A    My kids.
19       Q    Anybody else?
20       A    That's all I can recall.
21       Q    Okay.
22           Other than review documents and meet
23   with your attorneys, did you do anything else to
24   prepare for your deposition today?
25       A    Other than review documents and what

Page 17

5 (Pages 14 - 17)

1 else?
2     Q     And meet with your attorneys.
3     A     In preparation?  Just thought about all
4 the facts, I guess.  Would that be a fair answer?
5     Q     Sure.
6           Did you, for instance, go back and
7 review any of the interviews that you have given
8 related to the allegations in the complaint?
9     A     I've watched several news segments that
10 I've participated in.
11    Q     And which ones would those be?
12    A     It's hard to remember the outlets.
13 There was -- and see, again, I could get them wrong,
14 but I think there was CNN, ABC, which is Australia --
15 Australia Broadcasting Company, and I can't -- I can't
16 keep CBS and NBC straight; so, I know there was a
17 couple other ones in there.
18    Q     Okay.  So you think it was either CBS or
19 NBC?
20    A     CBS.
21    Q     Okay.
22    A     Let's go with that.  There was a
23 Channel 9 -- there's several.
24    Q     Did you review any written interviews
25 that you had given?

Page 18

1     A     Surfline is -- it's a forum, I guess,
2 where people go on the computer now.  It used to be
3 1-900-SURF, where you call in to see how the waves
4 were, back in my day; and now it's -- you can -- you
5 can see on certain news things in some areas of the
6 Web site, and this one happened to be on there, and I
7 read comments.
8     Q     And are there any particular comments
9 that you reviewed?
10    A     I don't remember specific comments.  I
11 just remember overwhelming support for what was going
12 on; so, to pick out comments, specifically what was
13 said, I can't tell you.
14    Q     Okay.
15          Do you have any documents at home that
16 are related to the case -- to the lawsuit?
17    MR. FRANKLIN:  Vague and ambiguous.
18    THE WITNESS:  I do not at home.
19 BY MS. HEWITT:
20    Q     Do you keep such documents anywhere
21 else?
22    A     Currently, the only thing physically
23 that I know that I have in my possession is in my car,
24 and that would be the complaint, disclosures, and there
25 was some form of questions wanting me -- to be answered

Page 20

1     A     No.
2     Q     And --
3     A     Can I ask you to --
4     Q     Sure.
5     A     Written by a journalist?
6     Q     Well, that's a good clarification to
7 make.  Did you go back and review any articles that
8 referenced any interviews you've given?
9     A     I've read articles written about, yes,
10 about the claim -- about the lawsuit, yes.
11    Q     And which articles would those be?
12    A     There was multiple L.A. Times articles.
13 That's all I can recall right now.
14    Q     Okay.  And was the L.A. Times article
15 that you reviewed, was it in print form, or was it
16 online?
17    A     Daily Breeze, print and online.
18    Q     Did you review any social media postings
19 that referenced this case?
20    A     I read comments on Surfline regarding
21 the case.  I don't use Facebook.  I don't use Twitter.
22 I don't know what other social -- I'm not a social
23 media guru.  All I can recall is reading comments on
24 Surfline.
25    Q     Okay.  And what is Surfline?

Page 19

1 by me by one of the defendants.  I have a couple
2 newspapers at a friend's house 'cause he saved some for
3 me.  I don't save them, but he's very interested in
4 keeping those for me.  I don't know why.  I told him I
5 don't really care about them.  That's all I can recall.
6     Q     Okay.  And what's the name of your
7 friend?
8     A     That would be Bill Ruane.
9     Q     Can you spell that, the last name?
10    A     R-u-a-n-e.
11    Q     Thank you.
12          Okay.  We've marked as Exhibit 40 the
13 notice of deposition.
14          (Defendants' Exhibit 40 was marked for
15 identification by the Certified Shorthand Reporter
16 and is enclosed herewith.)
17 BY MS. HEWITT:
18    Q     Have you seen that before today?
19    A     Do you want me to look at this?
20    Q     Yes, please.  Would you look at it, and
21 let me know if you've seen it before today.
22    A     Okay.  Give me a minute.
23    MS. HEWITT:  Do you mind muting your phone,
24 whoever is on the phone, please?
25    MR. VOSS:  Sure, no problem.  By the way, this

Page 21

6 (Pages 18 - 21)

1 is Matthew Voss, and we are co-counsel for defendant
2 Angelo Ferrara.
3          MS. HEWITT:  Thank you very much.
4          MR. VOSS:  You're welcome.
5          THE WITNESS:  Okay.  Yes, I have seen this.
6 BY MS. HEWITT:
7      Q     All right.
8            What is your date of birth?
9      A     My date of birth?
10     Q     Yes, sir.
11     A     12/13/1971.
12     Q     Okay.
13           Have you ever lived in
14 Palos Verdes Estates?
15     A     No, I have not.
16     Q     Okay.
17           What is the highest level of education
18 you've completed?
19     A     I have a bachelor's degree.
20     Q     From?
21     A     It's called the Union Institute and
22 University.
23     Q     Where is that, sir?
24     A     Los Angeles, California.
25     Q     Did you major in a particular area?

Page 22

1      Q     Oh, no.  I'm sorry.  Which academy did
2 you attend?
3      A     The Los Angeles Police Department,
4 Basic POST Academy.
5      Q     Okay.
6            And did you graduate from that academy?
7      A     Yes.
8      Q     All right.
9      A     So, to back up, going to the advanced
10 POST, once you graduate the academy and you're a police
11 officer, you obtain a basic intermediate, and I've
12 obtained an advanced.  I forgot to mention the basic
13 and the intermediate.  Sorry.
14     Q     I appreciate that.
15           And when did you graduate from the
16 L.A.P.D. academy?
17     A     I was in Class 1096, so we started in
18 October of '96, and I believe it was a seven-month-long
19 academy.  It was a long time ago; so, seven months.  I
20 guess that puts us in or around May of 97-ish --
21 97-ish, referring to, approximately, '97.  Sorry.
22     Q     Okay.
23           Now, earlier you referenced speaking to
24 your wife.  How long have you been married?
25     A     Since December of '97.

Page 24

1      A     I did.
2      Q     And what was that?
3      A     Criminal justice.
4      Q     All right.
5            Did you receive any other post-high
6 school degrees?
7      A     Degrees?  In the form of degrees, no.
8      Q     Okay.
9            Have you had any other education?
10          MR. FRANKLIN:  Vague and ambiguous.
11          THE WITNESS:  I've -- I received an EMT degree
12 or certificate, Firefighter 1 certificate.  I have an
13 advanced POST certificate, which is Peace Officer
14 Standard and Training for the abbreviation.
15           At one time, I got a phlebotomy
16 certificate; and that's all I can recall right now.
17 BY MS. HEWITT:
18     Q     Okay.  I understand that you are a
19 police officer; is that correct, sir?
20     A     That's correct.
21     Q     And did you attend a particular police
22 academy?
23     A     I did.
24     Q     And what is that?
25     A     What's an academy?

Page 23

1      Q     And what is your wife's name?
2      A     Diana Spencer.
3      Q     And how many children do you have?
4      A     I have one stepchild; two biological;
5 one that didn't make it.
6      Q     I'm sorry.
7            And how old are your -- how old is your
8 stepchild?
9      A     She's 23.
10     Q     Okay.  And how old are your other two
11 children?
12     A     Sixteen and fifteen.
13     Q     Okay.
14           Do you have any grandchildren?
15     A     Not yet.
16     Q     Are you expecting some?
17     A     Not yet.
18     Q     Okay.  All right.
19           Who is your current employer?
20     A     The City of El Segundo, California.
21     Q     And what is your position there, sir?
22     A     Police officer.
23     Q     And how long have you held that position
24 at the City of El Segundo?
25     A     Since March 13 of 2000.

Page 25

7 (Pages 22 - 25)

| | |
|---|---|
| 1   Q    Have you held any other positions at the | 1  never been convicted of a felony? |
| 2  City of El Segundo? | 2      A    Yes. |
| 3      A    No. | 3      Q    All right. |
| 4      Q    Prior to working as a police officer at | 4          Have you ever been a party -- excuse me. |
| 5  the City of El Segundo, did you work as a police | 5  Have you ever been a party to a civil lawsuit before |
| 6  officer in any other cities? | 6  this one? |
| 7      A    Los Angeles Police Department. | 7      A    I have not. |
| 8      Q    And how long did you work there? | 8      Q    Okay.  All right. |
| 9      A    Starting in October of '96 to March 10th | 9          You're -- withdraw the question. |
| 10  or 9th of 2000. | 10          When did you first retain Mr. Otten as |
| 11      Q    All right.  And other than El Segundo or | 11  your attorney? |
| 12  Los Angeles, have you worked as a police officer in any | 12      A    I have not thought about the dates, and |
| 13  other city? | 13  I don't recall.  I know I've seen it somewhere.  I |
| 14      A    I've -- I was hired as a reserve officer | 14  don't recall. |
| 15  -- and I cannot give you dates -- by the | 15      Q    Do you know if it was in 2016? |
| 16  City of Monterey Park.  I was offered -- hired and | 16      A    Yes. |
| 17  offered a position with the CIA, but I refused it. | 17      Q    Okay.  All right. |
| 18  That's the only thing in law enforcement that I can | 18          When did you first retain Mr. Franklin |
| 19  recall. | 19  as your attorney? |
| 20      Q    Okay. | 20      A    The same time as Mr. Otten. |
| 21          Can you describe to me very generally | 21      Q    Did you have any prior relationship with |
| 22  what your duties are as a police officer in the | 22  Mr. Otten before he became your attorney in this |
| 23  City of El Segundo? | 23  matter? |
| 24      MR. FRANKLIN:  Vague and ambiguous. | 24      A    No. |
| 25      THE WITNESS:  Generally? | 25      Q    All right. |
| Page 26 | Page 28 |

| | |
|---|---|
| 1      MS. HEWITT:  Yes. | 1          Same question with regard to |
| 2      THE WITNESS:  Generally, to protect and to | 2  Mr. Franklin. |
| 3  serve. | 3      A    No. |
| 4  BY MS. HEWITT: | 4      Q    Prior to retaining Mr. Otten, did you |
| 5      Q    Okay.  And, then, specifically, do you | 5  know anybody at his law firm? |
| 6  have any specific responsibilities that are different | 6      A    No. |
| 7  than other police officers in El Segundo, to your | 7      Q    Okay. |
| 8  knowledge? | 8          Same question with regard to |
| 9      MR. FRANKLIN:  Vague and ambiguous. | 9  Mr. Franklin and his firm. |
| 10      THE WITNESS:  Patrol officer. | 10      A    No. |
| 11  BY MS. HEWITT: | 11      MS. HEWITT:  Okay. |
| 12      Q    Do you patrol a particular area? | 12          I'll attach as 41 the complaint in this |
| 13      A    The City of El Segundo. | 13  matter, "CLASS ACTION COMPLAINT AND JURY DEMAND." |
| 14      Q    Okay. | 14          (Defendants' Exhibit 41 was marked for |
| 15          Particular area in the city? | 15  identification by the Certified Shorthand Reporter |
| 16      A    It changes daily. | 16  and is enclosed herewith.) |
| 17      Q    All right. | 17  BY MS. HEWITT: |
| 18          While you've been at the | 18      Q    All right.  I'm going to ask you to just |
| 19  City of El Segundo, have you ever missed any work in | 19  take a quick look at Exhibit 41 and just ask you if you |
| 20  the last two years for reasons that you attribute to | 20  believe you've seen the complaint before? |
| 21  the defendants' conduct in this matter? | 21      A    Yes. |
| 22      MR. FRANKLIN:  Vague and ambiguous. | 22      Q    Okay. |
| 23      THE WITNESS:  No. | 23          You'll see there that you are listed as |
| 24  BY MS. HEWITT: | 24  one of the plaintiffs in this matter here.  Do you have |
| 25      Q    Okay.  Am I correct in assuming you've | 25  an understanding of any responsibilities that you have |
| Page 27 | Page 29 |

8 (Pages 26 - 29)

1  to members of the class described in the complaint in
2  Exhibit 41?
3      A    Yes.
4      Q    And what are those?
5      A    To monitor progress of the complaint.
6      Q    And what do you mean by "monitor
7  progress of the complaint"?
8      A    Just keep abreast of, generally, where
9  it's at in proceedings.
10     Q    Are you done?
11     A    Yeah.
12     Q    I'm sorry.  I didn't want to interrupt
13 you.
14         And are you doing that?
15     A    Yes.
16     Q    And how are you doing that?
17     A    Staying in contact with my counsel.
18     Q    Anything else?
19     A    I -- I will hear of such as, you know,
20 the articles that are being printed that were discussed
21 earlier; read those when time permits.
22     Q    Do you believe you have an obligation to
23 supervise your lawyers in this matter?
24     A    Definitely.
25     Q    And do you do that?

Page 30

1      A    Yes.  They're my lawyers.
2      Q    Okay.  And how do you do that?
3      MR. FRANKLIN:  Objection to extent it calls for
4  attorney-client privilege.  If you've given us any
5  instruction, I'd instruct you not to answer.
6  BY MS. HEWITT:
7      Q    Separate and apart from anything that
8  you've discussed with your attorneys.
9      A    I don't understand.
10     Q    Are you able to answer the question
11 without referring to any instruction you've been given
12 by your attorneys in this matter?
13     MR. FRANKLIN:  Or instruction you've given us.
14     MS. HEWITT:  Oh, yes, of course.
15     THE WITNESS:  I'm lost here for a second.
16     MS. HEWITT:  Okay.
17     Q    Are you able to answer the question
18 without referring to any instructions you've given your
19 attorneys or they've given you?
20     A    Repeat the question, please.
21     MS. HEWITT:  Sure.
22         Would you read it back, please?
23         (Whereupon, the record was read back
24 by the court reporter as follows:
25         "Q    Do you believe you have an

Page 31

1      obligation to supervise your lawyers in this
2  matter?
3      "A    Definitely.
4      "Q    And do you do that?
5      "A    Yes.  They're my lawyers.
6      "Q    Okay.  And how do you do that?")
7  BY MS. HEWITT:
8      Q    So can you answer that question without
9  referring to any instructions you've given your
10 attorneys or vice versa?
11     A    Instructions?  I guess I'm just not
12 following your line of questioning there.  Am I
13 supervising my attorneys?  Yes.
14     Q    Okay.
15     A    That's -- I answered yes.
16     Q    Yes.
17     A    And then your question?
18     Q    How do you do that?
19     A    Talking with them.
20     Q    Okay.
21     MR. FRANKLIN:  Objection: calls for
22 attorney-client privilege, and instruct you not to
23 answer.
24 BY MS. HEWITT:
25     Q    Other than communicating with your

Page 32

1  attorneys, is there any other way that you monitor and
2  supervise your attorneys?
3      A    So, I guess on counsel's advice, I
4  refuse to answer that.
5      Q    Okay.  So, are you unable to answer that
6  question without referring to attorney-client
7  communications?
8      A    Am I not able to -- I'm still not
9  understanding, I guess, where you're going or what
10 you're asking.
11     Q    Sure.
12     A    I supervise my attorneys, yes.  And how
13 do I do that?  Well, I talk with them.  I make sure the
14 case is still on track with the goals, providing public
15 access to a place that we're not allowed to go surf.  I
16 make sure that their intentions are still pure with
17 that and that we're trying to gain public access and
18 stop this culture of bullying, and I make sure they're
19 on board with that.  Does that answer your question?
20     Q    Okay.  What I wanted to know --
21     A    Okay.
22     Q    -- is how you do that, and I wanted to
23 know if you can answer the question without referring
24 to any -- anything your attorneys have told you or
25 you've told your attorneys?

Page 33

9 (Pages 30 - 33)

1      MR. FRANKLIN:  Objection: calls for
2  attorney-client privilege and instruct you not to
3  answer.  I don't know how he tells us something without
4  communicating with us.
5  BY MS. HEWITT:
6      Q    Well, I wasn't limiting it to
7  communicating with your attorneys.  I just wanted to
8  know if there was -- separate and apart from any
9  communications you have with your attorneys, do you do
10  anything else separate, specific things to monitor and
11  supervise your attorneys?
12     A    No.
13     Q    Okay.
14          Did you review the complaint in
15  Exhibit 41 prior to the time it was filed in court?
16     A    As far as I remember, I reviewed drafts,
17  yes.
18     Q    Okay.
19          Do you recall about how much time you
20  spent reviewing drafts of the complaint before it was
21  filed in court?
22     A    I've read it through, approximately, two
23  -- two or three times.
24     Q    Can you estimate for me how much time
25  that took?

Page 34

1      Q    Okay.
2          How about more than four hours?
3      A    I don't know.
4      Q    Okay.
5      A    I mean, I'll just have to stop there.  I
6  -- it could be anywhere in there.
7      Q    Okay.
8          Do you have an estimate of how much time
9  you expect to spend on this lawsuit?
10     A    How much that I personally expect to
11  spend on it?
12     Q    Yes.  How much time?
13     A    I have no idea.
14     Q    Do you have any understanding of how
15  much time you'll have to spend?
16     MR. FRANKLIN:  Objection to the extent it calls
17  for attorney-client privilege.
18     THE WITNESS:  I just -- no.  I mean, I spend as
19  much time as it takes to make this, you know, a free
20  place to go.  I don't know.
21  BY MS. HEWITT:
22     Q    Do you have an expectation that you'll
23  spend more than an hour a week on the case?
24     A    I don't have any expectations.  I'll do
25  what it takes to get it done.

Page 36

1      A    No, I cannot.
2      Q    Do you know?
3      A    It varies.  You know, with my busy
4  schedule and whatnot, you know, I might pick up where I
5  left off; so, I can't give you an estimation.
6      Q    I understand.
7          Do you think it was longer than ten
8  hours?
9      A    Could have been.  I -- again, it's hard
10  to nail down a time frame.
11     Q    Oh, I understand.  I'm seeing if we can
12  maybe narrow it down a bit.  Do you think it was more
13  than an hour?
14     A    More than an hour?
15     Q    Yes, sir.
16     A    Yes.
17     Q    Okay.  But you're not sure if it was
18  more than ten hours?
19     A    It -- again, I don't know.
20     Q    Do you think it was more than two hours?
21     A    Yes.
22     Q    Okay.
23          Do you think it was more than three
24  hours?
25     A    Yes.

Page 35

1      Q    Now, we talked about this a little bit
2  earlier; but, in your understanding, what is this case
3  really about?  And let me rephrase that.  What is this
4  case about?
5      A    It's about public access and not being
6  unwelcome or being not harassed when you go somewhere
7  to enjoy the earth, you know, the ocean.  It's about
8  anybody who wants to use that part of the coastline to
9  be able to go use it without being bullied and have
10  their stuff destroyed and be injured.  That's what it's
11  about.
12     Q    Okay.  And just to be clear, I don't
13  want to have to state the obvious, but are we talking
14  about a certain particular area?
15     A    We are.
16     Q    Okay.
17          What area is that?
18     A    The area of Lunada Bay within the
19  Palos Verdes Peninsula in Southern California.
20     Q    Okay.
21          What claims are you making against the
22  City of Palos Verdes Estates?
23     A    It's -- it's evident in the lawsuit.
24  The city itself --
25     Q    Yes, sir.

Page 37

1       A    -- has turned a blind eye on what goes
2  on down and above and below the bluff and in the water.
3  They refuse to enforce laws that are already on the
4  books to take care of a problem that's been there for
5  30 to 40 years, almost as long as I've been alive.
6  They're -- you know, they've allowed a non-permitted,
7  non-accessible hangout for a bunch of bullies that
8  drink and possibly use drugs and, you know, vandalize
9  and assault people.  They have done little, if
10  anything, to make an appearance to keep that from
11  happening.
12      Q    And with regard to your last statement
13  that they've done -- they've done little -- the little
14  to stop that from happening -- I don't want to misstate
15  it.  Just with regard to the last thing you said --
16      A    Little, if anything.
17      Q    Little, if anything.  Is that in the
18  entirety of your experience?  What I mean by that is in
19  your experience, the city has acted this way during the
20  entire time that you've interacted with them?
21      A    I believe they have.
22      Q    Has there ever been a time when you felt
23  the city was acting to address the problem that you've
24  discussed here?
25          MR. FRANKLIN:  Vague and ambiguous.

Page 38

1          MR. WORGUL:  I'm going to object and move to
2  strike as nonresponsive to the question.
3          MS. HEWITT:  Can you read back the question?
4          (Whereupon, the record was read back
5  by the court reporter as follows:
6          "Q  Has there ever been a time when you
7  felt the city was acting to address the problem
8  that you've discussed here?")
9  BY MS. HEWITT:
10      Q    Okay.  Other than what you've just
11  discussed, were there any other times where you felt
12  the city was acting to address the problems that you've
13  discussed here today?
14      A    That's the only time that I felt the
15  city was proactively going to take care of the problem,
16  yes.
17      Q    Okay.  And just to be clear, does that
18  include any times when you felt the city was doing
19  anything to address the problems that you've discussed
20  here today?
21          MR. FRANKLIN:  Vague and ambiguous.
22  BY MS. HEWITT:
23      Q    And just to clarify, I just want to make
24  sure you're answering the question I asked, or that I'm
25  making sure I ask a clear question here.

Page 40

1          THE WITNESS:  Let me just say this.  Around
2  2002 or 2003, somewhere in the early 2000s, I was
3  almost ecstatic when my police chief was looking for
4  volunteers of officers to go surf at Lunada Bay to take
5  care of a problem that supposedly either the police
6  chief or the city at the time wanted to take care of,
7  and I was going to go in the capacity of a police
8  officer; be able to undercover surf in a place that I
9  wanted to surf since I was probably 15 years old and
10  take care of a bullying problem.  I thought at that
11  time, hey, these guys are going to do it.  You know,
12  this is -- this is going to happen, and I'm going to be
13  a part of it.  And that was -- that was exciting to me.
14  Yeah, I was excited.  I thought at that time it was
15  going to be taken care of.  But, for whatever reason,
16  that undercover operation, or whatever they were
17  planning on doing with us, was called off; and, again,
18  nothing happened.  That was a letdown.
19  BY MS. HEWITT:
20      Q    Okay.  Anything else?
21          MR. FRANKLIN:  Vague and ambiguous.
22          THE WITNESS:  Anything else about what?
23  BY MS. HEWITT:
24      Q    Is there anything -- can you read back
25  the question?

Page 39

1          Whether or not proactively, my question
2  was were there any times in which you felt the city was
3  acting to address the problems that you've discussed
4  here today?
5          MR. FRANKLIN:  Asked and answered.
6          THE WITNESS:  I haven't seen it.
7  BY MS. HEWITT:
8      Q    With regard to Chief Kepley, what are
9  the claims you're making against Chief Kepley?
10      A    Specifically, that he's an ineffective
11  leader taking care of literally a gang problem down on
12  his beach.  He's the head chief law enforcement officer
13  of the city, and he does nothing that is effective, in
14  my view, in taking care of a real problem of access to
15  the coast; of safety in the water; out of the water;
16  above and below the bluff.  There's documented numerous
17  incidents of all kinds of violations, and it seems
18  little, if anything, is done about it.  I mean, he's
19  the chief.
20      Q    When you say, "little" or -- I think you
21  said, "little"; so, was there anything that you believe
22  the chief has done to address the problem that you've
23  discussed here?
24      A    To sum up what I think he's done, I
25  think there's been some lip service.

Page 41

11 (Pages 38 - 41)

1    Q    And what do you mean by that?
2    A    Well, when push comes to shove, there is
3 reports here and there taken; people that, you know,
4 want to report crimes that happen to them. I
5 understand that, at one point, he either went down and
6 met with members of the Bay Boys and, basically,
7 instructed them that they need to behave better.
8         You don't tell a gang to behave better.
9 Is that to behave more secretly so they don't get
10 caught? I mean, I don't understand what his line of
11 thinking was on that one. I don't see any proactive
12 forms of police work, meaning citing for and arresting
13 for laws that are on the books.
14        Going back to the undercover operations,
15 none of that happens. It's ...
16   Q    The undercover operation that you
17 referenced earlier, you said you were really excited
18 about that; is that correct?
19   A    Yes.
20   Q    All right. And so you were excited
21 about going undercover at Lunada Bay as a surfer?
22   A    It was twofold. Not only would I get to
23 surf a place that I wanted to surf, on a selfish note I
24 guess you could say, but you could finally take care of
25 a problem that's festered for 30 to 40 years, a gang of

Page 42

1 BY MS. HEWITT:
2    Q    And 'cause I don't know. I don't
3 understand undercover operations.
4    A    Well, I think the expectation speaks for
5 itself on the undercover operation. You go in
6 undercover expecting that things that have been
7 reported for the last 30 or 40 years would happen to
8 you as an undiscovered outsider; and you, being an
9 on-duty police officer, would be able to make and
10 effect a proper arrest or a citation and send a message
11 that -- when I say, "we," meaning "we" as the
12 Palos Verdes Estates police are not going to tolerate a
13 gang in the water and on the beach, and the problem
14 would go away. Almost instantaneously within a couple
15 weeks this could be cleared up. We would not be
16 sitting here today.
17   Q    And is that based on your experience as
18 a police officer that you know it would go away in two
19 weeks?
20   A    I believe that it would, yes.
21   Q    And what experience is that based on?
22   A    Going into areas; taking care of
23 problems; what I've done for the past 20 years. You
24 address community issues, quality of life issues, and
25 you take care of them by using the law on your side,

Page 44

1 basically spoiled individuals that claim this territory
2 for themselves, and break that up.
3         On a law enforcement angle, that would
4 be very satisfying. That's what we spend our life's
5 work doing is protecting those who feel like they're in
6 trouble or things happen to them. Breaking up, you
7 know, bands of bullies so that people feel like they're
8 free to go there. I mean, so that's the other fold. I
9 mean, to surf and to take care of a problem? It
10 doesn't get any better.
11   Q    What did you personally hope you would
12 accomplish in working over -- working undercover -- not
13 over cover -- undercover at Lunada Bay?
14   A    When you say, "personally" --
15   Q    Yeah, what did you personally think you
16 would be able to do?
17   A    I guess that goes back to my original
18 answer. The satisfaction of taking care of the problem
19 and then the, I guess, selfish enjoyment of being able
20 to surf on duty.
21   Q    Okay. It was my fault for asking kind
22 of a bad question.
23        How did you think you would do that
24 during the undercover operation?
25   MR. FRANKLIN: Vague and ambiguous.

Page 43

1 citing when you can cite; making an arrest; having a
2 presence legally, and the problems go away. It's been
3 proven for the past hundreds of years of law
4 enforcement.
5         Look at, you know, New York. You know,
6 look, they went in there, and they made a legal
7 presence, and the city cleaned up. L.A. is starting to
8 clean up. You know, you go and take care of problems.
9 That's what we do. It hasn't been done there.
10   Q    And I did forget to ask you while you
11 were at L.A.P.D. working, were you assigned to a
12 specific division there?
13   A    Several.
14   Q    And what were those?
15   A    I started out -- after the police
16 academy, I started out in the Newton Division. While
17 at Newton, I was temporarily assigned to the
18 Rampart Division, uniformed narcotics. After my
19 probation was over at Newton, I was assigned to
20 Hollywood Division.
21   Q    And in the Hollywood Division, did you
22 work patrol there?
23   A    I worked patrol; and, then, I've worked
24 for a time in bicycle patrol, which is a little
25 different than regular patrol.

Page 45

12 (Pages 42 - 45)

1    Q    Did you say --
2    A    It's patrol on bicycles.
3    Q    Bicycles.  I thought you said, "vice."
4  It was something else.  I didn't hear.  I'm sorry.
5    A    No.
6    Q    Okay.  Bicycle patrol.  All right.
7         Did you work in any other -- did you
8  have any other types of assignments while you were at
9  the Hollywood Division?
10   A    No.
11   Q    Okay.
12        So, while you were at the L.A.P.D., you
13  were assigned to Newton and Hollywood Division; and
14  while at Newton, you had a temporary assignment to
15  Rampart.  Were there any other areas you were assigned
16  to while you were at L.A.P.D.?
17   A    No.
18   Q    Okay.
19        Okay.  Getting back to the complaint,
20  are there any -- you're making these claims on your own
21  behalf --
22        MR. FRANKLIN:  Objection --
23  BY MS. HEWITT:
24   Q    -- correct?
25        MR. FRANKLIN:  Vague and ambiguous; calls for a

Page 46

1    12.
2    Q    Okay.
3         So, sometime in your mid-teens, you
4  became aware of Lunada Bay; is that correct?
5    A    Correct.
6    Q    And how did you become aware of it?
7    A    I think it was a surfing magazine or
8  "SURFER" magazine, one of the surfing magazines -- a
9  magazine.
10   Q    All right.
11        Do you recall just generally what you
12  read about Lunada Bay in that surfer magazine or surfer
13  magazines?
14   A    I can remember a picture with a caption
15  below; and, then, kind of a small article.
16   Q    And do you remember, generally, what the
17  article was about?
18   A    I think it was, generally, about
19  basically the coming or the past winter season swell --
20  I don't remember what time of year I read the article,
21  or if it was the past or the present big, you know, the
22  wintertime, just wintertime waves.
23        MS. HEWITT:  Can you please mute your phone?
24  Thank you.
25   Q    Will you please turn to page 7 of the

Page 48

1  legal conclusion.
2        THE WITNESS:  On my own behalf, as well as two
3  other individual plaintiffs, as well as the class.
4  BY MS. HEWITT:
5    Q    And, then, with regard to the complaint,
6  let's go ahead and take a look at that.  If the clip is
7  not convenient for you, feel free to take it off and do
8  whatever is easiest for you.
9         So, first, let me ask you when did you
10  first become familiar with Lunada Bay?
11   A    How familiar do you want?  What do you
12  mean?
13   Q    When did you first become aware of
14  Lunada Bay?
15   A    I would say in my mid -- mid-teens.
16   Q    Okay.  And in your mid-teens, is it true
17  that you were living in La Mirada?
18   A    That's correct.
19   Q    All right.
20        While you were in your mid-teens, were
21  you a surfer?
22   A    Yes.
23   Q    Okay.  And when did you first start
24  surfing?
25   A    As far as I can remember, I was 11 or

Page 47

1  complaint, Mr. Spencer.  Do you see there in
2  paragraph 17 towards the bottom of that page, the
3  second paragraph -- second sentence, it says, "It is
4  also the State's" -- actually, you know what?  Let me
5  withdraw that.  Let me read the first sentence in that
6  paragraph (as read):
7              "Beyond its beauty, Lunada Bay
8         is Southern California's premiere big-wave
9         break."
10        Is that your understanding?
11   A    I believe that to be the case.
12   Q    All right.  And what is that based on?
13   A    Surfing experience.
14   Q    And, then, it goes on to say (as read):
15        "It is also the State's, and
16  perhaps the surfing world's, best-known
17  area for localism."
18        And it says (as read):
19        "Localism is a territorial
20  practice whereby resident surfers
21  attempt to exclude nonresident
22  beachgoers and surfers through
23  threats, intimidation, and violence."
24        Is that your understanding?
25   A    Yes.

Page 49

13 (Pages 46 - 49)

1      Q    All right.
2           When did you first hear the term
3   "localism"?
4      A    I'd have to say shortly after you start
5   surfing, you become aware of locals or localism.
6      Q    So did you ever become aware of localism
7   in some area other than Lunada Bay?
8      MR. FRANKLIN:  Vague and ambiguous.
9      THE WITNESS:  Yes.
10  BY MS. HEWITT:
11     Q    And what other areas?
12     A    I think -- well, from my experience,
13  just about most places there's a nice wave or a
14  particular popular place to go surfing, there is a --
15  an area that, you know, people specifically like to
16  claim as their spot; so are they locals?  Do they live
17  there?  Yes.  That's just, I guess, human nature.
18     Q    Are there any other specific beaches
19  that you have an understanding has an issue with
20  localism?
21     MR. FRANKLIN:  Vague and ambiguous.
22  BY MS. HEWITT:
23     Q    Other than Lunada Bay?
24     MR. FRANKLIN:  Vague and ambiguous.
25     THE WITNESS:  Again, there's places that people
Page 50

1   refer themselves as "locals," but it's not like
2   Lunada Bay locals.  It's different at Lunada Bay.
3   BY MS. HEWITT:
4      Q    So are you aware of any other beaches
5   where there is an issue of localism that you
6   understand?
7      MR. FRANKLIN:  Vague and ambiguous.
8      THE WITNESS:  Not like Lunada.  That's my
9   answer.
10  BY MS. HEWITT:
11     Q    Not like -- okay.  But my question is --
12     A    Localism not like Lunada; so, there is a
13  place where people consider themselves local, but it's
14  not like Lunada Bay.
15     Q    Okay.
16          That first part of your answer, what are
17  those places?
18     MR. FRANKLIN:  Vague and ambiguous.
19     THE WITNESS:  Look out at the coast.  Anywhere
20  there's good waves and people surf, there's going to be
21  -- the California coast, anywhere there's good waves
22  and where people surf, there's going to be locals
23  there, people that are local residents that consider it
24  their local break.  And anybody who is not from there,
25  I guess, would be considered not local.  I don't know.
Page 51

1   BY MS. HEWITT:
2      Q    Back when you were a teenager and you
3   first started reading articles -- or I think you said
4   you read an article about Lunada Bay, did that article
5   reference localism?
6      A    Yes.
7      Q    Okay.  So you have a specific
8   recollection of that?
9      A    Yes.
10     Q    All right.  And what is that
11  recollection?
12     A    In -- I can give it to you in general
13  terms, because it made an impression on me at the time.
14  It was something to the effect of the most -- one of
15  the most perfect waves in California in the wintertime;
16  but, basically, only a few are able to enjoy it,
17  something to that effect.
18     Q    All right.  And did it say why only a
19  few were able to enjoy it?
20     A    I don't -- I don't recall -- not
21  specifics.  I don't recall specifics, but it was
22  something that's well-known in Southern California that
23  you don't go there.
24     Q    And when you say that, is that what was
25  said in the article, or are you stating that of your
Page 52

1   own information and belief?
2      A    That's -- it's just known in the surfing
3   world.  You don't go to Lunada Bay unless you're a
4   local.
5      Q    Okay.  But right now I'm asking about
6   this article.
7      A    No, right.  No, it didn't, no.  You're
8   correct, but it just made reference that only a few can
9   enjoy or something to that effect.
10     Q    Okay.
11          Now, when you first -- sorry.
12     A    It didn't say anything about, you know,
13  you're going to go there, and this is going to happen,
14  or A, B, and C; X, Y, and Z, no, it didn't.  It just
15  made reference to like this is known.
16     Q    Okay.
17     A    I recall that specifically.  It was a
18  great picture.  I wish I could remember.
19     Q    Okay.
20          Now, if you will please turn to page 12;
21  to paragraph 21.  We'll get to the part where your name
22  is there.
23     A    Paragraph 21.  Okay.
24     Q    Yes, sir.  All right.
25          I think we already talked about the fact
Page 53

14 (Pages 50 - 53)

1 that you worked as a police officer for the
2 City of Los Angeles Police Department in the
3 South Central Division. Is that what it was called,
4 "South Central Division"?
5     A    Back then, you were politically correct
6 if you said, "South Central Division." It was actually
7 Newton Division, South Central L.A. Now you can only
8 say South L.A., I guess. But it wasn't
9 South Central Division. It was the Newton Division in
10 South Central L.A.
11    Q    Thank you.
12        All right. And, then, we talked about
13 the fact that you'd work as a police officer in the
14 City of El Segundo; and, then, it goes on to state
15 (as read):
16        "For more than 30 years,
17        he has wanted to surf the waves off
18        the coast of the City of Palos Verdes
19        Estates - specifically Lunada" --
20    A    Are we on another page?
21    Q    I'm sorry. We're on page 12, please.
22    A    I was on 21. You didn't tell me where
23 to go after that.
24    Q    We're still on 21.
25    A    I'm on a different area.

Page 54

1    Q    I'm sorry, sir. Paragraph 21. My
2 fault.
3    A    Okay. I was looking at lines. Sorry.
4 My mistake.
5    Q    No, that was my fault.
6    A    My mistake.
7    Q    So now we're on line 7, towards the end
8 where it says --
9    A    Yes. I'm with you now.
10    Q    All right.
11        So is that true that for more than 30
12 years you wanted to surf the waves off the coast of the
13 City of Palos Verdes Estates, specifically, Lunada Bay?
14    A    From the day I saw that picture.
15    Q    Okay. So that's where you date it from,
16 the day you saw that picture in the surfer magazine in
17 your mid-teens?
18    A    Yes.
19    Q    Okay. All right. And, then, the next
20 sentence, the second half of it says that you avoided
21 Lunada Bay because of fear, intimidation, vandalism,
22 and Lunada Bay's well-known reputation for violence and
23 beach localism.
24        Now, breaking that down a little bit
25 here, when did you first develop a fear of violence or

Page 55

1 beach localism at Lunada Bay?
2    A    Well, I think anybody -- well, when did
3 I?
4    Q    Yes.
5    A    Let's go back to that. When you see --
6 you question why you can't go there; and, then, you
7 start inquiring in the surfing world why you can't go
8 there, and you hear the stories that have gone on for
9 as long as they have up into that point. You
10 immediately get fearful. You don't want to go
11 somewhere where you're going to get your tires slashed;
12 your windows egged; your property thrown in the ocean.
13 Those were the stories that you get; so, you become
14 fearful right away, right? Or I did.
15    Q    My question was when this happened.
16    A    Shortly after I questioned from the
17 article why can only a few enjoy it.
18    Q    And who did you question?
19    A    I don't -- I didn't question anybody
20 that I can recall specifically. You just -- you just
21 hear stories in the surfing world about the place
22 through people, word of mouth. I don't recall an
23 individual.
24    Q    Okay. So, going back to the surfing
25 article you read as a mid-teen, judging from what you

Page 56

1 just told me, you don't date your fear back to that
2 article, do you; is that correct?
3    A    No, not to the article; but once you
4 start -- well, what about this Lunada? And, you know,
5 you ask this -- you know, you ask people. You ask
6 surfers. "Oh, you can't go there." This, you know.
7    Q    And that's what I'm trying to find out.
8    A    That's when you hear the stories.
9    Q    When did you first hear those stories?
10    A    Shortly after. I can't give you a date.
11    Q    Was it when you were still a teenager?
12    A    Oh, yes.
13    Q    Okay.
14        Do you think it was from your friends
15 who told you these stories?
16    A    Friends; not friends; people in the
17 water; people you don't know. I -- again, I can't give
18 you a specific. It's just something that's known in
19 the surfing world.
20    Q    And not being a surfer, I apologize for
21 asking. I know it seems like an obvious question, but
22 how are you hearing these stories that you're
23 testifying to right now with regard to how you
24 developed the fear of Lunada Bay? That's what I'm
25 trying to get at, just because, again, I'm not a

Page 57

15 (Pages 54 - 57)

1  surfer.
2      A    So, at the, I guess, at the cost of
3  hopefully not seeming vague and ambiguous to you, it's
4  just word of mouth in the water.  You're talking to
5  other surfers.  You hear of stories, you know.  You're
6  out in the water waiting for waves.  Guys -- people
7  talk.
8      Q    When was the first time you remember
9  someone telling you something that made you fearful of
10  Lunada Bay?
11     A    I can't give you a specific date.
12     Q    All right.  So we established it was
13  when you were a teenager though; right?
14     A    Yes.
15     Q    All right.
16          So, that's somewhere up until the time
17  you were 19?
18     A    Yes.
19     Q    Okay.
20     A    I mean, you -- you know, you hear about
21  it when, you know, in your mid-teens.  You start asking
22  about this place and talking about this place and
23  almost right away.
24     Q    Did you ever go to Lunada Bay up until
25  the time you were 20?

Page 58

1      A    Yes.
2      Q    Okay.
3          How many times?
4      A    I can't recall a specific number, but I
5  can tell you that, of course, you see it in magazines.
6  You want to see it in person; and, you know, you want
7  to go and investigate, I guess, for lack of a better
8  term; so, you just drive up and check it out.
9      Q    Are you able to estimate for me how many
10  times you went to Lunada Bay before you turned 20?
11     A    Oh, before I turned 20?  If I were to
12  give you an estimation, probably four to five times.
13     Q    Okay.
14          During any of the four or five times you
15  went there before you turned 20, did you experience
16  anything that made you fearful of Lunada Bay?
17          MR. FRANKLIN:  Vague and ambiguous.
18          THE WITNESS:  Fearful?  Just going there I was
19  in fear.  Just driving up the Palos Verdes Peninsula
20  road, you know, or whatever road it is to get up there,
21  you're a little afraid because you've heard stories.
22          MS. HEWITT:  Okay.
23     Q    During the four or five times you went
24  to Lunada Bay before you turned 20, did you experience
25  anything that made you fearful of Lunada Bay?

Page 59

1          MR. FRANKLIN:  Vague and ambiguous.
2          THE WITNESS:  I don't know how to answer that
3  any other way than I already did.  When you drive up,
4  you -- because of the lure, the stories, you feel
5  fearful of, hey, is this real?  Is this -- is this
6  place really like they say it is?  Am I going to get my
7  property vandalized?  Am I going to get, you know, in
8  some type of confrontation?  That's a fear.
9          MS. HEWITT:  Okay.
10          Let's break that down then.  Of the four
11  to five times you went to Lunada Bay before you turned
12  20, looking at the first time you went, did you
13  experience any intimidation there?
14          MR. FRANKLIN:  Vague and ambiguous.
15          THE WITNESS:  No.  I was never, per se,
16  confronted by anybody; so I was -- I wasn't intimidated
17  by any individual.
18  BY MS. HEWITT:
19     Q    Okay.  That same time, did you
20  experience any vandalism?
21     A    No.
22     Q    Okay.
23          Did anything occur during that first
24  visit to Lunada Bay -- to Lunada Bay, excuse me, before
25  you turned 20, that caused you to later be fearful of

Page 60

1  coming back to Lunada Bay?
2      A    No.
3      Q    Okay.
4          During the second time you visited
5  Lunada Bay before you turned 20, did you experience any
6  intimidation?
7      A    We're going time by time?
8      Q    Yes.
9      A    Let me just save you the, I guess, the
10  hassle of going through.  They were just every time you
11  would drive up the same way and just check it out, and
12  nothing that the line of questioning that we went
13  through happened in each one of those four to five
14  times.
15     Q    Okay.
16          During the four to five times?
17     A    Does that make sense?
18     Q    Sure.  Let me just restate it, and I
19  appreciate that.
20          During the four to five times you
21  visited Lunada Bay before you turned 20, you did not
22  experience any intimidation --
23          MR. FRANKLIN:  Vague and ambiguous.
24  BY MS. HEWITT:
25     Q    -- is that correct?

Page 61

16 (Pages 58 - 61)

| | |
|---|---|
| 1    A    Correct. | 1    A    Let me back up. |
| 2    Q    You did not experience any vandalism; is | 2    Q    Sure. |
| 3  that correct? | 3    A    I had my boards each time but ... |
| 4    A    Correct. | 4    Q    When you were -- before you were 20? |
| 5    Q    All right.  And you did not experience | 5    A    Yes. |
| 6  anything that caused you to later to be fearful of | 6    Q    Okay.  So you had your boards, but you |
| 7  later coming back to Lunada Bay; is that correct? | 7  didn't surf? |
| 8    A    Not on those times; correct. | 8    A    Correct. |
| 9    Q    Okay. | 9    Q    That's fine.  And between that time and |
| 10       All right.  If we go to the next | 10  January 2016, did you ever surf at Lunada Bay? |
| 11  sentence, it starts at line 13, sir (as read): | 11    A    No. |
| 12       "But in January 2016, Spencer | 12    Q    Okay. |
| 13       worked up his courage to surf Lunada Bay | 13       Between those four to five times and |
| 14       during a large winter swell." | 14  January 2016, did you go to Lunada Bay? |
| 15       Going to a time period before | 15    A    Yes. |
| 16  January 2016, is it true that you had never surfed | 16    Q    Okay. |
| 17  Lunada Bay before that time? | 17       About how many times? |
| 18    A    That's true. | 18    A    Four to five. |
| 19    Q    Okay.  So when you visited Lunada Bay | 19    Q    Between the time you were 20 and the |
| 20  before you turned 20, you went to Lunada Bay but did | 20  time January 2016? |
| 21  not surf; correct? | 21    A    Oh, oh, I'm sorry. |
| 22    A    That's correct. | 22    Q    That's okay. |
| 23    Q    All right. | 23    A    I thought we were back. |
| 24       When you went during those four to five | 24    Q    No. |
| 25  times, did you go on the beach? | 25    A    How many times after I was 20 and, then, |
| Page 62 | Page 64 |

| | |
|---|---|
| 1    A    Okay.  What do you consider the beach? | 1  up until January of 2016?  One time I went on my |
| 2  The -- down below the bluff?  Above the bluff? | 2  bicycle.  I would say, again, four to five times.  I |
| 3    Q    Good point.  I would just say to the | 3  know one was on a bike ride; and the others, one time |
| 4  area closest to the water that's not actually on the | 4  was working a task force for a DUI.  I was in a police |
| 5  water. | 5  car, and it was at night.  It would have been after |
| 6    A    No. | 6  10 p.m.; so not many people there at that time.  And I |
| 7    Q    Okay. | 7  would say probably the two or three extra would just be |
| 8       Was there one particular place you went | 8  in my car. |
| 9  to each time? | 9    Q    Okay. |
| 10    A    Yes, just pull up on the street in | 10       In any of those four to five times, did |
| 11  front. | 11  you attempt to surf? |
| 12    Q    Okay.  All right. | 12    A    No. |
| 13       Between the time that you turned 20 and | 13    Q    Okay. |
| 14  January of 2016, that's referenced in the complaint, | 14       During any of those four to five times, |
| 15  did you go to Lunada Bay to surf at all? | 15  were you intimidated? |
| 16    A    Between -- say that again, please. | 16    MR. FRANKLIN:  Vague and ambiguous. |
| 17    Q    Sure. | 17    THE WITNESS:  I'm -- I wouldn't -- no, I wasn't |
| 18       Between those four to five times that we | 18  intimidated. |
| 19  just discussed and the time in January of 2016 when you | 19    MS. HEWITT:  Okay. |
| 20  went to Lunada Bay -- | 20    Q    During any of those four to five times, |
| 21    A    Before that? | 21  again, that we're talking about right now, did you |
| 22    Q    Before that. | 22  experience any vandalism? |
| 23    A    No. | 23    A    No vandalism. |
| 24    Q    During that time.  Okay.  So you never | 24    Q    All right.  And during those four to |
| 25  went to surf during those times at Lunada Bay? | 25  five times, did you experience anything that made you |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

1 fearful to come back to Lunada Bay in the future?
2       MR. FRANKLIN: Vague and ambiguous.
3       THE WITNESS: On the -- on the time of my
4 bicycle, there was a few individuals -- and I don't
5 know who they were -- and you drive by, and I remember
6 getting off my bike and looking down over the bluff and
7 seeing kayaks and -- I think it was mostly just kayaks
8 kind of down in the bushes, and I thought that was kind
9 of weird, but I do remember a group of -- and I
10 couldn't even give you a description or anything -- a
11 group of guys -- and ages I don't know -- but just kind
12 of hanging out, and they were on the north end of the
13 -- I don't know what we want to call it because we're
14 not down in the bay. I guess the north end of the bay
15 on the bluff just hanging out; and so, then, you know,
16 your mind remembers all the lore and the stories; and I
17 go, oh, I wonder if it's those guys, but nobody
18 approached me. Nobody intimidated. Nobody vandalized,
19 but I thought it was kind of odd.
20 BY MS. HEWITT:
21       Q     The kayaks, they didn't scare you or
22 cause any fear?
23       A     No. It's just odd that people would
24 leave their property on the beach -- or, yeah, down on
25 the beach, and nothing would be stolen, or it would be

Page 66

1 okay to leave stuff there, and that never occurred to
2 me.
3       Q     All right.
4       So prior to January 16th, why had you
5 not surfed at Lunada Bay?
6       MR. WORGUL: Did you say January 2016 or 16?
7       MS. HEWITT: 2016.
8       THE WITNESS: Yeah. Why didn't I surf there?
9 Because I didn't want to get -- I didn't want the
10 stories to come true to me of what goes on down there.
11 BY MS. HEWITT:
12       Q     All right. And are these the stories
13 that you referenced earlier that you just heard when
14 you were out surfing?
15       A     Yes.
16       Q     Okay. So are you able to pinpoint the
17 source of any of these stories or tell me who related
18 them to you?
19       A     No.
20       Q     Prior to January 2016, when was the last
21 time you had heard such a story?
22       A     Prior to January -- I can't give you
23 specific dates. I don't know.
24       Q     Well, the complaint here -- and here's
25 why I'm asking. The complaint here says that you

Page 67

1 avoided Lunada Bay because of fear, intimidation, and
2 vandalism, and Lunada Bay's well-known reputation for
3 violence and beach localism; but in January 2016, you
4 worked up the courage to go surf there.
5       So, I want to find out before that time
6 you worked up the courage to go surf there, what story
7 was fresh in your mind and when had you heard that?
8       A     I can't point to a specific story. Just
9 what's gone over the 30 and 40 years of the stuff we
10 talked about.
11       Q     Well, let's go back to all those then.
12 The 30 to 40 years of stuff we've talked about, are you
13 able to tell me any particular person who told you any
14 story of what we talked about here today?
15       A     You know, no, that was after -- after it
16 happened. I can't -- I don't know a particular person.
17 I can't give you a particular source. It's just
18 general knowledge of what goes on there.
19       Q     Well, is the general knowledge purely
20 based on these stories from the people that you're
21 unable to identify right now?
22       MR. FRANKLIN: Vague and ambiguous; misstates
23 prior testimony.
24       THE WITNESS: I'm trying to think for you.
25       MS. HEWITT: I appreciate it.

Page 68

1       THE WITNESS: No, not that I can recall.
2 BY MS. HEWITT:
3       Q     Can you think of anybody who told you
4 about localism at Lunada Bay prior to January 2016?
5       A     Prior to January -- well, prior -- I
6 mean, very close up to 2016, I talked with -- I talked
7 with Chris Taloa about going down there.
8       Q     And how did you meet Chris Taloa?
9       A     I met him -- like physically how I met
10 him?
11       Q     Or just how did you become acquainted
12 with him?
13       A     How I became acquainted with him?
14       Q     Yeah.
15       A     In 20 -- I think 2014 or so, I learned
16 of kind of what his movement was, about going there in
17 numbers to go surf, through a friend named Tom Blair.
18 He told me about a friend of his, Chris Taloa, that was
19 engaging in a movement to go peacefully surf in numbers
20 so that it would be safe at Lunada; and I thought that
21 after all those years, that might be something that I
22 would attempt and so I -- it was towards the end of
23 2014; and I, you know, the big wave season was kind of
24 over, and I didn't contact him then, Chris -- meaning
25 Chris.

Page 69

18 (Pages 66 - 69)

| | |
|---|---|
| 1      And, so, in January -- about a week | 1   Aloha Point Facebook group? |
| 2   prior to me going out there was when I contacted Chris, | 2      A    Through Tom. |
| 3   I believe, on the phone -- or I might have texted him | 3      Q    Through Tom. Okay. And who is Tom? |
| 4   first. I can't remember. I think I might have texted | 4   He's a friend of yours. I'm sorry. You said he's a |
| 5   him, "Hey, there's a swell coming. Let's get some | 5   friend of yours. |
| 6   people together and try to go safely surf and have a | 6      A    More of an acquaintance who lives in |
| 7   good time." | 7   El Segundo, the city where I work. |
| 8      Q    Okay. And just to clarify, prior to | 8      Q    Is he a surfer? |
| 9   this time when you went to the beach in January of | 9      A    He surfs. |
| 10   2016, had you talked to Chris Taloa about localism at | 10      Q    Do you surf with him? |
| 11   Lunada Bay? | 11      A    I have on several occasions. I know |
| 12      A    Prior to going there? | 12   you're going to probably ask me for a number, and I |
| 13      Q    Yes. | 13   don't recall. |
| 14      A    Like after I called him? | 14      Q    Have you ever talked about localism at |
| 15      Q    No. Any time prior to going -- to | 15   Lunada Bay with him? |
| 16   actually going. | 16      A    Yes. |
| 17      MR. FRANKLIN: Asked and answered. | 17      Q    Okay. |
| 18      THE WITNESS: Yes. | 18      When did you first talk about that with |
| 19   BY MS. HEWITT: | 19   him? |
| 20      Q    Okay. And prior to the time you first | 20      A    Hum, probably -- I guess it would be |
| 21   called him, had you ever talked to him about localism | 21   safe to say probably around the same time as 2014 when |
| 22   at Lunada Bay? | 22   we, you know, started talking about Lunada Bay; and, |
| 23      MR. FRANKLIN: Vague and ambiguous. | 23   then, he told me he had a friend; and, so, I would |
| 24      THE WITNESS: No. | 24   venture to say it would be around then. |
| 25      MS. HEWITT: Okay. | 25      Q    Okay. |
| Page 70 | Page 72 |

| | |
|---|---|
| 1      THE WITNESS: Not Chris. | 1      Have you ever talked with Tom Blair |
| 2   BY MS. HEWITT: | 2   about any of his own experiences down in Lunada Bay? |
| 3      Q    So the time -- is it true, then, the | 3      A    He's made references, like, you know, |
| 4   time that you called him a week before going is the | 4   he's been up there before and those -- you know, those |
| 5   first time you'd ever spoken to him on the phone? | 5   guys are a bunch of boys and stuff like that, but I |
| 6      A    Yes. | 6   don't recall any specifics that happened to him if we |
| 7      Q    Okay. And did his movement have a name? | 7   had talked about them. |
| 8      A    As far as I know, it's known as | 8      Q    All right. |
| 9   "Aloha Point"; so, he basically renamed it Aloha Point, | 9      He never told you that he experienced |
| 10   you know, in the spirit of Aloha, friendly, peaceful, | 10   vandalism there? |
| 11   Aloha; and renamed the place, because it has such a | 11      A    Not that I recall. |
| 12   reputation of being non-Aloha, he named it Aloha Point; | 12      Q    All right. |
| 13   and, then, started, I guess, a Facebook page or | 13      Did he ever say he experienced any fear |
| 14   something -- I don't even know really. I don't know | 14   or intimidation there? |
| 15   how Facebook works, if he is Aloha Point or what; but I | 15      A    Not that I recall. |
| 16   know there's an Aloha Point Facebook page; and, then, | 16      Q    Did he say he experienced any violence? |
| 17   he's the one that kind of came up with that. | 17      A    Not that I recall. |
| 18      Q    Have you ever visited the Aloha Point | 18      Q    Okay. |
| 19   Facebook page? | 19      So, then, is it correct, if we break it |
| 20      A    I have not. I've seen like screenshots | 20   down, that between the time around when you're a |
| 21   of it, but I can't go on Facebook, as far as I know, | 21   teenager and the time right before you turn 20, you |
| 22   because I'm not a Facebooker or have an account or | 22   visited Lunada Bay four to five times; and, then, you |
| 23   whatever. I don't know how it works. | 23   visited it four to five times from that time until |
| 24      Q    All right. | 24   January of 2016; is that correct? |
| 25      How did you first become aware of the | 25      A    That's correct. |
| Page 71 | Page 73 |

Hahn & Bowersock, A Veritext Company
800.660.3187

```
 1    Q    All right.
 2    A    That would be fair.
 3    Q    That would be fair?
 4    A    Yeah.
 5    Q    Thank you.
 6    A    I think that was your original.
 7    Q    That is right.  That was my question.
 8  Okay.
 9         Okay.  How far is Lunada Bay from where
10  you currently live just in miles, if you know?
11    A    I would say 62 miles, because that's
12  basically from my house to where I work; and I always
13  draw, like, a linear line; but I don't know the
14  specific amount of miles; so, it's somewhere in the
15  60s.
16    Q    Okay.
17         Now, looking at the complaint again, the
18  statement about working up the courage to surf
19  Lunada Bay, why did you decide to visit?
20    A    Can you send me back to that?
21    Q    Sure.  I apologize.
22    A    Line 13?
23    Q    Yes, line 13.  My apologies.
24    A    Okay.
25    Q    Why did you decide to visit Lunada Bay
```
Page 74

```
 1  in January 2016?
 2    A    Well, there's safety in numbers.  You
 3  know, I work in a job where it's not safe all the time,
 4  and we're safer in numbers, and this movement kind of
 5  resonated with me because if you have a large number of
 6  people who want to go and enjoy the beach peacefully
 7  and safely, then, I thought that that would be probably
 8  No. 1, my -- my safest opportunity to go there, and
 9  they had a track record of doing it I think the year
10  prior.  And from what I understand, there was minor
11  incidents with that group but nothing to the extent of
12  the stories that I heard --
13    Q    Okay.
14    A    -- about fights and vandalism and stuff
15  like that so ...
16    Q    Okay.
17         Let me ask that this way.  Was it your
18  idea to go to Lunada Bay in January of 2016 unprompted
19  by anybody else?
20    A    On that time, yeah.  I called Chris or
21  texted him and said, "Hey, there's a swell coming.  I'm
22  Cory.  I'm Tom's friend.  Let's get some people
23  together and go surf."
24    Q    Okay.  And did he respond?
25    A    Yes.
```
Page 75

```
 1    Q    And how?
 2    A    He got all excited and said, "I'll put
 3  the word out, and let's -- we'll get a few of our Aloha
 4  people and go have some good, peaceful, clean surfing,
 5  hopefully."
 6    Q    Okay.
 7         Did you have, in your mind, how many
 8  people you wanted to go with in order to get up the
 9  nerve to go to Lunada Bay that day?
10    A    In my mind?
11    Q    Yes.
12    A    If it were a perfect scenario for me,
13  I'd like 100 -- at least 100 guys to go down there.
14    Q    Okay.  Bad question.
15         If only Chris had gone with you, would
16  you have gone?
17    A    No.
18    Q    All right.
19         So, eventually, you and Chris agreed to
20  go; correct?
21    A    Correct.
22    Q    Did he tell you how many other people
23  were going to come before you actually went?
24    A    No.
25    Q    Okay.
```
Page 76

```
 1         Did you have an understanding of how
 2  many people would be going?
 3    A    I had an idea.
 4    Q    And what was that?
 5    A    About six to eight --
 6    Q    Okay.
 7    A    -- surfers.
 8    Q    Surfers.  Did that include Tom Blair?
 9    A    No.
10    Q    All right.
11         Prior to the --
12    A    Tom is -- he's still scared to go down
13  there even with Facebook people.
14    Q    Okay.  So the answer is no, Tom Blair
15  did not go?
16    A    Correct.
17    Q    All right.
18         The six to eight people, they were all
19  surfers?  Is that what you're saying to me?
20    A    As far as I understood, yes.
21    Q    All right.
22         Do you know if any reporters were
23  planning to go -- that's a bad question.
24         Were you aware of any reporters who were
25  going to be going that day?
```
Page 77

20 (Pages 74 - 77)

1     A    I was not aware.

2     Q    Okay. All right.

3         Did you -- oh, prior to the day you

4   actually went in January of 2016, had you ever

5   communicated with anybody at the City of Palos Verdes

6   about any problems with Lunada Bay, including violence,

7   intimidation, fear, anything like that?

8     A    Yes.

9         MR. FRANKLIN:  Vague and ambiguous.

10  BY MS. HEWITT:

11    Q    Okay. On how many occasions?

12    A    Prior to going down there that day?

13    Q    Yes.

14    A    I think I contacted the chief first. I

15  don't recall getting a response from him; and, then,

16  kind of reading their organizational chart, and I

17  believe I contacted a captain, and I don't recall his

18  name.

19    Q    Okay. And what did you say -- or not

20  what did you say. How did you contact him?

21    A    I don't know if the first time was

22  initially E-mail or a call. It could have been either

23  one, and I just requested, "Hey, there's a group of us.

24  I'm sure you're aware of the group. We're going down

25  there this date. Can we get some extra patrol?"

Page 78

1     Q    Okay.

2         And did you get a response?

3     A    Yes. There was dialogue, and I don't

4   remember the exact -- I think it was mostly after that

5   through E-mail. I don't recall ever speaking -- I

6   don't recall if I ever spoke to him on the phone or

7   not, but I know most was through E-mail. That's my

8   best recollection right now.

9     Q    Okay.

10    A    Can I get a drink or --

11    Q    Sure. You know what? Why don't we take

12  a little break right now. We're going a little while.

13    A    My mouth is dry.

14        MS. HEWITT:  I'll bet.

15        Let's go off the record.

16        (A recess was taken at 11:31 a.m.

17        until 11:45 a.m.)

18  BY MS. HEWITT:

19    Q    What city do you live in?

20    A    I live in the City of Norco.

21    Q    Okay.

22        Oh, that's quite a commute to

23  El Segundo.

24    A    Yes.

25    Q    Okay.

Page 79

1         Where do you surf -- actually, I'll

2   withdraw that.

3         Do you surf regularly?

4     A    Yes.

5     Q    Okay.

6         On about how many times a week do you

7   surf?

8     A    Let's back up. Surfing regularly is a

9   -- I guess a different term than surfing, because you

10  surf when the waves are good; not all the time. So, I

11  regularly surf when the waves are good or to my liking

12  so -- and those are just based upon weather so ...

13    Q    Okay.

14    A    I don't know how to specifically nail

15  down ...

16    Q    Okay.

17        Is there a surf season? Again, I

18  apologize for not knowing.

19    A    Yes. In the summer, there's swells that

20  more consistently hit different parts of the coastline.

21  In the winter and fall, there's swells that hit other

22  parts of the coastline.

23    Q    Okay.

24        Well, during the times when it is surf

25  season from your perspective, how often do you surf on

Page 80

1   a weekly basis?

2         MR. FRANKLIN:  Vague and ambiguous; asked and

3   answered.

4         MS. HEWITT:  So, I'm sorry. What was the last

5   one you said?

6         MR. FRANKLIN:  Asked and answered.

7         MS. HEWITT:  I wanted just to know how many

8   times in a week. I took off the regularly part.

9         MR. WORGUL:  You instructed him not to answer;

10  right?

11        MR. FRANKLIN:  No, I did not instruct him not

12  to answer. I said, "asked and answered."

13        MR. WORGUL:  I thought you had.

14        MR. FRANKLIN:  No.

15        THE WITNESS:  So you want a number? I'll do

16  this for you. If a swell has -- a swell has a window;

17  okay? And say it's a three-day swell window, and if

18  the waves are going to be good all three days with

19  conditions and whatnot, I'll surf, if I can, all three

20  of those days.

21        MS. HEWITT:  Okay.

22    Q    Where do you surf typically in any given

23  year? Do you have a regular set of places that you

24  surf at?

25    A    I surf all over.

Page 81

21 (Pages 78 - 81)

1      Q     Okay.
2           What are the three places that you surf
3   at most often in any given year?
4      A     Most often any given year, I would say
5   El Porto in Manhattan Beach, Oceanside Harbor in
6   San Diego County, and I would really like it to be
7   Lunada in the winter if it was safe to go there, and I
8   think that's what this claim is about; so, that's not
9   one of them yet.  I could say Huntington in
10  Orange County.
11     Q     Okay.  Those are all fairly long drives
12  from Norco.  Do you often -- do you go directly from
13  home when you go surf at Manhattan Beach or Oceanside
14  or Huntington, or do you go to work first?
15     A     It just depends if I'm at work or home.
16  And when I have time to go, I'll usually have a board
17  stored at work; a board at home.
18     Q     Okay.
19          We were talking a little bit about
20  communications with the city prior to your actual visit
21  to Lunada Bay in January of 2016.  Let me go back a
22  little bit on that as well.
23          We went over fairly exhaustively before
24  the four to five times you went to Lunada Bay up until
25  the time you were 20; and, then, the four to five times
Page 82

1   you went after that up until January 2016.  During any
2   of those visits -- so, I guess it would be eight to ten
3   times that you visited prior to January 2016 -- did you
4   ever experience anything that you believed to be was
5   localism?
6      MR. FRANKLIN:  Vague and ambiguous.
7      THE WITNESS:  I'm going to say when I was on my
8   bike and you have a group of guys standing around kind
9   of looking at who's coming and going near the bluff, I
10  would say that would be a group of guys at their local
11  spot being locals, you know.  Did they threaten;
12  intimidate me?  Not -- it was a little intimidating,
13  you know.  Did they vandalize any of my property?  No.
14  Did they get all up in my face?  No.  But they were
15  there and looking at who's coming and going.
16  BY MS. HEWITT:
17     Q     And they didn't speak to you; correct?
18     A     No.
19     Q     And they didn't approach you?
20     A     No.
21     Q     And have you seen groups of guys like
22  that at other beaches?
23     A     Like --
24     Q     Just like you described, a group of
25  guys?
Page 83

1      A     Yeah.  I -- you see guys hanging out at
2   the parking lots and before they're going to get in the
3   water or after they get out of the water.
4      Q     Okay.
5           So, talking a little bit about your
6   communications, I think you said with Captain Velez.
7      A     That's the name.
8      Q     Okay.
9           Did you -- actually, I don't know if you
10  said, "Velez."  Do you think it was Velez?
11     A     You just did, but you refreshed my
12  memory.  Thank you very much.
13     Q     Okay.  I didn't mean to.  Okay.  So, you
14  believe it was Captain Velez; all right.
15     A     Yes.
16     Q     And you had testified that there was
17  dialogue, and I'm not sure if you meant dialogue
18  through E-mail or something on the phone.  Can you
19  clarify that?
20     MR. FRANKLIN:  Asked and answered.
21     THE WITNESS:  Can I clarify it?
22     MS. HEWITT:  Yeah.
23     THE WITNESS:  I don't recall if I -- I don't
24  recall speaking to him, but I may have.  The speaking
25  and the E-mail dialogue -- I know I E-mailed him for
Page 84

1   sure; but, as far as on the phone, I don't recall.
2   BY MS. HEWITT:
3      Q     All right.  And I think you said that
4   you requested extra patrols; correct?
5      A     Yes.
6      Q     All right.
7           Did any -- were any extra patrols
8   provided?
9      MR. FRANKLIN:  Vague and ambiguous; lacks
10  foundation.
11  BY MS. HEWITT:
12     Q     Well, let me ask you this.  Okay.  So,
13  you requested extra patrols for your visit in January
14  of 2016; is that correct?
15     A     Correct.
16     Q     Okay.
17           Do you know if your request was granted?
18     MR. FRANKLIN:  Lacks foundation.
19     THE WITNESS:  I can only tell you what I
20  experienced, that there was a group of officers that
21  was there after I was out of the water.
22  BY MS. HEWITT:
23     Q     On January 2016?
24     A     January 29th, 2016.
25     Q     I'm sorry.  Thank you.
Page 85

22 (Pages 82 - 85)

1      Did you speak to any of those officers?
2      MR. FRANKLIN:  Vague and ambiguous.
3      THE WITNESS:  I did.
4   BY MS. HEWITT:
5      Q    Okay.  And which ones -- sorry.  Do you
6   know who you spoke to?
7      A    I do not.
8      Q    Okay.
9           Okay.  Going back to the planning the
10  visit.  So, did you and Chris decide to meet up prior
11  to going to Lunada Bay in January of 2016?
12     A    Meet up where and when?  Your question
13  is --
14     Q    I'm sorry.  Vague.  Okay.
15          With regard to your visit to Lunada Bay
16  with Chris Taloa, did you meet up with him on the day
17  prior to going to Lunada Bay?
18     A    On the day prior to going to Lunada Bay?
19     Q    Yeah, not the day prior.  The day that
20  you went to Lunada Bay, did you meet with him before
21  you got to Lunada Bay?
22     A    No.
23     Q    Okay.
24          Did you meet at Lunada Bay?
25     A    We met at the bay.

Page 86

1      Q    Okay.
2           Where did you meet him?
3      A    On the street near the rocks.
4      Q    Okay.
5           In the complaint, it says that Spencer
6   and other surfers had to pay a security guard $100 to
7   watch their vehicles to protect the vehicles from
8   vandalism while they surfed.  Is that true?
9      A    That's true.
10     Q    And how did you know you had to pay a
11  security guard $100 to watch your vehicles to protect
12  the vehicles from vandalism while you surfed?
13     A    Well, Chris suggested that it would be a
14  good idea that we pay a security guard, you know, $100;
15  that we could all chip in towards the $100.  So, I
16  chipped in $20.  How did -- I guess you're asking -- it
17  wasn't a had to, but we felt we had to if we wanted our
18  stuff -- there was no toll booth to go through to pay
19  this security guard, or it wasn't a requirement to take
20  them there.  We felt we had to so that our stuff was
21  safe.  Does that make sense?
22     Q    Sure.  And this was Chris' suggestion?
23     A    Yes.
24     Q    Okay.
25          If Chris had not suggested paying a

Page 87

1   security guard, would you still have gone?
2      A    No.
3      Q    Okay.  So paying the security guard was
4   a requirement for you to visit Lunada Bay that day?
5      MR. FRANKLIN:  Misstates the prior testimony;
6   vague and ambiguous.
7      THE WITNESS:  He didn't require it, no.  Is
8   that what you're getting at?
9      MS. HEWITT:  No.  I think maybe it's not coming
10  across.
11     Q    I think you just testified that you
12  would not have visited Lunada Bay --
13     A    I would not have felt comfortable
14  leaving my car without somebody watching it.
15     Q    Okay.  So for you --
16     A    I would not have felt comfortable
17  without him, the security guard, without his presence,
18  that I would -- I didn't feel confident that I would
19  come back to a complete and full, intact car.
20     Q    Okay.  So, in your mind, you were not
21  going to go surf Lunada Bay in January 2016 unless you
22  had a paid security guard watching the vehicles; is
23  that correct?
24     MR. FRANKLIN:  Misstates prior testimony.
25     THE WITNESS:  If we didn't have either a paid

Page 88

1   security guard or a trusted friend or friends or
2   somebody that we trusted to watch the cars, I would not
3   have gone surfing.
4   BY MS. HEWITT:
5      Q    All right.  And why is that?
6      A    Going back to the past 30 to 40 years of
7   common knowledge in the surfing community and what has
8   happened; what's been documented to happen, I didn't
9   want to become a victim to what has happened in the
10  past.
11     Q    All right.  So, going back to the common
12  knowledge again here, did any of that common knowledge
13  come from Chris?
14     A    Yeah.  We -- we talk about what they do
15  down there.
16     Q    Okay.
17          Tell me all the conversations you've had
18  with Chris about what they do down there.
19     MR. FRANKLIN:  Vague and ambiguous.
20     THE WITNESS:  I can't do that.
21  BY MS. HEWITT:
22     Q    All right.  Well, tell me the first time
23  he told you what they do down there.
24     A    Well, I mean, we discuss the need -- I
25  guess that would have been in discussions on why would

Page 89

23 (Pages 86 - 89)

1  we need the security guard, on the phone prior to us
2  going down there, I would say, I guess, the week
3  before.
4      Q    Okay.
5          What did you discuss in that call with
6  Chris that made you have a personal requirement where
7  you wouldn't go down there to Lunada Bay to surf unless
8  you had someone watching your car?
9      A    We just discussed what goes on down
10 there and why it would be a good idea to have somebody
11 watch it, you know, just because of the vandalism
12 that's gone on.
13     Q    Okay.  Yes, exactly.  So tell me exactly
14 what you discussed in that conversation --
15     A    I don't recall specifically.
16     Q    -- that would relate to vandalism?
17     A    Just -- just in general.
18     Q    What in general?
19     A    What goes on there in general.
20     Q    Well, that's what I'm trying to figure
21 out, and I'm not trying to be -- I'm not trying to be,
22 you know --
23     MR. FRANKLIN:  Argumentative?
24 BY MS. HEWITT:
25     Q    -- argumentative or anything.  I just
Page 90

1  want to find out here what it is he told you, and you
2  keep telling me what all those --
3      A    I don't remember specifics.
4      Q    Let me just finish.
5          I want to know what all goes down there.
6      A    You want to know what all goes down
7  there?
8      Q    I want to know what he told you.
9      A    Slashed tires; broken windows.
10     Q    Sir, I want to know what it is he told
11 you -- Chris told you, specifically.
12     A    I can't recall specifics.
13     Q    Okay.
14          Did he tell you he'd ever experienced
15 any vandalism at Lunada Bay?
16     A    I don't recall if he experienced
17 vandalism specifically to him.  No, I don't recall
18 that.
19     Q    Okay.
20          Did Chris tell you he ever experienced
21 any intimidation at Lunada Bay?
22     A    Yes.
23     Q    Okay.
24          What did he tell you he experienced with
25 regard to intimidation?
Page 91

1      A    I -- I recall from Chris a story where
2  -- and I don't recall what family member of his was
3  pretty brutally beat up by some of the Bay Boys, and
4  that's kind of what had sparked his movement to go down
5  there and, basically, peacefully take over the bay and
6  I -- you know, I don't remember specifics about the
7  assault or what had happened to his family member, but
8  I know that was kind of his -- his point -- his turning
9  point in deciding to go down there and do something
10 about it.
11     Q    And is this something he told you about
12 the assault?
13     A    Oh, yeah.  I -- and like I said, I don't
14 remember, but it was either a cousin, an uncle, or
15 somebody was beat up.
16     Q    Right.
17          Is this something he told you in
18 conversation with you?
19     A    Yes.
20     Q    Okay.
21          In that conversation a week before you
22 went to Lunada Bay?
23     A    Oh, in the week before?  Yes.  Yeah, we
24 discussed that.
25     Q    Okay.  And was that the first time you
Page 92

1  had ever heard about that assault?
2      A    Yes.
3      Q    All right.
4          Prior to that time, that conversation
5  with Mr. -- with Chris Taloa a week before you went to
6  Lunada Bay in January 2016, had you ever heard any
7  specific accounts of any assaults at Lunada Bay?
8      A    Prior to that, not any specifics.  And
9  post going there, I've seen news clips of old footage
10 of assaults.
11     Q    Okay.
12          Prior to your conversation with
13 Mr. Taloa a week before you went to Lunada Bay in
14 January of 2016, had you ever heard any specific
15 accounts of anybody experiencing vandalism?
16     A    I don't -- I don't know who they were or
17 what; but people have told me that, you know, they've
18 had vandalism occur to their cars and I don't -- I
19 can't give you specific names or times or incidents,
20 no.
21     Q    Just to be clear, that's before January
22 of 2016?
23     A    Yes.
24     Q    Somebody -- people have told you
25 specifically that they experienced vandalism at
Page 93

24 (Pages 90 - 93)

1  Lunada Bay?
2      A     Yes.
3      Q     Okay.
4            About how many people?
5      A     I don't recall.
6      Q     And did they tell you --
7      A     Lots.
8      Q     Okay.
9            Did they tell you what specifically
10  happened to them?
11     A     Slashed tires.
12     Q     I'm sorry.  Go ahead.  I interrupted
13  you.
14     A     Go ahead.
15     Q     Okay.
16           How many people told you they
17  experienced slashed tires?
18     A     Many.  I don't recall.
19     Q     Did these people tell you they filed
20  police reports?
21     A     Not -- I don't recall anybody that I've
22  spoke to saying specific police reports being filed.
23     Q     And these people that told you about
24  getting their tires slashed, where did you come into
25  contact with these people?

Page 94

1  that.  They -- they know things that have happened to
2  them, their friends, their family, and they share those
3  stories with you; so, I don't know who these people
4  are.
5      Q     And you don't know if the stories are
6  true; right?
7      MR. FRANKLIN:  Argumentative; vague and
8  ambiguous.
9      THE WITNESS:  I can't testify.  I can't -- you
10  know, if I don't have personal knowledge, I, of course,
11  can't say that they're true or not.
12  BY MS. HEWITT:
13     Q     So the people that you're aware of that
14  told you that they had their tires slashed, do you have
15  any understanding of whether they could be part of the
16  class in this matter?
17     A     Well --
18     MR. FRANKLIN:  Calls for a legal conclusion.
19     THE WITNESS:  Anybody who wants to access the
20  beach can be part of the class if they feel they have
21  been denied access there or have been harassed or
22  assaulted.
23  BY MS. HEWITT:
24     Q     How about these people who told you that
25  they had tires slashed at Lunada Bay?

Page 96

1      A     Just around the beach.
2      Q     Which beach?
3      A     All beaches.  I don't mean to be
4  argumentative myself, but the surfing world is very --
5  you're in the water.  You're surfing, and you just talk
6  to people.  You come and go, and you might not see them
7  for months or weeks on end; and, then, you see them
8  again in the water, and you start talking to them.  You
9  know, it's just -- it's very vague and ambiguous.
10  Sorry.  But that's -- you just -- you just talk to
11  people, and you find out things.
12     Q     Did you make an effort to go back and
13  talk to any of these people who told you that they
14  experienced slashed tires and go back and tell them
15  about this lawsuit?
16     A     Go back?
17     Q     Or go find them and tell them?
18     A     Since I can't really recall who they
19  were, no.
20     Q     Do you remember the beaches you heard
21  this at?
22     A     Definitely El Porto, talking to various,
23  you know, people.  I mean, I can go back to Tom.  I
24  mean, you know, Tom is the guy that's been around
25  El Porto for years; and, you know, just people like

Page 95

1      A     Oh, they'd be prime.  I'm sure they'd be
2  prime people.
3      Q     Are you planning to make any efforts to
4  identify them?
5      A     I don't know who they are, ma'am.
6      Q     All right.  And Tom Blair -- you just
7  mentioned Tom Blair again.  Did he tell you that he had
8  his tires slashed?
9      A     No.
10     Q     Okay.  I misunderstood.
11           Okay.  All right.  So, who located the
12  security guard that went with you in January of 2016?
13     A     It was a friend of Chris'.  I don't know
14  his name.
15     Q     Friend of Chris'; okay.
16     A     Chris said he worked security.  He's
17  very competent; so, I was going on trust and belief
18  that that was the case.
19     Q     Okay.  And did the security guard meet
20  you at Lunada Bay?
21     A     He came with Chris.
22     Q     Oh, he came with Chris.  Okay.
23           All right.  And so, as far as you know,
24  Chris would have his contact number?
25     A     Yes.

Page 97

25 (Pages 94 - 97)

1     Q     You don't remember a name or anything
2  like that?
3     A     I don't remember a name.
4     Q     Okay. Fair enough.
5           All right. So, the next sentence in the
6  complaint starting at the end of 17, sir, and going to
7  18 states (as read):
8           "Upon arrival, members of the
9           Defendant LUNADA BAY BOYS told him, 'you
10          can't surf here kook.'"
11          Okay. About how long after you arrived
12 do you recall that occurred?
13    A     Almost instantaneously after you get
14 your boards; so, after we arrived, I would say,
15 approximately, within 20 to 30 minutes.
16    Q     Okay.
17          Were you already getting ready to surf?
18    A     Yes.
19    Q     Okay. All right. And, then, I forgot
20 to ask you. You said, "when we arrived." Who was the
21 "we"?
22    A     Chris and security guard --
23    Q     Okay.
24    A     -- guy.
25    Q     So, in the end, it was just you two? It

Page 98

1  wasn't the six to eight?
2     A     Not in the beginning, no.
3     Q     Okay. So, when you went down to prepare
4  to surf, it was you and Chris and the security guard?
5     MR. FRANKLIN: Misstates testimony.
6  BY MS. HEWITT:
7     Q     Is that right? Or if it's wrong, go
8  ahead and tell me.
9     A     Chris and I and the security guard.
10    Q     Okay.
11    A     Yes.
12    Q     And did the security guard stay by the
13 cars?
14    A     He stayed up with the cars.
15    Q     Okay. All right.
16          When you first got to the beach that day
17 and you're getting ready to surf, and you heard someone
18 say, "You can't surf here kook," were you able to
19 understand or were you able to identify who said that
20 to you?
21    A     No.
22    Q     Okay.
23          Did you see a group of people from whom
24 it came from?
25    A     A group of people?

Page 99

1     Q     Did you tell the direction where it came
2  from or anything like that?
3     A     To my north.
4     Q     Okay. But you couldn't tell who said
5  it?
6     A     No.
7     Q     Oh, okay. I see.
8     A     It's -- it was kind of sunrisie, dawn.
9     Q     Okay.
10          When you first got down to the beach,
11 could you see any other people there?
12    A     There was a few people, and I'm assuming
13 members of the Bay Boys at the -- way out at the point
14 on the fort.
15    Q     About how many people -- I'm sorry. Did
16 I interrupt you?
17    A     I couldn't recall a specific number but
18 just a few.
19    Q     More or less than five?
20    A     I would say right around five.
21    Q     Okay. And about how far were you from
22 those -- those people when you heard the, "You can't
23 surf here kook"?
24    MR. FRANKLIN: Assumes facts not in evidence.
25    THE WITNESS: Yeah, I didn't first hear that up

Page 100

1  on the beach. That was up on the bluff.
2     MS. HEWITT: Oh, my mistake.
3     THE WITNESS: It's almost from the time you're
4  leaving your car. It started well before the beach.
5     MS. HEWITT: Okay.
6     Q     Did you feel that it was directed
7  towards you and Chris?
8     A     Yes. We were the only ones, other than
9  maybe a few other guys up on the bluff, who didn't seem
10 to be getting called names or telling them that they
11 can't surf there; so, yes, it was directed at us, in my
12 opinion.
13    Q     Okay. All right.
14          What did you do right after you heard
15 that statement?
16    A     I made it a point -- and this is based
17 on conversation with Chris prior to even going there --
18 that we were going to just ignore any comments and just
19 go about our business trying to get to the beach safe;
20 out in the water safe; surf safe; and just ignore any
21 comments; any, you know, mad, hard looks, you know,
22 anything like that; and, so, that's what I did.
23    Q     So what did you do in order to
24 accomplish that?
25    A     What -- just ignore them.

Page 101

26 (Pages 98 - 101)

1     Q     Okay.
2           Can you tell me what you did up until
3   the point when you were on your second wave?
4           MR. FRANKLIN:  Vague and ambiguous.
5           THE WITNESS:  What do you mean?
6   BY MS. HEWITT:
7     Q     So you heard the statement, "kook"?
8     A     Okay.
9     Q     And you said you were going to ignore
10  them?
11    A     And several others.
12    Q     What were the other things that you
13  heard?
14          MR. FRANKLIN:  Calls for a narrative.
15          THE WITNESS:  Let's see.  Specifically, you
16  know, "How many other places did you pass to get here
17  to surf?"
18          Can we say expletives or --
19          MS. HEWITT:  Sure.
20          THE WITNESS:  You want --
21          MS. HEWITT:  Sure.
22          THE WITNESS:  You know, why -- basically, "Why
23  don't you fucking go home, you fucking kook"; and I
24  mentioned already, "How many other good places did you
25  pass to come here?"  Those are the ones that stand out.

Page 102

1   specific individual, who I could identify.  I don't
2   know his name.  Same things.  It was more of a -- more
3   of a closer, I guess, encounter with the same language
4   all the way down the trail; jumping into the water;
5   same individual just keep, you know, heckling.
6     Q     And when you say you could identify them
7   but you don't know their name, do you mean you can
8   describe what they look like?
9     A     This guy, I can describe what he looks
10  like.
11    Q     Okay.
12          What did he look like?
13    A     He was a male white, probably 45 to 50
14  years old; around six foot; one -- probably 185; black
15  wetsuit and a hood and a colorful surfboard that was
16  attached to his arm -- meaning he was holding it,
17  yellow, orange, blue; and I saw him prior to that --
18  so, I saw that same figure, not knowing if it's
19  specifically him but on a good guess, with the same
20  board, that that guy was walking across the bluff is
21  when he first picked up on us, and he was fully
22  clothed, light-blue sweatshirt with a hood, blue jeans,
23  tennis shoes, and I don't recall if he had a hat or
24  not, but dark hair.
25    Q     Okay.  All right.

Page 104

1   BY MS. HEWITT:
2     Q     Were there others?
3     A     There may have been.
4     Q     And did these all occur within those 20
5   minutes?
6     A     Yes.
7     Q     Okay.
8           Did any --
9     A     That's how it is when you go there.
10    Q     Okay.
11          Did anything else occur in those first
12  20 minutes after you arrived at Lunada Bay that caused
13  fear?
14          MR. FRANKLIN:  Vague and ambiguous.
15          MS. HEWITT:  Well, actually, I'm going to
16  withdraw that.
17    Q     Did these statements cause fear for you?
18    A     Yeah.
19    Q     Okay.
20    A     Yes.  Sorry.
21    Q     Did anything else occur in the 20
22  minutes that caused fear for you?
23    A     Yes.
24    Q     What was that?
25    A     More -- more of the same statements by a

Page 103

1           Anything else occur in those first 20
2   minutes that caused you fear?
3     A     No.  That was -- that was it.  The name
4   calling and the telling us to get out of there, and
5   that was all that I can recall now.
6     Q     Okay.
7           Between the end of that first 20 minutes
8   and the time when you were on your second wave of
9   Lunada Bay, did anything else occur to cause you fear?
10    A     Yes.
11    Q     Okay.  What was that?
12    A     A very uncomfortable feeling when the --
13  who I now know -- did not know at the time -- was
14  Defendant Blakeman paddling around myself and Chris
15  and, more specifically, Chris in a very tight circle;
16  blocking Chris from getting any waves; never saying a
17  word; just looking -- staring at both he and I.  That
18  was a little weird; fearful.  I've never experienced
19  that before in my life in the water like -- kind of
20  like a circling you like a shark.  You know, it was
21  weird -- just weird.
22    Q     Okay.  And was that during while you're
23  getting ready to catch a first wave?
24    A     Yeah -- yes, from --
25    Q     Okay.

Page 105

27 (Pages 102 - 105)

1      A      -- basically, the time we got in the
2  water.
3      Q      Okay.
4              Anything else up until the time of your
5  second wave?
6      A      Same comments from the original guy I
7  described, talking to -- they were talking to some guys
8  on the point in the fort back and forth; and, then, a
9  couple guys in the water, one of them being Blakeman
10  and I don't -- I just know they were talking to each
11  other. They were -- it was like you could tell they
12  knew each other.
13      Q      Okay.
14      A      And that was, again, a little
15  unsettling.
16      Q      Okay.
17              In the next sentence, it says, "Once in
18  the water ..." -- looking at your -- at the complaint
19  (as read):
20              "Once in the water, on his
21              second wave at Lunada Bay, a member
22              of Defendant LUNADA BAY BOYS intentionally
23              ran Spencer over with his surfboard and
24              sliced open Spencer's hand."
25              Is that true?

Page 106

1      A      Yes.
2      Q      All right.
3              Which hand was that?
4      A      The right wrist.
5      Q      Okay.
6      A      With about a half-inch scar.
7      Q      Do you mind showing it to me?
8      A      Right there.
9      Q      Okay. Okay. Thank you.
10      MR. WORGUL: Do you mind if I take a picture of
11  it?
12      THE WITNESS: I'd have to refer to counsel.
13      MR. FRANKLIN: That's fine.
14      THE WITNESS: Go ahead.
15      MS. LUTZ: Sorry. Can I see? Thank you.
16      MR. WORGUL: Mr. Spencer, if you don't mind.
17  And could you just take the pen and just point to where
18  it is so we can know right where you're showing us?
19              (Whereupon, the witness complies.)
20      MR. WORGUL: Okay. Thank you.
21      THE WITNESS: Uh-huh.
22      MS. HEWITT: Thank you, Mr. Spencer.
23      THE WITNESS: Yep -- yes.
24      MS. HEWITT: All right.
25      Q      How did you determine that somebody

Page 107

1  intentionally ran you over with the surfboard?
2      A      Well, how did I determine somebody
3  intentionally?
4      Q      Well, that's a bad question. How do you
5  know that the person who ran you over with the
6  surfboard intentionally did that?
7      A      I'm not in his brain; but I have surfed
8  for, you know, 30 years, and you can tell when somebody
9  locks eyes with you and is on one path, and they
10  specifically move their board and maneuver their body
11  to make their board go on another path that's directly
12  at you when they could go the more safer, more better
13  part of the wave being closer to the more critical part
14  of the wave, which is more enjoyable to surf than
15  aiming towards somebody paddling out to get back out to
16  the lineup. In my mind, I determined that, hey, this
17  guy tried to run me over.
18      Q      Okay.
19      A      That's how I determined it.
20      Q      And what part of the surfboard cut your
21  hand?
22      A      It would be one of -- not knowing which
23  one, the right or the left, of a -- I'm trying to
24  describe it for the court reporter and you, but it
25  would be a thruster setup or a three-scag model

Page 108

1  surfboard, a surfboard having three fins or scags on
2  the bottom. I don't know which of those three traveled
3  over my right wrist and slit it open.
4      Q      Okay.
5              When -- right after that occurred, what
6  was the next thing that you did? Or, rather, what did
7  you do?
8      A      Well, I don't know how to -- we're not
9  describing how I got to that point, though.
10      Q      No. Right after your hand was cut, what
11  was the next -- what did you do?
12      A      After my hand was cut?
13      Q      Yes.
14      A      I continued paddling on my path to get
15  out to the lineup.
16      Q      Okay. So this occurred --
17      A      With that individual who ran -- just ran
18  me over; start berating me with comments of, you know,
19  "What are you" -- "What are you fucking doing out here?
20  I told you to go home. I should have ran you over.
21  Why are you paddling in the sun glare where I can't see
22  you?" And that's it. "I should have ran you over."
23      Q      Did you get knocked off your surfboard?
24      A      So now we're backing up to the point --
25      Q      Correct, we are.

Page 109

28 (Pages 106 - 109)

Page 110

```
 1        A   Okay.  So once we locked eyes and I saw
 2   him veer and steer his board in my direction to -- to
 3   run over myself, I was paddling west out to the ocean.
 4   He was coming in east towards the shore, and I rolled
 5   off the left side of my board, and my hand was up --
 6   left high up on top of my board, and that's when he ran
 7   over the wrist.
 8        Q   Okay.
 9            Did you continue to surf after that
10   occurred?
11        A   Yes.
12        Q   Did you say anything to the person whose
13   surfboard cut your hand?
14        A   After he made the comment that, "I
15   should have ran you over," I says, "Well, you did," and
16   I held up my hand and showed him, and that's when he
17   said, you know, "Why are you paddling where I can't see
18   you?  You shouldn't paddle in the sunlight," stuff like
19   that.  Then I kept paddling off.
20        Q   Were you fearful of being further
21   injured after that point?
22        A   That's an understatement.
23        Q   So is the answer yes?
24        A   Yes.
25        Q   Okay.
```

Page 111

```
 1            Did you feel that what had occurred to
 2   you getting your hand cut and the way it happened was a
 3   crime?
 4        A   I know it was a crime.
 5        Q   Did you tell him it was a crime and that
 6   you were a police officer?
 7        A   I did not.
 8        Q   Why not?
 9        A   The way his explanation was going down
10   the road of, basically, avoiding taking any
11   responsibility for his actions; blaming it on the sun;
12   blaming, you know, me paddling where I'm not supposed
13   to be paddling -- I was paddling exactly where you're
14   supposed to paddle to avoid injury; to avoid conflict
15   with any other surfers.  I was paddling back to the
16   channel, which basically gets away from the critical
17   part of the wave, which is where he should have been
18   surfing when he redirected his path to run me over.
19            You know, in my opinion, yeah, it was a
20   crime.  Did I report it?  It's going to be with no
21   witnesses there; no police officers in the water, as
22   there could have been; no police officers down on the
23   beach, as there could have been; on the fort, as there
24   could have been; nothing to corroborate my story, it
25   would have been a "He said ..."; "He said ..." go
```

Page 112

```
 1   nowhere thing.
 2        Q   Do you feel that was the case even
 3   though you're a police officer?
 4        A   I don't get it.
 5        Q   Did you think that your -- your
 6   recitation of what had happened would carry more weight
 7   since you're a police officer?
 8        MR. FRANKLIN:  Calls for speculation.
 9        THE WITNESS:  You know, when I'm not on duty,
10   the best thing I can be is a good witness, and that's
11   how I've lived the last 20-some years.  I don't -- I
12   don't ever throw out off duty that I'm a police
13   officer; that you should treat me any different than
14   anybody else in the public because I'm a police
15   officer, and I didn't throw it out then.  I didn't see
16   a need to.  I didn't think that it would do any good
17   after the damage that was already done.  You know, in
18   retrospect, you know, I don't know.  It still would
19   have been a "He said ..."; "He said ..."; and I don't
20   see the need to engage that type of violent behavior
21   any more than it had already played out here.  The
22   best thing I thought I could do is paddle out like I
23   did and just get away from him.
24        MS. HEWITT:  Okay.
25        Q   Did you, at that point, have any fear
```

Page 113

```
 1   that the same thing would happen to your friend, Chris?
 2        A   Yeah -- yes.
 3        Q   Okay.
 4        A   It came alive.  All those stories of 30
 5   or 40 years just happened.
 6        Q   And given that you had that fear, did
 7   you consider that in order to avoid it potentially
 8   happening to Chris, that, perhaps, you should take some
 9   actions as a police officer -- and I think you said
10   that you felt it was a crime -- to prevent that from
11   happening to Chris?
12        MR. FRANKLIN:  Vague and ambiguous.
13        THE WITNESS:  I felt the best plan of action
14   was to stay clear of these guys, especially since they
15   just assaulted us.  I've got no radio.  I've got no
16   handcuffs.  I've got no gun; no bullet-proof vest.  I'm
17   not a police officer out there.  I'm a citizen; okay?
18   And the best plan of action was to avoid them; and that
19   was almost, I mean, impossible, when you got a guy
20   circling around you -- not the guy that ran me over but
21   they're all -- they all know each other, and here's the
22   guy that just injured me.  He knows his buddy is
23   circling my friend; and, so, it's like let's get out of
24   here; so we caught one more wave after that; and, then,
25   we decided that was -- it's getting too crazy out here,
```

1 and more and more started showing up on the fort.
2 BY MS. HEWITT:
3     Q     More and more what?
4     A     Bay Boys.
5     Q     Bay Boys?
6     A     Yeah.
7     Q     Okay.
8         How about the other people that were
9 supposed to come with you that day? Did they ever
10 appear?
11    A     So, after we got out of the water, there
12 were -- and Chris knows all these guys. There was
13 probably maybe six more -- six more people up top that
14 were, you know, supposed to come out with us early, but
15 some guys have different ideas of early; so ...
16    Q     Okay.
17        So after the second wave, you -- you and
18 Chris got out of the water; is that correct?
19    A     Third. I caught one more. I don't
20 know. Chris caught a lot of waves. Before I would say
21 maybe -- I don't know how many he got. Probably double
22 what I got. I got three; so, maybe he got more. I
23 don't know. But after my third one is when we got out.
24    Q     So after your hand was cut, how many
25 more waves did you surf?

Page 114

1     A     One.
2     Q     After you got cut, how many more waves
3 did Chris surf?
4     A     I don't -- I don't know specifically.
5 It wasn't many. I couldn't give you a number. I was
6 kind of -- I was getting a little hypothermic. I was
7 bleeding. I wanted to kind of stay in the cool water
8 at least a little while longer to let the cold help
9 with the cut. I was getting a little frail mentally
10 'cause it was in my -- my fault was having a 10 to
11 12-year-old wetsuit in the middle of winter, and I got
12 cold; getting hypothermic. Now I'm injured, and I was
13 worried about getting one more wave and getting out of
14 there.
15    Q     Did you tell Chris about your injury?
16    A     Yes.
17    Q     And when did you tell him that?
18    A     Shortly after it happened.
19    Q     All right.
20        While you were still in the water?
21    A     Yes.
22    Q     And did Chris tell you whether or not he
23 saw the incident once your hand was cut?
24    A     I don't recall if he saw it or not.
25    Q     When you left the water, did you talk to

Page 115

1 the six more people who were still on top that came
2 later to meet you? Did you talk to them?
3         MR. FRANKLIN: Misstates the testimony.
4         THE WITNESS: Just briefly, introductions. I
5 don't remember any specific conversation other than,
6 you know, "Hi" -- "Hi" type friend of Chris'. Other
7 than that, I -- I don't recall.
8 BY MS. HEWITT:
9     Q     Did any of them tell you that they were
10 verbally harassed or had any of those similar
11 statements said to them?
12    A     On that day?
13    Q     Yes.
14    A     I don't recall anybody saying that on
15 that day, no.
16    Q     Did anybody say that they saw you get --
17 did anybody say that they saw the incident in which
18 your hand was sliced open?
19    A     I don't recall.
20    Q     Did you tell any of those people about
21 that?
22    A     Yeah. Yeah, I believe I showed them all
23 my hand and, you know.
24    Q     What did you tell them about that?
25    A     Just, basically, the incident; what

Page 116

1 happened. I got ran over in the water by one of them.
2     Q     I'm sorry for interrupting. I'm sorry.
3     A     No problem.
4     Q     Did you tell them it was intentional?
5     A     Yeah -- yes.
6     Q     And what did they say?
7     A     I don't -- I don't recall any specific
8 conversation.
9     Q     Did those people go on to surf, if you
10 know?
11    A     I know several that did not. I know --
12 I believe one -- and I don't even know who he is --
13 went. Two, and I don't know if Diana went -- I know
14 two for sure went to surf after I had left.
15    Q     Okay. And who is Diana?
16    A     Another plaintiff.
17    Q     So she was there in January 2016?
18    A     Yes.
19    Q     Okay.
20        Did you know her before that date?
21    A     No.
22    Q     Did you meet her for the first time that
23 day?
24    A     Yes.
25    Q     Okay.

Page 117

30 (Pages 114 - 117)

1        Did you know the names of any other
2   person that was there that day, you know, part Chris'
3   big group?
4       A     Prior to going there?
5       Q     Right now can you tell me --
6       A     I met everybody that day.
7       Q     Okay.
8            Can you tell me the names of everybody
9   that you remember?
10      A     No, I cannot.
11      Q     Besides Diana?
12      A     Oh, that I remember?
13      Q     That you remember.
14      A     Chris Taloa, Jordan Wright, Diana -- I
15  don't know if her name is Milena or Reed or
16  Milena Reed.  I can't remember.  Diana Milena Reed, I
17  believe, is her name; a guy named Kenny.  That's all I
18  can remember.
19      Q     Okay.
20            Had you ever met Jordan Wright before
21  that day?
22      A     No.
23      Q     And did you ever meet Diana again in
24  person?
25      A     Yes.

Page 118

1       Q     Okay.
2            About how many times have you met Diana
3   in person?
4       A     In person?  Including that day, one, two
5   -- I think only three.
6       Q     Okay.  And during any of those meetings,
7   were your attorneys present?
8       A     They were.
9       Q     All right.
10            How many of those meetings?
11      A     I believe just one, to my recollection.
12      Q     Okay.  And the other one and other than
13  this first meeting at the beach, did you discuss the
14  Lunada Bay Boys or localism or anything like that?
15      A     In the other one?
16      Q     Other meeting.  Sorry.
17      A     Not with the attorneys?
18      Q     Right.
19      A     Like discuss specifically?
20      Q     Yeah, talk about it at all; talk about
21  these allegations.
22      A     Not these allegations 'cause we didn't
23  have the claim then.  It was several days after.
24      Q     Okay.  That's -- thank you for
25  clarifying that.

Page 119

1       So you met Diana Milena Reed the first
2   time January 29, 2016.  When is the next time you met
3   her?
4       A     Several days after, and I don't remember
5   how many days after.  But, again, when the waves are
6   good, you're going to go.  However, I didn't surf.  I
7   was -- I designated myself -- so we wouldn't have to
8   pay anybody and I was -- didn't have a good wetsuit and
9   I was injured -- to be the car watcher.
10      Q     Okay.  So we'll get to that in a little
11  bit here.
12            Other than the January 29, 2016 visit to
13  Lunada Bay, did you have any other incidents in January
14  of 2016 at Lunada Bay?
15      MR. FRANKLIN:  Vague and ambiguous.
16      THE WITNESS:  That's correct.  Because --
17  BY MS. HEWITT:
18      Q     Okay.  Related to the claims in this
19  case.  Was there any -- did you experience any
20  harassment or intimidation or vandalism at Lunada Bay
21  other than the January 29, 2016 visit that you
22  described?
23      A     Yes.
24      Q     Okay.
25            When was that?

Page 120

1       A     Again, several days after.  I'm not
2   exactly sure of the day.
3       Q     Well, let me stop you right there only
4   because in the complaint, if you look at the complaint,
5   Mr. Spencer, towards the bottom of page 12, it says
6   (as read):
7            "In February, Spencer returned
8        a second time with Jordan Wright and
9        others ...."
10      A     That would be the day.
11      Q     Okay.  Just backing up to make sure we
12  cover all of January.
13      A     Oh, okay.
14      Q     So were there any other instances or
15  incidents in January of 2016 that you can remember?
16      A     No.
17      Q     Okay.
18            All right.  And, then, going back real
19  quickly to the January 29, 2016 visit, did you witness
20  any harassment or violence towards anybody else other
21  than what you've described with regard to the verbal
22  statements and such?
23      MR. FRANKLIN:  Vague and ambiguous; misstates
24  prior testimony.
25      THE WITNESS:  See, I'm -- I remember an

Page 121

31 (Pages 118 - 121)

1 incident, but I'm not sure now if it's on the
2 January 29th day or the February day. I'm not sure
3 what that second incident was; so. I can't remember
4 if --
5     MS. HEWITT: Okay. We'll --
6     THE WITNESS: I think it was in February.
7     MS. HEWITT: Okay. And I'll make sure to ask
8 you about that.
9     Q    Going back to the January visit, I think
10 earlier you said that you did not --
11     A    It was -- I'm sorry.
12     Q    That's okay. Go ahead.
13     A    It was the January day another --
14 another thing.
15     Q    Okay. Go ahead and tell me what that
16 is.
17     A    That was some interaction -- 'cause I
18 remember I was getting changed; so, I was in the water
19 that day. That was an individual who came up to Chris
20 and started to engage him in some conversation
21 regarding why it is that they -- meaning the Bay Boys
22 -- act the way they do and keep the bay the way they
23 do.
24     Q    All right. So, this is this other
25 person telling Chris those things; is that right?

Page 122

1     A    That's correct.
2     Q    All right.
3         Did you hear any profanity in that
4 conversation?
5     A    Profanity? Yes.
6     Q    Okay. So tell me what -- and did you
7 hear any threats in that conversation?
8     A    No threats.
9     Q    Okay.
10         Did you hear any harassment in that
11 conversation?
12     MR. FRANKLIN: Vague and ambiguous.
13     THE WITNESS: You know, it wasn't directed at
14 me; so, I don't know if he felt harassed or not.
15 BY MS. HEWITT:
16     Q    Did he ever tell you -- I'm sorry. I
17 interrupted you. Go ahead.
18     A    I know if that line of dialogue was
19 directed to me, I think I would feel harassed.
20     Q    Okay. And what dialogue was that?
21     A    It was basically -- it was basically an
22 individual -- and I don't know if you want me to
23 identify him now or you want to ask me.
24     Q    Sure. If you know who that individual
25 is.

Page 123

1     A    So, I didn't know who it was at the
2 time, but it was Defendant Lee came up to Chris and I,
3 as we were changing out of our wetsuits. I mean, it
4 seemed like he started out basically questioning, you
5 know, why do we keep coming back. It's never going to
6 change here. This is the way it's been for, you know,
7 as long as he's been coming there. This is the way
8 it's been for, you know, years. And, then, he wanted
9 to bring up that incident that I'd mentioned earlier
10 where Chris' family member was assaulted, and I
11 remember Mr. Lee telling kind of his personal story,
12 how he became a Bay Boy to Chris; how -- how it is
13 there; how one works their way into, you know, the
14 little -- the gang they have going. He just kept
15 describing, basically, why they enforce it the way they
16 do; and, you know, Chris really was just trying to -- I
17 remember Chris saying, "Hey, we'll talk another time.
18 We'll talk another time," and he just kept coming at
19 him and coming at him, rehashing the same dialogue. It
20 was like, you know, are you trying to overwhelm or, you
21 know, berate me with this stuff or whatever, but it
22 wasn't directed at me.
23     Q    Okay.
24     A    I don't know if he felt harassed, going
25 back to your original question.

Page 124

1     Q    Okay.
2         Now, with regard to what occurred to
3 you, any of the things that you described for that
4 January 2016 visit to Lunada Bay, is it correct that
5 you did not report that to the City of Palos Verdes
6 Estates Police Department?
7     MR. FRANKLIN: Vague and ambiguous.
8     THE WITNESS: Are you talking about my hand?
9 BY MS. HEWITT:
10     Q    Yes, or anything that happened to you
11 that day?
12     A    I did not request a formal police
13 report, no. I did not.
14     Q    Okay.
15         Did you communicate to anybody at the
16 City of Palos Verdes Estates Police Department with
17 regard to what occurred to you that day at Lunada Bay?
18     MR. FRANKLIN: Vague and ambiguous.
19     THE WITNESS: Yes.
20 BY MS. HEWITT:
21     Q    Okay. When was that?
22     A    So, shortly after getting changed, I
23 noticed the group of police officers standing to my
24 south talking with what appeared to be another group of
25 newly-formed Bay Boys.

Page 125

32 (Pages 122 - 125)

1       So, the bay is a bay. There's a north
2  and a south end. The south group had, you know, trucks
3  and cars and guys standing kind of huddled around in a
4  group of guys, and the police officers were kind of
5  towards the south. They weren't right up next to the
6  group. And I did notice that a couple of police
7  officers appeared to be talking with a few members of
8  the group; and, so, I made a point, because there was,
9  in my opinion -- and I don't know if it was directed by
10 my contacts with the captain or whatnot, but I noticed
11 the group of police officers; so, I personally wanted
12 to go over and tell them, you know, "Hey, thanks for
13 showing up," you know. "We appreciate it." You know,
14 and the one younger officer -- I don't know his name.
15 I didn't get any of their names. I, basically, you
16 know, told him what happened to me down there, you
17 know; showed him my hand and -- and I told him, I says,
18 you know, "The guy is going to claim sun glare and
19 whatnot." I just didn't want to -- I knew where it was
20 going to go. "He said ..."; "He said ..."; and, no, he
21 didn't offer to take a report. You know, he didn't ask
22 me to point anybody out. I know you're going to ask
23 all these questions; so, we'll just cut to the chase.
24      Q    He did not offer to take a report;
25 right?

1       A    Right.
2       Q    Okay.
3       A    But, again, I thanked him for being down
4  there, you know, for what I felt a response to my
5  E-mail without knowing for sure.
6       Q    Okay. And you said that you didn't ask
7  for a formal report; is that right?
8       A    That's correct.
9       Q    Okay.
10      A    Just as I stated several minutes ago, it
11 wasn't ...
12      Q    Did you ask for any sort of follow-up
13 action to be taken?
14      MR. FRANKLIN: Vague and ambiguous.
15      THE WITNESS: No, not that I can recall.
16 BY MS. HEWITT:
17      Q    And you said that you showed them your
18 hand, or you told them about your hand?
19      A    No, I showed them. I showed a lot of
20 people my hand.
21      Q    You showed the police officers there
22 that day?
23      A    Like I showed all of you here, I showed.
24      Q    You showed the police officers?
25      A    Yes.

1       Q    Did the police officers have any
2  recommendations for you?
3       A    No.
4       Q    And I'm sorry. Again, because I don't
5  know these things, but is not requesting a formal
6  report, is that the same thing as whether or not you
7  pressed charges?
8       A    Yes.
9       Q    Okay. So you didn't press charges?
10      A    The reason you want a police report
11 taken is because you have a criminal action done to you
12 and you want --
13      Q    Got it.
14      A    -- to have them criminally, you know,
15 prosecuted.
16      Q    Okay.
17      A    That's why we take police reports.
18      Q    Okay.
19           Other than the officers you spoke to
20 that day, did you speak to any other
21 City of Palos Verdes Estates police officers about what
22 occurred on January 29, 2016?
23      MR. FRANKLIN: Vague and ambiguous.
24 BY MS. HEWITT:
25      Q    Let's start -- we'll start with, like,

1  face-to-face communications.
2       A    On that day?
3       Q    At any time.
4       A    So, in the February day, whatever day
5  that was --
6       Q    Uh-huh.
7       A    -- when I was back there, there was a
8  smaller number -- 'cause I sent -- I believe it was
9  just E-mail. Another E-mail, "Hey, we're coming back."
10 And on the February day, there was a smaller group of
11 officers. I think there was only two or three that I
12 saw plus the sergeant, and I recognized the sergeant.
13 He used to work for El Segundo.
14      MS. HEWITT: Okay. All right. The peanut
15 gallery is hungry. I'm sorry. I didn't see the time
16 going by. Are you ready to break for lunch?
17      THE WITNESS: Let's do it.
18      MS. HEWITT: All right. Let's go off the
19 record.
20      (A recess was taken for lunch at
21          12:47 p.m. until 1:42 p.m.)
22 ////
23 ////
24 ////
25 ////

1         Los Angeles, California
2    Tuesday, October 11, 2016, 1:42 p.m.
3         -oOo-
4
5    A F T E R N O O N   S E S S I O N
6
7         (All appearances remain as heretofore
8    noted in addition to Mark C. Fields, Esq.,
9    who has joined the proceedings.)
10
11        EXAMINATION (CONTINUED)
12   BY MS. HEWITT:
13   Q    Going back on the record, Mr. Spencer,
14   welcome back.
15   A    Thank you.
16   Q    We were talking about the January 29,
17   2016 visit to Lunada Bay, and the police presence that
18   you're describing. I think -- I looked at the court
19   reporter's screen. I think you said that there were
20   two to three police officers there, including a
21   sergeant; is that right?
22   A    Not in January.
23   Q    Not in January. Okay. Some other time.
24   Okay. In January, can you describe to me -- can you
25   tell me how many Palos Verdes Estates police officers

Page 130

1    were there?
2    A    I can't give you a for sure number, but
3    it was over the -- over the three that we just talked
4    about. I would say up to five or six.
5    Q    Okay. And did you see any police cars?
6    A    Yes.
7    Q    Okay.
8         Did you see any other police-type
9    vehicles?
10   A    Yes.
11   Q    What were those?
12   A    There was a motorcycle, and I don't know
13   what they call it, but it's equivalent to like we have
14   cadets; so and they -- I'm pretty sure they were in a
15   different color uniform. They weren't officers.
16   Q    Like an explorer?
17   A    Either parking -- not explorer, but they
18   were either a cadet, a police service officer, or like
19   a parking -- I don't recall.
20   Q    Okay. And were the police service/cadet
21   people, are those included in the three to five to six
22   that you saw?
23   A    Yes.
24   Q    Okay.
25        How many police cars did you see?

Page 131

1    A    Probably -- well, approximately, three
2    cars that were actual black-and-whites.
3    Q    Okay.
4         Did you see any other cars that you
5    believe were PVE police that that were not
6    black-and-whites?
7    A    Motorcycles.
8    Q    Okay.
9         How many motorcycles did you see?
10   A    Just one motorcycle.
11   Q    Okay.
12        When you left that day in January of
13   2016, were the police personnel that you just described
14   to me still there?
15   A    Yes.
16   Q    Okay.
17        When you left, did Chris Taloa leave at
18   the same time?
19   A    No.
20   Q    Okay.
21        Do you recall if Diana Milena Reed
22   stayed after you left?
23   A    Yes. I left before anyone else.
24   Q    Okay. All right.
25        Did you communicate to the

Page 132

1    PVE Police Department about the January 29, 2016
2    incident by phone to anybody?
3    A    What incidents?
4    Q    What occurred on January 29, 2016, any
5    part of it?
6    A    In regards to?
7    Q    What occurred to you on that day.
8    A    No.
9    Q    Okay.
10        How about with regard to -- how about by
11   E-mail?
12   A    I don't recall doing so, no.
13   Q    How about by letter, snail mail?
14   A    No. I am advanced enough. I don't
15   really send letters anymore.
16   Q    All right.
17        Did you post on social media of any
18   type --
19   A    No.
20   Q    -- specifically with regard to that
21   date? No?
22   A    No.
23   Q    Okay. And I should have been a little
24   clearer -- go ahead.
25   A    No, social media, no.

Page 133

34 (Pages 130 - 133)

1     Q     Okay.
2           Did you post on any city-related sites
3  Facebook posts? I know you're not on Facebook, but any
4  sort of tweeting at the city, anything like that,
5  telling the city about what occurred on January 29,
6  2016?
7     A     No.
8     Q     Okay.
9           Did you communicate with the city by any
10 other means that I did not go over?
11    A     No.
12    Q     Okay. All right.
13          If we go on in the complaint, still on
14 page 12, at the bottom, it says (as read):
15          "In February, Spencer returned
16       a second time with Jordan Wright and
17       others to observe and watch the outsiders'
18       cars parked on the bluff."
19          Is that correct?
20    A     That's correct.
21    Q     All right.
22          So Jordan Wright, when was the first
23 time you met him?
24    A     January 29th.
25    Q     Okay. And have you ever talked to

1     MR. WORGUL: Even though a person who is not
2  subject to the privilege was subject of the
3  communication?
4     MR. FRANKLIN: We don't know that.
5     MR. WORGUL: What? Do you guys represent
6  Mr. Wright?
7     MR. FRANKLIN: That's Mr. Wright's decision to
8  make at the time, yes.
9     MR. WORGUL: So, at the time, you did represent
10 Mr. Wright?
11 BY MS. HEWITT:
12    Q     Okay. In February, when you returned to
13 Lunada Bay with Mr. Wright and others, who were the
14 others?
15    A     I know that Jordan Wright; Diana Reed;
16 Chris Taloa. I remember Kenny -- I can't remember his
17 last name -- was there, and there might have been one
18 or two more people that either Jordan or either Chris
19 knew. I don't recall their names or who they were, but
20 just other people that wanted to surf.
21    Q     Okay.
22          How many people altogether? About five
23 to six?
24    A     Let me do the math. Sorry. Yes.
25    Q     Okay. And how did you decide to go to

1  Jordan write since that date or since -- that's
2  confusing. Sorry.
3           Other than in January and in February,
4  as referenced in the complaint, have you ever -- have
5  you ever -- ever met him at some other time?
6     A     Yes.
7     Q     Okay.
8           How many other times have you met
9  Jordan Wright?
10    A     I believe just one other time.
11    Q     And when was that one other time?
12    A     In counsel's office, and I don't recall
13 the date.
14    Q     Do you know if Jordan Wright is
15 represented by your counsel in this matter?
16    A     I know that he is not a lead plaintiff.
17    Q     Do you know if Mr. Wright has retained
18 Mr. Franklin's firm or Mr. Otten's firm?
19    A     I have no knowledge of that.
20    Q     What was said at that particular meeting
21 with Mr. Wright?
22    MR. FRANKLIN: To the extent it happened in
23 Mr. Otten's office, I instruct you not to answer.
24    MR. WORGUL: On what basis?
25    MR. FRANKLIN: Attorney-client privilege.

1  Lunada Bay?
2     A     How did I decide?
3     Q     Good point. Bad question.
4           Why did you decide?
5     A     I knew there was still swell in the
6  water. I knew that Chris still wanted to surf, and I
7  wanted to go help in any way I could, as far as making
8  it a peaceful endeavor and making sure that nothing was
9  damaged, meaning the property and the cars; and I
10 decided to go to watch the property.
11    Q     How did you find out that Jordan and
12 these others were going?
13    A     I think through texting with Chris, just
14 saying, you know, who was going to be there and what
15 day they were going.
16    Q     From the outset, like when you decided
17 -- from the point that you decided to go in February,
18 was it always the case that you did not intend to surf?
19    A     Yes.
20    Q     Okay. So you only intended to go and
21 watch the outsiders' cars parked on the --
22    A     I knew I wasn't going to surf that day.
23    Q     All right.
24          Did you only intend to go to watch the
25 outsiders' cars parked on the bluff?

Hahn & Bowersock, A Veritext Company
800.660.3187

1     MR. FRANKLIN:  Vague and ambiguous.
2     THE WITNESS:  And be a witness if anything
3  happened; watch cars; just kind of -- not protect the
4  area but just, you know, be a witness in case something
5  happened.
6     MS. HEWITT:  Okay.
7     Q    At the time that you went in February of
8  2016, had you retained Mr. Franklin and Mr. Otten?
9     A    I'm sorry.  Repeat that.
10    Q    At the time that you went to Lunada Bay
11 in February of 2016, had you retained Mr. Franklin and
12 Mr. Otten?
13    A    No.
14    Q    At the time that you went in February of
15 2016, had you discussed filing a lawsuit with regard to
16 Lunada Bay with anybody other than your attorneys in
17 this matter?
18    A    No.
19    Q    Okay.  All right.
20         When you arrived at Lunada Bay --
21 withdraw.
22         Did you advise anybody at the
23 City of Palos Verdes Estates about your February 2016
24 visit to Lunada Bay before it took place?
25    A    Forgive me.  Repeat.

Page 138

1     A    No, I didn't feel a need to say anything
2  else to him.
3     Q    Okay.
4         Other than Captain Velez, is there
5  anybody else that you communicated with at the city
6  with regard to your impending visit to Lunada Bay in
7  February of 2016?
8     MR. FRANKLIN:  Vague and ambiguous.
9     THE WITNESS:  At some -- at some point -- and I
10 don't recall when it was -- I had wrote the chief or
11 E-mailed the chief, and I don't know if it was on or
12 before that time you're speaking of.
13    MS. HEWITT:  Okay.
14    Q    When you went in February 2016, did you
15 go by yourself and meet people there?
16    A    Yes.  I met Chris and Jordan and Diana
17 and Kenny.
18    Q    Okay.
19         What happened when you first got there?
20    A    We parked.
21    Q    And what was the next thing you did?
22    A    They got ready to go in the water.
23    Q    And who is "they"?
24    A    Chris, and I believe Jordan.  I don't --
25 I don't recall -- I know more went in the water that

Page 140

1     Q    That's okay.
2         Before you went in February of 2016, did
3  you tell anybody at the City of PVE that you were going
4  to be there in February?
5     A    Yes.  Sorry.  I interrupted.
6     Q    That's okay.
7     A    Yes, I believe I E-mailed the same
8  Captain Velez and told him we'd be out there again.
9     Q    Did you get a response?
10    A    Yes.  And I don't recall what it was.  I
11 think -- something to the effect of, "Thank you for
12 letting us know," type thing.
13    Q    Were you satisfied with the response at
14 the time?
15    MR. FRANKLIN:  Vague and ambiguous.
16    THE WITNESS:  At the time, it was adequate to
17 what I asked for; so, I'd have to answer yes.
18 BY MS. HEWITT:
19    Q    Do you recall feeling any need to follow
20 up with the captain?
21    MR. FRANKLIN:  Vague and ambiguous.
22    THE WITNESS:  Following -- at what point?
23 BY MS. HEWITT:
24    Q    Oh, at that time when you received the
25 first response.

Page 139

1  day, but I don't know if they went at the same time as
2  those guys or later.
3     Q    Did you see Diana go in the water?
4     A    I did not.
5     Q    Okay.
6         Did you see her prepare to get in the
7  water?
8     A    I saw her with a wetsuit on and a helmet
9  and her board.  I think -- I think it was that day.
10    Q    Okay.
11         That day did you talk to Diana at all
12 about Lunada Bay and any localism issues -- can you
13 please mute your phone?  Thank you.  I'm sorry,
14 Mr. Spencer.
15    A    Say that again, please.
16    Q    Sure.
17         Did you talk to Diana at all that day in
18 February about any Lunada Bay localism issues?
19    A    I don't recall specific conversation.
20    Q    Do you recall anything generally?
21    A    Again, it's cloudy.  She -- I don't know
22 if it was that visit when it happened to them or the
23 January visit; but, at one point, I was not there when
24 she was -- went down and was assaulted, and they
25 weren't able to surf because they were basically

Page 141

36 (Pages 138 - 141)

1  assaulted down on the fort, and I can't remember what
2  day that was.
3      Q   Okay.  And you don't remember when she
4  told you that; right?
5      A   No, I don't.
6      Q   All right.
7          When you went in February of 2016, did
8  anybody -- withdraw.
9          Did you, in fact, watch the outsiders'
10  cars parked on the bluff?
11     A   Yes.
12     Q   Did anybody watch with you?
13     A   Not that I recall.  Like I say, I don't
14  -- there's a couple that stayed behind; so, I don't
15  know if they were -- I can only tell what I did.  I
16  don't know if a couple of the guys that were there with
17  the group either stayed behind, and I don't know what
18  they did, if they were watching; but I was specifically
19  there to watch everybody's cars so ...
20     Q   And what did you do in that regard?
21     A   I just sat on the side of the road and
22  watched our property.
23     Q   Okay.
24          Were you harassed while you were
25  watching the property?

Page 142

1      A   You could -- yes.  When people call you
2  the same things they called on the first visit, "kook,"
3  and, you know, "What are you doing?" Same stuff, that's
4  harassment.  I feel I was harassed.
5      Q   Okay.  Just to be -- I'm unclear.  Were
6  you harassed?
7      A   Yes.
8      Q   Okay.
9          Tell me what happened?
10     A   Just name calling.
11     Q   And who called you names?
12     A   I don't know who they are.
13     Q   Where were they?
14     A   Just passersby real slow in their
15  trucks; in their cars; guys standing on the bluff.  I
16  recall on the February date, specifically,
17  Defendant Blakeman constantly circling us, everybody
18  who was out there to surf that was not from there;
19  that's not a Bay Boy; sticking his GoPro in our faces
20  for reasons we could only determine were to identify us
21  to their group so that they would know who we are.
22  I've never had that happen.  Bless you.  And, you know,
23  when you go to a beach and somebody is sticking a
24  camera in your face, is it to --
25     Q   When did --

Page 143

1      A   Who knows?
2      Q   When did that occur?  While you were
3  watching the cars?
4      A   While we were watching the cars; when we
5  arrived; when they were getting out of the water,
6  meaning Jordan and Chris; while we were standing at our
7  cars.  It was just odd.
8      Q   So he stuck a GoPro in your face?
9      A   Yes.
10     Q   Okay.
11          Can you tell me just -- you can
12  demonstrate -- how close the GoPro got to your face?
13     A   Not -- when I say, "in my face," just
14  kind of, you know, even from a distance of this far; so
15  five feet to, you know, 30, 40, 50 feet.  It's just
16  odd.
17     Q   Did you feel threatened by that
18  behavior?
19     A   Of course.
20     Q   So --
21     A   When you show up to a beach and someone
22  that you know is one of the little -- the local
23  controllers/harassers of that place sticking a camera
24  in your face, why is he doing that?  To intimidate you
25  and to make you feel uncomfortable.

Page 144

1      Q   Okay.  So -- and do you know that he was
2  filming?
3      A   I didn't see the red dot record.  I know
4  it was a camera on a -- like a selfie stick.
5      Q   Okay.  Let's go back, then, again.  So
6  you're watching the cars.  All right.  And you said
7  there was name calling, first of all, by passersby in
8  trucks, you said?
9      A   Trucks and cars I said.
10     Q   Okay.
11          Did you recognize any of the drivers?
12     A   No.
13     Q   All right.  So do you know if they were
14  anybody -- if they were any part of the Bay Boys?
15     A   That's --
16     MR. WORGUL:  I'm just going to object.  It
17  lacks foundation as to who the Bay Boys are and what
18  they are.
19     MS. LUTZ:  Join.
20     THE WITNESS:  Repeat the question, please.
21     MS. HEWITT:  All right.
22     Q   With regard to any of the passersby you
23  said were calling you names as you were watching the
24  cars driving by in their trucks, were they anybody that
25  you came later to find out were people that you

Page 145

1  considered to be the Bay Boys?
2      MR. WORGUL:  Same objections.
3      THE WITNESS:  In my opinion?
4      MS. HEWITT:  Yes.
5      THE WITNESS:  The ones that roll by slowly;
6  that don't get called names themselves; that are doing
7  the name calling --
8      MS. HEWITT:  Yes.
9      THE WITNESS:  -- are members of the Bay Boys.
10     MS. HEWITT:  Okay.
11     Q    Did you recognize any of them?
12     A    No.
13     Q    Okay.  And, then, you described Blakeman
14  holding out a GoPro on a selfie stick.  Did anything
15  else occur to you while you were watching the cars that
16  day in February?
17     A    Anything else?
18     Q    Any other harassment; violence?
19     A    No.
20     Q    Okay.
21     Any other incidents of localism?
22     MR. FRANKLIN:  Vague and ambiguous.
23     THE WITNESS:  Well, you know, when they get on
24  their phones as they're passing by in their car; and,
25  then, more and more start to show up, you know, I guess

Page 146

1  that would be localism through their coordinated
2  efforts, if you want to put it that way.
3  BY MS. HEWITT:
4      Q    Oh, I'm not putting it any way.  I'm
5  just asking you.
6      A    But you did put it in such a way did
7  anything else happen?  Well, sure.  They're all on
8  their phones.  Every time they're passing by, more and
9  more start to show up and just magically, after you see
10  these guys talking on their phones.  How does -- like I
11  said, the north and the south start to get filled up
12  with guys that don't seem to get harassed.  Is it by
13  magic they show up?  Or, I mean, I don't know.  It's --
14  it's got to be only they're talking to each other.
15     Q    So when you say there's more and more
16  showing up, please tell me what numbers you're talking
17  about and over what time period you saw them start to
18  show up.
19     A    You start out in the morning, again,
20  like I say, it's early.  There's few numbers.  And,
21  then, as the morning grows on, the numbers just grow.
22  The numbers in the water; numbers down on the fort; the
23  numbers of the guys that stand up on the bluff, on the
24  north and south end.  I mean, almost like -- almost
25  like ramparts, you know, to protect the area.  It's

Page 147

1  really odd.
2      Q    How do the numbers grow?  By what
3  numbers?  So, what did they start out with when you
4  first got there; and, then, how did they increase over
5  time?
6      A    I would say from the morning of, you
7  know, starting out with just a few guys up on the
8  bluff, you know, going down to surf, you're looking at,
9  you know, five to six; a couple guys walking alone down
10  the path; a couple guys walking up in pairs.  And,
11  then, by the end of the morning, you know, there could
12  be -- I would estimate on the south end, it seemed to
13  be the larger concentration upwards of 15 to 20 guys
14  there; and, you know, the north seemed a little --
15  that's where Mr. Blakeman was with his camera and a few
16  sporadic, you know, groups; but all in the same general
17  area.  Again, 10 -- 10 to 15.
18     Q    Okay.  And what day of the week was
19  this?
20     A    I don't recall.
21     Q    Do you recall if it was a weekend?
22     A    I don't believe it was.
23     Q    Okay.  And, then, moving on to the next
24  sentence in the complaint -- now we're on the top of
25  page 13, sir.

Page 148

1      A    Yes.
2      Q    Okay.
3      It says (as read):
4      "Spencer observed Defendant
5      LUNADA BAY BOYS threaten and taunt
6      surfers."
7      We discussed Mr. Blakeman's actions.
8  Other than Mr. Blakeman's actions, did you witness any
9  other incidents of the Lunada Bay Boys threatening or
10  taunting surfers that day in February 2016?
11     MR. FRANKLIN:  Asked and answered.
12     THE WITNESS:  Well, I mean, how do I know who's
13  doing the taunting and threatening when it could be all
14  of them, when they're on their phones, and more and
15  more groups, you know, show up to kind of put this
16  stranglehold on the area, in my opinion?  That's
17  taunting and threatening in itself when you have a
18  little goat trail one way to go down there, and you've
19  got two groups of 15 to 20 on each end, and you got a
20  guy going around with a selfie stick and a camera,
21  people -- people yelling at you to fucking get out of
22  there; "Why are you here?  Go home.  Don't surf here."
23  I don't know who they are specifically.
24  BY MS. HEWITT:
25     Q    Well, I'm here to ask you about your

Page 149

38 (Pages 146 - 149)

1 allegations in your complaint here, Mr. Spencer, so --
2    A    And that's what --
3    Q    -- I'm not really casting any aspersions
4 one way or the other. I'm here just to make sure I get
5 all the information about this sentence here so --
6    A    In my opinion, they're all
7 Lunada Bay Boys, and they've all threatened and taunted
8 us by those actions I just described.
9    Q    That's great. That's what I'm trying to
10 find out. I want to find out everything that you've
11 observed because of this allegation you made in your
12 complaint here; so, I want to find out everything you
13 observed that falls under that sentence there.
14    A    I just don't know how to explain more
15 clearly than I did.
16    Q    All right.
17         So, do you feel like you've identified
18 for me all the incidences in which you observed the
19 Lunada Bay Boys threaten and taunt surfers in February
20 2006?
21    A    From my personal knowledge, yes.
22    Q    In February of 2016?
23    A    Yes.
24    Q    Okay. All right. Then, let's move on.
25 It says (as read):

1         "Spencer has complained to
2    PALOS VERDES ESTATES police officers."
3    A    Where are we at?
4    Q    We're on the next line, sir; so, about
5 line 2 to 3.
6    A    On what page?
7    Q    Same page, 13, sir. So you see where we
8 finished?
9    A    I'm at two to three, "Spencer ...."
10    Q    "... has complained ...."
11    A    Okay. Got it.
12    Q    All right. Great. All right.
13         "Spencer has complained to
14 PALOS VERDES ESTATES police officers."
15         So, can you identify for me each time
16 that you have complained to Palos Verdes police
17 officers?
18    A    I guess in -- in a complaint way,
19 meaning, "Hey, can you provide extra patrol because
20 there's problems down there?" It's a number of E-mails
21 I sent requesting that and describing to the captain.
22 That would be the best way I can describe is how I
23 complained to them.
24    Q    Is that Captain Velez?
25    A    Yes.

1    Q    Okay.
2         Is there anybody else that you -- I
3 think we've talked earlier. I think you said you
4 believe you E-mailed Chief Kepley?
5    A    Right. And I'm looking at the
6 complaint; so, either I misstated or somebody wrote it
7 down on the complaint wrong. It's 2016, March 4th.
8    Q    Okay. So referring to lines 3 to 5 on
9 the complaint, where it says, "Later, on March 4, 2014,
10 Spencer wrote to Defendant Chief of Police Kepley and
11 encouraged an undercover investigation," that should be
12 March 4, 2016; is that right, sir?
13    A    Correct.
14    Q    Okay.
15         All right. So, on March 4, 2016, you
16 wrote to Chief Kepley?
17    A    Yes.
18    Q    Okay.
19         How did you write to him?
20    A    E-mail.
21    Q    Okay.
22    A    I never spoke to him on the phone.
23    Q    Okay. Thank you. And by March 2016,
24 had you retained Mr. Franklin and Mr. Otten?
25    A    Forgive me. I don't recall the specific

1 date that we made our engagement formal.
2    Q    Do you have an understanding it took
3 place sometime in March of 2016?
4    A    At some point in March, yes.
5    Q    All right. Fair enough. All right.
6         So, what did you write in your E-mail to
7 Chief Kepley on March 4, 2016?
8    A    At that point, I wrote him something to
9 the effect that they might want to do something --
10    MS. HEWITT: Can you please mute your phone?
11 Thank you.
12         Sorry, Mr. Spencer.
13    THE WITNESS: They might want to do something
14 proactive to take care of the problem because at that
15 point I --
16    MS. BELL: That's why I keep asking them, is
17 there news? There's no news. I mean, I know you want
18 to get out of this, and I'm going to get you out of
19 this as fast as I can so --
20    MR. WORGUL: Is this all on the record?
21    MS. HEWITT: Excuse me. Excuse me. You're not
22 muted, and we're hearing a long conversation you're
23 having.
24    MS. BELL: I'm listening right now. Can you
25 hear them?

39 (Pages 150 - 153)

1    MS. HEWITT:  I can hear you.
2    THE WITNESS:  I think she has it reverse muted,
3    and that's bad.
4    MS. HEWITT:  We're hearing some sort of
5    attorney-client privilege.
6    MS. LUTZ:  Yeah.
7    MS. HEWITT:  Again, our apologies, Mr. Spencer.
8    THE WITNESS:  No problem.
9        So, I -- I was in the hopes that, I
10   guess, still in the dreams of them taking care of the
11   problem how I know it could be taken care of; and
12   suggesting to sum up what I remember of my E-mail, to
13   suggest that they take care of the problem that, you
14   know -- I don't -- I don't remember specifically; but,
15   hey, you might -- you might want to take care of this
16   problem because it's like getting a lot of press.  I
17   think I'd been contacted by a couple news outlets by
18   then.  I don't know how, or how they got a hold of me,
19   but I just wanted to compel him and say, "You're a cop.
20   I'm a cop.  Let's take care of this problem.  That's
21   what we do.  That's what we should do."
22       Q    All right.  So, in the complaint, where
23   it says that you encouraged an undercover
24   investigation, in your mind, is that -- did that --
25       A    Where are we at?  I'm sorry.  Oh,

Page 154

1    line 4, yes.
2        Q    That's right.  All right.
3        In your mind, is that statement that you
4    encouraged an undercover investigation, was that also a
5    complaint to the city?
6        A    A complaint or maybe -- apparently, the
7    problem isn't getting taken care of; so, maybe a
8    suggestion on how to take care of the problem.  Let's
9    get it handled.
10       Q    Then, if we look at the next sentence,
11   it says (as read):
12           "Upon information and belief,
13       Defendant Chief of Police Kepley did not
14       take the complaint seriously and took no
15       action."
16       Do you see that?
17       A    I agree to that.
18       Q    All right.
19       So, in your understanding, it's your
20   belief that you complained to Chief Kepley in this
21   March 4, 2016 communication; is that correct?
22       A    Yes, that's fair.
23       Q    All right.  And can you tell me what the
24   complaint was that you made in the March 4, 2016 E-mail
25   -- excuse me -- correspondence or communication?  I

Page 155

1    apologize.
2        MR. FRANKLIN:  Objection to the extent the
3    document speaks for itself.
4        THE WITNESS:  It's right there.  I mean,
5    there's a problem down there.  Let's take care of it.
6    Let's do an undercover investigation.  Let's make it
7    happen.  That's a complaint.  It didn't happen; so, as
8    line 6 says, "and took no action" on what I suggest.
9    BY MS. HEWITT:
10       Q    All right.  So, in thinking back, do you
11   recall if you made any other statements in the course
12   -- in the communication that complained that, perhaps,
13   the city was not doing certain things?
14       MR. FRANKLIN:  Vague and ambiguous.  The
15   document speaks for itself.
16       THE WITNESS:  Yeah, I don't recall specifics
17   right now of what my E-mail had said.
18   BY MS. HEWITT:
19       Q    All right.  And here is the part where
20   I'm a little confused.  Maybe you can help me with this
21   next part here in the complaint.  After it says
22   (as read):
23           "Upon information and belief,
24       Defendant Chief of Police Kepley did not
25       take the complaint seriously and took no

Page 156

1        action.  He said that they have considered
2        various enforcement strategies."
3        In what type of -- how did he respond --
4    or how did he make that response to you if, indeed,
5    that's what happened?
6        A    I don't know if it was either through
7    him or through the captain with a letter.  I don't -- I
8    mean, an E-mail.  I don't know.  I don't recall.
9        Q    All right.
10       As you sit here today, is it correct
11   that you don't know if Chief Kepley actually made that
12   response to you or if it was somebody else?
13       A    Correct.
14       Q    Okay.  And this next set of statements
15   here, it says (as read):
16           "And, he said:  'I have been down
17       the patio on several occasions and talked
18       with various surfers in an effort to educate
19       them on the position we are all in, and what
20       needs to change in terms of acceptable behavior
21       on their part.'"
22       Did Chief Kepley state that to you in
23   any form?
24       A    It could have.  I don't recall.
25       Q    You don't recall if Chief Kepley said

Page 157

40 (Pages 154 - 157)

1 that to you?

2    A    No, I don't.

3    MS. HEWITT:  Okay.  All right.  And, then,

4 let's look at this -- what's the next exhibit?

5    THE REPORTER:  Forty-two is your next exhibit.

6    MS. HEWITT:  Forty-two.  Okay.  Here is 42,

7 which is Bates-stamped CITY1807 for those of you on the

8 phone.

9        (Defendants' Exhibit 42 was marked for

10 identification by the Certified Shorthand Reporter

11 and is enclosed herewith.)

12 BY MS. HEWITT:

13    Q    This is a one-page E-mail that was

14 produced by the city, I think, in response to a

15 Public Records Act request, and it was produced

16 redacted; so, this is how I got it too.

17        Why don't you take a look at that,

18 Mr. Spencer, and tell me if you recognize what's said

19 in that E-mail.

20    A    Yeah, that's the E-mail I sent to him.

21    Q    Okay.

22        The date matches up with what you told

23 us today.  So, let's go through this E-mail.  First of

24 all, the subject line that you chose, "Lunada UC ops,"

25 can you tell me if "UC" referred to undercover.

Page 158

1 had been E-mailing Captain Velez every time you were

2 venturing out on a big swell day?

3    A    On those two days, yes.

4    Q    Okay.  So, you were referring to those

5 two days, January and February of 2016?

6    A    Correct.

7    Q    All right.  So, each time you E-mailed

8 them, is it correct that you witnessed extra patrols

9 being provided?

10    A    Yes.  In my opinion, that's what they

11 were.  The officers were there because, hopefully, in

12 response to my E-mail.

13    Q    All right.

14        You go on to write (as read):

15        "He has been kind enough to

16    respond, and we've been encouraged to

17    see PV officers."

18        Was that accurate?

19    A    Correct.

20    Q    The next paragraph states (as read):

21        "Anyway, several years ago

22    (around 02' or 03') the then chief of

23    PV asked several surrounding agencies to

24    see if officers who surfed would be willing

25    to paddle out 'on duty-undercover.'"

Page 160

1    A    Yes.

2    Q    And "ops" is operations?

3    A    Yes.

4    Q    Okay.  And the first sentence says

5 (as read):

6        "Sir, first of all, I'd like

7    to thank you and your dept. for the

8    response in extra patrols down at

9    Lunada Bay."

10    A    Correct.

11    Q    All right.

12        Did you feel thankful for extra patrols

13 down at Lunada Bay?

14    A    Of course.

15    Q    All right.

16        Next, you say (as read):

17        "I am active law enforcement

18    (ESPD) and have been emailing

19    Capt. Velez every time we (Aloha point

20    Facebook group - a group of non-locals)

21    venture out to the bay on a big swell day."

22        "ESPD," was that El Segundo Police

23 Department?

24    A    Yes.

25    Q    All right.  And was it correct that you

Page 159

1        Is that what we discussed earlier today?

2    A    Correct.

3    Q    Okay.

4        And, then, you write (as read):

5        "I was approached along with

6    a few more of our officers and we were

7    excited to help out.  For reasons unknown,

8    nothing ever materialized.  I think it would

9    be worth another shot and be very effective.

10    I'm sure my chief would assist in letting a

11    few of us that do surf help out should you

12    ever want to try something like that."

13        All right.  Was anything in that

14 paragraph inaccurate?

15    A    No.

16    Q    All right.

17        The next paragraph states (as read):

18        "It really is too hard to observe

19    anything that really goes down there from

20    the bluff."

21        What did you mean by that?

22    A    Assaults; property being dumped in the

23 ocean; defecation on people's property; fights;

24 drinking; alleged drug abuse; all that stuff in the

25 surf community over 30 years, 40 years has been alleged

Page 161

41 (Pages 158 - 161)

1 that goes on down there by unnamed people that I don't
2 know.
3        Q        Did you consider putting that in your
4 E-mail to Chief Kepley?
5        A        I just figured that -- no, I did not.
6        Q        Have you ever told Chief Kepley those
7 things in any form?
8        A        No.
9        Q        All right.
10               Have you ever told any City of Palos
11 Verdes Estates police officer that those -- or anybody
12 affiliated with the PVE Police Department that those
13 things go on down there?
14        MR. FRANKLIN:  Vague and ambiguous.
15        THE WITNESS:  No.
16 BY MS. HEWITT:
17        Q        Then, the next sentence says (as read):
18        "Although, I understand two
19        younger officers actually made their
20        way down to the fort and were actually
21        able to finally witness/document a 415."
22               What's a "415"?
23        A        Basically, a disturbance report.
24        Q        Okay.  And when -- sorry.  Go ahead.
25        A        Just acting in a threatening/harassing

Page 162

1 manner.
2        Q        Okay.  And what was that understanding
3 based on?  I'm sorry.  That was vague.  Let me
4 withdraw.
5               When you say you understand that these
6 two younger officers made their way down to the fort
7 and were actually able to finally witness and document
8 a 415, how did you know that?
9        A        I had learned after I left; and, again,
10 I can't -- I wish I could remember, but either on the
11 January date or the February date is when that incident
12 had occurred.  I had learned after I left that Jordan
13 and Diana had went down there, and there was some type
14 of a -- an assault that officers had witnessed and
15 documented.
16        Q        All right.  So, were you pleased that
17 that had taken place, that the police officers were
18 able to witness/document a 415?
19        MR. FRANKLIN:  Vague and ambiguous.
20        THE WITNESS:  I'd be pleased if they never had
21 to witness and document a 415 incident down there.  I'd
22 be pleased if it was safe for people to go down there;
23 but if it were to happen -- and it did -- was I pleased
24 to find out that finally an officer observed it and
25 documented it?  Yes.

Page 163

1        MS. HEWITT:  All right.
2        Q        Going on to the next sentence, it says
3 (as read):
4        "You know, and I know, the DA" --
5        Is that District Attorney?
6        A        Correct.
7        Q        (As read):  "will most likely
8        reject it, but kudos to them for their
9        descent from the bluff to the beach."
10               Why did you know that the DA would most
11 likely reject it?
12        A        We live in L.A. County.  I deal with the
13 legal system, and it's a reality.
14        Q        What's the reality?
15        A        The District Attorney is overloaded,
16 underpaid, overstressed with caseload; and they don't
17 want to -- the individual DAs I'm sure have very pure
18 intentions, but they're strapped.  And are they going
19 to file this, what they would probably consider petty,
20 in my opinion, of course?  I don't know for sure that.
21 I stated I know it; but, in reality, I don't know what
22 the DA is going to do.  I'm not a DA, but I know what I
23 see; so, I didn't think, and I still don't think that
24 they filed it.  I'm not sure.  I don't -- I didn't
25 follow up with that, but I thought at the time they

Page 164

1 would just reject it.
2        Q        Okay.
3        A        And I was glad, just like I wrote.  It
4 was incredible to actually see a couple younger
5 officers put some weight on the soles of their boots
6 and descend the stairs to maybe take care of a problem
7 that's been going on for 30 years.
8        Q        If you go on to the next paragraph, it
9 says (as read):
10        "Thanks for reading, and
11        possibly considering a UC operation
12        as I've suggested.  As a side issue,
13        I have recently been made aware of,
14        and feel a brotherly sense of duty, to
15        make you aware of some upcoming legal
16        issues [sic] in the works by a very
17        large, non-profit foundation heavily
18        invested in coastal matters (this is
19        separate from the coastal commission
20        thing)."
21               Was that accurate?
22        MR. FRANKLIN:  Vague and ambiguous.
23        THE WITNESS:  As far as my knowledge, I had
24 heard that Surfrider Foundation was very interested,
25 and this was through some reports of in the L.A. Times

Page 165

42 (Pages 162 - 165)

1 author -- and I can't remember who it was -- was saying
2 that the Surfrider Foundation was very interested in
3 taking care of the problem down there.
4 BY MS. HEWITT:
5     Q     At this point in time, March 4, 2016,
6 had you decided to become part of a lawsuit filed
7 against the City of Palos Verdes Estates?
8     A     No.
9     Q     And, then, in that same sentence, where
10 you write, "(this is separate from the coastal
11 commission thing)," what was the "coastal commission
12 thing"?
13     A     There is also -- from what I understand,
14 some efforts by the Coastal Commission to reach out to
15 the City of Palos Verdes, because of the known Bay Boy
16 problem, to improve access to the area; provide funding
17 to -- for the city to, basically, in my opinion, clean
18 up its act and make the public feel welcome there.
19 And, from what I understand, the Coastal Commission was
20 all in favor of anything they wanted to do to improve
21 the site and go so far as to help with funding.
22     Q     How did you become aware of that?
23     A     I think, again, through the L.A. Times,
24 and I read some articles.  It started -- I'd seen some
25 articles in the Times about the Coastal Commission and
Page 166

1 stuff like that through the -- through the Times; and,
2 then, I actually spoke with the Times reporter.
3     Q     And when did you speak to the Times
4 reporter?
5     A     It was sometime, I think, after the
6 February incident that I went down to watch the cars,
7 and I don't recall a specific date.
8     Q     And, then, in that same sentence, when
9 you talk about "brotherly sense of duty," what do you
10 mean by that?
11     A     He's a police chief.  I'm a police
12 officer.  We're in the brotherhood of law enforcement.
13 Nothing more; nothing less.  Just one cop to another
14 cop.  Take care of it.  Here's how you can do it.  I
15 know we wouldn't tolerate it where I work.
16     Q     And the next sentence, where it says
17 (as read):
18           "There are attorneys plotting
19           strategies as we speak, to basically force
20           the city (consent decree type) to make
21           Lunada Bay very 'public access.'"
22           How did you find that out?
23     A     That would be prior to securing counsel.
24 I'd learned what our counsel was -- my counsel and the
25 class' counsel was, basically, interested in providing
Page 167

1 a change down there and opening up access and getting
2 the city forced to take care of the problem.
3     Q     How did -- go ahead.
4     A     And your question was how?  So, some --
5 at some point -- I don't remember the time after -- but
6 I was contacted by a private investigator, who had seen
7 interviews -- interviews or articles.  I don't remember
8 what they suggested but they -- you know, they -- the
9 private attorney -- or the private investigator
10 indicated that there was some attorneys working on the
11 case, and he put me in contact with Mr. --
12 Counsel Otten; and so, then, I contacted Counsel Otten.
13     Q     So would that have been --
14     A     I don't remember dates.  Sorry.
15     Q     Well, given that you were aware of that
16 -- well, let me ask you the question, actually.
17           That information that you just told me,
18 was that information -- is that information upon which
19 you base that sentence on?
20     A     Yes.
21     Q     Okay.  So, is it safe to say -- I don't
22 know -- actually, I'll just ask you.
23           Is it fair to say that you were
24 contacted by Mr. -- by this private investigator prior
25 to this E-mail?
Page 168

1     A     Yes.  Private investigator, yes.
2     Q     And was it the private investigator that
3 put you in touch with Mr. Otten?
4     A     Yes.
5     Q     Okay.  And did that happen before this
6 E-mail?
7     A     Yes.
8     Q     All right.
9           The next sentence says (as read):
10           "This could mean many things
11           (signage, trail improvement, parking,
12           etc...)."
13           Were those your ideas or somebody else's
14 ideas?
15     A     I believe that -- I believe that was
16 some of the recommendations of either the
17 Coastal Commission or the Surfrider Foundation, and I
18 don't recall.  I want to say it was Coastal Commission,
19 but I don't recall where I learned of things that they
20 wanted to do.
21     Q     Did you ever talk to anybody from the
22 Coastal Commission about Lunada Bay at all?
23     A     I -- I don't remember if they were with
24 the Coastal Commission.  I have, but I don't remember
25 their name.  They said they were, at one point, either
Page 169

43 (Pages 166 - 169)

1  on the board or something like that, and I don't know
2  who that was.  From what I remember, I don't think they
3  were currently a member of them, but they used to be.
4  I don't remember who it was.
5      Q    Okay.
6           Put that right to the side because I'm
7  going to ask you some more questions about this E-mail.
8      A    Which one?
9      Q    The one we just looked at.  Yeah, put
10 that off, because I'm going to come back to that.
11 Going back real briefly to the complaint on page 13,
12 following the February 2016 visit to Lunada Bay, did
13 you ever return to Lunada Bay and attempt to surf?
14     A    No.
15     Q    Did you ever return to Lunada Bay and --
16 at all after that time?
17     A    I have, yes.
18     Q    All right.
19          How many times?
20     A    Anywhere from three to five.
21     Q    Okay.
22          On each of those visits, did you go down
23 to the beach?
24     A    No.  Up on the bluff only.
25     Q    Okay.

Page 170

1          Did you intend to surf on any of those
2  three to five times?
3      A    No.  There's no more waves for the
4  season.
5      Q    How many of those three to five times
6  took place in the month of March 2016?
7      A    I don't recall the dates or times that I
8  went back there.
9      Q    Do you recall whether any of them took
10 place in March of 2016?
11     A    I don't recall.
12     Q    Following your February 2016 visit --
13     A    Can I back up?
14     Q    Yes.
15     A    I -- I'm not sure if they would all be
16 -- no, I don't think any were in March.  They were
17 spread out over the next several months.  Sorry.
18     Q    That's okay.
19          So, if the complaint in this matter was
20 filed in March 29th, 2016, is it fair to say that you
21 did not visit Lunada Bay after February 2016 through
22 the date of filing of the complaint?
23     A    I don't recall.
24     Q    At the end of your February 2016 visit
25 -- actually, let me go back here.

Page 171

1      A    When I left --
2      Q    No, sorry.  Let me withdraw that.
3           How long was your visit in 2016 in
4  total?  Like how long did it last?
5      MR. FRANKLIN:  Vague and ambiguous.
6      THE WITNESS:  February?
7      MS. HEWITT:  Yeah.
8      THE WITNESS:  Not more than three hours.
9      MS. HEWITT:  All right.
10     Q    During the entire three hours, were you
11 watching the cars?
12     A    Yes.
13     Q    Did you -- were you outside the whole
14 time watching the cars?
15     A    No.
16     Q    Okay.
17          Where else were you?
18     A    In my car.
19     Q    How long were you in your car?
20     A    Off and on, I can't give you a -- I
21 mixed it up between inside and outside my car.  I don't
22 know.  I couldn't give you minutes.
23     Q    Why did you go in your car?
24     A    To sit down.
25     Q    Okay.

Page 172

1          Did you go in your car at any time
2  because you were afraid?
3      A    No.
4      Q    All right.
5           At any time when you were watching the
6  cars, were you in fear of violence?
7      MR. FRANKLIN:  Vague and ambiguous.
8      THE WITNESS:  It is, because you know -- you
9  don't know what's going to happen when you see guys on
10 cell phones driving by real slow looking at you; and,
11 then, more guys show up.  So was I worried that there
12 could be violence?  Yes, there could have been.
13     MS. HEWITT:  Okay.
14     Q    Were you worried about bodily harm
15 occurring to yourself?
16     A    Yes.
17     Q    And what did you base that worry on?
18     A    Guys on cell phones driving by real slow
19 and more guys showing up after you see them on cell
20 phones.  Kind of crazy at a beach where violence is
21 documented for 40 years.  I based it on my own fear.
22     Q    And this is the fear based on the 30 to
23 40 years of documented violence?
24     A    All the stories and violence and what
25 goes on down there, yeah.

Page 173

44 (Pages 170 - 173)

1    Q    Okay.
2    A    It's crazy.
3    Q    Is it based at all on your January 2016
4  visit?
5    A    I would say of course.  How can it not
6  when you get your hand sliced open?
7    Q    Okay.
8         Was it -- was it based on what or
9  anything you experienced while you were watching the
10  cars other than what you've already told me?
11    A    Yes, the whole totality -- the whole
12  totality of the situation gives you fear.  But, at some
13  point, you got to stand up to people that are acting
14  like bullies and, you know, deal with it.
15    Q    Okay.  So, I'm just trying to write down
16  all these things here.  So, we talked about the 30 to
17  40 years of documented incidents; guys on cell phones
18  driving by and, then, more guys showing up; having your
19  hand cut in January.  Is there anything else that I've
20  missed?
21    MR. FRANKLIN:  Misstates prior testimony.
22    THE WITNESS:  Guys walking around a bluff
23  throwing GoPros in your face and guys knowing --
24  potentially knowing who you are from those pictures
25  that he shares with his buddies, yeah, all that.  You
                                              Page 174

1  laid it out perfectly.
2  BY MS. HEWITT:
3    Q    Did someone throw a GoPro in your face?
4    MR. FRANKLIN:  Argumentative.
5    THE WITNESS:  Okay.  Figuratively from a
6  distance, as we spoke, from five to several feet away;
7  potentially videoing you and recording you without
8  actually seeing the red dot on the camera.
9  BY MS. HEWITT:
10    Q    Okay.  You said guys knowing that from
11  the video that they might know who you are too?
12    A    Of course.
13    Q    Had you ever heard any stories about
14  that, about people at the Lunada Bay videoing other
15  people in order to find out who they are?
16    A    For specific reasons of identifying
17  somebody?
18    Q    For the reasons that you told me.
19    A    No.  I personally have not.
20    Q    Okay.  All right.
21         Did you write to the chief any time
22  after the March 4, 2016 E-mail that we have marked as
23  42?
24    A    I may have.  I don't recall.
25    Q    All right.
                                              Page 175

1         Would you have written any E-mails from
2  any address other than whatever address you sent this
3  E-mail from?
4    A    I don't recall.
5    Q    Did you have E-mail addresses that had
6  your name in them, or did they tend to be E-mail
7  addresses that did not indicate what your name was?
8  You know, some people might say, you know, "cool cop"
9  or something.  Did you tend to have E-mail addresses
10  with your name in it?
11    A    Not that I recall.
12    Q    Okay.
13         Do you remember what E-mail address you
14  wrote to Chief Kepley from?
15    A    I don't.
16    Q    Do you remember what E-mails you were
17  using in March of 2016?
18    A    It would have either been from my work
19  one or Yahoo.
20    Q    What was your Yahoo address?
21    A    It's seaspencer433@yahoo.com.
22    Q    Okay.
23         Did you write to anybody else at the
24  city after this March 4, 2016 E-mail?
25    A    Not that I recall.
                                              Page 176

1    Q    Okay.
2         After the February 2016 visit to
3  Lunada Bay, were you afraid to go back to Lunada Bay?
4    MR. FRANKLIN:  Vague and ambiguous.
5    THE WITNESS:  Yes.
6  BY MS. HEWITT:
7    Q    Okay.  And were you afraid because of
8  all the reasons we've discussed already?
9    A    Yes.
10    Q    Which all took place before the
11  March 4th, 2016 E-mail; correct?
12    A    Correct.
13    Q    Okay.
14         After March 4th, 2016, through the end
15  of March 2016, do you have any recollection of any
16  communications with anybody at the city, any specific
17  recollections?  Communications by any means,
18  face-to-face; phone?
19    A    I don't have any recollection of it.
20    MS. HEWITT:  Okay.
21         Bless you.
22    THE WITNESS:  Bless you.
23    MR. WORGUL:  Thank you.
24  BY MS. HEWITT:
25    Q    Did the city fail to do anything, in
                                              Page 177

45 (Pages 174 - 177)

1  your opinion, with regard to the Lunada Bay
2  allegations, specifically, between March 4th and
3  March 29th of 2016?
4        MR. FRANKLIN:  Vague and ambiguous.
5        THE WITNESS:  Say the dates again.
6        MS. HEWITT:  Sure.
7        Q    We're looking between March 4, 2016; so,
8  the date of your E-mail until March 29, 2016, which is
9  the date that the complaint in this matter was filed,
10  was there anything, in your opinion, that the city
11  failed to do with regard to the allegations in your
12  complaint between that time period?
13        MR. FRANKLIN:  Vague and ambiguous; may call
14  for expert testimony.
15        THE WITNESS:  Yeah.  I believe -- yes.  I
16  believe they -- they're failing to this day, this
17  moment.  The Bay Boys still exist.  There's no access
18  down there.  The public doesn't feel welcome.  The city
19  is ineffective.  I feel that the police could clean
20  this up in two weeks, yes.
21  BY MS. HEWITT:
22        Q    And did that all -- the opinions that
23  you just expressed right now, have those been the
24  opinions that you've held since the first time in
25  January of 2016 that you went --

Page 178

1        A    Yes.
2        Q    -- to Lunada Bay?
3        A    Sorry.  Yes.
4        Q    All right.
5        Specifically, between May 4, 2016, and
6  March -- sorry.  Withdraw.
7        Specifically, between March 4, 2016, and
8  March 29, 2016, do you have any specific recollection
9  of going to Lunada Bay?
10        MR. FRANKLIN:  Asked and answered.
11        THE WITNESS:  I'm hearing clicking; so give me
12  the dates.
13        MS. HEWITT:  Sorry.  It's my pen.  I'm sorry.
14        THE WITNESS:  No, it's feedback on the phone;
15  but give me the dates again.
16        MS. HEWITT:  Sure.  March 14, 2016, the date of
17  your E-mail --
18        THE WITNESS:  Okay.
19        MS. HEWITT:  -- and March 29, 2016, the date
20  that the complaint was filed.
21        MR. FRANKLIN:  Asked and answered.
22        THE WITNESS:  And restate the question.
23        MS. HEWITT:  Sure.
24        Q    Between March 4, 2016, and March 29,
25  2016, do you recall -- do you have a specific

Page 179

1  recollection of going to Lunada Bay?
2        A    Again, I don't remember the actual
3  dates.  I've been there several times after and each
4  time -- each time I went there, it's very uncomfortable
5  when you're approached and even kind of watched from
6  the street by those that you feel that are members of
7  the Bay Boys; so, yes.  You'd feel uncomfortable.  I
8  did.
9        MS. HEWITT:  What was my question?  Maybe I
10  asked a bad question.
11        (Whereupon, the record was read back
12        by the court reporter as follows:
13        "Q  Between March 4, 2016, and
14        March 29, 2016, do you recall -- do you have a
15        specific recollection of going to Lunada Bay?")
16        THE WITNESS:  I don't remember the dates, but I
17  do specifically remember going back at some point after
18  March 4th.
19        MS. HEWITT:  Okay.  Fair enough.
20        Q    Would you agree that in Exhibit 42, the
21  E-mails that we looked at here earlier, you said that
22  -- you said that you felt a brotherly sense of cop to
23  cop with Chief Kepley; is that right?
24        A    That's just how I stated it.
25        Q    All right.

Page 180

1        After this E-mail, was there something
2  that occurred in the next three to four weeks that made
3  you decide you want -- that you went from the sense of
4  having a brotherly relationship with Chief Kepley to
5  wanting to file a lawsuit against Chief Kepley?
6        A    Nothing happened.
7        Q    So was there one specific --
8        A    That's specific.  Nothing happened.
9  Nothing got taken care of.  They still exist.  They
10  were still in existence; so, it's time to take care of
11  the problem.
12        Q    Was there a particular day --
13        A    Not that I recall.
14        Q    -- that you -- just let me finish the
15  question.  Sorry.
16        A particular day after expressing a
17  brotherly sense of duty to Chief Kepley in Exhibit 42,
18  up until the date that the complaint was filed, about
19  three-and-a-half weeks later, that you decided that was
20  enough.  You didn't -- it didn't matter if you had a
21  brotherly sense of duty with Chief Kepley; that you
22  wanted to file a lawsuit against Chief Kepley?
23        A    No specific day that I can recall.
24        Q    All right.
25        Earlier, we talked about your

Page 181

46 (Pages 178 - 181)

Hahn & Bowersock, A Veritext Company
800.660.3187

1  communications with Captain Velez; and, then, we
2  already went over your communications with
3  Chief Kepley.
4      A    Are we done with the E-mail?
5      Q    You can put -- we're going to go back to
6  it. You can put it right there.
7      A    May I get something to drink?
8      MS. HEWITT: Let's go off the record.
9           (A recess was taken at 2:49 p.m.
10          until 2:59 p.m.)
11     MR. FRANKLIN: So, just as a matter of
12  housekeeping, can we determine who is on the phone
13  again? Because we haven't had people check in, and it
14  was unclear to me whether clients might be in the room.
15  Would some of these folks, so just as a matter of
16  housekeeping -- I've heard them come in and out -- can
17  we identify who is on the phone?
18     MS. HEWITT: That's a great idea.
19          Anybody who is on the phone, would you
20  please identify yourself.
21     MR. VOSS: Yeah, this is Matthew Voss of
22  The Phillips Firm, co-counsel for defendant
23  Angelo Ferrara.
24     MR. FRANKLIN: I guess is anybody -- any
25  clients with them?

Page 182

1      MS. HEWITT: Yeah. Does anybody have any
2  clients with them?
3      MR. VOSS: No.
4      MR. OTTEN: Vic Otten here. No client.
5      MS. HEWITT: Anybody else? Ms. Bell? Okay.
6  Anybody else?
7      Q    All right. Mr. Spencer, we earlier
8  talked about E-mails that you sent to Captain Velez,
9  and we talked about one to two E-mails that you sent to
10  Chief Kepley, one that we attached as Exhibit 42, and
11  one I think you said you weren't sure, but I think you
12  did send to Chief Kepley before March 4, 2016. Is that
13  accurate?
14     A    I don't recall.
15     Q    All right.
16          Do you think you sent more than two
17  E-mails to Chief Kepley?
18     A    I don't remember.
19     Q    Do you have a specific recollection
20  about sending him one other than Exhibit 42?
21     A    I do not.
22     Q    Okay. All right. And with regard to
23  Captain Velez, do you have a recollection of sending
24  him any E-mails other than with regard to upcoming
25  visits you were going to have at Lunada Bay?

Page 183

1      A    I don't.
2      Q    Was the last time that you E-mailed
3  Captain Velez with regard to your February 2016 visit?
4      A    Again, may or may not be. I don't
5  recall the last E-mail.
6      Q    Okay.
7           Other than Captain Velez and
8  Chief Kepley, have you communicated with any other
9  City of Palos Verdes Estates Police Department
10  representatives?
11     A    Have I communicated with?
12     Q    Right. Good point. Let's go back.
13          We talked about some that you spoke with
14  in your January 29th, 2016 visit. At the February 2016
15  visit, were there any Palos Verdes Estates
16  Police Department representatives there?
17     A    Yes.
18     Q    Okay. And how many did you identify --
19     A    I think there was only two patrolmen and
20  a sergeant that day; but if there were more, I didn't
21  see them or don't recall.
22     Q    Okay.
23          Did you see any marked police cars in
24  February?
25     A    Yes.

Page 184

1      Q    How many?
2      A    Two or three.
3      Q    Okay.
4           Did you see any motorcycles?
5      A    I don't recall seeing a motorcycle in
6  February.
7      Q    All right.
8           Other than in January and February of
9  2016, did you ever speak to any City of Palos Verdes
10  Estates Police Department representatives in person
11  with regard to Lunada Bay?
12     A    I don't -- I don't recall. I don't
13  recall doing so.
14     Q    Okay.
15          Other than E-mails with Captain Velez
16  and Chief Kepley, do you recall any other E-mail
17  communication with anybody from the City of Palos
18  Verdes Estates Police Department with regard to
19  Lunada Bay?
20     A    I do not.
21     Q    Okay.
22          Do you recall any phone communications
23  with anybody at the PVE Police Department with regard
24  to Lunada Bay?
25     A    Again, I answered that before. I don't

Page 185

47 (Pages 182 - 185)

1  -- I don't remember talking to anybody on the phone. I
2  may or may not have. I don't recall.
3      Q.    Okay.
4          We already talked about that you don't
5  use regular mail anymore. Okay. And I think I asked
6  you this question; but, specifically, with regard to
7  the January 2016, again, with regard to any Lunada Bay
8  issues, have you ever posted or responded to any of the
9  city's social media sites with regard to Lunada Bay?
10     A.    No.
11     Q.    Okay.
12          Other than what we just discussed with
13 regard to your communications with the
14 PVE Police Department, have you ever communicated with
15 any other type of City of PVE employee or
16 representative with regard to Lunada Bay?
17     A.    I had a casual conversation, I believe,
18 on the February day with Sergeant Gaunt on the bluff.
19     Q.    And what did you talk with him about?
20     A.    A lot of it was catching up; seeing how
21 he was doing from when he came back from El Segundo to
22 PV. He used to work for my police department. He knew
23 why we were out there, and I remember him making the
24 statement, you know, "Hey, we're just -- we're just out
25 here to, you know, keep the peace," type thing. "We're
Page 186

1  just out here doing our job," basically. Specifics, in
2  regards to anything that happened to me, I don't recall
3  any conversation.
4      Q.    Did you make any specific complaints to
5  him at that time?
6      A.    Not that I recall.
7      Q.    Now, in your complaint, if we look on
8  page 13 still, Mr. Spencer, towards the end of the top
9  paragraph. We're looking at lines 11 and 12. Do you
10 see that, sir?
11     A.    Okay.
12     Q.    All right. It says (as read):
13          "Defendants' conduct has caused
14          Spencer pain and suffering, loss of sleep,
15          emotional distress, and mental anguish."
16          Is that an accurate statement?
17     A.    Yes.
18     Q.    All right.
19          With regard to the pain and suffering
20 that you allege, can you describe how you have suffered
21 that pain and suffering?
22     A.    Yeah, it's kind of a letdown. You just
23 feel sad that, you know, things that maybe you'd hoped
24 as a human that really weren't happening down there,
25 actually, when they did happen to you, kind of -- I
Page 187

1  don't know. I don't want to say a depression 'cause --
2  but just a sadness, you know, that, hey, it actually
3  happened; and kind of suffered, in the sense of, you
4  know, it just kind of a -- it's kind of a bummer that
5  it happened. You know, I'm -- in my sense, I'm
6  suffering that I'm not able to go enjoy a place that I
7  have a God-given right to go enjoy without being run
8  over; called names; told to leave; so, in that sense,
9  yeah, that's a suffering to me, I mean.
10     Q.    Have you experienced any crying episodes
11 as a result of the allegations in the complaint?
12     A.    Crying?
13     Q.    Yes.
14     A.    I don't see any crying in the complaint.
15     Q.    That's just my question.
16     A.    Oh, I have not cried.
17     Q.    Okay.
18          Have you experienced any headaches as a
19 result of the allegations in the complaint?
20     A.    No. I don't recall any headaches.
21     Q.    All right.
22          Did you experience any loss of sleep?
23     A.    Yes.
24     Q.    On how many occasions?
25     A.    I don't recall specific amount; but when
Page 188

1  you're laying in bed thinking about just getting run
2  over and feeling feeble in the water from being cold
3  and being called names, there was probably a few
4  minutes' loss of sleep. I don't know how many; how
5  many days; how many times; but there's been some loss
6  of sleep. I can't give you an accurate number.
7      Q.    Have you sought any treatment for the
8  loss of sleep?
9      A.    No, I have not.
10     Q.    Are you taking any medication for it?
11     A.    No, no medication.
12     Q.    Have you told a medical doctor about
13 your loss of sleep?
14     A.    No.
15     Q.    Have you sought any psychological
16 treatment?
17     A.    From a licensed psychologist?
18     Q.    Licensed or we'll get to the next part,
19 too. Licensed we'll start with.
20     A.    Licensed, no.
21     Q.    Okay. Unlicensed?
22     A.    I would say in a form.
23     Q.    Which is?
24     A.    I guess you could talk -- you could --
25 you could say a form of therapy or a form of dealing
Page 189

48 (Pages 186 - 189)

1   with it is, you know, continue to surf and enjoy what
2   areas of the coast you can enjoy, in hopes that you can
3   go back and surf there someday when this problem is
4   finally cleared up. I haven't seen any specific
5   therapist for it; but, you know, praying, in the hopes
6   that humanity will rear a more positive attitude down
7   there. I pray. I go to church. It would just be nice
8   if people that want to enjoy that area could go down
9   and do it; so, yeah, I pray for that. I'm not going to
10   lie. Because that -- is that a form of psychology,
11   therapy, or treatment? For me, I guess you could say.
12      Q    All right.
13           When you say you pray, do you pray that
14   you can surf at Lunada Bay?
15      A    Every day and especially in the winter.
16      Q    Okay.
17           Have any part of your family or your
18   kids commented on your loss of sleep?
19      A    Sometimes they ask why dad is grumpy but
20   not -- not loss of sleep.
21      Q    Have you complained to your wife about
22   your loss of sleep?
23      A    Not complained.
24      Q    Have you told her you're losing sleep
25   because of the allegations in this complaint?

Page 190

1      MR. FRANKLIN: You have a spousal privilege if
2   you choose to use it; so, your communication with your
3   wife is privileged if you want to.
4      THE WITNESS: No.
5   BY MS. HEWITT:
6      Q    With regard to the emotional stress
7   you've alleged in your complaint, can you please
8   describe the emotional distress you have suffered?
9      A    Emotional distress would for me be
10   described as -- I guess to a certain -- certain point
11   of draw me to, like, an inner anger that I've been
12   denied going somewhere. I'm distressed that, you know,
13   people would think it's their privilege to keep other
14   people away from something that doesn't belong to them
15   but belongs to everybody. That distresses me; so, I
16   guess feelings of anger and resentment to people that
17   would act so egregious and blatant.
18      Q    Have you sought any treatment for --
19   specifically for the emotional distress that you claim
20   to have suffered?
21      A    Along the lines we spoke of earlier, no,
22   I have not.
23      Q    With regard to mental anguish, can you
24   please describe the mental anguish you have suffered?
25      A    Easily. It goes along the lines of the

Page 191

1   continued desire. I want to go down there to surf; but
2   kind of feeling still, at this point, even maybe even
3   more so now that I've been photographed and/or I
4   perceived that I've been photographed and identified,
5   and I'm going to be like walking into the lion's den;
6   so, that's a form of mental anguish. That's the best I
7   can answer for you there.
8      Q    So, just to be clear, part of your
9   mental anguish is that you have desired to surf at
10   Lunada Bay but that you feel because you've been
11   identified by the people down there, that your safety
12   would be threatened; is that correct?
13      A    Yes.
14      Q    Now, when you went to Lunada Bay, say,
15   in the February 2016 time and you were watching the
16   cars, did you have any of your service revolvers with
17   you, or anything like that, from like being an
18   El Segundo Police Department -- or police officer?
19      A    At the expense of I don't want to make
20   this sound smug or --
21      Q    Oh, no smugness taken.
22      A    I don't carry a revolver anymore.
23      Q    Oh, okay.
24      A    So, I did have, as I -- you know, as I
25   always do, I do have the right to and I do carry an

Page 192

1   off-duty weapon.
2      Q    Okay. That didn't sound smug at all.
3      A    Okay. I didn't want to.
4      Q    Not at all.
5      A    They always say, "revolver." Yeah, we
6   used to carry those back in the '70s.
7      Q    I'm sure it's all TV.
8           All right. With regard to the pain and
9   suffering, lack of sleep, emotional distress, and
10   mental anguish, do you attribute any of those
11   specifically to the actions of Chief Kepley?
12      A    Yes. I'm disappointed in him. I'm
13   disappointed that him and his department are not taking
14   care of the problem, yes.
15      Q    And you're disappointed because
16   Chief Kepley has not eliminated the problem, or do you
17   mean something else by taking care of it?
18      A    Yes, eliminated the problem.
19      Q    All right.
20           You would agree that extra patrols were
21   provided in January and in February of 2016 when you
22   asked for them; right?
23      A    Wholeheartedly agree.
24      MR. FRANKLIN: Vague and ambiguous; calls for
25   speculation; move to strike.

Page 193

49 (Pages 190 - 193)

1    MS. HEWITT:  Did you move to strike, Counsel?
2    MR. FRANKLIN:  I did.
3    MS. HEWITT:  On what basis?
4    MR. FRANKLIN:  Lack of foundation.  It was
5  vague and ambiguous and calls for speculation.
6    MS. HEWITT:  Okay.
7    Q    So is it true that you believe that
8  extra patrols were provided at the January 2016 visit
9  to Lunada Bay?
10    MR. FRANKLIN:  Same objection.
11    THE WITNESS:  I believe extra patrol was sent
12  down there, yes.
13  BY MS. HEWITT:
14    Q    All right.  Same question for the
15  February 2016 visit.
16    MR. FRANKLIN:  Same objection.
17    THE WITNESS:  Yes.
18    MS. HEWITT:  Okay.
19    Q    All right.  With regard to your alleged
20  pain -- withdrawn.
21    With regard to the pain and suffering,
22  loss of sleep, emotional distress, and mental anguish
23  that you've discussed here today, do you attribute any
24  of that to the City of Palos Verdes Estates?
25    A    In the sense of the city employs the

Page 194

1  chief, the city is responsible for who they have as
2  employees, yes.
3    Q    Outside of any action or inaction of
4  Chief Kepley, do you have any other complaints about
5  what the city has or has not done?
6    MR. FRANKLIN:  Vague and ambiguous.
7    THE WITNESS:  This -- I'm sorry.  State it
8  again.
9    MS. HEWITT:  That's okay.  Sure.
10    Q    Outside of any actions or inactions you
11  allege against the chief, do you have any other
12  complaints against the City of Palos Verdes Estates?
13    MR. FRANKLIN:  Vague and ambiguous.
14    THE WITNESS:  Do I have, like, any formal
15  lawsuit?  Any complaints going on with them?
16    MS. HEWITT:  No, you're right.  That's a vague
17  question.
18    Q    So, aside from any inactions or actions
19  that you allege against Chief Kepley, with regard to
20  the lawsuit we're here, is there anything that you
21  separately think the city itself has done or not
22  done with regard to Lunada Bay?
23    A    Oh, yes.
24    MR. FRANKLIN:  Vague and ambiguous.
25    ////

Page 195

1  BY MS. HEWITT:
2    Q    Okay.  Go ahead.  And what are those?
3    A    They haven't -- here's the deal.  They
4  haven't provided access to an area that is popular for
5  a recreational sport for the public to enjoy.  They
6  haven't provided any signage; notifications on what to
7  do if there's any type of problems.  There's nothing
8  down there except a set of rocks that divide the
9  asphalt from the dirt.  They're very ineffective in
10  providing access down there, signage, which, in turn,
11  would automatically make it easy to patrol and enforce
12  laws and things that go on down there.  And let me just
13  say they had an opportunity to go through the
14  permitting process.  They've chose to tear down the
15  fort when they could have permitted it.  Whatever they
16  want to do, but just make it accessible to any human
17  being that wants to go enjoy it; not let it be
18  controlled by a bunch of pack animals that are acting
19  like bullies.  It's crazy.
20    Q    With regard to your allegations of pain
21  and suffering, loss of sleep, emotional distress, and
22  mental anguish, do you attribute any part of those
23  damages specifically against the City of Palos Verdes
24  with regard to the access issues you just discussed?
25    A    Again, yes.  They employed the chief.

Page 196

1  They -- they are separate entities.  The chief is a
2  human.  The city is a government agency that employs
3  that human.  They are equally a part of what I've
4  experienced down there.
5    Q    Are you seeking any damages against
6  Chief Kepley for any of the pain and suffering, loss of
7  sleep, emotional distress, or mental anguish.
8    MR. FRANKLIN:  Objection to the extent it calls
9  for a legal conclusion.
10    THE WITNESS:  I just -- I just want people to
11  go be able to surf there and enjoy the beach there;
12  walk down without getting harassed.  I'm sorry.  Do you
13  mean -- what do you mean?  Like another separate
14  lawsuit or --
15    MS. HEWITT:  No.
16    Q    Are you seeking damages specifically
17  from Chief Kepley --
18    MR. FRANKLIN:  Objection --
19  BY MS. HEWITT:
20    Q    -- for those alleged injuries?
21    MR. FRANKLIN:  Objection.
22    THE WITNESS:  I'm seeking --
23    MR. FRANKLIN:  Objection: calls for a legal
24  conclusion.  Also, object to the extent the complaint
25  speaks for itself.

Page 197

50 (Pages 194 - 197)

1    THE WITNESS: I'm seeking that he do his job,
2  and he enforce things that can be enforced in a very
3  effective way. That is not happening now. That's what
4  I want.
5  BY MS. HEWITT:
6    Q    Okay. So, is it fair to say, then, you
7  are not seeking any damages from the chief to
8  compensate you for any pain and suffering, loss of
9  sleep, emotional distress, and mental anguish?
10   A    Not at this time, no.
11   Q    All right.
12        Same question with regard to the
13 City of Palos Verdes Estates.
14   A    Not at this time, no.
15   Q    All right.
16        Okay. Just going briefly to the fort,
17 that I think you brought up just a little bit ago.
18 You're familiar with the concrete and wood structure
19 down there it sounds like; right? About how many times
20 have you been in that structure?
21   A    I've never been in it one time.
22   Q    One time or never been in it?
23   A    I've never been in it.
24   Q    Okay. All right.
25        Did that structure -- does that

Page 198

1  structure -- did it impede your ability or have any
2  effect on your ability to access Lunada Bay?
3    A    Yes.
4    Q    Okay. And how so?
5    A    It provides an operations point for
6  those guys to congregate and to prevent people from
7  using the beach; so, its very existence prevents
8  access.
9    Q    Okay.
10        In your -- from your perspective, what
11 does it mean for you to have "lawful, safe, and secure
12 access to Lunada Bay to engage in recreational
13 activities"?
14   A    You're asking for my opinion?
15   Q    Yes.
16   A    Just so I'm clear, just restate the
17 question.
18   Q    Sure.
19        What does it mean for you to have
20 lawful, safe, and secure access to Lunada Bay to engage
21 in recreational activities?
22   A    So, in interviews, I've given my dream
23 of access. I would love to see a nice, marked, open,
24 inviting parking lot, which has fixed, attached
25 restrooms to it with a, about, a 12-foot-wide cemented

Page 199

1  trail down to the beach; signage. No -- no fort, or a
2  permitted structure where people could legally access
3  and feel comfortable in doing so. That's kind of in
4  some interviews what I've pointed out to be my ideal
5  scenario.
6    Q    Okay.
7        Do those encompass the specific changes
8  you'd like the city to implement with regard to
9  Lunada Bay?
10   A    I would love them to implement it.
11   Q    Okay. And are there any other specific
12 changes that you'd like the city to implement to allow
13 you to -- allow for the goal of lawful, safe, and
14 secure access?
15   A    I'd like an ATV provided with a couple
16 officers that --
17   Q    I thought you meant --
18   A    No. A couple officers to routinely
19 patrol up and down the 12-foot-wide trail all along the
20 beach. That would be a nice added feature.
21   Q    Had you ever seen that at any other
22 beach?
23   A    All the time, up and down the coast.
24   Q    Which beaches?
25   A    Manhattan, L.A. County, L.A.P.D.,

Page 200

1  Huntington, Newport, Long Beach, Laguna, Oceanside --
2  let's see -- Malibu.
3    Q    Are those all places you've surfed in
4  the last two to three years?
5    A    Not Laguna; not Long Beach.
6    Q    Do you know Rory Carroll?
7    A    I've heard of the name, but I don't know
8  him.
9    Q    Okay.
10        You never met him?
11   A    Not that I know of.
12   Q    Okay.
13        How about Noah Smith?
14   A    Not that I know of.
15   Q    Okay.
16        We talked a little bit earlier about
17 your co-plaintiff Diana Milena Reed. The last time you
18 spoke with her or were at a meeting with her was that a
19 time when counsel was present?
20   A    Yes.
21   Q    Okay. And when was that?
22   A    I don't recall.
23   Q    Was it longer than six months ago?
24   A    No, I don't believe so.
25   Q    All right.

Page 201

51 (Pages 198 - 201)

1      Have you been in a room with her since
2 the complaint was filed March 29, 2016?
3      A   No.
4      Q   No.  Okay.
5      The time that you met her in January of
6 2016 at Lunada Bay, at that time, did you have any
7 discussions with her about possibly filing a lawsuit
8 against the city?
9      A   No.
10     Q   All right.
11     How about the second time in February?
12     A   No.
13     Q   All right.
14     Did the private investigator that
15 contacted you tell you about any conversations with
16 Diana Milena Reed?  Did he tell you -- he or she tell
17 you that he'd had any conversations with Diana?
18     A   Oh, you're talking about him to her?
19     Q   Right.
20     A   Or her to him?
21     Q   Any communications.
22     A   No.
23     Q   Okay.
24     When did you -- did you first hear from
25 Diana herself about any incident she experienced at

Page 202

1      Q   Okay.
2      A   Boyfriend/girlfriend is all I knew.
3      Q   Okay.  Jordan and Diana.  Okay.  And do
4 you know what Jordan does?
5      A   I think it's real estate, but I couldn't
6 tell you for sure.
7      Q   All right.
8      Do you know where Jordan and -- or do
9 you know where Diana lives, what city?
10     A   I think Malibu.  I'm not sure.
11     Q   And do you have any understanding of
12 whether Jordan and Diana are still together?
13     A   I don't know.
14     Q   Do you know where Jordan lives?
15     A   I don't.
16     Q   Did you ever have any discussions with
17 Jordan or Diana about potentially making a movie about
18 the Lunada Bay story?
19     A   I did not.
20     Q   Do -- have you discussed this case with
21 anybody at your current employer?
22     A   Only to the extent that I'm involved in
23 a lawsuit, and I'm a lead plaintiff seeking access for
24 the bay, but I don't discuss details or anything.
25     Q   Okay.

Page 204

1 Lunada Bay?
2      A   No, not from her.  I don't recall how I
3 learned of what happened to her.
4      Q   Okay.
5      In February 2016, when you spoke with
6 her, did you talk with her; get to know her at all?
7      A   Not more than just introductions.
8      Q   All right.
9      Did you find out what she does?
10     A   I have no idea what she does.
11     Q   Do you know if she's a model?
12     A   I -- I had heard something like that,
13 but I haven't confirmed or -- confirmed or spoke with
14 her about what she does.  I don't really know.
15     Q   All right.
16     Did you ever have a conversation with
17 her where counsel wasn't present in which she told you
18 that she wanted the city to do certain things with
19 regard to Lunada Bay?
20     A   I never had those conversations with
21 her.
22     Q   Okay.
23     Now, is it your understanding that
24 Jordan Wright knew Diana at the same time he knew you?
25     A   Yes.

Page 203

1      Has anybody at El Segundo said that
2 they're aware that you're in a lawsuit suing a police
3 officer?
4      A   I had a lieutenant -- lieutenant had
5 told me that a reporter wanted to get in contact with
6 me; so, he was aware; and a captain had asked me how it
7 was going in the gym.  That was very early on, and I
8 really didn't have anything to tell him.
9      Q   And did those two people, as far as you
10 know, were they aware of who the defendants were,
11 including Chief Kepley?
12     A   I don't believe so.  I -- I don't know.
13 I don't know what they knew.  I can't answer for what
14 they knew or didn't know.
15     Q   All right.
16     Have you ever had any discussions with
17 anybody at El Segundo about whether or not it's awkward
18 to have filed a lawsuit against a police chief?
19     MR. FRANKLIN:  Objection:  argumentative.
20     THE WITNESS:  No.
21     MS. HEWITT:  Have we -- I know you all marked
22 the supplemental disclosures, I think, as 34; so -- I
23 don't have that exact copy from yesterday's, but this
24 is a copy of the supplemental disclosures.  Here you
25 go.  I have a copy for you.

Page 205

52 (Pages 202 - 205)

1    MR. WORGUL:  I have a copy from yesterday.  It
2  should be exactly the same, or I can give him the copy
3  that we provided yesterday.
4    MS. HEWITT:  Yeah.
5    MR. WORGUL:  Let me take one note on it.  It
6  should be marked in the lower right-hand corner.
7    MS. HEWITT:  I'll show you that one.
8    THE WITNESS:  You want me to look at this one?
9    MS. HEWITT:  Yes, please.
10    MR. WORGUL:  That's previously been marked as
11  Exhibit 34.
12    MS. HEWITT:  In the deposition of Chief Kepley.
13    THE WITNESS:  Okay.
14    Do you want me to set this all aside?
15    MS. HEWITT:  The complaint, yes, sir, you can
16  put that aside.
17    THE WITNESS:  E-mails?
18  BY MS. HEWITT:
19    Q    You can put that aside, and I'm going to
20  ask you to take a look at the supplemental disclosures
21  and ask you if you believe you reviewed supplemental
22  disclosures before?
23    A    Oh, two sides.
24    Q    It's pretty long.  Do you just right now
25  recall reviewing anything called, "SUPPLEMENTAL

Page 206

1  DISCLOSURES"?
2    A    I'd have to review it to give you that
3  definite.
4    Q    I'm just going to ask you about some
5  names in here then.  I won't make you go through all
6  the pages.
7    A    You want me to turn to a specific place?
8    Q    Yes.  I will ask you.
9    A    Okay.
10    Q    Sir, to turn to page 20, please.  Oh,
11  I'm sorry.  Fourteen.  Fourteen.
12    A    And my 14 is going to be the same as
13  yours even though it's double-sided?
14    Q    I hope so.
15    All right.  Do you see a No. 44 down at
16  the bottom, "Jordan Wright"?
17    A    Yes.
18    Q    Okay.  Good.  We are on the same page
19  literally and figuratively.  All right.  Okay.
20    If you turn to the next page, it
21  continues about Mr. Wright, and you see where it says
22  about line 6 that he will testify as to being assaulted
23  on January 29, 2016, by David Melo?
24    A    I see that.
25    Q    All right.

Page 207

1    Are you familiar with that -- with that
2  incident?
3    A    Very vague.
4    Q    Did you see Mr. Wright being assaulted
5  by David Melo?
6    A    I did not.
7    Q    Okay.
8    Did you hear about it secondhand?
9    A    Yes.
10    Q    All right.
11    Who did you hear about it from.
12    MR. FRANKLIN:  Objection to the extent your
13  communication was with counsel.
14    MS. HEWITT:  Yes.
15    MR. FRANKLIN:  To the extent it was, I would
16  instruct you not to answer.
17  BY MS. HEWITT:
18    Q    Yes, if you know from any other sources
19  not from counsel, you can testify?
20    A    I don't recall hearing about it from
21  anybody else.
22    Q    Okay.  All right.
23    Has Mr. Wright told you how many times
24  he has tried to surf Lunada Bay and had incidents occur
25  with -- had incidents occur?

Page 208

1    MR. FRANKLIN:  Objection to extent you learned
2  that in your meeting with counsel.
3    THE WITNESS:  Yeah, I'm going to --
4  BY MS. HEWITT:
5    Q    You don't have any other information
6  other than that of counsel?
7    A    Right.
8    Q    Okay.
9    A    Yes.
10    Q    Okay.  All righty.  And with regard to
11  the incident with plaintiff Diana Reed, February 13,
12  2016, other than any information you received from
13  counsel, do you have any other independent knowledge of
14  that?
15    A    No.
16    Q    Okay.  All right.
17    If you look at No. 45, do you know who
18  Gavin Heaney is?
19    A    I do not.
20    Q    Have you ever met him?
21    A    I don't know.
22    Q    Okay.  Good question -- good answer.
23  All right.
24    If you see down there, line 19, it talks
25  about a Greg Cahill.  Do you know who Greg Cahill is?

Page 209

53 (Pages 206 - 209)

| | | |
|---|---|---|
| 1 | A | I don't see it. |
| 2 | Q | About -- |
| 3 | A | Line 19? |
| 4 | Q | Yeah. |
| 5 | A | I don't know who that is. |
| 6 | Q | Okay. |
| 7 | | Do you know who Tyler Canali is? |
| 8 | A | I do not know. |
| 9 | Q | Okay. |
| 10 | | Turning the page, do you know who |
| 11 | Jimmy Conn is, No. 47? | |
| 12 | A | I do not know. |
| 13 | Q | Daniel Dorn? |
| 14 | A | Again, I do not know. |
| 15 | Q | Okay. |
| 16 | | Derek Ellis? |
| 17 | A | I do not know. |
| 18 | Q | Geoff Hagins, G-e-o-f-f? |
| 19 | A | I do not know. |
| 20 | Q | All right. |
| 21 | | John Hagins? |
| 22 | A | I don't know. |
| 23 | Q | Mike Bernard? |
| 24 | A | I do not know. |
| 25 | Q | Mike Bernard, Jr.? |

Page 210

| | | |
|---|---|---|
| 1 | A | I don't specifically recall any |
| 2 | conversation with Kenny about that. | |
| 3 | Q | Okay. |
| 4 | | Do you know what Kenny does, his |
| 5 | occupation? | |
| 6 | A | I don't know for sure.  It's something |
| 7 | to do with construction or something.  I'm not sure. | |
| 8 | Q | And do you know what city he lives in? |
| 9 | A | I don't recall. |
| 10 | Q | Okay. |
| 11 | | Do you know Tom Wilson? |
| 12 | A | I don't know that name. |
| 13 | Q | Martin Tueling, T-u-e-l-i-n-g? |
| 14 | A | I don't know that name. |
| 15 | Q | Bernie Mann, two n's? |
| 16 | A | I don't know that name. |
| 17 | Q | Dr. Stephen Young, with a p-h? |
| 18 | A | I don't know that name. |
| 19 | Q | Hagan Kelly? |
| 20 | A | I don't know that name. |
| 21 | Q | Sef Krell, S-e-f K-r-e-l-l? |
| 22 | A | I don't know that name. |
| 23 | Q | Alan Haven? |
| 24 | A | I don't know that name. |
| 25 | Q | Okay. |

Page 212

| | | |
|---|---|---|
| 1 | A | I do not know. |
| 2 | Q | Charlie Rigano? |
| 3 | A | I do not know. |
| 4 | Q | Doug Disanti? |
| 5 | A | I do not know. |
| 6 | Q | Kurt Stanphenhorst? |
| 7 | A | I don't see that name. |
| 8 | Q | Number 56 on page 18. |
| 9 | A | I do not know. |
| 10 | Q | Randy Clark? |
| 11 | A | I do not know. |
| 12 | Q | Okay. |
| 13 | | Next page, No. 58, John Innis? |
| 14 | A | I do not know. |
| 15 | Q | Trish Laurie? |
| 16 | A | I do not know. |
| 17 | Q | Ken Claypool? |
| 18 | A | I've heard the name, and I believe that |
| 19 | would be somebody I know as "Kenny." | |
| 20 | Q | Oh, Kenny.  Okay.  All right.  And |
| 21 | that's the Kenny who was at Lunada Bay with you and | |
| 22 | Chris in January and February? | |
| 23 | A | Correct. |
| 24 | Q | Did you ever discuss with him any |
| 25 | incidents he had with one or more of the Ferraras? | |

Page 211

| | | |
|---|---|---|
| 1 | | Daniel Jongeward, J-o-n-g-e-w-a-r-d? |
| 2 | A | I don't know that name. |
| 3 | Q | Patrick Landon? |
| 4 | A | I don't know that name. |
| 5 | Q | Okay. |
| 6 | | Frank Netto? |
| 7 | A | I don't know that name. |
| 8 | Q | Randy Miestrell, M-i-e-s-t-r-e-l-l? |
| 9 | A | I've heard the last name.  I don't know |
| 10 | if he's involved in the surfing industry is all I know, | |
| 11 | the last name but I don't. | |
| 12 | Q | Okay. |
| 13 | | Sharlean Perez, S-h-a-r-l-e-a-n? |
| 14 | A | I don't know that name. |
| 15 | Q | Okay. |
| 16 | | Charles Michael Pinkerton? |
| 17 | A | I don't know that name. |
| 18 | Q | Okay. |
| 19 | | Turning the page, page 23, |
| 20 | Chris Taloa, is that your friend Chris? | |
| 21 | A | Christopher Taloa; correct. |
| 22 | Q | Okay. |
| 23 | | John MacHarg, M-a-c-H-a-r-g? |
| 24 | A | I don't know that name. |
| 25 | Q | Tim Tindall, T-i-n-d-a-l-l? |

Page 213

54 (Pages 210 - 213)

1    A    I don't know that name.

2    Q    All right.

3         We went over Rory Carroll.

4         Okay. You can put that aside, sir.

5    A    All right.

6    Q    Do you recall giving an interview to

7 Madeleine Brand of KCRW in or about February of this

8 year?

9    A    Madeleine Brand? The name Madeleine,

10 would that be NPR?

11   Q    It's the local NPR station.

12   A    Okay. I recall a name Madeleine.

13   Q    Okay.

14   A    And I associate that with NPR.

15   Q    As do I, because it's the local

16 affiliate.

17   A    Okay.

18   Q    Do you recall what the content of that

19 conversation was?

20   A    Just -- I don't recall specifically. It

21 was just -- I think it was just about my experience at

22 Lunada Bay, and I don't recall if it was one or both

23 days that I spoke about, but I know it was an

24 interview.

25   Q    Okay.

Page 214

---

1    Q    Do you have any agreements to receive

2 any incentive payments in this lawsuit?

3    A    No.

4    Q    All right. And when was the last time

5 you were actually at Lunada Bay?

6    A    I don't recall.

7    Q    Do you know if it was in the last month?

8    A    I haven't been there in the last month.

9    Q    Okay. So you have no recollection right

10 now the last time you were at Lunada Bay?

11   A    It was for an interview. The sun was

12 shining. I don't recall the date. I'm sorry.

13        MS. HEWITT: That's okay.

14        Okay. I am going to cede to other

15 counsel right now.

16        MR. WORGUL: Can we go off the record for one

17 second?

18        MR. FRANKLIN: Okay.

19        (A discussion was held off the record.)

20        (A recess was taken at 3:51 p.m.

21        until 3:54 p.m.)

22 ////

23 ////

24 ////

25 ////

Page 216

---

1         Do you remember talking about the city's

2 actions, specifically, the police department?

3    A    I don't recall. I'm sorry.

4    Q    My fault.

5    A    It was a long time ago.

6    Q    Okay.

7         Do you recall whether or not you were

8 complimentary of the city's actions with regard to

9 Lunada Bay?

10   A    I don't recall.

11   Q    All right.

12        Putting aside Madeleine Brand and

13 putting aside the interview sources we talked about

14 earlier, do you recall any other interviews that you've

15 given with regard to Lunada Bay?

16   A    Yeah, I recall several. Again, I don't

17 know who works for who and names, but I recall giving

18 several interviews.

19   Q    Okay.

20        Do you remember how many TV interviews

21 you've given?

22   A    Less than ten.

23   Q    And when was the last time you gave an

24 interview with regard to Lunada Bay?

25   A    I don't remember.

Page 215

---

1              EXAMINATION

2 BY MR. FIELDS:

3    Q    My name is Mark Fields. I represent

4 Angelo Ferrara and N.F. Let's talk about

5 Angelo Ferrara first. Of all the types of wrongful

6 conduct that you've alleged, whether it's physical

7 harassment, yelling, screaming, throwing dirt,

8 videoing, or intimidating in any fashion, are you aware

9 of any incidents where Angelo Ferrara has done that?

10       MR. FRANKLIN: Vague and ambiguous; compound.

11       THE WITNESS: Well, I mean, you know, I don't

12 know specifically quite how to answer that in

13 specifics, other than to say that, you know, he's been

14 identified as a Bay Boy through investigation counsel's

15 done; and whether or not he's part of that concerted

16 effort that I spoke about earlier today, either on the

17 phone, if he was on the other end of the phone, I don't

18 know if he's one of the Bay Boys that contributed to

19 any of that.

20 BY MR. FIELDS:

21   Q    So you have no personal knowledge of

22 that, of Angelo engaging in any of those activities?

23   A    Well, like I said, I don't know if he

24 was one on the phone or on the other end of the line

25 that contributed, you know, to when they show up

Page 217

---

55 (Pages 214 - 217)

1 and get in your face with a video or yell at you.  I
2 don't know if he was one that would show up.  I don't
3 know.
4     Q     Would you recognize him if you saw him?
5     A     I would not.
6     Q     How about N.F.?  Do you have any
7 knowledge, personal knowledge, of him engaging in any
8 of those types of activities you've alleged?
9     A     Again, my same answer.
10    Q     Now, going beyond personal knowledge,
11 other than what you've learned from your counsel, have
12 you had any discussions with anyone else regarding any
13 type of wrongful activity by Angelo Ferrara?
14    A     All I can tell you is this, that on more
15 than one occasion even in uniform on duty I've had
16 people come up to me -- I don't know who they are.  The
17 last time was on a burglary call in a perimeter where I
18 was standing on a street corner.  Somebody came up to
19 me on a bike.  I don't know who he was.  Thanked me up
20 and down.  As, you know, I'm telling the guy, "Hey, I'm
21 busy here," you know, he's thanking me for what I've
22 been doing on the lawsuit.  This has been going on too
23 long.  All of those guys you got named in there are --
24 and even more are dirty involved in it.
25    Q     Do you know who?
                                              Page 218

1     A     That was the last time, and there's been
2 a few of those.
3     Q     Do you know the names of any of those
4 people who gave you those "kudos," for lack of a better
5 word?
6     MR. FRANKLIN:  Asked and answered.
7     THE WITNESS:  I do not.
8 BY MR. FIELDS:
9     Q     Of the people who gave you those kudos
10 and said, "Thank you for doing this.  The Bay Boys are
11 bad," however you want to phrase it, did any of them
12 specifically mention Angelo Ferrara?
13    A     That's a name that keeps coming up as
14 one of the more prominent names who has been involved
15 over the years.  Like I said, I can't identify to you a
16 Ferraro -- Ferrara from the next Ferrara, but that is a
17 very popular name associated with the Bay Boys through
18 casual conversations that I have had from people
19 thanking me in the surfing community for doing what I'm
20 doing.
21    Q     And the people who thanked you, they
22 haven't distinguished one Ferrara from the next to you?
23    A     No.  Just the name.  It's synonymous
24 with that place.
25    Q     With -- take a look at the supplemental
                                              Page 219

1 disclosures.  I forget what exhibit that is.  It was
2 marked, I think, before I got here.
3     MR. WORGUL:  Thirty-four.
4 BY MR. FIELDS:
5     Q     Thirty-four, plaintiff's supplemental
6 disclosures, No. 28 makes a reference to "the
7 Ferraras."
8     A     We're on page 28?
9     Q     No, Witness 28.  We're on page 10.
10    MR. FRANKLIN:  The number.
11 BY MR. FIELDS:
12    Q     And it's regarding reference to
13 Jim Russi, R-u-s-s-i.
14    A     Do you want me to read that section?
15    Q     I'll read it.  I have a question about
16 in that paragraph, it says (as read):
17        "Plaintiffs are informed and
18    believe and on that basis allege that
19    this witness [Jim Russi] has information
20    regarding the illegal activities of the
21    Lunada Bay Boys including the Ferraras."
22        Do you know what information Mr. Russi
23 has regarding the Ferraras?
24    A     I personally don't.  Through
25 investigation through counsel, what they learned, that
                                              Page 220

1 information.
2     Q     And you don't know which Ferrara it is
3 referenced in 28?
4     A     In reference to what you just read?
5     Q     Yes.
6     A     I do not specifically, no.
7     Q     Now, I think the only other time that I
8 noticed a Ferrara being mentioned is on 60, the
9 Witness 60 page 19.
10    A     Okay.
11    Q     And Ken Claypool, that's someone who you
12 know; correct?
13    A     That is one who I had met two times and
14 just on a very informal basis, when you say, "know";
15 so, it's relative.
16    Q     I appreciate that.
17        Then it says (as read):
18        "This witness will testify about
19    several incidents of harassment at
20    Lunada Bay involving Individuals such as
21    Brant Blakeman and possibly one or more of
22    the Ferraras."
23        Do you know what information
24 Ken Claypool has regarding the Ferraras?
25    A     I do not.
                                              Page 221

56 (Pages 218 - 221)

Hahn & Bowersock, A Veritext Company
800.660.3187

1      Q    Other than what you've heard sort of
2  informally from people that you've met who haven't
3  identified themselves and information you have received
4  from your counsel, do you have any information
5  regarding wrongful conduct by Angelo Ferrara or N.F.?
6      MR. FRANKLIN:  Vague and ambiguous.
7  BY MR. FIELDS:
8      Q    Wrongful conduct of the type alleged in
9  this complaint?
10     A    Again, it goes back to original, when we
11  started out.  I don't know if they were on the other
12  end of that phone or if they were the ones showing up
13  in those numbers on the bluff.  So, I -- I can't give
14  you an answer "Yes" or "No."  I don't know.
15     MR. FIELDS:  I have no further questions.
16
17            EXAMINATION
18  BY MR. WORGUL:
19     Q    Mr. Spencer, my name is John Worgul.
20  I'm counsel for Brant Blakeman.
21         Just real quickly, what's your height
22  and weight?
23     A    My height and weight?
24     Q    Yeah.
25     A    Five-two, 115 at my last physical.

Page 222

1  BY MR. WORGUL:
2      Q    Officer Spencer, describe Brant Blakeman
3  for me.
4      A    Describe him?
5      Q    Yes, physically.
6      A    Physically?  Male, white.  I don't know
7  his specific height.
8      Q    Can you estimate for me, please?
9      A    I'd probably say five-eight to
10  five-eleven.
11     Q    If I stood up, is he taller than me?
12     A    Can I stand up?
13     MR. FRANKLIN:  Sure.
14     MR. WORGUL:  However you desire.
15     THE WITNESS:  He may or may not be a few inches
16  either way.  I couldn't tell you.
17  BY MR. WORGUL:
18     Q    As you sit here today, you can't tell
19  me?
20     A    Correct.
21     Q    What do you believe his weight is?
22     A    I've never seen him on a scale but ...
23     Q    Well, let me ask you, Officer, you're
24  used to describing people by their ethnicity, height,
25  weight, because you do that regularly as a police

Page 224

1  officer, don't you?
2      A    I do.
3      Q    So, based on your experience in doing
4  that, what do you believe my -- or Brant Blakeman's
5  weight was --
6      A    So, estimations --
7      Q    -- whenever you observed him?
8      A    I give estimations even when I'm on
9  duty.  Nothing is 100 percent right.  So, to estimate,
10  his weight would be 170 to 185.
11     Q    Hair color?
12     A    Kind of a light brown, blond, sandy --
13  not bleach blond; not black; not dark brown.
14     Q    Eye color?
15     A    I don't know his eye color.
16     Q    Were there any other physical
17  characteristics that you're aware of that would
18  describe Mr. Blakeman that you have not told me so far?
19     MR. FRANKLIN:  Vague and ambiguous.
20     THE WITNESS:  Not that -- not that I recall.
21  BY MR. WORGUL:
22     Q    Tattoos?
23     A    Not that I recall.
24     Q    How about clothing or wetsuits or
25  surfboards, anything that you would associate with him?

Page 225

1      Q    And --
2      A    Gravity could make that different.
3      Q    Okay.  And have you generally been that
4  same weight for the past ten years?
5      A    Generally, yes.
6      Q    Did your size ever preclude you from
7  working certain details as a police officer?
8      A    No, not that -- I mean, not that I know
9  of.
10     Q    What's your address?
11     MR. FRANKLIN:  I'm going to object and instruct
12  you not to answer on that there's a Penal Code
13  provision where a police officer doesn't need to
14  identify his address; so, if you need to contact him,
15  you can do so through me.  Later we can work something
16  out with a protective order in place.
17     MR. WORGUL:  Okay.
18     THE WITNESS:  I wasn't going to give it to you
19  anyways.
20     MR. WORGUL:  That's okay.  I'm sure we'll work
21  something out, if it's necessary; or, if not, we'll go
22  to court, and we'll deal with it.
23     THE WITNESS:  I'm sure you can find it through
24  Google.
25     ////

Page 223

1        A        Green surfboard, kneeboard.  He rides a
2  kneeboard, Bark, I believe, with white writing, Bark.
3  Most of the time, I would either see him, like, in a
4  Pendleton shorts and sandals on a bike or on foot
5  carrying a selfie GoPro stick with a GoPro attached.
6        Q        How many times have you seen
7  Mr. Blakeman in your life?
8        A        Person-to-person or video?
9        Q        Observed him with your eyes.
10        A        Again, physically with my eyes,
11  person-to-person like --
12        Q        Like you're not a video; not a picture.
13  You actually see him in --
14        A        Fair enough.
15        Q        -- in a setting.
16        A        Three times.
17        Q        When was the first time?
18        A        January 29th, 2016.
19        Q        Was that in the water?
20        A        In the water.
21        Q        And did you see him outside of the water
22  that day?
23        A        Yes.
24        Q        Where outside of the water?
25        A        At the base or on -- or on the palapa

*Page 226*

1  he was?
2        A        I believe, while in the water, Chris
3  told me his name was Brent Blakeman and later -- and,
4  at which point I want to say -- I don't know when I
5  became aware that it was Brant Blakeman, his true name.
6        Q        Okay.
7        A        But I was told who he was on the first
8  day in the water.
9        Q        Okay.  So you saw him, then, on the
10  beach before you got in the water; is that right?
11        A        Correct.
12        Q        And, then, you later saw him out in the
13  water; is that correct?
14        A        Correct.
15        Q        And, then, you learned who he was?
16        A        Correct.
17        Q        And that was from Mr. Taloa who told you
18  who he was?
19        A        Correct.
20        Q        Why did Mr. Taloa tell you who he was?
21        MR. FRANKLIN:  Calls for speculation.
22        THE WITNESS:  I don't know why he told me.
23  BY MR. WORGUL:
24        Q        What was the context that the
25  conversation arose in?

*Page 228*

1  for -- illegal, unpermitted structure at Lunada Bay.
2        Q        Okay.  So what's commonly referred to as
3  the "fort" or the "patio" --
4        A        Yes.
5        Q        -- that's located on the beach; correct?
6        A        Yes.
7        Q        It abuts the cliff; is that correct?
8        A        Correct.
9        Q        Is that the northern area of the bay; is
10  that correct?
11        A        Correct.
12        Q        And did you see him in the fort; on the
13  fort; in the beach front?  Where in relation to the
14  fort?
15        A        So, in what would be considered, I
16  guess, the south end of the fort, since the coast runs
17  on the south portion of it at the base; just, you know,
18  where you could step up on it.
19        Q        Okay.
20        Have you ever -- I'm sorry.  On
21  January 29th of 2016, were you aware of who Blake --
22  Brant Blakeman was at that time?
23        A        I was not.
24        Q        Okay.
25        When did you first become aware of who

*Page 227*

1        A        Well, this guy was -- Brant -- I'll say
2  Brant -- was circling us in the water and very
3  specifically really close to Chris trying to prevent
4  him from getting waves; and, like, we just had a
5  conversation -- I don't remember the start of it or
6  however it was; but, like, Chris knew who Brant was or
7  Mr. Blakeman.
8        Q        And did, Officer, did Mr. Taloa say how
9  he knew who Mr. Blakeman was?
10        A        Not then, no.
11        Q        Okay.  And it's your perception or
12  assumption that the reason he talked to you --
13  Mr. Taloa told you who Mr. Blakeman was, was because
14  you're alleging that Mr. Blakeman was circling you?
15        A        I'm not alleging.  He did circle me --
16  yes, I am alleging in the complaint, yes.  So, he did
17  circle us.  He did circle me.
18        Q        What's a "circle"?  What do you mean
19  when he circles you?  Is he going a complete 360-degree
20  circle around you?
21        A        Complete 360 in front; blocking;
22  obstructing.
23        Q        What's he obstructing you from?
24        A        Catching the waves.
25        Q        Well, why do you believe he's

*Page 229*

58 (Pages 226 - 229)

Hahn & Bowersock, A Veritext Company
800.660.3187

1 obstructing you from catching a wave?
2    MR. FRANKLIN: Argumentative.
3    THE WITNESS: So, when somebody is that close
4 to you in front of you when you're trying to paddle
5 forward, you don't want to paddle and hit them; so,
6 when they're in front of you, they're trying to prevent
7 you from catching waves.
8 BY MR. WORGUL:
9    Q    Could they be trying to catch a wave as
10 well?
11    MR. FRANKLIN: Assumes facts not in evidence;
12 lacks foundation.
13    THE WITNESS: On that day, in my opinion,
14 Mr. Blakeman was obstructing us from catching waves.
15    MR. WORGUL: I'm going to move to strike as
16 nonresponsive.
17       Could you please read back my question?
18       (Whereupon, the pending question
19       was read back by the court reporter.)
20    THE WITNESS: No.
21 BY MR. WORGUL:
22    Q    Okay. Whose waves are the waves out in
23 Lunada Bay?
24    MR. FRANKLIN: Vague and ambiguous.
25    THE WITNESS: They -- they should belong to

Page 230

1 everybody.
2 BY MR. WORGUL:
3    Q    Even the people that you allege that are
4 Bay Boys?
5    MR. FRANKLIN: Vague and ambiguous.
6    THE WITNESS: Yes.
7 BY MR. WORGUL:
8    Q    Okay. So, those people have just as
9 much a right to surf out there as you do; right?
10    MR. FRANKLIN: Vague and ambiguous; calls for
11 legal conclusion.
12    THE WITNESS: If they were not obstructing and
13 preventing us from surfing, as well as the rest of the
14 public, then, I would say yes.
15 BY MR. WORGUL:
16    Q    Who is "us"?
17    A    Anybody that wants to go out there and
18 surf.
19    Q    Okay.
20       Who makes the determination on whether
21 someone is obstructing somebody out there?
22    MR. FRANKLIN: Argumentative; lacks foundation.
23    THE WITNESS: Who -- repeat the question.
24    MR. FRANKLIN: Vague and ambiguous.
25 ////

Page 231

1 BY MR. WORGUL:
2    Q    You indicated that certain people are
3 obstructing other people out there, and I'm asking you
4 who makes that determination?
5    MR. FRANKLIN: Vague and ambiguous.
6    THE WITNESS: Well, there's certain -- there's
7 etiquette that's been established in surfing.
8 BY MR. WORGUL:
9    Q    Who established the etiquette?
10    MR. FRANKLIN: Vague and ambiguous.
11    THE WITNESS: Generations of surfers.
12 BY MR. WORGUL:
13    Q    Okay. Where is it written down?
14    MR. FRANKLIN: Vague and ambiguous.
15    THE WITNESS: It's not written down that I know
16 of.
17 BY MR. WORGUL:
18    Q    Okay. Who is the authority on the
19 etiquette?
20    MR. FRANKLIN: Vague and ambiguous; calls for
21 expert testimony. Also, calls for a legal conclusion
22 to the extent it involves Palos Verdes Estates
23 Municipal Code.
24    MR. WORGUL: We're not talking about municipal
25 codes. We're talking about the etiquette that

Page 232

1 Officer Spencer just described. That's all I'm talking
2 about.
3    Q    Who is the authority on that?
4    MR. FRANKLIN: Argumentative; same objections.
5    THE WITNESS: The authority is not known to me,
6 but there's well-established surfing etiquette that's
7 been in place for hundreds of years.
8 BY MR. WORGUL:
9    Q    Where did it start?
10    A    I don't know.
11    Q    How do you know it's been in place for
12 hundreds of years then?
13    A    Because I've been surfing for 40 years
14 or 30 years, and that's just how it is.
15    Q    Do you believe that by Mr. Blakeman
16 allegedly circling you and blocking you, that he was
17 committing a crime?
18    MR. FRANKLIN: Calls for legal conclusion.
19    THE WITNESS: I believe one could be
20 articulated.
21 BY MR. WORGUL:
22    Q    What?
23    A    I would say -- and I'm not fully aware
24 of the municipal code that counsel's referenced, but I
25 believe that if you're blocking and you're obstructing

Page 233

59 (Pages 230 - 233)

1 one's movement, you could possibly articulate a false
2 imprisonment. It would -- it would be cause for a lot
3 of review in Penal Code, which I don't have in front of
4 me, and I'm not 100 percent clear on, but it's possible
5 one could articulate false imprisonment.
6     Q    Officer Spencer, other than false
7 imprisonment being potentially a crime that you believe
8 that would fit within the actions of Mr. Blakeman
9 circling and blocking you, are there any other crimes
10 that you believe Mr. Blakeman was potentially
11 committing at that time?
12     MR. FRANKLIN: Objection to the extent it calls
13 for legal conclusion; also, to the extent it calls for
14 expert testimony.
15     THE WITNESS: None that I'm aware of right now.
16     MR. WORGUL: Okay.
17     Q    Have you ever actually spoken to
18 Mr. Blakeman?
19     A    No.
20     Q    Has Mr. Blakeman ever said any words to
21 you?
22     A    No.
23     Q    Other than the circling -- alleged
24 circling and alleged blocking on January 29 of 2016,
25 are there any other actions that you believe

Page 234

1 here. It could be him. I don't know.
2     Q    Do you have any actual knowledge that
3 he's done those things?
4     A    No, I don't.
5     Q    Okay.
6         Do you have any reason to believe that
7 he's done those things, other than your own
8 assumptions, for example, somebody else said something
9 or some other reason other than your feelings?
10     MR. FRANKLIN: Vague and ambiguous.
11     THE WITNESS: Not that I know of.
12     MR. WORGUL: Okay.
13     Q    When -- I think one of the only other
14 actions or interactions you had with Mr. Blakeman was
15 him, as you put it, putting a GoPro in your face; is
16 that right?
17     A    Correct.
18     Q    Okay. So, other than the circling you
19 in the water and allegedly blocking you from getting a
20 wave; and other than him talking on the telephone and,
21 then, other people arriving at Lunada Bay; and other
22 than the GoPro -- putting the GoPro in your face, is
23 there anything else that you believe Mr. Blakeman has
24 done that's been directed to you?
25     MR. FRANKLIN: Vague and ambiguous.

Page 236

1 Mr. Blakeman has directed to you at any point in time?
2     MR. FRANKLIN: Vague and ambiguous.
3     THE WITNESS: I don't know. It's possible.
4 BY MR. WORGUL:
5     Q    As you sit here today, can you tell me
6 other actions that you believe Mr. Blakeman has
7 directed to you other than the ones that occurred with
8 the alleged circling and blocking that occurred in the
9 water on January 29 of 2016?
10     MR. FRANKLIN: Vague and ambiguous; misstates
11 prior testimony.
12     THE WITNESS: I don't know. I mean, I find it
13 very odd that when people get on their phones, he,
14 along with many others, happen to show up; so, it's
15 possible.
16 BY MR. WORGUL:
17     Q    So, are you saying that, in addition to
18 the alleged circling you in the water and blocking you
19 from the waves, you're also saying that him talking on
20 the telephone and, then, other people arriving at the
21 location of Lunada Bay may also be something that he
22 directed at you?
23     A    It could be, because he could be one of
24 the ones that calls out to and tells people they're
25 kooks and to go fucking get home and why did they come

Page 235

1     THE WITNESS: You forgot potentially being ones
2 that call out to the outsiders to leave and to go home
3 and yell expletives. No.
4 BY MR. WORGUL:
5     Q    But you never heard him yell expletives
6 at you; correct?
7     A    No, but it's possible he could have been
8 one of them.
9     Q    As you sit here today, can you tell me
10 he's yelled out expletives to you at any point in time?
11     A    I can't.
12     MR. FRANKLIN: Asked and answered.
13 BY MR. WORGUL:
14     Q    As you sit here today, can you tell me
15 that Mr. Blakeman has told anyone else to direct some
16 sort of action against you?
17     MR. FRANKLIN: Assumes facts not in evidence;
18 lacks foundation.
19     THE WITNESS: I don't know. I can only tell
20 you that -- his actions towards me.
21     MR. WORGUL: Okay.
22     Q    Now, the putting the GoPro in your face,
23 I think before you said that he was never closer than
24 about five feet from you; is that right?
25     A    That would be fair, yes.

Page 237

Hahn & Bowersock, A Veritext Company
800.660.3187

1     Q     Okay.  And you had, I believe, a belief
2  that he was doing that in order to document who you
3  were; is that right?
4     A     That's my belief.  I mean ...
5     Q     Why do you have that belief?
6     A     Why would -- I'm just -- I have to
7  wonder to myself when I show up at a place that has
8  been documented over decades to be difficult to access;
9  difficult to surf; people have been harassed, and now
10  you have a group that wants to peacefully go there and
11  peacefully enjoy that area, I have to wonder why
12  somebody would be filming all of this.
13     Q     Well --
14     A     I don't know why they would walk around
15  and record somebody other than to share with all their
16  friends, who I believe that are other Bay Boys, to
17  identify us to them and say either, "Hey, these guys
18  are the ones that are creating problems for us," or,
19  "Hey," you know, "be on the lookout for these guys.
20  They're part of this movement that we don't want here."
21  I don't know what his intentions are with the camera.
22  It's just odd.
23     Q     Have you articulated your entire belief
24  as to why you think Mr. Blakeman was documenting you
25  with a camera?

Page 238

1     THE WITNESS:  The only camera that I've seen
2  was with Chris, and he takes it down with him and holds
3  it in his mouth while he boogie-boards.
4  BY MR. WORGUL:
5     Q     Does he do that to document people to
6  figure out who they are?
7     MR. FRANKLIN:  Assumes facts not in evidence.
8     THE WITNESS:  I don't know his intentions with
9  the camera, Chris.  He -- I know that he had sent me
10  videos of him boogie-boarding and getting in what's
11  called the "tube" on his boogie board with his camera.
12  BY MR. WORGUL:
13     Q     Do you think it's okay for Chris to go
14  down there with a camera and not for Mr. Blakeman to go
15  there with a camera?
16     MR. FRANKLIN:  Vague and ambiguous.
17     THE WITNESS:  I think it would be fine for
18  Mr. Blakeman to go down there with a camera if he
19  wasn't filming people that were showing up in -- what's
20  the word I'm looking for? -- protest to their violent
21  ways of being down there in their peaceful activism of
22  going down there to want to surf peacefully.  I think
23  it would be fine if he just had his own camera to film
24  his own surf footage; to video people that he knows.
25  It's just odd and weird behavior for somebody to walk

Page 240

1     MR. FRANKLIN:  Vague and ambiguous.
2  BY MR. WORGUL:
3     Q     Have you told me everything about that?
4     MR. FRANKLIN:  Same objection.
5     THE WITNESS:  That's -- that's all I can think
6  of right now.
7  BY MR. WORGUL:
8     Q     Okay.  So, you've told me everything
9  that you can recall as of today?
10     A     At this point, correct.
11     MR. FRANKLIN:  Same objections.
12  BY MR. WORGUL:
13     Q     All right.  Now, the group that you're
14  with, do you guys call yourselves "Aloha Point" or
15  something else?
16     A     Well, the Aloha Point is a name that was
17  kind of quasi given to that area by, from what I
18  understand, Chris Taloa.  The Aloha Point Facebook is
19  the Facebook page that people that want to go enjoy
20  that area will message and communicate with each other
21  on.  I have -- I'm not on there; so, I don't know.
22     Q     Okay.  And people who are part of that
23  group, they bring cameras down to Lunada Bay, don't
24  they?
25     MR. FRANKLIN:  Assumes facts not in evidence.

Page 239

1  up to complete strangers with their GoPro.  I don't see
2  Chris Taloa doing that with his GoPro.  He holds it in
3  his mouth, and he surfs with it.
4  BY MR. WORGUL:
5     Q     Well, aren't there videos that Mr. Taloa
6  took that are in part of your initial disclosures?
7     MR. FRANKLIN:  Assumes facts not in evidence;
8  lacks foundation.
9     THE WITNESS:  Yeah, there could be.
10  BY MR. WORGUL:
11     Q     And aren't they of people that you're
12  adverse to in this lawsuit?
13     MR. FRANKLIN:  Lacks foundation.
14     THE WITNESS:  I'm -- let's re -- let's get back
15  to the point.
16  BY MR. WORGUL:
17     Q     I've actually -- I'd just like you to
18  answer my question.
19     MR. FRANKLIN:  Argumentative.
20     THE WITNESS:  Restate your question.
21     MR. WORGUL:  Read it back, please.
22     (Whereupon, the record was read back
23  by the court reporter as follows:
24     "Q  And aren't they of people that
25  you're adverse to in this lawsuit?")

Page 241

61 (Pages 238 - 241)

1     THE WITNESS: You're talking about Chris'
2  videos?
3     MR. WORGUL: Yes.
4     THE WITNESS: They could be. I don't know what
5  he has on his videos.
6  BY MR. WORGUL:
7     Q   When Mr. Blakeman was using his camera
8  on a selfie stick or GoPro, whatever you termed it to
9  be, was he committing a crime?
10    MR. FRANKLIN: Calls for legal conclusion;
11  assumes facts; lacks foundation.
12    THE WITNESS: I don't know at this time.
13  BY MR. WORGUL:
14    Q   Well, you're a police officer, aren't
15  you?
16    MR. FRANKLIN: Argumentative.
17    THE WITNESS: I don't know every law on the
18  Penal Code. He could have been.
19    MR. FRANKLIN: Mr. Spencer, he has a fast
20  cadence; so, just slow down so I can object.
21    THE WITNESS: Okay.
22  BY MR. WORGUL:
23    Q   Did you feel like you were in bodily
24  harm at any point in time when Mr. Blakeman had his
25  camera out and you observed it?

Page 242

1  BY MR. WORGUL:
2     Q   Okay. So what else was it that
3  Mr. Blakeman was doing other than having the camera on
4  a pole five feet away from you that made you feel like
5  you were in bodily harm?
6     MR. FRANKLIN: Asked and answered.
7     THE WITNESS: I'll restate my answer.
8        Other guys showing up. They're all on
9  phones. It feels a little intimidating. It could be a
10  possible harm.
11    MR. WORGUL: And I'm just going to move to
12  strike because I'm asking about what else Mr. Blakeman
13  did, not what other people did. I'm asking about him.
14    Q   Other than having the camera on the pole
15  and being five feet away from you, was there anything
16  else that he did that made you feel like you were in
17  risk of bodily harm?
18    MR. FRANKLIN: Asked and answered.
19    THE WITNESS: My original answer is what I stay
20  with.
21  BY MR. WORGUL:
22    Q   So, am I correct that there was no other
23  action that made you feel as if you were in bodily harm
24  that Mr. Blakeman did other than have a camera on a
25  pole within five feet of you?

Page 244

1     A   The potential was there. It crossed my
2  mind.
3     Q   What made you feel in bodily harm by
4  Mr. Blakeman having his camera out?
5     A   It's potentially attached to a weapon.
6     Q   That's not my question. My question is
7  just --
8     A   But you're asking if I felt.
9     Q   Okay.
10    A   Right? So, it crossed my mind; so, when
11  I feel -- when it crosses my mind, I feel what I'm
12  thinking; so, the thought was there.
13    Q   Okay.
14       Do you think that's a reasonable belief?
15    MR. FRANKLIN: Argumentative.
16    THE WITNESS: Yes.
17  BY MR. WORGUL:
18    Q   Okay. And was there anything other than
19  having his camera attached to a selfie stick or pole
20  that made you feel you were in danger of bodily harm?
21    MR. FRANKLIN: Vague and ambiguous.
22    THE WITNESS: Again, when people are showing up
23  and people are on phones, those thoughts cross your
24  mind, why are these guys showing up? Yes.
25  ////

Page 243

1     MR. FRANKLIN: Misstates prior testimony;
2  argumentative.
3     THE WITNESS: And other people showing up with
4  -- on phones and being in the same area.
5  BY MR. WORGUL:
6     Q   Why do you believe Mr. Blakeman is
7  responsible for other people showing up on phones in
8  the same area?
9     A   Because that's just what happens there.
10    Q   Other than that's just what happens
11  there, is there any other reason you believe
12  Mr. Blakeman is responsible for other people showing up
13  with their phones?
14    A   No.
15    MR. FRANKLIN: Asked and answered.
16  BY MR. WORGUL:
17    Q   Okay. Now, getting to the people
18  showing up with phones, every time that you've arrived
19  at the Lunada Bay to surf, you arrive in the morning;
20  correct?
21    A   Both times that I showed up. One time
22  was to surf.
23    Q   Okay.
24       How early in the morning?
25    A   Um, 5:30 to 6:00 a.m.

Page 245

62 (Pages 242 - 245)

| | |
|---|---|
| 1    Q   And they were good surfing days? | 1   possible? |

1   Q   And they were good surfing days?
2   A   Both days were good surfing days.
3   Q   And how many years have you been
4  surfing?
5   A   Thirty plus.
6   Q   Okay. And in your 30-plus years, has it
7  been your experience that as the morning light starts
8  to come and the sky starts to light up, that more
9  people show up to a beach when there's good waves?
10   A   Yes.
11   Q   Okay. And is that consistent with more
12  people showing up at Lunada Bay?
13   MR. FRANKLIN: Assumes facts not in evidence;
14  lacks foundation.
15   THE WITNESS: It would be reasonable that more
16  and more people would show up.
17  BY MR. WORGUL:
18   Q   Have you ever been -- strike that.
19     Do you surf with other people?
20   MR. FRANKLIN: Vague and ambiguous.
21   THE WITNESS: Yes.
22  BY MR. WORGUL:
23   Q   Have you ever called one of your friends
24  when the waves are good and said, "Hey, the waves are
25  good"?

Page 246

1   MR. FRANKLIN: Vague and ambiguous.
2   THE WITNESS: Yes.
3  BY MR. WORGUL:
4   Q   Do they sometimes come to where you're
5  at and surf?
6   A   Yes.
7   Q   And does that increase the amount of
8  people that are in that location then?
9   A   Yes.
10   Q   Okay.
11     Is that possible that that's what those
12  people on their phones were doing at Lunada Bay?
13   A   I don't believe that's what they do
14  there.
15   MR. FRANKLIN: Assumes facts not in evidence.
16  BY MR. WORGUL:
17   Q   As far as you're concerned, that's
18  impossible; correct?
19   MR. FRANKLIN: Misstates prior testimony.
20   THE WITNESS: No.
21  BY MR. WORGUL:
22   Q   Okay. Well, is it possible?
23   A   I don't believe that's what they're
24  doing there.
25   Q   But I'm just asking you if it's

Page 247

1  possible?
2   A   Anything --
3   MR. FRANKLIN: Argumentative.
4   THE WITNESS: Anything is possible.
5   MR. WORGUL: Okay.
6   Q   Have you ever heard any of the
7  conversations that any of the people have been on that
8  are on the phones that you're alleging you see these
9  people that are at Lunada Bay on the phones? Have you
10  ever overheard the actual conversations they're having?
11   A   No.
12   Q   Have you ever seen anyone on
13  walkie-talkies there?
14   A   I have not.
15   Q   You've used the term "Bay Boy," and I've
16  seen many times you take your hands and you put quotes
17  whenever you say that. Why do you do that?
18   A   Why do I say it, or why do I make the
19  quotes?
20   Q   Put the figures of quotes around it.
21   A   Just to, I guess, set that term apart
22  for what it is. It's -- it's a name given to a group
23  of alleged individuals, I guess.
24   Q   Okay.
25   A   I don't know why I do it.

Page 248

1   Q   What is a Bay Boy?
2   A   A Bay Boy is a gang member that controls
3  the territory of Lunada Bay.
4   Q   Anything else?
5   A   They have been documented, and it's
6  known that they vandalize, and they keep people from
7  accessing the bay.
8   Q   Anything else?
9   A   That's good for now. If I think of
10  anything later, I can tell you.
11   Q   How can you distinguish -- are all the
12  Bay Boys male, or are there female Bay Boys?
13   A   I don't know all of them. I don't know
14  all of their genders, but I'm assuming the majority
15  would be male.
16   Q   Do you know who the Crips are?
17   A   Well, I don't know -- again, I don't
18  know them individually, but I know what the Crips are.
19   Q   You learned who they were in your time
20  with the Los Angeles Police Department?
21   A   Before that.
22   Q   Okay. And throughout your work with the
23  L.A.P.D.; right?
24   A   Yes.
25   Q   Officer, do you know who the Bloods are?

Page 249

Hahn & Bowersock, A Veritext Company
800.660.3187

1    A    Yes.
2    Q    Do you know of other gangs as well?
3    A    A few.
4    Q    Okay.  And in your experience working as
5    a police officer, there are usually certain
6    characteristics that define what a member of those
7    gangs are; right?
8        MR. FRANKLIN:  Vague and ambiguous; assumes
9    facts not in evidence; lacks foundation.
10       THE WITNESS:  There's -- again, do I know all
11   the elements that constitute a gang or what the
12   definition, or who made up the definition of a gang is?
13   I don't know that.
14   BY MR. WORGUL:
15       Q    Then how do you know that the Bay Boys
16   are a gang?
17       A    The general characteristics of what is
18   commonly thought of as a gang is what I'm referring to
19   them as a gang.
20       Q    Have you ever known a law enforcement
21   agency to designate the Bay Boys as a gang?
22       MR. FRANKLIN:  Assumes facts not in evidence;
23   lacks foundation.
24       THE WITNESS:  I don't know of any law
25   enforcement agency, no.

Page 250

1    BY MR. WORGUL:
2        Q    Have you ever known of any law
3    enforcement agency attempt to designate a gang dubbed
4    the Bay Boys?
5        MR. FRANKLIN:  Assumes facts not in evidence;
6    lacks foundation.
7        THE WITNESS:  Not that I'm aware of.
8        MR. WORGUL:  Okay.
9        Q    Are you aware of any murders that have
10   occurred in Lunada Bay?
11       A    I'm not.
12       Q    Okay.
13           Are you aware of any drug dealing that's
14   occurred in Lunada Bay?
15       A    I've heard that it goes on.
16       Q    What have you heard?
17       A    That there's narcotic use distribution.
18       Q    From who?
19       A    Just general knowledge.  Nobody in
20   specific.
21       Q    As you sit here today, can you tell me
22   one person that has told you about drug use or
23   distribution occurring at Lunada Bay?
24       A    So, interestingly enough, I had a
25   ride-along with a young kid.  I don't recall his name,

Page 251

1    but he is under the opinion that there's a bunch of
2    narcotic use going on there, and he grew up and
3    actually attempted to surf in Lunada Bay, and stated
4    that there's drug use that goes on there.
5        Q    Okay.
6        A    I can't substantiate that or corroborate
7    it.
8        MR. WORGUL:  I'll move to strike.
9        Q    I just want to know if you know the name
10   of anyone who alleges that there's drug abuse --
11       A    Oh.
12       Q    -- or narcotic use?  Do you know the
13   name of anyone as you sit here today?
14       A    I don't recall his name.  Sorry.
15       Q    Other than him, is there any other names
16   that you know, as you sit here today, of people who
17   have alleged that there's drug abuse or narcotic use or
18   drug trafficking occurring at Lunada Bay?
19       MR. FRANKLIN:  Vague and ambiguous.
20       THE WITNESS:  There's many names that I don't
21   know that have alleged that there's drug abuse going on
22   there.
23   BY MR. WORGUL:
24       Q    Do you contend that Brant Blakeman is
25   involved with any drug abuse?

Page 252

1    A    I don't know.
2    Q    Okay.
3        Do you contend that he is involved with
4    any drug trafficking?
5    A    I don't know.
6    Q    Okay.
7        Would it be fair to say that you don't
8    have any knowledge of whether Mr. Blakeman is involved
9    with drug use or drug trafficking?
10       MR. FRANKLIN:  Misstates prior testimony; vague
11   and ambiguous; lacks foundation.
12       THE WITNESS:  I don't know.
13       MR. WORGUL:  Okay.
14       Q    Are you aware of any assaults with
15   deadly weapons occurring at Lunada Bay?
16       MR. FRANKLIN:  Vague and ambiguous.
17       THE WITNESS:  Any assaults with deadly weapons?
18   I am aware of stories but are you looking -- restate
19   your question.
20   BY MR. WORGUL:
21       Q    Do you have actual knowledge of any
22   assaults with deadly weapons occurring at Lunada Bay?
23       MR. FRANKLIN:  Objection to the extent it calls
24   for a legal conclusion.
25       THE WITNESS:  Just what's been documented in

Page 253

64 (Pages 250 - 253)

1  press and stories.
2  BY MR. WORGUL:
3      Q     Would it be fair to say that you don't
4  have -- would it be fair to say that you lack personal
5  knowledge regarding any assaults with deadly weapons
6  that occurred at Lunada Bay?
7      MR. FRANKLIN:  Vague and ambiguous; calls for
8  legal conclusion.
9      THE WITNESS:  No, I don't think that's fair
10 because I personally read reports.  I've seen video.
11 I've seen footage of rock throwing, which can be
12 considered a deadly weapon; so, no, that's not a fair
13 statement.
14 BY MR. WORGUL:
15     Q     Okay, but you've never seen it actually
16 happen.  You've just viewed a picture or read a report;
17 correct?
18     MR. FRANKLIN:  Vague and ambiguous; calls for
19 legal conclusion.
20     THE WITNESS:  Correct.
21     MR. WORGUL:  Okay.
22     Q     Do you have any actual knowledge of any
23 person shooting at an inhabited dwelling or an occupied
24 motor vehicle in Lunada Bay?
25     A     No.

Page 254

1      Q     Do you have any actual knowledge of any
2  person discharging or permitting the discharge of a
3  firearm from a motor vehicle in Lunada Bay?
4      A     I don't have any knowledge of that.
5      Q     Do you have any actual knowledge of any
6  person committing arson at Lunada Bay?
7      A     No.
8      Q     Do you have any knowledge of any person
9  committing or engaged in grand theft at Lunada Bay?
10     MR. FRANKLIN:  Vague and ambiguous.
11     THE WITNESS:  No.
12 BY MR. WORGUL:
13     Q     Do you have any actual knowledge of
14 anybody committing grand theft of a firearm at
15 Lunada Bay?
16     A     No.
17     Q     Do you have any actual knowledge of
18 anybody engaged in burglary at Lunada Bay?
19     A     Actual knowledge?  No.
20     Q     Do you have any actual knowledge of
21 anyone engaged in rape at Lunada Bay?
22     A     No.
23     Q     Do you have any actual knowledge of
24 anyone engaged in looting at Lunada Bay?
25     A     No.

Page 255

1      Q     Do you have any actual knowledge of
2  anyone engaged in money laundering at Lunada Bay?
3      MR. FRANKLIN:  Assumes facts not in evidence.
4      THE WITNESS:  No.
5  BY MR. WORGUL:
6      Q     Do you have any actual knowledge of
7  anyone engaged in kidnapping at Lunada Bay?
8      A     No.
9      Q     Do you have any actual knowledge of
10 anybody engaged in mayhem at Lunada Bay?
11     MR. FRANKLIN:  Vague and ambiguous; calls for
12 legal conclusion.
13     THE WITNESS:  No.
14 BY MR. WORGUL:
15     Q     Do you have any actual knowledge of
16 anybody engaged in aggravated mayhem at Lunada Bay?
17     MR. FRANKLIN:  Same objection.
18     THE WITNESS:  No.
19 BY MR. WORGUL:
20     Q     Do you have any actual knowledge of
21 anyone being engaged in torture at Lunada Bay?
22     A     No.
23     Q     Do you have any actual knowledge of
24 anyone being engaged in felony extortion at Lunada Bay?
25     MR. FRANKLIN:  Vague and ambiguous; assumes

Page 256

1  facts not in evidence.
2      THE WITNESS:  No.
3  BY MR. WORGUL:
4      Q     Do you have any knowledge of anyone
5  engaged in felony vandalism at Lunada Bay?
6      MR. FRANKLIN:  Vague and ambiguous; lacks
7  foundation.
8      THE WITNESS:  No.
9  BY MR. WORGUL:
10     Q     Do you have any actual knowledge of
11 anyone engaged in carjacking at Lunada Bay?
12     A     No.
13     Q     Do you have any actual knowledge of
14 anyone engaged in a sale, delivery, or transfer of a
15 firearm at Lunada Bay?
16     A     No.
17     Q     Do you have any actual knowledge of any
18 person engaged in the possession of a pistol, revolver,
19 or other firearm capable of being concealed upon their
20 person at Lunada Bay?
21     A     Repeat the question.
22     Q     Do you have any actual knowledge of any
23 person being in the possession of a pistol, revolver,
24 or other firearm capable of being concealed upon the
25 person at Lunada Bay?

Page 257

65 (Pages 254 - 257)

1      A      Yes.
2      Q      Who?
3      A      Myself.
4      Q      Anyone else?
5      A      No.
6      Q      So, between you and the alleged gang
7  members, you're the only person you know of that's
8  brought a firearm to Lunada Bay?
9      A      Correct.
10     Q      Okay.
11            Do you have any actual knowledge of any
12 threats to commit a crime resulting in death to another
13 person or great bodily injury that has occurred at
14 Lunada Bay?
15            MR. FRANKLIN:  Lacks foundation; vague and
16 ambiguous; calls for legal conclusion.
17            THE WITNESS:  No.
18 BY MR. WORGUL:
19     Q      Do you have any knowledge of any person
20 committing a theft or unlawful taking or driving of a
21 vehicle at Lunada Bay?
22     A      No.
23     Q      Do you have any actual knowledge of
24 anyone committing a felony theft of an access card or
25 account information at Lunada Bay?

Page 258

1      A      No.
2      Q      Do you have any knowledge of any person
3  counterfeiting, designing, using, or attempting to use
4  an access card at Lunada Bay?
5      A      No.
6      Q      Do you have any knowledge of any person
7  committing felony fraudulent use of an access card or
8  account information at Lunada Bay?
9      A      No.
10     Q      Do you have any knowledge of any person
11 committing unlawful use of personal identifying
12 information to obtain credit, goods, services, or
13 medical information at Lunada Bay?
14     A      No.
15     Q      Do you have any knowledge of any person
16 wrongfully obtaining Department of Motor Vehicle
17 documentation at Lunada Bay?
18     A      No.
19     Q      Do you have -- do you know what
20 allegations you're making against Mr. Blakeman?
21     A      Well, he's -- how can I -- put it this
22 way.  He's denying access to any beachgoer that wants
23 to use it, in my opinion.
24     Q      What has he done to deny you access?
25     A      To -- well, he's impeded my movement.

Page 259

1      Q      How has he done that?
2      A      I explained it earlier.
3      Q      By having the camera?
4            MR. FRANKLIN:  Counsel, if you can let him
5  answer the question.  You keep interrupting him, and
6  he's trying to answer.  So, if you could let him
7  finish, that would be great.
8            And if you need to speak, keep speaking.
9            THE WITNESS:  Okay.
10           MR. WORGUL:  My apologies, Officer.
11           THE WITNESS:  I explained it earlier.  When
12 you're in the water and you have somebody within two
13 feet of you circling you; staring you down; preventing
14 you from getting waves; preventing you from just
15 enjoying the beach, like you came to do, he's -- he's
16 blocking access to a public place.  He's controlling
17 that access, in my opinion.  He, along with the other
18 Bay Boys, are in a coordinated effort to restrict
19 people from using that area as it was, in my belief,
20 intended by God to be able to use not just for the few
21 but for the entire public.  And for those that feel
22 comfortable to go surf in those waters, they should be
23 able to do so without being afraid; without somebody
24 throwing a camera in their face.
25 ////

Page 260

1  BY MR. WORGUL:
2      Q      Mr. Spencer --
3            MR. FRANKLIN:  He's not done.
4            MR. WORGUL:  I understand, but we have a
5  limited amount of time here.
6            MR. FRANKLIN:  You asked the question.  You
7  don't get to stop him.
8            MR. WORGUL:  I move to strike this.  In court I
9  think a judge would agree with me he's not answering
10 the question.  He's gone well beyond it.  Now he's
11 testifying and giving a narrative.
12           MR. FRANKLIN:  You asked for a narrative,
13 Counsel.
14           MR. WORGUL:  No, I didn't.  I asked what he
15 did.
16           MR. FRANKLIN:  You asked the question so --
17           MR. WORGUL:  About claims that are way afar of
18 my question, and there's a limited amount of time, and
19 I'd like to use it efficiently.  So, I mean, if he
20 wants to answer the questions, that would be much
21 easier.
22     Q      Has Mr. Blakeman ever physically
23 prevented you from walking from the bluff down to the
24 beach?
25     A      Describe "physically."  Give me an

Page 261

66 (Pages 258 - 261)

1 explanation for that, because there's different forms
2 of physical interruption of movement.
3     Q    Did he actually block your ability to
4 walk from the bluff to the beach?
5     A    It's not clear.
6     Q    Did he ever put an object in front of
7 you that stopped you from being able to walk from the
8 bluff to the beach?
9     A    Yes.
10     Q    What?
11     A    I didn't feel comfortable with the
12 camera being so close to me with a stranger holding it
13 filming me.
14     Q    Was that between you and the beach at
15 that time?
16     A    Oh, yes.
17     Q    Okay.
18          Could you have walked around it?
19     A    Should I have to?
20     Q    I'm just asking you if you could.
21     MR. FRANKLIN:  Argumentative.
22     THE WITNESS:  I guess I could have.
23 BY MR. WORGUL:
24     Q    Was there anything preventing you from
25 walking around it?

Page 262

1     MR. FRANKLIN:  Argumentative.
2     THE WITNESS:  Other people.
3     MR. WORGUL:  Okay.
4     Q    Did they actually stop you from walking
5 around it?
6     MR. FRANKLIN:  Argumentative.
7     THE WITNESS:  I didn't -- how can -- no.
8     MR. WORGUL:  Okay.
9     Q    Did Mr. Blakeman, at any point in time,
10 ever stop you from going from the beach and entering
11 the water?
12     A    No.
13     Q    Okay.  So, the only real complaint you
14 have to access against Mr. Blakeman is that you
15 couldn't catch a wave while you guys were both in the
16 water together; is that right?
17     MR. FRANKLIN:  Argumentative; misstates prior
18 testimony.
19     THE WITNESS:  That, along with feeling
20 uncomfortable about being there.
21 BY MR. WORGUL:
22     Q    Okay.  So it's just him making you feel
23 uncomfortable about being there and, then, you not
24 getting a wave that he might have been trying to get?
25     MR. FRANKLIN:  Argumentative; misstates prior

Page 263

1 testimony.
2     THE WITNESS:  He wasn't trying to get waves.
3 He was trying to block us.
4 BY MR. WORGUL:
5     Q    Why do you think he's out there?
6     MR. FRANKLIN:  Assumes facts not in evidence;
7 lacks foundation.  You've never asked him that.
8     MR. WORGUL:  I'm asking him right now.
9     THE WITNESS:  Why do I think he was out there?
10 BY MR. WORGUL:
11     Q    Well, he was out there -- was he
12 swimming?
13     A    He was on his kneeboard.
14     Q    What was -- what is the purpose of a
15 kneeboard?
16     A    Well, if -- if I wasn't there, I'd feel
17 that he would have got plenty of waves.  But since I
18 was there and Chris Taloa was out there, it seemed he
19 was making a concerted effort to block us more than
20 trying to get waves himself.
21     Q    Would you agree with me that surfing is
22 a competitive sport?
23     A    No.
24     MR. FRANKLIN:  Vague and ambiguous.
25     ////

Page 264

1 BY MR. WORGUL:
2     Q    You don't think it's a competitive
3 sport?
4     A    In some arenas, it's competitive.  In
5 other arenas, it's recreational.
6     Q    Even at a recreational level, do you
7 think it's competitive; that, for example, people
8 compete to get a wave?
9     MR. FRANKLIN:  Vague and ambiguous.
10     THE WITNESS:  It depends on who you're surfing
11 with.
12     MR. WORGUL:  Okay.
13     Q    Who determines who gets a wave when
14 there's two people who wants a wave or who want a wave?
15     MR. FRANKLIN:  Vague and ambiguous.
16     THE WITNESS:  Who determines it?
17 BY MR. WORGUL:
18     Q    Yeah.  How do we know who gets the wave?
19 Whose wave is it?
20     A    There's so many factors.  On a --
21 according to my knowledge, on a competitive arena,
22 where you're in a contest, there is several different
23 ways of determining who gets the wave or who has
24 priority of the wave.  I don't think we're talking
25 about that arena here.

Page 265

67 (Pages 262 - 265)

1      Q     No, we're talking about the recreational
2  arena.
3      A     So, if you want to talk about the
4  recreational arena between two civilized people that
5  are not trying to block someone's access --
6      Q     Who determines who is a civilized
7  person?  What is that?
8      MR. FRANKLIN:  Argumentative.
9      THE WITNESS:  Are you going to let me answer
10  the question?
11      MR. FRANKLIN:  I'll tell you right now we're
12  going to stop in a minute if you continue, Counsel.
13  So, you can continue and we'll leave, or we'll be done
14  with you.  I'll allow the other counsel to proceed, but
15  we're this close to being done with argumentative
16  questions; okay?  Do you understand?
17      MR. WORGUL:  It's not argumentative.
18      THE WITNESS:  It's very -- it seems
19  argumentative.
20      MR. FRANKLIN:  I'm telling you so you know this
21  is going to stop, and we're going to leave.
22      MR. WORGUL:  Okay.
23      MR. FRANKLIN:  Okay?
24      MR. WORGUL:  I heard you.  Do you want me to
25  ask another question, or do you want to go with what is
Page 266

1      MR. FRANKLIN:  Vague and ambiguous.
2      THE WITNESS:  No.
3  BY MR. WORGUL:
4      Q     Why not?
5      A     Because you could already be sitting at
6  the closest point.
7      Q     Okay.  But the objective is to get to
8  that closest point; right?
9      MR. FRANKLIN:  Vague and ambiguous; lacks
10  foundation.
11      THE WITNESS:  It depends on if you want to give
12  your friend a wave or not or the person you don't know,
13  give them a wave or not.
14  BY MR. WORGUL:
15      Q     Is there an obligation to give people --
16      A     You just enjoy it.
17      Q     Sorry.  I don't mean to interrupt you.
18  I thought you were stopping so ...
19      A     To just enjoy surfing, you take waves
20  that are given to you because your buddy or a stranger
21  gives them to you because they want to see you enjoy
22  it, or you give them to your buddy or a stranger that
23  you want them to -- I'll often tell somebody, "Hey, if
24  you ever see me going on a wave" -- I did this at
25  Topanga months -- a few months ago.  "If you ever see
Page 268

1  his pending response?
2      MR. FRANKLIN:  You can ask a question.
3      MR. WORGUL:  Okay.
4      Q     What is a -- the civilized surfer you're
5  talking about, describe that for me.
6      MR. FRANKLIN:  Vague and ambiguous.
7      THE WITNESS:  So, in my arena, what I'm
8  normally used to outside of Lunada, is when you're
9  surfing with people, I'll even ask somebody, "Hey, are
10  you going to go left or right?"  And if they say, "I'm
11  going to go left," then I'll go right.  If it's very
12  evident that, say, it's only a right-breaking wave, the
13  person closest, such as Lunada, to what you would call,
14  again, parentheses "the curl" with the most critical
15  new part of the wave is, where it's freshly breaking,
16  the person closest to that, in general surfing
17  etiquette in the surfing world -- nothing written down,
18  of course, as we discussed earlier -- it's that
19  person's wave.  And that is just the way it is; and for
20  the past 30 years it's -- of my life, it's how it's
21  operated very effective.
22  BY MR. WORGUL:
23      Q     Would you agree with me that to be the
24  closest person to the curl, you have to paddle to the
25  closest point?
Page 267

1  me up and riding and you want to go," because I kind of
2  observed a few people, "you go ahead and go.  I'll pull
3  out of your way."  That's -- I mean, that's normal in a
4  lot of places.  So, is that competitive?  I don't think
5  so.
6      Q     And that's your perception of what the
7  norm is in amongst people who surf?
8      A     That's what I've experienced in other
9  places other than Lunada.
10      Q     Okay.
11      Back to the Bay Boys, are there any
12  particular type of clothing that allows to you
13  distinguish a Bay Boy from everyone else?
14      A     Not that I'm aware of.
15      Q     Is there any sort of gang symbols?
16      A     I've heard that there's shirts or
17  sweatshirts, but I -- I have never seen them on
18  anybody, no.
19      Q     Tattoos?
20      A     I've heard tattoos.
21      Q     Okay.
22      Do you know what they look like or what
23  they say?
24      A     I do not.
25      Q     Are there any other defining
Page 269

68 (Pages 266 - 269)

1  characteristics of how you can distinguish a Bay Boy
2  from everyone else?
3      MR. FRANKLIN:  Vague and ambiguous.
4      THE WITNESS:  The only -- the only way I can
5  describe it as is if you're there, and you're not
6  getting hassled, and you have a surfboard, it seems
7  like those are either Bay Boys, or they're accepted to
8  surf there by the Bay Boys.
9  BY MR. WORGUL:
10     Q    Well, how do you know if someone is a
11  Bay Boy versus an accepted person, who is allowed to
12  surf there as a Bay Boy, as opposed to just somebody
13  else who's surfing there?
14     A    I only know that if you get harassed and
15  blocked and your stuff vandalized, that you're not a
16  Bay Boy.
17     Q    So, if you get blocked from surfing at
18  another beach, is that person a part of the gang?
19     MR. FRANKLIN:  Argumentative; incomplete
20  hypothetical.
21     THE WITNESS:  Counsel, I've never experienced
22  anywhere the type of blocking that your client did to
23  me anywhere in the world where I've surfed.
24     MR. WORGUL:  I'll move to strike as
25  nonresponsive.

Page 270

1      Can you read back my question?
2      (Whereupon, the record was read back
3  by the court reporter as follows:
4      "Q  So, if you get blocked from surfing
5  at another beach, is that person a part of the
6  gang?")
7      THE WITNESS:  I think I answered the question.
8  I've never been blocked at any other beach.
9  BY MR. WORGUL:
10     Q    Have you ever surfed Surfrider Beach in
11  Malibu?
12     A    Several times.
13     Q    And you've never been blocked there?
14     A    Never.
15     Q    With the hundreds of people that surf
16  there?
17     A    Thousands of people that surf there.
18     Q    Okay.
19     A    I get so many waves at Malibu, and I
20  give so many waves at Malibu.  It's incredible.
21     Q    Okay.
22         Would it be fair to say that the only
23  way you can describe a Bay Boy is by somebody who did
24  something to you that you didn't like?
25     MR. FRANKLIN:  Misstates prior testimony.

Page 271

1      THE WITNESS:  No.
2  BY MR. WORGUL:
3      Q    Well, is there anything -- I don't think
4  you've told me anything other than somebody who blocks
5  you while they're surfing at Lunada Bay or happening to
6  be surfing there who you don't know.  Is there anything
7  else so that I could determine who is and who isn't a
8  Bay Boy?
9      MR. FRANKLIN:  Misstates prior testimony.
10     THE WITNESS:  I think I answered that a long
11  time ago with the previous counsel, and that the people
12  that are not getting yelled at and called "kooks" and
13  told to go, "Get the fuck out of there," that would be
14  another determining factor of whether or not they're a
15  Bay Boy or not.
16  BY MR. WORGUL:
17     Q    Okay.  So, it's based upon the conduct
18  that's occurring in the water that determines whether
19  or not the person is a Bay Boy or not?
20     MR. FRANKLIN:  Misstates prior testimony.
21     THE WITNESS:  It starts from the street; down
22  the bluff; in the water; on the beach.
23  BY MR. WORGUL:
24     Q    So, am I saying it correctly that it's,
25  basically, anyone who can go down there and surf and

Page 272

1  not get hassled, that person is a Bay Boy to you?
2      A    Or allowed to surf there by them.
3      Q    Well, how do you know who is a Bay Boy
4  versus a person who is just allowed to surf there by
5  them?
6      A    I don't.
7      Q    Okay.
8          How did you make a distinction amongst
9  the named defendants other than the city and --
10  Palos Verdes Estates -- that any person was a Bay Boy?
11     MR. FRANKLIN:  Objection to the extent it calls
12  for communication with counsel.
13         To extent it was that, I'd instruct you
14  not to answer.
15     THE WITNESS:  I refuse to answer the question.
16  BY MR. WORGUL:
17     Q    Okay.  And that's based on your
18  counsel's instruction; correct?
19     A    Correct.
20     Q    Are you going to surf this weekend?
21     A    Possibly.
22     Q    Are you aware that there's a western
23  northwest swell that's going to be coming in?
24     A    I am.
25     Q    Are you going to go surf Lunada Bay?

Page 273

69 (Pages 270 - 273)

1    A    No.
2    Q    Why not?
3    A    I don't feel comfortable right now.
4    Q    What is it about right now that you
5    don't feel comfortable about?
6    A    I don't feel the problem has been
7    addressed by the police; by the city. I believe that
8    there's still Bay Boy members that are going to be
9    there, and I don't want to get into any type of
10   confrontation.
11   Q    Okay. And the only thing that's
12   different between now and the last time that you went
13   there and surfed is that you also have a lawsuit
14   against all these people right now as well; correct?
15        MR. FRANKLIN: Misstates -- excuse me. Vague
16   and ambiguous; lacks foundation.
17        THE WITNESS: That's not the only thing
18   different.
19   BY MR. WORGUL:
20   Q    What else is different?
21   A    Time has passed. I don't know what
22   their states of mind are. You know, what their
23   feelings are, if they're hostile. I don't know. I
24   don't want to even deal with any of that. I just want
25   to go surf somewhere peaceful, and I don't feel I can

Page 274

1    do that right now at Lunada.
2    Q    Do you consider Mr. Taloa to be a
3    peaceful person?
4    A    Every time I've dealt with him, he's
5    been peaceful.
6    Q    Have you ever seen him make aggressive
7    actions to anyone at Lunada Bay?
8    A    I have never seen that from Chris, no.
9    Q    Are you aware if he's ever communicated
10   any sort of violent words to anyone at Lunada Bay?
11   A    I'm not aware, no.
12   Q    What's a "kook"?
13   A    I can't give you a specific definition
14   of it.
15   Q    Do you know what one is?
16   A    No.
17   Q    Okay. And why would you be offended by
18   the term?
19   A    It's my understanding it's a derogatory
20   term, especially within the surf community, where you
21   call somebody a "kook" that doesn't either surf well or
22   doesn't belong there or that you just don't like, but I
23   don't know the specific definition. I don't know if
24   there is a definition for that.
25   Q    Do you surf well?

Page 275

1    A    Just average, in my opinion.
2    Q    Would you consider yourself an expert?
3    A    I don't -- I consider the top pros in
4    the world experts. I'm not that.
5    Q    What's the largest wave you've ever
6    surfed?
7    A    Well, over my head; but I don't have a
8    measurement. I don't know in feet, but Lunada was
9    overhead the day that we were there for me. A lot of
10   waves are overhead for me, unfortunately; but
11   fortunately.
12   Q    In your 30 years of surfing, have you
13   learned how to measure a wave at all in any way?
14   A    Not technically. I mean, there's
15   Hawaiian measurements. There's face-height
16   measurements. There's California measurements.
17   Q    Do you understand those?
18   A    An average understanding. Overhead is,
19   you know, overhead; and double overhead is double that.
20   Q    Based on your understanding, what's the
21   largest wave you've ever surfed?
22   A    It wasn't at Lunada, but it's probably a
23   good double; double overhead; triple overhead.
24   Q    You're about five-two; so, that's
25   somewhere between 10 and 15 feet on the front face?

Page 276

1    A    No. In general terms of the word
2    meaning "overhead"; so, I think -- I think they're
3    basing that on an average male height, and I don't
4    think five-two meets that.
5    Q    Well, I always think of overhead as
6    somewhere around six feet, and double overhead as
7    somewhere around 10, 12; and triple being somewhere in
8    the 15 to 20-foot range. Is that similar for you?
9    A    Yeah. That's -- that sounds pretty
10   close.
11   Q    Okay. So, the largest waves that you
12   surfed are maybe 10 to 12 feet?
13   A    Again, probably on face height,
14   El Segundo jetty, you know, is the fish 12-inches or,
15   you know, two feet. I don't know. If I were to
16   estimate, probably triple overhead.
17   Q    Okay. And you do that at the El Segundo
18   jetty?
19   A    Yes.
20        MR. FRANKLIN: Misstates prior testimony.
21   BY MR. WORGUL:
22   Q    That's a big wave spot, isn't it?
23   A    It can be.
24   Q    Just to the north of that is Hammerland?
25   A    Just to the north of the jetty?

Page 277

70 (Pages 274 - 277)

1     Q     Yes.
2     A     That's correct.
3     Q     The other side, I think, is sometimes
4   called "Secret Spot"? Some people call it other
5   things. They call it the "jetty"?
6     A     I don't know. I just call it the south
7   side of the jetty.
8     Q     You surf both spots?
9     A     I haven't surfed Hammerland, no.
10    Q     Why not?
11    A     I don't want to go left on a big wave.
12    Q     Have you surfed the Redondo Breakwall?
13    A     I have not.
14    Q     Do you consider that a premiere big wave
15  spot in Southern California?
16    A     I don't know about premiere but it's --
17  it gets big there.
18    Q     How about Black's Beach? Do you
19  consider that a premiere big wave spot?
20    A     San Diego County; correct? I've seen
21  pictures, but I've never surfed there.
22    Q     Do you consider yourself a big wave
23  surfer?
24    A     I just consider myself a surfer. I'll
25  surf whatever you want to give me or whatever God gives

Page 278

1   me.
2     Q     Have you ever advised someone on how to
3   do a citizen's arrest?
4     A     On how to do it?
5     Q     Yes.
6     A     Typically, what I advise somebody is
7   when they state they want to make one or, say, a
8   misdemeanor has been committed not in my presence, I
9   just -- the phone. I didn't know if that was something
10  coming up.
11          I'll advise them that they can make the
12  citizen's arrest. I will facilitate the arrest; take
13  that person into custody for them; either issue them a
14  citation, where it's warranted, or take the person to
15  jail if it's warranted.
16    Q     So, you have an understanding of how
17  that process works?
18    A     I -- I've done it several times; so, I
19  think so.
20    Q     Is there any reason that at any point in
21  time that you've had some sort of problem at
22  Lunada Bay, you have not effected a citizen's arrest?
23    A     Yes.
24    Q     What's the reason?
25    A     I didn't think it would go anywhere with

Page 279

1   the DA.
2     Q     Okay.
3          How would you know that unless you did
4   it?
5     A     I wouldn't.
6     Q     But would I be correct in saying that
7   you consciously knew you had the option to do it if you
8   desired to do it whenever you were present at
9   Lunada Bay, and there was other law enforcement
10  present?
11    A     Yes.
12    Q     And you chose not to; correct?
13    A     Well, I have that discretion. I chose
14  not to.
15    Q     You said there's a channel at
16  Lunada Bay. Where's the channel?
17    A     Well, a channel is a moving thing with
18  tide and positioning of the wave, depending on the
19  conditions; so, a "channel," again, in parenthesis --
20  sorry -- to describe a channel, is a place where the
21  wave is not breaking at a critical point, where you
22  would paddle out and into the channel to get back
23  out to what's called the "lineup," where you sit and
24  wait for the waves.
25    Q     Do you know where the channel is at

Page 280

1   Lunada Bay?
2          MR. FRANKLIN: Asked and answered.
3          MR. WORGUL: He explained what a channel is.
4   He didn't tell me whether he knew where it was or not.
5          THE WITNESS: Towards the middle of the bay.
6   BY MR. WORGUL:
7     Q     Can you more discreetly describe where
8   it is?
9     A     No.
10    Q     Okay. And when you say, "the middle,"
11  is that from the southern point to the northern point?
12    A     It could go southern point to the
13  northern point or northern point to the southern point.
14  Either point is in the middle.
15    Q     Okay.
16          When you were -- when you were skegged,
17  when you got your wrist cut, did Mr. Blakeman do that?
18    A     No.
19    Q     Do you know who did that?
20    A     I don't know who did it.
21    Q     Do you know if it was any named
22  defendant?
23    A     I don't know.
24    Q     Do you believe that Mr. Blakeman was
25  responsible for that at all?

Page 281

71 (Pages 278 - 281)

1     MR. FRANKLIN: Vague and ambiguous.
2     THE WITNESS: I don't know. I don't know if he
3 talked to whoever did it beforehand, and they
4 coordinated it.
5 BY MR. WORGUL:
6     Q     Do you believe --
7     A     I don't know.
8     Q     Do you believe that any other named
9 defendant was responsible for it?
10    A     I have no idea.
11    MR. FRANKLIN: Vague and ambiguous.
12 BY MR. WORGUL:
13    Q     Do you have any reason to believe
14 Mr. Blakeman was responsible for it?
15    A     I have every reason to believe he could
16 have been responsible for it. In some way, he's
17 identified as a Bay Boy. They communicate. They
18 intimidate. He could have been. I don't know.
19    Q     Who's identified Mr. Blakeman as a
20 Bay Boy?
21    A     It's just -- it's just well-known in the
22 community that he is one of them.
23    Q     As you sit here today, can you tell me
24 the name of any person who's --
25    A     I cannot.

Page 282

1     Q     -- identified Mr. Blakeman as a Bay Boy?
2     A     No.
3     Q     As you sit here today, can you tell me
4 the name of any person who's identified any named
5 defendants as a Bay Boy?
6     A     Any named defendant as a Bay Boy? Well,
7 Chris knows them all -- well, not knows them all; but
8 knows a lot of the names, yes.
9     Q     Other than Chris Taloa, is there any
10 other person?
11    A     Kenny, maybe.
12    Q     Other than Chris Taloa and Kenny, is
13 there any other person?
14    A     Not that I know.
15    Q     I believe you mentioned that there was
16 some sort of shirts or clothing you associated with the
17 Bay Boys. Have you ever seen Mr. Blakeman wear any
18 clothing that you associate with the Bay Boys?
19    A     No.
20    Q     Other than Mr. Blakeman's presence at
21 Lunada Bay, has he done anything that makes you believe
22 he's associated with the Bay Boys?
23    MR. FRANKLIN: Asked and answered.
24    THE WITNESS: Well, aside from what I described
25 earlier.

Page 283

1 BY MR. WORGUL:
2     Q     Aside from that?
3     A     Aside from -- aside from what's already
4 on record, no.
5     Q     Okay.
6     Are you aware of Mr. Blakeman ever
7 committing any criminal act?
8     MR. FRANKLIN: Calls for legal conclusion.
9     THE WITNESS: Again, I -- I'd have to see if I
10 could articulate that as what we described earlier as
11 false imprisonment. I don't know.
12 BY MR. WORGUL:
13    Q     Are you aware of Mr. Blakeman ever being
14 arrested for a criminal act?
15    A     I am not.
16    Q     Are you aware of Mr. Blakeman ever being
17 convicted of a criminal act?
18    A     I am not.
19    Q     Have you ever seen Mr. Blakeman hit
20 anyone?
21    A     I have not.
22    Q     Have you ever seen Mr. Blakeman
23 vandalize a car?
24    A     I have not.
25    Q     Have you ever seen Mr. Blakeman throw a

Page 284

1 rock at someone?
2     A     No, I have not.
3     Q     Have you ever seen Mr. Blakeman impede
4 boat traffic at Lunada Bay?
5     A     No boats.
6     Q     Have you ever seen Mr. Blakeman use a
7 phone at Lunada Bay?
8     A     I believe I have.
9     Q     What sort of phone?
10    A     I don't recall. I think I have seen him
11 on the phone.
12    Q     Can you describe it in any way? Was it
13 like a Smartphone, like an iPhone, a flip phone?
14    A     I don't recall.
15    Q     Do you have any knowledge of
16 Mr. Blakeman being involved with the rock fort or the
17 patio other than potentially being there on the day
18 that you said he was at the beach?
19    A     No, not other than that.
20    Q     Okay.
21    Are you aware of Mr. Blakeman ever
22 injuring anyone at or near Lunada Bay?
23    MR. FRANKLIN: Vague and ambiguous.
24    THE WITNESS: I cannot recall if he was one of
25 those that was present for exposing himself to my

Page 285

72 (Pages 282 - 285)

1 co-plaintiff. I'm not sure if he was there or not, but
2 I seem to remember that he might have exposed himself,
3 and that would be some -- if I were a female I think I
4 would have some mental anguish about that.
5    BY MR. WORGUL:
6    Q    Other than what you told me, do you know
7 anything else about Mr. Blakeman potentially exposing
8 himself to someone at Lunada Bay?
9    A    No.
10   Q    You get in and out of a wetsuit when you
11 surf, right, you yourself?
12   A    Yes.
13   Q    On occasion, do your private parts
14 sometimes get exposed?
15   MR. FRANKLIN:  Vague and ambiguous.
16   THE WITNESS:  I cannot remember exposing at any
17 point to anybody my private parts while I was changing
18 in a wetsuit -- in and out of a wetsuit, no.
19   BY MR. WORGUL:
20   Q    Okay.  Just in the past 30 years that
21 you've been surfing, have you ever seen, like, somebody
22 else who's surfing who's getting in or out of their
23 wetsuit inadvertently expose themselves to other
24 people?
25   A    Not that I can recall.

Page 286

1 nice path down there with parking.  I'd like to see
2 bathrooms, signs, and a good amount of police presence
3 to ensure that people feel safe to go there.
4    Q    Anything else?
5    A    At this time, that about sums it up.  I
6 can maybe think of a few other things but ...
7    Q    If you could have all of those things,
8 would you still be fine with Mr. Blakeman surfing
9 there?
10   A    If he were not to do the same things
11 that he's done in the past and be friendly and
12 welcoming and inviting, you know, maybe -- maybe after
13 a while, it would be nice to surf with anybody who
14 wants to surf there peacefully.
15   Q    Is it -- is that one of the other things
16 that you want?  You want Mr. Blakeman to be friendly
17 and inviting to you?
18   A    I just want people to be civil.
19   Q    I guess what my question, though, is do
20 you want Mr. Blakeman to be friendly and inviting to
21 you?  Is that something that you want?
22   A    I don't need him to be my buddy, but I
23 don't need to have cameras stuck in my face; be circled
24 around in the water; him or anybody else exposing
25 themselves to females that want to go down there and

Page 288

1    Q    So you've never seen somebody --
2    A    I've seen towels, and I've seen the
3 hoodie towels, but I've never seen anybody's genitals
4 changing in 30 years.  Maybe I haven't looked.
5    Q    How about their butt crack?  I don't
6 know who was looking at these times, but I'm just
7 curious whether or not that's something you've seen?
8    A    Yeah, I don't know.
9    MR. FRANKLIN:  Do you have a time estimate?
10   MR. WORGUL:  I'm almost done.
11   MR. FRANKLIN:  How much of our total record
12 time right now?
13   THE REPORTER:  Five hours thirty-nine minutes.
14   BY MR. WORGUL:
15   Q    I think you said earlier that you wanted
16 to have the ability to enjoy Lunada Bay.  What do you
17 need to enjoy Lunada Bay?
18   A    I need what I feel I've experienced at
19 other places, and that is nobody making you feel unsafe
20 while you go there; not running you over on purpose;
21 not immediately, once you get out of your car, trying
22 to verbally harass and intimidate you from going down
23 into the water.  I need people not to purposely prevent
24 me from catching waves by doing childish circles around
25 me.  And, as I mentioned earlier, I'd like to see a

Page 287

1 enjoy the beach.  I don't need him to coordinate with
2 his buddies from keeping people going down to the
3 beach, even to get to the water.  Yeah, I don't want
4 him to do all that.
5    Q    I believe you said the one time you
6 interacted with Mr. Blakeman was on January 29th of
7 2016, and there was two other times.  I just want to
8 check real quick.  Can you tell me when the other two
9 times were that you interacted with him?
10   A    Describe -- I guess clarify
11 "interaction" for me.
12   Q    Well, you said there was three times
13 that you actually saw him --
14   A    Okay.  Saw him.
15   Q    -- outside of a video or anything else,
16 and one was the 29th of January of 2016?
17   A    Yes, and I don't know the other two
18 specific dates.  I don't -- I couldn't tell you.
19   Q    Were they after that time or before that
20 time?
21   A    After the January time.
22   Q    Okay.  And were they -- can you tell me
23 where they were?  Was it on the bluff?  Was it in
24 the --
25   A    On the bluff.

Page 289

73 (Pages 286 - 289)

1      Q      Okay.  So it wasn't --
2      A      The other two times were on the bluff
3  not in the water.
4      Q      Not in the water, and was Mr. Blakeman
5  in a wetsuit?  Was he in normal clothes?
6      A      The other two times?
7      Q      Yes.
8      A      Normal clothing.
9      Q      And did you actually speak with
10  Mr. Blakeman at all?
11     A      Never spoke with him.
12     Q      You never said any words to him;
13  correct?
14     A      Correct.
15     Q      And he never said any words to you?
16     A      Correct.
17     Q      And Mr. Blakeman never touched you
18  either of those times; correct?
19     A      Correct.
20     Q      Okay.
21            Would you agree with me that -- strike
22  that.
23            Do you know why you're alleging that
24  Mr. Blakeman battered you?
25     A      That he battered me?

Page 290

1      Q      That's an allegation in your complaint.
2  Do you know why you're alleging that?
3      A      I don't recall where that's at.
4      Q      Okay.
5            Could you look at your -- at the
6  complaint.  It's -- I want to say it's the sixth or the
7  seventh cause of action.  It's towards the end.
8      A      So, give me a page and a line number.
9      Q      Page 38, and the heading starts on
10  line 25.
11     A      The only thing I see is "SEVENTH CAUSE
12  OF ACTION."  Am I in the wrong place?
13     Q      Do you see at line 26 where it says the
14  (Battery - LUNADA BAY BOYS and the Individual
15  Defendants)"?
16     A      Oh, I see what you're getting at.  So,
17  in regards to myself.  You want me to take a minute?
18  Where should I read from and to?
19     Q      Well, do you have any understanding why
20  you're alleging that Mr. Blakeman battered you?
21     A      So, I can --
22     MR. FRANKLIN:  Why don't you read the seventh
23  cause of action to answer the question.
24     THE WITNESS:  Okay.  So, I could only testify
25  as to myself.  As you know, there's other members in

Page 291

1  the class action and the class itself; so, in regards
2  to me, Mr. Blakeman never battered myself physically,
3  my person.
4  BY MR. WORGUL:
5      Q      And do you understand that when you made
6  this allegation, when this complaint was filed, that
7  you were alleging that he battered you?
8     MR. FRANKLIN:  Misstates this complaint.
9     THE WITNESS:  That's not accurate in my
10  understanding of the complaint.  That's not an accurate
11  statement.
12  BY MR. WORGUL:
13     Q      Okay.  And do you know if the complaint,
14  though, actually says that, that this says that you
15  were battered by Mr. Blakeman?
16     MR. FRANKLIN:  The document speaks for itself;
17  argumentative.
18     THE WITNESS:  I can only testify as to my
19  understanding of this complaint, and I don't understand
20  the complaint to describe that.
21  BY MR. WORGUL:
22     Q      Okay.  So, even though you're a class
23  representative or want to be a class representative,
24  you don't exactly understand what's in the complaint?
25     MR. FRANKLIN:  Argumentative; calls for a legal

Page 292

1  conclusion.
2     THE WITNESS:  So, as a class representative, as
3  a plaintiff, I'm definitely not an expert in all things
4  legal.  I don't understand this complaint to accurately
5  reflect your statement.
6  BY MR. WORGUL:
7      Q      Other than Mr. -- did you consider
8  Mr. Blakeman circling you in the water to be an
9  assault?
10     A      I consider it impeding and blocking my
11  movement.
12     Q      Did you consider it to be an assault?
13     A      No.
14     Q      Okay.
15            Do you know why you're alleging a cause
16  of action against Mr. Blakeman for assault?
17     A      Again --
18     MR. FRANKLIN:  Misstates the complaint.
19     THE WITNESS:  -- going back to the complaint --
20     MR. FRANKLIN:  The document speaks for itself.
21  BY MR. WORGUL:
22     Q      And I'm not asking what the document
23  says.  I'm just asking do you know why you're alleging
24  assault against Mr. Blakeman?
25     A      Going back to the complaint, it speaks

Page 293

74 (Pages 290 - 293)

1  for itself.  That's all I'm going to answer.
2      Q    So, the only reason that you're alleging
3  assault against Mr. Blakeman is because it's written in
4  the complaint; is that correct?
5      MR. FRANKLIN:  Argumentative; misstates his
6  testimony.
7      THE WITNESS:  Yes.
8      MR. WORGUL:  Okay.
9      Q    Do you know why you're alleging
10  negligence against Mr. Blakeman?
11     A    Again, going back to the complaint and
12  to the body of the class, I can only testify what
13  happened personally to me.
14     Q    You're aware that -- I'm sorry.
15     A    Other -- okay.  Other members within the
16  complaint can testify to what happened to them.  I
17  cannot.
18     Q    Do you know what the Bane Act is?
19     A    I do not.  I -- I know of it.  I don't
20  know all the details of it.  I know it has to do with
21  some type of civil gang injunction.
22     Q    Are you aware of any act that
23  Mr. Blakeman has done to you that gives rise to a
24  violation of the Bane Act?
25     MR. FRANKLIN:  Calls for expert testimony;
Page 294

1  also, calls for a legal conclusion.
2      THE WITNESS:  The only thing that I can testify
3  to that is through investigation that counsel has done,
4  including him within this class, would qualify him for
5  the Bane Act.
6  BY MR. WORGUL:
7      Q    That's the full extent --
8      A    On advice of my counsel.  That's the
9  full extent that I know; correct.
10     Q    Okay.
11          You understand what the Predicate Acts
12  are for the enhanced -- the gang enhancement in the
13  Penal Code; correct?
14     A    No.
15     Q    Do you remember when I asked you all
16  those questions about whether this crime was committed
17  at Lunada Bay?
18     A    I do.
19     Q    I was reading from the statute in asking
20  you if those things happened.  Are you aware of
21  Mr. Blakeman committing any sort of felonious act that
22  would give rise to some sort of gang enhancement under
23  that statute?
24     MR. FRANKLIN:  Calls for a legal -- objection.
25  Calls for a legal conclusion; calls for an expert
Page 295

1  testimony.
2      THE WITNESS:  I think we went over that.  I
3  didn't know any of -- or couldn't testify to any of
4  those points you made.
5  BY MR. WORGUL:
6      Q    I think you said earlier that it's your
7  God-given right to be able to use the coast.  Do you
8  remember saying that?
9      A    That's my belief.
10     Q    Is it your God-given right to get waves
11  at Lunada Bay?
12     MR. FRANKLIN:  Objection: argumentative.
13     THE WITNESS:  It would be nice to get some
14  peacefully.
15  BY MR. WORGUL:
16     Q    But is it your "God-given right" as you
17  used that term?
18     MR. FRANKLIN:  Objection: argumentative; vague
19  and ambiguous.
20     THE WITNESS:  I believe it is.
21  BY MR. WORGUL:
22     Q    Is that anyone else's right to be able
23  to do that?
24     A    I believe so.
25     Q    Has -- do you believe that your safety
Page 296

1  has ever been threatened since the time that you last
2  interacted with Mr. Blakeman?
3      MR. FRANKLIN:  Vague and ambiguous.
4      THE WITNESS:  Very vague and ambiguous.  My
5  safety is jeopardized on a daily basis.
6      MR. WORGUL:  I'll ask a better question.
7  You're right.  You're a police officer.
8      Q    Do you believe that your safety has ever
9  been threatened because of Brant Blakeman since the
10  last time you interacted with him?
11     A    Got it.
12     MR. FRANKLIN:  Vague and ambiguous.
13     THE WITNESS:  I don't -- again, I have to
14  answer very general because it could be.  I don't know
15  -- I don't know if they're plotting anything.  I don't
16  know -- I'm not aware of any of their actions after
17  that day; so, do I look over my shoulder at times?  I
18  do -- a lot.  But that's it.  I can't tell you whether
19  or not they're planning anything.  Do they plot
20  anything?  I don't know.
21  BY MR. WORGUL:
22     Q    Do you have any reason to believe that
23  Brant Blakeman ever circulated a photograph of you to
24  any other person?
25     A    I have no knowledge of that.
Page 297

75 (Pages 294 - 297)

1    Q    Do you have any reason to believe that
2   Brant Blakeman circulated a video of you to any other
3   person?
4        MR. FRANKLIN:  Vague and ambiguous.
5        THE WITNESS:  I have no knowledge.
6   BY MR. WORGUL:
7        Q    In your supplemental disclosures at
8   Witness No. 60 was, I think, Kenny --
9        MS. HEWITT:  Claypool.
10  BY MR. WORGUL:
11       Q    -- Kenny Claypool, and part of your
12  supplemental disclosures indicate that he will testify
13  about several incidents of harassment at Lunada Bay
14  involving individuals such as Brant Blakeman.
15           Are you aware of anything that
16  Mr. Blakeman's done that constitutes harassment that
17  Mr. Claypool has knowledge of?
18       MR. FRANKLIN:  Lacks foundation.
19       THE WITNESS:  I can only testify to what's
20  happened to me; so, I don't know.
21  BY MR. WORGUL:
22       Q    Exhibit 34 are your supplemental
23  disclosures; correct?
24       MR. FRANKLIN:  Misstates the document.
25  ////

Page 298

1   BY MR. WORGUL:
2        Q    Could you answer my question, please?
3        A    Are these mine?
4        Q    Yes.
5        A    Did I produce them?
6        Q    Well, they're your supplemental
7   disclosures as a party in this action, aren't they?
8        MR. FRANKLIN:  Misstates the document;
9   argumentative.  It says, "PLAINTIFFS' SUPPLEMENTAL
10  DISCLOSURES."  Counsel, if you want to point somewhere
11  where it specifically says, "Officer Cory Spencer's
12  Supplemental Disclosures," please do so.
13  BY MR. WORGUL:
14       Q    At page 2, line 15, let me know if I
15  read it correctly, "Plaintiffs CORY SPENCER ...."
16  Cory Spencer is you; correct?
17       A    Correct.
18       Q    So, (as read):
19           "Plaintiffs CORY SPENCER,
20  DIANA MILENA REED, and COASTAL PROTECTION
21  RANGERS ... make the following supplemental
22  initial disclosures pursuant to the
23  Federal Rules of Civil Procedure 26(a)(1)."
24           Did I read that correctly?
25       MR. FRANKLIN:  He also has counsel on this

Page 299

1   so ...
2        THE WITNESS:  Yes.
3   BY MR. WORGUL:
4        Q    Okay.  So are these your supplemental
5   disclosures?
6        A    They're mine.  They're Milena Reed's.
7   They're Coastal Protection Rangers, and they're the
8   class as a group.
9        Q    Do you have any knowledge why the
10  District Attorney is not a defendant in this case?
11       A    No.
12       Q    You believed that the District Attorney
13  wouldn't prosecute these crimes that you believe
14  occurred; correct?
15       A    That's -- that was my belief.
16       Q    And your experience as a police officer,
17  it is typically the District Attorney's responsibility
18  to prosecute crimes within the County of Los Angeles;
19  correct?
20       A    Correct.
21       Q    You testified earlier that the surfing
22  accident that happened, that the person who --
23       MR. FRANKLIN:  Misstates prior testimony.
24  BY MR. WORGUL:
25       Q    The person who allegedly ran you over,

Page 300

1   that's the event I just want to go back to for a few
2   questions, and I believe you said something along the
3   lines -- and correct me if I'm wrong -- that the person
4   who ultimately cut you, afterwards said, "I couldn't
5   see you," and "You shouldn't be paddling in the
6   sunlight," or something along that lines; correct?
7        A    Correct.
8        Q    Did you believe that to be that person
9   in a way acknowledging that they didn't intentionally
10  mean to cut you?
11       A    I didn't take what he said for that, no.
12  I took what he said deflection; and when you know
13  somebody committed an intentional act and they tried to
14  deflect, you know when they're deflecting, and that's
15  what he was doing.
16       Q    Is there a reason that you believe that
17  person would be deflecting, in light of these people
18  telling you, "Go home, fucking kook.  Don't surf here,"
19  the harassment that you've had that, then, somebody out
20  in the water, who you believe intentionally hurt you,
21  then provides statements that indicate that they didn't
22  intentionally hurt you?
23       A    What's your question?
24       MR. FRANKLIN:  Asked and answered.
25       MS. HEWITT:  Could you read back the question,

Page 301

76 (Pages 298 - 301)

1 please?
2        (Whereupon, the record was read back
3    by the court reporter as follows:
4        "Q  Is there a reason that you believe
5    that person would be deflecting, in light of
6    these people telling you, 'Go home, fucking
7    kook. Don't surf here,' the harassment that
8    you've had that, then, somebody out in the
9    water, who you believe intentionally hurt you,
10   then provides statements that indicate that
11   they didn't intentionally hurt you?")
12   MR. FRANKLIN:  Objection: compound; vague and
13 ambiguous; unintelligible.
14 BY MR. WORGUL:
15   Q    Do you understand my question?
16   A    I think so.
17   Q    Could you answer it, please?
18   A    I think he did that because he didn't
19 want me to implicate him in the crime that he just
20 committed and wanted to give a reason why he ran me
21 over.
22   Q    And you talked to police officers after
23 that crime that you believed happened; correct?
24   A    Did I talk to them?
25   Q    Well, you testified you did.

Page 302

1    A    Yes.
2    Q    And you didn't make a citizen's arrest;
3 correct?
4    A    Correct.
5    Q    And you didn't ask the police officers
6 to arrest that person either?
7    A    That's correct.
8    Q    Can you tell me the name of every person
9 that you believe is a victim of the Lunada Bay Boys?
10   A    No.
11   MR. FRANKLIN:  Vague and ambiguous.
12   MR. WORGUL:  Okay.
13   Q    Do you believe Blake -- or
14 Brant Blakeman is responsible for your pain and
15 suffering that you're alleging in this lawsuit?
16   A    I believe he's part of it.
17   Q    Do you believe that he's responsible for
18 your lost sleep?
19   A    As I stated earlier, I believe he's part
20 of it.
21   Q    Do you believe he's responsible for your
22 emotional distress?
23   A    Yes, he's part of it.
24   Q    Do you believe he's responsible for your
25 mental anguish?

Page 303

1    A    Of course.
2    Q    Other than the actions that you've told
3 me about Mr. Blakeman, which have been him holding up a
4 selfie GoPro with a camera and surfing around you in
5 the water and blocking you from getting away and, then,
6 other people being present on the bluffs at Lunada Bay
7 calling people on their phone, is there any other act
8 that Mr. Blakeman's done that you believe makes him
9 responsible for the damages you're alleging?
10   A    Just his association with the Bay Boys.
11   Q    Do you know any -- of any documents that
12 exist that associate Mr. Blakeman as a Bay Boy?
13   MR. FRANKLIN:  Vague and ambiguous.
14   THE WITNESS:  Any documents?
15   MR. WORGUL:  Yes.
16   MR. FRANKLIN:  Vague and ambiguous.
17   THE WITNESS:  I don't.
18 BY MR. WORGUL:
19   Q    Do you know of any photographs that
20 exist that associate Mr. Blakeman as a Bay Boy?
21   A    Not that I'm aware of.
22   Q    Do you know of any videos that exist
23 that associate Mr. Blakeman as a Bay Boy?
24   MR. FRANKLIN:  Vague and ambiguous.
25   THE WITNESS:  I don't know of any videos, no.

Page 304

1    MR. WORGUL:  Okay.
2    MS. LUTZ:  Can we take a break for a second?
3 Just like two minutes.
4    MS. HEWITT:  Is that okay with you,
5 Mr. Spencer?
6    THE WITNESS:  Yes.
7        (A recess was taken at 5:30 p.m.
8        until 5:39 p.m.)
9        (Whereupon, Mark C. Fields, Esq.,
10       left the proceedings.)
11
12       FURTHER EXAMINATION
13 BY MS. HEWITT:
14   Q    All right.  Counsel has kindly allowed
15 me to ask one question I forgot to ask earlier.
16   A    Okay.
17   Q    With regard to he asked you what a
18 "kook" meant, and I think you said something about not
19 being from around the area or such.  Did you -- were
20 you ever asked by anybody at the City of Palos Verdes
21 Police Department where you lived whenever you talked
22 to them about anything about Lunada Bay?
23   A    Not that I recall.
24   Q    Okay.  Thank you.
25   MR. WORGUL:  I'll want to attach it.

Page 305

77 (Pages 302 - 305)

FURTHER EXAMINATION
BY MR. WORGUL:
3     Q     John Worgul on behalf of Mr. Blakeman.
4  I said I had no more questions and I apologize.
5  That was the picture I took earlier, and does that show
6  the location where you were pointing to where your scar
7  is?
8     A     Is that -- let me make sure that's my
9  hand.  It looks bigger.  It looks accurate.
10     MR. WORGUL:  What was the last exhibit number
11  that we had?
12     THE REPORTER:  This will be 43.
13     MR. WORGUL:  Forty-three?  Okay.  We'll attach
14  the picture as 43 to the transcript.
15        (Defendants' Exhibit 43 was marked for
16  identification by the Certified Shorthand Reporter
17  and is enclosed herewith.)
18
19              EXAMINATION
20  BY MS. LUTZ:
21     Q     Mr. Spencer, my name is Tera Lutz.  I
22  represent defendant Sang Lee.  I appreciate your time.
23  I have a couple more questions for you.
24          Have you ever sought medical treatment
25  for the injury on your wrist?

Page 306

1     A     I just -- professional medical
2  treatment?
3     Q     Correct.
4     A     No.
5     Q     None after the incident?
6     A     No.
7     Q     Can you describe to me Sang Lee, his
8  physical characteristics?
9     A     Male; Asian; dark hair; kind of a raspy
10  voice.
11     Q     How many times have you seen Sang Lee?
12     A     In person?
13     Q     In person.
14     A     I believe just -- just the once.
15     Q     And you're referencing the February
16  incident?
17     A     That would be the January incident.
18     Q     January 29th?
19     A     Correct.
20     Q     And was that the first time you saw
21  Sang Lee?
22     A     Yes.
23     Q     Would you be able to identify Mr. Lee if
24  you saw him here today?
25     A     Possibly.

Page 307

1     Q     Why do you say, "possibly"?
2     A     It's been a while.
3     Q     You mentioned earlier this morning that
4  at the time you didn't know that the individual you now
5  know to be Sang Lee was Sang Lee; is that correct?
6     A     That's correct.
7     Q     At what point did you become aware that
8  that was Sang Lee?
9     A     After I talked to Chris after he got
10  done talking with Sang.
11     Q     Have you ever spoken with Sang Lee?
12     A     No, we did not speak.
13     Q     Has Sang Lee ever threatened you?
14     A     Again, I don't know.
15     Q     Why do you say, "I don't know"?
16     A     Well, it seems to be a coordinated
17  effort up there between members of the Bay Boys; and if
18  they coordinate and one gets assaulted, such as I have
19  -- going back, and I like to clarify something too.  If
20  there's a coordinated effort, such as I believe goes on
21  there, with cell phones, others in the past have
22  reported walkie-talkies.  I already stated on the
23  record I didn't see the walkie-talkies.  Others have
24  reported that.  When there's a concerted effort in that
25  regards, when I was assaulted and battered in the

Page 308

1  water, if they were talking to each other, that's an
2  assault and battery charge on all of them, as far as
3  I'm concerned.
4     Q     Has Sang Lee ever physically made
5  physical contact with you?
6     A     With me?  Physically?  With his body to
7  my body?
8     Q     Yes, his body to your body.
9     A     No.
10     Q     Has he ever threatened -- strike that.
11          Going to the January 29th, 2016
12  incident, when was it that Mr. Lee approached
13  Chris Taloa?
14     A     Are you looking for a specific hour?
15  Because I don't remember the hour, but it was after we
16  got out of the water.
17     Q     How long after?
18     A     I can't give you a specific minutes or
19  numbers, but we were out of the water and not surfing;
20  so, from the time it takes you to walk up from the
21  water to the time you get to your car, it was within,
22  you know, within a half an hour, an hour.
23     Q     Was it near your car?
24     A     It was right at, like, the rear of
25  Chris' car -- Chris Taloa's car.

Page 309

1    Q    Did Sang approach Chris Taloa?
2    A    Yes.
3    Q    What did he say?
4    A    Well, it was a conversation.  I don't
5 recall all the details of the conversation, but it
6 went, you know, to the tune of, basically, why they --
7 why they do what they do and general conversation of
8 it's always going to be this way.  We're -- you know,
9 there's always going to be, you know, basically, the
10 stronghold that they -- the Bay Boys have.  He was
11 bringing up the incident where Chris' family member --
12 I already put this on record earlier; so, his family
13 member that was assaulted, and it just seemed like
14 Chris was wanting to not continue the conversation, and
15 "We'll talk later," he was telling Sang; and he just
16 kept talking and talking and talking.
17    Q    In that conversation, did Mr. Lee make
18 any physical threats to either you or Chris Taloa?
19    A    No.
20    Q    Did he ever attempt to physically harm
21 Chris Taloa?
22    A    No.
23    Q    Did he ever make physical contact with
24 Chris Taloa?
25    A    Not that I recall.

Page 310

1    Q    You had mentioned earlier this morning
2 that Mr. Lee in that conversation had discussed how he
3 became a Bay Boy.  Can you expand on that?
4    A    I recall language to the effect of
5 Mr. Lee describing how he had been down there himself
6 not a member of the Bay Boys or associated with them
7 trying to surf and getting hassled and, basically,
8 harassed and not allowed to surf there for some period
9 of time.  I don't recall how long that was.  How he
10 would, then, start bringing beer for an amount of time,
11 which I don't recall how long that was, to basically
12 get friendly with the guys down at the fort and
13 eventually, I guess -- I guess there's -- must be an
14 amount of beer that lets you get in.  I don't know, but
15 that's what he described.
16    Q    Have you seen Mr. Lee drink beer in
17 Lunada Bay?
18    A    No, I have not seen him consume beer.
19    Q    You just mentioned earlier that Mr. Lee
20 had discussed why they enforced things the way they do.
21 I'm not sure what you meant by "they."
22    A    Bay Boys.
23    Q    Can you expand on that conversation?
24    A    Well, "they," meaning the Bay Boys,
25 No. 1, and how they keep the area free of outsiders,

Page 311

1 No. 2.  It's always going to be like that in his
2 opinion.  Hopefully, we can change that.  They're going
3 to continue to restrict access to hassle, harass,
4 vandalize, assault, and keep people in fear of going
5 there.
6    Q    Do you believe that Mr. Lee was hassling
7 Mr. Taloa that day?
8    A    Again, I can't -- my belief is if he was
9 talking to me the same way that he was talking to
10 Chris, I would consider it hassling me.  I don't know
11 how Chris took it; so, I think it was -- I think it was
12 a hassle, yes.
13    Q    Did Mr. Lee hassle you that day?
14    A    I mean, to the extent of, you know, him
15 being part of the Bay Boys and potentially coordinating
16 efforts, he could have either earlier or before.  I
17 don't know.
18    Q    Did he or did he not hassle you that
19 day?
20    MR. FRANKLIN:  Asked and answered.
21    THE WITNESS:  Again, if he's part of the
22 Bay Boys -- and we're alleging that he is -- and if
23 he's on the phone or the other end of the phone with
24 somebody, either me being out in the water getting
25 assaulted and battered, and if he's in any part acting

Page 312

1 in concert with that, then, I would say it's possible.
2 BY MS. LUTZ:
3    Q    Have you seen Mr. Lee ever be on the
4 phone at Lunada Bay?
5    A    I have not.
6    Q    Have you ever seen Mr. Lee injure anyone
7 at Lunada Bay?
8    A    No.
9    Q    Have you ever seen Mr. Lee slash
10 anyone's tires?
11    A    No.
12    Q    Have you ever seen Mr. Lee engage in the
13 destruction of property at Lunada Bay?
14    A    No.
15    Q    Do you contend that Mr. Lee is involved
16 in drug use?
17    A    I don't know his involvement in any drug
18 use.
19    Q    Is that a "No"?
20    A    I don't know if he's involved in any
21 drug use.
22    Q    Do you believe that Mr. Lee is involved
23 in any drug trafficking?
24    A    I don't know if he is.
25    Q    You have no facts to believe that?

Page 313

79 (Pages 310 - 313)

1     MR. FRANKLIN: Vague and ambiguous.
2     THE WITNESS: I don't.
3 BY MS. LUTZ:
4     Q     We discussed earlier this morning that
5 you had visited Lunada Bay at least four or five times
6 before you were 20 years old; is that correct?
7     A     Correct.
8     Q     How many times did you attempt to surf
9 Lunada Bay before you were 20?
10    A     So, attempt is -- you drive up there
11 with maybe the hopes of nobody being there, and maybe
12 you can go out and sneak in a couple waves. And to
13 actually get out of my car and suit up and go down
14 there to try to surf, none.
15    Q     And how many times since you were age 20
16 have you attempted to surf Lunada Bay?
17    A     In the same context, once.
18    Q     Is that the January 29th date?
19    A     Correct.
20    Q     Have you ever seen anyone slash any
21 tires at Lunada Bay?
22    A     I personally have not.
23    Q     Have you ever seen anyone throw rocks at
24 Lunada Bay?
25    A     On a video, I have.

Page 314

1     Q     But not in person?
2     A     Not in person.
3     Q     Have you ever seen anyone engage in
4 verbal abuse at Lunada Bay?
5     MR. FRANKLIN: Asked and answered.
6     THE WITNESS: Again, you asked if -- if it was
7 harassing to have Sang Lee continue to engage my friend
8 in conversation. I would have to answer yes to that.
9 BY MS. LUTZ:
10    Q     Engage in verbal abuse?
11    MR. FRANKLIN: Asked and answered.
12    THE WITNESS: Yes, I mean, if somebody wants to
13 not talk to you anymore, you shouldn't keep coming at
14 him and keep talking and prolonging what someone
15 doesn't want to engage in.
16 BY MS. LUTZ:
17    Q     Just for clarification, so any time
18 anyone engages in conversation you don't want to,
19 that's verbal abuse?
20    MR. FRANKLIN: Argumentative.
21    THE WITNESS: That's not what I'm saying.
22 BY MS. LUTZ:
23    Q     You'd mentioned earlier this morning
24 that prior to visiting Lunada Bay, you had heard rumors
25 about Lunada Bay. Have you -- can you name any person

Page 315

1 that told you about those rumors?
2     MR. FRANKLIN: Asked and answered.
3     THE WITNESS: Not that I can remember
4 specifically.
5 BY MS. LUTZ:
6     Q     On January 29, 2016, when you arrived at
7 Lunada Bay, how many people were in the water?
8     MR. FRANKLIN: Asked and answered; vague and
9 ambiguous.
10    THE WITNESS: In the water when we first
11 paddled out, there was two to three, somewhere in
12 there; maybe more. I don't recall the specific amount
13 right now.
14 BY MS. LUTZ:
15    Q     How long were you in the water?
16    A     Approximately, an hour to an
17 hour-and-a-half.
18    Q     When you were paddling out on
19 January 29th, 2016, were you paddling towards the west?
20    A     It's the south. It's so hard. The
21 California coast is so angled; so, I'm going to say
22 south.
23    Q     Was the wave break to your right?
24    A     The wave breaks from the north to the
25 south; and, as you're facing the beach, it breaks to

Page 316

1 your right. If you're paddling out, it breaks to your
2 left.
3     Q     So which was it for you?
4     A     When?
5     MR. FRANKLIN: Vague and ambiguous.
6 BY MS. LUTZ:
7     Q     When you were --
8     A     I don't mean to be argumentative.
9 Clarify for me if --
10    Q     Which way was the wave breaking as you
11 -- at the time that you collided with one of the other
12 surfers?
13    MR. FRANKLIN: Asked and answered; vague and
14 ambiguous.
15    THE WITNESS: The wave, the particular area
16 where you surf always breaks from north to south.
17 BY MS. LUTZ:
18    Q     So was it to your left or to your right
19 at the time of the incident?
20    MR. FRANKLIN: Vague and ambiguous.
21    THE WITNESS: To my left or to my right? When
22 I got hit?
23 BY MS. LUTZ:
24    Q     That's the question.
25    A     So, I'm paddling off south off to the

Page 317

80 (Pages 314 - 317)

1  channel.  The wave would have been to my right.
2      Q      Have you seen Sang Lee since
3  January 29th, 2016?
4      A      I have not in person.  Many videos I
5  have.
6      Q      How far away were you from Chris and
7  Sang as they're having their conversation on
8  January 29th, 2016?
9      A      Within three to five feet.
10      Q      And you could hear everything that they
11  were saying?
12      A      Yes.
13      Q      How long was the conversation?
14      A      Just an estimation, maybe ten minutes.
15      Q      Did Chris and Sang appear to know each
16  other?
17      A      Again, I can't speak, you know, for
18  Chris; but it was apparent they knew of each other.
19  Chris knew his name; so, in that sense, I would say
20  yes.  I don't -- I don't know to the extent of what
21  you're asking do they know each other.
22      Q      Did it appear as though they knew each
23  other based on --
24      A      They knew who each other were.
25      Q      When you later spoke to Chris Taloa

Page 318

1  about Sang, he told you who that -- that Sang was who
2  he was; is that correct?
3      A      Correct.
4      Q      Was that on the same day, on
5  January 29th?
6      A      Yes.
7      Q      What did Mr. Taloa say in that
8  conversation?
9      A      It was -- it was, basically, to the
10  effect that, you know, this is a known guy that, you
11  know, surfs here.  He's a Bay Boy.  He -- I don't know
12  to the extent of which Sang had knowledge of the
13  incident where Chris' family member was assaulted, but
14  I know there was conversation between me and Chris
15  that, you know, he is very well-versed on that
16  incident, that incident being something I'm not a whole
17  lot up to date on or informed of what happened with
18  Chris' family member, really.  I just know there was an
19  assault and that Sang knew about it but ...
20      Q      Do you know how Sang knew about it?
21      A      I don't know.  That was part of the
22  discussion they were having between them, as well,
23  that, as I indicated earlier, something about that
24  assault.
25      Q      But you don't remember the specifics?

Page 319

1      A      I don't.
2      Q      When Sang was describing to you how he
3  became what you allege a Bay Boy, did he use the term
4  "Bay Boy"?
5      A      Not that I recall.
6      Q      Did he call himself a "Bay Boy"?
7      A      Not that I recall.
8      Q      In the time before when you visited
9  Lunada Bay before you were 20, where were the swells,
10  if you remember?
11      A      What type of swells were they?
12      Q      Where were they?
13      A      What type of season was it?  So, you
14  know, I don't mean to question you.
15      Q      That's fine.  I don't know anything
16  about surfing so --
17      A      Okay.  So, being a young surfer -- that
18  might help you.
19      Q      What was the angle of the swells?
20      A      I don't recall.
21          Being a young surfer, I wasn't fully as
22  verse as I am now on swell direction; season; the way
23  it was breaking; and I don't even recall when I was
24  younger at what time I visited Lunada Bay.
25      Q      Were there swells that you remember?

Page 320

1      A      I -- I don't recall.
2      Q      Were there people surfing there?
3      A      It's when I was 15.  I don't remember.
4  I'm sorry.
5      Q      No, that's fine.
6          Did -- the conversation -- sorry to go
7  back and forth, but the conversation between Sang Lee
8  and Chris Taloa, did you -- do you believe that
9  Sang Lee raised his voice at any point in time?
10      A      It -- it wasn't raising a voice and it
11  wasn't -- it wasn't an argument.  It wasn't a conflict,
12  no.
13      MS. LUTZ:  Okay.  No further questions at this
14  time.  Thank you.
15
16          EXAMINATION
17  BY MR. HAVEN:
18      Q      Hello, Mr. Spencer.  Peter Haven.  I'll
19  try to make this as brief as possible.
20          You indicated earlier that you had
21  looked at some videos, and I assume that these --
22      MR. FRANKLIN:  Would you mind?  He doesn't know
23  who everybody represents.
24      MR. HAVEN:  Oh, I apologize.  Michael Papayans.
25      MR. FRANKLIN:  I didn't mean to interrupt you.

Page 321

81 (Pages 318 - 321)

1      MR. HAVEN:  That's all right.  I got carried
2  away.  Do you need me to come down there?  I'll come
3  down there.  I apologize.  I represent
4  Michael Papayans.
5      Q      You indicated earlier that you had
6  looked at some videos.  Could you describe for me the
7  videos that you looked at?  And I assume that these are
8  videos depicting alleged Bay Boy incidents?
9      A      So, videos I can remember, there's
10  several.  There's videos with Mr. Lee's voice.  It was
11  an undercover video shot by -- I don't know who.
12  There's videos of -- I believe it was back in the '80s
13  of a young kid being -- I don't think he was -- I don't
14  think he was -- basically, being told that he's not
15  allowed to surf there, and I think his uncle or
16  somebody was in there.  I don't remember.
17      Q      And that was a video -- I'm sorry.  That
18  was a video back in the '80s?
19      A      I think so.
20      Q      Okay.  Thank you.
21      A      There's a video -- and I'm not sure when
22  this was taken, but there's a video of a male hitting
23  several times another male, you know, in the head.
24  What other videos?  Other videos of guys walking on the
25  beach and, basically, getting asked the same questions
                                                      Page 322

1  on, you know, why -- why they're here -- undercover
2  videos, but I don't know the sources or anything.  I
3  did see them.
4      Q      As you sit here right now, any other
5  videos that you recall seeing?
6      A      Not at this time.
7      Q      Do you know who Michael Papayans is?
8      A      I know that's a name that's popped up a
9  lot in Lunada Bay.  I know he's allegedly a Bay Boy,
10  and I've heard it but ...
11      Q      I'm sorry.  Go ahead.  Are you finished?
12      A      I'm finished.
13      Q      Thank you.
14          To your knowledge, have you ever seen
15  Michael Papayans?
16      A      Not that I can recall.
17      Q      To your knowledge, have you ever seen
18  one of the other defendants named in this case,
19  Alan Johnston?
20      A      I don't know if I've seen him or not.
21      Q      These incidents that you've described at
22  Lunada Bay, it appears that you were able to identify
23  by name two individuals, and you've talked about them
24  today, Mr. Blakeman and Mr. Lee.
25          Now, just so I understand correctly,
                                                      Page 323

1  that was with Mr. Taloa's assistance?
2      A      You mean in identifying them?
3      Q      Yeah, putting names to faces.
4      A      Correct.
5      Q      Okay.
6          Has anybody ever pointed out to you by
7  name any other people you've seen in a video or any
8  other people that you recall interacting with at
9  Lunada Bay?
10      A      Anybody outside of Chris Taloa?
11      Q      Yeah.  I don't want to invade
12  attorney-client privilege.  If your attorneys have
13  identified somebody, then, I'll just leave it at that;
14  but outside of attorney-client communications, has
15  anybody pointed out someone and said, "That's
16  so-and-so"?
17      A      Not that I can recall.
18      Q      To your knowledge, do you know if
19  Michael Papayans had any involvement in these
20  Lunada Bay incidents that you've described here today
21  that you were personally involved with?
22      A      I don't know if he was there when I was
23  there.  I couldn't answer that.
24      Q      Okay.  And the same question as to
25  Alan Johnston.
                                                      Page 324

1      A      Same answer.
2      Q      Can you describe the individual who ran
3  over you with the surfboard?
4      A      Yes.
5      Q      Could you give us a description of him,
6  please?
7      A      Male, white; approximately, six foot;
8  185 to 200; dark hair; wetsuit.
9      Q      Any estimate as to his age?
10      A      I think mid-40s to mid-50s, somewhere in
11  there.
12      MR. HAVEN:  Okay.  I don't think I have any
13  other questions.  Let me pause here and think for a
14  moment.  I don't think I do.
15      MS. HEWITT:  That was quick.
16      MR. HAVEN:  Thank you very much.
17      MR. FRANKLIN:  Anybody else have questions?
18      MR. WORGUL:  I have two follow-ups.
19      THE WITNESS:  Can we just get some water?
20      MS. HEWITT:  Yes.
21      THE WITNESS:  Take a break?  Give me five
22  minutes.
23      MR. WORGUL:  Of course.
24          (A recess was taken at 6:09 p.m.
25          until 6:13 p.m.)
                                                      Page 325

82 (Pages 322 - 325)

FURTHER EXAMINATION
BY MR. WORGUL:

Q   Officer Spencer?

A   Yes.

Q   The videos that Mr. Haven was just talking with you about that you described, did you view those videos after your January 29th of 2016 incident, or did you view them beforehand?

A   After.

Q   Okay.  So, up until you had that incident on January 29th of 2016, you hadn't viewed any of those videos; correct?

A   Not those that I saw after, no.

Q   Okay.

Are you aware of any other surfer gangs?

A   No.

Q   Are you aware of any other surfers who are even in a gang if it's not a surfer gang?

MR. FRANKLIN:  Vague and ambiguous; calls for speculation.

THE WITNESS:  I'm not.

BY MR. WORGUL:

Q   I just wanted to go over and just clarify a little bit of the incident where you were run over, and you got skegged and you cut your wrist.  So,

Page 326

in surfer terms, as a surfer would refer to it, would you agree with me that Lunada Bay is a right, being it breaks from -- from -- strike that.

When surfers describe the direction of the wave, they usually describe it facing in towards the shore; correct?

A   Correct.

Q   Okay.  And that's how you distinguish between what's a left and a right wave; correct?

A   Correct.

Q   And, so, if you're facing in towards the shore, if the wave breaks from your left to your right, that is a right?

A   Yes.

Q   Okay.  And that's what Lunada Bay is; right?

A   The main part.

Q   Strike that.

That's what Lunada Bay is; correct?

A   The main part, correct.  There's other parts of the bay that break, but that part where we're specifically talking about is the left-to-right break.

Q   Okay.

A   Correct.

Q   And that's the most desirous wave that

Page 327

there is at Lunada Bay; correct?

A   That's, in my opinion, most desirous for me, you know.  I imagine for everybody else that wants to go surf out there.

Q   Okay.

That's the premiere wave that you're discussing in your complaint; correct?

A   Correct.

Q   Okay.  And that wave starts to break at the northern point of Lunada Bay; is that correct?

A   Correct.

Q   Okay.  And, generally, even though I know we don't know exact compass directions, when you're in the water, the shore is to your east?

A   When you're in the water, the shore would be to your east, yes.

Q   And I understand it's going to curve through the bay; right?

A   Correct.

Q   Okay.  And would you agree with me that the sun rises in the east?

A   The sun rises in the east.

Q   Okay.  So in the morning time, for someone who is surfing, the most desirous portion of Lunada Bay at that wave that breaks from left to right,

Page 328

the sun is actually facing right into the person's face who would be surfing on the waves; is that correct?

A   It could be, depending on which direction that person is facing.  It's not always directly -- it wasn't always directly in my face as I was facing the beach that day; but it, generally, is in your view to the east.

Q   Generally, in the morning, if you're going to be surfing on that desirous portion of the wave, your face is going to be in an eastern direction at some point; right?

A   Correct.

Q   And, so, it does have the potential to obstruct someone's view that's surfing on the wave in the morning time; correct?

A   It does.

Q   Okay.

Now, in surfing etiquette, per your knowledge, whenever -- did you understand what "paddling out" is?

A   I do.

Q   Okay.  And that's when you're actually going from the shore or after a wave back to the most desirous portion or area of the ocean to catch where the wave breaks; right?

Page 329

83 (Pages 326 - 329)

1     A    Correct.
2     Q    Okay.  And do you know any etiquette
3 that's involved in that process of paddling out to
4 where the wave is?
5     A    Just from years of surfing, I know that
6 you try to avoid the critical part of the wave where
7 other people are going to be surfing.
8     Q    What do you consider the critical part
9 of the wave?
10    A    Closest to where it's freshly breaking.
11 I guess the curl, so to speak.
12    Q    Okay.
13         Can people sometimes surf farther in
14 front of that?  For example, if the waves is breaking
15 from left to right and where it's actually breaking,
16 where the white water is, can people surf farther right
17 from where the wave is breaking on a wave?
18    MR. FRANKLIN:  Vague and ambiguous; lacks
19 foundation; incomplete hypothetical.
20    THE WITNESS:  You can -- yes, you can surf
21 anywhere on the wave that has enough energy to carry
22 your board.
23 BY MR. WORGUL:
24    Q    Okay.  And in surfing etiquette, if
25 there is a person who's actually on the wave and

Page 330

1 surfing it, and there's someone who's paddling out,
2 does one person have the right of way?
3     MR. FRANKLIN:  Vague and ambiguous; incomplete
4 hypothetical.
5     THE WITNESS:  Very.  It's -- that is very vague
6 to me, Counsel, only because each situation dictates a
7 different scenario.  But, generally, you, as the
8 surfer, have the most speed and control of your board,
9 which in my opinion, it's incumbent upon the surfer to
10 avoid somebody paddling out, who especially is paddling
11 in a safe direction, you know, away from the critical
12 part of the wave.
13 BY MR. WORGUL:
14    Q    Which way is away from the critical part
15 of the wave, particularly on a right-breaking wave,
16 like we described, if you're paddling out?  Which way
17 should a person who's paddling out paddle away from --
18    MR. FRANKLIN:  Vague.
19 BY MR. WORGUL:
20    Q    -- to avoid the critical part of the
21 wave?
22    MR. FRANKLIN:  Vague and ambiguous; incomplete
23 hypothetical.
24    THE WITNESS:  Just -- just where I was paddling
25 out, Lunada is a point break.  You want to paddle

Page 331

1 towards the middle of the bay and get away from the
2 point itself and the critical part of the wave.
3 BY MR. WORGUL:
4     Q    Well, I wasn't asking what you were
5 doing.  I was just asking in general terms.
6     A    I can only testify to what I was doing
7 and what I would do in that situation.
8     Q    I'm just asking about your knowledge
9 regarding surfing etiquette.
10    A    That's my knowledge, as I've answered.
11    Q    Well, okay.  Then, I just want to be
12 very clear 'cause I don't think you answered my
13 question in that regard.  You told me what --
14    A    I think I did.
15    Q    Now you're cutting me off.
16         You told me what you did in that
17 specific circumstance, but I'm not asking about that
18 specific circumstance.  I'm asking about your knowledge
19 of the etiquette; so -- and that, I don't believe
20 you've answered; so, I just want to make sure I'm clear
21 in what I'm asking you.
22         When you have a wave that breaks right,
23 meaning from the left to the right, and a person is
24 paddling out towards it, and the critical part of the
25 wave is where the white water is or the curl is, which

Page 332

1 way in surfing etiquette should the person paddling
2 paddle?
3     MR. FRANKLIN:  Vague and ambiguous; incomplete
4 hypothetical; asked and answered.
5     THE WITNESS:  I refer to my original answer.
6 BY MR. WORGUL:
7     Q    Okay, and your original answer was just
8 based on what you did that day; not about the
9 etiquette; right?
10    MR. FRANKLIN:  Asked and answered.
11    THE WITNESS:  I'm done answering the question.
12 BY MR. WORGUL:
13    Q    You're refusing to answer my question?
14    A    No.  I answered your question.
15    Q    Okay.
16         If -- I made a really crude drawing,
17 where I put the word "middle."  That's the middle of the
18 bay.  This is the shoreline.  Where I put this letter
19 "N," that's the northern point, and this is just a wave
20 right here.  The arrow I drew, is that the direction
21 that the wave would break at Lunada Bay?
22    A    I'll answer you because you're asking me
23 a question.  Do we need to enter this into evidence?
24 I'm not sure.
25    Q    I don't know.  It depends on what you

Page 333

84 (Pages 330 - 333)

1 say.
2      MR. FRANKLIN: If you're going to ask him a
3 question on a document, why don't you just mark it as
4 an exhibit?
5      MR. WORGUL: Okay. What was the last exhibit
6 we marked?
7      THE REPORTER: We marked 43. Our next one is
8 44.
9      MR. WORGUL: I'll mark it as Exhibit 44.
10        (Defendants' Exhibit 44 was marked for
11 identification by the Certified Shorthand Reporter
12 and is enclosed herewith.)
13      MR. FRANKLIN: Can you put north; south; east;
14 west?
15      MR. WORGUL: These are crude --
16      THE WITNESS: Very crude.
17      MR. WORGUL: -- compass directions.
18      THE WITNESS: For purposes of our conversation,
19 that's accurate, as a crude drawing goes.
20 BY MR. WORGUL:
21      Q     Okay. And based on the crude drawing,
22 the middle would be where you would paddle out; right?
23      MR. FRANKLIN: Vague and ambiguous.
24      THE WITNESS: Paddle out in the -- when you're
25 first getting in the water? Paddling out.
Page 334

1 BY MR. WORGUL:
2      Q     Middle is where the channel was that you
3 would paddle out in; correct?
4      A     But when you say, "paddle out," a paddle
5 out means when you're first paddling out, or you're
6 paddling out from catching your last wave?
7      Q     Either/or.
8      MR. FRANKLIN: Vague and ambiguous.
9      THE WITNESS: I guess the only way I could
10 accurately answer is for me to draw on your crude
11 drawing, and I don't know if that's allowed.
12      MR. WORGUL: You can, but you don't have to.
13      Q     Let me ask you this. When the person
14 who is surfing on the wave that allegedly ran you over,
15 where he ran you over, was that a surfable portion of
16 the wave?
17      MR. FRANKLIN: Vague and ambiguous.
18      THE WITNESS: Yes, he was up and riding; so, it
19 was surfable, I guess.
20 BY MR. WORGUL:
21      Q     Were you obstructing his ability to surf
22 the wave?
23      A     I don't believe I was.
24      Q     Is it -- would you agree with me that,
25 generally, the person who is surfing the wave has the
Page 335

1 right of way versus somebody who is paddling out?
2      MR. FRANKLIN: Incomplete hypothetical.
3 BY MR. WORGUL:
4      Q     Based on your years of surfing?
5      MR. FRANKLIN: Incomplete hypothetical; vague
6 and ambiguous.
7      THE WITNESS: I don't agree with that
8 statement.
9      MR. WORGUL: Okay.
10      MR. HAVEN: I apologize. If I could just ask
11 one more question?
12
13            FURTHER EXAMINATION
14 BY MR. HAVEN:
15      Q     I think earlier we talked about your
16 hand injury. You said you didn't seek medical
17 treatment, but my question is did you treat it in any
18 way?
19      A     Yes.
20      Q     What was the treatment?
21      A     Just bandage; ice; elevation for the
22 first -- I don't know -- day or so.
23      MR. HAVEN: Thank you very much.
24      MS. HEWITT: How much time do we have left?
25      THE REPORTER: We've been on the record for six
Page 336

1 hours and forty-three minutes.
2      MS. HEWITT: Does anybody else have any
3 questions?
4      THE WITNESS: Could I just clarify something on
5 your crude drawing?
6      MR. WORGUL: If you want to.
7      THE WITNESS: Without -- I'm not going to draw
8 on it. Is that --
9      MR. WORGUL: I can give you something if you
10 want to draw on it.
11      MS. HEWITT: Let me ask my couple questions;
12 then, we can go back. We'll get a couple colored
13 pencils.
14      THE WITNESS: Okay.
15
16            FURTHER EXAMINATION
17 BY MS. HEWITT:
18      Q     Mr. Spencer, earlier you were asked by
19 other counsel about citizens' arrests and your
20 knowledge and such. We talked a little bit about why
21 the DA may or may not have prosecuted a report that you
22 might have brought. Would you agree that even if a
23 District Attorney declined to prosecute charges that
24 you brought for any of the events that took place at
25 Lunada Bay, that even you, a police officer, effecting
Page 337

Hahn & Bowersock, A Veritext Company
800.660.3187

1 a citizen's arrest may have acted as a deterrent effect
2 to future actions by anybody at the Lunada Bay Boy,
3 like you've described -- excuse me -- at Lunada Bay,
4 like you've described here today?
5     MR. FRANKLIN:  Incomplete hypothetical.
6     THE WITNESS:  So, if I -- if I understand the
7 question, you're asking if I would have effected the
8 arrest, would it have prevented other incidents from
9 happening at the bay or could it?
10 BY MS. HEWITT:
11     Q     Not precisely.  Could it have acted as a
12 deterrent to future events?
13     A     In my opinion, no.  Only because there's
14 documented other arrests; lawsuits in the past and
15 based on personal injury that have not deterred this
16 type of activity.  I don't think mine would have been
17 significant.
18     Q     Okay.
19         What differently -- do you want the city
20 to effect more arrests out at Lunada Bay?
21     A     Do I want the city to effect more
22 arrests?  Only if they're justifiable and warranted
23 arrests.
24     Q     Okay.
25     A     Then I would love the city to enforce

Page 338

1 any type of actions starting from the smallest
2 infraction to the highest misdemeanor they can find if
3 they're committed there, yes.
4     Q     Okay.  So, you've told me that there
5 have been arrests out there, and you did not believe
6 that that prevented future arrests; correct?
7     A     I believe it's not been effective.
8     Q     Okay.
9         You agree you could have effected a
10 citizen's arrest based on one or more of the incidents
11 that you suffered at Lunada Bay; correct?
12     A     I believe, yeah -- yes.
13     Q     Okay.  And you declined to do so because
14 you felt the DA would not prosecute?
15     A     Correct.
16     Q     All right.
17         Is there any other reason why you did
18 not effect a citizen's arrest yourself at Lunada Bay?
19     MR. FRANKLIN:  Vague and ambiguous.
20     THE WITNESS:  No.  It just would have not gone
21 anywhere.
22 BY MS. HEWITT:
23     Q     All right.  And it's your testimony that
24 the act of a serving police officer to effect a
25 citizen's arrest at Lunada Bay would have not acted as

Page 339

1 a deterrent in any way, shape, or form going forward as
2 to the actions of who you called the "Lunada Bay Boys"?
3     MR. FRANKLIN:  Objection:  incomplete
4 hypothetical; vague and ambiguous; assumes facts not in
5 evidence.
6     THE WITNESS:  Are you talking about my arrest?
7 BY MS. HEWITT:
8     Q     Yes.  If you effected a citizen's arrest
9 as a police officer --
10     A     Uh-huh.
11     Q     -- if you effected a citizen's arrest
12 out there, given that they're -- as you testified,
13 there were city police officers out there to whom you
14 could have reported your citizen's arrest?
15     A     It wouldn't apply because I wasn't
16 acting in capacity of a police officer that day.
17     Q     You're right.  That was a bad question.
18 You would have acted --
19     A     It would have just been another
20 citizen's arrest.
21     Q     Right.  But it would have been a
22 citizen's arrest by a police officer.
23     MR. FRANKLIN:  Objection:  argumentative;
24 incomplete hypothetical; assumes facts not in evidence;
25 lacks foundation.

Page 340

1 BY MS. HEWITT:
2     Q     Would anything have barred you -- and I
3 don't know because, again, I'm a civilian who doesn't
4 know.  Would anything have barred you from, in the
5 process of effectuating a citizen's arrest on the
6 person who sliced your hand, for instance, in the
7 course of effectuating a citizen's arrest, telling them
8 that you, in fact, are an El Segundo Police Department
9 officer?
10     MR. FRANKLIN:  Objection:  vague and ambiguous;
11 incomplete hypothetical; assumes facts not in evidence.
12     THE WITNESS:  My capacity as a police officer
13 -- I wouldn't -- I wouldn't even bring that up.
14 BY MS. HEWITT:
15     Q     Does anything bar you from telling them
16 that in the process of conducting a citizen's arrest?
17     MR. FRANKLIN:  Objection:  assumes facts not in
18 evidence; incomplete hypothetical.
19     THE WITNESS:  Not that I know of.
20 BY MS. HEWITT:
21     Q     Okay.  When you spoke to the
22 City of Palos Verdes police officers at Lunada Bay, did
23 you tell them you were an El Segundo Police Department
24 officer?
25     MR. FRANKLIN:  Vague and ambiguous.

Page 341

86 (Pages 338 - 341)

1    THE WITNESS:  I didn't have to tell one of
2 them.  I used to work with one of them.
3 BY MS. HEWITT:
4    Q    Okay.  Other than Gaunt, who I believe
5 you said you saw in February; right?
6    A    Right.
7    Q    In the January 2016 time period, did you
8 tell anybody -- tell any of the PVE Police Department
9 officers that you were an El Segundo police officer?
10    MR. FRANKLIN:  Objection to the extent it
11 misstates prior testimony.
12    THE WITNESS:  I don't believe I did.
13    MS. HEWITT:  Okay.
14    Q    Did any of the alleged Lunada Bay Boys
15 ever ask you where you were from?
16    A    No.
17    Q    No.  Okay.  Okay.
18    Did anybody at the City of Palos Verdes
19 Estate Police Department ever refuse to take a report
20 from you?
21    A    No.
22    MS. HEWITT:  Okay.  That's all I have.
23 ////
24 ////
25 ////

Page 342

1    FURTHER EXAMINATION
2 BY MR. WORGUL:
3    Q    How many Lunada Bay Boys are there?
4    MR. FRANKLIN:  We're not playing Ping Pong back
5 and forth.  You're done.  She's done.  Anybody else
6 have any other questions?  I think you've already asked
7 some; so, this isn't like a free-for-all now to jump at
8 him.
9    Mr. Haven, you've been -- you've been
10 very quiet, if you wanted to ask a question.
11
12    FURTHER EXAMINATION
13 BY MR. HAVEN:
14    Q    Do you know how many members of the
15 Bay Boys there are?
16    A    I can't give you a specific number.
17    Q    Okay.
18    Do you know how many victims of localism
19 practice by the Bay Boys there are?  Do you know how
20 many victims of that?
21    A    I can only assume.  If you want me to
22 assume, I'll give you that assumption number.
23    Q    Go ahead and give me an estimation.
24    A    Hundreds.
25    MR. HAVEN:  Okay.  Thank you very much.  I

Page 343

1 appreciate it.  Thank you.
2    MS. HEWITT:  Did we have a stipulation from
3 last night?
4    MR. FRANKLIN:  I don't know what the
5 stipulation was last night.
6    MR. CROWLEY:  There was no stipulation.
7    MR. WORGUL:  There was no stipulation.
8    MR. FRANKLIN:  I would say I went on record at
9 the beginning.  We'd asked under the FRCP for the 30
10 days for him to review it.
11    MS. HEWITT:  Is there any objection to that?
12    MR. FRANKLIN:  You don't have to object.  I say
13 that and that happens.  In terms of -- I do have a
14 question.
15
16    EXAMINATION
17 BY MR. FRANKLIN:
18    Q    It was January 29th?  Was that the date
19 you encountered Mr. Blakeman?
20    A    Yes.
21    Q    In your opinion, was he surfing that
22 day?
23    A    No.
24    Q    What was he doing?
25    A    When I was in the water, in my opinion,

Page 344

1 I didn't -- No. 1, I didn't see him catch one wave; go
2 for any waves; attempt to catch any waves.  He just
3 repeatedly and completely blocked myself and
4 Chris Taloa from catching waves.  You know, which, in
5 fact, in my opinion, is an overt action to block us
6 from surfing, and I don't know who he was talking to
7 out in the water; and if he's talking to the guy that
8 hit me -- you asked if he assaulted me earlier.  If
9 he's talking to those guys and that guy assaulted me
10 like he did, which he did, then, I would say he'd be
11 responsible for an assault and battery.  That's all I'd
12 like to add.
13    MR. FRANKLIN:  Okay.  Thank you.
14    MR. WORGUL:  I'd like to ask a follow-up to a
15 question, unless you have a problem.
16    MR. FRANKLIN:  You get one question.  You went
17 on for a long time.  We're at -- are we at seven hours?
18    THE REPORTER:  Six hours fifty-one minutes.
19    MR. WORGUL:  Nine minutes.
20    MR. FRANKLIN:  Knock yourself out.
21
22    FURTHER EXAMINATION
23 BY MR. WORGUL:
24    Q    How much time did you observe
25 Mr. Blakeman in the water on that day?

Page 345

87 (Pages 342 - 345)

1    A    At least an hour.
2    Q    How much time had Mr. Blakeman been in
3  the water before that?
4    A    Before I got in the water?
5    Q    Yes.
6    A    I didn't see him in the water before I
7  got in the water.
8    Q    Was he -- did you see when he got in the
9  water?
10    A    Shortly after we got in the water.
11    Q    Okay. So how much time was he in the
12  water before you got out of the water? You saw him get
13  in?
14    A    Approximately, an hour.
15    MR. WORGUL: Okay. And I don't have any other
16  questions for you.
17    MR. FRANKLIN: Great. Thank you very much.
18    THE REPORTER: Does anybody wish to order a
19  certified transcript?
20    MR. CROWLEY: Dan Crowley.
21    MR. HAVEN: Peter Haven.
22    THE REPORTER: Mr. Worgul, you said you wanted
23  a certified transcript?
24    MR. WORGUL: Yes.
25    THE REPORTER: Ms. Lutz?

Page 346

1
2
3
4                        ***
5
6        I do solemnly declare under penalty of
7  perjury, under the laws of the State of California,
8  that the foregoing is my deposition under oath; that
9  these are the questions asked of me and my
10  answers thereto; that I have read same and have made
11  the necessary corrections, additions, or changes to
12  my answers that I deem necessary.
13        In witness thereof, I hereby subscribe my
14  name this _____ day of _____, 20_____.
15
16
17
18
19        _____
20                Witness Signature
21
22
23
24
25

Page 348

1    MS. LUTZ: Yes.
2    THE REPORTER: Mr. Franklin, did you want a
3  certified transcript?
4    MR. FRANKLIN: Yes.
5        (Deposition proceedings concluded at
6  6:35 p.m. Declaration under penalty of perjury on the
7  following page hereof.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 347

1        Certification of Court Reporter
2            Federal Jurat
3
4        I, the undersigned, a Certified Shorthand
5  Reporter of the State of California do hereby certify:
6        That the foregoing proceedings were taken
7  before me at the time and place herein set forth;
8  that any witnesses in the foregoing proceedings, prior
9  to testifying, were placed under oath; that a verbatim
10  record of the proceedings was made by me using machine
11  shorthand which was thereafter transcribed under my
12  direction; further, that the foregoing is an accurate
13  transcription thereof.
14        That before completion of the deposition, a
15  review of the transcript [X] was [ ] was not requested.
16        I further certify that I am neither
17  financially interested in the action nor a relative or
18  employee of any attorney of any of the parties.
19        IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21  Dated: October 21, 2016
22
23
24            Carmen R. Sanchez
25            CSR No. 5060

Page 349

88 (Pages 346 - 349)

# Exhibit N

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4

 5   CORY SPENCER, an individual; DIANA  )
     MILENA REED, an individual; and     )
 6   COASTAL PROTECTION RANGERS, INC., a )
     California non-profit public benefit)
 7   corporation,                        ) Case No.
                                         ) 2:16-cv-02129-SJO-RAO
 8                  Plaintiffs,          )
                                         )
 9            vs.                        )
                                         )
10   LUNADA BAY BOYS, et al.,            )
                                         )
11                  Defendants.          )
     _____)

12

13

14

15

16

17        VIDEOTAPED DEPOSITION OF DIANA MILENA REED

18                 Santa Monica, California

19                 Monday, October 24, 2016

20

21

22

23

24     REPORTED BY:
       Jimmy S. Rodriguez
25     CSR No. 13464

                                              Page 1
```

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

```
CORY SPENCER, an individual; DIANA    )
MILENA REED, an individual; and       )
COASTAL PROTECTION RANGERS, INC., a   )
California non-profit public benefit  )
corporation,                          ) Case No.
                                      ) 2:16-cv-02129-SJO-RAO
          Plaintiffs,                 )
                                      )
     vs.                              )
                                      )
LUNADA BAY BOYS, et al.,              )
                                      )
          Defendants.                 )
_____)
```

Videotaped deposition of DIANA MILENA REED, taken before Jimmy Rodriguez, a Certified Shorthand Reporter for the State of California, with principal office in the County of Orange, commencing at 9:12 a.m., Monday, October 24, 2016 at the Premier Business Centers - Santa Monica, 401 Wilshire Boulevard, 12th Floor, Santa Monica, California.

Page 2

---

APPEARANCES OF COUNSEL:

FOR PLAINTIFFS:

    HANSON BRIDGETT, LLP
    BY:  KURT A. FRANKLIN, Esq.
    425 Market Street
    26th Floor
    San Francisco, CA 94105
    TEL:  (415) 777-3200
    FAX:  (415) 541-9366
    Kfranklin@hansonbridgett.com

FOR DEFENDANTS, City of Palos Verdes Estates and Chief of Police Jeff Kepley:

    KUTAK ROCK, LLP
    BY:  ANTOINETTE P. HEWITT, Esq.
    5 Park Plaza
    Suite 1500
    Irvine, CA 92614
    TEL:  (949) 417-0999
    FAX:  (949) 417-5394
    Antoinette.hewitt@kutakrock.com

FOR DEFENDANT, Brant Blakeman:

    VEATCH CARLSON, LLP
    BY:  RICHARD P. DIEFFENBACH, Esq.
    1055 Wilshire Boulevard
    11th Floor
    Los Angeles, CA 90017
    TEL:  (213) 381-2861
    FAX:  (213) 383-6370
    Rdieffenbach@veatchfirm.com
    BUCHALTER NEMER
    BY:  ROBERT S. COOPER, Esq.
    1000 Wilshire Boulevard
    Suite 1500
    Los Angeles, CA 90017
    TEL:  (213) 891-0700
    FAX:  (213) 630-5609
    Rcooper@buchalter.com

Page 3

---

APPEARANCES OF COUNSEL (Continued):

FOR DEFENDANT, Alan Johnston aka Jalian Johnston:

    LAW OFFICES OF J. PATRICK CAREY
    BY:  J. PATRICK CAREY, Esq.
    1230 Rosecrans Avenue
    Suite 300
    Manhattan Beach, CA 90266
    TEL:  (310) 526-2237
    Pat@patcareylaw.com

FOR DEFENDANT, Angelo Ferrara and N.F.:

    LAW OFFICES OF MARK C. FIELDS, APC
    BY:  MARK C. FIELDS, Esq.
       (Via Telephone)
    333 South Hope Street
    35th Floor
    Los Angeles, CA 90071
    TEL:  (213) 617-5225
    FAX:  (213) 629-4520
    Fields@markfieldslaw.com

FOR DEFENDANT, Sang Lee:

    LEWIS BRISBOIS BISGAARD & SMITH
    BY:  TERA A. LUTZ, Esq.
    633 West 5th Street
    Suite 4000
    Los Angeles, CA 90071
    TEL:  (213) 250-1800
    FAX:  (213) 250-7900
    Tera.lutz@lewisbrisbois.com

FOR DEFENDANT, Sang Lee:

    BOOTH MITCHEL & STRANGE, LLP
    BY:  DANIEL M. CROWLEY, Esq.
    707 Wilshire Boulevard
    Suite 3000
    Los Angeles, CA 90017
    TEL:  (213) 738-0100
    FAX:  (213) 380-3308
    Dmcrowley@boothmitchel.com

Page 4

---

APPEARANCES OF COUNSEL (Continued):

FOR DEFENDANT, Michael Ray Papayans:

    HAVEN LAW
    BY:  PETER T. HAVEN, Esq.
    1230 Rosecrans Avenue
    Suite 300
    Manhattan Beach, CA 90266
    TEL:  (213) 842-4617
    FAX:  (213) 477-2137
    Peter@havenlaw.com

Also Present:

    MARNIE LEVY, Videographer

Page 5

---

2 (Pages 2 - 5)

```
 1            I N D E X
 2
 3  EXAMINATIONS                    PAGE
 4  BY MS. HEWITT                      9
 5
 6
 7          E X H I B I T S
 8
 9  Exhibit    Description        PAGE
10  Exhibit 50  notice of deposition     41
11
12
13      PREVIOUSLY MARKED EXHIBITS
14
15  Exhibit    Description        PAGE
16  Exhibit 41  complaint           97
17
18
19      WITNESS INSTRUCTED NOT TO ANSWER
20          (None)
21
22
23      INFORMATION REQUESTED
24          (None)
25
                                    Page 6
```

```
 1      Monday, October 24, 2016, 9:12 a.m.
 2          Santa Monica, California
 3                      09:12
 4      THE VIDEOGRAPHER:  Good morning.  We are  09:12
 5  on the record at 9:12 a.m. on Monday, October 24,  09:12
 6  2016.  This is the video recorded deposition of  09:13
 7  Ms. Diana Milena Reed.  My name is Marnie Levy,  09:13
 8  certified legal video specialist here with our court  09:13
 9  reporter Jim Rodriguez.  We are here from Veritext  09:13
10  Legal Solutions, and we are here representing the  09:13
11  defendants.                  09:13
12      This deposition is being held at 401  09:13
13  Wilshire Boulevard, 12th floor, in Santa Monica,  09:13
14  California.  The caption of this case is Cory  09:13
15  Spencer, et al., versus Lunada Bay Boys, case number  09:13
16  2:16-cv-02129-SJO-RAO.          09:13
17      Please note that audio and video recording  09:13
18  will take place unless all parties agree to go off  09:13
19  the record.  I am not related to any party in this  09:13
20  action nor am I financially interested in the  09:13
21  outcome in any way.              09:14
22      If there are any objections to proceeding,  09:14
23  please state them at the time of your appearance  09:14
24  beginning with the noticing attorney.  09:14
25      Thank you, the witness will be sworn in  09:14
                                    Page 7
```

```
 1  and counsel may begin the examination.      09:14
 2                      09:14
 3          DIANA MILENA REED,
 4  produced as a witness and having been first duly
 5  sworn by the Certified Shorthand Reporter, was
 6  examined and testified as follows:
 7
 8      MS. HEWITT:  Before we begin, may I have  09:14
 9  all counsel state their appearances on the record  09:14
10  please, and I'll begin with myself.      09:14
11      Antoinette Hewitt from Kutak Rock for the  09:14
12  City of Palos Verdes Estates and Police  09:14
13  Chief Kepley.                  09:14
14      MR. HAVEN:  Good morning, Peter Haven for  09:14
15  defendant Michael Papayans.          09:14
16      MS. LUTZ:  Good morning, Tera Lutz for  09:14
17  Defendant Sang Lee.              09:14
18      MR. CAREY:  Good morning, Pat Carey for  09:14
19  defendant Alan Johnston.          09:14
20      MR. DIEFFENBACH:  Richard Dieffenbach for  09:14
21  Brant Blakeman, defendant.          09:14
22      MR. CROWLEY:  Daniel Crowley for Sang Lee.  09:14
23      MR. FRANKLIN:  Kurt Franklin on behalf of  09:14
24  Ms. Diana Milena Reed and the other plaintiffs in  09:14
25  this matter and the putative class.      09:15
                                    Page 8
```

```
 1      As a quick matter of housekeeping, just so  09:15
 2  I can get it out early, the plaintiffs will be  09:15
 3  requesting under Rule 30 that they have the  09:15
 4  opportunity to review the transcript under the  09:15
 5  federal rules.                  09:15
 6      MS. HEWITT:  Thank you.          09:15
 7      On the phone?                09:15
 8      MR. FIELDS:  Mark Fields for Angelo  09:15
 9  Ferrara and NF.                09:15
10      MS. HEWITT:  Anybody else on the phone?  09:15
11      Thank you.  And would you please mute the  09:15
12  phone?  Thank you.              09:15
13                      09:15
14          EXAMINATION          09:15
15  BY MS. HEWITT:                09:15
16      Q    Would you please state and spell your name  09:15
17  for the record?                09:15
18      A    My name is Diana Milena Reed.  D-i-a-n-a.  09:15
19  M-i-l-e-n-a.  R-e-e-d.            09:15
20      Q    Thank you.  Have you ever had your  09:15
21  deposition taken before?          09:15
22      A    Yes, I have had a deposition taken before.  09:15
23      Q    How many times?              09:15
24      A    One time.                  09:15
25      Q    And was it in connection with a lawsuit?  09:15
                                    Page 9
```

3 (Pages 6 - 9)

```
 1      A    It was in connection with a lawsuit.    09:15
 2      Q    Were you a party to that lawsuit, were you  09:15
 3   either the defendant or the suing party in that    09:16
 4   matter?                                            09:16
 5      A    Yes.                                       09:16
 6      Q    My fault, which one were you?             09:16
 7      A    I was the suing party.                    09:16
 8      Q    What kind of case was that?               09:16
 9      A    It was a disability case.                 09:16
10      Q    How long ago was that deposition?        09:16
11      A    I don't remember the exact year, but it  09:16
12   was approximately -- about eight years ago or so.  09:16
13      Q    All right.  Where was that disability case  09:16
14   filed if you know?                                09:16
15      A    I don't know specifically where it was    09:16
16   filed, I know where the deposition was held.      09:16
17      Q    Okay.  Where was that?                    09:16
18      A    In Tallahassee, Florida.                  09:16
19      Q    Was the disability case against an        09:16
20   employer?                                         09:16
21      A    It was against the school.                09:16
22      Q    What school was that?                     09:16
23      A    Florida State University.                 09:16
24      Q    Thank you.  Is that the only deposition   09:16
25   you've given?                                     09:17
```

Page 10

```
 1      A    Yes.                                       09:17
 2      Q    Whether or not you gave a deposition, have  09:17
 3   you ever been a party to any other lawsuit?       09:17
 4      A    I'm going through a divorce.              09:17
 5      Q    Okay.  Has that divorce been -- divorce   09:17
 6   petition been filed?                              09:17
 7      A    Yes.                                       09:17
 8      Q    Where was it filed?                       09:17
 9      A    I know it was filed in Los Angeles, I     09:17
10   don't know the specifics.                         09:17
11      Q    Okay.  Do you have an attorney in that    09:17
12   matter?                                           09:17
13      A    Yes, I do.                                09:17
14      Q    Who's that attorney?                      09:17
15      A    Cary Goldstein.                           09:17
16      Q    And from whom are you divorcing?          09:17
17      A    I'm divorcing from Gabriel Reed.          09:17
18      Q    How long were you married to Gabriel Reed?  09:17
19      A    I was married for approximately two years.  09:17
20      Q    Do you know where Gabriel Reed lives?     09:18
21      A    I don't know where he currently lives.    09:18
22      Q    Do you know if he lives in California?    09:18
23      A    I do not.                                 09:18
24      Q    Do you know if Gabriel Reed has an        09:18
25   attorney in that matter, if you can tell me that  09:18
```

Page 11

```
 1   without disclosing any communications with your    09:18
 2   attorney in that matter?                          09:18
 3      A    I do know that he has an attorney, yes.   09:18
 4      Q    Do you know that attorney's name?         09:18
 5      A    I know the last name.                     09:18
 6      Q    That would be great.  If you can give me  09:18
 7   that.                                             09:18
 8      A    Fernandez.                                09:18
 9      Q    Do you know approximately how long ago    09:18
10   that divorce case was filed?                      09:18
11      A    I know that it's a multistep process and  09:18
12   it's a little bit confusing to me.  But I think that  09:18
13   it was filed in March.                            09:18
14      Q    Okay.  Thank you.                         09:18
15           All right.  The -- sorry, are there any    09:19
16   other lawsuits or legal matters that you've been a  09:19
17   party to?                                         09:19
18      A    Not that I'm aware of, no.                09:19
19      Q    The oath you took here has the same force  09:19
20   and effect as if you took it in a court of law even  09:19
21   thought we are in a fairly cramped conference room  09:19
22   here, it carries with it the penalty of perjury as  09:19
23   if you took it in a court of law.                 09:19
24           Do you understand that?                   09:19
25      A    Yes.                                       09:19
```

Page 12

```
 1      Q    You're already doing a great job of making  09:19
 2   sure all your responses are verbal because as you  09:19
 3   see, the court reporter is taking down everything we  09:19
 4   say in order to transcribe it into a transcript,  09:19
 5   which later you'll have a chance to review.       09:19
 6           Because he's doing his best to take down   09:19
 7   everything we say, it's very important that you let  09:19
 8   me finish all my questions before you begin an    09:19
 9   answer, and I'll make sure I let you complete all of  09:19
10   your responses before I begin another question; is  09:19
11   that fair?                                        09:19
12      A    Yes.                                       09:19
13      Q    All right.  You may hear your attorney    09:19
14   impose an objection or one of the other parties.  If  09:19
15   you hear that start to happen, go ahead and pause a  09:20
16   second so the objection can be made on the record,  09:20
17   and we'll go ahead and proceed with the questioning  09:20
18   after that.                                       09:20
19           If your attorney has instructed you not to  09:20
20   answer, that's a different matter.  But if he's not  09:20
21   instructed you not to answer, then I'm entitled to  09:20
22   an answer to the question; all right?  Yes?       09:20
23      A    Yes.                                       09:20
24      Q    Okay.  If you don't understand a question  09:20
25   I pose to you, feel free to ask me to restate it or it  09:20
```

Page 13

4 (Pages 10 - 13)

| | |
|---|---|
| 1 | rephrase it; otherwise, I'll assume you understood   09:20 |
| 2 | the question; all right?   09:20 |
| 3 | A   Okay.   09:20 |
| 4 | Q   I always talk kind of fast so I won't be   09:20 |
| 5 | offended if you say, "I didn't quite catch that, can   09:20 |
| 6 | you repeat that"; okay?   09:20 |
| 7 | A   All right.   09:20 |
| 8 | Q   Today, I'll be asking you for some   09:20 |
| 9 | estimates of time, distance, and maybe other matters   09:20 |
| 10 | that will require you to provide an estimate to me.   09:20 |
| 11 | When I ask you for an estimate, I'll be asking for   09:20 |
| 12 | an estimate as opposed to a guess.   09:20 |
| 13 | Do you understand the difference between   09:20 |
| 14 | an estimate and a guess?   09:20 |
| 15 | A   Can you explain the difference to me?   09:20 |
| 16 | Q   Sure.   09:20 |
| 17 | The example is if I asked you to estimate   09:20 |
| 18 | the length of this table, you have it in front of   09:21 |
| 19 | you, you have breadth of information and experience   09:21 |
| 20 | in your lifetime that will allow you to say, Well,   09:21 |
| 21 | it's probably close to eight feet long.   09:21 |
| 22 | However, if I ask you to estimate the   09:21 |
| 23 | length of the dining room table in my house, that   09:21 |
| 24 | would be a pure guess because you've never been   09:21 |
| 25 | there, never seen it, you don't even know if I have   09:21 |

Page 14

| | |
|---|---|
| 1 | a dining room table; all right, does that make   09:21 |
| 2 | sense?   09:21 |
| 3 | A   Yes.   09:21 |
| 4 | Q   What else?  We will definitely be taking   09:21 |
| 5 | breaks, I usually take them every hour, but of   09:21 |
| 6 | course if you need one I've been there, I remember   09:21 |
| 7 | being 37 years old and being 39 weeks pregnant and   09:21 |
| 8 | sitting in weeks of depositions and I needed breaks.   09:21 |
| 9 | So feel free to ask me and I'll be happy to do that;   09:21 |
| 10 | all right?   09:21 |
| 11 | A   Okay.   09:21 |
| 12 | Q   Or if you need water or if you're not   09:21 |
| 13 | feeling well; okay?   09:21 |
| 14 | A   All right.   09:21 |
| 15 | MR. FRANKLIN:  Could you just get the name   09:21 |
| 16 | of counsel that came in.   09:21 |
| 17 | MS. HEWITT:  Sure.   09:21 |
| 18 | And, Counsel, we'll be in a larger room   09:21 |
| 19 | tomorrow.   09:21 |
| 20 | MR. COOPER:  I hope so, sorry I'm late.   09:21 |
| 21 | MS. HEWITT:  Can you state your --   09:21 |
| 22 | MR. COOPER:  It's Robert Cooper on behalf   09:21 |
| 23 | of Defendant Brant Blakeman.   09:22 |
| 24 | MS. HEWITT:  And can you state your --   09:22 |
| 25 | MR. DIEFFENBACH:  I did already.   09:22 |

Page 15

| | |
|---|---|
| 1 | MS. HEWITT:  That's right, I'm sorry, my   09:22 |
| 2 | fault.   09:22 |
| 3 | BY MS. HEWITT:   09:22 |
| 4 | Q   Did you do anything in preparation for   09:22 |
| 5 | your deposition today?   09:22 |
| 6 | A   Yes.   09:22 |
| 7 | Q   Did you speak to your attorney?   09:22 |
| 8 | A   Yes.   09:22 |
| 9 | Q   Is that Mr. Franklin?   09:22 |
| 10 | A   Yes.   09:22 |
| 11 | Q   When did you speak to Mr. Franklin?   09:22 |
| 12 | A   I spoke to Mr. Franklin on many occasions.   09:22 |
| 13 | Q   Specifically in preparation for today, can   09:22 |
| 14 | you tell me how many times you met with   09:22 |
| 15 | Mr. Franklin?   09:22 |
| 16 | A   I met with Mr. Franklin one time in   09:22 |
| 17 | person.   09:22 |
| 18 | Q   When was that?   09:22 |
| 19 | A   That was yesterday.   09:22 |
| 20 | Q   How long did you meet with him?   09:22 |
| 21 | A   I met with Mr. Franklin for approximately   09:22 |
| 22 | four hours or so.   09:22 |
| 23 | Q   Where did you meet?   09:22 |
| 24 | A   I met Mr. Franklin at -- in Torrance.   09:22 |
| 25 | Q   Was Mr. Otten there?   09:22 |

Page 16

| | |
|---|---|
| 1 | A   Yes.   09:23 |
| 2 | Q   Were any other attorneys there?   09:23 |
| 3 | A   No.   09:23 |
| 4 | Q   Did you review any documents at the time?   09:23 |
| 5 | A   Yes, I did.   09:23 |
| 6 | Q   Did any of them refresh your recollection   09:23 |
| 7 | about any of the events in this matter?   09:23 |
| 8 | A   Yes.   09:23 |
| 9 | Q   Which documents were those?   09:23 |
| 10 | A   I reviewed a letter from Mr. Otten to the   09:23 |
| 11 | police. I also reviewed a police report. And I   09:23 |
| 12 | believe those were the only two documents that I   09:23 |
| 13 | reviewed.   09:23 |
| 14 | Q   Okay.  As to the police report, do you   09:23 |
| 15 | remember what incident that pertained to?   09:23 |
| 16 | A   Yes.  It pertained to the incident on   09:23 |
| 17 | February 13th.   09:23 |
| 18 | Q   Okay.  Anything else that you can remember   09:24 |
| 19 | that you -- I'm sorry -- that you reviewed, that   09:24 |
| 20 | refreshed your recollection?   09:24 |
| 21 | A   Yes, I did review other material as well.   09:24 |
| 22 | Q   That refreshed your recollection?   09:24 |
| 23 | A   Yes.   09:24 |
| 24 | Q   What were the other materials that you   09:24 |
| 25 | reviewed?   09:24 |

Page 17

5 (Pages 14 - 17)

1   A  I also reviewed an audio recording.  09:24
2   Q  Okay.  What else?  09:24
3   A  And I reviewed some photos that were part  09:24
4  of the complaint.  And I also, you know, reviewed  09:24
5  the complaint as well, it's another document.  09:24
6   Q  Anything else?  09:24
7   A  That's all I can remember at this time.  09:24
8   Q  All right.  The audio recording, what did  09:24
9  that pertain to?  09:24
10   A  The audio recording pertained to a  09:24
11  conversation that I had with Charlie Ferrara.  09:25
12   Q  Okay.  Did you actually listen to the  09:25
13  recording?  09:25
14   A  Yes, I did.  09:25
15   Q  Did you review a transcript of it as well?  09:25
16   A  I did not review a transcript of it.  09:25
17     MR. FRANKLIN:  I don't mean to interrupt,  09:25
18  but probably most plaintiff's lawyers maybe don't do  09:25
19  this, but these are the documents she reviewed.  09:25
20     MS. HEWITT:  That's nice.  09:25
21     MR. FRANKLIN:  Including a thumb drive of  09:25
22  the audio and video.  09:25
23     MS. HEWITT:  Thank you, Mr. Franklin.  09:25
24  This is -- Mr. Franklin has provided to us a Sandisk  09:25
25  drive, it's red; as well as a stack of documents  09:25

Page 18

1  that appear to be Bates stamped City 271 and then  09:25
2  City 266, 267, 272.  09:25
3     MR. FRANKLIN:  Unfortunately, they're not  09:26
4  in order, it's -- I tried to make sense of them last  09:26
5  night also, but...  09:26
6     MS. HEWITT:  They appear to be generally  09:26
7  Bates stamped, though, 266 through 296, and Palos  09:26
8  Verdes Estates Police Department officer report as  09:26
9  well as Mr. Otten's letter of March 10, 2016, to  09:26
10  Police Chief Kepley.  09:26
11  BY MS. HEWITT:  09:26
12   Q  All right.  Did you speak to anybody else  09:26
13  other than your attorneys with regard to your  09:26
14  deposition today?  09:26
15   A  With regard to the deposition, meaning  09:27
16  what?  09:27
17   Q  Did you talk about your deposition today  09:27
18  with anybody else other than your attorneys?  09:27
19   A  I spoke to my boyfriend to get my a ride  09:27
20  here.  09:27
21   Q  Who's your boyfriend?  09:27
22   A  Jordan Wright.  09:27
23   Q  How long has Mr. Wright been your  09:27
24  boyfriend?  09:27
25   A  For approximately a year.  09:27

Page 19

1   Q  Did you go back and review any interviews  09:27
2  that you've given in this matter to any media?  09:27
3   A  I did not have the opportunity to do that.  09:27
4   Q  Do you have any documents at home that  09:27
5  relate to this lawsuit?  09:27
6   A  I have a copy of the complaint from my  09:27
7  attorney, and that's all I can recall at the moment.  09:27
8   Q  With regard to Mr. Wright, did you talk  09:28
9  about anything about the deposition other than  09:28
10  getting a ride to the deposition today?  09:28
11   A  We did not discuss what I would be talking  09:28
12  about in the deposition, no.  09:28
13   Q  I will attach as A the Defendant's City of  09:28
14  Palos Verdes Estates and Chief of Police Kepler's  09:28
15  notice of deposition to Ms. -- Ms. Reed.  09:28
16     Ms. Reed, will you please take a look at  09:28
17  Exhibit A and let me know if you've seen that before  09:28
18  today.  I have an extra copy if anybody wants one.  09:28
19     Do you think you've seen that before  09:28
20  today?  09:30
21   A  The first page and second page I think  09:30
22  I've seen before.  09:31
23   Q  Okay.  What is your date of birth?  09:31
24   A  January 22, 1987.  09:31
25   Q  Okay.  What is your current address?  09:31

Page 20

1   A  I'm not sure of my current address, I'm  09:31
2  staying in a temporary housing unit.  09:31
3   Q  Okay.  Does that mean you're staying with  09:31
4  other people or something that's actually called a  09:31
5  temporary housing unit?  09:31
6   A  Yeah, no, I'm staying in a guest house.  09:31
7   Q  With whom are you staying?  09:31
8   A  With Jordan Wright.  09:31
9   Q  What's the address of Jordan Wright?  09:31
10   A  I don't know the address of the unit.  09:31
11   Q  What city is it in?  09:31
12   A  Topanga.  09:31
13   Q  Do you know what street it's on?  09:31
14   A  I know it's off of Topanga Canyon.  09:31
15   Q  Have you ever lived in Palos Verdes  09:31
16  Estates?  09:31
17   A  I have not lived in Palos Verdes Estates,  09:31
18  no.  09:32
19   Q  Have you ever lived in Malibu?  09:32
20   A  Yes, I have.  09:32
21   Q  How long did you live in Malibu?  09:32
22   A  I think I lived in Malibu for  09:32
23  approximately three to four years.  09:32
24   Q  Before you lived in Topanga, did you live  09:32
25  in Malibu?  09:32

Page 21

6 (Pages 18 - 21)

1    A    Yes, I did.                          09:32
2    Q    Before you lived in Malibu, what city did  09:32
3  you live in?                                09:32
4    A    Before I lived in Malibu, I was living in  09:32
5  Dallas, Texas.                             09:32
6    Q    Dallas, Texas.  How long did you live in  09:32
7  Dallas?                                     09:32
8    A    I lived in Dallas since I was about ten  09:32
9  years old.                                  09:32
10   Q    What is the highest grade or education  09:32
11  you've completed?                          09:32
12   A    I completed college.                 09:32
13   Q    Where did you complete college?      09:32
14   A    At USC.                              09:32
15   Q    What degree did you get?             09:32
16   A    Film production degree.              09:32
17   Q    When did you receive that degree?    09:32
18   A    I had my graduation ceremony in, I   09:32
19  believe, 2013.                             09:33
20   Q    All right.  And was that a bachelor of  09:33
21  arts or master's?                          09:33
22   A    I think it was a bachelor of arts, yes.  09:33
23   Q    Have you had any other formal schooling  09:33
24  since then?                                09:33
25   A    I have not had any formal schooling since  09:33

Page 22

1  then.                                       09:33
2    Q    All right.  Do you have any other    09:33
3  certifications or professional -- professional  09:33
4  certifications or licenses?                 09:33
5    A    I don't, no.                         09:33
6    Q    Okay.  Other than to Mr. Reed, have you  09:33
7  ever been married before?                   09:33
8    A    No.                                  09:33
9    Q    All right.  Do you have any children?  09:33
10   A    I don't have any children that have been  09:33
11  born yet.                                   09:33
12   Q    Are you employed?                    09:33
13   A    I'm not currently employed.          09:34
14   Q    Who is your most recent employer?    09:34
15   A    My most recent employer was Robbie French  09:34
16  Incorporated.                              09:34
17   Q    What was your job there?             09:34
18   A    I was a surf camp director.          09:34
19   Q    How long did you have that position there?  09:34
20   A    It was a summer position and I was   09:34
21  employed as a seasonal worker from approximately --  09:34
22  I believe it was June through August.      09:34
23   Q    Of what year?                        09:34
24   A    Of 2016.                             09:34
25   Q    Okay.  Prior to that, what was your most  09:34

Page 23

1  recent employment?                          09:34
2    A    Prior to that, I was not working.    09:34
3    Q    When was the last time you worked before  09:34
4  that?                                       09:34
5    A    I don't remember specifically when the  09:34
6  last time was that I worked before that.    09:35
7    Q    Okay.  Just to clarify, do you recall any  09:35
8  other jobs you held prior to Robbie French Inc.?  09:35
9    A    I don't remember any paid jobs.      09:35
10   Q    Did you have any unpaid jobs prior to  09:35
11  Robbie French Inc.?                        09:35
12   A    I had internships for a college credit,  09:35
13  but nothing paid that I can recall.        09:35
14   Q    Who was your -- if you had one, who was  09:35
15  your supervisor at Robbie French Inc.?     09:35
16   A    Robbie French.                       09:35
17   Q    How did you meet Robbie French?      09:35
18   A    I met her at a Starbucks in Redondo Beach.  09:35
19   Q    How did you get the job?             09:35
20   A    I interviewed with her.              09:35
21   Q    What were you paid?                  09:35
22   A    I was paid approximately $18 an hour.  09:36
23   Q    Where was the surf camp that you were the  09:36
24  director of?                               09:36
25   A    It was located in Santa Monica,      09:36

Page 24

1  California.                                 09:36
2    Q    Any particular part of Santa Monica, if  09:36
3  you can -- can you tell me where the beach was  09:36
4  generally?                                  09:36
5    A    Yeah, I don't remember if it was parking  09:36
6  lot six or nine, but it was in that approximate  09:36
7  area.                                       09:36
8    Q    Other than any internships you held for  09:36
9  college credit, did you ever have any internships  09:36
10  since you got out of college?              09:36
11   A    I have not, no.                      09:36
12   Q    Have you ever worked for money at all  09:36
13  since -- between college and Robbie French and  09:37
14  perhaps some other way -- online work, or anything  09:37
15  like that?                                 09:37
16   A    Not from what I remember, no.        09:37
17   Q    Have you ever been convicted of a felony?  09:37
18   A    No, I have not.                      09:37
19   Q    I assumed not, but have you ever filed any  09:37
20  workers' compensation claims?              09:37
21   A    I have not.                          09:37
22   Q    With regard to the disability suit that  09:37
23  you were a part of in Tallahassee, can you tell me  09:37
24  what condition that pertained to, medical condition?  09:37
25   A    Can you clarify the question?        09:37

Page 25

7 (Pages 22 - 25)

| | | |
|---|---|---|
| 1 | Q | Sure. Why did you file that suit? 09:37 |
| 2 | A | I filed the suit because it was related to 09:37 |
| 3 | a back condition that I have. 09:37 |
| 4 | Q | What is that back condition? 09:37 |
| 5 | A | I have scoliosis that's pretty severe. 09:38 |
| 6 | Q | Why did you sue Florida State University? 09:38 |
| 7 | A | I sued them because they failed to provide 09:38 |
| 8 | me accommodation for the disability. 09:38 |
| 9 | Q | Were you going to school there? 09:38 |
| 10 | A | Yes, I was. 09:38 |
| 11 | Q | When did you go to school at Florida 09:38 |
| 12 | State? 09:38 |
| 13 | A | I went to school at Florida State from 09:38 |
| 14 | approximately 2005 to 2007. 09:38 |
| 15 | Q | Okay. When did you start up at USC? 09:38 |
| 16 | A | I believe I started USC around 2012. 09:38 |
| 17 | Q | Okay. What did you do between 2007 and 09:38 |
| 18 | 2012? 09:38 |
| 19 | A | What do you mean? 09:38 |
| 20 | Q | So you were in Florida; right? First let 09:38 |
| 21 | me ask you, how did your disability suit conclude? 09:39 |
| 22 | A | When ended up settling the case. 09:39 |
| 23 | Q | Did you continue to live in Florida after 09:39 |
| 24 | that? 09:39 |
| 25 | A | I did not. 09:39 |

Page 26

| | | |
|---|---|---|
| 1 | A | After that year, I lived with my 09:40 |
| 2 | ex-husband. 09:40 |
| 3 | Q | Did you move to California sometime after 09:40 |
| 4 | that year in Dallas? 09:40 |
| 5 | A | I moved to California around 2012, I 09:40 |
| 6 | believe. 09:40 |
| 7 | Q | Where did you marry your soon to be 09:40 |
| 8 | ex-husband? 09:40 |
| 9 | A | I married him in Las Vegas, Nevada. 09:40 |
| 10 | Q | Where were you living when you got 09:40 |
| 11 | married? 09:40 |
| 12 | A | When we got married, we were living in 09:40 |
| 13 | Malibu. 09:40 |
| 14 | Q | When did you first move to Malibu -- 09:40 |
| 15 | sorry -- when did you first meet your ex-husband, 09:40 |
| 16 | soon-to-be ex-husband? 09:40 |
| 17 | A | I first met him in Addison, Texas in 09:40 |
| 18 | either the end of 2007 or beginning of 2008, I don't 09:40 |
| 19 | remember specifically. 09:40 |
| 20 | Q | Okay. And at some point, did you and your 09:40 |
| 21 | soon-to-be ex-husband move to California? 09:41 |
| 22 | A | We moved to California, yes. 09:41 |
| 23 | Q | Was that in 2012? 09:41 |
| 24 | A | I believe so. It was around 2012, I might 09:41 |
| 25 | be off by a year but it was around that time period. 09:41 |

Page 28

| | | |
|---|---|---|
| 1 | Q | Did you move at some point? 09:39 |
| 2 | A | Yes. 09:39 |
| 3 | Q | When did you move? 09:39 |
| 4 | A | I was never a resident of Florida at any 09:39 |
| 5 | point during my college there. 09:39 |
| 6 | Q | You didn't live in Florida while you were 09:39 |
| 7 | going to Florida State? 09:39 |
| 8 | A | I did, I did live there, but I went back 09:39 |
| 9 | and forth between my parents' house and -- 09:39 |
| 10 | Q | Dallas? 09:39 |
| 11 | A | -- school. 09:39 |
| 12 | Yes. 09:39 |
| 13 | Q | After you settled the disability case, did 09:39 |
| 14 | you continue to go to school at Florida State? 09:39 |
| 15 | A | I did not. 09:39 |
| 16 | Q | Did you withdraw? 09:39 |
| 17 | A | Yes. 09:39 |
| 18 | Q | After that, did you go to live in Dallas 09:39 |
| 19 | with your parents? 09:39 |
| 20 | A | Yes. 09:39 |
| 21 | Q | How long did you live in Dallas with your 09:39 |
| 22 | parents after 2007? 09:39 |
| 23 | A | I don't remember specifically how long. 09:39 |
| 24 | Probably about a year or so. 09:39 |
| 25 | Q | And after that year, where did you live? 09:40 |

Page 27

| | | |
|---|---|---|
| 1 | Q | And you started school in -- at USC in 09:41 |
| 2 | 2012; right? 09:41 |
| 3 | A | I believe so. 09:41 |
| 4 | Q | What did your ex-husband do, what's his 09:41 |
| 5 | employment if you know? 09:41 |
| 6 | A | His employment is a concert promoter. 09:41 |
| 7 | Q | All right. When did you first retain 09:41 |
| 8 | Mr. Otten and Mr. Franklin as your attorney in this 09:41 |
| 9 | matter -- attorneys in this matter? 09:41 |
| 10 | A | I retained them in approximately, I 09:41 |
| 11 | believe, in either February or March. 09:41 |
| 12 | Q | Of this year? 09:41 |
| 13 | A | Of 2016, yes. 09:41 |
| 14 | Q | So you're saying you don't remember the 09:42 |
| 15 | exact date? 09:42 |
| 16 | A | I don't remember the exact date, no. 09:42 |
| 17 | Q | Do you remember if there was some 09:42 |
| 18 | particular event that precipitated your retention of 09:42 |
| 19 | Mr. Otten and Mr. Franklin? 09:42 |
| 20 | A | There was not a specific event, no. 09:42 |
| 21 | Q | Do you recall if you retained Mr. Franklin 09:42 |
| 22 | and Mr. Otten prior to the February 13th incident 09:42 |
| 23 | that is reflected in the police reports that you 09:42 |
| 24 | reviewed? 09:42 |
| 25 | A | I don't recall specifically if I did. I 09:42 |

Page 29

8 (Pages 26 - 29)

1  don't think so.                          09:42
2      Q    So you think it was after that sometime?   09:42
3      A    I think so, yeah, but I'm not 100 percent   09:42
4  sure.                                    09:42
5      Q    Understood.                     09:42
6          And is it correct, though, that you   09:42
7  retained -- at least Mr. Otten -- by March 10, 2016,   09:42
8  when he wrote this letter on your behalf?   09:42
9      A    I would assume so, yes.          09:42
10      Q    Do you have a fairly reasonable   09:42
11  recollection in mind that you had retained him prior   09:42
12  to March 10th when he wrote this letter for you?   09:43
13      A    I don't know if it was prior to   09:43
14  March 10th.                             09:43
15      Q    Okay.  Do you know if you retained   09:43
16  Mr. Otten and Mr. Franklin at the same time?   09:43
17      A    I believe that it was at the same time,   09:43
18  yes.                                    09:43
19      Q    And did you sign a retainer agreement with   09:43
20  either or both attorneys?                09:43
21      A    I don't remember signing the document but   09:43
22  I'm assuming that I must have signed it with both   09:43
23  attorneys.                             09:43
24      Q    Do you have a retainer agreement at home?   09:43
25      A    I don't know.                  09:43

                                        Page 30

1      Q    And do you have a specific recollection of   09:43
2  receiving a retainer agreement?          09:43
3      A    I remember vaguely going through the   09:43
4  process of retaining them but I don't remember   09:43
5  specifically what I did detail by detail.   09:43
6      Q    Okay.  So is it correct then you don't   09:43
7  have a specific recollection of executing a retainer   09:43
8  agreement; is that fair?               09:44
9      A    No.                           09:44
10      MR. FRANKLIN:  Misstates prior testimony.   09:44
11  BY MS. HEWITT:                          09:44
12      Q    How's that not correct?         09:44
13      MR. FRANKLIN:  Objection, argumentative,   09:44
14  misstates prior testimony.             09:44
15      THE WITNESS:  I don't understand.    09:44
16      MR. FRANKLIN:  Let me object.        09:44
17      MS. HEWITT:  So the record is clear.   09:44
18      Did you get that?  Okay.            09:44
19  BY MS. HEWITT:                          09:44
20      Q    I'm just trying to clarify.  Do you have   09:44
21  any recollection of signing a retainer agreement   09:44
22  with your attorneys?                   09:44
23      A    I do vaguely remember doing that, yes.   09:44
24      Q    And is it correct, though, that you don't   09:44
25  believe you have a copy of that at home?   09:44

                                        Page 31

1      MR. FRANKLIN:  Misstates prior testimony.   09:44
2      THE WITNESS:  That's not what I said.   09:44
3  BY MS. HEWITT:                          09:44
4      Q    Okay.  I apologize.             09:44
5      Do you have a copy of that retainer   09:44
6  agreement at home?                     09:44
7      A    By copy, do you mean printed copy or --   09:44
8  what copy?                             09:44
9      Q    Do you have that at home at all either by   09:44
10  e-mail or hard copy?                    09:45
11      A    I would assume that I do.         09:45
12      Q    You assume -- are you sure?       09:45
13      MR. FRANKLIN:  Argumentative.         09:45
14      THE WITNESS:  I'm assuming that I have a   09:45
15  copy because I did sign a retainer agreement with   09:45
16  them at one point.                     09:45
17  BY MS. HEWITT:                          09:45
18      Q    Okay.  Had you ever -- let me ask you   09:45
19  this, I'm sorry -- when did you first meet   09:45
20  Mr. Otten?                             09:45
21      A    I think that I first met Mr. Otten at his   09:45
22  office in Torrance.                    09:45
23      Q    Okay.  Did you meet Mr. Otten at any time   09:45
24  before retaining him as your attorney -- that's a   09:45
25  bad question, withdraw that.            09:45

                                        Page 32

1      Had you ever met Mr. Otten before the date   09:45
2  that you actually retained him as your attorney?   09:45
3      MR. FRANKLIN:  Vague and ambiguous.    09:46
4      THE WITNESS:  I don't remember.       09:46
5  BY MS. HEWITT:                          09:46
6      Q    Okay.  And what were the circumstances   09:46
7  under which you first met Mr. Otten -- let me ask   09:46
8  you this:  Did anybody introduce you to Mr. Otten?   09:46
9      A    Yes.                          09:46
10      Q    Who was that?                   09:46
11      A    I was introduced to Mr. Otten by Jordan   09:46
12  Wright.                                09:46
13      Q    Do you know how Jordan Wright knew   09:46
14  Mr. Otten?                             09:46
15      A    Jordan Wright also met Mr. Otten for the   09:46
16  first time and did not know him as well.   09:46
17      Q    Did Jordan ever tell you how -- I'm sorry,   09:46
18  withdraw.                              09:46
19      Do you mean that Mr. Wright and you both   09:46
20  met Mr. Otten for the first time on the same date?   09:46
21      A    Yes.                          09:47
22      Q    What were the circumstances that brought   09:47
23  you to meet Mr. Otten that day?          09:47
24      A    We had been invited by Cory Spencer to   09:47
25  meet with Mr. Otten.  Jordan had been invited and I   09:47

                                        Page 33

                                9 (Pages 30 - 33)

Hahn & Bowersock, A Veritext Company
800.660.3187

1    accompanied him.                          09:47
2    Q    I think you said that was at Mr. Otten's   09:47
3    office; is that right?                     09:47
4    A    Yes.                                  09:47
5    Q    What was the purpose of that meeting?    09:47
6    A    The purpose of that meeting.          09:47
7        MR. FRANKLIN: I'm going to object to the   09:47
8    extent it calls for attorney-client privilege.  If   09:47
9    you can state the purpose for meeting with counsel.   09:47
10       THE WITNESS: Right, the purpose of the   09:47
11   meeting was something that I discussed between me   09:47
12   and the attorneys.                         09:47
13   BY MS. HEWITT:                             09:47
14   Q    Okay.  What made you go and meet with   09:47
15   Mr. Otten for the first time at his office in   09:47
16   Torrance?                                  09:47
17   A    I don't remember specifically.        09:47
18   Q    What did Cory Spencer tell you with regard   09:47
19   to getting you -- or inviting you, excuse me, to   09:48
20   meet with Mr. Otten?                       09:48
21   A    I don't remember if I spoke to Cory   09:48
22   directly or if Jordan spoke to him.        09:48
23   Q    What did Jordan tell you Cory told him?   09:48
24   A    I don't remember; sorry.              09:48
25   Q    It's okay.                           09:48
                                              Page 34

1        Do you have any recollection of any reason   09:48
2    in your mind why you wanted to go to that meeting?   09:48
3    A    I don't remember a specific reason.    09:48
4    Q    Before going to that meeting, had you   09:48
5    heard that a lawsuit against the City was being   09:48
6    discussed?                                 09:48
7    A    I don't know if I heard that before.   09:48
8    Q    Did you have any understanding that   09:48
9    Mr. Spencer had already met Mr. Otten at the time he   09:49
10   had invited you to meet Mr. Otten?         09:49
11   A    I don't recall having that understanding,   09:49
12   no.                                        09:49
13   Q    When you first met Mr. Otten, had you met   09:49
14   Mr. Franklin before?                       09:49
15   A    I had not met Mr. Franklin before, no.   09:49
16   Q    And when you first met Mr. Otten, was   09:49
17   Mr. Franklin there?                        09:49
18   A    Mr. Franklin was not there in person.   09:49
19   Q    When did you -- was he there by phone?   09:49
20   A    Yes.                                  09:49
21   Q    What other attorneys if you know were at   09:49
22   the meeting?                               09:49
23   A    I only know of Mr. Otten and Mr. Franklin.   09:49
24   Q    Okay.  Besides yourself and Mr. Wright,   09:49
25   did Mr. Spencer actually attend that meeting with   09:49
                                              Page 35

1    Mr. Otten?                                 09:49
2    A    Mr. Spencer was there.                09:49
3    Q    Any other people attended that meeting?   09:49
4    A    I don't recall anyone else there.      09:49
5    Q    How long did that meeting take place --   09:49
6    excuse me -- how long did that meeting last?   09:50
7    A    You know what, I don't remember   09:50
8    specifically.  I would assume, you know, between 30   09:50
9    minutes to an hour.                        09:50
10   Q    Did you retain Mr. Otten at that meeting?   09:50
11       MR. FRANKLIN: Vague and ambiguous.      09:50
12       THE WITNESS: I don't remember if I      09:50
13   retained him at the meeting or after the meeting,   09:50
14   I'm not sure.                              09:50
15   BY MS. HEWITT:                             09:50
16   Q    Had you ever met anybody at either   09:50
17   Mr. Franklin or Mr. Otten's office before the date   09:50
18   of your first meeting with Mr. Otten and   09:50
19   Mr. Franklin?                              09:50
20   A    I had not met anyone in that office   09:50
21   before, no.                               09:50
22   Q    When did you first decide you wanted to   09:50
23   file a lawsuit against the City of Palos Verdes   09:50
24   Estates and Police Chief Kepley?           09:50
25       MR. FRANKLIN: Objection to the extent it   09:50
                                              Page 36

1    calls attorney-client privilege.          09:50
2        THE WITNESS: That's something I discussed   09:50
3    with my attorneys and we decided the best course of   09:50
4    action for that.                          09:50
5    BY MS. HEWITT:                             09:50
6    Q    Had you thought about filing a lawsuit   09:50
7    before you ever met Mr. Otten?            09:51
8    A    I don't recall right now if I did or I   09:51
9    didn't.                                   09:51
10   Q    When you first spoke with -- not first   09:51
11   spoke, withdraw.                          09:51
12       When Mr. Spencer invited you to meet with   09:51
13   Mr. Otten, did he say anything about a lawsuit in   09:51
14   that conversation?                        09:51
15   A    I don't remember.                     09:51
16   Q    Had Mr. Spencer told you that he had heard   09:51
17   from other sources that some entities were thinking   09:51
18   of filing a lawsuit against the City?      09:51
19   A    I don't remember much of that           09:51
20   conversation.                             09:51
21   Q    What do you remember about that         09:51
22   conversation?                             09:51
23       MR. FRANKLIN: To the extent it happened   09:51
24   at the office with Mr. Otten, I'll instruct you not   09:51
25   to answer.                                09:51
                                              Page 37

10 (Pages 34 - 37)

**Page 38**

```
 1        If you recall a conversation with        09:51
 2   Mr. Spencer separately prior to that meeting, you   09:51
 3   can talk about that.                          09:51
 4        THE WITNESS:  Yeah, I don't recall a     09:51
 5   conversation with Mr. Spencer prior to that meeting.  09:52
 6   BY MS. HEWITT:                                 09:52
 7     Q   Okay.  All right.  Fair enough.          09:52
 8   Because -- right.                              09:52
 9        Mr. Jordan, I think you said, was the one  09:52
10   who actually talked to Mr. Spencer; is that right?  09:52
11     A   I know that they did speak together, yes.  09:52
12     Q   Then Jordan was -- was Jordan the one that  09:52
13   then told you about the invitation to this meeting  09:52
14   with Mr. Otten?                                09:52
15     A   I know that Jordan and I discussed it.  I   09:52
16   don't remember specifically, you know, what we  09:52
17   discussed.  I don't remember, you know, too many  09:52
18   details, the specifics of that event right now.  09:52
19     Q   All right.  Do you remember anything -- I  09:52
20   understand you don't recollect any specific details,  09:52
21   but do you remember any general topics in that  09:52
22   conversation with Jordan?                      09:52
23        MR. FRANKLIN:  Again, it would have to be  09:52
24   a conversation prior to that meeting.          09:52
25        MS. HEWITT:  Prior to the meeting, yes.   09:52
```

**Page 39**

```
 1        THE WITNESS:  I don't think we had a      09:52
 2   conversation, you know, prior to the meeting about  09:52
 3   what was going to happen in the meeting, no.   09:53
 4   BY MS. HEWITT:                                 09:53
 5     Q   All right.  Did Jordan say anything to you  09:53
 6   to make you want to attend this meeting with   09:53
 7   Mr. Otten?                                     09:53
 8     A   Not that I recall.                        09:53
 9     Q   All right.  Did you know at all before   09:53
10   going to the actual meeting with Mr. Otten, before  09:53
11   you got there, did you have any idea that any legal  09:53
12   action was going to be contemplated?           09:53
13     A   I don't remember.                         09:53
14     Q   Did Jordan ever say anything to you before  09:53
15   that meeting with Mr. Otten, ever, about possibly  09:53
16   filing a lawsuit against the City?             09:53
17     A   Jordan never told me that he wanted to   09:53
18   file a lawsuit, no.                            09:53
19     Q   Did Cory Spencer prior to the meeting with  09:53
20   Mr. Otten ever tell you he wanted to file a lawsuit  09:53
21   against the City?                              09:53
22     A   I don't recall speaking to Cory directly  09:53
23   about that.                                    09:53
24     Q   How about indirectly?                     09:53
25     A   How would I speak to him indirectly?      09:53
```

**Page 40**

```
 1     Q   I was just making sure I got all the     09:53
 2   details there.                                 09:54
 3        Is it correct that you met Mr. Spencer at  09:54
 4   least twice before your meeting with Mr. Otten?  09:54
 5        MR. FRANKLIN:  Misstates prior testimony.  09:54
 6        THE WITNESS:  I'm not sure if that's      09:54
 7   correct.                                       09:54
 8   BY MS. HEWITT:                                 09:54
 9     Q   Did you meet him in January at Lunada Bay?  09:54
10     A   I believe that I did meet him at some    09:54
11   point in January, yes.                         09:54
12     Q   And did you meet him in February as well  09:54
13   in Lunada Bay?                                 09:54
14     A   I don't know if I met him again in       09:54
15   February, I may have.                          09:54
16     Q   Do you have any recollection of him being  09:54
17   there on the date of the February 13th incident?  09:54
18     A   I remember that he wasn't down there with  09:54
19   me while the incident happened.                09:54
20     Q   All right.  Do you have an understanding  09:54
21   that you're a class representative in this matter;  09:54
22   is that right?                                 09:55
23     A   Yes.                                      09:55
24        THE WITNESS:  Before you ask me the next  09:55
25   question, can I take a bathroom break please?  09:55
```

**Page 41**

```
 1     MS. HEWITT:  Of course, let's go off the   09:55
 2   record.                                       09:55
 3        THE VIDEOGRAPHER:  This concludes video   09:55
 4   file one and we're off the record at 9:55 and we're  09:55
 5   clear, thank you.                             09:55
 6        (Break taken.)                            09:55
 7        THE VIDEOGRAPHER:  This commences video   10:04
 8   file two, we're on the record at              10:04
 9        MS. HEWITT:  First and foremost, I'm going  10:04
10   to remark the notice of deposition as Exhibit 51 --  10:04
11   or 50 -- 50, right?                           10:05
12     MR. CROWLEY:  I thought --             10:05
13     MR. CAREY:  I thought you said 41.     10:05
14     MR. HAVEN:  No, we left off around     10:05
15   Exhibit 43 with Mr. Spencer, so if you want to play  10:05
16   it safe and call it 50.                       10:05
17        MS. HEWITT:  All right.  Let's call it   10:05
18   Exhibit 50, thank you.                         10:05
19        (Deposition Exhibit 50, notice of        10:05
20        deposition, was marked for             10:05
21        identification.)                         10:05
22   BY MS. HEWITT:                                 10:05
23     Q   All right.  Do you have an agreement with  10:05
24   your attorneys that you'll receive some sort of  10:05
25   incentive payment in this matter?             10:05
```

11 (Pages 38 - 41)

| | | |
|---|---|---|
| 1 | A   No, I do not. | 10:05 |
| 2 | Q   As a class representative, do you believe | 10:05 |
| 3 | that you have an obligation to supervise your | 10:05 |
| 4 | attorneys? | 10:05 |
| 5 | A   Yes, I do. | 10:05 |
| 6 | Q   Have you been doing that? | 10:05 |
| 7 | A   Yes, I have. | 10:05 |
| 8 | Q   How have you done that? | 10:05 |
| 9 | A   I have been involved in -- | 10:05 |
| 10 | MR. FRANKLIN:  Before -- | 10:05 |
| 11 | THE WITNESS:  -- various discussions. | 10:05 |
| 12 | MR. FRANKLIN:  Before you respond, you can | 10:05 |
| 13 | generally -- I'm going to object to the extent it | 10:05 |
| 14 | calls for attorney-client privilege.  The actual | 10:05 |
| 15 | instruction you give us you cannot -- I'm going to | 10:05 |
| 16 | instruct you not to answer to that.  But in terms of | 10:06 |
| 17 | questions about when you communicate with us and | 10:06 |
| 18 | that type of thing you can, or how. | 10:06 |
| 19 | THE WITNESS:  Right, well, I've been | 10:06 |
| 20 | communicating on a regular basis and monitoring | 10:06 |
| 21 | pretty much all the activity on the case, so I've | 10:06 |
| 22 | been trying to be as actively involved as possible. | 10:06 |
| 23 | BY MS. HEWITT: | 10:06 |
| 24 | Q   Okay.  How often do you talk with your | 10:06 |
| 25 | attorneys? | 10:06 |

Page 42

| | | |
|---|---|---|
| 1 | A   I talk with my attorneys on an as-needed | 10:06 |
| 2 | basis. | 10:06 |
| 3 | Q   Up till now, has that been more than once | 10:06 |
| 4 | a month? | 10:06 |
| 5 | A   It's usually more than once a month. | 10:06 |
| 6 | Q   Okay.  Three times a month? | 10:06 |
| 7 | A   It's hard for me to give you a specific | 10:06 |
| 8 | answer because as I said it's on an as-needed basis. | 10:06 |
| 9 | Q   Now -- let's see, I think we established | 10:06 |
| 10 | that you retained them in either February or March | 10:06 |
| 11 | of -- 2013 -- 2016, sorry.  We're in October now, so | 10:06 |
| 12 | over the course of those five months or so, let's | 10:06 |
| 13 | work backwards. | 10:07 |
| 14 | So in -- in this month, approximately how | 10:07 |
| 15 | many times have you communicated with your | 10:07 |
| 16 | attorneys? | 10:07 |
| 17 | Q   In October? | 10:07 |
| 18 | Q   Yes, ma'am. | 10:07 |
| 19 | A   I don't remember the specific amount of | 10:07 |
| 20 | time, or specific amount I mean that I've spoken to | 10:07 |
| 21 | them, but I mean it was a multitude of occasions. | 10:07 |
| 22 | Q   More than two? | 10:07 |
| 23 | A   Yes. | 10:07 |
| 24 | Q   More than three? | 10:07 |
| 25 | A   Yes. | 10:07 |

Page 43

| | | |
|---|---|---|
| 1 | Q   Five? | 10:07 |
| 2 | A   I think more than that. | 10:07 |
| 3 | Q   How about in September, do you remember | 10:07 |
| 4 | approximately how many times you spoke to them in | 10:07 |
| 5 | September? | 10:07 |
| 6 | A   I don't remember, you know, specifically | 10:07 |
| 7 | in September.  I know that I communicate with them | 10:07 |
| 8 | on an as-needed basis but how many times | 10:07 |
| 9 | specifically in the month of September is hard for | 10:07 |
| 10 | me to say. | 10:07 |
| 11 | Q   Do you think you did at least once in | 10:07 |
| 12 | September? | 10:07 |
| 13 | A   Yes. | 10:07 |
| 14 | Q   At least twice? | 10:07 |
| 15 | A   I would assume it's usually about at least | 10:07 |
| 16 | three times a month or so at least. | 10:08 |
| 17 | Q   Would that be the same for August? | 10:08 |
| 18 | MR. FRANKLIN:  It lacks foundation, | 10:08 |
| 19 | misstates prior testimony. | 10:08 |
| 20 | You can answer. | 10:08 |
| 21 | THE WITNESS:  You know, I don't know, it's | 10:08 |
| 22 | hard for me to speculate, I just don't remember. | 10:08 |
| 23 | BY MS. HEWITT: | 10:08 |
| 24 | Q   When you do communicate with your | 10:08 |
| 25 | attorneys, can you tell me by what means, person, | 10:08 |

Page 44

| | | |
|---|---|---|
| 1 | phone, e-mail? | 10:08 |
| 2 | A   I communicate by all three of those. | 10:08 |
| 3 | Q   Okay.  And it's usually one particular | 10:08 |
| 4 | attorney at any given time or more than one attorney | 10:08 |
| 5 | at any given time? | 10:08 |
| 6 | A   What do you mean by if there's more than | 10:08 |
| 7 | one attorney? | 10:08 |
| 8 | Q   Is it usually Mr. Otten and Mr. Franklin | 10:08 |
| 9 | that you're communicating with or is it one or the | 10:08 |
| 10 | other? | 10:08 |
| 11 | A   Are you asking -- I'm sorry -- I'm | 10:08 |
| 12 | confused what you're asking. | 10:08 |
| 13 | Q   Probably a bad question. | 10:08 |
| 14 | When you communicate with your attorneys | 10:08 |
| 15 | about this case in the course of supervising your | 10:08 |
| 16 | attorneys, is it Mr. Otten and Mr. Franklin that | 10:08 |
| 17 | you're communicating with at any given time? | 10:09 |
| 18 | A   Yes, I communicate with both of them. | 10:09 |
| 19 | Q   Both of them, okay. | 10:09 |
| 20 | Is it ever just one of them? | 10:09 |
| 21 | A   Occasionally, yes. | 10:09 |
| 22 | Q   Do you communicate with anybody else from | 10:09 |
| 23 | either office, so for instance, any of | 10:09 |
| 24 | Mr. Franklin's colleagues at his office? | 10:09 |
| 25 | A   I don't believe that I communicate with | 10:09 |

Page 45

12 (Pages 42 - 45)

| | |
|---|---|
| 1    them directly, but I think that they're usually --   10:09 | BY MS. HEWITT:                          10:11 |
| 2    they're usually on the e-mails, I think.          10:09 | 2    Q    What do you mean on an as-needed basis?   10:11 |
| 3    Q    Okay.  Did you review the complaint before  10:09 | 3    A    It just depends what's going on with the  10:11 |
| 4    the attorneys filed it in court on your behalf?   10:09 | 4    case.                               10:11 |
| 5    A    Yes, I did review the complaint.          10:09 | 5    Q    Does that include reviewing any filings   10:12 |
| 6    Q    About how much time did you spend          10:09 | 6    that are made on your behalf?              10:12 |
| 7    reviewing the complaint before it was filed?     10:09 | 7    A    What do you mean by that?             10:12 |
| 8    A    I spent four or more hours on a few        10:09 | 8    Q    Have you reviewed any filings that were   10:12 |
| 9    occasions reviewing it.                    10:09 | 9    made on your behalf in this matter?          10:12 |
| 10    Q    Before it was filed?                 10:09 | 10    A    What do you mean by filings?          10:12 |
| 11    A    Yes.                            10:09 | 11    Q    Anything that was filed in court.       10:12 |
| 12    Q    In the course of reviewing it, did you   10:09 | 12        MR. FRANKLIN:  Vague and ambiguous.    10:12 |
| 13    have in your mind any suggestions for the complaint, 10:10 | 13        THE WITNESS:  I don't understand exactly 10:12 |
| 14    whether or not you made them, I just want to know in 10:10 | 14    what you're asking me.                 10:12 |
| 15    your mind did you have any suggestions for the   10:10 | 15    BY MS. HEWITT:                       10:12 |
| 16    complaint?                           10:10 | 16    Q    Okay.  Do you have any understanding of  10:12 |
| 17        MR. FRANKLIN:  I object to the extent it  10:10 | 17    the filings that have been made in court on your  10:12 |
| 18    calls for attorney-client privilege if you had  10:10 | 18    behalf up to this point?                10:12 |
| 19    suggestions I'm going to instruct you not to answer. 10:10 | 19        MR. FRANKLIN:  Vague and ambiguous.     10:12 |
| 20    Whether you provided input, that's fine.       10:10 | 20        THE WITNESS:  What do you mean by on my   10:12 |
| 21    BY MS. HEWITT:                        10:10 | 21    behalf?                             10:12 |
| 22    Q    Did you provide input on the complaint?   10:10 | 22    BY MS. HEWITT:                       10:12 |
| 23    A    I did.                          10:10 | 23    Q    Well, for instance, you said you reviewed 10:12 |
| 24    Q    Okay.  How much time did you spend        10:10 | 24    the complaint.                       10:12 |
| 25    preparing for the deposition today?  I forgot to ask 10:10 | 25        Do you have an understanding that the   10:12 |
| Page 46 | Page 48 |

| | |
|---|---|
| 1    you.                              10:10 | complaint has been filed on your behalf?       10:12 |
| 2        MR. FRANKLIN:  Asked and answered.       10:10 | 2    A    I have an understanding that the complaint 10:12 |
| 3    BY MS. HEWITT:                        10:10 | 3    was filed on behalf of the class.          10:12 |
| 4    Q    How much total time?                 10:10 | 4    Q    Do you have an understanding it was filed  10:12 |
| 5    A    It's hard for me to say how much total    10:10 | 5    on your behalf as well?                 10:12 |
| 6    time overall.  We met on the phone and in person,  10:10 | 6        MR. FRANKLIN:  Document speaks for itself. 10:12 |
| 7    and I reviewed some documents as well.        10:10 | 7        THE WITNESS:  I have an understanding that 10:12 |
| 8    Q    All right.  Now, in general, how much time  10:11 | 8    I represent the class.                  10:12 |
| 9    do you expect to spend on this case?          10:11 | 9    BY MS. HEWITT:                       10:12 |
| 10    A    However long it takes.              10:11 | 10    Q    Do you also have an understanding, though, 10:13 |
| 11    Q    Did you have any expectation in your mind  10:11 | 11    that the complaint was filed on your behalf?    10:13 |
| 12    as to how much that would be?              10:11 | 12        MR. FRANKLIN:  Document speaks for itself, 10:13 |
| 13    A    Just however long it takes, I'm willing to 10:11 | 13    argumentative, asked and answered.          10:13 |
| 14    put that time.                        10:11 | 14    BY MS. HEWITT:                       10:13 |
| 15    Q    Do you have an understanding that there's  10:11 | 15    Q    Meaning you specifically.            10:13 |
| 16    some sort of minimum amount of time that you need to 10:11 | 16    A    I know that I represent the class and that 10:13 |
| 17    spend on the case?                     10:11 | 17    that's what the document was filed on behalf of, I'm 10:13 |
| 18    A    As I said, I'm willing to do whatever it  10:11 | 18    part of it.                          10:13 |
| 19    takes and, you know, what the case demands of me.  10:11 | 19        MR. COOPER:  Move to strike to the extent 10:13 |
| 20    Q    On an average up to this point in any     10:11 | 20    it's nonresponsive to the question.         10:13 |
| 21    given month, can you estimate for me how much time  10:11 | 21        MS. HEWITT:  Join.                  10:13 |
| 22    you've spent on this case as a class representative? 10:11 | 22    BY MS. HEWITT:                       10:13 |
| 23        MR. FRANKLIN:  Vague and ambiguous.      10:11 | 23    Q    Let's put that aside for a second, we'll   10:13 |
| 24        THE WITNESS:  That's very hard for me to  10:11 | 24    loop back to that.                    10:13 |
| 25    do because it's on an as-needed basis.        10:11 | 25        Okay.  You understand that the --       10:13 |
| Page 47 | Page 49 |

13 (Pages 46 - 49)

Page 50

1     MR. FRANKLIN: Just if I can, so -- is   10:13

2  this the attorney for -- you represent Mr. Blakeman?  10:13

3     MR. COOPER: I do.    10:13

4     MR. FRANKLIN: We'll have one attorney, so  10:13

5  you're going to be the attorney that objects.  You   10:13

6  have another person, counsel here, so you get one   10:13

7  attorney at a deposition, you don't get two.   10:13

8     MR. COOPER: Did he say something just   10:13

9  now?    10:14

10     MR. FRANKLIN: No, I'm just -- I was   10:14

11  surprised because at the last deposition there   10:14

12  was -- you're cumis counsel I understand.  At the   10:14

13  last deposition, the panel counsel was objecting.  I  10:14

14  don't care who, just tell me who.   10:14

15     MR. COOPER: We're not going to enter into  10:14

16  a case decision as to who objects at a given   10:14

17  deposition.  But I will agree that only one of us  10:14

18  will at a particular proceeding.   10:14

19     MR. FRANKLIN: That's fair, that's all I'm  10:14

20  asking, so that -- thank you.   10:14

21     MR. COOPER: That's fine.   10:14

22  BY MS. HEWITT:   10:14

23   Q  Ms. Reed, other than the complaint, do you  10:14

24  have knowledge of any other filings that were made   10:14

25  either on your behalf or on behalf of the class in   10:14

Page 51

1  this matter?   10:14

2   A  Other than the complaint?   10:14

3   Q  Yes, ma'am.   10:14

4   A  I mean, I just know of the complaint   10:14

5  and -- filings in court you mean?  I'm a little bit  10:14

6  confused.   10:14

7   Q  Yes, filings in court.   10:14

8   A  To the best of my knowledge, all that I'm  10:14

9  aware of are the complaint filings in court.   10:15

10   Q  Okay.  What is your understanding -- let  10:15

11  me just ask you:  What is your understanding of the  10:15

12  causes of action that are filed against the City and  10:15

13  Chief Kepley, and I'll start with the City first  10:15

14  actually?   10:15

15     MR. FRANKLIN: Objection, calls for legal  10:15

16  conclusion.   10:15

17     THE WITNESS: I'm having trouble   10:15

18  understanding what you're asking me in that question  10:15

19  exactly.   10:15

20  BY MS. HEWITT:   10:15

21   Q  You reviewed the complaint; right?   10:15

22   A  Yes.   10:15

23   Q  In reviewing the complaint, were you able  10:15

24  to observe the way that the allegations are made   10:15

25  against certain defendants in this matter?   10:15

Page 52

1     MR. FRANKLIN: Objection, vague and   10:15

2  ambiguous, calls for legal conclusion.   10:15

3     THE WITNESS: It's hard for me to   10:15

4  speculate since I'm not a lawyer.  I did read the  10:15

5  complaint and I understand the complaint.   10:15

6  BY MS. HEWITT:   10:15

7   Q  Okay.  Do you understand -- do you have an  10:15

8  understanding rather that some allegations were   10:16

9  against some defendants and some allegations were   10:16

10  against other defendants?   10:16

11     MR. FRANKLIN: Objection, the document   10:16

12  speaks for itself.   10:16

13     THE WITNESS: Yes, I do understand that.   10:16

14  BY MS. HEWITT:   10:16

15   Q  Okay.  As to the City, do you know what   10:16

16  claims you brought against the City?   10:16

17   A  Yes, I do.   10:16

18   Q  Great.  What are those?   10:16

19   A  I know that we're requiring that the City  10:16

20  provide safe public access to Lunada Bay.   10:16

21   Q  Anything else?   10:16

22   A  That's the summary of their claims --   10:16

23   Q  Sorry I didn't mean to cut you off, go   10:16

24  ahead.   10:16

25   A  No, I was finished.   10:16

Page 53

1   Q  Do you recall reviewing the complaint   10:16

2  certain types of causes of actions or claims were   10:16

3  against certain defendants?   10:16

4     MR. FRANKLIN: Objection, to the extent it  10:16

5  calls for legal conclusion.   10:16

6     THE WITNESS: What specifically are you   10:16

7  referring to?   10:16

8  BY MS. HEWITT:   10:16

9   Q  The complaint.   10:16

10     MR. FRANKLIN: Same objection.   10:16

11     THE WITNESS: I just don't understand the  10:16

12  question.   10:17

13  BY MS. HEWITT:   10:17

14   Q  All right.  Let me ask you this:  Going   10:17

15  from the complaint to currently now, do you have an   10:17

16  understanding as to whether or not all the claims   10:17

17  that were made against the City are still viable?  10:17

18     MR. FRANKLIN: Objection, to the extent it  10:17

19  calls for attorney-client privilege, to the extent   10:17

20  you learned it from us, I'll instruct you not to   10:17

21  answer.   10:17

22     THE WITNESS: Okay.   10:17

23  BY MS. HEWITT:   10:17

24   Q  Can you -- are you able to answer that   10:17

25  without referring to any attorney-client privileged   10:17

14 (Pages 50 - 53)

**Page 54**

1   communications?                10:17
2     A   No, it would be difficult.      10:17
3     Q   Have you reviewed any media coverage of   10:17
4   the in-court motion hearings that took place in this  10:17
5   matter?                    10:17
6        MR. FRANKLIN:  Vague and ambiguous.     10:17
7        THE WITNESS:  I don't know if I reviewed   10:17
8   that.                    10:17
9   BY MS. HEWITT:             10:17
10     Q   Do you recall reviewing any news articles  10:17
11   about any challenges to the pleadings, meaning the   10:18
12   complaint, that were made by any of the defendants   10:18
13   in this matter?              10:18
14        MR. FRANKLIN:  Vague and ambiguous.     10:18
15        THE WITNESS:  I don't know.        10:18
16   BY MS. HEWITT:             10:18
17     Q   Without referring to any attorney-client   10:18
18   privileged information, do you know whether or not   10:18
19   any of the defendants has successively moved to   10:18
20   dismiss any of the cause of actions in your     10:18
21   complaint?                10:18
22        MR. FRANKLIN:  Objection, to the extent it  10:18
23   calls for attorney-client privilege, to the extent   10:18
24   you learned about any motion work from us I instruct  10:18
25   you not to answer.            10:18

**Page 55**

1   BY MS. HEWITT:             10:18
2     Q   So exactly -- that's what I asked exactly,  10:18
3   is without referring to any attorney-client     10:18
4   privileged communications, do you have any     10:18
5   understanding as to whether or not any of the causes  10:18
6   of action in the complaint that was brought on your  10:18
7   behalf were dismissed?         10:18
8        MR. FRANKLIN:  Same objection.      10:18
9        THE WITNESS:  Yeah, I can't really answer  10:18
10   that because it's something I discussed with my    10:18
11   attorneys.                10:18
12   BY MS. HEWITT:             10:18
13     Q   Okay.  So aside from communications with  10:18
14   your attorney, is it fair to say that you don't know  10:18
15   right now whether or not any of the causes of action  10:19
16   of the complaint were dismissed as to the City and   10:19
17   Chief Kepley?              10:19
18        MR. FRANKLIN:  Objection to the extent it   10:19
19   calls for attorney-client privilege.      10:19
20        THE WITNESS:  I can't answer that without  10:19
21   disclosing what I discussed with my attorneys.    10:19
22   BY MS. HEWITT:             10:19
23     Q   Okay.  I think earlier you said that in   10:19
24   the course of supervising your attorneys you also --  10:19
25   read my notes here -- you communicated with them on  10:19

**Page 56**

1   an as-needed basis, and there was -- what else do   10:19
2   you do in order to supervise your attorneys in this  10:19
3   matter?                    10:19
4        MR. FRANKLIN:  Objection, to the extent it  10:19
5   calls for communication with your counsel, your    10:19
6   specific instruction to us, I ask you not to answer,  10:19
7   I instruct you not to answer.        10:20
8        THE WITNESS:  I'm not able to answer that   10:20
9   question.                 10:20
10   BY MS. HEWITT:             10:20
11     Q   So aside from any instructions you give to  10:20
12   your counsel, what did you do besides that and    10:20
13   besides communicating with your counsel on an    10:20
14   as-needed basis in order to supervise your counsel  10:20
15   in this matter?             10:20
16        MR. FRANKLIN:  Vague and ambiguous.     10:20
17        THE WITNESS:  I've already answered what I  10:20
18   do.                     10:20
19   BY MS. HEWITT:             10:20
20     Q   Okay.  So you communicate with your    10:20
21   counsel on an as-needed basis?       10:20
22     A   Hmm-mm.             10:20
23     Q   And aside from any instruction you may or  10:20
24   may not give to your counsel, is it correct there's  10:20
25   nothing else?              10:20

**Page 57**

1        MR. FRANKLIN:  Objection, argumentative,   10:20
2   misstates prior testimony.         10:20
3        THE WITNESS:  I don't think I said that.   10:20
4   BY MS. HEWITT:             10:20
5     Q   Okay.  My fault.         10:20
6        Is there anything else other than -- let's  10:20
7   put aside this, so take that part -- you communicate  10:20
8   with your counsel on an as-needed basis?     10:20
9     A   Yes.               10:20
10     Q   Taking aside anything that has to do with  10:20
11   communicating with your counsel at all, is there    10:20
12   anything else you do in order to supervise your    10:20
13   counsel?                  10:20
14        MR. FRANKLIN:  Vague and ambiguous, calls  10:21
15   for attorney-client privilege.        10:21
16        THE WITNESS:  Yeah, I mean, I communicate   10:21
17   with my counsel as much as necessary to do what we  10:21
18   have to do.               10:21
19   BY MS. HEWITT:             10:21
20     Q   Right.  We have that part right now.    10:21
21   We're putting that aside for now.       10:21
22        Other than any communications with your    10:21
23   counsel, is there anything else you do in order to   10:21
24   supervise your counsel in this matter?     10:21
25     A   Such as what specifically?      10:21

Hahn & Bowersock, A Veritext Company
800.660.3187

| | |
|---|---|
| 1   Q   I don't know, I'm asking you.          10:21 | 1         THE WITNESS:  It's just difficult for me   10:23 |
| 2   A   Yeah, I can't think of anything else.       10:21 | 2   to remember things, but I'm doing the best that I   10:23 |
| 3   Q   Do you know who all the defendants are in   10:21 | 3   can.                    10:23 |
| 4   this matter?                    10:21 | 4         Q   Have you reviewed any discovery responses   10:23 |
| 5   A   What do you mean by know who they are?   10:21 | 5         Q   Have you reviewed any discovery responses   10:23 |
| 6   Q   Good point.  That was a kind of a vague   10:21 | 6   that are being served on your behalf?          10:23 |
| 7   question.                    10:21 | 7         MR. FRANKLIN:  Vague and ambiguous.       10:23 |
| 8         Are you able to list the people or      10:21 | 8         THE WITNESS:  I don't know what you mean   10:23 |
| 9   entities that are named as defendants in this    10:21 | 9   by that, I'm not sure.              10:23 |
| 10   matter?                    10:21 | 10   BY MS. HEWITT:                10:24 |
| 11   A   Without looking at the complaint?       10:21 | 11         Q   That's okay.              10:24 |
| 12   Q   Right.                  10:21 | 12         Do you recall reviewing any responses to   10:24 |
| 13   A   I don't know if I can list them all       10:21 | 13   questions that other parties ask you in a written   10:24 |
| 14   without looking at the complaint right now.  But I   10:22 | 14   form that are then put into a written document that   10:24 |
| 15   know what's written in the complaint.          10:22 | 15   you reviewed that were -- that were your responses   10:24 |
| 16   Q   You can answer without referring to the   10:22 | 16   that were going to be served on the other parties in   10:24 |
| 17   complaint or you can't, I'm sorry?          10:22 | 17   this matter?                  10:24 |
| 18         MR. FRANKLIN:  Objection, argumentative,   10:22 | 18         MR. FRANKLIN:  Lacks foundation, to the   10:24 |
| 19   there's a notice of deposition in front of you if   10:22 | 19   extent it calls for attorney-client privilege I   10:24 |
| 20   you needed to refer to a document.          10:22 | 20   instruct you not to answer.            10:24 |
| 21         MS. HEWITT:  Absolutely, I didn't tell her   10:22 | 21         THE WITNESS:  Okay.            10:24 |
| 22   to --                    10:22 | 22   BY MS. HEWITT:                10:24 |
| 23         THE WITNESS:  I know, I'm just -- I'm nine   10:22 | 23         Q   Have you reviewed any discovery responses   10:24 |
| 24   months pregnant and I have trouble remembering     10:22 | 24   that are being served on your behalf?          10:24 |
| 25   things right now, I've seen a doctor for depression,   10:22 | 25         A   Yeah, I don't understand the question.   10:24 |
| Page 58 | Page 60 |

| | |
|---|---|
| 1   so.                    10:22 | 1         Q   Do you recall reviewing any discovery   10:24 |
| 2   BY MS. HEWITT:                10:22 | 2   responses that are going to be served on your    10:24 |
| 3   Q   You know what, that's a good point.  And   10:22 | 3   behalf?                    10:24 |
| 4   what I should have asked you at the outset is, I'm   10:22 | 4         A   What do you mean by served on my behalf,   10:24 |
| 5   sorry, are you aware of any reason here today why   10:22 | 5   that's what I don't understand.            10:24 |
| 6   you can't give your best testimony here today?     10:22 | 6         Q   Given to the other parties on your behalf.   10:24 |
| 7         A   Well, because of those reasons it is   10:22 | 7         A   So you're asking me if I've reviewed     10:24 |
| 8   difficult for me to remember things, but I'm trying   10:22 | 8   responses that I've made?            10:24 |
| 9   to be as truthful and do the best job that I can,   10:22 | 9         Q   Yes.                  10:24 |
| 10   but given the circumstances it is hard for me to   10:22 | 10         A   Yeah, that's something I've discussed with   10:24 |
| 11   remember things, I'm not really myself right now.   10:22 | 11   my attorneys and --              10:25 |
| 12   Q   And I appreciate that.  I really do.       10:22 | 12         Q   I understand you discussed it with your   10:25 |
| 13         So as to the depression, are you being   10:22 | 13   counsel.                    10:25 |
| 14   treated right now for that?            10:23 | 14         Do you recall reviewing anything that are   10:25 |
| 15         A   I'm seeing a doctor for that.          10:23 | 15   discovery responses that are being made for you?   10:25 |
| 16   Q   Are you taking any medication that may   10:23 | 16         MR. FRANKLIN:  Asked and answered.       10:25 |
| 17   affect your memory or your ability to give your best   10:23 | 17         THE WITNESS:  I reviewed that information   10:25 |
| 18   testimony here today?              10:23 | 18   with my attorney.                10:25 |
| 19         A   I'm not taking any medication right now   10:23 | 19   BY MS. HEWITT:                10:25 |
| 20   for that.                    10:23 | 20         Q   Okay.  Separate from that, do you have any   10:25 |
| 21   Q   Do you have a belief that your -- that any   10:23 | 21   recollection of reviewing discovery responses that   10:25 |
| 22   medical conditions you have right now are affecting   10:23 | 22   are being made on your behalf?            10:25 |
| 23   your ability to provide your best testimony here     10:23 | 23         MR. FRANKLIN:  Asked and answered.       10:25 |
| 24   today?                    10:23 | 24         THE WITNESS:  I have a recollection of     10:25 |
| 25         MR. FRANKLIN:  Asked and answered.       10:23 | 25   reviewing it with my attorney.            10:25 |
| Page 59 | Page 61 |

16 (Pages 58 - 61)

BY MS. HEWITT:                          10:25

1    Q    Okay.  And what discovery responses were    10:25
2    those?                              10:25
3    A    Those are things that I discussed with my   10:25
4    attorney.                           10:25
5    Q    Do you recall what discovery responses      10:25
6    those were?                         10:25
7    A    I can't answer that; right?  Because        10:25
8    it's...                             10:25
9         MR. FRANKLIN:  If it's something -- my       10:25
10   objection is attorney-client privilege.  If it's  10:25
11   something you've learned from us, I'm going to    10:25
12   instruct you not to answer.          10:25
13   BY MS. HEWITT:                       10:25
14   Q    Whether or not you reviewed -- whether or    10:26
15   not you reviewed them, and I'm not asking you about 10:26
16   communications, but I -- to clarify, I'm asking   10:26
17   whether or not you, on your own, recall reviewing  10:26
18   any discovery responses that are made on your     10:26
19   behalf -- this is aside from any communications you 10:26
20   have with counsel?                   10:26
21   A    I recall reviewing the questions, yes.       10:26
22   Q    Great.  When do you remember that -- doing   10:26
23   that?                               10:26
24   A    Within the last month or so approximately.   10:26

Page 62

1    Q    Do you recall reviewing -- we'll look at     10:26
2    it in a little bit -- a document entitled         10:26
3    "disclosures" or "supplemental disclosures"?      10:27
4    A    I don't know.                   10:27
5    Q    Okay.  We talked a little bit earlier        10:27
6    about Cory Spencer and when you may have first met  10:27
7    him.  And I think we agreed that you did meet him in 10:27
8    January of 2016, but you're not sure if that's the 10:27
9    first time; is that right?          10:27
10   A    Yes.                          10:27
11   Q    Now that we've been talking about it a       10:27
12   little more, do you have any recollection of when  10:27
13   you did first meet Cory Spencer?     10:27
14   A    It's hard for me to say a specific date.     10:27
15   Q    Do we think it was in January of 2016?       10:27
16   A    I do think it was in January, yes.           10:27
17   Q    How did you meet him?           10:27
18   A    From what I recall, I met him on top of --   10:27
19   on top of the bluff at Lunada Bay.   10:27
20   Q    Had you ever talked to him or communicated   10:27
21   with him before first meeting him on the top of the 10:28
22   bluff?                              10:28
23   A    I don't think so.               10:28
24   Q    Who introduced you, if anybody?  10:28
25   A    I don't know if anyone introduced me or if  10:28

Page 63

1    he introduced himself, I'm not quite sure.        10:28
2    Q    What were the circumstances in which you     10:28
3    first met him, what were you there for?           10:28
4    A    It's hard for me to remember which           10:28
5    specific day I met him, so I feel like I would be  10:28
6    speculating on why I was there that day.          10:28
7    Q    In January of 2016, do you recall how many   10:28
8    times you went to the bluff at Lunada Bay?         10:28
9    A    I know that it was at least twice.           10:28
10   Q    Okay.  And one of those times you met        10:29
11   Cory Spencer; right?                 10:29
12   A    Yes, I would assume that was one of those    10:29
13   times, I don't know, I may have been there more than 10:29
14   that.  There are two instances that I recall.      10:29
15   Q    Do you -- sorry, withdraw.       10:29
16        When you met him, do you recall meeting      10:29
17   anybody else there for the first time?            10:29
18   A    For the first time?  Yes, I believe I met    10:29
19   some other people there for the first time, yes, as 10:29
20   well.                               10:29
21   Q    Who were those people?          10:29
22   A    I may have met Chris Taloa there for the     10:29
23   first time that day, I don't know if that was the  10:29
24   first time I met him, but I met him at the same    10:29
25   spot.                               10:30

Page 64

1        I met named a man -- not named -- I met a    10:30
2    man named Kenny.  And I know I met some other      10:30
3    people, too, I think, but I don't remember their   10:30
4    names.                              10:30
5    Q    Do you recall whether Jordan was there,      10:30
6    too?                                10:30
7    A    Yes, Jordan was there.          10:30
8    Q    Do you recall whether or not it appeared     10:30
9    that Jordan knew Chris Taloa before that day?      10:30
10   A    What do you mean by if it appeared that he   10:30
11   knew him?                           10:30
12   Q    Let me ask you this, you're right, that's    10:30
13   a bad question.                     10:30
14        Do you know whether Jordan and Chris Taloa   10:30
15   knew each other before this instance that we're    10:30
16   discussing right now?                10:30
17   A    Yes, I know that they knew each other, I     10:30
18   don't know specifically how well, but I do know that 10:30
19   they knew each other, yes.           10:30
20   Q    Do you know how they knew each other?        10:30
21   A    I actually don't know how they met, no.      10:30
22   Q    Do you know if they were social with each    10:30
23   other before this date?             10:31
24   A    Not very social.  Not outside of you        10:31
25   know, our meeting there.             10:31

Page 65

17 (Pages 62 - 65)

| | |
|---|---|
| 1 | Q   Does Jordan surf?   10:31 |
| 2 | A   Yes, Jordan surfs.   10:31 |
| 3 | Q   Is it your understanding that Chris Taloa   10:31 |
| 4 | surfs as well?   10:31 |
| 5 | A   I think Chris Taloa actually doesn't surf,   10:31 |
| 6 | I think he boogie-boards.   10:31 |
| 7 | Q   Good point.   10:31 |
| 8 | Do you know whether or not Jordan and   10:31 |
| 9 | Chris had gone out either surfing or boogie-boarding   10:31 |
| 10 | before this date?   10:31 |
| 11 | A   Whether they had gone out surfing at   10:31 |
| 12 | Lunada; is that the question?   10:31 |
| 13 | Q   No, in general, just ever.   10:31 |
| 14 | A   They've -- yeah, I know they've surfed   10:31 |
| 15 | before.   10:31 |
| 16 | Q   Before the date when you first met Chris?   10:31 |
| 17 | A   I'm confused at what you're asking me.   10:31 |
| 18 | Are you asking me if Jordan knew how to   10:31 |
| 19 | surf?   10:31 |
| 20 | Q   No, I'm asking whether or not Jordan and   10:31 |
| 21 | Chris had ever gone surfing or boogie-boarding   10:31 |
| 22 | before the date you first met Chris?   10:31 |
| 23 | A   Where?   10:31 |
| 24 | Q   Anywhere.   10:32 |
| 25 | A   Yeah, they've surfed in the ocean before.   10:32 |

Page 66

| | |
|---|---|
| 1 | Q   So they would go out socialize at least in   10:32 |
| 2 | the water before?   10:32 |
| 3 | A   Are you asking me if they went together?   10:32 |
| 4 | Q   Yeah.   10:32 |
| 5 | A   Okay.  Yeah, I don't know if they surfed   10:32 |
| 6 | together actually, I'm not sure.  I know that, yes,   10:32 |
| 7 | individually they've surfed in the ocean.   10:32 |
| 8 | Q   Okay.   10:32 |
| 9 | A   And whether Chris Taloa had surfed or not,   10:32 |
| 10 | I don't know, because I know he boogie-boards.   10:32 |
| 11 | Q   Right.  Okay.  So you're not sure whether   10:32 |
| 12 | or not they've ever gone out together?   10:32 |
| 13 | A   Together, yeah, I don't know.  I mean, I   10:32 |
| 14 | know that they knew each other but whether they went   10:32 |
| 15 | out together, I'm not sure.   10:32 |
| 16 | Q   Okay.  Fair enough.   10:32 |
| 17 | Going back to Cory Spencer, as of today,   10:32 |
| 18 | how many times have you been in his presence?   10:32 |
| 19 | A   That would be hard for me to say.  I guess   10:32 |
| 20 | I was aware of being in his presence a few times,   10:32 |
| 21 | but --   10:32 |
| 22 | Q   We'll break it down.   10:32 |
| 23 | First we know at the bluff you think there   10:32 |
| 24 | was one time?   10:32 |
| 25 | A   Yeah, yeah, there was, I think, one or two   10:33 |

Page 67

| | |
|---|---|
| 1 | times.  It's hard for me to say exactly how many   10:33 |
| 2 | times.   10:33 |
| 3 | Q   All right.  Then how about with regard to   10:33 |
| 4 | meetings with attorneys, how many times have you   10:33 |
| 5 | been at a meeting with your attorneys where   10:33 |
| 6 | Cory Spencer was present?   10:33 |
| 7 | A   Just one.   10:33 |
| 8 | Q   Have you ever been, as far as you're   10:33 |
| 9 | aware, in the same room with Cory at any other time?   10:33 |
| 10 | A   Not that I'm aware of, no.   10:33 |
| 11 | Q   Now, in the complaint that we'll take a   10:33 |
| 12 | look at in a little bit, do you recall reviewing the   10:33 |
| 13 | allegations that are specifically made against   10:33 |
| 14 | Chief Kepley?   10:33 |
| 15 | A   I do recall reviewing the complaint and   10:33 |
| 16 | the allegations, yes.   10:33 |
| 17 | Q   From that review, what is your   10:33 |
| 18 | understanding of the complaint you have against --   10:33 |
| 19 | not the complaint -- I just said complaint, sorry.   10:34 |
| 20 | What are the claims you have against   10:34 |
| 21 | Police Chief Kepley?   10:34 |
| 22 | MR. FRANKLIN:  Objection, to the extent   10:34 |
| 23 | the documents speak for themselves and calls for a   10:34 |
| 24 | legal conclusion.   10:34 |
| 25 | THE WITNESS:  Right, I know that we're   10:34 |

Page 68

| | |
|---|---|
| 1 | asking for public access, safe public access at   10:34 |
| 2 | Lunada Bay.   10:34 |
| 3 | BY MS. HEWITT:   10:34 |
| 4 | Q   Do you have any recollection or --   10:34 |
| 5 | withdraw that.   10:34 |
| 6 | Do you have an understanding of what   10:34 |
| 7 | allegations you're making against Chief Kepley as to   10:34 |
| 8 | what he did wrong?   10:34 |
| 9 | MR. FRANKLIN:  Same objections.   10:34 |
| 10 | THE WITNESS:  I know that we're saying   10:34 |
| 11 | that he failed to provide safe public access to   10:34 |
| 12 | Lunada Bay.   10:34 |
| 13 | BY MS. HEWITT:   10:34 |
| 14 | Q   And what is your understanding of the   10:34 |
| 15 | allegations are as to how he did that, didn't do   10:34 |
| 16 | that?   10:34 |
| 17 | MR. FRANKLIN:  Objection, to the extent   10:34 |
| 18 | the documents speak for themselves and calls for   10:34 |
| 19 | legal conclusion, asked and answered.   10:35 |
| 20 | THE WITNESS:  What is the question again   10:35 |
| 21 | you're asking?   10:35 |
| 22 | BY MS. HEWITT:   10:35 |
| 23 | Q   I'm asking -- what is your understanding   10:35 |
| 24 | from your review of the complaint as to how   10:35 |
| 25 | Chief Kepley has failed to provide safe access to   10:35 |

Page 69

18 (Pages 66 - 69)

```
1   Lunada Bay?                          10:35
2        MR. FRANKLIN: Vague and ambiguous.   10:35
3        THE WITNESS: My understanding is that he   10:35
4   failed to take the necessary steps to make it a safe   10:35
5   place.                             10:35
6   BY MS. HEWITT:                     10:35
7   Q    What steps were those?          10:35
8        MR. FRANKLIN: Vague and ambiguous, calls   10:35
9   for legal conclusion.               10:35
10       THE WITNESS: He failed to help with the   10:35
11  police reports, he failed to do anything to provide   10:35
12  safe access.                       10:35
13  BY MS. HEWITT:                     10:35
14  Q    Other than failed to help with police   10:35
15  reports, do you have any other recollection, or   10:35
16  understanding rather, of the allegations of what   10:35
17  Chief Kepley failed to do in order to provide safe   10:36
18  public access to Lunada Bay?         10:36
19       MR. FRANKLIN: Vague and ambiguous, calls   10:36
20  for legal conclusion.               10:36
21       THE WITNESS: I know he failed to provide   10:36
22  safe public access to Lunada Bay.    10:36
23  BY MS. HEWITT:                     10:36
24  Q    Okay. So we explored that a little bit   10:36
25  and you said -- I asked you what are the ways in   10:36
                                       Page 70
```

```
1   which he failed to do that and one of the things you   10:36
2   told me was that he failed to help with police   10:36
3   reports.                           10:36
4        Is there anything else that he failed to   10:36
5   do in the course of failing to provide safe public   10:36
6   access?                            10:36
7        MR. FRANKLIN: Vague and ambiguous,   10:36
8   documents speak for themselves.     10:36
9        THE WITNESS: Everything that's in the   10:36
10  document and just not following through to make it a   10:36
11  safe place for anyone to be able to go to.   10:36
12  BY MS. HEWITT:                     10:36
13  Q    Right. And those are the things that I'm   10:36
14  trying to ask about.               10:36
15       What is your understanding of what the   10:36
16  complaint says about those things that you're saying   10:36
17  he didn't follow through on, for instance?   10:36
18       MR. FRANKLIN: Vague and ambiguous,   10:37
19  document speaks for itself, calls for legal   10:37
20  conclusion.                        10:37
21       THE WITNESS: Not being able to provide   10:37
22  public access in a safe manner.     10:37
23  BY MS. HEWITT:                     10:37
24  Q    What has Chief Kepley in your   10:37
25  understanding failed to do that has led to him not   10:37
                                       Page 71
```

```
1   providing safe public access?       10:37
2        MR. FRANKLIN: Vague and ambiguous,   10:37
3   document speaks for itself, asked and answered.   10:37
4        THE WITNESS: I'm confused because I feel   10:37
5   you're asking me the same question over and over and   10:37
6   I keep trying to answer it.         10:37
7   BY MS. HEWITT:                     10:37
8   Q    And I appreciate that.         10:37
9        So I'm asking this question about the   10:37
10  complaint and your understanding of the complaint as   10:37
11  to the allegation against Police Chief Kepley. And   10:37
12  you've told me that he's failed to provide safe   10:37
13  public access to Lunada Bay, so I appreciate that   10:37
14  you gave me that response. And kind of as lawyers   10:37
15  do now, I have to kind of break that down now.   10:37
16       So I've been sort of going to the next   10:37
17  level.                             10:37
18       Okay. What is your understanding of what   10:37
19  he has or hasn't done which has led to him failing   10:38
20  to provide safe public access, and you said, Well,   10:38
21  one of the things is that he failed to help with   10:38
22  police reports. So that's one thing you told me.   10:38
23       Aside from that -- that's what I'm   10:38
24  asking -- are there any other things that he has   10:38
25  done or hasn't done that have led to him failing to   10:38
                                       Page 72
```

```
1   provide safe public access? I already know you're   10:38
2   telling me he failed to provide safe public access,   10:38
3   but I want to know what is your understanding of   10:38
4   what the complaint says about that, what has he   10:38
5   failed to do under that?           10:38
6        MR. FRANKLIN: Vague and ambiguous, the   10:38
7   document speaks for itself, calls for legal   10:38
8   conclusion.                        10:38
9        THE WITNESS: I know that he hasn't taken   10:38
10  the steps necessary to make it safe, it's not safe   10:38
11  for anyone to go down there right now.   10:38
12  BY MS. HEWITT:                     10:38
13  Q    What steps are necessary to your   10:38
14  understanding in the complaint?     10:38
15  A    I mean --                     10:38
16       MR. FRANKLIN: Vague and ambiguous,   10:38
17  document speaks for itself, calls for legal   10:38
18  conclusion, also calls for expert testimony.   10:38
19       THE WITNESS: I would -- it would be safe   10:39
20  if no one would harass anyone down there.   10:39
21  BY MS. HEWITT:                     10:39
22  Q    Okay. What steps has Chief Kepley taken   10:39
23  or not taken in that regard?        10:39
24       MR. FRANKLIN: Vague and ambiguous, lacks   10:39
25  foundation, calls for speculation, calls for expert   10:39
                                       Page 73
```

19 (Pages 70 - 73)

Page 74

```
 1    testimony.                              10:39
 2          THE WITNESS:  Right, not being a member of  10:39
 3    the police it would be hard for me to specifically   10:39
 4    say what he needs to do or doesn't need to do.  10:39
 5          I know that Lunada Bay is not safe,   10:39
 6    nothing has been done to make it any safer, and, you  10:39
 7    know, it's a public beach and he hasn't been of any  10:39
 8    help to grant access to the beach-goers.       10:39
 9    BY MS. HEWITT:                         10:39
10    Q    Okay.                            10:39
11          THE WITNESS:  Can I take a break, too?   10:39
12          MS. HEWITT:  Sure, let's take a break and  10:39
13    we'll go back to that point.             10:39
14          THE VIDEOGRAPHER:  We are off the record   10:39
15    10:39 15    at    a.m.
16
16          (Break taken.)                  10:40
17
17          THE VIDEOGRAPHER:  This commences video   11:15
18
18    11:15 18    file three, we're on the record at
19 .      11:15
19    BY MS. HEWITT:                         11:15
20    Q    Okay.  Ms. Reed, welcome back from the   11:15
21    break.  I'm glad you got something to eat.   11:15
22    We were talking a bit about your     11:15
23    understanding of the complaint.  So just to move on  11:15
24    from there, sitting here today, have we exhausted  11:15
25    your understanding of your claims against    11:15
```

Page 75

```
 1    Chief Kepley as reflected in the complaint?   11:15
 2          MR. FRANKLIN:  Vague and ambiguous,   11:15
 3    document speaks for itself.             11:15
 4          THE WITNESS:  What do you mean by exhaust?  11:15
 5    BY MS. HEWITT:                         11:15
 6    Q    Have you told us everything you know as we  11:15
 7    sit here today?                        11:16
 8          MR. FRANKLIN:  Vague and ambiguous.   11:16
 9          THE WITNESS:  I don't know with what    11:16
10    you're referring to.                   11:16
11    BY MS. HEWITT:                         11:16
12    Q    We had just finished a long series of   11:16
13    conversations about your understanding of your   11:16
14    allegations against Chief Kepley in the complaint,  11:16
15    we went over a few things, and I just wanted to make  11:16
16    sure you told me everything about your understanding  11:16
17    of your allegation against Chief Kepley in the   11:16
18    complaint so I can move on to the next subject.   11:16
19    A    Well, basically, I was just trying to say   11:16
20    that he's failed to provide public access for   11:16
21    beach-goers that are outside from Lunada Bay where   11:16
22    they can go there and not be harassed.       11:16
23          And there's a multitude of instances that  11:16
24    happened to me regarding the police that I believe  11:16
25    he's responsible for as the chief.       11:16
```

Page 76

```
 1    Q    Okay.  Sitting here today, though, have we  11:16
 2    exhausted your understanding of how he has failed to  11:16
 3    do that as reflected in the complaint?   11:16
 4          MR. FRANKLIN:  Vague and ambiguous, calls  11:17
 5    for legal conclusion.                  11:17
 6          THE WITNESS:  I don't know the answer to   11:17
 7    your question.                        11:17
 8    BY MS. HEWITT:                         11:17
 9    Q    Okay.                            11:17
10          THE VIDEOGRAPHER:  Counsel, can you put   11:17
11    your mic on?                          11:17
12          MR. FRANKLIN:  Sure.             11:17
13          THE WITNESS:  I can give you examples of   11:17
14    things that have happened to me.         11:17
15          MS. HEWITT:  That's okay, we'll move on   11:17
16    from there.                           11:17
17    BY MS. HEWITT:                         11:17
18    Q    A few things I need to go back and   11:17
19    clarify.                              11:17
20          Earlier we talked a little bit about your  11:17
21    employment history.  And I think you said that you  11:17
22    had not done any work for pay or -- paid or   11:17
23    unpaid -- since prior to your surf camp directorship  11:17
24    and going back, I think, even to USC; do you   11:17
25    remember that?                        11:17
```

Page 77

```
 1    A    Yes.  I remember you asking if there's any  11:17
 2    paid work.                            11:17
 3    Q    I think we went over unpaid work, and if   11:17
 4    that's not your understanding, let's make sure we   11:17
 5    clarify that.                         11:17
 6    A    Sure.                            11:17
 7    Q    Did you do any unpaid work or freelance   11:17
 8    work that was unpaid between USC and the current   11:17
 9    time, like now?                       11:17
10    A    I mean, I've done, you know, freelance   11:18
11    work here and there.  I've been working in film   11:18
12    since I was a kid, it's hard for me to specifically  11:18
13    name what I have and haven't done.       11:18
14    Q    Do you have a LinkedIn page?         11:18
15    A    I do have a LinkedIn page, I haven't been   11:18
16    on that page in quite a while.           11:18
17    Q    Is it accurate as far as you know as to   11:18
18    what is reflected on the LinkedIn page?   11:18
19          MR. FRANKLIN:  Vague and ambiguous.   11:18
20          THE WITNESS:  I don't know.  Honestly, I   11:18
21    don't even remember what's on the page.   11:18
22    BY MS. HEWITT:                         11:18
23    Q    Did you create the LinkedIn page?       11:18
24    A    I did, yeah.                     11:18
25    Q    Did you ever do any work as a         11:18
```

20 (Pages 74 - 77)

**Page 78**

1 photographer that was paid or unpaid in between 2012
2 and the present?
3    A    2012 and the present, yeah, I'm sure I
4 did.
5    Q    What kind of work did you do?
6    A    I mean, I enjoy doing photographs so I've
7 done photography work for myself, I did some
8 photography for my ex-husband.
9    Q    When you say for your ex-husband, aside
10 from anything personal, did you do photography for
11 him in connection with some sort of business
12 venture, some sort of business he had?
13    A    Yes, I did.
14    Q    What was that?
15    A    I took photos for him for one of his
16 tours.
17    Q    What tour was that?
18    A    The Rock and Roll All Stars Tour in
19 South America.
20    Q    How long was that?
21    Q    How long was the tour?
22    Q    Yes, how long was the tour?
23    A    It's hard for me to say how long the
24 actual tour was, I don't really remember.  I mean,
25 it was probably about a week or so, more or less, I

**Page 79**

1 don't remember.  I mean, I did some photos of them
2 preparing for the tour as well.
3    Q    Do you consider yourself a professional
4 photographer?
5    A    No.  I don't.
6    Q    Who are some of the people you were
7 photographing on this tour or -- was it a musical
8 tour?
9    A    Yeah.
10    Q    So were you photographing bands?
11    A    Yeah, I was photographing the people that
12 were in the Rock and Roll All Stars, I don't
13 remember all their names right now, but Gene Simmons
14 was one of them from Kiss -- who else was on it?
15 I'm terrible with names, especially now, I'm even
16 more terrible.
17       I would have to refresh my memory as to
18 the names of all the musicians on there.
19    Q    Were you paid for any of this work that
20 you did in photographing the Rock and Roll All
21 Stars?
22    A    No, I wasn't paid for it directly.  I
23 mean, I lived with my ex-husband and he paid for
24 everything, so...
25    Q    So it was your -- were you working for

**Page 80**

1 anybody in connection with taking these photographs
2 of the Rock and Roll All Stars?
3    A    What do you mean?
4    Q    Did your husband have a business that you
5 were taking the photographs for?
6    A    My husband has a business.
7    Q    And that business is -- was it tour
8 promoter --
9    A    Yeah, he's a concert promoter.
10    Q    He's a concert promoter.
11       Okay.  And was he promoting this tour that
12 you were photographing?
13    A    He was, yes, I don't know exactly what his
14 business structure was or what company he was doing
15 it under or if he was doing it as an individual, I
16 don't know these details.  But I do take the photos
17 for him to be able to use.
18    Q    Okay.  And what happened to those photos?
19    A    I know some of them, I think, most of, you
20 know, the ones that we selected were published on
21 social media.  I believe they were in some local
22 publications but I'm not sure exactly where they all
23 went.
24    Q    Do you have any ownership in the tour
25 promotion business of your former ex-husband?

**Page 81**

1       MR. FRANKLIN:  Calls for legal conclusion.
2 BY MS. HEWITT:
3    Q    Close-to-be former ex-husband.
4       MR. FRANKLIN:  To the extent it calls for
5 attorney-client privilege, she's going through a
6 divorce right now, I don't want you to damage your
7 case.
8 BY MS. HEWITT:
9    Q    If you know.
10       Do you know without turning into
11 attorney-client privilege whether or not you were
12 part owner of your soon-to-be ex-husband's business?
13    A    I didn't own the business with him, no.
14    Q    And you said you were not paid for those
15 photos.
16       Were you -- were you hired by his tour
17 promotion company to take these photographs?
18    A    His company entailed just him, just one
19 person.
20    Q    Did he hire you to take these photos?
21    A    I don't know what you mean by "hire."  It
22 was just me and him so it was very informal.
23    Q    Prior to that, had you ever done any other
24 professional photography for any other entity?
25    A    I may have.  I don't remember -- I mean,

21 (Pages 78 - 81)

1  I've been doing like I said film-related stuff since  11:23
2  I have a kid, so I've done a lot of stuff here and  11:23
3  there.  11:23
4  Q    Were you in film development at all?  11:23
5  A    I had an internship in film development,  11:23
6  yes.  11:23
7  Q    When was that?  In college?  11:23
8  A    Yeah, I believe that was -- that was maybe  11:23
9  2013.  11:23
10  Q    Okay.  Were you ever a director?  11:23
11  A    I've directed my own projects, yes.  11:23
12  Q    When was the last project that you  11:23
13  directed?  11:23
14  A    Last project I directed, I believe, was my  11:23
15  last student film at USC, I think.  11:23
16  Q    How about some cinematography, have you  11:23
17  ever done any cinematography?  11:23
18  A    Yes.  11:23
19  Q    When was the last time you did that in a  11:23
20  professional capacity?  11:24
21  A    Well, I've never actually done it, you  11:24
22  know, for a major Hollywood film or anything like  11:24
23  that.  It was all small projects.  11:24
24  Q    Your own projects?  11:24
25  A    For the most part.  I mean, I've done some  11:24

Page 82

1  shooting for other people, too, hmm-mm.  11:24
2  Q    For money?  11:24
3  A    I'm sorry?  11:24
4  Q    For money?  Did you get paid for those?  11:24
5  A    I know I got paid for some of them.  But  11:24
6  it was a long time ago.  11:24
7  Q    How long ago, like before college?  11:24
8  A    The ones that I got paid for, yeah, I  11:24
9  think it was before college.  11:24
10  Q    How about after college, did you do any  11:24
11  cinematography work that you did not get paid for?  11:24
12  MR. FRANKLIN:  Vague and ambiguous.  11:24
13  THE WITNESS:  I know I shot stuff for my  11:24
14  husband, but it's hard to say whether I got paid for  11:24
15  it or not because we lived together and he paid for  11:24
16  everything, so it's not like he would pay me, you  11:24
17  know, money.  11:25
18  BY MS. HEWITT:  11:25
19  Q    Did you do any -- do you know what  11:25
20  freelance means?  11:25
21  A    Hmm-mm, yeah, it means you're not hired by  11:25
22  a company is my understanding, you're not hired by a  11:25
23  major company.  It's like a temporary job.  11:25
24  Q    That could be one meaning.  But freelance  11:25
25  can also mean that you yourself are not employed by  11:25

Page 83

1  a particular company but you go out and get jobs on  11:25
2  your own.  11:25
3  Do you think between 2012 and current time  11:25
4  you were ever hired to do any cinematography or  11:25
5  photography on a freelance basis?  11:25
6  A    I mean, other than the stuff that I did  11:25
7  for my ex-husband, I don't recall of anything.  11:25
8  Q    Did you ever have any companies on your  11:25
9  own related to photography or cinematography or  11:25
10  movies or anything like that?  11:25
11  A    I did before college.  11:25
12  Q    Before college, what company was that?  11:25
13  A    I had -- what's the name of it?  I think  11:25
14  that I created a company when I was about 18 years  11:26
15  old or so.  11:26
16  Q    What kind of company is that?  11:26
17  A    Like film -- film company I was hoping for  11:26
18  it to become.  11:26
19  Q    Have you ever endeavored to get into movie  11:26
20  production since you've been here in California?  11:26
21  MR. FRANKLIN:  Vague and ambiguous.  11:26
22  THE WITNESS:  You know, I would have liked  11:26
23  to, but unfortunately I was in a very abusive  11:26
24  marriage and I just wasn't able to -- to follow my  11:26
25  career in the way that I would have wanted to.  11:26

Page 84

1  BY MS. HEWITT:  11:26
2  Q    Did you ever act -- were you ever a model?  11:26
3  A    I've done some modeling work, yes.  11:26
4  Q    When did you do your modeling work?  11:27
5  A    I mean, I've done it over -- since --  11:27
6  since I was in high school, maybe even earlier.  I  11:27
7  mean, nothing major.  Mostly just time for print  11:27
8  work which means that you model for free and then  11:27
9  the photographers will give you the photos.  11:27
10  Q    When was the last time you did that, did  11:27
11  any sort of modeling?  11:27
12  A    Did any sort of modeling?  I don't  11:27
13  remember.  11:27
14  Q    Paid or unpaid?  11:27
15  A    Yeah, I don't remember.  11:27
16  Q    Did you do any since 2012?  11:27
17  A    I did some time for print work, yes.  11:27
18  Q    When was that?  11:27
19  A    It's hard for me to remember the specific  11:27
20  dates.  11:28
21  Q    Just a year would be fine.  11:28
22  A    Maybe 2014 or 2015.  11:28
23  Q    Go ahead.  11:28
24  A    I don't believe I did anything this year.  11:28
25  I've primarily been focused on my pregnancy.  11:28

Page 85

22 (Pages 82 - 85)

Page 86

```
 1      Q    The last time you did modeling, who was it  11:28
 2  for?                                        11:28
 3      A    It was just different photographers who   11:28
 4  wanted to build their portfolio and they asked me to  11:28
 5  model for them in exchange for them getting to   11:28
 6  shoot.  So it wasn't for any official publication or  11:28
 7  anything.                                   11:28
 8      Q    What were you modeling?  I don't know the  11:28
 9  lingo, I'm sorry, was it clothes, was it surfboards,  11:28
10  cameras, I don't know?                     11:28
11      A    It's hard for me to remember to answer   11:28
12  that question because I wasn't modeling particular  11:29
13  clothing.  I was just, like, they were just taking  11:29
14  photos of me on the beach.                11:29
15      Q    Okay.  You were in a swimsuit?       11:29
16      A    Hmm-mm.                         11:29
17      Q    Yes?                           11:29
18      A    Yes.                           11:29
19      Q    Had you ever worked in TV in the last ten  11:29
20  years?                                    11:29
21      A    In the last ten years which would be from  11:29
22  2006?                                     11:29
23      Q    Yes.                           11:29
24      A    I don't think so, I don't think in the  11:29
25  last ten years I did anything specifically for TV, I  11:29
```

Page 87

```
 1  don't think so.                          11:29
 2      Q    Were you ever in pageants and those types  11:29
 3  of events -- I think they're called pageants; right?  11:30
 4      A    Yes.                           11:30
 5      Q    Did you ever do any pageant work?    11:30
 6      A    I did, yes.                     11:30
 7      Q    How old were you at the time?        11:30
 8      A    I was a teenager.                11:30
 9      Q    How old were you when you did any pageant  11:30
10  work?                                     11:30
11      A    I don't remember, I just remember I was a  11:30
12  teenager, but I don't remember how old I was, it was  11:30
13  a while ago.                             11:30
14      Q    I understand.  Have you ever done any   11:30
15  dancing professionally?                   11:30
16      A    Yes.                           11:30
17      Q    What type of dancing have you done?  11:30
18      A    Mostly ballet.                  11:30
19      Q    Okay.  Having discussed all this, does it  11:30
20  refresh your recollection about any other type of  11:30
21  paid or unpaid work you've done since 2012 to the  11:30
22  present?                                  11:30
23      A    Not anything other than what you've asked  11:30
24  me.                                       11:30
25      Q    Okay.  I'm going to go back briefly to  11:30
```

Page 88

```
 1  your understanding of the complaint and your duties  11:31
 2  as a class representative.                11:31
 3          As you sit here today, what is your   11:31
 4  understanding how Chief Kepley specifically has   11:31
 5  harmed you if at all in any way?          11:31
 6          MR. FRANKLIN:  Vague and ambiguous.  11:31
 7          THE WITNESS:  I know that he did not -- he  11:31
 8  failed to create public access at Lunada Bay.  And  11:31
 9  he failed to make it a safe place for all   11:31
10  individuals where they could go without being   11:31
11  harassed.                                 11:31
12  BY MS. HEWITT:                            11:31
13      Q    What is your understanding of how long  11:31
14  he's been failing to do this?            11:31
15          MR. FRANKLIN:  Vague and ambiguous, lacks  11:31
16  foundation.                              11:31
17          THE WITNESS:  I know that this situation  11:31
18  has been going on according to what Charlie Ferrara  11:31
19  told me for 59 years and even forever, so I would  11:32
20  assume that the police department in their   11:32
21  representative capacity has been doing this for  11:32
22  quite a while.                           11:32
23  BY MS. HEWITT:                            11:32
24      Q    How about Chief Kepley himself?      11:32
25      A    Specifically Chief Kepley himself?   11:32
```

Page 89

```
 1      Q    Yes.                           11:32
 2      A    I would assume that -- that the entire  11:32
 3  time he's been there, I don't know though, that's  11:32
 4  hard for me to say.  I just know my own personal  11:32
 5  experiences.                             11:32
 6      Q    Okay.  And do you have an understanding  11:32
 7  outside of any attorney-client privilege as to how  11:32
 8  long Chief Kepley has been the chief at PVE?  11:32
 9      A    I don't remember specifically how long.  11:32
10      Q    What damages are you seeking on behalf of  11:32
11  the class?                               11:32
12          MR. FRANKLIN:  Vague and ambiguous.  11:32
13          THE WITNESS:  I'm seeking whatever damages  11:32
14  are deemed appropriate by the attorneys, and I'm  11:33
15  seeking first and foremost public access to   11:33
16  Lunada Bay for all beachgoers.           11:33
17  BY MS. HEWITT:                            11:33
18      Q    Do you have an understanding if you're  11:33
19  seeking any money damages?               11:33
20      A    If that's what's deemed appropriate, I  11:33
21  leave that up to my attorneys.           11:33
22      Q    Are you seeking any damages on behalf of  11:33
23  yourself?                                11:33
24      A    I'm seeking only damages on behalf of the  11:33
25  class.                                   11:33
```

23 (Pages 86 - 89)

1    Q    Putting aside Chief Kepley, how has the    11:33
2    City of Palos Verdes Estates caused you any harm if    11:33
3    any?    11:33
4        MR. FRANKLIN: Vague and ambiguous, calls    11:33
5    for a narrative.    11:33
6        THE WITNESS: The City of Palos Verdes    11:33
7    Estates has failed to create safe and public access    11:33
8    at Lunada Bay.    11:33
9    BY MS. HEWITT:    11:33
10   Q    And then what does safe and public access    11:34
11   mean to you?    11:34
12   A    To me, it means that ideally anyone from    11:34
13   any race, any ethnicity, any, you know -- any level    11:34
14   of income, just anyone should be able to go there    11:34
15   without being harassed, without being scared,    11:34
16   without feeling that they're being intimidated,    11:34
17   without being videotaped by everyone, without being    11:34
18   told that you're not welcome.    11:34
19       And I feel that there should be a safe    11:34
20   pathway that's not obscured by the locals. And just    11:34
21   overall I feel that it should be a place that, you    11:35
22   know, people can enjoy for its beauty and for the    11:35
23   beach and for, you know, everything that -- that,    11:35
24   you know, such a beautiful beach, you know, offers.    11:35
25   There should be no -- there should be no fear or,    11:35

Page 90

1    you know, or anything that deters people from being    11:35
2    able to go there.    11:35
3    Q    Do you have an understanding of whether    11:35
4    the complaint mentions anything with regard to    11:35
5    people being denied access due to their race or    11:35
6    ethnicity?    11:35
7        MR. FRANKLIN: Document speaks for itself.    11:35
8        THE WITNESS: You know, it's over a    11:35
9    hundred pages, and I don't have the entire document    11:35
10   memorized, so I'm not sure if there's anything    11:35
11   specifically regarding race in the document.    11:36
12   BY MS. HEWITT:    11:36
13   Q    Okay. And how about with regard to    11:36
14   ethnicity?    11:36
15       MR. FRANKLIN: Same objection.    11:36
16       THE WITNESS: I don't know if there's    11:36
17   anything specifically regarding ethnicity in the    11:36
18   document.    11:36
19   BY MS. HEWITT:    11:36
20   Q    Sorry. How about with regard to level of    11:36
21   income?    11:36
22       MR. FRANKLIN: Same objection.    11:36
23       THE WITNESS: Yeah, I don't remember if    11:36
24   that's in the complaint or not.    11:36
25   ///

Page 91

1    BY MS. HEWITT:    11:36
2    Q    Do you believe you've been denied access    11:36
3    due to your race?    11:36
4    A    I don't know.    11:36
5    Q    Do you believe that?    11:36
6    A    I believe that I've been denied access.    11:36
7    Q    Due to your race?    11:36
8    A    I don't know what the reasons are for them    11:36
9    to be denying me access.    11:36
10   Q    I'm just asking of your own belief right    11:36
11   now.    11:36
12   A    Hmm-mm.    11:36
13   Q    Do you believe as you sit here today that    11:36
14   you've been denied access to Lunada Bay due to your    11:36
15   race?    11:36
16       MR. FRANKLIN: Asked and answered.    11:36
17       THE WITNESS: Yeah, I would have to    11:36
18   speculate, I don't know.    11:36
19   BY MS. HEWITT:    11:36
20   Q    I'm not asking you to speculate on what    11:36
21   somebody else thinks. Right now I'm only asking you    11:36
22   what you think. And so generally you think either    11:36
23   yes or no.    11:37
24       So as you sit here today, do you think    11:37
25   you've been denied access to Lunada Bay due to your    11:37

Page 92

1    race?    11:37
2        MR. FRANKLIN: Asked and answered.    11:37
3        THE WITNESS: I think that I've been    11:37
4    denied access to Lunada Bay, but whether or not it's    11:37
5    related to my race, I don't know.    11:37
6    BY MS. HEWITT:    11:37
7    Q    So you don't believe that as you sit here    11:37
8    today?    11:37
9        MR. FRANKLIN: Argumentative, misstates    11:37
10   prior testimony.    11:37
11       THE WITNESS: I don't know if that's their    11:37
12   reason, it's hard for me to speculate that.    11:37
13   BY MS. HEWITT:    11:37
14   Q    I'm not asking for their reason is,    11:37
15   though.    11:37
16       Right now, as you sit here today, I'm    11:37
17   asking you as a class representative, though, you    11:37
18   yourself, though, are you testifying today that you    11:37
19   have been discriminated or rather prevented public    11:37
20   access from Lunada Bay due to your race?    11:37
21       MR. FRANKLIN: Asked and answered.    11:37
22       THE WITNESS: I have been denied access    11:37
23   there. Whether it's due to my race, I cannot tell    11:37
24   you, I do not know.    11:38
25   ///

Page 93

24 (Pages 90 - 93)

BY MS. HEWITT:                          11:38
1
2       Q    As you sit here today, do you not have a   11:38
3   belief one way or another whether or not you've been   11:38
4   denied public access to Lunada Bay due to your race?   11:38
5       MR. FRANKLIN:  Asked and answered,       11:38
6   argumentative.                        11:38
7       THE WITNESS:  I can't tell you whether      11:38
8   it's due to my race or not, I'm not sure.       11:38
9   BY MS. HEWITT:                        11:38
10      Q    Do you have a belief one way or the other?   11:38
11      MR. FRANKLIN:  Asked and answered,       11:38
12  argumentative.                        11:38
13      THE WITNESS:  I'm not sure if it's due to   11:38
14  my race or not.                       11:38
15  BY MS. HEWITT:                        11:38
16      Q    Do you have a belief, though, one way or   11:38
17  the other, do you have a belief "yes" or have a   11:38
18  belief "no"?                          11:38
19      MR. FRANKLIN:  Asked and answered.       11:38
20      THE WITNESS:  Just my belief is what I   11:38
21  told you, I don't know what else to say.       11:38
22  BY MS. HEWITT:                        11:38
23      Q    We'll come back to that right now.       11:38
24      As you sit here today, do you believe       11:38
25  you've been denied access to Lunada Bay on the basis   11:38

Page 94

1   of your ethnicity?                     11:38
2       MR. FRANKLIN:  Same objections.       11:38
3       THE WITNESS:  I don't know if it's based   11:38
4   on my ethnicity.                       11:38
5   BY MS. HEWITT:                        11:38
6       Q    Have you ever formed any belief in your   11:38
7   head that you were denied access to Lunada Bay on   11:38
8   the basis of your ethnicity?               11:39
9       A    I can't answer that question other than   11:39
10  how I've answered it already.               11:39
11      Q    Well, to me, and I'm not telling you how   11:39
12  to answer, but to me it's either "yes," I've had   11:39
13  that at some time in my brain or "no" I have not.   11:39
14      So, has that thought ever come into your   11:39
15  mind that you believed, Yes, I was denied public   11:39
16  access to Lunada Bay because of my ethnicity?   11:39
17      A    It's hard for me to say yes or no.  I   11:39
18  just -- I haven't had that thought.           11:39
19      Q    And, then, the same answer with regard to   11:39
20  level of income?                       11:39
21      A    What is the question regarding level of   11:39
22  income?                             11:39
23      Q    The question is:  Have you ever had the   11:39
24  thought, Yes, I've been denied public access to   11:39
25  Lunada Bay on the basis of my level of income?   11:39

Page 95

1       A    I don't know if they would know my level   11:39
2   of income, but I have experienced comments that   11:40
3   might make me feel that yes, it would have to   11:40
4   do with my level of income not being quite as high   11:40
5   as people at Lunada Bay.                  11:40
6       Q    Do you know what the level of income is of   11:40
7   people at Lunada Bay?                    11:40
8       A    I don't know specifically the level of   11:40
9   income but I've been told that everyone that lives   11:40
10  in the surrounding area is from wealthy families.   11:40
11      Q    So the people who live around that -- so   11:40
12  are you differentiating between the people who live   11:40
13  around Lunada Bay as opposed to people who are at   11:40
14  Lunada Bay when you've been at Lunada Bay?   11:40
15      MR. FRANKLIN:  Vague and ambiguous.       11:40
16      THE WITNESS:  It's my understanding that   11:40
17  the people that are at Lunada Bay are mostly the   11:40
18  people that live at Lunada Bay.               11:40
19  BY MS. HEWITT:                        11:41
20      Q    Okay.  So other than what you've heard   11:41
21  about maybe the level of income of people in general   11:41
22  who live in Lunada Bay, do you have any specific   11:41
23  knowledge of what level of income is of anybody   11:41
24  you've ever come across at Lunada Bay?       11:41
25      A    I don't know specifically how much money   11:41

Page 96

1   they make.                          11:41
2       Q    And if I were to ask you about any one of   11:41
3   the people you've come across at Lunada Bay, you'd   11:41
4   be speculating, right, as to their level of income?   11:41
5       MR. FRANKLIN:  Argumentative.       11:41
6       THE WITNESS:  I just know what I've heard   11:41
7   in the surf community and what I've observed.  You   11:41
8   know, however, I haven't seen their income       11:41
9   statements, so I don't know specifically how much   11:41
10  money everyone makes.                    11:41
11  BY MS. HEWITT:                        11:41
12      Q    You'd be speculating as to that; right?   11:41
13      MR. FRANKLIN:  Argumentative.       11:41
14      THE WITNESS:  I would be speculating as to   11:41
15  how much money people make, yes.           11:41
16  BY MS. HEWITT:                        11:41
17      Q    Okay.  When you've gone to Lunada Bay,   11:41
18  have you ever told anybody how much money you make?   11:42
19      A    I have not.                     11:42
20      Q    All right.  Okay.  We're going to look at   11:42
21  the complaint, let me give you a copy.       11:42
22      Complaint was previously marked as       11:42
23  Exhibit 41.                          11:42
24      (Exhibit 41, complaint, was previously   11:42
25      marked for identification and is attached   11:42

Page 97

25 (Pages 94 - 97)

| | |
|---|---|
| 1 hereto.) 11:42 | 1 Q When did you first start surfing? 11:45 |
| 2 BY MS. HEWITT: 11:42 | 2 A I believe that I took my first lesson 11:45 |
| 3 Q Here you go. 11:42 | 3 around September or October 2014 approximately. 11:45 |
| 4 MS. HEWITT: Does anybody need one? 11:42 | 4 Q Okay. How did you decide to start 11:45 |
| 5 MR. HAVEN: I'll take one if you need an 11:42 | 5 surfing? 11:45 |
| 6 extra. 11:42 | 6 A I have always loved the water and the 11:45 |
| 7 MS. HEWITT: Of course. I have extras. 11:42 | 7 ocean, I grew up as a competitive swimmer, I did 11:45 |
| 8 MR. HAVEN: Okay, thank you. 11:42 | 8 many sports growing up my. Interest in surfing was 11:46 |
| 9 BY MS. HEWITT: 11:42 | 9 sparked by paddleboarding. I started paddleboarding 11:46 |
| 10 Q Okay. 11:42 | 10 on a trip to Hawaii and I enjoyed it. And I also 11:46 |
| 11 MR. DIEFFENBACH: What's the exhibit 11:43 | 11 lived right on the beach. At one point we had a 11:46 |
| 12 number? 11:43 | 12 house right on the ocean and it seemed like 11:46 |
| 13 MS. HEWITT: It's 41. 11:43 | 13 something fun to start. 11:46 |
| 14 BY MS. HEWITT: 11:43 | 14 Q When you say, "We had a house on the 11:46 |
| 15 Q Ms. Reed, will you turn to Page 13, 11:43 | 15 ocean," who was that? 11:46 |
| 16 please, and the page numbers are at the bottom. 11:43 | 16 A Me and my ex-husband. 11:46 |
| 17 Are you there? Go ahead, take the clip 11:43 | 17 Q So did you have that house in Malibu? 11:46 |
| 18 off, it would probably be easier for you. 11:43 | 18 A Yes. 11:46 |
| 19 All right. If we're looking at Line 13, 11:43 | 19 Q But before January 29, 2016, on how many 11:46 |
| 20 do you see the numbers on the left side, Ms. Reed? 11:43 | 20 occasions had you been big wave surfing? 11:46 |
| 21 A Hmm-mm. 11:43 | 21 MR. FRANKLIN: Vague and ambiguous. 11:46 |
| 22 Q It will correspond with the sentences 11:43 | 22 THE WITNESS: What do you mean by big wave 11:46 |
| 23 we'll refer to. 11:43 | 23 surfing? 11:46 |
| 24 "On January 29, 2016, plaintiff Diana 11:43 | 24 BY MS. HEWITT: 11:46 |
| 25 Milena Reed, who is an aspiring big wave surfer" -- 11:43 | 25 Q Whatever you mean by big wave surfing in 11:46 |
| Page 98 | Page 100 |

| | |
|---|---|
| 1 what is an aspiring big wave surfer? 11:43 | 1 the complaint. 11:47 |
| 2 A It is someone who aspires to become a big 11:43 | 2 MR. FRANKLIN: Vague and ambiguous. 11:47 |
| 3 wave surfer. 11:43 | 3 THE WITNESS: In the complaint I say that 11:47 |
| 4 Q What is a big wave surfer as opposed to 11:43 | 4 I'm an aspiring big wave surfer. 11:47 |
| 5 any kind of surfer? 11:44 | 5 BY MS. HEWITT: 11:47 |
| 6 A A big wave surfer is someone who surfs 11:44 | 6 Q Right. 11:47 |
| 7 big waves. 11:44 | 7 A What that means to me is it's something 11:47 |
| 8 Q Is there a certain -- I don't know, I 11:44 | 8 that I would like to do. 11:47 |
| 9 don't anything about surfing -- is there a certain 11:44 | 9 Q Had you ever been big wave surfing before 11:47 |
| 10 height of the wave that's considered a big wave? 11:44 | 10 January 29, 2016? 11:47 |
| 11 A I think it varies from individual to 11:44 | 11 A I'm an aspiring big wave surfer and I 11:47 |
| 12 individual on their definition. 11:44 | 12 don't consider myself a big wave surfer. I consider 11:47 |
| 13 Q How long had you been an aspiring big wave 11:44 | 13 it a goal. 11:47 |
| 14 surfer before January 29, 2016? 11:44 | 14 Q Does that mean, no, you've never been big 11:47 |
| 15 A I really love surfing and I enjoy pushing 11:44 | 15 wave surfing before January 29, 2016? 11:47 |
| 16 my limits and, you know, surfing is something that I 11:44 | 16 MR. FRANKLIN: Vague and ambiguous. 11:47 |
| 17 want to get better and better at. And since I've -- 11:44 | 17 THE WITNESS: It just depends what you 11:47 |
| 18 since I started, I enjoyed surfing waves that were 11:44 | 18 mean by big wave surfing. It's hard for me to 11:47 |
| 19 challenging to me. 11:44 | 19 answer your question because I don't know what 11:47 |
| 20 Q Prior to January 29th, 2016, how many 11:44 | 20 you're asking me exactly. 11:47 |
| 21 times had you been surfing, at all, any beach? 11:44 | 21 BY MS. HEWITT: 11:47 |
| 22 A Since I started surfing, I was surfing 11:45 | 22 Q Okay. It says in your complaint that you 11:47 |
| 23 pretty regularly, about three times a week at first, 11:45 | 23 are an aspiring big wave surfer on January 29, 2016. 11:47 |
| 24 and once I started surfing consistently, I was 11:45 | 24 I'm an aspiring marathon runner, I haven't 11:47 |
| 25 surfing every day. 11:45 | 25 quite gotten there, but I've done a half. 11:47 |
| Page 99 | Page 101 |

26 (Pages 98 - 101)

Page 102

```
 1      Had you ever done anything you would      11:47
 2   consider to be big wave surfing before January 29th,  11:47
 3   2016? Had you even attempted it once in your mind  11:47
 4   whatever is big wave surfing?                 11:48
 5      A  I've surfed waves that were challenging to  11:48
 6   me and, you know, were way over my head, and I've  11:48
 7   been in conditions that definitely challenged me  11:48
 8   both mentally and physically, but I'm not a big wave  11:48
 9   surfer and that's something that I would -- I would  11:48
10   love to do down the line.                     11:48
11      Q  So have you ever surfed a big wave up to  11:48
12   this point right now?                         11:48
13      MR. FRANKLIN:  Vague and ambiguous.         11:48
14      THE WITNESS:  It just depends what you       11:48
15   mean by a big wave.  A wave that's big to me right  11:48
16   now might be really small to Laird Hamilton.  11:48
17   There's all kinds of waves.  There's waves that are  11:48
18   80 feet, there's waves that are eight feet.  Someone  11:48
19   might think that an eight-foot wave is big and  11:48
20   someone else might think it's small, so it's very  11:48
21   hard for me to answer that question.          11:48
22   BY MS. HEWITT:                                11:48
23      Q  Are you still an aspiring big wave surfer?  11:48
24      A  Yes, I am.                             11:48
25      Q  All right.  And the next part of that  11:49
```

Page 103

```
 1   sentence it says you wanted to paddle out to  11:49
 2   experience the large waves found off Lunada Bay.  11:49
 3      In this sentence in your complaint here,  11:49
 4   did you mean that you wanted to go out and try to  11:49
 5   surf or you just wanted to paddle off to -- paddle  11:49
 6   out to see what the waves looked like?        11:49
 7      MR. FRANKLIN:  Vague and ambiguous.         11:49
 8      THE WITNESS:  I wanted to paddle out to  11:49
 9   surf.                                         11:49
10   BY MS. HEWITT:                                11:49
11      Q  Did you intend to surf?                11:49
12      A  I did intend to surf, yes.            11:49
13      Q  Did you feel prepared that day to catch a  11:49
14   big wave, whatever you thought was a big wave that  11:49
15   day?                                          11:49
16      A  I felt prepared that day to attempt to  11:49
17   catch some of the waves on the inside for the  11:49
18   conditions that were out that day.            11:49
19      Q  How did you decide to go to Lunada Bay  11:49
20   that day?                                     11:49
21      A  I don't remember specifically how I  11:49
22   decided to go to Lunada Bay that day.  I would  11:50
23   assume that the swell -- there was a good swell and  11:50
24   it wasn't, you know, too big, you know, and it was a  11:50
25   size that was something that I could try and  11:50
```

Page 104

```
 1   attempt.                                      11:50
 2      Q  I think earlier we decided that we weren't  11:50
 3   sure whether or not you'd been to Lunada Bay before  11:50
 4   that day.                                     11:50
 5      A  I didn't say that.                     11:50
 6      Q  My fault.                             11:50
 7      Had you been to Lunada Bay before        11:50
 8   January 29, 2016?                             11:50
 9      A  I had been to the top of the bluff.   11:50
10      Q  Top of the bluff, okay.               11:50
11      Do you remember -- is it like towards the  11:50
12   beginning of January, middle of January?      11:50
13      A  It was towards the beginning of January.  11:50
14   I think that it was around the 6th of January  11:50
15   approximately.                                11:50
16      Q  And before that time on approximately the  11:50
17   6th of January, had you ever been to the top of the  11:50
18   bluff at Lunada Bay before?                   11:50
19      A  I don't think so.  I may have at one point  11:51
20   driven up the coast looking at the coast, but I  11:51
21   don't know if I stopped at Lunada Bay or not.  And  11:51
22   that wasn't for surfing.  It was for scenic reasons.  11:51
23      Q  Okay.  Just to be clear so I don't get it  11:51
24   wrong again:  Before January 6, 2016, had you ever  11:51
25   been down to the beach at Lunada Bay?         11:51
```

Page 105

```
 1      A  I didn't go down to the beach on        11:51
 2   January 6th.                                  11:51
 3      Q  I understand that, I'm just making sure  11:51
 4   before that date you had never gone to the beach  11:51
 5   there?                                        11:51
 6      A  No.                                   11:51
 7      Q  And had you ever stopped at Lunada Bay at  11:51
 8   all before January 6, 2016?                   11:51
 9      MR. FRANKLIN:  Asked and answered.          11:52
10      THE WITNESS:  Yeah, I may have when I was  11:52
11   looking at the coast, I don't know.           11:52
12   BY MS. HEWITT:                                11:52
13      Q  Okay.  So in January 6, 2016, where did  11:52
14   you stop on the bluff?                        11:52
15      A  I went there to watch my friend surf.  11:52
16      Q  Who was that?                         11:52
17      A  It was a big day.  Much too big for me.  11:52
18      So I just went there to watch.            11:52
19      Q  Who was your friend?                  11:52
20      A  Well, my friend Jordan Wright, boyfriend,  11:52
21   and his friends.                             11:52
22      Q  Who was his friends that you went to  11:52
23   watch?                                        11:52
24      A  One of them was my friend Preston, I don't  11:52
25   remember his last name.  A friend of Jordan's called  11:52
```

27 (Pages 102 - 105)

1  Noah. And a couple of other people but I don't   11:52
2  remember their names.                            11:53
3  Q   Do you remember if Chris Taloa was there?    11:53
4  A   I don't think that Chris was there. Oh,      11:53
5  and there was someone -- another friend of Jordan's   11:53
6  also, called Billy, that was there.              11:53
7  Q   Did they, in fact, surf there as far as      11:53
8  you can tell?                                    11:53
9  A   They did surf there, yes.                    11:53
10  Q   And did you go with Jordan -- and you just   11:53
11  stayed on top of the bluff -- did you drive     11:53
12  separately?                                     11:53
13  A   I don't remember if we rode together or     11:53
14  not, I don't remember, but we walked down -- all of   11:53
15  us walked down there together.                  11:53
16  Q   Okay. Was Jordan your boyfriend at the      11:53
17  time?                                           11:53
18  A   I think so. I don't know. I don't know      11:53
19  if we considered ourselves that serious at the time.   11:53
20  I don't know. I think so. I mean, we were seeing   11:54
21  each other, hmm-mm.                             11:54
22  Q   Okay. How long had you been seeing Jordan   11:54
23  do you think at that point in time?             11:54
24  A   Like I said, we had been seeing each other   11:54
25  for approximately a year, but like we weren't, you   11:54

Page 106

1  know, boyfriend and girlfriend right when we started   11:54
2  seeing each other. I mean, I don't remember when we   11:54
3  officially started calling each other boyfriend and   11:54
4  girlfriend. I mean, we called each other friends   11:54
5  for a while and we were friends for quite a while   11:54
6  before we got involved.                         11:54
7  Q   When you went there in January 6, 2016,     11:54
8  you said you walked there.                      11:54
9      Do you remember why -- or did Jordan ever   11:54
10  tell you why they were going to surf there today --   11:54
11  not today, that day?                           11:54
12  A   They were going to surf there because      11:54
13  there was a big swell, and the waves -- there were   11:54
14  big waves. It was the day before his birthday, or   11:55
15  his birthday, I don't remember if it was exactly the   11:55
16  6th, but it was right around his birthday. And, you   11:55
17  know, the conditions were good to them, so they   11:55
18  wanted to go and I wanted to go watch.          11:55
19  Q   Okay. Had Jordan ever surfed there before   11:55
20  as far as you know?                            11:55
21  A   As far as I know, he has.                  11:55
22  Q   Okay. Did you have any hesitance of going   11:55
23  to Lunada Bay that day on January 6th?          11:55
24      MR. FRANKLIN: Vague and ambiguous.         11:55
25      THE WITNESS: I don't recall specifically   11:55

Page 107

1  if I had hesitance or not. I wasn't surfing so   11:55
2  there wasn't as much pressure on me.            11:55
3  BY MS. HEWITT:                                  11:55
4  Q   Before you went to Lunada Bay on           11:55
5  January 6th, had you heard about Lunada Bay?     11:55
6  A   I have heard about Lunada Bay from the      11:56
7  surf community, yes.                            11:56
8  Q   What had you heard?                        11:56
9  A   I heard that it's the best and one of the   11:56
10  only true deep water big wave spots in          11:56
11  Southern California.                            11:56
12  Q   And when you were there on January 6th,    11:56
13  how long were you there?                        11:56
14  A   It's hard for me to know approximately how   11:56
15  long we were there. But I think from the time that   11:56
16  we pulled up to the time that we left, I mean, it   11:56
17  was a span of at least two hours I would think.   11:56
18  Q   Okay. Is there anything specifically you   11:56
19  recall about that visit to Lunada Bay?          11:56
20  A   Yeah, what specifically would you like to   11:56
21  know?                                           11:56
22  Q   Did you come into contact with anybody who   11:56
23  harassed you that day or intimidated you?       11:56
24  A   It was raining that day and very muddy and   11:56
25  there wasn't anyone out that day.               11:57

Page 108

1  Q   So you didn't come in contact with anybody   11:57
2  who harassed or intimidated you that day; is that   11:57
3  correct?                                        11:57
4  A   No, because there was no individuals out   11:57
5  that I can remember.                            11:57
6  Q   So yes, that's correct?                    11:57
7      MR. FRANKLIN: Asked and answered.          11:57
8      THE WITNESS: It's correct that me -- that   11:57
9  I was one of the only people out there along with my   11:57
10  friend who was photographing, and there weren't   11:57
11  people there to talk to us so we were not harassed   11:57
12  since we were the only people there that I could   11:57
13  see.                                            11:57
14  BY MS. HEWITT:                                  11:57
15  Q   Okay. And same question for intimidation?   11:57
16  A   Yes.                                       11:57
17  Q   And did you experience any vandalism that   11:57
18  day?                                            11:57
19  A   No, we did not.                            11:57
20  Q   All right. Now, during that visit did you   11:57
21  talk with anybody who was present about any negative   11:57
22  experience at Lunada Bay?                       11:57
23      MR. FRANKLIN: Vague and ambiguous.         11:57
24      THE WITNESS: I don't remember if I        11:57
25  specifically discussed that.                    11:58

Page 109

28 (Pages 106 - 109)

BY MS. HEWITT:                           11:58
    Q    All right.  And prior to January 29, 2016, 11:58
for how long had you wanted to surf at Lunada Bay?   11:58
    A    Since I first heard about Lunada Bay it's   11:58
been a goal of mine to work up towards.        11:58
    Q    I assume that's after you started surfing   11:58
but I could be wrong, was it after you started   11:58
surfing?                           11:58
    A    It's after I started surfing, yes.      11:58
    Q    So sometime from 2014 forward is when you   11:58
first heard about Lunada Bay?          11:58
    A    Yes, I don't remember specifically who I   11:58
heard about it from.                11:58
    Q    But let's see, you took your first lesson   11:58
around September 2014; it was sometime either there   11:58
or thereafter that you first heard about Lunada Bay?   11:58
    A    Yeah, I would assume that it was -- it was   11:58
after December of 2014 when I started to take   11:58
surfing more seriously.              11:59
    Q    In your complaint, you referenced the term   11:59
"localism," what does localism mean to you?      11:59
    A    Well, I'm very new to the surfing      11:59
community so localism is not something that I've   11:59
experienced outside of Lunada Bay.  But what I   11:59
experienced at Lunada Bay would define localism,   11:59
                                        Page 110

meaning locals trying to deter nonlocal surfers from   11:59
going to or surfing at that spot.        11:59
    Q    All right.  Had you ever heard about   11:59
localism as you just described it at Lunada Bay   11:59
prior to January 29, 2016?          11:59
    A    I've heard various things in the surf   12:00
community.                         12:00
    Q    Okay.  From whom did you hear these   12:00
things?                            12:00
    A    You know, I don't remember from who   12:00
specifically.  Just from other surfers that I would   12:00
meet when I was out surfing.          12:00
    Q    How would it come up?            12:00
    MR. FRANKLIN:  Vague and ambiguous.      12:00
    THE WITNESS:  I don't -- I don't remember.  12:00
I mean, just everyone is always talking while you're   12:00
out surfing.                       12:00
BY MS. HEWITT:                       12:00
    Q    Was it Jordan Wright?            12:00
    A    Jordan also told me about it as well.    12:00
    Q    What did Jordan tell you?          12:00
    A    You know, I don't remember specifically   12:00
what he told me at the time, but I do remember him   12:00
telling me that it's the best big wave spot in   12:00
Southern California and he's told me that there is   12:00
                                        Page 111

localism there and that you have to go there in   12:00
groups.                            12:01
    Q    Okay.  And you believe he told you that   12:01
before January 29, 2016?            12:01
    A    Yeah, he did explain to me that localism   12:01
exists there but I don't know if I fully understood   12:01
it at the time as I had not experienced any kind of   12:01
localism until Lunada Bay.          12:01
    Q    Can you remember anybody else you heard   12:01
about it before January 29, 2016?        12:01
    A    Yes, as I said, I heard about it here and   12:01
there in the surf community.          12:01
    Q    My fault.  Do you remember any specific   12:01
people that you heard it from?        12:01
    A    I don't remember specific people.  You   12:01
know, there's a lot of people that you talk to in   12:01
the surf community but you don't remember their name   12:01
but you remember their face.          12:01
    Q    So is it fair to say that the only person   12:01
who you remember specifically, as far as their name   12:01
goes, telling you about localism before January 29th   12:01
is Jordan?                         12:02
    A    He's the only person whose name I remember   12:02
but I do remember people's faces.      12:02
    Q    Right, the only person whose name you   12:02
                                        Page 112

remember?                          12:02
    A    Yes.                       12:02
    Q    You don't recall any other names; is that   12:02
correct?                           12:02
    A    I believe so.                12:02
    Q    And we were talking about Chris Taloa   12:02
earlier.                           12:02
    A    Hmm-mm.                     12:02
    Q    Had you ever looked at a Facebook site   12:02
that Chris Taloa had prior to January 29, 2016, that   12:02
relates to surfing?                12:02
    A    I did look at his page but I don't believe   12:02
that it was before January 29th.  It's hard for me   12:02
to know the date but I think that all of my   12:02
interaction with him was after that date.      12:02
    Q    Do you have any understanding of what   12:02
Mr. Taloa's Facebook page pertains to as it relates   12:03
to surfing?                        12:03
    A    I haven't been on his page, you know,   12:03
much, but from what my understanding is, is that his   12:03
page is there to try to get people to go surf   12:03
Lunada Bay, is my understanding of it.      12:03
    Q    And have you ever discussed the page with   12:03
Mr. Taloa?                         12:03
    A    I don't know.  I don't know if I've talked   12:03
                                        Page 113

                                        29 (Pages 110 - 113)

Page 114

1    to him about his page or not.                12:03
2        Q   How many times have you talked to      12:03
3    Mr. Taloa specifically?                      12:03
4        A   Just, you know, every time that I've seen  12:03
5    him, I've said hello, I...                   12:03
6        Q   How many times approximately?       12:03
7        A   It's hard for me to say, I don't know.  12:03
8        Q   You think more than five times?      12:03
9        A   I don't know if more than five times, but  12:03
10   around then sounds right.                    12:04
11       Q   Prior to January 29, 2016, had you ever  12:04
12   visited Palos Verdes Estates, putting aside   12:04
13   Lunada Bay, but had you ever visited Palos Verdes  12:04
14   Estates?                                     12:04
15       A   I don't recall ever visiting it. Like I  12:04
16   said, I do remember once driving up the coast and  12:04
17   looking up the coast, but I -- you know, I never  12:04
18   specifically drove there to visit of the city, no.  12:04
19       Q   How far approximately is Lunada Bay from  12:04
20   where you live right now?                     12:04
21       A   From where I live in Topanga?        12:04
22       Q   Hmm-mm.                               12:04
23       A   You know, I don't know, I've never   12:04
24   actually driven to where I live in Topanga to  12:04
25   Lunada Bay. I think it would largely depend on  12:04

Page 115

1    traffic. Probably anywhere between, you know, maybe  12:05
2    30 to 40 minutes, maybe an hour.             12:05
3        Q   Do you know how many miles that is?  12:05
4        A   No, I would have to look at a map, I'm not  12:05
5    sure.                                         12:05
6        Q   All right. That's why we have Google  12:05
7    maps; right?                                  12:05
8            So going back to January 29, 2016, did you  12:05
9    recall having any discussions with Mr. Wright about  12:05
10   going there -- planning the visit on January 29th?  12:05
11       A   I'm sorry, you're asking me on which date?  12:05
12       Q   January 29th.                         12:05
13       A   So prior to January 29th did I speak to  12:05
14   him about going on January 29th?             12:05
15       Q   Yeah, did you both talk about or plan your  12:05
16   visit for January 29th?                       12:05
17       A   I don't know. I know that I had expressed  12:05
18   an interest in surfing there and I know that we were  12:05
19   waiting for a day that wasn't too big, you know,  12:05
20   where I could actually attempt to paddle out. But  12:06
21   that's the thing with surfing is it's -- you can't  12:06
22   really plan very much in advance because it depends  12:06
23   on, you know, on the weather, on the swells, on a  12:06
24   number of, you know, factors that have to do with  12:06
25   nature, so it's hard to say that I planned it.  12:06

Page 116

1            Had I expressed an interest in going  12:06
2    there? Yes.                                   12:06
3        Q   Okay. Who organized the trip?        12:06
4        A   I don't know. I don't know who organized  12:06
5    the trip.                                     12:06
6        Q   Prior to going that day, were you worried  12:06
7    about any localism at Lunada Bay?            12:06
8        A   Yes, I was worried about localism.    12:06
9        Q   What were you worried about specifically?  12:06
10       A   I didn't really know what to expect, but I  12:06
11   had heard stories of localism so, you know, I  12:06
12   expected some kind of difficulty in the water, you  12:06
13   know, people cutting me off maybe. But, again, I  12:07
14   had never experienced localism so the entire concept  12:07
15   was pretty new to me.                         12:07
16       Q   When you were planning the trip, did  12:07
17   you -- were you planning on meeting somebody there  12:07
18   besides going with Jordan?                    12:07
19       A   I don't remember exactly if it was   12:07
20   organized or how. But I do remember that other  12:07
21   people met us there.                          12:07
22       Q   Who met you there?                    12:07
23       A   I remember when we arrived that Cory was  12:07
24   there at some point. I think he had already  12:07
25   finished surfing, I think, and was on the bluff. I  12:07

Page 117

1    don't remember, you know, specifically the names of  12:07
2    the other people that were there.            12:08
3        Q   Okay. Was Chris Taloa there?         12:08
4        A   I don't know. I don't know if Chris was  12:08
5    there. He may have been but I don't know if he was  12:08
6    surfing or not surfing or what he was doing. But I  12:08
7    do think he was there.                        12:08
8        Q   Okay.                                 12:08
9        A   It's just hard for me to remember.    12:08
10       Q   Do you remember talking to Cory that day?  12:08
11       A   I remember meeting Cory on top of the  12:08
12   bluff and I'm assuming that this was the day.  12:08
13       Q   Do you remember anything he told you?  12:08
14       A   When I met Cory, I remember him telling me  12:08
15   that -- I don't know if he told me this directly or  12:08
16   if -- I remember there was other people around, too.  12:08
17   But I remember him telling me what his profession is  12:08
18   and I remember him telling us at one point that  12:08
19   someone had run him over in the water, cut his hand  12:09
20   or something.                                 12:09
21           But I don't believe that I spoke to him  12:09
22   about that directly so I might have heard it in  12:09
23   passing.                                      12:09
24       Q   Okay. You might have heard a conversation  12:09
25   you had with somebody else --                12:09

1     A    Yes. Yeah, what I remember is when I          12:09
2     arrived there the first thing that I did is go look   12:09
3     at the waves and try and understand the break and    12:09
4     try to understand, you know, where to paddle out.     12:09
5     Whenever I go somewhere that I haven't surfed         12:09
6     before, I try to take some time to watch the surf     12:09
7     and that was I remember primarily what I was doing    12:09
8     and what I was focused on, is to gain an              12:09
9     understanding of the conditions that day.             12:09
10    Q    Did you take your board?                          12:09
11    A    I took the board with me in the car. I           12:09
12    didn't have the board with me as I was standing       12:10
13    there looking at the waves.                            12:10
14    Q    Did you intend to go get the board later?  12:10
15    A    I intended to surf that day.                      12:10
16    Q    What time did you get there?                       12:10
17    A    I don't remember specifically what time we   12:10
18    got there. I remember it was -- it was mid to early  12:10
19    morning. It was already daylight. I remember we      12:10
20    got there when it was already daylight.               12:10
21    Q    Did you go with anybody but Jordan?       12:10
22          MR. FRANKLIN:  Asked and answered.          12:10
23    BY MS. HEWITT:                                        12:10
24    Q    In your car, sorry?                               12:10
25    A    In the car, no, just me and Jordan went      12:10

                                                        Page 118

1     there together.                                       12:10
2     Q    And after you heard maybe Cory's             12:10
3     conversation with somebody else, did it cause you   12:10
4     any concern?                                          12:10
5     A    I'm sure it did.                                 12:10
6     Q    As you sit here today, do you remember any  12:10
7     particular concern it caused you?                     12:10
8     A    I don't remember specifically, no.            12:10
9     Q    All right. Once you went to look at the     12:11
10    conditions --                                         12:11
11    A    Sorry if I'm a little bit distracted. My    12:11
12    baby is kicking like crazy now.                       12:11
13    Q    Sure.                                             12:11
14          When you went to go look at the               12:11
15    conditions, did you speak to anybody, anybody talk   12:11
16    to you?                                               12:11
17    A    Yeah, I mean, like I said, I had some         12:11
18    conversations with some people on the bluff, but I   12:11
19    kind of, I guess, get in the zone when I'm watching  12:11
20    the surf, and I was just trying to really watch and  12:11
21    gain an understanding of the conditions that day.    12:11
22          And I did have conversations with people,  12:11
23    it's just it's hard for me to remember at the moment 12:11
24    specifically what was said.                           12:11
25    Q    So at some point did you experience any     12:11

                                                        Page 119

1     harassment or intimidation when you were there on    12:11
2     January 29th?                                         12:11
3     A    Yes.                                             12:11
4     Q    What was that?                                   12:11
5     A    From what I recall when, you know, from      12:11
6     the moment that we arrived we were experiencing      12:12
7     harassment.                                           12:12
8     Q    Okay. Can you describe what the              12:12
9     harassment was?                                       12:12
10    A    I remember that people were circling        12:12
11    around the car when we parked and, you know, some   12:12
12    people yelled at us and said that we're kooks. And   12:12
13    there were other people, other bay boys on the bluff 12:12
14    that were looking at us and there were people        12:12
15    recording us.                                         12:12
16          So the situation there seemed very tense.   12:12
17    Q    Let's start with the people circling your   12:12
18    car, how many people circled your car?               12:12
19    A    I don't remember how many people, but I     12:12
20    remember, you know -- I remember a car driving by, I 12:12
21    remember a car driving by and having people yell at  12:12
22    us also.                                              12:12
23    Q    Okay. How many cars drove by and yelled    12:12
24    things at you?                                        12:13
25    A    I remember one car that yelled things at    12:13

                                                        Page 120

1     us.                                                   12:13
2     Q    Going back to the circling, is it people   12:13
3     or cars that circled your car?                        12:13
4     A    I know it was cars. Whether or not people  12:13
5     did that, there may have been people on bikes that  12:13
6     did that, I don't remember at the moment.             12:13
7     Q    What were people shouting at you?           12:13
8     A    They shouted that we were kooks.             12:13
9     Q    What else?                                   12:13
10    A    I remember at some point people telling us  12:13
11    that we can't surf there.                             12:13
12    Q    Is this all at the same time these things   12:13
13    are being shouted at you?                             12:13
14    A    I don't remember if it was at the same      12:13
15    time or not.                                          12:13
16    Q    Where were you specifically at this         12:13
17    particular time when these things were being shouted 12:13
18    at you?                                               12:13
19    A    Well, I specifically remember when they     12:13
20    shouted that they were kooks, I remember that we     12:14
21    were either just getting out of the car or just      12:14
22    pulling up, I don't remember specifically, but...    12:14
23    Q    Did you say anything back to them?          12:14
24    A    No, I didn't.                                12:14
25    Q    How about Jordan?                            12:14

                                                        Page 121

31 (Pages 118 - 121)

| | | |
|---|---|---|
| 1 | A   I don't think he did. | 12:14 |
| 2 | Q   Other than kooks and can't surf there, do | 12:14 |
| 3 | you remember them saying anything else to you at | 12:14 |
| 4 | that particular time? | 12:14 |
| 5 | A   At the time right now it's hard for me to | 12:14 |
| 6 | remember all of the little details.  I mean, I -- I | 12:14 |
| 7 | don't know if they were yelling profanities or not, | 12:14 |
| 8 | I just -- I don't remember.  I think that -- I think | 12:14 |
| 9 | that at one point someone did yell profanities but | 12:14 |
| 10 | it's just hard for me to remember right now. | 12:14 |
| 11 | Q   Where were the people who were shouting | 12:14 |
| 12 | these things at you, were they the ones in the car | 12:14 |
| 13 | or people standing somewhere? | 12:14 |
| 14 | A   They were the people in the car that I | 12:14 |
| 15 | remember. | 12:15 |
| 16 | Q   So they eventually drive by; right? | 12:15 |
| 17 | A   Hmm-mm. | 12:15 |
| 18 | Q   And do they come back? | 12:15 |
| 19 | A   I don't know if that same car came back or | 12:15 |
| 20 | not.  I don't remember. | 12:15 |
| 21 | Q   All right. | 12:15 |
| 22 | A   Then after the next question, if you don't | 12:15 |
| 23 | mind if I can take a bathroom break. | 12:15 |
| 24 | MS. HEWITT:  Sure, why don't we take a | 12:15 |
| 25 | bathroom break now. | 12:15 |

Page 122

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  This concludes video | 12:15 |
| 2 | file three and we're off the record | 12:15 |
| | at   and | 12:15 |
| 3 | | |
| 3 | we're clear. | 12:15 |
| 4 | | |
| 4 | (Break taken.) | 12:27 |
| 5 | | |
| 5 | THE VIDEOGRAPHER:  This commences video | 12:27 |
| 6 | | |
| | file four, we are on the record at | 12:27 |
| 7 | . | 12:27 |
| 8 | BY MS. HEWITT: | 12:27 |
| 9 | Q   Ms. Reed, have you ever gone by any other | 12:27 |
| 10 | names? | 12:27 |
| 11 | A   Other than what name? | 12:27 |
| 12 | Q   Other than Diana Milena Reed? | 12:27 |
| 13 | A   Yes. | 12:27 |
| 14 | Q   What names? | 12:27 |
| 15 | A   Reed is my married name. | 12:27 |
| 16 | Q   Okay. | 12:27 |
| 17 | A   And then my maiden name is. | 12:27 |
| 18 | Q   Can you spell that, please? | 12:27 |
| 19 | A   Yes.  I'll give you the full name. | 12:27 |
| 20 | Q   Great. | 12:27 |
| 21 | A   It's Smoluchowska-Miernik.  I've also used | 12:27 |
| 22 | Miernik by itself, last name. | 12:28 |
| 23 | Q   And that whole hyphenated name is your | 12:28 |
| 24 | maiden name? | 12:28 |
| 25 | A   Yes. | 12:28 |
| | Q   Have you ever gone by any other first | 12:28 |

Page 123

| | | |
|---|---|---|
| 1 | names other than Diana? | 12:28 |
| 2 | A   Just maybe nicknames when I was a kid, but | 12:28 |
| 3 | no. | 12:28 |
| 4 | Q   Going back briefly to your time at Florida | 12:28 |
| 5 | State and your legal matter with the accommodations, | 12:28 |
| 6 | what accommodations were you asking for? | 12:28 |
| 7 | A   I don't remember the case very well.  I | 12:28 |
| 8 | remember I was asking for accommodations related to | 12:28 |
| 9 | my disability but I don't remember the specifics. | 12:28 |
| 10 | Q   What was the disability? | 12:28 |
| 11 | A   You know, it was problems with my back. | 12:28 |
| 12 | Q   What were those problems? | 12:28 |
| 13 | MR. FRANKLIN:  Asked and answered. | 12:29 |
| 14 | THE WITNESS:  I don't remember the | 12:29 |
| 15 | specifics of the case at this time. | 12:29 |
| 16 | BY MS. HEWITT: | 12:29 |
| 17 | Q   During the course of the case, do you | 12:29 |
| 18 | remember any issues that came up in which it was | 12:29 |
| 19 | discussed what you needed in order to be able to -- | 12:29 |
| 20 | be able to continue at Florida State, like what were | 12:29 |
| 21 | you asking for? | 12:29 |
| 22 | A   Like I said, it was a long time ago, I | 12:29 |
| 23 | really don't remember. | 12:29 |
| 24 | Q   Are any of the accommodations you're | 12:29 |
| 25 | asking for -- I think earlier you said it was | 12:29 |

Page 124

| | | |
|---|---|---|
| 1 | related to scoliosis; right? | 12:29 |
| 2 | A   Yeah. | 12:29 |
| 3 | Q   Okay.  Whatever disability you had at that | 12:29 |
| 4 | time, do you know if it's been resolved? | 12:29 |
| 5 | A   What do you mean by that? | 12:29 |
| 6 | Q   Do you still have it, whatever the | 12:29 |
| 7 | condition is? | 12:29 |
| 8 | A   I have the same condition with my back | 12:29 |
| 9 | that I had at the time then, yes. | 12:29 |
| 10 | Q   So whatever accommodations you needed back | 12:29 |
| 11 | then, is it true that you still need them now? | 12:29 |
| 12 | MR. FRANKLIN:  Vague and ambiguous. | 12:29 |
| 13 | THE WITNESS:  I don't know.  I mean, my | 12:29 |
| 14 | condition changes, you know, depending on if I've | 12:30 |
| 15 | been injured or not or my level of activity. | 12:30 |
| 16 | BY MS. HEWITT: | 12:30 |
| 17 | Q   Okay.  Understanding it might be affected | 12:30 |
| 18 | by your condition right now, but is there anything | 12:30 |
| 19 | related to your disability, your back issues, that | 12:30 |
| 20 | still affects you today that you can tell me today? | 12:30 |
| 21 | A   Well, definitely makes my pregnancy more | 12:30 |
| 22 | difficult. | 12:30 |
| 23 | Q   How so?  Does your back hurt more often? | 12:30 |
| 24 | A   It does hurt more often now that I'm | 12:30 |
| 25 | pregnant, yes. | 12:30 |

Page 125

32 (Pages 122 - 125)

**Page 126**

```
 1      Q   Are there any other symptoms that you    12:30
 2   suffer from still with regard to the disability that  12:30
 3   you complained of at Florida State?              12:30
 4      MR. FRANKLIN:  Vague and ambiguous.       12:30
 5      THE WITNESS:  I don't remember, you know,  12:30
 6   what the complaint was specifically.            12:31
 7   BY MS. HEWITT:                                  12:31
 8      Q   But you know it still affects you today;   12:31
 9   right?                                          12:31
10      A   I know that I have issues with my back,   12:31
11   yes.                                            12:31
12      Q   All right.  Do any of those issues affect  12:31
13   your ability to surf?                           12:31
14      A   I have not had issues with my back that   12:31
15   have prevented me from surfing.  I've been able to  12:31
16   adapt my surfing to my disability.              12:31
17      Q   And how have you done that?             12:31
18      A   I don't understand.                      12:31
19      Q   You said you've been able to adapt your  12:31
20   surfing to your disability.  How have you done that?  12:31
21      A   I mean, I don't know.  I'm able to surf.   12:31
22      Q   Do you have to do anything special with   12:31
23   regard to your disability in order to surf?      12:31
24      A   I don't put any weight on my back, you    12:31
25   know, surfing.  I'm just standing on the board.  Is  12:31
```

**Page 127**

```
 1   it harder for me to balance?  Maybe, I don't know.  12:32
 2   I just do the best that I can to try to surf as well  12:32
 3   as I can.                                       12:32
 4      Q   Have you ever stopped surfing for a period  12:32
 5   of time due to your back injury, or your back    12:32
 6   condition?                                      12:32
 7      A   I did not stop surfing due to my back     12:32
 8   condition, I haven't had a need to.  It hasn't   12:32
 9   aggravated my back.                             12:32
10      Q   Going back to the period around          12:32
11   September 2014 when you first started taking      12:32
12   lessons, where did you take lessons?            12:32
13      A   I took lessons at Malibu at the pier --   12:32
14      Q   Do you remember what company?           12:32
15      A   -- the beach there.                      12:32
16      Yeah, I took them from an individual.        12:32
17      Q   Who's that?                              12:32
18      A   I'm terrible with names but I believe his  12:32
19   name is Travis, his first name.  Last name Stassart,  12:33
20   S-t-a-s-s-a-r-t.                                12:33
21      Q   And from September 2014 until January 29,  12:33
22   2016, what beaches did you surf at?             12:33
23      A   So you're asking me what beaches I've     12:33
24   surfed at from the time I started until          12:33
25   January 29th --                                 12:33
```

**Page 128**

```
 1      Q   Yes?                                     12:33
 2      A   -- 2016?                                 12:33
 3      Okay.  I've surfed on a lot of different     12:33
 4   beaches.  You know, First Point in Malibu, Second  12:33
 5   Point in Malibu, Third Point in Malibu.  County  12:33
 6   Line.  The beach break behind County Line.  Zeros.  12:33
 7   Zuma.  Westward.  I think Topanga, went there once.  12:33
 8      Most of the beaches in Malibu I'm trying      12:34
 9   to remember all the names.  Also beaches up north,  12:34
10   Silver Strand Beach in Oxnard.  Ventura Point, C  12:34
11   Street, those are beaches in Ventura.  Ventura    12:34
12   Overhead.  Pitas, Rincon, Leo Carillo in Malibu,  12:34
13   Heavens in Malibu.  There's like a break behind   12:34
14   Rincon that I surfed at -- I also surfed -- I went  12:34
15   up north to Santa Cruz, Norcal, I surfed at The   12:35
16   Lane, I surfed at Pleasure Point, Sewers.  I surfed  12:35
17   at a -- where was that break?  I surfed at --    12:35
18   there's a town south of -- there's a town south of  12:35
19   Santa Cruz that starts with a C, like a small city.  12:35
20      MR. FRANKLIN:  Capital.                      12:35
21      MS. HEWITT:  Carpinteria?                    12:35
22      MR. COOPER:  Cardiff.                        12:35
23      THE WITNESS:  I think I have surfed at       12:35
24   Cardiff, and I think I surfed at Trestles also and  12:35
25   going -- I surfed different places in OC.        12:36
```

**Page 129**

```
 1      But going back to Santa Cruz -- yeah, I     12:36
 2   don't know, I surfed at a lot of secret spots in  12:36
 3   Santa Cruz with my coach that I don't even remember  12:36
 4   the names of.  Where else did I surf?  I don't know,  12:36
 5   I've surfed at a lot of spots.                  12:36
 6   BY MS. HEWITT:                                  12:36
 7      Q   It sounds like it.                       12:36
 8      A   Morro Bay.  Morro Bay is interesting.  And  12:36
 9   I've surfed -- there's a spot north of Morro Bay,  12:36
10   it's a beach break, I don't remember the name of it,  12:36
11   but I've surfed there, too.                     12:36
12      Q   Going back to the complaint here.  Where  12:36
13   it says here, "Reed and Wright encountered members  12:36
14   of the Lunada Bay Boys," who were the Lunada Bay  12:36
15   Boys as you reference here in the complaint?     12:36
16      A   I don't know the specific names of the   12:36
17   individuals.                                    12:37
18      Q   Are you able to describe who it was that  12:37
19   screamed profanities at you on January 29, 2016?  12:37
20      A   I'm not able to describe the specific     12:37
21   person that screamed profanities because I didn't  12:37
22   get to see their face for long enough, and at the  12:37
23   moment I don't remember, my memory is not very good.  12:37
24      Q   Did anybody else scream profanities at you  12:37
25   other than the people in the car?               12:37
```

33 (Pages 126 - 129)

| | |
|---|---|
| 1 | A   At what point?                    12:37 |
| 2 | Q   At any point on January 29, 2016.        12:37 |
| 3 | A   The entire day?                    12:37 |
| 4 | Q   Yes.                    12:37 |
| 5 | A   Yes, there were several instances.        12:37 |
| 6 | Q   Okay.  So we went through the ones in the   12:37 |
| 7 | car.                    12:37 |
| 8 |       Let's go through the other times that    12:37 |
| 9 | people screamed profanities at you on January 29,    12:37 |
| 10 | 2016, what was the next instance of those?        12:37 |
| 11 | A   I believe there was an instance of people   12:37 |
| 12 | telling us that we can't surf while we were on   12:37 |
| 13 | the bluff.  There was the constant harassment of    12:37 |
| 14 | video cameras everywhere, recording everything.        12:38 |
| 15 |       What else is the question asking?  I'm    12:38 |
| 16 | sorry.                    12:38 |
| 17 | Q   I wanted to go through the different    12:38 |
| 18 | instances that day when people specifically screamed   12:38 |
| 19 | profanities at you.  For instance, in the complaint   12:38 |
| 20 | a man called you a whore.  When did that occur on   12:38 |
| 21 | January 29th?                    12:38 |
| 22 | A   Right, that's the words that I heard him   12:38 |
| 23 | scream.  That was once we were at the bottom of the   12:38 |
| 24 | hill when we were on the rocky beach walking to the   12:38 |
| 25 | spot where we would paddle out.            12:38 |
| | Page 130 |

| | |
|---|---|
| 1 | just paddled in, David.            12:39 |
| 2 | Q   What's David's last name?        12:40 |
| 3 | A   I'm not quite sure, but I think it's    12:40 |
| 4 | S-l-u-y-s, something like that.        12:40 |
| 5 | Q   So you -- Jordan wanted to wait for David   12:40 |
| 6 | to paddle in?                    12:40 |
| 7 | A   Yeah, I think so.            12:40 |
| 8 | Q   Did you want to wait for David to paddle   12:40 |
| 9 | in or did you want to leave?            12:40 |
| 10 | A   I think I wanted to wait for him, too.    12:40 |
| 11 | Q   Okay.                    12:40 |
| 12 | A   I don't remember.  I think I was just, you   12:40 |
| 13 | know, listening to Jordan and trying to follow his   12:40 |
| 14 | guidance.                    12:40 |
| 15 | Q   Did -- how long was it going to be until   12:40 |
| 16 | David was going to paddle in?  Was David on his way   12:40 |
| 17 | in, for instance?                    12:40 |
| 18 | A   I remember that he said something about    12:40 |
| 19 | waiting for Dave, but I don't know if Dave, you    12:41 |
| 20 | know, what he was doing specifically.        12:41 |
| 21 | Q   Did you wait for David?            12:41 |
| 22 | A   I think we did but then the man came back   12:41 |
| 23 | again and started yelling again.  So --        12:41 |
| 24 | Q   Between the time when the man left after   12:41 |
| 25 | calling you a whore and the time he came back, how   12:41 |
| | Page 132 |

| | |
|---|---|
| 1 | Q   At this point, had you brought down your   12:38 |
| 2 | board?                    12:38 |
| 3 | A   Yes, at this point, I had brought down my   12:38 |
| 4 | board.                    12:38 |
| 5 | Q   Were you in your wetsuit already?        12:38 |
| 6 | A   Yes, I was in my wetsuit.            12:38 |
| 7 | Q   What did you say to the man who called you   12:39 |
| 8 | a whore, if anything?            12:39 |
| 9 | A   I don't recall if I said anything to him.   12:39 |
| 10 | I think I didn't.                12:39 |
| 11 | Q   Was Jordan with you when that happened?    12:39 |
| 12 | A   Yes, he was.                12:39 |
| 13 | Q   Did Jordan say anything to the person who   12:39 |
| 14 | called you a whore?                12:39 |
| 15 | A   I don't think he said anything either.    12:39 |
| 16 | Q   After the man called you a whore, did you   12:39 |
| 17 | walk away?                    12:39 |
| 18 | A   We just stood there because he walked    12:39 |
| 19 | away.                    12:39 |
| 20 | Q   So the man walked away.  What did you and   12:39 |
| 21 | Jordan talk about after the man walked away?    12:39 |
| 22 | A   I mean, I just remember being really    12:39 |
| 23 | scared and -- I don't think I really was thinking   12:39 |
| 24 | clearly or knew what to do.  But I remember Jordan   12:39 |
| 25 | saying that we should wait for our friend who had   12:39 |
| | Page 131 |

| | |
|---|---|
| 1 | long of a time was that?                12:41 |
| 2 | A   It was very brief because he -- because    12:41 |
| 3 | he -- I think that he just walked away for a little   12:41 |
| 4 | bit and then came right back.            12:41 |
| 5 | Q   Was it minutes?                12:41 |
| 6 | A   I don't know, it's hard for me to say.    12:41 |
| 7 | Q   Do you think it was more than five        12:41 |
| 8 | minutes?                    12:41 |
| 9 | A   No.                    12:41 |
| 10 | Q   Do you think it was more than two minutes?   12:41 |
| 11 | A   I don't know.                12:41 |
| 12 | Q   Okay.  In between that time, what were you   12:41 |
| 13 | and Jordan doing?                12:41 |
| 14 | A   I was just standing there.            12:41 |
| 15 | Q   Okay.  Were you crying?            12:42 |
| 16 | A   I wasn't crying but I was scared.        12:42 |
| 17 | Q   All right.  Were you recording this --    12:42 |
| 18 | this visit to the beach at all?            12:42 |
| 19 | A   I was not recording it.            12:42 |
| 20 | Q   Tape recording or video recording; right?   12:42 |
| 21 | A   Right.                    12:42 |
| 22 | Q   Were there any media there as far as you   12:42 |
| 23 | know?                    12:42 |
| 24 | A   I don't know if there were that day.    12:42 |
| 25 | Q   But you weren't aware of any; right?    12:42 |
| | Page 133 |

34 (Pages 130 - 133)

```
 1    A   I just don't remember.              12:42
 2    Q   Had you contacted any media prior to your   12:42
 3  visit on January 29th?              12:42
 4    A   I had not contacted any media.        12:42
 5    Q   After the man came back, then what    12:42
 6  happened?              12:42
 7    A   I just remember him, you know, yelling at   12:42
 8  us more, screaming profanities.  And at one point I   12:42
 9  think -- he went away and I told Jordan that I   12:43
10  wanted to talk to the police.  The police were   12:43
11  standing in the fort and witnessed the incident.   12:43
12  And then they ended up walking over because they saw 12:43
13  what happened, so I didn't have to go to them.   12:43
14    Q   Okay.  So the police came to you; right?   12:43
15    A   Yes.              12:43
16    Q   Then what happened when the police came?   12:43
17    A   The police asked us what was going on and   12:43
18  we described what had happened.  And they -- I think 12:43
19  that they asked us if we wanted to file a report.   12:43
20  And I know that I wanted to file one, and so we   12:43
21  proceeded to go up the hill to file a report.   12:43
22    Q   So did you, in fact, file a report with   12:44
23  the police?              12:44
24    A   We did file a report with the police, yes. 12:44
25    Q   All right.  Do you remember -- withdraw.   12:44
                                         Page 134
```

```
 1        And they told me that I could file a   12:45
 2  citizen's arrest but that if I do file a citizen's   12:45
 3  arrest I'm at risk of getting sued because people at 12:45
 4  Lunada Bay have a lot of money and can hire good   12:45
 5  lawyers and that will put me at risk of getting into 12:45
 6  a lawsuit, and so it's not a good idea to file a   12:45
 7  citizen's arrest because it will, you know, because   12:45
 8  I don't need to be in a lawsuit and it's not a good   12:45
 9  idea.              12:46
10        So, they dissuaded me from filing a   12:46
11  citizen's arrest.              12:46
12    Q   Okay.  And then you filed -- so then   12:46
13  you --              12:46
14    A   So they told me to go ahead and write a   12:46
15  report instead because it would be the same outcome   12:46
16  and that way I don't have the liability of filing a   12:46
17  citizen's arrest.              12:46
18    Q   When you came up -- rather, when the   12:46
19  officers came from the fort, how many were there?   12:46
20    A   I don't know how many there were.  I   12:46
21  remember -- I definitely remember there was one   12:46
22  person, I don't know if there was one or two.   12:46
23    Q   Officers, you don't remember how many came 12:46
24  to you and walked up the bluff with you?   12:46
25    A   No.              12:46
                                         Page 136
```

```
 1        Are you able to describe the man who was   12:44
 2  yelling at you?              12:44
 3    A   Yes.              12:44
 4    Q   Can you please describe him?        12:44
 5    A   I remember he was pretty short in height,   12:44
 6  middle-aged, brown hair, I believe.        12:44
 7    Q   Anything else that you can remember in   12:44
 8  describing him?              12:44
 9    A   That's all I can remember in describing   12:44
10  him.              12:44
11    Q   When you went up the hill and -- were you   12:44
12  walking up with Jordan and the police?        12:44
13    A   I think so.              12:44
14    Q   And when you got to the top of the hill,   12:44
15  what did you do?              12:44
16    A   I remember at one point there was more   12:44
17  police that came, and so I don't remember who filed 12:44
18  the report specifically.  I don't remember if it was 12:45
19  the police that witnessed the incident or if it was 12:45
20  the police that came.  But I remember that they --   12:45
21  they detained the suspect and they -- but they --   12:45
22  even though that they witnessed the incident they   12:45
23  did not want to arrest him because they were saying   12:45
24  they didn't hear what he said specifically even   12:45
25  though they heard him yelling.        12:45
                                         Page 135
```

```
 1    Q   When you eventually got up to the bluff,   12:46
 2  do you remember how many officers there were?   12:46
 3    A   I remember there was more than one.  But I 12:46
 4  don't remember if there was more than two.   12:46
 5    Q   Okay.  Did you see any police cars up   12:46
 6  there?              12:46
 7    A   I would assume that there were police cars 12:46
 8  because I remember additional officers came.   12:46
 9    Q   Okay.  All right.  And when they took your 12:47
10  report, did you tell them everything that happened?   12:47
11        MR. FRANKLIN:  Vague and ambiguous.        12:47
12        THE WITNESS:  I told them what I could   12:47
13  remember at the time.              12:47
14  BY MS. HEWITT:              12:47
15    Q   Okay.  Did you ever see a copy of the   12:47
16  incident report that was filed with regard to this   12:47
17  matter?              12:47
18    A   I did not.              12:47
19    Q   Have -- did you ask -- did you tell the   12:47
20  police officers that day anything that they refused   12:47
21  to take down?              12:47
22        MR. FRANKLIN:  Vague and ambiguous.        12:47
23        THE WITNESS:  I don't know.        12:47
24  BY MS. HEWITT:              12:47
25    Q   Like is there anything that they told you, 12:47
                                         Page 137
```

35 (Pages 134 - 137)

| | |
|---|---|
| 1 | Oh, that's not important, we don't want to write   12:47 |
| 2 | that down; anything like that?   12:47 |
| 3 |   A   I don't remember if that happened.   12:47 |
| 4 |   Q   Did you -- how long did you talk to the   12:47 |
| 5 | police that day?   12:47 |
| 6 |   A   It's hard for me to say how long I spoke   12:47 |
| 7 | to them for.  I can guess maybe 30 minutes, I don't   12:48 |
| 8 | know.   12:48 |
| 9 |   Q   What profanities did you tell the police   12:48 |
| 10 | were screamed at you?   12:48 |
| 11 |   A   I remember something that sounded like   12:48 |
| 12 | "whore," so I did tell them that.  At this time, I   12:48 |
| 13 | don't remember specifically what profanities were   12:48 |
| 14 | screamed at.  Like I said, my memory is not good and   12:48 |
| 15 | I try to limit profanities in my life.  But I do   12:48 |
| 16 | remember, you know, being -- being very frightened   12:48 |
| 17 | because I hadn't been yelled at in that manner   12:48 |
| 18 | before by anyone.   12:48 |
| 19 |   Q   Did the police ask you when you were down   12:49 |
| 20 | on the beach, did they ask you where you were from?   12:49 |
| 21 |   A   I don't know if they asked me that or not.   12:49 |
| 22 |   Q   Do you remember them asking you where you   12:49 |
| 23 | were from at any time?   12:49 |
| 24 |   A   From what I remember when they filed the   12:49 |
| 25 | report, they write down your address from your   12:49 |

Page 138

| | |
|---|---|
| 1 | him but I don't remember what we talked about.   12:50 |
| 2 |   Q   Okay.  Did you tell Chris Taloa what   12:50 |
| 3 | happened?   12:50 |
| 4 |   A   I don't think so.  I never really spoke to   12:50 |
| 5 | him much, you know, directly.   12:50 |
| 6 |   Q   How about Kenny?   12:50 |
| 7 |   A   No, I don't think that I told him.   12:50 |
| 8 |   Q   All right.  After the police took your   12:50 |
| 9 | report, did they tell you what you should do in   12:50 |
| 10 | follow-up, if anything?   12:50 |
| 11 |   MR. FRANKLIN:  Vague and ambiguous.   12:51 |
| 12 | BY MS. HEWITT:   12:51 |
| 13 |   Q   Did they tell you, Please call us to find   12:51 |
| 14 | out what's going on with this, did they tell you you   12:51 |
| 15 | should leave, anything like that?   12:51 |
| 16 |   A   I don't remember what they told me.  I   12:51 |
| 17 | don't think that they told me anything regarding   12:51 |
| 18 | follow-up, you know.  What I do remember them   12:51 |
| 19 | telling me is the result would be the same whether   12:51 |
| 20 | it was filed as a citizen's arrest or whether it was   12:51 |
| 21 | not.  But the problem with filing it as a citizen's   12:51 |
| 22 | arrest would that I would be liable for a lawsuit   12:51 |
| 23 | and I don't need a lawsuit in my life and why take   12:51 |
| 24 | that risk.   12:51 |
| 25 |   Q   Did they tell you you would be liable for   12:51 |

Page 140

| | |
|---|---|
| 1 | driver's license.  Whether they asked me that or   12:49 |
| 2 | wrote it down from my driver's license, I don't   12:49 |
| 3 | remember.   12:49 |
| 4 |   Q   All right.  Did they take your driver's   12:49 |
| 5 | license at the point in time when they were starting   12:49 |
| 6 | to write their report or sometime before that?   12:49 |
| 7 |   A   I think they took it from me when they   12:49 |
| 8 | were writing the report.   12:49 |
| 9 |   Q   Had they given -- excuse me.   12:49 |
| 10 |   Had they taken your driver's license at   12:49 |
| 11 | the time you were talking about a citizen's arrest?   12:49 |
| 12 |   A   I don't know.   12:49 |
| 13 |   Q   Did any of your other friends tell you   12:49 |
| 14 | that they saw the incident with the man screaming at   12:50 |
| 15 | you and Jordan?   12:50 |
| 16 |   A   Not that I recall.  I don't think so.   12:50 |
| 17 |   Q   All right.  Did David eventually paddle   12:50 |
| 18 | in?   12:50 |
| 19 |   A   I would assume that he did, yeah, I don't   12:50 |
| 20 | know what he ended up doing.   12:50 |
| 21 |   Q   Did you tell David what happened?   12:50 |
| 22 |   A   I think I did.   12:50 |
| 23 |   Q   What did he say?   12:50 |
| 24 |   A   You know, I don't remember the   12:50 |
| 25 | conversation with David, so, I would assume I told   12:50 |

Page 139

| | |
|---|---|
| 1 | a lawsuit; is that what they told you?   12:51 |
| 2 |   A   They told me that it puts liability on me.   12:51 |
| 3 |   Q   No matter what happens, that definitely   12:51 |
| 4 | puts liability on you, is that what they told you?   12:51 |
| 5 |   MR. FRANKLIN:  Calls for legal conclusion.   12:51 |
| 6 |   THE WITNESS:  From my understanding, what   12:51 |
| 7 | they told me is that it would put me at a liability   12:51 |
| 8 | for a lawsuit if it was found to be, you know -- if   12:52 |
| 9 | it was found to be incorrect -- it puts me at   12:52 |
| 10 | liability, but if I don't file it as a citizen's   12:52 |
| 11 | arrest, then I'm not a liability.   12:52 |
| 12 | BY MS. HEWITT:   12:52 |
| 13 |   Q   Okay.  So did you understand that you   12:52 |
| 14 | could file a citizen's arrest, the outcome could be   12:52 |
| 15 | that if it was found to not be justified that you   12:52 |
| 16 | could incur liability at a later date?   12:52 |
| 17 |   MR. FRANKLIN:  Objection, calls for legal   12:52 |
| 18 | conclusion --   12:52 |
| 19 |   THE WITNESS:  Um --   12:52 |
| 20 |   MR. FRANKLIN:  Objection, calls for legal   12:52 |
| 21 | conclusion, it's also an incomplete hypothetical.   12:52 |
| 22 |   THE WITNESS:  Yeah, I don't really know.   12:52 |
| 23 | I mean, I don't understand.  I'm not a lawyer so   12:52 |
| 24 | it's hard for me to answer that question.  I just   12:52 |
| 25 | know that they dissuaded me from filing a citizen's   12:52 |

Page 141

36 (Pages 138 - 141)

```
 1    arrest.                        12:52
 2    BY MS. HEWITT:                 12:52
 3       Q    All right.  Is it fair to say you didn't    12:52
 4    really understand what they told you that day?    12:52
 5         MR. FRANKLIN:  Objection, misstates prior    12:52
 6    testimony.                     12:52
 7         THE WITNESS:  No, I feel like I understood    12:52
 8    what they were telling me.  They didn't, you know,    12:52
 9    use complicated language with me.          12:53
10    BY MS. HEWITT:                 12:53
11       Q    Okay.  Like lawyers?               12:53
12       A    Yeah.                    12:53
13       Q    But they didn't tell you you could not    12:53
14    file a citizen's arrest; right?          12:53
15         MR. FRANKLIN:  Objection, asked and    12:53
16    answered.                        12:53
17         THE WITNESS:  They told me that it's not a    12:53
18    good idea to file one.             12:53
19    BY MS. HEWITT:                 12:53
20       Q    But they did not tell you that they would    12:53
21    not help you do a citizen's arrest; right?    12:53
22         MR. FRANKLIN:  Objection, asked and    12:53
23    answered.                        12:53
24         THE WITNESS:  Well, what they told me    12:53
25    is -- they didn't say that; what they told me is    12:53
                                          Page 142
```

```
 1    that they don't recommend me filing one, like I    12:53
 2    said, because it puts a legal liability on me and    12:53
 3    because people at Lunada Bay are wealthy and they    12:53
 4    can afford good lawyers so...          12:53
 5    BY MS. HEWITT:                 12:53
 6       Q    After -- do you remember the names of the    12:53
 7    officers that you dealt with that day?    12:53
 8       A    Unfortunately, I don't.          12:53
 9       Q    Okay.  After you were done interacting    12:53
10    with the officers, what did you do next?    12:54
11       A    I remember that I think we just changed    12:54
12    and left.                        12:54
13       Q    And did you remember if Cory Spencer was    12:54
14    still there when you were changing and leaving?    12:54
15       A    I don't know if he was still there.  I    12:54
16    don't remember seeing him.             12:54
17       Q    Did you ever see Cory Spencer surf that    12:54
18    day?                              12:54
19       A    I don't know.  I don't think I did.    12:54
20       Q    And you didn't see him have any    12:54
21    interactions with people running him over or    12:54
22    anything like that; right?             12:54
23       A    No, I think we got there after he surfed.    12:54
24    I don't remember seeing him in the water.    12:54
25       Q    Did anybody tell you they saw him get run    12:54
                                          Page 143
```

```
 1    over in the water?                  12:54
 2       A    I don't remember if anyone told me that.    12:54
 3       Q    Okay.  Later in February I believe that    12:54
 4    you went to Lunada Bay with a photographer and    12:55
 5    writer from the L.A. Times; is that correct?    12:55
 6       A    I would say that the way you phrased that    12:55
 7    statement is not correct because I went to    12:55
 8    Lunada Bay and there happened to be a photographer    12:55
 9    there.                            12:55
10       Q    Was it coincidence that day?    12:55
11       A    I don't know.  I don't know if someone    12:55
12    told me to be there or not.  I know I went there    12:55
13    to take photos.                  12:55
14       Q    What did you go to take photos of?    12:55
15       A    Of Jordan.                    12:55
16       Q    For what purpose?               12:55
17       A    Because I couldn't surf.  I had broken my    12:55
18    arm snowboarding unfortunately around February 1st,    12:55
19    and if I'm not surfing then I love taking surf    12:55
20    photography.                     12:55
21       Q    How long were you unable to surf --    12:55
22    actually, withdraw.                12:56
23         Have you surfed since that time?    12:56
24       A    Have I surfed since what time?    12:56
25       Q    Since the time you broke your arm.    12:56
                                          Page 144
```

```
 1       A    I have surfed since February 1st, yes.    12:56
 2       Q    When was that?                12:56
 3       A    I don't remember specifically, I remember    12:56
 4    I surfed on a few occasions after that.    12:56
 5       Q    Did you get a cast for your broken arm?    12:56
 6       A    I did.                    12:56
 7       Q    When did you get your cast off?    12:56
 8       A    I believe I had it on for about two months    12:56
 9    more or less.                    12:56
10       Q    When it came off, did you have any    12:56
11    restrictions as to what you could do?    12:56
12       A    Not that I recall.             12:56
13       Q    So after April 1st -- did you surf while    12:56
14    you had a cast?                  12:56
15       A    I did.                    12:56
16       Q    How many times did you surf while you had    12:56
17    the cast?                        12:56
18       A    I surfed a few times on smaller days.  I    12:56
19    had a waterproof cast.  And I longboarded, so it    12:56
20    wasn't too difficult to get up with one arm.    12:57
21       Q    Then after April 1, 2016, did you surf?    12:57
22       A    Did I surf after April 1, 2016?    12:57
23       Q    Yes.                       12:57
24       A    Yeah, I remember surfing in Malibu in    12:57
25    June.                             12:57
                                          Page 145
```

37 (Pages 142 - 145)

**Page 146**

1   Q   Okay.  So in June, would you have been
2   about four and a half months pregnant or so?
3   A   I don't know.  I would have to calculate
4   it, I don't remember.
5   Q   Do you remember being pregnant when you
6   were surfing in June, though?
7   A   Yes, hmm-mm.
8   Q   When was the last time you've been
9   surfing?
10   A   That was about the last time.
11   Q   All right.  So, going back to February 5,
12   2016, I believe you told me that you went to
13   Lunada Bay to take photos of Jordan; is that
14   correct?
15   A   Yes.
16   Q   What made Jordan decide to go that day, to
17   go surf?
18   A   You know, I don't remember what his reason
19   was to go that day.  I just remember accompanying
20   him to take photos.
21   Q   Did you talk to anybody at the L.A. Times
22   before February 5, 2016?
23   A   I don't think so, no.
24   Q   Do you have any idea as you sit here today
25   how the writer and photographer from the

**Page 147**

1   L.A. Times -- let me you ask you this:  You reviewed
2   the complaint prior to its filing; right?
3   A   Yes.
4   Q   In the complaint Page 14, Line 6, 7, it
5   says, "On or about February 5th, 2016, Reed and
6   Wright returned to Lunada Bay with a photographer
7   and writer from the Los Angeles Times."
8       Is that accurate?
9   A   There was a photographer there at the time
10   I was there.  There was not a writer; he was just a
11   photographer.  And he was there; I didn't arrange
12   for him to be there or, you know, I don't recall
13   knowing that he was going to be there.
14   Q   Did you talk to the photographer at
15   Lunada Bay on February 5th?
16   A   Once I was there, I did talk to him.
17   Q   What did you talk about?
18   A   I don't remember specifically what we
19   talked about.  I just remember talking about
20   photography and I remember talking about some of the
21   work he's done and then -- I don't know, I think we
22   talked about, you know, the conditions that day
23   maybe.
24   Q   Did you talk at all about localism at
25   Lunada Bay?

**Page 148**

1   A   We may have talked about that, but I don't
2   remember speaking to him in much detail about it.  I
3   know Jordan spoke to him.
4   Q   Did you hear what Jordan talked to him
5   about?
6   A   You know, I don't recall the conversation
7   at the moment.
8   Q   Do you remember the photographer taking
9   pictures of you?
10   A   You know, I never actually realized that I
11   was in the photos until they were published.  But I
12   do remember him taking photos and I remember I was
13   taking photos.
14   Q   Do you remember talking to the
15   photographer about you being a, quote, outsider, end
16   quote, with regard to Lunada Bay?
17   A   Yeah, we may have discussed me not being
18   from Lunada Bay.  I would assume that he knew that
19   we didn't live there.
20   Q   Why would you assume that?
21   A   Because, you know, we're not part of the
22   Bay Boys.
23   Q   Is everybody who's not part of the
24   Bay Boys not from there?
25       MR. FRANKLIN:  Argumentative.

**Page 149**

1       THE WITNESS:  I don't know.  I think --
2   actually, I think they're not according to what
3   Charlie told me, some of them are from up north as
4   well, from different parts, but I think the majority
5   is from there, hmm-mm.
6   BY MS. HEWITT:
7   Q   Did you talk about the locals hangout fort
8   with the photographer?
9   A   I don't know, I may have.
10   Q   Did the photographer tell you why he was
11   there taking pictures that day?
12   A   You know, it's hard for me to remember all
13   the details.  He may have mentioned that they're
14   doing a story related to the coastal commission but
15   I don't know if he himself knew that many details
16   since he was just doing photos.  He wasn't the
17   actual reporter.  So I don't know.  It's hard for me
18   to say, I don't remember that day very well right
19   now.
20   Q   The complaint states that the L.A. Times
21   printed a newspaper story on February 13th and
22   contains several photographs of you.  Do you
23   remember that article?
24   A   I do remember the article coming out.
25   Q   And in it it says that -- in the article,

1  your complaint says that the article says -- stated   13:02
2  that you were an outsider who had filed a police   13:02
3  report for harassment against the Lunada Bay Boys.   13:02
4     Did you ever tell anyone from the   13:02
5  L.A. Times that you filed a police report for   13:02
6  harassment against the Lunada Bay Boys?   13:02
7     A   I would assume that I did since that's   13:02
8  what they wrote in the article.   13:03
9     Q   Do you have any recollection at all of   13:03
10  talking to anybody from the L.A. Times about that?   13:03
11     A   You know, I do remember talking to the   13:03
12  photographer. I don't remember if I spoke to the   13:03
13  reporter or not at that point. I know Jordan did.   13:03
14  I don't know. I haven't reviewed the article and   13:03
15  it's been sometime since I've read it.   13:03
16     Q   Okay. So your understanding is that   13:03
17  Jordan did have communications with this L.A. Times   13:03
18  photographer or writer about Lunada Bay and localism   13:03
19  and harassment at Lunada Bay?   13:03
20     A   I know that he spoke to the reporter after   13:03
21  surfing there that day. They had some kind of   13:03
22  communication. Whether or not he spoke to the   13:03
23  reporter before, I don't remember. I mean, that I don't   13:03
24  know. But I remember him -- I think I remember him   13:04
25  talking to the reporter afterwards.   13:04

Page 150

1     Q   Did it seem like he and the reporter knew   13:04
2  each other, or the photographer, knew each other   13:04
3  before?   13:04
4     A   We definitely didn't know the   13:04
5  photographer, I didn't know him, I don't -- it   13:04
6  didn't seem like Jordan did. Whether he knew the   13:04
7  reporter or not, I don't remember.   13:04
8     Q   In the complaint it says that the article   13:04
9  contains several photographs including one that   13:04
10  showed her in the locals hangout fort.   13:04
11     Do you recall the article having any other   13:04
12  pictures of you other than you standing in the local   13:04
13  hangout fort?   13:04
14     A   I think there was more than one photo of   13:04
15  me, but I don't know if that was the online version   13:04
16  or the print version.   13:04
17     Q   Okay. Good point.   13:04
18     With regard to all the pictures you've   13:04
19  seen with regard to those articles, were they all   13:04
20  pictures that you just coincidentally happened to be   13:04
21  standing near, that's why you were in the photos?   13:04
22     A   Yeah --   13:04
23     MR. FRANKLIN: Lacks foundation.   13:04
24     THE WITNESS: I mean, none of the photos   13:05
25  were staged; I know that. I went there to take   13:05

Page 151

1  photos with Jordan and I was taking photos of Jordan   13:05
2  and, you know, I happened to be in photos that he   13:05
3  was taking. It was hard for me to know, you know,   13:05
4  what he was aiming at and what he wasn't, I really   13:05
5  wasn't paying attention to that, I wasn't posing for   13:05
6  photos.   13:05
7  BY MS. HEWITT:   13:05
8     Q   Did the paper, L.A. Times, ever ask you   13:05
9  for permission to publish your photos that had you   13:05
10  in it?   13:05
11     A   I don't know if they did or they didn't.   13:05
12     Q   You don't know or you don't remember?   13:05
13     A   I don't remember, no.   13:05
14     Q   Is it fair to say you would defer to   13:05
15  Jordan in connection with regard to any   13:05
16  communication with the L.A. Times that day with   13:05
17  regard to the accident report -- sorry -- the police   13:05
18  report for harassment against the Lunada Bay Boys?   13:05
19     MR. FRANKLIN: Vague and ambiguous.   13:06
20     THE WITNESS: I don't understand the   13:06
21  question.   13:06
22  BY MS. HEWITT:   13:06
23     Q   All right. You know that Jordan spoke to   13:06
24  the L.A. Times reporter or photographer, but you're   13:06
25  not certain whether you talked to the reporter about   13:06

Page 152

1  the police report for harassment against   13:06
2  Lunada Bay Boys; right?   13:06
3     A   Right.   13:06
4     Q   Do you have any knowledge as to whether it   13:06
5  was Jordan that talked to them about that?   13:06
6     A   I don't remember specifically what they   13:06
7  talked about, I would assume that he told them about   13:06
8  that, I don't know.   13:06
9     Q   Do you know anybody else who would have   13:06
10  told the L.A. Times about your police report for   13:06
11  harassment against Lunada Bay Boys?   13:06
12     A   I don't know. Maybe the police told him,   13:06
13  I don't know.   13:06
14     Q   Okay. Did you tell the L.A. Times that   13:06
15  the Lunada Bay Boys "bombard outsiders with dirt   13:06
16  clods, slash their car tires, and assault them in   13:06
17  the water, sometimes coordinating the attacks with   13:06
18  walkie-talkies"?   13:06
19     A   I think that's something either Jordan   13:06
20  said or someone else said.   13:06
21     Q   Okay. Did you tell the photographer or   13:07
22  anybody from the L.A. Times that surfers had been   13:07
23  victimized over the years by the Lunada Bay Boys?   13:07
24     A   I don't think that was my quote.   13:07
25     Q   Do you have any e-mails on your computer   13:07

Page 153

39 (Pages 150 - 153)

Page 154

1  at home from anybody at the L.A. Times?         13:07
2    A   I have an e-mail with the photos from the  13:07
3  photographer.                     13:07
4    Q   And does that e-mail have any text in it?  13:07
5    A   I would assume it has some text in it.     13:07
6    Q   Have you given it to your attorneys?       13:07
7    A   I don't know. I think so.                  13:07
8    Q   Do you have any e-mails at home from any   13:07
9  other media organizations either online or print or  13:07
10  anything like that?                  13:07
11    A   I've been in several articles and don't   13:07
12  several interviews, so a bunch of media have reached  13:08
13  out to me, so I have e-mails. And then I also have,  13:08
14  you know, my attorneys also arranged some of it.   13:08
15    Q   Have you ever been -- withdraw.           13:08
16        Okay. With regard to the February 5th    13:08
17  visit, did you contact the City of Palos Verdes  13:08
18  Estates or the police department to tell them that  13:08
19  you were going to visit that day?          13:08
20    A   I think that Jordan may have done that.   13:08
21    Q   And do you know if Jordan asked for extra  13:08
22  patrols that day?                   13:08
23    A   I don't know if he asked for it that day.  13:08
24    Q   Do you recall seeing Palos Verdes Estates  13:08
25  police there that day?               13:08

Page 155

1    A   I don't remember if I saw them there that  13:08
2  day or not.                       13:09
3    Q   And at that point in time, you'd broken   13:09
4  your arm so you could not surf; is that correct?   13:09
5    A   That's correct. I had just broken it, I'm  13:09
6  sure it was still pretty painful so it wasn't   13:09
7  possible that time.                  13:09
8    Q   Did Jordan surf without incident as far as  13:09
9  you know?                        13:09
10    A   Jordan did surf without incident because  13:09
11  he was the only person out there surfing.      13:09
12    Q   And is it correct that neither you or     13:09
13  Jordan were intimidated that day?          13:09
14        MR. FRANKLIN: Vague and ambiguous.       13:09
15        THE WITNESS: I don't know. I don't       13:09
16  remember if we encountered anyone on top of the   13:09
17  bluff or not. I just remember that there was no one  13:09
18  in the water.                     13:09
19  BY MS. HEWITT:                      13:09
20    Q   Do you have a recollection of encountering  13:09
21  anybody on the bluff that intimidated you?     13:09
22    A   At this time, I just -- I don't remember  13:09
23  what we did on top of the bluff, and if there was  13:09
24  anyone there or not.                 13:09
25    Q   Okay.                       13:09

Page 156

1    A   So I can't say one way or the other.     13:10
2    Q   I'm not asking you to say one way or the  13:10
3  other. I'm asking you to state if right now you   13:10
4  have a memory of being intimidated by someone on top  13:10
5  of the bluff.                     13:10
6        MR. FRANKLIN: Vague and ambiguous.       13:10
7        THE WITNESS: I would have to think about  13:10
8  it more, I just don't know.             13:10
9  BY MS. HEWITT:                      13:10
10    Q   Do you remember that right now?          13:10
11        MR. FRANKLIN: Vague and ambiguous.       13:10
12        THE WITNESS: Right now, I don't remember  13:10
13  what happened on top of the bluff much, so it would  13:10
14  be hard for me to make that -- sorry.        13:10
15  BY MS. HEWITT:                      13:10
16    Q   Do you recall any vandalism that day?     13:10
17    A   I don't recall vandalism on February 5th.  13:10
18    Q   Did the police escort you down the bluff  13:10
19  that day?                        13:10
20    A   I don't know.                   13:10
21    Q   You don't remember?                 13:10
22    A   I don't remember.                 13:10
23    Q   Okay. Going to February 13th, as         13:10
24  described in your complaint, why did you decide to  13:11
25  go to Lunada Bay on February 13th?          13:11

Page 157

1    A   You know, I don't remember the specific   13:11
2  reasons, but I think that Jordan wanted to go surf  13:11
3  that day and I couldn't surf; so like I said, if I'm  13:11
4  not surfing I like to take photos so it was my   13:11
5  reason for going.                   13:11
6    Q   Has Jordan as far as you know ever wanted  13:11
7  to go surf at Lunada Bay and has decided not to   13:11
8  because of any localism there?           13:11
9        MR. FRANKLIN: Vague and ambiguous, calls  13:11
10  for speculation.                   13:11
11        THE WITNESS: Well, I was with him on     13:11
12  January 29, 2016, when we decided not to surf.    13:11
13  BY MS. HEWITT:                      13:11
14    Q   Prior to going on a particular day did you  13:11
15  decide to stay home because of any localism issues?  13:11
16        MR. FRANKLIN: Vague and ambiguous.       13:11
17        THE WITNESS: Well, I mean if there wasn't  13:11
18  localism there I would have been surfing there all  13:11
19  winter as often as I surf in Malibu and Ventura and  13:12
20  other places, so yeah, I would be there as often as  13:12
21  it was good.                      13:12
22  BY MS. HEWITT:                      13:12
23    Q   Jordan specifically -- sorry, that was my  13:12
24  fault for a vague question.             13:12
25        Do you have any recollection of instances  13:12

40 (Pages 154 - 157)

| | |
|---|---|
| 1 | where Jordan said, I want to go to Lunada Bay today   13:12 |
| 2 | but I'm worried about the localism there and I'm   13:12 |
| 3 | worried about being harassed or intimidated?   13:12 |
| 4 | A   I don't know.  Yeah, I don't know if we   13:12 |
| 5 | had that discussion.  But I do remember him always   13:12 |
| 6 | wanting to have more than one person there, you   13:12 |
| 7 | know, if possible.   13:12 |
| 8 | Q   So he was -- he would go but he just   13:12 |
| 9 | wanted to make sure there was at least one other   13:12 |
| 10 | person or a group?   13:12 |
| 11 | MR. FRANKLIN:  Objection, misstates prior   13:12 |
| 12 | testimony.   13:12 |
| 13 | THE WITNESS:  I mean, he went there   13:12 |
| 14 | sometimes by himself, but I think he preferred to   13:12 |
| 15 | have other people go with him for safety reasons.   13:12 |
| 16 | BY MS. HEWITT:   13:12 |
| 17 | Q   Has Jordan ever come back -- withdraw.   13:12 |
| 18 | Has Jordan ever told you that one of the   13:12 |
| 19 | times he we went by himself that he was intimidated   13:13 |
| 20 | or harassed, vandalized?   13:13 |
| 21 | MR. FRANKLIN:  Vague and ambiguous.   13:13 |
| 22 | THE WITNESS:  Jordan and I have had   13:13 |
| 23 | discussions about Lunada Bay, you know, since then,   13:13 |
| 24 | so it would be hard for me to say when we spoke   13:13 |
| 25 | about these things, but I mean, we've talked about   13:13 |

Page 158

| | |
|---|---|
| 1 | not because I think we were the only people there   13:14 |
| 2 | from what I recall, I don't know.   13:14 |
| 3 | Q   Did you intend to surf that day?   13:14 |
| 4 | A   On February 13th?   13:15 |
| 5 | Q   Hmm-mm.   13:15 |
| 6 | A   I would have loved to if I didn't have a   13:15 |
| 7 | broken arm.   13:15 |
| 8 | Q   So you did not intend to surf that day;   13:15 |
| 9 | right?   13:15 |
| 10 | A   No.   13:15 |
| 11 | Q   Did you call -- withdraw.   13:15 |
| 12 | Did you communicate in any way with any   13:15 |
| 13 | news reporters about the visit on February 13th?   13:15 |
| 14 | MR. FRANKLIN:  Vague and ambiguous.   13:15 |
| 15 | THE WITNESS:  Did I communicate with any   13:15 |
| 16 | reporters?  When?   13:15 |
| 17 | BY MS. HEWITT:   13:15 |
| 18 | Q   Yes, any new organizations with regard to   13:15 |
| 19 | your visit on February 13th, any time?   13:15 |
| 20 | MR. FRANKLIN:  Vague and ambiguous.   13:15 |
| 21 | THE WITNESS:  Can you be more specific   13:15 |
| 22 | please?   13:15 |
| 23 | BY MS. HEWITT:   13:15 |
| 24 | Q   Sure.  Let's break it down from the point   13:15 |
| 25 | in time before the visit, so right up until the time   13:15 |

Page 160

| | |
|---|---|
| 1 | instances that he's had there.   13:13 |
| 2 | BY MS. HEWITT:   13:13 |
| 3 | Q   Tell me what he's told you specifically   13:13 |
| 4 | with regard to those instances.   13:13 |
| 5 | A   What he told me from that point to now,   13:13 |
| 6 | until today?   13:13 |
| 7 | Q   Anything about the times where he's gone   13:13 |
| 8 | to Lunada Bay himself, any harassment or   13:13 |
| 9 | intimidation or vandalism he experienced?   13:13 |
| 10 | A   Just by himself only?   13:13 |
| 11 | Q   Just by himself.   13:13 |
| 12 | A   Yeah, I don't know, I don't remember --   13:13 |
| 13 | because I remember he told me about a time that he   13:13 |
| 14 | went when he was 16 with a friend and a friend's   13:13 |
| 15 | mom, he told me about a time that he went with his   13:14 |
| 16 | father and friend.  I think that -- I know that   13:14 |
| 17 | there were times that he surfed there by himself, I   13:14 |
| 18 | think, but I don't know if he actually went there   13:14 |
| 19 | completely by himself or not.   13:14 |
| 20 | Q   How old is Jordan?   13:14 |
| 21 | A   Jordan is 31.   13:14 |
| 22 | Q   Okay.  On the February 13th day, do you   13:14 |
| 23 | recall whether it was a meet-up of the Aloha Point   13:14 |
| 24 | Facebook page organized by Chris Taloa?   13:14 |
| 25 | A   I don't remember but I would assume it was   13:14 |

Page 159

| | |
|---|---|
| 1 | of the visit before, did you call or talk to any   13:15 |
| 2 | news medias or organizations that you were going to   13:15 |
| 3 | be visiting on February 13th?   13:15 |
| 4 | A   Not that I recall.   13:15 |
| 5 | Q   Do you know if Jordan did?   13:15 |
| 6 | A   I don't know.   13:15 |
| 7 | Q   Do you know if during your February 13th   13:15 |
| 8 | visit there were any media of any type there that   13:15 |
| 9 | day?   13:16 |
| 10 | A   Can you clarify the question?  Are you   13:16 |
| 11 | asking me if I knew that there would be media there   13:16 |
| 12 | prior to February 13th?   13:16 |
| 13 | Q   Did you know -- do you know if there were   13:16 |
| 14 | any media there on February 13th when you were there   13:16 |
| 15 | at Lunada Bay?   13:16 |
| 16 | A   Well, the photographer was there and I was   13:16 |
| 17 | talking to him.   13:16 |
| 18 | Q   On February 13th; right?   13:16 |
| 19 | MR. FRANKLIN:  Vague and ambiguous.   13:16 |
| 20 | THE WITNESS:  Oh, no, no, no, no, I'm   13:16 |
| 21 | sorry.  I got my dates mixed up.  That was --   13:16 |
| 22 | February 5th was the photographer.   13:16 |
| 23 | You're asking me about February 13th?  Did   13:16 |
| 24 | I know there would be media there?  No.  Was there   13:16 |
| 25 | media there?   13:16 |

Page 161

41 (Pages 158 - 161)

BY MS. HEWITT:                              13:16

Q    That was my question.  Do you recall any   13:16
media being there on February 13th?          13:16

A    I'm sorry, let me think a little bit about  13:16
the dates.  I don't think there was.         13:16

MR. FRANKLIN:  Diana, you seem -- do you   13:17
need to drink something?                     13:17

THE WITNESS:  Yeah, it would be nice to   13:17
have a little snack if I could have one.     13:17

MS. HEWITT:  Let's take a break.        13:17

THE WITNESS:  Okay.  Thank you.        13:17

THE VIDEOGRAPHER:  This concludes video   13:17
file four, we are off the record at 1:17 and we're   13:17
clear, thank you.                            13:17

(Break taken.)                          13:17

THE VIDEOGRAPHER:  This commences video   13:33
file five, we're on the record at 1:33.      13:33

BY MS. HEWITT:                              13:33

Q    Ms. Reed, going back to the January 29th   13:33
incident at Lunada Bay, have you seen a video taken   13:33
by Mr. Wright of that incident?              13:33

A    Yes, I have.                        13:33

Q    Did you and Mr. Wright talk about       13:33
recording that day?                          13:33

A    I don't remember what we discussed       13:33

Page 162

specifically.  I know that he was recording.   13:33

Q    Were you planning on recording that day in   13:33
order to capture any potential encounters with   13:33
anybody who might be harassing you or intimidating   13:33
you that day?                                13:33

A    I don't know.  I just remember him telling   13:33
me that he always records down there because he's   13:33
had previous encounters that were negative.   13:33

Q    During the time that you were being       13:33
intimidated and harassed on January 29th, what was   13:33
Mr. Wright doing?                            13:34

A    It's hard for me to remember what he was   13:34
doing because I was so focused on the harassment   13:34
that was happening, but I think that we were -- I   13:34
think we were just both standing there, I think.   13:34

Q    You were scared; right?                13:34

A    Yeah.                               13:34

Q    And Mr. Wright was there and he was       13:34
filming you being scared; right?             13:34

A    He wasn't filming me specifically.  There   13:34
was a GoPro mounted on him that was filming so he   13:34
wasn't, you know, it was just filming, it's not like   13:34
he was pointing and filming.                 13:34

Q    Did -- you've seen the film; right?      13:34

A    Yes.                               13:34

Page 163

Q    Does it capture you being shouted at by   13:34
somebody?                                    13:34

A    Yeah, it does capture some of that.     13:34

Q    It captures you at a time when you       13:34
testified you were scared; right?            13:34

MR. FRANKLIN:  Vague and ambiguous.     13:34

THE WITNESS:  I don't -- it doesn't     13:34
capture the entire incident.                 13:35

There's times when the video isn't       13:35
recording me or it's pointing down, but it does   13:35
capture some of that incident, yes.          13:35

BY MS. HEWITT:                              13:35

Q    All right.  Afterwards, after the       13:35
incident, did you and -- when was the first time you   13:35
and Mr. Wright reviewed the film footage that he   13:35
took?                                        13:35

A    I don't remember.  I think that the police   13:35
requested it, from what I recall, and I think that   13:35
they took the disc, and so I don't think it was   13:35
until a few weeks after the incident that we   13:35
reviewed it.                                 13:35

Q    All right.                          13:35

And did you and Jordan talk about taking   13:35
additional video in the future?             13:35

A    Not that I recall.  I don't think we     13:35

Page 164

specifically spoke about it.  I just know that   13:35
whenever he goes surf there he takes his GoPro.   13:36

Q    In the video, do you recall whether it   13:36
captures you or Jordan telling the guy to go away,   13:36
buzz off, anything like that, that I'm going to call the   13:36
cops, anything like that?                    13:36

A    Yeah, I don't know.  I don't think we said   13:36
anything to him because we thought -- we thought he   13:36
would leave us alone and go away.            13:36

Q    Okay.  Okay.  Let's go forward to        13:36
February 13th again.                         13:36

When you got to Lunada Bay that day, what   13:36
time was it?                                 13:36

A    It's hard for me to remember the specific   13:36
time.  I know it was daytime.  It was the morning   13:36
and it was daytime.                          13:36

Q    Okay.  And had you made any arrangements   13:36
as far as you know with anybody to watch your cars   13:36
that day?                                    13:36

A    I hadn't made any arrangements.  I don't   13:37
know if Jordan had.                          13:37

Q    Do you remember Jordan saying anything   13:37
about anybody watching the cars that day?     13:37

A    I don't remember anything right now about   13:37
that.                                        13:37

Page 165

42 (Pages 162 - 165)

Page 166

```
 1    Q   All right.  Do you know in Chris Taloa was  13:37
 2  there that day?                          13:37
 3    A   I don't remember.  He may have been.    13:37
 4    Q   How about Kenny?           13:37
 5    A   He may have been as well, I don't      13:37
 6  remember.                               13:37
 7    Q   And did you drive with Jordan to      13:37
 8  Lunada Bay that day?                    13:37
 9    A   I think so.                     13:37
10    Q   All right.  And had you and Jordan     13:37
11  discussed what to do in case you were intimidated or  13:37
12  harassed by anybody at Lunada Bay that day?   13:37
13    A   I don't remember.            13:37
14    Q   Did Jordan surf that day at all?       13:37
15    A   On February 13th?            13:37
16    Q   Yes.                       13:37
17    A   Yeah, Jordan did surf that day.      13:37
18    Q   Okay.  After you parked that day, what did  13:37
19  you -- after you parked that day, did you experience  13:38
20  any harassment while you were still in your car?   13:38
21      MR. FRANKLIN:  Vague and ambiguous.    13:38
22      THE WITNESS:  That day was very traumatic  13:38
23  for me so I blocked a lot of it out.  It's hard for  13:38
24  me to remember a lot of the little details.  So I   13:38
25  don't remember if people yelled at us as we were   13:38
```

Page 167

```
 1  parking the car.                        13:38
 2  BY MS. HEWITT:                          13:38
 3    Q   Okay.  Fair enough.  Do you remember   13:38
 4  anybody yelling any profanities at you that day?  13:38
 5      MR. FRANKLIN:  Vague and ambiguous.    13:38
 6      THE WITNESS:  During what part of the day?  13:38
 7  BY MS. HEWITT:                          13:38
 8    Q   Any part of the day that you were there.   13:38
 9    A   Yes.                       13:38
10    Q   Okay.  Tell me what you recall being    13:38
11  yelled at you as far as profanities?     13:38
12      MR. FRANKLIN:  Vague and ambiguous.    13:38
13      THE WITNESS:  You know, I don't remember  13:38
14  the specific insults, the specific words of the   13:38
15  insults that were yelled.  I mean, I just -- I   13:38
16  remember various profanities of various instances.  13:39
17  I remember when we were preparing to walk down the  13:39
18  trail, there was a man, middle-aged blond haired  13:39
19  man, and a teenage boy that were filming us and they  13:39
20  were attempting to block the pathway, and they were  13:39
21  telling us that we were done, whatever that means.  13:39
22      I do remember some people yelling at us   13:39
23  when we were on the bluff, and I don't remember much  13:39
24  of the detail at this time.             13:39
25      I remember once we were at the bottom of   13:39
```

Page 168

```
 1  the hill on the beach, I remember, you know, people  13:39
 2  yelling at us, yeah, everyone seemed pretty hostile.  13:40
 3  BY MS. HEWITT:                          13:40
 4    Q   When you say down to the beach, you mean  13:40
 5  after you came down the bluff; right?     13:40
 6    A   Yes, after we came down the trail.    13:40
 7    Q   Down the trail, okay.          13:40
 8      Did you see any police there at all    13:40
 9  anytime during the day?                 13:40
10      MR. FRANKLIN:  Vague and ambiguous.    13:40
11      THE WITNESS:  Yeah, I don't remember what  13:40
12  the situation was with the police when we arrived.  13:40
13  BY MS. HEWITT:                          13:40
14    Q   Okay.  Were you aware that Cory Spencer   13:40
15  had asked for additional patrols to be provided by  13:40
16  the PVE P.D. for that day?              13:40
17      MR. FRANKLIN:  Vague and ambiguous, lacks  13:40
18  foundation.                             13:40
19      THE WITNESS:  I don't know, I don't     13:40
20  remember at the time if I was aware of that or not.  13:40
21  BY MS. HEWITT:                          13:40
22    Q   Were you aware that he had asked for extra  13:40
23  patrols be provided before the January 29th visit?  13:41
24      MR. FRANKLIN:  Vague and ambiguous, lacks  13:41
25  foundation.                             13:41
```

Page 169

```
 1      THE WITNESS:  I don't know if I knew that  13:41
 2  at the time, I think that's when I first met him.  13:41
 3  BY MS. HEWITT:                          13:41
 4    Q   Okay.  Do you know that Cory Spencer was  13:41
 5  communicating with Police Chief Kepley around the   13:41
 6  time of the visits?                     13:41
 7    A   I know that I found out that he had asked  13:41
 8  for the police at a later date.  Whether or not I   13:41
 9  knew that on February 13th or January 29th, I don't  13:41
10  remember if I knew that.  I don't think I knew that  13:41
11  on January 29th because I didn't know him.   13:41
12    Q   Okay.  Fair enough.            13:41
13      The complaint indicates at some point you   13:41
14  were -- let's see -- you had spent about two hours   13:41
15  at Lunada Bay and then certain individual defendants  13:41
16  approached you with a case of beer.     13:41
17      Do you recall that?            13:42
18    A   I do, but again, that event was very     13:42
19  traumatic to me so I do remember what happened but I  13:42
20  have blocked out certain small details of it and,    13:42
21  you know, with my pregnancy, my memory right now,    13:42
22  certain things are hard to remember but I'm doing my  13:42
23  best to remember.                       13:42
24    Q   Tell me what you remember -- and I    13:42
25  appreciate that.                        13:42
```

Hahn & Bowersock, A Veritext Company
800.660.3187

```
 1          MR. FRANKLIN:  Vague and ambiguous.      13:42
 2          THE WITNESS:  Specifically, what would you  13:42
 3   like to know?                              13:42
 4   BY MS. HEWITT:                             13:42
 5      Q    Specifically, my question is about:  Do  13:42
 6   you remember being approached by individual     13:42
 7   defendants with a case of beer?            13:42
 8      A    Yes.                               13:42
 9      Q    What do you remember about being    13:42
10   approached by individual defendants with a case of  13:42
11   beer?                                      13:42
12      A    I remember that they approached me very  13:42
13   rapidly and I was caught by surprise.  I remember  13:42
14   that they rushed towards me in a hostile manner.  I  13:42
15   remember, you know, declining that I wanted to drink  13:43
16   beer.  I remember being videotaped by         13:43
17   Brant Blakeman.  I remember there were times when I  13:43
18   was being videotaped very close to my face and it  13:43
19   felt very intimidating and definitely felt like I  13:43
20   was being harassed.  And I think that I asked them,  13:43
21   you know, why they're videotaping me because it made  13:43
22   me very uncomfortable.                     13:43
23          I remember Mr. Johnston opening the can of  13:43
24   beer in a way that sprayed my arm and my camera.  I  13:43
25   remember him chucking beer and throwing beer cans on  13:44
                                              Page 170
```

```
 1   the floor.  I remember him being very loud and very  13:44
 2   scary, very intimidating, and acting in a sexual  13:44
 3   manner.                                    13:44
 4      Q    Where did this take place?         13:44
 5      A    These events took place in the fort.  13:44
 6      Q    Okay.  When -- why did you go to the fort  13:44
 7   initially?                                 13:44
 8      A    I initially went to the fort to take  13:44
 9   photographs of Jordan, as he was surfing.  13:44
10      Q    Okay.  When you went to the fort, were  13:44
11   there already people in the fort?          13:44
12      A    I don't remember if there was already  13:44
13   someone in the fort or not when I first went into  13:44
14   the fort.                                  13:44
15      Q    Do you have any recollection of there  13:44
16   being anybody in the -- in the fort area when you  13:45
17   went to the fort?                          13:45
18          MR. FRANKLIN:  Vague, ambiguous.     13:45
19          THE WITNESS:  I don't remember if there  13:45
20   was someone as I was walking into the fort.  I do  13:45
21   remember having conversations with a certain man in  13:45
22   the fort prior to these two individuals, but whether  13:45
23   he was there as I was walking up the steps I don't  13:45
24   remember that detail.                      13:45
25   ///
                                              Page 171
```

```
 1   BY MS. HEWITT:                             13:45
 2      Q    Okay.  And the man who you said you had a  13:45
 3   conversation with, can you describe that man?  13:45
 4      A    It's hard for me to remember the details  13:45
 5   specifically, but I remember that he was a man,  13:45
 6   middle-aged man, from what I recall, dark hair, he  13:45
 7   did not appear to be intoxicated.  Just, you know,  13:45
 8   ordinary-looking middle-aged man, nothing unusual  13:46
 9   about him.                                 13:46
10      Q    Okay.  And what was the conversation you  13:46
11   had with him?                             13:46
12      A    He started asking me a lot of questions  13:46
13   and it was a little bit uncomfortable because I felt  13:46
14   as though I was being interrogated and I didn't  13:46
15   quite understand why because I was just there to  13:46
16   enjoy the beach and take photos.           13:46
17      Q    About how long did that conversation last?  13:46
18      A    It's hard for me to say how long it  13:46
19   lasted.  I would say it lasted maybe ten minutes,  13:46
20   probably not more than 30.  I don't remember  13:46
21   specifically how long it took.             13:46
22      Q    What was Jordan doing at this time?  13:46
23      A    I think Jordan was already surfing.  I'm  13:47
24   not sure if he was already surfing, but I know that  13:47
25   he was paddling out and he might have been sitting  13:47
                                              Page 172
```

```
 1   and waiting for waves, I don't remember.   13:47
 2      Q    Were you alone?                    13:47
 3      A    From what I remember, I think so.  I think  13:47
 4   that -- I think that I would be the only person  13:47
 5   there with him, I'm not -- I'm not sure.   13:47
 6      Q    Was anybody else surfing at the time?  13:47
 7      A    I don't know, I don't remember that.  I  13:47
 8   know that, you know, there were people changing as I  13:47
 9   was walking there, but who was in the water I don't  13:47
10   remember at this time.                     13:47
11      Q    With regard to the man -- sorry, the  13:47
12   individual defendants who approached you with a case  13:47
13   of beer, do you know who those individual defendants  13:47
14   were?                                      13:47
15      A    I know who they are now.           13:47
16      Q    Okay.  Who are they?              13:47
17      A    Brant Blakeman and Jalian Johnston.  13:47
18      Q    Did they discuss the L.A. Times article at  13:48
19   all with you?                             13:48
20      A    They made statements related to the  13:48
21   L.A. Times article, yes.                   13:48
22          MR. CAREY:  Objection, vague as to "they."  13:48
23   BY MS. HEWITT:                             13:48
24      Q    Do you remember who it was that made  13:48
25   statements to you about the L.A. Times article?  13:48
                                              Page 173
```

44 (Pages 170 - 173)

1    A    I mean, I know Jalian made statements. I   13:48
2    don't remember if Brant Blakeman made the statements   13:48
3    or if he was just recording at that time.            13:48
4    Q    Okay. And when you were approached by the   13:48
5    individual defendants with a case of beer, where was   13:48
6    Jordan?                                              13:48
7    A    Jordan had went to go surf, but I don't    13:48
8    remember, you know, specifically where he was,       13:48
9    whether, you know, what position he was in in the    13:48
10   water or anything, I don't remember.                 13:49
11   Q    But he wasn't with you while you were        13:49
12   encountering the individual defendants; is that      13:49
13   correct?                                             13:49
14   A    Yes.                                            13:49
15   Q    All right. While you were in the fort,       13:49
16   did you make any attempts to leave the fort?         13:49
17        MR. FRANKLIN: Vague and ambiguous.             13:49
18        THE WITNESS: At what point in time?           13:49
19   BY MS. HEWITT:                                       13:49
20   Q    When you were being -- when you were         13:49
21   talking with -- I think you said Blakeman and        13:49
22   Johnston with regard to the beer and that particular 13:49
23   time, during that sequence of events, did you        13:49
24   attempt to leave the fort?                           13:49
25        MR. FRANKLIN: Vague and ambiguous.             13:49

Page 174

1    A    I don't know. Again, I've blocked a lot   13:50
2    of this out because I've lost a lot of sleep over it  13:50
3    and it was very traumatic to me, but I do remember   13:51
4    him spraying beer on my arm and on the camera.       13:51
5    Q    Was your camera damaged?                   13:51
6    A    Thankfully, the camera was not damaged.    13:51
7    You know, I remember there were drops of beer all    13:51
8    over it, but I do remember that it still continued   13:51
9    to work, so...                                       13:51
10   Q    Were you filming this event at all, or     13:51
11   recording it?                                        13:51
12   A    No, I was not.                             13:51
13   Q    Was anybody else as far as you're aware   13:51
14   filming or recording this event?                     13:51
15   A    Mr. Blakeman was filming the event.       13:51
16   Q    How did you find that out?                 13:51
17   A    He had a camera that was pointed at me    13:51
18   during the -- during the event, but I don't know,   13:52
19   you know, how much of it he was filming or wasn't    13:52
20   filming. I don't know if he was recording or not.   13:52
21   But I do remember that there were instances where he 13:52
22   had a camera close to my face.                       13:52
23   Q    And was it only Mr. Blakeman that had the  13:52
24   camera?                                              13:52
25   A    He's the only person that I remember to be 13:52

Page 176

1        THE WITNESS: I'm having trouble           13:49
2    understanding to when you're asking me specifically. 13:49
3    BY MS. HEWITT:                                       13:49
4    Q    How long were you in the fort after you   13:49
5    were approached with the case of beer?               13:49
6    A    I don't remember. It's hard for me to     13:49
7    pinpoint exact amount of time.                       13:49
8    Q    Do you recall trying to leave the fort and 13:50
9    being unable to do so because you were blocked?      13:50
10       MR. FRANKLIN: Vague and ambiguous.             13:50
11       THE WITNESS: I recall them standing in     13:50
12   front of me, and the way to leave would be to go,   13:50
13   you know, to get close to them. And I do recall     13:50
14   attempting to call the police but not having cell   13:50
15   phone service.                                       13:50
16   BY MS. HEWITT:                                       13:50
17   Q    Okay. In your complaint you say that      13:50
18   Johnston poured beer on your arm. Is that separate  13:50
19   from what you told me earlier where that he sprayed  13:50
20   your arm and your camera with beer?                  13:50
21   A    No, that's the same.                       13:50
22   Q    Same thing?                                13:50
23   A    Hmm-mm.                                     13:50
24   Q    So he didn't separately pour beer on your 13:50
25   arm as opposed to spraying your arm and your camera? 13:50

Page 175

1    filming me with his camera.                         13:52
2    Q    Okay. Okay. At any point, did you walk   13:52
3    away when they were making the, I think you said,    13:52
4    sexual references to you; were you able to walk away 13:52
5    at that point and exit the fort?                     13:52
6        MR. FRANKLIN: Vague and ambiguous.             13:52
7        THE WITNESS: I was not able to exit the   13:52
8    fort, I was frozen in fear.                          13:52
9    BY MS. HEWITT:                                       13:52
10   Q    All right. At some point, were you able   13:52
11   to leave the fort?                                   13:53
12   A    I was able to leave the fort at some       13:53
13   point, yes.                                          13:53
14   Q    Can you tell me what the sexual comments  13:53
15   were that were made to you that you referenced       13:53
16   earlier?                                             13:53
17   A    I don't remember all of them.             13:53
18   Q    I understand.                              13:53
19   A    I do remember asking, you know, why I was 13:53
20   being filmed and, you know, being told that they're  13:53
21   filming me because I'm sexy. I remember             13:53
22   Mr. Johnston saying that he's big enough to get the  13:53
23   job done while, you know, also, you know, he was     13:53
24   also grunting and making -- making moans and noises  13:53
25   resembling, you know, an orgasm. He was, you know,  13:54

Page 177

45 (Pages 174 - 177)

| | |
|---|---|
| 1 thrusting and rubbing his torso in a sexual manner, 13:54 | 1 Q So she's in the fort at this time, though; 13:56 |
| 2 just acting in a very -- very frightening way. 13:54 | 2 right? 13:56 |
| 3 Q Was there anybody else in the fort or fort 13:54 | 3 A Yes. 13:56 |
| 4 area during this time who wasn't part of the group 13:54 | 4 Q So while you're having beer sprayed on 13:56 |
| 5 of men? 13:54 | 5 your arm, she was taking pictures of somebody 13:56 |
| 6 A What do you mean by the group of men? 13:54 | 6 surfing; is that right? 13:56 |
| 7 Q Were there any women down there as well? 13:54 | 7 A I don't know what she was doing, I wasn't 13:56 |
| 8 A Yes, there was a woman down there. 13:54 | 8 paying attention to what she was doing. 13:56 |
| 9 Q Who was that? 13:54 | 9 Q Did she speak up for you and say, Hey, 13:56 |
| 10 A Woman named Jen. 13:54 | 10 knock it off, guys, anything like that? 13:56 |
| 11 Q Was she a friend of yours? 13:54 | 11 A I don't remember. 13:56 |
| 12 A No. 13:54 | 12 Q Do you remember if she was nearby when the 13:56 |
| 13 Q Did you just meet her that day? 13:54 | 13 sexual comments that you discussed earlier, rubbing 13:56 |
| 14 A Yes, sir. 13:54 | 14 of the belly and orgasmic comments were being made 13:56 |
| 15 Q How did you meet Jen that day? 13:54 | 15 to you whether she was nearby? 13:56 |
| 16 A Jen walked into the fort when we were 13:54 | 16 A I think so. 13:56 |
| 17 there. 13:54 | 17 Q Was she looking at you all when that was 13:56 |
| 18 Q Did she walk into the fort while the men 13:54 | 18 occurring? 13:56 |
| 19 were talking to you? 13:54 | 19 MR. FRANKLIN: Lacks foundation. 13:56 |
| 20 A Which men? 13:54 | 20 THE WITNESS: I don't know what she was 13:56 |
| 21 Q Any of the men. 13:54 | 21 looking at. Again, I was pretty scared and I wasn't 13:56 |
| 22 A Which men specifically? I don't know, I 13:54 | 22 paying attention to what she was doing at the time. 13:57 |
| 23 was approached by many men. 13:54 | 23 BY MS. HEWITT: 13:57 |
| 24 Q Okay. Did you -- did Jen walk into the 13:54 | 24 Q Did you call her and say, Jen, can you 13:57 |
| 25 fort prior to you being approached by the 13:55 | 25 help me out here for a second? 13:57 |
| Page 178 | Page 180 |

| | |
|---|---|
| 1 individuals with the case of beer? 13:55 | 1 A I was too scared to do anything. 13:57 |
| 2 A I think so, yes, I think she walked into 13:55 | 2 Q Okay. At some point did you get in touch 13:57 |
| 3 the fort prior to that. 13:55 | 3 with any police that were at the beach or the bluff 13:57 |
| 4 Q Did you have any conversations with her? 13:55 | 4 in order to get a police escort down to the beach? 13:57 |
| 5 A Did I have a conversation with her? 13:55 | 5 MR. FRANKLIN: Lacks foundation. 13:57 |
| 6 Q Yes. 13:55 | 6 THE WITNESS: At what point? I'm having 13:57 |
| 7 A I think I had a conversation with her and 13:55 | 7 trouble understanding the question. 13:57 |
| 8 I believe she told me she was there to take photos 13:55 | 8 BY MS. HEWITT: 13:57 |
| 9 of Dave. 13:55 | 9 Q At any time, on February 13th, did you 13:57 |
| 10 Q And Dave, your friend Dave? 13:55 | 10 talk to the police at all that day about assisting 13:57 |
| 11 A Yeah. And she also told me that she was 13:55 | 11 you with regard to any harassment at Lunada Bay? 13:57 |
| 12 harassed on her way down there. She explained some 13:55 | 12 MR. FRANKLIN: Vague and ambiguous. 13:57 |
| 13 of the things that had happened to her. 13:55 | 13 THE WITNESS: Can you be more specific 13:57 |
| 14 Q Okay. Do you know if she witnessed any of 13:55 | 14 please? 13:57 |
| 15 the beer being sprayed on your arm and camera? 13:55 | 15 BY MS. HEWITT: 13:57 |
| 16 A I don't know what she witnessed and what 13:55 | 16 Q Did you talk to the police at all that 13:57 |
| 17 she didn't witness. She was also taking photos at 13:55 | 17 day? 13:57 |
| 18 the time so... 13:55 | 18 MR. FRANKLIN: Vague and ambiguous. 13:57 |
| 19 Q Was she in the fort at the time when the 13:55 | 19 THE WITNESS: I spoke to the police on 13:57 |
| 20 beer was sprayed on your arm? 13:56 | 20 February 13th, yes. 13:57 |
| 21 A Yes. 13:56 | 21 BY MS. HEWITT: 13:57 |
| 22 Q When you say you think she was taking 13:56 | 22 Q So when did you speak to them? 13:57 |
| 23 photos, you think she was taking photos of what? 13:56 | 23 A I, you know, after I made it up the trail, 13:57 |
| 24 A She was taking photos of her friend Dave 13:56 | 24 I saw a police car parked on the bluff and I 13:58 |
| 25 who was surfing. 13:56 | 25 approached them immediately, I was in tears, and I 13:58 |
| Page 179 | Page 181 |

46 (Pages 178 - 181)

| | |
|---|---|
| 1  told them what had happened down there.        13:58 | 1        (DECLARATION UNDER PENALTY OF PERJURY ON |
| 2   Q    Okay.  And what did the police officer do? 13:58 | 2   THE FOLLOWING PAGE HEREOF.) |
| 3   A    He -- he listened to what I had to say     13:58 | 3 |
| 4  and, you know, I don't remember the exact sequence   13:58 | 4 |
| 5  of events.  I know he eventually took a report.  I    13:58 | 5 |
| 6  don't know if he took the report or if someone else   13:58 | 6 |
| 7  took a report but I know a report was taken, and I    13:58 | 7 |
| 8  know that at one point a police officer escorted me    13:58 | 8 |
| 9  back down the trail to try and see if those          13:58 | 9 |
| 10  individuals were still down there and try to        13:58 | 10 |
| 11  identify them.                                  13:58 | 11 |
| 12   Q    Do you remember how many police officers   13:58 | 12 |
| 13  there were?                                    13:58 | 13 |
| 14   A    I don't, no.                              13:58 | 14 |
| 15   Q    Do you remember at some point there being 13:59 | 15 |
| 16  three or four?                                  13:59 | 16 |
| 17   A    I don't remember the amount.             13:59 | 17 |
| 18   Q    All right.  Did you ask the police officer   13:59 | 18 |
| 19  to do anything specific?                         13:59 | 19 |
| 20   A    What I remember is I remember telling them 13:59 | 20 |
| 21  what happened and I remember filing the report and I  13:59 | 21 |
| 22  remember going down there to try and identify the    13:59 | 22 |
| 23  individual.                                     13:59 | 23 |
| 24   Q    And were you able to -- I'm sorry I         13:59 | 24 |
| 25  interrupted you?                                13:59 | 25 |
| Page 182 | Page 184 |

| | |
|---|---|
| 1   A    No, no problem.                          13:59 | 1                     *** |
| 2        He wasn't down there when we went down    13:59 | 2 |
| 3  there; all we found was a broken board that         13:59 | 3 |
| 4  resembled the board that I had seen him use.        13:59 | 4        I, DIANA MILENA REED, do solemnly declare |
| 5   Q    Did you go back down to the fort?           13:59 | 5   under penalty of perjury that the foregoing is my |
| 6   A    I went back down there with the police.      13:59 | 6   deposition under oath; that these are the questions |
| 7   Q    Were there people in the fort still?         13:59 | 7   asked of me and my answers thereto; that I have read |
| 8   A    There were some people in the fort,         13:59 | 8   same and have made the necessary corrections, |
| 9  Charlie was down there as well.                   13:59 | 9   additions, or changes to my answers that I deem |
| 10   Q    How do you know that was Charlie?          13:59 | 10   necessary. |
| 11   A    Because the police said, "Hi, Charlie" and 13:59 | 11        It witness thereof, I hereby subscribe my |
| 12  apparently the police said that he knew him.       14:00 | 12   name this day of _____, 2016. |
| 13   Q    Okay.                                    14:00 | 13 |
| 14        MS. HEWITT:  What time is it?  Where are  14:00 | 14 |
| 15  we at?  Are we at 3:30?                          14:00 | 15 |
| 16        MR. FRANKLIN:  I have 3:31, but --         14:00 | 16 |
| 17        THE VIDEOGRAPHER:  Yes, that's probably   14:00 | 17 |
| 18  it.                                            14:00 | 18 |
| 19        MS. HEWITT:  We're concluding.            14:00 | 19   _____ |
| 20        THE VIDEOGRAPHER:  Okay.  This concludes  14:00 | 20        WITNESS SIGNATURE |
| 21  Volume 1 deposition of Ms. Diana Milena Reed, we are 14:00 | 21 |
| 22  off the record at 2:00 o'clock.                   14:00 | 22 |
| 23        (Whereupon the deposition was concluded at | 23 |
| 24  2:00 p.m.) | 24 |
| 25 | 25 |
| Page 183 | Page 185 |

47 (Pages 182 - 185)

```
 1          Certification of Court Reporter
 2               Federal Jurat
 3
 4      I, the undersigned, a Certified Shorthand
 5   Reporter of the State of California do hereby
 6   certify:
 7      That the foregoing proceedings were taken
 8   before me at the time and place herein set forth;
 9   that any witnesses in the foregoing proceedings,
10   prior to testifying, were placed under oath; that a
11   verbatim record of the proceedings was made by me
12   using machine shorthand which was thereafter
13   transcribed under my direction; further, that the
14   foregoing is an accurate transcription thereof.
15      That before completion of the deposition, a
16   review of the transcript [x] was [ ] was not
17   requested.  I further certify that I am neither
18   financially interested in the action nor a relative
19   or employee of any attorney of any of the parties.
20      IN WITNESS WHEREOF, I have this date
21   subscribed my name.
22   Dated:  November 3, 2016
23
24
          Jimmy Rodriguez, RPR
25          Certificate Number 13464
                                      Page 186
```

Hahn & Bowersock, A Veritext Company
800.660.3187

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                     WESTERN DIVISION

 4

 5    CORY SPENCER, an individual; DIANA  )
      MILENA REED, an individual; and     )
 6    COASTAL PROTECTION RANGERS, INC., a )
      California non-profit public benefit)
 7    corporation,                        ) Case No.
                                          ) 2:16-cv-02129-SJO-RAO
 8                   Plaintiffs,          )
                                          )
 9              vs.                       )
                                          )
10    LUNADA BAY BOYS, et al.,            )
                                          )
11                   Defendants.          )
      _____)

12

13

14

15

16

17

18        VIDEOTAPED DEPOSITION OF DIANA MILENA REED

19                       VOLUME II

20                 Santa Monica, California

21                Tuesday, October 25, 2016

22

23

24    REPORTED BY:
      Jimmy S. Rodriguez
25    CSR No. 13464
```

Page 187

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3               WESTERN DIVISION
 4
 5  CORY SPENCER, an individual; DIANA  )
    MILENA REED, an individual; and    )
 6  COASTAL PROTECTION RANGERS, INC., a )
    California non-profit public benefit)
 7  corporation,              ) Case No.
                              ) 2:16-cv-02129-SJO-RAO
 8       Plaintiffs,       )
                              )
 9       vs.                 )
                              )
10  LUNADA BAY BOYS, et al.,        )
                              )
11       Defendants.        )
    _____)
12
13
14
15
16
17
18      Videotaped deposition of DIANA MILENA REED, Volume II,
19  taken before Jimmy Rodriguez, a Certified Shorthand
20  Reporter for the State of California, with principal
21  office in the County of Orange, commencing at 9:24 a.m.,
22  Tuesday, October 25, 2016 at Premier Business Centers -
23  The Water Garden, 2425 Olympic Boulevard, Suite 4000,
24  Santa Monica, California.
25
```

Page 188

```
 1  APPEARANCES OF COUNSEL:
 2  FOR PLAINTIFFS:
 3      HANSON BRIDGETT, LLP
        BY:  KURT A. FRANKLIN, Esq.
 4      425 Market Street
        26th Floor
 5      San Francisco, CA 94105
        TEL:  (415) 777-3200
 6      FAX:  (415) 541-9366
        Kfranklin@hansonbridgett.com
 7
 8  FOR DEFENDANTS, City of Palos Verdes Estates and Chief of
    Police Jeff Kepley:
 9
        KUTAK ROCK, LLP
10      BY:  ANTOINETTE P. HEWITT, Esq.
        5 Park Plaza
11      Suite 1500
        Irvine, CA 92614
12      TEL:  (949) 417-0999
        FAX:  (949) 417-5394
13      Antoinette.hewitt@kutakrock.com
14
    FOR DEFENDANT, Brant Blakeman:
15
        VEATCH CARLSON, LLP
16      BY:  RICHARD P. DIEFFENBACH, Esq.
        1055 Wilshire Boulevard
17      11th Floor
        Los Angeles, CA 90017
18      TEL:  (213) 381-2861
        FAX:  (213) 383-6370
19      Rdieffenbach@veatchfirm.com
20
21
22
23
24
25
```

Page 189

```
 1  APPEARANCES OF COUNSEL (Continued):
 2  FOR DEFENDANT, Alan Johnston aka Jalian Johnston:
 3      LAW OFFICES OF J. PATRICK CAREY
        BY:  J. PATRICK CAREY, Esq.
 4      1230 Rosecrans Avenue
        Suite 300
 5      Manhattan Beach, CA 90266
        TEL:  (310) 526-2237
 6      Pat@patcareylaw.com
 7
    FOR DEFENDANT, Angelo Ferrara and N.F.:
 8
        LAW OFFICES OF MARK C. FIELDS, APC
 9      BY:  MARK C. FIELDS, Esq.
        333 South Hope Street
10      35th Floor
        Los Angeles, CA 90071
11      TEL:  (213) 617-5225
        FAX:  (213) 629-4520
12      Fields@markfieldslaw.com
13
    FOR DEFENDANT, Sang Lee:
14
        LEWIS BRISBOIS BISGAARD & SMITH
15      BY:  TERA A. LUTZ, Esq.
        633 West 5th Street
16      Suite 4000
        Los Angeles, CA 90071
17      TEL:  (213) 250-1800
        FAX:  (213) 250-7900
18      Tera.lutz@lewisbrisbois.com
19
    FOR DEFENDANT, Sang Lee:
20
        BOOTH MITCHEL & STRANGE, LLP
21      BY:  JACKIE K. VU, Esq.
        707 Wilshire Boulevard
22      Suite 3000
        Los Angeles, CA 90017
23      TEL:  (213) 738-0100
        FAX:  (213) 380-3308
24      Jkvu@boothmitchel.com
25
```

Page 190

```
 1  APPEARANCES OF COUNSEL (Continued):
 2  FOR DEFENDANT, Michael Ray Papayans:
 3      HAVEN LAW
        BY:  PETER T. HAVEN, Esq.
 4      1230 Rosecrans Avenue
        Suite 300
 5      Manhattan Beach, CA 90266
        TEL:  (213) 842-4617
 6      FAX:  (213) 477-2137
        Peter@havenlaw.com
 7
 8  Also Present:
 9      JAMES KORALEK, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 191

2 (Pages 188 - 191)

I N D E X

| EXAMINATIONS | PAGE |
|---|---|
| BY MS. HEWITT | 194 |
| BY MR. DIEFFENBACH | 294 |
| BY MR. FIELDS | 343 |
| BY MR. CAREY | 351 |
| BY MS. LUTZ | 365 |
| BY MR. HAVEN | 369 |

E X H I B I T S

| Exhibit | Description | PAGE |
|---|---|---|
| Exhibit 51 | Proof of Service of Diana Reed | 243 |
| Exhibit 52 | Request For Entry of Default | 243 |
| Exhibit 53 | documents and flash drive | 373 |

WITNESS INSTRUCTED NOT TO ANSWER

(None)

INFORMATION REQUESTED

PAGE     LINE

331      7

Page 192

---

1  Tuesday, October 25, 2016, 9:24 a.m.
2  Santa Monica, California
3  09:20
4  THE VIDEOGRAPHER:  Good morning, we are on  09:24
5  the record at 9:24 a.m. on October 25th, 2016.  This  09:24
6  is the video recorded deposition of Diana Milena  09:24
7  Reed, Volume 2.  My name is James Koralek here with  09:24
8  our court reporter, Jimmy Rodriguez, we are here  09:24
9  from Veritext Legal Solutions by the request of the  09:24
10  defendant.  09:25
11  This deposition is being held at Premier  09:25
12  Business Center, 2425 Olympic Boulevard, Suite 4000,  09:25
13  in Santa Monica, 90404.  The caption of the case is  09:25
14  Spencer, et al., versus Lunada Bay Boys, et al.  09:25
15  Case number 2:16-CV-02129-SJO-RAO.  09:25
16  Please note that audio and video recording  09:25
17  will take place unless all parties agree to go off  09:25
18  the record.  09:25
19  Microphones are sensitive and may pick up  09:25
20  whispers and private conversations and cellular  09:25
21  interference.  I'm not authorized to administer an  09:25
22  oath, I'm not related to any party in this action,  09:25
23  nor am I financially interested in the outcome in  09:25
24  any way.  09:25
25  If there are any objections to proceeding,  09:25

Page 193

---

1  please state them at the time of your appearance  09:26
2  beginning with the noticing attorney.  09:26
3  09:26
4  EXAMINATION  09:26
5  BY MS. HEWITT:  09:26
6  Q   Ms. Reed, do you understand that you're  09:26
7  still under oath today?  09:26
8  A   Yes.  09:26
9  MS. HEWITT:  All right.  Let's get a quick  09:26
10  rundown of who's here today.  09:26
11  Antoinette Hewitt for the City and for  09:26
12  Chief Kepley.  09:26
13  MR. DIEFFENBACH:  Richard Dieffenbach for  09:26
14  Brant Blakeman, defendant.  09:26
15  MS. VU:  Jackie Vu for Defendant Sang Lee.  09:26
16  MS. LUTZ:  Tera Lutz for Defendant  09:26
17  Sang Lee.  09:26
18  MR. FIELDS:  Mark Fields for Angelo  09:26
19  Ferrara and NF.  09:26
20  MR. HAVEN:  Peter Haven for Michael  09:26
21  Papayans.  09:26
22  MR. CAREY:  Pat Carey for Defendant Alan  09:26
23  Johnston.  09:26
24  MR. FRANKLIN:  Kurt Franklin on behalf of  09:26
25  Diana Milena Reed and the other plaintiffs in this  09:26

Page 194

---

1  matter.  09:26
2  And as before, we just ask that at the end  09:26
3  of the deposition once it's transcribed that the  09:26
4  plaintiff be allowed to make changes if necessary  09:26
5  under Rule 30.  09:26
6  BY MS. HEWITT:  09:26
7  Q   Good morning, Ms. Reed.  09:26
8  A   Good morning.  09:26
9  THE VIDEOGRAPHER:  Thank you.  The witness  09:26
10  will be sworn in, and Counsel may begin the  09:26
11  examination.  09:27
12  MS. HEWITT:  She was sworn in yesterday,  09:27
13  so --  09:27
14  THE VIDEOGRAPHER:  Oh, sorry.  09:27
15  MS. HEWITT:  That's okay.  09:27
16  BY MS. HEWITT:  09:27
17  Q   We already discussed that.  You understand  09:27
18  you're still under oath?  09:27
19  A   All right.  09:27
20  Q   Ms. Reed, yesterday we discussed some of  09:27
21  the other names that you have previously gone by and  09:27
22  you gave us a couple and said that's all you  09:27
23  remember.  I just want to ask you a couple others.  09:27
24  Have you ever gone by Sophia Reed?  09:27
25  A   No.  09:27

Page 195

3 (Pages 192 - 195)

| | | |
|---|---|---|
| 1 | Q | Do you know who Sophia Reed is?    09:27 |
| 2 | A | Well, Sophia is my middle name.  I haven't 09:27 |

1    Q    Do you know who Sophia Reed is?    09:27
2    A    Well, Sophia is my middle name.  I haven't 09:27
3    used it.  And then Sophia is also the name of my    09:27
4    ex-husband's daughter.    09:27
5    Q    Have you ever gone by Diana Milena Sophia 09:27
6    Gabrielle?    09:27
7    A    Those are all my middle names.    09:27
8    Q    Have you ever gone by Grace?    09:27
9    A    It's my middle name.    09:27
10    Q    Okay.  So yes, you've gone by that name    09:27
11    before?
12    A    I may have, you know, had people call me 09:27
13    by that name at some point when I was a kid.    09:28
14    Q    What is Visual Inspiration LLC?    09:28
15    A    It was a company I started when I was 18. 09:28
16    Q    Okay.  And that company, was it still    09:28
17    doing business in approximately 2012?    09:28
18    A    I don't remember.    09:28
19    Q    Did you -- did Visual Inspiration do any 09:28
20    work with your soon-to-be ex-husband's companies? 09:28
21    A    It did not, but I know that there was one 09:28
22    point where he did use my bank account because he 09:28
23    told me that he can't get his own bank account.    09:28
24    Q    And were you the -- if you recall, do you 09:28
25    know, were you ever listed as the service for --    09:28

Page 196

1    agent for service of process for Visual Inspiration 09:28
2    LLC?    09:28
3    A    I'm not sure what that means.    09:28
4    Q    Do you know -- do you ever remember    09:28
5    agreeing to be the agent for service of process,    09:28
6    just that particular -- agent for service of process 09:28
7    for Visual Inspiration?    09:28
8    A    No, I know I was the managing member of    09:29
9    the LLC.    09:29
10    Q    What do you understand that to mean --    09:29
11    sorry, I interrupted you.  Go ahead.    09:29
12    A    Like I was the owner of the LLC was my    09:29
13    understanding.    09:29
14    Q    You were the owner of Visual Inspiration    09:29
15    LLC?    09:29
16    A    Hmm-mm.    09:29
17    Q    What was Visual Inspiration LLC?    09:29
18    A    It was a company I started when I was 18 09:29
19    and I graduated from high school, and the goal was    09:29
20    to make inspiring films and projects and you, know, 09:29
21    any kind of media work that, I guess, makes a    09:29
22    difference in a positive way.    09:29
23    Q    Did you act in any of those movies?    09:29
24    A    I -- honestly, I don't remember if I,    09:29
25    like, officially, you know, made anything under that 09:29

Page 197

1    company or not.  I was 18 and I was just out of high 09:29
2    school, so it's hard for me to remember.    09:29
3    Q    As you sit here today, do you have any    09:29
4    recollection of acting in any -- any production of 09:29
5    Visual Inspiration?    09:30
6    A    Possibly, yeah, I mean, I don't really    09:30
7    remember, you know.    09:30
8    Q    As you sit here today, you don't have a 09:30
9    recollection; is that correct?    09:30
10    A    Yeah, I don't remember.    09:30
11    Q    Putting aside Visual Inspiration, have you 09:30
12    acted in any -- in any movie -- large, small,    09:30
13    homemade, anything like that?    09:30
14    A    Yeah, I have.    09:30
15    Q    How many times?    09:30
16    A    I don't remember.  I mean, nothing large. 09:30
17    Mostly just my own little projects or things I did 09:30
18    with my friends.  Yeah, not anything significant    09:30
19    that I can think of.  Student films.    09:30
20    Q    Student films?    09:30
21    A    As well.    09:30
22    Q    Have you ever acted in anything that was 09:30
23    distributed in any fashion for sale?    09:30
24    A    Not that I would know of.    09:30
25    Q    Have you ever been sued for fraud?    09:30

Page 198

1    A    Not that I know of, no.    09:31
2    Q    Have you ever had a judgment entered    09:31
3    against you with regard to a lawsuit in which you    09:31
4    were sued for fraud?    09:31
5    A    Not that I'm aware of, no.    09:31
6    Q    Have you ever been served with a judgment 09:31
7    in which -- judgment in a case in which you were    09:31
8    sued for fraud?    09:31
9    A    Not to my knowledge.    09:31
10    Q    Have you ever been sued by a person by the 09:31
11    last name of Rubin, R-u-b-i-n?    09:31
12    A    I haven't heard of that person, no.    09:31
13    Q    Have you ever been sued by the entity    09:31
14    called Superfin, S-u-p-e-r-f-i-n, for fraud in the 09:31
15    L.A. Superior Court?    09:31
16    A    Not that I know of, no.    09:31
17    Q    Have you ever -- let me ask you this:  Do 09:31
18    you recall an entity called Superfin?    09:31
19    A    I do not, no.    09:31
20    Q    Have you ever had a judgment entered    09:31
21    against you by the Berger Trust in Santa Monica    09:31
22    Municipal Court?    09:32
23    A    Not that I know of.    09:32
24    Q    Have you ever had a judgment entered    09:32
25    against you in Santa Monica Municipal Court?    09:32

Page 199

4 (Pages 196 - 199)

Page 200

```
1      A    Not that I know of.  I think my -- if it's     09:32
2   related to my divorce, I think that was filed in       09:32
3   L.A., I'm not sure.                                    09:32
4      Q    Have you ever been sued for breach of          09:32
5   contract?                                              09:32
6      A    Not that I know of, no.                        09:32
7      Q    Have you ever been sued for negligent          09:32
8   misrepresentation?                                     09:32
9      A    No, not that I know of.                        09:32
10     Q    Did your -- are you aware that your            09:32
11  soon-to-be ex-husband has been sued several times?     09:32
12     A    I have read the press articles about him       09:32
13  recently, and, you know, it was very surprising for    09:32
14  me to hear.  And, you know, I don't really know what   09:32
15  the truth is behind his business because I wasn't      09:32
16  actively involved in his proceedings.                  09:32
17     Q    Would you be surprised to hear that you        09:32
18  had been sued for fraud in court with regard to one    09:32
19  of your dealings with your soon-to-be ex-husband's     09:33
20  business?                                              09:33
21      MR. FRANKLIN:  Objection, argumentative.           09:33
22      THE WITNESS:  I would be surprised if it           09:33
23  included my name, yes, I would be very surprised.      09:33
24  BY MS. HEWITT:                                         09:33
25     Q    Yes, okay.                                     09:33
```

Page 201

```
1           What is Music Tramp LLC?                       09:33
2      A    I don't know.                                  09:33
3      Q    Do you recall starting that company or         09:33
4   forming that company?                                  09:33
5      A    I don't recall that, no.                       09:33
6      Q    And sitting here today, given that we've       09:33
7   gone through this for a couple of days now, are        09:33
8   there any other names that you recall using since      09:33
9   you were a child?                                      09:33
10     A    I just mostly went by my first name.  I        09:33
11  mean, I can give you my full name, I have a very       09:33
12  long name.                                             09:33
13     Q    Why don't you go ahead and do that.            09:33
14     A    On some social media sites I have              09:33
15  different middle names than I do on others, but.       09:34
16     Q    Good -- that's a good point.                   09:34
17     A    I don't know if that counts as using           09:34
18  different names.                                       09:34
19     Q    Why don't you go ahead and give me that        09:34
20  full name that you talked about.                       09:34
21     A    Sure.  Diana Milena Gabrielle Sophia           09:34
22  Beatrice Sharon Ada Grace Helen.  And then the last    09:34
23  name is Smoluchowska-Miernik, which I gave you guys    09:34
24  the spelling yesterday.                                09:34
25     Q    You did.                                       09:34
```

Page 202

```
1           And is Ada, A-d-a?                             09:34
2      A    Yes.                                           09:34
3      Q    And you mentioned social media sites, what    09:34
4   social media sites are you referring to?              09:34
5      A    I haven't been super active on very many      09:34
6   of them since going through the divorce because it's  09:34
7   just been very emotionally tolling on me.  But        09:34
8   Instagram and Facebook mostly is what I use,          09:34
9   sometimes Twitter.  And I don't typically use my      09:34
10  last name on those sites, which is for                09:35
11  confidentiality.                                      09:35
12     Q    How about MySpace, do you have a MySpace      09:35
13  page or account?                                      09:35
14     A    I did when I was a kid, I have no idea if     09:35
15  it's still up or not; I didn't know if anyone still   09:35
16  uses it.  But they might.                             09:35
17     Q    How about Snapchat?                           09:35
18     A    I think I had one at some point.  But I       09:35
19  never really -- I never really liked it so I didn't   09:35
20  keep using it.                                        09:35
21     Q    Okay.  Let's go back a little bit to a        09:35
22  couple things from yesterday that I needed to         09:35
23  clarify.                                              09:35
24          Going back to the February 13th event,        09:35
25  Ms. Reed, when you were in the fort and there were    09:35
```

Page 203

```
1   other people in there including Jen, do you recall    09:35
2   Jen?                                                  09:35
3      A    Yes, which date are we referring to?          09:36
4      Q    February 13th.                                09:36
5      A    Okay.                                         09:36
6      Q    All right?                                    09:36
7           I think you told me yesterday that you        09:36
8   wanted to call the police but that you got no cell    09:36
9   signal; is that correct?                              09:36
10     A    Hmm-mm.                                       09:36
11     Q    Yes?                                          09:36
12     A    Yes.                                          09:36
13     Q    Why were you trying to call the police?       09:36
14     A    I wanted to call the police because I was,    09:36
15  you know, I felt threatened and scared and I mean, I  09:36
16  felt like anything could happen.  I was extremely     09:36
17  uncomfortable in the situation.                       09:36
18     Q    If you had gotten through to the police,      09:36
19  what did you intend to tell them?                     09:36
20     A    I just intended to tell them, you know,       09:36
21  what had happened.                                    09:36
22     Q    Were you going to ask for help?               09:36
23     A    Yes.                                          09:36
24     Q    What kind of help would you ask for?          09:36
25     A    For them to -- to come down to the fort       09:36
```

5 (Pages 200 - 203)

1   and make sure nothing happens to me, and I was going   09:36
2   to tell them about the incident with the beer being   09:36
3   sprayed on me and, you know, just have them help me.   09:37
4       Q   Did you want them to escort you back up or   09:37
5   did you want them to stay with you down at the fort?   09:37
6       A   I don't think I contemplated that. I just   09:37
7   wanted someone to help, whatever that means.   09:37
8       Q   Did you want to leave?   09:37
9       A   I'm sure I did. I don't know.   09:37
10      Q   At the same time, when you were -- this   09:37
11  time when you were in the fort, did you witness any   09:37
12  harassment towards Jen?   09:37
13      A   I did, yes.   09:37
14      Q   What did you witness?   09:37
15      A   I witnessed Mr. Johnston moaning towards   09:37
16  her, oscillating his body in a sexual manner, you   09:37
17  know, other things, but it's hard for me to remember   09:38
18  because I was mostly focused on what was happening   09:38
19  to me and I was so scared that I, you know, I wasn't   09:38
20  thinking very clearly.   09:38
21      Q   What you said right now as to what you   09:38
22  witnessed -- the harassment you witnessed towards   09:38
23  Jen, is that separate and apart from any actions   09:38
24  that Mr. Johnston did towards you if, in fact, he   09:38
25  did any?   09:38

Page 204

1       MR. FRANKLIN: Vague and ambiguous,   09:38
2   argumentative.   09:38
3       THE WITNESS: I'm not sure what you mean   09:38
4   by that.   09:38
5   BY MS. HEWITT:   09:38
6       Q   I think you described some similar actions   09:38
7   yesterday that you experienced as well, including   09:38
8   moaning and I believe the thrusting or oscillating   09:38
9   of the hips.   09:38
10      What you just told me with regard to those   09:38
11  things as to Jen, is that a separate incident from   09:38
12  that you experienced?   09:38
13      A   What do you mean by being a separate   09:38
14  incident?   09:38
15      Q   Okay. When Mr. Johnston moaned, was he   09:38
16  moaning at you and Jen, or just to you, and then   09:38
17  another time just to Jen?   09:38
18      A   Oh, I don't remember. But I would assume   09:38
19  that some of it was targeted just towards her.   09:39
20      Q   Do you recall if he was facing her at the   09:39
21  time?   09:39
22      A   You know, I don't remember much about what   09:39
23  was happening to her; but yeah, I would think he was   09:39
24  facing her.   09:39
25      Q   Okay. I'm going to show you the complaint   09:39

Page 205

1   again.   09:39
2       There you go, Ms. Reed.   09:39
3       I'm going to ask you to please look at   09:39
4   Page 16. All right. Would you please look at the   09:39
5   very top, Lines 2 through 4; do you see that,   09:40
6   Ms. Reed?   09:40
7       A   Yes.   09:40
8       Q   It says, "Reed had requested a police   09:40
9   escort to the beach upon her arrival at Lunada Bay   09:40
10  earlier that day because of her previous experiences   09:40
11  but the police refused her request."   09:40
12      Is that an accurate statement?   09:40
13      A   Yes.   09:40
14      Q   Who did you request that escort from   09:40
15  earlier that day?   09:40
16      A   You know, at this time, I don't remember   09:40
17  who it was from specifically, I don't remember -- I   09:40
18  don't remember who I spoke to, I think I called them   09:40
19  on the phone.   09:40
20      Q   What time did you call them?   09:40
21      A   Again, I don't remember the specifics, but   09:40
22  I would assume that it was before my arrival, either   09:40
23  that or right after I arrived, but I would assume it   09:40
24  was before.   09:40
25      Q   And why did you want an escort?   09:40

Page 206

1       A   I think that I wanted an escort at the   09:40
2   time because of the previous incident in January   09:40
3   where I was yelled at by the other individual.   09:41
4       Q   Okay. What did you want the escort for?   09:41
5       A   For safety.   09:41
6       Q   Did you want the escort to stay with you   09:41
7   down on the beach?   09:41
8       A   I don't know if I wanted them to stay with   09:41
9   me but I do know that I wanted them to escort me   09:41
10  down there.   09:41
11      Q   That you wanted them to walk down with   09:41
12  you?   09:41
13      A   Yes.   09:41
14      Q   And how long did you anticipate needing an   09:41
15  escort that day?   09:41
16      A   I don't know. I don't know if I   09:41
17  anticipated a time.   09:41
18      Q   Did you want the escort to stay with you   09:41
19  while you took photographs?   09:41
20      A   I don't remember that.   09:41
21      Q   Did you want the escort to go to the fort   09:41
22  with you?   09:41
23      A   I did want them to escort me there.   09:41
24      Q   At the time that you wanted the escort,   09:41
25  did you know whether anybody was in the fort that   09:41

Page 207

6 (Pages 204 - 207)

Hahn & Bowersock, A Veritext Company
800.660.3187

| | |
|---|---|
| 1   day?                                    09:41 | 1   Q   Okay.  You know that you asked for an   09:44 |
| 2   A   I did not.                          09:41 | 2   escort down to the beach?                  09:44 |
| 3   Q   All right.  What specifically did you ask  09:41 | 3   A   Yeah, for someone to accompany me.   09:44 |
| 4   when you asked for the police escort?    09:41 | 4   Q   Did you use the word "escort" or did you   09:44 |
| 5   A   It's hard for me to remember right now,   09:41 | 5   say "accompany"?                          09:44 |
| 6   because I don't remember the conversation too well.   09:42 | 6   A   I may have used either one, I don't know.   09:44 |
| 7   Q   Okay.  Please tell me everything you   09:42 | 7   Q   Did you ask for the escort to meet you at   09:44 |
| 8   remember about that conversation.        09:42 | 8   the bluff?                                09:44 |
| 9   A   I just remember -- yeah, I just remember   09:42 | 9   A   I don't know; I don't know where I asked   09:44 |
| 10   speaking to the police and requesting someone to   09:42 | 10   them to meet me.                         09:44 |
| 11   escort me.  I remember, you know, the idea of doing   09:42 | 11   Q   All right.  Do you have a recollection of   09:44 |
| 12   that, but it's hard for me to remember, you know,   09:42 | 12   wanting the escort to meet you at the bluff or to   09:44 |
| 13   anything that was said specifically.       09:42 | 13   meet you at the station or someplace else?   09:44 |
| 14   Q   Did you talk to a man or a woman?    09:42 | 14   A   I don't remember the specifics, I'm sorry.   09:44 |
| 15   A   I don't remember.                    09:42 | 15   Q   Generally, do you remember anything about   09:44 |
| 16   Q   Did you say you called on the phone?   09:42 | 16   that?                                     09:44 |
| 17   A   I think so.                          09:42 | 17   A   About asking them where to meet me, no, I   09:44 |
| 18   Q   Okay.  Is there another means by which you   09:42 | 18   don't know, I don't remember.             09:44 |
| 19   think you may have contacted the police that day?   09:42 | 19   Q   As you sit here today, is there any   09:44 |
| 20   A   I mean, I don't think it was via e-mail so   09:42 | 20   other -- anything else that you remember about your   09:45 |
| 21   I'm assuming it must have been on the phone.  It   09:42 | 21   conversation with the PV Police Department on   09:45 |
| 22   wasn't in person.                        09:42 | 22   February 13th when you asked for a police escort to   09:45 |
| 23   Q   Okay.  And are you aware that -- I think   09:42 | 23   the beach?                               09:45 |
| 24   we talked a little bit about this yesterday   09:42 | 24   MR. FRANKLIN:  Vague and ambiguous.   09:45 |
| 25   actually.  I think you told me yesterday you were   09:43 | 25   THE WITNESS:  I mean, I think that's all I   09:45 |
| Page 208 | Page 210 |

| | |
|---|---|
| 1   not aware at this time, February 13th, that Cory   09:43 | 1   can remember right now, I think.           09:45 |
| 2   Spencer had also asked for extra patrols that day in   09:43 | 2   BY MS. HEWITT:                            09:45 |
| 3   advance of the February 13th visit?        09:43 | 3   Q   At some point later on February 13th, you   09:45 |
| 4   A   Right, yeah, I don't think I was aware of   09:43 | 4   did make contact with the police officer; is that   09:45 |
| 5   that, no.                                09:43 | 5   correct?                                  09:45 |
| 6   Q   So is it your understanding, though, that   09:43 | 6   A   I did make contact with the police officer   09:45 |
| 7   your request for a police escort that day was   09:43 | 7   on that day, yes.                         09:45 |
| 8   separate and apart from anything Cory may or may not   09:43 | 8   Q   When you first made contact with them   09:45 |
| 9   have done with regard to asking for extra patrols;   09:43 | 9   later that day, did you tell them that you had asked   09:45 |
| 10   is that correct?                         09:43 | 10   for an escort that day?                   09:45 |
| 11   A   Yes, I think so.                      09:43 | 11   A   I don't know.                         09:45 |
| 12   Q   All right.  How long did the conversation   09:43 | 12   Q   When you -- going back to your          09:45 |
| 13   last that you had in which you asked for a police   09:43 | 13   conversation when you asked for the police escort,   09:45 |
| 14   escort to the beach?                     09:43 | 14   when they refused your request, what words did they   09:45 |
| 15   A   I don't remember.  But I'm assuming that   09:43 | 15   use in refusing your request?            09:45 |
| 16   it was probably a brief conversation.      09:43 | 16   A   I don't remember exactly why they weren't   09:45 |
| 17   Q   Did you make it from your cell phone?   09:43 | 17   available.                               09:45 |
| 18   A   I don't know.  I either made it probably   09:43 | 18   Q   Did they tell you they weren't available   09:45 |
| 19   from my phone or from Jordan Wright's phone.   09:43 | 19   or did they refuse your request?          09:45 |
| 20   Q   And as you sit here today, do you have a   09:43 | 20   A   Is there a difference between that?     09:45 |
| 21   specific recollection of asking for a police escort   09:43 | 21   Q   I'm asking -- I'm looking at your       09:45 |
| 22   as opposed to perhaps asking for the police to   09:44 | 22   complaint and the complaint says they refused your   09:46 |
| 23   provide extra patrols that day?           09:44 | 23   request, so I'm trying to clarify.         09:46 |
| 24   A   Yeah, I know I didn't ask for extra   09:44 | 24   Did they say, No, you may not have an   09:46 |
| 25   patrol.                                  09:44 | 25   escort?                                  09:46 |
| Page 209 | Page 211 |

7 (Pages 208 - 211)

1     A   I don't remember how they said it. But I   09:46
2  remember that they weren't there to accompany me   09:46
3  down.                                          09:46
4     Q   Is it fair to say then that they -- you   09:46
5  know -- you believe they refused your request since   09:46
6  there was nobody to accompany you down?         09:46
7     A   I can't say that because I don't remember   09:46
8  the specific wording.                          09:46
9     Q   Is it fair to say you don't recall if    09:46
10 whether on the phone call with the police department   09:46
11 where you asked for police escort, you don't recall   09:46
12 whether or not they actually refused your request on   09:46
13 that call; is that fair?                       09:46
14     A   I'm not sure what you mean by "refused."   09:46
15 I mean, I know they weren't available, so if to you   09:46
16 that means refused, then I guess you're right, I    09:46
17 mean, I don't know.                            09:46
18     Q   Do you know -- as you sit here today, do   09:46
19 you believe, again, going from the complaint that    09:47
20 they refused your request because nobody was there   09:47
21 to meet you at Lunada Bay and walk you down to the   09:47
22 beach -- escort you down to the beach?          09:47
23     MR. FRANKLIN:  Asked and answered,          09:47
24 misstates prior testimony.                     09:47
25     THE WITNESS:  I don't know why they        09:47

Page 212

1  weren't available.                             09:47
2  BY MS. HEWITT:                                 09:47
3     Q   Do you believe they -- is your belief that   09:47
4  they refused your request based on the fact that    09:47
5  there was nobody at Lunada Bay -- no police officer   09:47
6  there to escort you down to the beach?          09:47
7     A   I don't have a belief as to what the      09:47
8  reasoning was.                                 09:47
9     Q   Not their reasoning. I'm sorry, that was   09:47
10 a little vague on my -- I'm sorry.              09:47
11     Is it true that you believe that the        09:47
12 police refused your request for an escort on      09:47
13 February 13th?                                 09:47
14     A   Like I told you, I don't remember the    09:47
15 conversation at this moment very well. All I        09:48
16 remember is that they weren't able to escort me.   09:48
17 Why they told me that they can't, I don't         09:48
18 specifically remember right now.               09:48
19     Q   Do you remember them telling you that they   09:48
20 can't?                                         09:48
21     A   I don't remember that part of the        09:48
22 conversation; but I remember that they were not    09:48
23 available.                                     09:48
24     Q   What do you mean by "not available"?     09:48
25     A   That they weren't able to escort me.     09:48

Page 213

1     Q   By that, do you mean there was nobody     09:48
2  there to escort you?                           09:48
3     A   No, I mean, I believe I was told that no   09:48
4  one was available but I don't know what the reason   09:48
5  behind that was.                               09:48
6     Q   But in your mind right now you have a     09:48
7  specific recollection of the police telling you on   09:48
8  February 13th when you asked them for an escort that   09:48
9  they didn't have anybody?                      09:48
10     A   The memory is extremely vague so I'm     09:48
11 assuming that that's what they said but it's very   09:48
12 hard for me to remember, I don't know.          09:48
13     Q   Okay.                                   09:48
14     A   I just know for whatever reason they     09:48
15 weren't there and I'm assuming that they told me   09:48
16 they're not available.                         09:48
17     Q   Okay. Let's go down to the next paragraph   09:49
18 if you don't mind, Paragraph 26, same page.     09:49
19     Actually, let's go down to Paragraph 27.    09:49
20 I'm sorry, Paragraph 26, sorry. It's Tuesday.   09:49
21     The Lines 7 through 9 where it says, "The   09:49
22 officer was completely unaware of the events        09:49
23 occurring below the cliff and the fort and on the   09:49
24 beach."                                        09:49
25     How do you know the officer was completely   09:49

Page 214

1  unaware of the events?                         09:49
2     A   Well, I know that because he told me that   09:49
3  he was unaware of anything that had happened to me.   09:49
4     Q   So was the police officer a man or woman?   09:49
5     A   It was a man.                            09:49
6     Q   All right. What's the first thing you    09:49
7  said to that police officer?                   09:49
8     A   I don't remember the first thing that I   09:49
9  said but I remember that I was very upset and I was   09:49
10 in tears and I just tried to tell him as best I     09:50
11 could as to what happened. But how I said it, I    09:50
12 don't know.                                    09:50
13     Q   Was Jordan with you?                     09:50
14     A   I don't think so, no.                    09:50
15     Q   Was Jordan still surfing?               09:50
16     A   Jordan wasn't surfing anymore. Jordan had   09:50
17 come in, and -- but I don't think he walked up to   09:50
18 the police car with me, I don't know if he was     09:50
19 behind me or not.                              09:50
20     Q   Sometime between the time of the incidents   09:50
21 in the fort and the time you talked to the police   09:50
22 officer, did you tell Jordan what had happened to   09:50
23 you?                                           09:50
24     A   I don't know, I don't think so.         09:50
25     Q   Is there a reason you recall why you     09:50

Page 215

8 (Pages 212 - 215)

1    didn't tell him?           09:50
2    A   I think I was just too upset to talk, I   09:50
3    don't remember.         09:50
4    Q   Were you with him at any time between the  09:50
5    time in the fort and the time that you spoke to the  09:50
6    police officer?        09:50
7    A   I don't remember, I don't remember how I  09:50
8    got up the hill. I don't remember that part. I  09:50
9    just remember that he was done surfing, I remember  09:50
10   him paddling in, and I remember at some point after  09:50
11   that Jalian paddled out and left and I felt like it  09:51
12   was safe to go back up the hill. Whether Jordan was  09:51
13   with me or not as I was going up the hill, I don't  09:51
14   remember.          09:51
15   Q   Do you have any recollection of Jordan  09:51
16   saying, Hey, what's wrong, you seem upset, or   09:51
17   anything like that?       09:51
18   A   No, I don't remember that part   09:51
19   unfortunately.         09:51
20   Q   When you found the officer, was it just  09:51
21   one officer in a police car, was it a police car?  09:51
22   A   Yeah, from what I remember it was a just  09:51
23   one officer in the car, but I don't know, there may  09:51
24   have been two, but I remember -- my memory right now  09:51
25   is speaking to one officer.     09:51

Page 216

1    Q   What did you tell the officer?    09:51
2    A   As best I could, I described what had  09:51
3    happened to me.         09:51
4    Q   What is it that you told him?    09:51
5    A   I told him what had happened to me in the  09:52
6    fort regarding the incident with Mr. Blakeman and  09:52
7    Jalian and the beer and everything else that   09:52
8    happened down there.       09:52
9    Q   Okay. And as best you can right now, tell 09:52
10   me everything that you told the officer in that  09:52
11   conversation.         09:52
12      MR. FRANKLIN: Calls for a narrative.  09:52
13      THE WITNESS: First of all, I was   09:52
14   extremely upset at the time so I couldn't even, you  09:52
15   know -- there's no way I remember that conversation  09:52
16   word-for-word and it was also very traumatic, so   09:52
17   I've blocked a lot of that out. So I can describe  09:52
18   to you what I remember that happened to me.   09:52
19   BY MS. HEWITT:        09:52
20    Q   That's all I'm asking.     09:52
21    A   But I can't specifically describe the   09:52
22   conversation that I had with the policeman other   09:52
23   than I remember telling him what happened to me and  09:53
24   why I was upset.         09:53
25    Q   And I understand, I understand that.   09:53

Page 217

1    So yes, all I can ask you is what you do  09:53
2    remember. I can't ask you to tell me what you don't  09:53
3    remember. So tell me what you do remember telling  09:53
4    the officer in that conversation.    09:53
5    A   Okay. I remember -- you know, again, it's 09:53
6    hard for me because I don't remember the   09:53
7    conversation with the officer word-for-word at this  09:53
8    time. I can tell you what I remember at this time  09:53
9    from the event.        09:53
10   Q   As opposed to telling me what you remember 09:53
11   about the conversation?     09:53
12   A   Well, I mean, I do remember telling him  09:53
13   about the two individuals whose names I didn't know  09:53
14   at the time.         09:53
15   Q   What did you tell him about the two   09:53
16   individuals?         09:53
17   A   I know that I described them entering the  09:53
18   fort and I described them spraying the beer on my  09:54
19   arm and my camera and attempting to, you know,   09:54
20   intimidate me and destroy the camera and attempting  09:54
21   to harass me, being intimidating, you know,   09:54
22   basically the stuff that's written in the complaint.  09:54
23     I know that they asked for descriptions so 09:54
24   I remember providing them with descriptions to the  09:54
25   best of my knowledge. Time frames I think they   09:54

Page 218

1    asked me, which I gave them. And yeah, I don't  09:54
2    know, I tried to describe the incident as best as I  09:54
3    could, I was extremely shaken up and upset, so.  09:55
4    Q   When you say you told them that you were  09:55
5    harassed, did you say you were harassed or did you  09:55
6    describe any harassment?     09:55
7    A   Yeah, I described the specific events that 09:55
8    made me believe that I was harassed.   09:55
9    Q   You told me that you described -- their  09:55
10   entering into the fort, spraying beer on your arm  09:55
11   and your camera, attempting to intimidate you.   09:55
12     What did you say about how they attempted  09:55
13   to intimidate you?       09:55
14   A   I don't remember, again, specifically what  09:55
15   I told the policeman at this time. I remember them  09:55
16   trying to intimidate me by holding the camera right  09:55
17   up to my face, you know, two feet from my face and,  09:55
18   you know, chugging beer and throwing it on the   09:55
19   ground, yelling, moaning, saying sexual comments; I  09:55
20   mean, there was a bunch of behavior that happened  09:56
21   there that was pretty disturbing to me.    09:56
22   Q   Is it correct, though, you're not certain  09:56
23   whether you told the police officers any of that   09:56
24   specifically right now, that right now you don't   09:56
25   recollect that?        09:56

Page 219

9 (Pages 216 - 219)

1    MR. FRANKLIN:  Misstates prior testimony.  09:56
2    THE WITNESS:  I know that I described the  09:56
3  event as best that I could at the time to the      09:56
4  police.                    09:56
5  BY MS. HEWITT:                09:56
6    Q    Okay.  Is that the extent of your     09:56
7  recollection of that conversation with the police?  09:56
8    MR. FRANKLIN:  Asked and answered.     09:56
9    THE WITNESS:  At this time, yes.      09:56
10  BY MS. HEWITT:                09:56
11    Q    Is there anything that you think that   09:56
12  you'd be able to do that would refresh my memory at  09:56
13  all?                      09:56
14    A    I mean, I think if I wasn't dealing with  09:56
15  nine months of pregnancy and not being able to    09:56
16  remember anything and not sleeping and not dealing  09:56
17  with depression, I think I could remember a lot   09:56
18  more.                     09:56
19    Q    Okay.  And I understand --        09:56
20    A    So I mean, it's just -- it's tough.   09:57
21    Q    I understand.  This is my only opportunity  09:57
22  to ask you what happened in that conversation so I'm  09:57
23  sure you understand that as well.        09:57
24    A    Yeah, I'm doing my best but it's just I --  09:57
25  I can barely remember to bring a snack and water   09:57

Page 220

1  bottle and tie my shoes, so it's not easy.      09:57
2    Q    Let's move on to Paragraph 27 for now,   09:57
3  maybe we'll circle back to that.  Paragraph 27 says,  09:57
4  "Palos Verdes Estates initially attempted to     09:57
5  investigate the incident"; do you see that?     09:57
6    A    Yes.                 09:57
7    Q    If we skip down to Line 18 it says, "The  09:57
8  Palos Verdes Estates police officer then offered to  09:57
9  allow Reed to identify the other men from photos   09:57
10  that the police kept on all members of Lunada Bay   09:57
11  Boys.  But ultimately Palos Verdes Estates police   09:57
12  showed no interest or ability in following up on    09:57
13  Reed's complaint"; do you see that?        09:57
14    A    Yes.                 09:57
15    Q    That's not true, is it?         09:57
16    MR. FRANKLIN:  Argumentative.       09:57
17    THE WITNESS:  Why do you say that?     09:57
18  BY MS. HEWITT:                09:57
19    Q    Did you eventually have an opportunity to  09:57
20  review a photo lineup?             09:58
21    MR. FRANKLIN:  Lacks foundation.      09:58
22    THE WITNESS:  Yes, but that's not what is   09:58
23  written here.                 09:58
24  BY MS. HEWITT:                09:58
25    Q    That ultimately they showed no interest or  09:58

Page 221

1  ability in following up on Reed's complaint.  At the  09:58
2  time of this complaint, had you seen a photo lineup  09:58
3  yet?                      09:58
4    A    I don't know at what point I saw the photo  09:58
5  lineup.  But I think this is referring to a book    09:58
6  that they told me about.  They told me that they    09:58
7  know all the people that frequent the area, this is  09:58
8  what the policeman told me that I was speaking to   09:58
9  when I filed the report.            09:58
10    Q    Okay.  So you have a specific recollection  09:58
11  of that; right?                09:58
12    A    Yes, I do, of the book.         09:58
13    Q    That specific conversation, tell me     09:58
14  everything you remember with specificity just like  09:58
15  you gave me right now.             09:58
16    A    I remember -- the problem was I didn't   09:58
17  know the names of the individuals that did this to  09:58
18  me, and so I had to describe them.  And I was upset  09:58
19  that they were filming me and, you know, in the heat  09:58
20  of the moment in the fear that I was in, I wasn't   09:59
21  thinking straight but I should have pulled out my   09:59
22  phone or something and taken a photo of them so they  09:59
23  could identify them.              09:59
24    But anyway, so I couldn't identify them,   09:59
25  and the policeman that I was speaking to -- and I   09:59

Page 222

1  don't know if this was the same one that I wrote the  09:59
2  report with or not because I don't know if -- there  09:59
3  was more than one -- but if there was just one, then  09:59
4  it was the same one.              09:59
5    He told me that they have photos of all    09:59
6  the individuals that frequent Lunada Bay, that they  09:59
7  have a book of photos and that it won't be a problem  09:59
8  to identify the individuals because they know the   09:59
9  people that frequent the area.          09:59
10    Q    Okay.  At some point, were you -- did you  09:59
11  feel like you were not given the opportunity to try  09:59
12  to identify the individuals from any photos that the  09:59
13  PVE Police Department may have had?        10:00
14    A    I do feel like that because he had made me  10:00
15  feel that it would be very simple to do because    10:00
16  there was a book that I could look through, and he   10:00
17  made me feel that it would be easy to find a photo   10:00
18  of this individual.              10:00
19    Q    What did he say specifically that made you  10:00
20  feel that it would be simple?          10:00
21    A    He seemed very assuring that they knew    10:00
22  pretty much everyone that frequents the area or    10:00
23  surfs down there.  And he seemed assuring that it   10:00
24  would be simple to look through this book and     10:00
25  identify him.                 10:00

Page 223

10 (Pages 220 - 223)

Page 224

1     Q   Is that what he told you, or is that what   10:00
2   you felt about the conversation?   10:00
3     A   He told me something along those lines,   10:00
4   but I don't remember his specific wording.   10:00
5     Q   When was this conversation?   10:00
6     A   This conversation was after the incident   10:01
7   on February 13th.
8     Q   When you say "after," do you mean it   10:01
9   happened on February 13th but after the incident or   10:01
10   some other day?   10:01
11     A   It happened on February 13th after the   10:01
12   incident after I had walked up to the top of the   10:01
13   bluff.   10:01
14     Q   Okay.  All right.  So this is -- is your   10:01
15   memory being jogged now as you're remembering   10:01
16   additional things about the conversation?   10:01
17     A   Well, you had asked me previously what I   10:01
18   had told him about the incident.   10:01
19     Q   True, good point.   10:01
20     A   So, I mean, this is a separate memory for   10:01
21   me.   10:01
22     Q   Good point.   10:01
23         So if there's anything else that you   10:01
24   discussed with the police officer, I'd appreciate it   10:01
25   if you can tell me that so we'll go through the   10:01

Page 225

1   photo part here.   10:01
2         Tell me any memories you have of anything   10:01
3   specific that the police officer told you about the   10:01
4   photos.   10:01
5     MR. FRANKLIN:  Vague and ambiguous.   10:01
6     THE WITNESS:  I think that he told me that   10:01
7   they're driver's license photos from what I recall,   10:02
8   or some kind of mug shot.  And that there's a book   10:02
9   with photos of the individuals that surf down there   10:02
10   and frequent the area.   10:02
11         And, you know, he also told me that they   10:02
12   know a lot of them if not most of them, and so that   10:02
13   it wouldn't be hard to find out who this person is.   10:02
14   So the fact that I didn't take a photo of them or   10:02
15   have any way to show a photo of the face that that   10:02
16   wasn't a problem because I would be able to identify   10:02
17   them in an easy way because they had this   10:02
18   information available.   10:02
19   BY MS. HEWITT:   10:02
20     Q   So he said that to you, that it was no   10:02
21   problem that you hadn't taken a photo because it   10:02
22   would be easy to identify them?   10:02
23     A   He didn't say that word-for-word, but that   10:02
24   is the, you know -- that's what he expressed to me.   10:02
25     Q   Okay.  All right.  So in the conversation   10:03

Page 226

1   with the police officer on the 13th of February, we   10:03
2   talked about or described the incident down at the   10:03
3   fort; talked about a potential identification   10:03
4   through a photo book or through mug shots.   10:03
5         Were there any other subjects of   10:03
6   conversation -- excuse me -- were there any topics   10:03
7   in that conversation on the 13th with the police   10:03
8   officer?   10:03
9     A   Yeah, I think that we also -- I mean, I   10:03
10   know we eventually walked down to try and identify   10:03
11   these people, so I'm sure we, you know, we talked   10:03
12   about how to do that.  I don't remember if it was   10:03
13   the same officer that walked down there with me or   10:03
14   if it was someone different.  So, you know, I'm sure   10:03
15   we talked as to how to do that.   10:03
16         But the main topics that I remember is   10:03
17   just telling him what had happened to me and trying   10:04
18   to describe the individuals and then, you know, him   10:04
19   telling me what the procedure would be to identify   10:04
20   them.   10:04
21     Q   Eventually, were you given an opportunity   10:04
22   to identify any of the perpetrators of the incident   10:04
23   in the fort through a photo lineup?   10:04
24     MR. FRANKLIN:  Vague and ambiguous.   10:04
25     THE WITNESS:  Eventually, I was given a   10:04

Page 227

1   piece of paper with different mug shots to look at.   10:04
2   It wasn't what he had described to me.   10:04
3   BY MS. HEWITT:   10:04
4     Q   What specifically did he describe to you?   10:04
5     A   Well, it wasn't the book, you know, the   10:04
6   book of photos.   10:04
7     Q   So you wanted to review a book of photos?   10:04
8     A   You know, I didn't care what I was   10:04
9   viewing.  I just wanted to be able to identify the   10:04
10   suspect.   10:04
11     Q   Were you disappointed that it wasn't a   10:04
12   book of photos?   10:04
13     A   No, I wasn't disappointed about that.  I   10:04
14   was disappointed that I had to keep calling the   10:04
15   police over and over to set up a time to identify   10:05
16   this individual because it took a really long time   10:05
17   and I felt like, you know, they weren't doing enough   10:05
18   to help me with this.   10:05
19     Q   Okay.  And at some point between the time   10:05
20   that you were able to look at the photos in the --   10:05
21   and February 13th, I should go the other way, sorry   10:05
22   -- between February 13th and the time you were able   10:05
23   to look at the photos, you engaged counsel; correct?   10:05
24     A   I believe so.   10:05
25     Q   And Mr. Otten wrote a letter to the City   10:05

11 (Pages 224 - 227)

| | |
|---|---|
| 1 describing the incident that took place down at the 10:05 | 1 have any understanding of what took place after -- 10:07 |
| 2 fort among other things; right? 10:05 | 2 withdraw. 10:07 |
| 3 A Yes. 10:05 | 3 At the lineup, did you identify any 10:07 |
| 4 Q And at some point in time, before you 10:05 | 4 individuals through the lineup? 10:07 |
| 5 identified -- before you went and looked at the 10:05 | 5 MR. FRANKLIN: Lacks foundation. 10:07 |
| 6 photos, Mr. Otten told you who it was that had 10:05 | 6 THE WITNESS: I circled a photo. 10:07 |
| 7 perpetrated harassment or intimidation at the fort; 10:05 | 7 BY MS. HEWITT: 10:07 |
| 8 right? 10:05 | 8 Q As you sit here today, do you know who 10:07 |
| 9 MR. FRANKLIN: Objection, instruct you not 10:05 | 9 that photo was of? 10:07 |
| 10 to answer to the extent it calls for your 10:05 | 10 A The photo appeared to be an individual 10:07 |
| 11 communication with Mr. Otten. 10:05 | 11 that I now know as Jalian Johnston. 10:07 |
| 12 THE WITNESS: I mean, I had privileged 10:05 | 12 Q Okay. 10:07 |
| 13 conversations with him. 10:05 | 13 A But I didn't give them any names at the 10:07 |
| 14 BY MS. HEWITT: 10:05 | 14 time, I don't think that they asked me. 10:07 |
| 15 Q Did you tell the police that Mr. Otten had 10:05 | 15 Q Okay. 10:07 |
| 16 told you who it was at the fort? 10:06 | 16 A And I don't know if I knew or not by the 10:07 |
| 17 A I don't know, I don't think so. 10:06 | 17 time. 10:07 |
| 18 Q Do you recall having that in the police 10:06 | 18 Q All right. Once you picked out the 10:07 |
| 19 report where it says that Mr. Otten told you who the 10:06 | 19 photograph, what happened next? 10:08 |
| 20 people were down at the fort? 10:06 | 20 A I think I was asked to leave. I don't 10:08 |
| 21 A I don't recall reading that. 10:06 | 21 remember. 10:08 |
| 22 Q Okay. So you don't recall that 10:06 | 22 Q Were you told what was -- any of the next 10:08 |
| 23 conversation at all with the police -- 10:06 | 23 steps would be, anything like that? 10:08 |
| 24 MR. FRANKLIN: Misstates prior testimony. 10:06 | 24 A I don't remember. I just remember that it 10:08 |
| 25 THE WITNESS: I just don't remember. 10:06 | 25 was very brief, but as far as what conversation I 10:08 |
| Page 228 | Page 230 |

| | |
|---|---|
| 1 MR. FRANKLIN: Vague and ambiguous. 10:06 | 1 had with him, I don't recall right now. 10:08 |
| 2 BY MS. HEWITT: 10:06 | 2 Q Do you recall what if any actions were 10:08 |
| 3 Q Okay. All right. 10:06 | 3 taken by the PVE Police Department following your 10:08 |
| 4 A I'm not saying I did it or didn't do it; I 10:06 | 4 selection of the photograph? 10:08 |
| 5 don't really remember if I told him that or not. 10:06 | 5 A I don't, I think it went to the D.A. 10:08 |
| 6 Q Okay. And then -- but before the 10:06 | 6 Q Do you have an understanding that the 10:08 |
| 7 lineup -- I think we agreed before the lineup, did 10:06 | 7 police department forwarded your report to the 10:08 |
| 8 you know who it was that had -- that were the two 10:06 | 8 district attorney? 10:08 |
| 9 people down at the fort? 10:06 | 9 MR. FRANKLIN: Calls for speculation. 10:08 |
| 10 MR. FRANKLIN: Vague and ambiguous. 10:06 | 10 THE WITNESS: I don't know, I mean, I 10:08 |
| 11 Actually, we don't know when this lineup was. 10:06 | 11 think that they said it went to the D.A., you know, 10:08 |
| 12 THE WITNESS: Yeah. 10:06 | 12 whatever that means. 10:08 |
| 13 BY MS. HEWITT: 10:06 | 13 BY MS. HEWITT: 10:08 |
| 14 Q Did you know who they were before? 10:06 | 14 Q Did you talk -- have a subsequent -- I 10:08 |
| 15 A It's hard for me to say because I don't 10:06 | 15 interrupted. 10:08 |
| 16 remember the exact dates of when that occurred. 10:06 | 16 A Sorry, I don't know the process that the 10:08 |
| 17 Q If you told the police a week before the 10:06 | 17 police -- 10:08 |
| 18 lineup that you did know who the individuals were, 10:06 | 18 Q I didn't want to interrupt you. 10:08 |
| 19 do you have any reason to doubt that, that you did 10:07 | 19 A -- do. 10:08 |
| 20 in fact know that? 10:07 | 20 Q So did you have a subsequent conversation 10:08 |
| 21 MR. FRANKLIN: Argumentative, lacks 10:07 | 21 after the lineup with anybody at the police 10:09 |
| 22 foundation, vague and ambiguous. 10:07 | 22 department in which the district attorney was 10:09 |
| 23 THE WITNESS: I don't know. 10:07 | 23 discussed? 10:09 |
| 24 BY MS. HEWITT: 10:07 | 24 A In -- what do you mean by the district 10:09 |
| 25 Q All right. At some point in time, do you 10:07 | 25 attorney? 10:09 |
| Page 229 | Page 231 |

12 (Pages 228 - 231)

| | |
|---|---|
| 1    Q    With regard to whether or not your report 10:09<br>2  was forwarded to the district attorney.    10:09<br>3    A    I have no idea; yeah, I don't know.    10:09<br>4    Q    Did you have a conversation with the 10:09<br>5  police after the lineup in which anything about    10:09<br>6  forwarding your report to the district attorney was 10:09<br>7  discussed?    10:09<br>8    A    Not that I remember.  I don't remember 10:09<br>9  ever saying anything about any district -- the    10:09<br>10  district attorney.    10:09<br>11    Q    Okay.    10:09<br>12    A    I don't know who they are.    10:09<br>13    Q    Okay.  Aside from any conversations that 10:09<br>14  you may have had with your attorneys, do you have    10:09<br>15  any understanding of, as you sit here today, of    10:09<br>16  whether or not the district attorney decided to    10:09<br>17  proceed with any -- proceed with any action against 10:09<br>18  Mr. Johnston?    10:09<br>19      MR. FRANKLIN:  Lacks foundation, calls for 10:09<br>20  speculation.    10:09<br>21      THE WITNESS:  I don't know.    10:09<br>22  BY MS. HEWITT:    10:09<br>23    Q    Did you call the police department    10:09<br>24  subsequently to find out what took place with regard 10:10<br>25  to your identification of Mr. Johnston?    10:10<br><div align="right">Page 232</div> | 1    through conversations with your attorney as to    10:11<br>2  whether or not the police interviewed Jen with    10:11<br>3  regard to what she may or may not have seen on the 10:11<br>4  13th?    10:11<br>5    A    I know that the police told me that they 10:11<br>6  spoke to a witness and I -- I'm assuming that's 10:11<br>7  Jen.    10:11<br>8    Q    Did you have communications with Jen after 10:11<br>9  the event, after February 13th, as to what happened 10:11<br>10  on that date?    10:11<br>11    A    I think I did text her after    10:11<br>12  February 13th.    10:11<br>13    Q    Why did you text her?    10:11<br>14    A    I remember asking her if she had any    10:12<br>15  photos, you know, of the individuals, you know, and 10:12<br>16  if there was any way that she could help because she 10:12<br>17  had told me that she's friends with one of the    10:12<br>18  Bay Boys who's a friendly Bay Boy.  And I know she 10:12<br>19  was trying to get him to forward her an e-mail    10:12<br>20  because she told me that her friend got a group    10:12<br>21  e-mail that apparently goes out to all the Bay Boys 10:12<br>22  about the incidents that had happened.    10:12<br>23      And I don't know, and then she tried to    10:12<br>24  help me identify the individuals.  She was the one 10:12<br>25  that told me that one of the men, that his name    10:12<br><div align="right">Page 234</div> |
| 1    A    I may have; or I may have, you know,    10:10<br>2  relied on my attorneys, I don't remember.    10:10<br>3    Q    Other than any -- going back to    10:10<br>4  February 13th -- other than Jen, did you witness any 10:10<br>5  harassment towards anybody else there at Lunada Bay 10:10<br>6  on February 13th?    10:10<br>7      MR. FRANKLIN:  Vague and ambiguous.    10:10<br>8      THE WITNESS:  I don't remember.  I mean, I 10:10<br>9  think people -- well, I mean, I guess, yeah, people 10:10<br>10  were yelling stuff at me and Jordan when we arrived, 10:10<br>11  so, I guess, towards Jordan.    10:10<br>12  BY MS. HEWITT:    10:10<br>13    Q    So other than yourself, Jordan, and Jen, 10:10<br>14  did you witness any harassment towards anybody else 10:11<br>15  at Lunada Bay that day?    10:11<br>16    A    I think that's it.  I don't remember if I 10:11<br>17  witnessed any harassment towards his friends or not. 10:11<br>18    Q    Did you witness any violence towards    10:11<br>19  Jordan -- towards Jordan that day?    10:11<br>20      MR. FRANKLIN:  Vague and ambiguous.    10:11<br>21      THE WITNESS:  I don't remember.  Like I 10:11<br>22  said, the day was very traumatic so I mostly just 10:11<br>23  remember what happened to me.    10:11<br>24  BY MS. HEWITT:    10:11<br>25    Q    Do you have any understanding other than 10:11<br><div align="right">Page 233</div> | 1    might be Blakeman and she said that he sells drugs 10:12<br>2  to kids.  The text messages are in the report, you 10:12<br>3  know.    10:13<br>4    Q    Did she ever forward you that e-mail?    10:13<br>5    A    No, she never forwarded me that e-mail; 10:13<br>6  no.    10:13<br>7    Q    Are you still in touch with her?    10:13<br>8    A    I haven't been in touch with her for a 10:13<br>9  very long time.    10:13<br>10    Q    When was the last time you communicated 10:13<br>11  with her in any fashion?    10:13<br>12    A    I don't remember.    10:13<br>13    Q    Do you remember if it was more than six 10:13<br>14  months ago?    10:13<br>15    A    I would think so, yes.    10:13<br>16    Q    Do you know what city Jen lives in?    10:13<br>17    A    I don't.  I don't know if she told me or 10:13<br>18  not.    10:13<br>19    Q    And David is her friend or her boyfriend? 10:13<br>20    A    It's her friend, that's what they both 10:13<br>21  told me.    10:13<br>22    Q    Where does David live, do you know?    10:13<br>23    A    I know that David lived in Malibu at one 10:13<br>24  point.  I don't know if he still lives there or not. 10:13<br>25    Q    When you say he is -- is he your friend, 10:13<br><div align="right">Page 235</div> |

<div align="right">13 (Pages 232 - 235)</div>

1    too, David, or is he Jordan's friend?        10:14
2        A    No, he's a friend of mine, too, he's a    10:14
3    mutual friend.        10:14
4        Q    What do you know him from?        10:14
5        A    I met him while surfing.        10:14
6        Q    Did you ever have any conversations with    10:14
7    Cory Spencer with regard to his belief that he would    10:14
8    understand if the district attorney agreed -- the    10:14
9    district attorney felt like they couldn't prosecute    10:14
10   the incident with Johnston?        10:14
11       MR. FRANKLIN:    Lacks foundation.        10:14
12       THE WITNESS:    I don't recall having any    10:14
13   conversation with Cory about that, no.        10:14
14   BY MS. HEWITT:        10:14
15       Q    Okay.  As you sit here today, do you have    10:14
16   any recollection -- we'll get to that in a second.    10:14
17       Let me ask you this:  After the    10:14
18   February 13th incident that very day, in which time    10:14
19   you spoke with the police that day, subsequent to    10:15
20   that, I understand that you contacted the police to    10:15
21   follow up on your report; right, is that what you    10:15
22   told me a little bit earlier today?        10:15
23       MR. FRANKLIN:    Vague and ambiguous.    10:15
24       THE WITNESS:    I called the police after    10:15
25   the incident occurred on February 13th in an attempt    10:15

Page 236

1    to try to reach the detectives so I could schedule a    10:15
2    time to come in and identify the suspect.        10:15
3    BY MS. HEWITT:        10:15
4        Q    Okay.  So you called to try and reach a    10:15
5    detective, did you leave a message?        10:15
6        A    I don't know.  I may have left a message.    10:15
7        Q    You're not sure?        10:15
8        A    I'm not sure.        10:15
9        Q    Which detective were you trying to reach?    10:15
10       A    Detective Venegas.        10:15
11       Q    When was the next time you tried to    10:15
12   contact the police?        10:15
13       A    Well, I don't think I gave you an exact    10:15
14   date for that one because I don't remember the exact    10:15
15   date.        10:15
16       Q    I know, I agree.  When was -- regardless    10:15
17   of when the date of that was when you called and    10:16
18   maybe left a message, maybe not; the next time after    10:16
19   that, what was the next time?        10:16
20       A    I don't remember, I just remember I called    10:16
21   them a few times but I don't remember the exact    10:16
22   dates, exact time frame.        10:16
23       Q    Okay.  Do you remember if you left a    10:16
24   message during any of those subsequent times?    10:16
25       A    I don't, no.        10:16

Page 237

1        Q    At some point did you get in contact with    10:16
2    Detective Venegas?        10:16
3        A    I believe that at some point either he    10:16
4    called me or someone else called me from the    10:16
5    department.        10:16
6        Q    What did he say?        10:16
7        A    I don't remember the first conversation    10:16
8    very well because I think eventually I did meet with    10:16
9    him, I think, I don't know.  But I do remember    10:16
10   speaking to someone from the police department, you    10:16
11   know, telling me that it's not safe at Lunada Bay    10:17
12   and why would I want to go back, it's a rocky beach    10:17
13   and why would a woman want to go to a rocky beach,    10:17
14   and it just seemed like they weren't doing much to    10:17
15   help the situation.  I was also surprised that they    10:17
16   were, you know -- they told me that -- I mean, they    10:17
17   implied that women shouldn't go down to rocky    10:17
18   beaches; I found that comment a little bit strange.    10:17
19       Q    Is this conversation you just told me    10:17
20   about, is this in the sequence of calls you were    10:17
21   making to try to get ahold of Detective Venegas, or    10:17
22   is this some other time?        10:17
23       A    No, it's in that same sequence of me    10:17
24   trying to get ahold of, you know, him or someone at    10:17
25   the police department to help.        10:17

Page 238

1        Q    When you would call to try to get ahold of    10:17
2    Detective Venegas, what would you say to the person    10:17
3    who answered the phone?        10:17
4        A    I don't remember specifically what I would    10:18
5    say at this time, but I would assume that I asked    10:18
6    for him or I would explain, you know, that I'm    10:18
7    trying to reach someone to help me identify the    10:18
8    suspects related to the incident.        10:18
9        Q    At some point -- so let's make sure we get    10:18
10   all these there.        10:18
11       If you were to give me an estimate of how    10:18
12   many times you called the department between    10:18
13   February 13th and the time you came in for the    10:18
14   lineup, what would that be?        10:18
15       A    Well, I probably called maybe three times,    10:18
16   and, you know, I remember then eventually I    10:18
17   proceeded to retain my attorneys because I felt like    10:18
18   that was the only course of action I could take    10:18
19   because the police weren't helping me.        10:18
20       Q    That's why you retained your attorneys?    10:18
21       A    That was one of the reasons why.        10:18
22       Q    When you say that you felt that was the    10:18
23   only course of action that you could take, what do    10:18
24   you mean by that?        10:18
25       A    That that was the only way that I could    10:18

Page 239

14 (Pages 236 - 239)

Page 240

1 get help.                                      10:18
2    Q    What kind of help?                      10:19
3    A    To try to identify the suspect and, you  10:19
4 know, try to stop the harassment at Lunada Bay.  10:19
5    Q    So you also wanted to stop harassment at  10:19
6 Lunada Bay; that's why you retained counsel?     10:19
7    A    That was one of the reasons, yeah, to stop  10:19
8 harassment and, you know, make the public beach  10:19
9 truly public for everyone.                       10:19
10    Q    And when did you start forming that idea  10:19
11 in your head that you wanted to retain counsel?  10:19
12    A    I don't remember when.                  10:19
13    Q    So you know it was sometime between     10:19
14 February 13th and the March 10th letter; right?  10:19
15    A    I don't remember when I first met with Vic  10:19
16 so it would be hard for me to put exact dates on it.  10:19
17    Q    But it would be before March 10th; right?  10:19
18    A    March 10th was what?                    10:19
19    Q    The date of his letter to the City that  10:19
20 you looked at, do you want me to show it to you?  10:19
21    A    No, I remember the letter more or less.  10:19
22         But yeah, I would assume it would be    10:20
23 before March 10th, yes.                          10:20
24    Q    About how many days before March 10th had  10:20
25 you first met with Mr. Otten?                     10:20

Page 241

1    A    I don't remember that.                   10:20
2    Q    Do you think it was more than a week?    10:20
3    A    I don't remember the time frame at all so  10:20
4 I can't guess, I don't know.                      10:20
5    Q    After February 13th during the time you  10:20
6 were calling the City to try to get some help as you  10:20
7 said earlier, were you calling once a week, were you  10:20
8 calling every day?                                10:20
9    A    I don't remember how often I was calling.  10:20
10 I just remember, you know, calling several times and  10:20
11 not being able to schedule a time to come in and     10:20
12 identify the suspect.                             10:20
13    Q    Okay.  And sometime before you first met  10:20
14 with Mr. Otten, is it correct that you decided that  10:20
15 you wanted to retain an attorney; is that right?  10:20
16    A    I don't know; I don't remember.          10:21
17    Q    A little bit earlier today you said you  10:21
18 went and retained counsel because it was the only  10:21
19 way you thought you could get help?               10:21
20    A    Right.  But I don't know if that was     10:21
21 before or after I met with him.  I don't remember.  10:21
22    Q    So it may have been after you first met  10:21
23 with him that you thought retaining counsel was the  10:21
24 only way you could get help; is that correct?     10:21
25    A    Perhaps.  I just don't remember if I met  10:21

Page 242

1 with him before or after.                         10:21
2         THE WITNESS:  If you don't mind, if I can  10:21
3 take a bathroom break in a couple questions.      10:21
4         MS. HEWITT:  Let's take a break.          10:21
5 Absolutely.                                       10:21
6         THE VIDEOGRAPHER:  We are now off the    10:21
7 record.  The time is       a.m.                   10:21
8
8         (Break taken.)                            10:21
9
9         THE VIDEOGRAPHER:  We are now back on the  10:41
10
10 record.  The time is       a.m.                  10:41
11 BY MS. HEWITT:                                   10:41
12    Q    Ms. Reed, did you ever reside at 2341   10:41
13 Chumash Road, Malibu, California, 90265?          10:41
14    A    Yes.                                     10:41
15    Q    Did you live there sometime in 2014?     10:41
16    A    I think so, yeah.                        10:41
17    Q    Do you recall being served with a summons  10:41
18 and complaint in the matter of Eli Rubin versus Gabe  10:42
19 Reed, Gabe Reed Productions, Diana Reed, AKA     10:42
20 Diana -- forgive me, I'm sorry --               10:42
21 Smoluchowska-Miernik AKA Diana Milena Sophia     10:42
22 Gabriella?                                        10:42
23    A    I don't recall being served with that, no.  10:42
24    Q    All right.  And then do you recall -- do  10:42
25 you recall being personally served with that -- I'm  10:42

Page 243

1 sorry, I didn't ask you that -- having someone hand  10:42
2 these to you?                                      10:42
3         MR. FRANKLIN:  Asked and answered.        10:42
4         THE WITNESS:  I don't recall that, no.    10:42
5 BY MS. HEWITT:                                    10:42
6    Q    Do you recall ever receiving in the mail  10:42
7 request for entry of judgment in Eli Rubin versus  10:42
8 Gabe Reed et al.?                                  10:42
9    A    No.                                       10:42
10         MS. HEWITT:  I'll mark as 51, I'll give  10:42
11 everyone else copies later, 51 proof of service  10:43
12 of Diana Reed -- proof of service of Diana Reed.  10:43
13         (Deposition Exhibit 51, Proof of Service  10:43
14         of Diana Reed, was marked for            10:43
15         identification.)                         10:43
16         MS. HEWITT:  And then 52, Request For    10:43
17 Entry of Default.                                 10:43
18         (Deposition Exhibit 52, Request For Entry  10:43
19         of Default, was marked for               10:43
20         identification.)                         10:43
21 BY MS. HEWITT:                                    10:43
22    Q    51 I marked as the proof of service and 52  10:43
23 is the --                                         10:43
24    A    What am I supposed to do?                10:43
25    Q    I haven't asked you a question yet.       10:43

15 (Pages 240 - 243)

| | |
|---|---|
| 1 Just look looking at the caption, does the 10:43 | 1 Lunada Bay. 10:46 |
| 2 caption look familiar to you at all? 10:43 | 2 Since February 13th, how many times have 10:46 |
| 3 A No. 10:43 | 3 you been back to Lunada Bay? 10:46 |
| 4 Q And the caption is -- if you look on page 10:43 | 4 A Since February 13th until what time? 10:46 |
| 5 -- Exhibit 51, do you see the on the left side 10:43 | 5 Q At all. 10:46 |
| 6 there's plaintiff, and then there's a series of 10:43 | 6 A Until today? 10:46 |
| 7 defendants there on the left side named; do you see 10:43 | 7 Q Yes. 10:46 |
| 8 that? 10:43 | 8 A It's hard for me to say, I don't remember 10:46 |
| 9 A Yes. 10:43 | 9 the specific amount but I know it's been a few 10:46 |
| 10 Q Do you see your name in there? 10:43 | 10 times. 10:46 |
| 11 A I do, yes, it's misspelled. 10:44 | 11 Q How many times have you been there with 10:46 |
| 12 Q Okay. Do you ever recall receiving any 10:44 | 12 any reporters or new photographers since 10:46 |
| 13 documents related to that matter reflected in 10:44 | 13 February 13th? 10:46 |
| 14 Exhibit 51? 10:44 | 14 A I don't remember how many interviews we 10:46 |
| 15 A I don't, no. 10:44 | 15 did, but you mean since we filed the lawsuit? 10:46 |
| 16 Q And if you turn the page, you'll see that 10:44 | 16 Q No, since February 13th. 10:46 |
| 17 a couple pages in there is a declaration from a 10:44 | 17 A Since February 13th? I don't know. It 10:47 |
| 18 Mr. McMillan who indicates he served you personally 10:44 | 18 would be hard for me to say. 10:47 |
| 19 on April 7, 2014; do you see that? 10:44 | 19 Q How many times do you recall specifically 10:47 |
| 20 A I'm trying to see it -- where is it, does 10:44 | 20 being at Lunada Bay since February 13th with a news 10:47 |
| 21 it say that? 10:44 | 21 reporter or writer? 10:47 |
| 22 Q If you -- I'm sorry -- you just turn the 10:44 | 22 A I remember there was a time after we filed 10:47 |
| 23 page there and you see there right the third page of 10:44 | 23 the lawsuit when I was doing interviews for TV for 10:47 |
| 24 this document right there it says Mr. McMillan 10:44 | 24 some TV reporters, I was there with Vic, my 10:47 |
| 25 served these documents -- summons and complaint on 10:45 | 25 attorney. And I met them there at the bluff. And 10:47 |
| Page 244 | Page 246 |

| | |
|---|---|
| 1 Diana Reed at this address; do you see that? Do you 10:45 | 1 it was for TV, I don't remember what channel it was 10:47 |
| 2 have any recollection of that? 10:45 | 2 for, though. 10:47 |
| 3 A No, I don't. 10:45 | 3 Q Okay. 10:47 |
| 4 Q Do you ever recall being served with any 10:45 | 4 A But I remember there were two separate 10:47 |
| 5 legal documents at any time in 2014? 10:45 | 5 reporters that were working together as a team to do 10:47 |
| 6 MR. FRANKLIN: Vague and ambiguous, asked 10:45 | 6 like two different stories. 10:47 |
| 7 and answered. 10:45 | 7 Q Okay. 10:47 |
| 8 THE WITNESS: I mean, not that I can 10:45 | 8 A And they were like both recording me at 10:47 |
| 9 remember right now. 10:45 | 9 the same time. So I remember that. 10:47 |
| 10 BY MS. HEWITT: 10:45 | 10 I remember that some members of the 10:47 |
| 11 Q Okay. Do you remember being served at the 10:45 | 11 Bay Boys came out as well and they were recording me 10:48 |
| 12 house with any legal documents related to lawsuits 10:45 | 12 with their cameras, and that was uncomfortable. 10:48 |
| 13 in regard to your husband -- soon-to-be ex-husband, 10:45 | 13 Q How many times have you been back to -- 10:48 |
| 14 I'm sorry? 10:45 | 14 how many times have you attempted to surf at 10:48 |
| 15 A I can't really remember, I have no idea 10:45 | 15 Lunada Bay since February 13th? 10:48 |
| 16 what this is concerning. 10:45 | 16 A I have not attempted to surf at Lunada Bay 10:48 |
| 17 Q And in looking at that document, does it 10:45 | 17 since then because of my injury, I broke my arm 10:48 |
| 18 refresh your recollection at all as to an Eli Rubin? 10:45 | 18 snowboarding so I didn't have that opportunity. 10:48 |
| 19 A I do know that he had a friend Eli. 10:46 | 19 Q Have you attempted to engage in any other 10:48 |
| 20 Q When you say "he," your former ex-husband? 10:46 | 20 water sports at Lunada Bay since February 13th? 10:48 |
| 21 A Yeah. 10:46 | 21 A No, I have not. 10:48 |
| 22 Q He had a friend named Eli Rubin? 10:46 | 22 Q Have you gone to Lunada Bay to try to take 10:48 |
| 23 A That he was doing business with, but I 10:46 | 23 pictures since February 13th? 10:48 |
| 24 don't remember ever seeing these documents. 10:46 | 24 A Yes, I have. 10:48 |
| 25 Q Okay. Let's see. Going back to 10:46 | 25 Q Okay. How many times? 10:48 |
| Page 245 | Page 247 |

16 (Pages 244 - 247)

| | |
|---|---|
| 1    A    I don't remember how many times. I'm sure 10:48 | MR. DIEFFENBACH:  Give her time to think,  10:51 |

**Page 248**

1    A    I don't remember how many times. I'm sure   10:48
2  more than twice. But I would have to think about it   10:49
3  a little bit more. I don't remember the exact   10:49
4  amount of time.   10:49
5    Q    Those times that you were taking   10:49
6  photographs, were you harassed or intimidated?   10:49
7    A    Yeah, unfortunately, I was harassed every   10:49
8  time I was there.   10:49
9    Q    What was the day of the first time you   10:49
10  went back to take photographs after February 13th?   10:49
11    A    Well, like I said, I don't remember   10:49
12  specifically how many times I've been back, so it   10:49
13  would be hard for me to give you a date as of the   10:49
14  first time since the 13th, I don't know if there's   10:49
15  anything I could do to refresh my memory, but...   10:49
16    Q    Let's just break it down. I think you   10:49
17  told me that you've been back twice to take   10:49
18  photographs, so let's just take one --   10:49
19    MR. FRANKLIN:  Misstates prior testimony.   10:49
20    THE WITNESS:  Yeah, at least twice.   10:49
21  BY MS. HEWITT:   10:49
22    Q    At least twice, okay. At least twice,   10:49
23  that's what you told me, at least twice.   10:49
24    Let's look at the first one. The first   10:49
25  one that you remember when you went back to take   10:49

**Page 248**

1  photographs, what harassment or intimidation did you   10:50
2  experience?   10:50
3    A    I would have to think about it for a   10:50
4  little bit longer because I don't remember -- I   10:50
5  mean, I don't remember all the specific times; I   10:50
6  just remember going back more than once and I   10:50
7  remember the harassment that I experienced, but I --   10:50
8  it's hard for me to differentiate them, all the   10:50
9  times from each other, because like I said, I have   10:50
10  to think --   10:50
11    Q    Okay.   10:50
12    A    -- more and do more to refresh my memory.   10:50
13    Q    Okay. What could you do to refresh your   10:50
14  memory about that?   10:50
15    A    Just try to think of when I went.   10:50
16    Q    If you want, we can go off the record and   10:50
17  you want to think about it or you can step out and   10:50
18  talk to your attorney; do you want to do that?   10:50
19    MR. FIELDS:  Look at some photos she took   10:50
20  on her phone maybe?   10:50
21    THE WITNESS:  I don't have any of that   10:50
22  with me.   10:50
23    MR. DIEFFENBACH:  I think we should go off   10:51
24  the record and do that.   10:51
25    MS. HEWITT:  Let's go off the record.   10:51

**Page 249**

1    MR. DIEFFENBACH:  Give her time to think,   10:51
2  because it chews up our time in deposition.   10:51
3    THE VIDEOGRAPHER:  We're off the record.   10:51
4  The time is 10:51a.m.   10:51
5    (Break taken.)   10:56
6    THE VIDEOGRAPHER:  We're now back on the   10:56
7  record. The time is 10:56a.m.   10:56
8  BY MS. HEWITT:   10:56
9    Q    Ms. Reed, we were talking about the   10:56
10  instances since February 13th during which you had   10:56
11  gone back to Lunada Bay in order to take photographs   10:56
12  and you experienced harassment or intimidation. And   10:56
13  I think where we left off is I think you said you   10:56
14  wanted to refresh your recollection about those   10:56
15  instances.   10:56
16    So were you able to do that?   10:56
17    MR. FRANKLIN:  Misstates prior testimony.   10:56
18    THE WITNESS:  What I can do is I do   10:56
19  remember various things from various instances, like   10:56
20  I don't remember, you know, this happened on this   10:56
21  day and this is this day, and this is this day, this   10:56
22  is this day. I kind of remember different bits and   10:56
23  pieces from the times that I went, so I can try to   10:56
24  answer the best I can from what I remember.   10:56
25  ///

**Page 250**

1  BY MS. HEWITT:   10:56
2    Q    So just focusing on instances when you   10:56
3  went back to take photographs after February 13th,   10:56
4  what harassment or intimidation did you experience?   10:57
5    A    Sure.   10:57
6    I remember being constantly photographed   10:57
7  and recorded on cameras. I remember instances, you   10:57
8  know, of people on the bluff doing that. I remember   10:57
9  walking down the trail and people telling me that I   10:57
10  shouldn't be there, and that I should leave and, Oh,   10:57
11  no, you're coming here again, no one wants you here,   10:57
12  what are you doing here. And, you know, I tell   10:57
13  them, well, it's beautiful, public beach, and I'm   10:57
14  allowed to be here.   10:57
15    They would say offensive things to me.   10:57
16  They would, you know, call me a bitch, and they   10:57
17  would say stuff to me after I had passed -- if I was   10:57
18  with a friend, then they would, you know, say   10:57
19  insults about me to my friend.   10:58
20    They -- yeah, they kept basically telling   10:58
21  me that I shouldn't be there and that I'm not   10:58
22  welcome. And I also remember talking to Charlie a   10:58
23  few times and he approached me. I feel like maybe   10:58
24  he felt bad that he didn't do anything regarding the   10:58
25  beer incident to help, so maybe it was his way of   10:58

**Page 251**

17 (Pages 248 - 251)

| | |
|---|---|
| 1 | saying sorry to kind of try to talk to me and   10:58 |
| 2 | explain who the Bay Boys are and how they work   10:58 |
| 3 | and -- I don't know, so I've had various discussions   10:58 |
| 4 | with him. I had discussions with people in the fort   10:58 |
| 5 | and, you know, I also unfortunately experienced   10:59 |
| 6 | harassment in the way that I was told I'm not   10:59 |
| 7 | welcomed there.   10:59 |
| 8 | Q   All right. During any of these incidents,   10:59 |
| 9 | were you ever alone?   10:59 |
| 10 | A   I don't know. I don't recall ever being   10:59 |
| 11 | completely alone. I think I always brought someone   10:59 |
| 12 | with me.   10:59 |
| 13 | Q   Did Jordan ever go with you during any of   10:59 |
| 14 | these instances?   10:59 |
| 15 | A   The only time Jordan went with me was when   10:59 |
| 16 | he was surfing and I don't remember if he surfed   10:59 |
| 17 | since February 13th. If he did, then he would have   10:59 |
| 18 | been there.   10:59 |
| 19 | Q   Do you have a recollection of you   10:59 |
| 20 | experiencing harassment while Jordan was out   10:59 |
| 21 | surfing?   10:59 |
| 22 | MR. FRANKLIN: Vague and ambiguous.   10:59 |
| 23 | BY MS. HEWITT:   10:59 |
| 24 | Q   Since February 13th?   10:59 |
| 25 | A   Right, since February 13th, I don't have a   10:59 |

Page 252

| | |
|---|---|
| 1 | specific recollection of whether or not he went with   10:59 |
| 2 | me down there.   11:00 |
| 3 | I do remember though -- I do remember some   11:00 |
| 4 | people standing on the bluff like telling me that   11:00 |
| 5 | I'm done and that it's over as they were recording   11:00 |
| 6 | me, whatever that means.   11:00 |
| 7 | Q   Who else was with you other -- who else   11:00 |
| 8 | may have been with you other than Jordan; who else   11:00 |
| 9 | do you recall going there with you since --   11:00 |
| 10 | A   Um --   11:00 |
| 11 | Q   -- February 13th?   11:00 |
| 12 | A   I remember I met some surfers at the cove   11:00 |
| 13 | in Pacific Palisades, and I told them about what was   11:00 |
| 14 | going on at Lunada, and they went down there with me   11:00 |
| 15 | a couple of times.   11:00 |
| 16 | Q   Did they experience harassment as far as   11:00 |
| 17 | you could tell?   11:00 |
| 18 | A   Well, they experienced the same harassment   11:00 |
| 19 | that I did, people were telling them they're not   11:00 |
| 20 | welcomed there, they need to leave, and they called   11:00 |
| 21 | me a bitch and they're like, Oh, why aren't you   11:00 |
| 22 | walking next to your bitch friend. They would just   11:00 |
| 23 | say offensive things to us.   11:00 |
| 24 | Q   Who were these --   11:01 |
| 25 | A   And try to intimidate us to leave.   11:01 |

Page 253

| | |
|---|---|
| 1 | Q   Who were these surfers from Pacific   11:01 |
| 2 | Palisades?   11:01 |
| 3 | A   Honestly, I don't remember their names   11:01 |
| 4 | anymore because I just met them in the water.   11:01 |
| 5 | Q   Do you have their name or contact   11:01 |
| 6 | information on your phone anywhere?   11:01 |
| 7 | A   I don't. I have a new phone now, so I   11:01 |
| 8 | don't have their info anymore.   11:01 |
| 9 | Q   Did you attempt to keep in touch with them   11:01 |
| 10 | since they might be class -- they might be putative   11:01 |
| 11 | class members?   11:01 |
| 12 | A   No, I didn't intend to keep in touch with   11:01 |
| 13 | them.   11:01 |
| 14 | Q   Did you tell them that you were bringing   11:01 |
| 15 | this action on behalf of people who you believe were   11:01 |
| 16 | harassed and prevented from going to Lunada Bay?   11:01 |
| 17 | A   You know, I did tell them about the   11:01 |
| 18 | lawsuit, but they after those experiences, they just   11:01 |
| 19 | didn't want to keep in touch with me and they didn't   11:01 |
| 20 | want to be involved. So I didn't keep in touch with   11:01 |
| 21 | them.   11:01 |
| 22 | Q   What phone did you have at the time in   11:01 |
| 23 | this time period, so it would have been sometime   11:01 |
| 24 | subsequent to February 2016 to the present?   11:01 |
| 25 | A   I had an iPhone but my ex-husband threw it   11:01 |

Page 254

| | |
|---|---|
| 1 | into the ocean.   11:02 |
| 2 | Q   And is it the same phone number that you   11:02 |
| 3 | have now?   11:02 |
| 4 | A   It's a different phone number.   11:02 |
| 5 | Q   What phone number was that?   11:02 |
| 6 | A   ███████-3995.   11:02 |
| 7 | Q   Well, who else do you recall going to   11:02 |
| 8 | Lunada Bay with on February 13th when you were   11:02 |
| 9 | taking photographs and experienced harassment?   11:02 |
| 10 | A   I went down there also with a friend of   11:02 |
| 11 | mine that I went to school with.   11:02 |
| 12 | Q   Who's that?   11:02 |
| 13 | A   From USC.   11:02 |
| 14 | Q   What's her name or his name?   11:02 |
| 15 | A   What's his name? Oh, my gosh, I'm so   11:02 |
| 16 | terrible with names. It starts with a "B," I think.   11:02 |
| 17 | But I know his face, I can find his name.   11:02 |
| 18 | Q   Why did you decide to go with "B" to   11:02 |
| 19 | Lunada Bay?   11:02 |
| 20 | A   You know, I just didn't want to go by   11:02 |
| 21 | myself, I was scared, so if I could find someone to   11:02 |
| 22 | go with me then -- then I would ask them to go with   11:02 |
| 23 | me.   11:03 |
| 24 | Q   B is a friend of yours; is that right?   11:03 |
| 25 | A   Yeah, I mean, he's not a close friend, you   11:03 |

Page 255

18 (Pages 252 - 255)

Page 256

```
 1    know, he's more of a classmate I would say.      11:03
 2       Q   Have you been in touch with "B" over the   11:03
 3    time since you graduated from USC?               11:03
 4       A   Off and on, not very much.        11:03
 5       Q   Is there any reason why out of a lot of   11:03
 6    people you picked "B" to go with you to Lunada Bay?  11:03
 7       A   I just reached out to some of my friends   11:03
 8    that I knew surfed. I didn't surf at the time that  11:03
 9    I was going to USC so it wasn't as important to me  11:03
10    then, and he wanted to come along, he was in town.  11:03
11       Q   What does "B" do for a living?        11:03
12       A   He works in film, in the film business.   11:03
13    But I'm not sure what he does right now. Actually,  11:03
14    I'm not even sure if he works in film right now but  11:03
15    we went to film school together so I'm assuming    11:03
16    that's what he does.                  11:03
17       Q   All right. Do you believe currently on   11:03
18    your phone you have B's contact information, either  11:03
19    his phone number or his address, e-mail address,   11:04
20    anything like that?                   11:04
21       A   I have his old phone number that wasn't   11:04
22    working the last time I tried to contact him. So --  11:04
23       Q   When was the last time you tried to     11:04
24    contact him?                       11:04
25       A   I don't remember but I do remember that at  11:04
```

Page 257

```
 1    one point I was trying to contact him and I couldn't  11:04
 2    because he changed his phone number.        11:04
 3       Q   Okay. When you went with "B," did you see  11:04
 4    "B" experience any harassment or intimidation?    11:04
 5       A   Yeah, the same type of stuff as me being   11:04
 6    told that we're not welcomed there, that, you know,  11:04
 7    that we need to leave.               11:04
 8       Q   Okay. Have you with you right now a     11:04
 9    specific recollection of what specific things were  11:04
10    said to "B" and yourself when you were there with   11:04
11    "B"?                           11:04
12       A   I don't have a specific recollection of   11:04
13    what was said to him word-for-word, I don't remember  11:04
14    if he actually walked down the bluff with me or if  11:05
15    he stayed on top of the bluff as I walked down so I  11:05
16    would have to verify that. But the two surfers     11:05
17    from -- that I met at the cove were the ones that --  11:05
18    one of them walked down with me.          11:05
19       Q   The two surfers, did either one of them   11:05
20    surf that day at Lunada Bay?            11:05
21       A   No, they wanted to but they just felt too  11:05
22    intimidated, you know.               11:05
23       Q   Did they say that to you, they felt      11:05
24    intimidated?                       11:05
25       A   Hmm-mm.                   11:05
```

Page 258

```
 1       Q   What did they say?             11:05
 2       A   That -- I don't remember their exact    11:05
 3    wording again, but they felt intimidated by the    11:05
 4    comments that they were experiencing and they      11:05
 5    decided not to go out and we just watched the waves  11:05
 6    instead.                        11:05
 7       Q   What made you think they felt intimidated?  11:05
 8       A   Because that's what they told me.     11:05
 9       Q   They told you they felt intimidated?    11:05
10       A   Yes.                       11:05
11       Q   And "B," did "B" surf that day when you   11:05
12    went with "B"?                     11:05
13       A   No, he didn't surf. He just came to take  11:05
14    photos.                        11:05
15       Q   Okay. Who else did you go down to       11:05
16    Lunada Bay with since February 13th to take photos?  11:05
17       A   That's all I can recall at the moment    11:06
18    right now.                       11:06
19       Q   During any of these instances when you   11:06
20    went down to Lunada Bay since February 13th, had you  11:06
21    already retained counsel?              11:06
22       A   I think so. Yeah, I'm pretty sure I would  11:06
23    have retained counsel but I know the lawsuit wasn't  11:06
24    filed yet because I didn't go back since it was    11:06
25    filed except for the instances with the reporters.  11:06
```

Page 259

```
 1       Q   Okay. So since the complaint was filed    11:06
 2    you have not been back to Lunada Bay except with    11:06
 3    reporters or media?                 11:06
 4       A   Hmm-mm.                   11:06
 5       Q   Yes?                       11:06
 6       A   Yes, yes, hmm-mm.               11:06
 7       Q   All right. With the instances of       11:06
 8    harassment or intimidation that you described to me  11:06
 9    that occurred since February 13th when you went to  11:06
10    Lunada Bay, did you report any of that to the      11:07
11    police?                        11:07
12       A   I don't know, I don't remember. I may    11:07
13    have told them, you know, the people were harassing  11:07
14    me on my way down there.               11:07
15       Q   Do you have a recollection right now of   11:07
16    contacting the police and telling them about those  11:07
17    instances we just discussed?            11:07
18       A   I don't have that recollection right now.  11:07
19       Q   Have you been to Lunada Bay since       11:07
20    February 13th at any time and not experienced any   11:07
21    physical or verbal harassment?           11:07
22       A   Not that I can remember.          11:07
23       Q   So each time you've been back since --   11:07
24       A   Well, I take that back because there was a  11:07
25    time with reporters that I believe that we weren't  11:07
```

| | |
|---|---|
| 1   harassed because I don't think anyone was out -- I   11:07 | 1   like it might overlap; I'm going to try not to   11:09 |
| 2   think that was with -- I'm remembering now -- I   11:07 | 2   overlap with anything we already discussed.   11:09 |
| 3   think that was when we were doing a radio interview,   11:07 | 3     A   Okay.   11:09 |
| 4   I believe, with NPR, NPR or one of those stations.   11:07 | 4     Q   Prior to January 6, 2016, had you ever   11:09 |
| 5         I think that by that point there were no,   11:07 | 5   communicated with the City with regard to anything   11:09 |
| 6   you know, there were no locals out so I don't think   11:08 | 6   pertaining to Lunada Bay?   11:10 |
| 7   anyone harassed us then.   11:08 | 7     A   No.   11:10 |
| 8     Q   Was that the only instance that you can   11:08 | 8     Q   Okay.  Prior to January 29th, so between   11:10 |
| 9   remember when you were not harassed since   11:08 | 9   January 6th and January 29th -- I mean, January 6th   11:10 |
| 10   February 13th when you were at Lunada Bay?   11:08 | 10   and January 29th -- had you ever discussed anything   11:10 |
| 11     A   This time, yes.   11:08 | 11   with anybody from the City with regard to   11:10 |
| 12     Q   Have you seen any communications between   11:08 | 12   Lunada Bay?   11:10 |
| 13   Cory Spencer and the City in which Spencer thanks   11:08 | 13     A   Between January 6th and January 29th?   11:10 |
| 14   Chief Kepley for what Chief Kepley has done to help   11:08 | 14     Q   Right.   11:10 |
| 15   out the situation at Lunada Bay?   11:08 | 15     A   I don't think so.   11:10 |
| 16         MR. FRANKLIN:  Vague and ambiguous.   11:08 | 16     Q   Before you actually went on January 29th?   11:10 |
| 17         THE WITNESS:  I have not seen that, no.   11:08 | 17     A   I don't think so.   11:10 |
| 18   BY MS. HEWITT:   11:08 | 18     Q   Was your contact with police on   11:10 |
| 19     Q   Have you seen any communications in which   11:08 | 19   January 29th the first time you had ever spoken with   11:10 |
| 20   Cory Spencer thanks Chief Kepley for providing extra   11:08 | 20   anybody from the Palos Verdes Estates Police   11:10 |
| 21   patrols whenever Spencer has asked for them?   11:08 | 21   Department with regard to Lunada Bay?   11:10 |
| 22         MR. FRANKLIN:  Vague and ambiguous.   11:08 | 22     A   Yes, I think so, yes.   11:10 |
| 23         THE WITNESS:  I don't remember him showing   11:08 | 23     Q   When I say communicated, meaning e-mail,   11:10 |
| 24   me any kind of communication.   11:08 | 24   phone, in person?   11:11 |
| 25   ///                                                       Page 260 | 25     A   Yeah, you're referring to when I filed the   11:11                                                       Page 262 |

| | |
|---|---|
| 1   BY MS. HEWITT:   11:08 | 1   report.   11:11 |
| 2     Q   Okay.  Had Cory ever told you he had done   11:08 | 2     Q   Well, I'm just making sure when I say,   11:11 |
| 3   that, that he had e-mailed Chief Kepley and thanked   11:08 | 3   "Have you ever communicated with them" --   11:11 |
| 4   him for all that Chief Kepley has done?   11:08 | 4     A   You mean have I communicated with -- not   11:11 |
| 5     A   I don't remember that, no, I don't think   11:08 | 5   that I know of, I don't think so, no.   11:11 |
| 6   so.   11:08 | 6     Q   Between January 29th -- so on January 29th   11:11 |
| 7     Q   Okay.   11:08 | 7   we discussed your interactions with the police that   11:11 |
| 8     A   You know, I don't know Cory that well so I   11:08 | 8   day; and then going from January 29th through the   11:11 |
| 9   don't really have conversations with him, you know,   11:08 | 9   day before February 5th I think you went with the --   11:11 |
| 10   other than the conversations that I told you about.   11:09 | 10   you went and you encountered the L.A. Times   11:11 |
| 11   I don't, like, call him or talk to him or anything   11:09 | 11   photographer there --   11:11 |
| 12   like that.   11:09 | 12     A   Hmm-mm.   11:11 |
| 13     Q   Just to finish that part out.   11:09 | 13     Q   In between that time, did you communicate   11:11 |
| 14         Did Cory ever tell you that he tried to   11:09 | 14   with anybody at the City with regard to Lunada Bay?   11:11 |
| 15   warn Chief Kepley about some litigation that was   11:09 | 15         MR. FRANKLIN:  Vague.   11:11 |
| 16   going to be filed with regard to Lunada Bay?   11:09 | 16   BY MS. HEWITT:   11:11 |
| 17     A   He did not tell me that, no.   11:09 | 17     Q   When I say "City," I mean, police   11:11 |
| 18     Q   And did Cory ever tell you that he felt a   11:09 | 18   department or anybody at the City.   11:11 |
| 19   sense of brotherly obligation cop-to-cop with   11:09 | 19         MR. FRANKLIN:  Vague and ambiguous.   11:11 |
| 20   Chief Kepley?   11:09 | 20         THE WITNESS:  Between what date and what   11:11 |
| 21     A   No, he didn't tell me that.   11:09 | 21   date?  Between February 6th and then what was the   11:11 |
| 22     Q   Since the -- let's work backwards now.   11:09 | 22   start date?   11:11 |
| 23         I want to now discuss here so that I can   11:09 | 23   BY MS. HEWITT:   11:11 |
| 24   finish my questioning here.  I want to discuss all   11:09 | 24     Q   Between January 29th, so concluding with   11:11 |
| 25   your communication with the City.  Some of it seems   11:09                                                       Page 261 | 25   that day.   11:11                                                       Page 263 |

20 (Pages 260 - 263)

```
 1     A    Uh-huh.                          11:11
 2     Q    And February 6th -- or February 5th when   11:11
 3  you went to the --                       11:12
 4     A    Right.                          11:12
 5         Well, I know that at some time I picked up  11:12
 6  a hard drive, not the hard drive, the card, like the  11:12
 7  SD card, I think, it was.  But I don't know if I   11:12
 8  picked it up prior to the 5th or after the 5th.  I  11:12
 9  know it was after the 29th that I picked it up.   11:12
10     Q    Did you pick it up in person?        11:12
11     A    Yes.                           11:12
12     Q    Did you contact somebody there in order to  11:12
13  arrange pickup?                        11:12
14     A    I don't remember if I called them prior to  11:12
15  that or if I just drove there to go get it.      11:12
16     Q    Did you talk to anybody at the City about  11:12
17  Lunada Bay when you were picking up the hard      11:12
18  drive -- picking up the card, sorry?            11:12
19     A    I don't believe so.  I believe that     11:12
20  everyone was at lunch and so I spoke to -- I only   11:12
21  was helped by a lady at the window that gave me the  11:12
22  card from what I could remember, I think I did -- I  11:13
23  think I did ask for Detective Venegas, so I'm     11:13
24  assuming this was after the February 13th incident  11:13
25  that I picked it up.                      11:13
                                    Page 264
```

```
 1     Q    Okay.                          11:13
 2     A    Yeah, I think I did ask for him and he    11:13
 3  said he wasn't available for some reason, like he   11:13
 4  wouldn't come out and talk to me.  So that must have  11:13
 5  been after the February 13th incident that I picked  11:13
 6  it up.                               11:13
 7     Q    Aside from picking up the card then, as   11:13
 8  you sit here today, do you recall any communications  11:13
 9  with the City between January 29th and February 5th  11:13
10  with regard to Lunada Bay?                   11:13
11         MR. FRANKLIN:  Vague and ambiguous.      11:13
12         THE WITNESS:  I don't remember if I had   11:13
13  any communications regarding what was filed on the   11:13
14  29th between that time.  It's possible.  But I don't  11:13
15  recall anything right now.                  11:14
16  BY MS. HEWITT:                         11:14
17     Q    Between February 5th and February 13th, do  11:14
18  you recall any communications with the City or City  11:14
19  police department with regard to Lunada Bay?      11:14
20     A    Again, I don't remember anything, but it  11:14
21  is possible that I might have had communications    11:14
22  related to the incident on the 29th.            11:14
23     Q    You don't have recollection of that right  11:14
24  now?                               11:14
25     A    I don't have recollection of it right now,  11:14
                                    Page 265
```

```
 1  no.                                11:14
 2     Q    Following February 13th we talked about   11:14
 3  your interactions with the police that day, and we  11:14
 4  talked about the fact that you called the City     11:14
 5  several times after February 13th.  But I think you  11:14
 6  weren't sure exactly how many times; right?       11:14
 7     A    Yeah, I mean, I just remember calling the  11:14
 8  City many times to try to reach Detective Venegas.  11:14
 9  I remember now going there to try to get the card   11:14
10  and try to talk to Detective Venegas which I think  11:14
11  is the reason why I went there in person.  He     11:14
12  didn't, you know, couldn't meet with me for whatever  11:14
13  reason, he couldn't meet with me.             11:15
14         I remember it was an extremely, extremely  11:15
15  difficult process to try and get them to identify --  11:15
16  to try to give him the photos to identify the      11:15
17  suspect.                             11:15
18         I remember my attorney had to write a      11:15
19  letter.  I remember then meeting with Mr. Kepley,   11:15
20  and they still wouldn't show me the photos at that  11:15
21  meeting.  And it wasn't until a long, long time     11:15
22  after the incident that I could finally identify the  11:15
23  suspects.  It was an incredibly, incredibly long    11:15
24  process.                             11:15
25     Q    About how many months do you think that   11:15
                                    Page 266
```

```
 1  took?                               11:15
 2     A    I don't know.  But I just remember it took  11:15
 3  a lot of attempts both on my part and on my       11:15
 4  attorney's part to get that to happen.          11:15
 5     Q    So let's go through that here now.  Right  11:15
 6  now we're focusing on communications you had with   11:15
 7  the City.                            11:15
 8         So earlier on I think you said you had     11:15
 9  contacted them or tried to call Venegas many times;  11:16
10  I think you said you didn't know how many times.    11:16
11     A    Right.  I mean, I remember there were many  11:16
12  times I tried to reach him and I couldn't.        11:16
13     Q    Can you quantify for me or estimate what  11:16
14  "many" means.  To me, "many" is different than what  11:16
15  we talked about earlier.                   11:16
16     A    Right.                         11:16
17     Q    So, is it more than five times?        11:16
18     A    I mean, to me it would be, you know, three  11:16
19  times would be many times, depending, you know, what  11:16
20  time period it's in of course.  You know, three     11:16
21  times over a long period of time would not be many.  11:16
22  But I do remember, you know, going there in person  11:16
23  as well now, I just remember I kept trying and     11:16
24  trying to reach him and I couldn't.            11:16
25     Q    Now, when you went there and you said you  11:16
                                    Page 267
```

21 (Pages 264 - 267)

Page 268

```
 1   couldn't meet with Detective Venegas, did you have   11:16
 2   an appointment that day?                              11:16
 3       A   I don't remember, I don't believe so.        11:16
 4       Q   Is that when you went to pick up the card?   11:16
 5       A   I think so.                                   11:17
 6       Q   So those are the same event, okay?           11:17
 7       A   Hmm-mm.                                       11:17
 8       Q   You said separately you went to go meet      11:17
 9   Chief Kepley?                                         11:17
10       A   I did, yes.                                   11:17
11       Q   Who did you go with to meet Chief Kepley?    11:17
12       A   I went with my attorney, with Vic.           11:17
13       Q   Okay.  Anybody else?                          11:17
14       A   No, just with him.                            11:17
15       Q   At the time you went with Vic to meet with   11:17
16   Chief Kepley, were you meeting with Chief Kepley      11:17
17   because you wanted him to do something more with the  11:17
18   report that you filed on February 13th?              11:17
19       A   Yes, we had been trying to have them help    11:17
20   us identify the suspect.  And we were under the       11:17
21   impression that it was a meeting to look at photos    11:17
22   to try and identify, you know, who did those things  11:17
23   to me.                                                11:17
24       Q   Okay.  And do you know -- recall if it was   11:17
25   you or Mr. Otten who requested the meeting, who       11:18
```

Page 269

```
 1   specifically requested, like made the request of the  11:18
 2   City to meet with Chief Kepley?                        11:18
 3       A   I believe that Vic specifically requested      11:18
 4   to meet with Mr. Kepley.  I had been requesting to     11:18
 5   meet with Mr. Venegas.                                 11:18
 6       Q   How many times did you meet with              11:18
 7   Chief Kepley personally?                               11:18
 8       A   With met with him, I believe, once.  I        11:18
 9   don't think he was there the second time I came        11:18
10   back.                                                  11:18
11       Q   Okay.  Who have you met with in person at     11:18
12   the City of Palos Verdes Estates Police Department     11:18
13   besides Chief Kepley?                                  11:18
14       A   Well, there was someone else in the room      11:18
15   with him that I don't remember his name.  And then     11:18
16   when I was there to pick up the hard drive, I met      11:18
17   with a female police officer.  When I was              11:18
18   identifying photos there was more than one person in   11:18
19   the room with me and Detective Venegas may have been   11:18
20   one of them because I think I do remember meeting      11:19
21   him so I think he might have been there.               11:19
22       Q   When was the time that somebody told you     11:19
23   why would a woman want to go to the beach in the       11:19
24   rocky fort anyway?                                     11:19
25       A   That was during one of the times that I      11:19
```

Page 270

```
 1   was calling, you know, one of the attempts to come    11:19
 2   in to identify the photos.                             11:19
 3       Q   Okay.                                          11:19
 4       A   The suspects.                                  11:19
 5       Q   Did you say that was a female that you        11:19
 6   talked to then?                                        11:19
 7       A   No, it was not a female.                       11:19
 8       Q   Do you recall the name of that person now     11:19
 9   who told you that?                                     11:19
10       A   I don't unfortunately.  I remember it was     11:19
11   a man but I don't remember his name.                   11:19
12       Q   Did you ever tape record or record in any    11:19
13   way any conversations you had with anybody at the     11:19
14   City of Palos Verdes Estates?                          11:19
15       A   No.                                            11:19
16       Q   Did anybody who was with you as far as you   11:19
17   know ever tape record or record any conversations     11:19
18   that were had with anybody at the City of             11:19
19   Palos Verdes Estates Police Department?               11:20
20       A   Not that I know of, no.                        11:20
21       Q   Who recorded the conversation that you       11:20
22   provided to us today with Ferrara?                     11:20
23       A   My phone.                                      11:20
24       Q   Did you ask Mr. Ferrara if it was okay to    11:20
25   record?                                                11:20
```

Page 271

```
 1           MR. FRANKLIN:  Vague and ambiguous.           11:20
 2           THE WITNESS:  I did not ask Mr. Ferrara if    11:20
 3   it was okay to record because he was recording me as  11:20
 4   well.                                                  11:20
 5   BY MS. HEWITT:                                         11:20
 6       Q   Okay.  Okay.  Following the conversation      11:20
 7   with Chief Kepley, did you have any expectation of     11:20
 8   further action that was going to be taken?             11:20
 9       A   Following the conversation?                    11:20
10       Q   (Nods head.)                                   11:20
11       A   Yeah, I assumed that I would be able to       11:20
12   finally try and identify those individuals.            11:20
13       Q   Okay.  And were you able to do that?          11:20
14       A   Eventually, yeah, after calling repeated      11:20
15   times, after meeting with Mr. Kepley, eventually I,   11:21
16   you know -- I don't know how I found out about it if  11:21
17   it was through my attorneys or if someone contacted   11:21
18   me directly, but eventually I came in to identify     11:21
19   the suspects, yes.  Just one of them.                  11:21
20       Q   Okay.  So the answer was "yes"?               11:21
21           MR. FRANKLIN:  Vague as to time.              11:21
22           THE WITNESS:  The answer was that             11:21
23   eventually, yes, I was provided with the opportunity  11:21
24   to identify one of the suspects.                       11:21
25   ///
```

22 (Pages 268 - 271)

BY MS. HEWITT:                                  11:21

Q    Okay. Have you communicated with anybody  11:21
at the City via e-mail?                         11:21

A    I don't know. I may have. I don't know.   11:21

Q    Do you have any recollection of sending   11:21
any e-mails to anybody at the City of Palos Verdes  11:21
Estates regarding Lunada Bay?                   11:21

A    I don't. I have a recollection of talking  11:21
on the phone, I don't have a recollection of e-mail,  11:21
but it is possible that I did that, but I don't  11:21
remember doing that right now.                  11:21

And the reason I say it is possible         11:22
because perhaps it was an e-mail that my attorneys  11:22
wrote that I was copied on or attached on, I don't  11:22
remember.                                       11:22

Q    If you had any e-mails, would they be on  11:22
your computer at home or do you typically print them  11:22
out?                                            11:22

A    No, I don't print them out and they're    11:22
just all on the server.                         11:22

Q    Do you keep them in an e-mail folder or   11:22
something on your computer?                     11:22

A    No, I don't download them.                 11:22

Q    Okay. What kind of e-mail do you have?    11:22

A    Gmail.                                     11:22

Page 272

Q    Do you just keep them in your Gmail?      11:22

A    Yeah, so Google has all of them.          11:22

Q    Have you provided any e-mails that you    11:22
have that relate to your claims as to Lunada Bay to  11:22
your attorneys?                                 11:22

MR. FRANKLIN: Vague and ambiguous.          11:22

THE WITNESS: I think that I've provided     11:22
everything that I have to them.                 11:22

BY MS. HEWITT:                                  11:22

Q    What is your Gmail address?               11:22

A    D-i-a-n-a-m-i-l-e-n-a-f-i-l-m at          11:23
Gmail.com.                                      11:23

Q    Are there any other e-mail addresses that  11:23
you use currently or that you have within the last  11:23
two years?                                      11:23

A    There are, but I don't really use them.   11:23

Q    What are they?                            11:23

A    I have Diana Milena, which is the same    11:23
spelling as that, Reed at Gmail. And Diana Milena  11:23
Gabrielle at Gmail.                             11:23

Q    Have you sent any hard copy letters to    11:23
anybody at the City of Palos Verdes with regard to  11:23
Lunada Bay?                                     11:23

A    The attorneys have sent them on my behalf  11:23
but I haven't sent any directly.                11:23

Page 273

Q    Have you received anything in the mail    11:24
from the City of Palos Verdes Estates directly to  11:24
you with regard to Lunada Bay?                  11:24

A    No.                                        11:24

Q    When you did the photo lineup, who did you  11:24
meet with at the City?                          11:24

MR. FRANKLIN: Vague as to time.             11:24

THE WITNESS: Again, I told you I don't      11:24
remember. I remember there was, I think, two police  11:24
officers, one of them may have been             11:24
Detective Venegas because I do have a memory of  11:24
meeting a person at one point so I'm assuming it was  11:24
then.                                           11:24

BY MS. HEWITT:                                  11:24

Q    Detective Venegas was the one that you    11:24
were calling to try to -- you were trying to see  11:24
him; right?                                     11:24

A    Yes.                                       11:24

Q    But you're not sure if that's who was     11:24
there at the lineup; right?                     11:24

A    I'm not sure, but I think he was there,   11:24
but I'm not a hundred percent positive.         11:24

Q    Let's just go with -- in the complaint    11:24
you've alleged that defendant's conduct has caused  11:24
you pain and suffering, loss of sleep, emotional  11:24

Page 274

distress, and mental anguish; is that true?     11:24

A    Yes.                                       11:25

Q    How has Chief Kepley caused you pain and  11:25
suffering?                                      11:25

MR. FRANKLIN: Vague and ambiguous.          11:25

THE WITNESS: Chief Kepley is a             11:25
representative of the police and all the things I  11:25
feel have not been done, you know, by the police I  11:25
would attribute to him since he's in charge so --  11:25
you know, the fact that it was so difficult to  11:25
identify these individuals, the fact that I had to  11:25
call repeatedly over and over, the fact that I had  11:25
to have my attorneys write a letter before they  11:25
would even meet with me; the fact that I had to  11:25
drive there in an attempt to meet with the      11:25
detective, they wouldn't meet with me; just this  11:25
entire struggle of trying to identify who these  11:25
people were and trying to overcome all the trauma  11:25
that I was dealing with. I do attribute all that to  11:26
Mr. Kepley by not -- by not helping to make the  11:26
situation happen in a, you know, a quicker way where  11:26
I had to take all those steps in order to finally be  11:26
able to view those photos.                      11:26

BY MS. HEWITT:                                  11:26

Q    You said that Venegas wouldn't meet with  11:26

Page 275

23 (Pages 272 - 275)

1    you.                               11:26
2         Did you ever go there and they said he    11:26
3    would not meet with you?               11:26
4         A    Yes, yes, the time I went there to get the   11:26
5    hard drive, he wouldn't meet with me because, you   11:26
6    know, he just wasn't available.          11:26
7         Q    Was he -- did they tell you he was not   11:26
8    available or did they say he won't meet with you?   11:26
9         A    I don't remember the wording that they   11:26
10   used.                              11:26
11        Q    Okay.  Do you have any knowledge as to   11:26
12   what the -- withdraw.                 11:27
13        Now, the pain and suffering that you   11:27
14   attribute, how have you experienced pain and   11:27
15   suffering?  Describe your symptoms with the pain and   11:27
16   suffering you suffered?               11:27
17        A    I've had loss of sleep -- you mean the   11:27
18   entire -- the entire course of events that happened   11:27
19   to me at the fort was extremely traumatic, you know,   11:27
20   I felt -- felt like I could have even been raped.  I   11:27
21   mean, it was incredibly frightening, I felt   11:27
22   helpless.  Just that whole memory of the event has   11:27
23   caused me to be fearful and just really affected my   11:27
24   piece of mind.                      11:27
25        Q    Did it cause you to be fearful of going to   11:27
                                                  Page 276

1    Lunada Bay after February 13th?          11:28
2         A    Of course.  Yeah, it caused that as well,   11:28
3    hmm-mm.                           11:28
4         Q    Okay.  And you did go to Lunada Bay after   11:28
5    that, February 13th; right?             11:28
6         A    I do go back.  And the reason why is   11:28
7    because I don't believe in bullying.  I will stand   11:28
8    up to bullies.  I will do what's right, it's a   11:28
9    public beach, and if I don't go then who else will   11:28
10   go.  And, you know, I just, you know, I don't   11:28
11   believe in them bullying me into being fearful of   11:28
12   going somewhere that's beautiful and should be   11:28
13   accessible to all people.             11:28
14        Q    Now, your loss of sleep, are you able to   11:28
15   differentiate from any loss of sleep between any of   11:28
16   Chief Kepley's actions and being pregnant?   11:28
17        A    Yes, because at the time that this   11:28
18   occurred I wasn't pregnant.            11:28
19        Q    When did you get pregnant?          11:28
20        A    You know, we're not 100 percent sure.   11:29
21        Q    Who's "we"?                   11:29
22        A    Me and my partner.               11:29
23        But around the beginning of March I would   11:29
24   think.                              11:29
25        Q    Have you experienced loss of sleep that   11:29
                                                  Page 277

1    you attribute to Chief Kepley from beginning of   11:29
2    March on?                          11:29
3         A    I attribute -- I experienced loss of sleep   11:29
4    immediately following the February 13th incident.   11:29
5    And the fact that Chief Kepley, you know, failed to   11:29
6    help with the matter, you know, aggravated the way   11:29
7    that I felt.                        11:29
8         Q    Okay.  And how many times did you ask   11:29
9    Chief Kepley?                      11:29
10        A    And by the way, regarding the pregnancy, I   11:29
11   didn't start experiencing loss of sleep until my   11:29
12   third trimester.                    11:29
13        Q    That you attribute to the --         11:30
14        A    That I attribute to the pregnancy.     11:30
15        Q    Are you sure that's the only loss of sleep   11:30
16   that you can attribute to the pregnancy?   11:30
17        A    I'm positive.  If I didn't have to empty   11:30
18   my bladder every hour and I could sleep normally,   11:30
19   you know.                          11:30
20        Q    Have you discussed your loss of sleep due   11:30
21   to these events with any of your physicians?   11:30
22        A    I mean, I think that what I discussed with   11:30
23   my doctors is private.               11:30
24        Q    Ordinarily so, but you put your loss of   11:30
25   sleep at issue in this case.           11:30
                                                  Page 278

1         So, have you discussed your loss of sleep   11:30
2    with any of your physicians?           11:30
3         A    I have discussed some of these incidents   11:30
4    with him.                          11:30
5         Q    What did you discuss specifically with   11:30
6    your physicians with regard to these incidents?   11:30
7         A    You know, I just -- I explained the   11:30
8    trauma, you know, that I'm dealing with because of   11:30
9    that.                              11:30
10        Q    What physician was that that you talked   11:30
11   about that with?                    11:30
12        A    I don't remember her name right now.   11:30
13        Q    How many doctors have you talked about   11:31
14   this with?                          11:31
15        A    Just one.                     11:31
16        Q    Is it -- what type of doctor is that?  Is   11:31
17   it your ob-gyn?                     11:31
18        A    No, no, it's not my ob-gyn.  It was a   11:31
19   mental health doctor, I don't know her exact title.   11:31
20        Q    Where is she located?             11:31
21        A    UCLA.                        11:31
22        Q    So do you think she's a psychiatrist or a   11:31
23   psychologist?                      11:31
24        A    She's the one that has an M.D., I always   11:31
25   mix them up, I'm sorry, but she's the one that's an   11:31
                                                  Page 279

24 (Pages 276 - 279)

| | | |
|---|---|---|
| 1 | actual doctor. | 11:31 |
| 2 | Q    How long have you been seeing her? | 11:31 |
| 3 | A    I just saw her once for an initial | 11:31 |
| 4 | recommendation for other doctors that were closer to | 11:31 |
| 5 | my area. | 11:31 |
| 6 | Q    When was that that you talked to her about | 11:31 |
| 7 | the trauma? | 11:31 |
| 8 | A    I don't recall specifically.  I mean, it | 11:31 |
| 9 | was in my third trimester. | 11:32 |
| 10 | Q    That would have been within the last two | 11:32 |
| 11 | months? | 11:32 |
| 12 | A    Yes. | 11:32 |
| 13 | Q    You don't recall her name? | 11:32 |
| 14 | A    No, I don't. | 11:32 |
| 15 | Q    Did she prescribe any medication to you | 11:32 |
| 16 | for any of the loss of sleep? | 11:32 |
| 17 | A    She didn't prescribe medication, but I | 11:32 |
| 18 | don't want to take any medication right now because | 11:32 |
| 19 | it can have bad health effects for the baby, so... | 11:32 |
| 20 | Q    Understood, yes. | 11:32 |
| 21 | Do you attribute any loss of sleep to your | 11:32 |
| 22 | divorce that you're undergoing right now? | 11:32 |
| 23 | A    Not at the moment, no. | 11:32 |
| 24 | Q    Have you ever -- you described your | 11:32 |
| 25 | marriage as an abusive relationship? | 11:32 |

Page 280

| | | |
|---|---|---|
| 1 | A    Right. | 11:32 |
| 2 | Q    How was it so? | 11:32 |
| 3 | A    It was verbally and physically abusive. | 11:32 |
| 4 | Q    Do you attribute any of the emotional | 11:32 |
| 5 | distress that you are claiming to anything related | 11:33 |
| 6 | to your divorce and your abusive marriage? | 11:33 |
| 7 | A    Not during this time period, no. | 11:33 |
| 8 | Q    What do you mean by "not during this | 11:33 |
| 9 | period"? | 11:33 |
| 10 | A    That -- well, the stress that I felt was | 11:33 |
| 11 | while I was married. | 11:33 |
| 12 | Q    So once -- | 11:33 |
| 13 | A    Or while we were living together I would | 11:33 |
| 14 | say. | 11:33 |
| 15 | Q    So once you stopped living with Mr. Reed, | 11:33 |
| 16 | you no longer felt any emotional distress? | 11:33 |
| 17 | A    I felt a lot of relief, yes. | 11:33 |
| 18 | Q    Did you still feel any emotional distress? | 11:33 |
| 19 | A    No, not really, no. | 11:33 |
| 20 | Q    Okay.  When did you move out from -- move | 11:33 |
| 21 | out from wherever you were living with Mr. Reed? | 11:33 |
| 22 | A    We moved out of our home in Malibu in May, | 11:33 |
| 23 | I'm just trying to remember what year, I think, | 11:34 |
| 24 | 2015.  Around May.  May or June. | 11:34 |
| 25 | Q    Other than the UCLA Medical Center doctor | 11:34 |

Page 281

| | | |
|---|---|---|
| 1 | that you described earlier, have you told any of | 11:34 |
| 2 | your -- any physician that you've seen about any of | 11:34 |
| 3 | the incidents that you're alleging in the matter | 11:34 |
| 4 | here today? | 11:34 |
| 5 | A    I told my attorney about it, Vic. | 11:34 |
| 6 | Q    Any -- I'm sorry, I probably wasn't clear. | 11:34 |
| 7 | Any physicians or medical providers? | 11:34 |
| 8 | A    No, I didn't have insurance at the time | 11:34 |
| 9 | unfortunately so although I really wanted to see | 11:34 |
| 10 | someone, I couldn't afford to do it. | 11:34 |
| 11 | Q    Do you have an ob-gyn? | 11:34 |
| 12 | A    I do. | 11:34 |
| 13 | Q    Have you told your ob-gyn about any of the | 11:35 |
| 14 | loss of sleep or emotional distress you're claiming | 11:35 |
| 15 | from the events in this matter? | 11:35 |
| 16 | A    My ob-gyn doesn't discuss mental health | 11:35 |
| 17 | with me. | 11:35 |
| 18 | MS. HEWITT:  Maybe you can read back the | 11:35 |
| 19 | question. | 11:35 |
| 20 | (Record read:  "Have you told your ob-gyn | 11:35 |
| 21 | about any of the loss of sleep or | 11:35 |
| 22 | emotional distress you're claiming from | 11:35 |
| 23 | the events in this matter?") | 11:35 |
| 24 | THE WITNESS:  Yeah, I don't discuss mental | 11:35 |
| 25 | health with her, so. | 11:35 |

Page 282

| | | |
|---|---|---|
| 1 | BY MS. HEWITT: | 11:35 |
| 2 | Q    So is that a "no"? | 11:35 |
| 3 | A    Yes. | 11:35 |
| 4 | Q    How about -- what other medical providers | 11:35 |
| 5 | do you see -- have you seen within the last five | 11:35 |
| 6 | months other than the medical doctor at UCLA? | 11:35 |
| 7 | A    Well, I just got insurance finally, I | 11:35 |
| 8 | believe, in July or August.  So I haven't seen that | 11:35 |
| 9 | many doctors related to this incident. | 11:35 |
| 10 | Q    What medical providers have you seen in | 11:35 |
| 11 | the last five months other than the UCLA Medical | 11:36 |
| 12 | Center doctor you described? | 11:36 |
| 13 | A    Well, I had a prior ob-gyn prior to her. | 11:36 |
| 14 | Q    What was the ob-gyn's name? | 11:36 |
| 15 | A    Dr. Samuel Porter. | 11:36 |
| 16 | Q    Where is Samuel Porter located? | 11:36 |
| 17 | A    He's located in Los Angeles. | 11:36 |
| 18 | Q    Who is your current ob-gyn? | 11:36 |
| 19 | A    Dr. Pamela Boyer. | 11:36 |
| 20 | Q    Is that B-o-y-e-r? | 11:36 |
| 21 | A    Yes. | 11:36 |
| 22 | Q    Where is Dr. Boyer located? | 11:36 |
| 23 | A    At UCLA hospital. | 11:36 |
| 24 | Q    Other than Dr. Boyer and Samuel Porter -- | 11:36 |
| 25 | Dr. Samuel Porter, and the UCLA Medical Center | 11:36 |

Page 283

25 (Pages 280 - 283)

| | |
|---|---|
| 1 doctor, have you ever seen any other medical 11:36 | BY MS. HEWITT: 11:38 |
| 2 providers in the last six to nine months? 11:36 | 2  Q  As you sit here today, would you like the 11:38 |
| 3  A  From all fields you mean? 11:36 | 3 City of Palos Verdes Estates Chief of Police, Chief 11:38 |
| 4  Q  All fields. 11:36 | 4 Kepley, to pay you any money for anything related to 11:38 |
| 5  A  Yes, I have. 11:36 | 5 in this complaint? 11:38 |
| 6  Q  Who are those besides the ones we've 11:36 | 6  A  What I want Chief Kepley to do is create 11:38 |
| 7 already discussed? 11:36 | 7 public access at Lunada Bay that's safe for all 11:39 |
| 8  A  I also have seen a dermatologist at UCLA 11:36 | 8 individuals, that's what I want him to do. 11:39 |
| 9 Medical Center, I don't remember her name. I have 11:37 | 9  Q  Is that all you want -- 11:39 |
| 10 also seen a doctor at Venice Family Clinic, and I 11:37 | 10  A  Whether -- 11:39 |
| 11 don't remember her name either. The very first 11:37 | 11  Q  Go ahead. 11:39 |
| 12 doctor that I saw for the pregnancy was located in 11:37 | 12  A  Whether that entails money, that's up to 11:39 |
| 13 downtown L.A. but I don't recall his name, I just 11:37 | 13 my attorneys, I don't know what they want. You 11:39 |
| 14 saw him, I believe, just one time. 11:37 | 14 know, if they deem that that's fair. But I want 11:39 |
| 15  And I think that's everyone that I've 11:37 | 15 public access at Lunada Bay. That's why I'm here. 11:39 |
| 16 seen. 11:37 | 16  Q  As you sit here today, that's what you 11:39 |
| 17  Q  Okay. Thank you. 11:37 | 17 want? 11:39 |
| 18  With regard to any pain and suffering, 11:37 | 18  A  Yes. 11:39 |
| 19 loss of sleep, emotional distress, and mental 11:37 | 19  Q  Do you want the City itself to pay you any 11:39 |
| 20 anguish that you claimed Chief Kepley caused you, 11:37 | 20 money? 11:39 |
| 21 are you seeking any damages from the chief for those 11:37 | 21  A  Again, I leave that decision up to the 11:39 |
| 22 damages? 11:37 | 22 court and my attorneys to decide if that's 11:39 |
| 23  MR. FRANKLIN: Complaint speaks for 11:37 | 23 appropriate, but my primary goal here is public 11:39 |
| 24 itself. 11:37 | 24 access. 11:39 |
| 25  /// | 25  Q  Did you enter into this action hoping that 11:39 |
| Page 284 | Page 286 |

| | |
|---|---|
| 1 BY MS. HEWITT: 11:37 | 1 you were going to recover some monies in this matter 11:39 |
| 2  Q  What do you mean damages for damages? 11:37 | 2 for any of the damages that you claimed you have 11:39 |
| 3  A  Are you seeking any damages for those 11:38 | 3 suffered? 11:39 |
| 4 particular allegations for -- you claimed the 11:38 | 4  A  I entered into it because I was hoping to 11:39 |
| 5 defendant's conduct and we discussed Chief Kepley, 11:38 | 5 create public access and I was hoping that anyone 11:39 |
| 6 Chief Kepley's conduct has caused you pain and 11:38 | 6 could go to Lunada Bay, and that was my primary 11:39 |
| 7 suffering, loss of sleep, emotional distress, and 11:38 | 7 objective. 11:39 |
| 8 mental anguish. Are you seeking damages for those 11:38 | 8  Q  I appreciate that. 11:39 |
| 9 from Chief Kepley? 11:38 | 9  Did you hope to recover any money damages 11:39 |
| 10  MR. FRANKLIN: Complaint speaks for 11:38 | 10 from the City as part of the reasons for entering 11:40 |
| 11 itself. 11:38 | 11 into this litigation? 11:40 |
| 12  THE WITNESS: What I'm seeking is public 11:38 | 12  MR. FRANKLIN: Asked and answered. 11:40 |
| 13 access to Lunada Bay for everyone, and, you know, 11:38 | 13  THE WITNESS: I don't have an expectation 11:40 |
| 14 any damages that my attorneys feel are fair, if any. 11:38 | 14 for that. Again, I leave that up to my attorneys. 11:40 |
| 15 BY MS. HEWITT: 11:38 | 15 BY MS. HEWITT: 11:40 |
| 16  Q  Do you want Chief Kepley to pay you money? 11:38 | 16  Q  Before you entered in this litigation, 11:40 |
| 17  MR. FRANKLIN: Document speaks for itself. 11:38 | 17 were you hoping to get money from the City? 11:40 |
| 18  THE WITNESS: I'm not expecting anything 11:38 | 18  A  Before I retained my attorneys? 11:40 |
| 19 that the lawyers don't think is unreasonable. 11:38 | 19  Q  Yes. 11:40 |
| 20 BY MS. HEWITT: 11:38 | 20  A  No, I wasn't thinking about that at all, 11:40 |
| 21  Q  Do you want Chief Kepley to pay you money? 11:38 | 21 no. I just wanted public access. 11:40 |
| 22  MR. FRANKLIN: Same objection. 11:38 | 22  Q  You had no expectation or -- 11:40 |
| 23  THE WITNESS: I leave that decision up to 11:38 | 23  A  Of getting money from the City, no. 11:40 |
| 24 my attorneys. 11:38 | 24  Q  -- or inclination of getting money from 11:40 |
| 25  /// | 25 the City or Chief Kepley? 11:40 |
| Page 285 | Page 287 |

26 (Pages 284 - 287)

| | |
|---|---|
| 1   A   Prior to the lawsuit, no.   11:40 | 1   Q   Have you communicated with anybody   11:43 |
| 2   Q   Okay.  How many times total have you   11:40 | 2   regarding making a movie out of your experiences at   11:43 |
| 3   visited the fort?   11:40 | 3   Lunada Bay?   11:43 |
| 4   A   Does one day count as one visit?   11:40 | 4   A   Yes, it was an idea that I discussed with   11:43 |
| 5   Q   Yeah, how many different -- on how many   11:40 | 5   some people, yes.   11:43 |
| 6   different days -- good point.   11:40 | 6   Q   Who did you discuss that with?   11:43 |
| 7   How many different days have you visited   11:40 | 7   A   I discussed it in length with Jordan   11:43 |
| 8   the fort?   11:40 | 8   Wright's former landlord.   11:43 |
| 9   A   On January 29th, I know I did.  On   11:40 | 9   Q   Who is Jordan Wright's former landlord?   11:43 |
| 10   February either 5th or 6th, whatever day it was we   11:41 | 10   A   His name is Nurnur, N-u-r-n-u-r, first   11:43 |
| 11   were down there.  On February 13th.  And I would say   11:41 | 11   name.  And last name, I think, is Cummings, I'm not   11:43 |
| 12   maybe two times after that.   11:41 | 12   sure.  I think it's C-u-m-m-i-n-g-s.   11:43 |
| 13   Q   Okay.   11:41 | 13   Q   What did you discuss with Mr. Cummings   11:43 |
| 14   A   Maybe three, I don't know.   11:41 | 14   with regard to making a movie out of your   11:43 |
| 15   Q   Okay.  At present, does the fort have any   11:41 | 15   experiences at Lunada Bay?   11:44 |
| 16   effect on your ability to have safe public access to   11:41 | 16   MR. FRANKLIN:  Misstates prior testimony.   11:44 |
| 17   Lunada Bay?   11:41 | 17   THE WITNESS:  I've always, you know,   11:44 |
| 18   MR. FRANKLIN:  Vague and ambiguous.   11:41 | 18   growing up I was involved in a lot of journalism and   11:44 |
| 19   THE WITNESS:  Well, the fort remains a   11:41 | 19   documentary work, and I always felt that a good way   11:44 |
| 20   hangout place for the locals.  And it makes me feel   11:41 | 20   to bring about social change and, you know, make a   11:44 |
| 21   unsafe, yes, because, you know, it's not regulated   11:41 | 21   difference in the world was by, you know, exposing   11:44 |
| 22   by the police or the State or the coastal   11:41 | 22   the information in either a documentary or news   11:44 |
| 23   commission, so.   11:41 | 23   story, so you know it's my background and I went to   11:44 |
| 24   BY MS. HEWITT:   11:41 | 24   film school.   11:44 |
| 25   Q   Is it your testimony that the fort, as it   11:41 | 25   So, you know, all events that I   11:44 |
| Page 288 | Page 290 |

| | |
|---|---|
| 1   currently exists, has an effect on the safe access   11:41 | 1   experienced that have an impact to me, I will think   11:44 |
| 2   that you are attempting to obtain for yourself and   11:42 | 2   of in film terms.  I don't know who initially came   11:44 |
| 3   the class?   11:42 | 3   up with the idea.  I mean, I always thought it would   11:44 |
| 4   A   Yeah, the fort is not regulated, that's   11:42 | 4   be an interesting concept.  And Nurnur, I remember,   11:44 |
| 5   where a lot of the illegal activity occurs, so I   11:42 | 5   was the one that was saying that it would make a   11:44 |
| 6   would say "yes" to your question.   11:42 | 6   great documentary to try to change things at   11:44 |
| 7   Q   Do you know Rory Carroll?   11:42 | 7   Lunada Bay and, you know, help to make it a public   11:44 |
| 8   A   He sounds familiar, but I can't recall him   11:42 | 8   place for everyone.   11:45 |
| 9   right now.   11:42 | 9   BY MS. HEWITT:   11:45 |
| 10   Q   Noah Smith?   11:42 | 10   Q   When did you have -- how many   11:45 |
| 11   A   Noah sounds familiar as well, I don't   11:42 | 11   conversations did you have with Mr. Cummings?   11:45 |
| 12   know -- oh, I think that they're the two reporters,   11:42 | 12   A   Since he was the landlord of where Jordan   11:45 |
| 13   yes, yes, yes.  They are the two reporters that   11:42 | 13   was living, I had several conversations with him   11:45 |
| 14   wrote for the Guardian and filmed the undercover   11:42 | 14   about that.   11:45 |
| 15   video; correct?   11:42 | 15   Q   About that potential documentary?   11:45 |
| 16   Q   Correct, yes -- well, I mean, right, yes,   11:42 | 16   A   Right, yeah.   11:45 |
| 17   whatever your testimony is, I'm not telling you who   11:42 | 17   Q   What does he do for a living if you know?   11:45 |
| 18   they are.   11:42 | 18   A   I know that he's a landlord.  And that he   11:45 |
| 19   Do you keep in regular contact with any   11:42 | 19   has many houses, but I'm not quite sure what he does   11:45 |
| 20   reporters with regard to your action in this matter?   11:42 | 20   for a living specifically.  I know he's written film   11:45 |
| 21   A   I don't keep in regular contact, but, you   11:42 | 21   scripts and I think he's made a film but I'm not --   11:45 |
| 22   know, I have contacted and he's contacted me.   11:43 | 22   I don't know what his regular job is, I'm not sure.   11:45 |
| 23   Q   Who's "he"?   11:43 | 23   Q   Do you have an action plan or anything   11:45 |
| 24   A   I don't know if it's Rory or Noah, but one   11:43 | 24   like that with regard to the next steps in making a   11:45 |
| 25   of them.   11:43 | 25   documentary or movie about your experiences at   11:45 |
| Page 289 | Page 291 |

27 (Pages 288 - 291)

1    Lunada Bay?                              11:45
2         MR. FRANKLIN:  Objection, lacks    11:45
3    foundation.                             11:45
4         THE WITNESS:  You know, I don't.  It's a   11:45
5    great idea but as far as a current action plan, I   11:45
6    don't.  I'm just trying to focus on having my baby   11:45
7    in a couple of weeks hopefully, so.     11:46
8    BY MS. HEWITT:                          11:46
9         Q    I apologize if I asked you this.  What   11:46
10   does Jordan do for a living?            11:46
11        A    Jordan is a real estate agent.   11:46
12        Q    Okay.                         11:46
13        THE VIDEOGRAPHER:  We have three minutes   11:46
14   left on the DVD.                        11:46
15   BY MS. HEWITT:                          11:46
16        Q    Okay.  What specific changes would you   11:46
17   like to see the City accomplish the goal of lawful,   11:46
18   safe and secure access at Lunada Bay to engage in   11:46
19   recreational activities?                11:46
20        A    So you're asking what I would like to have   11:46
21   the City do to make it safe?            11:46
22        Q    Yeah.  What does it mean -- what would you   11:46
23   like to see in place to have a safe, lawful, and   11:46
24   secure access to Lunada Bay?            11:46
25        A    You know, a multitude of things, and I

Page 292

1    feel I'm not an expert but I can tell you things   11:46
2    that would make a difference to me.     11:46
3         You know, it would be nice to be able to   11:46
4    go there to surf anytime without being scared that   11:46
5    someone's going to be videotaping me, someone's   11:46
6    going to tell me I'm not wanted there, you know,   11:47
7    being asked why I'm there.              11:47
8         So, the whole -- the attitude of the   11:47
9    place, the -- also, you know, the people that harass   11:47
10   everyone and, you know, the entire group of locals   11:47
11   that is territorial and tries to exclude outsiders;   11:47
12   I would feel safe if their behavior changed and if   11:47
13   the ones that have done violent crimes weren't there   11:47
14   anymore.                                11:47
15        I would feel safe if there wasn't ongoing,   11:47
16   you know, illegal activity in the fort such as   11:47
17   drinking.  I would feel safe if, you know, people   11:47
18   weren't trying to spear other surfers in the water   11:47
19   with their boards or throw rocks at them or yell at   11:47
20   them.                                   11:47
21        I would feel safe if I could actually park   11:47
22   my car there without being scared that it's going to   11:47
23   be vandalized.  I would feel safe if I knew that   11:48
24   there wasn't any racism going on there.   11:48
25        You know, there's a number of things that   11:48

Page 293

1    would make it safe and the way that it is right now   11:48
2    it's not safe.  And even the pathway is not safe.   11:48
3    Like the pathway just goes straight down the   11:48
4    mountain without any kind of safety precautions.   11:48
5    There's usually people obstructing the pathway as   11:48
6    well.                                   11:48
7         Q    Okay.                        11:48
8         MS. HEWITT:  Let's go off the record if   11:48
9    you're okay with that since we're at the end of the   11:48
10   tape.                                   11:48
11        THE VIDEOGRAPHER:  We're now off the   11:48
12 48 record.  The time is          a.m.   11:48
13        (Break taken.)                     11:48
14        THE VIDEOGRAPHER:  We're now back on the   12:25
15 25 record at          p.m. and this marks the beginning of   12:25
16   media No. 2 of the deposition of Diana Milena Reed.   12:25
17                                         12:25
18        EXAMINATION                        12:25
19   BY MR. DIEFFENBACH:                      12:25
20        Q    Ms. Reed, my name is Richard Dieffenbach,   12:25
21   I represent Brant Blakeman, and I'm going to ask you   12:25
22   some questions.                         12:25
23        You're still under oath, you understand   12:25
24   that?                                   12:25
25        A    Yes.                         12:25

Page 294

1         Q    Okay.  Did you ever meet Mr. Blakeman?   12:25
2         A    Yes, I did.                   12:25
3         Q    When?                        12:25
4         A    I don't remember specifically the first   12:25
5    time that I met him.                    12:25
6         And what do you mean by meet exactly?  Do   12:26
7    you mean when I first saw him?          12:26
8         Q    When you first encountered him, met him,   12:26
9    meeting?                                12:26
10        A    I don't think we ever had actually -- he   12:26
11   never introduced himself to me in a proper manner.   12:26
12   He was just always harassing me.        12:26
13        Q    Let's start with when did you first ever   12:26
14   see him or be in his company?           12:26
15        A    Sure.                        12:26
16        It's hard for me to pinpoint the exact   12:26
17   time, but I do remember him -- seeing him   12:26
18   continuously filming.  He usually carries around a   12:26
19   mono pod with a camera and is always recording   12:26
20   either on top of the bluff or below.    12:26
21        Q    Okay.                        12:26
22        A    I don't know if I saw him prior to the   12:26
23   incident on February 13th or not, but I definitely   12:26
24   encountered him then.  But I have seen him on other   12:26
25   instances.                              12:27

Page 295

28 (Pages 292 - 295)

```
 1    Q   You saw him on February 13th, that was the   12:26
 2  incident which you described yesterday with the     12:27
 3  beer?                                      12:27
 4    A   Yes.                                12:27
 5    Q   And we'll go over that in a minute.    12:27
 6        Do you think you saw him there before    12:27
 7  February 13th or you just don't remember?       12:27
 8    A   I may have.  He's one of the number of     12:27
 9  individuals that is constantly there videotaping.   12:27
10  There's him and there's another brown-haired man, I   12:27
11  think his name is Hank.                      12:27
12    Q   Do you have any specific recollection of   12:27
13  any interaction with Mr. Blakeman before       12:27
14  February 13th between him and yourself?          12:27
15    A   I don't have any specific recollection at   12:27
16  this time.                                  12:27
17    Q   So the first specific recollection you    12:27
18  have of an encounter with him is on the       12:27
19  February 13th?                              12:27
20    A   At this time -- at this time, I can be     12:27
21  sure that -- I can be sure of meeting him then.  If   12:27
22  I met him before, I wouldn't remember at this time.   12:27
23    Q   Were there any times after February 13th   12:28
24  when you encountered him at the bluffs or --   12:28
25    A   Yes, there were.                      12:28
                                        Page 296
```

```
 1    Q   How many times after February 13th did you   12:28
 2  see him or encounter him?                   12:28
 3    A   I don't remember.  At least once, maybe   12:28
 4  twice, maybe three times.                     12:28
 5    Q   Can you separate those out and -- in terms   12:28
 6  of dates or times or relative times after      12:28
 7  February 13th like a week after, month after, year   12:28
 8  after?                                   12:28
 9    A   I can't separate them as to the exact     12:28
10  times of the month and week.  That would be    12:28
11  difficult for me.                            12:28
12    Q   Do you have a specific recollection of one  12:28
13  or two or three separate times, or is it just sort   12:28
14  of a vague recollection that it was at least once   12:28
15  and more than once?                         12:28
16    A   Yeah, it's a vague recollection.  I mean,   12:28
17  I think it was more than once because I do remember   12:28
18  seeing him with a camera and I remember speaking to   12:28
19  him briefly after that incident as well.       12:28
20    Q   Okay.  What do you remember about any of   12:29
21  the encounters after February 13th with Mr. Blakeman   12:29
22  if you can tell me?                          12:29
23    A   I remember that he looked familiar because   12:29
24  I -- you know, because after the incident -- I   12:29
25  recognized him after the incident with the beer.   12:29
                                        Page 297
```

```
 1  And I remember he was always with a video camera.  I   12:29
 2  remember he told me that one of the reasons he keeps   12:29
 3  filming me is because he's making a documentary.  I   12:29
 4  remember -- yeah, him always filming me and -- in   12:29
 5  ways that were intimidating to me.            12:29
 6        I remember one time in particular that he   12:29
 7  was sitting on top of the rocks and I had gone to   12:30
 8  the fort that day to take photos, and as I was     12:30
 9  coming back I had to pass next to him on the way   12:30
10  back up the hill.  That was the time that I believe   12:30
11  I asked him, you know, why he keeps filming me, and   12:30
12  he told me he's making a documentary I think for A&E   12:30
13  I believe is what he told me.                12:30
14        And I don't know, just he acted as     12:30
15  though -- as though it was just normal to constantly   12:30
16  have a camera pointed in my face.            12:30
17    Q   Anything else that he said to you on those   12:30
18  occasions other than --                      12:30
19    A   I remember --                         12:30
20    Q   -- February 13th?                      12:30
21    A   -- him commenting, yes -- I'm sorry I     12:30
22  interrupted you.                             12:30
23        I remember him commenting that I believe   12:30
24  the kneeboarder was very good.               12:31
25        I remember him just constantly following   12:31
                                        Page 298
```

```
 1  me, you know, with a camera.                12:31
 2    Q   Anything else you remember he said?       12:31
 3    A   What he said specifically, he never really   12:31
 4  talked much.                                 12:31
 5    Q   Okay.                                12:31
 6    A   He mostly just kind of made a menacing,   12:31
 7  scowling face and would record -- he did tell me his   12:31
 8  name once.  He said his name was Kelly Logan.   12:31
 9    Q   When did he tell you that?              12:31
10    A   On one of the instances I went down there.   12:31
11  But I think at that point I already knew his name   12:32
12  and I told him, No, I know your name is       12:32
13  Brant Blakeman and he said, No, that's not my name.   12:32
14    Q   That was after February 13th?          12:32
15    A   Yes.                                12:32
16    Q   Was that after --                      12:32
17    A   That was as I was walking down the trail   12:32
18  and he was walking up the trail and he passed me on   12:32
19  his way up.                                  12:32
20    Q   How did you come to learn his name was   12:32
21  Brant Blakeman and not Kelly Logan?          12:32
22    A   That was after the complaint was failed.   12:32
23    Q   How did you come to know --             12:32
24    A   Actually, that was not after the complaint   12:32
25  was filed, I'm sorry, because I hadn't gone back   12:32
                                        Page 299
```

29 (Pages 296 - 299)

Page 300

```
 1   after the complaint was filed, so I take that back.  12:32
 2      Q   Okay.  How did you know that was his name?  12:32
 3      A   I knew his name from Jen, was the first  12:32
 4   person that knew his name.  And then I knew it based  12:32
 5   on the investigation and my attorneys.             12:32
 6      Q   This was --                         12:32
 7      A   And I believe the police identified him to  12:33
 8   me as well at that point.  But yes, this was before  12:33
 9   the complaint was filed.                    12:33
10      Q   And Jen knew him?               12:33
11      A   She never told me that she knew him.  All  12:33
12   she told me is what is in those text messages that  12:33
13   were attached to the police report, that's all that  12:33
14   I knew.                                12:33
15      Q   Did you ever see Brant Blakeman do  12:33
16   anything besides filming or speaking to you as you  12:33
17   told us at the bay area?                    12:33
18      A   Well, during the incident that occurred on  12:33
19   February 13th, it appeared as though he had  12:33
20   orchestrated that event with Mr. Jalian Johnston.  12:33
21      Q   What specifically did he do that made you  12:33
22   think that he had orchestrated that?        12:33
23      A   It appeared as though they had planned the  12:33
24   event out in an attempt to try to ruin my camera and  12:34
25   in an attempt to try to intimidate me.       12:34
```

Page 301

```
 1      Q   What specifically was done or did you see  12:34
 2   that caused you to believe that?             12:34
 3      A   The fact that when they entered the fort  12:34
 4   it seemed like all of their actions were     12:34
 5   orchestrated, they immediately rushed towards me.  12:34
 6   Johnston immediately opened the can of beer and, you  12:34
 7   know, sprayed it on me and on my camera in what I  12:34
 8   believe they intended to appear as an accident but  12:34
 9   to me it felt very intentional.             12:34
10      The way that, you know, he was -- he was  12:34
11   filming Johnston as though it was like a planned  12:34
12   performance it seemed like, you know.  The fact that  12:34
13   he was holding the camera just right, right next to  12:35
14   my face in a way that made me feel threatened or  12:35
15   intimidated.                           12:35
16      Q   Go ahead.                      12:35
17      A   A lot of the actions at Lunada Bay between  12:35
18   the locals all appeared to be orchestrated based on  12:35
19   what I've seen and what I've heard in the surf  12:35
20   community.                            12:35
21      Q   Can you give me any specifics as to why  12:35
22   you thought the February 13th episode was  12:35
23   orchestrated or scripted or somehow created by  12:35
24   Mr. Blakeman or with his direction?         12:35
25      A   I don't know who planned it.  I don't know  12:35
```

Page 302

```
 1   who planned it but it appeared that they were  12:35
 2   following a very distinct plan to try to intimidate  12:35
 3   me and try to ruin my camera.               12:35
 4      Q   Can you give me any specifics as to why  12:35
 5   you think that?                         12:35
 6      A   I think that because of the way that that  12:35
 7   the actions unfolded that I just described.  12:36
 8      Q   Were you in the fort and they came to the  12:36
 9   fort?                                  12:36
10      A   Yes.                          12:36
11      Q   And were you there with anyone else?  12:36
12      A   Jen was there as well.            12:36
13      Q   Anyone else?                   12:36
14      A   Charlie may have been there sitting on the  12:36
15   roof.                                  12:36
16      Q   Charlie Ferrara?                12:36
17      A   Yes.                          12:36
18      Q   Anyone else?                   12:36
19      A   I think that was it.             12:36
20      Q   And how close were you and Jen together to  12:36
21   each other when Mr. Blakeman came to --      12:36
22      A   I don't remember specifically, probably  12:36
23   about as close as me and the lady with the red  12:36
24   flowers.                               12:36
25      Q   So ten feet maybe, eight feet?      12:36
```

Page 303

```
 1      A   Maybe.  I mean, it's hard for me to say,  12:36
 2   but I mean, we weren't --                 12:36
 3      MR. FRANKLIN:  Five feet.             12:36
 4      MR. DIEFFENBACH:  Five feet, okay.    12:36
 5      THE WITNESS:  Maybe five feet.  I mean, I  12:36
 6   remember she wasn't right next to me.        12:36
 7   BY MR. DIEFFENBACH:                       12:36
 8      Q   How far was Mr. Charlie Ferrara from  12:36
 9   where you and Jen --                     12:36
10      A   Charlie was sitting on the roof.    12:37
11      Q   Okay.                         12:37
12      A   Not of the bluff, but of the fort.  12:37
13      Q   Were you near him?               12:37
14      A   I wasn't on the roof, no, so I wasn't near  12:37
15   him.                                   12:37
16      Q   How many feet between you and Charlie?  12:37
17      A   Again, it's hard for me to estimate  12:37
18   because I haven't been to the fort in some time, but  12:37
19   I know our relative locations.  You know, he was on  12:37
20   the fort on the roof, and I was towards the end  12:37
21   where there's like a little carved seating area.  12:37
22      Q   The patio is there, whatever it is?  12:37
23      A   Yeah, kind of near the back table.  12:37
24      Q   Was Charlie closer to you or farther away  12:37
25   from you than you were to Jen?              12:37
```

| | |
|---|---|
| 1 | A    I don't remember that.          12:37 |
| 2 | Q    From which direction did Mr. Blakeman    12:37 |
| 3 | enter the scene?          12:37 |
| 4 | A    They -- Mr. Blakeman and Mr. Johnston both  12:37 |
| 5 | entered through the entrance.  There's only one    12:37 |
| 6 | entrance that I know of to the fort.          12:37 |
| 7 | Q    Which is on the north end?          12:37 |
| 8 | A    I don't know which direction it faces.    12:38 |
| 9 | Q    The end towards Malibu?          12:38 |
| 10 | A    I would have to look at a map, I don't    12:38 |
| 11 | have a compass in front of me.  But there's only one  12:38 |
| 12 | entrance that I know of.          12:38 |
| 13 | Q    Describe for me what -- how it unfolded,   12:38 |
| 14 | how your encounter with him, Mr. Blakeman, unfolded  12:38 |
| 15 | at that time.          12:38 |
| 16 | A    Again, it's hard for me to remember the    12:38 |
| 17 | specific details, but I'll do my best to tell you    12:38 |
| 18 | what I remember.          12:38 |
| 19 | Q    Okay.  That would be great.          12:38 |
| 20 | A    I do remember being very startled by them  12:38 |
| 21 | entering because I didn't see them walking down the  12:38 |
| 22 | pathway.  I don't know if that means that I was    12:38 |
| 23 | facing away from them.  There's a possibility I was  12:38 |
| 24 | and I was facing the ocean.  I don't recall if I was  12:38 |
| 25 | taking photos at the time because I think my camera  12:38 |

Page 304

| | |
|---|---|
| 1 | carrying on a tripod?          12:40 |
| 2 | A    I don't remember what type of camera he    12:40 |
| 3 | had.          12:40 |
| 4 | Q    Was it a video camera or digital camera or  12:40 |
| 5 | movie camera, could you tell, was it big, little, in  12:40 |
| 6 | between?          12:40 |
| 7 | A    You know, I don't remember the specific    12:40 |
| 8 | model of camera that it was.  It appeared to be a    12:40 |
| 9 | video camera.          12:40 |
| 10 | Q    Go ahead.          12:41 |
| 11 | A    But I don't remember -- I don't remember    12:41 |
| 12 | if it had a view finder that popped out or not, it's  12:41 |
| 13 | hard for me to say.          12:41 |
| 14 | Q    Did you have a microphone with it?      12:41 |
| 15 | A    I would assume it did since pretty much    12:41 |
| 16 | all cameras do.          12:41 |
| 17 | Q    Do you have a specific recollection of    12:41 |
| 18 | that or just you're assuming?          12:41 |
| 19 | A    Yeah, I'm just assuming that it had a    12:41 |
| 20 | microphone on it.  It didn't have an external    12:41 |
| 21 | microphone that was attached that you typically    12:41 |
| 22 | attach to professional cameras if that's what you're  12:41 |
| 23 | asking.  It appeared to be a consumer-level camera.  12:41 |
| 24 | Q    Was there any indication that the camera   12:41 |
| 25 | was actually recording, for instance, a red light or  12:41 |

Page 306

| | |
|---|---|
| 1 | was on the table.  Or it may have been around my    12:38 |
| 2 | neck but I don't believe that I was taking photos at  12:39 |
| 3 | that time.  I think I was watching my friend    12:39 |
| 4 | surfing.          12:39 |
| 5 | But as I said, I remember being very    12:39 |
| 6 | startled.  I remember Mr. Blakeman coming in holding  12:39 |
| 7 | his camera on a tripod.          12:39 |
| 8 | Q    Who came in first, Mr. Blakeman or    12:39 |
| 9 | Mr. Johnston?          12:39 |
| 10 | A    I'm not 100 percent sure, but I think    12:39 |
| 11 | Mr. Blakeman was behind Mr. Johnston, I think.    12:39 |
| 12 | Q    Was Mr. Blakeman doing anything as he    12:39 |
| 13 | entered?          12:39 |
| 14 | A    Yes, as I was saying, he was holding the   12:39 |
| 15 | camera on some kind of tripod device recording, very  12:39 |
| 16 | menacing, threatening look on his face that made me  12:39 |
| 17 | extremely fearful.          12:40 |
| 18 | Mr. Johnston was -- also had a very    12:40 |
| 19 | menacing and fearful expression.  The way that they  12:40 |
| 20 | walked and their body language also appeared    12:40 |
| 21 | threatening.  They were making big, loud steps and   12:40 |
| 22 | just a lot of heavy, you know, frightening movements  12:40 |
| 23 | that made me feel that they were there in an    12:40 |
| 24 | aggressive and hostile way.          12:40 |
| 25 | Q    What kind of camera was Mr. Blakeman    12:40 |

Page 305

| | |
|---|---|
| 1 | some flashing light or something that you can    12:41 |
| 2 | recall?          12:41 |
| 3 | A    I don't remember.          12:41 |
| 4 | Q    So they entered, Mr. Johnston entered    12:41 |
| 5 | first and Mr. Blakeman was right behind him or?    12:41 |
| 6 | A    Again, I'm not 100 percent sure.  But I    12:41 |
| 7 | think that that's the way that they entered.  I    12:42 |
| 8 | remember they entered fairly close together, I    12:42 |
| 9 | think.          12:42 |
| 10 | Q    And did anyone --          12:42 |
| 11 | A    Because Mr. Blakeman was recording the    12:42 |
| 12 | incident, so that's why I'm -- I think he was behind  12:42 |
| 13 | him.          12:42 |
| 14 | Q    Did anyone say anything to you as they    12:42 |
| 15 | entered?          12:42 |
| 16 | A    Yes, Mr. Johnston appeared to be forging a  12:42 |
| 17 | celebration, and, you know, he was raising his voice  12:42 |
| 18 | and saying woo-hoo, you know, L.A. Times, and he    12:42 |
| 19 | was -- as I can assume now, attempting to celebrate  12:42 |
| 20 | the fact that the L.A. Times had published an    12:42 |
| 21 | article about Lunada Bay and it was on the front    12:42 |
| 22 | page that day.  And I was unaware of that fact at    12:42 |
| 23 | the time.          12:42 |
| 24 | Q    When you say "forging a celebration," what  12:42 |
| 25 | do you mean?          12:42 |

Page 307

31 (Pages 304 - 307)

1     A    What I mean is that they were obviously    12:42
2   there to intimidate and harass me, and the way that    12:43
3   they wanted to do it, I guess, was to pretend that    12:43
4   they were celebrating the fact that the article came    12:43
5   out but clearly they were upset about the article.    12:43
6     Q    Did they say anything other than woo-hoo,    12:43
7   L.A. Times, to give you an indication that they --    12:43
8     A    Yeah, they did.              12:43
9     Q    Let me finish my question.            12:43
10        Did they give you any indication that they    12:43
11   were trying to intimidate based on the article?    12:43
12     A    They did.  I don't remember the specific    12:43
13   things that they said.  I definitely do remember    12:43
14   their facial expressions and their body language    12:43
15   and, you know, that can say a lot more than words    12:43
16   can say.                     12:43
17     Q    After the woo-hoo comment, was there    12:43
18   anything else said to you?            12:43
19     A    Well, it all seemed to me like it happened    12:43
20   at once.  It was very frightening to me, so kind    12:43
21   of -- to me it feels like everything all happened at    12:43
22   the same time.  I remember, you know, them rushing    12:44
23   towards me with the beer, offering me beer.  I    12:44
24   believe I said, No.  But I remember him rushing    12:44
25   towards me.                    12:44
                              Page 308

1     Q    When you say "rushing towards me," what do    12:44
2   you mean?                    12:44
3     A    By that, I mean I remember him walking,    12:44
4   you know, moving towards me quickly, I wouldn't say    12:44
5   walking, but moving towards me in an extremely quick    12:44
6   and frightening way to where he was in my personal    12:44
7   space, very close.                12:44
8     Q    This is Mr. Johnston or Mr. Blakeman?    12:44
9     A    I remember Mr. Johnston doing it.    12:44
10   Mr. Blakeman was close to me as well.    12:44
11     Q    Did Mr. Johnston have anything in his    12:44
12   hands?                       12:44
13     A    He -- I think that he had a can of beer in    12:44
14   his hands, I don't remember if he entered with the    12:45
15   can of beer or if he pulled out the can of beer, I    12:45
16   don't know at what point that can of beer was in his    12:45
17   hands.  But I do remember him shaking up the can of    12:45
18   beer and spraying it on my arm and my camera.    12:45
19     Q    Did Mr. Blakeman have anything besides the    12:45
20   camera and tripod in his hands?          12:45
21     A    He may have had; I don't know.    12:45
22     Q    It was just one can of beer -- I heard    12:45
23   mention of I thought a case of beer.  Was there a    12:45
24   case of beer somewhere?            12:45
25     A    At this moment it's hard for me to    12:45
                              Page 309

1   remember.  I believe in the complaint I think it    12:45
2   says a case of beer.  I do remember him throwing a    12:45
3   lot of beer down, like chugging the beers and    12:45
4   throwing them down.              12:45
5     Q    Empty cans you mean?            12:45
6     A    I don't think they were empty.  I think    12:45
7   that he was just taking one sip and throwing them    12:45
8   down on the floor in an attempt to spray beer and    12:45
9   intimidate as well.                12:46
10     Q    Did -- this is Mr. Johnston you're talking    12:46
11   about?                       12:46
12     A    Yes.                     12:46
13     Q    Did Mr. Johnston ever say any words to you    12:46
14   like, Take that, or any kind of challenging words or    12:46
15   anything like that to you that you can recall?    12:46
16     A    He said a lot of things to me that were    12:46
17   very traumatic and so it's hard for me to recall    12:46
18   everything.                    12:46
19        What I'm remembering right now is I    12:46
20   remember -- I remember Mr. Blakeman very, very close    12:46
21   to my face with the camera, you know, and I remember    12:46
22   being extremely frightened and, you know, kind of    12:46
23   frozen.  And I remember asking him, you know, Why    12:46
24   are you filming me?              12:46
25     Q    The positioning of everything, when they    12:46
                              Page 310

1   came in, were they off to your left, to your right,    12:46
2   in front of you, behind you?            12:46
3     A    The positioning for me is hard for me to    12:47
4   remember.  I'm pretty sure they weren't behind me    12:47
5   obviously.  But as to like specifically where in the    12:47
6   front it's hard for me to remember at this time.    12:47
7     Q    How soon after you first saw them on the    12:47
8   patio there did Mr. Johnston, for instance, say,    12:47
9   Woo-hoo, L.A. Times, or whatever he said?    12:47
10     A    To me, it's, again -- it was very    12:47
11   traumatic and it seemed like everything all happened    12:47
12   at once.                     12:47
13        And, you know, it's hard for me to -- to    12:47
14   remember the event in slow motion, I guess, is what    12:47
15   you're trying to get me to do.  But it all seemed to    12:47
16   happen very quickly.              12:47
17     Q    Did he come in and say this thing and then    12:47
18   immediately he was shaking a beer can while he did    12:47
19   it and opened it; if you can tell me how that    12:48
20   happened.                    12:48
21     A    Yeah, it seemed -- from what I can    12:48
22   remember, what it seemed like was, you know, they    12:48
23   entered the fort in a hostile manner, it seemed like    12:48
24   that's when they were pretending to forge a    12:48
25   celebration for the L.A. Times, and then proceeded    12:48
                              Page 311

                                          32 (Pages 308 - 311)

```
 1   to rush towards me with a can of beer.  And it all   12:48
 2   happened very quickly, what it seemed like to me.    12:48
 3      Q    Just ask for your recollection, that's all   12:48
 4   I can get.                            12:48
 5         Was it within -- did it all occur within a    12:48
 6   minute or less than five seconds, if you can tell   12:48
 7   me?                                12:48
 8      A    I can't tell you that, I don't know.    12:48
 9      Q    Was it within a minute do you think of    12:48
10   their entering, or five minutes or?          12:48
11         MR. FRANKLIN:  Vague and ambiguous.      12:48
12         THE WITNESS:  It's hard for me to say.  It  12:48
13   just seems like it happened very fast.         12:48
14   BY MR. DIEFFENBACH:
15      Q    Can you estimate for me how long the     12:48
16   entire episode of involving you and Mr. Johnston,   12:48
17   Mr. Blakeman, lasted that you were at the patio and  12:49
18   they were there and something was going on that day,  12:49
19   the February 13th encounter?               12:49
20      A    From the moment they entered until he went  12:49
21   into the water?                      12:49
22      Q    Yeah, while you were at the -- while you   12:49
23   were near them and they were near you, how long did  12:49
24   that last?  Was it a matter of just a minute or was  12:49
25   it ten minutes or?                    12:49
```
Page 312

```
 1      A    I'm not quite sure, you know, what you're   12:49
 2   asking me specifically because a lot of stuff     12:49
 3   happened.  So if you're asking me from the time that  12:49
 4   they entered the fort to the time Blakeman went to   12:49
 5   go sit on the roof and Mr. Johnston went in the    12:49
 6   water?                             12:49
 7      Q    Sure, that's fine.               12:49
 8      A    It seemed like awhile but it's hard for me  12:49
 9   to quantify the exact amount of time because I was   12:49
10   really scared and I was just frozen in fear, I     12:49
11   really couldn't think straight, so it seemed like   12:49
12   forever to me.                       12:49
13      Q    And the beer incident, you said       12:49
14   Mr. Johnston shook up the can of beer and -- is that  12:50
15   correct?                           12:50
16      A    Yes.                       12:50
17      Q    And you remember him shaking it like he   12:50
18   was trying to make it foamy or whatever?        12:50
19      A    Yeah.  He did it all very, very quickly is  12:50
20   what I remember.                     12:50
21      Q    And he was standing near you or far away  12:50
22   from you when he opened the beer?            12:50
23      A    I think that -- I think that he was pretty  12:50
24   near me.  I mean, it seemed like he was near me.    12:50
25      Q    Can you estimate how close he was?     12:50
```
Page 313

```
 1      A    Again, that's hard for me to do.  I think  12:50
 2   that he may have leaned into me as he was trying to  12:50
 3   do this.                           12:50
 4      Q    When he opened the beer, was he standing  12:50
 5   on one side or the other of you, do you remember, or  12:50
 6   in front of you or whatever?               12:50
 7      A    Yeah, I don't remember exactly.  I       12:50
 8   think -- I mean, I know he was facing me.        12:50
 9      Q    Did he open the beer with his left hand or  12:51
10   his right hand, do you recall?             12:51
11      A    No, I don't recall that type of detail.   12:51
12      Q    Or what hand he was holding the beer in?   12:51
13      A    No, I don't recall that at all.       12:51
14      Q    Did he extend his arms as he opened it    12:51
15   towards you or did he just open the beer?        12:51
16      A    I don't remember.               12:51
17      Q    And you said some beer came out.  And     12:51
18   describe --                          12:51
19      A    Some beer what?                 12:51
20      Q    Some beer came out of the can; right, when  12:51
21   he opened it?                       12:51
22      A    Yes, there was a spray, a large spray of   12:51
23   beer.                              12:51
24      Q    Was it -- have you ever opened a soda that  12:51
25   was shaken up or opened a beer that was shaken up   12:51
```
Page 314

```
 1   and it sort of, it's like a fountain, was it like    12:51
 2   that?  Or was it just a -- describe the spray, I    12:51
 3   guess.                             12:51
 4      A    I haven't opened a beer that's done that   12:51
 5   but I've opened a soda that's done that.  But from a  12:51
 6   bottle.                            12:51
 7         Yeah, I mean, it was a lot of spray on my  12:51
 8   arm and my camera.  I mean, it felt like he poured   12:52
 9   it on me but, again, it happened so quickly.       12:52
10      Q    Where did the beer land on you?       12:52
11      A    From what I remember, you know, it landed  12:52
12   all over my arm.                     12:52
13      Q    Which one?                   12:52
14      A    I think it was my left arm, I think.    12:52
15      Q    Did it -- were you wearing anything on    12:52
16   your arm, or did it just land on your skin?       12:52
17      A    I don't remember what I was wearing.     12:52
18      Q    Did you have a towel with you that day?   12:52
19      A    I don't think so.               12:52
20      Q    Can you estimate how much beer landed on  12:52
21   your arm?  Were you soaking wet?  Was it just a    12:52
22   couple of drops?                     12:52
23      A    It was definitely more than a couple of   12:52
24   drops, but it's hard for me to estimate the exact   12:52
25   amount.                            12:52
```
Page 315

33 (Pages 312 - 315)

| | |
|---|---|
| 1    Q    What about your camera, what kind of  12:52 | 1   time?                            12:55 |
| 2   camera was it?                      12:53 | 2    A    I think that he was on the roof during the  12:55 |
| 3    A    It was a Cannon 5D Mark III.      12:53 | 3   entire time which I would assume that he saw  12:55 |
| 4    Q    That's a 35-millimeter?           12:53 | 4   everything.                       12:55 |
| 5    A    No, it's a digital camera.         12:53 | 5    Q    Did he say anything that you can recall?  12:55 |
| 6    Q    I guess I used the old fashioned term,  12:53 | 6    A    He didn't say anything.          12:55 |
| 7   it's an SLR type camera?               12:53 | 7    Q    Did Mr. Blakeman say anything that you can  12:55 |
| 8    A    It's an SLR type camera, yes.      12:53 | 8   recall?                           12:55 |
| 9    Q    Do you remember, did you have it on your  12:53 | 9    A    I don't remember. I think he was just  12:55 |
| 10  neck, was it on your hand, was it sitting next to  12:53 | 10  recording and, you know, just -- I remember, like I  12:55 |
| 11  you on a table or something?            12:53 | 11  said, there was a point in time where the camera was  12:55 |
| 12   A    Again, it's hard for me to remember  12:53 | 12  literally, like, right in my face and I felt  12:55 |
| 13  whether it was on my neck or on the table. I mean,  12:53 | 13  extremely, extremely scared.           12:55 |
| 14  I do remember the beer getting on it. I think it  12:53 | 14   Q    When you say "right in my face," what does  12:55 |
| 15  might have been sitting on the table, but I'm not  12:53 | 15  that mean, how close?                 12:55 |
| 16  100 percent sure.                    12:53 | 16   A    To me, I mean, it seemed like it was, you  12:55 |
| 17   Q    Where was it in relation to you, was it  12:53 | 17  know, very, very close. But, again, you know, I was  12:55 |
| 18  over to your right or to your left?       12:53 | 18  scared, so it's hard for me to give you an exact  12:55 |
| 19   A    Again, I don't remember. I just remember  12:53 | 19  amount as, you know, things sometimes seem closer  12:55 |
| 20  that I think it was pretty close to me.    12:53 | 20  than they are when you're scared.       12:55 |
| 21   Q    Was it -- if it -- do you remember if it  12:53 | 21   Q    You gestured like a foot away, was it that  12:55 |
| 22  was on the table, was it laying on the bottom of the  12:53 | 22  close?                            12:56 |
| 23  camera like sitting on the table, or was it on its  12:53 | 23   A    Maybe. Maybe a foot, maybe two feet. But  12:56 |
| 24  edge, or was it lens up, lens down?      12:53 | 24  it was close enough to where it felt uncomfortable.  12:56 |
| 25   A    No, if it was on the table, you know, I  12:53 | 25   Q    Have you told me all the things you can  12:56 |
| Page 316 | Page 318 |

| | |
|---|---|
| 1   would assume it was just, you know, just the way  12:53 | 1   remember about your encounter with Mr. Blakeman on  12:56 |
| 2   that you put a camera down, just down --  12:54 | 2   the 13th of February? Is there anything else that  12:56 |
| 3    Q    With the lens sticking up horizontally and  12:54 | 3   we haven't covered?                  12:56 |
| 4   the camera body -- bottom of the camera body on the  12:54 | 4        MR. FRANKLIN: Vague and ambiguous.  12:56 |
| 5   flat surface?                       12:54 | 5   BY MR. DIEFFENBACH:                 12:56 |
| 6    A    Yes.                         12:54 | 6    Q    That you can recall?             12:56 |
| 7    Q    And what part of the camera got beer on  12:54 | 7        MR. FRANKLIN: Calls for a narrative.  12:56 |
| 8   it, do you remember?                 12:54 | 8        THE WITNESS: There's definitely a lot  12:56 |
| 9    A    Yeah, I remember that a lot of the body of  12:54 | 9   more that I haven't told you about the encounter.  12:56 |
| 10  the camera got beer on it which was concerning to me  12:54 | 10  BY MR. DIEFFENBACH:                 12:56 |
| 11  because that's the part that's not waterproof. I  12:54 | 11   Q    Okay. Please tell me what else you can  12:56 |
| 12  think it got on the lens, too.          12:54 | 12  tell me about that.                  12:56 |
| 13   Q    Did you have something to wipe it off  12:54 | 13   A    It's hard for me to remember everything.  12:56 |
| 14  with, or did you use anything to wipe it off with?  12:54 | 14  I can just tell you what I recall at the moment.  12:56 |
| 15   A    I don't remember.               12:54 | 15  But the more questions you ask me the more it helps  12:56 |
| 16   Q    Did you say anything when that happened,  12:54 | 16  me.                              12:56 |
| 17  when the beer sprayed?                12:54 | 17   Q    I wasn't there so I don't know what to ask  12:56 |
| 18   A    I wish I did say something but I was too  12:54 | 18  you except to ask you to tell me what other things  12:56 |
| 19  scared.                           12:54 | 19  you can recall about the episode on the 13th  12:56 |
| 20   Q    Did Jen say anything?            12:54 | 20  specifically with regard to Mr. Blakeman that you  12:56 |
| 21   A    I don't remember if she said anything.  12:54 | 21  haven't told me about already.          12:56 |
| 22   Q    Do you remember?                12:54 | 22        You told me that he had a camera, that he  12:57 |
| 23   A    I don't know if she saw it, I don't know  12:54 | 23  took videos, that he looked menacing to you, that he  12:57 |
| 24  what she saw.                      12:54 | 24  videotaped or whatever?               12:57 |
| 25   Q    Was Charlie Ferrara still around at that  12:54 | 25   A    Yeah, I remember that he wouldn't stop  12:57 |
| Page 317 | Page 319 |

34 (Pages 316 - 319)

Hahn & Bowersock, A Veritext Company
800.660.3187

1    videotaping me.  I think I might have asked him to   12:57
2    stop -- I mean, I definitely asked him why they're   12:57
3    doing that.  I feel like his role was to record       12:57
4    rather than to speak and to intimidate through his   12:57
5    camera.                                              12:57
6         So I remember him, like I said, getting        12:57
7    very close to me and being -- felt like he was right   12:57
8    in my face with the camera.  I remember asking them   12:57
9    why they're filming me and they said they're filming   12:57
10   me because I'm sexy and because I turn them on and   12:57
11   that was what Mr. Johnston was saying.               12:57
12   Q    Did Mr. Blakeman say that?                      12:57
13   A    I don't remember if Mr. Blakeman said that   12:57
14   or not, but I do remember Mr. Johnston said that.    12:57
15   Q    Okay.  Anything else?                           12:57
16        I mean, I can only ask you for your            12:58
17   memory, I'm not trying to put words in your mouth or   12:58
18   maybe there isn't anything else but I have just have   12:58
19   to say anything else and you tell me?                12:58
20        MR. FRANKLIN:  Vague and ambiguous.            12:58
21        THE WITNESS:  There's definitely a lot         12:58
22   that happened, it was just very traumatic, so.       12:58
23        You know, I remember him following             12:58
24   Mr. Johnston around as well filming him.  There were   12:58
25   points in time where he was close to me, there were   12:58

Page 320

1    other points in time where he was far away from me.   12:58
2    Eventually, he was on the roof with Charlie, I don't   12:58
3    remember how he got up there.                         12:58
4         I remember Mr. Johnston changing.  I don't    12:58
5    remember where Mr. Blakeman was at that point, if he   12:58
6    was next to me or not.                                12:58
7         I remember, like I said, Mr. Johnston         12:59
8    throwing the cans of beer down and Mr. Blakeman       12:59
9    filming that.  And, again, I remember just his       12:59
10   extremely menacing expressions and, you know, the    12:59
11   manner that he was walking around in.                12:59
12   BY MR. DIEFFENBACH:                                  12:59
13   Q    What is a menacing expression to you, what   12:59
14   does that mean?                                       12:59
15   A    I mean, he looked like -- I mean, he           12:59
16   was -- obviously, he was scowling, he was -- his     12:59
17   body language conveyed that he was hostile, he -- I   12:59
18   mean, they were making -- he was making sexual       12:59
19   comments, Mr. Johnston was.  And I just felt very    12:59
20   frightened like anything could happen, you know.     13:00
21   Q    The hostile body language, was that           13:00
22   Mr. Blakeman doing that, too?                        13:00
23   A    Yes.                                            13:00
24   Q    What is hostile body language, describe       13:00
25   that if you can.                                      13:00

Page 321

1    A    You know, stature, someone's stature,          13:00
2    someone's walk, someone's expression.               13:00
3    Q    What was it that --                            13:00
4    A    You being threatening by getting into         13:00
5    someone's personal space.                            13:00
6    Q    What stature was employing that was           13:00
7    hostile if you can recall?                           13:00
8    A    What stature?                                  13:00
9    Q    Hmm-mm.                                        13:00
10   A    I mean, the way that they entered into the   13:00
11   fort even was very -- just it seemed like they had a   13:00
12   lot of built-up anger, like if you ever see people   13:00
13   that are about to fight other people, that's what it   13:01
14   seemed like.                                         13:01
15   Q    Did they fight with you?                      13:01
16   A    They didn't fight with me but they           13:01
17   definitely had that -- they definitely had that feel   13:01
18   to them; very tense, very hostile, very            13:01
19   intimidating, very threatening, both through body   13:01
20   language, the way that they walked, the way that     13:01
21   they had their facial expression.                    13:01
22   Q    Okay.  Were there any other specifics you   13:01
23   can tell me about any of the other encounters you   13:01
24   had with Mr. Blakeman that you haven't told me      13:01
25   about?                                               13:01

Page 322

1        MR. FRANKLIN:  Vague and ambiguous.            13:01
2        THE WITNESS:  Again, I don't remember         13:01
3    everything at this moment, but I did tell you about,   13:01
4    you know, the time that I encountered him on the     13:01
5    trail when he said that his name is not              13:01
6    Brant Blakeman.  I mean, every time I've encountered   13:01
7    him he's appeared very hostile both in his body     13:02
8    language and his expressions.                        13:02
9    BY MR. DIEFFENBACH:                                 13:02
10   Q    When you encountered him --                   13:02
11   A    And also, the time that he told me he's      13:02
12   making the documentary for cable television, I think   13:02
13   it was A&E that he told me he was making a          13:02
14   documentary for, he seemed -- I mean, again, he was   13:02
15   even hostile then, always recording me, you know,    13:02
16   even whether or not I'm close to him.                13:02
17   Q    When he was sitting on the rocks and you     13:02
18   said you walked past him, and -- was that the time   13:02
19   when he said he was making a documentary for A&E,   13:02
20   was that all the same time?                          13:02
21   A    I think so.                                   13:02
22        And he recorded me when he was saying        13:02
23   that.  Pretty much every encounter that I've had    13:03
24   with him he recorded.                                13:03
25   Q    Do you know whether that episode with the   13:03

Page 323

35 (Pages 320 - 323)

**Page 324**

1  making a documentary and sitting on the rocks, was   13:03
2  that before or after you had filed the lawsuit?   13:03
3      A   I never went back after I filed the   13:03
4  lawsuit except with news reporters.   13:03
5      Q   Did you ever see Mr. Blakeman --   13:03
6      A   Um.   13:03
7      Q   Go ahead.   13:03
8      A   Actually now that I'm thinking about it, I   13:03
9  believe that he may have been there on January 29th   13:03
10  recording on the bluff.   13:03
11     Q   What makes you think that?   13:03
12     A   There's a photo of him that was published   13:03
13  and is attached to the police report.  It's the   13:03
14  police report describing the incident on   13:03
15  February 13th, that's the one.  But if you look   13:03
16  through the photographs, because I reviewed this   13:03
17  document, there's a photo of a man holding a camera   13:04
18  with like a plaid shirt, and that's him.   13:04
19     Q   Did you encounter him on the 29th that you   13:04
20  can recall?   13:04
21     A   I remember being uncomfortable because I   13:04
22  was being recorded and the more I think about it,   13:04
23  the more -- the more it seems like it must have been   13:04
24  Mr. Blakeman that recorded me.   13:04
25     Q   But did you have any personal encounter   13:04

**Page 325**

1  with him at that time or he was just -- he's in a   13:04
2  photograph and it's reminding you that maybe he was   13:04
3  there taking videos?   13:04
4      A   Well, it's uncomfortable anytime someone's   13:04
5  just outright recording you.  I mean, he's not --   13:04
6  he's there to intimidate people.  He's not there to   13:04
7  take photos of Lunada Bay or record Lunada Bay, or   13:04
8  you know, be friendly to the visitors.  I mean, he's   13:04
9  there in an effort to intimidate people by recording   13:04
10  them, making them not feel welcomed, making them   13:05
11  feel as though they're intruders.  I feel that's his   13:05
12  role as part of the Bay Boys is, you know, to   13:05
13  record, so that, you know.   13:05
14     Q   That's your opinion, your impression?   13:05
15     A   It's what -- that's what he makes it seem   13:05
16  like, yeah, but he definitely -- he definitely   13:05
17  portrays a hostile attitude by his actions towards   13:05
18  outsiders.  I mean, he's not there recording --   13:05
19  they're not there recording themselves.   13:05
20     MR. FIELDS:  Could I interject?  How much   13:05
21  time do we have left?  I want to make sure we don't   13:05
22  run out of time.   13:05
23     THE VIDEOGRAPHER:  We have 50 minutes.   13:05
24     MR. FIELDS:  We need to --   13:05
25     MR. DIEFFENBACH:  Okay.   13:05

**Page 326**

1  BY MR. DIEFFENBACH:   13:05
2      Q   Did Mr. Blakeman ever use the words   13:05
3  "Bay Boys" with you?   13:05
4      A   I don't know if he has or hasn't.   13:05
5      Q   Did you ever see him wearing clothing that   13:05
6  had any insignias like "Bay Boys" on it or something   13:06
7  like that?   13:06
8      A   I did not, no.   13:06
9      Q   Did you ever see him sell drugs at   13:06
10  Lunada Bay?   13:06
11     A   I didn't see him sell drugs.   13:06
12     Q   Did you ever buy drugs at Lunada Bay   13:06
13  yourself?   13:06
14     A   I don't do drugs, so no.   13:06
15     Q   Okay.   13:06
16     A   I believe that I saw him drinking beer   13:06
17  which is illegal so I think I did see him doing   13:06
18  that.   13:06
19     Q   When was that?   13:06
20     A   That must have been on the incident on   13:06
21  February 13th.  I believe he was drinking beer on   13:06
22  the roof when he was sitting there with Charlie.  So   13:06
23  I guess to answer your question, I did see him doing   13:06
24  illegal activity by drinking alcohol because it's   13:06
25  not allowed there.   13:06

**Page 327**

1      Q   That was just that one occasion, the   13:06
2  February 13th?   13:06
3      A   Yeah, I don't think I saw him drinking   13:06
4  alcohol.   13:06
5      MR. FIELDS:  We really need to wrap up so   13:06
6  other people can ask questions.   13:06
7      MR. DIEFFENBACH:  I'm moving.   13:06
8  BY MR. DIEFFENBACH:   13:06
9      Q   Did you see Mr. Blakeman commit any   13:06
10  assaults or batteries on anybody ever?   13:07
11     A   I did not see him.   13:07
12     MR. FRANKLIN:  Objection to the extent it   13:07
13  calls for a legal conclusion.   13:07
14     THE WITNESS:  I didn't see him, you know,   13:07
15  physically beating anyone or attacking anyone.  Like   13:07
16  I said, I've only seen him act in a very hostile way   13:07
17  by, you know, intimidation through his camera.   13:07
18  BY MR. DIEFFENBACH:   13:07
19     Q   Did you ever see him vandalize anything?   13:07
20     MR. FRANKLIN:  Objection, to the extent it   13:07
21  calls for legal conclusion.   13:07
22     MR. FIELDS:  I'm going to ask you in about   13:07
23  five minutes to just switch over no matter what.   13:07
24     MR. DIEFFENBACH:  Okay.   13:07
25     THE WITNESS:  I mean, if you mean by   13:07

36 (Pages 324 - 327)

1 vandalize, you know, orchestrating this whole event 13:07
2 with the beer in attempt to damage my camera, you 13:07
3 know, then that would be an attempt to vandalize my 13:07
4 property. 13:07
5 BY MR. DIEFFENBACH: 13:07
6 Q Did he ever slash your tires or scratch 13:07
7 your car or break a window that you can recall? 13:07
8 A He never did anything related to my car 13:07
9 that I can recall. 13:08
10 Q Did he ever injure you? 13:08
11 A Yes. 13:08
12 Q Physically? 13:08
13 A Not physically. You know, as far as 13:08
14 pouring the beer on me, I would suppose that's an 13:08
15 injury if you can relate him to organizing it but, 13:08
16 you know, he have definitely injured me mentally. 13:08
17 Q Okay. Those are the ways you described 13:08
18 already? 13:08
19 A What are you asking me specifically? 13:08
20 Q Those were the acts you described already, 13:08
21 the hostile acts and the videotape? 13:08
22 A What is the question? 13:08
23 Q The question is the way that he injured 13:08
24 you was through the acts that you've already 13:08
25 described? 13:08

Page 328

1 MR. FRANKLIN: Vague and ambiguous. 13:08
2 THE WITNESS: I -- he -- the way that he 13:08
3 injured me mentally has had repercussions that I 13:08
4 have not described. 13:08
5 BY MR. DIEFFENBACH: 13:08
6 Q Tell me about that. 13:08
7 A The way that you, know, through his 13:08
8 behavior of being incredibly hostile and 13:09
9 intimidating and frightening, he's evoked a lot of 13:09
10 fear in me, you know. Obviously, the incident on 13:09
11 February 13th was extremely traumatic and, you know, 13:09
12 it's caused me loss of sleep, it's caused me to be 13:09
13 very fearful. It's had on -- you know, a lot of 13:09
14 effects on me and I definitely attribute him to 13:09
15 that. 13:09
16 And, you know, constantly feeling 13:09
17 threatened by him and feeling as though anything can 13:09
18 happen and feeling harassed and feeling like I just 13:09
19 can't enjoy this beach even though it's public for 13:09
20 everyone. All of his actions has had an effect on 13:09
21 me mentally. 13:09
22 Q Did you ever seek medical care for that? 13:09
23 A I wanted to see a specialist and, you 13:09
24 know, have someone help me, but unfortunately I 13:10
25 couldn't afford it at the time. 13:10

Page 329

1 MR. FIELDS: This is going to eat up the 13:10
2 rest of the day, and other people are entitled to 13:10
3 ask questions. 13:10
4 MR. DIEFFENBACH: Okay. 13:10
5 MS. LUTZ: Let's take a break to figure 13:10
6 out -- 13:10
7 MR. FRANKLIN: We're like -- I have, like, 13:10
8 45 minutes. 13:10
9 MR. FIELDS: Oh, he said 15. 13:10
10 Oh, 5-0, that's why I was freaking out. 13:10
11 MS. LUTZ: I heard 15, too. 13:10
12 All right. We're still on the record. 13:10
13 MR. FIELDS: You're still okay now. 13:10
14 THE VIDEOGRAPHER: You're at two hours and 13:10
15 45 minutes. 13:10
16 MR. DIEFFENBACH: So we have about 13:10
17 45 minutes. 13:10
18 BY MR. DIEFFENBACH: 13:10
19 Q Do you plan to seek medical care for that 13:10
20 now that you have insurance? 13:11
21 A I am already seeking medical care for it. 13:11
22 Q What kind of treatment? 13:11
23 A I mentioned that to the previous attorney. 13:11
24 Q Who is that, what's the doctor's name? 13:11
25 A I said that I don't remember her exact 13:11

Page 330

1 name, she's at UCLA, the other lady I was speaking 13:11
2 to. 13:11
3 Q Okay. I'm going to leave a blank in the 13:11
4 deposition, and if you could put that name in when 13:11
5 you review it, that would be helpful if your counsel 13:11
6 will permit. 13:11
7 (Information requested: _____ 13:11
8 _____ 13:11
9 _____ 13:11
10 _____.) 13:11
11 BY MR. DIEFFENBACH: 13:11
12 Q Did you ever see Mr. Blakeman use a gun on 13:11
13 the -- Lunada Bay or otherwise? 13:11
14 A I did not see him use a gun. 13:11
15 Q Did you ever see him with a gun? 13:11
16 A I didn't see him with a gun. 13:11
17 Q Did you ever see him using drugs at -- 13:11
18 anywhere? 13:11
19 A Is alcohol defined as a drug? 13:11
20 Q Let's separate out alcohol, you've told us 13:11
21 about beer. 13:11
22 What about any other drugs? 13:11
23 A I seen him using alcohol. As far as like 13:11
24 other drugs, I'm not -- I don't think so. 13:12
25 Q Did you ever actually try to surf at 13:12

Page 331

37 (Pages 328 - 331)

**Page 332**

1    Lunada Bay?   13:12
2    A   Yes, I tried to surf at Lunada Bay on   13:12
3    January 29, 2016.   13:12
4    Q   Okay.  And did you have your board with   13:12
5    you at the time?   13:12
6    A   Yes, I did.   13:12
7    Q   At the bluffs, did you take your board   13:12
8    down -- down to the bay to surf?   13:12
9    A   Yes, I did, on January 29th.   13:12
10    Q   What size of a board was it?   13:12
11    A   I don't remember specifically.  Somewhere   13:12
12    upwards of six feet, no more than eight.   13:12
13    Q   And you were prevented from surfing that   13:12
14    day?   13:12
15    A   That's the day that the police report was   13:12
16    filed due to harassment.  But I can describe the day   13:12
17    for you if you'd like.   13:12
18    Q   We've been through that.   13:12
19    What about on February the 13th you were   13:13
20    with Jordan Wright that day?   13:13
21    A   Yes.   13:13
22    Q   And he surfed that day?   13:13
23    A   Yes, he did.   13:13
24    Q   Was there ever a day that you can recall   13:13
25    that he went there to surf and he did not surf?   13:13

**Page 333**

1    MR. FRANKLIN:  Vague, ambiguous, lacks   13:13
2    foundation.   13:13
3    THE WITNESS:  I remember that he didn't   13:13
4    surf on January 29th when we went there together   13:13
5    because we went up to the top of the hill to file   13:13
6    the police report.   13:13
7    BY MR. DIEFFENBACH:   13:13
8    Q   Any other days that he was there that you   13:13
9    were there that he wanted to surf and he did not   13:13
10    surf?   13:13
11    A   I don't remember.   13:13
12    Q   Okay.  Other than the 29th of January,   13:13
13    were there any other days that you wanted to surf   13:13
14    but did not surf at Lunada Bay?   13:13
15    MR. FRANKLIN:  Vague, ambiguous.   13:13
16    THE WITNESS:  There were many days that I   13:13
17    wanted to surf but I did not surf, I had a broken   13:13
18    arm so I couldn't surf.   13:13
19    BY MR. DIEFFENBACH:   13:13
20    Q   Except for those days after you broke your   13:13
21    arm, was there any days since the 29th of January   13:13
22    that you went to Lunada Bay with the intention of   13:13
23    surfing but were not able to surf?   13:14
24    A   I broke my arm on February 1st.   13:14
25    Q   So the answer is "no"?   13:14

**Page 334**

1    A   Well, the answer is that there were a lot   13:14
2    of days -- I mean, the 29th, it's very close to the   13:14
3    1st, so as you can see that would have meant I would   13:14
4    have wanted to surf on the 30th and 31st because on   13:14
5    the 1st I broke my arm -- so I would love to surf   13:14
6    at Lunada Bay all the time.  I mean, I wish I could   13:14
7    go there as much as I go to other spots.  It's a   13:14
8    great wave and there's, you know, been a ton of   13:14
9    times I wish I could have gone there, but just been   13:14
10    too scared to because scared of being harassed.   13:14
11    Q   The kind of break that's at Lunada, what's   13:14
12    that called?   13:14
13    MR. FRANKLIN:  Vague, ambiguous.   13:14
14    THE WITNESS:  I don't know.   13:14
15    BY MR. DIEFFENBACH:   13:14
16    Q   You said you spoke earlier about a beach   13:14
17    break, is it a beach break?   13:14
18    MR. FRANKLIN:  Vague, ambiguous, misstates   13:14
19    prior testimony.   13:15
20    THE WITNESS:  I think that Lunada Bay has   13:15
21    a lot of different breaks inside of the bay and I   13:15
22    think that they all have different names.   13:15
23    BY MR. DIEFFENBACH:   13:15
24    Q   Are you familiar with any of their names?   13:15
25    A   I don't know what the locals call them.   13:15

**Page 335**

1    Q   Is there something that you call them?   13:15
2    A   I just call it Lunada Bay but I'm not   13:15
3    familiar with all the little names.  I know that   13:15
4    they exist but I would have to ask my friends, I   13:15
5    just don't remember at this time.   13:15
6    But I know that you can surf on the left   13:15
7    side, you can surf in the middle, you can surf on   13:15
8    the inside, you can surf on the outside when it's   13:15
9    really big.  Apparently, it's really good.  I know   13:15
10    most of the locals, you know, sit kind of on the   13:15
11    shoulder when it's bigger on the -- because, I don't   13:15
12    know, that's where they like to sit.  I know it   13:15
13    breaks all over, different spots, depending on the   13:15
14    swell.   13:15
15    Q   Is there any type of break that's more   13:15
16    dangerous like a reef break versus a beach break in   13:16
17    your experience?   13:16
18    MR. FRANKLIN:  Vague, ambiguous.   13:16
19    THE WITNESS:  In my experience they're all   13:16
20    equally dangerous in different ways.  A beach break   13:16
21    can be just as dangerous as a point break there's a   13:16
22    number of factors including the size of the swell,   13:16
23    so.   13:16
24    BY MR. DIEFFENBACH:   13:16
25    Q   Is there a point break at Lunada Bay?   13:16

38 (Pages 332 - 335)

1    A   I think so.                              13:16
2    Q   Is there anything about the configuration   13:16
3    of Lunada Bay that you're aware of that makes     13:16
4    Lunada Bay more dangerous than other surf breaks   13:16
5    that you've surfed?                         13:16
6        MR. FRANKLIN:  Vague, ambiguous.        13:16
7        THE WITNESS:  I don't know, I mean,     13:16
8    they're all different.
9    BY MR. DIEFFENBACH:                         13:16
10   Q   Nothing that sticks out for you like the   13:16
11   fact that it's very rocky or shallow?       13:16
12       MR. FRANKLIN:  Vague, ambiguous.        13:16
13       THE WITNESS:  I've surfed a lot of places   13:16
14   that are rocky and shallow and they're all different   13:16
15   in their own ways, so it's hard for me to say.  I   13:16
16   know that the locals make it dangerous by, you know,   13:17
17   spearing their boards at you and using them as   13:17
18   weapons.                                    13:17
19   BY MR. DIEFFENBACH:                         13:17
20   Q   Has that that happened to you?  Did you   13:17
21   get speared?                               13:17
22   A   That's not happened to me, but that's   13:17
23   things that I've heard in the surf community.   13:17
24   Q   Never happened to you?                  13:17
25   A   It never happened to me because I never   13:17

Page 336

1    got the opportunity to surf there, so I don't have   13:17
2    any experience in the water there.          13:17
3    Q   So you're just telling us what other    13:17
4    people have told you; right?               13:17
5    A   Yes.                                    13:17
6        MR. FRANKLIN:  Argumentative.           13:17
7        THE WITNESS:  I'm telling you what I've   13:17
8    heard.                                      13:17
9    BY MR. DIEFFENBACH:                         13:17
10   Q   Your cell phone was thrown in the ocean by   13:17
11   your soon-to-be ex-husband?                13:17
12   A   Yes, it was.                            13:17
13   Q   What type of phone was it?              13:17
14   A   It was an iPhone.                       13:17
15   Q   Do you download things to the cloud     13:17
16   through your iPhones?                       13:17
17   A   I try to.  I'm not always very good at it.   13:17
18   Q   Was the phone that was thrown in the ocean   13:17
19   a phone that was hooked up to the cloud?    13:17
20   A   I wasn't able to back up that information   13:17
21   unfortunately.                             13:17
22   Q   Who was the cell phone provider for that   13:18
23   phone?                                      13:18
24   A   I believe it was Sprint.                13:18
25   Q   Is that your current provider?          13:18

Page 337

1    A   I currently have Sprint as well but the   13:18
2    previous contract was in my husband's name.   13:18
3    Q   And that's Gabriel?                     13:18
4    A   Yes.                                    13:18
5    Q   Reed?                                   13:18
6    A   Yes.                                    13:18
7    Q   Was it under that name or a company name?   13:18
8    A   I think it was under his first name, I'm   13:18
9    not sure, I never paid the bill so I'm not sure.   13:18
10   Q   And that phone number that you gave      13:18
11   earlier, that was the phone number for that phone?   13:18
12   A   Yes, that was my old phone number.      13:18
13   Q   And your current phone number?          13:18
14   A   (310) 579-5683.                         13:18
15   Q   That's with Sprint also; right?         13:18
16   A   Yes.                                    13:18
17       Regarding the instances in the fort on   13:19
18   February 13th.                             13:19
19   Q   Yes.                                    13:19
20   A   I don't remember specifically where     13:19
21   Mr. Blakeman was when Mr. Johnston exposed himself   13:19
22   to me, I don't remember if he was on the roof at the   13:19
23   time or if he was, you know, or if he was closer to   13:19
24   me, but I forgot to mention that part.      13:19
25   Q   All right.  When you gave us your Gmail   13:19

Page 338

1    accounts, was it Diana Milena Gabrielle at Gmail.com   13:20
2    was one of them, how is Gabrielle spelled?   13:20
3    A   It's spelled with two Ls and an E on the   13:20
4    end.                                        13:20
5    Q   G-a-b-r-i-e-l-l-e?                      13:20
6    A   Yes.                                    13:20
7    Q   Thank you.  When you -- what you described   13:20
8    as Mr. Johnston exposing himself, are you aware   13:20
9    whether that was something that was filmed by   13:20
10   Mr. Blakeman?                               13:20
11   A   I don't know if it was filmed or not.   13:20
12   Because like I said, I don't remember if     13:20
13   Mr. Blakeman was filming at that point, I just don't   13:20
14   remember his positioning.                   13:20
15   Q   Mr. Cummings, Nurnur Cummings, when did   13:20
16   you have the conversation with him about making a   13:20
17   documentary or that might be a good idea or cool   13:20
18   idea, whatever was said?                    13:20
19       MR. FRANKLIN:  Objection, misstates prior   13:20
20   testimony.                                  13:20
21       THE WITNESS:  I spoke to him about the   13:20
22   article that came out on February 13th, and he   13:21
23   mentioned to me that making a documentary about   13:21
24   Lunada Bay would be a really great idea.    13:21
25   ///

Page 339

39 (Pages 336 - 339)

Page 340

BY MR. DIEFFENBACH:                            13:21

Q   So that was the first time, February 13th,  13:21
or was it after that?                          13:21

A   I don't remember exactly when I spoke to   13:21
him.  I know it was after the article came out, but  13:21
I can't pinpoint to a specific date.           13:21

Q   The article came out on February 14th, I   13:21
guess, because the incident happened on the 13th?   13:21

A   No, it came out on the 13th.               13:21

Q   Did it?                                    13:21

A   That's why they were pretending to        13:21
celebrate.  I believe the online version and the   13:21
print version came out on different dates, but the   13:21
print version came out on that Saturday and it was   13:21
on everyone's door step.                       13:21

Q   When you had this conversation with        13:21
Mr. Cummings, you were no longer a tenant of his and  13:22
your husband was no longer a tenant of his.    13:22

A   My husband and I were separated at that    13:22
time.  We weren't living together.             13:22

Q   Was your husband still his tenant?         13:22

A   My husband was never his tenant.           13:22

Q   Were you his tenant?                       13:22

A   I was never his tenant.                    13:22

Q   He's just a landlord but not your          13:22

Page 341

landlord?                                      13:22

A   He's not my landlord.                      13:22

Q   Maybe I misunderstood.  Had he been your   13:22
landlord before?                               13:22

A   No, he was never my landlord.              13:22

Q   He had been your husband's landlord        13:22
before?                                        13:22

A   No.                                        13:22

MS. HEWITT:  Jordan's.                          13:22

BY MR. DIEFFENBACH:                            13:22

Q   I'm sorry, Jordan's landlord?              13:22

A   Right.                                     13:22

Q   At the time you had that conversation with  13:22
Mr. Cummings, was he Jordan's landlord still?  13:22

A   Yes.                                       13:22

Q   Is he still Jordan's landlord?             13:22

A   No.                                        13:22

Q   When did that end?                         13:22

A   I don't remember exactly, I don't know.    13:22

Q   What was Jordan's -- where did he live     13:22
when he was Mr. Cummings's tenant?             13:23

A   In Venice, California.                     13:23

Q   Do you remember the address?              13:23

A   I don't unfortunately, no.                13:23

Q   Do you remember the street?               13:23

Page 342

A   I don't.                                   13:23

Q   Just a couple of follow-ups here.          13:23

THE VIDEOGRAPHER:  You have approximately   13:23
33 minutes.                                     13:23

BY MR. DIEFFENBACH:                            13:23

Q   The name of your husband's company is Rock  13:23
and Roll All Star sponsoring company -- what's the   13:23
name of his company?                           13:23

A   Oh, the name of his company to the best of  13:23
my knowledge, I don't know if he did the Rock and   13:23
Roll All Stars under that company or not, but it's   13:23
Gabe Reed Productions.  But as to, you know, the   13:23
business structure of how he did that, I don't know;  13:23
I don't know if he used that company or something   13:24
else.                                          13:24

Q   You mentioned yesterday that you had a     13:24
surfing coach that took you to secret spots in  13:24
Santa Cruz, who was that coach?                13:24

A   Tyler Fox.                                 13:24

Q   Are you still coached by him?              13:24

A   Well, I'm not surfing right now because    13:24
I'm nine months pregnant.  So I'm not currently  13:24
being coached by him.                          13:24

Q   Okay.  Where is he located?                13:24

A   He's located in Santa Cruz.                13:24

Page 343

Q   It's F-a-l-k?  Spelled F-a-l-k, Falk?      13:24

A   No, Fox, like the animal fox, F-o-x.       13:24
Yeah, Tyler Fox, he got fourth place in Mavericks, I  13:24
believe, this year.                            13:24

MR. DIEFFENBACH:  Thanks.  That's all I    13:24
have, thanks.                                   13:24

MR. FIELDS:  Briefly.                           13:24

Off the record.                                13:25

THE VIDEOGRAPHER:  We are now off the      13:25
record.  The time is 1:25 p.m.                 13:25

(Break taken.)                                 13:30

THE VIDEOGRAPHER:  We're now back on the   13:32
record.  The time is 1:32 p.m.                 13:32

EXAMINATION                             13:32

BY MR. FIELDS:                                 13:32

Q   Good afternoon, Ms. Reed, you realize      13:32
you're still under oath?                       13:32

A   Yes.                                       13:32

Q   Have you ever met Angelo Ferrara?          13:32

A   I don't recall if I've met him.  And,      13:32
again, I'm not sure what you mean by "meet," do you  13:32
mean by seeing him?                            13:32

Q   Let's start with that, have you ever seen  13:32
him?                                           13:32

Page 344

1    A   I'm not sure if I've seen him or not.   13:32
2    Q   If you were to walk into the room, would   13:32
3  you recognize him?   13:32
4    A   Yeah, I know what he looks like.   13:32
5    Q   What does he look like?   13:32
6    A   An older man, middle-aged man, not very   13:32
7  distinguishable, grayish hair.   13:32
8    Q   Any sense of his height?   13:32
9    A   I don't know his height.   13:32
10   Q   Do you know whether he's closer to 5-5 or   13:32
11  6-5?   13:32
12   A   I would assume that he's probably closer   13:32
13  to like 5-10 -- not 5-10, but 5-11 to six-foot, I'm   13:33
14  not sure, that's a guess.   13:33
15   Q   How do you know that anyone that you've   13:33
16  seen is Angelo Ferrara; has he ever introduced   13:33
17  himself to you?   13:33
18   A   He has not introduced himself to me.   13:33
19   Q   Has anyone pointed him out and said,   13:33
20  That's Angelo Ferrara?   13:33
21   A   I don't recall anyone doing that.   13:33
22   Q   So what makes you think that if someone   13:33
23  walked in the door you would know whether he'd be   13:33
24  Angelo Ferrara versus any other member of the human   13:33
25  race?   13:33

Page 345

1    A   I don't know, I would do my best.   13:33
2    Q   Have you ever -- have you ever personally   13:33
3  been harassed by in any manner by Angelo Ferrara?   13:33
4    A   I don't think I've had any personal   13:33
5  interactions with him that I know of.   13:33
6    Q   Have you ever heard of -- has anyone told   13:33
7  you that they either have been harassed by   13:33
8  Angelo Ferrara or have known of situations where   13:33
9  Angelo Ferrara harassed anybody?   13:34
10       MR. FRANKLIN:  Vague, ambiguous.   13:34
11       THE WITNESS:  I've heard various things in   13:34
12  the surf community.  You know, I've also relied on   13:34
13  the investigation of my attorneys.   13:34
14  BY MR. FIELDS:   13:34
15   Q   Other than what your attorneys have told   13:34
16  you, what have you heard in the surf community about   13:34
17  what Angelo Ferrara may have done whether it's   13:34
18  harassing or assault or any type of the wrongful   13:34
19  acts alleged in the complaint?   13:34
20   A   I mean, I've talked to Charlie Ferrara and   13:34
21  I've had several conversations with him.  Charlie   13:34
22  told me that the harassment has been continuing for   13:34
23  a very long time.  He told me that -- that Angelo   13:34
24  and his brother were some of the original Bay Boys   13:34
25  and that they're all a family and that they're all,   13:34

Page 346

1  you know, an organized family that tries to harass   13:35
2  outsiders by making their surf experience   13:35
3  unpleasant.   13:35
4    Q   Did he use Angelo's name?   13:35
5    A   I believe so.  I believe that he used his   13:35
6  parents names -- his parents and uncle's name.   13:35
7    Q   Other than what Charlie Ferrara told you,   13:35
8  anyone else tell you anything about Angelo Ferrara   13:35
9  doing anything improper?   13:35
10   A   I've heard stuff from Chris Taloa, and   13:35
11  like I said I've heard various things in the surf   13:35
12  community from various people that I -- I can't   13:35
13  recall their names.   13:35
14   Q   What did Chris Taloa tell you about   13:35
15  Angelo Ferrara?   13:35
16   A   I don't specifically remember what he told   13:35
17  me.  I do remember that -- that he told me he's part   13:35
18  of the Bay Boys and that he's one of the main people   13:35
19  that organizes the harassment and threats and   13:36
20  violence that goes on there.   13:36
21   Q   So Chris Taloa told you that   13:36
22  Angelo Ferrara is one of the main people who   13:36
23  organizes the threats and harassment?   13:36
24   A   He said something along those lines.   13:36
25   Q   Do you recall anything -- any more detail   13:36

Page 347

1  than that?   13:36
2    A   You know, I don't recall at this time any   13:36
3  more detail because I don't think I've had any   13:36
4  personal interaction with him.   13:36
5    Q   Other than Charlie -- Mr. Taloa, anyone   13:36
6  else mention Angelo's name to vague?   13:36
7        MR. FRANKLIN:  Vague and ambiguous.   13:36
8        THE WITNESS:  Like I said, I've heard   13:36
9  various stories about him in the surf community and   13:36
10  I've relied upon the investigation of my attorneys.   13:36
11  BY MR. FIELDS:   13:36
12   Q   What stories did you hear about Angelo in   13:36
13  the surf community?   13:36
14   A   It's hard for me to really remember, but   13:36
15  I've heard that he's part of the Bay Boys and that   13:37
16  he helps to organize the violence and the threats   13:37
17  and the intimidation that go on down there.   13:37
18   Q   Do you recall anyone, the names of anyone   13:37
19  who said that to you --   13:37
20   A   No --   13:37
21   Q   -- besides Mr. Taloa?   13:37
22   A   (Shakes head).   13:37
23   Q   How about NF -- actually, can we just   13:37
24  strike that, make it NF.   13:37
25       Do you know who I mean by "NF"?   13:37

41 (Pages 344 - 347)

Page 348

```
 1      A    NF?                        13:37
 2      Q    Move to strike that. We'll use -- I would  13:37
 3  ask --                             13:37
 4      MR. FRANKLIN: If she axe MOK (phonetic) I  13:37
 5  think probably everybody here in terms of that   13:37
 6  particular name, NF, being --       13:37
 7      MR. FIELDS: Have that stricken and put   13:37
 8  "NF" in the transcript.              13:37
 9      MR. FRANKLIN: So stipulated. We were not  13:37
10  supposed to use his name because he's a minor.   13:37
11      MS. HEWITT: So stipulated.     13:37
12  BY MR. FIELDS:                       13:38
13      Q    So, NF, have you had any personal   13:38
14  interactions with NF?                13:38
15      A    I don't know if I have or I haven't, I  13:38
16  don't think so.                      13:38
17      Q    Sorry?                     13:38
18      A    What does he look like?    13:38
19      Q    I really don't want to answer.   13:38
20      A    Okay.                      13:38
21      Q    He's a minor.              13:38
22      A    Right. I don't think I've had anyone --  13:38
23  interactions with anyone in that age group.   13:38
24      Q    Have you heard of anyone -- has anyone  13:38
25  discussed NF with you, besides your lawyers?   13:38
```

Page 349

```
 1      A    My attorneys, I believe, there's some  13:38
 2  press about him.                     13:38
 3      Q    Have you discussed NF with anybody?   13:38
 4      A    I've discussed him with my attorneys. If  13:38
 5  I'm thinking of the correct person that, you know,  13:38
 6  that there's press articles about. I discussed that  13:38
 7  with Jordan.                         13:38
 8      Q    Did Jordan have any personal knowledge   13:39
 9  with, in fact, or did he read the same articles that  13:39
10  you read?                            13:39
11      A    No, he just read the same articles as me.  13:39
12  Chris Taloa also sent me a text message at one   13:39
13  point -- or Jordan forwarded me a text that Chris  13:39
14  sent him and I believe that text is included in the  13:39
15  police report and I don't know if it mentions NF in  13:39
16  it or not, but I know that it mentions the Ferrara  13:39
17  family.                              13:39
18      Q    Are you a member of SAG?   13:39
19      A    I'm not a member of SAG.   13:39
20      Q    Are you member of AFTRA?   13:39
21      A    No.                        13:39
22      Q    Have you prepared any type of scripts or  13:39
23  treatments or outlines with respect to the potential  13:39
24  documentary about the Lunada Bay Boys?   13:39
25      A    I have not, no.            13:39
```

Page 350

```
 1      Q    With the Rock and Roll All Star Tour of  13:39
 2  South America, did you have any official capacity?  13:39
 3      A    I photographed the tour for my then   13:40
 4  husband.                             13:40
 5      Q    Were you an official photographer?   13:40
 6      A    You can call me that.      13:40
 7      Q    Have you ever done a documentary called  13:40
 8  Keepers of Light?                    13:40
 9      A    Yes.                       13:40
10      Q    Did it win any awards?     13:40
11      A    It did. That was my first -- my first   13:40
12  documentary that I made when I was -- I think I was  13:40
13  16 or 17 in high school.             13:40
14      Q    Did it win any national or   13:40
15  international -- did it win any awards at national  13:40
16  or international film festivals?     13:40
17      A    I think so, I remember it won a bunch of  13:40
18  stuff and I was pretty happy at the time.   13:40
19      Q    Do you recall what festivals?   13:40
20      A    I don't remember, it was such a long time  13:40
21  ago, it would be hard for me to remember.   13:40
22      MR. FIELDS: No further questions, thank  13:40
23  you.                                 13:40
24      THE WITNESS: Thank you.         13:40
25                                       13:40
```

Page 351

```
 1      EXAMINATION                      13:40
 2  BY MR. CAREY:                        13:40
 3      Q    Hi.                        13:40
 4      A    Hi.                        13:41
 5      THE VIDEOGRAPHER: Could you clip it on?  13:41
 6      MR. CAREY: Sure.                 13:41
 7  BY MR. CAREY:                        13:41
 8      Q    Almost done.               13:41
 9      My name is Pat Carey, I represent Alan   13:41
10  Johnston, or Jalian as you referred to him.   13:41
11      Prior to February 13th, the date that   13:41
12  we've talked about a lot, have you personally seen  13:41
13  Mr. Johnston at Lunada Bay?          13:41
14      A    I don't remember seeing him there before,  13:41
15  no.                                  13:41
16      Q    So on January 29th, the incident we've  13:41
17  also talked, to your memory, Mr. Johnston was not  13:41
18  there; correct?                      13:41
19      A    I don't remember seeing him there.   13:41
20      Q    The January 29th video -- strike that.  13:41
21      You've given us a video of that incident;  13:41
22  correct, January 29th?               13:41
23      A    I don't know who provided the video.   13:41
24      Q    Are you aware that there's a video of that  13:41
25  incident?                            13:41
```

42 (Pages 348 - 351)

1      A    Yes, I've seen the video, I'm aware of the   13:42
2   video.                                          13:42
3      Q    And your boyfriend recorded that video;   13:42
4   correct?                                        13:42
5      A    Jordan Wright recorded it, yes.          13:42
6      Q    Did you know he had a camera when going   13:42
7   down the cliff prior to interacting with whoever is   13:42
8   shown on the video?                             13:42
9      A    Did I know that Jordan had a camera?     13:42
10     Q    Yes.                                     13:42
11     A    Yes, Jordan had a GoPro, and I believe it   13:42
12   was mounted on him.                            13:42
13     Q    And the purpose was to hopefully catch   13:42
14   someone harassing either you or Jordan; correct?   13:42
15         MR. FRANKLIN:  Vague, ambiguous.          13:42
16         THE WITNESS:  No, that's not correct.    13:42
17   Jordan likes to film himself surfing so the purpose   13:42
18   was to surf and Jordan said it's also for safety   13:42
19   because he had been harassed in the past.       13:42
20   BY MR. CAREY:                                   13:42
21     Q    Sure.                                    13:42
22         So the camera was on prior to him going in   13:42
23   the water; correct?                            13:42
24     A    The camera was on prior to him going into   13:42
25   the water, but I don't know at what point it was   13:42

Page 352

1   turned on.                                      13:42
2      Q    So, the partial purpose at least was to   13:42
3   hopefully catch people harassing on camera; correct?   13:43
4         MR. FRANKLIN:  Vague --                   13:43
5         THE WITNESS:  No.                          13:43
6         MR. FRANKLIN:  -- ambiguous, misstates    13:43
7   prior testimony.                               13:43
8         THE VIDEOGRAPHER:  20 minutes.             13:43
9         THE WITNESS:  No, the purpose was to      13:43
10   maintain safety in addition to recording waves.   13:43
11   BY MR. CAREY:                                   13:43
12     Q    The --                                   13:43
13     A    I don't think anyone wants to be harassed,   13:43
14   purposefully.  I definitely don't.             13:43
15     Q    Can you recall that video in your mind   13:43
16   right now?  I don't want to show it to you; can you   13:43
17   recall that video?                            13:43
18     A    I looked at it once in preparation, I    13:43
19   don't have it memorized.                       13:43
20     Q    Do you know who the individual is in that   13:43
21   video that appears to be talking to you and Jordan?   13:43
22     A    That's something that I discussed with my   13:43
23   attorneys.                                     13:43
24     Q    Sure.  So you don't personally know; is   13:43
25   that what you're saying?                       13:43

Page 353

1      A    That I don't know what?                  13:43
2      Q    Do you have personal knowledge of who that   13:43
3   is?                                            13:43
4      A    I discussed with my attorneys as to who it   13:44
5   is.                                            13:44
6      Q    Okay.  And is the incident where you     13:44
7   allege that you were called a whore, is that shown   13:44
8   on that video?                                 13:44
9      A    It is, yeah.                            13:44
10     Q    So, so it's -- there's an individual that   13:44
11   appears to be in the foreground of the video that's   13:44
12   yelling towards yourself and Jordan; correct?   13:44
13     A    There is, yes.                          13:44
14     Q    And do you recall exactly what that      13:44
15   individual said?                              13:44
16     A    Well, the video doesn't show the entire   13:44
17   incident.  But what the video does show, I mean, it   13:44
18   does sound like he's saying "whore" in the video.   13:44
19     Q    And is that -- that part where you said it   13:44
20   sounds like he's saying "whore," is that the exact   13:44
21   time where you're alleging he called you a whore, or   13:44
22   was there another time?                        13:44
23     A    I don't know if there was more than one   13:45
24   time.                                         13:45
25     Q    But that's the time where you said it    13:45

Page 354

1   sounds like he's calling you a whore, that's the   13:45
2   time that you're testifying that you were called a   13:45
3   whore; correct?                                13:45
4         MR. FRANKLIN:  Misstates prior testimony.   13:45
5         THE WITNESS:  That's not what I'm saying.   13:45
6   But it does sound like that's what he's saying in   13:45
7   the video.                                     13:45
8   BY MR. CAREY:                                   13:45
9      Q    Is there another time other than that time   13:45
10   in the video that you were called a whore?     13:45
11     A    I don't remember exactly.               13:45
12     Q    Going to February 13th, what was your    13:45
13   purpose for going to Lunada Bay -- I'm sorry -- what   13:45
14   was your -- what was your purpose for going to   13:45
15   Lunada Bay on February 13th?                   13:45
16     A    My purpose on February 13th was to take   13:45
17   pictures, maybe video of my friend, but mostly just   13:45
18   photos.                                       13:45
19     Q    That was your sole purpose to go there?   13:45
20     A    Yes.                                    13:46
21     Q    And it had nothing to do -- your trip to   13:46
22   Lunada Bay had nothing to do with the fact that the   13:46
23   L.A. Times article was released that morning?   13:46
24     A    I didn't know it was released that       13:46
25   morning.                                      13:46

Page 355

43 (Pages 352 - 355)

1    Q   Okay.  You said that it had actually been    13:46
2    released on the Internet the night before, do you    13:46
3    recall saying that?    13:46
4    A   It may have been, the online version,    13:46
5    yeah, I don't know if it was the night before or    13:46
6    after, but I remember it was at different times,    13:46
7    hmm-mm.    13:46
8    Q   Do you recall seeing the online version    13:46
9    prior to the print version; correct?    13:46
10   MR. FRANKLIN:  Misstates prior testimony.    13:46
11   THE WITNESS:  No, I don't remember if I    13:46
12   read the article before I read the print version,    13:46
13   I'm not sure.    13:46
14   BY MR. CAREY:    13:46
15   Q   What time did you and Jordan go on    13:46
16   February 13th?    13:46
17   A   I don't know the exact time, but I    13:46
18   remember it was already daylight out.  It would come    13:46
19   morning and it was already daylight.    13:46
20   Q   Did you ever communicate with Jordan or    13:46
21   anyone else about any other motive as to why to go    13:46
22   to Lunada Bay that day?    13:46
23   MR. FRANKLIN:  Vague, ambiguous.    13:47
24   THE WITNESS:  I'm not sure what you're    13:47
25   asking me.    13:47

Page 356

1    BY MR. CAREY:    13:47
2    Q   Sure.    13:47
3    You said your purpose was to take photos    13:47
4    or videos; correct?    13:47
5    A   I couldn't surf because I broke my arm.    13:47
6    Q   So try to follow me, your purpose, as you    13:47
7    said, was to take photos or videos; correct?    13:47
8    MR. FRANKLIN:  Vague, ambiguous.    13:47
9    THE WITNESS:  No, I think that maybe you    13:47
10   have the wrong understanding.    13:47
11   BY MR. CAREY:    13:47
12   Q   Help me out.    13:47
13   A   Sure.    13:47
14   I know that Jordan was going to surf, I    13:47
15   couldn't surf with Jordan, and we spent all winter    13:47
16   surfing together.  And since I wasn't able to surf,    13:47
17   I love watching all my friends surf, and so that was    13:47
18   why I went, was to take photos of him and I know    13:47
19   that his friends were there as well.  But I don't    13:47
20   think I would have gone there if he wouldn't have    13:47
21   gone.    13:47
22   Q   Is there any communication via text or    13:47
23   e-mail between you and Jordan expressing any other    13:47
24   motive as to why you should go to Lunada Bay on    13:47
25   February 13th?    13:48

Page 357

1    A   Not that I know of, no.    13:48
2    THE VIDEOGRAPHER:  15 minutes.    13:48
3    MR. CAREY:  I'll move quick.    13:48
4    BY MR. CAREY:    13:48
5    Q   And how about any communication with    13:48
6    Chris Taloa as to why you should go to Lunada Bay on    13:48
7    February 13th?    13:48
8    A   I don't think I had any direct    13:48
9    communication with him at that point.    13:48
10   Q   "Him" meaning Chris Taloa?    13:48
11   A   Yes.    13:48
12   Q   Okay.  Now, the -- we've questioned you a    13:48
13   lot -- or they've questioned you a lot about the    13:48
14   exact details, I'm not going to go through that all    13:48
15   over again in the interest of time.  I do want to    13:48
16   ask about you some specifics.    13:48
17   A   Okay.    13:48
18   Q   You just stated at the end of your    13:48
19   questioning with prior counsel for the first time    13:48
20   that my client exposed himself to you during that    13:48
21   incident.  Describe exactly what happened.    13:48
22   A   It's hard for me to remember all the    13:48
23   details but what I do remember is that while he had    13:48
24   a towel on himself there was a moment when it seemed    13:48
25   that he intentionally exposed his penis to me while    13:49

Page 358

1    he was changing.    13:49
2    Q   So he was changing into his wetsuit?    13:49
3    A   He was in the process of doing that.    13:49
4    Q   And he had a towel around his waist?    13:49
5    A   I believe so; yes.    13:49
6    Q   Have you changed in a wetsuit on a beach    13:49
7    before?    13:49
8    A   I've changed many times.    13:49
9    Q   What's the purpose of putting a towel    13:49
10   around you on the beach while changing into your    13:49
11   wetsuit?    13:49
12   A   To cover yourself up.    13:49
13   Q   The -- you said you believe that he    13:49
14   intentionally flashed himself at you -- I'm sorry    13:49
15   used the word "flash" but you didn't use that word,    13:49
16   but can you describe exactly what you saw?    13:49
17   A   I mean, I remember -- I think he was    13:49
18   facing me which is odd because usually when people    13:49
19   change in their wetsuits, they try to face away from    13:49
20   you.  And, again, it seemed like it happened very    13:50
21   quickly and combined with, you know, the yelling and    13:50
22   the comments and the moaning, you know, I remember    13:50
23   there was a moment when he seemed like he    13:50
24   purposefully removed his towel in order to expose    13:50
25   himself.    13:50

Page 359

44 (Pages 356 - 359)

Hahn & Bowersock, A Veritext Company
800.660.3187

| | |
|---|---|
| 1   Q    So he completely removed his towel is your  13:50 | BY MR. CAREY:                                    13:52 |
| 2   testimony?                              13:50 | 2   Q    So I'll be clear.                        13:52 |
| 3   A    No, I'm not saying that.            13:50 | 3        Was there two incidents, one in which he  13:52 |
| 4   Q    Okay.  So what specifically did he do to  13:50 | 4   opened the can and sprayed you; two, he then poured  13:52 |
| 5   expose himself if you can describe his action;  13:50 | 5   it on your arm and camera?                  13:52 |
| 6   meaning, did he open the towel briefly and then  13:50 | 6   A    From what I can recall, it was one      13:52 |
| 7   close it, what exactly happened?           13:50 | 7   incident.                                13:52 |
| 8   A    It's hard for me to remember but I do  13:50 | 8   Q    Okay.  Just the spray, not actual pouring  13:52 |
| 9   remember, you know, his towel being open in a way  13:50 | 9   of the beer?                             13:52 |
| 10   where I could see what was underneath.       13:50 | 10        MR. FRANKLIN:  Misstates testimony.       13:52 |
| 11   Q    In your experience, is that an unusual  13:50 | 11        THE WITNESS:  You know, I remember the   13:52 |
| 12   occurrence for someone to be partially exposed while  13:50 | 12   spray, pouring all over my arm and the camera.   13:52 |
| 13   changing into their wetsuit prior to surfing?  13:50 | 13   BY MR. CAREY:                            13:52 |
| 14        MR. FRANKLIN:  Misstates testimony.      13:50 | 14   Q    Would you agree if a police officer said  13:52 |
| 15        THE WITNESS:  It's unusual for someone to  13:51 | 15   that you told him that Mr. Johnston after the spray  13:52 |
| 16   expose their penis while they're changing into a  13:51 | 16   poured the beer on your left arm and camera, that  13:53 |
| 17   wetsuit by opening their towel, yes.        13:51 | 17   that would be incorrect?                   13:53 |
| 18   BY MR. CAREY:                            13:51 | 18   A    I don't know.  I don't remember.        13:53 |
| 19   Q    So you are saying that he opened his towel  13:51 | 19        THE VIDEOGRAPHER:  Ten minutes.          13:53 |
| 20   to flash himself at you?                   13:51 | 20        MR. CAREY:  I need two minutes, guys.     13:53 |
| 21   A    There was a moment of time where his towel  13:51 | 21   BY MR. CAREY:                            13:53 |
| 22   appeared to be open and that's when I saw what I  13:51 | 22   Q    Did you tell the police that Mr. Johnston  13:53 |
| 23   saw.                                 13:51 | 23   told you, "I saw you on the front page of the   13:53 |
| 24   Q    The -- I want to ask you about the police  13:51 | 24   L.A. Times, now you're done"?               13:53 |
| 25   report.                               13:51 | 25   A    I may have said that.                 13:53 |
| Page 360 | Page 362 |

| | |
|---|---|
| 1        And you stated previously you described it  13:51 | 1   Q    Did Mr. Johnston, in fact, say that?     13:53 |
| 2   the best you could at the time to the police   13:51 | 2   A    He may have.                        13:53 |
| 3   officer; correct?                         13:51 | 3   Q    Do you recall him saying that today?     13:53 |
| 4   A    Yes.                              13:51 | 4   A    Today -- I mean, it's -- like I said, it's  13:53 |
| 5   Q    I'm going to ask you about those specific  13:51 | 5   hard for me to remember all the details today  13:53 |
| 6   statements and I'll try to go through it quickly;  13:51 | 6   because of everything I'm dealing with, but it  13:53 |
| 7   okay?                                13:51 | 7   sounds familiar.                         13:53 |
| 8   A    Hmm-mm.                          13:51 | 8   Q    Okay.  Did he make any other statements  13:53 |
| 9   Q    Did you state to the police officer that  13:51 | 9   that you can recall at this time, specific    13:54 |
| 10   Mr. Johnston shook up a beer can and opened it in  13:51 | 10   statements, with regards to sexual behavior    13:54 |
| 11   your face spraying you with its content?      13:51 | 11   activity?                              13:54 |
| 12        MR. FRANKLIN:  Document speaks for itself.  13:51 | 12        MR. FRANKLIN:  Vague, ambiguous.          13:54 |
| 13        THE WITNESS:  I said something like that,  13:51 | 13        THE WITNESS:  In addition to the sounds   13:54 |
| 14   I mean, I don't know if it was specific wording,  13:51 | 14   that he was making and the motions that he was  13:54 |
| 15   but...                                13:52 | 15   making?                               13:54 |
| 16   BY MR. CAREY:                            13:52 | 16   BY MR. CAREY:                            13:54 |
| 17   Q    Did you then tell him that Mr. Johnston,  13:52 | 17   Q    Correct, beyond what you've already told  13:54 |
| 18   after that, then took the open beer and poured it on  13:52 | 18   us, not to repeat any of that, anything specific he  13:54 |
| 19   your left arm and camera, did you tell him that that  13:52 | 19   said to you with regard to sexual innuendo?    13:54 |
| 20   happened?                             13:52 | 20        MR. FRANKLIN:  Vague, ambiguous.          13:54 |
| 21        MR. FRANKLIN:  Document speaks for itself.  13:52 | 21        THE WITNESS:  I mean, I remember him     13:54 |
| 22        THE WITNESS:  I would assume that I did.  13:52 | 22   saying that he's big enough to get the job done.  13:54 |
| 23   I mean, I told him that he shook up the can of beer  13:52 | 23   BY MR. CAREY:                            13:54 |
| 24   in a way that sprayed my arm and the camera and that  13:52 | 24   Q    Did you tell that to the police?        13:54 |
| 25   it seemed intentional.                     13:52 | 25   A    I think so.                        13:54 |
| Page 361 | Page 363 |

45 (Pages 360 - 363)

1    Q    And --                              13:54
2    A    I mean, there's many things.       13:54
3    Q    Did you describe his penis to the police?   13:54
4    A    I think I did.                      13:54
5    Q    Did you describe it as white, three inches   13:54
6    in length, and flaccid?                  13:54
7    A    I think so, yes, hmm-mm.            13:54
8    Q    And are you aware -- so you're aware that   13:54
9    Jen was present; correct?                13:55
10   A    I'm aware that Jen was in the fort.   13:55
11   Q    Are you aware that Jen's account of what   13:55
12   occurred is different from what your account of what   13:55
13   occurred is?                            13:55
14       MR. FRANKLIN:  Lacks foundation.     13:55
15       THE WITNESS:  I'm not aware of what her   13:55
16   account is.                             13:55
17   BY MR. CAREY:                            13:55
18   Q    You became aware that the district   13:55
19   attorney did not file charges against Mr. Johnston;   13:55
20   correct?                                13:55
21   A    Yes.                               13:55
22       MS. LUTZ:  Can we take a break?  How much   13:55
23   time?                                   13:55
24       MR. CAREY:  Sure.                    13:55
25       MS. LUTZ:  Off the record.           13:55

Page 364

1        THE VIDEOGRAPHER:  We are now off the   13:55
2    record.  The time is 1:55 p.m.           13:55
3        (A discussion was held off the record.)   13:56
4        THE VIDEOGRAPHER:  We're now on the   13:56
5    record.  The is 1:56 p.m.                13:56
6                                           13:56
7            EXAMINATION                      13:56
8    BY MS. LUTZ:                             13:56
9    Q    Do you know defendant Sang Lee?      13:56
10   A    I don't know him personally.         13:56
11   Q    Do you have personal knowledge of    13:56
12   defendant Sang Lee?                      13:56
13   A    What do you mean by personal knowledge?   13:56
14   Q    Aside from what your attorney has told   13:56
15   you, do you have personal knowledge of who Sang Lee   13:56
16   is?                                     13:56
17       MR. FRANKLIN:  Vague, ambiguous.      13:56
18       THE WITNESS:  I don't know what you mean   13:56
19   by personal knowledge.                   13:56
20   BY MS. LUTZ:                             13:56
21   Q    From any information aside from what your   13:56
22   attorney has told you?                   13:56
23   A    I've heard about him from the surf   13:56
24   community, from my friends.              13:56
25   Q    Who specifically have you heard about him   13:56

Page 365

1    from?                                   13:56
2    A    I've heard about him from various people   13:56
3    in the surf community.  I don't remember all their   13:56
4    names.                                  13:57
5    Q    Do you remember any of their names?   13:57
6    A    I do remember hearing about him from   13:57
7    Chris Taloa, I don't know whether or not Jordan told   13:57
8    me about him.                           13:57
9    Q    Have you seen defendant Sang Lee in   13:57
10   Lunada Bay?                             13:57
11   A    I don't know if I've personally seen him.   13:57
12   Q    Let me ask you this:  Would you be able to   13:57
13   identify him if he came into the room right now?   13:57
14   A    I think so.                         13:57
15   Q    How would you describe his physical   13:57
16   characteristics?                        13:57
17   A    Asian, thin, brown hair, brown eyes.   13:57
18   Q    Did you see him at Lunada Bay on   13:57
19   January 29, 2016?                       13:57
20   A    I'm not sure if I saw him or not on the   13:57
21   29th.  I may have seen him in the fort but I'm not   13:57
22   sure.  Far away.                        13:57
23   Q    You can't testify today that you saw him   13:57
24   in the fort on January 29, 2016; is that correct?   13:57
25   A    Yeah, I don't remember.             13:57

Page 366

1    Q    Did you see Sang Lee in Lunada Bay on, I   13:57
2    think, February 5th or 6th 2016?         13:58
3    A    No, I did not.                      13:58
4    Q    Did you see Sang Lee in Lunada Bay on   13:58
5    February 13, 2016?                      13:58
6    A    No, I did not.                      13:58
7    Q    Has Sang Lee ever approached you?    13:58
8    A    I don't think so.                   13:58
9    Q    Has Sang Lee ever made physical contact   13:58
10   with you?                               13:58
11   A    I don't think so, no.               13:58
12   Q    Have you ever personally felt physically   13:58
13   threatened by Sang Lee?                  13:58
14       MR. FRANKLIN:  Objection, vague and   13:58
15   ambiguous.                              13:58
16       THE WITNESS:  I haven't personally had any   13:58
17   interaction with him that I know of, that I can   13:58
18   remember.                               13:58
19       THE VIDEOGRAPHER:  Five minutes.      13:58
20   BY MS. LUTZ:                             13:58
21   Q    Has Sang Lee caused you to lose any sleep?   13:58
22   A    Not Sang Lee specifically.           13:58
23   Q    You mentioned earlier that you knew Rory   13:58
24   Carroll and Noah Smith; is that correct?   13:58
25   A    I know who they are and I have spoken to   13:58

Page 367

46 (Pages 364 - 367)

| | |
|---|---|
| 1 one of them.                                    13:58 | 1   Q   To Michael Papayans, yes.          14:00 |
| 2   Q   Which one?                                13:58 | 2   A   I couldn't really tell you.  Between maybe 14:00 |
| 3   A   I don't know; I'm sorry.  But I have      13:58 | 3 two and three videos.                        14:00 |
| 4 spoken to one of them.                          13:58 | 4   Q   And these are videos that Chris Taloa  14:00 |
| 5   Q   Have either of them told you about        13:58 | 5 showed you?                                   14:00 |
| 6 interactions they had with Sang Lee?            13:59 | 6   A   That he took, yes.                     14:00 |
| 7   A   Yeah.  Actually, I think so, yes.         13:59 | 7   Q   To your knowledge, does Chris Taloa still 14:00 |
| 8   Q   What did they tell you?                   13:59 | 8 have those videos?                            14:00 |
| 9   A   It's hard for me to remember.  I think we 13:59 | 9   A   I don't know if he still has them, I would 14:00 |
| 10 did talk a little bit about their experience there 13:59 | 10 assume he does.                              14:01 |
| 11 when they were recording the video, but they were 13:59 | 11   Q   When did you see these videos?        14:01 |
| 12 mostly interested in learning about what had   13:59 | 12   A   It's hard for me to pinpoint an exact  14:01 |
| 13 happened to me, so.                            13:59 | 13 time.  I think -- yeah, I can't tell you, I'm sorry, 14:01 |
| 14   Q   Did they mention Sang Lee specifically?  13:59 | 14 I don't know when I saw them.                14:01 |
| 15   A   I couldn't tell you right now.           13:59 | 15   Q   Do you know if you saw the videos before 14:01 |
| 16   Q   Is it your testimony that you don't have a 13:59 | 16 your first visit to Lunada Bay or after?    14:01 |
| 17 recollection of whether or not either Rory Carroll 13:59 | 17   A   No, I know it was after.             14:01 |
| 18 or Noah Smith mentioned Sang Lee specifically to 13:59 | 18   Q   Okay.  Now, so you do -- you are able to 14:01 |
| 19 you?                                           13:59 | 19 sort of put a face to the name of Michael Papayans, 14:01 |
| 20   A   Yeah, I can't say one way or the other.  13:59 | 20 it's your understanding of what he looks like based 14:01 |
| 21   Q   So that's a "no"?                        13:59 | 21 on these videos; is that correct?           14:01 |
| 22       MR. FRANKLIN:  Misstates the testimony.  13:59 | 22   A   That's correct, yes.                  14:01 |
| 23       THE WITNESS:  I can't say "no," I can't  13:59 | 23   Q   Do you know if you have ever personally 14:01 |
| 24 say "no" because we may have talked about that. 13:59 | 24 seen Michael Papayans at Lunada Bay when you were 14:01 |
| 25 /// | 25 there?                                        14:01 |
| Page 368 | Page 370 |

| | |
|---|---|
| 1 BY MS. LUTZ:                                    13:59 | 1   A   I don't remember personally seeing him  14:01 |
| 2   Q   But you don't recall it as you sit here   13:59 | 2 myself.                                        14:01 |
| 3 today?                                          13:59 | 3   Q   To your knowledge, did he have any     14:01 |
| 4   A   Yes, I'm not -- I'm not exactly sure.     13:59 | 4 involvement with any of the incidents that you've 14:01 |
| 5       MS. LUTZ:  Thank you, no further         13:59 | 5 described that you experienced at Lunada Bay? 14:01 |
| 6 questions.                                      13:59 | 6       MR. FRANKLIN:  Vague, ambiguous, lacks  14:01 |
| 7                                                 13:59 | 7 foundation.                                    14:01 |
| 8       EXAMINATION                                13:59 | 8       THE WITNESS:  Well, to my knowledge, he's 14:01 |
| 9 BY MR. HAVEN:                                   13:59 | 9 involved in the organization of the Bay Boys and so 14:01 |
| 10   Q   Hello.                                   13:59 | 10 I would assume that he's involved in organizing the 14:02 |
| 11   Hello.                                       13:59 | 11 harassment and the violence that occurs there that, 14:02 |
| 12   Q   May name is Peter Haven, I represent     13:59 | 12 you know, also happened to me.               14:02 |
| 13 Michael Papayans.                              | 13 BY MR. HAVEN:                                 14:02 |
| 14   Do you know who Michael Papayans is?         14:00 | 14   Q   What do you base that understanding on, 14:02 |
| 15   A   I know about him through what I've heard  14:00 | 15 why do you believe that?                     14:02 |
| 16 from the surf community and what I've read about in 14:00 | 16   A   It's based on, you know, the investigation 14:02 |
| 17 the media.  And videos that I've seen of him from 14:00 | 17 of my attorneys and my own personal experiences and 14:02 |
| 18 Chris Taloa and that are in the media.         14:00 | 18 what I've heard about in the surf community and 14:02 |
| 19   Q   And what videos have you seen from       14:00 | 19 videos that I've seen.                        14:02 |
| 20 Chris Taloa?                                   14:00 | 20   Q   What have you heard about Michael Papayans 14:02 |
| 21   A   I've seen videos of him harassing        14:00 | 21 in the surf community?                        14:02 |
| 22 Chris Taloa on the bluff and yelling insults, I 14:00 | 22   A   You know, I've also read articles about 14:02 |
| 23 think I've also seen him harassing him in the water. 14:00 | 23 him in the press.                             14:02 |
| 24   Q   How many videos have you seen?           14:00 | 24   You know, I've just heard that he's really 14:02 |
| 25   A   Directly related to him?                 14:00 | 25 bad at hassling people and that he's violent. 14:02 |
| Page 369 | Page 371 |

Hahn & Bowersock, A Veritext Company
800.660.3187

| | |
|---|---|
| 1   Q   This is what you've heard, but you   14:02 | 1                  *** |
| 2   personally have never had any encounter with him to   14:02 | 2 |
| 3   your knowledge?                  14:02 | 3 |
| 4   A   I personally haven't had anything like   14:02 | 4        I, DIANA MILENA REED, do solemnly declare |
| 5   person to person with him.                  14:02 | 5   under penalty of perjury that the foregoing is my |
| 6   Q   Okay.  One final question, I apologize for   14:02 | 6   deposition under oath; that these are the questions |
| 7   asking this in advance, can you tell us who the   14:02 | 7   asked of me and my answers thereto; that I have read |
| 8   father of your child is, please?                  14:03 | 8   same and have made the necessary corrections, |
| 9   A   It's Jordan Wright.                  14:03 | 9   additions, or changes to my answers that I deem |
| 10   Q   Okay.  I appreciate that, thank you very   14:03 | 10   necessary. |
| 11   much, I have no further questions.                  14:03 | 11        It witness thereof, I hereby subscribe my |
| 12        MR. FRANKLIN:  Thank you.  Thank you very   14:03 | 12   name this day of _____, 2016. |
| 13   much.                  14:03 | 13 |
| 14        THE REPORTER:  Off the record?          14:03 | 14 |
| 15        MR. FRANKLIN:  Yes.                  14:03 | 15 |
| 16        MS. HEWITT:  Off the record.          14:03 | 16 |
| 17        THE VIDEOGRAPHER:  We are now off the   14:03 | 17 |
| 18   record.  The time is 2:03 p.m.                  14:03 | 18 |
| 19        (A discussion was held off the record.)   14:03 | 19       _____ |
| 20        THE VIDEOGRAPHER:  We are off the record.   14:04 | 20            WITNESS SIGNATURE |
| 21   It's 2:04 p.m., and this concludes today's testimony   14:04 | 21 |
| 22   given by Diana Milena Reed, Volume 2.  The total   14:04 | 22 |
| 23   number of media used was two, and will be retained   14:04 | 23 |
| 24   by Veritext Legal Solutions.                  14:04 | 24 |
| 25        MS. HEWITT:  And you can do this off the   14:04 | 25 |
| Page 372 | Page 374 |

| | |
|---|---|
| 1   video, but I think forgot to just mark what you gave   14:04 | 1        Certification of Court Reporter |
| 2   to us.                  14:04 | 2            Federal Jurat |
| 3        Can I just mark it as Exhibit -- whatever   14:04 | 3 |
| 4   is next in order, that and the flash drive.          14:04 | 4        I, the undersigned, a Certified Shorthand |
| 5        (Deposition Exhibit 53, documents and | 5   Reporter of the State of California do hereby |
| 6        flash drive, was marked for | 6   certify: |
| 7        identification.) | 7        That the foregoing proceedings were taken |
| 8 | 8   before me at the time and place herein set forth; |
| 9        (Whereupon the deposition was concluded at | 9   that any witnesses in the foregoing proceedings, |
| 10   2:04 p.m.) | 10   prior to testifying, were placed under oath; that a |
| 11 | 11   verbatim record of the proceedings was made by me |
| 12        (DECLARATION UNDER PENALTY OF PERJURY ON | 12   using machine shorthand which was thereafter |
| 13   THE FOLLOWING PAGE HEREOF.) | 13   transcribed under my direction; further, that the |
| 14 | 14   foregoing is an accurate transcription thereof. |
| 15 | 15        That before completion of the deposition, a |
| 16 | 16   review of the transcript [x] was [ ] was not |
| 17 | 17   requested.  I further certify that I am neither |
| 18 | 18   financially interested in the action nor a relative |
| 19 | 19   or employee of any attorney of any of the parties. |
| 20 | 20        IN WITNESS WHEREOF, I have this date |
| 21 | 21   subscribed my name. |
| 22 | 22   Dated:  November 7, 2016 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25        Jimmy Rodriguez, RPR |
| Page 373 | Certificate Number 13464 |
| | Page 375 |

# Exhibit O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


Cory Spencer, et al.,

          Plaintiffs,

          vs.                    Case No.
                                 2:16-CV-02129-SJO
Lunada Bay Boys, et al.,         (RAOx)

          Defendants.
_____



DEPOSITION OF KENNETH CLAYPOOL


June 13, 2017

10:23 a.m.


20320 S.W. Birch Street, 2nd Floor

Newport Beach, California



REPORTED BY:

Angela M. Schubert

CSR No. 12027, CSR

```
 1   APPEARANCES:

 2

 3              For Plaintiffs:

 4                  HANSON & BRIDGETT
                    KURT A. FRANKLIN
 5                  425 Market Street, 26th Floor
                    San Francisco, California  94105
 6                  415.777.3200
                    415.541.9366 fax
 7                  KFranklin@HansonBridgett.com

 8

                For Defendant Brant Blakeman:
 9
                    VEATCH CARLSON
10                  RICHARD P. DIEFFENBACH
                    1055 Wilshire Boulevard, 11th Floor
11                  Los Angeles, California  90017
                    213.381.2861
12                  213.383.6370  fax
                    RDieffenbach@VeatchFirm.com
13
                    BUCHALTER & NEMER
14                  ROBERT S. COOPER
                    1000 Wilshire Boulevard, Suite 1500
15                  Los Angeles, California  90017
                    213.891.5230
16                  213.630.5609
                    RCooper@BuchAlter.com
17

18              For Defendants City of Palos Verdes
                Estates and Chief of Police Jeff Kepley:
19
                    KUTAK ROCK, LLP
20                  CHRISTOPHER D. GLOS
                    5 Park Plaza, Suite 1500
21                  Irvine, California  92614
                    949.417.0999
22                  949.417.0979 fax
                    Christopher.Glos@KutakRock.com
23

24

25
```

```
 1  APPEARANCES:  (Cont.)

 2

 3               For Defendant Sang Lee:
                 (Telephonic appearance)
 4
                      BOOTH, MITCHEL & STRANGE
 5                    JACKIE K. VU
                      707 Wilshire Boulevard, Suite 4450
 6                    Los Angeles, California  90017
                      213.738.0100
 7                    213.380.3308 fax
                      JKVu@BoothMitchel.com
 8
                      LEWIS, BRISBOIS, BISGAARD & SMITH
 9                    EDWARD E. WARD, JR.
                      633 West 5th Street, Suite 4000
10                    Los Angeles, California  90071
                      213.580.3853
11                    213.250.7900
                      Edward.Ward@LewisBrisbois.com
12

13               For Defendants Angelo Ferrara and NF:
                 (Telephonic appearance)
14
                      THE PHILLIPS FIRM
15                    MATTHEW E. VOSS
                      800 Wilshire Boulevard, Suite 1550
16                    Los Angeles, California  90017
                      213.244.9913
17                    213.244.9915 fax
                      MVoss@ThePhillipsFirm.com
18

19               For Defendant Michael Ray Papayans:
                 (Telephonic appearance)
20
                      HAVEN LAW
21                    PETER T. HAVEN
                      1230 Rosecrans Avenue, Suite 300
22                    Manhattan Beach, California  90266
                      213.842.4617
23                    213.477.2137  fax
                      Peter@HavenLaw.com
24

25
```

APPEARANCES:   (Cont.)

        For Defendants Frank Ferrara and Charlie
        Ferrara:

                BREMER, WHYTE, BROWN & O'MEARA
                TIFFANY BACON
                20320 S.W. Birch Street, 2nd Floor
                Newport Beach, California  92660
                949.221.1000
                949.221.1001 fax
                TBacon@BremerWhyte.com

Kenneth Claypool
June 13, 2017

```
 1              INDEX TO EXAMINATION

 2

 3          WITNESS:  KENNETH CLAYPOOL

 4

 5   EXAMINATION                          PAGE

 6   By Ms. Bacon                    7,84,238

 7   By Mr. Glos                      107,246

 8   By Mr. Ward                          180

 9   By Mr. Cooper                        199

10   By Mr. Haven                          75

11   By Mr. Voss                           77

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kenneth Claypool
June 13, 2017

```
1              INDEX TO EXHIBITS

2               KENNETH CLAYPOOL

3    Cory Spencer, et al., vs. Lunada Bay Boys, et al.

4              Tuesday, June 13, 2017

5         Angela M. Schubert, CSR No. 12027, CSR

6

7  MARKED              DESCRIPTION              PAGE

8  Exhibit 250   Notice of deposition          10

9  Exhibit 251   Plaintiff's supplemental      18
                 disclosures
10
   Exhibit 252   Declaration of Kenneth        91
11               Claypool

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    NEWPORT BEACH, CALIFORNIA;

 2              TUESDAY, JUNE 13, 2017, 10:23 A.M.

 3

 4                      KENNETH CLAYPOOL,

 5      having been first duly sworn, was examined and

 6                    testified as follows:

 7

 8                        EXAMINATION

 9

10  BY MS. BACON:

11      Q.  Good morning, Mr. Claypool.  My name is

12  Tiffany Bacon and I represent defendants Franker

13  Ferrara and Charlie Ferrara in this action.  Can you

14  please state and spell your name for the record?

15      A.  Ken Claypool, K-e-n, C-l-a-y-p-o-o-l.

16      Q.  Have you ever gone by any other names besides

17  Ken Claypool?

18      A.  Kenneth.

19      Q.  Does anyone ever refer to you as Kenny?

20      A.  Yes.

21      Q.  Have you ever been deposed before?

22      A.  No.

23      Q.  Do you understand that you're here today to

24  provide us your best testimony?

25      A.  Yes.
```

1    A.   Correct.  I just know that for sure it was the

2  person that I thought it was.  It was Angelo Ferrara's

3  stepson.

4    Q.   Do you know who is the father of Charlie

5  Ferrara?

6    A.   Charlie, I would assume it was Angelo Ferrara.

7    Q.   So apart from that one incident earlier when

8  you identified Angelo Ferrara's stepson, are there any

9  other instances, any accidents, that you can recall

10  involving that particular person harassing anyone at

11  Lunada Bay?

12        MR. FRANKLIN:  Vague and ambiguous.

13        THE WITNESS:  No but I've seen them around

14  there a lot.

15  BY MS. BACON:

16    Q.   Are you aware of any behavior of father

17  Ferrara that leads you to believe that he's what you

18  refer to as a Lunada Bay Boy?

19    A.   If you're referring to Frank Ferrara, that I

20  know of, is the father of Angelo Ferrara.

21    Q.   No.

22    A.   There's a Frank senior that I'm speaking of.

23    Q.   I'm not speaking of Frank senior.  So if

24  you're referring to Frank as Angelo Ferrara's father?

25    A.   I don't know Frank then.

1      Q.   So you don't know Frank senior's son?

2      A.   No.

3      Q.   Is the Frank Ferrara that you're referring to

4  as Angelo Ferrara's father still alive?

5      A.   I believe he is.

6      Q.   How old is Angelo Ferrara if you know or can

7  you estimate?

8      A.   Close to 60.

9      Q.   Have you ever met any siblings of Angela

10  Ferrara?

11      A.   No.

12      Q.   So you're not aware of any other son of father

13  Ferrara senior other than Angelo Ferrara; is that

14  correct?

15           MR. FRANKLIN:  Vague and ambiguous.

16           THE WITNESS:  I don't know.

17           MS. BACON:  Okay.

18  BY MS. BACON:

19      Q.   Have you ever witnessed Charlie Ferrara and

20  I'm not referring to Angelo's stepson, Charlie Ferrara

21  threaten or intimidate anyone at Lunada Bay?

22           MR. FRANKLIN:  Vague and ambiguous.

23           THE WITNESS:  I can't say for sure.

24  BY MS. BACON:

25      Q.   So that's a no?

```
 1        A.  I could have if they've been down there but I
 2   don't recollect specifically meeting them.
 3        Q.  Would you classify Frank Ferrara as one of the
 4   Lunada Bay Boys?
 5        A.  Not the father or Angelo's dad.
 6        Q.  Do you know of any other Frank Ferrara?
 7        A.  That's the only Frank Ferrara that I know of.
 8        Q.  Would you consider Charlie Ferrara, not Angelo
 9   Ferrara's stepson, as one of the Lunada Bay Boys?
10        A.  Yes, as far as I know.
11        Q.  How did you come to know Charlie Ferrara?
12        A.  Just heard it over and over in conversations
13   regarding the Bay Boys.
14        Q.  Who in particular has mentioned Charlie
15   Ferrara's name?
16        A.  I've heard that from -- I think I've heard --
17   it might have been on Facebook.
18        Q.  It might have been on Facebook?
19        A.  Yeah.  It had to have been because I can't
20   remember specific conversations who I heard it from.
21        Q.  Prior to the filing of the entire case, had
22   you heard of the name Charlie Ferrara?
23        A.  Yes.
24        Q.  And was that through Facebook that you're
25   talking about?
```

Kenneth Clay 011724
June 13, 2017

```
 1            MR. FRANKLIN:  You are going to drive home

 2   with traffic.

 3            THE WITNESS:  Thank you.

 4            MS. BACON:  Thank you, sir.  I appreciate your

 5   time.

 6            THE WITNESS:  Leave this here.

 7            MR. FRANKLIN:  Yes.

 8            MR. WARD:  I need a copy of this one please.

 9            MS. REPORTER:  Who would like copies?

10            MR. GLOS:  I do.

11            MR. DIEFFENBACH:  Copy please.

12            (Deposition concluded at 5:24 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kenneth Claypool
June 13, 2017

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3         I, Kenneth Claypool, do hereby certify under

 4    penalty of perjury that I have read the foregoing

 5    transcript of my deposition taken on June 13, 2017;

 6    that I have made such corrections as appear noted

 7    herein in ink, initialed by me; that my testimony as

 8    contained herein, as corrected, is true and correct.

 9

10         Dated this _____ day of _____,

11    2017, at _____,

12    California.

13

14

15

16

17    _____

18    Kenneth Claypool

19

20

21

22

23

24

25
```

Kenneth Claypool
June 13, 2017

```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____ Line No. _____

 3   Change:_____

 4   Reason for change: _____

 5   Page No._____ Line No. _____

 6   Change:_____

 7   Reason for change: _____

 8   Page No._____ Line No. _____

 9   Change:_____

10   Reason for change: _____

11   Page No._____ Line No. _____

12   Change:_____

13   Reason for change: _____

14   Page No._____ Line No. _____

15   Change:_____

16   Reason for change: _____

17   Page No._____ Line No. _____

18   Change:_____

19   Reason for change: _____

20   Page No._____ Line No. _____

21   Change:_____

22   Reason for change: _____

23

24   _____   _____

25   KENNETH CLAYPOOL                   Dated
```

```
 1              REPORTER'S CERTIFICATE

 2         I, Angela Schubert, CSR No. 12027, Certified

 3  Shorthand Reporter, certify:

 4         That the foregoing proceedings were taken

 5  before me at the time and place therein set forth, at

 6  which time the witness was put under oath by me;

 7         That the testimony of the witness, the

 8  questions propounded, and all objections and statements

 9  made at the time of the examination were recorded

10  stenographically by me and were thereafter transcribed;

11         That a review of the transcript by the

12  deponent was required;

13         That the foregoing is a true and correct

14  transcript of my shorthand notes so taken.

15         I further certify that I am not a relative or

16  employee of any attorney of the parties, nor

17  financially interested in the action.

18         I declare under penalty of perjury under the

19  laws of California that the foregoing is true and

20  correct.

21

22  Dated this 18th day of June, 2017

23         Angela Schubert

24  _____

25  ANGELA SCHUBERT, CSR NO. 12027
```

# Exhibit P

Alison K. Hurley, State Bar No. 234042
ahurley@bremerwhyte.com
Tiffany L. Bacon, State Bar No. 292426
tbacon@bremerwhyte.com
BREMER WHYTE BROWN & O'MEARA LLP
20320 S.W. Birch Street
Second Floor
Newport Beach, California 92660
Telephone:  (949) 221-1000
Facsimile:  (949) 221-1001

Attorneys for Defendants,
FRANK FERRARA and CHARLIE FERRARA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation,

                        Plaintiff,

            vs.

LUNADA BAY BOYS; THE INDIVIDUAL MEMBERS OF THE LUNADA BAY BOYS, including but not limited to SANG LEE, BRANT BLAKEMAN, ALAN JOHNSTON AKA JALIAN JOHNSTON, MICHAEL RAE PAPAYANS, ANGELO FERRARA, FRANK FERRARA, CHARLIE FERRARA; CITY OF PALOS VERDES ESTATES; CHIEF OF POLICE JEFF KEPLEY, in his representative capacity; and DOES 1-10,

                        Defendants.

Case No. 2:16-cv-2129

Judge:    Hon. S. James Otero
Dept:     Courtroom 10C

Magistrate Judge:
Hon. Rozella A. Oliver

**DECLARATION OF JAMES RUSSI**

Complaint Filed:   March 29, 2016
Trial Date:        November 7, 2017

I, James Russi, declare as follows:

1.      I am not a party to this action.  My legal name is James Russi, but I use the name "Jim."  The matters stated herein are true of my own personal knowledge and, if called upon as a witness, I could and would competently testify thereto under oath.

BREMER WHYTE BROWN &
O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

DECLARATION OF JAMES RUSSI

2.      I am a resident of Hawaii and have lived in Hawaii since 1979.  I am a photographer, and I photograph images for surfing magazines.

3.      I grew up in Palos Verdes Estates, California and attended Palos Verdes High School, where I graduated from in 1974.

4.      I attended Palos Verdes High School with Frank Ferrara, and he graduated in the same year.  Frank Ferrara and I have remained friends since high school, and we talk approximately 2-3 times per year.

5.      While I lived in Palos Verdes Estates, California, I surfed at Lunada Bay approximately 30 times per year, on average, from the year of 1969.

6.      From 1975 to 1979, I attended college at the University of California, Santa Barbara and occasionally surfed at Lunada Bay.

7.      Since moving to Hawaii in 1979, I have surfed at Lunada Bay approximately 40 times.

8.      While living in Palos Verdes Estates, California, I never heard the use of the terms "Bay Boy" or "Lunada Bay Boy" and was only made aware of these terms by the use of these terms in the media.

9.      I have no knowledge of Frank Ferrara being involved in any surf related incidents at or around Lunada Bay.

10.      I have no knowledge of Frank Ferrara being involved in any incident of vandalism, harassment, intimidation or threatening behavior at or near Lunada Bay, nor any other wrongful behavior.

11.      I have no knowledge of Charlie Ferrara, Frank Ferrara's son, being involved in any surf related incident at or around Lunada Bay.

12.      I have no knowledge of Charlie Ferrara being involved in any incident of vandalism, harassment, intimidation or threatening behavior at or near Lunada Bay, nor any other wrongful behavior.

13.      I have no knowledge of Frank Ferrara or Charlie Ferrara ever being involved in any illegal activity at or near Lunada Bay.

BREMER WHYTE BROWN & O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA  92660
(949) 221-1000

DECLARATION OF JAMES RUSSI

1       14.   I have no knowledge of Frank Ferrara or Charlie Ferrara ever attempting

2   to exclude any person from visiting or surfing at or around the area of Lunada Bay.

3       15.   I have no knowledge of Frank Ferrara or Charlie Ferrara ever being

4   involved in any physical altercation, physical fight, incident of violence, or intent to

5   cause harm to any person at or near the area of Lunada Bay.

6       16.   I have no knowledge of Frank Ferrara or Charlie Ferrara ever having

7   any discussions with any other person about preventing anyone from visiting or

8   surfing at or near Lunada Bay.

9       I declare under penalty of perjury under the laws of the United States of

10   America that the foregoing is true and correct.

11   Executed on this 3ᴿᴰ day of JULY 2017, at HALEIWA , Hawaii.

12

13

14                                        James Russi

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BREMER WHYTE BROWN &
O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA 92660
(949) 221-1000

3
DECLARATION OF JAMES RUSSI

# Exhibit Q

1   HANSON BRIDGETT LLP
    KURT A. FRANKLIN, SBN 172715
2   kfranklin@hansonbridgett.com
    SAMANTHA WOLFF, SBN 240280
3   swolff@hansonbridgett.com
    JENNIFER ANIKO FOLDVARY, SBN 292216
4   jfoldvary@hansonbridgett.com
    425 Market Street, 26th Floor
5   San Francisco, California 94105
    Telephone: (415) 777-3200
6   Facsimile:  (415) 541-9366

7   HANSON BRIDGETT LLP
    TYSON M. SHOWER, SBN 190375
8   tshower@hansonbridgett.com
    LANDON D. BAILEY, SBN 240236
9   lbailey@hansonbridgett.com
    500 Capitol Mall, Suite 1500
10  Sacramento, California 95814
    Telephone: (916) 442-3333
11  Facsimile:  (916) 442-2348

12  OTTEN LAW, PC
    VICTOR OTTEN, SBN 165800
13  vic@ottenlawpc.com
    KAVITA TEKCHANDANI, SBN 234873
14  kavita@ottenlawpc.com
    3620 Pacific Coast Highway, #100
15  Torrance, California 90505
    Telephone: (310) 378-8533
16  Facsimile:  (310) 347-4225

17  Attorneys for Plaintiffs
    CORY SPENCER, DIANA MILENA
18  REED, and COASTAL PROTECTION
    RANGERS, INC.
19

20              UNITED STATES DISTRICT COURT

21      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

22

23  CORY SPENCER, an individual;          CASE NO. 2:16-cv-02129-SJO (RAOx)
    DIANA MILENA REED, an
24  individual; and COASTAL               **PLAINTIFF CORY SPENCER'S
    PROTECTION RANGERS, INC., a           RESPONSE TO FIRST SET OF
25  California non-profit public benefit   REQUESTS FOR ADMISSION
    corporation,                          PROPOUNDED BY DEFENDANT
26                                        FRANK FERRARA**
27                Plaintiffs,
28

| | Complaint Filed: March 29, 2016 |
|---|---|

1

2     v.

Complaint Filed:   March 29, 2016
Trial Date:       November 7, 2017

3 LUNADA BAY BOYS; THE

4 INDIVIDUAL MEMBERS OF THE LUNADA BAY BOYS, including but

5 not limited to SANG LEE, BRANT BLAKEMAN, ALAN JOHNSTON

6 AKA JALIAN JOHNSTON,

7 MICHAEL RAE PAPAYANS, ANGELO FERRARA, FRANK

8 FERRARA, CHARLIE FERRARA, and N. F.; CITY OF PALOS

9 VERDES ESTATES; CHIEF OF

10 POLICE JEFF KEPLEY, in his

11 representative capacity; and DOES 1-10,

12

13         Defendants.

14

15 PROPOUNDING PARTY: Defendant Frank Ferrara

16 RESPONDING PARTY:   Plaintiff Cory Spencer

17 SET NO.:           One

18     Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff

19 Cory Spencer ("Responding Party") hereby submits these objections and

20 responses to the First Set of Requests for Admission propounded by

21 Defendant Frank Ferrara ("Propounding Party").

22             **PRELIMINARY STATEMENT**

23     Nothing in this response should be construed as an admission by

24 Responding Party with respect to the admissibility or relevance of any fact or

25 document, or of the truth or accuracy of any characterization or statement of

26 any kind contained in Propounding Party's Requests for Admission.

27 Responding Party has not completed his investigation of the facts relating to

28

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

1  this case, his discovery or his preparation for trial.  All responses and

2  objections contained herein are based only upon information that is

3  presently available to and specifically known by Responding Party.  It is

4  anticipated that further discovery, independent investigation, legal research

5  and analysis will supply additional facts and add meaning to known facts, as

6  well as establish entirely new factual conclusions and legal contentions, all

7  of which may lead to substantial additions to, changes in and variations from

8  the responses set forth herein.  The following objections and responses are

9  made without prejudice to Responding Party's right to produce at trial, or

10  otherwise, evidence regarding any subsequently discovered information.

11  Responding Party accordingly reserves the right to modify and amend any

12  and all responses herein as research is completed and contentions are

13  made.

14  **<u>GENERAL OBJECTIONS</u>**

15       Responding Party generally objects to the Requests for Admission as

16  follows:

17       1.     Responding Party objects generally to the Requests for

18  Admission to the extent that they seek to elicit information that is neither

19  relevant to the subject matter of this action, nor reasonably calculated to

20  lead to the discovery of admissible evidence;

21       2.     Responding Party objects generally to the Requests for

22  Admission to the extent that they are unreasonably overbroad in scope, and

23  thus burdensome and oppressive, in that each such request seeks

24  information pertaining to items and matters that are not relevant to the

25  subject matter of this action, or, if relevant, so remote therefrom as to make

26  its disclosure of little or no practical benefit to Propounding Party, while

27  placing a wholly unwarranted burden and expense on Responding Party in

28

13524692.1

1  locating, reviewing and producing the requested information;

2      3.      Responding Party objects generally to the Requests for

3  Admission to the extent that they are burdensome and oppressive, in that

4  ascertaining the information necessary to respond to them would require the

5  review and compilation of information from multiple locations, and

6  voluminous records and files, thereby involving substantial time of

7  employees of Responding Party and great expense to Responding Party,

8  whereas the information sought to be obtained by Propounding Party would

9  be of little use or benefit to Propounding Party;

10      4.      Responding Party objects generally to the Requests for

11  Admission to the extent that they are vague, uncertain and overbroad, being

12  without limitation as to time or specific subject matter;

13      5.      Responding Party objects generally to the Requests for

14  Admission to the extent that they seek information at least some of which is

15  protected by the attorney-client privilege or the attorney work-product

16  doctrine, or both;

17      6.      Responding Party objects generally to the Requests for

18  Admission to the extent that they seek to have Responding Party furnish

19  information that is a matter of the public record, and therefore, is equally

20  available to the propounding party as to Responding Party; and

21      7.      Responding Party objects generally to the Requests for

22  Admission to the extent that they seek to have Responding Party furnish

23  information that is proprietary to Responding Party and contain confidential

24  information.

25      8.      Responding Party expressly incorporates each of the foregoing

26  General Objections into each specific response to the requests set forth

27  below as if set forth in full therein.  An answer to a request is not intended to

28

-4-

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

1  be a waiver of any applicable specific or general objection to such request.

2  Without waiver of the foregoing, Responding Party further responds as

3  follows:

4  **RESPONSES TO REQUESTS FOR ADMISSION**

5  **REQUEST FOR ADMISSION NO. 1:**

6  Admit YOU have no facts that support YOUR First Cause of Action for

7  Bane Act against Propounding Party as alleged in YOUR COMPLAINT.

8  **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

9  Without waiving set objections, Plaintiff responds as follows: Denial

10  **REQUEST FOR ADMISSION NO. 2:**

11  Admit YOU can IDENTIFY no PERSONS with knowledge to support

12  YOUR First Cause of Action for Bane Act against Propounding Party as

13  alleged in YOUR COMPLAINT.

14  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

15  Without waiving set objections, Plaintiff responds as follows: Denial

16

17  **REQUEST FOR ADMISSION NO. 3:**

18  Admit YOU can IDENTIFY no DOCUMENTS to support YOUR First

19  Cause of Action for Bane Act against Propounding Party as alleged in

20  YOUR COMPLAINT.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

22  Without waiving set objections, Plaintiff responds as follows: Denial

23

24  **REQUEST FOR ADMISSION NO. 4:**

25  Admit YOU have no facts that support YOUR Second Cause of Action

26  for Public Nuisance against Propounding Party as alleged in YOUR

27  COMPLAINT.

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Without waiving set objections, Plaintiff responds as follows: Denial

**REQUEST FOR ADMISSION NO. 5:**

Admit YOU can IDENTIFY no PERSONS with knowledge to support YOUR Second Cause of Action for Public Nuisance against Propounding Party as alleged in YOUR COMPLAINT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Without waiving set objections, Plaintiff responds as follows: Denial

**REQUEST FOR ADMISSION NO. 6:**

Admit YOU can IDENTIFY no DOCUMENTS to support YOUR Second Cause of Action for Public Nuisance against Propounding Party as alleged in YOUR COMPLAINT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Without waiving set objections, Plaintiff responds as follows: Denial

**REQUEST FOR ADMISSION NO. 7:**

Admit YOU have no facts that support YOUR Sixth Cause of Action for Assault against Propounding Party as alleged in YOUR COMPLAINT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Without waiving set objections, Plaintiff responds as follows: Denial

**REQUEST FOR ADMISSION NO. 8:**

Admit YOU can IDENTIFY no PERSONS with knowledge to support YOUR Sixth Cause of Action for Assault against Propounding Party as alleged in YOUR COMPLAINT.

13524692.1

1    **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

2    Without waiving set objections, Plaintiff responds as follows: Denial

3

4    **REQUEST FOR ADMISSION NO. 9:**

5        Admit YOU can IDENTIFY no DOCUMENTS to support YOUR Sixth

6    Cause of Action for Assault against Propounding Party as alleged in YOUR

7    COMPLAINT.

8    **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

9    Without waiving set objections, Plaintiff responds as follows: Denial

10

11   **REQUEST FOR ADMISSION NO. 10:**

12       Admit YOU have no facts that support YOUR Seventh Cause of Action

13   for Battery against Propounding Party as alleged in YOUR COMPLAINT.

14   **RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

15   Without waiving set objections, Plaintiff responds as follows: Denial

16

17   **REQUEST FOR ADMISSION NO. 11:**

18       Admit YOU can IDENTIFY no PERSONS with knowledge to support

19   YOUR Seventh Cause of Action for Battery against Propounding Party as

20   alleged in YOUR COMPLAINT.

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

22   Without waiving set objections, Plaintiff responds as follows: Denial

23

24   **REQUEST FOR ADMISSION NO. 12:**

25       Admit YOU can IDENTIFY no DOCUMENTS to support YOUR

26   Seventh Cause of Action for Battery against Propounding Party as alleged in

27   YOUR COMPLAINT.

28

Case No. 2:16-cv-02129-SJO (RAOx)

13524692.1

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

2  Without waiving set objections, Plaintiff responds as follows: Denial

3

4  **REQUEST FOR ADMISSION NO. 13:**

5  Admit YOU have no facts that support YOUR Eighth Cause of Action

6  for Negligence against Propounding Party as alleged in YOUR

7  COMPLAINT.

8  **RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

9  Without waiving set objections, Plaintiff responds as follows: Denial

10

11  **REQUEST FOR ADMISSION NO. 14:**

12  Admit YOU can IDENTIFY no PERSONS with knowledge to support

13  YOUR Eighth Cause of Action for Negligence against Propounding Party as

14  alleged in YOUR COMPLAINT.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

16  Without waiving set objections, Plaintiff responds as follows: Denial

17

18  **REQUEST FOR ADMISSION NO. 15:**

19  Admit YOU can IDENTIFY no DOCUMENTS to support YOUR Eighth

20  Cause of Action for Negligence against Propounding Party as alleged in

21  YOUR COMPLAINT.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

23  Without waiving set objections, Plaintiff responds as follows: Denial

24

25  **REQUEST FOR ADMISSION NO. 16:**

26  Admit YOU have never met Propounding Party in person.

27

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

1 **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

2 Without waiving set objections, Plaintiff responds as follows: Denial

3

4 **REQUEST FOR ADMISSION NO. 17:**

5     Admit Propounding Party has never harassed YOU.

6 **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

7 Without waiving set objections, Plaintiff responds as follows: Denial

8

9 **REQUEST FOR ADMISSION NO. 18:**

10     Admit Propounding Party has never caused YOU any pain or suffering.

11 **RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

12 Without waiving set objections, Plaintiff responds as follows: Denial

13

14 **REQUEST FOR ADMISSION NO. 19:**

15     Admit YOU have no knowledge of Propounding Party ever being

16 involved in any alleged incident of harassment at Lunada Bay at any time.

17 **RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

18 Without waiving set objections, Plaintiff responds as follows: Denial

19

20 **REQUEST FOR ADMISSION NO. 20:**

21     Admit YOU have no personal knowledge of Propounding Party ever

22 being involved in any incident of violence at Lunada Bay at any time.

23 **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

24 Without waiving set objections, Plaintiff responds as follows: Denial

25

26 **REQUEST FOR ADMISSION NO. 21:**

27     Admit YOU have no personal knowledge of Propounding Party ever

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

1  being involved in any incident of vandalism at Lunada Bay at any time.

2  **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

3  Without waiving set objections, Plaintiff responds as follows: Denial

4

5  **REQUEST FOR ADMISSION NO. 22:**

6       Admit YOU have never seen Propounding Party at Lunada Bay at any

7  time YOU have visited Lunada Bay at any location of Lunada Bay.

8  **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

9  Without waiving set objections, Plaintiff responds as follows: Denial

10

11  **REQUEST FOR ADMISSION NO. 23:**

12       Admit that, prior to filing this Action, no PERSON ever told YOU that

13  Propounding Party was involved in any incident of harassment at Lunada

14  Bay at any time.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

16  Without waiving set objections, Plaintiff responds as follows: Denial

17

18  **REQUEST FOR ADMISSION NO. 24:**

19       Admit that, prior to filing this Action, no PERSON ever told YOU that

20  Propounding Party was involved in any incident of violence at Lunada Bay at

21  any time.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

23  Without waiving set objections, Plaintiff responds as follows: Denial

24

25  **REQUEST FOR ADMISSION NO. 25:**

26       Admit that, prior to filing this Action, no PERSON ever told YOU that

27  Propounding Party was involved in any incident of vandalism at Lunada Bay

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

1 | at any time.

2 | **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

3 | Without waiving set objections, Plaintiff responds as follows: Denial

5 | DATED:  May 31, 2017                    OTTEN LAW, PC

8 | By:    /s/Victor Otten

9 | VICTOR OTTEN
10 | KAVITA TEKCHANDANI
    | Attorneys for Plaintiffs
11 | CORY SPENCER, DIANA MILENA
    | REED, and COASTAL PROTECTION
12 | RANGERS, INC.

PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

**PROOF OF SERVICE**
*Spencer, et al. v. Lunada Bay Boys, et al.*
**U.S.D.C. for the Central District of California**

## Case No. 2:16-cv-02129-SJO (RAOx)

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is: 3620 Pacific Coast Highway, Suite 100, Torrance, CA 90505.

On June 5, 2017, I served the original or a true copy of the following document(s) described as:

**PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA**

on the interested parties in this action as follows:
**SEE ATTACHED SERVICE LIST**

**X BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Hanson Bridgett LLP's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **June 5, 2017**, at Torrance, California.

/s/Victor Otten
_____
Victor Otten

-12-

Case No. 2:16-cv-02129-SJO (RAOx)

13524692.1

1

**SERVICE LIST**
*Spencer, et al. v. Lunada Bay Boys, et al.*
**U.S.D.C. for the Central District of California**
**Case No. 2:16-cv-02129-SJO (RAOx)**

2

3

Robert T. Mackey, Esq.            *(Attorneys for Defendant BRANT*
Peter H. Crossin, Esq.            *BLAKEMAN)*
Richard P. Dieffenbach, Esq.      (served original)
John P. Worgul, Esq.
VEATCH CARLSON, LLP
1055 Wilshire Blvd., 11th Floor
Los Angeles. CA  90017

4

5

6

7

Robert S. Cooper, Esq.            *(Attorneys for Defendant BRANT*
BUCHALTER NEMER, APC              *BLAKEMAN)*
1000 Wilshire Blvd., Suite 1500   (served true copy)
Los Angeles. CA  90017

8

9

J. Patrick Carey, Esq.            *(Attorney for Defendant ALAN*
LAW OFFICES OF                    *JOHNSTON a/k/a JALIAN*
  J. PATRICK CAREY                *JOHNSTON)*
1230 Rosecrans Ave., Suite 300    (served true copy)
Manhattan Beach. CA  90266

10

11

12

Peter T. Haven, Esq.              *(Attorney for Defendant MICHAEL*
HAVEN LAW                         *RAY PAPAYANS)*
1230 Rosecrans Ave., Suite 300    (served true copy)
Manhattan Beach. CA  90266

13

14

15

Dana Alden Fox, Esq.              *(Attorneys for Defendant SANG LEE)*
Edward E. Ward, Jr., Esq.         (served true copy)
Eric Y. Kizirian, Esq.
Tera Lutz, Esq.
LEWIS BRISBOIS
  BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles. CA  90071

16

17

18

19

Daniel M. Crowley, Esq.           *(Attorneys for Defendant SANG LEE)*
BOOTH, MITCHEL &                  (served true copy)
  STRANGE LLP
707 Wilshire Blvd., Suite 4450
Los Angeles. CA  90017

20

21

22

Mark C. Fields, Esq.              *(Attorney for Defendant ANGELO*
LAW OFFICES OF                    *FERRARA and Defendant N. F.*
  MARK C. FIELDS, APC             *appearing through Guardian Ad*
333 South Hope Street, 35th Floor *Litem, Leonora Ferrara)*
Los Angeles. CA  90071            (served true copy)

23

24

25

26

27

28

-13-

PLAINTIFF CORY SPENCER'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524692.1

1  Thomas M. Phillip, Esq.                *(Attorneys for Defendant ANGELO*
   Aaron G. Miller, Esq.                  *FERRARA)*
2  THE PHILLIPS FIRM                      (served true copy)
   800 Wilshire Blvd., Suite 1550
3  Los Angeles, CA  90017

4  Patrick Au, Esq.                       *(Attorneys for Defendants FRANK*
   Laura L. Bell, Esq.                    *FERRARA and CHARLIE FERRARA)*
5  BREMER WHYTE                           (served true copy)
     BROWN & O'MEARA, LLP
6  21271 Burbank Blvd., Suite 110
   Woodland Hills, CA  91367
7
   Edwin J. Richards, Esq.                *(Attorneys for Defendants CITY OF*
8  Antoinette P. Hewitt, Esq.             *PALOS VERDES and CHIEF OF*
   Rebecca L. Wilson, Esq.                *POLICE JEFF KEPLEY)*
9  Jacob Song, Esq.                       (served true copy)
   Christopher D. Glos, Esq.
10 KUTAK ROCK LLP
   5 Park Plaza, Suite 1500
11 Irvine, CA  92614-8595

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-14-

Case No. 2:16-cv-02129-SJO (RAOx)

13524692.1

1   HANSON BRIDGETT LLP
    KURT A. FRANKLIN, SBN 172715
2   kfranklin@hansonbridgett.com
    SAMANTHA WOLFF, SBN 240280
3   swolff@hansonbridgett.com
    JENNIFER ANIKO FOLDVARY, SBN 292216
4   jfoldvary@hansonbridgett.com
    425 Market Street, 26th Floor
5   San Francisco, California 94105
    Telephone: (415) 777-3200
6   Facsimile:  (415) 541-9366

7   HANSON BRIDGETT LLP
    TYSON M. SHOWER, SBN 190375
8   tshower@hansonbridgett.com
    LANDON D. BAILEY, SBN 240236
9   lbailey@hansonbridgett.com
    500 Capitol Mall, Suite 1500
10  Sacramento, California 95814
    Telephone: (916) 442-3333
11  Facsimile:  (916) 442-2348

12  OTTEN LAW, PC
    VICTOR OTTEN, SBN 165800
13  vic@ottenlawpc.com
    KAVITA TEKCHANDANI, SBN 234873
14  kavita@ottenlawpc.com
    3620 Pacific Coast Highway, #100
15  Torrance, California 90505
    Telephone: (310) 378-8533
16  Facsimile:  (310) 347-4225

17  Attorneys for Plaintiffs
    CORY SPENCER, DIANA MILENA
18  REED, and COASTAL PROTECTION
    RANGERS, INC.
19

20              **UNITED STATES DISTRICT COURT**

21       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

22

23  CORY SPENCER, an individual;          CASE NO. 2:16-cv-02129-SJO (RAOx)
24  DIANA MILENA REED, an
    individual; and COASTAL               **PLAINTIFF CORY SPENCER**
25  PROTECTION RANGERS, INC., a           **RESPONSE TO SECOND SET OF**
                                          **INTERROGATORIES PROPOUNDED**
26  California non-profit public benefit  **BY DEFENDANT FRANK FERRARA**
    corporation,
27
28              Plaintiffs,               Complaint Filed:    March 29, 2016

                                          Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

1         v.

2

3    LUNADA BAY BOYS; THE
     INDIVIDUAL MEMBERS OF THE
4    LUNADA BAY BOYS, including but
     not limited to SANG LEE, BRANT
5    BLAKEMAN, ALAN JOHNSTON
     AKA JALIAN JOHNSTON,
6    MICHAEL RAE PAPAYANS,
     ANGELO FERRARA, FRANK
7    FERRARA, CHARLIE FERRARA,
     and N. F.; CITY OF PALOS
8    VERDES ESTATES; CHIEF OF
     POLICE JEFF KEPLEY, in his
9    representative capacity; and DOES
     1-10,
10

11

12           Defendants.

13

Trial Date:        November 7, 2017

14

15   PROPOUNDING PARTY: Defendant Frank Ferrara

16   RESPONDING PARTY:   Plaintiff Cory Spencer

17   SET NO.:            Two

18        Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff

19   CORY SPENCER ("Responding Party") hereby submits these objections

20   and responses to the Second Set of Interrogatories propounded by

21   Defendant Frank Ferrara ("Propounding Party").

22                    <u>**PRELIMINARY STATEMENT**</u>

23        Nothing in this response should be construed as an admission by

24   Responding Party with respect to the admissibility or relevance of any fact,

25   or of the truth or accuracy of any characterization or statement of any kind

26   contained in Propounding Party's Interrogatories.  Responding Party has not

27   completed her investigation of the facts relating to this case, her discovery or

28

-2-                          Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

1    her preparation for trial.  All responses and objections contained herein are

2    based only upon information that is presently available to and specifically

3    known by Responding Party.  It is anticipated that further discovery,

4    independent investigation, legal research and analysis will supply additional

5    facts and add meaning to known facts, as well as establish entirely new

6    factual conclusions and legal contentions, all of which may lead to

7    substantial additions to, changes in and variations from the responses set

8    forth herein.  The following objections and responses are made without

9    prejudice to Responding Party's right to produce at trial, or otherwise,

10   evidence regarding any subsequently discovered information.  Responding

11   Party accordingly reserves the right to modify and amend any and all

12   responses herein as research is completed and contentions are made.

13                                  **GENERAL OBJECTIONS**

14          Responding Party generally objects to the Interrogatories as follows:

15          1.     Responding Party objects generally to the Interrogatories to the

16   extent that they seek to elicit information that is neither relevant to the

17   subject matter of this action, nor reasonably calculated to lead to the

18   discovery of admissible evidence;

19          2.     Responding Party objects generally to the Interrogatories to the

20   extent that they are unreasonably overbroad in scope, and thus burdensome

21   and oppressive, in that each such request seeks information pertaining to

22   items and matters that are not relevant to the subject matter of this action,

23   or, if relevant, so remote therefrom as to make its disclosure of little or no

24   practical benefit to Propounding Party, while placing a wholly unwarranted

25   burden and expense on Responding Party in locating, reviewing and

26   producing the requested information;

27          3.     Responding Party objects generally to the Interrogatories to the

28

13524251.1

1  extent that they are burdensome and oppressive, in that ascertaining the

2  information necessary to respond to them would require the review and

3  compilation of information from multiple locations, and voluminous records

4  and files, thereby involving substantial time of employees of Responding

5  Party and great expense to Responding Party, whereas the information

6  sought to be obtained by Propounding Party would be of little use or benefit

7  to Propounding Party;

8      4.    Responding Party objects generally to the Interrogatories to the

9  extent that they are vague, uncertain and overbroad, being without limitation

10  as to time or specific subject matter;

11      5.    Responding Party objects generally to the Interrogatories to the

12  extent that they seek information at least some of which is protected by the

13  attorney-client privilege or the attorney work-product doctrine, or both;

14      6.    Responding Party objects generally to the Interrogatories to the

15  extent that they seek to have Responding Party furnish information that is a

16  matter of the public record, and therefore, is equally available to the

17  propounding party as to Responding Party; and

18      7.    Responding Party objects generally to the Interrogatories to the

19  extent that they seek to have Responding Party furnish information that is

20  proprietary to Responding Party and contain confidential information.

21      8.    Responding Party objects to the interrogatories, and to any

22  individual interrogatory set forth therein, to the extent that they are

23  compound and constitute an impermissible effort to circumvent the 25

24  interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure.

25      9.    Responding Party expressly incorporates each of the foregoing

26  General Objections into each specific response to the requests set forth

27  below as if set forth in full therein.  An answer to a request is not intended to

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1  be a waiver of any applicable specific or general objection to such request.

2      Without waiver of the foregoing, Responding Party further responds as

3  follows:

## RESPONSES TO INTERROGATORIES

4

5  **INTERROGATORY NO. 13:**

6      If YOU denied any of the Requests for Admissions served by

7  Propounding Party in this action, then for each Request for Admission

8  denied, state all facts RELATING TO YOUR denial.

9  **RESPONSE TO INTERROGATORY NO. 13:**

10     Responding Party objects to this interrogatory as premature. Because

11  this interrogatory seeks or necessarily relies upon a contention, and

12  because this matter is in its early stages and pretrial discovery has only just

13  begun, Responding Party is unable to provide a complete response at this

14  time, nor is it required to do so.  See *Kmiec v. Powerwave Techs. Inc. et al.*,

15  2014 WL 11512195 (C.D. Cal. Dec. 2, 2014) at *1; *Folz v. Union Pacific*

16  *Railroad Company*, 2014 WL 357929 (S.D. Cal. Jan. 31, 2014) at *1-2.; see

17  also Fed. R. Civ. P. 33(a)(2) ("the court may order that [a contention]

18  interrogatory need not be answered until designated discovery is complete,

19  or until a pretrial conference or some other time.").

20     Responding Party further objects to this interrogatory as unduly

21  burdensome, harassing, and duplicative of information disclosed in

22  Responding Party's Rule 26(a) disclosures and supplemental disclosures.

23  Propounding Party may look to Responding Party's Rule 26(a) disclosures

24  and supplemental disclosures for the information sought by this

25  interrogatory.  Moreover, Responding Party had the opportunity to depose

26  Mr. Spencer on this topic.

27     Responding Party further objects to this interrogatory as compound.

28

1  This "interrogatory" contains multiple impermissible subparts, which
2  Propounding Party has propounded in an effort to circumvent the numerical
3  limitations on interrogatories provided by Federal Rule of Civil Procedure
4  33(a)(1).

5      Responding Party further objects to this interrogatory on the grounds
6  that it seeks information that is outside of Responding Party's knowledge.

7      Responding Party further objects to the extent that this interrogatory
8  invades attorney-client privilege and/or violates the work product doctrine by
9  compelling Responding Party to disclose privileged communications and/or
10 litigation strategy.  Responding Party will not provide any such information.

11     Subject to and without waiver of the foregoing objections, Responding
12 Party responds as follows:

13 **Facts Supporting Denial of RFA Nos. 1-25:**

14     The Complaint alleges that Defendant Lunada Bay Boys is an
15 unincorporated association within the meaning of Code of Civil Procedure §
16 369.5 acting by and through its respective members and associates.
17 Defendant Lunada Bay Boys acts by and through its respective members,
18 individually, collectively, and in concert, and conducts its affairs and activities
19 in the City of Palos Verdes Estates, County of Los Angeles, State of California.
20 Defendant Lunada Bay Boys claims gang territory, or "turf" within the City of
21 Palos Verdes Estates' Lunada Bay neighborhood (Lunada Bay). The Lunada
22 Bay Boys have received benefits from holding itself out to the public as an
23 entity. The Lunada Bay Boys functions under circumstances where "fairness
24 requires that the group be recognized as a legal entity."[1]

25

26

27 [1] *Barr v. United Methodist Church*, 90 Cal. App. 3rd 259,267, cert. denied,
   444 U.S. 973 (1979), quoted and followed with approval in *People v. Colonia*
28 (footnote continued)

-6-                                    Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

1    The Complaint further alleges that Defendant Lunada Bay Boys are

2    criminal street gang as defined in California Penal Code § 186.22, subdivision

3    (f), in as much as it is a group of three or more individuals with a common

4    name or common symbol and whose members, individually or collectively,

5    engage in or have engaged in a pattern of criminal gang activity, and has as

6    one of its primary activities the commission of enumerated "predicate crimes,"

7    including but not limited to assault, battery, vandalism, intimidation,

8    harassment, upon information and belief, the sale and use of illegal controlled

9    substances.

10   The Complaint alleges that Defendant Lunada Bay Boys use the

11   unpermitted Rock Fort to conduct criminal activity.

12   The Complaint also alleges that Defendant Lunada Bay Boys is also an

13   unincorporated association within the meaning of Corporations Code § 18035,

14   subdivision (a), inasmuch it consists of two or more individuals joined by

15   mutual consent for some common lawful purposes, such a attending social

16   gatherings, and recreational events. However, notwithstanding any common

17   lawful purpose, Defendant Lunada Bay Boys is a criminal gang whose

18   members are primarily engaged in criminal and nuisance activities which

19   constitute Bane Act violations and a public nuisance.

20   Defendant Lunada Bay Boys is comprised of members including, but

21   not limited to Sang Lee, Brant Blakeman, Angelo Ferrara, Frank Ferrara,

22   Nicholas Ferrara, Charlie Ferrara, Michael Rae Papayans, Alan Johnston aka

23   Jalian Johnston, each of whom has been within the Lunada Bay and is

24   responsible in some manner for the Bane Act violations and public nuisance

25   described in this Complaint.

26   _____

27   *Chiques*, 156 Cal. App. 4th 31, 38-39 (2007) (holding the criminal street

28   gang "Colonia Chiques may be sued as an unincorporated association").

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

Plaintiffs' first Claim is for an injunction and equitable relief under Civil Code § 52.1(b). Some of the facts that support the claim include:

Some of the acts committed by the Lunada Bay Boys include:

1.      On January 22,1995, a Brazilian surfer was accosted by several Lunada Bay Boys including David Hilton. The Brazilian surfer reported to the police that suspect #1 told him angrily, "If you go out, no more car, no more tires, no more glass, your car will be trash."  He said that the suspect #1 was much taller and bigger than he was and he was afraid of the suspect.  He said he backed away from suspect #l and suspect #2 walked up to him and deliberately knocked his surfboard into his [surfboard].  He said the suspect #2 told him, "If you cross, I will fight you.  I will break your face."  He said he was afraid that suspect would hurt him and backed away from him.  He said the suspect #3 yelled at him, "Fuck Brazil."  The Brazilian surfer told the police that approximately 15 other Lunada Bay Boys were standing around them. He said he was fearful that he and his friends were going to be hurt, went back to their car, drove to a local gas station and called the police.[2]

2.      On March13, 1995, Geoff Hagins and five 9 juveniles and another adult were assaulted at Lunada Bay by Peter McCullom. Plaintiffs are informed and believe that David Hilton, Kelly Logan, Sang Lee and others were also part of the incident. Geoff Hagins called Ed Jaakola prior to going to surf and informed him. The police records are redacted but the paper reports: Peter McCollum, David Hilton, Defendant Sang Lee and Kelly Hogan.[3]

3.      On February 17, 2014, an unknown individual reports to Officer

_____

[2] DR 95-0062 (CITY 1-6).

[3] CITY1969; DR 95-031; P.V.P. News 11-30-96

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1  Alex Gonzales: that he arrived at the 2300 block of Paseo Del Mar with the
2  intention of surfing. Before he was able to collect his gear and walk down the
3  trail to the beach, he was confronted by two unknown individuals who started
4  to harass him. The subjects told he was not allowed to surf at Lunada Bay,
5  and if he proceeded persisted to do so, they would follow him into the water
6  to block his waves and run their surfboards into him.[4]

7          4.      On November 15, 2014, Sef Krell attempts to surf Lunada Bay.
8  As he walks down the trail, dirt clods and rocks are thrown at him.

9          The Complaint also alleges a civil conspiracy amount the Defendants
10  and other individuals.[5]

11          Diana Reed: believes that members of the Lunada Bay Boys engaged
12  in a concerted effort with other Bay Boys to obstruct the plaintiffs' and the
13  publics' free passage and use in the customary manner of a public space.
14  Reed also believes that members of the Bay Boys harass and assault the
15  plaintiffs and the public when they were visiting Lunada Bay. Reed believes
16  that the conduct directed at the plaintiffs and others trying to surf Lunada Bay
17  is part of an agreement among Defendant Ferrara and the other Bay Boys,
18  which at a minimum, may be implied by the conduct of the parties and other
19  members of the Bay Boys.[6] Reed believes that the Bay Boys concerted efforts
20  to stop the public from accessing the beach are documented in statements
21  made to the media, text messages and emails some of which have been
22  destroyed or are being withheld by the Defendants in this case. For example,

23

24

[4] DR 14-01520.

25

26

[6] "A conspiracy is an agreement by two or more persons to commit a
27  wrongful act. Such an agreement may be made orally or in writing or may be
28  implied by the conduct of the parties." (CivilConspiracy-CACI3600)

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED
BY DEFENDANT FRANK FERRARA

13524251.1

1    Defendant Frank Ferrara was featured in the article "People Who Surf,"
2 December 1991 edition of Surfer Magazine. Plaintiffs are informed and
3 believe that the article was arranged by Lunada Bay local Jim Russi who was
4 a photographer at the magazine which is quoted in relevant part:

5          Q: There was an article a few months ago in the
6          L.A. Times that called the Palos Verdes surfers a
7          bunch elitist gangsters. As a P.V. guy, what do
8          you think of that?
9          A: I think that Palos Verdes is a beautiful surfing
10         spot and that some of the people who have come
11         up there in the past haven't really respected it.
12         Q: But the complaint from visitors is they're not
13         even given a chance to prove themselves. They're
14         run out or hit with rocks just trying to get to the
15         beach.
16         A: Look at what happened to Malibu, Trestles,
17         Rincon; there's five or six guys on every wave.
18         The guys who surf in Palos Verdes…have seen
19         what happens. One guy comes and surfs it, and
20         then he brings two or three guys, and they bring
21         three or four of their friends and it snowballs and
22         gets out of hand. That is exactly why we want to
23         protect it.
24 Defendant Frank Ferrara followed his interview up with a letter defending
25 localism printed in the March 1992 edition of Surfer Magazine stating; "I am
26 a protector of Palos Verdes. It is also protected by the pirates who surf there."
27 Members of the Bay Boys have worn pirate shirts.
28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

In a May 5, 1995 article published in the Easy Reader entitled "A Bay Boy Explains localism: 'A Great Sense of Community here'," Jim Russi admits to the illegal acts the Bay Boys engage in to exclude outsiders. Russi said the harassment stems from a desire by locals to preserve the beach for their own use, especially during the winter when the surf is exceptional. "We feel a great sense of community here and we need to protect it. I can tell you about places that get overrun by outsiders." Russi even attempts to blame the harassment of Geoff Hagins by Defendant Sang Lee, Bay Boys Peter McCollum and Kelly Logan: "Hagins is a real troublemaker. He's a bully. He came e down with a gang of kids, including a Boogie boarder. There's never been a Boogie boarder at Lunada Bay."

Finally, Defendant Charlie Ferrara, who is the son of Defendant Frank Ferrara, admitted that generations of surfers have used intimidation and even violence to successfully prevent the isolated spot from becoming a crowded destination. In the 13-minute recording of the conversation, Defendant Charlie Ferrara is heard saying:

1. "I can't tell you can't be down here. I can't tell you can't go surfing, but what I can do is I can make sure you don't have fun out there."

2. Echoing the words of his father to Surfer Magazine, he states: "if one person is "cool" and gets along, then "everyone gets along, and then it turns into Rincon and Malibu."

3. "My dad's 59 years old, for 59 years it's been like that; who are you to come here and change something, get me?" he said. "I'm sorry to say it like that, I'm not rude, but that's how they're looking at it, you know?"

There are numerous examples of the members of Lunada Bay Boys conspiring to harass and intimidate visiting surfers which are set forth in

-11-

Plaintiffs' Supplemental Disclosures and previous discovery responses including but not limited to:

1. Emails from Defendant Sang Lee and others that describe Bay Boy tactics to keep outsiders and non-locals from surfing Lunada Bay including emails dated 1/7/2011,1/8/2011,1/17/2011.

2. On February 5, 2016, Charles Mowat sent a text message to Defendant Brant Blakeman, Tom Sullivan, David Yoakley, Andy Patch, Defendant Michael Papayans and several others that said "There are 5 kooks standing on the bluff taking pictures...I think that same Taloa guy. Things could get ugly." A Los Angeles Times photographer captured a pictured of Defendant Blakeman of the bluff filming plaintiffs.  Plaintiffs believe that the Bay Boys take photos and/or video tape people as a form of harassment and intimidation. Plaintiffs are also informed and believe that a Lunada Bay local named Joshua Berstein was taking pictures at the MLK 2014 paddle out. Plaintiffs are also informed and believe that Berstein told several people after he photographed them, "Now we know who you are." Plaintiffs believe that the conduct directed at Reed by Blakeman and the individual Bay Boys is because she is a woman. Plaintiff is informed and believes that there are numerous text messages where the Bay Boys refer to Reed as a "bitch" and make sexual comments about her.

3. Emails dated January 16 and 17, 2014 that Charlie Mowatt sent to Defendant Sang Lee and other Lunada Bay locals regarding plans to harass Chris Taloa and visiting surfers at the MLK event in 2014

The specific acts directed against Reed include but are not limited to the following: i) Reed went to Lunada Bay on January 29, 2016 with Jordan

-12-

1  Wright.  Reed had intended to surf at Lunada Bay that day because the

2  conditions were such that she felt comfortable surfing. Immediately after they

3  parked their car along the bluffs, the harassment began. Several men drove

4  by and circled around their car. This was the day that she and Wright were

5  harassed and intimidated by David Melo. Blakeman was recording them on

6  land with his camera. It was very disturbing to Reed and made her feel very

7  uncomfortable. Plaintiffs are informed and believe that this was witnessed by

8  John MacHarg. ii) On or about February 12, 2016, The Los Angeles Times

9  published an article called "Bay Boys surfer gang cannot block access to

10  upscale beach, Coastal Commission says." Jordan Wright and Cory Spencer

11  are quoted in the article. Mr. Wright and a few others had planned to surf

12  Lunada Bay the following morning. Plaintiffs are informed and believe that

13  Defendants Johnston and Blakeman learned that Jordan Wright and Diana

14  Reed were going to Lunada Bay and planned to be there to harass them. On

15  February 12, 2016, Defendant Alan Johnston sent the following text

16  messages to an unknown recipient: "No fucking way Taloa is back this year"

17  and "If u really wanna be a bay boy we might meet help tomm." iii) On

18  February 13, 2016, Reed returned to Lunada Bay with Jordan Wright to watch

19  him surf and take photographs. Prior to her arrival, she contacted the Palos

20  Verdes Estates Police and requested an escort from the bluffs to the beach.

21  She was concerned about her safety given the January 29, 2016 incident. She

22  was told that the police were unavailable and no officers were present when

23  they arrived.

24      When Reed and Wright reached the beach, they encountered angry

25  locals who were yelling at them. Reed and Wright ignored the harassment and

26  Wright got into the water to surf and Reed made her way to the Rock Fort

27  where she planned to watch Wright and photograph him.  Approximately two

28

13524251.1

1 hours after Reed had arrived at Lunada Bay, while she was standing in the

2 Rock Fort taking photos, defendant Blakeman and defendant Alan Johnston

3 rushed into the fort and ran towards her in a hostile and aggressive manner.

4 It seemed that they had coordinated and orchestrated the attack which

5 completely caught Reed off guard. Blakeman was filming Reed again, and at

6 times, held his camera right in her face. It was intimidating and harassing to

7 Reed, and she feared for her safety. Reed asked Blakeman and Johnston

8 why they were filming her, because it made her uncomfortable. Blakeman

9 responded, "because I feel like it." Johnston responded, "Because you're hot.

10 Because you're fucking sexy baby, woooh!"  Johnston then opened a can of

11 beer in a purposeful way so that it sprayed Reed's arm and her camera. Reed,

12 paralyzed with fear, was unable to leave the Rock Fort as Blakeman and

13 Johnston were standing closest to the exit.  iv) Plaintiffs are informed and

14 believe that after the incident Defendant Johnston started calling and/or

15 texting other Lunada Bay locals to check for police to plan a getaway. At

16 around 1:00 pm Brad Travers (Travers Tree Service) texted Johnston: "Don't

17 see any cops at the top." Plaintiffs are informed and believe that later that day

18 Johnston received a text from his mother asking him "What happened at the

19 bay?" Johnston replied "Nothing happened really just couple of trolls they got

20 nothing."

21      Spencer further identifies the following individuals as having knowledge

22 of concerted efforts by the Bay Boys:

23      Cory Spencer: Cory Spencer and Chris Taloa went to surf Lunada Bay.

24 Almost instantly after they arrived at Lunada Bay, they started getting

25 harassed by Bay Boys. They were told that they couldn't surf there, and

26 Spencer was called a "kook," which is a derogatory surfing term. Spencer was

27 also told: "why don't you fucking go home, you fucking kook;" and was asked,

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED
BY DEFENDANT FRANK FERRARA

13524251.1

"how many other good places did you pass to come here?" These are the same types of statements made by Defendant Sang Lee and others that can be observed on the video published by the Guardian.  These taunts started while Spencer and Taloa were on the bluffs getting ready to surf. One individual continued to heckle Spencer and Taloa on their way down to the beach and into the water. Blakeman was already in the water and began paddling around Spencer and Taloa in a tight circle – staying just a few feet away from them. There was no legitimate reason for this conduct. Spencer believes that this is a tactic used by the Bay Boys to harass people.  Blakeman impeded Spencer's movement in any direction and was intentionally blocking him from catching any waves. It was clear to Spencer that Blakeman was not there to surf that morning. Instead, his mission was to prevent Spencer and Taloa from surfing and to keep them from enjoying their time in the water, the open space, the waves, and nature. This type of concerted effort was described by Charlie Ferrara to Reed as the way the Bay Boys act to keep people from surfing at Lunada Bay. In the approximately 90 minutes that Spencer was in the water that day, Blakeman was focused on Spencer and Taloa and continued to shadow their movements and sit uncomfortably close to them. Spencer had never experienced anything like that before in his life. It was bizarre but also incredibly frightening and disturbing. It appeared to Spencer that Blakeman was coordinating his actions with a group of guys who were standing in the Rock Fort, along with others in the water. They were all talking to each other and it was clear they all knew each other. At one point while Spencer was in the water and was paddling west out to the ocean, he saw a man surfing, coming in east towards the shore. The Bay Boy ran over his hand/wrist that was holding his surfboard and one of the fins on his surfboard sliced open his right wrist. Spencer has about a half-inch scar from

where this man ran him over. As soon as the Bay Boy ran him over, he started berating Spencer, saying things like "what are you fucking doing out here? I told you to go home. I should have run you over. Why are you paddling in the sun glare where I can't see you?" The Bay Boy was pretending that he didn't see Spencer but it was obvious that he did and intentionally ran him over. With over 30 years of surfing experience, Spencer knew that this collision was intentional on his part. Fearful of being further injured at that point, and not wanting to get into an argument with him, Spencer just paddled away. Spencer and Taloa caught one more wave after that and then decided it was getting too dangerous to surf. More men started showing up at the Rock Fort and Spencer and Taloa were growing increasingly fearful for their safety. Spencer was also bleeding and in pain. These incidents are described in the declarations filed with Plaintiffs' motion for class certification and the deposition of Spencer.

Christopher Taloa: As set forth above, Taloa and Spencer went surfing at Lunada Bay and were harassed by Blakeman. Taloa witnessed Blakeman shadowing Spencer's movement in the water. Blakeman was in the water with four or five other Lunada Bay Locals.  At one point, Blakeman paddled toward Taloa, at which point Taloa told him that he was too close.  Blakeman replied, "This is the ocean. We are surfing. I can be wherever."  Taloa kept moving in the water, and Blakeman attempted to keep up with him but was not in good enough shape to do so.

Jordan Wright: Wright attempted to surf Lunada Bay in January 2015 with Chris Claypool and Kenneth Claypool. He observed Blakeman harassing Chris and Ken. Wright was sitting on the outside waiting his turn for waves. By regular surfing norms, he had priority. He caught a 10- to 12foot-high wave and was up riding for several seconds. Alan Johnston paddled the wrong way

-16-

1   on this wave, dropped in on him going the wrong way on the wave, and yelled,

2   "Oh no, you don't!" Dropping in on a surfer while going the wrong way violates

3   normal surf etiquette. Johnston then collided with Wright, and their leashes

4   got tangled. After they surfaced from the collision, Johnston then got close to

5   Wright and yelled, "You had to fucking take that wave, didn't you!" The next

6   wave that came through then broke Wright's leash plug and the board was

7   carried into the rocks, which destroyed a new surfboard. Wright had to swim

8   in over rocks to get his board and cut his hands on the rocks doing so. Wright

9   is confident that Johnston attempted to purposefully injure him. What he did

10  was extremely dangerous.

11       Wright has observed Blakeman on many occasions. Blakeman is easy

12  to identify because he rides a kneeboard and he is regularly filming visitors on

13  land with a camcorder. Wright believes his filming is an effort to intimidate

14  visitors. In the water, Wright has observed what appears to be Blakeman

15  directing other Bay Boys to sit close to visiting surfers. Wright has observed

16  Bay Boys who seem to be assigned to visiting surfers—they'll sit too close to

17  the visitors, impede their movements, block their surfing, kick at them, splash

18  water at them, and dangerously drop in on them. In addition to Blakeman, he

19  has seen Michael Papayans, Sang Lee, Alan Johnston, Charlie Ferrara, and

20  David Melo engage in this activity. These incidents are described in the

21  declarations filed with Plaintiffs' motion for class certification.

22       Ken Claypool: has been harassed and filmed by Blakeman in an attempt

23  to intimidate him at Lunada Bay on multiple occasions. In January 2015,

24  Claypool and his brother Chris Claypool along with Jordan Wright went to surf

25  Lunada Bay.  There were about five Lunada Bay locals in the water, including

26  Blakeman who paddled over and threatened them. Claypool observed

27  Blakeman intentionally drop in on Wright at least twice.  On February 5, 2016,

28

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED
BY DEFENDANT FRANK FERRARA

13524251.1

Claypool went to Lunada Bay with Chris Taloa and Jordan Wright. There was a photographer from the Los Angeles Times that was there. Also in attendance was Cory Spencer and Diana Reed.  Spencer was there to watch the cars.  Blakeman was there filming in an effort to intimidate visitors. Blakeman can be seen in one of the pictures taken by the photographer. Also present was Defendant Papayans.

Plaintiffs are informed and believe that there was a text message sent that day to Papayans, Michael Thiel and 11 other people stating that there were 5 kooks standing on the bluff taking pictures, including Taloa. Plaintiffs are informed that the text states: "Things could get ugly." These incidents are described in the declarations filed with Plaintiffs' motion for class certification. Chris Claypool: he and his brother Ken and Jordan Wright attempted to surf Lunada Bay in January 2015.  There were about five locals in the water, including Blakeman who paddled over and was yelling, "Try and catch a wave and see what happens. There is no fucking way you are getting a wave. Just go in. Just go. You better not cut me off."  Blakeman looked possessed or possibly on drugs. His behavior got more bizarre throughout the morning. He seemed to be paddling for every wave that he could physically push himself into, perhaps to make a point, but he was wiping out a lot and falling down the face and tumbling across the rock reef. Blakeman looked dangerous to himself. When Blakeman would actually catch a wave in, he would paddle back to where Claypool and his brother were sitting, and continue his insane rant. On one occasion, Blakeman came less than 12 inches from Claypool's ear and was screaming. It was so loud, Claypool had to put his fingers in his ear to protect them from being damaged. Claypool is a sound engineer and to put this in perspective, a rock concert creates about 120 decibels of noise - this was louder; a jet engine creates about 150 decibels. At one point

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1    Blakeman caught a wave and drew a line aiming right at Claypool. Another
2    Bay Boy tried the same thing and said "mother fucker" as he narrowly missed
3    Claypool's head. Claypool watched as Blakeman intentionally dropped in on
4    Jordan at least twice. It seemed obvious to Claypool that Blakeman and the
5    other Bay Boy wanted to make sure none of them were having fun. Because
6    of the danger, they decided to leave. When Claypool and his brother got out
7    of water, they saw people gathering on top of the cliff. One person was
8    videotaping them from the top of the cliff; it was clear to Claypool that he was
9    doing this to try and intimidate them. The people were watching them from the
10    cliff. It was obvious that Blakeman engaged in a concerted effort with other
11    Bay Boys to obstruct his free passage and use in the customary manner of a
12    public space. It also seemed clear that Blakeman engaged in a concerted
13    effort with other Bay Boys to try and injure him. These incidents are described
14    in the declarations filed with Plaintiffs' motion for class certification.

15    Jason Gersch: While observing the surf, Gersch was approached by two
16    local Bay Boys named Peter McCollum and Brant Blakeman. These
17    individuals made it known to Gersch that he could not surf there. These
18    incidents are described in the declarations filed with Plaintiffs' motion for class
19    certification. Plaintiffs are informed and believe and on that basis allege that
20    Defendant Blakeman and his attorneys are attempting to intimidate witnesses
21    in this case.

22    The request is premature. Because the defendants are refusing to
23    comply with their obligations to produce documents under the federal rules
24    and are impermissibly withholding evidence and/or possibly spoilating
25    evidence, we are not able to fully respond to discovery requests which
26    necessarily rely on our ability to fully investigate the facts. As discovery is
27    continuing, Spencer reserves the right to update this response.

28

13524251.1

**INTERROGATORY NO. 14:**

If YOU denied any of the Requests for Admissions served by Propounding Party in this action, then for each Request for Admission denied, IDENTIFY all PERSONS with knowledge RELATING TO YOUR denial.

**RESPONSE TO INTERROGATORY NO. 14:**

Responding Party objects to this interrogatory as premature. Because this interrogatory seeks or necessarily relies upon a contention, and because this matter is in its early stages and pretrial discovery has only just begun, Responding Party is unable to provide a complete response at this time, nor is it required to do so.  See *Kmiec v. Powerwave Techs. Inc. et al.*, 2014 WL 11512195 (C.D. Cal. Dec. 2, 2014) at *1; *Folz v. Union Pacific Railroad Company*, 2014 WL 357929 (S.D. Cal. Jan. 31, 2014) at *1-2.; see also Fed. R. Civ. P. 33(a)(2) ("the court may order that [a contention] interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.").

Responding Party further objects to this interrogatory as unduly burdensome, harassing, and duplicative of information disclosed in Responding Party's Rule 26(a) disclosures and supplemental disclosures. Propounding Party may look to Responding Party's Rule 26(a) disclosures and supplemental disclosures for the information sought by this interrogatory.  Moreover, Responding Party had the opportunity to depose Mr. Spencer on this topic.

Responding Party further objects to this interrogatory as compound. This "interrogatory" contains multiple impermissible subparts, which Propounding Party has propounded in an effort to circumvent the numerical

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1 limitations on interrogatories provided by Federal Rule of Civil Procedure

2 33(a)(1).

3      Responding Party further objects to this interrogatory on the grounds

4 that it seeks information that is outside of Responding Party's knowledge.

5      Responding Party further objects to the extent that this interrogatory

6 invades attorney-client privilege and/or violates the work product doctrine by

7 compelling Responding Party to disclose privileged communications and/or

8 litigation strategy.  Responding Party will not provide any such information.

9 <u>Subject to and without waiver of the foregoing objections, Responding</u>

10 <u>Party responds as follows:</u>

11      The following Persons are identified to have knowledge of facts

12 supporting Plaintiff's denial of the Requests for Admissions, and have

13 information of the concerted efforts of the Bay Boys, are:

14   ■ <u>Diana Reed</u>

15   ■ <u>Cory Spencer</u>

16   • <u>Christopher Taloa</u>:

17   • <u>Jordan Wright</u>:

18   • <u>Ken Claypool</u>:

19   • <u>Andy MacHarg</u>:

20   • <u>Jason Gersch</u>:

21
22   ○ <u>Sef Krell</u>

23   ○ <u>Geoff Hagins</u>

24   ○ <u>Peter McCullom, David Hilton, Kelly Logan, Sang Lee</u>

25
26   ○ <u>Officer Alex Gonzales</u>

27   ○ <u>Jim Russi</u>

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

- o <u>David Hunt</u>
- o <u>Jen Bell</u>
- o <u>Chris Taloa</u>
- o <u>Plaintiffs</u>
- o <u>Michael Papayans,</u>
- o <u>Sang Lee,</u>
- o <u>Alan Johnston,</u>
- o <u>Charlie Ferrara,</u>
- o <u>David Melo</u>
- o <u>Ken Claypool</u>
- o <u>Chris Claypool</u>
- o <u>Jordan Wright</u>
- o <u>Jason Gretch</u>

The request is premature. Because the defendants are refusing to comply with their obligations to produce documents under the federal rules and are impermissibly withholding evidence and/or possibly spoliating evidence, we are not able to fully respond to discovery requests which necessarily rely on our ability to fully investigate the facts. As discovery is continuing, Reed reserves the right to update this response.

**<u>INTERROGATORY NO. 15</u>:**

If YOU denied any of the Requests for Admissions served by Propounding Party in this action, then for each Request for Admission

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1   denied, IDENTIFY **all DOCUMENTS** RELATING TO YOUR denial.

2   **RESPONSE TO INTERROGATORY NO. 15:**

3       Responding Party objects to this interrogatory as premature. Because

4   this interrogatory seeks or necessarily relies upon a contention, and

5   because this matter is in its early stages and pretrial discovery has only just

6   begun, Responding Party is unable to provide a complete response at this

7   time, nor is it required to do so.  See *Kmiec v. Powerwave Techs. Inc. et al.*,

8   2014 WL 11512195 (C.D. Cal. Dec. 2, 2014) at *1; *Folz v. Union Pacific*

9   *Railroad Company*, 2014 WL 357929 (S.D. Cal. Jan. 31, 2014) at *1-2.; see

10  also Fed. R. Civ. P. 33(a)(2) ("the court may order that [a contention]

11  interrogatory need not be answered until designated discovery is complete,

12  or until a pretrial conference or some other time.").

13      Responding Party further objects to this interrogatory as unduly

14  burdensome, harassing, and duplicative of information disclosed in

15  Responding Party's Rule 26(a) disclosures and supplemental disclosures.

16  Propounding Party may look to Responding Party's Rule 26(a) disclosures

17  and supplemental disclosures for the information sought by this

18  interrogatory.  Moreover, Responding Party had the opportunity to depose

19  Ms. Reed on this topic.

20      Responding Party further objects to this interrogatory as compound.

21  This "interrogatory" contains multiple impermissible subparts, which

22  Propounding Party has propounded in an effort to circumvent the numerical

23  limitations on interrogatories provided by Federal Rule of Civil Procedure

24  33(a)(1).

25      Responding Party further objects to this interrogatory on the grounds

26  that it seeks information that is outside of Responding Party's knowledge.

27      Responding Party further objects to the extent that this interrogatory

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1  invades attorney-client privilege and/or violates the work product doctrine by

2  compelling Responding Party to disclose privileged communications and/or

3  litigation strategy.  Responding Party will not provide any such information.

4         Subject to and without waiver of the foregoing objections, Responding

5  Party responds as follows:

6  **Documents which relate to or support Plaintiff's denial of the Requests**

7  **for Admissions are the following:**

8         ▪   DR- 95-0062,

9         o  DR 95-031, and

10        o  DR- 14-01520,

11        o  "People Who Surf," December 1991 edition of Surfer Magazine,

12           March 1992 edition of Surfer Magazine,

13        o  May 5, 1995 article published in the Easy Reader entitled "A Bay

14           Boy Explains localism: 'A Great Sense of Community here'

15        o  13-minute recording of the conversation, Defendant Charlie

16           Ferrara,

17        o  Emails from Defendant Sang Lee and others that describe Bay

18           Boy tactics to keep outsiders and non-locals from surfing Lunada

19           Bay including emails dated 1/7/2011,1/8/2011,1/17/2011,

20        o  Phone records from Defendant Sang Lee, Phone records from

21           Defendant Alan Johnston, and Declarations produced in support

22           of plaintiff's motion for class certification.

23        The request is premature. Because the defendants are refusing to

24  comply with their obligations to produce documents under the federal rules

25  and are impermissibly withholding evidence and/or possibly spoliating

26  evidence, we are not able to fully respond to discovery requests which

27  necessarily rely on our ability to fully investigate the facts. As discovery is

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1   continuing, Reed reserves the right to update this response.

2

3   DATED:  June 5, 2017                    OTTEN LAW, PC

4

5

6                                    By:   _____/s/Victor Otten_____

7                                          VICTOR OTTEN
                                           KAVITA TEKCHANDANI
8                                          Attorneys for Plaintiffs
                                           CORY SPENCER, DIANA MILENA
9                                          REED, and COASTAL PROTECTION
                                           RANGERS, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED
BY DEFENDANT FRANK FERRARA

13524251.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

**PROOF OF SERVICE**
*Spencer, et al. v. Lunada Bay Boys, et al.*
**U.S.D.C. for the Central District of California**
**Case No. 2:16-cv-02129-SJO (RAOx)**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is: 3620 Pacific Coast Highway, Suite 100, Torrance, CA 90505.

On June 5, 2017, I served the original or a true copy of the following document(s) described as:

**PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**X BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Hanson Bridgett LLP's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **June 5, 2017**, at Torrance, California.

_/s/Victor Otten_
_____
Victor Otten

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

**SERVICE LIST**
*Spencer, et al. v. Lunada Bay Boys, et al.*
U.S.D.C. for the Central District of California
Case No. 2:16-cv-02129-SJO (RAOx)

Robert T. Mackey, Esq.                   *(Attorneys for Defendant BRANT*
Peter H. Crossin, Esq.                   *BLAKEMAN)*
Richard P. Dieffenbach, Esq.
John P. Worgul, Esq.                     (served original)
VEATCH CARLSON, LLP
1055 Wilshire Blvd., 11th Floor
Los Angeles, CA  90017

Robert S. Cooper, Esq.                   *(Attorneys for Defendant BRANT*
BUCHALTER NEMER, APC                     *BLAKEMAN)*
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA  90017                   (served true copy)

J. Patrick Carey, Esq.                   *(Attorney for Defendant ALAN*
LAW OFFICES OF                           *JOHNSTON a/k/a JALIAN*
 J. PATRICK CAREY                        *JOHNSTON)*
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA  90266               (served true copy)

Peter T. Haven, Esq.                     *(Attorney for Defendant MICHAEL*
HAVEN LAW                                *RAY PAPAYANS)*
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA  90266               (served true copy)

Dana Alden Fox, Esq.                     *(Attorneys for Defendant SANG LEE)*
Edward E. Ward, Jr., Esq.
Eric Y. Kizirian, Esq.                   (served true copy)
Tera Lutz, Esq.
LEWIS BRISBOIS
 BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA  90071

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED
BY DEFENDANT FRANK FERRARA

13524251.1

| | | |
|---|---|---|
| 1 | Daniel M. Crowley, Esq. | *(Attorneys for Defendant SANG LEE)* |
| 2 | BOOTH, MITCHELL & STRANGE LLP | (served true copy) |
| 3 | 707 Wilshire Blvd., Suite 4450 Los Angeles, CA  90017 | |
| 4 | | |
| 5 | Mark C. Fields, Esq. | *(Attorney for Defendant ANGELO* |
| 6 | LAW OFFICES OF MARK C. FIELDS, APC | *FERRARA and Defendant N. F. appearing through Guardian Ad* |
| 7 | 333 South Hope Street, 35th Floor Los Angeles, CA  90071 | *Litem, Leonora Ferrara)* |
| 8 | | (served true copy) |
| 9 | | |
| 10 | Thomas M. Phillip, Esq. Aaron G. Miller, Esq. | *(Attorneys for Defendant ANGELO FERRARA)* |
| 11 | THE PHILLIPS FIRM 800 Wilshire Blvd., Suite 1550 | (served true copy) |
| 12 | Los Angeles, CA  90017 | |
| 13 | | |
| 14 | Patrick Au, Esq. | *(Attorneys for Defendants FRANK* |
| 15 | Laura L. Bell, Esq. BREMER WHYTE | *FERRARA and CHARLIE FERRARA)* |
| 16 | BROWN & O'MEARA, LLP 21271 Burbank Blvd., Suite 110 | (served true copy) |
| 17 | Woodland Hills, CA  91367 | |
| 18 | | |
| 19 | Edwin J. Richards, Esq. Antoinette P. Hewitt, Esq. | *(Attorneys for Defendants CITY OF PALOS VERDES and CHIEF OF* |
| 20 | Rebecca L. Wilson, Esq. Jacob Song, Esq. | *POLICE JEFF KEPLEY)* |
| 21 | Christopher D. Glos, Esq. KUTAK ROCK LLP | (served true copy) |
| 22 | 5 Park Plaza, Suite 1500 | |
| 23 | Irvine, CA  92614-8595 | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1  HANSON BRIDGETT LLP
   KURT A. FRANKLIN, SBN 172715
2  kfranklin@hansonbridgett.com
   SAMANTHA WOLFF, SBN 240280
3  swolff@hansonbridgett.com
   JENNIFER ANIKO FOLDVARY, SBN 292216
4  jfoldvary@hansonbridgett.com
   425 Market Street, 26th Floor
5  San Francisco, California 94105
   Telephone: (415) 777-3200
6  Facsimile:  (415) 541-9366

7  HANSON BRIDGETT LLP
   TYSON M. SHOWER, SBN 190375
8  tshower@hansonbridgett.com
   LANDON D. BAILEY, SBN 240236
9  lbailey@hansonbridgett.com
   500 Capitol Mall, Suite 1500
10 Sacramento, California 95814
   Telephone: (916) 442-3333
11 Facsimile:  (916) 442-2348

12 OTTEN LAW, PC
   VICTOR OTTEN, SBN 165800
13 vic@ottenlawpc.com
   KAVITA TEKCHANDANI, SBN 234873
14 kavita@ottenlawpc.com
   3620 Pacific Coast Highway, #100
15 Torrance, California 90505
   Telephone: (310) 378-8533
16 Facsimile:  (310) 347-4225

17 Attorneys for Plaintiffs
   CORY SPENCER, DIANA MILENA
18 REED, and COASTAL PROTECTION
   RANGERS, INC.
19

20           **UNITED STATES DISTRICT COURT**

21      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

22

23 CORY SPENCER, an individual;      CASE NO. 2:16-cv-02129-SJO (RAOx)

24 DIANA MILENA REED, an            **PLAINTIFF CORY SPENCER'S**
   individual; and COASTAL          **RESPONSE TO SECOND SET OF**
25 PROTECTION RANGERS, INC., a      **REQUESTS FOR PRODUCTION**
                                    **PROPOUNDED BY DEFENDANT**
26 California non-profit public benefit **FRANK FERRARA**
   corporation,
27
28           Plaintiffs,

Case No. 2:16-cv-02129-SJO (RAOx)

1    v.

2

Complaint Filed:    March 29, 2016
Trial Date:         November 7, 2017

3    LUNADA BAY BOYS; THE
     INDIVIDUAL MEMBERS OF THE
4    LUNADA BAY BOYS, including but
     not limited to SANG LEE, BRANT
5    BLAKEMAN, ALAN JOHNSTON
     AKA JALIAN JOHNSTON,
6    MICHAEL RAE PAPAYANS,
     ANGELO FERRARA, FRANK
7    FERRARA, CHARLIE FERRARA,
     and N. F.; CITY OF PALOS
8    VERDES ESTATES; CHIEF OF
     POLICE JEFF KEPLEY, in his
9    representative capacity; and DOES
     1-10,
10

11

12               Defendants.

13

14

15   PROPOUNDING PARTY: Defendant Frank Ferrara

16   RESPONDING PARTY:   Plaintiff Cory Spencer

17   SET NO.:            Two

18        Pursuant to Federal Rule of Civil Procedure 34, Plaintiff Cory Spencer

19   ("Responding Party") submits these responses and objections to the Second

20   Set of Requests for Production propounded by Defendant Frank Ferrara

21   ("Propounding Party").

22                    **PRELIMINARY STATEMENT**

23        Nothing in this response should be construed as an admission by

24   Responding Party with respect to the admissibility or relevance of any fact or

25   document, or of the truth or accuracy of any characterization or statement of

26   any kind contained in Propounding Party's Requests for Production.

27   Responding Party has not completed his investigation of the facts relating to

28

-2-                                    Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1   this case, his discovery or his preparation for trial.  All responses and

2   objections contained herein are based only upon such information and such

3   documents that are presently available to and specifically known by

4   Responding Party.  It is anticipated that further discovery, independent

5   investigation, legal research and analysis will supply additional facts and add

6   meaning to known facts, as well as establish entirely new factual

7   conclusions and legal contentions, all of which may lead to substantial

8   additions to, changes in and variations from the responses set forth herein.

9   The following objections and responses are made without prejudice to

10   Responding Party's right to produce at trial, or otherwise, evidence

11   regarding any subsequently discovered documents.  Responding Party

12   accordingly reserves the right to modify and amend any and all responses

13   herein as research is completed and contentions are made.

14             **GENERAL OBJECTIONS TO REQUESTS FOR PRODUCTION**

15           Responding Party generally objects to the Requests for Production as

16   follows:

17           A.       Responding Party objects generally to the Requests for

18   Production to the extent that they seek to elicit information that is neither

19   relevant to the subject matter of this action, nor reasonably calculated to

20   lead to the discovery of admissible evidence;

21           B.       Responding Party objects generally to the Requests for

22   Production to the extent that they are unreasonably overbroad in scope, and

23   thus burdensome and oppressive, in that each such request seeks

24   information pertaining to items and matters that are not relevant to the

25   subject matter of this action, or, if relevant, so remote therefrom as to make

26   its disclosure of little or no practical benefit to Propounding Party, while

27   placing a wholly unwarranted burden and expense on Responding Party in

28

13524430.1

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

1  locating, reviewing and producing the requested information;

2      C.    Responding Party objects generally to the Requests for

3  Production to the extent that they are burdensome and oppressive, in that

4  ascertaining the information necessary to respond to them, and to produce

5  documents in accordance therewith, would require the review and

6  compilation of information from multiple locations, and voluminous records

7  and files, thereby involving substantial time of employees of Responding

8  Party and great expense to Responding Party, whereas the information

9  sought to be obtained by Propounding Party would be of little use or benefit

10  to Propounding Party;

11      D.    Responding Party objects generally to the Requests for

12  Production to the extent that they are vague, uncertain and overbroad, being

13  without limitation as to time or specific subject matter;

14      E.    Responding Party objects generally to the Requests for

15  Production to the extent that they seek information at least some of which is

16  protected by the attorney-client privilege or the attorney work-product

17  doctrine, or both;

18      F.    Responding Party objects generally to the Requests for

19  Production to the extent that they seek to have Plaintiff furnish information

20  and identify documents that are a matter of the public record, and therefore,

21  are equally available to the propounding party as they are to Responding

22  Party; and

23      G.    Responding Party objects generally to the Requests for

24  Production to the extent that they seek to have Responding Party furnish

25  information and identify documents that are proprietary to Responding Party

26  and contain confidential information.

27      Without waiver of the foregoing, Responding Party further responds as

28

-4-

follows:

## RESPONSES TO REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 13:**

If YOUR response to Propounding Party's Request for Admission No. 3 was anything other than an unqualified admission, produce each and every DOCUMENT RELATING TO said response.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Responding Party objects to this request for production as premature. Because this request for production necessarily relies upon a contention, Responding Party is unable to provide a complete response at this time, nor is it required to do so.

Responding Party further objects to this request on the grounds that it violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe with reasonable particularity each item or category of items to be inspected." Propounding Party's request for production does not describe an item or category of items with reasonable particularity.

Responding Party further objects to the extent that this request for production invades attorney-client privilege and/or violates the work product doctrine by compelling Responding Party to disclose privileged communications and/or litigation strategy.  Responding Party will not provide any such privileged information.

Responding Party further objects to this request on the grounds that this information is equally available to the Requesting Party, and some of the documents are publically available.

Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

Responding Party directs the Defendant to Plaintiff's previous

-5-

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1  productions. For any responsive documents, not already produced in
2  Plaintiff's prior discovery responses, Plaintiff is producing such documents.
3  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

4  Additionally, Responding Party notes that discovery is ongoing, and
5  this contention-based interrogatory is poorly defined and premature.  Thus,
6  Responding Party reserves the right to amend this response at the
7  appropriate time in the future if necessary.

8

9  **REQUEST FOR PRODUCTION NO. 14:**

10  If YOUR response to Propounding Party's Request for Admission No.
11  6 was anything other than an unqualified admission, produce each and
12  every DOCUMENT. RELATING TO said response.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

14  Responding Party objects to this request for production as premature.
15  Because this request for production necessarily relies upon a contention,
16  Responding Party is unable to provide a complete response at this time, nor
17  is it required to do so.

18  Responding Party further objects to this request on the grounds that it
19  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe
20  with reasonable particularity each item or category of items to be inspected."
21  Propounding Party's request for production does not describe an item or
22  category of items with reasonable particularity.

23  Responding Party further objects to the extent that this request for
24  production invades attorney-client privilege and/or violates the work product
25  doctrine by compelling Responding Party to disclose privileged
26  communications and/or litigation strategy.  Responding Party will not provide
27  any such privileged information.

28

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1   Responding Party further objects to this request on the grounds that

2   this information is equally available to the Requesting Party, and some of the

3   documents are publically available.

4   Subject to and without waiver of the foregoing objections, Responding

5   Party responds as follows:

6   Responding Party directs the Defendant to Plaintiff's previous

7   productions. For any responsive documents, not already produced in

8   Plaintiff's prior discovery responses, Plaintiff is producing such documents.

9   (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

10   Additionally, Responding Party notes that discovery is ongoing, and

11   this contention-based interrogatory is poorly defined and premature.  Thus,

12   Responding Party reserves the right to amend this response at the

13   appropriate time in the future if necessary.

14

15   **REQUEST FOR PRODUCTION NO. 15:**

16   If YOUR response to Propounding Party's Request for Admission No.

17   9 was anything other than an unqualified admission, produce each and

18   every DOCUMENT RELATING TO said response.

19   **RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

20   Responding Party objects to this request for production as premature.

21   Because this request for production necessarily relies upon a contention,

22   Responding Party is unable to provide a complete response at this time, nor

23   is it required to do so.

24   Responding Party further objects to this request on the grounds that it

25   violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

26   with reasonable particularity each item or category of items to be inspected."

27   Propounding Party's request for production does not describe an item or

28

-7-

Case No. 2:16-cv-02129-SJO (RAOx)

13524430.1

1  category of items with reasonable particularity.

2      Responding Party further objects to the extent that this request for

3  production invades attorney-client privilege and/or violates the work product

4  doctrine by compelling Responding Party to disclose privileged

5  communications and/or litigation strategy.  Responding Party will not provide

6  any such privileged information.

7      Responding Party further objects to this request on the grounds that

8  this information is equally available to the Requesting Party, and some of the

9  documents are publically available.

10     Subject to and without waiver of the foregoing objections, Responding

11  Party responds as follows:

12     Responding Party directs the Defendant to Plaintiff's previous

13  productions. For any responsive documents, not already produced in

14  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

15  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

16      Additionally, Responding Party notes that discovery is ongoing, and

17  this contention-based interrogatory is poorly defined and premature.  Thus,

18  Responding Party reserves the right to amend this response at the

19  appropriate time in the future if necessary.

20

21  **REQUEST FOR PRODUCTION NO. 16:**

22     If YOUR response to Propounding Party's Request for Admission No.

23  12 was anything other than an unqualified admission, produce each and

24  every DOCUMENT RELATING TO said response.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

26     Responding Party objects to this request for production as premature.

27  Because this request for production necessarily relies upon a contention,

28

-8-

13524430.1

1  Responding Party is unable to provide a complete response at this time, nor
2  is it required to do so.

3  Responding Party further objects to this request on the grounds that it
4  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe
5  with reasonable particularity each item or category of items to be inspected."
6  Propounding Party's request for production does not describe an item or
7  category of items with reasonable particularity.

8  Responding Party further objects to the extent that this request for
9  production invades attorney-client privilege and/or violates the work product
10  doctrine by compelling Responding Party to disclose privileged
11  communications and/or litigation strategy.  Responding Party will not provide
12  any such privileged information.

13  Responding Party further objects to this request on the grounds that
14  this information is equally available to the Requesting Party, and some of the
15  documents are publically available.

16  Subject to and without waiver of the foregoing objections, Responding
17  Party responds as follows:

18  Responding Party directs the Defendant to Plaintiff's previous
19  productions. For any responsive documents, not already produced in
20  Plaintiff's prior discovery responses, Plaintiff is producing such documents.
21  (Responsive documents are collectively attached hereto as Exhibit A).

22  Additionally, Responding Party notes that discovery is ongoing, and
23  this contention-based interrogatory is poorly defined and premature.  Thus,
24  Responding Party reserves the right to amend this response at the
25  appropriate time in the future if necessary.

26
27
28

13524430.1

**REQUEST FOR PRODUCTION NO. 17:**

If YOUR response to Propounding Party's Request for Admission No. 15 was anything other than an unqualified admission, produce each and every DOCUMENT RELATING TO said response.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Responding Party objects to this request for production as premature. Because this request for production necessarily relies upon a contention, Responding Party is unable to provide a complete response at this time, nor is it required to do so.

Responding Party further objects to this request on the grounds that it violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe with reasonable particularity each item or category of items to be inspected." Propounding Party's request for production does not describe an item or category of items with reasonable particularity.

Responding Party further objects to the extent that this request for production invades attorney-client privilege and/or violates the work product doctrine by compelling Responding Party to disclose privileged communications and/or litigation strategy.  Responding Party will not provide any such privileged information.

Responding Party further objects to this request on the grounds that this information is equally available to the Requesting Party, and some of the documents are publically available.

Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

Responding Party directs the Defendant to Plaintiff's previous productions. For any responsive documents, not already produced in Plaintiff's prior discovery responses, Plaintiff is producing such documents.

-10-

13524430.1

1  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

2      Additionally, Responding Party notes that discovery is ongoing, and
3  this contention-based interrogatory is poorly defined and premature.  Thus,
4  Responding Party reserves the right to amend this response at the
5  appropriate time in the future if necessary.

6

7  **REQUEST FOR PRODUCTION NO. 18:**

8      If YOUR response to Propounding Party's Request for Admission No.
9  16 was anything other than an unqualified admission, produce each and
10  every DOCUMENT RELATING TO said response.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

12      Responding Party objects to this request for production as premature.
13  Because this request for production necessarily relies upon a contention,
14  Responding Party is unable to provide a complete response at this time, nor
15  is it required to do so.

16      Responding Party further objects to this request on the grounds that it
17  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe
18  with reasonable particularity each item or category of items to be inspected."
19  Propounding Party's request for production does not describe an item or
20  category of items with reasonable particularity.

21      Responding Party further objects to the extent that this request for
22  production invades attorney-client privilege and/or violates the work product
23  doctrine by compelling Responding Party to disclose privileged
24  communications and/or litigation strategy.  Responding Party will not provide
25  any such privileged information.

26      Responding Party further objects to this request on the grounds that
27  this information is equally available to the Requesting Party, and some of the

28

-11-

13524430.1

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

1   documents are publically available.

2      Subject to and without waiver of the foregoing objections, Responding

3   Party responds as follows:

4      Responding Party directs the Defendant to Plaintiff's previous

5   productions. For any responsive documents, not already produced in

6   Plaintiff's prior discovery responses, Plaintiff is producing such documents.

7   (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

8      Additionally, Responding Party notes that discovery is ongoing, and

9   this contention-based interrogatory is poorly defined and premature.  Thus,

10  Responding Party reserves the right to amend this response at the

11  appropriate time in the future if necessary.

12

13  **REQUEST FOR PRODUCTION NO. 19:**

14     If YOUR response to Propounding Party's Request for Admission No.

15  17 was anything other than an unqualified admission, produce each and

16  every DOCUMENT RELATING TO said response.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

18     Responding Party objects to this request for production as premature.

19  Because this request for production necessarily relies upon a contention,

20  Responding Party is unable to provide a complete response at this time, nor

21  is it required to do so.

22     Responding Party further objects to this request on the grounds that it

23  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

24  with reasonable particularity each item or category of items to be inspected."

25  Propounding Party's request for production does not describe an item or

26  category of items with reasonable particularity.

27     Responding Party further objects to the extent that this request for

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1  production invades attorney-client privilege and/or violates the work product

2  doctrine by compelling Responding Party to disclose privileged

3  communications and/or litigation strategy.  Responding Party will not provide

4  any such privileged information.

5       Responding Party further objects to this request on the grounds that

6  this information is equally available to the Requesting Party, and some of the

7  documents are publically available.

8       Subject to and without waiver of the foregoing objections, Responding

9  Party responds as follows:

10      Responding Party directs the Defendant to Plaintiff's previous

11  productions. For any responsive documents, not already produced in

12  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

13  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

14       Additionally, Responding Party notes that discovery is ongoing, and

15  this contention-based interrogatory is poorly defined and premature.  Thus,

16  Responding Party reserves the right to amend this response at the

17  appropriate time in the future if necessary.

18

19  **REQUEST FOR PRODUCTION NO. 20:**

20      If YOUR response to Propounding Party's Request for Admission No.

21  18 was anything other than an unqualified admission, produce each and

22  every DOCUMENT RELATING TO said response.

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

24      Responding Party objects to this request for production as premature.

25  Because this request for production necessarily relies upon a contention,

26  Responding Party is unable to provide a complete response at this time, nor

27  is it required to do so.

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1    Responding Party further objects to this request on the grounds that it

2    violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

3    with reasonable particularity each item or category of items to be inspected."

4    Propounding Party's request for production does not describe an item or

5    category of items with reasonable particularity.

6    Responding Party further objects to the extent that this request for

7    production invades attorney-client privilege and/or violates the work product

8    doctrine by compelling Responding Party to disclose privileged

9    communications and/or litigation strategy.  Responding Party will not provide

10   any such privileged information.

11   Responding Party further objects to this request on the grounds that

12   this information is equally available to the Requesting Party, and some of the

13   documents are publically available.

14   Subject to and without waiver of the foregoing objections, Responding

15   Party responds as follows:

16   Responding Party directs the Defendant to Plaintiff's previous

17   productions. For any responsive documents, not already produced in

18   Plaintiff's prior discovery responses, Plaintiff is producing such documents.

19   (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

20   Additionally, Responding Party notes that discovery is ongoing, and

21   this contention-based interrogatory is poorly defined and premature.  Thus,

22   Responding Party reserves the right to amend this response at the

23   appropriate time in the future if necessary.

24

25   **REQUEST FOR PRODUCTION NO. 21:**

26   If YOUR response to Propounding Party's Request for Admission No.

27   19 was anything other than an unqualified admission, produce each and

28

-14-

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1  every DOCUMENT RELATING TO said response.

2  **RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

3       Responding Party objects to this request for production as premature.

4  Because this request for production necessarily relies upon a contention,

5  Responding Party is unable to provide a complete response at this time, nor

6  is it required to do so.

7       Responding Party further objects to this request on the grounds that it

8  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

9  with reasonable particularity each item or category of items to be inspected."

10  Propounding Party's request for production does not describe an item or

11  category of items with reasonable particularity.

12       Responding Party further objects to the extent that this request for

13  production invades attorney-client privilege and/or violates the work product

14  doctrine by compelling Responding Party to disclose privileged

15  communications and/or litigation strategy.  Responding Party will not provide

16  any such privileged information.

17       Responding Party further objects to this request on the grounds that

18  this information is equally available to the Requesting Party, and some of the

19  documents are publically available.

20       Subject to and without waiver of the foregoing objections, Responding

21  Party responds as follows:

22       Responding Party directs the Defendant to Plaintiff's previous

23  productions. For any responsive documents, not already produced in

24  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

25  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

26        Additionally, Responding Party notes that discovery is ongoing, and

27  this contention-based interrogatory is poorly defined and premature.  Thus,

28

13524430.1

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

1   Responding Party reserves the right to amend this response at the

2   appropriate time in the future if necessary.

3

4   **REQUEST FOR PRODUCTION NO. 22:**

5       If YOUR response to Propounding Party's Request for Admission No.

6   20 was anything other than an unqualified admission, produce each and

7   every DOCUMENT RELATING TO said response.

8   **RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

9       Responding Party objects to this request for production as premature.

10  Because this request for production necessarily relies upon a contention,

11  Responding Party is unable to provide a complete response at this time, nor

12  is it required to do so.

13      Responding Party further objects to this request on the grounds that it

14  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

15  with reasonable particularity each item or category of items to be inspected."

16  Propounding Party's request for production does not describe an item or

17  category of items with reasonable particularity.

18      Responding Party further objects to the extent that this request for

19  production invades attorney-client privilege and/or violates the work product

20  doctrine by compelling Responding Party to disclose privileged

21  communications and/or litigation strategy.  Responding Party will not provide

22  any such privileged information.

23      Responding Party further objects to this request on the grounds that

24  this information is equally available to the Requesting Party, and some of the

25  documents are publically available.

26      Subject to and without waiver of the foregoing objections, Responding

27  Party responds as follows:

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1     Responding Party directs the Defendant to Plaintiff's previous

2 productions. For any responsive documents, not already produced in

3 Plaintiff's prior discovery responses, Plaintiff is producing such documents.

4 (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

5     Additionally, Responding Party notes that discovery is ongoing, and

6 this contention-based interrogatory is poorly defined and premature.  Thus,

7 Responding Party reserves the right to amend this response at the

8 appropriate time in the future if necessary.

9

10 **REQUEST FOR PRODUCTION NO. 23:**

11     If YOUR response to Propounding Party's Request for Admission No.

12 21 was anything other than an unqualified admission, produce each and

13 every DOCUMENT RELATING TO said response.

14 **RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

15     Responding Party objects to this request for production as premature.

16 Because this request for production necessarily relies upon a contention,

17 Responding Party is unable to provide a complete response at this time, nor

18 is it required to do so.

19     Responding Party further objects to this request on the grounds that it

20 violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

21 with reasonable particularity each item or category of items to be inspected."

22 Propounding Party's request for production does not describe an item or

23 category of items with reasonable particularity.

24     Responding Party further objects to the extent that this request for

25 production invades attorney-client privilege and/or violates the work product

26 doctrine by compelling Responding Party to disclose privileged

27 communications and/or litigation strategy.  Responding Party will not provide

28

-17-

Case No. 2:16-cv-02129-SJO (RAOx)

13524430.1

1  any such privileged information.

2      Responding Party further objects to this request on the grounds that

3  this information is equally available to the Requesting Party, and some of the

4  documents are publically available.

5      Subject to and without waiver of the foregoing objections, Responding

6  Party responds as follows:

7      Responding Party directs the Defendant to Plaintiff's previous

8  productions. For any responsive documents, not already produced in

9  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

10  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

11      Additionally, Responding Party notes that discovery is ongoing, and

12  this contention-based interrogatory is poorly defined and premature.  Thus,

13  Responding Party reserves the right to amend this response at the

14  appropriate time in the future if necessary.

15

16  **REQUEST FOR PRODUCTION NO. 24:**

17      If YOUR response to Propounding Party's Request for Admission No.

18  22 was anything other than an unqualified admission, produce each and

19  every DOCUMENT RELATING TO said response.

20  **RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

21      Responding Party objects to this request for production as premature.

22  Because this request for production necessarily relies upon a contention,

23  Responding Party is unable to provide a complete response at this time, nor

24  is it required to do so.

25      Responding Party further objects to this request on the grounds that it

26  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

27  with reasonable particularity each item or category of items to be inspected."

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1  Propounding Party's request for production does not describe an item or
2  category of items with reasonable particularity.

3        Responding Party further objects to the extent that this request for
4  production invades attorney-client privilege and/or violates the work product
5  doctrine by compelling Responding Party to disclose privileged
6  communications and/or litigation strategy.  Responding Party will not provide
7  any such privileged information.

8        Responding Party further objects to this request on the grounds that
9  this information is equally available to the Requesting Party, and some of the
10  documents are publically available.

11        Subject to and without waiver of the foregoing objections, Responding
12  Party responds as follows:

13        Responding Party directs the Defendant to Plaintiff's previous
14  productions. For any responsive documents, not already produced in
15  Plaintiff's prior discovery responses, Plaintiff is producing such documents.
16  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

17        Additionally, Responding Party notes that discovery is ongoing, and
18  this contention-based interrogatory is poorly defined and premature.  Thus,
19  Responding Party reserves the right to amend this response at the
20  appropriate time in the future if necessary.

21

22  **REQUEST FOR PRODUCTION NO. 25:**

23        If YOUR response to Propounding Party's Request for Admission No.
24  23 was anything other than an unqualified admission, produce each and
25  every DOCUMENT RELATING TO said response.

26  **RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

27        Responding Party objects to this request for production as premature.

28

-19-                          Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1 Because this request for production necessarily relies upon a contention,

2 Responding Party is unable to provide a complete response at this time, nor

3 is it required to do so.

4      Responding Party further objects to this request on the grounds that it

5 violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

6 with reasonable particularity each item or category of items to be inspected."

7 Propounding Party's request for production does not describe an item or

8 category of items with reasonable particularity.

9      Responding Party further objects to the extent that this request for

10 production invades attorney-client privilege and/or violates the work product

11 doctrine by compelling Responding Party to disclose privileged

12 communications and/or litigation strategy.  Responding Party will not provide

13 any such privileged information.

14      Responding Party further objects to this request on the grounds that

15 this information is equally available to the Requesting Party, and some of the

16 documents are publically available.

17      Subject to and without waiver of the foregoing objections, Responding

18 Party responds as follows:

19      Responding Party directs the Defendant to Plaintiff's previous

20 productions. For any responsive documents, not already produced in

21 Plaintiff's prior discovery responses, Plaintiff is producing such documents.

22 (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

23      Additionally, Responding Party notes that discovery is ongoing, and

24 this contention-based interrogatory is poorly defined and premature.  Thus,

25 Responding Party reserves the right to amend this response at the

26 appropriate time in the future if necessary.

27

28

13524430.1

**REQUEST FOR PRODUCTION NO. 26:**

If YOUR response to Propounding Party's Request for Admission No. 24 was anything other than an unqualified admission, produce each and every DOCUMENT RELATING TO said response.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Responding Party objects to this request for production as premature. Because this request for production necessarily relies upon a contention, Responding Party is unable to provide a complete response at this time, nor is it required to do so.

Responding Party further objects to this request on the grounds that it violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe with reasonable particularity each item or category of items to be inspected." Propounding Party's request for production does not describe an item or category of items with reasonable particularity.

Responding Party further objects to the extent that this request for production invades attorney-client privilege and/or violates the work product doctrine by compelling Responding Party to disclose privileged communications and/or litigation strategy.  Responding Party will not provide any such privileged information.

Responding Party further objects to this request on the grounds that this information is equally available to the Requesting Party, and some of the documents are publically available.

Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

Responding Party directs the Defendant to Plaintiff's previous productions. For any responsive documents, not already produced in Plaintiff's prior discovery responses, Plaintiff is producing such documents.

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

2  Additionally, Responding Party notes that discovery is ongoing, and

3  this contention-based interrogatory is poorly defined and premature.  Thus,

4  Responding Party reserves the right to amend this response at the

5  appropriate time in the future if necessary.

6

7  **REQUEST FOR PRODUCTION NO. 27:**

8  If YOUR response to Propounding Party's Request for Admission No.

9  25 was anything other than an unqualified admission, produce each and

10  every DOCUMENT RELATING TO said response.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

12  Responding Party objects to this request for production as premature.

13  Because this request for production necessarily relies upon a contention,

14  Responding Party is unable to provide a complete response at this time, nor

15  is it required to do so.

16  Responding Party further objects to this request on the grounds that it

17  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

18  with reasonable particularity each item or category of items to be inspected."

19  Propounding Party's request for production does not describe an item or

20  category of items with reasonable particularity.

21  Responding Party further objects to the extent that this request for

22  production invades attorney-client privilege and/or violates the work product

23  doctrine by compelling Responding Party to disclose privileged

24  communications and/or litigation strategy.  Responding Party will not provide

25  any such privileged information.

26  Responding Party further objects to this request on the grounds that

27  this information is equally available to the Requesting Party, and some of the

28

Case No. 2:16-cv-02129-SJO (RAOx)

13524430.1

1  documents are publically available.

2       Subject to and without waiver of the foregoing objections, Responding

3  Party responds as follows:

4       Responding Party directs the Defendant to Plaintiff's previous

5  productions. For any responsive documents, not already produced in

6  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

7  (Responsive documents are collectively attached hereto as Exhibit A).

8       Additionally, Responding Party notes that discovery is ongoing, and

9  this contention-based interrogatory is poorly defined and premature.  Thus,

10  Responding Party reserves the right to amend this response at the

11  appropriate time in the future if necessary.

12

13  DATED:  May 31, 2017                    OTTEN LAW, PC

14

15

16                                  By:  _/s/Victor Otten_____

17                                  VICTOR OTTEN
                                    KAVITA TEKCHANDANI
18                                  Attorneys for Plaintiffs
                                    CORY SPENCER, DIANA MILENA
19                                  REED, and COASTAL PROTECTION
                                    RANGERS, INC.
20

21

22

23

24

25

26

27

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1

**PROOF OF SERVICE**
*Spencer, et al. v. Lunada Bay Boys, et al.*
**U.S.D.C. for the Central District of California**
**Case No. 2:16-cv-02129-SJO (RAOx)**

2

3

4 **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

5   At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.
6 My business address is: 3620 Pacific Coast Highway, Suite 100, Torrance, CA  90505.

7

  On June 5, 2017, I served the original or a true copy of the following
8 document(s) described as:

9 **PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT**
10 **FRANK FERRARA**

11

on the interested parties in this action as follows:
12

**SEE ATTACHED SERVICE LIST**
13

  **X BY MAIL:**  I enclosed the document(s) in a sealed envelope or
14 package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary
15 business practices.  I am readily familiar with Hanson Bridgett LLP's practice for collecting and processing correspondence for mailing.  On the same day
16 that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a
17 sealed envelope with postage fully prepaid.

18   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in
19 the office of a member of the bar of this Court at whose direction the service was made.

20

  Executed on **June 5, 2017**, at Torrance, California.
21

22

23           */s/Victor Otten*
         _____
24           Victor Otten

25

26

27

28

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

1

## SERVICE LIST
### *Spencer, et al. v. Lunada Bay Boys, et al.*
### U.S.D.C. for the Central District of California
### Case No. 2:16-cv-02129-SJO (RAOx)

2

3

4

5

Robert T. Mackey, Esq.            *(Attorneys for Defendant BRANT*
Peter H. Crossin, Esq.            *BLAKEMAN)*
Richard P. Dieffenbach, Esq.
John P. Worgul, Esq.              (served original)
VEATCH CARLSON, LLP
1055 Wilshire Blvd., 11th Floor
Los Angeles, CA  90017

6

7

8

9

10

Robert S. Cooper, Esq.            *(Attorneys for Defendant BRANT*
BUCHALTER NEMER, APC              *BLAKEMAN)*
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA  90017           (served true copy)

11

12

13

J. Patrick Carey, Esq.            *(Attorney for Defendant ALAN*
LAW OFFICES OF                    *JOHNSTON a/k/a JALIAN*
 J. PATRICK CAREY                 *JOHNSTON)*
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA  90266       (served true copy)

14

15

16

17

Peter T. Haven, Esq.              *(Attorney for Defendant MICHAEL*
HAVEN LAW                         *RAY PAPAYANS)*
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA  90266       (served true copy)

18

19

20

21

Dana Alden Fox, Esq.              *(Attorneys for Defendant SANG LEE)*
Edward E. Ward, Jr., Esq.
Eric Y. Kizirian, Esq.           (served true copy)
Tera Lutz, Esq.
LEWIS BRISBOIS
 BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA  90071

22

23

24

25

26

27

28

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

| | | |
|---|---|---|
| 1 | Daniel M. Crowley, Esq. | *(Attorneys for Defendant SANG LEE)* |
| 2 | BOOTH, MITCHELL & STRANGE LLP | (served true copy) |
| 3 | 707 Wilshire Blvd., Suite 4450 Los Angeles, CA  90017 | |
| 4 | | |
| 5 | Mark C. Fields, Esq. | *(Attorney for Defendant ANGELO* |
| 6 | LAW OFFICES OF MARK C. FIELDS, APC | *FERRARA and Defendant N. F. appearing through Guardian Ad* |
| 7 | 333 South Hope Street, 35th Floor Los Angeles, CA  90071 | *Litem, Leonora Ferrara)* |
| 8 | | (served true copy) |
| 9 | | |
| 10 | Thomas M. Phillip, Esq. Aaron G. Miller, Esq. | *(Attorneys for Defendant ANGELO FERRARA)* |
| 11 | THE PHILLIPS FIRM 800 Wilshire Blvd., Suite 1550 | (served true copy) |
| 12 | Los Angeles, CA  90017 | |
| 13 | | |
| 14 | Patrick Au, Esq. | *(Attorneys for Defendants FRANK* |
| 15 | Laura L. Bell, Esq. BREMER WHYTE | *FERRARA and CHARLIE FERRARA)* |
| 16 | BROWN & O'MEARA, LLP 21271 Burbank Blvd., Suite 110 | (served true copy) |
| 17 | Woodland Hills, CA  91367 | |
| 18 | | |
| 19 | Edwin J. Richards, Esq. Antoinette P. Hewitt, Esq. | *(Attorneys for Defendants CITY OF PALOS VERDES and CHIEF OF* |
| 20 | Rebecca L. Wilson, Esq. Jacob Song, Esq. | *POLICE JEFF KEPLEY)* |
| 21 | Christopher D. Glos, Esq. KUTAK ROCK LLP | (served true copy) |
| 22 | 5 Park Plaza, Suite 1500 | |
| 23 | Irvine, CA  92614-8595 | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF CORY SPENCER'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524430.1

HANSON BRIDGETT LLP
KURT A. FRANKLIN, SBN 172715
kfranklin@hansonbridgett.com
SAMANTHA WOLFF, SBN 240280
swolff@hansonbridgett.com
JENNIFER ANIKO FOLDVARY, SBN 292216
jfoldvary@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366

HANSON BRIDGETT LLP
TYSON M. SHOWER, SBN 190375
tshower@hansonbridgett.com
LANDON D. BAILEY, SBN 240236
lbailey@hansonbridgett.com
500 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone: (916) 442-3333
Facsimile:  (916) 442-2348

OTTEN LAW, PC
VICTOR OTTEN, SBN 165800
vic@ottenlawpc.com
KAVITA TEKCHANDANI, SBN 234873
kavita@ottenlawpc.com
3620 Pacific Coast Highway, #100
Torrance, California 90505
Telephone: (310) 378-8533
Facsimile:  (310) 347-4225

Attorneys for Plaintiffs
CORY SPENCER, DIANA MILENA
REED, and COASTAL PROTECTION
RANGERS, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation,<br><br>Plaintiffs, | CASE NO. 2:16-cv-02129-SJO (RAOx)<br><br>**PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA** |

|  |  |
|---|---|
| 1 | |
| 2 | v. |
| 3 | LUNADA BAY BOYS; THE |
| 4 | INDIVIDUAL MEMBERS OF THE LUNADA BAY BOYS, including but |
| 5 | not limited to SANG LEE, BRANT BLAKEMAN, ALAN JOHNSTON |
| 6 | AKA JALIAN JOHNSTON, |
| 7 | MICHAEL RAE PAPAYANS, ANGELO FERRARA, FRANK |
| 8 | FERRARA, CHARLIE FERRARA, |
| 9 | and N. F.; CITY OF PALOS VERDES ESTATES; CHIEF OF |
| 10 | POLICE JEFF KEPLEY, in his |
| 11 | representative capacity; and DOES 1-10, |
| 12 | |
| 13 | Defendants. |

Complaint Filed:    March 29, 2016
Trial Date:           November 7, 2017

PROPOUNDING PARTY: Defendant Frank Ferrara

RESPONDING PARTY:   Plaintiff Diana Milena Reed

SET NO.:                      One

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff Diana Milena Reed ("Responding Party") hereby submits these objections and responses to the First Set of Requests for Admission propounded by Defendant Frank Ferrara ("Propounding Party").

## **PRELIMINARY STATEMENT**

Nothing in this response should be construed as an admission by Responding Party with respect to the admissibility or relevance of any fact or document, or of the truth or accuracy of any characterization or statement of any kind contained in Propounding Party's Requests for Admission. Responding Party has not completed her investigation of the facts relating to

1  this case, her discovery or her preparation for trial.  All responses and

2  objections contained herein are based only upon information that is

3  presently available to and specifically known by Responding Party.  It is

4  anticipated that further discovery, independent investigation, legal research

5  and analysis will supply additional facts and add meaning to known facts, as

6  well as establish entirely new factual conclusions and legal contentions, all

7  of which may lead to substantial additions to, changes in and variations from

8  the responses set forth herein.  The following objections and responses are

9  made without prejudice to Responding Party's right to produce at trial, or

10  otherwise, evidence regarding any subsequently discovered information.

11  Responding Party accordingly reserves the right to modify and amend any

12  and all responses herein as research is completed and contentions are

13  made.

14  **GENERAL OBJECTIONS**

15  Responding Party generally objects to the Requests for Admission as

16  follows:

17  1.  Responding Party objects generally to the Requests for

18  Admission to the extent that they seek to elicit information that is neither

19  relevant to the subject matter of this action, nor reasonably calculated to

20  lead to the discovery of admissible evidence;

21  2.  Responding Party objects generally to the Requests for

22  Admission to the extent that they are unreasonably overbroad in scope, and

23  thus burdensome and oppressive, in that each such request seeks

24  information pertaining to items and matters that are not relevant to the

25  subject matter of this action, or, if relevant, so remote therefrom as to make

26  its disclosure of little or no practical benefit to Propounding Party, while

27  placing a wholly unwarranted burden and expense on Responding Party in

28

-3-

13524730.1

1  locating, reviewing and producing the requested information;

2      3.     Responding Party objects generally to the Requests for

3  Admission to the extent that they are burdensome and oppressive, in that

4  ascertaining the information necessary to respond to them would require the

5  review and compilation of information from multiple locations, and

6  voluminous records and files, thereby involving substantial time of

7  employees of Responding Party and great expense to Responding Party,

8  whereas the information sought to be obtained by Propounding Party would

9  be of little use or benefit to Propounding Party;

10      4.     Responding Party objects generally to the Requests for

11  Admission to the extent that they are vague, uncertain and overbroad, being

12  without limitation as to time or specific subject matter;

13      5.     Responding Party objects generally to the Requests for

14  Admission to the extent that they seek information at least some of which is

15  protected by the attorney-client privilege or the attorney work-product

16  doctrine, or both;

17      6.     Responding Party objects generally to the Requests for

18  Admission to the extent that they seek to have Responding Party furnish

19  information that is a matter of the public record, and therefore, is equally

20  available to the propounding party as to Responding Party; and

21      7.     Responding Party objects generally to the Requests for

22  Admission to the extent that they seek to have Responding Party furnish

23  information that is proprietary to Responding Party and contain confidential

24  information.

25      8.     Responding Party expressly incorporates each of the foregoing

26  General Objections into each specific response to the requests set forth

27  below as if set forth in full therein.  An answer to a request is not intended to

28

be a waiver of any applicable specific or general objection to such request.

Without waiver of the foregoing, Responding Party further responds as follows:

## RESPONSES TO REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

Admit YOU have no facts that support YOUR First Cause of Action for Bane Act against Propounding Party as alleged in YOUR COMPLAINT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Without waiving set objections, Plaintiff responds as follows: Denial


**REQUEST FOR ADMISSION NO. 2:**

Admit YOU can IDENTIFY no PERSONS with knowledge to support YOUR First Cause of Action for Bane Act against Propounding Party as alleged in YOUR COMPLAINT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Without waiving set objections, Plaintiff responds as follows: Denial


**REQUEST FOR ADMISSION NO. 3:**

Admit YOU can IDENTIFY no DOCUMENTS to support YOUR First Cause of Action for Bane Act against Propounding Party as alleged in YOUR COMPLAINT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Without waiving set objections, Plaintiff responds as follows: Denial


**REQUEST FOR ADMISSION NO. 4:**

Admit YOU have no facts that support YOUR Second Cause of Action for Public Nuisance against Propounding Party as alleged in YOUR

PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524730.1

1  COMPLAINT.

2  **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

3  Without waiving set objections, Plaintiff responds as follows: Denial

4

5  **REQUEST FOR ADMISSION NO. 5:**

6  Admit YOU can IDENTIFY no PERSONS with knowledge to support

7  YOUR Second Cause of Action for Public Nuisance against Propounding

8  Party as alleged in YOUR COMPLAINT.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

10  Without waiving set objections, Plaintiff responds as follows: Denial

11

12  **REQUEST FOR ADMISSION NO. 6:**

13  Admit YOU can IDENTIFY no DOCUMENTS to support YOUR

14  Second Cause of Action for Public Nuisance against Propounding Party as

15  alleged in YOUR COMPLAINT.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

17  Without waiving set objections, Plaintiff responds as follows: Denial

18

19  **REQUEST FOR ADMISSION NO. 7:**

20  Admit YOU have no facts that support YOUR Sixth Cause of Action for

21  Assault against Propounding Party as alleged in YOUR COMPLAINT.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

23  Without waiving set objections, Plaintiff responds as follows: Denial

24

25  **REQUEST FOR ADMISSION NO. 8:**

26  Admit YOU can IDENTIFY no PERSONS with knowledge to support

27  YOUR Sixth Cause of Action for Assault against Propounding Party as

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524730.1

1  alleged in YOUR COMPLAINT.

2  **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

3  Without waiving set objections, Plaintiff responds as follows: Denial

4

5  **REQUEST FOR ADMISSION NO. 9:**

6      Admit YOU can IDENTIFY no DOCUMENTS to support YOUR Sixth

7  Cause of Action for Assault against Propounding Party as alleged in YOUR

8  COMPLAINT.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

10  Without waiving set objections, Plaintiff responds as follows: Denial

11

12  **REQUEST FOR ADMISSION NO. 10:**

13      Admit YOU have no facts that support YOUR Seventh Cause of Action

14  for Battery against Propounding Party as alleged in YOUR COMPLAINT.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

16  Without waiving set objections, Plaintiff responds as follows: Denial

17

18  **REQUEST FOR ADMISSION NO. 11:**

19      Admit YOU can IDENTIFY no PERSONS with knowledge to support

20  YOUR Seventh Cause of Action for Battery against Propounding Party as

21  alleged in YOUR COMPLAINT.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

23  Without waiving set objections, Plaintiff responds as follows: Denial

24

25  **REQUEST FOR ADMISSION NO. 12:**

26      Admit YOU can IDENTIFY no DOCUMENTS to support YOUR

27  Seventh Cause of Action for Battery against Propounding Party as alleged in

28

1 YOUR COMPLAINT.

2 **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

3 Without waiving set objections, Plaintiff responds as follows: Denial

4

5 **REQUEST FOR ADMISSION NO. 13:**

6 Admit YOU have no facts that support YOUR Eighth Cause of Action

7 for Negligence against Propounding Party as alleged in YOUR

8 COMPLAINT.

9 **RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

10 Without waiving set objections, Plaintiff responds as follows: Denial

11

12 **REQUEST FOR ADMISSION NO. 14:**

13 Admit YOU can IDENTIFY no PERSONS with knowledge to support

14 YOUR Eighth Cause of Action for Negligence against Propounding Party as

15 alleged in YOUR COMPLAINT.

16 **RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

17 Without waiving set objections, Plaintiff responds as follows: Denial

18

19 **REQUEST FOR ADMISSION NO. 15:**

20 Admit YOU can IDENTIFY no DOCUMENTS to support YOUR Eighth

21 Cause of Action for Negligence against Propounding Party as alleged in

22 YOUR COMPLAINT.

23 **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

24 Without waiving set objections, Plaintiff responds as follows: Denial

25

26 **REQUEST FOR ADMISSION NO. 16:**

27 Admit that, prior to filing YOUR COMPLAINT, YOU never met

28

13524730.1

PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

1  Propounding Party.

2  **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

3  Without waiving set objections, Plaintiff responds as follows: Denial

4

5  **REQUEST FOR ADMISSION NO. 17:**

6  Admit Propounding Party has never harassed YOU.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

8  Without waiving set objections, Plaintiff responds as follows: Denial

9

10  **REQUEST FOR ADMISSION NO. 18:**

11  Admit Propounding Party has never caused YOU any pain or suffering.

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

13  Without waiving set objections, Plaintiff responds as follows: Denial

14

15  **REQUEST FOR ADMISSION NO. 19:**

16  Admit YOU have no personal knowledge of Propounding Party ever

17  being involved in any incident of harassment at Lunada Bay at any time.

18  **RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

19  Without waiving set objections, Plaintiff responds as follows: Denial

20

21  **REQUEST FOR ADMISSION NO. 20:**

22  Admit YOU have no personal knowledge of Propounding Party ever

23  being involved in any incident of violence at Lunada Bay at any time.

24  **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

25  Without waiving set objections, Plaintiff responds as follows: Denial

26

27

28

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524730.1

**REQUEST FOR ADMISSION NO. 21:**

Admit YOU have no personal knowledge of Propounding Party ever being involved in any incident of vandalism at Lunada Bay at any time.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Without waiving set objections, Plaintiff responds as follows: Denial

**REQUEST FOR ADMISSION NO. 22:**

Admit that Propounding Party, Frank Ferrara, is not the "dad" or "father" referenced and/or mentioned by the male individual in the audio recording YOU identified at Volume One, Page 18 of YOUR deposition taken in this matter on October 24, 2016. (A true and correct copy of Page 18, Volume One of YOUR deposition is attached hereto as Exhibit A.)

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Without waiving set objections, Plaintiff responds as follows: Denial

**REQUEST FOR ADMISSION NO. 23:**

Admit YOU have no personal knowledge that Propounding Party, Frank Ferrara, is the "dad" or "father" referenced and/or mentioned by the male individual in the audio recording that YOU identified at Volume One, Page 18 of YOUR deposition taken in this matter on October 24, 2016.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Without waiving set objections, Plaintiff responds as follows: Denial

**REQUEST FOR ADMISSION NO. 24:**

Admit YOU have never seen Propounding Party at Lunada Bay at any time YOU have visited Lunada Bay at any location of Lunada Bay.

13524730.1

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Without waiving set objections, Plaintiff responds as follows: Denial

DATED:  May 31, 2017                    OTTEN LAW, PC


                                   By:  _____/s/Victor Otten_____
                                        VICTOR OTTEN
                                        KAVITA TEKCHANDANI
                                        Attorneys for Plaintiffs
                                        CORY SPENCER, DIANA MILENA
                                        REED, and COASTAL PROTECTION
                                        RANGERS, INC.

PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524730.1

**PROOF OF SERVICE**
*Spencer, et al. v. Lunada Bay Boys, et al.*
**U.S.D.C. for the Central District of California**

## Case No. 2:16-cv-02129-SJO (RAOx)

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is: 3620 Pacific Coast Highway, Suite 100, Torrance, CA 90505.

On June 5, 2017, I served the original or a true copy of the following document(s) described as:

**PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA**

on the interested parties in this action as follows:
**SEE ATTACHED SERVICE LIST**

**X BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Hanson Bridgett LLP's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **June 5, 2017**, at Torrance, California.

/s/Victor Otten
_____
Victor Otten

-12-                                    Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524730.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SERVICE LIST**
***Spencer, et al. v. Lunada Bay Boys, et al.***
**U.S.D.C. for the Central District of California**
**Case No. 2:16-cv-02129-SJO (RAOx)**

Robert T. Mackey, Esq.
Peter H. Crossin, Esq.
Richard P. Dieffenbach, Esq.
John P. Worgul, Esq.
VEATCH CARLSON, LLP
1055 Wilshire Blvd., 11th Floor
Los Angeles, CA 90017

*(Attorneys for Defendant BRANT BLAKEMAN)*
(served original)

Robert S. Cooper, Esq.
BUCHALTER NEMER, APC
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017

*(Attorneys for Defendant BRANT BLAKEMAN)*
(served true copy)

J. Patrick Carey, Esq.
LAW OFFICES OF
  J. PATRICK CAREY
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA 90266

*(Attorney for Defendant ALAN JOHNSTON a/k/a JALIAN JOHNSTON)*
(served true copy)

Peter T. Haven, Esq.
HAVEN LAW
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA 90266

*(Attorney for Defendant MICHAEL RAY PAPAYANS)*
(served true copy)

Dana Alden Fox, Esq.
Edward E. Ward, Jr., Esq.
Eric Y. Kizirian, Esq.
Tera Lutz, Esq.
LEWIS BRISBOIS
  BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA 90071

*(Attorneys for Defendant SANG LEE)*
(served true copy)

Daniel M. Crowley, Esq.
BOOTH, MITCHEL &
  STRANGE LLP
707 Wilshire Blvd., Suite 4450
Los Angeles, CA 90017

*(Attorneys for Defendant SANG LEE)*
(served true copy)

Mark C. Fields, Esq.
LAW OFFICES OF
  MARK C. FIELDS, APC
333 South Hope Street, 35th Floor
Los Angeles, CA 90071

*(Attorney for Defendant ANGELO FERRARA and Defendant N. F. appearing through Guardian Ad Litem, Leonora Ferrara)*
(served true copy)

-13-

Case No. 2:16-cv-02129-SJO (RAOx)

13524730.1

1 | Thomas M. Phillip, Esq.      *(Attorneys for Defendant ANGELO*
2 | Aaron G. Miller, Esq.      *FERRARA)*
   | THE PHILLIPS FIRM      (served true copy)
   | 800 Wilshire Blvd., Suite 1550
3 | Los Angeles. CA  90017

4 | Patrick Au, Esq.      *(Attorneys for Defendants FRANK*
   | Laura L. Bell, Esq.      *FERRARA and CHARLIE FERRARA)*
5 | BREMER WHYTE      (served true copy)
   |   BROWN & O'MEARA, LLP
6 | 21271 Burbank Blvd., Suite 110
   | Woodland Hills. CA  91367
7 |
8 | Edwin J. Richards, Esq.      *(Attorneys for Defendants CITY OF*
   | Antoinette P. Hewitt, Esq.      *PALOS VERDES and CHIEF OF*
   | Rebecca L. Wilson, Esq.      *POLICE JEFF KEPLEY)*
9 | Jacob Song, Esq.      (served true copy)
   | Christopher D. Glos, Esq.
10 | KUTAK ROCK LLP
   | 5 Park Plaza, Suite 1500
11 | Irvine. CA  92614-8595

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524730.1

HANSON BRIDGETT LLP
KURT A. FRANKLIN, SBN 172715
kfranklin@hansonbridgett.com
SAMANTHA WOLFF, SBN 240280
swolff@hansonbridgett.com
JENNIFER ANIKO FOLDVARY, SBN 292216
jfoldvary@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366

HANSON BRIDGETT LLP
TYSON M. SHOWER, SBN 190375
tshower@hansonbridgett.com
LANDON D. BAILEY, SBN 240236
lbailey@hansonbridgett.com
500 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone: (916) 442-3333
Facsimile:  (916) 442-2348

OTTEN LAW, PC
VICTOR OTTEN, SBN 165800
vic@ottenlawpc.com
KAVITA TEKCHANDANI, SBN 234873
kavita@ottenlawpc.com
3620 Pacific Coast Highway, #100
Torrance, California 90505
Telephone: (310) 378-8533
Facsimile:  (310) 347-4225

Attorneys for Plaintiffs
CORY SPENCER, DIANA MILENA
REED, and COASTAL PROTECTION
RANGERS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation,<br><br>Plaintiffs, | CASE NO. 2:16-cv-02129-SJO (RAOx)<br><br>**PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA**<br><br>Complaint Filed:   March 29, 2016<br>Case No. 2:16-cv-02129-SJO (RAOx) |

13524251.1

1
2

v.

Trial Date:          November 7, 2017

3
4
5
6
7
8
9
10
11
12
13

LUNADA BAY BOYS; THE
INDIVIDUAL MEMBERS OF THE
LUNADA BAY BOYS, including but
not limited to SANG LEE, BRANT
BLAKEMAN, ALAN JOHNSTON
AKA JALIAN JOHNSTON,
MICHAEL RAE PAPAYANS,
ANGELO FERRARA, FRANK
FERRARA, CHARLIE FERRARA,
and N. F.; CITY OF PALOS
VERDES ESTATES; CHIEF OF
POLICE JEFF KEPLEY, in his
representative capacity; and DOES
1-10,

            Defendants.

14

15    PROPOUNDING PARTY: Defendant Frank Ferrara

16    RESPONDING PARTY:   Plaintiff Diana Milena Reed

17    SET NO.:                Two

18        Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff

19    Diana Milena Reed ("Responding Party") hereby submits these objections

20    and responses to the Second Set of Interrogatories propounded by

21    Defendant Frank Ferrara ("Propounding Party").

22                    **PRELIMINARY STATEMENT**

23        Nothing in this response should be construed as an admission by

24    Responding Party with respect to the admissibility or relevance of any fact,

25    or of the truth or accuracy of any characterization or statement of any kind

26    contained in Propounding Party's Interrogatories.  Responding Party has not

27    completed her investigation of the facts relating to this case, her discovery or

28

-2-                    Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

her preparation for trial.  All responses and objections contained herein are based only upon information that is presently available to and specifically known by Responding Party.  It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts and add meaning to known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the responses set forth herein.  The following objections and responses are made without prejudice to Responding Party's right to produce at trial, or otherwise, evidence regarding any subsequently discovered information.  Responding Party accordingly reserves the right to modify and amend any and all responses herein as research is completed and contentions are made.

## GENERAL OBJECTIONS

Responding Party generally objects to the Interrogatories as follows:

1. Responding Party objects generally to the Interrogatories to the extent that they seek to elicit information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence;

2. Responding Party objects generally to the Interrogatories to the extent that they are unreasonably overbroad in scope, and thus burdensome and oppressive, in that each such request seeks information pertaining to items and matters that are not relevant to the subject matter of this action, or, if relevant, so remote therefrom as to make its disclosure of little or no practical benefit to Propounding Party, while placing a wholly unwarranted burden and expense on Responding Party in locating, reviewing and producing the requested information;

3. Responding Party objects generally to the Interrogatories to the

-3-

extent that they are burdensome and oppressive, in that ascertaining the information necessary to respond to them would require the review and compilation of information from multiple locations, and voluminous records and files, thereby involving substantial time of employees of Responding Party and great expense to Responding Party, whereas the information sought to be obtained by Propounding Party would be of little use or benefit to Propounding Party;

4.     Responding Party objects generally to the Interrogatories to the extent that they are vague, uncertain and overbroad, being without limitation as to time or specific subject matter;

5.     Responding Party objects generally to the Interrogatories to the extent that they seek information at least some of which is protected by the attorney-client privilege or the attorney work-product doctrine, or both;

6.     Responding Party objects generally to the Interrogatories to the extent that they seek to have Responding Party furnish information that is a matter of the public record, and therefore, is equally available to the propounding party as to Responding Party; and

7.     Responding Party objects generally to the Interrogatories to the extent that they seek to have Responding Party furnish information that is proprietary to Responding Party and contain confidential information.

8.     Responding Party objects to the interrogatories, and to any individual interrogatory set forth therein, to the extent that they are compound and constitute an impermissible effort to circumvent the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure.

9.     Responding Party expressly incorporates each of the foregoing General Objections into each specific response to the requests set forth below as if set forth in full therein.  An answer to a request is not intended to

1  be a waiver of any applicable specific or general objection to such request.

2      Without waiver of the foregoing, Responding Party further responds as

3  follows:

4                    **RESPONSES TO INTERROGATORIES**

5  **INTERROGATORY NO. 13:**

6      If YOU denied any of the Requests for Admissions served by

7  Propounding Party in this action, then for each Request for Admission

8  denied, state all facts RELATING TO YOUR denial.

9  **RESPONSE TO INTERROGATORY NO. 13:**

10     Responding Party objects to this interrogatory as premature. Because

11 this interrogatory seeks or necessarily relies upon a contention, and

12 because this matter is in its early stages and pretrial discovery has only just

13 begun, Responding Party is unable to provide a complete response at this

14 time, nor is it required to do so.  See *Kmiec v. Powerwave Techs. Inc. et al.*,

15 2014 WL 11512195 (C.D. Cal. Dec. 2, 2014) at *1; *Folz v. Union Pacific*

16 *Railroad Company*, 2014 WL 357929 (S.D. Cal. Jan. 31, 2014) at *1-2.; see

17 also Fed. R. Civ. P. 33(a)(2) ("the court may order that [a contention]

18 interrogatory need not be answered until designated discovery is complete,

19 or until a pretrial conference or some other time.").

20     Responding Party further objects to this interrogatory as unduly

21 burdensome, harassing, and duplicative of information disclosed in

22 Responding Party's Rule 26(a) disclosures and supplemental disclosures.

23 Propounding Party may look to Responding Party's Rule 26(a) disclosures

24 and supplemental disclosures for the information sought by this

25 interrogatory.  Moreover, Responding Party had the opportunity to depose

26 Ms. Reed on this topic.

27     Responding Party further objects to this interrogatory as compound.

28

-5-                                Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

1  This "interrogatory" contains multiple impermissible subparts, which
2  Propounding Party has propounded in an effort to circumvent the numerical
3  limitations on interrogatories provided by Federal Rule of Civil Procedure
4  33(a)(1).

5        Responding Party further objects to this interrogatory on the grounds
6  that it seeks information that is outside of Responding Party's knowledge.

7        Responding Party further objects to the extent that this interrogatory
8  invades attorney-client privilege and/or violates the work product doctrine by
9  compelling Responding Party to disclose privileged communications and/or
10  litigation strategy.  Responding Party will not provide any such information.

11        Subject to and without waiver of the foregoing objections, Responding
12  Party responds as follows:

13  **Facts Supporting Denial of RFA Nos. 1-24:**

14        The Complaint alleges that Defendant Lunada Bay Boys is an
15  unincorporated association within the meaning of Code of Civil Procedure §
16  369.5 acting by and through its respective members and associates.
17  Defendant Lunada Bay Boys acts by and through its respective members,
18  individually, collectively, and in concert, and conducts its affairs and activities
19  in the City of Palos Verdes Estates, County of Los Angeles, State of California.
20  Defendant Lunada Bay Boys claims gang territory, or "turf" within the City of
21  Palos Verdes Estates' Lunada Bay neighborhood (Lunada Bay). The Lunada
22  Bay Boys have received benefits from holding itself out to the public as an
23  entity. The Lunada Bay Boys functions under circumstances where "fairness
24  requires that the group be recognized as a legal entity."[1]

25

26

27  [1] *Barr v. United Methodist Church*, 90 Cal. App. 3rd 259,267, cert. denied,
    444 U.S. 973 (1979), quoted and followed with approval in *People v. Colonia*
28  (footnote continued)

-6-

13524251.1

1       The Complaint further alleges that Defendant Lunada Bay Boys are
2   criminal street gang as defined in California Penal Code § 186.22, subdivision
3   (f), in as much as it is a group of three or more individuals with a common
4   name or common symbol and whose members, individually or collectively,
5   engage in or have engaged in a pattern of criminal gang activity, and has as
6   one of its primary activities the commission of enumerated "predicate crimes,"
7   including but not limited to assault, battery, vandalism, intimidation,
8   harassment, upon information and belief, the sale and use of illegal controlled
9   substances.

10      The Complaint alleges that Defendant Lunada Bay Boys  use the
11  unpermitted Rock Fort to conduct criminal activity.

12      The Complaint also alleges that Defendant Lunada Bay Boys is also an
13  unincorporated association within the meaning of Corporations Code § 18035,
14  subdivision (a), inasmuch it consists of two or more individuals joined by
15  mutual consent for some common lawful purposes, such a attending social
16  gatherings, and recreational events. However, notwithstanding any common
17  lawful purpose, Defendant Lunada Bay Boys is a criminal gang whose
18  members are primarily engaged in criminal and nuisance activities which
19  constitute Bane Act violations and a public nuisance.

20      Defendant Lunada Bay Boys is comprised of members including, but
21  not limited to Sang Lee, Brant Blakeman, Angelo Ferrara, Frank Ferrara,
22  Nicholas Ferrara, Charlie Ferrara, Michael Rae Papayans, Alan Johnston aka
23  Jalian Johnston, each of whom has been within the Lunada Bay and is
24  responsible in some manner for the Bane Act violations and public nuisance
25  described in this Complaint.

26  —————————————————

27  *Chiques*, 156 Cal. App. 4th 31, 38-39 (2007) (holding the criminal street
28  gang "Colonia Chiques may be sued as an unincorporated association").

13524251.1

1    Plaintiffs' first Claim is for an injunction and equitable relief under Civil
2    Code § 52.1(b). Some of the facts that support the claim include:

3    Some of the acts committed by the Lunada Bay Boys include:

4    1.    On January 22,1995, a Brazilian surfer was accosted by several
5    Lunada Bay Boys including David Hilton. The Brazilian surfer reported to the
6    police that suspect #1 told him angrily, "If you go out, no more car, no more
7    tires, no more glass, your car will be trash."  He said that the suspect #1 was
8    much taller and bigger than he was and he was afraid of the suspect.  He said
9    he backed away from suspect #l and suspect #2 walked up to him and
10   deliberately knocked his surfboard into his [surfboard].  He said the suspect
11   #2 told him, "If you cross, I will fight you.  I will break your face."  He said he
12   was afraid that suspect would hurt him and backed away from him.  He said
13   the suspect #3 yelled at him, "Fuck Brazil."  The Brazilian surfer told the police
14   that approximately 15 other Lunada Bay Boys were standing around them.
15   He said he was fearful that he and his friends were going to be hurt, went back
16   to their car, drove to a local gas station and called the police.[2]

17   2.    On March13, 1995, Geoff Hagins and five 9 juveniles and another
18   adult were assaulted at Lunada Bay by Peter McCullom. Plaintiffs are
19   informed and believe that David Hilton, Kelly Logan, Sang Lee and others
20   were also part of the incident. Geoff Hagins called Ed Jaakola prior to going
21   to surf and informed him. The police records are redacted but the paper
22   reports: Peter McCollum, David Hilton, Defendant Sang Lee and Kelly
23   Hogan.[3]

24   3.    On February 17, 2014, an unknown individual reports to officer

25

26   _____

27   [2] DR 95-0062 (CITY 1-6).

28   [3] CITY1969; DR 95-031; P.V.P. News 11-30-96

13524251.1

1   Alex Gonzales: that he arrived at the 2300 block of Paseo Del Mar with the
2   intention of surfing. Before he was able to collect his gear and walk down the
3   trail to the beach, he was confronted by two unknown individuals who started
4   to harass him. The subjects told he was not allowed to surf at Lunada Bay,
5   and if he proceeded persisted to do so, they would follow him into the water
6   to block his waves and run their surfboards into him.[4]

7       4.      On November 15, 2014, Sef Krell attempts to surf Lunada Bay.
8   As he walks down the trail, dirt clods and rocks are thrown at him.

9       The Complaint also alleges a civil conspiracy amount the Defendants
10  and other individuals.[5]

11      Diana Reed: believes that members of the Lunada Bay Boys engaged
12  in a concerted effort with other Bay Boys to obstruct the plaintiffs' and the
13  publics' free passage and use in the customary manner of a public space.
14  Reed also believes that members of the Bay Boys harass and assault the
15  plaintiffs and the public when they were visiting Lunada Bay. Reed believes
16  that the conduct directed at the plaintiffs and others trying to surf Lunada Bay
17  is part of an agreement among Defendant Ferrara and the other Bay Boys,
18  which at a minimum, may be implied by the conduct of the parties and other
19  members of the Bay Boys.[6] Reed believes that the Bay Boys concerted efforts
20  to stop the public from accessing the beach are documented in statements
21  made to the media, text messages and emails some of which have been
22  destroyed or are being withheld by the Defendants in this case. For example,

23
24  [4] DR 14-01520.
25
26  [6] "A conspiracy is an agreement by two or more persons to commit a
27  wrongful act. Such an agreement may be made orally or in writing or may be
28  implied by the conduct of the parties." (CivilConspiracy-CACI3600)

13524251.1

1   Defendant Frank Ferrara was featured in the article "People Who Surf,"
2   December 1991 edition of Surfer Magazine. Plaintiffs are informed and
3   believe that the article was arranged by Lunada Bay local Jim Russi who was
4   a photographer at the magazine which is quoted in relevant part:

5           Q: There was an article a few months ago in the
6           L.A. Times that called the Palos Verdes surfers a
7           bunch elitist gangsters. As a P.V. guy, what do
8           you think of that?
9           A: I think that Palos Verdes is a beautiful surfing
10          spot and that some of the people who have come
11          up there in the past haven't really respected it.
12          Q: But the complaint from visitors is they're not
13          even given a chance to prove themselves. They're
14          run out or hit with rocks just trying to get to the
15          beach.
16          A: Look at what happened to Malibu, Trestles,
17          Rincon; there's five or six guys on every wave.
18          The guys who surf in Palos Verdes…have seen
19          what happens. One guy comes and surfs it, and
20          then he brings two or three guys, and they bring
21          three or four of their friends and it snowballs and
22          gets out of hand. That is exactly why we want to
23          protect it.

24  Defendant Frank Ferrara followed his interview up with a letter defending
25  localism printed in the March 1992 edition of Surfer Magazine stating; "I am
26  a protector of Palos Verdes. It is also protected by the pirates who surf there."
27  Members of the Bay Boys have worn pirate shirts.

28

-10-

13524251.1

In a May 5, 1995 article published in the Easy Reader entitled "A Bay Boy Explains localism: 'A Great Sense of Community here'," Jim Russi admits to the illegal acts the Bay Boys engage in to exclude outsiders. Russi said the harassment stems from a desire by locals to preserve the beach for their own use, especially during the winter when the surf is exceptional. "We feel a great sense of community here and we need to protect it. I can tell you about places that get overrun by outsiders." Russi even attempts to blame the harassment of Geoff Hagins by Defendant Sang Lee, Bay Boys Peter McCollum and Kelly Logan: "Hagins is a real troublemaker. He's a bully. He came e down with a gang of kids, including a Boogie boarder. There's never been a Boogie boarder at Lunada Bay."

Finally, Defendant Charlie Ferrara, who is the son of Defendant Frank Ferrara, admitted that generations of surfers have used intimidation and even violence to successfully prevent the isolated spot from becoming a crowded destination. In the 13-minute recording of the conversation, Defendant Charlie Ferrara is heard saying:

1. "I can't tell you can't be down here. I can't tell you can't go surfing, but what I can do is I can make sure you don't have fun out there."

2. Echoing the words of his father to Surfer Magazine, he states: "if one person is "cool" and gets along, then "everyone gets along, and then it turns into Rincon and Malibu."

3. "My dad's 59 years old, for 59 years it's been like that; who are you to come here and change something, get me?" he said. "I'm sorry to say it like that, I'm not rude, but that's how they're looking at it, you know?"

There are numerous examples of the members of Lunada Bay Boys conspiring to harass and intimidate visiting surfers which are set forth in

-11-

13524251.1

Plaintiffs' Supplemental Disclosures and previous discovery responses including but not limited to:

1. Emails from Defendant Sang Lee and others that describe Bay Boy tactics to keep outsiders and non-locals from surfing Lunada Bay including emails dated 1/7/2011,1/8/2011,1/17/2011.

2. On February 5, 2016, Charles Mowat sent a text message to Defendant Brant Blakeman, Tom Sullivan, David Yoakley, Andy Patch, Defendant Michael Papayans and several others that said "There are 5 kooks standing on the bluff taking pictures...I think that same Taloa guy. Things could get ugly." A Los Angeles Times photographer captured a pictured of Defendant Blakeman of the bluff filming plaintiffs.  Plaintiffs believe that the Bay Boys take photos and/or video tape people as a form of harassment and intimidation. Plaintiffs are also informed and believe that a Lunada Bay local named Joshua Berstein was taking pictures at the MLK 2014 paddle out. Plaintiffs are also informed and believe that Berstein told several people after he photographed them, "Now we know who you are." Plaintiffs believe that the conduct directed at Reed by Blakeman and the individual Bay Boys is because she is a woman. Plaintiff is informed and believes that there are numerous text messages where the Bay Boys refer to Reed as a "bitch" and make sexual comments about her.

3. Emails dated January 16 and 17, 2014 that Charlie Mowatt sent to Defendant Sang Lee and other Lunada Bay locals regarding plans to harass Chris Taloa and visiting surfers at the MLK event in 2014

The specific acts directed against Reed include but are not limited to the following: i) Reed went to Lunada Bay on January 29, 2016 with Jordan

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1   Wright.  Reed had intended to surf at Lunada Bay that day because the

2   conditions were such that she felt comfortable surfing. Immediately after they

3   parked their car along the bluffs, the harassment began. Several men drove

4   by and circled around their car. This was the day that she and Wright were

5   harassed and intimidated by David Melo. Blakeman was recording them on

6   land with his camera. It was very disturbing to Reed and made her feel very

7   uncomfortable. Plaintiffs are informed and believe that this was witnessed by

8   John MacHarg. ii) On or about February 12, 2016, The Los Angeles Times

9   published an article called "Bay Boys surfer gang cannot block access to

10  upscale beach, Coastal Commission says." Jordan Wright and Cory Spencer

11  are quoted in the article. Mr. Wright and a few others had planned to surf

12  Lunada Bay the following morning. Plaintiffs are informed and believe that

13  Defendants Johnston and Blakeman learned that Jordan Wright and Diana

14  Reed were going to Lunada Bay and planned to be there to harass them. On

15  February 12, 2016, Defendant Alan Johnston sent the following text

16  messages to an unknown recipient: "No fucking way Taloa is back this year"

17  and "If u really wanna be a bay boy we might meet help tomm." iii) On

18  February 13, 2016, Reed returned to Lunada Bay with Jordan Wright to watch

19  him surf and take photographs. Prior to her arrival, she contacted the Palos

20  Verdes Estates Police and requested an escort from the bluffs to the beach.

21  She was concerned about her safety given the January 29, 2016 incident. She

22  was told that the police were unavailable and no officers were present when

23  they arrived.

24      When Reed and Wright reached the beach, they encountered angry

25  locals who were yelling at them. Reed and Wright ignored the harassment and

26  Wright got into the water to surf and Reed made her way to the Rock Fort

27  where she planned to watch Wright and photograph him.  Approximately two

28

13524251.1

hours after Reed had arrived at Lunada Bay, while she was standing in the Rock Fort taking photos, defendant Blakeman and defendant Alan Johnston rushed into the fort and ran towards her in a hostile and aggressive manner. It seemed that they had coordinated and orchestrated the attack which completely caught Reed off guard. Blakeman was filming Reed again, and at times, held his camera right in her face. It was intimidating and harassing to Reed, and she feared for her safety. Reed asked Blakeman and Johnston why they were filming her, because it made her uncomfortable. Blakeman responded, "because I feel like it." Johnston responded, "Because you're hot. Because you're fucking sexy baby, woooh!"  Johnston then opened a can of beer in a purposeful way so that it sprayed Reed's arm and her camera. Reed, paralyzed with fear, was unable to leave the Rock Fort as Blakeman and Johnston were standing closest to the exit.  iv) Plaintiffs are informed and believe that after the incident Defendant Johnston started calling and/or texting other Lunada Bay locals to check for police to plan a getaway. At around 1:00 pm Brad Travers (Travers Tree Service) texted Johnston: "Don't see any cops at the top." Plaintiffs are informed and believe that later that day Johnston received a text from his mother asking him "What happened at the bay?" Johnston replied "Nothing happened really just couple of trolls they got nothing."

Reed further identifies the following individuals as having knowledge of concerted efforts by the Bay Boys:

Cory Spencer: Cory Spencer and Chris Taloa went to surf Lunada Bay. Almost instantly after they arrived at Lunada Bay, they started getting harassed by Bay Boys. They were told that they couldn't surf there, and Spencer was called a "kook," which is a derogatory surfing term. Spencer was also told: "why don't you fucking go home, you fucking kook;" and was asked,

1   "how many other good places did you pass to come here?" These are the

2   same types of statements made by Defendant Sang Lee and others that can

3   be observed on the video published by the Guardian.  These taunts started

4   while Spencer and Taloa were on the bluffs getting ready to surf. One

5   individual continued to heckle Spencer and Taloa on their way down to the

6   beach and into the water. Blakeman was already in the water and began

7   paddling around Spencer and Taloa in a tight circle – staying just a few feet

8   away from them. There was no legitimate reason for this conduct. Reed

9   believes that this is a tactic used by the Bay Boys to harass people.  Blakeman

10  impeded Spencer's movement in any direction and was intentionally blocking

11  him from catching any waves. It was clear to Spencer that Blakeman was not

12  there to surf that morning. Instead, his mission was to prevent Spencer and

13  Taloa from surfing and to keep them from enjoying their time in the water, the

14  open space, the waves, and nature. This type of concerted effort was

15  described by Charlie Ferrara to Reed as the way the Bay Boys act to keep

16  people from surfing at Lunada Bay. In the approximately 90 minutes that

17  Spencer was in the water that day, Blakeman was focused on Spencer and

18  Taloa and continued to shadow their movements and sit uncomfortably close

19  to them. Spencer had never experienced anything like that before in his life.

20  It was bizarre but also incredibly frightening and disturbing. It appeared to

21  Spencer that Blakeman was coordinating his actions with a group of guys who

22  were standing in the Rock Fort, along with others in the water. They were all

23  talking to each other and it was clear they all knew each other. At one point

24  while Spencer was in the water and was paddling west out to the ocean, he

25  saw a man surfing, coming in east towards the shore. The Bay Boy ran over

26  his hand/wrist that was holding his surfboard and one of the fins on his

27  surfboard sliced open his right wrist. Spencer has about a half-inch scar from

28

Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

1  where this man ran him over. As soon as the Bay Boy ran him over, he started

2  berating Spencer, saying things like "what are you fucking doing out here? I

3  told you to go home. I should have run you over. Why are you paddling in the

4  sun glare where I can't see you?" The Bay Boy was pretending that he didn't

5  see Spencer but it was obvious that he did and intentionally ran him over. With

6  over 30 years of surfing experience, Spencer knew that this collision was

7  intentional on his part. Fearful of being further injured at that point, and not

8  wanting to get into an argument with him, Spencer just paddled away.

9  Spencer and Taloa caught one more wave after that and then decided it was

10  getting too dangerous to surf. More men started showing up at the Rock Fort

11  and Spencer and Taloa were growing increasingly fearful for their safety.

12  Spencer was also bleeding and in pain. These incidents are described in the

13  declarations filed with Plaintiffs' motion for class certification and the

14  deposition of Spencer.

15      Christopher Taloa: As set forth above, Taloa and Spencer went surfing

16  at Lunada Bay and were harassed by Blakeman. Taloa witnessed Blakeman

17  shadowing Spencer's movement in the water. Blakeman was in the water with

18  four or five other Lunada Bay Locals.  At one point, Blakeman paddled toward

19  Taloa, at which point Taloa told him that he was too close.  Blakeman replied,

20  "This is the ocean. We are surfing. I can be wherever."  Taloa kept moving in

21  the water, and Blakeman attempted to keep up with him but was not in good

22  enough shape to do so.

23      Jordan Wright: Wright attempted to surf Lunada Bay in January 2015

24  with Chris Claypool and Kenneth Claypool. He observed Blakeman harassing

25  Chris and Ken. Wright was sitting on the outside waiting his turn for waves.

26  By regular surfing norms, he had priority. He caught a 10- to 12foot-high wave

27  and was up riding for several seconds. Alan Johnston paddled the wrong way

28

-16-

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1   on this wave, dropped in on him going the wrong way on the wave, and yelled,

2   "Oh no, you don't!" Dropping in on a surfer while going the wrong way violates

3   normal surf etiquette. Johnston then collided with Wright, and their leashes

4   got tangled. After they surfaced from the collision, Johnston then got close to

5   Wright and yelled, "You had to fucking take that wave, didn't you!" The next

6   wave that came through then broke Wright's leash plug and the board was

7   carried into the rocks, which destroyed a new surfboard. Wright had to swim

8   in over rocks to get his board and cut his hands on the rocks doing so. Wright

9   is confident that Johnston attempted to purposefully injure him. What he did

10  was extremely dangerous.

11      Wright has observed Blakeman on many occasions. Blakeman is easy

12  to identify because he rides a kneeboard and he is regularly filming visitors on

13  land with a camcorder. Wright believes his filming is an effort to intimidate

14  visitors. In the water, Wright has observed what appears to be Blakeman

15  directing other Bay Boys to sit close to visiting surfers. Wright has observed

16  Bay Boys who seem to be assigned to visiting surfers—they'll sit too close to

17  the visitors, impede their movements, block their surfing, kick at them, splash

18  water at them, and dangerously drop in on them. In addition to Blakeman, he

19  has seen Michael Papayans, Sang Lee, Alan Johnston, Charlie Ferrara, and

20  David Melo engage in this activity. These incidents are described in the

21  declarations filed with Plaintiffs' motion for class certification.

22      Ken Claypool: has been harassed and filmed by Blakeman in an attempt

23  to intimidate him at Lunada Bay on multiple occasions. In January 2015,

24  Claypool and his brother Chris Claypool along with Jordan Wright went to surf

25  Lunada Bay.  There were about five Lunada Bay locals in the water, including

26  Blakeman who paddled over and threatened them. Claypool observed

27  Blakeman intentionally drop in on Wright at least twice.  On February 5, 2016,

28

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

Claypool went to Lunada Bay with Chris Taloa and Jordan Wright. There was a photographer from the Los Angeles Times that was there. Also in attendance was Cory Spencer and Diana Reed. Spencer was there to watch the cars. Blakeman was there filming in an effort to intimidate visitors. Blakeman can be seen in one of the pictures taken by the photographer. Also present was Defendant Papayans.

Plaintiffs are informed and believe that there was a text message sent that day to Papayans, Michael Thiel and 11 other people stating that there were 5 kooks standing on the bluff taking pictures, including Taloa. Plaintiffs are informed that the text states: "Things could get ugly." These incidents are described in the declarations filed with Plaintiffs' motion for class certification. Chris Claypool: he and his brother Ken and Jordan Wright attempted to surf Lunada Bay in January 2015. There were about five locals in the water, including Blakeman who paddled over and was yelling, "Try and catch a wave and see what happens. There is no fucking way you are getting a wave. Just go in. Just go. You better not cut me off." Blakeman looked possessed or possibly on drugs. His behavior got more bizarre throughout the morning. He seemed to be paddling for every wave that he could physically push himself into, perhaps to make a point, but he was wiping out a lot and falling down the face and tumbling across the rock reef. Blakeman looked dangerous to himself. When Blakeman would actually catch a wave in, he would paddle back to where Claypool and his brother were sitting, and continue his insane rant. On one occasion, Blakeman came less than 12 inches from Claypool's ear and was screaming. It was so loud, Claypool had to put his fingers in his ear to protect them from being damaged. Claypool is a sound engineer and to put this in perspective, a rock concert creates about 120 decibels of noise - this was louder; a jet engine creates about 150 decibels. At one point

-18-

13524251.1

1  Blakeman caught a wave and drew a line aiming right at Claypool. Another
2  Bay Boy tried the same thing and said "mother fucker" as he narrowly missed
3  Claypool's head. Claypool watched as Blakeman intentionally dropped in on
4  Jordan at least twice. It seemed obvious to Claypool that Blakeman and the
5  other Bay Boy wanted to make sure none of them were having fun. Because
6  of the danger, they decided to leave. When Claypool and his brother got out
7  of water, they saw people gathering on top of the cliff. One person was
8  videotaping them from the top of the cliff; it was clear to Claypool that he was
9  doing this to try and intimidate them. The people were watching them from the
10  cliff. It was obvious that Blakeman engaged in a concerted effort with other
11  Bay Boys to obstruct his free passage and use in the customary manner of a
12  public space. It also seemed clear that Blakeman engaged in a concerted
13  effort with other Bay Boys to try and injure him. These incidents are described
14  in the declarations filed with Plaintiffs' motion for class certification.

15  Jason Gersch: While observing the surf, Gersch was approached by two
16  local Bay Boys named Peter McCollum and Brant Blakeman. These
17  individuals made it known to Gersch that he could not surf there. These
18  incidents are described in the declarations filed with Plaintiffs' motion for class
19  certification. Plaintiffs are informed and believe and on that basis allege that
20  Defendant Blakeman and his attorneys are attempting to intimidate witnesses
21  in this case.

22  The request is premature. Because the defendants are refusing to
23  comply with their obligations to produce documents under the federal rules
24  and are impermissibly withholding evidence and/or possibly spoliating
25  evidence, we are not able to fully respond to discovery requests which
26  necessarily rely on our ability to fully investigate the facts. As discovery is
27  continuing, Reed reserves the right to update this response.

28

Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

**(Additional) Facts Supporting Denial of RFA No. 22-23:**

The denial of the Request for Admission No. 22, asking the Plaintiff to admit that "Frank Ferrara, is not the 'dad' or 'father' referenced and/or mentioned by the male individual in the audio recording YOU identified at…. YOUR deposition…" Plaintiff, Diana Reed, bases the denial on the following facts, in addition to the facts aforementioned in this response: she had knowledge of what Charlie Ferrara looks like.   At the 2/23/217 incident at the Lunada Bay Fort, Reed also saw the Palos Verdes police walk up to Charles Ferrara, and called him by the name of "Charlie" indicating their familiarity with him. Further, she also personally taken the audio recording and observed the individual being recorded at the time.

Defendant Charlie Ferrara, who is the son of Defendant Frank Ferrara, admitted that generations of surfers have used intimidation and even violence to successfully prevent the isolated spot from becoming a crowded destination. In the 13-minute recording of the conversation, Defendant Charlie Ferrara is heard saying:

1. "I can't tell you you can't be down here. I can't tell you you can't go surfing, but what I can do is I can make sure you don't have fun out there."

2. Echoing the words of his father to Surfer Magazine, he states: "if one person is "cool" and gets along, then "everyone gets along, and then it turns into Rincon and Malibu."

3. "My dad's 59 years old, for 59 years it's been like that; who are you to come here and change something, get me?" he said. "I'm sorry to say it like that, I'm not rude, but that's how they're looking at it, you know?"

There are numerous examples of the members of Lunada Bay Boys

-20-

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

1   conspiring to harass and intimidate visiting surfers which are set forth in

2   Plaintiffs' Supplemental Disclosures and previous discovery responses.

3

4   **INTERROGATORY NO. 14:**

5        If YOU denied any of the Requests for Admissions served by

6   Propounding Party in this action, then for each Request for Admission

7   denied, IDENTIFY all PERSONS with knowledge RELATING TO YOUR

8   denial.

9   **RESPONSE TO INTERROGATORY NO. 14:**

10       Responding Party objects to this interrogatory as premature. Because

11  this interrogatory seeks or necessarily relies upon a contention, and

12  because this matter is in its early stages and pretrial discovery has only just

13  begun, Responding Party is unable to provide a complete response at this

14  time, nor is it required to do so.  See *Kmiec v. Powerwave Techs. Inc. et al.*,

15  2014 WL 11512195 (C.D. Cal. Dec. 2, 2014) at *1; *Folz v. Union Pacific*

16  *Railroad Company*, 2014 WL 357929 (S.D. Cal. Jan. 31, 2014) at *1-2.; see

17  also Fed. R. Civ. P. 33(a)(2) ("the court may order that [a contention]

18  interrogatory need not be answered until designated discovery is complete,

19  or until a pretrial conference or some other time.").

20       Responding Party further objects to this interrogatory as unduly

21  burdensome, harassing, and duplicative of information disclosed in

22  Responding Party's Rule 26(a) disclosures and supplemental disclosures.

23  Propounding Party may look to Responding Party's Rule 26(a) disclosures

24  and supplemental disclosures for the information sought by this

25  interrogatory.  Moreover, Responding Party had the opportunity to depose

26  Ms. Reed on this topic.

27       Responding Party further objects to this interrogatory as compound.

28

-21-

13524251.1

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES
PROPOUNDED BY DEFENDANT FRANK FERRARA

1  This "interrogatory" contains multiple impermissible subparts, which
2  Propounding Party has propounded in an effort to circumvent the numerical
3  limitations on interrogatories provided by Federal Rule of Civil Procedure
4  33(a)(1).

5  Responding Party further objects to this interrogatory on the grounds
6  that it seeks information that is outside of Responding Party's knowledge.

7  Responding Party further objects to the extent that this interrogatory
8  invades attorney-client privilege and/or violates the work product doctrine by
9  compelling Responding Party to disclose privileged communications and/or
10  litigation strategy.  Responding Party will not provide any such information.

11  Subject to and without waiver of the foregoing objections, Responding
12  Party responds as follows:

13  The following Persons are identified to have knowledge of facts
14  supporting Plaintiff's denial of the Requests for Admissions Nos. 1-24, and
15  have information of the concerted efforts of the Bay Boys, are:

16  Diana Reed Cory Spencer:

17  • Christopher Taloa:

18  • Jordan Wright:

19  • Ken Claypool:

20  • Andy MacHarg:

21  • Jason Gersch:

22  Sef Krell

23

24  Geoff Hagins

25  Peter McCullom, David Hilton, Kelly Logan, Sang Lee

26  officer Alex Gonzales

27

28  Jim Russi

-22-

13524251.1

David Hunt

Jen Bell

Chris Taloa

Plaintiffs

Michael Papayans,

Sang Lee,

Alan Johnston,

Charlie Ferrara,

David Melo

Ken Claypool

Chris Claypool

Jordan Wright

Jason Gretch

The request is premature. Because the defendants are refusing to comply with their obligations to produce documents under the federal rules and are impermissibly withholding evidence and/or possibly spoliating evidence, we are not able to fully respond to discovery requests which necessarily rely on our ability to fully investigate the facts. As discovery is continuing, Reed reserves the right to update this response.

**INTERROGATORY NO. 15:**

If YOU denied any of the Requests for Admissions served by Propounding Party in this action, then for each Request for Admission denied, IDENTIFY **all DOCUMENTS** RELATING TO YOUR denial.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this interrogatory as premature. Because this interrogatory seeks or necessarily relies upon a contention, and because this matter is in its early stages and pretrial discovery has only just begun, Responding Party is unable to provide a complete response at this time, nor is it required to do so.  See *Kmiec v. Powerwave Techs. Inc. et al.*, 2014 WL 11512195 (C.D. Cal. Dec. 2, 2014) at *1; *Folz v. Union Pacific Railroad Company*, 2014 WL 357929 (S.D. Cal. Jan. 31, 2014) at *1-2.; see also Fed. R. Civ. P. 33(a)(2) ("the court may order that [a contention] interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.").

Responding Party further objects to this interrogatory as unduly burdensome, harassing, and duplicative of information disclosed in Responding Party's Rule 26(a) disclosures and supplemental disclosures. Propounding Party may look to Responding Party's Rule 26(a) disclosures and supplemental disclosures for the information sought by this interrogatory.  Moreover, Responding Party had the opportunity to depose Ms. Reed on this topic.

Responding Party further objects to this interrogatory as compound. This "interrogatory" contains multiple impermissible subparts, which Propounding Party has propounded in an effort to circumvent the numerical limitations on interrogatories provided by Federal Rule of Civil Procedure 33(a)(1).

Responding Party further objects to this interrogatory on the grounds that it seeks information that is outside of Responding Party's knowledge.

Responding Party further objects to the extent that this interrogatory invades attorney-client privilege and/or violates the work product doctrine by

13524251.1

1  compelling Responding Party to disclose privileged communications and/or

2  litigation strategy.  Responding Party will not provide any such information.

3        Subject to and without waiver of the foregoing objections, Responding

4  Party responds as follows:

5  **Documents which relate to or support Plaintiff's denial of the Requests**

6  **for Admissions Nos. 1-24 are the following:**

7        ▪  DR- 95-0062,

8        o  DR 95-031, and

9        o  DR- 14-01520,

10       o  "People Who Surf," December 1991 edition of Surfer Magazine,

11          March 1992 edition of Surfer Magazine,

12       o  May 5, 1995 article published in the Easy Reader entitled "A Bay

13          Boy Explains localism: 'A Great Sense of Community here'

14       o  13-minute recording of the conversation, Defendant Charlie

15          Ferrara,

16       o  Emails from Defendant Sang Lee and others that describe Bay

17          Boy tactics to keep outsiders and non-locals from surfing Lunada

18          Bay including emails dated 1/7/2011,1/8/2011,1/17/2011,

19       o  Phone records from Defendant Sang Lee, Phone records from

20          Defendant Alan Johnston, and Declarations produced in support

21          of plaintiff's motion for class certification.

22       The request is premature. Because the defendants are refusing to

23  comply with their obligations to produce documents under the federal rules

24  and are impermissibly withholding evidence and/or possibly spoilating

25  evidence, we are not able to fully respond to discovery requests which

26  necessarily rely on our ability to fully investigate the facts. As discovery is

27  continuing, Reed reserves the right to update this response.

28

-25-

Case No. 2:16-cv-02129-SJO (RAOx)

13524251.1

1

2  DATED:  June 5, 2017                    OTTEN LAW, PC

3

4

5                                    By:  _____/s/Victor Otten_____

6                                         VICTOR OTTEN
                                          KAVITA TEKCHANDANI
7                                         Attorneys for Plaintiffs
                                          CORY SPENCER, DIANA MILENA
8                                         REED, and COASTAL PROTECTION
                                          RANGERS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13524251.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13524251.1

**PROOF OF SERVICE**
*Spencer, et al. v. Lunada Bay Boys, et al.*
**U.S.D.C. for the Central District of California**
**Case No. 2:16-cv-02129-SJO (RAOx)**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is: 3620 Pacific Coast Highway, Suite 100, Torrance, CA  90505.

On June 5, 2017, I served the original or a true copy of the following document(s) described as:

**PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**X BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Hanson Bridgett LLP's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **June 5, 2017**, at Torrance, California.

*/s/Victor Otten*
_____
Victor Otten

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

**SERVICE LIST**
*Spencer, et al. v. Lunada Bay Boys, et al.*
U.S.D.C. for the Central District of California
Case No. 2:16-cv-02129-SJO (RAOx)

| | |
|---|---|
| Robert T. Mackey, Esq.<br>Peter H. Crossin, Esq.<br>Richard P. Dieffenbach, Esq.<br>John P. Worgul, Esq.<br>VEATCH CARLSON, LLP<br>1055 Wilshire Blvd., 11th Floor<br>Los Angeles, CA  90017 | *(Attorneys for Defendant BRANT BLAKEMAN)*<br><br>(served original) |
| Robert S. Cooper, Esq.<br>BUCHALTER NEMER, APC<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA  90017 | *(Attorneys for Defendant BRANT BLAKEMAN)*<br><br>(served true copy) |
| J. Patrick Carey, Esq.<br>LAW OFFICES OF<br> J. PATRICK CAREY<br>1230 Rosecrans Ave., Suite 300<br>Manhattan Beach, CA  90266 | *(Attorney for Defendant ALAN JOHNSTON a/k/a JALIAN JOHNSTON)*<br><br>(served true copy) |
| Peter T. Haven, Esq.<br>HAVEN LAW<br>1230 Rosecrans Ave., Suite 300<br>Manhattan Beach, CA  90266 | *(Attorney for Defendant MICHAEL RAY PAPAYANS)*<br><br>(served true copy) |
| Dana Alden Fox, Esq.<br>Edward E. Ward, Jr., Esq.<br>Eric Y. Kizirian, Esq.<br>Tera Lutz, Esq.<br>LEWIS BRISBOIS<br> BISGAARD & SMITH LLP<br>633 W. 5th Street, Suite 4000<br>Los Angeles, CA  90071 | *(Attorneys for Defendant SANG LEE)*<br><br>(served true copy) |

-29-

Case No. 2:16-cv-02129-SJO (RAOx)

1   Daniel M. Crowley, Esq.              *(Attorneys for Defendant SANG LEE)*
2   BOOTH, MITCHEL &
     STRANGE LLP                          (served true copy)
3   707 Wilshire Blvd., Suite 4450
    Los Angeles, CA  90017
4

5   Mark C. Fields, Esq.                 *(Attorney for Defendant ANGELO*
6   LAW OFFICES OF                       *FERRARA and Defendant N. F.*
     MARK C. FIELDS, APC                 *appearing through Guardian Ad*
7   333 South Hope Street, 35th Floor    *Litem, Leonora Ferrara)*
    Los Angeles, CA  90071
8                                         (served true copy)

9
10  Thomas M. Phillip, Esq.              *(Attorneys for Defendant ANGELO*
    Aaron G. Miller, Esq.                *FERRARA)*
11  THE PHILLIPS FIRM
    800 Wilshire Blvd., Suite 1550       (served true copy)
12  Los Angeles, CA  90017

13

14  Patrick Au, Esq.                     *(Attorneys for Defendants FRANK*
15  Laura L. Bell, Esq.                  *FERRARA and CHARLIE FERRARA)*
    BREMER WHYTE
16   BROWN & O'MEARA, LLP                (served true copy)
    21271 Burbank Blvd., Suite 110
17  Woodland Hills, CA  91367

18

19  Edwin J. Richards, Esq.              *(Attorneys for Defendants CITY OF*
    Antoinette P. Hewitt, Esq.           *PALOS VERDES and CHIEF OF*
20  Rebecca L. Wilson, Esq.              *POLICE JEFF KEPLEY)*
    Jacob Song, Esq.
21  Christopher D. Glos, Esq.            (served true copy)
    KUTAK ROCK LLP
22  5 Park Plaza, Suite 1500
    Irvine, CA  92614-8595
23

24

25

26

27

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF INTERROGATORIES
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524251.1

HANSON BRIDGETT LLP
KURT A. FRANKLIN, SBN 172715
kfranklin@hansonbridgett.com
SAMANTHA WOLFF, SBN 240280
swolff@hansonbridgett.com
JENNIFER ANIKO FOLDVARY, SBN 292216
jfoldvary@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366

HANSON BRIDGETT LLP
TYSON M. SHOWER, SBN 190375
tshower@hansonbridgett.com
LANDON D. BAILEY, SBN 240236
lbailey@hansonbridgett.com
500 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone: (916) 442-3333
Facsimile:  (916) 442-2348

OTTEN LAW, PC
VICTOR OTTEN, SBN 165800
vic@ottenlawpc.com
KAVITA TEKCHANDANI, SBN 234873
kavita@ottenlawpc.com
3620 Pacific Coast Highway, #100
Torrance, California 90505
Telephone: (310) 378-8533
Facsimile:  (310) 347-4225

Attorneys for Plaintiffs
CORY SPENCER, DIANA MILENA
REED, and COASTAL PROTECTION
RANGERS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation,<br><br>       Plaintiffs, | CASE NO. 2:16-cv-02129-SJO (RAOx)<br><br>**PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA** |

1

2          v.

3    LUNADA BAY BOYS; THE
     INDIVIDUAL MEMBERS OF THE
4    LUNADA BAY BOYS, including but
5    not limited to SANG LEE, BRANT
     BLAKEMAN, ALAN JOHNSTON
6    AKA JALIAN JOHNSTON,
7    MICHAEL RAE PAPAYANS,
     ANGELO FERRARA, FRANK
8    FERRARA, CHARLIE FERRARA,
9    and N. F.; CITY OF PALOS
     VERDES ESTATES; CHIEF OF
10   POLICE JEFF KEPLEY, in his
11   representative capacity; and DOES
     1-10,
12

13              Defendants.

14

| Complaint Filed: | March 29, 2016 |
| Trial Date: | November 7, 2017 |

15   PROPOUNDING PARTY: Defendant Frank Ferrara

16   RESPONDING PARTY:   Plaintiff Diana Milena Reed

17   SET NO.:                    Two

18        Pursuant to Federal Rule of Civil Procedure 34, Plaintiff Diana Milena

19   Reed ("Responding Party") submits these responses and objections to the

20   Second Set of Requests for Production propounded by Defendant Frank

21   Ferrara ("Propounding Party").

22                      **PRELIMINARY STATEMENT**

23        Nothing in this response should be construed as an admission by

24   Responding Party with respect to the admissibility or relevance of any fact or

25   document, or of the truth or accuracy of any characterization or statement of

26   any kind contained in Propounding Party's Requests for Production.

27   Responding Party has not completed her investigation of the facts relating to

28

-2-                     Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1  this case, her discovery or her preparation for trial.  All responses and

2  objections contained herein are based only upon such information and such

3  documents that are presently available to and specifically known by

4  Responding Party.  It is anticipated that further discovery, independent

5  investigation, legal research and analysis will supply additional facts and add

6  meaning to known facts, as well as establish entirely new factual

7  conclusions and legal contentions, all of which may lead to substantial

8  additions to, changes in and variations from the responses set forth herein.

9  The following objections and responses are made without prejudice to

10  Responding Party's right to produce at trial, or otherwise, evidence

11  regarding any subsequently discovered documents.  Responding Party

12  accordingly reserves the right to modify and amend any and all responses

13  herein as research is completed and contentions are made.

14  **GENERAL OBJECTIONS TO REQUESTS FOR PRODUCTION**

15  Responding Party generally objects to the Requests for Production as

16  follows:

17  A.  Responding Party objects generally to the Requests for

18  Production to the extent that they seek to elicit information that is neither

19  relevant to the subject matter of this action, nor reasonably calculated to

20  lead to the discovery of admissible evidence;

21  B.  Responding Party objects generally to the Requests for

22  Production to the extent that they are unreasonably overbroad in scope, and

23  thus burdensome and oppressive, in that each such request seeks

24  information pertaining to items and matters that are not relevant to the

25  subject matter of this action, or, if relevant, so remote therefrom as to make

26  its disclosure of little or no practical benefit to Propounding Party, while

27  placing a wholly unwarranted burden and expense on Responding Party in

28

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1  locating, reviewing and producing the requested information;

2       C.     Responding Party objects generally to the Requests for

3  Production to the extent that they are burdensome and oppressive, in that

4  ascertaining the information necessary to respond to them, and to produce

5  documents in accordance therewith, would require the review and

6  compilation of information from multiple locations, and voluminous records

7  and files, thereby involving substantial time of employees of Responding

8  Party and great expense to Responding Party, whereas the information

9  sought to be obtained by Propounding Party would be of little use or benefit

10  to Propounding Party;

11       D.     Responding Party objects generally to the Requests for

12  Production to the extent that they are vague, uncertain and overbroad, being

13  without limitation as to time or specific subject matter;

14       E.     Responding Party objects generally to the Requests for

15  Production to the extent that they seek information at least some of which is

16  protected by the attorney-client privilege or the attorney work-product

17  doctrine, or both;

18       F.     Responding Party objects generally to the Requests for

19  Production to the extent that they seek to have Plaintiff furnish information

20  and identify documents that are a matter of the public record, and therefore,

21  are equally available to the propounding party as they are to Responding

22  Party; and

23       G.     Responding Party objects generally to the Requests for

24  Production to the extent that they seek to have Responding Party furnish

25  information and identify documents that are proprietary to Responding Party

26  and contain confidential information.

27       Without waiver of the foregoing, Responding Party further responds as

28

13524445.1

1  follows:

2  **RESPONSES TO REQUESTS FOR PRODUCTION**

3  **REQUEST FOR PRODUCTION NO. 13:**

4      If YOUR response to Propounding Party's Request for Admission No.

5  3 was anything other than an unqualified admission, produce each and

6  every DOCUMENT RELATING TO said response.

7  **RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

8      Responding Party objects to this request for production as premature.

9  Because this request for production necessarily relies upon a contention,

10  Responding Party is unable to provide a complete response at this time, nor

11  is it required to do so.

12      Responding Party further objects to this request on the grounds that it

13  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

14  with reasonable particularity each item or category of items to be inspected."

15  Propounding Party's request for production does not describe an item or

16  category of items with reasonable particularity.

17      Responding Party further objects to the extent that this request for

18  production invades attorney-client privilege and/or violates the work product

19  doctrine by compelling Responding Party to disclose privileged

20  communications and/or litigation strategy.  Responding Party will not provide

21  any such privileged information.

22      Responding Party further objects to this request on the grounds that

23  this information is equally available to the Requesting Party, and some of the

24  documents are publically available.

25      Subject to and without waiver of the foregoing objections, Responding

26  Party responds as follows:

27      Responding Party directs the Defendant to Plaintiff's previous

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1 productions. For any responsive documents, not already produced in

2 Plaintiff's prior discovery responses, Plaintiff is producing such documents.

3 (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

4       Additionally, Responding Party notes that discovery is ongoing, and

5 this contention-based interrogatory is poorly defined and premature.  Thus,

6 Responding Party reserves the right to amend this response at the

7 appropriate time in the future if necessary.

8

9 **REQUEST FOR PRODUCTION NO. 14:**

10      If YOUR response to Propounding Party's Request for Admission No.

11 6 was anything other than an unqualified admission, produce each and

12 every DOCUMENT RELATING TO said response.

13 **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

14      Responding Party objects to this request for production as premature.

15 Because this request for production necessarily relies upon a contention,

16 Responding Party is unable to provide a complete response at this time, nor

17 is it required to do so.

18      Responding Party further objects to this request on the grounds that it

19 violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

20 with reasonable particularity each item or category of items to be inspected."

21 Propounding Party's request for production does not describe an item or

22 category of items with reasonable particularity.

23      Responding Party further objects to the extent that this request for

24 production invades attorney-client privilege and/or violates the work product

25 doctrine by compelling Responding Party to disclose privileged

26 communications and/or litigation strategy.  Responding Party will not provide

27 any such privileged information.

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1  Responding Party further objects to this request on the grounds that
2  this information is equally available to the Requesting Party, and some of the
3  documents are publically available.

4  Subject to and without waiver of the foregoing objections, Responding
5  Party responds as follows:

6  Responding Party directs the Defendant to Plaintiff's previous
7  productions. For any responsive documents, not already produced in
8  Plaintiff's prior discovery responses, Plaintiff is producing such documents.
9  (Responsive documents are collectively attached hereto as Exhibit A).

10  Additionally, Responding Party notes that discovery is ongoing, and
11  this contention-based interrogatory is poorly defined and premature.  Thus,
12  Responding Party reserves the right to amend this response at the
13  appropriate time in the future if necessary.

14  **REQUEST FOR PRODUCTION NO. 15:**

15  If YOUR response to Propounding Party's Request for Admission No.
16  9 was anything other than an unqualified admission, produce each and
17  every DOCUMENT RELATING TO said response.

18  **RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

19  Responding Party objects to this request for production as premature.
20  Because this request for production necessarily relies upon a contention,
21  Responding Party is unable to provide a complete response at this time, nor
22  is it required to do so.

23  Responding Party further objects to this request on the grounds that it
24  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe
25  with reasonable particularity each item or category of items to be inspected."
26  Propounding Party's request for production does not describe an item or
27  category of items with reasonable particularity.

28

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1    Responding Party further objects to the extent that this request for

2    production invades attorney-client privilege and/or violates the work product

3    doctrine by compelling Responding Party to disclose privileged

4    communications and/or litigation strategy.  Responding Party will not provide

5    any such privileged information.

6    Responding Party further objects to this request on the grounds that

7    this information is equally available to the Requesting Party, and some of the

8    documents are publically available.

9    Subject to and without waiver of the foregoing objections, Responding

10   Party responds as follows:

11   Responding Party directs the Defendant to Plaintiff's previous

12   productions. For any responsive documents, not already produced in

13   Plaintiff's prior discovery responses, Plaintiff is producing such documents.

14   (Responsive documents are collectively attached hereto as Exhibit A).

15   Additionally, Responding Party notes that discovery is ongoing, and

16   this contention-based interrogatory is poorly defined and premature.  Thus,

17   Responding Party reserves the right to amend this response at the

18   appropriate time in the future if necessary.

19   **REQUEST FOR PRODUCTION NO. 16:**

20   If YOUR response to Propounding Party's Request for Admission No.

21   12 was anything other than an unqualified admission, produce each and

22   every DOCUMENT RELATING TO said response.

23   **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

24   Responding Party objects to this request for production as premature.

25   Because this request for production necessarily relies upon a contention,

26   Responding Party is unable to provide a complete response at this time, nor

27   is it required to do so.

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1    Responding Party further objects to this request on the grounds that it

2  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

3  with reasonable particularity each item or category of items to be inspected."

4  Propounding Party's request for production does not describe an item or

5  category of items with reasonable particularity.

6    Responding Party further objects to the extent that this request for

7  production invades attorney-client privilege and/or violates the work product

8  doctrine by compelling Responding Party to disclose privileged

9  communications and/or litigation strategy.  Responding Party will not provide

10  any such privileged information.

11    Responding Party further objects to this request on the grounds that

12  this information is equally available to the Requesting Party, and some of the

13  documents are publically available.

14    Subject to and without waiver of the foregoing objections, Responding

15  Party responds as follows:

16    Responding Party directs the Defendant to Plaintiff's previous

17  productions. For any responsive documents, not already produced in

18  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

19  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

20    Additionally, Responding Party notes that discovery is ongoing, and

21  this contention-based interrogatory is poorly defined and premature.  Thus,

22  Responding Party reserves the right to amend this response at the

23  appropriate time in the future if necessary.

24  **REQUEST FOR PRODUCTION NO. 17:**

25    If YOUR response to Propounding Party's Request for Admission No.

26  15 was anything less than an unqualified admission, produce each and

27  every DOCUMENT in RELATING TO said response.

28

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Responding Party objects to this request for production as premature. Because this request for production necessarily relies upon a contention, Responding Party is unable to provide a complete response at this time, nor is it required to do so.

Responding Party further objects to this request on the grounds that it violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe with reasonable particularity each item or category of items to be inspected." Propounding Party's request for production does not describe an item or category of items with reasonable particularity.

Responding Party further objects to the extent that this request for production invades attorney-client privilege and/or violates the work product doctrine by compelling Responding Party to disclose privileged communications and/or litigation strategy.  Responding Party will not provide any such privileged information.

Responding Party further objects to this request on the grounds that this information is equally available to the Requesting Party, and some of the documents are publically available.

Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

Responding Party directs the Defendant to Plaintiff's previous productions. For any responsive documents, not already produced in Plaintiff's prior discovery responses, Plaintiff is producing such documents. (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

Additionally, Responding Party notes that discovery is ongoing, and this contention-based interrogatory is poorly defined and premature.  Thus, Responding Party reserves the right to amend this response at the

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1  appropriate time in the future if necessary.

2  **REQUEST FOR PRODUCTION NO. 18:**

3      If YOUR response to Propounding Party's Request for Admission No.

4  16 was anything less than an unqualified admission, produce each and

5  every DOCUMENT RELATING TO said response.

6  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

7      Responding Party objects to this request for production as premature.

8  Because this request for production necessarily relies upon a contention,

9  Responding Party is unable to provide a complete response at this time, nor

10  is it required to do so.

11      Responding Party further objects to this request on the grounds that it

12  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

13  with reasonable particularity each item or category of items to be inspected."

14  Propounding Party's request for production does not describe an item or

15  category of items with reasonable particularity.

16      Responding Party further objects to the extent that this request for

17  production invades attorney-client privilege and/or violates the work product

18  doctrine by compelling Responding Party to disclose privileged

19  communications and/or litigation strategy.  Responding Party will not provide

20  any such privileged information.

21      Responding Party further objects to this request on the grounds that

22  this information is equally available to the Requesting Party, and some of the

23  documents are publically available.

24      Subject to and without waiver of the foregoing objections, Responding

25  Party responds as follows:

26      Responding Party directs the Defendant to Plaintiff's previous

27  productions. For any responsive documents, not already produced in

28

-11-

13524445.1

1   Plaintiff's prior discovery responses, Plaintiff is producing such documents.

2   (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

3       Additionally, Responding Party notes that discovery is ongoing, and

4   this contention-based interrogatory is poorly defined and premature.  Thus,

5   Responding Party reserves the right to amend this response at the

6   appropriate time in the future if necessary.

7

8   **REQUEST FOR PRODUCTION NO. 19:**

9      If YOUR response to Propounding Party's Request for Admission No.

10   17 was anything less than an unqualified admission, produce each and

11   every DOCUMENT RELATING TO said response.

12   **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

13      Responding Party objects to this request for production as premature.

14   Because this request for production necessarily relies upon a contention,

15   Responding Party is unable to provide a complete response at this time, nor

16   is it required to do so.

17      Responding Party further objects to this request on the grounds that it

18   violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

19   with reasonable particularity each item or category of items to be inspected."

20   Propounding Party's request for production does not describe an item or

21   category of items with reasonable particularity.

22      Responding Party further objects to the extent that this request for

23   production invades attorney-client privilege and/or violates the work product

24   doctrine by compelling Responding Party to disclose privileged

25   communications and/or litigation strategy.  Responding Party will not provide

26   any such privileged information.

27      Responding Party further objects to this request on the grounds that

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1  this information is equally available to the Requesting Party, and some of the

2  documents are publically available.

3      Subject to and without waiver of the foregoing objections, Responding

4  Party responds as follows:

5      Responding Party directs the Defendant to Plaintiff's previous

6  productions. For any responsive documents, not already produced in

7  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

8  (Responsive documents are collectively attached hereto as Exhibit A).

9       Additionally, Responding Party notes that discovery is ongoing, and

10  this contention-based interrogatory is poorly defined and premature.  Thus,

11  Responding Party reserves the right to amend this response at the

12  appropriate time in the future if necessary.

13

14  **REQUEST FOR PRODUCTION NO. 20:**

15      If YOUR response to Propounding Party's Request for Admission No.

16  18 was anything less than an unqualified admission, produce each and

17  every DOCUMENT RELATING TO said response.

18  **RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

19      Responding Party objects to this request for production as premature.

20  Because this request for production necessarily relies upon a contention,

21  Responding Party is unable to provide a complete response at this time, nor

22  is it required to do so.

23      Responding Party further objects to this request on the grounds that it

24  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

25  with reasonable particularity each item or category of items to be inspected."

26  Propounding Party's request for production does not describe an item or

27  category of items with reasonable particularity.

28

-13-

1    Responding Party further objects to the extent that this request for

2  production invades attorney-client privilege and/or violates the work product

3  doctrine by compelling Responding Party to disclose privileged

4  communications and/or litigation strategy.  Responding Party will not provide

5  any such privileged information.

6    Responding Party further objects to this request on the grounds that

7  this information is equally available to the Requesting Party, and some of the

8  documents are publically available.

9    Subject to and without waiver of the foregoing objections, Responding

10 Party responds as follows:

11    Responding Party directs the Defendant to Plaintiff's previous

12 productions. For any responsive documents, not already produced in

13 Plaintiff's prior discovery responses, Plaintiff is producing such documents.

14 (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

15    Additionally, Responding Party notes that discovery is ongoing, and

16 this contention-based interrogatory is poorly defined and premature.  Thus,

17 Responding Party reserves the right to amend this response at the

18 appropriate time in the future if necessary.

19

20 **REQUEST FOR PRODUCTION NO. 21:**

21    If YOUR response to Propounding Party's Request for Admission No.

22 19 was anything less than an unqualified admission, produce each and

23 every DOCUMENT RELATING TO said response.

24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

25    Responding Party objects to this request for production as premature.

26 Because this request for production necessarily relies upon a contention,

27 Responding Party is unable to provide a complete response at this time, nor

28

1   is it required to do so.

2      Responding Party further objects to this request on the grounds that it

3   violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

4   with reasonable particularity each item or category of items to be inspected."

5   Propounding Party's request for production does not describe an item or

6   category of items with reasonable particularity.

7      Responding Party further objects to the extent that this request for

8   production invades attorney-client privilege and/or violates the work product

9   doctrine by compelling Responding Party to disclose privileged

10  communications and/or litigation strategy.  Responding Party will not provide

11  any such privileged information.

12     Responding Party further objects to this request on the grounds that

13  this information is equally available to the Requesting Party, and some of the

14  documents are publically available.

15     Subject to and without waiver of the foregoing objections, Responding

16  Party responds as follows:

17     Responding Party directs the Defendant to Plaintiff's previous

18  productions. For any responsive documents, not already produced in

19  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

20  (Responsive documents are collectively attached hereto as Exhibit A).

21      Additionally, Responding Party notes that discovery is ongoing, and

22  this contention-based interrogatory is poorly defined and premature.  Thus,

23  Responding Party reserves the right to amend this response at the

24  appropriate time in the future if necessary.

25

26  **REQUEST FOR PRODUCTION NO. 22:**

27     If YOUR response to Propounding Party's Request for Admission No.

28

-15-

Case No. 2:16-cv-02129-SJO (RAOx)

1  20 was anything less than an unqualified admission, produce each and

2  every DOCUMENT RELATING TO said response.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

4        Responding Party objects to this request for production as premature.

5  Because this request for production necessarily relies upon a contention,

6  Responding Party is unable to provide a complete response at this time, nor

7  is it required to do so.

8        Responding Party further objects to this request on the grounds that it

9  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

10  with reasonable particularity each item or category of items to be inspected."

11  Propounding Party's request for production does not describe an item or

12  category of items with reasonable particularity.

13        Responding Party further objects to the extent that this request for

14  production invades attorney-client privilege and/or violates the work product

15  doctrine by compelling Responding Party to disclose privileged

16  communications and/or litigation strategy.  Responding Party will not provide

17  any such privileged information.

18        Responding Party further objects to this request on the grounds that

19  this information is equally available to the Requesting Party, and some of the

20  documents are publically available.

21        Subject to and without waiver of the foregoing objections, Responding

22  Party responds as follows:

23        Responding Party directs the Defendant to Plaintiff's previous

24  productions. For any responsive documents, not already produced in

25  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

26  (Responsive documents are collectively attached hereto as Exhibit A).

27        Additionally, Responding Party notes that discovery is ongoing, and

28

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1   this contention-based interrogatory is poorly defined and premature.  Thus,

2   Responding Party reserves the right to amend this response at the

3   appropriate time in the future if necessary.

4

5   **REQUEST FOR PRODUCTION NO. 23:**

6        If YOUR response to Propounding Party's Request for Admission No.

7   21 was anything less than an unqualified admission, produce each and

8   every DOCUMENT RELATING TO said response.

9   **RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

10       Responding Party objects to this request for production as premature.

11  Because this request for production necessarily relies upon a contention,

12  Responding Party is unable to provide a complete response at this time, nor

13  is it required to do so.

14       Responding Party further objects to this request on the grounds that it

15  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

16  with reasonable particularity each item or category of items to be inspected."

17  Propounding Party's request for production does not describe an item or

18  category of items with reasonable particularity.

19       Responding Party further objects to the extent that this request for

20  production invades attorney-client privilege and/or violates the work product

21  doctrine by compelling Responding Party to disclose privileged

22  communications and/or litigation strategy.  Responding Party will not provide

23  any such privileged information.

24       Responding Party further objects to this request on the grounds that

25  this information is equally available to the Requesting Party, and some of the

26  documents are publically available.

27       Subject to and without waiver of the foregoing objections, Responding

28

13524445.1

1  Party responds as follows:

2       Responding Party directs the Defendant to Plaintiff's previous

3  productions. For any responsive documents, not already produced in

4  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

5  (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

6        Additionally, Responding Party notes that discovery is ongoing, and

7  this contention-based interrogatory is poorly defined and premature.  Thus,

8  Responding Party reserves the right to amend this response at the

9  appropriate time in the future if necessary.

10

11  **<u>REQUEST FOR PRODUCTION NO. 24</u>:**

12       If YOUR response to Propounding Party's Request for Admission No.

13  22 was anything less than an unqualified admission, produce each and

14  every DOCUMENT in support of such denial.

15  **<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 24</u>:**

16       Responding Party objects to this request for production as premature.

17  Because this request for production necessarily relies upon a contention,

18  Responding Party is unable to provide a complete response at this time, nor

19  is it required to do so.

20       Responding Party further objects to this request on the grounds that it

21  violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

22  with reasonable particularity each item or category of items to be inspected."

23  Propounding Party's request for production does not describe an item or

24  category of items with reasonable particularity.

25       Responding Party further objects to the extent that this request for

26  production invades attorney-client privilege and/or violates the work product

27  doctrine by compelling Responding Party to disclose privileged

28

<div align="center">-18-</div>

13524445.1

1  communications and/or litigation strategy.  Responding Party will not provide
2  any such privileged information.

3      Responding Party further objects to this request on the grounds that
4  this information is equally available to the Requesting Party, and some of the
5  documents are publically available.

6      Subject to and without waiver of the foregoing objections, Responding
7  Party responds as follows:

8      Responding Party directs the Defendant to Plaintiff's previous
9  productions. For any responsive documents, not already produced in
10 Plaintiff's prior discovery responses, Plaintiff is producing such documents.
11 (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

12      Additionally, Responding Party notes that discovery is ongoing, and
13 this contention-based interrogatory is poorly defined and premature.  Thus,
14 Responding Party reserves the right to amend this response at the
15 appropriate time in the future if necessary.

16

17 **REQUEST FOR PRODUCTION NO. 25:**

18      If YOUR response to Propounding Party's Request for Admission No.
19 23 was anything less than an unqualified admission, produce each and
20 every DOCUMENT RELATING TO said response.

21 **RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

22      Responding Party objects to this request for production as premature.
23 Because this request for production necessarily relies upon a contention,
24 Responding Party is unable to provide a complete response at this time, nor
25 is it required to do so.

26      Responding Party further objects to this request on the grounds that it
27 violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe

28

-19-

Case No. 2:16-cv-02129-SJO (RAOx)

13524445.1

1  with reasonable particularity each item or category of items to be inspected."

2  Propounding Party's request for production does not describe an item or

3  category of items with reasonable particularity.

4         Responding Party further objects to the extent that this request for

5  production invades attorney-client privilege and/or violates the work product

6  doctrine by compelling Responding Party to disclose privileged

7  communications and/or litigation strategy.  Responding Party will not provide

8  any such privileged information.

9         Responding Party further objects to this request on the grounds that

10  this information is equally available to the Requesting Party, and some of the

11  documents are publically available.

12         Subject to and without waiver of the foregoing objections, Responding

13  Party responds as follows:

14         Responding Party directs the Defendant to Plaintiff's previous

15  productions. For any responsive documents, not already produced in

16  Plaintiff's prior discovery responses, Plaintiff is producing such documents.

17  (Responsive documents are collectively attached hereto as Exhibit A).

18         Additionally, Responding Party notes that discovery is ongoing, and

19  this contention-based interrogatory is poorly defined and premature.  Thus,

20  Responding Party reserves the right to amend this response at the

21  appropriate time in the future if necessary.

22

23  **REQUEST FOR PRODUCTION NO. 26:**

24         If YOUR response to Propounding Party's Request for Admission No.

25  24 was anything less than an unqualified admission, produce each and

26  every DOCUMENT RELATING TO said response.

27

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Responding Party objects to this request for production as premature. Because this request for production necessarily relies upon a contention, Responding Party is unable to provide a complete response at this time, nor is it required to do so.

Responding Party further objects to this request on the grounds that it violates Federal Rule of Civil Procedure 34(b)(1)(A) by failing to "describe with reasonable particularity each item or category of items to be inspected." Propounding Party's request for production does not describe an item or category of items with reasonable particularity.

Responding Party further objects to the extent that this request for production invades attorney-client privilege and/or violates the work product doctrine by compelling Responding Party to disclose privileged communications and/or litigation strategy.  Responding Party will not provide any such privileged information.

Responding Party further objects to this request on the grounds that this information is equally available to the Requesting Party, and some of the documents are publically available.

Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

Responding Party directs the Defendant to Plaintiff's previous productions. For any responsive documents, not already produced in Plaintiff's prior discovery responses, Plaintiff is producing such documents. (Responsive documents are collectively attached hereto as <u>Exhibit A</u>).

Additionally, Responding Party notes that discovery is ongoing, and this contention-based interrogatory is poorly defined and premature.  Thus, Responding Party reserves the right to amend this response at the

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1 | appropriate time in the future if necessary.

2

3

4 | DATED:  May 31, 2017                    OTTEN LAW, PC

5

6

7 |                                    By: _____/s/Victor Otten_____

8 |                                        VICTOR OTTEN
                                         KAVITA TEKCHANDANI

9 |                                        Attorneys for Plaintiffs
                                         CORY SPENCER, DIANA MILENA

10 |                                       REED, and COASTAL PROTECTION
                                         RANGERS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1

### PROOF OF SERVICE
***Spencer, et al. v. Lunada Bay Boys, et al.***
**U.S.D.C. for the Central District of California**
**Case No. 2:16-cv-02129-SJO (RAOx)**

2

3

4

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

5

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is: 3620 Pacific Coast Highway, Suite 100, Torrance, CA  90505.

6

7

On June 5, 2017, I served the original or a true copy of the following document(s) described as:

8

9

**PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA**

10

11

on the interested parties in this action as follows:

12

### SEE ATTACHED SERVICE LIST

13

**X BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Hanson Bridgett LLP's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

14

15

16

17

18

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

19

20

Executed on **June 5, 2017**, at Torrance, California.

21

22

23

*/s/ Victor Otten*
_____
Victor Otten

24

25

26

27

28

-23-

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION PROPOUNDED BY DEFENDANT FRANK FERRARA

**SERVICE LIST**
*Spencer, et al. v. Lunada Bay Boys, et al.*
U.S.D.C. for the Central District of California
Case No. 2:16-cv-02129-SJO (RAOx)

Robert T. Mackey, Esq.                    *(Attorneys for Defendant BRANT*
Peter H. Crossin, Esq.                    *BLAKEMAN)*
Richard P. Dieffenbach, Esq.
John P. Worgul, Esq.                      (served original)
VEATCH CARLSON, LLP
1055 Wilshire Blvd., 11th Floor
Los Angeles, CA  90017

Robert S. Cooper, Esq.                    *(Attorneys for Defendant BRANT*
BUCHALTER NEMER, APC                      *BLAKEMAN)*
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA  90017                    (served true copy)

J. Patrick Carey, Esq.                    *(Attorney for Defendant ALAN*
LAW OFFICES OF                            *JOHNSTON a/k/a JALIAN*
 J. PATRICK CAREY                         *JOHNSTON)*
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA  90266                (served true copy)

Peter T. Haven, Esq.                      *(Attorney for Defendant MICHAEL*
HAVEN LAW                                 *RAY PAPAYANS)*
1230 Rosecrans Ave., Suite 300
Manhattan Beach, CA  90266                (served true copy)

Dana Alden Fox, Esq.                      *(Attorneys for Defendant SANG LEE)*
Edward E. Ward, Jr., Esq.
Eric Y. Kizirian, Esq.                    (served true copy)
Tera Lutz, Esq.
LEWIS BRISBOIS
 BISGAARD & SMITH LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA  90071

Case No. 2:16-cv-02129-SJO (RAOx)
PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

1   Daniel M. Crowley, Esq.       *(Attorneys for Defendant SANG LEE)*

2   BOOTH, MITCHEL &
    STRANGE LLP       (served true copy)

3   707 Wilshire Blvd., Suite 4450
   Los Angeles, CA  90017

4

5   Mark C. Fields, Esq.       *(Attorney for Defendant ANGELO*

6   LAW OFFICES OF       *FERRARA and Defendant N. F.*
    MARK C. FIELDS, APC    *appearing through Guardian Ad*

7   333 South Hope Street, 35th Floor  *Litem, Leonora Ferrara)*
   Los Angeles, CA  90071

8                     (served true copy)

9

10  Thomas M. Phillip, Esq.     *(Attorneys for Defendant ANGELO*
   Aaron G. Miller, Esq.      *FERRARA)*

11  THE PHILLIPS FIRM
   800 Wilshire Blvd., Suite 1550   (served true copy)

12  Los Angeles, CA  90017

13

14  Patrick Au, Esq.        *(Attorneys for Defendants FRANK*
   Laura L. Bell, Esq.       *FERRARA and CHARLIE FERRARA)*

15  BREMER WHYTE
    BROWN & O'MEARA, LLP   (served true copy)

16  21271 Burbank Blvd., Suite 110

17  Woodland Hills, CA  91367

18

19  Edwin J. Richards, Esq.    *(Attorneys for Defendants CITY OF*
   Antoinette P. Hewitt, Esq.    *PALOS VERDES and CHIEF OF*

20  Rebecca L. Wilson, Esq.    *POLICE JEFF KEPLEY)*
   Jacob Song, Esq.

21  Christopher D. Glos, Esq.    (served true copy)
   KUTAK ROCK LLP

22  5 Park Plaza, Suite 1500
   Irvine, CA  92614-8595

23

24

25

26

27

28

Case No. 2:16-cv-02129-SJO (RAOx)

PLAINTIFF DIANA MILENA REED'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
PROPOUNDED BY DEFENDANT FRANK FERRARA

13524445.1

# Exhibit R

Atkinson-Baker Court Reporters
www.depo.com

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4                            - - -

5    CORY SPENCER, AN INDIVIDUAL;     )
     DIANA MILENA REED, AN            )
6    INDIVIDUAL; AND COASTAL          )
     PROTECTION RANGERS, INC.,        )
7    A CALIFORNIA NON-PROFIT PUBLIC   )
     BENEFIT CORPORATION,             )
8                                     )
                     Plaintiffs,      )
9                                     )
         vs.                          ) No.:  2:16-cv-02129-SJO
10                                    )        (RAOx)
                                      )
11   LUNADA BAY BOYS; THE INDIVIDUAL  )
     MEMBERS OF THE LUNADA BAY BOYS,  )
12   INCLUDING BUT NOT LIMITED TO     )
     SANG LEE, BRANT BLAKEMAN, ALAN   )
13   JOHNSTON AKA JALIAN JOHNSTON,    )
     MICHAEL RAE PAPAYANS, ANGELO     )
14   FERRARA, FRANK FERRARA,          )
     CHARLIE FERRARA, ET AL.,         )
15                                    )
                     Defendants.      )
16   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

17                   VIDEOTAPED DEPOSITION OF

18                       CHARLES FERRARA

19                      IRVINE, CALIFORNIA

20                       JULY 7, 2017

21   Atkinson-Baker, Inc.
     Court Reporters
22   www.depo.com
     (800) 288-3376

23

24   REPORTED BY:  ANGELIQUE MELODY FERRIO, CSR NO. 6979

25   FILE NO:     AB06A33

                                                             1

Atkinson-Baker Court Reporters
www.depo.com

1              UNITED STATES DISTRICT

2            COURT CENTRAL DISTRICT OF

3           CALIFORNIA WESTERN DIVISION

4                    - - -

5

6   CORY SPENCER, AN INDIVIDUAL;    )
    DIANA MILENA REED, AN           )
7   INDIVIDUAL; AND COASTAL         )
    PROTECTION RANGERS, INC.,       )
8   A CALIFORNIA NON-PROFIT PUBLIC  )
    BENEFIT CORPORATION,            )
9                                   )
              Plaintiffs,           )
10                                  )
         vs.                        ) No.:  2:16-cv-02129-SJO
11                                  )           (RAOx)
                                    )
12  LUNADA BAY BOYS; THE INDIVIDUAL )
    MEMBERS OF THE LUNADA BAY BOYS, )
13  INCLUDING BUT NOT LIMITED TO    )
    SANG LEE, BRANT BLAKEMAN, ALAN  )
14  JOHNSTON AKA JALIAN JOHNSTON,   )
    MICHAEL RAE PAPAYANS, ANGELO    )
15  FERRARA, FRANK FERRARA,         )
    CHARLIE FERRARA, ET AL.,        )
16                                  )
              Defendants.           )
17  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

18

19

20        Videotaped deposition of CHARLES FERRARA, taken

21  on behalf of the Plaintiffs, at Premier Business Center,

22  2600 Michelson Drive, Suite 1700, Irvine, California,

23  92612, commencing at 9:36 a.m., Friday, July 7, 2017,

24  before ANGELIQUE MELODY FERRIO, CSR No. 6979.

25

Atkinson-Baker Court Reporters
www.depo.com

```
1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4          HANSON, BRIDGETT, LLP
           BY:  SAMANTHA WOLFF, ESQ.
5          425 Market Street
           26th Floor
6          San Francisco, California 94105

7

8

9    FOR DEFENDANTS FRANK FERRARA AND CHARLIE FERRARA:

10         BREMER, WHYTE, BROWN & O'MEARA, LLP
           BY:  ALISON K. HURLEY, ESQ.
11         20320 S.W. Birch Street
           Second Floor
12         Newport Beach, California 92660

13

14

15   FOR THE DEFENDANTS CITY OF PALOS VERDES
     AND CHIEF OF POLICE JEFF KEPLEY:
16
           KUTAK, ROCK, LLP
17         BY:  CHRISTOPHER D. GLOS, ESQ.
           5 Park Plaza
18         Suite 1500
           Irvine, California 92614
19

20

21   FOR DEFENDANT SANG LEE:

22         BOOTH, MITCHEL & STRANGE, LLP
           BY:  JACKIE K. VU, ESQ.
23         707 Wilshire Boulevard
           Suite 3000
24         Los Angeles, California 90017

25
```

Charles Ferrara
July 7, 2017

```
1    APPEARANCES CONTINUED:

2

3    FOR DEFENDANT BRANT BLAKEMAN:

4         VEATCH, CARLSON, LLP
          BY:  RICHARD P. DIEFFENBACH, ESQ.
5         1055 Wilshire Boulevard
          11th Floor
6         Los Angeles, California 90017

7

8

9    FOR THE DEFENDANT SANG LEE:

10        LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
          BY:  KRISTIN A. MCLAUGHLIN, ESQ.
11        633 West 5th Street
          Suite 4000
12        Los Angeles, California 90071

13

14

15   FOR DEFENDANT BRANT BLAKEMAN:

16        (BY TELEPHONE)
          BUCHALTER, NEMER, APC
17        BY:  ROBERT S. COOPER, ESQ.
          1000 Wilshire Boulevard
18        Suite 1500
          Los Angeles, California 90017

19

20

21   FOR DEFENDANT MICHAEL RAY PAPAYANS:

22        (BY TELEPHONE)
23        HAVEN LAW
          BY:  PETER T. HAVEN, ESQ.
24        1230 Rosecrans Avenue
          Suite 300
25        Manhattan Beach, California 90266
```

4

Atkinson-Baker Court Reporters
www.depo.com

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE DEFENDANT N.F.:

 4

 5        (BY TELEPHONE)
          LAW OFFICES OF MARK C. FIELDS, APC
 6        BY:  MARK C. FIELDS, ESQ.
          333 South Hope Street
 7        35th Floor
          Los Angeles, California 90071
 8

 9

10

11   ALSO PRESENT:  GARY BOWDEN, VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

Atkinson-Baker Court Reporters
www.depo.com

```
 1                               INDEX

 2

 3   WITNESS:  CHARLES FERRARA

 4

 5   EXAMINATION BY:                               PAGE

 6        MS. WOLFF                                 10

 7

 8   EXAMINATION BY:                               PAGE

 9        MR. GLOS                                 190

10

11

12   EXHIBITS

13   NUMBER                 DESCRIPTION           PAGE

14    266      Plaintiffs' Notice of Deposition    13
              of Defendant Charlie Ferrara
15            Dated June 15, 2017
              Consisting of six pages
16

17

18    267      Transcription of recording         140
              12823269.1
19            Consisting of seven pages

20

21    268      Xeroxed Colored Photograph         146
              Consisting of one page
22

23

24    269      Xeroxed Colored Photograph         148
              Consisting of one page
25
```

6

Charles Ferrara
July 7, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1            EXHIBITS CONTINUED:

 2

 3    270     Xeroxed Colored Photograph          151
              Consisting of one page
 4

 5

 6    271     Xeroxed Colored Photograph          153
              Consisting of one page
 7

 8

 9    272     Xeroxed Colored Photograph          155
              Consisting of one page
10

11

12    273     Xeroxed Colored Photograph          156
              Consisting of one page
13

14

15    274     Xeroxed Colored Photograph          178
              Consisting of one page
16

17

18    275     Xeroxed Colored Photograph          182
              Consisting of one page
19

20

21    276     Xeroxed Colored Photograph          186
              Fort Structure in 2016
22            Consisting of one page

23

24    277     Xeroxed Black-And-White             189
              Photograph
25            Consisting of one page
```

7

Charles Ferrara
July 7, 2017

```
1    INDEX CONTINUED:

2

3    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

4    PAGE       LINE

5

6    16             9

7    77          19

8    175         18

9    176         11

10

11

12   INFORMATION TO BE SUPPLIED:

13   PAGE       LINE

14   (NONE)

15

16

17

18

19

20

21

22

23

24

25
```

8

Atkinson-Baker Court Reporters
www.depo.com

1          IRVINE, CALIFORNIA, FRIDAY, JULY 7, 2017

2                    9:36 A.M.

3                     -OOo-

4                                                    09:35:44

5          THE VIDEOGRAPHER:  Good morning.  I'm      09:35:45

6    Gary Bowden, your videographer.  And I represent  09:35:47

7    Atkinson-Baker, Incorporated, in Glendale,        09:35:50

8    California.                                        09:35:50

9          I'm not financially interested in this action  09:35:53

10   nor am I a relative or employee of any attorney or  09:35:56

11   any of the parties.                                09:36:00

12         The date is July 7, 2017.  And the time is   09:36:02

13   9:36 a.m.  This deposition is taking place at     09:36:07

14   Premiere Business Center, 2600 Michelson Drive,   09:36:12

15   Suite 1700, Irvine, California.                    09:36:15

16         This is case number 2:16-cv-02129-SJO (RAOx)  09:36:19

17   entitled Spencer versus Lunada Bay Boys.  The     09:36:33

18   deponent is Charles Ferrara.  And this deposition is  09:36:38

19   being taken on behalf of the Plaintiffs.           09:36:44

20         Counsel will now please introduce themselves.  09:36:49

21   After all counsel present have introduced themselves,  09:36:52

22   the witness will be sworn in by the court reporter.  09:36:55

23         This is the beginning of D.V.D. one,        09:36:59

24   Volume One.  The D.V.D. is running and we're now on  09:37:00

25   the record.                                        09:37:03

9

Charles Ferrara
July 7, 2017

| | | |
|---|---|---|
| 1 | MS. WOLFF:  Good morning.  Samantha Wolff on | 09:37:04 |
| 2 | behalf of the Plaintiffs. | 09:37:06 |
| 3 | MS. HURLEY:  Good morning.  Alison Hurley on | 09:37:07 |
| 4 | behalf of the witness, Charles Ferrara. | 09:37:09 |
| 5 | MS. MCLAUGHLIN:  Kristin McLaughlin for | 09:37:11 |
| 6 | Defendant Sang Lee. | 09:37:11 |
| 7 | MR. GLOS:  Christopher Glos on behalf of the | 09:37:13 |
| 8 | City and Chief Kepley. | 09:37:17 |
| 9 | MR. FIELDS:  On the phone is Mark Fields, | 09:37:23 |
| 10 | attorney for Angelo Ferrara and N.F. | 09:37:26 |
| 11 | MR. COOPER:  Robert Cooper on behalf of the | 09:37:30 |
| 12 | Defendant Brant Blakeman. | 09:37:32 |
| 13 | | |
| 14 | CHARLES FERRARA, | |
| 15 | having first been duly sworn, was | |
| 16 | examined and testified as follows: | |
| 17 | | |
| 18 | EXAMINATION | |
| 19 | | 09:37:44 |
| 20 | BY MS. WOLFF: | 09:37:44 |
| 21 | Q.  Good morning. | 09:37:45 |
| 22 | A.  Good morning. | 09:37:45 |
| 23 | Q.  Are you represented by counsel today? | 09:37:46 |
| 24 | A.  Yes. | 09:37:48 |
| 25 | Q.  And who is your counsel? | 09:37:49 |

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | A.  Ms. Bacon -- sorry. | 09:37:50 |
| 2 | MS. HURLEY:  That's okay.  Tiffany Bacon | 09:37:56 |
| 3 | works in my office. | 09:37:58 |
| 4 | BY MS. WOLFF: | 09:38:00 |
| 5 | Q.  Are there any other attorneys representing | 09:38:00 |
| 6 | you other than what you just mentioned? | 09:38:03 |
| 7 | A.  No. | 09:38:05 |
| 8 | Q.  Can you please spell your name for the | 09:38:05 |
| 9 | record. | 09:38:06 |
| 10 | A.  Charles Michael Ferrara, C-h-a-r-l-e-s, | 09:38:06 |
| 11 | M-i-c-h-a-e-l, F-e-r-r-a-r-a. | 09:38:08 |
| 12 | Q.  Thank you. | 09:38:16 |
| 13 | Have you ever had your deposition taken | 09:38:17 |
| 14 | before? | 09:38:19 |
| 15 | A.  No. | 09:38:19 |
| 16 | Q.  Have you ever signed any written documents | 09:38:20 |
| 17 | like a declaration under penalty of perjury before? | 09:38:22 |
| 18 | A.  No. | 09:38:25 |
| 19 | Q.  Have you ever testified in court before? | 09:38:26 |
| 20 | A.  No. | 09:38:28 |
| 21 | Q.  So, since you're sort of new to all of this, | 09:38:28 |
| 22 | I'll go over some ground rules.  I'm sure that your | 09:38:34 |
| 23 | attorney probably went over some with you, but just | 09:38:37 |
| 24 | so that you understand how the process works. | 09:38:39 |
| 25 | Now, you're under oath which is the same oath | 09:38:42 |

Charles Ferrara
July 7, 2017

| | | |
|---|---|---|
| 1 | A.  Thank you. | 09:44:24 |
| 2 | Q.  Your uncle is Angelo Ferrara and he's a | 09:44:24 |
| 3 | Defendant in this lawsuit; is that correct? | 09:44:27 |
| 4 | A.  Yes, Ma'am. | 09:44:29 |
| 5 | Q.  And what does he do for a living? | 09:44:29 |
| 6 | A.  Auto body and paint, it's a body shop. | 09:44:31 |
| 7 | Q.  Is he also a shaper? | 09:44:35 |
| 8 | A.  Yes, but he's in auto body.  He's an auto | 09:44:38 |
| 9 | body, he fixes cars and paints them. | 09:44:41 |
| 10 | Q.  And your cousin is N.F., and you understand | 09:44:44 |
| 11 | that we're using his initials because when he was | 09:44:49 |
| 12 | first named in this lawsuit, he was a minor at the | 09:44:51 |
| 13 | time? | 09:44:54 |
| 14 | A.  Yes. | 09:44:54 |
| 15 | Q.  And he's also a Defendant in this lawsuit; is | 09:44:55 |
| 16 | that correct? | 09:44:58 |
| 17 | A.  Yes. | 09:44:58 |
| 18 | Q.  And is Leo Ferrara N.F.'s brother? | 09:44:59 |
| 19 | A.  Yes. | 09:45:04 |
| 20 | Q.  So, other than the conversation that you've | 09:45:04 |
| 21 | had with your father in the presence of your | 09:45:14 |
| 22 | attorneys, have you had any other conversations with | 09:45:18 |
| 23 | other family members about this lawsuit? | 09:45:20 |
| 24 | A.  No. | 09:45:22 |
| 25 | Q.  And aside from you and Felipa, have any of | 09:45:22 |

18

Charles Ferrara
July 7, 2017

```
 1              THE REPORTER:  Counsel, do you want a copy
 2    of the deposition?
 3              MR. GLOS:  Yes.
 4              MS. VU:  No.
 5              MR. DIEFFENBACH:  Yes.
 6              MS. MCLAUGHLIN:  Yes.
 7              MS. HURLEY:  Yes.
 8              MR. HAVEN:  Yes.
 9
10
11              (Whereupon, the deposition of
12              CHARLES FERRARA commenced at
13              9:36 a.m. and concluded at
14              1:40 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

194

Atkinson-Baker Court Reporters
www.depo.com

```
 1   STATE OF CALIFORNIA   )
                           )
 2   COUNTY OF LOS ANGELES )

 3

 4

 5

 6           I, the undersigned, declare under penalty of

 7   perjury that I have read the foregoing transcript, and I

 8   have made any corrections, additions, or deletions that

 9   I was desirous of making; that the foregoing is a true

10   and correct transcript of my testimony contained

11   therein.

12

13           EXECUTED this _____ day of _____,

14   20_____, at _____, _____.

15                       (City)                 (State)

16

17

18

19
     _____
20   CHARLES FERRARA

21

22

23

24

25
```

Charles Ferrara
July 7, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, ANGELIQUE MELODY FERRIO, C.S.R. NO. 6979, a

 4    Certified Shorthand Reporter, certify:

 5           That the foregoing proceedings were taken

 6    before me at the time and place therein set forth, at

 7    which time the witness was put under oath by me;

 8           That the testimony of the witness and all

 9    objections made at the time of the examination were

10    recorded stenographically by me and were thereafter

11    transcribed;

12           That the foregoing is a true and correct

13    transcript of my shorthand notes so taken.

14           I further certify that I am not a relative or

15    employee of any attorney or of any of the parties, nor

16    financially interested in the action.

17           I declare under penalty of perjury under the

18    law of the State of California that the foregoing is

19    true and correct.

20           Dated this 7th day of July, 2017.

21

22

23           _____

24           Angelique Melody Ferrio
             CSR No. 6979
25
```

196

Charles Ferrara
July 7, 2017

Atkinson-Baker Court Reporters
www.depo.com

1          REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4          I, ANGELIQUE MELODY FERRIO, CSR No. 6979, a

5    Certified Shorthand Reporter in the State of California,

6    certify that the foregoing pages are a true and correct

7    copy of the original deposition of CHARLES FERRARA,

8    taken on Friday, July 7, 2017.

9          I declare under penalty of perjury under the

10   laws of the State of California that the foregoing is

11   true and correct.

12          Dated this 7th day of July, 2017.

13

14

15

16

17          _____

18          Angelique Melody Ferrio
            CSR No. 6979

19

20

21

22

23

24

25

197

Charles Ferrara
July 7, 2017

# Exhibit S

Atkinson-Baker Court Reporters
www.depo.com

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4                              - - -

5    CORY SPENCER, AN INDIVIDUAL;     )
     DIANA MILENA REED, AN            )
6    INDIVIDUAL; AND COASTAL          )
     PROTECTION RANGERS, INC.,        )
7    A CALIFORNIA NON-PROFIT PUBLIC   )
     BENEFIT CORPORATION,             )
8                                     )
                     Plaintiffs,      )
9                                     )
         vs.                          ) No.:  2:16-cv-02129-SJO
10                                    )        (RAOx)
     LUNADA BAY BOYS; THE INDIVIDUAL  )
11   MEMBERS OF THE LUNADA BAY BOYS,  )
     INCLUDING BUT NOT LIMITED TO     )
12   SANG LEE, BRANT BLAKEMAN, ALAN   )
     JOHNSTON AKA JALIAN JOHNSTON,    )
13   MICHAEL RAE PAPAYANS, ANGELO     )
     FERRARA, FRANK FERRARA,          )
14   CHARLIE FERRARA, ET AL.,         )
                                      )
15                   Defendants.      )
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
16

17                  VIDEOTAPED DEPOSITION OF

18                          SANG LEE

19                   COSTA MESA, CALIFORNIA

20                       MAY 31, 2017

21   Atkinson-Baker, Inc.
     Court Reporters
22   www.depo.com
     (800) 288-3376
23

24   REPORTED BY:  ANGELIQUE MELODY FERRIO, CSR NO. 6979

25   FILE NO:      AB05A10

Atkinson-Baker Court Reporters
www.depo.com

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                     WESTERN DIVISION

 4                        -  -  -

 5   CORY SPENCER, AN INDIVIDUAL;   )
     DIANA MILENA REED, AN          )
 6   INDIVIDUAL; AND COASTAL        )
     PROTECTION RANGERS, INC.,      )
 7   A CALIFORNIA NON-PROFIT PUBLIC )
     BENEFIT CORPORATION,           )
 8                                  )
                    Plaintiffs,     )
 9                                  )
         vs.                        ) No.:  2:16-cv-02129-SJO
10                                  )       (RAOx)
                                    )
11   LUNADA BAY BOYS; THE INDIVIDUAL )
     MEMBERS OF THE LUNADA BAY BOYS, )
12   INCLUDING BUT NOT LIMITED TO   )
     SANG LEE, BRANT BLAKEMAN, ALAN )
13   JOHNSTON AKA JALIAN JOHNSTON,  )
     MICHAEL RAE PAPAYANS, ANGELO   )
14   FERRARA, FRANK FERRARA,        )
     CHARLIE FERRARA, ET AL.,       )
15                                  )
                    Defendants.     )
16   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

17

18

19

20         Videotaped deposition of SANG LEE, taken on

21   behalf of the Plaintiffs, at 3420 Bristol Street,

22   Sixth Floor, Costa Mesa, California, 92626, commencing

23   at 9:03 a.m., Wednesday, May 31, 2017, before

24   ANGELIQUE MELODY FERRIO, CSR No. 6979.

25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        HANSON, BRIDGETT, LLP
          BY:  LISA M. POOLEY, ESQ.
 5        AND  VICTOR OTTEN, ESQ.
          425 Market Street
 6        26th Floor
          San Francisco, California 94105

 7

 8

 9   FOR THE DEFENDANTS:

10        BOOTH, MITCHEL & STRANGE, LLP
          BY:  DANIEL M. CROWLEY, ESQ.
11        707 Wilshire Boulevard
          Suite 3000
12        Los Angeles, California 90017

13

14        LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
          BY:  EDWARD E. WARD, JR., ESQ.
15        633 West 5th Street
          Suite 4000
16        Los Angeles, California 90071

17

18        BREMER, WHYTE, BROWN & O'MEARA, LLP
          BY:  TIFFANY L. BACON, ESQ.
19        20320 S.W. Birch Street
          Second Floor
20        Newport Beach, California 92660

21

22        VEATCH, CARLSON, LLP
          BY:  RICHARD P. DIEFFENBACH, ESQ.
23        1055 Wilshire Boulevard
          11th Floor
24        Los Angeles, California 90017

25
```

3

Sang Lee
May 31, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1    APPEARANCES CONTINUED:

 2

 3         KUTAK, ROCK, LLP
           BY:  ANTOINETTE P. HEWITT, ESQ.
 4         5 Park Plaza
           Suite 1500
 5         Irvine, California 92614

 6

 7         (BY TELEPHONE)
           BUCHALTER, NEMER, APC
 8         BY:  ROBERT S. COOPER, ESQ.
           1000 Wilshire Boulevard
 9         Suite 1500
           Los Angeles, California 90017
10         (213) 891-0700

11

12
           (BY TELEPHONE)
13         HAVEN LAW
           BY:  PETER T. HAVEN, ESQ.
14         1230 Rosecrans Avenue
           Suite 300
15         Manhattan Beach, California 90266
           (310) 272-5353
16

17

18         (BY TELEPHONE)
           LAW OFFICES OF MARK C. FIELDS, APC
19         BY:  MARK C. FIELDS, ESQ.
           333 South Hope Street
20         35th Floor
           Los Angeles, California 90071
21

22

23    ALSO PRESENT:

24         Barbra Westmore, Videographer

25
```

4

Sang Lee
May 31, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1                          INDEX

 2

 3    WITNESS:  SANG LEE

 4

 5    EXAMINATION BY:                        PAGE

 6        MS. POOLEY                          10

 7

 8    EXAMINATION BY:                        PAGE

 9        BY MS. BACON                       293

10

11

12

13    EXHIBITS

14

15
      NUMBER               DESCRIPTION       PAGE
16

17    221     Plaintiffs' Notice of Deposition    17
              of Defendant Sang Lee
18            Dated May 19, 2017
              Consisting of seven pages
19

20

21
      222     Memo From Sang Lee                   88
22            To John Camplin
              Dated 1/8/2011
23            Lee 00000001 - Lee 00000003
              Consisting of three pages
24

25
```

5

Sang Lee
May 31, 2017

```
 1              EXHIBITS CONTINUED:

 2

 3    223       Memo From Sang Lee                    140
                To Ringer Surfboards
 4              Dated 1/10/2011
                Lee 00000015
 5              Consisting of one page

 6

 7    224       Memo From Sang Lee                    158
                To Zen Del Rio
 8              Dated 1/16/2011
                Lee 00000591
 9              Consisting of one page

10

11    225       Memo From Charlie Mowat               166
                To Sang Lee
12              Dated 1/16/2014
                Lee 00000595
13              Consisting of one page

14

15    226       Memo From Charlie Mowat               172
                To Andy Patch
16              Dated 1/17/2014
                Lee 00000596
17              Consisting of one page

18

19    227       Memo From Sang Lee                    177
                To Yoaks Wagon
20              Dated 1/17/2014
                Lee 00000014
21              Consisting of one page

22

23

24

25
```

6

Atkinson-Baker Court Reporters
www.depo.com

```
 1        COSTA MESA, CALIFORNIA, WEDNESDAY, MAY 31, 2017
 2                        9:03 A.M.
 3                         -oOo-
 4                                                        09:02:39
 5        THE VIDEOGRAPHER:  Good morning.  We're on      09:02:39
 6   the record.  My name is Barbra Westmore, your        09:02:48
 7   videographer.                                        09:02:51
 8        And I represent Atkinson-Baker, Inc., located   09:02:51
 9   in Glendale, California.  The date is May 31, 2017,  09:02:55
10   and the time is 9:03 a.m.                            09:02:59
11        This deposition is taking place at              09:03:02
12   3420 Bristol Street in Costa Mesa, California.  The  09:03:05
13   case number is 2:16-CV-02129-SJO, in the matter      09:03:09
14   entitled Corey Spencer versus Lunada Bay Boys.       09:03:19
15        The witness is Sang Lee.  And this deposition   09:03:24
16   is being taken on behalf of the Plaintiffs.  Your    09:03:26
17   court reporter is Angelique Ferrio.                  09:03:29
18        Would counsel please state their appearances    09:03:32
19   for the record.                                      09:03:34
20        MS. POOLEY:  Lisa Pooley, Hansen Bridgett on    09:03:35
21   behalf of the Plaintiff.                             09:03:38
22        MR. CROWLEY:  Daniel Crowley of Booth,          09:03:39
23   Mitchel & Strange on behalf of Mr. Lee.             09:03:43
24        MR. WARD:  Edward Ward, Junior, of Lewis,       09:03:43
25   Brisbois on behalf of Mr. Lee as well.               09:03:45
```

Sang Lee
May 31, 2017

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | MS. BACON:  Tiffany Bacon with Bremer, Whyte, | 09:03:48 |
| 2 | Brown & O'Meara on behalf of Frank Ferrara and | 09:03:50 |
| 3 | Charlie Ferrara. | 09:03:52 |
| 4 | MR. DIEFFENBACH:  Richard Dieffenbach for | 09:03:52 |
| 5 | Mr. Brant Blakeman, the Defendant. | 09:03:54 |
| 6 | And I'm getting E-Mails from the woman that | 09:03:55 |
| 7 | just came to the door saying that several of the | 09:03:58 |
| 8 | other attorneys are calling in unsuccessfully and | 09:04:00 |
| 9 | can't hook in, Ms. Hewitt, Mr. Fields, and | 09:04:03 |
| 10 | Mr. Cooper. | 09:04:07 |
| 11 | MS. POOLEY:  The phone here indicates that | 09:04:14 |
| 12 | the number is (949) 330-7004. | 09:04:17 |
| 13 | MR. DIEFFENBACH:  It's 330-7004.  Let me text | 09:04:23 |
| 14 | these people to tell them. | 09:04:28 |
| 15 | BY MS. POOLEY: | 09:05:13 |
| 16 | Q.  Mr. Lee, I represent Plaintiffs Corey | 09:05:13 |
| 17 | Spencer, Diana Milena Reed, and the Costal Protection | 09:05:17 |
| 18 | Rangers, Inc., in this lawsuit that they filed | 09:05:21 |
| 19 | against Lunada Bay Boys and the individual members, | 09:05:24 |
| 20 | including you, as well as the City of Palos Verdes | 09:05:27 |
| 21 | Estates and Police Chief Jeff Kepley. | 09:05:30 |
| 22 | Are you represented today by counsel? | 09:05:33 |
| 23 | A.  Yes. | 09:05:36 |
| 24 | Q.  And who is representing you today? | 09:05:38 |
| 25 | A.  Mr. Dan and Ed. | 09:05:39 |

8

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.   Have you ever had your deposition taken     09:05:47
 2   before?                                               09:05:50
 3        A.   No, Ma'am.                                  09:05:50
 4        Q.   Have you ever signed any written statements 09:05:51
 5   such as a declaration or affidavit related to any     09:05:56
 6   litigation?                                           09:06:00
 7        A.   What do you mean?                           09:06:01
 8        Q.   Have you ever signed any documents under    09:06:02
 9   oath?                                                 09:06:06
10        A.   No, Ma'am.                                  09:06:06
11        Q.   And have you ever testified at a trial?     09:06:07
12        A.   No.                                         09:06:11
13        Q.   Have you ever given sworn testimony in any  09:06:12
14   case?                                                 09:06:17
15        A.   Sworn testimony?                            09:06:17
16        Q.   In any matter, excuse me.                   09:06:18
17        A.   No, Ma'am.                                  09:06:24
18        MS. POOLEY:   Which reminds me, perhaps we
19   should swear in the witness.
20
21                      SANG LEE,
22        having first been duly sworn, was
23        examined and testified as follows:
24
25
```

9

Sang Lee
May 31, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1                          EXAMINATION

 2

 3   BY MS. POOLEY:

 4        Q.   Has the testimony that you've already given    09:06:39

 5   been truthful?                                           09:06:42

 6        A.   Yes, Ma'am.                                    09:06:42

 7        Q.   Okay.   So, you've been placed under oath.     09:06:43

 8   And it's the same oath that you would take if you        09:06:47

 9   were testifying in a courtroom in front of a judge or    09:06:51

10   a jury.                                                  09:06:54

11        And it has the same force or effect -- force        09:06:55

12   and effect as if you were testifying in that setting;    09:06:59

13   do you understand that?                                  09:07:03

14        A.   Yes, Ma'am.                                    09:07:04

15        Q.   Okay.   The court reporter as she explained a  09:07:04

16   little bit before we got started is going to take        09:07:08

17   down everything that is said.   The questions that I     09:07:10

18   ask, your answers, any objections that are made.         09:07:17

19        And it's important that we try to have one          09:07:19

20   person talk at a time so that the record is clear.       09:07:22

21        So, I will ask that you try to wait until I         09:07:26

22   finish the question before you start your answer.        09:07:30

23   And I will try to wait for you to finish your answer     09:07:33

24   before I ask my next question; all right?                09:07:36

25        A.   Okay.                                          09:07:37
```

10

Sang Lee
May 31, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.   Yes.                                    16:31:31

 2        Q.   Were you actually on the boat during that   16:31:31

 3   time?                                               16:31:33

 4        A.   No.   We were on the cliff.              16:31:33

 5        Q.   Did you witness the ashes being spread?  16:31:35

 6        A.   No.   He was very far away.   The boat was very  16:31:38

 7   far away.                                           16:31:41

 8        Q.   Okay.   Do you know exactly how far out the   16:31:41

 9   boat was?                                           16:31:44

10        A.   It was pretty far.                        16:31:45

11        Q.   Could you estimate or would that be a guess?  16:31:47

12        A.    It would be a guess.   I think it was -- it   16:31:51

13   was a long time, like in 1984 so.                  16:31:59

14        Q.   And you also testified earlier that Frank   16:32:03

15   Ferrara was one of the, quote-unquote, older boys as  16:32:05

16   referenced in the E-Mails, meaning, as you stated,   16:32:08

17   he's just been surfing at Lunada Bay longer than you;  16:32:13

18   do you recall that testimony?                       16:32:17

19        A.   Yes.                                      16:32:18

20        Q.   And you also testified that he has never told   16:32:19

21   you to behave in any certain way when it comes to   16:32:22

22   actions at Lunada Bay?                              16:32:25

23        A.   Absolutely not, yeah.                     16:32:26

24        Q.   Have you ever had any communications with   16:32:28

25   Frank Ferrara about preventing persons from visiting   16:32:34
```

294

Sang Lee
May 31, 2017

| | | |
|---|---|---|
| 1 | Lunada Bay? | 16:32:38 |
| 2 | A.  Absolutely not. | 16:32:39 |
| 3 | Q.  What about preventing persons from surfing at | 16:32:40 |
| 4 | Lunada Bay? | 16:32:43 |
| 5 | A.  Absolutely not. | 16:32:44 |
| 6 | Q.  Have you ever had any communications with | 16:32:45 |
| 7 | Charlie Ferrara about preventing any person from | 16:32:47 |
| 8 | surfing at Lunada Bay? | 16:32:49 |
| 9 | A.  Absolutely not. | 16:32:50 |
| 10 | Q.  Have you ever had any communications with | 16:32:50 |
| 11 | Charlie Ferrara about preventing any persons from | 16:32:52 |
| 12 | visiting Lunada Bay? | 16:32:54 |
| 13 | A.  Absolutely not. | 16:32:56 |
| 14 | Q.  Have you ever witnessed Charlie Ferrara ever | 16:32:58 |
| 15 | attempt to prevent somebody from visiting Lunada Bay? | 16:33:18 |
| 16 | A.  Absolutely not. | 16:33:22 |
| 17 | Q.  And what about surfing at Lunada Bay? | 16:33:23 |
| 18 | A.  Absolutely not. | 16:33:25 |
| 19 | Q.  The same questions for Frank. | 16:33:27 |
| 20 | Have you ever witnessed Frank ever try to | 16:33:27 |
| 21 | attempt to prevent anybody from surfing at Lunada | 16:33:29 |
| 22 | Bay? | 16:33:30 |
| 23 | A.  Absolutely not. | 16:33:30 |
| 24 | Q.  What about visiting Lunada Bay? | 16:33:32 |
| 25 | A.  Absolutely not. | 16:33:35 |

295

Atkinson-Baker Court Reporters
www.depo.com

```
 1              MS. BACON:  Those are all of the questions      16:33:37
 2   that I have.  Thank you.                                   16:33:38
 3              MR. CROWLEY:  Anybody else in the room?         16:33:39
 4              Anybody on the phone?                           16:33:42
 5              Going once, going twice.                        16:33:46
 6              MS. POOLEY:  Thank you, Mr. Lee.                16:33:51
 7              THE WITNESS:  Thanks.                           16:33:53
 8              MS. POOLEY:  We may see you again.             16:33:54
 9              THE REPORTER:  Did you want a copy of the      16:33:54
10   transcript?                                                16:33:54
11              MR. CROWLEY:  Yes, please.                     16:34:04
12              MR. DIEFFENBACH:  Copy, please.                16:34:11
13              MR. HAVEN:  This is Peter Haven on the phone,  16:34:12
14   I would like a copy of the transcript.                    16:34:19
15              MS. BACON:  Copy of the transcript.            16:34:21
16              MS. HEWITT:  Copy of the transcript.           16:34:24
17              THE VIDEOGRAPHER:  This concludes the          16:34:33
18   deposition of Sang Lee.  The time is 4:34 p.m. and        16:34:34
19   we're off the record.                                      16:34:38
20              MR. DIEFFENBACH:  And I'll take a rough,       16:35:30
21   please.
22              (Whereupon, the deposition
23              of Sang Lee commenced at
24              9:03 a.m. and concluded at
25              4:34 p.m.)
```

296

Sang Lee
May 31, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1   STATE OF CALIFORNIA   )
                           )
 2   COUNTY OF LOS ANGELES )

 3

 4

 5

 6            I, the undersigned, declare under penalty of

 7   perjury that I have read the foregoing transcript, and I

 8   have made any corrections, additions, or deletions that

 9   I was desirous of making; that the foregoing is a true

10   and correct transcript of my testimony contained

11   therein.

12

13            EXECUTED this _____ day of _____,

14   20_____, at _____, _____.

15                        (City)              (State)

16

17

18

19   _____

20   SANG LEE

21

22

23

24

25
```

297

Sang Lee
May 31, 2017

```
 1                     REPORTER'S CERTIFICATE

 2

 3           I, ANGELIQUE MELODY FERRIO, C.S.R. NO. 6979, a

 4    Certified Shorthand Reporter, certify:

 5           That the foregoing proceedings were taken

 6    before me at the time and place therein set forth, at

 7    which time the witness was put under oath by me;

 8           That the testimony of the witness and all

 9    objections made at the time of the examination were

10    recorded stenographically by me and were thereafter

11    transcribed;

12           That the foregoing is a true and correct

13    transcript of my shorthand notes so taken.

14           I further certify that I am not a relative or

15    employee of any attorney or of any of the parties, nor

16    financially interested in the action.

17           I declare under penalty of perjury under the

18    law of the State of California that the foregoing is

19    true and correct.

20           Dated this 1st day of June, 2017.

21

22

23           _____

24           Angelique Melody Ferrio
             CSR No. 6979
25
```

Sang Lee
May 31, 2017

Atkinson-Baker Court Reporters
www.depo.com

1           REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4           I, ANGELIQUE MELODY FERRIO, CSR No. 6979, a

5    Certified Shorthand Reporter in the State of California,

6    certify that the foregoing pages are a true and correct

7    copy of the original deposition of SANG LEE, taken on

8    Wednesday, May 31, 2017.

9              I declare under penalty of perjury under the

10   laws of the State of California that the foregoing is

11   true and correct.

12             Dated this 1st day of June, 2017.

13

14

15

16

17                    _____

18                    Angelique Melody Ferrio
                      CSR No. 6979

19

20

21

22

23

24

25

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 20320 S.W. Birch Street, Second Floor, Newport Beach, California 92660.

On July 24, 2017, I served the within document(s) described as:

DECLARATION OF TIFFANY BACON IN SUPPORT OF FRANK FERRARA'S MOTION FOR SUMMARY JUDGMENT OR, IN ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

on the interested parties in this action as stated on the attached mailing list.

[X]   (BY ELECTRONIC SERVICE) Complying with Code of Civil Procedure § 1010, I caused such document(s) to be Electronically Filed and Served through the _for the above-entitled case. Upon completion of transmission of said document(s), a filing receipt is issued to the filing party acknowledging receipt, filing and service by 's system. A copy of the [Email receipt System] filing receipt page will be maintained with the original document(s) in our office.

Executed on July 24, 2017, at Newport Beach, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Hailey Williams
(Type or print name)

_____
(Signature)

BREMER WHYTE BROWN & O'MEARA LLP
20320 S.W. BIRCH STREET
SECOND FLOOR
NEWPORT BCH, CA 92660
(949) 221-1000

1

H:\1178\176\PROOF OF SERVICE.docx

<u>**Cory Spencer v. Lunada Bay Boys et al.,**</u>

**Case No. 2:16-cv-2129-SJO**

**BWB&O CLIENT:    Frank and Charlie Ferrara**
**BWB&O FILE NO.:   1178.176**

<u>**SERVICE LIST**</u>

| | | |
|---|---|---|
| Samantha Wolff, Esq.<br>**HANSON BRIDGETT**<br>425 Market Street<br>26th Floor<br>San Francisco, CA 94105<br>(415) 777-3200<br>(415) 541-9366 Fax<br>Attorneys For **PLAINTIFF**<br><br>swolff@hansonbridgett.com<br>kfranklin@hansonbridgett.com | Tyson M. Shower, Esq.<br>**HANSON BRIDGETT**<br>500 Capitol Mall<br>Suite 1500<br>Sacramento, CA 95814<br>(916) 442-3333<br>(916) 442-2348 Fax<br>Attorneys For **PLAINTIFFS**<br><br>tshower@hansonbridgett.com | Victor Otten, Esq.<br>**OTTEN LAW, PC**<br>3620 Pacific Coast Highway<br>Suite 100<br>Torrance, CA 90505<br>(310) 378-8533<br>(310) 347-4225 Fax<br>Attorneys For **PLAINTIFFS**<br><br>vic@ottenlawpc.com |
| Jacob Song, Esq.<br>**KUTAK ROCK LLP**<br>5 Park Plaza<br>Suite 1500<br>Irvine, CA 92614<br>(949) 417-0999<br>(949) 417-5639<br>Attorney For **CITY OF PALOS VERDES ESTATES and JEFF KEPLEY, in his representative capacity, serves as the Chief of Police Department of Defendant City of Palos Verdes Estates.**<br><br>jacob.song@kutakrock.com | J. Patrick Carey, Esq.<br>**LAW OFFICE OF PATRICK CAREY**<br>1230 Rosecrans Avenue<br>Suite 270<br>Manhattan Beach, CA 90266<br>(310) 526-2237<br>(310) 356-3671 Fax<br>Attorney For **ALAN JOHNSTON individual membeer of LUNADA BAY BOYS aka JALIAN JOHNSTON**<br><br>pat@patcareylaw.com | Aaron G. Miller, Esq.<br>**THE PHILIPS FIRM**<br>800 Wilshire Boulevard<br>Suite 1550<br>Los Angeles, CA 90017<br>(213) 244-9913<br>(213) 244-9915 Fax<br>Attorneys For **ANGELO FERRARA**<br><br>amiller@thephillipsfirm.com |
| Mark Fields, Esq.<br>**LAW OFFICES OF MARK C. FIELDS**<br>333 So. Hope Street<br>Suite 3500<br>Los Angeles, CA 90071<br>(213) 617-5225<br>(213) 629-2420 Fax<br>Attorney For **ANGELO FERRARA an individual member of LUNADA BAY BOYS and N.F. an individual member of LUNADA BAY BOYS**<br><br>fields@markfieldslaw.com | Peter R. Haven, Esq.<br>**HAVEN LAW**<br>1230 Rosecrans Avenue<br>Suite 300<br>Manhattan Beach, CA 90266<br>(310) 272-5353<br>(213) 477-2137 Fax<br>Attorneys For **MICHAEL RAY PAPAYANS**<br><br>peter@havenlaw.com | Dana Alden Fox, Esq.<br>**LEWIS BRISBOIS BISGAARD & SMITH, LLP**<br>633 W. 5th Street<br>Site 4000<br>Los Angeles, CA 90071<br>(213) 580-3858<br>(213) 250-7900 Fax<br>Attorneys For **SANG LEE**<br><br>Dana.Fox@lewisbrisbois.com |

H:\1178\176\PROOF OF SERVICE.docx