# Exhibit A

Case 2:16-cv-02129-SJO-RAO   Document 303-1   Filed 07/31/17   Page 2 of 31   Page ID #:7830

7/30/2017       The Hazards of Surfing Lunada Bay : Peninsula: Outsiders run the risk of being pelted with rocks or having their vehicles vandalized. The locals…

## Los Angeles Times | ARTICLE COLLECTIONS

← Back to Original Article

# The Hazards of Surfing Lunada Bay : Peninsula: Outsiders run the risk of being pelted with rocks or having their vehicles vandalized. The locals offer no apologies for treating the public area as if it was their own.

July 05, 1991 | TIM WATERS | TIMES STAFF WRITER

George, a 42-year-old surfer from Torrance, likens the surfers at Lunada Bay in Palos Verdes Estates to an inner-city youth gang staking out its own turf, terrorizing the innocent and trashing private property.

"It's typical punk behavior," he says.

Erick, a surfer from Manhattan Beach, calls the situation with the surfers there a "territoriality-type thing, like an animal marking its place."

John, another surfer from Manhattan Beach, says it boils down to a group of selfish rich kids out to make trouble.

"It's the spoiled Palos Verdes guy with no brains."

With summer here and surfers hitting the area beaches in droves in search of the perfect wave, one place many say they have no intention of visiting is Lunada Bay, where the local surfers rule and outsiders are disdained.

Of the South Bay beaches frequented by surfers, the area is known as a war zone of sorts, a spot where interlopers venture only if they are willing to risk being pelted with rocks or having their vehicle vandalized.

In fact, surfers such as George, Erick and John say they don't want their last names printed because they fear retribution from the locals.

"If they are surfers from the South Bay, the word usually spreads through the grapevine that Lunada Bay is not a good place for non-locals," said Palos Verdes Estates Police Capt. Mike Tracy.

The locals, many of whom grew up in upper- and upper-middle-class neighborhoods near Lunada Bay, offer no apologies for treating the public coastal area as if it was their own private, back-yard pool.

Hard-core violence is certainly not condoned or practiced, the locals say. And they have no intention of hurting anyone who may venture to the area.

"You can't compare us to a gang," said Mark Griep, 30, who grew up half a block from the bay and has been surfing there for 20 years.

But verbally threatening outsiders or throwing rocks at them as they scale the steep cliffs at the ocean's edge, does occur, locals admit. And in the past, outsiders, or trolls as they are called, have returned to their cars after surfing to find their tires flattened, windshields smashed or paint scratched.

"It's not just a barbaric thing, it is done for a purpose," said 30-year-old Peter McCollum, who was surfing in the bay recently with several buddies.

"The crowds are so intense these days, you can't have your own little sanctuary. But we do."

"It's just a real strong friendship with one another, we all feed off each other's high," said John Givens, 21. "It's a brotherhood, I must say."

For decades, surfers have tried to protect their favorite areas from outsiders. Up and down the Southern California coastline, various beaches have reputations as places where visiting surfers can expect to encounter the wrath of the locals.

"Just about every place you surf has localism," said Ventura County Sheriff's Department Lt. Paul Anderson. "It's not a phenomenon that started last month or last week. When I was a kid up here in the mid-'60s you had localism."

Some surfers say the Palos Verdes Peninsula in general, where popular surf spots include The Indicator, Boneyards and The Cove, has long been perceived as a place where outsiders are frowned upon by locals.

"Palos Verdes is pretty famous for its localism," said Donna Oakley, managing editor of The Surf Report, a newsletter that forecasts surf conditions worldwide.

Police Capt. Tracy recalls an incident a couple of years ago near The Indicator. While on routine patrol, he spotted a surfer running beside the road, surfboard in hand. He had been dodging rocks thrown at him by the locals.

"He had a panicked look on his face and our eyes met and he flagged me down," Tracy said. "He said he and a friend were starting to go down a trail and some kids (told them they) should get the hell out."

But many surfers agree that Lunada Bay is the worst place on the peninsula, and perhaps in all of Los Angeles, for local surfers hassling outsiders.

The reputation is so widespread that a T-shirt sold in local surf shops and emblazoned with a map of South Bay surfing spots has the words "Locals Only" next to Lunada Bay. The Surf Report, in an issue printed several years ago, told readers Lunada Bay wasn't worth going to until peak surfing conditions ceased and

the local crowd thinned out, "unless you know someone who lives there."

"It's just not worth it because you don't necessarily have to have anything done to you physically, but they could do something to your car," said one surfer who refuses to go to Lunada Bay.

George, the Torrance surfer who stopped going there after he was verbally harassed and had a tire flattened, said: "I figured it was just a bad scene there."

Tracy said the Lunada Bay surfers rule "by numbers and intimidation, kind of a mini-gang mentality." Although separate statistics are not kept for Lunada Bay, he estimated the department receives two dozen complaints a year from surfers whose vehicles have been vandalized at Lunada Bay and The Indicator.

Just how many locals regularly ride the waves at Lunada Bay is unknown, but several surfers estimated the number at 100. In past years, they said, feelings that outsiders should not be allowed were even more intense, and often erupted into more violent behavior. One surfer recalled an outsider's car being pushed over the cliff overlooking the bay.

Nevertheless, the locals say they have no intention of laying down a welcome mat for outsiders. "We have a little attitude going down here, but we have to do it," said John Rall, an 18-year-old senior at Palos Verdes High School.

"Surfing is a spiritual thing, and when outsiders come up they are not respecting the surfing grounds of the locals," he said. "Normally, my conscience would say don't do this, but my heart would say it is the right thing to do because my heart is what is into surfing."

# Exhibit B

Case 2:16-cv-02129-SJO-RAO   Document 303-1   Filed 07/31/17   Page 5 of 31   Page ID #:7833

7/30/2017       Turf Wars Spoil Sanctity of Southland Surf Beaches : Violence: Popularity leads to crowding. Charges that one group attacked outsiders highlig...

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

# Turf Wars Spoil Sanctity of Southland Surf Beaches : Violence: Popularity leads to crowding. Charges that one group attacked outsiders highlight the problem.

May 08, 1995 | TONY PERRY | TIMES STAFF WRITER

Peter McCullom, a member of the feared Bay Boys of Palos Verdes Estates, stood beside one of the best surfing spots in Southern California and explained the law of Lunada Bay.

The law is as simple as a smack in the face: If you don't live here, don't surf here. Not if you know what's good for you.

"Everybody knows to stay away from Lunada Bay because they'll get hassled," said McCullom, 34, a Palos Verdes "local" who lives on an inheritance and spends his days surfing and traveling.

Last month, Los Angeles prosecutors slapped McCullom with a criminal charge after he and several friends confronted a group of surfers from Torrance who dared to venture to Lunada Bay. The Torrance surfers have filed a $6-million claim against the city of Palos Verdes Estates for allegedly looking the other way for years while the Bay Boys intimidated outsiders from surfing at Lunada Bay.

Incidents at Lunada Bay, where locals have long had the reputation of being the most hostile in Southern California to outsiders, are not the only cases of surf strife now headed for the criminal courts.

The number of arrests for surfer-on-surfer violence is still small. But the level of hostility appears to be growing, and each case is the object of much discussion on the beaches and in the surf shops of Southern California, possibly because violence runs counter to the surf mystique of a shared brotherhood among wave riders forever searching for the perfect wave.

At the Oxbow World Longboard Championships, held at Malibu's Surfrider Beach, a competitor and a competitor's father allegedly beat a non-competitor who refused to give up his wave. The 45-year-old victim suffered a separated shoulder and cuts that required 15 stitches.

The felony trial of ace longboarder Lance Hookano and Joseph Tudor, father of world-ranked surfer Joel Tudor, is set for late June. Hookano has not returned from Hawaii for court appearances, and a $100,000 warrant has been issued for his arrest.

In Del Mar, two surfers, one of whom was a martial arts expert, allegedly beat up a Chula Vista sixth-grade teacher, resulting in his being hospitalized with a broken pelvis, lacerated liver and damaged ribs after a dispute over who had priority on a wave. Amid disagreement over who threw the first punch, a trial is set for this summer.

Surfers and observers of surf culture say two factors are turning up the heat at the beach and in the water: the proliferation of surfing contests that require non-contestants to abandon the waves and increasing numbers of surfers chasing the same waves.

And then there is the decades-old phenomenon known as "localism," where surfers at a particular beach, or "break," do their best to scare outsiders into leaving.

Intimidation can begin as verbal harassment and escalate to threats to break the windows, slash the tires and snap the antennas of non-locals' cars. In some cases, localism leads to fistfights and spearing (diving off your surfboard in the water and aiming it at someone like a weapon).

Just how much intimidation goes on in the name of localism is unclear, but at least one veteran surfer, Rep. Brian P. Bilbray (R-San Diego), thinks it is getting out of hand and needs to be stopped.

"As a local in Imperial Beach, we'd joke about guys from Chula Vista surfing I.B.," said Bilbray, just before leaving on a surf vacation in Baja California with champion Mike Doyle. "But what is really frustrating is when you see what's going on now. It's fascism on the water."

Bilbray would like to see police with surfing experience go undercover to catch "some of these localism punks" in action.

"The good thing about being on the water is that you leave all the uptight attitudes on the shore," he said. "What we've got now is the aquatic version of gangs and their territorial battles."

In Palos Verdes Estates, Police Chief Gary Johansen thinks that a half a dozen arrests and convictions would break the back of localism at Lunada Bay. Although he does not advocate it, he also thinks that it might help if somebody really stood up to the Bay Boys.

"These kids grow up in a very, very sheltered environment," he said. "They don't know what a bad guy really is."

If localism has an anthem, it might be "Locals Only" by the Surf Punks, a rock band from the late 1970s and early 1980s that did whimsical, satiric takes on the Southern California surf lifestyle:

7/30/2017   Turf Wars Spoil Sanctity of Southland Surf Beaches : Violence: Popularity leads to crowding. Charges that one group attacked outsiders highlig…

*"We went down to Diego*

*for the big waves for to see*

*When I got into the water*

*those boys threw rocks at me*

*and screamed 'Locals Only!'"*

In "The Surfin'ary: A Dictionary of Surfing Terms and Surfspeak," surfer Trevor Cralle defines localism as "territorial defiance in defense of a surf spot." His secondary definition of localism is even more direct: "when surfers who frequently ride the same surf break are jerks to those who don't."

"The Surfin'ary," only slightly tongue in cheek, notes that the first example of localism may have occurred in 1779 when angry Hawaiians killed Capt. James Cook at Kealakekua Bay.

Tom Wolfe's "The Pump House Gang," published in 1966, captured localism at Windansea Beach in La Jolla. Wolfe's story begins with a description of locals harassing a middle-aged couple into leaving by making menacing comments behind their backs:

"Nobody says it to the two old crocks directly. God, they must be practically 50 years old. Naturally, they're carrying every piece of garbage imaginable: the folding aluminum chairs, the newspapers. . . ."

Three decades later, Windansea still has a reputation for "heavy localism," where surfers have an exaggerated sense of entitlement to the waves.

Other surf breaks in San Diego County known for localism are Bird Rock in La Jolla and Swami's at Cardiff-by-the-Sea. In Orange County, the Huntington Beach Pier has periodic outbreaks of localism; and in Los Angeles County, the areas mentioned most frequently besides Lunada Bay are Haggerty's, the Redondo Beach breakwater and Point Dume.

