# EXHIBIT 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

Cory Spencer, et al.,

       Plaintiffs,

  vs.                  Case No.
                          2:16-CV-02129-SJO
Lunada Bay Boys, et al.,  (RAOx)

       Defendants.
_____

DEPOSITION OF KENNETH CLAYPOOL

June 13, 2017

10:23 a.m.

20320 S.W. Birch Street, 2nd Floor

Newport Beach, California

REPORTED BY:

Angela M. Schubert

CSR No. 12027, CSR

U.S. LEGAL SUPPORT
(714) 486-0737

```
 1  first time you contacted the police department to
 2  report one of the incidents of harassment or
 3  intimidation?
 4       A.  The very first time that you're asking?  The
 5  very first time?
 6       Q.  Correct.
 7       A.  The very first time, I had conversations with
 8  different police officers on the bluff over the
 9  course -- between 2014 and present, but the one where I
10  actually filed a report was the incident where the
11  female surfers were cutting us off.
12       Q.  Do you recall the year that the female surfer
13  incident was?
14       A.  It was this year, Martin Luther King Day.
15           MR. DIEFFENBACH:  I'm sorry.  I thought I
16  heard you say female surfers plural.  Am I mishearing
17  that?
18           THE WITNESS:  Two.
19           MR. DIEFFENBACH:  Okay.
20  BY MR. GLOS:
21       Q.  So at what point in time did you contact the
22  police department?
23       A.  The next day.
24       Q.  Did you call or did you go there in person?
25       A.  I called.
```

```
 1       Q.   Who did you speak to?
 2       A.   Whoever answered the phone.  It was, you know,
 3  dispatch, whatever you call it.
 4       Q.   And what did you tell them?
 5       A.   I told them that I wanted to file a report on
 6  what happened at the incident.  I think I said
 7  attempted assault because I viewed in my eyes that they
 8  were trying to hurt us.
 9       Q.   Okay.  And did the individual that initially
10  spoke to you transfer you to someone else or did she
11  take a report or what happened?
12       A.   I don't remember exactly but I think she
13  transferred me at that time but I remember I was
14  contacted by -- I believe it was Helanga.  It was
15  Helanga.
16       Q.   When you say you believe you were contacted by
17  Helanga, are you meaning in a separate phone call?
18       A.   Correct.
19       Q.   Or in the same conversation?
20       A.   Correct.  Separate phone call.
21       Q.   So let's stick with the first phone call for a
22  minute.  Did you speak to anybody other than who
23  initially answered the phone at the police department?
24            MR. FRANKLIN:  Vague and ambiguous.
25            THE WITNESS:  Can you repeat the question
```

1  please.

2          MR. GLOS:  Sure.

3  BY MR. GLOS:

4      Q.  When you called the police department to

5  report the attempted assault, did you speak to anyone

6  other than the initial person that answered the phone?

7      A.  No.

8      Q.  You don't recall the name of who answered the

9  phone; correct?

10     A.  Correct.

11     Q.  But it sounds like the individual was female;

12  is that correct?

13     A.  I believe the first person that I talked to

14  was female.

15     Q.  And did that person transfer you somewhere

16  that you got a voicemail or how --

17     A.  I do not remember that exact details.

18     Q.  Okay.  Then after that call, you received a

19  follow up call from Detective Helanga; correct?

20     A.  I'm not sure if it was Helanga.  Let me jump

21  forward a little bit.  I spoke to two, I think it was a

22  sergeant and a detective or two detectives.  I'm not

23  sure of their rank but I did get contacted by the first

24  person, male officer, and I can't remember if it's

25  Helanga or what his name was.  He made me feel really

```
 1  uncomfortable.  No matter what I said he was right in
 2  his eyes and I got the feeling he was trying to
 3  intimidate and our conversation was very short.
 4       Q.  How long after you contacted the police
 5  department on the first occasion did you wait until you
 6  got a call back?
 7       A.  How long after?  Repeat the question please.
 8       Q.  Sure.  The day after Martin Luther King, you
 9  made a call to the police department; correct?
10       A.  Correct.
11       Q.  When did the police or the police department
12  contact you back?
13       A.  If I recall correctly, it was a couple days
14  and I don't think it was the very next day.  I think I
15  had to wait and I remember thinking am I ever going to
16  get a call.
17       Q.  A couple days is that two days, three days?
18       A.  It might have been more like four or five
19  days.
20       Q.  And in the time that you waited, did you ever
21  follow up with the police department?
22       A.  Not until I got the call from the second
23  individual, the detective that I ended up meeting with.
24       Q.  Between the first call when you contacted the
25  police department and the call where they contacted you
```

