# EXHIBIT 5

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 2 of 69  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 270-7  Filed 07/14/17  Page 2 of 44  Page ID
#:8107
#:5806

Atkinson-Baker Court Reporters
www.depo.com

```
1              UNITED STATES DISTRICT COURT

2           ·   CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4                     - - -

5

6    CORY SPENCER, AN INDIVIDUAL;     )
     DIANA MILENA REED, AN            )
7    INDIVIDUAL; AND COASTAL          )
     PROTECTION RANGERS, INC.,        )
8    A CALIFORNIA NON-PROFIT PUBLIC   )
     BENEFIT CORPORATION,             )
9                                     )
                 Plaintiffs,          )
10                                    )
           vs.                        )  No.:  2:16-cv-02129-SJO(RAOx)
11                                    )
                                      )
12   LUNADA BAY BOYS; THE INDIVIDUAL  )
     MEMBERS OF THE LUNADA BAY BOYS,  )
13   INCLUDING BUT NOT LIMITED TO     )
     SANG LEE, B RANT BLAKEMAN, ALAN  )
14   JOHNSTON, AKA JALIAN JOHNSTON,   )
     MICHAEL RAE PAPAYANS, ANGELO     )
15   FERRARA, FRANK FERRARA, CHARLIE  )
     FERRARA, AND N.F.; CITY OF       )
16   PALOS VERDES ESTATES; CHIEF      )
     OF POLICE JEFF KEPLEY AND        )
17   DOES 1 - 10,                     )
                                      )
18               Defendants.          )
                                      )
19   - - - - - - - - - - - - - - - -

20          Deposition of ANTON DAHLERBRUCH, taken on

21   behalf of the Plaintiffs, at Premier Business Center,

22   One Park Plaza, Suite 600, Irvine, California, 92614,

23   commencing at 9:45 a.m., Friday, November 18, 2016,

24   before ANGELIQUE MELODY FERRIO, CSR No. 6979.

25
```

2

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 242

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 3 of 69   Page ID
#:8108
Case 2:16-cv-02129-SJO-RAO   Document 270-7   Filed 07/14/17   Page 3 of 44   Page ID
#:5807

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    A P P E A R A N C E S

 2          '                                              '

 3     FOR THE PLAINTIFFS:

 4          LAW OFFICES OF HANSON, BRIDGETT, LLP
            BY:  KURT A. FRANKLIN, ESQ.
 5          425 Market Street
            26th Floor
 6          San Francisco, California 94105

 7

 8          OTTEN LAW, P.C.
            BY:  VICTOR J. OTTEN, ESQ.
 9          3620 Pacific Coast Highway
            Suite 100
10          Torrance, California 90505

11

12     FOR THE DEFENDANT CITY OF PALOS VERDES:

13          KUTAK, ROCK, LLP
            BY:  EDWIN J. RICHARDS, ESQ.
14          5 Park Plaza
            Suite 500
15          Irvine, California 92614

16

17     FOR THE DEFENDANT MICHAEL PAPAYANS:

18          HAVEN LAW
            BY:  PETER T. HAVEN, ESQ.
19          1230 Rosecrans Avenue
            Suite 300
20          Manhattan Beach, California 90266

21

22     FOR THE DEFENDANT SANG LEE:

23          LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
            BY:  TERA A. LUTZ, ESQ.
24          633 West 5th Street
            Suite 4000
25          Los Angeles, California 90071
```

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 243

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 4 of 69  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 28009  Filed 07/14/17  Page 4 of 44  Page ID
#:5808

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE DEFENDANT BRANT BLAKEMAN:

 4       VEATCH CARLSON, LLP
         BY:  RICHARD P. DIEFFENBACH, ESQ.
 5       1055 Wilshire Boulevard
         11th Floor
 6       Los Angeles, California 90071

 7

 8   FOR THE DEFENDANT SANG LEE:

 9       LAW OFFICES OF BOOTH, MITCHEL & STRANGE, LLP
         BY:  JACKIE K. VU, ESQ.
10       707 Wilshire Boulevard
         Suite 3000
11       Los Angeles, California 90017

12

13   FOR THE DEFENDANT ANGELO FERRARA AND N.F.:

14       (BY TELEPHONE)

15       LAW OFFICES OF MARK C. FIELDS, APC
         BY:  MARK C. FIELDS, ESQ.
16       333 South Hope Street
         35th Floor
17       Los Angeles, California 90071

18

19   FOR THE DEFENDANTS FRANK AND CHARLIE FERRARA:

20       (BY TELEPHONE)

21       BREMER, WHYTE, BROWN & O'MEARA, LLP
         BY:  LAURA L. BELL, ESQ.
22       21271 Burbank Boulevard
         Suite 110
23       Woodland Hills, California 91367

24

25
```

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 244

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 5 of 69   Page ID
#:8110
Case 2:16-cv-02129-SJO-RAO   Document 270-7   Filed 07/14/17   Page 5 of 44   Page ID
#:5809

Atkinson-Baker Court Reporters
www.depo.com

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE DEFENDANT BRANT BLAKEMAN:

 4        (BY TELEPHONE)

 5        BUCHALTER NEMER, APC
          BY:   ROBERT S. COOPER, ESQ.
 6        1000 Wilshire Boulevard, Suite 1500
          Los Angeles, California 90017
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Atkinson-Baker, Inc.
     Court Reporters
24   www.depo.com
     (800) 288-3376
25
```

5

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 245

Case 2:16-cv-02129-SJO-RAO Document 305-5 Filed 07/31/17 Page 6 of 69 Page ID
Case 2:16-cv-02129-SJO-RAO Document 28ce7d Filed 07/14/17 Page 6 of 44 Page ID
#:5810

```
1              IRVINE, CALIFORNIA, FRIDAY, NOVEMBER 18, 2016
2                            9:45 A.M.              .
3                              -OOO-
4
5              MR. FRANKLIN:  Let's have everyone make their
6      appearances for the record, please.
7              THE WITNESS:  Anton Dahlerbruch.
8              MR. RICHARDS:  Ed Richards and I represent the
9      City.
10             MS. LUTZ:  I'm Tera Lutz and I represent
11     Sang Lee.
12             MR. DIEFFENBACH:  Richard Dieffenbach for
13     Brant Blakeman.
14             MS. VU:  Jackie Vu representing Sang Lee.
15             MR. FRANKLIN:  Why don't we go to the phone
16     next.
17             MR. COOPER:  And I'm Robert Cooper for
18     Brant Blakeman.
19             MR. FIELDS:  Mark Fields for Angelo Ferrara and
20     N.F.
21             MS. BELL:  Laura Bell for Frank Ferrara and
22     Charlie Ferrara.
23             MR. HAVEN:  And I'm Peter Haven for Michael
24     Papayans.
25             MR. FRANKLIN:  Kurt Franklin on behalf of
```

10

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 7 of 69  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 291-2  Filed 07/14/17  Page 7 of 44  Page ID
#:5811

Atkinson-Baker Court Reporters
www.depo.com

