# EXHIBIT 13

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 2 of 85   Page ID
#:8483
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 2 of 67   Page ID
#:5644

```
 1                  UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
 3                        WESTERN DIVISION
 4
 5   CORY SPENCER, an individual;  )  Case No.
     DIANA MILENA REED, an         )  2:16-cv-02129-SJO-RAO
 6   individual; and COASTAL       )
     PROTECTION RANGERS, INC., a    )
 7   California non-profit public   )
     benefit corporation,          )
 8                                  )
                       Plaintiffs,  )
 9                                  )
              v.                    )
10                                  )
     LUNADA BAY BOYS; THE          )
11   INDIVIDUAL MEMBERS OF THE     )
     LUNADA BAY BOYS, including     )
12   but not limited to SANG LEE,   )
     BRANT BLAKEMAN, ALAN JOHNSTON  )
13   aka JALIAN JOHNSTON, MICHAEL   )
     RAE PAPAYANS, ANGELO FERRARA,  )
14   FRANK FERRARA, CHARLIE         )
     FERRARA and N.F.; CITY OF      )
15   PALOS VERDES ESTATES;         )
     CHIEF OF POLICE JEFF KEPLEY,   )
16   in his representative          )
     capacity; and DOES 1-10,      )
17                                  )
                       Defendants.  )
18   _____)
19
20        Deposition of CORY ELDON SPENCER, taken
21   on behalf of defendants, at 777 South Figueroa Street,
22   Suite 4550, Los Angeles, California, beginning at
23   10:01 a.m. and ending at 6:35 p.m., on Tuesday,
24   October 11, 2016, before Carmen R. Sanchez,
25   Certified Shorthand Reporter No. 5060.
```

Page 2

Exhibit C, page 80

```
 1      APPEARANCES:
 2      For the Plaintiffs:
 3              HANSON BRIDGETT LLP
                BY:  KURT A. FRANKLIN, ESQ.
 4              425 Market Street
                Twenty-sixth Floor
 5              San Francisco, California  94105
                Telephone:  (415) 777-3200
 6              Facsimile:  (415) 541-9366
                E-mail:  kfranklin@hansonbridgett.com
 7
                HANSON BRIDGETT LLP
 8              BY:  TYSON M. SHOWER, ESQ.
                     LANDON D. BAILEY, ESQ.
 9              500 Capitol Mall
                Suite 1500
10              Sacramento, California  95814
                Telephone:  (916) 442-3333
11              Facsimile:  (916) 442-2348
                E-mail:  tshower@hansonbridgett.com
12                       lbailey@hansonbridgett.com
                (NOT PRESENT)
13
                OTTEN LAW PC
14              BY:  VICTOR OTTEN, ESQ.
                3620 Pacific Coast Highway
15              Suite 100
                Torrance, California  90505
16              Telephone:  (310) 378-8533
                Facsimile:  (310) 347-4225
17              E-mail:  vic@ottenlawpc.com
                (TELEPHONIC APPEARANCE)
18
19
20
21                           Continued ....
22
23
24
25

                                           Page 3
```

Exhibit C, page 81

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 4 of 85   Page ID
#:8485
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 4 of 67   Page ID
#:5646

```
 1    APPEARANCES (CONTINUED):
 2    For the Defendants City of Palos Verdes Estates and
      Chief of Police Jeff Kepley:
 3
              KUTAK ROCK LLP
 4            BY:  ANTOINETTE P. HEWITT, ESQ.
              5 Park Plaza
 5            Suite 1500
              Irvine, California  92614-8595
 6            Telephone:  (949) 417-0999
              Facsimile:  (949) 417-5394
 7            E-mail:  Antoinette.Hewitt@KutakRock.com
 8    For the Defendant Brant Blakeman:
 9            VEATCH CARLSON, LLP
              BY:  JOHN P. WORGUL, ESQ.
10            1055 Wilshire Boulevard
              Eleventh Floor
11            Los Angeles, California  90017
              Telephone:  (213) 381-2861
12            Facsimile:  (213) 383-6370
              E-mail:  jworgul@veatchfirm.com
13
      For the Defendant Michael Rae Papayans:
14
              HAVEN LAW
15            BY:  PETER T. HAVEN, ESQ.
              1230 Rosecrans Avenue
16            Suite 300
              Manhattan Beach, California   90266
17            Telephone:  (310) 272-5353
              Facsimile:  (213) 477-2137
18            E-mail:  peter@havenlaw.com
19    For the Defendant Sang Lee:
20            LEWIS BRISBOIS BISGAARD & SMITH LLP
              BY:   TERA A. LUTZ, ESQ.
21            633 West 5th Street
              Suite 4000
22            Los Angeles, California   90071
              Telephone:  (213) 250-1800
23            Facsimile:  (213) 250-7900
              E-mail:  Tera.Lutz@lewisbrisbois.com
24
                          Continued ....
25
                                                    Page 4
```

Exhibit C, page 82

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 5 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 284-6   Filed 07/14/17   Page 5 of 67   Page ID
#:5647
#:2486

```
 1    APPEARANCES (CONTINUED):
 2    For the Defendant Sang Lee:
 3          BOOTH, MITCHEL & STRANGE
            BY:  DANIEL M. CROWLEY, ESQ.
 4          707 Wilshire Boulevard
            Suite 4450
 5          Los Angeles, California  90017
            Telephone:  (213) 738-0100
 6          Facsimile:  (213) 380-3308
            E-mail:  dmcrowley@boothmitchel.com
 7
      For the Defendants Angelo Ferrara; N.F.
 8    appearing through [Proposed] Guardian Ad Litem,
      Leonora Ferrara Attorney for Petitioner:
 9
            LAW OFFICES OF MARK C. FIELDS, APC
10          BY:  MARK C. FIELDS, ESQ.
            333 South Hope Street
11          Thirty-fifth Floor
            Los Angeles, California  90071
12          Telephone:  (213) 617-5225
            Facsimile:  (213) 629-4520
13          E-mail:  fields@markfieldslaw.com
            (TELEPHONIC APPEARANCE AND PERSONAL APPEARANCE)
14
      For the Defendants Frank Ferrara and Charlie Ferrara:
15
            BREMER WHYTE BROWN & O'MEARA
16          BY:  LAURA L. BELL, ESQ.
            21271 Burbank Boulevard
17          Suite 110
            Woodland Hills, California  91367
18          Telephone:  (818) 712-9800
            Facsimile:  (818) 712-9900
19          E-mail:  lbell@bremerwhyte.com
            (TELEPHONIC APPEARANCE)
20
21
22
23
24                          Continued ....
25
                                                      Page 5
```

Exhibit C, page 83

Case 2:16-cv-02129-SJO-RAO Document 305-13 Filed 07/31/17 Page 6 of 85 Page ID
#:8487
Case 2:16-cv-02129-SJO-RAO Document 270-4 Filed 07/14/17 Page 6 of 67 Page ID
#:5648

```
 1     APPEARANCES (CONTINUED):
 2     For the Defendant Brant Blakeman:
 3             BUCHALTER NEMER, APC
               BY:  ROBERT S. COOPER, ESQ.
 4             1000 Wilshire Boulevard
               Suite 1500
 5             Los Angeles, California  90017
               Telephone:  (213) 891-5230
 6             Facsimile:  (213) 896-0400
               E-mail:  rcooper@buchalter.com
 7             (TELEPHONIC APPEARANCE)
 8     For the Defendant Angelo Ferrara:
 9             THE PHILLIPS FIRM
               BY:  MATTHEW E. VOSS, ESQ.
10             800 Wilshire Boulevard
               Suite 1550
11             Los Angeles, California  90017
               Telephone:  (213) 244-9913
12             Facsimile:  (213) 244-9915
               E-mail:  mvoss@thephillipsfirm.com
13             (TELEPHONIC APPEARANCE)
14     For the Defendant Alan Johnston aka Jalian Johnston:
15             LAW OFFICES OF J. PATRICK CAREY
               BY:  J. PATRICK CAREY, ESQ.
16             1230 Rosecrans Avenue
               Suite 300
17             Manhattan Beach, California  90266
               Telephone:  (310) 526-2237
18             Facsimile:  (310) 526-2237
               E-mail:  pat@patcareylaw.com
19             (NOT PRESENT)
20
21
22
23
24
25
```

Page 6

Exhibit C, page 84

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 7 of 85   Page ID
#:8488
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 7 of 67   Page ID
#:5649

```
 1                       I N D E X
 2    WITNESS
 3    CORY ELDON SPENCER
 4    Examination by:                          Page
 5    MS. HEWITT                       11, 305, 337
 6    MR. FIELDS                                217
 7    MR. WORGUL           222, 306, 326, 343, 345
 8    MS. LUTZ                                  306
 9    MR. HAVEN                     321, 336, 343
10    MR. FRANKLIN                              344
11
12                     E X H I B I T S
13    Defendants'                   Page        Page
      Exhibit       Description   Introduced   Marked
14
      Exhibit 40    Copy of a document
15                  entitled, "DEFENDANTS
                    CITY OF PALOS VERDES
16                  ESTATES AND CHIEF
                    OF POLICE JEFF
17                  KEPLEY'S NOTICE OF
                    DEPOSITION TO
18                  PLAINTIFF CORY
                    SPENCER"               21          21
19
      Exhibit 41    Copy of a document
20                  entitled, "CLASS
                    ACTION COMPLAINT
21                  AND JURY DEMAND"       29          29
22
23
24                  Continued ....
25

                                          Page 7
```

```
 1                    I N D E X  (CONTINUED)
 2
 3                      E X H I B I T S
 4    Defendants'                         Page          Page
      Exhibit       Description           Introduced    Marked
 5
      Exhibit 42    Copy of an E-mail
 6                  dated March 05,
                    2016, from
 7                  Jeff Kepley to
                    Mark Velez;
 8                  Bates-stamped
                    CITY1807              158           158
 9
      Exhibit 43    Color copy of a
10                  photograph
                    taken at the
11                  deposition of
                    Cory Eldon
12                  Spencer depicting
                    his hand and scar    306           306
13
      Exhibit 44    Copy of a drawing
14                  made on yellow
                    legal pad paper
15                  by Mr. Worgul
                    during the
16                  deposition of
                    Cory Eldon
17                  Spencer             334           334
18
19
20
21
22
23
24                      Continued ....
25
                                              Page 8
```

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 9 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 9 of 67   Page ID
#:8490
#:5651

```
 1              Los Angeles, California

 2      Tuesday, October 11, 2016, 10:01 a.m. - 6:35 p.m.

 3

 4          THE REPORTER:  Pursuant to the Federal Rules of

 5   Civil Procedure, I am required to state the following:

 6              My name is Carmen R. Sanchez, a

 7   certified court reporter with Hahn & Bowersock, A

 8   Veritext Company, located at 20 Corporate Park,

 9   Suite 350, Irvine, California.

10              This is the deposition of

11   Cory Eldon Spencer, in the matter of Cory Spencer,

12   et al., vs. Lunada Bay Boys, et al., beginning at

13   10:01 a.m., on Tuesday, October 11, 2016.

14              Counsel, will you please state your

15   appearances for the record.

16          MS. HEWITT:  Antoinette Hewitt for the city.

17          MR. WORGUL:  John Worgul for defendant

18   Brant Blakeman.

19          MR. HAVEN:  Peter Haven for defendant

20   Michael Papayans.

21          MR. CROWLEY:  Daniel Crowley with Booth,

22   Mitchel & Strange on behalf of Sang Lee.

23          MS. LUTZ:  Tera Lutz for defendant Sang Lee.

24          MR. COOPER:  Robert S. Cooper, Buchalter Nemer

25   for defendant Brant Blakeman telephonically.
```

Page 10

Exhibit C, page 87

1          MR. FIELDS:  Mark Fields for Angelo Ferrara and

2     N.F. telephonically.

3          MS. BELL:  Laura Bell for Frank Ferrara and

4     Charlie Ferrara appearing telephonically.

5          MR. FRANKLIN:  Kurt Franklin on behalf of

6     Mr. Spencer and the other plaintiffs in this matter.

7     And if I can, just as a matter of housekeeping, the

8     plaintiffs would request under FRCP 30, the ability to

9     review the transcript within 30 days.

