```
 1  HANSON BRIDGETT LLP
    KURT A. FRANKLIN, SBN 172715
 2  kfranklin@hansonbridgett.com
    LISA M. POOLEY, SBN 168737
 3  lpooley@hansonbridgett.com
    SAMANTHA WOLFF, SBN 240280
 4  swolff@hansonbridgett.com
    JENNIFER ANIKO FOLDVARY, SBN 292216
 5  jfoldvary@hansonbridgett.com
    425 Market Street, 26th Floor
 6  San Francisco, California 94105
    Telephone: (415) 777-3200
 7  Facsimile:  (415) 541-9366

 8  HANSON BRIDGETT LLP
    TYSON M. SHOWER, SBN 190375
 9  tshower@hansonbridgett.com
    LANDON D. BAILEY, SBN 240236
10  lbailey@hansonbridgett.com
    500 Capitol Mall, Suite 1500
11  Sacramento, California 95814
    Telephone: (916) 442-3333
12  Facsimile:  (916) 442-2348

13  OTTEN LAW, PC
    VICTOR OTTEN, SBN 165800
14  vic@ottenlawpc.com
    KAVITA TEKCHANDANI, SBN 234873
15  kavita@ottenlawpc.com
    3620 Pacific Coast Highway, #100
16  Torrance, California 90505
    Telephone: (310) 378-8533
17  Facsimile:  (310) 347-4225

18  Attorneys for Plaintiffs
    CORY SPENCER, DIANA MILENA
19  REED, and COASTAL PROTECTION
    RANGERS, INC.
20
```

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation, | CASE NO. 2:16-cv-02129-SJO (RAOx)<br><br>**DECLARATION OF BENJAMIN SIOUNIT**<br><br>Complaint Filed:  March 29, 2016 |

-1-

2:16-cv-02129-SJO (RAOx)

DECLARATION OF BENJAMIN SIOUNIT

13636189.1

*B.S. Page 1 of 8*

| | | | |
|---|---|---|---|
| Plaintiffs, | Trial Date: | November 7, 2017 |
| v. | | |
| LUNADA BAY BOYS; THE INDIVIDUAL MEMBERS OF THE LUNADA BAY BOYS, including but not limited to SANG LEE, BRANT BLAKEMAN, ALAN JOHNSTON AKA JALIAN JOHNSTON, MICHAEL RAE PAPAYANS, ANGELO FERRARA, FRANK FERRARA, CHARLIE FERRARA, and N. F.; CITY OF PALOS VERDES ESTATES; CHIEF OF POLICE JEFF KEPLEY, in his representative capacity; and DOES 1-10, | | |
| Defendants. | | |

I, Benjamin Siounit, declare as follows:

1. From June 19, 2007 to February 11, 2012, I worked as a Level II Reserve Police Officer for the City of Palos Verdes Estates Police Department. I have personal knowledge of the facts set forth herein, except for those stated upon information and belief, and to those, I am informed and believe them to be true.

2. I graduated from Georgia State University in 1996 with a BA in Business Administration and later earned an AA in Criminal Justice. After college, I began my career as a corporate accountant. On February 10, 2005, I graduated from Rio Hondo Police Academy with Aaron Belda, who is presently a police officer with the City of Palos Verdes Estates Police Department.

3. I first became aware of the problem of "localism" in Palos Verdes Estates from then Chief Daniel Dreiling. During a meeting with the Chief,

and in the months that followed, I learned that surfers and others from out of the area were not welcomed by the residents of Palos Verdes Estates. Moreover, I learned that surfers and other beachgoers who are not from Palos Verdes Estates stayed away from the City because they were afraid of assaults and harassment from the local surfers. For example, while working for Palos Verdes Estates, I learned that some Lunada Bay local surfers had terrorized and assaulted non-residents and vandalized their cars and other property brought to the beach. If a non-local tried to surf Lunada Bay, the local surfers known as the "Bay Boys" would make an example out of them. Even people walking along the bluffs and looking at the surf would get harassed. I observed cars that had been vandalized. While I worked for the City, it did little to address the problem.

