HANSON BRIDGETT LLP
KURT A. FRANKLIN, SBN 172715
kfranklin@hansonbridgett.com
LISA M. POOLEY, SBN 168737
lpooley@hansonbridgett.com
SAMANTHA WOLFF, SBN 240280
swolff@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:   (415) 541-9366

HANSON BRIDGETT LLP
TYSON M. SHOWER, SBN 190375
tshower@hansonbridgett.com
LANDON D. BAILEY, SBN 240236
lbailey@hansonbridgett.com
500 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone:   (916) 442-3333
Facsimile:   (916) 442-2348

OTTEN LAW, PC
VICTOR OTTEN, SBN 165800
vic@ottenlawpc.com
KAVITA TEKCHANDANI, SBN 234873
kavita@ottenlawpc.com
3620 Pacific Coast Highway, #100
Torrance, California 90505
Telephone:   (310) 378-8533
Facsimile:   (310) 347-4225

Attorneys for Plaintiffs
CORY SPENCER, DIANA MILENA
REED, and COASTAL PROTECTION
RANGERS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation,<br><br>Plaintiffs, | CASE NO. 2:16-cv-02129-SJO (RAOx)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |

Case No. 2:16-cv-02129-SJO (RAOx)

PLTFS.' OPPOSITION TO DEFTS. CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S MOT. FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

13672381.1

v.

LUNADA BAY BOYS; THE INDIVIDUAL MEMBERS OF THE LUNADA BAY BOYS, including but not limited to SANG LEE, BRANT BLAKEMAN, ALAN JOHNSTON AKA JALIAN JOHNSTON, MICHAEL RAE PAPAYANS, ANGELO FERRARA, FRANK FERRARA, CHARLIE FERRARA, and N. F.; CITY OF PALOS VERDES ESTATES; CHIEF OF POLICE JEFF KEPLEY, in his representative capacity; and DOES 1-10,

        Defendants.

| | |
|---|---|
| Judge: | Hon. S. James Otero |
| Date: | September 5, 2017 |
| Time: | 10:00 a.m. |
| Crtrm.: | 10C |
| | |
| Complaint Filed: | March 29, 2016 |
| Trial Date: | November 7, 2017 |

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   STANDARD ........................................................................................................ 3

III.  STATEMENT OF FACTS .................................................................................. 4

    A.   The City's Practice And Custom Of Exclusion ........................................ 4

        1.   The City Has A Longstanding Custom And Practice Of Unlawful Exclusion Of Outsiders, And Discourages Them From Coming To The City. ................................................................ 4

        2.   The City Has Been Aware Of And Condoned The Exclusionary Practices Of The Lunada Bay Boys For Decades. .................................................................................................. 7

        3.   Alleged City Efforts To Combat Illegal Exclusivity Are Woefully Inadequate And Ineffective. ..................................... 9

        4.   The City's Actions And Failures Have Resulted In The Harassment Of Outsiders And The Deterrence To Outsiders From Visiting The City. ............................................. 10

    B.   Plaintiffs Have Suffered Discrimination And A Loss Of Their Equal Protection Rights Upon Their Attempts To Visit The City. ...... 11

        1.   Plaintiff CPR Represents All People Who Want Coastal Access, Including Minorities And Women. ............................. 11

        2.   In Response To Plaintiff Reed's Complaints Of Sexual Harassment By The Bay Boys, City Police Discouraged Her From Returning To Lunada Bay. .......................................... 12

        3.   City Police Failed To Investigate A Bay Boy's Harassment And Battery Of Plaintiff Spencer. ................................................. 14

IV.   ARGUMENT ..................................................................................................... 14

    A.   Plaintiff Coastal Protection Rangers Represents Individuals Whose Equal Protection Rights Have Been Violated By The City. ....................................................................................................... 15

    B.   The City's Discriminatory Actions Against Racial Minorities Are A Violation Of Section 1983. ................................................................ 17

    C.   The City's Gender Discrimination Violates Section 1983. ................... 18

    D.   Even If The Exclusion Of Outsiders Is Analyzed Under Rational Basis Review, The City Has Admitted It Has No Rational Basis For This Action. ....................................................................................... 19

13672381.1

1   V.    CONCLUSION ................................................................................................ 20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13672381.1

PLTFS.' OPP. TO DEFTS. CITY AND KEPLEY'S MSJ OR, IN THE ALTERNATIVE, MSA

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 3

*Arc of Washington State Inc. v. Braddock*,
129 F. App'x 348 (9th Cir. 2005) ...................................................................... 16

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v.
California Dep't of Transp.*,
713 F.3d 1187 (9th Cir. 2013) ............................................................................ 17

*Associated Gen. Contractors of Am. v. Metro. Water Dist. of S.
California*,
159 F.3d 1178 (9th Cir. 1998) ............................................................................ 15

*Comm. for Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*,
644 F. Supp. 2d 1177 (N.D. Cal. 2009) ........................................................ 16, 17

*Cornwell v. Electra Central Credit Union*,
439 F.3d 1018 (9th Cir. 2006) ............................................................................ 4

*De Shaney v. Winnebago County Department of Social Services*,
489 U.S. 189 (1988) ............................................................................................ 15

*Harrington v. Scribner*,
785 F.3d 1299 (9th Cir. 2015) ...................................................................... 14, 17

*Jeldness v. Pearce*,
30 F.3d 1220 (9th Cir. 1994) .............................................................................. 14

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................ 3

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) .....................................................................*passim*

*Norsworthy v. Beard*,
87 F. Supp. 3d 1104 (N.D. Cal. 2015) .......................................................... 14, 18

13672381.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Retiree Support Grp. of Contra Costa Cty. v. Contra Costa Cty.*,
    944 F. Supp. 2d 799 (N.D. Cal. 2013)...................................................... 15

