# EXHIBIT 10

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3                     -   -   -

 4   CORY SPENCER, an individual,  )
     DIANA MILENA REED, an         )
 5   individual; and COASTAL       )
     PROTECTION RANGERS, INC., a    )
 6   California non-profit public  )
     benefit corporation,          )
 7                                 )
                  Plaintiffs,      )
 8                                 )
          vs.                      ) No. 2:16-cv-02129-SJO (RAOx)
 9                                 )
     LUNADA BAY BOYS; THE          )
10   INDIVIDUAL MEMBERS OF THE     )
     LUNADA BAY BOYS, including    )
11   but not limited to SANG LEE,  )
     BRANT BLAKEMAN, ALAN          )
12   JOHNSTON, MICHAEL RAE         )
     PAPAYANS, ANGELO FERRARA,     )
13   FRANK FERRARA, CHARLIE        )
     FERRARA, and N.F.; CITY OF    )
14   PALOS VERDES ESTATES; CHIEF   )
     OF POLICE JEFF KEPLEY, in his )
15   representative capacity; and  )
     DOES 1-10,                    )
16                                 )
                  Defendants.      )
17   _____)

18                    DEPOSITION OF

19                    STEVEN BARBER

20                 IRVINE, CALIFORNIA

21                  JUNE 22, 2017

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24
     REPORTED BY:  DENISE J. PAGANO, CSR. 7233
25   FILE NO.:  AB064C5
```

Atkinson-Baker Court Reporters
www.depo.com

1      Q      Did you ever just talk about that with any                    12:20

2   officers?

3      A      Not really, no.  I wasn't involved.

4      Q      Do you know who he accused of being a black face?

5      A      No, I think Strahan was maybe in the picture, but

6   it wasn't -- from what I heard, it wasn't black-faced.

7   Somehow they got the negative of the picture and produced

8   that as being in black face, and when you see a negative of

9   a photo, it may appear like that, so that's all I know about

10  that.

11     Q      Now, related -- do you remember there being an

12  allegation related to a noose, also?

13     A      I remember it was something with a noose around the

14  neck of somebody, but I don't know.

15     Q      And have you ever seen nooses in the Department in     12:21

16  your 20 years in terms of someone's locker or that type of

17  thing?

18     A      No, not at all.

19     Q      Do you know a person named Richard Delmont?

20     A      Yes.

21     Q      Who is Richard Delmont?

22     A      A former police officer from our department.

23     Q      How long was Mr. Delmont --

24     A      Mr. Delmont worked for approximately 15 to 16

25  years, I think, as a police officer.  I could be wrong with

80

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1   that, though.                                                12:22

 2           MR. RICHARDS:  Kurt, can we take a break?

 3           MR. FRANKLIN:  Sure.

 4           MR. RICHARDS:  I'm dying here, sorry.

 5                        (Recess taken.)

 6   BY MR. FRANKLIN:

 7      Q    So we're back on the record, and you're still under

 8   oath.

 9           Do you understand that?

10      A    Yes, I do.

11      Q    We had just started talking about someone that used

12   to work for the police department named Richard Delmont?

13      A    Yes.

14      Q    And he retired?  Is that what he did, or did he

15   just leave?                                                  12:29

16      A    It was a medical retirement.

17      Q    What's the number for that?  Is that a four

18   thousand series?

19      A    Yeah, it's something like that, yeah.

20           MR. FRANKLIN:  You know, we've --

21           MR. FLAUTT:  (Nods head.)

22           THE WITNESS:  Yeah.

23   BY MR. FRANKLIN:

24      Q    So what position?  Was he an officer, a sergeant

25   or --
```

81

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1     A     He was an officer.                                          12:30

2     Q     Officer.   And do you know, is he currently dating

3  someone in the Department?

4     A     Just broke up.

5     Q     Okay.   Who was that?

6     A     Jaylin Albao.

7     Q     How do you spell the first and last?   I'm sorry.

8     A     J-a-y-l-i-n, Albao, A-l-b-a-o.

9     Q     And what is Jaylin Albao's position within the

10  Department?

11    A     Property and evidence officer.

12    Q     And as property and evidence officer, that's not a

13  sworn position?

14    A     No.

15    Q     If you know, do you know how long -- I guess now     12:30

16  he's not working, Mr. Delmont -- and Ms. Albao were dating?

17    A     I don't know exact number of years.

18    Q     Was it years, do you think?

19    A     Yeah, it was a couple years I would think.

20    Q     And a bit of a non sequitur, but you said property

21  and evidence.

22          Is that person in charge of once an officer brings

23  in evidence, it goes into an evidence locker; is that --

24    A     Correct.

25    Q     How big is that locker?

82

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1      A      It depends.  We have several of them for --          12:31

2      Q      Okay.

3      A      -- different items.

4      Q      And what are the types that you have?

5      A      Anywhere from a tiny one for flash disks containing

6   photographs to a large one that can hold a rifle or a

7   firearm, a long firearm.

8      Q      And if it was something bigger, do you contract

9   with somewhere else, or what happens then?

10     A      No, that's the initial locker.  Then she takes them

11  out to a secured location in our garage area that's an

12  alarmed room that's a much bigger property evidence locker.

13     Q      And then if I recall reading the reports related to

14  that robbery of the liquor store or event at the liquor

15  store involving N.F., cell phones from that would have          12:32

16  gone into -- if they were taken, would have gone into the

17  evidence locker?

18     A      Correct.

19     Q      And do you know, would those cell phones still be

20  there or would they have been released by now?

21     A      Probably because it's been adjudicated, they would

22  have been released.

