UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   CV 16-02129 SJO (RAO)         DATE: February 12, 2018

TITLE:   Cory Spencer et al. v. Lunada Bay Boys et al.

========================================================================

PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz                              Not Present
Courtroom Clerk                               Court Reporter

COUNSEL PRESENT FOR PLAINTIFF(S):    COUNSEL PRESENT FOR DEFENDANT(S):

Not Present                                   Not Present

========================================================================

PROCEEDINGS (in chambers): ORDER (1) GRANTING DEFENDANTS CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S MOTION FOR SUMMARY JUDGMENT [Docket No. 268]; (2) SUA SPONTE DISMISSING PLAINTIFFS' STATE LAW CLAIMS

This matter comes before the Court on Defendants City of Palos Verdes Estates ("City") and Chief of Police Jeff Kepley's ("Chief Kepley") (collectively, "City Defendants") Motion for Summary Judgment ("Motion"), filed July 14, 2017.  Plaintiffs Cory Spencer ("Spencer"), Diana Reed ("Reed), and Coastal Protection Rangers, Inc. ("CPRI") (collectively, "Plaintiffs") opposed the Motion ("Opposition") on July 31, 2017.  City Defendants replied ("Reply") on August 7, 2017.  Per the Court's Order dated October 3, 2017, Plaintiffs filed a supplemental opposition to the Motion ("Supplemental Opposition") on October 18, 2017, and City Defendants filed a supplemental reply ("Supplemental Reply") on October 27, 2017.  The Court found this matter suitable for disposition without oral argument and vacated the hearing set for September 5, 2017.  See Fed R. Civ. P. 78(b).  For the following reasons, the Court **GRANTS** City Defendants' Motion and **DISMISSES** the action as to Plaintiffs' remaining state law claims.

I.   FACTUAL AND PROCEDURAL BACKGROUND

An oft cited quote with dubious origins remarks that "there is nothing, nothing, more sad than a surfer who used to surf."[1] Perhaps inspired by similar sentiments, Plaintiffs initiated this lawsuit on March 29, 2016, alleging that the infamous surfer gang known as the "Lunada Bay Boys" uses threats, intimidation, and violence to illegally exclude nonresident visitors from access to parks, beaches, and ocean in Palos Verdes Estates ("PVE").  (See Compl. ¶¶ 1-2, 17, ECF No. 1.) Buoyed by City Defendants' deliberate failure to investigate or prosecute these crimes, the Lunada Bay Boys have brought this practice, known as "localism" in the surfing community, to its malfeasant peak. (See Compl. ¶¶ 17-18.)  Against this backdrop, Plaintiffs have raised a multitude

---

[1] See, e.g., Ned Barrett, *Before Your Next Excuse: A True Story of Addiction, Loss, Hope, and the Power of Choice* ch. 24 (1st ed. 2015).

Page 1 of  19

Case 2:16-cv-02129-SJO-RAO   Document 545   Filed 02/12/18   Page 2 of 19   Page ID #:19222

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
Scan Only ___

CASE NO.:   CV 16-02129 SJO (RAO)          DATE: February 12, 2018

of charges against both City Defendants and alleged individual members of the Lunada Bay Boys ("Individual Defendants").  (*See generally* Compl.)

  A.   Procedural History

The history of this action is notoriously long and replete with evidentiary disputes, allegations of spoliation, sanctions, and discovery issues.  In the interest of brevity, the Court will only address the few items relevant to the disposition of the instant Motion.

On March 29, 2016, Plaintiffs filed their Complaint against City Defendants, the Lunada Bay Boys, and Individual Defendants, the latter of whom includes Defendants Sang Lee, Brant Blakeman, Alan Johnston, Michael Papayans, Angelo Ferrara, Frank Ferrara, Charlie Ferrara, and N.F.[2] (*See generally* Compl.)  In addition to asserting several state law claims against the Individual Defendants, the Complaint asserted three causes of action against City Defendants, including: (1) violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 ("Equal Protection Claim") (2) violation of the Privileges and Immunities Clause of Article IV of the United States Constitution pursuant to 42 U.S.C. § 1983 ("P&I Claim"); and (3) violation of various provisions of the California Coast Act ("Coastal Act Claim").  (*See* Compl. ¶¶ 61-94.)  The Court dismissed Plaintiffs' P&I and Coastal Act Claims on July 11, 2016, leaving only the Equal Protection Claim intact.  (Order on the City's Mot. to Dismiss ("Dismissal Order") 13, ECF No. 84.)  In addition, the Court denied Plaintiffs' motion for class certification on February 21, 2017.  (ECF No. 225.)

City Defendants filed the instant Motion on July 14, 2017; Plaintiffs filed their Opposition on July 31, 2017.  (*See generally* Mot., ECF No. 268; Opp'n, ECF No. 299.)  On August 8, 2017, Plaintiffs filed a Motion for Administrative Relief ("Relief Motion") requesting that the Court order the City Defendants to produce responsive material from PVE police officers' personal cellular phones. (Relief Mot. 5, ECF No. 397.)  The Court denied the request as Plaintiffs had not been diligent in pursuing this discovery, but allowed Plaintiffs to supplement their Opposition based on late-produced discovery recently submitted by City Defendants.  (10/3/17 Minute Order 11-12, ECF No. 471.)

On October 30, 2017, Plaintiffs requested leave to file a motion for sanctions ("Sanctions Motion") against City Defendants and Brant Blakeman based on their alleged failure to preserve a number of text messages sent between Brant Blakeman and Sang Lee on a cell phone provided by City Defendants pursuant to the Palos Verdes Estates Disaster District Program ("DDP"). (Sanctions Mot., ECF No. 508.)  The Court ultimately denied Plaintiffs' requested relief against City

---

[2] Plaintiffs filed a similar action against Defendants in Los Angeles County Superior Court (the "State Court Action") on August 4, 2016.  *See Spencer, et al. v. Lunada Bay Boys, et al.*, Case No. BC629596.  The State Court Action has since been stayed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
Scan Only ___

CASE NO.: **CV 16-02129 SJO (RAO)**    DATE: **February 12, 2018**

Defendants on February 12, 2018, finding that no causal connection existed between the loss of the text messages and City Defendants' conduct. (*See generally* Order, ECF No. 544) The Court did, however, grant monetary sanctions against Brant Blakeman. (Order 4-5.)