Ventura County has several beaches with reputations for localism: Hollywood-by-the-Sea, Silver Strand, Oxnard and Port Hueneme. Just across the line in Santa Barbara County, The (Hollister) Ranch is known as unfriendly to outsiders.

At Windansea, woe to the novice, or "gremmie," who paddles out and thinks all he has to do is wait his turn and take a wave.

"Soon as you paddle out, you can feel the vibes are not good and that you're not wanted," said James Accardi, 27, who owns Bird Rock Surf & Snow shop. He has been surfing Windansea for six years and only recently has begun to get grudging acceptance from the locals.

He has avoided problems by being deferential, by letting locals who are lower in the pecking order take a wave, and by never bringing other outsiders with him.

"The problems start when you get a guy who is clueless that a break is massively localized and he brings a crowd," Accardi said. "A guy like that is asking for trouble."

The same is true for other beaches with strong local followings.

"Trouble starts when there hasn't been much surf and then there is a good surf and suddenly a guy shows up with 15 other guys in a Suburban," said Stan Fujii, owner of Ventura Surfshop. "Even the mellowest local will begin using the 'stink eye,' " a surfing term for a particularly contemptuous glare.

Blaine Roberts, 46, a San Diego business consultant and venture capitalist, has been surfing San Diego beaches since he was a kid and has learned to be mindful of territorial locals. He got challenged twice recently at Del Mar but decided the wisest response was to back off.

"When localism erupts into violence or shouting, it's usually when a local has been shoulder-hopped or snaked by a non-local or a guy who doesn't surf that break very often," Roberts said.

Shoulder-hopping, snaking and dropping-in are terms to describe taking a wave that someone else is already riding. Not only does this violate the one-surfer, one-wave rule, it sets up the potential for collision and conflict.

The Rev. Rick Yeomans, 38, a founding pastor at San Clemente Christian Center and former director of Surfers For Missions, a missionary project, said he had a tough-talking surfer "go off on me" at Salt Creek north of Dana Point.

"As a surfer, I can understand that surfers do not want outsiders at their break," he said. "But as a Christian and a pastor, I think it's too bad that people are that way. I just told the guy: 'Hey, what's your problem?' "

Peter Navarro, a bodysurfer who is an associate professor in the graduate school of management at UC Irvine and a onetime San Diego mayoral candidate, has seen hassles at several San Diego breaks, including Ocean Beach, Torrey Pines, Del Mar and Trestles. He said the problem comes from overcrowding.

"It has to do with the waves being overpopulated, like much of San Diego," said Navarro, 45, who ran for mayor in 1992 on a slow-growth platform. "The violence isn't just locals versus outsiders. It's local versus local, surfer versus bodyboarder, expert versus novice, longboarder versus shortboarder."

In the surf shops north of San Diego, the word is that if you're not a local, do not stop if you see a certain purple van parked in the lot at Cardiff Beach. The van belongs to a particularly hostile local.

7/30/2017    Turf Wars Spoil Sanctity of Southland Surf Beaches : Violence: Popularity leads to crowding. Charges that one group attacked outsiders highlig…

A letter in the June edition of Surfer magazine from a 15-year-old Ventura boy decried localism at Solimar beach. The letter writer, Mike Dixon, told of a tumble in the water when he and a longboarder accidentally collided:

"He came up and started cussing at me and telling me to get the hell out of here and surf somewhere else. I told him I was sorry. He didn't even look at me. I think many surfers are getting way too territorial."

At Malibu's Surfrider Beach, surfer and actor Vincent Klyn, 30, puts an environmental spin on localism. Non-locals, said Klyn, who played the murderous villain in Jean-Claude Van Damme's movie "Cyborg," often show a lack of respect for the beach.

"If I see you dropping trash on the beach, I'm going to kick your ass," Klyn said. "If you're not happy, then move to another break because I'm going to be here every time."

Klyn also claims that non-locals are prone to show disrespect toward women surfers, such as Klyn's actress-friends, Blueberry Blervaque, 27, and Charlene Henryson, 30, by dropping in on their waves without waiting their turn. This too requires Klyn's intervention.

"I just throw (the non-locals) around the water and they get the message," he said.

Surf journalist Chris Ahrens, 46, abhors localism and notes that only a few surfers engage in it. He suggests that far more punches are thrown on basketball courts than at the beach.

At the same time, Ahrens admits to past indiscretions.

"When I was in my early 20s, I went through a period where I was very localistic," he said. "My tactic was to pretend I was out of control and get loud and aggressive. But I realized it was a foolish, regressive way to be, and I was embarrassed."

Lunada Bay has several elements conducive to ferocious localism.

For openers, the neighborhood is one of the most exclusive in Southern California, with a sense of superiority infusing the air like sea spray. A fixer-upper home can cost half a million dollars.

Many of the most dedicated surfers at Lunada Bay are, in the words of Surfer magazine editor Steve Hawk, "trust-fund babies."

The bay is a gorgeous horseshoe of deep green, popular with seals and lobsters. In the winter, the surf is as good as any in Southern California, with waves off the north point up to 20 feet high and offering a long and demanding ride.

And there is only one trail down the 200-foot cliff, a twisting series of switchbacks that can be treacherous to the unwary.

The lone trail allows the Bay Boys to pinch off access, harassing surfers as they attempt to descend to the beach, or, as was the case with the confrontation between McCullom and the Torrance contingent, allows them to approach outsiders as they reach the top of the cliff and head for their cars.

"Localism is way out of hand at Lunada Bay, and it's been like that as long as there has been surfing," said Eric Cooperman, manager of Natural Progression surf shop in Malibu.

"Localism is very bad in Hawaii, and there are lots of reasons for the locals there to resent the outsiders, but it's not nearly as bad as Lunada Bay," said Nick Carroll, editor-in-chief of Surfing magazine.

McCullom sees himself as heroically guarding Lunada Bay against outsiders who would ruin it. By his own admission, he yelled at the Torrance surfers never to return to Lunada Bay, pounded his fist in his palm just short of one surfer's nose, and spewed "Budweiser breath" in his face.

"Those guys at Lunada Bay remind me of the early stages of guys who would become Nazis," Geoff Hagins, 39, a plumber and surfer whose effort to "take back Lunada Bay" led to the confrontation. "They just seem to hate anyone who isn't part of their small group."

Hagins says the police have done nothing to thwart the Bay Boys because it suits the wishes of the residents to uphold the community's exclusivity.

But the police deny the allegation and say that they are equally sick of the Bay Boys' intimidation of outsiders and that they welcomed the opportunity to arrest McCullom on a charge of misdemeanor assault.

In January, police arrested another member of the Bay Boys for assault after a skirmish with a Brazilian surfer who had heard of the gorgeous winter swells at Lunada Bay. Threats to trash the Brazilian's car escalated when he paddled out to catch a wave, police say.

McCullom is aware that the law of Lunada Bay does not square with the law of the California Penal Code. But, he says, it is necessary to keep Lunada Bay free of the graffiti, pollution, trash, crowding and unruliness found at other surf beaches where a come-one, come-all attitude is allowed to exist.

"We've protected this beach for years," said McCullom, as he picked up a piece of driftwood. "This is why: so we can have driftwood on the beach rather than Kentucky Fried Chicken boxes. If this place was ever opened up, it would be packed with lowriders, guys in VW bugs; the rocks would be marked with graffiti, and the beach wouldn't be safe at night."

He likens Lunada Bay to a fraternity, a fraternity of local surfers who have inherited a tradition from their fathers and older brothers. If someone from outside shows up and is respectful and accepts some hazing, ultimately, possibly in a few years, he might be accepted as a new member, McCullom said.

Case 2:16-cv-02129-SJO-RAO   Document 303-1   Filed 07/31/17   Page 8 of 31   Page ID #:7836

But the police in this tiny enclave of affluence--4 1/2 square miles, 14,000 people--find this pose a cover for illegally usurping a public beach into a private club.

They wish that more surfers who are hassled would drop the surfer code of silence and file complaints against the Bay Boys, a name that McCullom hates but acknowledges is used by outsiders to describe him and several dozen other like-minded local surfers.

"It is really frustrating for us," said police Lt. Ed Jaakola. "You can't talk to those guys. There is no reasoning with them. They honestly believe it's their birthright to restrict access to Lunada Bay to only a few (surfers) chosen by the Bay Boys."

Meanwhile, Hagins, whose nephew, Hagan Kelly, is a world-class surfer, vows to see the criminal case against McCullom to the end and also to file a lawsuit if the Palos Verdes Estates City Council rejects the $6-million claim, which is based on an assertion that the Bay Boys are violating the civil rights of non-local surfers.

"There is no way they should be able to push people off a (surf) break," Hagins said. "That is not surfing."

(BEGIN TEXT OF INFOBOX / INFOGRAPHIC)

Making Waves

Bloody clashes among surfers from Del Mar to Malibu and arrests at Lunada Bay off Palos Verdes Estates contradict the Southern California myth that the sport is untouched by discord. In fact, a phenomenon called localism leads surfers at several popular breaks to use intimidation to repel outsiders.

---

**Los Angeles Times**   Copyright 2017 Los Angeles Times

# Exhibit C



# Jail Inmates in 2015

**Bureau of Justice Statistics**

*Summary | NCJ250394 | December 2016*

An estimated 721,300 inmates were confined in county and city jails on an average day in 2015, down from the peak of 776,600 inmates on an average day in 2008. In 2015, these local jails admitted 10.9 million persons. From 2008 to 2015, the volume of admissions to jails steadily declined. The number of persons admitted to jail in 2015 was nearly 15 times the size of the average daily population (ADP) in 2015.

The jail incarceration rate in 2015 (230 inmates per 100,000 U.S. residents) decreased from a peak of 260 inmates per 100,000 in 2006 through 2008. This was the lowest rate since midyear 2000 (220 per 100,000). The adult incarceration rate for persons age 18 or older also declined from a peak of 340 per 100,000 in 2006 through 2008 to about 300 per 100,000 each year since 2013.

## About jail inmates

Males have accounted for at least 85% of the jail population every year since 2000. The female jail population grew from 11% of the total jail population in 2000 to 14% in 2013 and 2014. During that period, the female jail incarceration rate increased from about 50 per 100,000 in 2000 to nearly 70 per 100,000 in 2014, while the male incarceration rate (400 per 100,000) remained relatively stable.

In 2015, less than 4,000 juveniles (those age 17 or younger) were held in jail custody, down from a peak of about 7,600 in 2010. Since 2000, at least 80% of jailed juveniles were on trial or awaiting trial in adult court.

Since 2013, 47% of jail inmates were white, which was an increase from 42% in 2000. Conversely, the percentage of black inmates declined from about 40% in 2005 to 35% in 2015. The percentage of Hispanics (about 15%) in local jails was unchanged between 2000 and 2014. American Indian and Alaska Native inmates represented a small proportion (about 1%) of the jail population, but their number nearly doubled since 2000.

Since 2005, more than 60% of all jail inmates were awaiting court action on a current charge, and the rest were sentenced offenders or convicted offenders awaiting sentencing. Regardless of conviction status, about two-thirds (68%) of jail inmates in 2015 were held for a felony offense. About a third (32%) of inmates were held for either misdemeanor (27%) or other offenses (5%).

**Average daily population of inmates confined in local jails, 2000 and 2005–2015**

Average daily population



Note: Average daily population is the sum of all inmates in jail each day for a year, divided by the number of days in the year.
Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2005–2015; and Census of Jail Inmates, 2005.