1  back, did you ever follow up?
2       A.  No.
3       Q.  Now the first male officer that you spoke to
4  that you said made you feel uncomfortable and it was a
5  short conversation.  What was the substance of the
6  conversation as you can recall it?
7       A.  I think he was asking me what occurred, and
8  you know, the gist of why I was filing a report.
9       Q.  And did you tell him basically what you've
10 testified to this morning about the two women?
11      A.  I tried to and then he was -- he would just
12 come back with questions and how do I know that they
13 were doing this.  He was making me second guess myself
14 and his tone escalated to where he was actually yelling
15 at me on the other end of the phone.  I'm not used to
16 that kind of stuff so I don't know the procedures and
17 what I'm allowed to say, you know, because I know I'm
18 supposed to give my statement and everything but he
19 made me feel really nervous like I was the one in
20 trouble.
21      Q.  When you said he was yelling at you, what made
22 you believe he was yelling?
23      A.  Well, he raised his voice, you know.  I could
24 yell.  If you want me to yell, I can give you an
25 example.  He was yelling to where I had to put the

1  phone over here and you can still hear his voice and
2  then he said why are you being so cryptic and I took
3  that as like, well, this guy is not going to listen to
4  anything that I have to say.  And I think at that point
5  I asked him if it was okay that any further contact
6  would be from my lawyer.  And then also with regards to
7  the police in my experience with Lunada Bay, everybody
8  that's visited Lunada Bay through the years as far back
9  as I can remember is afraid of the police and we think
10 that they don't do anything so we already have an
11 opinion that just because we're telling what happened
12 that nothing is going to even happen so we're nervous
13 going into it.  Nothing is ever going to get taken care
14 of.  But if it was getting taken care of, it wouldn't
15 have happened to me that day.
16      Q.  Okay.  I want to focus on your experiences.
17 Not other people.
18      A.  Well, that's my experience.
19      Q.  Well, let's go back to it.  He was asking you
20 questions.  How do you know that happened -- what is it
21 that he yelled at you?  Or when he raised his voice,
22 what was it that he was saying that raised voice?
23      A.  What he was saying exactly?
24      Q.  As close as you can recall?
25      A.  I think to the effect I don't know why you're

1  being so argumentative or why are you being so aloof,

2  or you know, just -- I don't know.  You aren't

3  answering my questions and he was just angry.

4       Q.   Were there questions that you were not

5  answering?

6       A.   He got me flustered so I just -- I just kind

7  of shut down.  I didn't want to deal with him anymore.

8       Q.   Anything else that you recall about that

9  conversation?

10      A.   That was pretty much the gist of it.

11      Q.   How long was that conversation?  You said it

12 was short?

13      A.   Less than five minutes.

14      Q.   Okay.  And you told him can my lawyer contact

15 you; is that correct?

16      A.   Yeah.

17      Q.   And what was the response to that?

18      A.   Yeah.  I guess so.

19      Q.   Did you identify the name of your lawyer?

20      A.   Yes.

21      Q.   And who did you identify?

22      A.   Vic Otten.

23      Q.   Do you know whether or not the officer that

24 you spoke to was taking any notes during this call?

25      A.   I don't know for sure but I assume he wouldn't

```
 1  physically walk into the station because I didn't think
 2  anything was going to be done about that incident.  If
 3  I hadn't walked into the station because of my past
 4  experiences at Lunada Bay and after meeting Chris
 5  Taloa, I was pulled over by a Palos Verdes police
 6  officer for nothing, out of the blue, and I was coming
 7  from a job estimate or a job that I was on.  He asked
 8  me for my license and registration and asked me what I
 9  was doing there and there was no reason -- he didn't
10  give me any reason to pull me over or nothing.  He just
11  asked me what I was doing there and didn't write me a
12  ticket.  Went back to his car and ran my plates and
13  said, okay, on your way.
14          But halfway between my window and his car
15  walking away, he says, by the way, fix that trailer
16  hitch.  It's blocking your license plate.  And in my
17  whole career of doing construction, I've never gotten a
18  ticket for that.  I didn't know it was a violation and
19  I thought it was rather odd and I thought it was an
20  intimidation tactic, you know, because -- it was just
21  kind of weird that all of a sudden I get pulled over in
22  the middle of all that, after I see him talking to
23  Chris Taloa.  So I just wanted to clarify my statements
24  of me saying that I never reported an incident to an
25  officer on the day that it happened when I did in fact
```

```
 1                REPORTER'S CERTIFICATE

 2         I, Angela Schubert, CSR No. 12027, Certified

 3  Shorthand Reporter, certify:

 4         That the foregoing proceedings were taken

 5  before me at the time and place therein set forth, at

 6  which time the witness was put under oath by me;

 7         That the testimony of the witness, the

 8  questions propounded, and all objections and statements

 9  made at the time of the examination were recorded

10  stenographically by me and were thereafter transcribed;

11         That a review of the transcript by the

12  deponent was required;

13         That the foregoing is a true and correct

14  transcript of my shorthand notes so taken.

15         I further certify that I am not a relative or

16  employee of any attorney of the parties, nor

17  financially interested in the action.

18         I declare under penalty of perjury under the

19  laws of California that the foregoing is true and

20  correct.

21

22  Dated this 18th day of June, 2017

23
          _Angela Schubert_ (signature)
24  _____

25  ANGELA SCHUBERT, CSR NO. 12027
```