```
 1   Plaintiffs Corey Spencer, Diana Milena Reed, and the
 2   Coastal Protection Rangers in the punitive class.
 3            Counsel, if I can just as a matter of
 4   housekeeping, I'll suggest that in terms of objections,
 5   I will stipulate if there's an objection that is made by
 6   all so that we don't need to join an objection.  If
 7   that's okay with everybody here, it might help us speed
 8   through the deposition.
 9            If it's a different objection, I'm okay, but if
10   it's simply joining, I think that might be more
11   efficient; are people okay with that?
12            MR. RICHARDS:  I'm fine with that.
13
14                  ANTON DAHLERBRUCH,
15            having first been duly sworn, was
16            examined and testified as follows:
17
18                      EXAMINATION
19
20   BY MR. FRANKLIN:
21       Q.   Everybody has joined.
22            And if you can on the phone, I'll try to be
23   slow, and just identify yourself so that the court
24   reporter can figure out who is talking.
25            We've marked as the first exhibit the Notice of
```

11

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 247

Atkinson-Baker Court Reporters
www.depo.com

1    City government, how does the Palos Verdes Estates Homes

2    Association interact with Palos Verdes Estates, the Home

3    Association; do they have a role in planning and

4    building and that type of thing?

5        A.   The Home Association is a separate agency,

6    independent of the City.  And they're the ones that

7    enforce the deeds and covenants.

8            And they have an art jury that is responsible

9    for the architecture, approving architecture of

10   properties --

11       Q.   Okay.

12       A.   -- structures on properties.

13       Q.   So, I think that I heard you right and I was

14   curious about it.

15           The Palos Verdes Estate Home Association is a

16   separate public entity?

17       A.   I don't know what you mean by public entity,

18   but they're separate from us.

19       Q.   Do they have to follow the Brown Act?

20       A.   No to my knowledge.

21       Q.   Do they follow the Brown Act to your knowledge?

22       A.   I don't know.

23       Q.   Are you familiar with any of the historical

24   covenants in Palos Verdes Estates?

25       A.   Clarify that for me.

40

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1       Q.  Covenants, well, I'll just say it because I'm

2    blunt.

3            Did you have an understanding that Palos Verdes

4    Estates used to be a deed restriction community?

5       A.  I'm not sure what deed restriction means.

6       Q.  A community where it was written into the

7    covenants of the real estate of Palos Verdes Estates

8    that a person couldn't sell their home to someone of

9    color?

10      A.  I had heard that, but I have not seen that.

11      Q.  Have you done any research on that?

12      A.  No.

13      Q.  Have you asked your staff to do any research on

14   that?

15      A.  No.

16      Q.  Do you know has there ever been any resolution

17   with the City disavowing that even if it was a platitude

18   saying that we don't believe in deed restricted

19   covenants?

20      A.  I'm not aware one way or the other.

21      Q.  Are you aware of any other deed restriction

22   communities in your work in the City Manager's

23   association?

24      A.  Do you mean other cities that had at one point

25   in time like that?

41

Atkinson-Baker Court Reporters
www.depo.com

 1   evidence either.

 2          MR. RICHARDS:  I'm just stating my objections

 3   for the record.

 4          MR. FRANKLIN:  And I wanted to give you the

 5   context of that.

 6          And in terms of exclusivity, we're alleging a

 7   complaint.  It's illegal exclusivity that affects all

 8   beach goers and beach goers of color and all protected

 9   categories.  That's why I'm asking the question.

10          MR. RICHARDS:  And that's why I'm objecting.

11          MR. FRANKLIN:  Understood.  Fair enough.

12   BY MR. FRANKLIN:

13      Q.  Do you know, have there been any efforts on

14   behalf of the City to, related to the old deed

15   restrictions in terms of disavowing it or coming out

16   with a statement whether it's an E.E.O. type statement

17   or something else in terms of treatment of people?

18      A.  I'm not aware historically of what the City has

19   done.  However, I can assure you that the City welcomes

20   everybody into the community and treats everybody fairly

21   and there's no such discrimination.

22      Q.  How frequently does the City do its AB 1825

23   training?

24      A.  What number?

25      Q.  AB 1825.

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    asked for those documents, there should be documents of
 2    attendance?
 3          A.  Yes.
 4          Q.  Does the City have a no retaliation policy?
 5          A.  Can you clarify that for me, please.
 6          Q.  Well, I'll ask it in terms of if a resident or
 7    someone makes a complaint, is there a formal policy that
 8    the City shall not retaliate against somebody for making
 9    a complaint related to race or some other civil right?
10          A.  I'm not aware if we have a policy or not.
11          Q.  Does the City have anti-harassment policies?
12          A.  Yes.
13          Q.  Is there a person who is in charge of
14    overseeing to make sure that those policies are updated?
15          A.  It would also be out of the Human Resources
16    Office.
17          Q.  So, is the Palos Verdes Homes Association, do
18    they have oversight over restrictive covenants; is that
19    fair?
20          A.  Yes.
21          Q.  And then what is the, what is the, this is --
22    this is new to me in terms of my work in City
23    government.
24              How does the Art Jury work; they're a
25    sub-committee of the Home Association?
```

45

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    asked for those documents, there should be documents of

2    attendance?

3         A.   Yes.

4         Q.   Does the City have a no retaliation policy?

5         A.   Can you clarify that for me, please.

6         Q.   Well, I'll ask it in terms of if a resident or

7    someone makes a complaint, is there a formal policy that

8    the City shall not retaliate against somebody for making

9    a complaint related to race or some other civil right?

10        A.   I'm not aware if we have a policy or not.

11        Q.   Does the City have anti-harassment policies?

12        A.   Yes.

13        Q.   Is there a person who is in charge of

14   overseeing to make sure that those policies are updated?

15        A.   It would also be out of the Human Resources

16   Office.

17        Q.   So, is the Palos Verdes Homes Association, do

18   they have oversight over restrictive covenants; is that

19   fair?

20        A.   Yes.

21        Q.   And then what is the, what is the, this is --

22   this is new to me in terms of my work in City

23   government.

24             How does the Art Jury work; they're a

25   sub-committee of the Home Association?

45

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 248

1    term first.

2    BY MR. FRANKLIN:

3        Q.  Do you think it was after 2014 or before?

4        A.  It was after, but I don't know exactly when it

5    came up.

6        Q.  What to your knowledge as the chief executive

7    and City Manager of Palos Verdes Estates research has

8    the City done on the concept of localism?

9        A.  What do you mean by research.

10       Q.  Have you asked anybody to conduct a study on

11   localism generally?

12       A.  Like write a report about it?

13       Q.  Yes, evaluate it?

14       A.  I'm not sure how to answer that question.  We

15   have not conducted a thesis-type study or a research

16   study about what is localism or how you define localism,

17   if that's what you mean.

18       Q.  Have you reached out to any other City Manager

19   of beach communities with respect to the issue of

20   localism?

21       A.  No.  What are you defining as localism?

22           MR. DIEFFENBACH:  I'll join with the objection,

23   vague and ambiguous.

24   BY MR. FRANKLIN:

25       Q.  Well, the City has on its web page, you can

61

Atkinson-Baker Court Reporters
www.depo.com

1  start there, and I can pull it up.  I think that we

2  printed it.  There's a web page done by the Wolcott

3  Company.

4          There's something along the lines of that we

5  don't tolerate localism.  I think that's the intent of

6  that web page.

7          Do you authorize -- are you the person that

8  authorizes the postings on the web page?

9      A.  Yeah, yes, I am, yes.

10     Q.  And in terms of public communication and

11 outreach, are you in charge of P.R. for Palos Verdes

12 Estates, if there is such a thing?

13     A.  I work with a team of staff to do that, yes.

14     Q.  And what is the team of staff that works on

15 public relations?

16     A.  It's a combination of the executive staff

17 depending on what the issue is.

18     Q.  What about the localism issue, who were the

19 executive staff that worked on it?

20     A.  Do you mean what is posted on the website?

21     Q.  Yes.

22     A.  Primarily, me, yeah, I think it's only me.

23     Q.  Just you, you said probably?

24     A.  It's a difficult question to answer defining

25 what you mean by localism.

62

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 250

1          In terms of what is on the website, I'm

2      involved.  Since Jackie was hired, Jackie Wu which I

3      spelled before, she has helped update our website.  And

4      she has been with us two months.  So, it has not been

5      very long.

6          Q.  How long has the Wolcott Company done work for

7      the City?

8          A.  Probably a year thereabouts or a year and a

9      half maybe.

10         Q.  How were they retained?

11         A.  They were retained -- do you mean what process

12     did we go through?

13         Q.  Was there a specific incident that caused you

14     to reach out to the Wolcott Company?

15         A.  Yeah.  Their job to us is to build our website

16     and to help us convert from what was our old website to

17     our new website.  And that was the purpose.

18         Q.  And were they hired related to any specific

19     incident?

20         A.  Only for building the website and actually

21     helping with creating our FaceBook account, presence,

22     not content, but for the actual creating the new web

23     page and associated links.

24         Q.  How much was that contract; do you know?

25         A.  Oh, I think that it's now at $50,000.  We

63

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 251

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 16 of 69  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 270-1  Filed 07/14/17  Page 12 of 44  Page ID
#:5816

1   modified it at one point.  It started out at 17 or
2   something like that.  ·
3        Q.  Who is your primary contact; Mr. Wolcott, is
4   that the primary contact?
5        A.  That's correct.
6        Q.  And how many employees does he have; do you
7   know?
8        A.  I don't know.
9        Q.  Was there an R.F.P. for that or how was he
10  hired?
11       A.  We did send out a request for proposals after,
12  to several companies.  And then we interviewed them and
13  then made a decision.
14       Q.  Is that a bidder type of proposal or is there
15  discretion in terms of that type of hire?
16       A.  It's not low bid, but they were the lowest.
17       Q.  And in terms of what the text that's on the
18  website related to localism, who was the primary author
19  of that?
20       A.  Me.
21       Q.  And before you wrote it, who did you consult
22  with?
23       A.  Well, I got input from staff, including
24  Mr. Wolcott, and typically, share information with the
25  City Council as appropriate.  I don't know if I did on

                                                              64

Atkinson-Baker Court Reporters
www.depo.com

1    that one or not, but depending.

2        Q.  Do you remember what staff you got input on, on

3    that particular?

4        A.  I don't, sorry.

5        Q.  But that should be in your E-Mails in terms of

6    people you typically communicate with staff by E-Mail or

7    text?

8        A.  Not text.

9        Q.  E-Mail?

10       A.  E-Mail.  And sometimes we send it out to

11   everybody and everyone looks at it and they give us your

12   thoughts.  And other times it's let's sit down and talk

13   about it.

14       Q.  In terms of your E-Mail habits, do you

15   typically copy the City Clerk?

16       A.  No.

17       Q.  How do things get put into a file or do they in

18   terms of your E-Mails?

19       A.  They're saved through the system and others

20   lawsuit related.  I have to make sure they're put aside.