10

11               CORY ELDON SPENCER,

12     called as a witness by and on behalf of the

13     defendants, and having been first duly sworn

14     by the Certified Shorthand Reporter, was examined and

15     testified as follows:

16

17                    EXAMINATION

18     BY MS. HEWITT:

19          Q     Would you please state and spell your

20     name for the record.

21          A     Cory Spencer.

22                This is a microphone?  Cory Spencer, C-o

23     -- Cory Eldon Spencer, C-o-r-y E-l-d-o-n S-p-e-n-c-e-r.

24          Q     Have you ever given a deposition before?

25          A     I have.

                                             Page 11

Exhibit C, page 88

```
 1            THE WITNESS:  Let me just say this.  Around
 2    2002 or 2003, somewhere in the early 2000s, I was
 3    almost ecstatic when my police chief was looking for
 4    volunteers of officers to go surf at Lunada Bay to take
 5    care of a problem that supposedly either the police
 6    chief or the city at the time wanted to take care of,
 7    and I was going to go in the capacity of a police
 8    officer; be able to undercover surf in a place that I
 9    wanted to surf since I was probably 15 years old and
10    take care of a bullying problem.  I thought at that
11    time, hey, these guys are going to do it.  You know,
12    this is -- this is going to happen, and I'm going to be
13    a part of it.  And that was -- that was exciting to me.
14    Yeah, I was excited.  I thought at that time it was
15    going to be taken care of.  But, for whatever reason,
16    that undercover operation, or whatever they were
17    planning on doing with us, was called off; and, again,
18    nothing happened.  That was a letdown.
19    BY MS. HEWITT:
20            Q      Okay.  Anything else?
21            MR. FRANKLIN:  Vague and ambiguous.
22            THE WITNESS:  Anything else about what?
23    BY MS. HEWITT:
24            Q      Is there anything -- can you read back
25    the question?
```

Page 39

1      BY MS. HEWITT:

2          Q      And 'cause I don't know.  I don't

3      understand undercover operations.

4          A      Well, I think the expectation speaks for

5      itself on the undercover operation.  You go in

6      undercover expecting that things that have been

7      reported for the last 30 or 40 years would happen to

8      you as an undiscovered outsider; and you, being an

9      on-duty police officer, would be able to make and

10     effect a proper arrest or a citation and send a message

11     that -- when I say, "we," meaning "we" as the

12     Palos Verdes Estates police are not going to tolerate a

13     gang in the water and on the beach, and the problem

14     would go away.  Almost instantaneously within a couple

15     weeks this could be cleared up.  We would not be

16     sitting here today.

17         Q      And is that based on your experience as

18     a police officer that you know it would go away in two

19     weeks?

20         A      I believe that it would, yes.

21         Q      And what experience is that based on?

22         A      Going into areas; taking care of

23     problems; what I've done for the past 20 years.  You

24     address community issues, quality of life issues, and

25     you take care of them by using the law on your side,

Page 44

```
 1    beach localism at Lunada Bay?

 2            A       Well, I think anybody -- well, when did

 3    I?

 4            Q       Yes.

 5            A       Let's go back to that.  When you see --

 6    you question why you can't go there; and, then, you

 7    start inquiring in the surfing world why you can't go

 8    there, and you hear the stories that have gone on for

 9    as long as they have up into that point.  You

10    immediately get fearful.  You don't want to go

11    somewhere where you're going to get your tires slashed;

12    your windows egged; your property thrown in the ocean.

13    Those were the stories that you get; so, you become

14    fearful right away, right?  Or I did.

15            Q       My question was when this happened.

16            A       Shortly after I questioned from the

17    article why can only a few enjoy it.

18            Q       And who did you question?

19            A       I don't -- I didn't question anybody

20    that I can recall specifically.  You just -- you just

21    hear stories in the surfing world about the place

22    through people, word of mouth.  I don't recall an

23    individual.

24            Q       Okay.  So, going back to the surfing

25    article you read as a mid-teen, judging from what you
```

Page 56

1      A      Yes.

2      Q      Okay.

3             How many times?

4      A      I can't recall a specific number, but I

5  can tell you that, of course, you see it in magazines.

6  You want to see it in person; and, you know, you want

7  to go and investigate, I guess, for lack of a better

8  term; so, you just drive up and check it out.

9      Q      Are you able to estimate for me how many

10 times you went to Lunada Bay before you turned 20?

11     A      Oh, before I turned 20?  If I were to

12 give you an estimation, probably four to five times.

13     Q      Okay.

14            During any of the four or five times you

15 went there before you turned 20, did you experience

16 anything that made you fearful of Lunada Bay?

17         MR. FRANKLIN:  Vague and ambiguous.

18         THE WITNESS:  Fearful?  Just going there I was

19 in fear.  Just driving up the Palos Verdes Peninsula

20 road, you know, or whatever road it is to get up there,

21 you're a little afraid because you've heard stories.

22         MS. HEWITT:  Okay.

23     Q      During the four or five times you went

24 to Lunada Bay before you turned 20, did you experience

25 anything that made you fearful of Lunada Bay?

1            MR. FRANKLIN:  Vague and ambiguous.

2            THE WITNESS:  I don't know how to answer that

3     any other way than I already did.  When you drive up,

4     you -- because of the lure, the stories, you feel

5     fearful of, hey, is this real?  Is this -- is this

6     place really like they say it is?  Am I going to get my

7     property vandalized?  Am I going to get, you know, in

8     some type of confrontation?  That's a fear.

9            MS. HEWITT:  Okay.

10                Let's break that down then.  Of the four

11    to five times you went to Lunada Bay before you turned

12    20, looking at the first time you went, did you

13    experience any intimidation there?

14           MR. FRANKLIN:  Vague and ambiguous.

15           THE WITNESS:  No.  I was never, per se,

16    confronted by anybody; so I was -- I wasn't intimidated

17    by any individual.

18    BY MS. HEWITT:

19           Q     Okay.  That same time, did you

20    experience any vandalism?

21           A     No.

22           Q     Okay.

23                Did anything occur during that first

24    visit to Lunada Bay -- to Lunada Bay, excuse me, before

25    you turned 20, that caused you to later be fearful of

Page 60

1          MR. FRANKLIN:  Vague and ambiguous.

2          THE WITNESS:  I don't know how to answer that

3     any other way than I already did.  When you drive up,

4     you -- because of the lure, the stories, you feel

5     fearful of, hey, is this real?  Is this -- is this

6     place really like they say it is?  Am I going to get my

7     property vandalized?  Am I going to get, you know, in

8     some type of confrontation?  That's a fear.

9          MS. HEWITT:  Okay.

10              Let's break that down then.  Of the four

11    to five times you went to Lunada Bay before you turned

12    20, looking at the first time you went, did you

13    experience any intimidation there?

14         MR. FRANKLIN:  Vague and ambiguous.

15         THE WITNESS:  No.  I was never, per se,

16    confronted by anybody; so I was -- I wasn't intimidated

17    by any individual.

18    BY MS. HEWITT:

19         Q     Okay.  That same time, did you

20    experience any vandalism?

21         A     No.

22         Q     Okay.

23              Did anything occur during that first

24    visit to Lunada Bay -- to Lunada Bay, excuse me, before

25    you turned 20, that caused you to later be fearful of

                                        Page 60

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 17 of 85   Page ID
#:8498
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 12 of 67   Page ID
#:5654

```
 1    coming back to Lunada Bay?

 2         A     No.

 3         Q     Okay.

 4               During the second time you visited

 5    Lunada Bay before you turned 20, did you experience any

 6    intimidation?

 7         A     We're going time by time?

 8         Q     Yes.

 9         A     Let me just save you the, I guess, the

10    hassle of going through.  They were just every time you

11    would drive up the same way and just check it out, and

12    nothing that the line of questioning that we went

13    through happened in each one of those four to five

14    times.

15         Q     Okay.

16               During the four to five times?

17         A     Does that make sense?

18         Q     Sure.  Let me just restate it, and I

19    appreciate that.

20               During the four to five times you

21    visited Lunada Bay before you turned 20, you did not

22    experience any intimidation --

23         MR. FRANKLIN:  Vague and ambiguous.

24    BY MS. HEWITT:

25         Q     -- is that correct?
```

Page 61

```
 1            A       Correct.

 2            Q       You did not experience any vandalism; is

 3    that correct?

 4            A       Correct.

 5            Q       All right.  And you did not experience

 6    anything that caused you to later to be fearful of

 7    later coming back to Lunada Bay; is that correct?

 8            A       Not on those times; correct.

 9            Q       Okay.

10                    All right.  If we go to the next

11    sentence, it starts at line 13, sir (as read):

12                    "But in January 2016, Spencer

13            worked up his courage to surf Lunada Bay

14            during a large winter swell."

15                    Going to a time period before

16    January 2016, is it true that you had never surfed

17    Lunada Bay before that time?

18            A       That's true.

19            Q       Okay.  So when you visited Lunada Bay

20    before you turned 20, you went to Lunada Bay but did

21    not surf; correct?

22            A       That's correct.

23            Q       All right.

24                    When you went during those four to five

25    times, did you go on the beach?
```

Page 62

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 19 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 285-10   Filed 07/14/17   Page 13 of 67   Page ID
#:5655

1    in January 2016?

2         A    Well, there's safety in numbers.  You

3    know, I work in a job where it's not safe all the time,

4    and we're safer in numbers, and this movement kind of

5    resonated with me because if you have a large number of

6    people who want to go and enjoy the beach peacefully

7    and safely, then, I thought that that would be probably

8    No. 1, my -- my safest opportunity to go there, and

9    they had a track record of doing it I think the year

10   prior.  And from what I understand, there was minor

11   incidents with that group but nothing to the extent of

12   the stories that I heard --

13        Q    Okay.

14        A    -- about fights and vandalism and stuff

15   like that so ...

16        Q    Okay.

17             Let me ask that this way.  Was it your

18   idea to go to Lunada Bay in January of 2016 unprompted

19   by anybody else?

20        A    On that time, yeah.  I called Chris or

21   texted him and said, "Hey, there's a swell coming.  I'm

22   Cory.  I'm Tom's friend.  Let's get some people

23   together and go surf."

24        Q    Okay.  And did he respond?

25        A    Yes.

Page 75

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 20 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 28-501   Filed 07/14/17   Page 14 of 67   Page ID
#:5656

1          Q        And how?

2          A        He got all excited and said, "I'll put

3     the word out, and let's -- we'll get a few of our Aloha

4     people and go have some good, peaceful, clean surfing,

5     hopefully."

6          Q        Okay.

7                   Did you have, in your mind, how many

8     people you wanted to go with in order to get up the

9     nerve to go to Lunada Bay that day?

10         A        In my mind?

11         Q        Yes.

12         A        If it were a perfect scenario for me,

13    I'd like 100 -- at least 100 guys to go down there.

14         Q        Okay.  Bad question.

15                  If only Chris had gone with you, would

16    you have gone?

17         A        No.

18         Q        All right.

19                  So, eventually, you and Chris agreed to

20    go; correct?

21         A        Correct.

22         Q        Did he tell you how many other people

23    were going to come before you actually went?