4. During the five years I worked for the City, I did not observe the police department take the issue of localism seriously and doubt that they do today. For example, I cannot recall any fulltime police officers walking down any of the cliffs to the local beaches to address localism issues. Instead, occasionally the fulltime officers would simply view beaches with their binoculars from the bluff top. But viewing the beach and surf break from the cliff was not an effective way to police the area because you cannot hear or see everything. This is especially true if you do not understand and have no training in surf etiquette. While I am not a surfer, I understand that one technique the locals use to harass visiting surfers is to drop in front of them when they are surfing a wave. They sometimes refer to this practice as "burning" the visiting surfer on a wave. I recently watched a video clip of an event held on Martin Luther King Day 2017 where you can see two women surfers burning visiting surfers on waves. The clip shows a couple officers on the cliff with binoculars. One Officer states: "I'm not a surfer so I don't understand surf etiquette, and I don't even know what dropping in is." I

observed officers call the local surfers by name, and engage in lengthy, non-work-related conversations.

5. While I worked for the City, the police department provided no trainings on localism, how the practice violated local ordinances and state law, or how it could be addressed. In my entire time with the Department, it only mentioned what it called a "surf issue" a couple of times, but never suggested how officers could or should address it. Moreover, while the City's police department had access to a boat, I did not see it being used to address the issue of local surfers deterring outsiders from visiting Lunada Bay or other City beaches. The former chief did ask the reserve officers to take the quads down to the beach to show a police presence; however, the quads only had very limited access to the beach and didn't have access to the portion of the beach where the Lunda Bay Boys were surfing at. The only quad access was in the 400 block of Paso Del Mar close to the "Neighborhood Church" that actually covers more of the Rat Beach which is part of City of Torrance than City of Palos Verdes Estates.

6. Beyond Lunada Bay, I observed unfair treatment against other visitors to the City by police officers, which started upon entry into the City. Most of the patrol time was devoted to the main drives (Palos Verdes Drive West and North) as the officers were profiling the individuals driving through the City coming from San Pedro or Torrance. I believe this was an effort to discourage people from coming to the City. Specifically, while I worked for the City, the Palos Verdes Police Department treated residents and those who grew up in Palos Verdes Estates differently from non-residents. This was particularly true for people of low economic status and people of color. For example, when a police officer would pull a resident over for a traffic violation, the officer was more likely to use his "discretion" to issue a verbal warning for a "minor traffic violation." In contrast, for nonresidents,

1 | especially people of color or people driving older or beat-up cars, I observed
2 | that they were more likely to be issued an expensive traffic ticket. Officers
3 | would ask the non-residents where they were coming from, and their
4 | purpose for being in the City. This double standard existed my entire time
5 | with the City.

6 |     7. While working for the City, I frequently patrolled with different
7 | Officers. On one occasion around 2010 or 2011, the Officer that I was on
8 | patrol with observed a Hispanic man driving a pickup truck that appeared to
9 | be used for gardening. The Officer said to me, "I guarantee that guy has no
10 | license and is an illegal from Mexico." This was enough for the Officer to
11 | pull this man over. It turned out that the man did not have a driver's license.
12 | Because of this, the Officer used his "discretion" to have the man's work
13 | truck towed. The Officer made it clear to me that he did not like Hispanic or
14 | African American people in the City, and that he liked to profile people. And,
15 | the Officer laughed about impounding the work truck.

16 |     8. While I worked with the City, there was a reserve Officer that
17 | frequently worked traffic. In addition to working as a reserve officer, his
18 | family privately owned Van Lingen Towing. And, in Palos Verdes Estates,
19 | all impounded vehicles went to his family's towing company, including any
20 | vehicles for which the reserve Officer had issued a citation. Upon
21 | information and belief, before a towed vehicle could be released, the owner
22 | had to pay: (a) an administrative fee to the City, (b) a "hook up fee" to the
23 | towing company, and (c) a storage fees to the towing company. Further,
24 | before the towing company would release a vehicle, the owner of the vehicle
25 | had to show: (d) ID, (e) current vehicle registration, (f) proof of insurance,
26 | and (g) physically return to Palos Verdes Police Department to obtain a
27 | police department "release."