*Sanchez v. City of Fresno*,
    914 F. Supp. 2d 1079 (E.D. Cal. 2012) ....................................... 4, 14, 19

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ............................................................ 16

*Tucson Elec. Power Co. v. Pauwels Canada Inc.*,
    651 F. App'x 681 (9th Cir. 2016) .......................................................... 3

*W. States Paving Co. v. Washington State Dep't of Transp.*,
    407 F.3d 983 (9th Cir. 2005) ....................................................... 14, 17

*Ex Parte Young*,
    209 U.S. 123(1908) ............................................................................. 1

**Statutes**

42 U.S.C. § 1983..............................................................................*passim*

13672381.1

# I.   INTRODUCTION

Outsiders, including people of color and the poor, are systematically excluded by the City of Palos Verdes Estates police and by the self-styled "Lunada Bay Boys," with whom members of the police department maintain close friendship. This is so even though the State of California granted Lunada Bay and the rest of the Palos Verdes Estates Shoreline Preserve to the City, while reserving it for the people of California.  (Plaintiffs' Additional Material Facts ("PAMF") 108.)

The evidence in this case goes far beyond simply denying surfers access to a public beach; rather, Defendants' collective actions affect all members of the public who may wish to visit.[1]  While Lunada Bay should be a popular destination to recreate, it is not because of the long-standing treatment of outsiders under the name of "localism."  As succinctly put by the City's former Chief of Police Timm Browne:

> People here do not like outsiders in general.  Umm, I mean, they pay a price to live here.  Umm, they have beautiful views of the ocean from most of the homes in the City.  Umm, so, uh, they are protective of their community as a whole, umm, I mean surfers or non-surfers"

(PAMF 163.)  As police dispatcher Catherine Placek stated in regard to the Bay Boys specifically:

> We know all of them.  They are infamous around here.  They are pretty much grown men in little mens' mindset.  They don't like anyone that's not one of the Bay Boys surfing down there.  It literally is like a game with kids on a schoolyard to them.  And they don't want you playing on their swing set.  But, you know, it is what it is.  If you feel

---

[1]  Defendant Jeff Kepley is Palos Verdes Estates' current Chief of Police, having been appointed by the City on June 1, 2014.  Chief Kepley is named in his representative capacity.  (Compl., ¶ 9.)  Private parties can sue officials in their official capacity to enforce federal laws and regulations for prospective injunctive and declaratory relief.  *Ex Parte Young*, 209 U.S. 123(1908) (official may be sued in official capacity for injunctive relief).  Here, while Chief Kepley reports to the City Manager, it is the position of Chief of Police that is named because the Chief oversees sworn personnel.  (PAMF 164.)

PLTFS.' OPP. TO DEFTS. CITY AND KEPLEY'S MSJ OR, IN THE ALTERNATIVE, MSA

13672381.1

1    uncomfortable, you know, then don't do it.

2  (PAMF 166.)  And as the Deputy City Manager said in her deposition:

3       I don't remember exactly who said something like that ["we don't want
        to be too welcoming in Lunada Bay"] but I know a number of residents
4       did not like the idea of having the boulders [for seating] there. ... I think
        it's basically the consideration of loitering.
5

6  (PAMF 165.)

7       Plaintiffs Cory Spencer and Diana Milena Reed are "outsiders" who stand up

8  to bullying.  They don't want to "loiter," but do want to visit Lunada Bay without

9  fear of being harassed and the need to make a reservation with the police in advance.

10 They expect the City to enforce the laws equally – resident or non-resident.  They

11 bravely step forward to bring their claims and to stop the illegal bullying actions of

12 the Bay Boys, and police who have condoned it.  In addition to their direct standing

13 to seek injunctive relief, they are the voice of all outsiders who have or would like to

14 visit Lunada Bay but for the bullying actions of "locals" and the City's illegal

15 exclusionary activity.  In addition to Spencer and Reed, Plaintiff Coastal Protection

16 Rangers ("CPR"), is a California nonprofit dedicated to coastal access laws and

17 diversity.  (PAMF 109, 102-115.)  It, too, has legal standing to represent members

18 of the public who are denied equal access to this pristine and undeveloped coastline.

19 Like Plaintiffs Spencer and Reed, the people CPR protects do not want to "loiter"

20 but simply enjoy what amounts to a beautiful park in the heart of Los Angeles

21 County.  CPR protects people of color, the poor and other protected categories – the

22 very "outsiders" and "undesirables" that the City and the defendant Bay Boys have

23 for decades sought to exclude.  (PAMF 116.)  The City's direct discrimination and

24 localism deter and adversely affect the individual plaintiffs and the protected

25 categories of beachgoers whom CPR represents.  (PAMF 114-116, 118.)

26      The City's historic and present-day exclusionary practices include the

27 following:  pulling over, ticketing, and towing the vehicles of outsiders, and in

28 particular Hispanics and African Americans (PAMF 136-143, 154);

13672381.1

1 disproportionately detaining outsiders in its own 24-7 jail (PAMF 144-145);

2 refusing to diversify its police force (PAMF 150-151); condoning the use of "officer

3 discretion" in response to the exclusionary practices of the Lunada Bay Boys who

4 harass, bully, and cause bodily injury and property damage to outsiders (PAMF 163-

5 164, 166, 171, 172); ignoring its own ordinances meant to combat localism (PAMF

6 175); and declining to take any other steps to address outsiders' complaints and

7 make them feel welcome at a public beach (PAMF 175-187).  Consequently, the

8 California Coastal Commission has expressed concern about the City's impediments

9 to people from inland communities using the coast, providing coastal experiences to

10 lower-income as well as other underserved populations, and mitigating

11 discriminatory impacts to other protected-category beachgoers.  (PAMF 168.)