23     Q      And it would have been -- it would have been

24  released -- do they wait for either there to be a plea and

25  finally adjudicated or trial?

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1      A     Yeah, that's usually how it goes with our property     12:33

2  until it's been actually adjudicated and we get the notice

3  from the court and everything, so . . .

4      Q     Once there is a charge, does evidence move from the

5  City evidence locker to the DA's evidence locker?

6      A     No.

7      Q     Okay.  So in terms of -- is there a chain of

8  custody, and it stays in the chain of custody of the police

9  department --

10      A     Correct.

11      Q     -- and if evidence is needed for the trial, the

12  chain of custody, whoever checks it out for the trial brings

13  it?

14      A     That's correct.

15      Q     Does -- forensics on phones, does the police     12:33

16  department do its own forensics on phones or hire somebody

17  out?

18      A     We do not do our own.

19      Q     Do you know who you hire it out to?

20      A     To do that case?  I don't know, but I know we had a

21  contact at Torrance Police Department, who was an officer

22  there, who does a lot of phone forensics.

23      Q     So you -- is it more often than not it goes to a --

24  I'm going to call it a sister police department -- another

25  police department who might have that expertise to look at

84

1   it or to a private entity or --                    12:34

2       A    That would be normally how we would do things.

3       Q    To another police department first?

4       A    If they're available and can do it, yes.  And we

5   usually ask for permission through, you know, a captain or a

6   sergeant from their department.

7       Q    And are there -- in terms of the evidence, is there

8   a -- if a phone -- is there a chain of custody log that goes

9   to another department where --

10      A    Of course, yes.

11      Q    And then it gets locked up by whomever that is that

12  takes receipt of it on the other end?

13      A    Yes.

14      Q    As you sit here today, you don't know what happened

15  in those -- N.F.'s phone in particular from that day?      12:35

16      A    I do not, no.

17      Q    Is there a rule at Palos Verdes Estates where

18  officers are not permitted to bring their cell phones into

19  the field, personal cell phones?

20      A    Personal cell phones?  No.

21      Q    Do officers bring their personal cell phones into

22  the field?

23      A    Yes, they do.

24      Q    Is there -- how do officers -- do -- have you ever

25  received a text from another officer in the field?

Atkinson-Baker Court Reporters
www.depo.com

```
 1              MR. FLAUTT:  Vague and ambiguous as to how?  What    12:36

 2     phone?

 3     BY MR. FRANKLIN:

 4          Q    On your personal phone?

 5          A    Yes.

 6          Q    And how often might you receive a text from another

 7     officer when he or she is in the field or you are in the

 8     field?

 9          A    It could be a couple times a day.

10          Q    Do you have the cell phone numbers of the other

11     officers available to you?

12          A    Yes, I do.  Not all.

13          Q    Is there a -- what type of -- what type of personal

14     phone do you have that might go into the field?

15          A    My personal cell phone?                            12:37

16          Q    When I say what type, is it an Apple or --

17          A    It's an Apple iPhone.

18          Q    Do you know what -- kids know better than me --

19     what?

20          A    Oh, what type it is?

21          Q    Yes.

22          A    6S Plus.

23          Q    Okay.  And do you -- do you carry that into the

24     field with you virtually every time you go into the field?

25          A    Yes.
```

Steven Barber
June 22, 2017

1    Q    And would it be more common for people than not for    12:37

2    people to bring their personal phones into the field?

3    A    It's probably more common.

4    Q    Does the City issue a phone available for officers?

5    A    They do -- they do issue a phone for certain

6    positions, and then we do have patrol assigned phones in

7    case we need to contact a victim or something.

8    Q    So your personal phone, they don't get your

9    personal number when you call?  Is that the idea?

10    A    No, it's a separate phone from the City that they

11    issue to us, that they issue to the office who is out in the

12    field; so there are two patrol phones and one watch

13    commander phone that is a City phone.

14    Q    So that goes back to the staffing.  There is --

15    each car has a phone --                                      12:38

16    A    Correct --

17    Q    -- in it?

18    A    -- that is assigned.

19    Q    Okay.  And what type of phones are in the patrol

20    cars when they go out?

21    A    Apple, Apple iPhones, and they're old, so I don't

22    know what kind.

23    Q    Something older than 6S?

24    A    Oh, yeah.

25    Q    How often -- is it more -- because they're old, do

Atkinson-Baker Court Reporters
www.depo.com

```
 1   officers use their personal phones more frequently than the    12:39
 2   City-assigned phones or --
 3        A    For only --
 4             MR. FLAUTT:  Object to the extent it calls for
 5   speculation.
 6             Answer if you know.
 7   BY MR. FRANKLIN:
 8        Q    In your experience?
 9        A    Just for personal calls to family and friends.
10        Q    So what would -- so they use their -- they use
11   their phone for calls to family and friends.  Occasionally,
12   to other officers; is that right?
13        A    Which is usually just personal stuff.
14        Q    Have you ever texted -- I'll as you personally --
15   or have you ever received a text from an officer that might   12:39
16   be even tangentially work-related?
17             MR. FLAUTT:  Object.  Vague and ambiguous as to
18   what it was received on.  Was it received on a work phone?
19   On a personal phone?
20             MR. FRANKLIN:  We're talking about his personal
21   phone.
22             MR. FLAUTT:  Okay.  Object to the extent that it
23   violates his privacy rights under the California
24   Constitution and the U.S. Constitution to his only personal
25   phone and the contents thereof.
```