    B.    <u>Factual Background</u>

The following facts are either not in genuine dispute or construed in the light most favorable to Plaintiffs, the non-moving parties. Lunada Bay, a world class site for surfing, is an asset of priceless value and exceptional and dramatic beauty. (City Defs.' Response in Opp'n to Pls.' Additional Material Facts ("OPAMF") ¶ 107, ECF No. 338.) While the State of California granted Lunada Bay and the rest of the Palos Verdes Estates Shoreline Preserve to the City, its use and enjoyment is reserved for the People of California. (OPAMF ¶ 108.) "Localism," or the practice of excluding or attempting to exclude nonresident surfers, is a longstanding and well-known issue in Lunada Bay. (OPAMF ¶ 171.)

CPRI, along with Spencer and Reed, brought this action in order to secure "lawful, safe, and secure access to Lunada Bay to engage in recreational activities" for all visitors to the City. (Compl. ¶ 30, ECF No. 1.) CPRI is a California non-profit public benefit corporation whose mission is dedicated to ensuring public access to the California coast. (OPAMF ¶ 109.) According to Mark Slatten, a representative from CPR, several of CPR's board members and volunteers "would have liked to have surfed, dived, taken photographs, hiked, or even just enjoyed nature and the beach at Lunada Bay but were afraid to because of the reputation that it had for localism." (GDMF ¶ 57.)

    1.    <u>Spencer's Harassment at Lunada Bay</u>

Spencer is an El Segundo police officer and surfer who lives in the inland community of Norco, over sixty miles from Lunada Bay. (OPAMF ¶ 126.) Prior to January 2016, Spencer visited Lunada Bay approximately eight to ten times, but did not attempt to surf. (Pls.' Genuine Dispute of Material Facts ("GDMF") ¶¶ 1-2.) While he did not experience any intimidation, vandalism, or any other harmful act during those visits, Spencer "believes" he experienced localism on one of the visits because there was a "group of guys at their local spot being locals." (GDMF ¶¶ 1-2; Dep. Pl. Cory Eldon Spencer ["Spencer Dep."] 82:19-84:03, ECF No. 270-4.) Specifically, "they were there and looking at who's coming and going." (Spencer Dep. 83:14-15.)

In January 2016, Spencer decided to make plans to surf at Lunada Bay with a group of other surfers. (GDMF ¶ 3.) Prior to the planned visit on January 29, 2016, Spencer contacted the Palos Verdes Estates Police Department ("PVEPD") to request extra police patrols. (GDMF ¶ 4.) Spencer also made arrangements to bring a security guard with him to Lunada Bay to watch over the surfers' cars. (Spencer Dep. 99:09-14.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.: <u>CV 16-02129 SJO (RAO)</u>   DATE: <u>February 12, 2018</u>

During his visit on January 29, 2016, an unidentified individual told Spencer that "you can't surf here kook."[3] (GDMF ¶ 6.) Other individuals made similar statements such as "how many other places did you pass to get here to surf?" and "why don't you fucking go home, you fucking kook." (GDMF ¶ 7.) While Spencer was in the water, one of the individuals ran into Spencer with his surfboard and sliced open his hand. (GDMF ¶ 9.) The assailant claimed that Spencer was paddling in the sun glare and that he had not seen him. (GDMF ¶ 10.) Spencer continued to surf at least one more wave. (GDMF ¶ 11.)

Upon leaving the water, Spencer encountered five or six police officers, three police vehicles, and a motorcycle. (GDMF ¶ 13.) Spencer approached the police officers to thank them for showing up and to express his appreciation. (GDMF ¶ 14.) He told one of the police officers about the collision, including stating "[t]he guy is going to claim sun glare and whatnot" caused it. (GDMF ¶ 14.) Spencer did not ask for a formal police report or follow up on the matter. (GDMF ¶ 16.) After January 29, 2016, Spencer did not communicate to any of the City Defendants about the incident. (GDMF ¶ 17.)

Spencer planned another trip to Lunada Bay in February to observe for incidents and watch other surfers' property while they surfed. (GDMF ¶ 19.) Spencer again contacted the PVEPD prior to his trip. (GDMF ¶ 20.) During the visit, several individuals called him a "kook" and asked him "what are you doing?" (GDMF ¶ 21.) Spencer recognized one of the individuals as Defendant Brant Blakeman, who stood nearby circling the visiting surfers and "sticking his GoPro in [their] faces." (GDMF ¶ 6; Spencer Dep. 143:13-144:16.) Spencer also observed the presence of two or three police vehicles, two patrolmen, and a sergeant. (GDMF ¶ 20.)

In the subsequent months, Spencer visited Lunada Bay between three and five times. (GDMF ¶ 25.) He observed unidentified individuals slowly drive by while using cell phones, and then later observed more unidentified individuals show up, but no violence occurred during these subsequent visits. (GDMF ¶ 26.) On March 4, 2016, Spencer emailed Chief Kepley to thank him and PVEPD for providing extra police patrols but also noted that the localism problem at Lunada Bay had not been effectively addressed. (GDMF ¶ 24.) Spencer, an El Segundo police officer, "used to work with one of [the PVEPD officers]." (GDMF ¶ 27.)

   2.   <u>Reed's Harassment at Lunada Bay</u>

Reed, like Spencer, is a nonresident visitor to Lunada Bay. (OPAMF ¶ 119.) The first visit to Lunada Bay that Reed can remember occurred on January 6, 2016. (GDMF ¶ 27.) Reed was

---

   [3]   The word "kook" is a pejorative term in surfing jargon, which is "generally applied to the rank of beginners or any surfer thought to be in violation of surfing's codes." (Compl. 12 n.18. [internal citations omitted].)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.: CV 16-02129 SJO (RAO)　　　　　DATE: February 12, 2018

there for two hours and did not experience harassment, intimidation, or vandalism, as no local surfers were present. (GDMF ¶ 29.) On January 29, 2016, Reed returned to Lunada Bay to surf with her boyfriend. (GDMF ¶ 30.) Unidentified individuals in automobiles drove around Reed's vehicle and yelled "kooks," "you can't surf here," and various profanities; other unidentified individuals videotaped her. (GDMF ¶ 31.) When Reed and her boyfriend arrived at the beach, an unidentified individual called Reed a "whore," and then returned to yell profanities at them. (GDMF ¶ 32.)