**Midyear custody population, average daily population, and rated capacity in local jails, 2000–2015**

Inmate population/bed space



[a] Maximum number of beds or inmates assigned by a rating official to a facility, excluding separate temporary holding areas.
[b] Number of inmates held on the last weekday in June.
[c] Sum of all inmates in jail each day for a year, divided by the number of days in the year.
Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000–2004 and 2006–2015; and Census of Jail Inmates, midyear 2005.

## Local jail capacity

The rated capacity in jails reached 904,900 beds at yearend 2015. From 2008 to 2015, the rated capacity increased by 9% while the ADP declined by 7%. Since peaking in 2007 at 95%, the percentage of occupied capacity on an average day declined to 80% by yearend 2015.

The full report (*Jail Inmates in 2015*, NCJ 250394), related documents, and additional information about the Bureau of Justice Statistics can be found at www.bjs.gov.

 

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

December 2016, NCJ 250394

# Jail Inmates in 2015

Todd D. Minton and Zhen Zeng, *BJS Statisticians*

The average daily population (ADP) of jail inmates in 2015 (721,300) remained stable from 2011 to 2015 after peaking in 2008 (776,600) (figure 1, table 1). The ADP jail population count is a fraction of the number of inmates flowing into jail each year. In 2015, there were 10.9 million admissions to jails (table 2). From 2008 to 2015, the volume of admissions to jails steadily declined. The number of admissions to jail in 2015 was nearly 15 times the size of ADP in 2015.

The jail incarceration rate—the confined population per 100,000 U.S. residents—decreased from a peak in 2006 through 2008 (260 per 100,000) to 230 per 100,000 at midyear 2015. These data are based on midyear counts, which includes the number of inmates held in custody on the last weekday in June. This was the lowest rate since midyear 2000 (220 per 100,000). The adult incarceration rate for persons age 18 or older also declined from a peak of 340 per 100,000 in 2006 through 2008 to about 300 per 100,000 each year since 2013.

In addition to tracking the midyear population and the ADP, the Bureau of Justice Statistics (BJS) has tracked the confined jail population at yearend since 2000. (See *Terms and definitions* textbox.) The jail population goes through seasonal change, typically

**FIGURE 1**
**Average daily population of inmates confined in local jails, 2000 and 2005–2015**



Average daily population of inmates

Note: Average daily population is the sum of all inmates in jail each day for a year, divided by the number of days in the year.
Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2005–2015; and Census of Jail Inmates, 2005.

with fewer inmates at yearend than at midyear (about 4% lower on average from 2000 to 2015), but the year-to-year changes of midyear and yearend population counts have followed a similar pattern (not shown). The total number of inmates confined in local jails was 693,300 on December 31, 2015.

## HIGHLIGHTS

- An estimated 721,300 inmates were confined in county and city jails on an average day in 2015, down from the peak of 776,600 inmates on an average day in 2008.

- In 2015, there were 10.9 million admissions to jails, continuing a steady decline since 2008.

- The number of admissions to jail in 2015 was nearly 15 times the size of average daily population in 2015.

- The adult jail incarceration rate declined from a peak of 340 per 100,000 in 2006 through 2008 to about 300 per 100,000 each year since 2013.

- The juvenile population in local jails continued to decline in 2015, to fewer than 4,000—down from a peak of about 7,600 juveniles in 2010.

- About 68% of jail inmates in 2015 were held for a felony offense, and the remaining 32% were held for either misdemeanor (27%) or other offenses (5%).

- The rated capacity in jails reached 904,900 beds at yearend 2015, up by nearly 47,000 beds since 2010.

- Local jail jurisdictions employed an estimated 213,300 full-time staff at yearend 2015 of which most (79%) were correctional officers.



## Terms and definitions

- **Adult incarceration rate**—The number of adult inmates held in the custody of local jails, per 100,000 U.S. residents age 18 or older.

- **Admissions**—Persons who are officially booked and housed in jails by formal legal document and the authority of the courts or some other official agency. Jail admissions include persons sentenced to weekend programs and those who are booked into the facility for the first time. Excluded from jail admissions are inmates reentering the facility after an escape, work release, medical appointment or treatment facility appointment, and bail and court appearances.

- **Average daily population**—The average is derived by the sum of inmates in jail each day for a year, divided by the number of days in the year.

- **Average annual change**—The mean average change across a 12-month period.

- **Calculating weekly jail turnover rate**—This rate is calculated by adding average weekly admissions and releases and dividing by the average daily population. See *Calculating weekly turnover rates* section for additional information.

- **Inmates confined at midyear**—The number of inmates held in custody on the last weekday in June.

- **Inmates confined at yearend**—The number of inmates held in custody on December 31. This number is typically smaller than the number of inmates confined at midyear.

- **Jail incarceration rate**—The number of inmates held in the custody of local jails, per 100,000 U.S. residents.

- **Percent of capacity occupied**—This percentage is calculated by taking the number of inmates (e.g. confined inmate population or average daily population) and dividing by the rated capacity.

- **Rated capacity**—The number of beds or inmates assigned by a rating official to a facility, excluding separate temporary holding areas.

- **Releases**—Persons released after a period of confinement (e.g., sentence completion, bail or bond releases, other pretrial releases, transfers to other jurisdictions, and deaths). Releases include those persons who have completed their weekend program and who are leaving the facility for the last time. Excluded from jail releases are temporary discharges, including work release, medical appointment or treatment center, court appearance, furlough, day reporting, and transfers to other facilities within the jail's jurisdiction.

- **Under jail supervision but not confined**—This classification includes all persons in community-based programs operated by a jail facility. These programs include electronic monitoring, house arrest, community service, day reporting, and work programs. The classification excludes persons on pretrial release and who are not in a community-based program run by the jail, as well as persons under supervision of probation, parole or other agencies, inmates on weekend programs, and inmates who participate in work release programs and return to the jail at night.

**TABLE 1**
**Inmates confined in local jails, average daily population, and incarceration rates, midyear 2000 and 2005–2015; yearend 2015**

| Year | Confined inmates[a] | | Average daily population[b] | | Jail incarceration rate[c] | |
|---|---|---|---|---|---|---|
| | Total | Year-to-year percent change | Total | Year-to-year percent change | Adults and juveniles | Adults only |
| 2000 | 621,100** | 2.5%*** | 618,300** | 1.7%*** | 220 | 290 |
| 2005 | 747,500** | 4.7*** | 733,400 | 3.9*** | 250 | 330 |
| 2006 | 765,800** | 2.4*** | 755,300** | 3.0*** | 260 | 340 |
| 2007 | 780,200** | 1.9*** | 773,100** | 2.4*** | 260 | 340 |
| 2008 | 785,500** | 0.7 | 776,600** | 0.4 | 260 | 340 |
| 2009 | 767,400** | -2.3*** | 768,100** | -1.1 | 250 | 330 |
| 2010 | 748,700** | -2.4*** | 748,600** | -2.5*** | 240 | 320 |
| 2011 | 735,600 | -1.8 | 735,600 | -1.7 | 240 | 310 |
| 2012 | 744,500 | 1.2 | 737,400 | 0.2 | 240 | 310 |
| 2013 | 731,200 | -1.8 | 731,400 | -0.8 | 230 | 300 |
| 2014 | 744,600 | 1.8 | 739,000 | 1.0 | 230 | 300 |
| 2015* | 728,200 | -2.2 | : | : | 230 | |
| 2015[d] | 693,300 ! | ! | 721,300** | -2.4 | ! | ! |

Note: Data are adjusted for nonresponse and rounded to the nearest 100 for confined inmates and average daily population. See appendix table 1 for standard errors. Starting in 2015, the Annual Survey Jails collects data on the number of inmates confined on the last weekday in June (midyear) and on December 31 (yearend).
…Not collected.
: Not calculated.
! Not compared because the jail population goes through seasonal variation, typically with fewer inmates at yearend than at midyear.
*Comparison year on confined inmates and average daily population.
**Difference with comparison year is significant at the 95% confidence level.
***Year-to-year change is significant at the 95% confidence level.
[a]Unless noted for a specific year, data are based on the number of inmates confined on the last weekday in June.
[b]Sum of all inmates in jail each day for a year, divided by the number of days in the year.
[c]Number of confined inmates per 100,000 U.S. residents. Adults are defined as persons age 18 or older, and juveniles are defined as persons age 17 or younger.
[d]Data are based on the number of inmates confined on December 31, 2015.
Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2006–2015; and Census of Jail Inmates, 2005.

**TABLE 2**
**Number of annual admissions to local jails, 1999 and 2007–2015**

| Year | Estimated total number of annual admissions[a] | Year-to-year percent change |
|---|---|---|
| 1999 | 11,400,000** | : |
| 2007 | 13,100,000** | : |
| 2008 | 13,600,000** | 3.8% |
| 2009 | 12,800,000** | -5.9*** |
| 2010 | 12,900,000** | 0.8 |
| 2011 | 11,800,000** | -8.5*** |
| 2012 | 11,600,000** | -1.7 |
| 2013 | 11,700,000 | 0.9 |
| 2014 | 11,400,000** | -2.6 |
| 2015* | 10,900,000 | -4.4*** |
| Average annual change | | |
| 1999–2014 | 0.0% | |
| 2014–2015 | -4.4*** | |

Note: Data are adjusted for nonresponse and rounded to the nearest 100,000. See appendix table 2 for standard errors.
: Not calculated.
*Comparison year on annual admissions.
**Difference with comparison year is significant at the 95% confidence level.
***Year-to-year change is significant at the 95% confidence level.
[a]In 2015, the ASJ collected annual admissions. The 1999 Census of Jails and the 2007–2014 ASJ collected data on weekly admissions during the last week in June. The number of annual admissions was calculated by multiplying the weekly admissions by 365 days and dividing by 7 days.
Source: Bureau of Justice Statistics, Census of Jails, 1999; and Annual Survey of Jails (ASJ), 2007–2015.

## Juvenile population in adult jails continued to decline

The juvenile population (those age 17 or younger) in local jails continued to decline in 2015, to fewer than 4,000 inmates (tables 3 and 4). This was down from a peak of about 7,600 juveniles in 2010. Since 2000, at least 8 in 10 juveniles held in local jails were on trial or awaiting trial in adult court.

While males accounted for at least 85% of the jail population each year since 2000, the female jail population grew from 11% of the total jail population in 2000 to more than 14% in 2013 and 2014. As a result, the female jail incarceration rate increased from about 50 per 100,000 female U.S. residents in 2000 to nearly 70 per 100,000 in 2014. The male incarceration rate remained relatively stable since 2000 (about 400 per 100,000 male U.S. residents) (not shown).

White inmates accounted for at least 47% of the jail population since 2013, up from 42% in 2000. Conversely, the percentage of black inmates held in local jails declined from about 40% in 2005 to 35% in 2014 and 2015. Hispanics represented about 15% of the jail population in 2014, unchanged since 2000. American Indian and Alaska Native inmates represented a small proportion (about 1%) of the jail population, but their number has nearly doubled since 2000.

## Nearly 7 in 10 inmates were held in jail for a felony offense

Since 2005, more than 60% of all jail inmates were awaiting court action on a current charge. About 4 in 10 inmates were sentenced offenders or convicted offenders awaiting sentencing. The growth in the overall jail inmate population since 2000 was due to the increase in the unconvicted population. Regardless of conviction status, about 68% of jail inmates in 2015 were held for a felony offense, and the remaining 32% were held for either misdemeanor (27%) or other offenses (5%) (not shown).