21   And then if it's correspondence with residents, I also

22   make a point of putting those aside so they don't get

23   lost.

24       Q.  Do you have an in-box or folders where you put

25   things?

65

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 18 of 69   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 281-23   Filed 07/14/17   Page 14 of 44   Page ID
#:5818

Atkinson-Baker Court Reporters
www.depo.com

```
1        A.   It's not an in-box, but on the hard drive.
2        Q.   So, there are separate folders that you've
3    created for different topics?
4        A.   Not by topics, but just moved into a folder.
5        Q.   What type of organization do you use for your
6    folders?
7        A.   Do you mean what's the title of the folder?
8        Q.   Yes.
9        A.   I have one for, two folders that I save the
10   E-Mails in.  One is council correspondence and the other
11   one is staff correspondence.
12       Q.   And in terms of, do those automatically migrate
13   or do you drag them into it?
14       A.   I drag them into it.
15       Q.   And do you do that weekly, monthly, daily, when
16   you have time?
17       A.   As I send the E-Mail.
18       Q.   So, if you send it, you have a habit that you
19   send it and drag it afterwards and put it in the folder
20   so that it's saved?
21       A.   Right.
22       Q.   Have all of those been retained?
23       A.   Yes.
24       Q.   And before you wrote the E-Mail on localism,
25   did you take a historical look at any police reports
```

66

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 254

1  related to surfing incidents?

2      A.  No.  I did not look at specific police reports,

3  no.

4      Q.  Did you look at any data in terms of how many

5  incidents, beach-related incidents there may have been

6  prior to writing that report?

7      A.  I'm aware of it.  Did I look at specific

8  documents, it depends.  We have a variety of different

9  files that I make myself familiar with.

10      Q.  And what files did you make yourself familiar

11  with?

12      A.  Whatever is in the Police Department and with

13  the City Clerk.

14      Q.  And about how much time did you spend preparing

15  that?

16      A.  What is on the web page, I don't know offhand,

17  sorry.

18      Q.  More than a few hours?

19      A.  Yeah, it's hard to say.  It goes through, you

20  look at it and you go back and look at it and look again

21  and you tweak and you modify.  Sorry.  I didn't keep

22  track of how long it was.

23      Q.  Do you think it's fewer than ten hours?

24          I'm trying to get how serious that you took in

25  posting this on the web page and how long that you spent

67

Case 2:16-cv-02129-SJO-RAO Document 305-5 Filed 07/31/17 Page 20 of 69 Page ID
#:8125
Case 2:16-cv-02129-SJO-RAO Document 270-7 Filed 07/14/17 Page 16 of 44 Page ID
#:5820

Atkinson-Baker Court Reporters
www.depo.com

```
 1   on it.
 2          .   MR. RICHARDS:  What's the question?
 3   BY MR. FRANKLIN:
 4       Q.  How long did you spend preparing the text of
 5   localism on your web page?
 6              MR. DIEFFENBACH:  Calls for speculation.
 7              THE WITNESS:  I can't tell you.  I don't know
 8   how long I spent.
 9   BY MR. FRANKLIN:
10       Q.  And so that means, I'm not asking for specifics
11   in terms of I'm asking for your best estimate.  And I
12   didn't go through this.  I'm entitled to your best
13   estimate.
14              I'm not asking you to guess.  So, you think it
15   might have been, did you spend two days; was it a whole
16   weekend; was it a few hours?
17              MR. RICHARDS:  So, what's the question?
18   BY MR. FRANKLIN:
19       Q.  What is your best estimate in terms of how much
20   time that you spent preparing the text that is posted on
21   the City of Palos Verdes Estates website related to
22   localism?
23       A.  I'm sorry.  I'm not trying to be obstinate, but
24   I don't know really how to -- I don't remember and I
25   don't recall how long it took me.
```

68

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 256

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 21 of 69  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 281-26  Filed 07/14/17  Page 17 of 44  Page ID
#:5821

Atkinson-Baker Court Reporters
www.depo.com

1           I'll tell you that we took it very seriously

2     and it's important to us to make sure that everybody has

3     a clear understanding of our concern about the

4     situation.  And we wanted to make sure that it was

5     appropriately drafted.

6           Q.   Did you get the first draft from Mr. Wolcott?

7           A.   I don't remember.

8           Q.   Is it possible that you got the first draft

9     from Mr. Wolcott?

10          MR. DIEFFENBACH:  Speculation.

11          THE WITNESS:  No, well, it's possible, but not

12    for sure.

13    BY MR. FRANKLIN:

14          Q.   Okay.

15          A.   Because there are oftentimes that I would write

16    something and then just get feedback from people.

17          Q.   So, is it fair to say that you did not consult

18    any historians relating to the issue of localism prior

19    to writing that piece that is posted on the Palos Verdes

20    Estates web page?

21          A.   Remind me when it went up, please.

22          Q.   One second and I can do that.  I believe that

23    it went up in 2015.  So, does that help you, I mean, in

24    terms of --

25          A.   We spent a significant amount of time trying to

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 257

Atkinson-Baker Court Reporters
www.depo.com

1   understand what the situation was and collected and had

2   meetings and collected information, collected verbal

3   information from people to have an understanding of what

4   the concerns are.

5          And I don't, and part of that may have been

6   before, during or after the website was updated.  And I

7   just don't remember the dates.

8       Q.  You said that you had meetings trying to

9   understand the issue, who did you have meetings with?

10      A.  First, it was with the Surf Rider Foundation.

11      Q.  Okay, keep going.  That was first?

12      A.  Yes.

13      Q.  What was second?

14      A.  The Heal The Bay, actually, it may have been

15  the Coastal Commission or one or the other.

16      Q.  Okay.  Anybody else?

17      A.  The Lunada Bay Homeowner's Association.

18      Q.  Anybody else?

19      A.  I can't think of anything offhand.

20      Q.  And in terms of when these might be, do you

21  keep an Outlook calendar?

22      A.  I do.

23      Q.  And do you, would you calendar such meetings on

24  your Outlook calendar?

25      A.  Yeah.

70

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 258

```
 1        Q.   And so if we, if there was a production of your

 2   Outlook calendar for the last few years, we would be

 3   able to find that you attended or at least it was

 4   scheduled?

 5        A.   We can find the things if that's what you're

 6   asking for.

 7        Q.   Okay.   Do you calendar your own meetings or

 8   does the City Clerk calendar your meetings?

 9        A.   A number of people including me will calendar

10   meetings.

11        Q.   Who most frequently calendars your meetings,

12   yourself?

13        A.   Yes.

14        Q.   And prior to trying to understand the issue

15   with Surf Rider, the Coastal Commission, Heal The Bay,

16   and the Lunada Bay Homeowner's Association, have you

17   done any other independent investigation in terms of the

18   issue of localism?

19        A.   I have walked down there.

20        Q.   When did you walk down there after this in

21   terms of localism being an issue, when did you walk down

22   there?

23        A.   I don't have the dates.

24        Q.   Was it this year of 2016?

25        A.   I've been down there in 2016, yes.
```