24         A        No.

25         Q        Okay.

                                                    Page 76

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 21 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 270-2   Filed 07/14/17   Page 15 of 67   Page ID
#:8502
#:5657

```
 1              A        I was not aware.

 2              Q        Okay.  All right.

 3                       Did you -- oh, prior to the day you

 4      actually went in January of 2016, had you ever

 5      communicated with anybody at the City of Palos Verdes

 6      about any problems with Lunada Bay, including violence,

 7      intimidation, fear, anything like that?

 8              A        Yes.

 9              MR. FRANKLIN:  Vague and ambiguous.

10      BY MS. HEWITT:

11              Q        Okay.  On how many occasions?

12              A        Prior to going down there that day?

13              Q        Yes.

14              A        I think I contacted the chief first.  I

15      don't recall getting a response from him; and, then,

16      kind of reading their organizational chart, and I

17      believe I contacted a captain, and I don't recall his

18      name.

19              Q        Okay.  And what did you say -- or not

20      what did you say.  How did you contact him?

21              A        I don't know if the first time was

22      initially E-mail or a call.  It could have been either

23      one, and I just requested, "Hey, there's a group of us.

24      I'm sure you're aware of the group.  We're going down

25      there this date.  Can we get some extra patrol?"
```

                                                    Page 78

Exhibit C, page 93

```
 1          Q      Okay.

 2                 And did you get a response?

 3          A      Yes.   There was dialogue, and I don't

 4   remember the exact -- I think it was mostly after that

 5   through E-mail.   I don't recall ever speaking -- I

 6   don't recall if I ever spoke to him on the phone or

 7   not, but I know most was through E-mail.   That's my

 8   best recollection right now.

 9          Q      Okay.

10          A      Can I get a drink or --

11          Q      Sure.   You know what?   Why don't we take

12   a little break right now.   We're going a little while.

13          A      My mouth is dry.

14      MS. HEWITT:   I'll bet.

15                 Let's go off the record.

16                 (A recess was taken at 11:31 a.m.

17                 until 11:45 a.m.)

18   BY MS. HEWITT:

19          Q      What city do you live in?

20          A      I live in the City of Norco.

21          Q      Okay.

22                 Oh, that's quite a commute to

23   El Segundo.

24          A      Yes.

25          Q      Okay.
```

Page 79

Exhibit C, page 94

Case 2:16-cv-02129-SJO-RAO Document 305-13 Filed 07/31/17 Page 23 of 85 Page ID
Case 2:16-cv-02129-SJO-RAO Document 285-4 Filed 07/14/17 Page 17 of 67 Page ID
#:5659

1        Q        Okay.

2                 What are the three places that you surf

3     at most often in any given year?

4        A        Most often any given year, I would say

5     El Porto in Manhattan Beach, Oceanside Harbor in

6     San Diego County, and I would really like it to be

7     Lunada in the winter if it was safe to go there, and I

8     think that's what this claim is about; so, that's not

9     one of them yet.  I could say Huntington in

10    Orange County.

11       Q        Okay.  Those are all fairly long drives

12    from Norco.  Do you often -- do you go directly from

13    home when you go surf at Manhattan Beach or Oceanside

14    or Huntington, or do you go to work first?

15       A        It just depends if I'm at work or home.

16    And when I have time to go, I'll usually have a board

17    stored at work; a board at home.

18       Q        Okay.

19                We were talking a little bit about

20    communications with the city prior to your actual visit

21    to Lunada Bay in January of 2016.  Let me go back a

22    little bit on that as well.

23                We went over fairly exhaustively before

24    the four to five times you went to Lunada Bay up until

25    the time you were 20; and, then, the four to five times

                                                    Page 82

Exhibit C, page 95

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 24 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 285-05   Filed 07/14/17   Page 18 of 67   Page ID
#:5660

```
1    you went after that up until January 2016.  During any

2    of those visits -- so, I guess it would be eight to ten

3    times that you visited prior to January 2016 -- did you

4    ever experience anything that you believed to be was

5    localism?

6             MR. FRANKLIN:  Vague and ambiguous.

7             THE WITNESS:  I'm going to say when I was on my

8    bike and you have a group of guys standing around kind

9    of looking at who's coming and going near the bluff, I

10   would say that would be a group of guys at their local

11   spot being locals, you know.  Did they threaten;

12   intimidate me?  Not -- it was a little intimidating,

13   you know.  Did they vandalize any of my property?  No.

14   Did they get all up in my face?  No.  But they were

15   there and looking at who's coming and going.

16   BY MS. HEWITT:

17        Q     And they didn't speak to you; correct?

18        A     No.

19        Q     And they didn't approach you?

20        A     No.

21        Q     And have you seen groups of guys like

22   that at other beaches?

23        A     Like --

24        Q     Just like you described, a group of

25   guys?
```

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 25 of 85  Page ID
#:8506
Case 2:16-cv-02129-SJO-RAO  Document 279-4  Filed 07/14/17  Page 19 of 67  Page ID
#:5661

```
 1              A       Yeah.  I -- you see guys hanging out at
 2     the parking lots and before they're going to get in the
 3     water or after they get out of the water.
 4              Q       Okay.
 5                      So, talking a little bit about your
 6     communications, I think you said with Captain Velez.
 7              A       That's the name.
 8              Q       Okay.
 9                      Did you -- actually, I don't know if you
10     said, "Velez."  Do you think it was Velez?
11              A       You just did, but you refreshed my
12     memory.  Thank you very much.
13              Q       Okay.  I didn't mean to.  Okay.  So, you
14     believe it was Captain Velez; all right.
15              A       Yes.
16              Q       And you had testified that there was
17     dialogue, and I'm not sure if you meant dialogue
18     through E-mail or something on the phone.  Can you
19     clarify that?
20              MR. FRANKLIN:  Asked and answered.
21              THE WITNESS:  Can I clarify it?
22              MS. HEWITT:  Yeah.
23              THE WITNESS:  I don't recall if I -- I don't
24     recall speaking to him, but I may have.  The speaking
25     and the E-mail dialogue -- I know I E-mailed him for
```

Page 84

```
 1    sure; but, as far as on the phone, I don't recall.

 2    BY MS. HEWITT:

 3           Q      All right.  And I think you said that

 4    you requested extra patrols; correct?

 5           A      Yes.

 6           Q      All right.

 7                  Did any -- were any extra patrols

 8    provided?

 9    MR. FRANKLIN:  Vague and ambiguous; lacks

10    foundation.

11    BY MS. HEWITT:

12           Q     Well, let me ask you this.  Okay.  So,

13    you requested extra patrols for your visit in January

14    of 2016; is that correct?

15           A      Correct.

16           Q      Okay.

17                  Do you know if your request was granted?

18    MR. FRANKLIN:  Lacks foundation.

19    THE WITNESS:  I can only tell you what I

20    experienced, that there was a group of officers that

21    was there after I was out of the water.

22    BY MS. HEWITT:

23           Q      On January 2016?

24           A      January 29th, 2016.

25           Q      I'm sorry.  Thank you.
```

Page 85

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 27 of 85   Page ID
#:8508
Case 2:16-cv-02129-SJO-RAO   Document 2-8-13   Filed 07/14/17   Page 20 of 67   Page ID
#:5662

```
1              Q        You don't remember a name or anything
2      like that?
3              A        I don't remember a name.
4              Q        Okay.  Fair enough.
5                       All right.  So, the next sentence in the
6      complaint starting at the end of 17, sir, and going to
7      18 states (as read):
8                       "Upon arrival, members of the
9              Defendant LUNADA BAY BOYS told him, 'you
10             can't surf here kook.'"
11                      Okay.  About how long after you arrived
12     do you recall that occurred?
13             A        Almost instantaneously after you get
14     your boards; so, after we arrived, I would say,
15     approximately, within 20 to 30 minutes.
16             Q        Okay.
17                      Were you already getting ready to surf?
18             A        Yes.
19             Q        Okay.  All right.  And, then, I forgot
20     to ask you.  You said, "when we arrived."  Who was the
21     "we"?
22             A        Chris and security guard --
23             Q        Okay.
24             A        -- guy.
25             Q        So, in the end, it was just you two?  It
```

Page 98

1    wasn't the six to eight?

2         A     Not in the beginning, no.

3         Q     Okay.  So, when you went down to prepare

4    to surf, it was you and Chris and the security guard?

5         MR. FRANKLIN:  Misstates testimony.

6    BY MS. HEWITT:

7         Q     Is that right?  Or if it's wrong, go

8    ahead and tell me.

9         A     Chris and I and the security guard.

10        Q     Okay.

11        A     Yes.

12        Q     And did the security guard stay by the

13   cars?

14        A     He stayed up with the cars.

15        Q     Okay.  All right.

16              When you first got to the beach that day

17   and you're getting ready to surf, and you heard someone

18   say, "You can't surf here kook," were you able to

19   understand or were you able to identify who said that

20   to you?

21        A     No.

22        Q     Okay.

23              Did you see a group of people from whom

24   it came from?

25        A     A group of people?

                                        Page 99

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 29 of 85   Page ID
#:8510
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 22 of 67   Page ID
#:5664

```
 1          Q       Did you tell the direction where it came

 2     from or anything like that?

 3          A       To my north.

 4          Q       Okay.  But you couldn't tell who said

 5     it?

 6          A       No.

 7          Q       Oh, okay.  I see.

 8          A       It's -- it was kind of sunrisie, dawn.

 9          Q       Okay.

10                  When you first got down to the beach,

11     could you see any other people there?

12          A       There was a few people, and I'm assuming

13     members of the Bay Boys at the -- way out at the point

14     on the fort.

15          Q       About how many people -- I'm sorry.  Did

16     I interrupt you?

17          A       I couldn't recall a specific number but

18     just a few.

19          Q       More or less than five?

20          A       I would say right around five.

21          Q       Okay.  And about how far were you from

22     those -- those people when you heard the, "You can't

23     surf here kook"?

24                  MR. FRANKLIN:  Assumes facts not in evidence.

25                  THE WITNESS:  Yeah, I didn't first hear that up
```

Page 100

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 30 of 85   Page ID
#:8511
Case 2:16-cv-02129-SJO-RAO   Document 270-11   Filed 07/14/17   Page 23 of 67   Page ID
#:5665

1        Q     Okay.

2             Can you tell me what you did up until

3  the point when you were on your second wave?

4        MR. FRANKLIN:  Vague and ambiguous.

5        THE WITNESS:  What do you mean?

6  BY MS. HEWITT:

7        Q     So you heard the statement, "kook"?

8        A     Okay.

9        Q     And you said you were going to ignore

10  them?

11        A     And several others.

12        Q     What were the other things that you

13  heard?

14        MR. FRANKLIN:  Calls for a narrative.

15        THE WITNESS:  Let's see.  Specifically, you

16  know, "How many other places did you pass to get here

17  to surf?"

18             Can we say expletives or --

19        MS. HEWITT:  Sure.

20        THE WITNESS:  You want --

21        MS. HEWITT:  Sure.

22        THE WITNESS:  You know, why -- basically, "Why

23  don't you fucking go home, you fucking kook"; and I

24  mentioned already, "How many other good places did you

25  pass to come here?"  Those are the ones that stand out.