28 |     9. When I worked for the City, I also observed a different Officer

1  search for non-resident cars that were parked illegally so he could have
2  them towed. On one occasion, I recall that Officer spotted a car parked with
3  a political campaign sticker supporting President Obama with the words
4  "YES WE CAN." The Officer believed the car was parked illegally, looked at
5  me and said "Yes we can!" The Officer high fived me and called Van Lingen
6  Towing.

7      10. On another occasion, I recall an Officer who came across a
8  stranded motorist from out of town who had run out of gas. Although there
9  was a gas station in Palos Verdes Estates, it did not take cash after hours.
10 When the stranded motorist sought help, the Officer told the man: "You
11 should have thought about that before you left your town" and left the person
12 stranded.

13     11. Similarly, as a reserve officer working for the City, when a car
14 was towed and the owner was a non-resident I was told that "you are not a
15 taxi service and you better not give anyone a ride back to the station or
16 anywhere else for that matter." Palos Verdes Estates has few street lights,
17 and few services. And cell phone service in Palos Verdes Estates can be
18 spotty. Still, we were instructed to leave people on the side of the road after
19 towing their vehicle.

20     12. During my time working for the City, I understood many of the
21 residents of Palos Verdes Estates had deep-seated prejudice to people of
22 color. In discussions with some of my fellow officers I learned that some
23 residents did not want an African American police officer patrolling their city.

24     13. Captain Kevin Scroggins, who is African American, was hired by
25 the City's police department around March 2008. Captain Scroggins and I,
26 along with several other officers, were working a Halloween Party at the
27 home of a wealthy couple located along lower Paseo La Cresta. I am
28 informed and believe that Officer Scroggins was accused of acting

inappropriately. After the event, the former chief (Dan Dreiling) asked me if I saw Captain Scroggins do anything inappropriate during the time we were conducting traffic control for this party. I told him "absolutely not." Captain Scroggins was fired shorty after this event. Before this, Captain Scroggins had complained about illegal discrimination within the Palos Verdes Estates Police Department. I was informed by a fellow officer that a resident that was pulled over by Captain Scroggins (who was driving in an unmarked detective vehicle and in plainclothes) had complained about black officers patrolling the city.

14. I am a Jewish Iranian American citizen. I try to adhere strictly to my religious beliefs and maintain great pride in my Iranian heritage. I immigrated to the United States as a teenager after being granted "refugee asylum" status by the federal government due to the severely hostile and targeted anti-Semitic policies in Iran. During the time that I worked for the department, I was subjected to illegal harassment from fellow officers related to my race and religious beliefs.

15. During a meeting on or about February 6, 2012, with three superiors, I made a formal complaint about the illegal discrimination that was directed at me. One of my superiors replied, "let's not go there," making it clear that neither he nor the Department had any concern about the treatment I received, and did not intend to do anything about it. Several days later, I was asked by two of my superiors to participate in a meeting that allegedly related to an internal affairs investigation the Department was initiating related to my complaints. Instead of discussing my complaints, they told me that I was being terminated and that the order to fire me had come down from the chief himself which I later learned was not true. I was handed two documents by my supervising Sergeant – a resignation letter and a termination letter – and told to choose between the two. After I informed him

1   that I was not able to make a decision that very moment, he said the "offer"
2   of resignation was only good for the night. Because I did not resign that
3   night, I was fired with no explanation provided.

4      16.   In 2016, the former Chief of Police reached out to me on an
5   unrelated matter. We went to lunch, and I asked him why I had been fired.
6   The Chief stated that he did not know that I had been terminated until after
7   he saw a lawsuit that I filed against the Department because he was told
8   that I had resigned. I learned that one of my supervising officers had told the
9   former chief that I had come in acting all disgruntled, used profanity, and left
10  the department on my own free will which was a total lie.

11     17.   In my almost five years working as a reserve police officer for
12  Palos Verdes Estates, I came to believe that certain officers make every
13  effort to discourage non-residents from visiting the City, including by looking
14  the other way when residents like the local surfers break the law. As in my
15  case, I also believe that there are several rogue officers that seem to act
16  with impunity.

17      I declare under penalty of perjury under the laws of the United States
18  of America that the foregoing is true and correct. Executed in _Los Angeles_
19  California on July _25_, 2017.

_Behrouz S._
BENJAMIN SIOUNIT