12      Here, the City fails to address what is important - because of its custom and

13 practice of exclusion, this matter requires three levels of Section 1983 Equal

14 Protection analysis:  (1) strict scrutiny; (2) intermediate scrutiny; and (3) rational

15 basis review.  42 U.S.C. § 1983.  And, the City ignores material facts.

## II.  STANDARD

17      In opposing summary judgment, the burden on the nonmoving party is not a

18 heavy one; the nonmoving party is simply required to show specific facts, as

19 opposed to general allegations, that present a genuine issue worthy of trial.  *Lujan v.*

20 *Defenders of Wildlife*, 504 U.S. 555 (1992).  Plaintiffs' burden in opposing this

21 motion for summary judgment is met by coming forward with appropriate evidence

22 showing a pending dispute of a material fact.  *Tucson Elec. Power Co. v. Pauwels*

23 *Canada Inc.*, 651 F. App'x 681, 682 (9th Cir. 2016).

24      And in deciding a summary judgment motion, the court must view the

25 evidence in the light most favorable to the nonmoving party and draw all justifiable

26 inferences in the nonmoving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477

27 U.S. 242, 255 (1986).  Moreover, circumstantial evidence alone may create a

28 genuine issue of material fact, sufficient to defeat a motion for summary judgment

as it may be more certain and persuasive than direct evidence.  *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1029-1030 (9th Cir. 2006).  The line between "isolated or sporadic incidents" and "persistent and widespread conduct" is not clearly delineated; there is no "bright line test" although it appears to require more than one or two.  The actual quantum of evidence therefore requires a fully-developed factual record at trial.  *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1096 (E.D. Cal. 2012).  Moreover, an unconstitutional policy or custom, pattern or practice by a municipality can be established by inference where there is evidence of continuous actions by police.  *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).

Here, there is an abundance of evidence demonstrating the City's longstanding custom and practice of illegal exclusivity.  This evidence includes declarations by witnesses Andrew Willis, Peter Neushul, and Philip King, who each confirm that Lunada Bay would have multiples more people using it but for localism.  (PAMF 167, 168.)  The City provides no evidence to rebut this.  (PAMF 169.)

## III.   STATEMENT OF FACTS[2]

**A.   The City's Practice And Custom Of Exclusion**

   **1.   The City Has A Longstanding Custom And Practice Of Unlawful Exclusion Of Outsiders, And Discourages Them From Coming To The City.**

The City's history of exclusion harkens back to the year when it was founded.  When Palos Verdes Estates was founded in 1923, and later incorporated as a city in 1939, Palos Verdes Homes Association deed restrictions barred people of color from the City.  (PAMF 131.)  The Palos Verdes Home Association did not repeal the

_____

[2] Plaintiffs are unable to fully and completely oppose the instant motion due to Defendants' continued withholding of evidence.  *See* PAMF 137, 146-147, 188-191; Decl. Lisa Pooley.  Plaintiffs request that this Court deny the City's motion, or in the alternative, delay consideration to enable the production and/or review of improperly withheld or belatedly produced evidence.  Fed. R. Civ. P. 56(d).

illegal deed restriction until 2000, and even after doing so, it is still handing out copies of its restrictions with the illegal provisions merely whited out.  (*Id*.)  The Palos Verdes Homes Association is located at City Hall and still works closely with the City.  (PAMF 133-134.)  The City took no action requiring the Palos Verdes Home Association to repeal the illegal deed restriction, nor did it pass a resolution or take other action condemning the illegal restriction.  (PAMF 132.)  Housed at the Civic Center facility with City Hall and the police, the Palos Verdes Homes Association still enforces deed restrictions in the City, and all homeowners in the City must abide under its jurisdiction.  (PAMF 133-134.)

For decades and continuing through today, the City has taken affirmative actions to continue to exclude minorities and other outsiders.  For example, to deter outsiders away from its streets and beaches, the City has targeted them with unfavorable treatment for traffic citations, parking tickets, and towed vehicles, while looking the other way when local residents break the law.  (PAMF 136-140, 142-143.)  Further, City police officers have openly expressed their dislike of Hispanic and African American people in the City, profiled these minorities, and pulled them over in disproportionate numbers.  (PAMF 136.)  When asked by Plaintiffs, the City refused to provide the number of traffic citations issued to outsiders versus residents and traffic citations issued to minorities versus white persons, even though it admitted it has this data.  (PAMF 137.)

In fact, the City and its local towing provider have a perverse financial incentive to target outsiders.  For at least 10 years, outsiders who dare to come to Palos Verdes Estates have risked having their vehicles impounded by a towing company owned by a City police officer, Robert Vanlingen.  (PAMF 139.)  After towing an outsider's vehicle, the police would leave them stranded without a way to get home.  (PAMF 140.)  Similarly, on one occasion, when an outsider was stranded because he had run out of gas, an officer responded by saying "You should have thought about that before you left your town."  (PAMF 141.)  Vanlingen towing

1   company and the City literally profit from towing outsiders' vehicles.  (PAMF 142.)

2          As a deterrent for outsiders who want to visit City streets and beaches, the

3   City of just 13,500 residents has its own 24-hour seven-day-per-week city jail.

4   (PAMF 144.)  High for a city of its size, the City averages between 350 and 400

5   bookings into its city jail each year.  (PAMF 145.)[3]  The City refused to estimate

6   what percentage of jail bookings are residents of the City versus outsiders, even

7   though it maintains this data.  (PAMF 146.)  Similarly, the City refused to estimate

8   how many bookings in the City jail involve persons of color versus Caucasians.