88

Atkinson-Baker Court Reporters
www.depo.com

```
 1   BY MR. FRANKLIN:                                          12:40

 2       Q    I'm not asking about the contents.  I'm asking have

 3   you ever received something --

 4       A    Related to work?

 5       Q    Yes.

 6            MR. FLAUTT:  Vague and ambiguous as to related to

 7   work.

 8            Can we get a little bit more definition?

 9            MR. FRANKLIN:  No.

10   BY MR. FRANKLIN:

11       Q    Do you understand what related to work means?

12            MR. FLAUTT:  Do you understand?

13            THE WITNESS:  It could be a multitude of different

14   things.  I mean, I don't --

15            MR. FLAUTT:  For instance, if he's calling in sick   12:40

16   or somebody else was.

17            MR. FRANKLIN:  Well, let's have it related to work.

18   BY MR. FRANKLIN:

19       Q    How about related to something you observed in the

20   field?

21       A    No.

22       Q    How about related to something where somebody else

23   observed in the field?

24       A    No.

25       Q    That's never happened?
```

89

```
 1      A    Not that I can recall, no.                    12:40

 2      Q    How about coverage issues, covering -- can you

 3    cover my assignment, that type of thing?

 4      A    Can you cover a shift?

 5      Q    Yes.

 6           MR. FLAUTT:  Object to the extent it's not actually

 7    work-related.

 8           THE WITNESS:  To cover a shift?

 9    BY MR. FRANKLIN:

10      Q    Yes.

11      A    I suppose I've texted somebody if they're available

12    to work, yes.

13      Q    And have you -- have you ever communicated with

14    Mr. Mowat on your personal phone?

15      A    Yes.                                           12:41

16           MR. FLAUTT:  Object to the extent, again, it

17    violates his privacy rights.

18    BY MR. FRANKLIN:

19      Q    That's "yes"?  Have you ever communicated with

20    Mr. Blakeman on your personal phone?

21           MR. FLAUTT:  Object to extent it violates his

22    privacy rights, especially if it's not work-related.

23           THE WITNESS:  Mr. Blakeman?  Brant Blakeman, no.

24    BY MR. FRANKLIN:

25      Q    How about his wife?  Have you ever communicated
```

90

1    with her?                                                                    12:42

2        A    No.

3        Q    Have you ever communicated with any of the Ferraras

4    on your personal phone?

5        A    No.

6        Q    Have you ever communicated with any of the Papayans

7    on your personal phone?

8        A    No.

9        Q    Have you ever communicated with Sang Lee on your

10   personal phone?

11       A    No.

12       Q    Have you ever communicated with Mr. Delmont on your

13   personal phone?

14       A    Yes.

15       Q    Have you ever communicated with any elected           12:42

16   official at Palos Verdes Estates on your personal phone?

17       A    No.

18            MR. FLAUTT:    Vague and ambiguous as to elected

19   official.

20   BY MR. FRANKLIN:

21       Q    Have you ever communicated with Joe Bark on your

22   personal phone?

23       A    No.

24       Q    And I'm going to run down a list so to make it

25   quicker in the questioning.

91

Atkinson-Baker Court Reporters
www.depo.com

| | | | |
|---|---|---|---|
| 1 | A | Okay. | 12:43 |
| 2 | Q | I'm going to run down a list of people that you | |
| 3 | | communicated with them on your personal phone -- | |
| 4 | A | Okay. | |
| 5 | Q | -- and after I -- | |
| 6 | | MR. FRANKLIN:  You could have a standing objection. | |
| 7 | | MR. FLAUTT:  Okay. | |
| 8 | | MR. FRANKLIN:  That's fine. | |
| 9 | | MR. FLAUTT:  With regards to the privacy, | |
| 10 | | obviously. | |
| 11 | | BY MR. FRANKLIN: | |
| 12 | Q | Charlie Ferrara? | |
| 13 | A | No. | |
| 14 | Q | Alan Johnston? | |
| 15 | A | No. | 12:43 |
| 16 | Q | Do you know Alan Johnston? | |
| 17 | A | Yes. | |
| 18 | Q | Leonora Buchema? | |
| 19 | A | No. | |
| 20 | Q | Anthony Buchema? | |
| 21 | A | No. | |
| 22 | Q | John Camplin? | |
| 23 | A | No. | |
| 24 | Q | Do you know John Camplin? | |
| 25 | A | I do know John Camplin. | |

92

Atkinson-Baker Court Reporters
www.depo.com

1    Q    How do you know John Camplin?                          12:44

2    A    He is a resident or lived in PV -- I don't know if

3    he lives in PV Estates anymore.   He is a surfer who surfs

4    Lunada Bay.   I've gotten to know John a little bit through

5    Charlie Mowat, but that's the extent of John.

6    Q    A barbecue or something?

7    A    Yeah, yeah, he's been around for a long time,

8    though, so . . .

9    Q    How about Michael Thiel?   Have you -- I'm going

10   back to the -- have you ever texted him on your personal

11   phone --

12   A    No.

13   Q    -- or communicated to Michael?

14        Did you know Michael?

15   A    Yes.                                                    12:44

16   Q    How do you Michael Thiel?

17   A    He's a resident of PV Estates, who, also, frequents

18   Lunada Bay, but I don't even know if he surfs.

19   Q    Do you know -- other than frequent Lunada Bay, do

20   you know what his interest is in Lunada Bay?