A police officer approached Reed and asked Reed what was going on. (GDMF ¶ 32.) Reed described the incident, and the officer inquired whether she wanted to file a police report, which she did. (GDMF ¶ 32.) The police then detained a suspect, but informed Reed that because they did not overhear the words yelled, they could not arrest the individual. (GDMF ¶ 33.) The police further counseled Reed against filing a citizen's arrest, saying that it was "not a good idea to file a citizen's arrest" because "people at Lunada Bay have a lot of money and can hire good lawyers and that will put [Reed] in a risk of getting into a lawsuit." (GDMF ¶ 34; Dep. Pl. Diana Milena Reed ["Reed Dep."] 135:14-136:11, ECF Nos. 270-2; 270-3.) The police told Reed that the outcome would be the same whether she filed a police report or undertook a citizen's arrest, but that filing a police report would not expose Reed to civil liability. (GDMF ¶ 35.) Reed provided the officers with her driver's license, which contained her address, when the officers wrote their report. (GDMF ¶ 36; Reed Dep. 138:19-139:08.)

On February 5, 2016, Reed returned to Lunada Bay. (GDMF ¶ 37.) No local surfers were present and her boyfriend surfed without incident. (GDMF ¶ 38.) On February 13, 2016, Reed again returned to Lunada Bay. (GDMF ¶ 39.) Reed asked the PVEPD for an escort from the bluffs to the beach but was told no officers were available. (OPAMF ¶ 121.) Upon arrival, Reed was accosted by several individuals who yelled "various profanities of various instances." (GDMF ¶ 40.) A middle-aged male and teenage boy filmed her and her boyfriend, attempted to block their path, and told them they were "done." (GDMF ¶ 41.)

When she arrived at the beach, Defendants Alan Johnston and Brant Blakeman approached Reed, "rushed" her in a hostile manner, asked whether she wanted a beer, and "opened a can of beer in a way that sprayed on [her] arm and camera." (GDMF ¶ 42.) During the exchange, Brant Blakeman got close to Reed's face and filmed her. (GDMF ¶ 42.) In addition, Alan Johnston acted in a sexual manner toward Reed and another woman by grunting, making moans and noises resembling an orgasm, and thrusting and rubbing his torso. (GDMF ¶ 43.) Reed asked why she was being filmed and Alan Johnston responded that it was because she was sexy, also adding that he's "big enough to get the job done" while grunting and moaning. (GDMF ¶ 43.) Lastly, while changing out of his wetsuit, Alan Johnston permitted the towel wrapped around him to open, exposing his penis. (GDMF ¶ 45.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   CV 16-02129 SJO (RAO)              DATE: February 12, 2018

Reed attempted to call the police but did not have reception on her cell phone. (GDMF ¶ 44.) Reed then returned to the top of the bluff and approached a police officer to explain what had occurred. (GDMF ¶ 46.) The police officer listened, and then escorted Reed back down the bluff to identify the men. (GDMF ¶ 47.) Alan Johnston and Brant Blakeman were no longer present. (GDMF ¶ 47.) Reed was informed by one of the officers that "they have photos of all the individuals that frequent Lunada Bay, that they have a book of photos and that it won't be a problem to identify the individuals because they know the people that frequent that area." (GDMF ¶ 48; Reed Dep. 223:05-09.) Despite the officer's statement, no known book of photos of the type described was in the possession of the PVEPD at that time. (GDMF ¶ 50.)

After the incident on February 13, 2016, Reed called the PVEPD to set up a time to review the photographs cited by the officer and identify the individuals who had harassed her. (Decl. Diana Milena Reed in Supp. Mot. Cert. Class ("Reed Decl.") ¶ 30, ECF No. 159-5.) Instead of scheduling the appointment, the PVEPD officer asked, "Why would a woman want to go to that beach and the Rock Fort anyways? There are only rocks down there." (OPAMF ¶ 120; Reed Decl. ¶ 30.) Reed contacted the PVEPD approximately three times to schedule an appointment to review the photos, retaining an attorney after her third unsuccessful attempt. (GDMF ¶ 49; Reed Dep. 239:15-19.) Reed returned to Lunada Bay at least twice after February 13, 2016, and was verbally harassed and photographed by locals on at least one occasion. (GDMF ¶¶ 54-56.)

On March 21, 2016, Reed and her attorney met with Police Chief Kepley and Captain Tony Best. (Reed Decl. ¶ 31.) Plaintiff was informed that she would not be able to view any photographs at that time. (OPAMF ¶ 123.) In addition, Chief Kepley and Captain Best stated that it wasn't safe in Lunada Bay, that this was a long term problem, and that Reed should take a cell phone with her to the beach and travel in large groups. (OPAMF ¶ 124.) On April 7, 2016, Reed was brought in to the PVEPD to review a photo line-up and circled a photo identifying Alan Johnston as one of the perpetrators. (GDMF ¶ 52; Reed Dep. 230:10-14; Reed Decl. ¶ 33.) An arrest was subsequently made pursuant to Reed's complaint, but the district attorney declined to file charges or prosecute the case. (GDMF ¶ 53.)

### 3.   The City's History of Localism and Exclusion

The Palos Verdes Homes Association ("PVHA") is an independently operated organization located adjacent to City Hall that enforces the deeds and covenants in PVE. (OPAMF ¶¶ 131-134.) Until the year 2000, the deeds issued by the PVHA contained restrictions barring people of color from the City. (OPAMF ¶ 131.) At least one PVE resident has stated that many residents "like it segregated" and "do not want people coming to our neighborhood." (OPAMF ¶ 135.) As a result, few persons of color live in or use Lunada Bay on a regular basis. (OPAMF ¶ 158.)

Benjamin Siounit ("Siounit"), a PVEPD reserve officer from June 19, 2007 to February 11, 2012, made the following observations about his time on the force: (1) An unidentified PVEPD police

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

| | |
|---|---|
| CASE NO.: CV 16-02129 SJO (RAO) | DATE: **February 12, 2018** |

officer pulled over a Hispanic man driving a pickup truck because he "did not like Hispanic or African American people in the City," and "liked to profile people"; (2) A different unidentified officer would "search for non-resident cars that were parked illegally so he could have them towed"; (3) Certain of the officers would "make every effort to discourage non-residents from visiting the City, including by looking the other way when residents like the local surfers break the law"; and (4) some residents "did not want an African American police officer patrolling their city." (OPAMF ¶ 136.) In addition, Siounit was instructed to leave people on the side of the road after towing their vehicle if the owner was a non-resident. (OPAMF ¶ 140; Decl. Benjamin Siounit in Supp. Mot. ("Siounit Decl.") ¶ 11, ECF No. 308.) The towing company used by the City is owned by PVEPD reserve officer Robert Van Lingen. (OPAMF ¶ 139.)