**TABLE 3**
**Number of confined inmates in local jails, by characteristics, midyear 2000, 2005, and 2010–2014; yearend 2015**

| Characteristic | 2000 | 2005 | 2010 | 2011 | 2012 | 2013 | 2014* | Yearend 2015 |
|---|---|---|---|---|---|---|---|---|
| | | | | Midyear | | | | |
| Total | 621,100** | 747,500 | 748,700 | 735,600 | 744,500 | 731,200 | 744,600 | 693,300 ! |
| **Sex** | | | | | | | | |
| Male | 550,200** | 653,000** | 656,400** | 642,300 | 645,900 | 628,900 | 635,500 | 594,200 ! |
| Female | 71,000** | 94,600** | 92,400** | 93,300** | 98,600** | 102,400** | 109,100 | 99,100 ! |
| **Adult** | 613,500** | 740,800 | 741,200 | 729,700 | 739,100 | 726,600 | 740,400 | 689,900 ! |
| Male | 543,100** | 646,800** | 649,300** | 636,900 | 640,900 | 624,700 | 631,600 | 591,100 ! |
| Female | 70,400** | 94,000** | 91,900** | 92,800** | 98,100** | 101,900** | 108,800 | 98,800 ! |
| **Juvenile[a]** | 7,600** | 6,800** | 7,600** | 5,900** | 5,400** | 4,600 | 4,200 | 3,500 ! |
| Held as adult[b] | 6,100** | 5,800** | 5,600** | 4,600** | 4,600** | 3,500 | 3,700 | 3,200 ! |
| Held as juvenile | 1,500** | 1,000 | 1,900** | 1,400 | 900 | 1,100 | 500 | 300 ! |
| **Race/Hispanic origin[c]** | | | | | | | | |
| White | 260,500** | 331,000** | 331,600** | 329,400** | 341,100 | 344,900 | 352,800 | 335,100 ! |
| Black/African American | 256,300 | 290,500** | 283,200** | 276,400** | 274,600 | 261,500 | 263,800 | 243,400 ! |
| Hispanic/Latino | 94,100** | 111,900 | 118,100** | 113,900 | 112,700 | 107,900 | 110,600 | 99,000 ! |
| American Indian/ Alaska Native[d] | 5,500** | 7,600** | 9,900 | 9,400 | 9,300 | 10,200 | 10,400 | 8,600 ! |
| Asian/Native Hawaiian/ Other Pacific Islander[d] | 4,700** | 5,400** | 5,100** | 5,300** | 5,400 | 5,100** | 6,000 | 5,800 ! |
| Two or more races | … | 1,000 | 800 | 1,200 | 1,500** | 1,600** | 1,000 | 1,500 ! |
| **Conviction status[d,e]** | | | | | | | | |
| Convicted | 271,300 | 284,400 | 291,300** | 289,600** | 293,100** | 278,000 | 277,100 | 258,800 ! |
| Unconvicted | 349,800** | 463,200 | 457,400 | 446,000** | 451,400** | 453,200 | 467,500 | 434,600 ! |

Note: Data are adjusted for nonresponse and rounded to the nearest 100. Detail may not sum to total due to rounding. Midyear estimates are based on the number of inmates confined on the last weekday in June, and yearend estimates are based on the number of inmates confined on December 31. In 2015, the ASJ collected characteristic data at yearend but did not collect details for midyear 2015. See appendix table 3 for standard errors. See *Jail Inmates at Midyear 2014* for years 2006–2009.
…Not collected.
! Not compared because the jail population goes through seasonal variation, typically with fewer inmates at yearend than at midyear.
*Comparison year for each characteristic.
**Difference with comparison year is significant at the 95% confidence level.
[a]Persons age 17 or younger.
[b]Includes juveniles who were tried or awaiting trial as adults.
[c]Excludes persons of Hispanic or Latino origin, unless specified.
[d]Reports prior to 2014 combined American Indians and Alaska Natives and Asians, Native Hawaiians, and Other Pacific Islanders into an other race category.
[e]Includes juveniles who were on trial or awaiting trial as adults.
Source: Bureau of Justice Statistics, Annual Survey of Jails (ASJ), 2000, 2005, and 2010–2015; and Census of Jail Inmates, 2005.

**TABLE 4**
**Percent of confined inmates in local jails, by characteristics, midyear 2000, 2005, and 2010–2014; yearend 2015**

| Characteristic | 2000 | 2005 | 2010 | 2011 | 2012 | 2013 | 2014* | Yearend 2015 |
|---|---|---|---|---|---|---|---|---|
| | | | | Midyear | | | | |
| **Sex** | | | | | | | | |
| Male | 88.6%** | 87.3%** | 87.7%** | 87.3%** | 86.8%** | 86.0%** | 85.3% | 85.7% ! |
| Female | 11.4%** | 12.7%** | 12.3%** | 12.7%** | 13.2%** | 14.0%** | 14.7 | 14.3 ! |
| **Adult** | 98.8%** | 99.1%** | 99.0%** | 99.2%** | 99.3%** | 99.4% | 99.4% | 99.5% ! |
| Male | 87.4%** | 86.5%** | 86.7%** | 86.6%** | 86.1%** | 85.4%** | 84.8 | 85.2 ! |
| Female | 11.3%** | 12.6%** | 12.3%** | 12.6%** | 13.2%** | 13.9%** | 14.6 | 14.3 ! |
| **Juvenile**[a] | 1.2%** | 0.9%** | 1.0%** | 0.8%** | 0.7%** | 0.6% | 0.6% | 0.5% ! |
| Held as adult[b] | 1.0%** | 0.8%** | 0.8%** | 0.6%** | 0.6%** | 0.5 | 0.5 | 0.5 ! |
| Held as juvenile | 0.2%** | 0.1%** | 0.3%** | 0.2%** | 0.1%** | 0.1%** | 0.1 | -- |
| **Race/Hispanic origin**[c] | | | | | | | | |
| White | 41.9%** | 44.3%** | 44.3%** | 44.8%** | 45.8%** | 47.2% | 47.4% | 48.3% ! |
| Black/African American | 41.3%** | 38.9%** | 37.8%** | 37.6%** | 36.9%** | 35.8 | 35.4 | 35.1 ! |
| Hispanic/Latino | 15.2 | 15.0 | 15.8%** | 15.5 | 15.1 | 14.8 | 14.9 | 14.3 ! |
| American Indian/ Alaska Native[d] | 0.9%** | 1.0%** | 1.3 | 1.3 | 1.2 | 1.4 | 1.4 | 1.2 ! |
| Asian/Native Hawaiian/ Other Pacific Islander[d] | 0.8 | 0.7%** | 0.7%** | 0.7%** | 0.7 | 0.7%** | 0.8 | 0.8 ! |
| Two or more races | ... | 0.1 | 0.1 | 0.2 | 0.2 | 0.2%** | 0.1 | 0.2 ! |
| **Conviction status**[e] | | | | | | | | |
| Convicted | 44.0%** | 38.0% | 38.9%** | 39.4%** | 39.4%** | 38.0% | 37.2% | 37.3% ! |
| Unconvicted | 56.0%** | 62.0 | 61.1%** | 60.6%** | 60.6%** | 62.0 | 62.8 | 62.7 ! |

Note: Percentages are based on the total number of confined inmates in table 3. Detail may not sum to total due to rounding. Midyear estimates are based on the number of inmates confined on the last weekday in June, and yearend estimates are based on the number of inmates confined on December 31. In 2015, the ASJ collected characteristic data at yearend. See appendix table 4 for standard errors. See *Jail Inmates at Midyear 2014* for years 2006–2009.
--Less than 0.05%.
…Not collected.
! Not compared because the jail population goes through seasonal change, typically with fewer inmates at yearend than at midyear.
*Comparison year for each characteristic.
**Difference with comparison year is significant at the 95% confidence level.
[a]Persons age 17 or younger.
[b]Includes juveniles who were tried or awaiting trial as adults.
[c]Excludes persons of Hispanic or Latino origin, unless specified.
[d]Reports prior to 2014 combined American Indians and Alaska Natives and Asians, Native Hawaiians, and Other Pacific Islanders into an other race category.
[e]Includes juveniles who were tried or awaiting trial as adults.
Source: Bureau of Justice Statistics, Annual Survey of Jails (ASJ), 2000, 2005, and 2010–2015; and Census of Jail Inmates, 2005.

## Jail jurisdictions with 2,500 or more inmates held 21% of the population in 2015, down from 25% in 2014

Large jail jurisdictions with 2,500 or more inmates held 21% of the population in 2015, down from 25% in 2014 nationwide (table 5). In 2015, 1 in 5 inmates were held in 30 jail jurisdictions with an ADP of 2,500 or more inmates (not shown). Jail jurisdictions with 100–249 average daily population held 14% of inmates in 2015, up from 12% in 2014. In comparison, jail jurisdictions with an ADP of under 100 held less than 10% of the inmate population, but accounted for more than half of all jail jurisdictions in 2014 (57%) and 2015 (56%) (not shown). While the mean ADP of all jail jurisdictions decreased from 269 to 253 inmates between 2014 and 2015, the ADP within jail size categories remained stable.

## Bed space increased between 2008 and 2015, while jail population decreased

The rated capacity in jails reached 904,900 beds at yearend 2015, up nearly 47,000 beds since 2010. (figure 2, table 6). Jail capacity grew at an annual rate of nearly 2% between midyear 2000 and yearend 2015. The rated capacity is the maximum number of beds or inmates allocated to each jail facility by a rating official, excluding separate temporary holding areas. While the jail population and rated capacity increased at similar rates from 2000 through 2008, the growth rates have diverged since 2008. The ADP declined by 7% from 2008 to 2015, while the rated capacity increased by 9%.

Since peaking in 2007 at 95%, the percentage of occupied capacity on an average day (the ratio of ADP in a year to rated capacity) declined to 80% by yearend 2015. Combined, jail jurisdictions holding under 100 inmates reported the lowest occupied capacity (between 55% and 71%) compared to jail jurisdictions holding 100 inmates or more (between 80% and 86%) (table 7). In 2014 and 2015, about 80% of jail jurisdictions were operating at less than 100% of their capacity. The percentage of jail jurisdictions operating at more than 100% of their capacity ranged from 4% of jail jurisdictions with an ADP of 49 or fewer inmates to 24% of jail jurisdictions with an ADP of 1,000 to 2,499 inmates.

**FIGURE 2**

**Midyear custody population, average daily population, and rated capacity in local jails, 2000–2015**



Inmate population/bed space

[a] Maximum number of beds or inmates assigned by a rating official to a facility, excluding separate temporary holding areas.
[b] Number of inmates held on the last weekday in June.
[c] Sum of all inmates in jail each day for a year, divided by the number of days in the year.
Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000–2004 and 2006–2015; and Census of Jail Inmates, 2005.

**TABLE 5**

**Mean and proportion of the average daily jail population, by size of jurisdiction, 2014 and 2015**

| Jurisdiction size[b] | Mean ADP[a] | | Percent of total ADP | |
|---|---|---|---|---|
| | 2014 | 2015* | 2014 | 2015* |
| Total | 269** | 253 | 100% | 100% |
| 49 or fewer | 20 | 22 | 2.8 | 3.4 |
| 50–99 | 72 | 72 | 4.9 | 4.9 |
| 100–249 | 162 | 162 | 11.6** | 14.1 |
| 250–499 | 346 | 354 | 14.6 | 14.5 |
| 500–999 | 702 | 695 | 18.2 | 18.2 |
| 1,000–2,499 | 1,444 | 1,423 | 23.1 | 24.1 |
| 2,500 or more | 5,109 | 4,942 | 24.8** | 20.8 |

Note: See appendix table 5 for standard errors.
*Comparison year for jurisdiction size.
**Difference with comparison year is significant at the 95% confidence level.
[a] Sum of all inmates in jail each day for a year, divided by the number of days in the year.
[b] For 2014, the jurisdiction size was based on the ADP during the 12-month period ending June 30, 2014. For 2015, the jurisdiction size was based on the ADP during the 12-month period ending December 31, 2015.
Source: Bureau of Justice Statistics, Annual Survey of Jails, 2014–2015.