71

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.   Would those be on your calendar, too, in terms
 2   of walking down there?
 3        A.   I don't know that they would be.
 4        Q.   In terms of trying to understand the issue, did
 5   you go down and talk to any surfers down there or beach
 6   goers?
 7        A.   Yeah, I have.
 8        Q.   Who did you talk to?
 9        A.   I don't remember their names.
10        Q.   Do you remember -- you don't remember any of
11   their names?
12        A.   No.
13        Q.   Did you take any notes of who you talked to?
14        A.   No.
15        Q.   And what was the discussion that you had with
16   them?
17        A.   Just learning about or hearing about their
18   perception of what's going on.
19        Q.   And what was their perception?
20        A.   Their perceptions were that the space down at
21   the coastline is available for everybody.
22        Q.   Anything else?
23        A.   No.
24        Q.   Did you reach out to anybody; what did Surf
25   Rider Foundation tell you about the subject of localism?
```

72

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 260

1     A.  Actually, not much.

2     Q.  Why do you say that?

3     A.  Well, I called them when there was an interest

4  gathering on the particular issue of surfing in the

5  area, we reached out or I reached out to them to

6  understand their perspective on it and how to work

7  together to try to address it.

8     Q.  And what did they tell you?

9     A.  Not much.

10    Q.  Did you ask them if they would be willing to

11  send their members down there as undercover?

12    A.  I asked them, we feel that the, that it is open

13  to the public.  Everybody does have access to it.  And

14  we wanted to validate that and asked them to go down and

15  experience it for themselves, to draw their own

16  conclusion.

17    Q.  And what did they tell you?

18    A.  No.

19    Q.  Didn't they tell you that they didn't want to

20  put their members in harm's way?

21    A.  They were concerned about their members.  I

22  don't remember the exact words.

23    Q.  But something like that?

24    A.  Yeah.

25    Q.  And did that resonate with you?

73

1   A.   No.

2        Q.   It didn't cause you any concern that the Surf

3   Rider Foundation was afraid to send people down there?

4        A.   No, because we feel that we've been doing

5   everything that we need to do to make sure that the area

6   is safe for everybody.

7             And there was not, there have not been, there

8   have been isolated incidents, not a preponderance of

9   incidents so.

10       Q.   When you say we feel that we have been doing

11  everything, who is we?

12       A.   I would say the City.   I represent the City.

13       Q.   Is there anyone specifically when you say we

14  feel?

15       A.   I represent the City.

16       Q.   And the Coastal Commission how many times, what

17  did the Coastal Commission, what do you recall of that

18  meeting and their interests and the issue of localism?

19       A.   They were interested in the patio structure.

20       Q.   Weren't they interested in the issue of

21  localism also?

22       A.   Their main focus is the patio structure.

23       Q.   I understand that, but I also understand that

24  they asked the City to address the issue of localism,

25  isn't it fair to say that they asked you to the evaluate

74

Atkinson-Baker Court Reporters
www.depo.com

1    the issue of localism?

2        A.   I respectfully disagree with you because they

3    acknowledged in their correspondence that in terms of

4    localism that the behavior is a local matter under

5    police jurisdiction of theirs.

6        Q.   So, the fact that they raised the issue of

7    localism, there's a State agency, did not cause you take

8    that more or less seriously?

9        A.   What we took seriously was the, that we needed

10   to address the patio structure and that is the main

11   relationship and focus with them.

12       Q.   And did you do any surveys of beach goers

13   outside of the area to better understand the issue of

14   localism?

15       A.   No surveys.

16       Q.   And so if I've got this right, right now you're

17   basing your opinion on visiting the surfers on the

18   patio; what else did you base your opinion on in terms

19   of their being equal access to all?

20       A.   Having talked to the Surf Rider Foundation,

21   having talked to the Coastal Commission and talked to

22   Lunada Bay homeowners, having various residents coming

23   to council meetings and non-residents coming to council

24   meetings and talking with the Police Chief who has

25   explained everything that they're doing to address the

75

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    situation.

2         Q.  I guess I'm puzzled because of, we'll get to

3    the documents, but at least two of those said that there

4    is a problem down there.

5              And what I'm hearing so far is that we the City

6    were only listening to the local surfers down on the

7    patio and perhaps local residents.

8              Is it fair to say that other than the meeting

9    with the Coastal Commission, and Surf Rider, and Heal

10   The Bay, did you reach out to any other groups to try to

11   identify and better understand the issue of localism?

12             MR. RICHARDS:  I'm sorry, but what is the

13   question that you're asking?

14   BY MR. FRANKLIN:

15        Q.  Other than these four groups that you have

16   identified in terms of the other side of the story that

17   there's a problem with localism, what investigation did

18   you do; and it sounds like there's none?

19        A.  I think that I explained what we did do and can

20   reiterate that the instances that you just referred to

21   were investigated and responded to.

22        Q.  But no survey was done; is that fair to say?

23        A.  That's correct.

24        Q.  And no survey in terms of beach goers outside

25   the City; is that fair to say?

76

Atkinson-Baker Court Reporters
www.depo.com

1        Q.  Was it just one in-person meeting or was there
2    more than one in-person meeting?
3        A.  I know that there was one.  I don't recall if
4    there was another one or not.
5        Q.  Does that mean that there was not another one
6    or you don't remember either way?
7        A.  I don't remember another one.  I know that we
8    communicated after that.
9        Q.  And how did you communicate with Surf Rider
10   after the in-person meeting?
11       A.  We followed up, my recollection is that
12   inviting them again to get back to us about, you know,
13   we wanted them to come down and enjoy the community and
14   use the area.  And then they sent back a letter that you
15   referenced.
16       Q.  So, was the follow-up an E-Mail or a phone
17   message?
18       A.  I honestly don't recall.
19       Q.  Who would have been the person that followed up
20   with Mr. Cadwallader; would it have been you or someone
21   who works for you?
22       A.  It may have been both, but I just don't
23   remember.  Someone who works for me and me.
24       Q.  Who would have been the person that followed
25   up, other than you?

85

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 263

Atkinson-Baker Court Reporters
www.depo.com

```
 1   BY MR. FRANKLIN:

 2       Q.  And what did the letter say?

 3       A.  You know, it has been a long time since I saw

 4   it.  So, I don't recall specifically.

 5       Q.  Is it fair to say that they were afraid to send

 6   their members down to Lunada Bay?

 7           MR. DIEFFENBACH:  The document speaks for

 8   itself, calls for speculation.

 9           MR. RICHARDS:  Are you asking if that's what it

10   said?

11           MR. FRANKLIN:  He said that he cared about this

12   issue.

13           MR. RICHARDS:  Well, that has nothing to do

14   with it.

15           MR. FRANKLIN:  So, I'm asking if he remembers

16   what was in this E-Mail back.

17           MR. RICHARDS:  So, what's the question without

18   the preface?

19   BY MR. FRANKLIN:

20       Q.  What do you recall being in that E-Mail; did it

21   have a reference to their members not wanting to send

22   their members to Lunada Bay?

23       A.  I don't believe that there was an E-Mail along

24   those lines at all.  I recall that they sent us a

25   letter.
```

88

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     Q.  Do you recall that being a letter along those

2   lines?

3     A.  I recall the letter and I don't remember the

4   specifics of it.  And they were concerned about, you

5   know, helping us out.

6     Q.  Were they concerned about safety of their

7   members or were they concerned about helping you out?

8     A.  I need to see the letter to tell you what it

9   said.  I don't recall what it said.

10     Q.  So as of today, you don't recall it's fair to

11   say that Surf Rider ever expressed concern about member

12   safety relating to Lunada Bay?

13     A.  Your question, I'm sorry, say that question

14   again, please.

15     Q.  As you sit here today, you don't recall that

16   Surf Rider ever expressed to the City of Palos Verdes

17   Estates that they were worried about their members'

18   safety at Lunada Bay?

19     A.  I recall that their letter to us was in

20   response to our suggestion and interest in having them

21   come and enjoy surfing in the City and go out in the

22   water because we felt that it was safe.  And they

23   declined to do that for their reasons.

24     Q.  So, you don't remember them ever expressing any

25   reasons for their declining?

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      A.  I think they were concerned about doing that,

2  just end of story.

3      Q.  The question is their members' safety.

4          And you don't remember them expressing anything

5  to Palos Verdes Estates about member safety at Palos

6  Verdes Estates?

7      A.  I'd have to see the letter.  I don't remember

8  if they used the word "safety" or not.

9          If you have the letter, I could tell you, but

10  our position was that we wanted them to go out there.

11  And we felt that it was safe and that they should, you

12  know, prove us wrong.

13      Q.  And so we'll look at the letter later today.

14      A.  Okay.

15      Q.  But as you sit here right now, you just don't

16  remember; is that fair?

17      A.  Okay.

18      Q.  You don't remember what was in that letter?

19      A.  Yeah.  I'd have to see the letter to see what

20  it says.

21      Q.  And you don't remember Surf Rider ever

22  expressing a concern about Lunada Bay?

23          MR. DIEFFENBACH:  Asked and answered five times

24  already.

25          THE WITNESS:  I think that you're taking it out

90

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    of context, and I'm repeating myself also maybe for

2    them, but we had encouraged them to go down there

3    because we felt that it was safe.

4    BY MR. FRANKLIN:

5        Q.   And the part that I'm asking you that you

6    haven't answered yet is that you don't remember them

7    being concerned about safety?

8            MR. DIEFFENBACH:  Objection, asked and

9    answered.  He answered the question.

10           THE WITNESS:  I need to see the letter.

11   BY MR. FRANKLIN:

12       Q.   So, you're unable to answer that question

13   without reviewing the letter?

14       A.   I'd like to look at the letter.

15       Q.   I know that you would like to, but you're

16   unable to answer the question without looking at the

17   letter?

18       A.   Yes.

19       Q.   Okay.  How about the -- and so what I have on

20   Surf Rider was their, did you initiate the call or was

21   it a call or an E-Mail to setup that meeting?

22       A.   I recall that I called them.

23       Q.   And so it was the South Bay chapter of Surf

24   Rider?

25       A.   That's correct.

91

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 264

Atkinson-Baker Court Reporters
www.depo.com

1        Q.  And did you have any interaction with Surf

2   Rider National?  They're a parent organization of Surf

3   Rider.

4        A.  I did not, no.

5        Q.  And were you aware before that meeting that

6   Surf Rider had expressed concern about safety at Lunada

7   Bay many years before?

8        A.  I did not know that when I called them.

9        Q.  Did you learn that at some other point?

10       A.  In the meeting I recall that they brought that

11  up.

12       Q.  What do you recall them bringing up?

13       A.  Exactly what you just said.

14       Q.  What was that?

15       A.  That there was a history that they were aware

16  of.

17       Q.  It was the history that they were afraid of or

18  worried about safety of surfers at Lunada Bay?

19       A.  No.  I recall that they knew of the allegations

20  that people made about being at Lunada Bay.

21       Q.  And in terms of before that meeting, you did

22  not know that Surf Rider had formal concerns about the

23  safety of surfers at Lunada Bay who were not locals?

24       A.  Correct.

25       Q.  How about your, in terms of then in terms of