                                                Page 102

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 31 of 85  Page ID
#:8512
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 24 of 67  Page ID
#:5666

```
 1    BY MS. HEWITT:

 2             Q      Were there others?

 3             A      There may have been.

 4             Q      And did these all occur within those 20

 5    minutes?

 6             A      Yes.

 7             Q      Okay.

 8                    Did any --

 9             A      That's how it is when you go there.

10             Q      Okay.

11                    Did anything else occur in those first

12    20 minutes after you arrived at Lunada Bay that caused

13    fear?

14             MR. FRANKLIN:  Vague and ambiguous.

15             MS. HEWITT:  Well, actually, I'm going to

16    withdraw that.

17             Q      Did these statements cause fear for you?

18             A      Yeah.

19             Q      Okay.

20             A      Yes.  Sorry.

21             Q      Did anything else occur in the 20

22    minutes that caused fear for you?

23             A      Yes.

24             Q      What was that?

25             A      More -- more of the same statements by a
```

Page 103

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 32 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 285-13   Filed 07/14/17   Page 25 of 67   Page ID
#:5667

```
 1    specific individual, who I could identify.  I don't

 2    know his name.  Same things.  It was more of a -- more

 3    of a closer, I guess, encounter with the same language

 4    all the way down the trail; jumping into the water;

 5    same individual just keep, you know, heckling.

 6          Q     And when you say you could identify them

 7    but you don't know their name, do you mean you can

 8    describe what they look like?

 9          A     This guy, I can describe what he looks

10    like.

11          Q     Okay.

12                What did he look like?

13          A     He was a male white, probably 45 to 50

14    years old; around six foot; one -- probably 185; black

15    wetsuit and a hood and a colorful surfboard that was

16    attached to his arm -- meaning he was holding it,

17    yellow, orange, blue; and I saw him prior to that --

18    so, I saw that same figure, not knowing if it's

19    specifically him but on a good guess, with the same

20    board, that that guy was walking across the bluff is

21    when he first picked up on us, and he was fully

22    clothed, light-blue sweatshirt with a hood, blue jeans,

23    tennis shoes, and I don't recall if he had a hat or

24    not, but dark hair.

25          Q     Okay.  All right.
```

Page 104

```
 1              Anything else occur in those first 20
 2     minutes that caused you fear?
 3          A     No.  That was -- that was it.  The name
 4     calling and the telling us to get out of there, and
 5     that was all that I can recall now.
 6          Q     Okay.
 7              Between the end of that first 20 minutes
 8     and the time when you were on your second wave of
 9     Lunada Bay, did anything else occur to cause you fear?
10          A     Yes.
11          Q     Okay.  What was that?
12          A     A very uncomfortable feeling when the --
13     who I now know -- did not know at the time -- was
14     Defendant Blakeman paddling around myself and Chris
15     and, more specifically, Chris in a very tight circle;
16     blocking Chris from getting any waves; never saying a
17     word; just looking -- staring at both he and I.  That
18     was a little weird; fearful.  I've never experienced
19     that before in my life in the water like -- kind of
20     like a circling you like a shark.  You know, it was
21     weird -- just weird.
22          Q     Okay.  And was that during while you're
23     getting ready to catch a first wave?
24          A     Yeah -- yes, from --
25          Q     Okay.
```

Page 105

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 34 of 85   Page ID
#:8515
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 26 of 67   Page ID
#:5668

```
 1          A       -- basically, the time we got in the

 2    water.

 3          Q       Okay.

 4                  Anything else up until the time of your

 5    second wave?

 6          A       Same comments from the original guy I

 7    described, talking to -- they were talking to some guys

 8    on the point in the fort back and forth; and, then, a

 9    couple guys in the water, one of them being Blakeman

10    and I don't -- I just know they were talking to each

11    other.  They were -- it was like you could tell they

12    knew each other.

13          Q       Okay.

14          A       And that was, again, a little

15    unsettling.

16          Q       Okay.

17                  In the next sentence, it says, "Once in

18    the water ..." -- looking at your -- at the complaint

19    (as read):

20                  "Once in the water, on his

21              second wave at Lunada Bay, a member

22              of Defendant LUNADA BAY BOYS intentionally

23              ran Spencer over with his surfboard and

24              sliced open Spencer's hand."

25                  Is that true?
```

Page 106

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 35 of 85  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 285-16  Filed 07/14/17  Page 27 of 67  Page ID
#:5669

```
1              A     Yes.

2              Q     All right.

3                    Which hand was that?

4              A     The right wrist.

5              Q     Okay.

6              A     With about a half-inch scar.

7              Q     Do you mind showing it to me?

8              A     Right there.

9              Q     Okay.  Okay.  Thank you.

10             MR. WORGUL:  Do you mind if I take a picture of

11       it?

12             THE WITNESS:  I'd have to refer to counsel.

13             MR. FRANKLIN:  That's fine.

14             THE WITNESS:  Go ahead.

15             MS. LUTZ:  Sorry.  Can I see?  Thank you.

16             MR. WORGUL:  Mr. Spencer, if you don't mind.

17       And could you just take the pen and just point to where

18       it is so we can know right where you're showing us?

19                   (Whereupon, the witness complies.)

20             MR. WORGUL:  Okay.  Thank you.

21             THE WITNESS:  Uh-huh.

22             MS. HEWITT:  Thank you, Mr. Spencer.

23             THE WITNESS:  Yep -- yes.

24             MS. HEWITT:  All right.

25             Q     How did you determine that somebody
```

Page 107

1    intentionally ran you over with the surfboard?

2         A    Well, how did I determine somebody

3    intentionally?

4         Q    Well, that's a bad question.  How do you

5    know that the person who ran you over with the

6    surfboard intentionally did that?

7         A    I'm not in his brain; but I have surfed

8    for, you know, 30 years, and you can tell when somebody

9    locks eyes with you and is on one path, and they

10   specifically move their board and maneuver their body

11   to make their board go in another path that's directly

12   at you when they could go the more safer, more better

13   part of the wave being closer to the more critical part

14   of the wave, which is more enjoyable to surf than

15   aiming towards somebody paddling out to get back out to

16   the lineup.  In my mind, I determined that, hey, this

17   guy tried to run me over.

18        Q    Okay.

19        A    That's how I determined it.

20        Q    And what part of the surfboard cut your

21   hand?

22        A    It would be one of -- not knowing which

23   one, the right or the left, of a -- I'm trying to

24   describe it for the court reporter and you, but it

25   would be a thruster setup or a three-scag model

Page 108

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 37 of 85  Page ID
#:8518
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 28 of 67  Page ID
#:5670

1    surfboard, a surfboard having three fins or scags on

2    the bottom.  I don't know which of those three traveled

3    over my right wrist and slit it open.

4              Q       Okay.

5                      When -- right after that occurred, what

6    was the next thing that you did?  Or, rather, what did

7    you do?

8              A       Well, I don't know how to -- we're not

9    describing how I got to that point, though.

10             Q       No.  Right after your hand was cut, what

11   was the next -- what did you do?

12             A       After my hand was cut?

13             Q       Yes.

14             A       I continued paddling on my path to get

15   out to the lineup.

16             Q       Okay.  So this occurred --

17             A       With that individual who ran -- just ran

18   me over; start berating me with comments of, you know,

19   "What are you" -- "What are you fucking doing out here?

20   I told you to go home.  I should have ran you over.

21   Why are you paddling in the sun glare where I can't see

22   you?" And that's it.  "I should have ran you over."

23             Q       Did you get knocked off your surfboard?

24             A       So now we're backing up to the point --

25             Q       Correct, we are.

                                              Page 109

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 38 of 85  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 280-19  Filed 07/14/17  Page 29 of 67  Page ID
#:5671

```
 1          A       Okay.  So once we locked eyes and I saw
 2     him veer and steer his board in my direction to -- to
 3     run over myself, I was paddling west out to the ocean.
 4     He was coming in east towards the shore, and I rolled
 5     off the left side of my board, and my hand was up --
 6     left high up on top of my board, and that's when he ran
 7     over the wrist.
 8          Q       Okay.
 9                  Did you continue to surf after that
10     occurred?
11          A       Yes.
12          Q       Did you say anything to the person whose
13     surfboard cut your hand?
14          A       After he made the comment that, "I
15     should have ran you over," I says, "Well, you did," and
16     I held up my hand and showed him, and that's when he
17     said, you know, "Why are you paddling where I can't see
18     you?  You shouldn't paddle in the sunlight," stuff like
19     that.  Then I kept paddling off.
20          Q       Were you fearful of being further
21     injured after that point?
22          A       That's an understatement.
23          Q       So is the answer yes?
24          A       Yes.
25          Q       Okay.
```

Page 110

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 39 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 85-20   Filed 07/14/17   Page 30 of 67   Page ID
#:5672

```
 1                    Did you feel that what had occurred to

 2      you getting your hand cut and the way it happened was a

 3      crime?

 4            A       I know it was a crime.

 5            Q       Did you tell him it was a crime and that

 6      you were a police officer?

 7            A       I did not.

 8            Q       Why not?

 9            A       The way his explanation was going down

10      the road of, basically, avoiding taking any

11      responsibility for his actions; blaming it on the sun;

12      blaming, you know, me paddling where I'm not supposed

13      to be paddling -- I was paddling exactly where you're

14      supposed to paddle to avoid injury; to avoid conflict

15      with any other surfers.  I was paddling back to the

16      channel, which basically gets away from the critical

17      part of the wave, which is where he should have been

18      surfing when he redirected his path to run me over.

19                    You know, in my opinion, yeah, it was a

20      crime.  Did I report it?  It's going to be with no

21      witnesses there; no police officers in the water, as

22      there could have been; no police officers down on the

23      beach, as there could have been; on the fort, as there

24      could have been; nothing to corroborate my story, it

25      would have been a "He said ..."; "He said ..." go
```

Page 111

Case 2:16-cv-02129-SJO-RAO Document 305-13 Filed 07/31/17 Page 40 of 85 Page ID
Case 2:16-cv-02129-SJO-RAO Document 285-21 Filed 07/14/17 Page 31 of 67 Page ID
#:5673

```
 1   nowhere thing.
 2          Q      Do you feel that was the case even
 3   though you're a police officer?
 4          A      I don't get it.
 5          Q      Did you think that your -- your
 6   recitation of what had happened would carry more weight
 7   since you're a police officer?
 8          MR. FRANKLIN:  Calls for speculation.
 9          THE WITNESS:  You know, when I'm not on duty,
10   the best thing I can be is a good witness, and that's
11   how I've lived the last 20-some years.  I don't -- I
12   don't ever throw out off duty that I'm a police
13   officer; that you should treat me any different than
14   anybody else in the public because I'm a police
15   officer, and I didn't throw it out then.  I didn't see
16   a need to.  I didn't think that it would do any good
17   after the damage that was already done.  You know, in
18   retrospect, you know, I don't know.  It still would
19   have been a "He said ..."; "He said ..."; and I don't
20   see the need to engage that type of violent behavior
21   any more than it had already played itself out.  The
22   best thing I thought I could do is paddle out like I
23   did and just get away from him.
24          MS. HEWITT:  Okay.
25          Q      Did you, at that point, have any fear
```

Page 112

1    that the same thing would happen to your friend, Chris?

2         A      Yeah -- yes.

3         Q      Okay.

4         A      It came alive.  All those stories of 30

5    or 40 years just happened.

6         Q      And given that you had that fear, did

7    you consider that in order to avoid it potentially

8    happening to Chris, that, perhaps, you should take some

9    actions as a police officer -- and I think you said

10   that you felt it was a crime -- to prevent that from

11   happening to Chris?

12        MR. FRANKLIN:  Vague and ambiguous.

13        THE WITNESS:  I felt the best plan of action

14   was to stay clear of these guys, especially since they

15   just assaulted us.  I've got no radio.  I've got no

16   handcuffs.  I've got no gun; no bullet-proof vest.  I'm

17   not a police officer out there.  I'm a citizen; okay?

18   And the best plan of action was to avoid them; and that

19   was almost, I mean, impossible, when you got a guy

20   circling around you -- not the guy that ran me over but

21   they're all -- they all know each other, and here's the

22   guy that just injured me.  He knows his buddy is

23   circling my friend; and, so, it's like let's get out of

24   here; so we caught one more wave after that; and, then,

25   we decided that was -- it's getting too crazy out here,

Page 113

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 42 of 85   Page ID
#:8523
Case 2:16-cv-02129-SJO-RAO   Document 270-43   Filed 07/14/17   Page 32 of 67   Page ID
#:5674

1    and more and more started showing up on the fort.

2    BY MS. HEWITT:

3         Q      More and more what?

4         A      Bay Boys.

5         Q      Bay Boys?

6         A      Yeah.

7         Q      Okay.

8                How about the other people that were

9    supposed to come with you that day?  Did they ever

10   appear?

11        A      So, after we got out of the water, there

12   were -- and Chris knows all these guys.  There was

13   probably maybe six more -- six more people up top that

14   were, you know, supposed to come out with us early, but

15   some guys have different ideas of early; so ...