9   (PAMF 147.)

10          Further, the City has made it clear that it does not want African American

11   police officers working for it.  (PAMF 149-151.)  Since its incorporation in 1939,

12   the City has had just two African American police officers.  (PAMF 150.)  Both

13   were terminated.  (*Id*.)  One, Captain Kevin Scroggins, was terminated when he

14   complained the Chief called him "boy" and that, at a retirement party, City police

15   showed a slide of a white officer with a noose around his neck and made up with

16   blackface.  (PAMF 151.)[4]  In its treatment of outsiders, and in particular, minorities,

17   and its refusal to diversify its police force, the City has practiced exclusion of

18   outsiders over many decades.

19          The deterrent effect works.  Veteran City police officers report that they

20   rarely see African Americans or Latinos at Lunada Bay – perhaps twice in over 20

21   years.  (PAMF 158.)

22

23

24   _____

25   [3]  By contrast, the 2015 Bureau of Justice statistics' incarceration rates for cities and counties is 230 inmates per 100,000 residents.  (PAMF 148.)

26   [4]  In its excuse, the City argues the phrase was "buddy boy" and that the "blackface"

27   slide of a white officer with a noose around his neck was a film negative so he looked black.  (PAMF 151.)

28

### 2.    The City Has Been Aware Of And Condoned The Exclusionary Practices Of The Lunada Bay Boys For Decades.

Not only has the City engaged in its own exclusionary actions, but the City has condoned the exclusionary practices of the Lunada Bay Boys for decades. (PAMF 163-166, 171, 172.)  Hiding behind a "surf problem," the City allows the Bay Boys to do its dirty work.  Defendant Chief Kepley admits that "there have been conflicts and issues in the surfing culture" at Lunada Bay for "many, many years, as many as 50 years or more" and that localism continues to be a problem. (PAMF 171.)  As Bay Boy Peter McCollum explained to the Los Angeles Times in 1995, "We protected this beach for years.  This is why.  So we can have driftwood on the beach rather than Kentucky Fried Chicken boxes.  If the beach opened up it would be packed with low riders ... the rocks would be marked with graffiti." (PAMF 152.)  Veteran City police officers had knowledge of McCollum's "protective" actions toward outsiders and persons they viewed as undesirables coming to Lunada Bay.  (PAMF 153.)

While the City is strict in enforcing its laws against outsiders, in contrast, it is lenient when locals break the law.  (PAMF 186.)  For decades, the City allowed the Bay Boys to build and maintain an illegal structure ("Rock Fort") on City property, which was used as the Bay Boys headquarters.[5]  (PAMF 164, 165.)  For about five years, the City permitted Bay Boy local and Defendant Brant Blakeman to use a City-owned phone to coordinate efforts to exclude outsiders, including the harassment of Plaintiffs Reed and Spencer.  (PAMF 183.)  And when Bay Boy Michael Thiel directed the City to cancel its undercover investigation, the City agreed.  (PAMF 185; *see also* PAMF 186 (Defendant Alan Johnston texted a Bay Boy the same day:  "Could be a great help if ur there!!!  Supposed to be a police

---

[5]  Last November, facing pressure from this lawsuit, the City finally removed the long-in-place Rock Fort.

13672381.1

1  setup at our spot calling all gards [sic].").)

2      City police officers also know and socialize with Lunada Bay locals who

3  exclude outsiders from the City.  (PAMF 194.)  Police Officer Association President

4  Sergeant Steve Barber is friends with several Bay Boys, goes to barbecues and

5  parties with them, and communicates with them on his personal phone.  (PAMF

6  188.)  This includes Charles Mowat, who had informed Barber that he complained

7  directly to the City's elected officials about Defendant Chief Kepley's plan to

8  enforce surfing-related rules in Lunada Bay.  (PAMF 188.)  Although Barber

9  "investigates" his friends when they're accused of wrongdoing, the City did not

10  search Sergeant Barber's phone in response to Plaintiffs' discovery requests and

11  Sergeant Barber refused to provide his phone number or provide documents relevant

12  to this case off his personal phone.  (PAMF 188-191.)  When asked if the City

13  requested Sergeant Barber to preserve data on his personal phone, he answered "no"

14  and refused to provide further information based on an instruction from his lawyer.

15  (*Id.*)  When asked if he deleted information off his personal phone since the filing of

16  this lawsuit, again, he was instructed not to answer.  (*Id.*)

17      With the City's longstanding support of their behavior, the Bay Boys bully,

18  harass, and lash out at outsiders.  For example, during the first Lunada Bay Martin

19  Luther King, Jr. Day event on January 20, 2014, with City police present, a native

20  Hawaiian (and later Coastal Protection Ranger volunteer) Christopher Taloa was

21  told by a local wearing blackface and an afro wig:  "You don't pay enough taxes to

22  be here."  (PAMF 155.)  When Taloa attempted to surf Lunada Bay, he was asked:

23  "Who are the black guys on the cliff?"  (PAMF 156.)  And then he was told by a

24  local surfers that they owned the local police and judges.  (*Id.*)  Taloa was

25  threatened thusly:  "I'm going to have you arrested and have you f*@#&% in the ass

26  by a black or Mexican in the holding cell."  (*Id.*)  Further, in an effort to deter

27  outsiders, local surfers hurl pejoratives at them like "kook," "gook," or "fucking

28  faggots."  (PAMF 157.)  During a second Martin Luther King, Jr. Day celebration,

1   which Plaintiff CPR sponsored on January 16, 2017, associates of the Bay Boys
2   endangered event participants.  (PAMF 161.)  And when event participants
3   complained to the police, the police made it difficult on the CPR event participants
4   and acted uninterested.  (*Id*.)