21   A    Just that he lives in Lunada Bay.

22   Q    Oh, the community?

23   A    Yeah.

24   Q    How about Mark Griep?

25   A    I have never texted Mark Griep.

93

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

| | | | |
|---|---|---|---|
| 1 | Q | Do you know Mark Griep? | 12:45 |
| 2 | A | I know who Mark Griep is. | |
| 3 | Q | Who is mark Griep? | |
| 4 | A | He is just a guy who comes to Lunada Bay to surf. | |
| 5 | Q | Do you know anything else, other than he comes to | |
| 6 | | Lunada Bay to surf? | |
| 7 | A | No. | |
| 8 | Q | David Mellow? | |
| 9 | A | Yes, I know David -- or are we asking if I know him | |
| 10 | | or -- | |
| 11 | Q | Have you communicated with him on your phone? | |
| 12 | A | No. | |
| 13 | Q | Do you know David Mellow? | |
| 14 | A | Yes. | |
| 15 | Q | How do you know David Mellow? | 12:45 |
| 16 | A | He is known to surf the Lunada Bay area. | |
| 17 | Q | Do you know, had he been involved in any | |
| 18 | | surf-related incidents? | |
| 19 | A | Yes. | |
| 20 | Q | Do you recall how many? | |
| 21 | A | I think the only -- the only -- the one that I know | |
| 22 | | of, that was the only one that I know of. | |
| 23 | Q | Is that the one involving the Diana Reed -- | |
| 24 | A | Yes. | |
| 25 | Q | -- and Jordan Wright? | |

94

1      A    Yes.                                                    12:45

2      Q    How about Dan Dreiling, Junior?  Do you know who he

3  is?

4      A    Yes.

5      Q    Have you communicated with him on your phone?

6      A    No.

7      Q    Do you remember -- what do you know about Dan

8  Dreiling, Junior?  Do you know, does he surf Lunada Bay?

9      A    I don't know if Dan -- if D.J. -- that's his name.

10  I don't think he surfs Lunada Bay very often, no.  He may

11  have in the past.

12     Q    Do you -- D.J. or Dan Dreiling, Junior, he's the

13  former chief's son; is that right?

14     A    Correct.

15     Q    And did he grow up on that bluff there?  Did he      12:46

16  live on that bluff?  Was -- did Mr. Dreiling live in one of

17  those houses --

18     A    No, he was never one of those that lived in the

19  house.

20     Q    Okay.  Do you know, was Dan Dreiling, Junior ever a

21  victim of surf-related incidents?

22     A    Not that I know of.

23     Q    How about Pete Bavros?  Do you know that name?

24     A    I know that name, yes.

25     Q    How do you know that name?

Atkinson-Baker Court Reporters
www.depo.com

```
 1      A    He's a -- I believe he grew up in PV Estates and        12:46
 2  surfs Lunada Bay.
 3      Q    And have you had interaction with him?  How do you
 4  know he surfs Lunada Bay?
 5      A    I've -- actually, I spoke to him not too long ago
 6  regarding an incident that happened to Torrance Beach, which
 7  is the beach right over from our city.
 8      Q    Yes.
 9      A    Just the jurisdiction of the City of Torrance, and
10  this is a few weeks ago.
11      Q    What was that incident?  Do you remember?
12      A    He witnessed somebody getting punched.
13      Q    How was --
14      A    That was in Torrance.
15      Q    How was it that he contacted you about that?         12:47
16      A    He was a witness to it, and he contacted us in the
17  parking lot above the beach.
18      Q    Oh, okay.
19           And you never communicated on your personal phone
20  with Mr. Bavros?
21      A    No.
22      Q    How about Ron Bornstein?  Does that name --
23      A    Don't know that name.
24      Q    Joe Malam, M-a-l-a-m?
25      A    Malam?  No, I don't know that name.
```

96

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    Q    And then Mr. Mowat, you think you have communicated    12:48

2  with him on your personal phone?

3    A    Yes.

4    Q    And communicated with him via Facebook?

5    A    I don't even know if Charlie's on Facebook.

6    Q    And James Reinhart, do you know that name?

7    A    No.

8    Q    Fred Straeter, do you know that name?

9    A    Yes, I do.

10   Q    How do you know Fred Straeter?

11   A    Fred Straeter is a -- lived with Charlie for a

12  little bit, and he was an artist -- or is an artist.  He

13  likes to do paintings of, like, Lunada Bay and stuff like

14  that.

15   Q    Have you communicated with Fred Straeter on his    12:48

16  personal phone?

17   A    No.

18   Q    When was the last time you communicated with

19  Mr. Straeter?

20   A    With -- with Mr. Straeter?

21   Q    Yeah.

22   A    I have not --

23   Q    In any way.

24   A    Yeah, I have not seen Fred Straeter in maybe over a

25  year now.

97

Atkinson-Baker Court Reporters
www.depo.com

1      Q      Do you remember when he lived with Charlie Mowat,      12:49
2  about what period?
3      A      I don't know the exact dates.
4      Q      Does Mr. Mowat have like an in-law unit or
5  something, or was he just renting a room or --
6      A      I believe he was renting a room.
7      Q      How about Mark Bonney?  Do you know that person?
8      A      No.
9      Q      David Hilton?  Do you know that person?
10      A      I do not know David Hilton.
11      Q      Eric Hilton?  Do you know that person?
12      A      Yes, I know him.
13      Q      How do you know Eric Hilton?
14      A      Been arrested by us several times.
15      Q      What types of things was he arrested by you for?      12:49
16      A      You name it; drugs, driving on a suspended license,
17  violation of a restraining order.
18      Q      A civil restraining order?  Was it --
19      A      Yes.
20      Q      -- a domestic issue?
21      A      It was his mother.
22      Q      And I take it you've not communicated with Eric
23  Hilton on your personal phone?
24      A      No.
25      Q      Kelly Logan?  Do you know that name?