Allegations of localism in Lunada Bay garnished a fair amount of media attention over the years. (OPAMF ¶¶ 152-53.) In 1995, Peter McCollum ("McCollum"), an alleged member of the Lunada Bay Boys, was quoted by the Los Angeles Times as follows: "We protected this beach for years. This is why. So we can have driftwood on the beach rather than Kentucky Fried Chicken boxes. If the beach opened up it would be packed with low riders . . . the rocks would be marked with graffiti." (OPAMF ¶ 152.) In addition, news website the Guardian released a video which showed McCollum intimidating non-resident journalists (the "Guardian Video"). (GDMF ¶ 65; OPAMF ¶ 153.)

During Lunada Bay's first Martin Luther King, Jr. Day event on January 20, 2014, a native Hawaiian named Christopher Taloa was told by a local wearing blackface and an afro wig, "You don't pay enough taxes to be here." (OPAMF ¶ 155.) When Taloa attempted to surf Lunada Bay, he was asked, "Who are the black guys on the cliff?" (OPAMF ¶ 156.) He was also told by local surfers that they owned the local police and the judges, and that they would "have [him] arrested and have [him] fucked in the ass by a black or Mexican in the holding cell." (OPAMF ¶ 156.) At the same event in 2017, a PVEPD officer reportedly ogled women and "stalked the cliffs for any female who would give him attention." (City's Response to Pls.' Supp. Additional Material Facts ("PSAMF") ¶ 214, ECF No. 502-1.)

Incidents of localism were known to City officials and officers for many years. (OPAMF ¶¶ 152-53, 166-67, 171-72.) Catherine Placek, a Community Services Officer for the PVE, admitted that the Lunada Bay Boys did not want outsiders using Lunada Bay and that if an outsider is "uncomfortable, you know, then don't do it." (OPAMF ¶ 166.) In spite of this, the City's Planning Commission declined a number of Coastal Commission recommendations, with comments on the decision indicating a reluctance to be "too welcome" to outsiders. (OPAMF ¶ 165.) In addition, the City or associates of the City: (1) provided cellular phones to alleged members of the Lunada Bay Boys as part of the City's disaster preparedness program, used by the Lunada Bay Boys to coordinate their harassment; (2) solicited donations from residents in exchange for decals with a badge that can be placed on a resident's car and a coin with a badge that can be carried in a person's pocket if he or she is pulled over; and (3) regularly socialized and discussed local issues

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority  ____
Send      ____
Enter     ____
Closed    ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.: CV 16-02129 SJO (RAO)        DATE: February 12, 2018

with alleged members of the Lunada Bay Boys, in some cases even discussing matters of police enforcement. (OPAMF ¶¶ 183, 197, 188-196.) In particular, Sergeant Steven Barber, President of the Police Officer Association and one of the police officers tasked with the investigation of illegal activity by the Lunada Bay Boys, is a friend of some of local surfers. (OPAMF ¶ 196.)

### 4. The City's Attempts to Address the Localism Issue

To combat the localism issue, the City passed two written ordinances. (OPAMF ¶ 174.) The first, City Municipal Code section 9.16.030, makes it illegal to block access to the City's beach. (GDMF ¶ 58.) The second, City Municipal Code section 9.16.010, requires surfers to engage in the sport with due regard to others, including but not limited to "accommodating other persons utilizing the beach and/or water to the extent feasible." (GDMF ¶ 59.) PVEPD police officers are "normally expect[ed]" to enforce the municipal code, but are not specifically trained on these ordinances or other provisions of the Coastal Act. (GDMF ¶ 60; OPAMF ¶ 176.) In addition, the City has an anti-harassment policy. (GDMF ¶ 61.)

Defendant Chief Kepley, who had never lived in the City, joined the Police Department in June 2014. (GDMF ¶¶ 63-64.) In or around May 2015, Chief Kepley became aware of the Guardian Video. (GDMF ¶ 65.) As a result, Chief Kepley assigned extra police patrols to Lunada Bay. (GDMF ¶ 65.) These extra patrols, still in place as of October 10, 2016, resulted in over four to five hundred police patrols of the Lunada Bay bluff and surf. (GDMF ¶ 67.)

Chief Kepley educated himself on the rumors and claims that localism at Lunada Bay had existed for as long as fifty years. (GDMF ¶ 69.) On May 15, 2015, Chief Kepley sent a memorandum to the City Mayor and Council regarding localism in Lunada Bay. (GDMF ¶ 72.) Chief Kepley identified measures taken by PVEPD in the past, including: (1) conducting extra patrols with uniformed officers on high surf days; (2) utilizing ATVs to patrol the cliff's edge; (3) having officers dress in plain clothes and drive unmarked vehicles to observe and interact with people along the cliffs and bluffs; (4) conducting undercover operations; and (5) conducting boat patrols in Lunada Bay. (GDMF ¶ 73.) However, Chief Kepley testified that, while he believed policing by boat would helpful, replacing the old ocean patrol boat would be "cost prohibitive." (GDMF ¶ 74.)

Prior to Plaintiffs' incidents, Chief Kepley directed the police captains to actively engage the surfers to express the City's position that Lunada Bay was a public beach, everyone was expected to be civil, and the City would not tolerate harassment. (GDMF ¶ 76.) Chief Kepley also stated that "at the same time, we do not want to alienate many of [the] long-term residents" or to create the perception that the police are "so overbearing and so aggressive." (GDMF ¶ 76.) In response, the PVEPD began to make a number of regular contacts with surfers at Lunada Bay. (GDMF ¶ 77.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
Scan Only ___

CASE NO.: **CV 16-02129 SJO (RAO)**     DATE: **February 12, 2018**

During this period Chief Kepley communicated in "101 conversations" with members of the PVEPD that the City does not condone localism. (GDMF ¶ 80.) Chief Kepley also reached out to other law enforcement agencies in other beach cities to discuss best practices and to collaborate on surf localism challenges, though they did not "have any information" because they "did not believe they had a localism problem in their jurisdictions." (GDMF ¶ 81.) Chief Kepley indicated a reluctance to take harsh gang-related measures, as though "this problem has gang mentality similarities (territorial bullies)," it "is not a true gang[,] does not meet established gang criteria[,] and moving forward with gang injunctions could complicate the matter." (PSAMF ¶ 209.)