**TABLE 6**

**Rated capacity of local jails and percent of capacity occupied, 2000 and 2005–2015**

| | | | Percent of capacity occupied based on[b]— | |
|---|---|---|---|---|
| Year[d] | Rated capacity[c] | Year-to-year percent change in rated capacity[a] | Confined 1-day population[d] | Average daily population[e] |
| 2000 | 677,800** | 3.9%*** | 92.0%** | 91.2%** |
| 2005 | 787,000** | 4.1*** | 95.0** | 93.2** |
| 2006 | 795,000** | 1.0 | 96.3** | 95.0** |
| 2007 | 810,500** | 2.0*** | 96.3** | 95.4** |
| 2008 | 828,700** | 2.2*** | 94.8** | 93.7** |
| 2009 | 849,900** | 2.6*** | 90.3** | 90.4** |
| 2010 | 857,900** | 0.9 | 87.3** | 87.3** |
| 2011 | 870,400 | 1.5 | 84.5 | 84.5 |
| 2012 | 877,400 | 0.8 | 84.9 | 84.0 |
| 2013 | 872,900 | -0.5 | 83.8 | 83.8 |
| 2014* | 890,500 | 2.0 | 83.6 | 83.0 |
| 2015[f] | 904,900 | 1.6 | 76.6! | 79.7** |
| Change in rated capacity | | | | |
| Average annual change, 2000–2015 | | 1.9% | | |

Note: Data are adjusted for nonresponse and rounded to the nearest 100. See appendix table 6 for standard errors.

! Not compared because the jail population goes through seasonal change, typically with fewer inmates at yearend than at midyear.

*Comparison year on rated capacity and percent of capacity occupied.

**Difference with comparison year is significant at the 95% confidence level.

***Year-to-year change is significant at the 95% confidence level.

[a]Increase or reduction in the number of beds during the 12 months ending midyear of each year. Number and percentage change for 2000 are calculated using the rated capacity of 652,321 for 1999.

[b]Based on the inmate population divided by the rated capacity.

[c]Maximum number of beds or inmates assigned by a rating official to a facility, excluding separate temporary holding areas.

[d]Data are based on the number of inmates confined on the last weekday in June except for 2015 which was based on December 31, 2015.

[e]Sum of all inmates in jail each day for a year, divided by the number of days in the year.

[f]Data are based on the rated capacity for December 31, 2015.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2006–2015; and Census of Jail Inmates, 2005.

**TABLE 7**

**Percent of jail capacity occupied based on average daily population, by size of jurisdiction, 2014 and 2015**

| | Percent of capacity occupied | | Percent of jail jurisdictions operating over 100% of capacity | |
|---|---|---|---|---|
| Jurisdiction size | 2014 | 2015* | 2014 | 2015* |
| Total | 83.0%** | 79.7% | 12.8% | 12.0% |
| 49 or fewer | 57.3 | 55.3 | 3.8 | 4.1 |
| 50–99 | 68.0 | 71.3 | 11.7 | 12.3 |
| 100–249 | 78.7** | 83.7 | 20.2 | 18.9 |
| 250–499 | 83.3 | 80.1 | 21.0 | 17.9 |
| 500–999 | 84.1** | 79.2 | 19.6 | 17.6 |
| 1,000–2,499 | 88.8** | 85.8 | 28.9** | 24.1 |
| 2,500 or more | 87.0** | 79.5 | 22.9** | 17.4 |

Note: The average daily population (ADP) is divided by the rated capacity. For 2014, the jurisdiction size was based on the ADP during the 12-month period ending June 30, 2014. For yearend 2015, the jurisdiction size is based on the ADP during the 12-month period ending December 31, 2015. See appendix table 7 for standard errors.

*Comparison year for jurisdiction size.

**Difference with comparison year is significant at the 95% confidence level.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2014–2015.

**The smallest jail jurisdictions turn over inmates three times faster than the largest jails**

For the smallest jail jurisdictions (49 or fewer inmates), the number of admissions to their jails was 37 times the size of the ADP in 2015 (table 8). The smallest jails accounted for less than 10% of all jail admission in 2014 and 2015, and large jails (1,000 or more) accounted for more than a third of all admissions. The smallest jails weekly turnover rate (140%) was three times that of the largest jail jurisdictions with an ADP of 2,500 or more inmates (42%). The smallest jails also maintained the lowest capacity occupied at 55%. A higher inmate turnover rate indicates a shorter length of stay in jail and is associated with an increased burden by jurisdictions to process admissions and releases.

**Jail staff supervised an additional 57,100 persons in various community programs outside of jail**

In addition to the confined jail population at yearend 2015, jail authorities also supervised 57,100 persons in various programs outside of the jail, including electronic monitoring, home detention, day reporting, community service, treatment programs, and other pretrial and work programs. On average, jails supervised an estimated 66,000 nonconfined persons each year between 2000 and 2015 (table 9).

**TABLE 8**
**Average daily jail population, admissions, and turnover rate, by size of jurisdiction, 2014 and 2015**

| Jurisdiction size[c] | ADP[a] | | Estimated number of annual admissions | | Weekly turnover rate[b] | |
|---|---|---|---|---|---|---|
| | 2014 | 2015* | 2014[d] | 2015*[e] | 2014 | 2015* |
| Total | 739,000 | 721,300 | 11,400,000** | 10,900,000 | 58.1% | 57.0% |
| 49 or fewer | 20,600 | 24,300 | 653,800** | 902,000 | 119.0 | 139.6 |
| 50–99 | 36,500 | 35,000 | 899,800 | 694,200 | 88.0 | 73.9 |
| 100–249 | 85,400** | 101,100 | 1,588,600 | 1,820,300 | 69.9 | 67.4 |
| 250–499 | 107,700 | 105,000 | 1,864,100 | 1,716,600 | 65.0 | 62.2 |
| 500–999 | 134,500 | 131,600 | 1,940,100 | 1,857,600 | 54.5 | 53.6 |
| 1,000–2,499 | 170,900 | 173,900 | 2,327,800 | 2,200,800 | 52.5** | 48.6 |
| 2,500 or more | 183,400** | 150,100 | 2,141,200** | 1,661,700 | 43.7 | 41.8 |

Note: Data are adjusted for nonresponse and rounded to the nearest 100. Detail may not sum to total due to rounding. See appendix table 8 for standard errors.
*Comparison year for jurisdiction size.
**Difference with comparison year is significant at the 95% confidence level.
[a]Sum of all inmates in jail each day for a year, divided by the number of days in the year.
[b]Calculated by adding weekly admissions and releases, dividing by the average daily population (ADP). To calculate weekly admissions for 2015, the annual number of admissions was divided by the number of weeks in 2015.
[c]For 2014, the jurisdiction size was based on the ADP during the 12-month period ending June 30, 2014. For 2015, the jurisdiction size is based on the ADP during the 12-month period ending December 31, 2015, the first year in the current ASJ sample.
[d]The 2014 ASJ collected data on weekly admissions during the last week in June. The number of annual admissions was calculated by multiplying the weekly admissions by 365 days and dividing by 7 days. See *Methodology* for more detail on estimation procedures.
[e]Starting in 2015, the ASJ collects annual admissions.
Source: Bureau of Justice Statistics, Annual Survey of Jails (ASJ), 2014–2015.

Local jail jurisdictions employed an estimated 213,300 full-time staff at yearend 2015 (table 10). Similar to 2013, most (79%) of the facility staff were correctional officers, including deputies, monitors, and other custody staff who spend more than 50% of their time with the incarcerated population. About 21% of the staff consisted of administrators, clerical and maintenance staff, educational staff, professional and technical

staff, and other unspecified staff who spend more than 50% of their time in the facility. In 2013 and 2015, about 65% of the jail staff and 70% of all correctional officers were male. Nationally, the inmate-to-correctional officer ratio was 4.1 in 2015 and 2015, similar to 2013. For state-level estimates of correctional officers for 2013, see *Census of Jails: Population Changes, 1999–2013* (NCJ 248627, BJS web, December 2015).

## TABLE 9
**Persons under jail supervision, by confinement status, 2000 and 2006–2015**

| Year | Total | Held in jail[a] | Supervised outside of a jail facility[b] |
|---|---|---|---|
| 2000 | 687,000** | 621,100** | 65,900 |
| 2006 | 826,000 | 765,800** | 60,200 |
| 2007 | 848,400** | 780,200** | 68,200 |
| 2008 | 858,400** | 785,500** | 72,900** |
| 2009 | 837,600** | 767,400** | 70,200** |
| 2010 | 809,400 | 748,700 | 60,600 |
| 2011 | 798,400 | 735,600 | 62,800 |
| 2012 | 808,600 | 744,500 | 64,100 |
| 2013 | 790,600 | 731,200 | 59,400 |
| 2014* | 808,100 | 744,600 | 63,500 |
| 2015[c] | 750,500 ! | 693,300 ! | 57,100 ! |

Note: Data are adjusted for nonresponse and rounded to the nearest 100. Detail may not sum to total due to rounding. See appendix table 9 for standard errors.

! Not compared because the jail population goes through seasonal change, typically with fewer inmates at yearend than at midyear.

*Comparison year on confined inmates and inmates supervised outside of jail.

**Difference with comparison year is significant at the 95% confidence level.

[a]Unless noted for a specific year, data are based on the number of inmates confined on the last weekday in June.

[b]Unless noted for a specific year, the number of persons under jail supervision but not confined is based on the last weekday in June. Excludes persons supervised by a probation or parole agency. Includes offenders that served their sentences of confinement on weekends only (i.e., Friday to Sunday), persons under electronic monitoring, persons in work release programs, work gangs, and other alternative work programs, and persons in drug, alcohol, mental health, and other medical treatment.

[c]Data are based on the number of persons under jail supervision on December 31, 2015.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2006–2015.

## TABLE 10
**Staff employed in local jails, by sex, December 2013 and 2015**

| Job function | Number | | Percent | |
|---|---|---|---|---|
| | 2013 | 2015* | 2013 | 2015 |
| Total | 220,000** | 213,300 | 100% | 100% |
| Correctional officers[a] | 173,900** | 169,200 | 79.0% | 79.3% |
| Male | 123,400** | 117,300 | 56.1 | 55.0 |
| Female | 50,500 | 52,000 | 23.0 | 24.4 |
| All other staff[b] | 46,100** | 44,000 | 21.0% | 20.6% |
| Male | 20,800 | 20,000 | 9.5 | 9.4 |
| Female | 25,200** | 24,000 | 11.5 | 11.3 |
| Inmate-to-correctional officer ratio[c] | 4.2 | 4.1 | | |

Note: Data are adjusted for nonresponse and rounded to the nearest 100. Detail may not sum to total due to rounding. See appendix table 10 for standard errors.

*Comparison year on staff.

**Difference with comparison year is significant at the 95% confidence level.

[a]Includes deputies, monitors, and other custody staff who spend more than 50% of their time with the incarcerated population.