```
 1    the follow-up, it's clear that there was not another
 2    in-person meeting with Surf Rider South Bay?
 3         A.   I don't recall one.
 4         Q.   And you cannot recall any specific phone calls
 5    with them afterwards?
 6         A.   No, no specific phone calls with them.
 7         Q.   And then in terms of, when did you first meet
 8    with -- strike that.
 9              When did the City first meet with the Coastal
10    Commission about the un-permitted structure at Lunada
11    Bay?
12         A.   I don't remember the date, but it was after
13    that meeting with Surf Rider.
14         Q.   Was it after -- when you met with the Coastal
15    Commission, had you already received correspondence from
16    them?
17         A.   I think so, but I'm not sure.
18         Q.   And when was the -- was it more than one
19    in-person meeting with the Coastal Commission regarding
20    Lunada Bay?
21         A.   Yes, there have been.
22         Q.   And how many meetings have there been?
23         A.   I believe two.
24         Q.   And who attended those meetings?
25         A.   The first one included the Police Chief, the
```

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 36 of 69  Page ID
#:8141
Case 2:16-cv-02129-SJO-RAO  Document 270-7  Filed 07/14/17  Page 26 of 44  Page ID
#:5830

Atkinson-Baker Court Reporters
www.depo.com

1     Planning & Building Director.

2          Q.   Is that the City Manager?

3          A.   Yes, that person, and me.

4          Q.   And how about on the Coastal Commission side,

5     who attended?

6          A.   I don't know all their names.

7          Q.   Was there more than one person?

8          A.   They had four or five people and someone on the

9     telephone, too.

10         Q.   Where was that first meeting with the Coastal

11    Commission?

12         A.   Their office.

13         Q.   Is that in Long Beach; where is their office

14    located?

15         A.   It's in Long Beach.

16         Q.   Do you know about how long that first meeting

17    was with the Coastal Commission?

18         A.   Probably about an hour or so.

19         Q.   Who setup that first meeting with the Coastal

20    Commission?

21         A.   Either I did or the Planning & Building

22    Director, slash, Deputy City Manager.  We asked for it

23    or I asked for it.

24         Q.   What was the purpose of you asking for that

25    meeting?

94

1      A.   Similar to the other meetings that we had.   We

2   wanted to do fact-finding and understand their

3   perspective and concerns and issues and build a

4   relationship so we could mutually work together to

5   address the situation.

6      Q.   Did you have an agenda for that meeting, paper

7   agenda, a paper agenda, purpose driven?

8      A.   I don't recall one.

9      Q.   Did you take notes at that meeting?

10      A.   I did not.

11      Q.   Is it your habit not to take notes of meetings?

12           I'm just trying to understand what your

13   personal habits are in terms of notes; how do you

14   memorialize meetings that you've had?

15      A.   I do my best to remember.

16      Q.   Do you dictate?

17      A.   No.

18      Q.   Okay.   And so with a meeting like that, that's

19   not the type of meeting where you would make notes to

20   yourself?

21      A.   Correct.   And I was with other people and

22   collectively, you know, we have a recollection.

23      Q.   All right.   And did anybody on the City side

24   take notes?

25      A.   I don't know.

95

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.   Have you asked?

 2        A.   No.

 3        Q.   Was there an E-Mail exchange following that

 4   meeting, first meeting with the Coastal Commission?

 5        A.   I don't know.

 6        Q.   Did you have any telephone calls with the

 7   Coastal Commission subsequent to that first in-person

 8   meeting in Long Beach?

 9        A.   No.

10        Q.   Did your staff have any telephone calls to your

11   knowledge with the Coastal Commission following that

12   first in-person meeting in Long Beach?

13        A.   I believe so.

14        Q.   Who?

15        A.   Ms. Repp-Loadsman.

16        Q.   Did she report to you on her interaction with

17   the Coastal Commission?

18        A.   Generally.

19        Q.   Was it in-person or by letter or memo or

20   E-Mail; how did she report to you?

21        A.   In-person.

22        Q.   What did she tell you?

23        A.   That she had talked with them to understand,

24   also, their concerns and to convey our interest in

25   working together to address the situation that we were
```

96

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 268

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 39 of 69  Page ID
#:8144
Case 2:16-cv-02129-SJO-RAO  Document 270-7  Filed 07/14/17  Page 29 of 44  Page ID
#:5833

Atkinson-Baker Court Reporters
www.depo.com

 1   dealing with.

 2       Q.   Okay.  And at that time what did you understand

 3   the situation to be with respect to the Coastal

 4   Commission?

 5       A.   That we have an un-permitted structure.  And

 6   either we have to obtain permits to maintain it or

 7   remove it.

 8       Q.   Was there anything else on the Coastal

 9   Commission's mind that you know of that related to you?

10       A.   From that meeting, no, I think that was

11   primarily it.

12       Q.   Was there a second in-person meeting with the

13   Coastal Commission?

14       A.   Yes.

15       Q.   And when was the second in-person meeting?

16       A.   I don't know the date, sorry.

17       Q.   Do you remember the general time frame; was it

18   the summer of 2016?

19       A.   I don't know.

20       Q.   Where was that meeting, also in Long Beach?

21       A.   No.  That was actually at the site, at the

22   Lunada Bay site.

23       Q.   Who attended the second meeting at the Lunada

24   Bay site?

25       A.   From the City it was me, Ms. Repp-Loadsman, and

                                                          97

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 269

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 40 of 69   Page ID
#:8145
Case 2:16-cv-02129-SJO-RAO   Document 270-7   Filed 07/14/17   Page 30 of 44   Page ID
#:5834

1   the Police Chief.

2        Q.   Did the Chief of Police attend that first

3   meeting?

4        A.   Yes.

5        Q.   Why was he there?

6        A.   Because he and his department are responsible

7   for public safety.  And we felt that it would be

8   valuable to have him as part of this conversation.

9        Q.   Public safety was a topic at these meetings?

10       A.   No, but it was a matter of concern to us.  And

11  we wanted to make sure that everybody knew that we were

12  addressing it.

13       Q.   What was the specific public safety concern

14  that the City had at that point?

15       A.   So, what was the City's concern with public

16  safety?

17       Q.   Yes.

18       A.   The City wanted to reinforce that we're doing

19  everything that we could to maintain public access in a

20  safe environment for anyone who is visiting the

21  coastline.

22       Q.   And how was that conveyed to the Coastal

23  Commission?

24       A.   Just like that.

25       Q.   And was there a detailed plan or what were the

98

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 270

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 41 of 69   Page ID
#:8146
Case 2:16-cv-02129-SJO-RAO   Document 270-7   Filed 07/14/17   Page 31 of 44   Page ID
#:5835

Atkinson-Baker Court Reporters
www.depo.com

1    specifics besides that statement?

2        A.   You know, I don't recall from that particular

3    meeting.

4        Q.   Do you recall any specific plans in terms of

5    the City's representation to the Coastal Commission

6    related to safety and access?

7        A.   At that meeting?

8        Q.   At anytime.

9        A.   Say that again, please.

10       Q.   Do you recall any specific plans with respect

11   to safety and access being communicated to the Coastal

12   Commission from the City of Palos Verdes Estates?

13       A.   I don't remember.  I don't know because we have

14   shared with many people our efforts to, and the police

15   have been active, the Police Chief has been active in

16   communicating and having his staff put out fliers and

17   communicate.  So, I just don't remember.

18       Q.   Was there follow-up in terms of the site

19   location, Lunada Bay site meeting, how many people from

20   the Coastal Commission attended?

21       A.   They may have had like four people.

22       Q.   Do you remember any of their names?

23       A.   Jordan Sanchez is one of them.  And I don't

24   remember the other ones.