16        Q      Okay.

17               So after the second wave, you -- you and

18   Chris got out of the water; is that correct?

19        A      Third.  I caught one more.  I don't

20   know.  Chris caught a lot of waves.  Before I would say

21   maybe -- I don't know how many he got.  Probably double

22   what I got.  I got three; so, maybe he got more.  I

23   don't know.  But after my third one is when we got out.

24        Q      So after your hand was cut, how many

25   more waves did you surf?

                                        Page 114

```
 1              A      One.

 2              Q      After you got cut, how many more waves

 3       did Chris surf?

 4              A      I don't -- I don't know specifically.

 5       It wasn't many.  I couldn't give you a number.  I was

 6       kind of -- I was getting a little hypothermic.  I was

 7       bleeding.  I wanted to kind of stay in the cool water

 8       at least a little while longer to let the cold help

 9       with the cut.  I was getting a little frail mentally

10       'cause it was in my -- my fault was having a 10 to

11       12-year-old wetsuit in the middle of winter, and I got

12       cold; getting hypothermic.  Now I'm injured, and I was

13       worried about getting one more wave and getting out of

14       there.

15              Q      Did you tell Chris about your injury?

16              A      Yes.

17              Q      And when did you tell him that?

18              A      Shortly after it happened.

19              Q      All right.

20                     While you were still in the water?

21              A      Yes.

22              Q      And did Chris tell you whether or not he

23       saw the incident once your hand was cut?

24              A      I don't recall if he saw it or not.

25              Q      When you left the water, did you talk to
```

                                              Page 115

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 44 of 85  Page ID
#:8525
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 34 of 67  Page ID
#:5676

```
1          Q      Okay.

2                 Now, with regard to what occurred to

3    you, any of the things that you described for that

4    January 2016 visit to Lunada Bay, is it correct that

5    you did not report that to the City of Palos Verdes

6    Estates Police Department?

7          MR. FRANKLIN:  Vague and ambiguous.

8          THE WITNESS:  Are you talking about my hand?

9    BY MS. HEWITT:

10         Q      Yes, or anything that happened to you

11   that day?

12         A      I did not request a formal police

13   report, no.  I did not.

14         Q      Okay.

15                Did you communicate to anybody at the

16   City of Palos Verdes Estates Police Department with

17   regard to what occurred to you that day at Lunada Bay?

18         MR. FRANKLIN:  Vague and ambiguous.

19         THE WITNESS:  Yes.

20   BY MS. HEWITT:

21         Q      Okay.  When was that?

22         A      So, shortly after getting changed, I

23   noticed the group of police officers standing to my

24   south talking with what appeared to be another group of

25   newly-formed Bay Boys.
```

Page 125

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 45 of 85  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 270-46  Filed 07/14/17  Page 35 of 67  Page ID
#:8526
#:5677

```
1              So, the bay is a bay.  There's a north

2     and a south end.  The south group had, you know, trucks

3     and cars and guys standing kind of huddled around in a

4     group of guys, and the police officers were kind of

5     towards the south.  They weren't right up next to the

6     group.  And I did notice that a couple of police

7     officers appeared to be talking with a few members of

8     the group; and, so, I made a point, because there was,

9     in my opinion -- and I don't know if it was directed by

10    my contacts with the captain or whatnot, but I noticed

11    the group of police officers; so, I personally wanted

12    to go over and tell them, you know, "Hey, thanks for

13    showing up," you know.  "We appreciate it." You know,

14    and the one younger officer -- I don't know his name.

15    I didn't get any of their names.  I, basically, you

16    know, told him what happened to me down there, you

17    know; showed him my hand and -- and I told him, I says,

18    you know, "The guy is going to claim sun glare and

19    whatnot." I just didn't want to -- I knew where it was

20    going to go.  "He said ..."; "He said ..."; and, no, he

21    didn't offer to take a report.  You know, he didn't ask

22    me to point anybody out.  I know you're going to ask

23    all these questions; so, we'll just cut to the chase.

24         Q     He did not offer to take a report;

25    right?
```

Hahn & Bowersock, A Veritext Company
800.660.3187

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 46 of 85  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 279-4  Filed 07/14/17  Page 36 of 67  Page ID
#:8527
#:5678

1          A      Right.

2          Q      Okay.

3          A      But, again, I thanked him for being down

4     there, you know, for what I felt a response to my

5     E-mail without knowing for sure.

6          Q      Okay.  And you said that you didn't ask

7     for a formal report; is that right?

8          A      That's correct.

9          Q      Okay.

10         A      Just as I stated several minutes ago, it

11    wasn't ...

12         Q      Did you ask for any sort of follow-up

13    action to be taken?

14         MR. FRANKLIN:  Vague and ambiguous.

15         THE WITNESS:  No, not that I can recall.

16    BY MS. HEWITT:

17         Q      And you said that you showed them your

18    hand, or you told them about your hand?

19         A      No, I showed them.  I showed a lot of

20    people my hand.

21         Q      You showed the police officers there

22    that day?

23         A      Like I showed all of you here, I showed.

24         Q      You showed the police officers?

25         A      Yes.

Page 127

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 47 of 85   Page ID
#:5679
Case 2:16-cv-02129-SJO-RAO   Document 285-28   Filed 07/14/17   Page 37 of 67   Page ID
#:5679

```
 1              Q        Did the police officers have any

 2      recommendations for you?

 3              A        No.

 4              Q        And I'm sorry.  Again, because I don't

 5      know these things, but is not requesting a formal

 6      report, is that the same thing as whether or not you

 7      pressed charges?

 8              A        Yes.

 9              Q        Okay.  So you didn't press charges?

10              A        The reason you want a police report

11      taken is because you have a criminal action done to you

12      and you want --

13              Q        Got it.

14              A        -- to have them criminally, you know,

15      prosecuted.

16              Q        Okay.

17              A        That's why we take police reports.

18              Q        Okay.

19                       Other than the officers you spoke to

20      that day, did you speak to any other

21      City of Palos Verdes Estates police officers about what

22      occurred on January 29, 2016?

23              MR. FRANKLIN:  Vague and ambiguous.

24      BY MS. HEWITT:

25              Q        Let's start -- we'll start with, like,
```

Page 128

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 48 of 85   Page ID
#:8529
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 38 of 67   Page ID
#:5680

```
1              Los Angeles, California

2         Tuesday, October 11, 2016, 1:42 p.m.

3                      -oOo-

4

5         A F T E R N O O N   S E S S I O N

6

7              (All appearances remain as heretofore

8         noted in addition to Mark C. Fields, Esq.,

9         who has joined the proceedings.)

10

11              EXAMINATION (CONTINUED)

12    BY MS. HEWITT:

13         Q      Going back on the record, Mr. Spencer,

14    welcome back.

15         A      Thank you.

16         Q      We were talking about the January 29,

17    2016 visit to Lunada Bay, and the police presence that

18    you're describing.  I think -- I looked at the court

19    reporter's screen.  I think you said that there were

20    two to three police officers there, including a

21    sergeant; is that right?

22         A      Not in January.

23         Q      Not in January.  Okay.  Some other time.

24    Okay.  In January, can you describe to me -- can you

25    tell me how many Palos Verdes Estates police officers
```

Page 130

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 49 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 285-30   Filed 07/14/17   Page 39 of 67   Page ID
#:5681

```
 1    were there?

 2            A       I can't give you a for sure number, but

 3    it was over the -- over the three that we just talked

 4    about.  I would say up to five or six.

 5            Q       Okay.  And did you see any police cars?

 6            A       Yes.

 7            Q       Okay.

 8                    Did you see any other police-type

 9    vehicles?

10            A       Yes.

11            Q       What were those?

12            A       There was a motorcycle, and I don't know

13    what they call it, but it's equivalent to like we have

14    cadets; so and they -- I'm pretty sure they were in a

15    different color uniform.  They weren't officers.

16            Q       Like an explorer?

17            A       Either parking -- not explorer, but they

18    were either a cadet, a police service officer, or like

19    a parking -- I don't recall.

20            Q       Okay.  And were the police service/cadet

21    people, are those included in the three to five to six

22    that you saw?

23            A       Yes.

24            Q       Okay.

25                    How many police cars did you see?
```

Page 131

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 50 of 85  Page ID
#:8531
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 40 of 67  Page ID
#:5682

```
 1          A       Probably -- well, approximately, three

 2   cars that were actual black-and-whites.

 3          Q       Okay.

 4                  Did you see any other cars that you

 5   believe were PVE police that that were not

 6   black-and-whites?

 7          A       Motorcycles.

 8          Q       Okay.

 9                  How many motorcycles did you see?

10          A       Just one motorcycle.

11          Q       Okay.

12                  When you left that day in January of

13   2016, were the police personnel that you just described

14   to me still there?

15          A       Yes.

16          Q       Okay.

17                  When you left, did Chris Taloa leave at

18   the same time?

19          A       No.

20          Q       Okay.

21                  Do you recall if Diana Milena Reed

22   stayed after you left?

23          A       Yes.  I left before anyone else.

24          Q       Okay.  All right.

25                  Did you communicate to the
```

Page 132

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 51 of 85   Page ID
#:8532
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 41 of 67   Page ID
#:5683

```
1        PVE Police Department about the January 29, 2016
2        incident by phone to anybody?
3               A       What incidents?
4               Q       What occurred on January 29, 2016, any
5        part of it?
6               A       In regards to?
7               Q       What occurred to you on that day.
8               A       No.
9               Q       Okay.
10                      How about with regard to -- how about by
11       E-mail?
12              A       I don't recall doing so, no.
13              Q       How about by letter, snail mail?
14              A       No.  I am advanced enough.  I don't
15       really send letters anymore.
16              Q       All right.
17                      Did you post on social media of any
18       type --
19              A       No.
20              Q       -- specifically with regard to that
21       date?  No?
22              A       No.
23              Q       Okay.  And I should have been a little
24       clearer -- go ahead.
25              A       No, social media, no.
```

Page 133

Exhibit C, page 119

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 52 of 85   Page ID
#:8533
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 42 of 67   Page ID
#:5684

```
 1          Q       Okay.

 2                  Did you post on any city-related sites

 3     Facebook posts?  I know you're not on Facebook, but any

 4     sort of tweeting at the city, anything like that,

 5     telling the city about what occurred on January 29,

 6     2016?

 7          A       No.

 8          Q       Okay.

 9                  Did you communicate with the city by any

10     other means that I did not go over?

11          A       No.

12          Q       Okay.  All right.

13                  If we go on in the complaint, still on

14     page 12, at the bottom, it says (as read):

15                  "In February, Spencer returned

16                  a second time with Jordan Wright and

17                  others to observe and watch the outsiders'

18                  cars parked on the bluff."

19                  Is that correct?

20          A       That's correct.

21          Q       All right.

22                  So Jordan Wright, when was the first

23     time you met him?

24          A       January 29th.

25          Q       Okay.  And have you ever talked to
```

Page 134

1      Lunada Bay?

2              A      How did I decide?

3              Q      Good point.  Bad question.

4                     Why did you decide?

5              A      I knew there was still swell in the

6      water.  I knew that Chris still wanted to surf, and I

7      wanted to go help in any way I could, as far as making

8      it a peaceful endeavor and making sure that nothing was

9      damaged, meaning the property and the cars; and I

10     decided to go to watch the property.

11             Q      How did you find out that Jordan and

12     these others were going?

13             A      I think through texting with Chris, just

14     saying, you know, who was going to be there and what

15     day they were going.

16             Q      From the outset, like when you decided

17     -- from the point that you decided to go in February,

18     was it always the case that you did not intend to surf?

19             A      Yes.

20             Q      Okay.  So you only intended to go and

21     watch the outsiders' cars parked on the --

22             A      I knew I wasn't going to surf that day.

23             Q      All right.

24                     Did you only intend to go to watch the

25     outsiders' cars parked on the bluff?