5   While the City has long known about the Bay Boys' concerted efforts to
6   exclude outsiders, it does not take complaints seriously.  (PAMF 171, 174, 182.)
7   When outsiders complain to the City about locals breaking the law, the police
8   belittle the outsiders and respond with:  "I'm not a surfer."  (PAMF 179, 187.)  The
9   outsiders are discouraged from making complaints, and the complaints they do file
10  are not followed up on but merely logged as "incidents."  (PAMF 187.)  Because of
11  this, the City comes nowhere near capturing the complaints of all victims who have
12  been harassed.  (PAMF 173.)

13  ### 3.   Alleged City Efforts To Combat Illegal Exclusivity Are Woefully Inadequate And Ineffective.
14

15  The City claims to be combatting the localism problem, but action speaks
16  louder than words.  For about a decade, the City has had two ordinances related to
17  localism.  (PAMF 174.)  The first makes it illegal to block access to the beach, and
18  the second makes it illegal to dangerously operate a surfboard (surf-riding or
19  "dropping in" ordinance).  (PAMF 175.)  But the blocking access to the beach
20  ordinance has never been used and the surf-riding ordinance was allegedly first used
21  a few months ago – and only after a CPR volunteer insisted on follow up.  (*Id*.)

22  While it has a known problem with illegal localism, the City has failed to
23  train its personnel on coastal access laws, including its own municipal ordinances.
24  (PAMF 176.)  The City and its leaders call the illegal exclusivity a "myth" or "urban
25  legend."  (PAMF 177.)  When the Coastal Commission asked the City to address its
26  concerns, its request was not followed.  (PAMF 178.)  Moreover, the City has
27  provided no training to officers on surfing etiquette or coastal access laws and little
28  training on diversity issues.  (PAMF 179.)  It refuses to post signs indicating Lunada

Bay is a public beach and provides no maps or markers indicating trail locations. (PAMF 125.)  The City's police officers generally do not go down to the beach to enforce its laws.  (PAMF 180.)  The City's five claimed efforts to end localism are stale, ineffective, or otherwise overstated:  (1) it had boat patrols, (2) had undercover operations, (3) printed localism fliers, (4) placed an LED message board on the bluff, and (5) started community outreach to learn about the problem.  (PAMF 181, 182.)  But according to the City's own representatives, (1) the City's boats have not worked in about four years and were used to patrol surfers only rarely before, (2) the City has had just two undercover operations in about 17 years, one of which targeted the outsiders, not the locals, and a third that was cancelled at the request of a Bay Boy, (3) it printed somewhere between hundreds to 1,000 localism fliers, but does not know how many were distributed, let alone distributed to outsiders, (4) the LED message board was ineffective and only used about 10 times over 18 months, and (5) the community outreach program was not directed to help people being denied access, but was used to collect information from locals.  (PAMF 182.)

The City's own Planning Commission declines Coastal Commission recommendations, indicating the City does not want to be "too welcoming" to outsiders.  (PAMF 165.)  Like the Bay Boys, the City does not want outsiders using Lunada Bay and counsels outsiders that if they are uncomfortable facing the locals, then they should go somewhere else.  (PAMF 166.)  As the City's police dispatcher stated, "We know all of them.  They are infamous around here.  They are pretty much grown men in little men's mindset.  They don't like anyone that's not one of the Bay Boys surfing down there.  ...  But, you know, it is what it is.  If you feel uncomfortable, you know, then don't do it."  (*Id.*)

### 4. The City's Actions And Failures Have Resulted In The Harassment Of Outsiders And The Deterrence To Outsiders From Visiting The City.

The exclusionary practices of the City and the individual Defendants are effective.  Because of its and the Bay Boys' reputation, outsiders avoid Lunada Bay.

(PAMF 167, 168.)  The City admits that the Bay Boys have a gang mentality and attempt to dissuade outsiders from coming to City.  (PAMF 172.)  And the City admits the Bay Boys are territorial, discourage outsiders from using the beach, and intimidate outsiders.  (*Id*.)  Given the City's complicity, the Bay Boys' plan works.  While it's a prized wave, Lunada Bay is known to only have a few surfers using it.  (PAMF 167, 168.)  The City's best estimate is only between 5 to 15 surfers use Lunada Bay when the surf is good.  (PAMF 170.)  The Coastal Commission has also been made aware of the exclusionary practices of the City and that beachgoers are being denied access to Lunada Bay in violation of the law, and, thus, are continuing to suffer irreparable harm.  (PAMF 168.)  Lunada Bay is known as one of the most localized surf spots in the world.  (PAMF 167.)

The City's exclusion captures people of color, too.  The City admits that few persons of color and few others in protected categories use Lunada Bay.  (PAMF 158, 159.)  Its representatives stated they are only aware of two occasions of African Americans at Lunada Bay over 21.5 years, that Latinos do not go to Lunada Bay, and that fewer women visit Lunada Bay than men.  (*Id*.)

**B.      Plaintiffs Have Suffered Discrimination And A Loss Of Their Equal Protection Rights Upon Their Attempts To Visit The City.**

**1.      Plaintiff CPR Represents All People Who Want Coastal Access, Including Minorities And Women.**

Plaintiff CPR is a California nonprofit public benefit corporation whose mission is dedicated to ensuring public access to the California coast.  (PAMF 109, 110, 113.)  CPR has diverted resources to achieve open access for all at Lunada Bay, and if it were not for the illegal exclusivity by the City, these resources could be used for other important CPR projects related to coastal access.  (PAMF 117.)  CPR board members and/or volunteers, as well as the individuals they advocate for, have suffered from unlawful exclusion at Lunada Bay.  (PAMF 114-116.)  CPR's members, volunteers, and the people it helps include people of color, people with disabilities, women, and people of different sexual orientations who are concerned

about illegal exclusion from the coast.  (PAMF 115.)  CPR has investigated illegal exclusion by the City of Palos Verdes Estates, and, on behalf of its members and volunteers, wants to remedy unequal treatment against persons of color, women, the poor, and other protected categories – and, on behalf of its members and volunteers, specifically desires to address civil rights issues as they relate to beach access. (PAMF 114-116.)