98

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
1     A    I've heard of the name, but I don't know him.        12:50

2     Q    John Rall, R-a-l-l?

3     A    No.

4     Q    Zen Del Rio?  Do you know that name?

5     A    I've heard of that name.  I believe I've heard his

6  name brought up as being a surfer from Lunada Bay.

7     Q    Do you know how you -- who you would have heard

8  that from?

9     A    Just I -- probably from Charlie Mowat.

10    Q    How about Chad Beede?  Do you know that name?

11    A    No.

12    Q    Mark Kohler?

13    A    No.

14    Q    We talked about Jason Buck.

15         Do you know Jason Buck outside of him getting hit     12:50

16  by Mr. VanDine?

17    A    Yeah, he's a realtor, yes.  I've known Jason for a

18  little while.

19    Q    Have you -- do you -- other than that incident,

20  have you had occasion to interact with Mr. Buck?

21    A    No.

22    Q    Tony Pazanowski, do you know that name?

23    A    I know Tony, yes.

24    Q    How do you Mr. Pazanowski?

25    A    Through just having -- he grew up in Palos Verdes
```

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    Estates, surfed Lunada Bay, friends with Charlie Mowat.          12:51

2    That's about it.

3        Q    Have you been to barbecues with Mr. Pazanowski in

4    attendance?

5        A    Maybe one at Charlie Mowat's house.

6        Q    Does he have regular barbecues, or does he

7    entertain a lot, Mr. Mowat?

8        A    You know what?  I know, because he flies a lot, so

9    no.

10       Q    Okay.  What airline does he work for?  Do you know?

11       A    I think he's United.

12       Q    Derek -- D-a-i -- Daigneault, like a French name,

13   D-a-i-g-n-e-a-u-l-t.

14       A    No.

15       Q    Danny Ecker?                                             12:52

16       A    No.

17       Q    Greg Cahill?

18       A    No.

19       Q    Alex Hooks?

20       A    No.

21       Q    Alex Gray?

22       A    Yes.

23       Q    How do you Alex Gray?

24       A    Alex is a friend of Charlie's.  He's also a

25   professional surfer, and he grew up in Palos Verdes and

Atkinson-Baker Court Reporters
www.depo.com

```
 1    surfs in Lunada Bay.                                          12:52

 2         Q     And have you socialized with Alex?

 3         A     At one of Charlie's barbecues, yes.

 4         Q     How about Dudley Gray?  Do you know that?

 5         A     I know he's a judge.  I've never met him.

 6         Q     Is that Alex's father, to your understanding?

 7         A     Yes.

 8         Q     How about a name, Peter McCollum?  Do you know that

 9    name?

10         A     I know the name.

11         Q     How do you know the name?

12         A     He was involved in an incident -- '95.  I don't

13    know.  I had just gotten on, I believe.  There was a -- an

14    argument, and it made the news.  I know he was on it.  I

15    know the video shows him kind of yelling on the video, but    12:53

16    that's all.  I've never met Mr. McCollum in my life, though.

17         Q     Okay.  So the video of Mr. McCollum interacting on

18    the top of the bluff with -- I think it's a Mr. Hagens and

19    Hamboy.  Do you recall seeing that video?

20         A     Yes, I did see that.

21         Q     When did you see that?

22         A     Probably not long after it happened.

23         Q     And were you assigned to -- was he charged by the

24    Palos Verdes Estate Police Department?

25         A     I don't recall.  I --
```

Steven Barber
June 22, 2017

1       A       To me?                                                    14:55

2       Q       To others?

3       A       No.

4       Q       Related to Diana Reed?

5       A       I've not seen any from Charlie.

6       Q       I'm going to represent to you that there is a

7    group, MMS, from Mr. Mowat that says something like this:

8    "My source tells me that a class-action lawsuit in Lunada

9    Bay is in the works."  Let me start this over.

10           This text is at 10:20 a.m. on March -- excuse me.

11   This text is on Wednesday, March 30th at 9:00 -- a little

12   after 9:00 a.m., and that's 2016.

13           Charlie Mowat says, quote, "My source tells me that

14   a class-action lawsuit is in the works against the," quote,

15   "'bay boys,'" close quote, "and the City of PVE.  Probably   14:56

16   that Diana bitch.  Watch out for subpoenas.  Great time to

17   be on the low down" -- "down low."  Excuse me.

18           Does that sound like Charlie to you?

19       A       I --

20           MR. FLAUTT:  Objection.  Lacks foundation, vague

21   and ambiguous.

22           THE WITNESS:  -- have no idea.

23           MR. FLAUTT:  Calls for speculation.

24   BY MR. FRANKLIN:

25       Q       Is it fair to say that you've never talked  to