Chief Kepley also made a public announcement that he hoped to make an arrest of one of the harassing individuals in the Guardian video. (GDMF ¶ 78.) Chief Kepley hoped the publicity from an arrest would change perceptions and show the public that improper behavior at Lunada Bay would not be tolerated. (GDMF ¶ 79.) Significant community backlash followed Chief Kepley's public comments and Chief Kepley became concerned that the PVEPD appeared a "little bit off balance . . . [that] we are heavy handed or too eager to make an arrest for self-promotion reasons." (GDMF ¶ 79.) Despite the backlash, however, Chief Kepley put together an undercover operation with assistance from a different law enforcement agency, coincidentally scheduled on February 13, 2016, the day Reed was sexually harassed in Lunada Bay. (GDMF ¶ 82; OPAMF ¶ 122.) The operation was canceled when Chief Kepley learned that the operation had been compromised as the local surfers had found out about it. (GDMF ¶ 82; OPAMF ¶ 122.)

As to the City's efforts to combat localism, City Manager Anton Dahlerbruch ("Dahlerbruch") contacted the City Manager of Malibu to discuss issues of public access to beaches. (GDMF ¶ 83.) The City then conducted a "listening tour" to understand the issue of surfing localism, including meeting with Heal the Bay ("HTB"), a non-profit organization which supports efforts to preserve the California coastline and watersheds. (GDMF ¶¶ 84, 90.) The City also requested a meeting with the Surf Rider Foundation ("SRF") to understand their perspective on localism issues. (GDMF ¶ 84.) Dahlerbruch asked SRF to send members to surf at Lunada Bay to "experience it for themselves, to draw their own conclusion," but they refused because they did not want to put their members in harm's way. (GDMF ¶ 84.)

In addition, the City or PVEPD officers: (1) Distributed hundreds of cardboard fliers around the City encouraging surfers and others to feel comfortable at Lunada Bay and to report crimes or any incidents that may have occurred in surfing areas; (2) Parked a patrol car in Lunada Bay with a LED display message in the rear window requesting anyone with information, or anyone victimized, or otherwise encountering an incident, to report it; and (3) Posted content on its website stating the City does not tolerate localism. (GDMF ¶¶ 93-99.) The City undertook these efforts despite the fact that it was experiencing a substantial increase in residential burglaries; in December 2015, for example, the City experienced twenty to twenty-five burglaries compared to the normal rate of zero to three per month. (GDMF ¶¶ 100-01.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

| | |
|---|---|
| **CASE NO.:** CV 16-02129 SJO (RAO) | **DATE:** February 12, 2018 |

Several alleged members of the Lunada Bay Boys expressed outrage over Chief Kepley's behavior and policies. (PSAMF ¶ 213.) Chief Kepley went on leave from the PVEPD in late April 2017 and retired on August 28, 2017. (PSAMF ¶ 206.)

II.  **LEGAL STANDARD**

City Defendants argue that Plaintiff's Equal Protection Claim must fail because: 1) CPRI does not have standing to bring the action on behalf of "all potential visitors to coastal areas"; 2) The named Plaintiffs have not experienced actionable discriminatory conduct; and 3) The alleged discriminatory conduct is not attributable to the City Defendants. (*See generally* Mot., ECF No. 268; Reply, ECF No. 331.) The relevant legal standards are summarized below.

   A.  **Summary Judgment**

Federal Rule of Civil Procedure 56(a) mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325. Rather, the moving party's initial burden "may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Id. "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and f]actual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*,

Case 2:16-cv-02129-SJO-RAO Document 545 Filed 02/12/18 Page 11 of 19 Page ID #:19231

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

| CASE NO.: | CV 16-02129 SJO (RAO) | DATE: | February 12, 2018 |
|---|---|---|---|

477 U.S. at 248. At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence. *See id.* at 249. A court is required to draw all inferences in a light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

    B.    <u>Standing</u>

The doctrine of standing delimits the "irreducible constitutional minimum[s]" required for a plaintiff to bring suit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet the requirement of standing, a plaintiff must establish: (1) that she has suffered an "injury in fact" that is concrete, particularized, actual, and imminent; (2) the existence of a causal connection between the injury and the defendant's conduct; and (3) the likelihood that the injury will be redressed by a favorable decision. *Id.* These elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case [and] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, in response to a summary judgment motion, "the plaintiff can no longer rest on [] mere allegations, but must set forth by affidavit or other evidence specific facts" supporting each element. *Id.* (quotations and citations omitted).

Under the doctrine of associational standing, an organization may sue to redress its members' injuries even without a showing of injury to the organization itself. *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996). To establish associational standing, an organization must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 553 (citing *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977)). The first prong guarantees the satisfaction of the traditional elements of standing "by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *Id.* at 555.

    C.    <u>Equal Protection Pursuant to 42 U.S.C. § 1983</u>

Section 1983, created to "enforce the provisions of the fourteenth amendment," provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: CV 16-02129 SJO (RAO)         DATE: February 12, 2018

Title 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 665 (1978). The purpose of this law "is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254–57 (1978)). To succeed on a Equal Protection claim under Section 1983, a plaintiff must prove that: (1) a state actor intentionally discriminated against him; (2) because of membership in a protected class; and (3) pursuant to a custom, policy, or practice of the entity. *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001); *Monell*, 436 U.S. at 690. If the alleged discrimination is not against a protected class, a plaintiff may still succeed on his claims if he can prove that there is no rational basis for the discriminatory practice or policy. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1111-12 (E.D. Cal. 2012).

III.   **DISCUSSION**

   A.   **CPRI's Standing to Sue**

      1.   **Organizational Standing**

To have standing to bring its claims, CPRI must establish: (1) that it has suffered an "injury in fact" that is concrete, particularized, actual, and imminent; (2) the existence of a causal connection between the injury and the defendant's conduct; and (3) the likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561. CPRI may satisfy the element of "injury in fact" if it can demonstrate both "frustration of its organizational mission" and "diversion of its resources" to combat this frustration. *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).