[b]Includes administrators, clerical and maintenance staff, educational staff, professional and technical staff, and other unspecified staff who spend more than 50% of their time in the facility.

[c]Number of confined inmates per correctional officer.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2015; and Census of Jails, 2013.

## Methodology

### Annual Survey of Jails sampling design

In years between the complete censuses of jails, the Bureau of Justice Statistics (BJS) conducts the Annual Survey of Jails (ASJ). The ASJ is a nationally representative survey of all county or city jail jurisdictions and all regional jails in the country. A jail jurisdiction is a county (parish in Louisiana) or municipal government that administers one or more local jails and represents the entity responsible for managing the jail facilities under its authority. Most jail jurisdictions consist of a single facility, but some contain multiple facilities and/or multiple facility operators, called reporting units. For example, four reporting units in Allegheny County, Pennsylvania, represent a single jail jurisdiction.

The ASJ sample is drawn at the jurisdiction level. When a jail jurisdiction with multiple reporting units is sampled, data are collected from all reporting units within that jail jurisdiction. BJS collapses the reporting units into jail jurisdictions and reports statistics at the jurisdiction level.

ASJ uses a stratified probability sample of jail jurisdictions to estimate the number and characteristics of jail inmates nationwide. The 2015 ASJ sample consists of 876 jail jurisdictions, representing 2,851 active jail jurisdictions nationwide.

The 2015 ASJ used 2013 Census of Jails as its sampling frame. All jail jurisdictions were grouped into 10 strata based on their average daily population (ADP) and presence of juveniles in 2013. In 8 of the 10 strata, a random sample of jail jurisdictions was selected. The remaining two strata were certainty strata, where all jurisdictions were selected with probability 1. One stratum consisted of all jails that were operated jointly by two or more jurisdictions (referred to as multijurisdictional jails). The other stratum consisted of all jail jurisdictions that—

- held juvenile inmates at the time of the 2013 Census of Jails and had an ADP of 500 or more inmates during the 12 months ending on December 31, 2013

- held only adult inmates and had an ADP of 750 or more

- were located in California

- were known to be operating in 2015 and not included in the 2013 Census of Jails.

The ASJ sample includes all California jail jurisdictions. This sampling feature was introduced in 2013 in response to the enactment of California AB 109 and AB 117, aimed to reduce the number of inmates housed in state prisons starting on October 1, 2011. After the enactment of these two laws, the jail population in California experienced an unusual increase, which was atypical of the rest of the United States. For this reason, the ASJ sampling design was modified to include all California jail jurisdictions in a certainty (self-representing) stratum (see *Methodology* in *Jail Inmates at Midyear* 2014 (NCJ 248629, BJS web, June 2015)). The inclusion of all California jail jurisdictions resulted in an additional 21 jurisdictions.

The sample also includes in the certainty stratum all six new jail jurisdictions that were known to be operating in 2015 and not represented in the sampling frame (2013 Census of Jails).

### Response rate and nonresponse adjustment

Data were collected through a web-based survey. The initial sample consisted of 881 jail jurisdictions. Six jurisdictions were closed or merged with other jurisdictions at the time of the survey and dropped from the sample, resulting in a total of 876 active jail jurisdictions. The response rate was 97%.

#### Nonresponse weighting adjustment

Nonresponse weighting was implemented to account for unit nonresponse. Jurisdictions were grouped into weighting classes based on sampling stratum and the 2013 inmate population. Using a simple weighting class method, the design weight of nonresponding jail jurisdictions was equally allocated to each of the responding jails within the same weighting class. The nonresponse weighting adjustment factor calculated within each weighting class h as:

$$F_h = \frac{\sum_{i=1}^{n_h} W_{hi} \times JURISA_{hi}}{\sum_{i=1}^{n_h} W_{hi} \times JURISR_{hi}}$$

where

$n_h$ = number of jurisdictions sampled in weighting class h,

$w_{hi}$ = sampling weight for jurisdiction i in weighting class h,

$JURISA_{hi}$ = active status indicator for jurisdiction i in weighting class h (1 = active, 0 = out-of-scope), and

$JURISR_{hi}$ = response indicator of jurisdiction i in weighting class h (1 = respondent, 0 = nonrespondent).

#### Final weight

The final weight $FW_{hi}$ for each jail jurisdiction is

$$FW_{hi} = W_{hi} \times F_h \times JURISR_{hi}$$

where

$JAILR_{hi}$ set the final weight to 0 for jurisdictions that were out-of-scope or nonrespondents.

### Item nonresponse imputation

Item response rates ranged from 92% to 99%. For responding jail jurisdictions that were unable to provide some requested items, a weighted sequential hot-deck/cold-deck imputation procedure was used to impute values. This procedure, implemented using the SUDAAN software package, substitutes current-year respondent and prior-year (2013 Census of Jails, cold-deck) data for missing values. The donor for each missing item was randomly selected from within a set of similar jails, sorted by related previous-year population values. The

resulting imputed values are generally similar to the reported values of the previous year, but are not identical because of differences between each donor and item pairing and the year-to-year fluctuation in donor population values.

### Midyear and yearend population difference

Prior to 2015, the ASJ used midyear (last weekday in June) as the reference date in data collection. The 2015 ASJ changed the reference date to December 31. Comparisons of yearend data from 2015 ASJ with previous midyear data need to consider seasonal variations, as jails typically hold fewer inmates at yearend than at midyear.

### Calculating weekly turnover rates

Weekly jail turnover rates were modeled after the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey. Additional information on turnover rates is available at http://www.bls.gov/jlt/. Jail turnover rates were calculated by adding admissions and releases, and then dividing by the ADP. The turnover rate accounts for jail admissions and releases and gives an indication of the fluctuation of the jail population. It is calculated as the sum of average weekly admissions and releases, divided by the average daily population: (annual admissions + annual releases)/ADP*(7/365).

### Jurisdiction size categories

In the 2011 through 2014 jail inmate reports, BJS categorized jurisdiction sizes based on the ADP during the 12 months ending midyear 2006 (the first year in the ASJ sample for that period). The jurisdiction size for 2015 was based on the ASJ 2015 sample. The jurisdiction size categories for 2014 were based on average daily population during the 12-month period ending June 30, 2014, and for 2015 ADP was based on the 12-month period ending December 31, 2015. It assumes a similar fluctuation in the ADP during the two time periods. As a result, not all data in previous reports are comparable with data in this report.

### Jail functions

Jails in the ASJ include confinement facilities—usually administered by a local law enforcement agency—that are intended for adults but may hold juveniles before or after they are adjudicated. Facilities include jails and city or county correctional centers, special jail facilities, such as medical or treatment release centers, halfway houses, and work farms, and temporary holding or lockup facilities that are part of the jail's combined function. Inmates sentenced to jail facilities usually have a sentence of 1 year or less.

Within the ASJ, jails—

- receive individuals pending arraignment and hold them awaiting trial, conviction, or sentencing

- re-admit probation, parole, and bail bond violators and absconders temporarily detain juveniles pending their transfer to juvenile authorities

- hold mentally ill persons pending their movement to appropriate mental health facilities

- hold individuals for the military, for protective custody, for contempt, and for the courts as witnesses

- release convicted inmates to the community upon completion of sentence

- transfer inmates to federal, state, or other authorities

- house inmates for federal, state, or other authorities because of crowding of their facilities

- sometimes operate community-based programs as alternatives to incarceration.

**APPENDIX TABLE 1**

**Standard errors for table 1: Inmates confined in local jails, average daily population, and incarceration rates, midyear 2000 and 2005–2015; yearend 2015**

| Year | Confined inmates | Average daily population |
|------|-----------------|--------------------------|
| 2000 | 2,504 | 2,265 |
| 2005 | ~ | ~ |
| 2006 | 3,552 | 3,230 |
| 2007 | 3,720 | 3,549 |
| 2008 | 4,016 | 3,883 |
| 2009 | 4,231 | 4,109 |
| 2010 | 5,430 | 5,359 |
| 2011 | 6,009 | 5,879 |
| 2012 | 7,684 | 7,769 |
| 2013 | 8,042 | 7,943 |
| 2014 | 8,382 | 8,430 |
| 2015 | 7,378 | : |
| 2015* | 7,017 | 7,312 |

~Not applicable. Data represent a complete enumeration based on the 2005 Census of Jail Inmates.

:Not calculated.

*Data are based on the number of persons under jail supervision on December 31, 2015.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2006–2015; and Census of Jail Inmates, 2005.

**APPENDIX TABLE 2**

**Standard errors for table 2: Number of annual admissions to local jails, 1999 and 2007–2015**

| Year | Total |
|------|-------|
| 1999 | ~ |
| 2007 | 169,151 |
| 2008 | 272,916 |
| 2009 | 178,537 |
| 2010 | 233,704 |
| 2011 | 211,335 |
| 2012 | 188,549 |
| 2013 | 688,181 |
| 2014 | 205,287 |
| 2015 | 159,097 |

~Not applicable. Data represent a complete enumeration based on the 1999 Census of Jails.

Source: Bureau of Justice Statistics, Census of Jails, 1999; and Annual Survey of Jails (ASJ), 2007–2015.

**APPENDIX TABLE 3**

**Standard errors for table 3: Number of confined inmates in local jails, by characteristics, midyear 2000, 2005, and 2010–2014; yearend 2015**

| Characteristic | Midyear 2000 | 2005 | 2010 | 2011 | 2012 | 2013 | 2014 | Yearend 2015 |
|----------------|------|------|------|------|------|------|------|--------------|
| Total | 2,504 | ~ | 5,430 | 6,009 | 7,684 | 8,042 | 8,382 | 7,017 |
| **Sex** | | | | | | | | |
| Male | 2,235 | ~ | 4,832 | 5,278 | 6,776 | 7,088 | 7,015 | 6,096 |
| Female | 548 | ~ | 999 | 1,179 | 1,404 | 1,469 | 1,532 | 1,258 |
| **Adult** | 2,492 | ~ | 5,400 | 6,004 | 7,655 | 8,049 | 8,004 | 7,003 |
| Male | 2,223 | ~ | 4,794 | 5,241 | 6,685 | 7,025 | 6,961 | 6,083 |
| Female | 542 | ~ | 994 | 1,177 | 1,398 | 1,467 | 1,531 | 1,258 |
| **Juvenile** | 211 | ~ | 263 | 172 | 241 | 199 | 164 | 118 |
| Held as adult | 181 | ~ | 246 | 151 | 230 | 143 | 158 | 114 |
| Held as juvenile | 132 | ~ | 255 | 77 | 84 | 139 | 46 | 42 |
| **Race/Hispanic origin** | | | | | | | | |
| White | 2,676 | ~ | 3,589 | 3,764 | 4,370 | 4,574 | 4,605 | 3,917 |
| Black/African American | 1,853 | ~ | 3,194 | 3,418 | 4,608 | 4,860 | 4,712 | 3,413 |
| Hispanic/Latino | 1,075 | ~ | 2,131 | 2,617 | 2,958 | 2,580 | 2,719 | 3,080 |
| American Indian/ Alaska Native | 363 | ~ | 1,031 | 933 | 866 | 932 | 926 | 838 |
| Asian/Native Hawaiian/ Other Pacific Islander | 112 | ~ | 130 | 188 | 239 | 125 | 196 | 182 |
| Two or more races | … | ~ | 153 | 149 | 161 | 212 | 180 | 120 |
| **Conviction status** | | | | | | | | |
| Convicted | 2,258 | ~ | 3,292 | 3,521 | 3,750 | 3,619 | 4,156 | 4,734 |
| Unconvicted | 2,256 | ~ | 4,515 | 4,819 | 5,918 | 6,740 | 5,691 | 4,668 |

Note: Standard errors are based on the reported data for 2000 and 2005–2014 in table 3 and were not estimated for survey item nonresponse.