25       Q.   Mr. Willis, does that sound familiar?

99

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 271

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.  Yes.
 2        Q.  And in terms of Lunada Bay, it's marked on the
 3   map as the southwest edge of the City?
 4        A.  Yes.
 5        Q.  And is the bottom portion of Lunada Bay is a
 6   point that they call Resort Point; is that your
 7   understanding?
 8        A.  Based on the map.
 9        Q.  Other than the map, do you have an
10   understanding of sort of the local geographical terms?
11        A.  Other than the map, no.
12        Q.  Is it fair to say in terms of Rocky Point, too,
13   other than the map, you don't know that outcropping is
14   called Rocky Point?
15        A.  Correct, yes.
16        Q.  And then when the trail, that green part of the
17   map around Lunada Bay to your understanding is that City
18   property; is that bluff top park there?
19        A.  That bluff top is parkland, yes.
20        Q.  And then the shoreline is parkland, too; is
21   that fair to say?
22        A.  Yes.
23        Q.  And does the City shoreline, does it wrap
24   around even the areas where there are homes around the
25   base of the bluff; that's my understanding is that
```

102

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    there's some shoreline at the base of the bluff that the

2    City park actually wraps around between the bluff and

3    the --

4         A.   I couldn't tell you that.

5         Q.   Who would know that at the City?

6         A.   Palos Verdes Estates Homes Association.

7         Q.   They would know that; and why would they know

8    that?

9         A.   They have the deeds that identify the actual

10   lot lines and parameters of all of the properties.

11        Q.   Is there a map at the City parks?

12        A.   The City does not have parks.

13        Q.   What does the City call it, open space?

14        A.   Yes.

15        Q.   Is there City owned open space?

16        A.   No.

17        Q.   And if someone wanted to define City owned open

18   space, how would they do that?

19        A.   What do you mean by define?

20        Q.   I'd like a tour of Palos Verdes Estates' open

21   space, Mr. Dahlerbruch, can you tell me does the City

22   have a map where I can go visit?

23        A.   We would probably send them over to the Home

24   Association to look at their original documents.

25        Q.   And the Home Association they would have the

103

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    original deeds, too?

2         A.   Correct.

3         Q.   And so your memory of that second meeting with

4    the Coastal Commission is that the group used the trail

5    to the south and walked down to the shoreline and then

6    walked along the shoreline up to what the City, I think,

7    calls a patio and others call Rock Fort; is that fair?

8         A.   Yes.

9         Q.   And what did you observe along the way; did you

10   notice items stored along the way?

11        A.   There was debris along the way.  There were a

12   couple of kayaks.

13        Q.   Is it fair to say crab pots, lobster traps,

14   sort of ocean-oriented recreational tools?

15        A.   As if they had washed up on the beach.

16        Q.   That's your impression that these things had

17   all washed up on the beach?

18        A.   Yes.  They were not in an organized fashion.

19        Q.   So, is that your impression with the kayaks,

20   too?

21        A.   The kayaks were in the bushes.  So, I don't

22   know how they arrived there, but they were actually in

23   the bushes.

24        Q.   Would the City allow residents to store

25   personal items in open space?

Atkinson-Baker Court Reporters
www.depo.com

1   Coastal Commission, you made it to the fort and then

2   what happened?

3        A.   They had never seen it before.  They had never

4   been down there.  They had only looked from on top.  So,

5   they looked at it and inspected it and evaluated its

6   condition and talked about its removal and that was it.

7        Q.   Did the Coastal Commission say that it had to

8   be removed?

9        A.   They have consistently told us that the City

10  Council has the option of permitting it or removing it.

11       Q.   And if it was permitted, did they want other

12  things to happen as part of the permitting process?

13       A.   They have suggested in writing that if it was

14  permitted there may be other amenities that they feel

15  would enhance the area.

16       Q.   And so do you recall any of the amenities that

17  the Coastal Commission thought that might enhance the

18  area?

19       A.   They talked about benches and binoculars.

20       Q.   Signs?

21       A.   Signs, yeah.

22       Q.   Does the City consider that a beach to be used

23  by the public or that is an accessible beach or does the

24  City have some other in terms of storm runoff or that

25  type of thing, is that a usable beach for residents and

106

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 272

Atkinson-Baker Court Reporters
www.depo.com

```
1    that going to start?

2         A.   Monday.

3         Q.   And do you know how long that it's supposed to

4    take?

5         A.   I would defer to the City Engineer to give you

6    the specifics on that.

7         Q.   Have you heard anything -- I've heard they're

8    bringing a dumpster down there; is that how they're

9    getting out that material?

10        A.   Again, the City Engineer is the most

11   knowledgeable on the process.  And there are options

12   available to the contractor to determine.

13        Q.   And then in terms of after that second on-site

14   meeting, do you recall any other communications with the

15   Coastal Commission?

16        A.   There has been an exchange of letters.

17        Q.   Other than the exchange of letters, any

18   additional calls or in-person meetings?

19        A.   No, not that I'm aware of.

20        Q.   Do you have any familiarity if the Coastal

21   Commission is doing a survey of the coastal beach goers

22   related to the Lunada Bay?

23        A.   I don't know.

24        Q.   In terms of the next meeting with Heal The Bay,

25   who negotiated the contact with Heal The Bay?
```

112

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 273

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 47 of 69   Page ID
#:8152
Case 2:16-cv-02129-SJO-RAO   Document 270-7   Filed 07/14/17   Page 34 of 44   Page ID
#:5838

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.   I did.
 2        Q.   And about when did you first call Heal The Bay
 3   relating to the specifics of Lunada?
 4        A.   I really don't know when I initiated that.
 5        Q.   Would there be E-Mail communications relating
 6   to that?
 7        A.   Not that I'm aware of.
 8        Q.   And was that an in-person meeting or a
 9   telephone call?
10        A.   In-person.
11        Q.   Where was the meeting?
12        A.   Their office.
13        Q.   What City?
14        A.   Santa Monica.
15        Q.   Did you meet with Matt King?
16        A.   Yes, Matt King and a woman, and I don't
17   remember her name.
18        Q.   And how about on the City side, was there
19   someone beside yourself?
20        A.   The same two other people, the Police Chief and
21   the Planning Director, slash, Deputy City Manager.
22        Q.   And why was the Police Chief in attendance?
23        A.   We were all on a listening tour to understand
24   perspectives and information and history and perceptions
25   and facts that people had.
```

113

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 274

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 48 of 69   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 28-53   Filed 07/14/17   Page 35 of 44   Page ID
#:5839

1          And it was important that all of us heard it

2     together, just like Surf Rider.

3          Q.   What did you learn from the Heal The Bay

4     meeting?

5          A.   They made suggestions about communicating with

6     the public and more from a public relation perspective

7     how we might illustrate to people through communications

8     that, you know, the space is accessible to everybody and

9     safe for everybody.

10         And that ended up being the primary point of

11    the discussion from their perspective.

12         Q.   Is that because Mr. King has a P.R. background

13    or what?

14         A.   No, because they're mostly a scientific

15    research oriented interest group for protecting the

16    quality of the water and beaches so they're again safe

17    for public use and in that way accessible for public

18    use.  So, that's where they're coming from.

19         Q.   And with the Heal The Bay meeting, how did it

20    end up with beach clean up day coming out of that, what

21    was the -- how did beach clean up equate to public

22    access?

23         A.   The City has had a long history of working with

24    Heal The Bay and doing a beach clean up.  So, I'm not

25    sure that there was a correlation between that meeting

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q.   Who with the City met with the Homeowner's
2  Association?
3      A.   I recall that it was Ms. Repp-Loadsman and me.
4      Q.   Who from Lunada Bay Homeowner's Association
5  attended the meeting?
6      A.   There were probably half a dozen.  And I don't
7  remember who they all were.
8      Q.   Do you remember any of them of the half a dozen
9  people that you meet with?
10     A.   The President is a gentleman by the name of
11  Peter Bena, P-e-t-e-r, B-e-n-a.
12     Q.   And whom else do you remember meeting with?
13     A.   I'm not sure.
14     Q.   And what did the, as part of your listening
15  tour, what did the Lunada Bay Homeowner's Association
16  tell you; what did you gather from their sentiments?
17     A.   They were equally concerned about the behavior
18  in the area and wanted it changed.  They felt that the
19  area is open to the public and wanted it that way.  And
20  they conveyed that to us.
21          It's kind of the essence of what we were
22  talking about.
23     Q.   And what specific behavior did you understand
24  they were concerned with?
25     A.   What they were reading in the newspaper.

124

Atkinson-Baker Court Reporters
www.depo.com

```
 1              (At 12:45 p.m., the deposition of

 2              ANTON DAHLERBRUCH was adjourned for

 3              the noon recess.)

 4   ///

 5              (At 1:45 p.m., the deposition of

 6              ANTON DAHLERBRUCH was reconvened

 7              from the noon recess.)

 8

 9   BY MR. FRANKLIN:

10        Q.   Back on the record.

11             Mr. Dahlerbruch, can you tell me in terms of

12   your visits down to the beach, at the rock fort did

13   anyone ever offer you a beer?

14        A.   Yes.

15        Q.   And at that time did you know that there was no

16   alcohol policy or City ordinance at Palos Verdes

17   Estates?

18        A.   I was not aware of it at the time.

19        Q.   Did you report it to the Chief of Police as

20   something that was perhaps the City needed to look into

21   in terms of enforcing?

22        A.   I did not.

23        Q.   Why is that?

24        A.   Because first of all, I didn't see a beer.

25   Somebody had mentioned it as I was just standing there
```

131

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

 1   on the beach.

 2           And I didn't see anything harmful taking place

 3   for me to walk back, the time that it takes to get back

 4   up the path, to call the police and have them come and

 5   respond.  I don't know that there would have been

 6   anything there by that time anyway.

 7           And I was there on a fact-finding, on my own

 8   time just to, I heard lots of things going on.  And I

 9   wanted to understand it, you know, and was concerned

10   about what I had heard and I wanted to see it for

11   myself.

12       Q.  As the chief executive of the City, do you

13   expect the ordinances to be enforced?