                                              Page 137

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 54 of 85   Page ID
#:8535
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 44 of 67   Page ID
#:5686

```
 1              MR. FRANKLIN:  Vague and ambiguous.

 2              THE WITNESS:  And be a witness if anything

 3    happened; watch cars; just kind of -- not protect the

 4    area but just, you know, be a witness in case something

 5    happened.

 6              MS. HEWITT:  Okay.

 7         Q    At the time that you went in February of

 8    2016, had you retained Mr. Franklin and Mr. Otten?

 9         A    I'm sorry.  Repeat that.

10         Q    At the time that you went to Lunada Bay

11    in February of 2016, had you retained Mr. Franklin and

12    Mr. Otten?

13         A    No.

14         Q    At the time that you went in February of

15    2016, had you discussed filing a lawsuit with regard to

16    Lunada Bay with anybody other than your attorneys in

17    this matter?

18         A    No.

19         Q    Okay.  All right.

20              When you arrived at Lunada Bay --

21    withdraw.

22              Did you advise anybody at the

23    City of Palos Verdes Estates about your February 2016

24    visit to Lunada Bay before it took place?

25         A    Forgive me.  Repeat.
```

Page 138

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 55 of 85  Page ID
#:8536
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 45 of 67  Page ID
#:5687

```
 1           Q       That's okay.

 2                   Before you went in February of 2016, did

 3     you tell anybody at the City of PVE that you were going

 4     to be there in February?

 5           A       Yes.  Sorry.  I interrupted.

 6           Q       That's okay.

 7           A       Yes, I believe I E-mailed the same

 8     Captain Velez and told him we'd be out there again.

 9           Q       Did you get a response?

10           A       Yes.  And I don't recall what it was.  I

11     think -- something to the effect of, "Thank you for

12     letting us know," type thing.

13           Q       Were you satisfied with the response at

14     the time?

15           MR. FRANKLIN:  Vague and ambiguous.

16           THE WITNESS:  At the time, it was adequate to

17     what I asked for; so, I'd have to answer yes.

18     BY MS. HEWITT:

19           Q       Do you recall feeling any need to follow

20     up with the captain?

21           MR. FRANKLIN:  Vague and ambiguous.

22           THE WITNESS:  Following -- at what point?

23     BY MS. HEWITT:

24           Q       Oh, at that time when you received the

25     first response.
```

                                        Page 139

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 56 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 46 of 67   Page ID
#:8537
#:5688

```
 1              A      No, I didn't feel a need to say anything

 2     else to him.

 3              Q      Okay.

 4                     Other than Captain Velez, is there

 5     anybody else that you communicated with at the city

 6     with regard to your impending visit to Lunada Bay in

 7     February of 2016?

 8              MR. FRANKLIN:  Vague and ambiguous.

 9              THE WITNESS:  At some -- at some point -- and I

10     don't recall when it was -- I had wrote the chief or

11     E-mailed the chief, and I don't know if it was on or

12     before that time you're speaking of.

13              MS. HEWITT:  Okay.

14              Q      When you went in February 2016, did you

15     go by yourself and meet people there?

16              A      Yes.  I met Chris and Jordan and Diana

17     and Kenny.

18              Q      Okay.

19                     What happened when you first got there?

20              A      We parked.

21              Q      And what was the next thing you did?

22              A      They got ready to go in the water.

23              Q      And who is "they"?

24              A      Chris, and I believe Jordan.  I don't --

25     I don't recall -- I know more went in the water that
```

Page 140

Exhibit C, page 124

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 57 of 85  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 2-8538 Filed 07/14/17  Page 47 of 67  Page ID
#:5689

```
 1    assaulted down on the fort, and I can't remember what
 2    day that was.
 3           Q     Okay.  And you don't remember when she
 4    told you that; right?
 5           A     No, I don't.
 6           Q     All right.
 7                 When you went in February of 2016, did
 8    anybody -- withdraw.
 9                 Did you, in fact, watch the outsiders'
10    cars parked on the bluff?
11           A     Yes.
12           Q     Did anybody watch with you?
13           A     Not that I recall.  Like I say, I don't
14    -- there's a couple that stayed behind; so, I don't
15    know if they were -- I can only tell what I did.  I
16    don't know if a couple of the guys that were there with
17    the group either stayed behind, and I don't know what
18    they did, if they were watching; but I was specifically
19    there to watch everybody's cars so ...
20           Q     And what did you do in that regard?
21           A     Just sat on the side of the road and
22    watched our property.
23           Q     Okay.
24                 Were you harassed while you were
25    watching the property?
```

Page 142

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 58 of 85  Page ID
#:8539
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 48 of 67  Page ID
#:5690

```
 1          A     You could -- yes.  When people call you

 2    the same things they called on the first visit, "kook,"

 3    and, you know, "What are you doing?" Same stuff, that's

 4    harassment.  I feel I was harassed.

 5          Q     Okay.  Just to be -- I'm unclear.  Were

 6    you harassed?

 7          A     Yes.

 8          Q     Okay.

 9                Tell me what happened?

10          A     Just name calling.

11          Q     And who called you names?

12          A     I don't know who they are.

13          Q     Where were they?

14          A     Just passersby real slow in their

15    trucks; in their cars; guys standing on the bluff.  I

16    recall on the February date, specifically,

17    Defendant Blakeman constantly circling us, everybody

18    who was out there to surf that was not from there;

19    that's not a Bay Boy; sticking his GoPro in our faces

20    for reasons we could only determine were to identify us

21    to their group so that they would know who we are.

22    I've never had that happen.  Bless you.  And, you know,

23    when you go to a beach and somebody is sticking a

24    camera in your face, is it to --

25          Q     When did --
```

Page 143

Case 2:16-cv-02129-SJO-RAO Document 305-13 Filed 07/31/17 Page 59 of 85 Page ID
Case 2:16-cv-02129-SJO-RAO Document 270-4 Filed 07/14/17 Page 49 of 67 Page ID
#:8540
#:5691

```
 1              A     Who knows?

 2              Q     When did that occur?  While you were

 3      watching the cars?

 4              A     While we were watching the cars; when we

 5      arrived; when they were getting out of the water,

 6      meaning Jordan and Chris; while we were standing at our

 7      cars.  It was just odd.

 8              Q     So he stuck a GoPro in your face?

 9              A     Yes.

10              Q     Okay.

11                    Can you tell me just -- you can

12      demonstrate -- how close the GoPro got to your face?

13              A     Not -- when I say, "in my face," just

14      kind of, you know, even from a distance of this far; so

15      five feet to, you know, 30, 40, 50 feet.  It's just

16      odd.

17              Q     Did you feel threatened by that

18      behavior?

19              A     Of course.

20              Q     So --

21              A     When you show up to a beach and someone

22      that you know is one of the little -- the local

23      controllers/harassers of that place sticking a camera

24      in your face, why is he doing that?  To intimidate you

25      and to make you feel uncomfortable.
```

                                              Page 144

1    considered to be the Bay Boys?

2          MR. WORGUL:  Same objections.

3          THE WITNESS:  In my opinion?

4          MS. HEWITT:  Yes.

5          THE WITNESS:  The ones that roll by slowly;

6    that don't get called names themselves; that are doing

7    the name calling --

8          MS. HEWITT:  Yes.

9          THE WITNESS:  -- are members of the Bay Boys.

10         MS. HEWITT:  Okay.

11         Q     Did you recognize any of them?

12         A     No.

13         Q     Okay.  And, then, you described Blakeman

14    holding out a GoPro on a selfie stick.  Did anything

15    else occur to you while you were watching the cars that

16    day in February?

17         A     Anything else?

18         Q     Any other harassment; violence?

19         A     No.

20         Q     Okay.

21               Any other incidents of localism?

22         MR. FRANKLIN:  Vague and ambiguous.

23         THE WITNESS:  Well, you know, when they get on

24    their phones as they're passing by in their car; and,

25    then, more and more start to show up, you know, I guess

                                            Page 146

Exhibit C, page 128

1    that would be localism through their coordinated

2    efforts, if you want to put it that way.

3    BY MS. HEWITT:

4         Q     Oh, I'm not putting it any way.  I'm

5    just asking you.

6         A     But you did put it in such a way did

7    anything else happen?  Well, sure.  They're all on

8    their phones.  Every time they're passing by, more and

9    more start to show up and just magically, after you see

10   these guys talking on their phones.  How does -- like I

11   said, the north and the south start to get filled up

12   with guys that don't seem to get harassed.  Is it by

13   magic they show up?  Or, I mean, I don't know.  It's --

14   it's got to be only they're talking to each other.

15        Q     So when you say there's more and more

16   showing up, please tell me what numbers you're talking

17   about and over what time period you saw them start to

18   show up.

19        A     You start out in the morning, again,

20   like I say, it's early.  There's few numbers.  And,

21   then, as the morning grows on, the numbers just grow.

22   The numbers in the water; numbers down on the fort; the

23   numbers of the guys that stand up on the bluff, on the

24   north and south end.  I mean, almost like -- almost

25   like ramparts, you know, to protect the area.  It's

Page 147

1      really odd.

2            Q      How do the numbers grow?  By what

3      numbers?  So, what did they start out with when you

4      first got there; and, then, how did they increase over

5      time?

6            A      I would say from the morning of, you

7      know, starting out with just a few guys up on the

8      bluff, you know, going down to surf, you're looking at,

9      you know, five to six; a couple guys walking alone down

10     the path; a couple guys walking up in pairs.  And,

11     then, by the end of the morning, you know, there could

12     be -- I would estimate on the south end, it seemed to

13     be the larger concentration upwards of 15 to 20 guys

14     there; and, you know, the north seemed a little --

15     that's where Mr. Blakeman was with his camera and a few

16     sporadic, you know, groups; but all in the same general

17     area.  Again, 10 -- 10 to 15.

18           Q      Okay.  And what day of the week was

19     this?

20           A      I don't recall.

21           Q      Do you recall if it was a weekend?

22           A      I don't believe it was.

23           Q      Okay.  And, then, moving on to the next

24     sentence in the complaint -- now we're on the top of

25     page 13, sir.

Page 148

```
 1              A      Yes.

 2              Q      Okay.

 3                     It says (as read):

 4                     "Spencer observed Defendant

 5              LUNADA BAY BOYS threaten and taunt

 6              surfers."

 7                     We discussed Mr. Blakeman's actions.

 8      Other than Mr. Blakeman's actions, did you witness any

 9      other incidents of the Lunada Bay Boys threatening or

10      taunting surfers that day in February 2016?

11              MR. FRANKLIN:  Asked and answered.

12              THE WITNESS:  Well, I mean, how do I know who's

13      doing the taunting and threatening when it could be all

14      of them, when they're on their phones, and more and

15      more groups, you know, show up to kind of put this

16      stranglehold on the area, in my opinion?  That's

17      taunting and threatening in itself when you have a

18      little goat trail one way to go down there, and you've

19      got two groups of 15 to 20 on each end, and you got a

20      guy going around with a selfie stick and a camera,

21      people -- people yelling at you to fucking get out of

22      there; "Why are you here?  Go home.  Don't surf here."

23      I don't know who they are specifically.

24      BY MS. HEWITT:

25              Q      Well, I'm here to ask you about your
```

Page 149

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 64 of 85   Page ID
#:8545
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 51 of 67   Page ID
#:5693

1    that to you?

2           A      No, I don't.

3           MS. HEWITT:  Okay.  All right.  And, then,

4    let's look at this -- what's the next exhibit?

5           THE REPORTER:  Forty-two is your next exhibit.

6           MS. HEWITT:  Forty-two.  Okay.  Here is 42,

7    which is Bates-stamped CITY1807 for those of you on the

8    phone.

9                      (Defendants' Exhibit 42 was marked for

10   identification by the Certified Shorthand Reporter

11   and is enclosed herewith.)

12   BY MS. HEWITT:

13          Q      This is a one-page E-mail that was

14   produced by the city, I think, in response to a

15   Public Records Act request, and it was produced

16   redacted; so, this is how I got it too.