### 2. In Response To Plaintiff Reed's Complaints Of Sexual Harassment By The Bay Boys, City Police Discouraged Her From Returning To Lunada Bay.

Plaintiff Diana Milena Reed is a female outsider who has been harassed at Lunada Bay with City complicity, and is deterred from visiting Lunada Bay. (PAMF 119-124.)  As the City describes in its Motion, Reed visited Lunada Bay on January 29, 2016 with her friend.  (Motion, p. 4.)  Lunada Bay Boys in automobiles drove around their vehicle and yelled "kooks," "you can't surf here," and profanities at them.  (*Id*.)  Other Bay Boys videotaped them in an efforts to keep them away. (*Id*.)  After descending to the beach, another Bay Boy called her a "whore" and then returned to yell profanities at them.  (*Id*.)  The next time Reed was harassed was on February 13, 2016.  (PAMF 121, 122.)  The day before, a Bay Boy made a personal visit to the City Manager and directed him to call off a planned undercover operation.  (PAMF 185.)  The City acquiesced.  (*Id*.)

On February 13, 2016, while Reed and her boyfriend were descending the trail to the beach, Bay Boys yelled profanities, filmed them, attempted to block their path, and told them they were "done."  (Motion, p. 5.)  When Reed reached the beach, she was approached by Defendants Brant Blakeman and Alan Johnston who "rushed" her in a hostile manner.  (*Id*.)  Defendant Johnston opened a can of beer in a way that sprayed on Reed's arm and camera.  (*Id*.)  He also acted in a sexual manner toward her and another woman by "grunting and making – making moans and noises resembling an orgasm.  He was thrusting and rubbing his torso in a sexual manner."  (*Id*.)  Reed asked why she was being filmed and the alleged

13672381.1

1  response was because she was "fucking sexy baby ... want to film it?"  Defendant

2  Johnston told her, "I seen you and I think I touched myself a little bit." (*Id*.)  And

3  Defendant Blakeman said, "I can do whatever I want ... because I feel like it."

4  Defendant Johnston told her he's "big enough to get the job done" while grunting

5  and moaning.  (Motion, p. 5.)  When he changed into his wetsuit, he intentionally

6  permitted the towel wrapped around him to open such that he exposed his penis to

7  Reed.  (*Id*.)

8       Reed's complaint and plea to the City for help on both days were disregarded.

9  (PAMF 121-124.)  The City made it hard for her to lodge complaints in the first

10 place, asking her:  "Why would a woman want to go to that beach and the Rock Fort

11 anyways?  There are rocks down there." (PAMF 120.)  Specifically, before being

12 harassed on February 13, 2016, she asked the police for an escort from the bluffs to

13 the beach but was told no officers were available. (PAMF 121.)  When she finally

14 had the attention of Defendant Chief Kepley and Captain Tony Best, they said that

15 they had photographs of the Lunada Bay Boys members. (PAMF 123.)  However,

16 they would not allow her to view the photos because it would impede the

17 investigation.  (*Id*.)  In response to her desire to return, the City told her to carry a

18 cell phone and travel in a large group.  (PAMF 124.)  Defendant Chief Kepley told

19 her it was not safe to go to Lunada Bay, that he wouldn't even tell a man to go down

20 there, and that he viewed it as a long-term problem.  (*Id*.)  As an outsider, Reed is

21 denied access to a public area granted to the City from the State, and forced to

22 announce her coming in advance only to be harassed. (PAMF 125.)  Rather than to

23 promote public access with simple things like a Coastal Commission recommended

24 park bench, seating, trail markers and maps, trail improvements, and signs, the

25 City's failed response was to make it hard to file a complaint, and tell her it is not

26 safe.  (*Id*.)

27 / / /

28 / / /

Case No. 2:16-cv-02129-SJO (RAOx)

13672381.1

### 3.    City Police Failed To Investigate A Bay Boy's Harassment And Battery Of Plaintiff Spencer.

Plaintiff Spencer grew up in La Mirada, more than 30 miles from Palos Verdes Estates, and now lives in Norco.  (PAMF 126.)  Supported by other outsiders, Spencer decided to address his fear and attempt to surf Lunada Bay in 2016.  Upon Spencer's arrival at Lunada Bay on January 29, 2016, a Bay Boy told him, "You can't surf here kook."  (Motion, p. 2.)  Spencer also recalled statements like "How many other places did you pass to get here to surf?" and "Why don't you fucking go home, you fucking kook."  (*Id.*)  When Spencer went in the water, a Lunada Bay Boy ran over him on purpose with his surfboard and left a half-inch cut on Spencer's wrist.  Even though Spencer had given the City advance notice that he and other outsiders would be coming to Lunada Bay, the City failed to arrive as requested and failed to patrol the shoreline near the water.  (*Id.*)  Moreover, even though he had been purposefully run over by a Bay Boy and attempted to tell a City policeman, the City showed no interest in investigating a crime against an outsider, even though the victim was a fellow police officer.  (*Id.*)  Given the custom and practice of discrimination by the City against outsiders, Spencer is afraid to return to Lunada Bay to use this public area.  (*Id.*)