```
 1    Charlie -- when Charlie refers to a source, do you know what    14:56
 2    he's talking about?
 3        A    I have no idea.
 4             MR. FLAUTT:  Lacks foundation, calls for
 5    speculation.
 6    BY MR. FRANKLIN:
 7        Q    Is Charlie friends with anybody else in the police
 8    department?
 9        A    Probably not as close as I am.
10        Q    How about -- are there some others he's friends
11    with?
12        A    He may know or be familiar with officers.
13        Q    Who do you think he -- who would you estimate that
14    he's familiar with?
15        A    To tell you the truth, maybe Rick Delmont, who    14:57
16    used to work for us.
17        Q    And what is it that sticks out in your mind with
18    Rick Delmont?  You've seen him at Charlie's house before?
19        A    Uh-huh, yes.
20        Q    Do you -- are you familiar with an Internal -- an
21    IA.  I actually don't know if it's an IA, Internal Affairs
22    investigation, or an IA -- some other type of IA related to
23    an alleged leak of the undercover operation in February
24    2016?
25        A    I'm not aware of any Internal Affairs
```

147

Steven Barber
June 22, 2017

1    investigation.                                                    14:58

2         Q    Did anybody interview you related to the leak

3    related to the undercover operation?

4         A    Well, I wasn't even aware that there was a leak.  I

5    had heard that an operation was canceled, so, no, nobody

6    contacted me within the Department.

7         Q    Would -- if I represented to you that the

8    allegation involving bluff reports later involving Diana

9    Milena Reed and Alan Johnston and Brant Blakeman, do you

10   recall there being an investigation related to that?

11        A    Regarding Alan Johnston?

12        Q    And Mr. Blakeman?

13        A    Yeah, I do recall that incident.

14        Q    And is that --

15             MR. FLAUTT:  Vague and ambiguous, compound.        14:59

16   BY MR. FRANKLIN:

17        Q    Is that the one where Ms. Reed claimed that she was

18   sexually harassed?

19        A    Yes.

20        Q    Do you know -- was that an incident report that was

21   completed on that or something else initially?

22        A    I don't know what the initial report was, but I

23   know it was investigated as a crime.

24        Q    But if it was initially investigated as an incident

25   report, it would fall in one of those buckets; it's not

148

Atkinson-Baker Court Reporters
www.depo.com

1    going anywhere we talked about?                                    14:59

2           MR. FLAUTT:  Calls for speculation, improper

3    hypothetical.

4           THE WITNESS:  Not necessarily.

5    BY MR. FRANKLIN:

6       Q    Why is it not necessarily?

7       A    Well, they are reviewed by our captains and our

8    chief.

9           MR. FLAUTT:  It also lacks foundation.

10   BY MR. FRANKLIN:

11      Q    Is every incident report reviewed by the captain

12   and the chief?

13      A    Every report that we create and generate, a copy of

14   it is placed into the captain's and chief's box.

15      Q    And is it up to the captain and the chief to decide   15:00

16   whether an incident report should be elevated and, perhaps,

17   turned into a crime report?

18      A    Most of the time, they are the people, yes.

19      Q    Are there occasions when that's somebody else?

20      A    It could be the detective sergeant who oversees the

21   Detective Bureau.

22      Q    And in February 2016, who was the detective

23   sergeant?

24      A    Sergeant Lou Coalinga.

25      Q    And would there typically be documentation of who

                                                                      149

Steven Barber
June 22, 2017

1    makes that recommendation of an investigative report being          15:00

2    elevated?

3         A    I'm not sure on any type of documentation.

4         Q    Do you recall going out to Mr. Blakeman's house on

5    February 29th, 2016 about noon to talk to him about what

6    happened down -- between him and Mr. Johnston and Diana

7    Milena Reed?

8         A    Yes.

9         Q    What do you recall?

10        A    Sergeant Coalinga knew that I knew Brant, had -- I

11   guess, during their course of their investigation, they had

12   found out that Mr. Blakeman had possibly videotaped the

13   incident, so because I have a better rapport with Brant

14   Blakeman, I Lou Coalinga asked me to go and ask him if he

15   has a copy of it.                                                    15:02

16        Q    And do you know what happened?

17        A    Brant said, "I don't have anything.  I'm sorry."

18        Q    So he told you, "I don't have any video of that"?

19        A    He wouldn't -- well, I mean, I wouldn't say he

20   wouldn't cooperate, but he just said, "No, I have nothing.

21   I really don't want to comment on it."

22        Q    And in terms of interacting with an officer, if

23   someone's untruthful as part of that, is that a crime?

24        A    It -- if someone's untruthful?

25        Q    You've tried to follow-up on a lead and someone