Plaintiffs have submitted the following as evidence pertaining to CPRI's standing. CPRI is a California non-profit public benefit corporation whose mission is dedicated to ensuring public access to the California coast. (OPAMF ¶ 109.) CPRI's members, volunteers, and the people helped by CPRI include people of color, people with disabilities, women, and people of different sexual orientations who are concerned about illegal exclusion from the coast. (OPAMF ¶ 115.) Several of CPR's board members and volunteers "would have liked to have surfed, dived, taken photographs, hiked, or even just enjoyed nature and the beach at Lunada Bay but were afraid to because of the reputation that it had for localism." (GDMF ¶ 57.) As such, CPRI has "diverted its resources and volunteer time to achieve open access for all at Lunada Bay, including extensive research, educational efforts, promotional efforts, media outreach, and the Martin Luther King Day event." (Decl. Alicia Apostol in Supp. Opp'n ["Apostol Decl."] ¶ 15, ECF No. 304.)

CPRI has adequately established the first requirement of injury-in-fact. The extensive and compelling evidence submitted in this case all support a finding that non-resident visitors to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority  ___
Send      ___
Enter     ___
Closed    ___
JS-5/JS-6 ___
Scan Only ___

CASE NO.:   CV 16-02129 SJO (RAO)              DATE: February 12, 2018

Lunada Bay have been harassed or intimidated; this directly frustrates CPRI's purpose of ensuring open access to California's beaches and coast. CPRI has also submitted a sworn declaration from its Chief Operating Officer enumerating the resources it has diverted to address this problem. While CPRI has not quantified or valuated these resources, the declaration itself is enough to create a triable issue of fact on the injury requirement. *See Lujan*, 504 U.S. at 561 (noting that "specific facts" set forth by affidavit will be taken as true during summary judgment, but must be "supported adequately by the evidence adduced at trial.")

Whether CPRI has established the existence of a causal connection between the injury and City Defendants' conduct is a more difficult question. Plaintiffs allege that City Defendants "knowingly allow[] the Lunada Bay Boys to exclude non-residents from Lunada Bay" and "irrationally and arbitrarily" discriminate against others "on the basis of their status as non-residents." (Compl. ¶¶ 62-63.) The first statement fails to establish a causal connection, as "knowingly allowing" exclusion to happen is fundamentally different from causing the exclusion itself. It is also far from clear that the discriminatory behavior referenced in the second statement– the primary examples being City Defendants' failure to investigate or prosecute harassment, and the discriminatory enforcement of traffic violations– directly causes the exclusion to happen. Plaintiffs provide no evidence to support a conclusion that the enforcement of traffic violations equally among residents and non-residents would have any effect on the Lunada Bay Boys' harassment and exclusion. Moreover, while investigating and prosecuting instances of harassment could certainly have a deterrent effect on the practice, it is a paradigmatic logical fallacy to equate lack of prevention with causation.

In any case, the question of causality is directly relevant to the merits of Plaintiffs' Equal Protection Claim, and so will be more thoroughly analyzed with due regard to the laws and application of the Fourteenth Amendment below. This minor deflection brings us to the third element of standing: the likelihood that the injury will be redressed by a favorable decision.

Plaintiffs seek the following relief with respect to the Equal Protection Claim: (1) that the Court declare City Defendants "to have engaged in unlawful municipal exclusion under 42 U.S.C. § 1983" and "unlawfully excluded Plaintiffs, and persons like them, from their right to recreational opportunities at Palos Verdes Estates' parks, beaches, and access to the ocean on the basis of their status as nonresidents"; and (2) that the Court issue an injunction requiring City Defendants "to investigate complaints against the Lunada Bay Boys and the Individual Defendants, and prosecute these complaints as appropriate[.]" (Compl. at 41.) With regard to the first claim for relief, it is unclear what effect, if any, this declaration would have on the incidents of harassment by the Lunada Bay Boys. As to the second claim for relief, the effect of an injunction of this nature would be largely dependent on the success of City Defendants' efforts to prosecute and investigate the alleged crimes and the reaction of the Lunada Bay Boys to these efforts; as with any effort to reduce crime, efficacy is far from a given. Assuming that increased police

Case 2:16-cv-02129-SJO-RAO Document 545 Filed 02/12/18 Page 14 of 19 Page ID #:19234

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
Scan Only ___

CASE NO.: CV 16-02129 SJO (RAO)	DATE: February 12, 2018

intervention regarding incidents of harassment will likely deter harassment, however, the injury to CPRI may be somewhat redressable by a grant of this relief.

It is worth noting that Plaintiffs' claims and claim for relief address only one form of discrimination: discrimination "**on the basis of their status as nonresidents**." (*See* Compl. ¶¶ 62-63, p. 41.) In the Opposition, Plaintiffs argue that City Defendants also discriminate on the basis of race and gender. (Opp'n 16-18, ECF No. 299.) Aside from violating the long-standing rule against raising new legal theories in an opposition to summary judgment, *see Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000), Plaintiffs offer no support for a finding that the requested relief would redress, or indeed have any effect, on these types of discrimination. As such, CPRI does not have standing to allege claims based on racial or gender discrimination.

   2. <u>Associational Standing</u>

CPRI also argues that it has standing sue to redress its members' injuries under the doctrine of associational standing. To establish associational standing, CPRI must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food*, 517 U.S. at 553. Under the first prong, CPRI must "include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *Id.* at 555.

CPRI does not include or identify a single member that is representative of its claims, and thus the Court cannot determine whether or not its members would otherwise have standing to sue in their own right. Alleging facts general to the organization, as CPRI does here, is insufficient to meet this requirement. Even assuming it satisfies the other requirements, CPRI's claim of associational standing must fail.

   B. <u>Plaintiffs' Equal Protection Claim</u>

Plaintiffs argue that Section 1983 applies because "the City has a custom and practice of excluding outsiders and so-called undesirables which violates their right to equal protection laws." (Opp'n 14.) According to Plaintiffs, City Defendants discriminate against others on the basis of their race, gender, and/or status as nonresidents. (Opp'n 17-20.) In order to succeed on this claim, Plaintiffs must demonstrate that: (1) a representative of the City intentionally discriminated against a plaintiff; (2) because of membership in a protected class; and (3) pursuant to a custom, policy, or practice of the City. *Lee*, 250 F.3d at 687; *Monell*, 436 U.S. at 690. If the second requirement is not met, Plaintiffs may still succeed on their claims if they can prove that there is no rational basis for the discriminatory practice or policy. *See Lazy Y Ranch Ltd.*, 546 F.3d at 580.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  <u>CV 16-02129 SJO (RAO)</u>          DATE: <u>February 12, 2018</u>

      1.      <u>Intentional Discrimination by the City against Plaintiffs</u>

Throughout this action, Plaintiffs have submitted tomes of evidence regarding the history of localism in Lunada Bay, various incidents that have been reported and publicized over the decades, and the response or lack of response from City Defendants to these incidents.  The only acts of discrimination directly attributed to the named Plaintiffs, however, is the alleged gender discrimination to Reed during her interactions with the PVEPD and the alleged nonresident discrimination to Spencer based on the City's failure to investigate his claim.  Plaintiffs attempt to fill in the gaps of this requirement by stating that CPRI "represents" all racial minorities, women, and nonresidents who have been excluded from Lunada Bay.  For the reasons stated above, however, CPRI does not have standing to bring claims for racial or gender discrimination, and cannot therefore serve to meet this requirement.