…Not collected.

~Not applicable. Data represent a complete enumeration based on the 2005 Census of Jail Inmates.

Source: Bureau of Justice Statistics, Annual Survey of Jails (ASJ), 2000 and 2010–2015; and Census of Jail Inmates, 2005.

**APPENDIX TABLE 4**

**Standard errors for table 4: Percent of confined inmates in local jails, by characteristics, midyear 2000, 2005, and 2010–2014; yearend 2015**

| Characteristic | 2000 | 2005 | 2010 | 2011 | 2012 | 2013 | 2014 | Yearend 2015 |
|---|---|---|---|---|---|---|---|---|
| | | | Midyear | | | | | |
| **Sex** | | | | | | | | |
| Male | 0.1% | ~ | 0.1% | 0.1% | 0.1% | 0.1% | 0.2% | 0.1% |
| Female | 0.1 | ~ | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 |
| **Adult** | -- | ~ | -- | -- | -- | -- | -- | -- |
| Male | 0.1% | ~ | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Female | 0.1 | ~ | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 |
| **Juvenile** | -- | ~ | -- | -- | -- | -- | -- | -- |
| Held as adult | -- | ~ | -- | -- | -- | -- | -- | -- |
| Held as juvenile | -- | ~ | -- | -- | -- | -- | -- | -- |
| **Race/Hispanic origin** | | | | | | | | |
| White | 0.3% | ~ | 0.4% | 0.4% | 0.5% | 0.5% | 0.5% | 0.5% |
| Black/African American | 0.3 | ~ | 0.4 | 0.4 | 0.5 | 0.5 | 0.5 | 0.4 |
| Hispanic/Latino | 0.2 | ~ | 0.3 | 0.3 | 0.4 | 0.3 | 0.3 | 0.4 |
| American Indian/ Alaska Native | 0.1 | ~ | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Asian/Native Hawaiian/ Other Pacific Islander | -- | ~ | -- | -- | -- | -- | -- | -- |
| Two or more races | … | ~ | -- | -- | -- | -- | -- | -- |
| **Conviction status** | | | | | | | | |
| Convicted | 0.3% | ~ | 0.4% | 0.4% | 0.5% | 0.5% | 0.5% | 0.5% |
| Unconvicted | 0.3 | ~ | 0.4 | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 |

--Less than 0.05%.

…Not collected.

~Not applicable. Data represent a complete enumeration based on the 2005 Census of Jail Inmates.

Source: Bureau of Justice Statistics, Annual Survey of Jails (ASJ), 2000 and 2006–2015; and Census of Jail Inmates, 2005

**APPENDIX TABLE 5**

**Standard errors for table 5: Mean and proportion of the average daily jail population, by size of jurisdiction, 2014 and 2015**

| Jurisdiction size | Mean ADP | | Percent of total ADP | |
|---|---|---|---|---|
| | 2014 | 2015 | 2014 | 2015 |
| Total | 3.1 | 2.6 | ~ | ~ |
| 49 or fewer | 1.2 | 1.4 | 0.2% | 0.3% |
| 50–99 | 1.6 | 1.7 | 0.4 | 0.4 |
| 100–249 | 2.8 | 3.3 | 0.6 | 0.6 |
| 250–499 | 4.7 | 3.7 | 0.7 | 0.4 |
| 500–999 | 4.7 | 4.3 | 0.7 | 0.4 |
| 1,000–2,499 | 10.1 | 6.9 | 0.5 | 0.4 |
| 2,500 or more | 105.0 | 160.4 | 0.8 | 0.8 |

~Not applicable.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2014–2015.

**APPENDIX TABLE 6**

**Standard errors for table 6: Rated capacity of local jails and percent of capacity occupied, 2000 and 2005–2015**

| Year | Rated capacity | Percent of capacity occupied | |
|---|---|---|---|
| | | Confined 1-day population | Average daily population |
| 2000 | 3,425 | 0.4% | 0.4% |
| 2005 | ~ | ~ | ~ |
| 2006 | 4,741 | 0.4 | 0.4 |
| 2007 | 5,056 | 0.4 | 0.4 |
| 2008 | 5,063 | 0.4 | 0.4 |
| 2009 | 6,460 | 0.5 | 0.5 |
| 2010 | 11,013 | 0.9 | 0.9 |
| 2011 | 11,776 | 0.9 | 0.9 |
| 2012 | 10,217 | 0.5 | 0.5 |
| 2013 | 13,198 | 0.5 | 0.5 |
| 2014 | 11,082 | 0.4 | 0.4 |
| 2015 | 9,518 | 0.4 | 0.4 |

~Not applicable. Data represent a complete enumeration based on the 2005 Census of Jail Inmates.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2006–2015; and Census of Jail Inmates, 2005.

**APPENDIX TABLE 7**
**Standard errors for table 7: Percent of jail capacity occupied based on average daily population, by size of jurisdiction, 2014 and 2015**

| Jurisdiction size | Percent | | Percent of jail jurisdictions operating over 100% of capacity | |
|---|---|---|---|---|
| | 2014 | 2015 | 2014 | 2015 |
| Total | 0.42% | 0.40% | 1.3% | 1.3% |
| 49 or fewer | 2.47 | 2.72 | 2.1 | 2.2 |
| 50–99 | 2.15 | 3.00 | 4.0 | 4.1 |
| 100–249 | 1.58 | 1.55 | 2.7 | 3.0 |
| 250–499 | 1.43 | 1.00 | 2.9 | 1.9 |
| 500–999 | 0.86 | 0.44 | 1.5 | 1.3 |
| 1,000–2,499 | 0.47 | 0.32 | 1.1 | 0.7 |
| 2,500 or more | 0.72 | 0.63 | 1.3 | 1.6 |

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2014–2015.

**APPENDIX TABLE 8**
**Standard errors for table 8: Average daily jail population, admissions, and turnover rate, by size of jurisdiction, 2014 and 2015**

| Jurisdiction size | ADP | | Estimated number of annual admissions | | Weekly turnover rate | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 |
| Total | 8,430 | 7,312 | 205,287 | 159,097 | 0.9% | 0.7% |
| 49 or fewer | 1,655 | 1,927 | 76,172 | 95,276 | 12.8 | 10.3 |
| 50–99 | 3,283 | 3,214 | 113,967 | 71,177 | 8.8 | 4.4 |
| 100–249 | 4,740 | 4,567 | 127,025 | 104,293 | 3.8 | 2.4 |
| 250–499 | 5,082 | 3,090 | 129,569 | 92,134 | 3.2 | 2.8 |
| 500–999 | 5,144 | 3,043 | 67,870 | 50,822 | 1.1 | 0.6 |
| 1,000–2,499 | 3,649 | 1,807 | 58,340 | 29,450 | 0.7 | 0.3 |
| 2,500 or more | 7,471 | 7,120 | 87,695 | 64,185 | 0.6 | 0.9 |

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2014–2015.

**APPENDIX TABLE 9**
**Standard errors for table 9: Persons under jail supervision, by confinement status, 2000 and 2006–2015**

| Year | Total | Held in jail | Supervised outside of a jail facility |
|---|---|---|---|
| 2000 | 2,728 | 2,504 | 996 |
| 2006 | 3,783 | 3,552 | 1,151 |
| 2007 | 4,041 | 3,720 | 1,267 |
| 2008 | 4,732 | 4,016 | 2,327 |
| 2009 | 4,548 | 4,231 | 1,535 |
| 2010 | 5,897 | 5,430 | 1,960 |
| 2011 | 6,446 | 6,009 | 1,832 |
| 2012 | 8,438 | 7,684 | 2,418 |
| 2013 | 8,692 | 8,042 | 2,351 |
| 2014 | 9,248 | 8,382 | 2,707 |
| 2015* | 7,398 | 7,017 | 1,671 |

*Data are based on the number of persons under jail supervision on December 31, 2015.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000 and 2006–2015.

**APPENDIX TABLE 10**
**Standard errors for table 10: Staff employed in local jails, by sex, December 2013 and 2015**

| Job function | 2015 |
|---|---|
| Total | 2,599 |
| Correctional officers | 2,260 |
| Male | 1,532 |
| Female | 918 |
| All other staff | 791 |
| Male | 463 |
| Female | 428 |

Note: For 2013, data represent a complete enumeration based on the 2013 Census of Jails.

Source: Bureau of Justice Statistics, Annual Survey of Jails, 2015.



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable and valid statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Jeri M. Mulrow is acting director.

This report was written by Todd D. Minton and Zhen Zeng, Ph.D. Danielle Kaeble verified the report.

Matt Bensen carried out data collection and processing with assistance from Megan Waggy, under the supervision of Chris Ellis and Susan Brumbaugh, RTI International. Scott Ginder provided statistical assistance, and Elizabeth Robbins provided technical assistance.

Brigitte Coulton edited the report. Amy Salsbury produced the report.

December 2016, NCJ 250394



NCJ250394

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.usdoj.gov**

# Exhibit D

*Tracts 6887 and 7143*

VALMONTE

# PROTECTIVE RESTRICTIONS PALOS VERDES ESTATES

LOS ANGELES
CALIFORNIA



BANK OF AMERICA, *Trustee*

HENRY CLARKE, *Director of Sales*
501 LANE MORTGAGE BUILDING
LOS ANGELES, CALIF.

strictly limited, and the project will control their architectural design in such a way as to make them distinctive, attractive and convenient without in any way detracting from, but rather supplementing, the fine and extensive residential neighborhood surrounding them.

There are also established as a matter of convenience additional small business building groups at local centers about a mile apart, as at Monte Malaga, Zurita, Margate, etc., to serve areas that would otherwise be inconveniently far from a neighborhood store and market.

Industries, asylums, or nuisance businesses are prohibited in all parts of the Estates.

No billboards, advertising signs or "For Sale" signs can be erected in Palos Verdes, and the few store and business signs necessary must meet with the approval of the Art Jury.

The character of the property is such as to preclude the keeping of live stock, which includes rabbits, pigeons, chickens and other poultry, except where there is no residence within a considerable distance when they may be allowed in special cases, for private use only, by a special permit from the Palos Verdes Homes Association. Likewise, on the larger lots, a special permit may also be given for the keeping of horses and cows.

No outhouses, private garages or tents may be erected prior to the erection of the dwelling house or principal building on the lot.

The minimum cost of houses that may be erected ranges from a fairly low amount in areas where there are cheaper lots to considerably higher restrictions along the ocean bluffs and at special points, the amount being determined by the size, value and neighborhood of the lot.

But more important than any specific requirement as to the minimum cost of houses is the provision in the restrictions for the approval by Palos Verdes Homes Association and the Art Jury of the plans and specifications of all buildings prior to the beginning of construction, and of inspection during construction. This will be done from

[ 4 ]

DECLARATION NO. 1

# DECLARATION OF ESTABLISHMENT

OF

BASIC PROTECTIVE RESTRICTIONS, CONDITIONS, COVENANTS, RESERVATIONS, LIENS AND
CHARGES AFFECTING THE REAL PROPERTY TO BE KNOWN AS

## PALOS VERDES ESTATES—PARCELS A AND B

WHICH IS SITUATED IN THE COUNTY OF LOS ANGELES, IN THE STATE OF CALIFORNIA.
DATED JUNE 26, 1923.