14       A.  Yes.

15       Q.  And if you knew that police officers under your

16   employment observed local surfers drinking beer at the

17   rock fort, would you expect them to issue a citation or

18   follow-up in some way?

19       A.  You know, I feel very strongly that the Police

20   Department needs to enforce the laws and ordinances of

21   the City and, you know, anything going on down there,

22   that, you know, is not legal needs to be addressed with

23   very much care about that.

24           But then I leave it to the Police Chief to

25   manage his department and staff in terms of how they go

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    about doing their business.

2         Q.   About when were you offered that beer?

3         A.   Like the time of day?

4         Q.   No, the month and year?

5         A.   You know, I don't remember when it was.  Again,

6    I had been down there a couple of times just to look at

7    it for myself.  And I don't exactly remember the

8    particular visit.

9              There's a reference in one of my weekly reports

10   of me going down there.  So, whatever date that is, I

11   just don't remember offhand.

12        Q.   And in terms of are you aware that there's a no

13   open fire ordinance within the City in terms of camp

14   fires on the beach?

15        A.   I'm aware of that now, yes.

16        Q.   Do you expect that to be enforced?

17        A.   Again, I very much feel that the laws of the

18   City have to be enforced.  And I care very much about

19   people following the laws.

20             And I would leave it to the Police Department

21   and the Police Chief to determine how to do that

22   enforcement.

23        Q.   And are you aware if there's a no cooking hot

24   food outside ordinance?

25        A.   I'm not aware of that.

133

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1       Q.  And who within the department follows up on

2    that, parking citations?

3       A.  I would have to ask the Police Chief.  I don't

4    know offhand.

5       Q.  In terms of parking citations, about how much

6    in terms of the budget is that each year; do you know?

7       A.  Parking citations?

8       Q.  Yes.

9       A.  I don't know.  It's relatively small.

10      Q.  Does $60,000 sound about right?

11      A.  I can't speculate, but I know that it's not

12   big.

13      Q.  And how about moving citations, do you know how

14   much revenue that brings into the City?

15      A.  I don't know.

16      Q.  And it would be someone within the, either the

17   Chief of Police or someone that works for him that would

18   be able to determine whether citations are issued more

19   frequently to people inside the City or outside the

20   City?

21      A.  Yes.

22      Q.  Do you know Charlie Mowat?

23      A.  I recognize the name.

24      Q.  Have you met with him before?

25      A.  I think that he was one of, on one of my visits

136

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    down to the patio, he was one of the people there.

2        Q.   And Mr. Mowat is a resident of Palos Verdes

3    Estates; is that correct?

4        A.   I don't know that for sure.

5        Q.   Did you ever receive communications from him in

6    the form of having concerns about Chief Kepley?

7        A.   Oh, we did.  We got a letter.  I think that we

8    got a letter or an E-Mail from him.

9        Q.   And what do you remember about that?

10       A.   He was concerned that the Police Department is

11   not doing what he thinks the Police Chief should be

12   doing.

13       Q.   And what did he think that the Chief of Police

14   should be doing?

15       A.   I would have to see the letter again and I

16   could tell you.

17       Q.   How about Mr. Papayans, did you ever have

18   communications with him; do you know who he is?

19       A.   I know the name as an outcome of the lawsuit,

20   but I don't know him.

21       Q.   There's a Michael Papayans who is an older

22   gentleman, older than the Defendant in this lawsuit;

23   have you ever received any communications from him?

24       A.   Not to my recollection, but I don't know.

25       Q.   So, right now you don't remember any specific

137

Anton Dahlerbruch
November 18, 2016

```
 1    communications with either Mr. Mowat or Mr. Papayans?
 2         A.  Not Mr. Papayans.  Mr. Mowat might have sent us
 3    an E-Mail or a letter among all of the other residents
 4    that we've heard from.
 5         Q.  Do you remember going down with to the City
 6    Attorney to the rock fort and meeting with Mr. Mowat?
 7         A.  Two City attorneys, no.
 8         Q.  Do you remember going down with any City
 9    Attorney to the rock fort?
10         A.  I've not gone down with the City Attorney, but
11    I was down there.  And I believe that he was one of the
12    people when I was down there that was there at the time,
13    yes.
14         Q.  Do you remember receiving communications with
15    him in terms of how to best handle the issue with the
16    press?
17         A.  Say that again.
18         Q.  How to handle the issue with the press,
19    focusing on Lunada Bay?
20         A.  From him, no, I don't recall that.
21         Q.  Do you recall there being an undercover
22    operation set for January of 2016 to try to ferret out
23    the issue of violence on the beach?
24         A.  At one point I was aware from the Police Chief
25    that they had planned some type of operation.
```

138

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.  And did you receive a telephone call from
 2   somebody indicating that, complaining about the
 3   undercover operation?
 4        A.  No.
 5        Q.  Did you receive a call from the community
 6   anonymously from someone relating to an undercover
 7   operation?
 8        A.  A phone call, no.
 9        Q.  Did you receive an E-Mail?
10        A.  No, not that I recall.
11        Q.  Did you receive an in-person visit from anybody
12   relating to an undercover operation planned for Lunada
13   Bay?
14        A.  One of the folks that had reached out to the
15   City shared an in-person meeting that he was aware that
16   there might be something planned.
17        Q.  And who was that?
18        A.  I think his name was Thiel was his last name.
19   I don't remember his first name.
20        Q.  T-h-i-e-l?
21        A.  Something like that.
22        Q.  Is it a Mr. Thiel or is that his first name?
23        A.  He's male, but I don't recall his first name.
24        Q.  Thiel is the last name.
25            What do you recall -- where was the visit with
```

139

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 57 of 69   Page ID
Case 2:16-cv-02129-SJO-RAO   Document #:6162   Filed 07/14/17   Page 37 of 44   Page ID
#:5841

1      A.   Yes.

2      Q.   Did you ever hear that on Martin Luther King

3  Day paddle out that regular surfers and people who live

4  in Palos Verdes Estates who protested the protesters

5  paddled out in black face?

6      A.   No.

7      Q.   And if that had happened, would you expect that

8  to be written up in a police report?

9          MR. DIEFFENBACH:  Calls for speculation, no

10  foundation.

11         THE WITNESS:  I would be very concerned with

12  something like that, yes.

13  BY MR. FRANKLIN:

14     Q.   Are you aware that a person that paddled out in

15  black face on Martin Luther King Day and told Mr. Taloa

16  that you don't pay enough taxes to be here?

17     A.   No.  I'm not aware.

18     Q.   And is that as the City Manager, that would be

19  the type of thing that you would want investigated; is

20  that fair?

21     A.   I would defer to the Police Department for what

22  violation of law took place and they would handle it,

23  yes.

24     Q.   Would it cause you concern?

25     A.   You know, it concerns me when there's

155

Exhibit F, page 277

Atkinson-Baker Court Reporters
www.depo.com

1     intimidation taking place.  We don't want that as a

2     community. · And we take that very seriously and would

3     respond to it.

4         Q.   Showing up in black face on Martin Luther King

5     Day, would you take that as intimidation?

6         A.   I would refer to the Police Department to

7     handle it as they would be responsible for doing.

8         Q.   Have you ever heard that some of the regular

9     surfers at Lunada Bay work for the Long Beach Police

10    Department?

11        A.   No.

12        Q.   Have you ever visited with the liquor store

13    owner related to an event that happened at his store, I

14    think, in 2015?

15            MR. DIEFFENBACH:  Vague, ambiguous,

16    unintelligible.

17            THE WITNESS:  Where is the store that you're

18    talking about?

19    BY MR. FRANKLIN:

20        Q.   There's a liquor store in Lunada Bay.  And it's

21    owned by an immigrant who is suing some of the same

22    individuals in this lawsuit; have you heard about that

23    lawsuit?

24        A.   From the newspaper.

25        Q.   Have you ever visited with the liquor store

156

Exhibit F, page 278

1      Q.  And does it work well?

2      A.  Yeah.

3      Q.  Full bars?

4      A.  I don't recall.

5      Q.  But enough to call?

6      A.  Yes.

7          MR. FRANKLIN:  I'm going to hand you a document

8   that has not been marked yet, but it appears to be a

9   City document.

10         This is from Charlie Mowat to Anton

11  Dahlerbruch, subject, patio structure dated Wednesday,

12  March 23, 2016, at 9:43 a.m.  And that will be marked as

13  Exhibit 156.

14

15         (Deposition Exhibit 156 was

16         marked for identification

17         and is attached hereto.)

18

19  BY MR. FRANKLIN:

20     Q.  Does that refresh your memory in terms of a

21  face-to-face meeting that you might have had with

22  Mr. Mowat?

23     A.  Yes.

24     Q.  In terms of timing it says that he met you the

25  other day.

221

1          So, does it sound like a few days ago, would

2    that be that week in March 23, 2016; does that sound

3    about right?

4          A.   Yes.

5          Q.   And he makes reference to you and Officer Best

6    were down on the shoreline; do you recall that?

7          A.   Yes.

8          Q.   And what was the purpose of being down there on

9    the shoreline with Officer Best?

10         A.   We were providing a tour of the area to the

11   people that were with us.

12         Q.   And you were with two lawyers?

13         A.   No.

14         Q.   Did he have it wrong?

15         A.   Yes.

16         Q.   Who were the people that you were with?

17         A.   Two council members.

18         Q.   They might have been lawyers because I think

19   that you have several lawyers on your council?

20         A.   They could have been, but I don't know them in

21   that capacity.

22         Q.   And who were the council members?

23         A.   I don't recall.

24         Q.   Was one of them the Mayor?

25         A.   I don't recall which ones they were.

222

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.  No.
 2        Q.  Have you ever heard of the Bird Rock Bandits in
 3   San Diego?
 4        A.  No.
 5        Q.  Have you ever heard of the Pier Point Rats in
 6   Ventura?
 7        A.  No.
 8        Q.  We touched on it briefly, but I think that your
 9   answer was you had not reached out to any of these
10   communities to see how they might have dealt with the
11   problem of surfing gangs in their communities?
12        A.  These other cities that you referenced; that's
13   correct.
14        Q.  And if I were to ask the same question about
15   counties, it's the same answer that you haven't reached
16   out to any counties to see how they might have dealt
17   with the problem of surfing localism?
18        A.  I have not.
19        Q.  To your knowledge before today what did you
20   understand the problem of localism to be; what did you
21   understand the allegation to be?
22             MR. RICHARDS:  Sorry, in this lawsuit?
23             MR. FRANKLIN:  Generally, in terms of it being
24   an issue at Lunada Bay.
25             MR. RICHARDS:  Thank you.
```