17                 Why don't you take a look at that,

18   Mr. Spencer, and tell me if you recognize what's said

19   in that E-mail.

20          A      Yeah, that's the E-mail I sent to him.

21          Q      Okay.

22                 The date matches up with what you told

23   us today.  So, let's go through this E-mail.  First of

24   all, the subject line that you chose, "Lunada UC ops,"

25   can you tell me if "UC" referred to undercover?

                                          Page 158

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 65 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 52 of 67   Page ID
#:8546
#:5694

```
 1              A      Yes.

 2              Q      And "ops" is operations?

 3              A      Yes.

 4              Q      Okay.  And the first sentence says

 5     (as read):

 6                     "Sir, first of all, I'd like

 7              to thank you and your dept. for the

 8              response in extra patrols down at

 9              Lunada Bay."

10              A      Correct.

11              Q      All right.

12                     Did you feel thankful for extra patrols

13     down at Lunada Bay?

14              A      Of course.

15              Q      All right.

16                     Next, you say (as read):

17                     "I am active law enforcement

18              (ESPD) and have been emailing

19              Capt. Velez every time we (Aloha point

20              Facebook group - a group of non-locals)

21              venture out to the bay on a big swell day."

22                     "ESPD," was that El Segundo Police

23     Department?

24              A      Yes.

25              Q      All right.  And was it correct that you
```

Page 159

Exhibit C, page 130

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 66 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 53 of 67   Page ID
#:8547
#:5695

```
 1    had been E-mailing Captain Velez every time you were
 2    venturing out on a big swell day?
 3            A      On those two days, yes.
 4            Q      Okay.  So, you were referring to those
 5    two days, January and February of 2016?
 6            A      Correct.
 7            Q      All right.  So, each time you E-mailed
 8    them, is it correct that you witnessed extra patrols
 9    being provided?
10            A      Yes.  In my opinion, that's what they
11    were.  The officers were there because, hopefully, in
12    response to my E-mail.
13            Q      All right.
14                   You go on to write (as read):
15                   "He has been kind enough to
16            respond, and we've been encouraged to
17            see PV officers."
18                   Was that accurate?
19            A      Correct.
20            Q      The next paragraph states (as read):
21                   "Anyway, several years ago
22            (around 02' or 03') the then chief of
23            PV asked several surrounding agencies to
24            see if officers who surfed would be willing
25            to paddle out 'on duty-undercover.'"

                                              Page 160
```

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 67 of 85  Page ID
#:8548
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 54 of 67  Page ID
#:5696

```
1    on the board or something like that, and I don't know

2    who that was.  From what I remember, I don't think they

3    were currently a member of them, but they used to be.

4    I don't remember who it was.

5          Q     Okay.

6                Put that right to the side because I'm

7    going to ask you some more questions about this E-mail.

8          A     Which one?

9          Q     The one we just looked at.  Yeah, put

10   that off, because I'm going to come back to that.

11   Going back real briefly to the complaint on page 13,

12   following the February 2016 visit to Lunada Bay, did

13   you ever return to Lunada Bay and attempt to surf?

14         A     No.

15         Q     Did you ever return to Lunada Bay and --

16   at all after that time?

17         A     I have, yes.

18         Q     All right.

19               How many times?

20         A     Anywhere from three to five.

21         Q     Okay.

22               On each of those visits, did you go down

23   to the beach?

24         A     No.  Up on the bluff only.

25         Q     Okay.
```

                                          Page 170

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 68 of 85  Page ID
#:8549
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 55 of 67  Page ID
#:5697

1          Did you go in your car at any time

2    because you were afraid?

3          A     No.

4          Q     All right.

5                At any time when you were watching the

6    cars, were you in fear of violence?

7          MR. FRANKLIN:  Vague and ambiguous.

8          THE WITNESS:  It is, because you know -- you

9    don't know what's going to happen when you see guys on

10   cell phones driving by real slow looking at you; and,

11   then, more guys show up.  So was I worried that there

12   could be violence?  Yes, there could have been.

13         MS. HEWITT:  Okay.

14         Q     Were you worried about bodily harm

15   occurring to yourself?

16         A     Yes.

17         Q     And what did you base that worry on?

18         A     Guys on cell phones driving by real slow

19   and more guys showing up after you see them on cell

20   phones.  Kind of crazy at a beach where violence is

21   documented for 40 years.  I based it on my own fear.

22         Q     And this is the fear based on the 30 to

23   40 years of documented violence?

24         A     All the stories and violence and what

25   goes on down there, yeah.

                                        Page 173

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 69 of 85   Page ID
#:8550
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 56 of 67   Page ID
#:5698

```
 1          Q      Okay.

 2          A      It's crazy.

 3          Q      Is it based at all on your January 2016

 4     visit?

 5          A      I would say of course.  How can it not

 6     when you get your hand sliced open?

 7          Q      Okay.

 8                 Was it -- was it based on what or

 9     anything you experienced while you were watching the

10     cars other than what you've already told me?

11          A      Yes, the whole totality -- the whole

12     totality of the situation gives you fear.  But, at some

13     point, you got to stand up to people that are acting

14     like bullies and, you know, deal with it.

15          Q      Okay.  So, I'm just trying to write down

16     all these things here.  So, we talked about the 30 to

17     40 years of documented incidents; guys on cell phones

18     driving by and, then, more guys showing up; having your

19     hand cut in January.  Is there anything else that I've

20     missed?

21          MR. FRANKLIN:  Misstates prior testimony.

22          THE WITNESS:  Guys walking around a bluff

23     throwing GoPros in your face and guys knowing --

24     potentially knowing who you are from those pictures

25     that he shares with his buddies, yeah, all that.  You
```

Page 174

Exhibit C, page 134

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 70 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 285-1   Filed 07/14/17   Page 57 of 67   Page ID
#:5699

```
1              A       I don't.

2              Q       Was the last time that you E-mailed

3    Captain Velez with regard to your February 2016 visit?

4              A       Again, may or may not be.  I don't

5    recall the last E-mail.

6              Q       Okay.

7                      Other than Captain Velez and

8    Chief Kepley, have you communicated with any other

9    City of Palos Verdes Estates Police Department

10   representatives?

11             A       Have I communicated with?

12             Q       Right.  Good point.  Let's go back.

13                     We talked about some that you spoke with

14   in your January 29th, 2016 visit.  At the February 2016

15   visit, were there any Palos Verdes Estates

16   Police Department representatives there?

17             A       Yes.

18             Q       Okay.  And how many did you identify --

19             A       I think there was only two patrolmen and

20   a sergeant that day; but if there were more, I didn't

21   see them or don't recall.

22             Q       Okay.

23                     Did you see any marked police cars in

24   February?

25             A       Yes.
```

Page 184

Exhibit C, page 135

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 71 of 85  Page ID
#:8552
Case 2:16-cv-02129-SJO-RAO  Document 270-4  Filed 07/14/17  Page 58 of 67  Page ID
#:5700

```
 1            Q      How many?

 2            A      Two or three.

 3            Q      Okay.

 4                   Did you see any motorcycles?

 5            A      I don't recall seeing a motorcycle in

 6     February.

 7            Q      All right.

 8                   Other than in January and February of

 9     2016, did you ever speak to any City of Palos Verdes

10     Estates Police Department representatives in person

11     with regard to Lunada Bay?

12            A      I don't -- I don't recall.  I don't

13     recall doing so.

14            Q      Okay.

15                   Other than E-mails with Captain Velez

16     and Chief Kepley, do you recall any other E-mail

17     communication with anybody from the City of Palos

18     Verdes Estates Police Department with regard to

19     Lunada Bay?

20            A      I do not.

21            Q      Okay.

22                   Do you recall any phone communications

23     with anybody at the PVE Police Department with regard

24     to Lunada Bay?

25            A      Again, I answered that before.  I don't
```

Page 185

```
 1      just out here doing our job," basically.  Specifics, in

 2      regards to anything that happened to me, I don't recall

 3      any conversation.

 4           Q      Did you make any specific complaints to

 5      him at that time?

 6           A      Not that I recall.

 7           Q      Now, in your complaint, if we look on

 8      page 13 still, Mr. Spencer, towards the end of the top

 9      paragraph.  We're looking at lines 11 and 12.  Do you

10      see that, sir?

11           A      Okay.

12           Q      All right.  It says (as read):

13                  "Defendants' conduct has caused

14             Spencer pain and suffering, loss of sleep,

15             emotional distress, and mental anguish."

16                  Is that an accurate statement?

17           A      Yes.

18           Q      All right.

19                  With regard to the pain and suffering

20      that you allege, can you describe how you have suffered

21      that pain and suffering?

22           A      Yeah, it's kind of a letdown.  You just

23      feel sad that, you know, things that maybe you'd hoped

24      as a human that really weren't happening down there,

25      actually, when they did happen to you, kind of -- I
```

```
 1    don't know.  I don't want to say a depression 'cause --
 2    but just a sadness, you know, that, hey, it actually
 3    happened; and kind of suffered, in the sense of, you
 4    know, it just kind of a -- it's kind of a bummer that
 5    it happened.  You know, I'm -- in my sense, I'm
 6    suffering that I'm not able to go enjoy a place that I
 7    have a God-given right to go enjoy without being run
 8    over; called names; told to leave; so, in that sense,
 9    yeah, that's a suffering to me, I mean.
10            Q      Have you experienced any crying episodes
11    as a result of the allegations in the complaint?
12            A      Crying?
13            Q      Yes.
14            A      I don't see any crying in the complaint.
15            Q      That's just my question.
16            A      Oh, I have not cried.
17            Q      Okay.
18                   Have you experienced any headaches as a
19    result of the allegations in the complaint?
20            A      No.  I don't recall any headaches.
21            Q      All right.
22                   Did you experience any loss of sleep?
23            A      Yes.
24            Q      On how many occasions?
25            A      I don't recall specific amount; but when
```

Page 188

Case 2:16-cv-02129-SJO-RAO Document 305-13 Filed 07/31/17 Page 74 of 85 Page ID
#:8555
Case 2:16-cv-02129-SJO-RAO Document 270-4 Filed 07/14/17 Page 59 of 67 Page ID
#:5701

1    off-duty weapon.

2            Q    Okay.  That didn't sound smug at all.

3            A    Okay.  I didn't want to.

4            Q    Not at all.

5            A    They always say, "revolver."  Yeah, we

6    used to carry those back in the '70s.

7            Q    I'm sure it's all TV.

8                 All right.  With regard to the pain and

9    suffering, lack of sleep, emotional distress, and

10   mental anguish, do you attribute any of those

11   specifically to the actions of Chief Kepley?

12           A    Yes.  I'm disappointed in him.  I'm

13   disappointed that him and his department are not taking

14   care of the problem, yes.

15           Q    And you're disappointed because

16   Chief Kepley has not eliminated the problem, or do you

17   mean something else by taking care of it?

18           A    Yes, eliminated the problem.

19           Q    All right.

20                You would agree that extra patrols were

21   provided in January and in February of 2016 when you

22   asked for them; right?

23           A    Wholeheartedly agree.

24           MR. FRANKLIN:  Vague and ambiguous; calls for

25   speculation; move to strike.