## IV.    ARGUMENT

Plaintiffs sue the City under Section 1983 because the City has a custom and practice of excluding outsiders and other so-called undesirables which violates their right to equal protection laws.  The level of review the Court applies to determine whether the City's actions are constitutional depends on the class of people being denied equal protection.  First, where strict scrutiny is applied in a 1983 claim, the court finds a state action constitutional only where the action is justified by a compelling government interest that is narrowly tailored.  *W. States Paving Co. v. Washington State Dep't of Transp.*, 407 F.3d 983, 990 (9th Cir. 2005); *Harrington v. Scribner*, 785 F.3d 1299, 1307 (9th Cir. 2015).  Second, under intermediate scrutiny,

a state action is constitutional only if it serves an important government interest that is substantially related to that action.  *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1120 (N.D. Cal. 2015); *Jeldness v. Pearce*, 30 F.3d 1220, 1227 n.4 (9th Cir. 1994). Finally, under rational basis review, a court will uphold a state action if it is rationally related to a legitimate government interest.  *Sanchez* , 914 F. Supp. 2d at 1112.  Here, under all applicable levels, the City's actions are not constitutional.

Although Plaintiffs told the City of the framework for this lawsuit at the required meet-and-confer prior to the City filing its motion (and during the depositions of City employees), the City nevertheless attacks a straw man in its Motion.  The City argues that it is not liable because it has no duty to protect Plaintiffs from the acts of third parties, citing *De Shaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1988).  The City's argument and *De Shaney* miss the mark of Plaintiffs' claims.  Here, Plaintiffs are alleging the City *affirmatively* took actions that violated Plaintiffs' equal protection rights, not that the City failed to meet a duty.  Because the City affirmatively took such steps, and because of the established relationship between the Bay Boys and the police, the Court must evaluate their constitutionality under the appropriate test as described above, and not under cases discussing the City's duties or lack thereof.

Here, Plaintiffs have more than met their burden for opposing summary judgment in that they can establish, by direct evidence and by inference, that the City has engaged in and condoned a pattern and practice over at least a 50-year period of overt discrimination.

## A.   Plaintiff Coastal Protection Rangers Represents Individuals Whose Equal Protection Rights Have Been Violated By The City.

While the City argues that CPR cannot bring this action without citing a single authority and without having deposed CPR, it in fact has both associational and organization standing.  First, an entity has associational standing, also known as representational standing, if "(a) its members would otherwise have standing to sue

in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. California*, 159 F.3d 1178, 1181 (9th Cir. 1998).  "Individualized proof from the members is not needed where, as here, declaratory and injunctive relief is sought rather than monetary damages." *Id.*; *Retiree Support Grp. of Contra Costa Cty. v. Contra Costa Cty.*, 944 F. Supp. 2d 799, 806 (N.D. Cal. 2013).  Second, an entity has organizational standing if it alleges "(1) frustration of its organizational mission and (2) diversion of its resources to combat the particular [problem] in question." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).

Multiple courts have determined that an organization representing the rights of individuals has both associational and organizational standing.  In *Arc of Washington State Inc. v. Braddock*, 129 F. App'x 348 (9th Cir. 2005), a social services organization helping people with intellectual and developmental disabilities, and three developmentally disabled people, brought suit against the Washington State Department of Social and Health Services for violation of Section 1983 when the state placed restrictions on the number of individuals that could participate in a special Medicaid program.  The Ninth Circuit found that the organization's request for declaratory and injunctive relief did not require individual participation by its members, that the interests it sought to protect were germane to its purposes, that its members have standing to sue in their own right, and that the state's action tends to frustrate its mission and divert its resources.  *Id.* at 350-51 (internal citations omitted).  The Court came to the same conclusion in a case brought by an organization serving immigrants and three individuals who brought Section 1983 claims in *Comm. for Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1193-94 (N.D. Cal. 2009), finding that the plaintiff organization had both associational and organizational standing.

1    Likewise, CPR has both associational and organizational standing.  With

2    regard to associational standing, (a) its members, individuals who want to visit

3    coastal cities, have standing to sue in their own right although CPR does not have to

4    show such proof because it seeks only declaratory relief, (b) the interests CPR seeks

5    to protect here, access to Palos Verdes Estates and its beaches, are germane to its

6    purpose of providing public access to coastal areas, and (c) CPR's individual

7    members are not required to participate in this lawsuit.  (PAMF 109-118.)  With

8    regards to organizational standing, (1) the City's actions have frustrated CPR's

9    mission to protect public access to coastal areas; and (2) CPR's resources are being

10   diverted as a result of its efforts to gain this access at Palos Verdes Estates.  (*Id.*)

11   Therefore, CPR properly brings this action on behalf of itself and its members.

12   **B.    The City's Discriminatory Actions Against Racial Minorities Are A**
     **Violation Of Section 1983.**

13

14   Where a state action is alleged to be racially discriminatory, the courts apply

15   strict scrutiny to determine if the action is constitutional.  *Associated Gen.*

16   *Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp*., 713

17   F.3d 1187 (9th Cir. 2013); *W. States Paving Co*, 407 F.3d at 990 ; *Harrington* 785

18   F.3d at1307.  The court must find the state action to be unconstitutional unless the

19   action is justified by a compelling government interest that is narrowly tailored.  *Id*.

20   CPR represents all potential visitors to coastal areas, including members of

21   racial minorities who have been discriminated by police at, or have been dissuaded

22   from, visiting Palos Verdes Estates, including Lunada Bay.  The City admits that

23   minorities, particularly African Americans and Latinos, are discouraged from

24   visiting the City and Lunada Bay because of its exclusionary police activities.