```
15:02
1    says I don't have something --
2         A    If someone's untruthful, you have to have proof
3    that they're being untruthful; and if they're impeding an
4    investigation, I guess that could be a crime, yes.
5         Q    At any time, have you learned that Mr. Blakeman, in
6    fact, did have a video of that incident?
7         A    I have never learned one way or the other.
8         Q    So throughout this litigation, no one has shown you
9    a copy of that video?
10        A    Of the actual incident between them --
11        Q    Yes.
12        A    -- that occurred on -- no.
13        Q    Would that be something that would have been
14   helpful in terms of your criminal investigation, had you had
15   that video?                                            15:03
16        A    Anytime you would have a video of an incident for a
17   crime, or even if it's not a crime, yeah, of course, that
18   would be helpful.  That's why I went and asked for if he
19   actually had something.
20        Q    And your memory is that he said he did not?
21        A    That's correct.
22        Q    And then, at some point, had you heard a rumor that
23   Alan Johnston was involved in that?
24        A    Yes.
25        Q    Who did you hear that rumor from?
```

151

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1    A    Honestly, I don't recall, but it was something that    15:04
2    was going around some of the people that surf Lunada Bay.
3    Q    And would it have been Mr. Mowat?
4    A    I don't -- no, it wasn't Charlie.
5    Q    Do you have an estimate of who it might have been,
6    your best recollection?
7    A    I don't.  I heard the name, and I gave it to our
8    detectives.
9    Q    What is the process of if a victim wants to
10   follow-up on something that's an incident report?  Is it --
11   do they have to initiate that follow-up?
12   A    Not necessarily, no.
13   Q    I guess I'm trying to understand, because if I
14   understood you correctly earlier, if it's just an
15   investigation report, it pretty much ends there?    15:05
16        MR. FLAUTT:  Misstates prior testimony.
17        THE WITNESS:  Investigation?  No, the investigation
18   continues.
19   BY MR. FRANKLIN:
20   Q    Okay.  Incident report.  In terms of the incident
21   report, it pretty much ends there?
22   A    Well, no, I think I said earlier that a captain or
23   a chief could look at it and then decide that, hey, we're
24   gonna look into this.
25   Q    And if a captain or chief doesn't do that, an

Steven Barber
June 22, 2017

1    to tell them to put out the fire, and they did.                    16:45

2        Q    And when you said you would ask a family to put the

3    barbecue away, what would that be based on?  This ordinance

4    or some other ordinance or --

5        A    A camp fire, to me, personal opinion, is an open

6    flame, open fire.  If they have a Weber or a little Hibachi,

7    it's contained fire, so, therefore, the fire danger isn't as

8    great with the little Hibachi as it is with the actual open

9    camp fire.

10       Q    No, I understood that -- but maybe I misheard you.

11   I thought you said if you saw a family with a Weber or a

12   Hibachi, you'd ask them to put it away?

13       A    Yes, I said that.

14       Q    And what is the reason for that?

15       A    Because you -- obviously, the Municipal Code          16:46

16   section.  You can't cook outside.

17       Q    Has that ever happened to you?

18       A    That has never happened to me.

19       Q    How about dogs off a leash?

20            Is that an ordinance that's enforced?

21       A    Yes.

22       Q    Down on the coast, too?  If someone has their dog

23   off leash, would they be cited?

24       A    People have been cited for that, yes.

25       Q    Have you cited people for having their dogs off

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | leash? | 16:46 |
| 2 | A    Yes, I have. | |
| 3 | Q    And in the Lunada Bay area? | |
| 4 | A    Not in the necessarily in the Lunada Bay area, no. | |
| 5 | Q    And if that happens, is it serendipity, that | |
| 6 | they're coming up from their walk down below when you see | |
| 7 | them with their dog off, or would you actually wait for them | |
| 8 | to come up? | |
| 9 | A    Like I said, I never had to.  I've never done that, | |
| 10 | so I can't speculate on that. | |
| 11 | Q    There is an ordinance related to dogs on the beach | |
| 12 | or in the ocean not being permitted at all is my | |
| 13 | understanding, 6.08.070?  Are you familiar with that | |
| 14 | ordinance? | |
| 15 | A    I was not. | 16:47 |
| 16 | Q    At some point, did you take a -- do the officers | |
| 17 | take a test on the local ordinances? | |
| 18 | A    No, when we receive our training from our field | |
| 19 | training officers, we receive -- I know personal opinion -- | |
| 20 | or personal experience, I receive a little cheat sheet of | |
| 21 | certain municipal codes.  Probably some of them are so | |
| 22 | outdated and maybe even have been removed from the -- from | |
| 23 | the books, but I do know that dog off leash is one, dog, a | |
| 24 | loud-barking dog is another.  These are common ones we | |
| 25 | respond to. | |

220

Steven Barber
June 22, 2017

1          Q       Can you tell me your cell phone number?          16:48

2          A       No.

3                  MR. FLAUTT:   Vague and ambiguous as to which cell

4     phone.

5     BY MR. FRANKLIN:

6          Q       Your personal cell phone number?

7                  MR. FLAUTT:   I'll raise the same privacy objections

8     as before and instruct not to answer.

9                  THE WITNESS:   No.

10    BY MR. FRANKLIN:

11         Q       Okay.  Do you intend to follow your counsel's

12    instruction on that?

13         A       Yes, I am.

14                 MR. FRANKLIN:   Okay.  What I suspect will end up

15    doing is reserving time at the end, and we'll have a call --    16:49

16    Ed, are you instructing him not to answer on that?

17                 MR. RICHARDS:   Well, I'm not -- you keep -- with

18    all due respect, you keep fluctuating back and forth as to

19    what you think you're allowing me to do or not.

20                 MR. FRANKLIN:   There is a stipulation in place

21    specific as to phone numbers on this.

22                 MR. RICHARDS:   Yes, I would be instructing him.  We

23    have consistently not done that.  We have consistently

24    limited the cell phone numbers of officers, including the

25    chief, as you know.

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | Is it in person orally or in writing?  What's the common | 17:07 |
| 2 | interaction? | |
| 3 |     A    It all depends.  It could be an e-mail.  It could | |
| 4 | be orally right in person. | |
| 5 |     Q    Text? | |
| 6 |     A    Text, no. | |
| 7 |     Q    Who is responsible for -- does the POA have an IT | |
| 8 | system or computer system that it uses? | |
| 9 |     A    No. | |
| 10 |         MR. FLAUTT:  Vague and ambiguous. | |
| 11 | BY MR. FRANKLIN: | |
| 12 |     Q    Does the POA own a computer? | |
| 13 |     A    Yes, a laptop. | |
| 14 |     Q    Where is that held? | |
| 15 |     A    In a drawer that the police department has allowed | 17:07 |
| 16 | us to keep in the station -- | |
| 17 |     Q    Do you know what -- | |
| 18 |     A    -- locked. | |
| 19 |     Q    -- kind of laptop it is? | |
| 20 |     A    Couldn't tell you. | |
| 21 |     Q    Is there a person who's in charge of that computer? | |
| 22 |     A    No, I don't think we've used it -- | |
| 23 |     Q    Okay. | |
| 24 |     A    -- for a long time. | |
| 25 |     Q    Since you've not -- is it fair to say you've not | |

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

```
 1   received a request from anyone to reserve data on your      17:08

 2   phone --

 3       A    No.

 4       Q    -- personal phone?

 5            MR. FLAUTT:  Compound, possibly calls for

 6   attorney-client communication, possibly calls for attorney

 7   work product.

 8            Instruct not to answer as to those specific

 9   subjects.