The remaining claims of discriminatory conduct thus fall in two categories: 1) the City's discriminatory enforcement of traffic laws and ordinances; and 2) the City's failure to investigate and prosecute incidents of harassment perpetrated by the Lunada Bay Boys.  As to the first category, neither Reed nor Spencer make any allegation that the City has enforced any traffic violation against them, and thus have not provided any evidence to support a claim that the City has discriminated against them in this manner.  CPRI, on the other hand, has not adequately demonstrated that this kind of activity **causes** the injury it seeks to redress; namely, the harassment perpetrated by the Lunada Bay Boys that prevents would-be-beachgoers from access to the coast.  In addition to being a requirement to standing, causation is a fundamental requirement to the enforcement of a Section 1983 claim.  *See Estate of Amos ex rel. Amos v. City of Page, Arizona*, 257 F.3d 1086, 1095 (9th Cir. 2001) ("If a person has suffered no constitutional injury at the hands of the police, the fact that the police department and city might have maintained a policy or custom authorizing constitutional violations is quite beside the point.") (citations and quotations omitted).  As such, no Plaintiff to the suit has met the requirements to allege any claim of this nature.

Defendants argue that Plaintiffs' second claim of discriminatory conduct is not actionable because the Supreme Court has made clear that the Constitution "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Deshaney v. Winnebago County Department of Social Services*, 489 U.S. 196 (1989); see also *Ketchum v. County of Alameda*, 811. F.2d 1243, 1247 (9th Cir. 1987) (holding that "citizens have no constitutional right to be protected by the state from attack by private third parties, absent some special relationship between the state and the victim or the criminal and the victim that distinguishes the victim from the general public"). *Deshaney*, however, discussed only the constitutional rights guaranteed under the Fourteenth Amendment's Due Process Clause, not the discriminatory conduct prohibited under the Fourteenth Amendment's Equal Protection Clause. In fact, the *Deshaney Court* made it unequivocally clear that "[t]he State may not, of course, selectively deny its protective services

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority __
Send __
Enter __
Closed __
JS-5/JS-6 __
Scan Only __

CASE NO.: **CV 16-02129 SJO (RAO)**  DATE: **February 12, 2018**

to certain disfavored minorities without violating the Equal Protection Clause." *Deshaney*, 489 U.S. at 197 n. 3; *see also Elliot-Park v. Manglona*, 592 F.3d 1003, 1006 (9th Cir. 2010) (holding that while an officer's discretion in deciding whom to arrest or investigate is broad, "it cannot be exercised in a racially discriminatory fashion"). As Plaintiffs' claims are based on allegations that the PVEPD's failure to investigate was motivated by discriminatory purposes, they are actionable under the Equal Protection Clause.

  2.  Because of Membership in a Protected Class

Turning now to Reed's claim for gender discrimination, Plaintiffs cite to evidence that show that the PVEPD "discouraged her from making a complaint, said that it was unsafe for her at Lunada Bay, and that she shouldn't return unless she brought a cell phone and traveled in a group." (Opp'n 18.) It is clear that Reed's gender was referenced during these interactions– for example, the question from the PVEPD officer asking "[w]hy would a woman want to go to that beach and the Rock Fort anyways? There are only rocks down there"– and that some of these comments may in fact have the distasteful edge of sexism to them. (OPAMF ¶ 120; Reed Decl. ¶ 30.) Plaintiffs cite to no evidence, however, that suggests that the alleged discriminatory action– the PVEPD's failure to investigate Reed's complaint– occurred **because** of her gender, rather than a host of other reasons, including her nonresident status. Moreover, it is far from clear that the record suggests a true failure to investigate actually occurred; Reed was discouraged from conducting a citizen's arrest, but was asked and obliged when she wanted to file a police report. (*See* GDMF ¶¶ 35; 44-46.) More tellingly, Reed's complaint did eventually result in an investigation and arrest, even if both occurred later than Reed would have liked. (GDMF ¶¶ 52-53.) Central to a claim of discriminatory conduct is that the plaintiff is treated differently than others; absent evidence that shows that police reports by men or locals are treated in a more timely fashion, or direct evidence that the PVEPD acted sluggishly because Reed was a woman or nonresident, Reed's claim of discriminatory conduct is substantially weakened.

Spencer's claim of discriminatory conduct based on failure to investigate is even less convincing. Spencer admits that the PVEPD was responsive to his requests to provide extra patrols, and that he did not ask to file a police report or follow up on the incident that occurred when he was surfing. (GDMF ¶¶ 14-17.) Spencer's communications with the officers, including stating "[t]he guy is going to claim sun glare and whatnot," indicate that there was some disagreement as to whether or not a crime had actually occurred. (*See* GDMF ¶ 14.) Without evidence that shows that the officers observed and ignored clear criminal conduct, or rejected Spencer's express intent to instigate an investigation into the matter, it cannot be said that a failure to investigate occurred.