(Recorded July 5, 1923, in Book 2360, Page 231, Official Records of Los Angeles County; as amended by
Amendment No. 1 dated Nov. 26, 1923, recorded Dec. 5, 1923, in Book 2940, Page 27, Official
Records of Los Angeles County; and as amended by Amendment No. 3 dated
June 16, 1924, recorded June 25, 1924, in Book 4019, Page 274,
Official Records of Los Angeles County.)

DECLARATION, made and dated this 26th day of June, 1923, by Commonwealth Trust Company, a corporation organized and existing under and by virtue of the laws of the State of California.

WHEREAS, Commonwealth Trust Company is the owner of a certain tract of land in the County of Los Angeles, State of California, described as follows:

USES OF
PROPERTY
PROHIBITED

Those portions of Lot "H," as shown on map of Rancho Los Palos Verdes, in the County of Los Angeles, State of California, as partitioned in case No. 2373, in the District Court of the 17th Judicial District, in and for said County, and entered in Book 4, Page 57, of Judgments in the Superior Court of said County and particularly described as follows:

Parcel "A." Beginning at an angle point in the Easterly line of said Lot "H," which angle point is North 26½°, East One Hundred Forty-nine and Nineteen Hundredths (149.19) chains from the most Southerly corner of Lot "H."

Thence along the Easterly line of said Lot "H," South Twenty-six degrees (26°), Forty-six Minutes (46'). Fifty-four and Five-tenths Seconds (54.5"), West Fifteen Hundred and Fifty-one and Six Hundredths (1551.06) feet.

Thence West Seven Hundred Seventeen and Eleven Hundredths (717.11) feet.

Thence North Thirty-six Degrees (36°), Twenty-three Minutes (23'), Three and Seven-tenths Seconds (03.7"), West Fourteen Hundred Sixteen and Five Hundredths (1416.05) feet.

Thence North Twenty-eight Hundred Sixty (2860) feet.

Thence East Twenty-two Hundred Seventy and Six Hundredths (2270.06) feet more or less to a point in the Easterly line of said Lot "H."

Thence South no degrees (0°), Eighteen Minutes (18'), Twenty-eight and One-tenth Seconds (28.1"), West Twenty-six Hundred Fifteen and Thirty-six Hundredths (2615.36) feet more or less to the place of beginning.

Parcel "B." Beginning at a point at high tide on the Shore of the Pacific Ocean at the South West corner of Lot "A," shown on said partition map.

Thence along the North line of said Lot "H," South Eighty-nine Degrees (89°), Forty-five Minutes (45'), Twenty-one and Three-tenths Seconds (21.3"), East Two Hundred Thirty and Six-tenths (230.6) feet more or less to a Two (2) inch capped iron pipe.

Thence along the North line of said Lot "H,"

South Eighty-nine Degrees (89°), Forty-five Minutes (45'), Twenty-one and Three-tenths Seconds (21.3"), East Ninety-six Hundred Forty-three and Fifty-one Hundredths (9643.51) feet to a Two (2) inch capped iron pipe; thence along the Northerly line of said Lot "H," South Forty-four Degrees (44°), Forty-one Minutes (41'), Twelve and Two-tenths Seconds (12.2"), East Forty-five Hundred Eighty-seven and Nine Hundredths (4587.09) feet to a point on said Northerly line of Lot "H."

Thence West Ninety-nine Hundred Thirty-five and Twenty-two Hundredths (9935.22) feet.

Thence South Eleven Degrees (11°), Forty-eight Minutes (48'), Twenty and Eight-tenths Seconds (20.8"), West Forty-nine Hundred Eighty-five and Forty-five Hundredths (4985.45) feet.

Thence West Fifty Hundred Forty (5040) feet.

Thence South Sixty-three Hundred Seventy (6370) feet.

Thence South Eighty-one Degrees (81°), Seven Minutes (07'), Thirty Seconds (30"), West Forty-four Hundred Twenty-eight (4428) feet, more or less to a point in the high tide line of the Pacific Ocean.

Thence along said high tide line of the Pacific Ocean in a general North Westerly and North Easterly direction to the place of beginning;

Saving and excepting therefrom that portion thereof described as follows:

Beginning at a point in the North Easterly boundary line of Lot "H," which is South 44 Degrees, 41 Minutes, 12.2 Seconds East, and 3883.42 feet South Easterly from an original corner of Lots "H" and "B," said original corner being marked by a two-inch capped iron pipe; thence South 49 Degrees and 30 Minutes West, a distance of 770.34 feet to a point in the South line of parcel "B"; thence Easterly on the Southerly line of parcel "B," a distance of 1080.62 feet to a point in the North Easterly line of Lot "H," said point being the South Easterly corner of parcel "B"; thence on a course bearing North 44 Degrees, 41 Minutes, 12.2 Seconds West, a distance of 703.67 feet to the point of beginning, the whole inclosing an area of 6.21 acres.

WHEREAS, the said Commonwealth Trust Company is about to sell, dispose of or convey in portions said hereinabove described property which it desires to subject to certain basic protective restrictions, conditions, covenants, reservations, liens and charges between it and the acquirers or users of said property as hereinafter set forth;

[ 16 ]

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: that the Commonwealth Trust Company hereby certifies and declares that it has established and does hereby establish the general plan for the protection, maintenance, improvement and development of said property, and has fixed and does hereby fix the protective restrictions, conditions, covenants, reservations, liens and charges upon and subject to which all lots, parcels and portions of said property shall be held, leased or sold and/or conveyed by it as such owner, each and all of which is and are for the benefit of said property and of each owner of land therein and shall inure to and pass with said property and each and every parcel of land therein and shall apply to and bind the respective successors in interest of the present owner thereof, and are and each thereof is imposed upon said realty as a servitude in favor of said property, and each and every parcel of land therein as the dominant tenement or tenements, as follows, to-wit:

## ARTICLE I

### GENERAL BASIC RESTRICTIONS

**USES OF PROPERTY PROHIBITED**

*Section 1.* There shall never at any time be erected, permitted, maintained or carried on upon said property or any part thereof any saloon or place for the sale or manufacture for sale of malt, vinous or spirituous liquors; any foundry, brickyard, cemetery, columbarium, crematory; any establishment for the care or cure of persons afflicted with tuberculosis, or for the care, cure or restraint of the mentally impaired or of victims of drink or drugs or any detention home, detention or reform school, asylum or institution of like or kindred nature; any building for the manufacture of gun powder or explosives, any product or by-product of kelp, fish meal, stock food made of fish, fish oil or fertilizer or for carrying on any copper or other smelting or for conducting a slaughter house, stock yard, tannery, oil refinery or fish cannery; or a building for any other business or industrial use not specifically mentioned herein unless such use is approved by the Board of Directors of the Palos Verdes Homes Association hereinafter referred to and is located in a use district permitting the same as provided in Article IV hereof, or any noxious trade or business or use of the property whatsoever.

**DRILLING FOR OIL PROHIBITED**

*Section 3.* No derrick or other structure designed for use in boring for oil or natural gas shall be erected, placed or permitted upon any part of said property, nor shall any oil, natural gas, petroleum, asphaltum, or hydro-carbon products or substances be produced or extracted therefrom.

**ENFORCEMENT BY PALOS VERDES HOMES ASSOCIATION AND PALOS VERDES ART JURY**

*Section 4.* There is hereby conferred upon Palos Verdes Homes Association, a non-profit, co-operative corporation, organized and existing under and by virtue of the laws of the State of California, hereinafter referred to as the "Homes Association," and upon Palos Verdes Art Jury, appointed by Commonwealth Trust Company April 12, 1923, hereinafter referred to as the "Art Jury," the right and power as in this declaration provided to interpret and enforce the restrictions, conditions, covenants, reservations, liens and charges im-

[ 17 ]

Now, Therefore, Know All Men By These Presents: that the Commonwealth Trust Company hereby certifies and declares that it has established and does hereby establish the general plan for the protection, maintenance, improvement and development of said property, and has fixed and does hereby fix the protective restrictions, conditions, covenants, reservations, liens and charges upon and subject to which all lots, parcels and portions of said property shall be held, leased or sold and/or conveyed by it as such owner, each and all of which is and are for the benefit of said property and of each and every parcel of land therein and shall inure to and pass with said property and each and every parcel of land therein and shall apply to and bind the respective successors in interest of the present owner thereof, and are and each thereof is imposed upon said realty as a servitude in favor of said property, and each and every parcel of land therein as the dominant tenement or tenements, as follows, to-wit:

## ARTICLE I

### GENERAL BASIC RESTRICTIONS

USES OF PROPERTY PROHIBITED

*Section 1.* There shall never at any time be erected, permitted, maintained or carried on upon said property or any part thereof any saloon or place for the sale or manufacture for sale of malt, vinous or spirituous liquors; any foundry, brickyard, cemetery, columbarium, crematory; any establishment for the care or cure of persons afflicted with tuberculosis, or for the care, cure or restraint of the mentally impaired or of victims of drink or drugs or any detention home, detention or reform school, asylum or institution of like or kindred nature; any building for the manufacture of gun powder or explosives, any product or byproduct of kelp, fish meal, stock food made of fish, fish oil or fertilizer or for carrying on any copper or other smelting or for conducting a slaughter house, stock yard, tannery, oil refinery or fish cannery; or a building for any other business or industrial use not specifically mentioned herein unless such use is approved by the Board of Directors of the Palos Verdes Homes Association hereinafter referred to and is located in a use district permitting the same as provided in Article IV hereof, or any noxious trade or business or use of property whatsoever.

*Section 2.* (a) No part of said property shall be sold, conveyed, rented or leased in whole or in part to any persons of African or Asiatic descent or to any person not of the white or Caucasian race.

(b) No part of said property shall be used or occupied or permitted to be used or occupied in whole or in part by any person of African or Asiatic descent or by any person not of the white or Caucasian race, except domestic servants, chauffeurs, or gardeners of other than the white or Caucasian race may live on or occupy the premises where their employer resides or with the written approval of Palos Verdes Homes Association hereinafter referred to, may reside in such hotel, club, student boarding house, hospital or other building as it may approve under uniform regulation; provided that the provisions of this paragraph may be temporarily waived by Commonwealth Trust Company during the original development and street construction work on said property as to any laborers or workers of other than of the white or Caucasian race while employed on the said work; and provided further, that pending development, subdivision and sale, or leasing agreements or farming leases for periods not to exceed ten years each may with the approval of Palos Verdes Homes Association hereinafter referred to be executed by Commonwealth Trust Company to persons other than of the white or Caucasian race.

*Section 3.* No derrick or other structure designed for use in boring for oil or natural gas shall be erected, placed or permitted upon any part of said property, nor shall any oil, natural gas, petroleum, asphaltum, or hydro-carbon products or substances be produced or extracted therefrom.

DRILLING FOR OIL PROHIBITED

*Section 4.* There is hereby conferred upon Palos Verdes Homes Association, a non-profit, co-operative corporation, organized and existing under and by virtue of the Laws of the State of California, hereinafter referred to as the "Homes Association" and upon Palos Verdes Art Jury, appointed by Commonwealth Trust Company April 12, 1923, hereinafter referred to as the "Art Jury," the right and power as in this declaration provided to interpret and enforce the restrictions, conditions, covenants, reservations, liens and charges im-

ENFORCEMENT BY PALOS VERDES HOMES ASSOCIATION AND PALOS VERDES ART JURY

[ 17 ]