250

Anton Dahlerbruch
November 18, 2016

1      Q.  Have you ever heard this phrase used by any of

2  the residents, if you want waves out here, you have to

3  earn your keep by cutting off kooks?

4      A.  No.

5      Q.  Have you ever heard of this, this is sort of

6  the opposite of localism.  It's what some would call

7  Aloha or sharing of waves where it's actually a term,

8  it's a kook; have you heard of that?

9      A.  I have not.

10      Q.  And the concept is this, you know, to me the

11  best surfer in the water is the one having the most fun?

12      A.  No.

13      Q.  Or if you think someone is a novice paddling to

14  them and saying, hey, that's not how we do things here.

15  Why don't you take the next wave and I'll take the one

16  after that.

17          Have you ever heard of that being used in other

18  surf breaks?

19      A.  No.

20      Q.  Have you ever checked with any other surfing

21  communities whether it's Santa Cruz or San Clemente or

22  Huntington Beach where basically they put interpretive

23  signage for people at the top of their breaks outlining

24  basic rules for that particular break?

25      A.  I'm sorry, the question is --

258

Atkinson-Baker Court Reporters
www.depo.com

1       Q.   Some municipalities post interpretive signage

2   at their surf breaks that outline the rules for that

3   break and might say that break is basically like a black

4   diamond expert, you should not go out there unless you

5   are an expert.

6           And it might say respect people, share waves.

7   Usually there are a handful of them and they say

8   something similar.

9           Have you as City Manager investigated what

10  other surfing communities have done trying to ease the

11  tension of the sharing of waves and the people that want

12  to use them?

13      A.   If your question is have we investigated with

14  other cities what signage they have, we have not.

15      Q.   Okay.  Do you know the City Manager for

16  Santa Cruz?

17      A.   No, I do not.

18      Q.   How about Huntington Beach or Ventura or any of

19  the beach communities?

20      A.   I know a couple of them.

21      Q.   Do any come to mind in terms of communities,

22  not the person?

23      A.   I know the manager in Oxnard.

24      Q.   Okay.

25      A.   Up until his retirement, I knew the manager in

259

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1       Q.  Some municipalities post interpretive signage
 2   at their surf breaks that outline the rules for that
 3   break and might say that break is basically like a black
 4   diamond expert, you should not go out there unless you
 5   are an expert.
 6            And it might say respect people, share waves.
 7   Usually there are a handful of them and they say
 8   something similar.
 9            Have you as City Manager investigated what
10   other surfing communities have done trying to ease the
11   tension of the sharing of waves and the people that want
12   to use them?
13       A.  If your question is have we investigated with
14   other cities what signage they have, we have not.
15       Q.  Okay.  Do you know the City Manager for
16   Santa Cruz?
17       A.  No, I do not.
18       Q.  How about Huntington Beach or Ventura or any of
19   the beach communities?
20       A.  I know a couple of them.
21       Q.  Do any come to mind in terms of communities,
22   not the person?
23       A.  I know the manager in Oxnard.
24       Q.  Okay.
25       A.  Up until his retirement, I knew the manager in
```

259

Anton Dahlerbruch
November 18, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    Malibu.

2         Q.  Is it fair to say that you didn't have surfing

3    localism related conversations with either of those

4    people?

5         A.  It's a double negative.

6         Q.  Fair enough.

7             Did you seek -- did you talk to either of those

8    two City Managers about localism?

9         A.  I talked to the City Manager of Manhattan, I'm

10   sorry, Malibu about the patio structure and how they

11   dealt with anything similar in terms of public access.

12        Q.  Did they have something similar?

13        A.  No.

14        Q.  They have a different public access issue

15   there?

16        A.  Yes.

17        Q.  It has to do with gates?

18        A.  Yes.

19        Q.  Is there any employee designated to handle

20   complaints from visitors?

21        A.  Such as what?

22        Q.  Any type of complaint if it's a, if it relates

23   to police it goes to the police department and do

24   complaints go to anywhere else if someone calls in; how

25   does that work?

                                                              260

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 279

Case 2:16-cv-02129-SJO-RAO  Document 305-5  Filed 07/31/17  Page 66 of 69  Page ID
#:8171
Case 2:16-cv-02129-SJO-RAO  Document 270-7  Filed 07/14/17  Page 40 of 44  Page ID
#:5844

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.   If someone is going to file a complaint with
 2   the City, they can go on the website and there's a form
 3   that they can fill in.  And it designates who they send
 4   it to.
 5        We also have a directory on the website that
 6   allows people to send individual E-Mails to whoever they
 7   feel should get their complaint.
 8        Or sometimes people will just call the City and
 9   the receptionist will determine where best to direct the
10   complaint.
11        Q.   Do you have an understanding of what a
12   citizen's arrest is?
13        A.   A little bit.
14        Q.   Do you have any understanding that there has
15   been an allegation in this lawsuit that Palos Verdes
16   Estates police officers have said, asking people do they
17   want to make a citizen's arrest rather than take a
18   report or do something else?
19        And the allegation is that they have been
20   discouraging outsiders from making reports or making a
21   citizen's arrest after that was suggested.
22        Words to the effect of, well, if you make a
23   citizen's arrest, these guys here are all wealthy.  And
24   you're going to take on civil liability.  And maybe you
25   don't want to do that; do you want to make a citizen's
```

261

Case 2:16-cv-02129-SJO-RAO   Document 305-5   Filed 07/31/17   Page 67 of 69   Page ID #:8172
Case 2:16-cv-02129-SJO-RAO   Document 270-7   Filed 07/14/17   Page 41 of 44   Page ID #:5845

Atkinson-Baker Court Reporters
www.depo.com

```
 1          MR. DIEFFENBACH:   Copy and rough draft, please.

 2          THE REPORTER:   Does any other Counsel want a

 3    rough draft?

 4          MS. VU:   Copy.

 5          MR. FIELDS:   Copy.

 6

 7

 8          (Whereupon, the deposition of

 9          ANTON DAHLERBRUCH commenced at

10          9:45 a.m. and concluded at

11          5:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

266

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 281

Atkinson-Baker Court Reporters
www.depo.com

1          REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4          I, ANGELIQUE MELODY FERRIO, CSR No. 6979, a

5    Certified Shorthand Reporter in the State of California,

6    certify that the foregoing pages are a true and correct

7    copy of the original deposition of ANTON DAHLERBRUCH,

8    taken on Friday, November 18, 2016.

9          I declare under penalty of perjury under the

10   laws of the State of California that the foregoing is

11   true and correct.

12         Dated this 18th day of November, 2016.

13

14

15

16

17   _____

18         Angelique Melody Ferrio
           CSR No. 6979

19

20

21

22

23

24

25

Anton Dahlerbruch
November 18, 2016

Exhibit F, page 284

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, ANGELIQUE MELODY FERRIO, C.S.R. NO. 6979, a

 4   Certified Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken

 6   before me at the time and place therein set forth, at

 7   which time the witness was put under oath by me;

 8          That the testimony of the witness and all

 9   objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12          That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14          I further certify that I am not a relative or

15   employee of any attorney or of any of the parties, nor

16   financially interested in the action.

17          I declare under penalty of perjury under the

18   law of the State of California that the foregoing is

19   true and correct.

20          Dated this 18th day of November, 2016.

21          read and sign not requested

22

23          Angelique Melody Ferrio

24          Angelique Melody Ferrio
            CSR No. 6979

25
```