                                          Page 193

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 75 of 85  Page ID
Case 2:16-cv-02129-SJO-RAO  Document 285-6  Filed 07/14/17  Page 60 of 67  Page ID
#:5702

| | |
|---|---|
| 1 | MS. HEWITT:  Did you move to strike, Counsel? |
| 2 | MR. FRANKLIN:  I did. |
| 3 | MS. HEWITT:  On what basis? |
| 4 | MR. FRANKLIN:  Lack of foundation.  It was |
| 5 | vague and ambiguous and calls for speculation. |
| 6 | MS. HEWITT:  Okay. |
| 7 | Q      So is it true that you believe that |
| 8 | extra patrols were provided at the January 2016 visit |
| 9 | to Lunada Bay? |
| 10 | MR. FRANKLIN:  Same objection. |
| 11 | THE WITNESS:  I believe extra patrol was sent |
| 12 | down there, yes. |
| 13 | BY MS. HEWITT: |
| 14 | Q      All right.  Same question for the |
| 15 | February 2016 visit. |
| 16 | MR. FRANKLIN:  Same objection. |
| 17 | THE WITNESS:  Yes. |
| 18 | MS. HEWITT:  Okay. |
| 19 | Q      All right.  With regard to your alleged |
| 20 | pain -- withdrawn. |
| 21 | With regard to the pain and suffering, |
| 22 | loss of sleep, emotional distress, and mental anguish |
| 23 | that you've discussed here today, do you attribute any |
| 24 | of that to the City of Palos Verdes Estates? |
| 25 | A      In the sense of the city employs the |

Page 194

Exhibit C, page 138

```
 1          A      No.

 2          Q      Why not?

 3          A      I don't feel comfortable right now.

 4          Q      What is it about right now that you

 5    don't feel comfortable about?

 6          A      I don't feel the problem has been

 7    addressed by the police; by the city.  I believe that

 8    there's still Bay Boy members that are going to be

 9    there, and I don't want to get into any type of

10    confrontation.

11          Q      Okay.  And the only thing that's

12    different between now and the last time that you went

13    there and surfed is that you also have a lawsuit

14    against all these people right now as well; correct?

15          MR. FRANKLIN:  Misstates -- excuse me.  Vague

16    and ambiguous; lacks foundation.

17          THE WITNESS:  That's not the only thing

18    different.

19    BY MR. WORGUL:

20          Q      What else is different?

21          A      Time has passed.  I don't know what

22    their states of mind are.  You know, what their

23    feelings are, if they're hostile.  I don't know.  I

24    don't want to even deal with any of that.  I just want

25    to go surf somewhere peaceful, and I don't feel I can
```

Page 274

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 77 of 85   Page ID
#:8558
Case 2:16-cv-02129-SJO-RAO   Document 270-4   Filed 07/14/17   Page 61 of 67   Page ID
#:5703

1    me.

2        Q    Have you ever advised someone on how to

3    do a citizen's arrest?

4        A    On how to do it?

5        Q    Yes.

6        A    Typically, what I advise somebody is

7    when they state they want to make one or, say, a

8    misdemeanor has been committed not in my presence, I

9    just -- the phone.  I didn't know if that was something

10    coming up.

11        I'll advise them that they can make the

12    citizen's arrest.  I will facilitate the arrest; take

13    that person into custody for them; either issue them a

14    citation, where it's warranted, or take the person to

15    jail if it's warranted.

16        Q    So, you have an understanding of how

17    that process works?

18        A    I -- I've done it several times; so, I

19    think so.

20        Q    Is there any reason that at any point in

21    time that you've had some sort of problem at

22    Lunada Bay, you have not effected a citizen's arrest?

23        A    Yes.

24        Q    What's the reason?

25        A    I didn't think it would go anywhere with

Hahn & Bowersock, A Veritext Company
800.660.3187

Exhibit C, page 139

```
 1    the DA.

 2            Q       Okay.

 3                    How would you know that unless you did

 4    it?

 5            A       I wouldn't.

 6            Q       But would I be correct in saying that

 7    you consciously knew you had the option to do it if you

 8    desired to do it whenever you were present at

 9    Lunada Bay, and there was other law enforcement

10    present?

11            A       Yes.

12            Q       And you chose not to; correct?

13            A       Well, I have that discretion.  I chose

14    not to.

15            Q       You said there's a channel at

16    Lunada Bay.  Where's the channel?

17            A       Well, a channel is a moving thing with

18    tide and positioning of the wave, depending on the

19    conditions; so, a "channel," again, in parenthesis --

20    sorry -- to describe a channel, is a place where the

21    wave is not breaking at a critical point, where you

22    would paddle out to and into the channel to get back

23    out to what's called the "lineup," where you sit and

24    wait for the waves.

25            Q       Do you know where the channel is at
```

Page 280

```
 1              MR. WORGUL:  Okay.

 2              MS. LUTZ:  Can we take a break for a second?

 3    Just like two minutes.

 4              MS. HEWITT:  Is that okay with you,

 5    Mr. Spencer?

 6              THE WITNESS:  Yes.

 7                      (A recess was taken at 5:30 p.m.

 8                      until 5:39 p.m.)

 9                      (Whereupon, Mark C. Fields, Esq.,

10                      left the proceedings.)

11

12                  FURTHER EXAMINATION

13    BY MS. HEWITT:

14         Q     All right.  Counsel has kindly allowed

15    me to ask one question I forgot to ask earlier.

16         A     Okay.

17         Q     With regard to he asked you what a

18    "kook" meant, and I think you said something about not

19    being from around the area or such.  Did you -- were

20    you ever asked by anybody at the City of Palos Verdes

21    Police Department where you lived whenever you talked

22    to them about anything about Lunada Bay?

23         A     Not that I recall.

24         Q     Okay.  Thank you.

25              MR. WORGUL:  I'll want to attach it.
```

Page 305

```
 1    BY MS. HEWITT:
 2         Q     Would anything have barred you -- and I
 3    don't know because, again, I'm a civilian who doesn't
 4    know.  Would anything have barred you from, in the
 5    process of effectuating a citizen's arrest on the
 6    person who sliced your hand, for instance, in the
 7    course of effectuating a citizen's arrest, telling them
 8    that you, in fact, are an El Segundo Police Department
 9    officer?
10         MR. FRANKLIN:  Objection:  vague and ambiguous;
11    incomplete hypothetical; assumes facts not in evidence.
12         THE WITNESS:  My capacity as a police officer
13    -- I wouldn't -- I wouldn't even bring that up.
14    BY MS. HEWITT:
15         Q     Does anything bar you from telling them
16    that in the process of conducting a citizen's arrest?
17         MR. FRANKLIN:  Objection:  assumes facts not in
18    evidence; incomplete hypothetical.
19         THE WITNESS:  Not that I know of.
20    BY MS. HEWITT:
21         Q     Okay.  When you spoke to the
22    City of Palos Verdes police officers at Lunada Bay, did
23    you tell them you were an El Segundo Police Department
24    officer?
25         MR. FRANKLIN:  Vague and ambiguous.
```

Page 341

```
 1           THE WITNESS:  I didn't have to tell one of

 2     them.  I used to work with one of them.

 3     BY MS. HEWITT:

 4           Q     Okay.  Other than Gaunt, who I believe

 5     you said you saw in February; right?

 6           A     Right.

 7           Q     In the January 2016 time period, did you

 8     tell anybody -- tell any of the PVE Police Department

 9     officers that you were an El Segundo police officer?

10           MR. FRANKLIN:  Objection to the extent it

11     misstates prior testimony.

12           THE WITNESS:  I don't believe I did.

13           MS. HEWITT:  Okay.

14           Q     Did any of the alleged Lunada Bay Boys

15     ever ask you where you were from?

16           A     No.

17           Q     No.  Okay.  Okay.

18                 Did anybody at the City of Palos Verdes

19     Estate Police Department ever refuse to take a report

20     from you?

21           A     No.

22           MS. HEWITT:  Okay.  That's all I have.

23     ////

24     ////

25     ////
```

Page 342

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 82 of 85   Page ID
Case 2:16-cv-02129-SJO-RAO   Document 285-3   Filed 07/14/17   Page 64 of 67   Page ID
#:5706

```
 1              MS. LUTZ:  Yes.

 2              THE REPORTER:  Mr. Franklin, did you want a

 3      certified transcript?

 4              MR. FRANKLIN:  Yes.

 5                      (Deposition proceedings concluded at

 6      6:35 p.m.  Declaration under penalty of perjury on the

 7      following page hereof.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page  347
```

Exhibit C, page 142

Case 2:16-cv-02129-SJO-RAO  Document 305-13  Filed 07/31/17  Page 83 of 85  Page ID
#:8564
Case 2:16-cv-02129-SJO-RAO  Document 270-34  Filed 07/14/17  Page 66 of 67  Page ID
#:5708

```
 1                 Certification of Court Reporter

 2                        Federal Jurat

 3

 4          I, the undersigned, a Certified Shorthand

 5     Reporter of the State of California do hereby certify:

 6          That the foregoing proceedings were taken

 7     before me at the time and place herein set forth;

 8     that any witnesses in the foregoing proceedings, prior

 9     to testifying, were placed under oath; that a verbatim

10     record of the proceedings was made by me using machine

11     shorthand which was thereafter transcribed under my

12     direction; further, that the foregoing is an accurate

13     transcription thereof.

14          That before completion of the deposition, a

15     review of the transcript [X] was [ ] was not requested.

16          I further certify that I am neither

17     financially interested in the action nor a relative or

18     employee of any attorney of any of the parties.

19          IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21     Dated:   October 21, 2016

22

23

24               Carmen R. Sanchez

25               CSR No. 5060

                                              Page 349
```

Exhibit C, page 144

```
1
2
3
4                              * * *
5
6          I do solemnly declare under penalty of
7    perjury, under the laws of the State of California,
8    that the foregoing is my deposition under oath; that
9    these are the questions asked of me and my
10   answers thereto; that I have read same and have made
11   the necessary corrections, additions, or changes to
12   my answers that I deem necessary.
13         In witness thereof, I hereby subscribe my
14   name this _____ day of _____, 20_____.
15
16
17
18
19                    _____
20                             Witness Signature
21
22
23
24
25
                                        Page 348
```

Case 2:16-cv-02129-SJO-RAO   Document 305-13   Filed 07/31/17   Page 85 of 85   Page ID
#:8566
Case 2:16-cv-02129-SJO-RAO   Document 270-46   Filed 07/14/17   Page 67 of 67   Page ID
#:5709

**Mark Velez**

| | |
|---|---|
| **From:** | Jeff Kepley |
| **Sent:** | Saturday, March 05, 2016 9:11 AM |
| **To:** | Mark Velez |
| **Subject:** | Fwd: Lunada UC ops |

REDACTED

FYI.

Jeff Kepley

Begin forwarded message:

**From:** '
**Date:** March 4, 2016 at 10:12:35 PM PST
**To:** jkepley@pvestates.org
**Subject:** Lunada UC ops

Sir, first of all, I'd like thank you and your dept. for the response in extra patrols down at Lunada Bay. I am active law enforcement (ESPD) and have been emailing Capt. Velez every time we (Aloha point Facebook group-a group of non-locals) venture out to the bay on a big swell day. He has been kind enough to respond, and we've been encouraged to see PV officers.

Anyway, several years ago (around 02' or 03') the then chief of PV asked several surrounding agencies to see if officers who surfed would be willing to paddle out "on duty-undercover."
I was approached along with a few more of our officers and we were excited to help out. For reasons unknown, nothing ever materialized. I think it would be worth another shot and be very effective. I'm sure my chief would assist in letting the few of us that do surf help out should you ever want to try something like that.

It really is too hard to observe anything that really goes on down there from the bluff. Although, I understand two younger officers actually made their way down to the fort and were actually able to finally witness/document a 415. You know, and I know, the DA will most likely reject it, but kudos to them for their descent from the bluff to the beach.

Thanks for reading, and possibly considering a UC operation as I've suggested. As a side issue, I have recently been made aware of, and feel a brotherly sense of duty, to make you aware of some upcoming legal actions in the works by a very large, non-profit foundation heavily invested in coastal matters (this is separate from the coastal commission thing). There are attorneys plotting strategies as we speak, to basically force the city (consent decree type) to make Lunada Bay very "public access." This could mean many things (signage, trail improvement, parking,etc...). Just wanted to give you a heads up so your not blindsided.

Again, thanks for the response.

DEFENDANT'S EXHIBIT NO. *42*
For Identification
Witness *C.E.Spencer*
Date *10/11/2017* Page No: *105*
Carmen R. Sanchez, CSR No. 5060

1

*42*