25   (PAMF 131-136, 138-145, 147-162.)  The police pull over and jail minorities at a

26   disproportionate rate, and refuse to meaningfully diversify its police force.  (PAMF

27   136, 138, 147, 150.)  Further, the police are aware of and condone the activities of

28   the Bay Boys, who use racial profanities against minorities and engage in activities

such as wearing blackface during a Martin Luther King Day event.  (PAMF 152, 155, 156, 158, 185, 188-197.)   In short, minorities never make it to the beach.  (PAMF 158.)

Here, this evidence shows that the City has developed a practice and custom of excluding individuals who are members of racial minorities.  Under strict scrutiny, the City must first identify a compelling government interest that this act of exclusion serves.  Not only has the City failed to state any such government interest but it will not be able to credibly do so.  There is no interest that excluding minorities serves except racism – like the old restrictive covenants of the Palos Verdes Homes Association.  The City's actions with regards to racial minorities are not constitutional under strict scrutiny.

**C.     The City's Gender Discrimination Violates Section 1983.**

Where a state action is alleged to discriminate on the basis of gender, the courts apply intermediate scrutiny to determine if the action is constitutional.  *Norsworthy*, 87 F. Supp. 3d at1120.  Under intermediate scrutiny, a state action is unconstitutional unless it serves an important government interest that is substantially related to that action.  *Id.*

Plaintiff Reed personally experienced the City's discriminatory practices.  (PAMF 119-125, 185.)  When she was sexually harassed at Lunada Bay (PAMF 121, 122), City police discouraged her from making a complaint (PAMF 120), said that it was unsafe for her at Lunada Bay (PAMF 124), and that she shouldn't return unless she brought a cell phone and traveled in a group (*Id.*).  Further, Plaintiff CPR represents all potential visitors to coastal areas, including women who have been discriminated by City police or have been dissuaded from visiting Palos Verdes Estates, including Lunada Bay.  (PAMF 115, 116.)  As the City admits, far fewer women visit Lunada Bay than men.  (PAMF 159.)

It is evident from the undisputed facts that the City has engaged in a practice and custom of gender discrimination.  Under intermediate scrutiny, the City will be

1  unable to articulate an important government interest that is to be served by

2  discriminating against women.  Therefore, the City's practice and custom of

3  ignoring the complaints of women who want to visit Palos Verdes Estates, including

4  Lunada Bay, should be found unconstitutional.

**D.    Even If The Exclusion Of Outsiders Is Analyzed Under Rational Basis Review, The City Has Admitted It Has No Rational Basis For This Action.**

7          Where discrimination is alleged against a group that is not a protected class,

8  such as racial minorities or women, courts apply rational basis review to determine

9  if an action against the group is constitutional.  *Sanchez*, 914 F. Supp. 2d at 1112.

10  Courts will uphold a state action if it is rationally related to a legitimate government

11  interest.  *Id.*

12          Individuals who are not residents of Palos Verdes Estates, including

13  inlanders, the working class, and the poor, have experienced consistent

14  discrimination by the City over decades.  (PAMF 136, 137, 139-147, 163-172, 174-

15  198.)  For example, City police failed to pursue an investigation after Plaintiff Cory

16  Spencer informed them he was harassed by the Bay Boys and one cut him off in the

17  water, causing injuries.  (PAMF 129.)  Further, CPR represents non-residents who

18  want to visit Palos Verdes Estates but have been discriminated against by City

19  police or have been dissuaded from visiting the City, including Lunada Bay.  For

20  decades, the City has made a practice of pulling over outsiders, towing their cars to

21  a location owned by a City police officer, and jailing them at a disproportional rate,

22  all the while failing to take any measures to enforce its own ordinances regarding

23  localism.  An untold number of outsiders are turned away by the City before they

24  make it to the beach – as evidenced by the disproportionately low numbers of people

25  that visit Lunada Bay.  (PAMF 167-170.)

26          Rational basis review applies to the outsiders.  While rational basis review is

27  the lowest level of review the Court may undertake, it is not a rubber stamp.  Here,

28  the City's actions against outsiders should not be found to be constitutional under

13672381.1

rational basis review for the plain reason that the City has admitted it has no rational basis for these actions.  (PAMF 198.)  In response to Plaintiff Spencer's Interrogatory No. 1 asking, "Do YOU contend that a RATIONAL BASIS exists for YOU to treat RESIDENTS of the CITY differently from NON-RESIDENTS of the CITY with regard to facilitating lawful, safe, and secure access to LUNADA BAY?," the City responded, "No" and denied that it treated residents differently from non-residents.  (*Id*.)  Then, in response to a Plaintiff Spencer's Interrogatory No. 2, asking the City to explain the nature of the rational basis for this disparate treatment, the City responded, "Not applicable."  (*Id*.)  In any case, the City would be hard-pressed to identify a legitimate government interest that is rationally related to its practice and custom of stopping non-resident motorists, treating outsiders differently with respect to enforcement of city ordinances, and refusing to take outsiders' complaints to the police seriously.  Thus, even under the lowest standard of equal protection review, the City's actions cannot be found to be constitutional.

## V.    CONCLUSION

In sum, injustice anywhere is a threat to justice everywhere.  And whatever affects one directly, affects all indirectly.  Much more than any reference to a beach movie remake or other trifle, this lawsuit is about addressing present-day illegal exclusivity imposed and condoned by the City against the Plaintiffs and all beachgoers (would-be and otherwise) who are deterred by the City.  Summary judgment or adjudication is not warranted for Defendants City and Chief Kepley in this case.  Plaintiffs have raised sufficient material facts that must be heard at trial.  For these reasons, Plaintiffs ask the Court to deny the City's and Chief Kepley's Motion in its entirety.

DATED:  July 31, 2017                           HANSON BRIDGETT LLP

By:    */s/ Kurt A. Franklin*
_____
KURT A. FRANKLIN
Attorneys for Plaintiffs