10            Do you understand?

11            THE WITNESS:  I do.

12            MR. FLAUTT:  Please answer the question.

13            THE WITNESS:  No.

14   BY MR. FRANKLIN:

15       Q    And have you deleted any personal data off your    17:09

16   phone in the last -- since March 29th, 2016?

17            MR. FLAUTT:  Instruct not to answer with regards to

18   the same privacy objections raised earlier.

19            THE WITNESS:  I -- yeah, I would -- I'm not gonna

20   answer that question.

21   BY MR. FRANKLIN:

22       Q    So I'm going to ask you, in terms of to preserve

23   data, you can follow your attorney's instructions on it, but

24   to not delete any information, at least from here on out, if

25   no one has told you that, related to the civil lawsuit,
```

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1   because we plan to go to court to ask for that information,        17:09

2   so I just ask you not to delete anything.

3         MR. FLAUTT:   So noted.

4   BY MR. FRANKLIN:

5      Q    Did anybody ask you not to delete anything off

6   iCloud?  You said you have an iPhone; is that right?

7         MR. FLAUTT:   Instruct not to answer with regards

8   to any attorney-client communications, with regards to any

9   attorney work product.

10        Please answer aside from those.

11        THE WITNESS:   Has anyone asked me to?

12  BY MR. FRANKLIN:

13     Q    To not destroy any information?

14     A    Nobody said anything, but there was an e-mail from

15  the chief, but I don't remember exactly what it said.        17:10

16     Q    And did you follow that e-mail from the chief?

17     A    Yes, I did.

18     Q    Okay.  So did his e-mail ask you to preserve

19  information?

20     A    From what I recall, yeah.  It's been a while.

21     Q    Okay.  And is it fair to say you have preserved

22  information, then?

23     A    I have -- yes, I have.

24     Q    Okay.  And that includes information on your

25  personal phone?

239

Steven Barber
June 22, 2017

```
 1            MR. FLAUTT:   Instruct not to answer.              17:10

 2            THE WITNESS:   Yeah, I'm not going to answer that.

 3            MR. FLAUTT:   Same objections.

 4   BY MR. FRANKLIN:

 5       Q    Does the police department keep data on how many

 6   tickets are issued, vehicle tickets?

 7       A    Yes.

 8       Q    Is that in a report somewhere?

 9       A    I know all tickets are entered by our data entry

10   clerk.

11       Q    Do you know, do ticket citations go to the

12   municipal budget?  Where does that money go?

13            Do you know?

14       A    I think a part of it does -- part of them do, yeah.

15       Q    Okay.                                              17:12

16       A    Some has to go towards the court services.

17       Q    Do you have an estimate -- have you -- in your 20

18   years, have you had a time where you were assigned to

19   Traffic Enforcement?

20       A    As patrol officers, part of our job is Traffic

21   Enforcement, but not exclusively Traffic Enforcement.

22       Q    Is -- the motorcycle police officers, that's what

23   they do mostly?

24       A    Correct.

25       Q    Do you have an estimation of how many tickets Palos
```

240

Atkinson-Baker Court Reporters
www.depo.com

1     Q    Do you have any knowledge of Charlie Mowat    17:20

2  complaining to elected officials about Chief Kepley's

3  enforcing surfing rules in Lunada Bay?

4       MR. FLAUTT:   Lacks foundation, calls for

5  speculation, double hearsay.

6       THE WITNESS:   I do recall hearing about him writing

7  some correspondence.

8  BY MR. FRANKLIN:

9     Q    Who did you hear that from?

10    A    I -- I think it was probably from Charlie, himself.

11    Q    What did Charlie tell you?

12    A    Charlie told me that he was not happy with the way

13  that the Chief of Police was handling this so-called

14  localism issue in Lunada Bay.

15    Q    And when did Charlie tell you that?    17:21

16    A    Right after he did it.

17    Q    Okay.

18    A    Yeah.

19    Q    And did you have any discussion with Charlie

20  further or --

21    A    No, nothing more.

22    Q    And do you have any knowledge about Mr. Thiel

23  making a similar comment?

24    A    Yeah, I heard from Charlie that he and Mr. Thiel

25  wrote letters.

246

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

1     Q   Did you have an understanding that Charlie was   17:21

2  encouraging people to write letters?

3     A   No, I didn't get that impression at all.

4     Q   Do you have any understanding that Mr. Thiel

5  communicating with the City manager about an undercover

6  operation and the City better not do an undercover

7  operation?

8     MR. FLAUTT:  Compound, lacks foundation, calls for

9  speculation, double hearsay.

10     THE WITNESS:  I do not recall hearing about that.

11  BY MR. FRANKLIN:

12     Q   Is this the first time you've heard about it.

13     A   No, I -- at the time, I didn't hear about it, but

14  that came out later.

15     Q   When did it come out later?   17:22

16     A   When I was reading -- I believe it was through the

17  Complaint and everything.  I think that was in there.  If

18  not, it was from the -- possibly, from the chief.

19     Q   Did you review any documents in preparation for

20  today?

21     A   Yes.

22     Q   What documents did you review?

23     A   I reviewed a couple of crime reports and incident

24  reports.

25     Q   What crime report did you review?  Do you remember?

Steven Barber
June 22, 2017

Atkinson-Baker Court Reporters
www.depo.com

REPORTER'S CERTIFICATE

I, DENISE J. PAGANO, CSR. No. 7233, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness, STEVEN BARBER, was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 5th day of July, 2017.

*Denise J. Pagano*
DENISE J. PAGANO, CSR NO. 7233

290

Steven Barber
June 22, 2017