  3.  Pursuant to a Custom, Policy or Practice of the City

Finally, Plaintiffs must not only prove that discriminatory conduct occurred, but that this conduct was pursuant to a custom, policy or practice of the city. *Monell*, 436 U.S. at 690. Aside from the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: CV 16-02129 SJO (RAO)     DATE: February 12, 2018

incidents reported by Spencer and Reed, Plaintiffs' primary evidence regarding the City's discriminatory refusal to investigate crimes against non-residents is the City's failure to implement effective measures to stop the harassment perpetrated by the Lunada Bay Boys. Indeed, the record is replete with facts that demonstrate the City has been on notice of this harassment for years, and that some harassment continues to occur. (See OPAMF ¶¶ 152-53, 166-67, 171-72.) The record also clearly reflects, however, that the City did implement **some** measures in an attempt to deter harassment, even if those measures were not as effective or as strong as non-residents would have liked. (GDMF ¶¶ 93-99.) A City's failure to effectively address certain crimes does not mean it is complicit in those crimes, and any evidence that would support the latter is either extremely weak or nonexistent. For example, Plaintiffs point to the friendship of one police officer with certain local surfers, or the fact that Chief Kepley resigned after some of the locals surfers' expressed dissatisfaction with his attempts at enforcement. (PSAMF ¶¶ 196, 206, 213.) Plaintiffs have supplied no evidence that would connect the officer's friendship with any specific action or lack of action by the PVEPD, or that would demonstrate a relationship between Chief Kepley's retirement and the efforts by the Lunada Bay Boys. Moreover, the fact that the local surfers were unhappy with Chief Kepley's actions would suggest that he was in fact making efforts to deter their unwanted behavior.

Most importantly, the record is notoriously absent of any examples that would demonstrate that a PVEPD officer or representative of the city had actual knowledge of a specific incident or crime and failed to investigate or follow up on this crime. Without showing that a failure to investigate has happened repeatedly, Plaintiffs' cannot even begin to argue that such failure is a "custom, policy, or practice" of the City. On this ground alone, Plaintiffs' Equal Protection Claim must fail.

    C.    Conclusion

Plaintiffs' Equal Protection Claim has a number of deficiencies, including: 1) CPRI's lack of standing to bring claims of racial and gender discrimination; 2) lack of a causal nexus between the claims of discriminatory traffic enforcement and the alleged injuries; 3) lack of evidence that would demonstrate that a discriminatory failure to investigate occurred against Plaintiffs; and 4) lack of evidence that would demonstrate that such discriminatory failure to investigate is a custom, policy, or practice of the City. As no reasonable jury could find that Plaintiffs' equal protection rights were violated, Plaintiffs' Equal Protection Claim must be wiped out. Accordingly, the Court **GRANTS** City Defendants' Motion.

IV.    THE COURT'S JURISDICTION OVER PLAINTIFFS' REMAINING CLAIMS

In addition to the Equal Protection Claim against City Defendants, Plaintiffs bring several state law claims against alleged individual members of the Lunada Bay Boys. Specifically, Plaintiffs allege that each Individual Defendant has committed or participated in a conspiracy to commit: (1) violation of the Bane Act, California Civil Code § 52.1(b); (2) public nuisance; (3) violation of

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   <u>CV 16-02129 SJO (RAO)</u>          DATE: <u>February 12, 2018</u>

the California Coastal Act; (4) assault; (5) battery; and (6) negligence, based on their concentrated efforts to prevent nonresident access to beaches and coast at PVE.

Under 28 U.S.C.A. § 1367, a federal district court has the discretion to decline jurisdiction over a party's supplemental state law claims if it has dismissed all claims over which it has original jurisdiction.  The U.S. Supreme Court has made it clear that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  The Court in *Gibbs* indicated that a decision to relinquish jurisdiction will favor dismissal when "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought."  *Id.* at 726; *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

As an initial matter, the Court notes that it had previously held that admiralty jurisdiction was proper over Plaintiff's state tort claims based on allegations that members of the Lunada Bay Boys "impede boat traffic with threats and by circling the boats on surfboards, kneeboards, boogey boards, kayaks, rowboats, and other manual powered vessels." (Order Denying Individual Def's Mot. to Dismiss 8, ECF No. 88.)  Since the filing of the original complaint, however, the Court denied Plaintiff's motion for class certification and the scope of the issues and the evidence presented have narrowed significantly.  The claims and evidence presented by Plaintiffs on relevant issues of state law include that the Individual Defendants "harass and intimidate 'outsiders' who visit or try to surf at Lunada Bay, from the moment they arrive, including by ensuring large numbers of Bay Boys are present when visitors come, surrounding and blocking paths to the shoreline, approaching visitors aggressively, telling visitors they cannot or should not be coming to Lunada Bay, heckling, starting or trying to start fights, throwing rocks at visitors, vandalizing cars, circling surfers in the water so that they cannot catch waves, and dangerously 'dropping in' on or 'burning' surfers."  (Opp'n to Individual Def's MSJ, ECF No. 328.)  Without evidence supporting Plaintiff's allegation that the Bay Boys "impede boat traffic" or any other type of traditional maritime activity, these facts alone are insufficient to demonstrate that Plaintiffs' claims warrant admiralty jurisdiction.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 5394 (1995) (to establish admiralty jurisdiction over state tort claims, the "general character of the activity giving rise to the incident" must bear "a substantial relationship to traditional maritime activity").  Accordingly, the Court holds that it does not have original jurisdiction over Plaintiffs' state law claims.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (noting that courts have an independent obligation to determine whether subject-matter jurisdiction exists, and may examine both the claims and evidence to make this determination).

Whether the Court should decline supplemental jurisdiction over Plaintiffs' remaining claims is a more difficult question.  It is undoubted that Plaintiffs have spent a significant amount of time and resources pursuing their claims in federal court and have faced a plethora of issues related to discovery.  Plaintiffs' claims, however, raise distinct issues of state law, involve parties who are

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: <u>CV 16-02129 SJO (RAO)</u>   DATE: <u>February 12, 2018</u>

all citizens of California, concern access to property that is all located in California, and consider matters that have been deemed of great concern to local governments and media outlets. Given the State of California's significant interest in enforcing its own laws, the fact that there is already a co-pending action in state court, and the possibility that the discovery issues resolved here may streamline these processes in state court, the Court finds that the values of "econnomy, convenience, fairness, and comity" weigh in favor of dismissal.[4]  *See Carnegie-Mellon*, 484 U.S. at 352-53.

V.   <u>RULING</u>

For the foregoing reasons, the Court **GRANTS** Defendants City of Palos Verdes Estates and Chief of Police Jeff Kepley's Motion for Summary Judgment. City Defendants shall lodge a proposed judgment within **seven (7) days** of the issuance of this Order. In addition, the Court **DISMISSES** Plaintiffs' remaining state law claims.

IT IS SO ORDERED.

---

[4]  The Court notes that it has already granted Plaintiffs monetary sanctions against certain Individual Defendants based on issues raised in discovery. This Order does not affect these awards and Plaintiffs may continue to pursue recovery of its costs and fees before the Magistrate Judge.