EDWIN J. RICHARDS (SBN 43855)
Email: Ed.Richards@kutakrock.com
ANTOINETTE P. HEWITT (SBN 181099)
Email: Antoinette.hewitt@kutakrock.com
CHRISTOPHER D. GLOS (SBN 210877)
Email: Christopher.Glos@kutakrock.com
KEVIN J. GROCHOW (SBN 288586)
Email: Kevin.Grochow@kutakrock.com
KUTAK ROCK LLP
5 Park Plaza, Suite 1500
Irvine, CA  92614-8595
Telephone:   (949) 417-0999
Facsimile:   (949) 417-5394

**[EXEMPT FROM FILING FEES PURSUANT TO GOVERNMENT CODE § 6103]**

Attorneys for Defendants
CITY OF PALOS VERDES ESTATES and
CHIEF OF POLICE JEFF KEPLEY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA; WESTERN DIVISION

| | |
|---|---|
| CORY SPENCER, an individual; DIANA MILENA REED, an individual; and COASTAL PROTECTION RANGERS, INC., a California non-profit public benefit corporation, | Case No.  2:16-cv-02129-MWF-RAO |
| | Assigned to District Judge:  Hon. Michael W. Fitzgerald Courtroom: 5A First Street Courthouse |
| Plaintiffs, | Assigned Discovery: Magistrate Judge:  Hon. Rozella A. Oliver |
| v. | **[EXEMPT FROM FILING FEES PURSUANT TO GOVERNMENT CODE § 6103]** |
| LUNADA BAY BOYS; THE INDIVIDUAL MEMBERS OF THE LUNADA BAY BOYS, including but not limited to SANG LEE, BRANT BLAKEMAN, ALAN JOHNSTON aka JALIAN JOHNSTON, MICHAEL RAE PAPAYANS, ANGELO FERRARA, FRANK FERRARA, CHARLIE FERRARA and N.F.; CITY OF PALOS VERDES ESTATES; CHIEF OF POLICE JEFF KEPLEY, in his representative capacity; and DOES 1-10, | **SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S SUR-REPLY TO PLAINTIFFS' MOTION TO STAY ENFORCEMENT OF COSTS JUDGMENT** |
| | *Vacated Date:    July 20, 2020* |
| Defendants. | Complaint Filed:    March 29, 2016 Trial:                      N/A |

KUTAK ROCK LLP
ATTORNEYS AT LAW
IRVINE

- 1 -                                      2:16-cv-02129-MWF-RAO

SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S SUR-REPLY TO PLAINTIFFS' MOTION TO STAY ENFORCEMENT OF COSTS JUDGMENT

4839-6980-7299.1

Defendants CITY OF PALOS VERDES ESTATES and CHIEF OF POLICE, JEFF KEPLEY ("Defendants") request pursuant to Federal Rules of Evidence, Rule 201, that this Court take judicial notice of the following documents in connection with the Defendants' Sur-Reply to Plaintiffs' Motion to Stay Enforcement of Costs Judgment. Exhibits A through C are judicially noticeable under Rule 201 because they are matters of public record contained in public court filings. Rule 201 permits the district court to take judicial notice of facts that are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

| **EXHIBIT** | **DOCUMENT** |
|---|---|
| **A** | A true and correct copy of the July 14, 2020 Order Granting Defendant City of Palos Verdes Estates' ("City") Motion for Judgment on the Pleadings with Leave to Amend in *Spencer, et al. v. Lunada Bay Boys, et al.*, Case No. BC629596 (Los Angeles County Superior Court) |
| **B** | A true and correct copy of the Court's July 14, 2020 Minute Order granting Defendant's Motion for Judgment on the Pleadings in *Spencer, et al. v. Lunada Bay Boys, et al.*, Case No. BC629596 (Los Angeles County Superior Court) |
| **C** | A true and correct copy of the Reporter's Transcript of Proceedings from the July 9, 2020 hearing on the City's Motion for Judgment on the Pleadings in Spencer, et al. v. Lunada Bay Boys, et al., Case No. BC629596 (Los Angeles County Superior Court) |

KUTAK ROCK LLP
ATTORNEYS AT LAW
IRVINE

SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S SUR-REPLY TO PLAINTIFFS' MOTION TO STAY ENFORCEMENT OF COSTS JUDGMENT

4839-6980-7299.1

1

Dated:  July 15, 2020                    KUTAK ROCK LLP

2

By:  /s/ *Kevin J. Grochow*

3

Edwin J. Richards
Antoinette P. Hewitt

Christopher D. Glos

4

Kevin J. Grochow
Attorneys for Defendants

5

CITY OF PALOS VERDES ESTATES
and CHIEF OF POLICE JEFF KEPLEY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KUTAK ROCK LLP
ATTORNEYS AT LAW
IRVINE

SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S SUR-REPLY TO PLAINTIFFS' MOTION TO STAY ENFORCEMENT OF COSTS JUDGMENT

4839-6980-7299.1

# EXHIBIT A

**FILED**
Superior Court of California
County of Los Angeles

JUL 1 4 2020

Sherri R. Carter, Executive Officer/Clerk of Court
By _____ Deputy
Patricia Flores

1

2

3

4

5

6        SUPERIOR COURT OF THE STATE OF CALIFORNIA

7           FOR THE COUNTY OF LOS ANGELES

8

| | |
|---|---|
| CORY SPENCER, DIANA MILENA SMOLUCHOWSKA-MIERNIK, COASTAL PROTECTION RANGERS, INC., a California non-profit benefit corporation,<br><br>                 Plaintiffs,<br><br>vs.<br><br>LUNADA BAY BOYS; THE INDIVIDUAL MEMBERS OF THE LUNADA BAY BOYS, including but not limited to DAVID MELO, CHARLIE MOWAT, SANG LEE, BRANT BLAKEMAN, ALAN JOHNSTON, MICHAEL RAE PAPAYANS, ANGELO FERRARA, FRANK FERRARA, CHARLIE FERRARA, TOM SULLIVAN, JR., BRENDON LAMERS, MICHAEL THIEL, PAUL HUGOBOOM, CASSIDY BEUKEMA, DEVON DEMARIA; CITY OF PALOS VERDES ESTATES; and DOES 9-100,<br><br>                 Defendants. | Case No.:  BC629596<br><br>ORDER GRANTING DEFENDANT CITY OF PALOS VERDES ESTATES'S MOTION FOR JUDGMENT ON THE PLEADINGS WITH LEAVE TO AMEND<br><br>Hearing Date:  July 9, 2020<br>Time: 2:00 p.m.<br>Dept.: 7 |

- 1 -

I.      Introduction

Cory Spencer, Diana Milena Smoluchowska-Miernik, and Coastal Protection Rangers, Inc. (collectively, "Plaintiffs") allege a single cause of action in their Fourth Amended Class Action Complaint ("FAC") against Defendant City of Palos Verdes Estates ("City") for violation of the California Coastal Act (the "Act"). The FAC prays for multiple remedies against City. In addition to an award of attorneys' fees, it seeks civil penalties and daily fines. (FAC, pp. 25-26.)

City now moves for judgment on the pleadings[1] on the following grounds: (1) Plaintiffs fail to allege facts showing that City violated the Coastal Act, and, regardless, Coastal Act section 30005 bars their claim; (2) Plaintiffs both lack standing, and fail to assert a viable Coastal Act Equal Justice Amendment claim; (3) Plaintiffs cannot assert a "conspiracy claim" against City because it is a common law claim barred by Government Code section 815; and (4) Plaintiff Coastal Protection Rangers cannot prosecute the action because it is a suspended corporation. (Motion, 2:10-19.) Plaintiffs oppose City's motion.

The Court generally agrees with City that the Coastal Act "does not create any basis for civil liability against a local government entity for failure of a developer to comply with the permitting process [and instead] creates a system of fines and penalties that can be assessed . . . against the developer . . . , not the city who would have issued it." (Reply, pp. 2-3.) As set for the below, the Court GRANTS City's motion.

---

[1] City previously demurred to Plaintiffs' First Amended Complaint on the following grounds: (1) collateral estoppel, based on Plaintiffs' unsuccessful federal action against City; (2) the Act's Equal Justice Amendment does not apply retroactively; (3) Plaintiffs' pleading is uncertain regarding the groups needing protection from the alleged Coastal Act violations; (4) Plaintiffs improperly seek declaratory relief for past wrongs; (5) the statute of limitations time-bars Plaintiffs' claims; and (6) the court lacks jurisdiction. On January 28, 2019, the Court overruled City's demurrer on all grounds except ground (3), uncertain pleading. Accordingly, the Court granted Plaintiffs leave to amend their complaint "so that it is clearer who is alleged to have been harmed by Defendants, and to clarify that Plaintiffs are not bringing their [Coastal Act] claim against the City on behalf of a putative class." (Court's Ruling on Submitted Matter (Jan. 28, 2019) 4.)

- 2 -

II.     Plaintiffs' Allegations Against City Are Based on Three Categories of Conduct: (A) Allowing Others to Erect Unpermitted Structures, (B) Selective Law Enforcement, and (C) Harassment.

Plaintiffs' only cause of action against City alleges violations of the Coastal Act.[2] (FAC, 19:13-14.) As detailed below, their claims are based on three categories of alleged conduct: (A) allegedly building or allowing others to build unpermitted structures on the beach (e.g., FAC ¶¶ 2, 86); (B) selectively enforcing motor vehicle and anti-harassment laws to discourage outsiders (FAC, ¶¶ 16, 52, 56, 61, 94); and (C) harassing or conspiring to harass outsiders with physical assaults, batteries, vandalism, nuisances and other unlawful acts (FAC, ¶ 16).

A.      Allegedly Allowing or Condoning Others to Build Structures on the Beach.

Plaintiffs complain that City has "allowed" and "condoned" the other Defendants' beach structure "development" by failing to enforce the Coastal Act's development permit requirement. Specifically, the FAC alleges:

2.      The City has violated the Act by: (a) **allowing** unpermitted structures . . . .built and maintained by the [Bay Boys] and its individual Defendant members . . . .  (FAC, ¶ 2 (emphasis added).)

86.      City has impermissibly engaged in or allowed development in the coastal zone **by allowing the construction of the Rock Fort**, and **tacitly permitting and encouraging the Bay Boys' conduct**, **which changes the density and/or intensity of use** by impeding access.  (FAC, ¶ 86 (emphasis added).)

87.      On the north side of Lunada Bay, the Bay Boys . . . built and maintained the illegal Rock Fort.  The City was long aware of [the Rock Fort] and **only removed the structure in late 2016**. . . . [T]he Bay Boys have since undertaken efforts to rebuild a structure in its place on City property.  (FAC, ¶ 87 (emphasis added).)

---

[2] Although the FAC alleges City conspired with the other Defendants, it specifies that City's "civil conspiracy . . . [is] as to the Coastal Act only."  (FAC, ¶ 78.)

- 3 -

88.     Defendant Bay Boys and Individual Defendants built a campfire ring on City property . . . which was removed by the City in late 2016 . . . (FAC, ¶ 88.)

89.     Defendants also built and keep [trails and a campfire ring] on City property. (FAC, ¶ 89.)

92.     [T]here are or were several **unpermitted structures** at [other beaches] on City-owned property.  (FAC, ¶ 92 (emphasis added).)

64.     On January 21, 2016, the **California Coastal Commission [informed the police chief]** that . . . City must address unpermitted structures . . . and again **urged the City to address public access**.  (FAC, ¶ 64 (emphasis added).)

65.     In response . . . [City] issued a memorandum recommending that a public hearing to discuss removal of the unpermitted Rock Fort.  (FAC, ¶ 65.)

B.      Allegedly Selective Enforcement of Motor Vehicle Laws against Outsiders and Non-enforcement of Anti-Harassment Laws against Bay Boys.

Regarding the City's allegedly selective enforcement of motor vehicle and non-enforcement of anti-harassment laws, the FAC alleges:

2.      The City has violated the Act by . . . (c) **enforcing municipal and other laws in a discriminatory manner that deters visitors; and allowing the Bay Boys to unlawfully exclude the public.** (FAC, ¶ 2 (emphasis added).)

16.     . . . **City has long known** about the Coastal Act violations, which continue in Lunada Bay and other areas of PVE [and] . . . has **condoned and conspired with** [the other Defendants] **to exclude underrepresented persons from its coastline by targeting them with unfavorable treatment for traffic citations, parking tickets, and towed vehicles.** (FAC, ¶ 16 (emphasis added).)

94.     To deter outsiders in violation of the Coastal Act, **the City has targeted outsiders with unfavorable treatment [by] deterring outsiders from filing complaints, and in a disproportionate manner, issuing traffic citations, parking tickets, towing vehicles, and detaining outsiders in disproportionate numbers.**  (FAC, ¶ 94.) 46. In  or  about 2015, the City hired a new police chief, Jeff Kepley [who said] . . . [City] would "make an example out of anyone who behaves criminally" at Lunada Bay. (FAC, ¶ 46 (emphasis added).)

- 4 -

47.   **[R]ather than hold the Bay Boys accountable**, the City opted for a "community policing" approach to develop an even cozier relationship with the Bay Boys.  (FAC, ¶ 47 (emphasis added).)

52.     Also on January 29, 2016, Plaintiff Miernik [was] targeted [and] confronted by Melo, who maliciously confronted them screamed at them . . . **City police officers observed the incident but took no action** . . . .  (FAC, ¶ 52 (emphasis added).)

56.     Also on February 12, 2016, [Defendant] Thiel . . . told City Manager Dahlerbruch that he was aware of an undercover police operation scheduled to occur at Lunada Bay . . . [f]ollowing the meeting, [City] **canceled the operation**.  (FAC, ¶ 56 (emphasis added).)

62.     [City Police Chief Kepley said,] "I wish [Lunada Bay] was safe, but it's not.  I wouldn't even tell a man to go down there . . . I view this as a long term problem."  (FAC, ¶ 62.)

64.     On January 21, 2016, the California Coastal Commission [informed the police chief] that . . . "threatening behavior intended to discourage public use of the coastline" amounts to a violation of the LCP. . . . (FAC, ¶ 64.)

86.     City has impermissibly engaged in or allowed development in the coastal zone by allowing the construction of the Rock Fort and **tacitly permitting and encouraging the Bay Boys' conduct, which changes the density and/or intensity of use** by impeding access.  (FAC, ¶ 86 (emphasis added).)

C.     Alleged Harassment of Outsiders

Regarding the City's alleged harassment of outsiders, Plaintiffs allege:

3.     The City . . . has long been **aware** of the unlawful exclusion of outsiders and has conspired with the Bay Boys to "protect" Lunada Bay.  (FAC, ¶ 3 (emphasis added).)

4.     **With City knowledge and complicity**, the individual Defendant members of the Bay Boys conspired to keep the public away by: (1) physically obstructing outsiders' access to the beach trails; (2) throwing rocks; (3) running people over with surfboards in the water; (4) punching outsiders; (5) stealing outsiders' wallets, wetsuits, and surfboards; (6) vandalizing vehicles, slashing tires, and waxing pejorative slurs onto vehicle windows; (7) levying threats; and (8) intimidating outsiders with pejorative and other verbal insults, gestures, and threats of serious injury.  (FAC, ¶ 4 (emphasis added).)

16.     [T]he City has condoned and **conspired with the Individual Defendants' and Defendant Bay Boys' threatening behavior discouraging outsiders** from accessing Lunada Bay . . . ." (FAC, ¶ 16 (emphasis added).)

93.     **With City complicity, [Defendants] conspire to and do regularly confront, attack, harass and assault people attempting to access the beach** [or] pass[ing] through the Lunada Bay area [,] for the primary purpose of preventing those people from accessing the beach area . . . (FAC, ¶ 93 (emphasis added).)

D.      <u>Civil Conspiracy Allegations</u>

In addition to the conspiracy allegations in paragraphs Plaintiffs 4, 16 and 93 quoted above, Plaintiffs allege City "[has] engaged in a civil conspiracy with the other Defendants as to the Coastal Act only." (FAC, ¶ 78.)

79.     Defendant Bay Boys' members . . . [i]n violation of the Coastal Act, municipal ordinances, and other laws . . . regularly confront, harass, assault, and batter people attempting to access the beach, and confront, threaten, assault, vandalize property, and bring harm to other persons who live in, work in, or pass through the Lunada Bay area for the purpose of preventing full and equal access . . . (FAC, ¶ 79.)

81.     Each of the Defendants [including **City] was aware that members of the Bay Boys planned to engage in the illegal activities detailed above, cooperated and/or agreed to cooperate with members of the Bay Boys, and intended that the illegal activities be committed.** (FAC, ¶ 81 (emphasis added).)

82.     Based on the circumstances described above, including the nature of the acts done, the relationships between Defendants, and the interests of Defendants, each of the Defendants engaged in a civil conspiracy, which is ongoing. (FAC, ¶ 82.)

84.     The actions and inaction of the City . . . violate the California Coastal Act . . . [and the] Environmental Justice Amendment . . . (FAC, ¶ 84 (emphasis added).)

III.    <u>Legal Standard: Motion for Judgment on the Pleadings</u>

"A motion for judgment on the pleadings is akin to a general demurrer; it tests the sufficiency of the complaint to state a cause of action." (*Wise v. Pacific Gas and Elec. Co.* (2005) 132 Cal.App.4th 725, 738; *Kapsimallis v. Allstate Insurance Co.* (2002) 104 Cal.App.4th 667, 672.) A defendant may move for judgment on the pleadings on the ground that the plaintiff's

- 6 -

complaint "does not state facts sufficient to constitute a cause of action" against the defendant. (Cal. Code Civ. Proc. § 438(c)(1)(B)(ii).)

The motion's grounds must "appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice." (Cal. Code Civ. Proc. § 438(d).) The court accepts as true all material facts alleged in the challenged pleading, but does not consider legal or factual conclusions, opinions, speculation, or allegations contrary to judicially-noticed law or facts. (*Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103, 1111.)

A court must deny a motion for judgment if the pleading states, under any theory, a cause of action. (*Hudson v. County of Los Angeles* (2014) 232 Cal.App.4th 392, 408 [citing *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 ("If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer.")].)

IV.   <u>Plaintiffs Fail to State a Cause of Action Against City for Violating the Coastal Act.</u>

City contends that Plaintiffs fail to allege facts sufficient to state an actionable claim for violation of the Coastal Act. City advances several arguments to support this contention, but its main argument is that Plaintiffs fail to allege City has performed or undertaken development as defined by the Act. The Court agrees.

Coastal Act section 30820 imposes civil liability on "any person" who "performs or undertakes development that is in violation of [the Act]." Section 30804 permits "[a]ny person" to maintain an action to enforce "the duties specifically imposed upon . . . any local government . . ." by the Act. As noted above, Plaintiffs' allegations against City describe three categories of conduct: constructing structures, selective code enforcement, and harassment. The Court addresses each category of conduct below.

-7-

A.    Plaintiffs Fail to Allege a Violation of the Coastal Act Based on the Erection of Structures or Failure to Require Permits for Structures.

1.    *Plaintiffs Do Not Allege City Itself Performed or Undertook Development of Structures.*

Plaintiffs have not alleged City employees either were present or physically participated in erecting the Rock Fort, fire pits, and other structures that other Defendants allegedly built on the beach. Plaintiffs instead seek to hold City liable for passive behavior: condoning or "allowing unpermitted development in the coastal zone." (Opp., 14:15-16; 18-19.) City counters that "the language and legislative history [of the Coastal Act] demonstrate no intent to impose liability against a coastal city for the acts of private citizens even if those acts deter other private citizens from visiting the coast." (Motion, p. 9.) The Court agrees with City.

In interpreting a statute, a court's "fundamental task" is to "ascertain the aim and goal of the lawmakers so as to effectuate the purpose of the statute." (*Gualala Festivals Committee v. California Coastal Commission* (2010) 183 Cal.App.4th 60, 67.) Courts first examine the statute's "usual and ordinary meaning"; if the meaning is not ambiguous, courts "presume that the lawmakers meant what they said, and the plain meaning of the language governs." (*Ibid.*)

The Coastal Act requires "any person . . . wishing to *perform* or *undertake* development" to obtain a Permit. (Pub. Res. Code § 30600(a) (italics added).) The words "perform" and "undertake" are reasonably interpreted to mean active participation in development rather than passive "condoning" or "allowing" others to "perform" or "undertake" development. The FAC's allegations regarding beach structures therefore fail allege that City performed or undertook the development of those structures.

Plaintiffs' conspiracy allegations do state an actionable claim. "The sine qua non of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that objective." (*Schick v. Lerner* (1987) 193

- 8 -

1   Cal.App.3d 1321, 1327-78.)  Plaintiffs must make "a showing of knowledge of the planned tort

2   and intent to aid in its commission." (5 Witkin, Summary 11th Torts § 153 (2019) citing *Wyatt v.*

3   *Union Mrtg. Co.* (1979) 24 Cal.3d 773, 784-85.)   The FAC's allegations City condoned or failed

4   to take action *after* the structures were in place are antithetical to the required proof that City tacitly

5   or expressly agreed on a plan to erect the structures *before* they were built.  Although the FAC

6   includes an allegation that "[e]ach of the Defendants was aware that members of the Bay Boys

7   planned to engage in the illegal activities detailed above, cooperated and/or agreed to cooperate

8   with members of the Bay Boys, and intended that the illegal activities be committed," this

9   boilerplate allegation apparently refers to the conduct "detailed" in the preceding sentence which

10  identifies alleged harassment rather than the erection of beach structures.  (FAC, ¶ 81.)  To the

11  extent Plaintiffs intended to incorporate City's conduct related to the unpermitted structures, their

12  allegations contradict the more specific allegations and are too vague to state a claim against City

13  based on conspiracy to violate the Coastal Act.

14       Citing *Feduniak v. Coastal Commission* (2007) 148 Cal.App.4th 1346,  Plaintiff's counsel

15  argues City can be liable for unpermitted development on its land even if City was not responsible

16  for constructing it.   In *Feduniak*, the Commission issued a cease and desist order requiring

17  homeowners to comply with native vegetation landscaping conditions on a coastal development

18  permit issued to the former owners of the Feduniak's residential property.  The former owners

19  agreed to comply with the conditions but later breached them by building a three-hole golf course.

20  The Feduniaks petitioned for a writ of mandate reversing the cease and desist order.  The trial court

21  denied the petition but agreed with the Feduniaks that the Commission's inaction on the permit

22  conditions for eighteen years estopped the Commission from enforcing them.  The appellate court

23  reversed, finding among other things, that the Commission had no duty to inspect the land or take

24  action against the homeowners.

25       *Feduniak* is distinguishable.  The Feduniaks were not "strictly liable" for the former

26  owners' unlawful development.  They were responsible because the coastal permit conditions were

27  duly recorded when they were issued and therefore applied to the Feduniaks as well as the former

28  owners.

- 9 -

Plaintiff also argue the *Leslie Salt Co. v. San Francisco Bay Conservation & Development Commission* (1984) 153 Cal.App.3d 605, provides authority for holding the City liable for development on its land effectuated by third parties.   In *Leslie Salt*, the San Francisco Bay Conservation and Development Commission issued a cease and desist order requiring a landowner to remove fill material dumped on its property by unknown third persons.   The landowner filed a petition for writ of mandate seeking to reverse the Commission's order.   The court held that the McAteer-Petris Act, which created the Commission, gave it the authority to hold the landowner responsible.   This case is distinguishable because it is addresses a writ of mandate for an order not issued by the Coastal Commission and not involving the Coastal Act.

Therefore, Plaintiffs' cause of action against City based on its alleged erection or conspiracy to erect unpermitted structures on the beach fails to state an actionable claim. The Court grants Plaintiffs leave to amend to allege facts supporting an actionable claim, i.e., that City agents or employees built unlawful structures on the beach and/or entered into advance agreements to have other defendants construct them.

2.   *City's Alleged Failure to Require Development Permits Is Not Actionable Under the Coastal Act.*

Plaintiffs' allegation that City has failed to enforce the Coastal Act against other Defendants who built structures on the beach is non-actionable because City has no mandatory duty to enforce the Coastal Act. The California Supreme Court in *Yost v. Thomas* (1984) 36 Cal.3d 561, 572 concluded the Act "does not mandate the action to be taken by a local government in implementing local land use controls."   Instead, it sets "minimum standards and policies" with which a local government's local coastal plan must comply, and once the Commission has approved a government's LCP it then "has discretion to choose what action to take to implement its LCP . . . [and] [t]he act, therefore, leaves wide discretion to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans." (*Id.* at pp. 572-573; see also *Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 317, review

- 10 -

dismissed, cause remanded April 10, 2019 [holding that there is no property right in a discretionary permit that has not yet been issued because "[t]he Coastal Act sets only minimum standards and policies and creates no mandatory duty to issue development permits"; *Lindstrom v. California Coastal Commission* (2019) 40 Cal.App.5th 73, 91 [the Coastal Act "requires local governments to develop [LCPs], comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives . . ."] (bracketing original); contra *Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1552-1553 [holding that the Mello Act imposes mandatory duties on local governments having coastal zones with its express language that "[e]ach respective local government *shall comply* . . ." and "[t]he conversion or demolition of existing residential dwelling units occupied by persons and families of low or moderate income . . . *shall not be authorized* . . .] (italics added).)

Government Code section 815.6's definition of 'mandatory duty' informs.  That section imposes liability on a public entity for its failure to discharge a statutorily-imposed mandatory duty.  A mandatory duty is not created by a statute that requires a public entity to perform a function involving its "exercise of discretion."  (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898.)  Nor is a mandatory duty created by a statute that "merely recites legislative goals and policies that must be implemented through a public agency's exercise of discretion" or a statute that commands an act open to "normative or qualitative debate" over whether the act was adequately completed.  (*Jacqueline T. v. Alameda County Child Protective Services* (2007) 155 Cal.App.4th 456, 470-471; *Lawson v. Superior Court* (2010) 180 Cal.App.4th 1372, 1392.) Affirmatively, a mandatory duty must be statutorily imposed in "explicit and forceful language" that requires the public entity to take a "clear and discrete" action that requires "no evaluation" of whether the public entity took the action.  (*Guzman, supra,* at p. 910; *Lawson, supra,* at p. 1392; see also *Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 501 [city ordinance imposed mandatory duty by prescribing that "the Superintendent of Building *shall* also file . . ."] (italics added).)

Applying these principles, the Coastal Act does not impose a mandatory duty on City to enforce permitting requirements. As discussed above, it leaves "wide discretion to a local

- 11 -

government not only to determine the contents of its land use plans, but to choose how to implement these plans." (*Yost v. Thomas, supra,* 36 Cal.3d at pp. 572-573.) It sets "minimum standards and policies" with which a local government's local coastal plan must comply. (*Ibid.*) But it lacks "explicit and forceful language" that requires City to take a "clear and discrete action" to ensure "any person . . . wishing to perform or undertake development" obtain Permits. (Cal. Pub. Res. Code § 30600(a).) Instead, it imposes an affirmative duty on the "person . . . wishing to perform or undertake development" by prescribing that any such person "shall obtain a coastal development permit." (*Ibid.*)

In addition, section 30811, "Restoration order; violations" provides, in part, that "a local government that is implementing a certified local coastal program . . . *may,* after a public hearing, order restoration of a site if it finds that the development has occurred without a coastal development permit . . ." (italics added).  The word "may" underscores that enforcement is discretionary rather than mandatory.

Furthermore, the Coastal Act's government liability language mirrors Government Code section 815.6's requirement that a statute impose a mandatory duty in "explicit and forceful language" by permitting "any person" to "maintain an action to enforce the duties *specifically imposed* [by the Act] upon . . . any governmental agency . . . ." (*Guzman v. County of Monterey, supra,* 46 Cal.4th at p. 910; Cal. Pub. Res. Code § 30804 (italics added).)

The Court does not agree with Plaintiffs that *Greenfield v. Mandalay Shores Community Assn.* (2018) 21 Cal.App.5th 896 establishes that the Coastal Act imposes mandatory enforcement duties on City.  In that case, the issue was whether a homeowners' association had the power to ban its member homeowners from renting out their properties to short term tenants.  (*Id.* at p. 898.) The homeowners sought to enjoin the association's ban because it was "development" under the Coastal Act and thus the association first needed to obtain a Permit.  (*Ibid.*)  The Court of Appeal agreed, relying on Coastal Act section 30803, subd. (a) as requiring *a court* to issue preliminary equitable relief upon a prima facie showing of a Coastal Act violation.  (*Id.* at p. 902.) *Greenfield* did not address City's discretionary decision to enforce or not enforce Act provisions,

- 12 -

only that the ban was "development" and thus "a matter for the City and Coastal Commission to address" upon the homeowners' association's permit application. (*Id.* at p. 901.)

Therefore, Plaintiffs' allegations that City failed to enforce the Coastal Act against the other Defendants who built structures on the beach are not actionable under the Coastal Act.

B.  City's Discretionary Enforcement of Motor Vehicle and Anti-Harassment Laws is Not Coastal Act "Development."

1.  *Motor Vehicle Code Enforcement and Alleged Failures to Enforce Anti-Harassment Laws Are Not Uses of Land.*

The second category of City's alleged Coastal Act violations includes City's active law enforcement efforts, specifically its issuance of vehicle citations and towing of cars in a manner that "exclude(s) underrepresented persons from its coastline" and alleged failure to police harassment directed to outsiders. (FAC, ¶¶ 16, 94, 52, 56, 61.) City argues that this conduct is not "development" and the Court agrees.

The word "development" is commonly defined as "the process of converting land to a new purpose by constructing buildings or making use of its resources." (Oxford English Dictionary, www.lexico.com).  It is not reasonable to interpret "development" to encompass a City's enforcement or non-enforcement of vehicle or anti-harassment laws.

The Coastal Act's definition of "development" in section 30106 describes various activities that fit within this common definition of "development."  None of them describe the enforcement or nonenforcement of laws by police agencies.

> Development" means, **on land**, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; **change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410**

- 13 -

**of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto**; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511).

As used in this section, "structure" includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line.

(Pub. Res. Code § 30106 (emphasis added).) The Legislature's references to "use of land" and "use of water" underscore its focus on land use.

(i) "change in the density or intensity of **use of land** including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use;" and

(ii) "change in intensity of **use of water** or access thereto."

As City points out, "[t]he extensive legislative history of the Coastal Act is filled with references to restraining construction on the coast, preserving the last unbuilt coast for the public to enjoy, preserving coastal resources, and providing for access through easements." (Motion, 9:13-15.) According to City, "the legislative history shows the purpose of the Act was to balance construction interests or other private property interests against conservation of resources and provision of easements across private developments . . . [but] demonstrates no intent to impose liability against a coastal city for the acts of private citizens even if those acts deter other private citizens from visiting the coast." (*Id.* at 9:21-25.) "There is no doubt that the Coastal Act is an attempt to deal with coastal land use on a statewide basis." (*Yost v. Thomas, supra,* 36 Cal.3d at p. 571.)

- 14 -

Moreover, the terms "use," "land use," and "use of land" have "generally well-accepted meaning in planning and land use law." (*Building Industry Legal Defense Foundation v. Superior Court* (1999) 72 Cal.App.4th 1410, 1416.) *Building Industry Legal Defense Foundation* analyzed California's Planning and Zoning Law's meaning of "use." Specifically, the court examined Government Code section 65858 which allows a city to adopt, as an urgency measure, an interim ordinance "prohibiting any *uses* which may be in conflict with" a contemplated but not yet adopted general plan. The term "use" was not defined in section 65858. To interpret the term "use," the court referred to Government Code section 65850 of the Planning and Zoning Law which empowers cities to regulate land based on "the use of buildings, structures, and land" as between competing purposes including "industry, business, residences, open space including agriculture, recreation, enjoyment of scenic beauty, use of natural resources and other purposes" and to "regulate signs and billboards," "intensity of land use" and "requirements for offstreet parking." Referring to section 65850, the court defined "use" in section 65858 according to its "generally well-accepted meaning":

> Pursuant to its police power, a general law city is permitted to "[r]egulate the use of buildings, structures, and land as between industry, business, residences, open space, including agriculture, recreation, enjoyment of scenic beauty, use of natural resources, and other purposes." (Gov.Code, § 65850, subd. (a).) This provision allows a city to classify, exclude, restrict, and limit what a land owner may do with his or her property, subject of course to certain constitutional constraints. (*Euclid v. Ambler* (1926) 272 U.S. 365, 394–395, 47 S.Ct. 114, 71 L.Ed. 303; see also 8 McQuillin, Municipal Corporations (1991) Zoning, §§ 25.119–25.119.10, pp. 462–467; California Zoning Practice (Cont.Ed.Bar 1969) Types of Zones, §§ 6.4–6.32, pp. 200–219.) In day-to-day terms, this means a city may determine where residential, commercial, industrial, and other uses may be located within the city.

(*Id.* at p. 1416.)

"Use," as interpreted by *Building Industry Legal Defense Foundation,* applies equally to "use" and "use of land" in Coastal Act Section 30106.[3] Three reasons support adopting this interpretation. First, the California Supreme Court has identified the Act's intent and purpose as

---

[3] The Coastal Act uses the term "land use" approximately 75 times.

- 15 -

regulation of "coastal *land use* on a statewide basis." (*Yost v. Thomas, supra,* 36 Cal.3d at p. 571 (italics added).) Second, the Act requires cities to develop and submit to the Coastal Commission local coastal programs that are comprised of "a *land use plan*" along with "zoning ordinances [and] zoning district maps . . . ." (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles, supra,* 55 Cal.4th at p. 794 (italics added); Pub. Res. Code §§ 30511, 30512(a), 30108.6 ["The *land use* plan of a proposed local coastal program shall be submitted to the commission"] (italics added); ["Local coastal program" means a local government's (a) *land use* plans, zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions, which, when taken together, meet the requirements of, and implement the provisions and policies of, [the Coastal Act] at the local level"] (italics added).) Third, and as City notes, the Act section 30106 modifies "use of land" with language that references traditional government land use concerns: "including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use." (Motion, 11:20-25.)

This Court therefore interprets "use" and "use of land" to mean "use of buildings, structures or land," erection of signage, provision of off-street parking and other conduct subject to City's power to regulate land use under Government Code Section 65850. It is not reasonable to interpret "use" or "use of land" to include municipal enforcement of vehicle laws or failure to enforce anti-harassment laws.

2.      *Law Enforcement Is Not a "Change in the Intensity of Use" or "Access" to Water.*

Plaintiffs also fail to allege an actionable claim based on the other potentially applicable provision in the Coastal Act's definition of development: "change in intensity of use of water or access thereto." (Pub. Res. Code § 30106.)     As a preliminary matter, Plaintiffs' vehicle code

- 16 -

allegations fail because they do not identify conduct by City that blocked or impeded access *to water*. Selectively enforcing vehicle code laws against "outsiders" may or may not impact access to water; it depends on whether the "outsiders" visited City to go *to the water* or for some other purpose. As City points out, Plaintiffs do not allege that City's anti-outsider enforcement efforts "even took place in the coastal zone," let alone impeded their access to water. (Motion, 14:14-15.) The allegations therefore fail to state a viable claim for violation of the Coastal Act based on "development" defined as "change in intensity of use of water or access thereto."

As noted above, it is also not reasonable to interpret "development" under section 30106 to include City's "selective enforcement" of vehicle and anti-harassment. As with the terms "use" and "use of land" found elsewhere in section 30106, the Court interprets "use of water" in the sense of the "uses" that Govt. Code section 65850 empowers cities to regulate. Water is one of the "natural resources" and source of "scenic beauty" cities may consider as they regulate "the use of buildings, structures, and land as between industry, business, residences, open space . . . , recreation, enjoyment of scenic beauty, use of natural resources, and other purposes." (Govt. Code § 65850, subd. (a).) Erection of structures or other tangible barriers are "development" if they physically block or impede access to water. City's conduct in enforcing or not enforcing vehicle or anti-harassment laws is not "development" because it involves interpersonal contact rather than any physical barrier to access and because these laws regulate personal conduct rather than "the use of buildings, structures and land" as between competing uses.

### 3. *Case Law Does Not Support Plaintiffs' Interpretation*

Plaintiffs have cited no cases interpreting "use of land" or "change in intensity of use of water or access thereto" as embracing selective enforcement of vehicle code or anti-harassment laws. None of the cases cited by Plaintiffs interpret "use of land" or "access to water" under section 30601 to include conduct analogous to City's alleged conduct in this case. To the contrary, these cases either rest on provisions in section 30601 that do not apply to this case or address conduct typically subject to municipal land use regulation under Government Code section 65850.

- 17 -

For example, the decision in *Gualala Festivals Committee v. California Coastal Commission, supra,* 183 Cal.App.4th 60 rested on a specific phrase in section 30106 defining "development" as the "discharge. . . of any . . . gaseous . . . [or] solid . . . waste." In that case, a festivals committee challenged the Coastal Commission's intended order prohibiting the committee from discharging fireworks without a coastal development permit. (*Id.* at p. 63.) The trial court rejected the committee's contention that the Coastal Commission lacked jurisdiction because a fireworks display was not "development" under the Coastal Act. (*Id.* at pp. 65-66.) Instead, the court found that the prior year's fireworks display discharged fireworks debris — both solid and gaseous waste — within the coastal zone. (*Id.* at p. 68.) Based on this evidence, the appellate court agreed that the fireworks display met section 30106's definition of development as the "discharge . . . of any . . . gaseous . . . [or] solid . . . waste." (*Id.* at p. 71.) That language in the section 30106 "development" definition has no application here.

The decision in *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles, supra,* 55 Cal.4th 783 also rested on language in the Coastal Act's "development" definition that is inapplicable to this case. The issue was whether converting a mobile home park from tenancies to resident ownerships was "development" under the Coastal Act. (*Id.* at pp. 792-793.) The Court cited several cases, including *Gualala Festivals Committee,* for the general proposition that "development" under the Coastal Act is "not restricted to activities that *physically alter* the land or water." (*Id.* at p. 796.) But the court based its holding that the conversion was development on the Coastal Act's express inclusion of "subdivision pursuant to the Subdivision Map Act" and "any other division of land, including lot splits . . ." in "change in the density or intensity of use of land . . . ." (*Id.* at p. 794.) The court also relied on language in the Subdivision Map Act that "specifically refers to the conversion of a rental mobilehome park to resident ownership as a form of 'subdivision'. . . ." (*Ibid.*) These "subdivision" provisions of the Coastal Act and the Subdivision Map Act have no application here.

The other cases cited by Plaintiffs are inapposite because they each involved a "structure" "on land" that plainly qualified as "development" under section 30106. In *Surfrider Foundation v. California Coastal Commission* (1994) 26 Cal.App.4th 151, 154, there was no dispute that the

- 18 -

challenged conduct was "development" "on land." The Coastal Commission issued a coastal use permit allowing the State to erect small structures for collecting beach parking fees. (*Id.* at pp. 154-155.) A nonprofit organization challenged the propriety of the permit, arguing that the fees were inconsistent with policies expressed in other provisions of the Act such as section 30211 ("[d]evelopment shall not interfere with the public's right of access to the sea") and section 30604, subd. (c) (requiring certain permits to include "a specific finding that the development is in conformity with the Coastal Act's public access and recreation policies.") (*Id.* at p. 157.) The court agreed that because parking fees fell within the scope of these policies, the Commission had to consider them when it issued the permit. (*Ibid.*) The court cited provisions in the Coastal Plan of 1975 identifying a broad range of traditional land use concerns: "the erection of fences, buildings, and other structures" and "indirect or nonphysical impediments to access, including reduction of road capacity and off-street parking . . . ." (*Id.* at p. 158.) Based on this history, the court "conclude[d] that public access and recreational policies of the Coastal Act should be broadly construed to encompass all impediments to access, whether direct or indirect, physical or nonphysical." (*Ibid.*) The Court affirmed the Coastal Commission's permit approving the parking fees because it took these policies into account by making specific findings based on statistical "evidence that completely undermin[ed] . . . arguments that the challenged fees will prevent people from using state park beaches." (*Ibid.*)

The *Surfrider* decision provides no guidance because there was no dispute the parking fee devices were "structures" "on land" that qualified as "development" under section 30106. The court's comments encouraging broad construction referred to the "public access and recreational policies" of the Act, not to the "development" definition. The decision accordingly provides no guidance on the question whether the City's allegedly selective enforcement of vehicle code laws or anti-harassment laws qualifies as "development" under section 30106.

In *Surfrider Foundation v. Martins Beach 1 LLC* (2017) 14 Cal.App.5th 238, the challenged conduct included a structure on land that physically blocked access to water. Specifically, coastal homeowners erected a physical barrier (i.e., closed a gate), posted a "BEACH CLOSED KEEP OUT" sign on the gate, stationed security guards, and painted over a billboard

Exhibit A, Page 23

that previously advertised beach access.  (*Id.* at p. 247.)  The trial court held "appellants' conduct in closing public access to Martins Beach was 'development' under the Coastal act because it decreased access to the water." (*Id.*, at 252.)  The Court of Appeal agreed. (*Id.* at pp. 248-249.)

The appellate court noted that "development" under the Coastal Act is not restricted to activities that physically *alter* the land or water, citing *Pacific Palisades* and *Gualala.* (*Id.* at p. 252.)  It also relied on *Surfrider Foundation v. California Coastal Commission*'s broad dicta that the Act "should be broadly construed to encompass all impediments to access, whether direct or indirect, physical or nonphysical." (*Ibid*; see also *LT-WR, LLC v. California Coastal Commission* (2012) 151 Cal.App.4th 427, 443, opn. mod. at 152 Cal.App.4th 770 [finding that metal gates and no trespassing signs are "development" subject to the Coastal Commission's permitting requirement].)

Plaintiffs argue that the landowner's use of security guards was "development" under the Coastal Act, analogous to City's alleged law enforcement activities in this case.  Nothing in the appellate court's decision supports this argument.  The decision cites no evidence of any conduct by the security guards impeding access to the beach.  The issue on appeal was whether the closed gate which physically blocked access to the beach without altering the land – was "development." The decision did not address the question whether interpersonal conduct can constitute "development" under the Coastal Act.

In all of these cases, the conduct subjected to Coastal Act regulation was conduct typically addressed by municipal land use regulations. *Gualala Festivals Committee v. California Coastal Commission* upheld the Coastal Commission's regulation of a land use that deposited debris on land. *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* upheld government regulation of subdivision, a traditional land use concern specifically identified in section 30106. In the two *Surfrider* cases and *LT-WR, LLC*, the appellate courts affirmed government regulation under the Coastal Act of traditional land use concerns: structures closing off access to land or water and the regulation of off street parking.  None of these cases supports Plaintiffs' contention that City's non-land-use regulatory activity – enforcement of vehicle laws against "outsiders" or non-enforcement of anti-harassment laws  – qualifies as "development" under the Act.

- 20 -

1    Plaintiffs' reliance on City's law enforcement activities as a violation of the Coastal Act

2    accordingly fails as a matter of law.

3

4

5    C.    City's Allegedly Harassing Conduct Is Not Actionable as a Coastal Act Violation.

6

7        The FAC alleges Individual Defendants engaged in "development" (i.e., assaulted,

8    battered, or otherwise personally harassed outsiders) while City condoned it. As discussed infra,

9    the Coastal Act regulates those who "perform" or "undertake" development. The City's conduct

10   in merely standing by as others "perform" or "undertake" alleged development is not actionable.[4]

11       Even if Plaintiffs had directly alleged that City employees assaulted or battered Plaintiffs,

12   this Court would conclude that such conduct is not actionable under the Coastal Act because it is

13   not "development" under the Coastal Act even if the perpetrator is motivated by a desire to deny

14   access to or use of water.  As noted above, the "uses" the Act was designed to address are

15   reasonably interpreted to refer to the "uses" cities may regulate under Government Code section

16   65860.  Such "uses" do not include ordinary criminal or tortious conduct.  Plaintiffs have cited no

17   legislative history suggesting that, in addition to the criminal and civil remedies already provided

18   for violent conduct, the Legislature intended to provide Coastal Act remedies for victims of assault

19

20

21

22       [4] The FAC's boilerplate conspiracy allegations against the City are also not sufficient to state a viable claim.
23   As noted above, allegations of condoning or failing to police unlawful conduct after the fact is antithetical to a
     conspiracy which requires each participant to agree to the unlawful conduct ahead of time.  Furthermore, "'bare'
24   allegations and 'rank' conjecture do not suffice for a civil conspiracy."  (*Choate v. County of Orange* (2000) 86
     Cal.App.4th 312, 333.)  A complaint "must contain more than a bare allegation [that] defendants conspired . . . ."
25   (*AREI II Cases* (2013) 216 Cal.App.4th 1004, 1022.)  Here, Plaintiffs' allegations City "has condoned and conspired
     with the Individual Defendants' and Defendant Bay Boys' threatening behavior discouraging outsiders" and that
26   "[e]ach of the Defendants was aware that members of the Bay Boys planned to engage in the illegal activities detailed
     above, cooperated and/or agreed to cooperate with members of the Bay Boys, and intended that the illegal activities"
27   are so generalized and factually devoid that they fail to state a viable claim for civil conspiracy as against City. (FAC,
     ¶ 81.)
28

- 21 -

or battery based on the attacker's motive.  As detailed in Section B above, none of the cases cited by Plaintiffs supports such an interpretation.

Plaintiffs' allegations the City violated the Coastal Act by conspiring to engage in criminal or tortious conduct is not viable as a matter of law.

V.   Plaintiffs Cannot Obtain an Injunction Under the Coastal Act's Equal Justice Amendment ("EJA")

City contends[5] Plaintiffs both lack standing to assert, and fail to assert, an Environmental Justice Amendment (EJA) claim against City.  (Motion, 14:9; 16:1-2.)

In 2017, the Legislature supplemented the Coastal Act's introductory "findings and declarations" with section 30013, the EJA, which reads as follows:

> The Legislature further finds and declares that in order to advance the principles of environmental justice and equality, subdivision (a) of Section 11135 of the Government Code and subdivision (e) of Section 65040.12 of the Government Code apply to the commission and all public agencies implementing the provisions of this division.  As required by Section 11135 of the Government Code, no person in the State of California, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability, shall be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination, under any program or activity that is conducted, operated, or administered pursuant to this division, is funded directly by the state for purposes of this division, or receives any financial assistance from the state pursuant to this division.

Although the Court rejects City's argument regarding standing requirements, it finds merit in City's argument that Plaintiffs fail to state an actionable claim under the EJA.

City contends that, to obtain standing under the EJA, Plaintiffs must be "members of underserved and disadvantaged communities who were prevented access to the beach due to their

---

[5] Additionally, City contends that the EJA does not apply retroactively to its alleged conduct occurring before the EJA's January 1, 2017 effective date. (Motion, 17:27.) The Court already addressed, and dismissed, this argument in overruling City's demurrer. (Ruling on Submitted Matter (Jan. 28, 2019) 4.) Thus, the Court does not address this argument again here because a motion for judgment on the pleadings is functionally "akin to a general demurrer." (*Wise v. Pacific Gas and Elec. Co.*, *supra*, 132 Cal.App.4th at p. 738.)

- 22 -

race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability." (Motion, 17:8-10.)   Because the EJA incorporates language from Government Code Article 9.5, section 11135(a), City argues that it necessarily also imposes the standing requirements in Government Code section 11139.  To have standing to bring a section 11139 claim, a claimant must allege that he or she was injured by discriminatory practices. (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1002.)

Standing requirements vary by statute based upon the Legislature's intent and the statute's purpose. (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1000.) The statute's words are "the most reliable indicator of legislative intent." (*Absher v. AutoZone, Inc.* (2008) 164 Cal.App.4th 332, 339.)  If the statute's language is clear and unambiguous, its plain meaning governs. (*Ibid.*)  The court must read the statue as a whole and harmonize its parts, and cannot "insert provisions omitted by the Legislature." (*Huff v. Securitas Security Services USA, Inc.* (2018) 23 Cal.App.5th 745, 759; *In re Rudy L.* (1994) 29 Cal.App.4th 1007, 1011.)

Here, the Act's section 30803(a) provides that "*[a]ny person* may maintain an action for declaratory and equitable relief to restrain any violation of this division . . ." (italics added). First, the Court must interpret the Act as a whole and apply section 30803(a) to the EJA instead of importing Government Code section 11139.  The Court must assume that if the Legislature intended Government Code § 11139's standing requirements to apply to the EJA, it would have expressly incorporated section 11139.

The Court must also interpret "any person" to plainly mean "any person" without special standing requirements.  Government Code section 11139's standing requirement would conflict with Act section 30803(a)'s plain meaning that "all persons" may maintain actions under the Act; the Court must read the Act as a whole rather than judicially importing and applying requirements from a different code.   Additionally, the Act's language elsewhere shows that the Legislature considered standing requirements when drafting the Act, but did not apply them to section 11139. For example, Act sections 30801 and 30802 permit "[a]ny person *aggrieved*" to seek judicial review (emphasis added).  The Legislature could have likewise limited section 30803(a) to

- 23 -

"persons aggrieved" but did not, choosing instead "any person."  The Court must assume the Legislature chose the Act's language intentionally.

Nevertheless, Plaintiffs' effort to obtain injunctive relief under the EJA fails.  The EJA's plain language allows a court to enjoin a discriminatory "program or activity" that City "*conducted, operated or administered pursuant to [the Coastal Act].*"  (Pub. Res. Code § 30803, subd. (a)) (italics added).)  As City notes, all versions of the bill ultimately enacted identified the issuance or non-issuance of coastal development permits as "the point at which environmental justice considerations are to be made."  (Motion, p. 17; RJN, Ex. B, p. 8313[6] [EJA "[e]liminates prohibition on requiring housing policies and programs in [Local Coastal Programs]" and "[a]llows the [Coastal] Commission to consider environmental justice when acting on a [development permit]"]; see also Act § 30604(h).)  Issuing permits is plainly government conduct that operates or administers the Coastal Act.  Plaintiffs' allegations City conspired to build unpermitted beach structures, selectively enforced vehicle laws, engaged in harassment and failed to police harassment fail to identify conduct under a "*program or activity*" "*operated or administered pursuant to*" the Coastal Act.

As a matter of law, Plaintiffs' Fourth Amended Complaint fails to allege conduct that provides a basis for injunctive relief under the EJA.

VI.   Plaintiffs Submit Prima Facie Evidence Coastal Protection Ranger's Corporate Status Is Revived.

City submits evidence that on October 18, 2018, the California Secretary of State suspended Plaintiff Coastal Protection Ranger's ("CPR") corporate status for failure to meet tax requirements.[7]  City contends that CPR cannot prosecute its claim against City and that the Court should strike all documents CPR filed and discovery it served since its suspension date.

---

[6] The Court GRANTS City's request for judicial notice of Exhibit B.
[7] The Court GRANTS City's request for judicial notice of Exhibit L.

- 24 -

A California domestic corporation's "powers, rights, and privileges" may be suspended if it fails to pay certain taxes and penalties. (Rev. & Tax Code § 23301.) While suspended, a corporation may not prosecute or defend an action. (*Center for Self-Improvement and Community Development v. Lennar Corp.* (2009) 173 Cal.App.4th 1543, 1552.)

A suspended corporation regains its corporate powers by "filing all required tax returns, paying the necessary taxes, penalties, or fees due, and applying to the Franchise Tax Board for a certificate of revivor. (Rev. & Tax Code § 23305.) A certificate of revivor is prima facie evidence of reinstatement. (Rev. & Tax Code § 23305(a).)

A certificate of revivor validates "procedural steps" taken by the corporation while suspended and enables it to proceed with prosecuting the action. (*Center for Self-Improvement and Community Development v. Lennar Corp., supra,* 173 Cal.App.4th at p. 1553-1554.) Corporate acts such as undertaking discovery and filing and appearing on motions are validated by revivor. (*Benton v. County of Napa* (1991) 226 Cal.App.3d 1485, 1490-1491.)

Plaintiffs submit a certificate of revivor for CPR dated March 20, 2020.[8] Plaintiffs thus have submitted prima facie evidence that CPR's corporate status has been reinstated. The documents CPR served and discovery it propounded during its suspension are validated.

The Court DENIES City's motion to strike.

VII.   Conclusion

The Court GRANTS City's Motion for Judgment on the Pleadings, allowing 30 days leave to amend allegations against the City consistent with this ruling by filing a fifth amended complaint not longer than 25 pages.   To state a viable claim, Plaintiffs must allege that City employees constructed unpermitted structures or formed agreements directing others to construct them. As detailed above, the Court finds that the City's other alleged conduct is not actionable under the

---

[8] The Court GRANTS Plaintiffs' Supplemental Request for Judicial Notice in Opposition, Exh. 1.

- 25 -

Coastal Act.

Dated: July 14, 2020

AMY D. HOGUE
JUDGE OF THE SUPERIOR COURT

- 26 -

# EXHIBIT B

E-Served: Jul 14 2020 5:55PM PDT  Via Case Anywhere

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Spring Street Courthouse, Department 7

**BC629596**
**CORY SPENCER ET AL VS LUNADA BAY BOYS ET AL**

July 14, 2020
4:40 PM

Judge: Honorable Amy D. Hogue
Judicial Assistant: Patricia Flores
Courtroom Assistant: T. Bivins

CSR: None
ERM: None
Deputy Sheriff: None

**APPEARANCES:**

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter

The Court, having taken the matter under submission on 07/09/2020, now rules as follows:
The Motion The Motion for Judgment on the Pleadings filed by City of Palos Verdes Estates on 02/14/2020 is Granted.

The Court grants the Motion for Judgment on the Pleadings with 30 days leave to amend allegations against the City consistent with this ruling by filing a fifth amended complaint no longer than 25 pages.

The Court issues an Order Granting Defendant City of Palos Verdes Estates's Motion for Judgment on the Pleadings with Leave to Amend. The Order is singed and filed this date and incorporated by reference into the court file.

Judicial Assistant is giving notice via Case Anywhere.

Clerk's Certificate of Service By Electronic Service is attached.

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

COURTHOUSE ADDRESS:

Spring Street Courthouse
312 North Spring Street, Los Angeles, CA 90012

PLAINTIFF:

Michael Thiel  et al

DEFENDANT:

Lunada Bay Boys et al

**FILED**
Superior Court of California
County of Los Angeles

07/14/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____P. Flores_____ Deputy

## CERTIFICATE OF ELECTRONIC SERVICE
## CODE OF CIVIL PROCEDURE 1010.6

CASE NUMBER:

BC629596

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the  Minute Order  entered herein, on ___07/14/2020___, upon each party or counsel of record in the above entitled action, by electronically serving the document(s) on _____Case Anywhere_____ at www.caseanywhere.com _____ on ___07/14/2020___ from my place of business, Spring Street Courthouse  312 North Spring Street, Los Angeles, CA 90012 in accordance with standard court practices.

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 07/14/2020

By:  P. Flores

Deputy Clerk

LACIV XXX
LASC Approved 00-00

**CERTIFICATE OF ELECTRONIC SERVICE**
**CODE OF CIVIL PROCEDURE 1010.6**

CODE Civ. Proc. § 1013(f)

Exhibit B, Page 33

# EXHIBIT C

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3     DEPARTMENT SSC7  HON. AMY D. HOGUE, JUDGE PRESIDING

4

5     CORY SPENCER, ET AL.,            )
                                       )
6                     PLAINTIFFS,      )
                                       )
7              V.                      ) NO. BC629596
                                       )
8     LUNADA BAY BOYS,                 )
      ET AL.,                          )
9                                      )
                      DEFENDANTS.      )
10    _____)

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14           THURSDAY, JULY 9, 2020; 2:00 P.M.

15

16

17

18

19

20

21

22

23

24

25

26              REPORTED BY:

27               ALEXANDER T. JOKO, CSR NO. 12272

28               COURT REPORTER PRO TEM

```
 1      TELEPHONIC APPEARANCES:

 2

        FOR THE PLAINTIFFS:    HANSON BRIDGETT LLP
 3                             BY:  ELLIS F. RASKIN
                                    KURT A. FRANKLIN
 4                             425 MARKET STREET
                               26TH FLOOR
 5                             SAN FRANCISCO, CA 94105

 6

                               LISA M. POOLEY
 7                             GYMMEL TREMBLY
                               SEAN G. HERMAN
 8                             SEAN ROTSTAN
                               JERETT YAN
 9

10

        FOR THE DEFENDANT CITY OF PALOS VERDES ESTATES:
11

                               KUTAK ROCK LLP
12                             BY:  ANTOINETTE HEWITT
                                    KEVIN GROCHOW
13                             JAMBOREE CENTER
                               5 PARK PLAZA
14                             SUITE 1500
                               IRVINE, CALIFORNIA 92614-8595
15

16

        FOR DEFENDANT BRANT BLAKEMAN:
17

                               BUCHALTER
18                             BY:  ROBERT S. COOPER
                               1000 WILSHIRE BOULEVARD
19                             SUITE 1500
                               LOS ANGELES, CA 90017
20

21

        FOR DEFENDANTS:        JEFFREY GILLETTE
22                             EDWARD E. WARD, JR.
                               MARK C. FIELDS
23                             J. PATRICK CAREY
                               JOHN P. WORGUL
24                             COREY C. GARRARD
                               COURTNEY M. SERRATO
25                             RICHARD P. DIEFFENBAC

26

27

28
```

```
 1                    I N D E X
 2                   (NONE)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

1

```
1    CASE NUMBER:              BC629596

2    CASE NAME:                SPENCER, ET AL. VS.

3                              LUNADA BAY BOYS, ET AL.

4    LOS ANGELES, CALIFORNIA  THURSDAY, JULY 9, 2020

5    DEPARTMENT SSC7           JUDGE AMY D. HOGUE

6    APPEARANCES:              (AS HERETOFORE NOTED.)

7    REPORTER:                 ALEXANDER JOKO, CSR NO. 12272

8    TIME:                     2:00 P.M.

9

10          (THE FOLLOWING PROCEEDINGS WERE HELD

11       IN OPEN COURT:)

12

13          THE COURT:  ALL RIGHT.  SO I'M CALLING NOW THE

14   SPENCER MATTER.

15              AND LET ME JUST LOOK AT WHO I HAVE ON

16   THIS.  I KNOW I HAVE A NUMBER OF PEOPLE ON THE

17   TELEPHONE.  I'M NOT GOING TO CHECK EVERYBODY IN.

18              I SEE MS. HEWITT.

19              WHO IS GOING TO BE SPEAKING ON BEHALF OF

20   THE PLAINTIFF?

21          MR. RASKIN:  GOOD AFTERNOON, YOUR HONOR.  THIS

22   IS ELLIS RASKIN FROM HANSON BRIDGETT ON BEHALF OF THE

23   PLAINTIFFS.

24          THE COURT:  OKAY.  GOOD.  MR. RASKIN, NICE TO

25   SEE YOU.

26              SO YOU ALL GOT A LONG TENTATIVE THAT WE

27   ISSUED A LITTLE WHILE BACK, AND I TRIED TO GIVE IT TO

28   YOU IN ADVANCE.
```

2

```
 1              LET ME JUST MAKE SURE EVERYTHING IS FINE

 2   WITH THE NOTION THAT WE HAVE A COURT REPORTER PRESENT.

 3   HE'S ACTUALLY IN THE COURTROOM, BUT I WILL JUST HAVE

 4   THE RECORD REFLECT EVERYBODY STIPULATED TO HAVE THE

 5   COURT REPORTER IN THE COURTROOM?

 6          MS. HEWITT:  YES.

 7          MR. RASKIN:  YES.

 8          THE COURT:  OKAY.  MR. RASKIN, SINCE THE

 9   TENTATIVE IS -- OH, THE COURT REPORTER IS REMOTE.

10   WE'RE STIPULATING THAT HE'S A REMOTE REPORTER.  THANK

11   YOU.

12              GOVERNMENT CODE ACTUALLY SAYS THE

13   REPORTER HAS TO SIT IN THE COURTROOM, BUT IT SEEMS KIND

14   OF SILLY NOW.  SO WE'RE JUST HAVING PEOPLE STIPULATE

15   AND LET THE COURT REPORTER SIT WHEREVER JUST LIKE THE

16   REST OF US.

17              SO, MR. RASKIN, I THINK THE BALL IS IN

18   YOUR COURT BECAUSE THE TENTATIVE IS LARGELY ADVERSE TO

19   THE PLAINTIFFS.  I'M HAPPY TO HEAR FROM YOU, SIR.

20          MR. RASKIN:  YES, YOUR HONOR.  AND THANK YOU

21   VERY MUCH.

22              I WOULD RESPECTFULLY ASK THIS COURT TO

23   RECONSIDER ITS TENTATIVE.

24              AND TO THE EXTENT THAT THE COURT NOW ASKS

25   US TO SHOW THAT CITY EMPLOYEES CONSTRUCTED UNPERMITTED

26   STRUCTURES ON THE BEACH OR FORMED AGREEMENTS ASKING

27   OTHERS TO CONSTRUCT THEM, UNDER THE COASTAL ACT, WE ARE

28   NOT REQUIRED TO SHOW THAT, NOR COULD WE.
```

3

1        UNDER THE FEDUNIAK ACT DECISION - THAT'S

2   SPELLED, F-E-D-U-N-I-A-K - AND OTHER RELATED CASE LAW,

3   THE CITY IS STRICTLY LIABLE FOR THE COASTAL ACT

4   VIOLATIONS THAT HAVE OCCURRED HERE.

5        IN THE FEDUNIAK CASE, THERE WERE

6   HOMEOWNERS THAT WERE FOUND TO BE STRICTLY LIABLE UNDER

7   THE COASTAL ACT FOR PURCHASING A HOME WITH AN

8   UNPERMITTED GOLF COURSE ON IT.

9        AND, ULTIMATELY, THE SAME PRINCIPLES OF

10  STRICT LIABILITY HAVE OCCURRED HERE WHERE THE CITY IS

11  STRICTLY LIABLE FOR THE COASTAL ACT VIOLATIONS THAT

12  HAVE OCCURRED ON ITS PROPERTY THROUGH THE OBSTRUCTIONS

13  TO THE PUBLIC ACCESS OF THE BEACH AND, FURTHERMORE, FOR

14  ALLOWING UNPERMITTED STRUCTURES TO BE BUILT ON IT.

15       IF THIS COURT WOULD LIKE, WE WOULD LIKE

16  TO TAKE THIS OPPORTUNITY TO WALK THROUGH SOME OF THE

17  ISSUES IN THE TENTATIVE THAT WE BELIEVE THAT THE

18  TENTATIVE HAS INTERPRETED INCORRECTLY, BUT WE'LL DEFER

19  TO THE COURT IN TERMS OF HOW YOU WOULD LIKE TO WALK

20  THROUGH THIS ISSUE.

21       THE COURT:  YOUR ARGUMENT HERE -- (TECHNICAL

22  ISSUES).

23       I'M HEARING A LOT OF ECHO -- (TECHNICAL

24  ISSUES).

25       IF EVERYONE WHO IS NOT SPEAKING COULD

26  MUTE THEIR PHONE, THAT MIGHT HELP.

27       SO WHAT I'M GOING TO DO IS ASK MS. HEWITT

28  TO RESPOND TO THAT ARGUMENT.

4

```
 1          MS. HEWITT:  THANK YOU, YOUR HONOR.

 2               THE FEDUNIAK CASE WAS -- (TECHNICAL

 3    ISSUES) IN THE CITY'S MOVING PAPERS.  WE THOROUGHLY

 4    DISCUSSED THAT CASE -- (TECHNICAL ISSUES).

 5          THE COURT:  ON THE SPENCER MATTER, CAN I

 6    PLEASE KNOW THAT EVERYBODY IS MUTED ON THE PHONE ON THE

 7    AUDIO L.A. COURT CONNECT OR ON THE VIDEO L.A. COURT

 8    CONNECT?

 9               OKAY.  SAY SOMETHING, MS. HEWITT, LET'S

10    SEE IF WE GET AN ECHO.

11          MS. HEWITT:  IS THIS BETTER?

12          THE COURT:  YES, THAT'S BETTER.

13          MS. HEWITT:  THE CASE WAS DISCUSSED AT LENGTH

14    IN THE MOVING PAPERS, AND I NOTICED IT WASN'T ADDRESSED

15    IN THE OPPOSING PAPERS.  SO I FIRST WONDERED ABOUT

16    THAT.

17               BUT IN THE CASE OF FEDUNIAK, THE

18    DISTINGUISHING FACTORS IS THAT THE -- THERE WAS A

19    DISCUSSION ABOUT STRICT LIABILITY THERE.  THERE WAS NO

20    DISCUSSION THERE ABOUT ASSIGNING STRICT LIABILITY TO

21    THE PUBLIC ENTITY AT ISSUE THERE.

22               IT CENTERED ON ESTOPPEL ISSUES AND

23    PRINCIPLES AS IT APPLIED TO THE COMMISSION IN THAT

24    PARTICULAR CASE.  THAT'S WHAT RENDERS IT COMPLETELY

25    DISTINGUISHABLE FROM THIS CASE -- (TECHNICAL ISSUES).

26          THE COURT:  A LOT OF THE ISSUES, AS I

27    UNDERSTAND IT, IS USUALLY ON YOUR END, YOUR COMPUTER OR

28    YOUR SYSTEM DOESN'T HAVE ENOUGH BANDWIDTH OR SPECS TO
```

Exhibit C, Page 41

5

1   HANDLE OUR SYSTEM.  SO AFTER TODAY, EVERYBODY SHOULD

2   DOUBLE CHECK YOUR COMPUTERS.  AND I KNOW A LOT OF FOLKS

3   ARE WORKING FROM HOME WHERE THE EQUIPMENT MIGHT BE A

4   LITTLE DIFFERENT THAN AT THE OFFICE.  ANYWAY, THAT'S MY

5   UNDERSTANDING.  BUT LET'S ALL JUST TRY TO TALK SLOWLY.

6           MS. HEWITT:  YES, YOUR HONOR.

7               THE FEDUNIAK CASE -- I'M HOPING THIS IS

8   BETTER.  I'M GOING TO TRY TO TALK VERY EVENLY AND

9   SLOWLY.

10              THE FEDUNIAK CASE WAS, AGAIN, ADDRESSED

11  THOROUGHLY IN THE CITY'S MOVING PAPERS.  AND WE DID NOT

12  SEE IT ADDRESSED IN THE OPPOSING PAPERS.

13              IN THE FEDUNIAK CASE, THERE WAS NO

14  DISCUSSION OF STRICT LIABILITY AS IT PERTAINS TO A

15  PUBLIC ENTITY.  AND, IN FACT, THAT CASE REVOLVED AROUND

16  WHETHER OR NOT ESTOPPEL COULD BE ASSERTED AGAINST THE

17  COMMISSION.

18              IN THAT CASE, THERE WAS A LONG TIME --

19  PARDON ME, YOUR HONOR.

20              THERE WAS AN ISSUE AS TO WHETHER OR NOT

21  AN EASEMENT THAT HAD BEEN PREVIOUSLY ISSUED WITH REGARD

22  TO THAT PROPERTY WITH A LONG-STANDING PERMIT ISSUE

23  COULD THEN BE USED AS AN ESTOPPEL AGAINST THE

24  COMMISSION, BECAUSE THE COMMISSION WAS KNOWN TO HAVE

25  KNOWN ABOUT THIS THREE-HOLE GOLF COURSE.  THEREFORE, IN

26  THAT CASE, THE HOMEOWNERS ASSERTED, WELL, THERE SHOULD

27  BE ESTOPPEL THAT WE CAN ASSERT AGAINST IT.

28              THERE'S CERTAINLY NO DISCUSSION HERE THAT

6

1     WE CAN USE TO ANALOGIZE IN THIS CASE BECAUSE THERE WAS

2     NO ASSIGNMENT OF ANY STRICT LIABILITY -- (TECHNICAL

3     ISSUES).  I SEE NO ISSUES IN THAT CASE THAT I CAN

4     DISCUSS AS IT PERTAINS TO A CITY'S STRICT LIABILITY.

5               IF THERE IS LANGUAGE THAT COUNSEL WOULD

6     LIKE TO REFER TO THAT DOES HAVE SUCH -- THAT DOES GIVE

7     SUCH INDICATION, I WOULD BE -- THAT WOULD BE USEFUL.

8     BUT THERE'S NO DISCUSSION OF IT.  WE DID NOT SEE IT,

9     YOUR HONOR.

10        THE COURT:  OKAY.  I'M JUST PULLING IT UP ON

11    WESTLAW.

12              I THINK LET'S GO BACK TO YOU, MR. RASKIN.

13    YOU CAN EITHER RESPOND OR GO ON TO ANOTHER POINT,

14    WHATEVER YOU PLEASE.

15        MR. RASKIN:  I'LL RESPOND BRIEFLY.

16              I WOULD LIKE TO GO TO OTHER POINTS AS

17    WELL.

18              THE FEDUNIAK CASE DOES STAND FOR THE

19    PROPOSITION THAT IT DOESN'T MATTER WHO CAUSES THE

20    VIOLATION TO OCCUR, BUT SIMPLY THAT THE PRESENCE OF THE

21    VIOLATION ON A PROPERTY OWNED BY SOMEBODY WHO IS

22    REQUIRED TO GET A CDP FOR DEVELOPMENT IS STRICTLY

23    LIABLE.

24              AND, INDEED, I SHOULD ALSO POINT OUT THAT

25    THE COASTAL ACT'S DEFINITION OF WHO THE PERSON WHO IS

26    REQUIRED TO GET DEVELOPMENTS INCLUDES CITIES.  CITIES

27    ARE DEFINED BY PEOPLE IN THE CROSS-REFERENCE DEFINITION

28    SECTION 21066 OF THE PUBLIC RESOURCES CODE.

7

```
 1              BUT FOR THAT MATTER, THERE'S OTHER CASE
 2    LAW THAT HOLDS THE SAME PROPOSITION.  FOR EXAMPLE, IN
 3    THE LESLIE SALT VERSUS THE BAY CONSERVATION DEVELOPMENT
 4    CORPORATION CASE, THERE, THE COURT SAID THAT THE
 5    CORPORATION WAS STRICTLY LIABLE FOR FILLING SALT PONDS
 6    IN THE BAY, AND IT DIDN'T MATTER WHO DID IT.  THE
 7    RELEVANT LOGIC HERE IS THAT, THE MERE PRESENCE OF THE
 8    VIOLATION ON A PERSON'S PROPERTY GIVES RISE TO A
 9    VIOLATION.
10              BUT I WOULD LIKE TO MOVE ON TO A FEW
11    OTHER POINTS AS WELL.  THE COURT, IN ITS TENTATIVE,
12    TAKES A VERY, VERY NARROW VIEW OF THE TERM
13    "DEVELOPMENT" FOCUSING PRIMARILY ON LAND USE.
14              AND WE RESPECTFULLY SUBMIT THAT THAT
15    INTERPRETATION IS CONTRARY TO WELL-ESTABLISHED CASE
16    LAW, INCLUDING THE CALIFORNIA SUPREME COURT'S RECENT
17    DECISION IN THE PACIFIC PALISADES BOWL CASE.  THERE,
18    THE CALIFORNIA SUPREME COURT HELD THAT DEVELOPMENTS, AS
19    A TERM, SHOULD BE GIVEN ITS MOST EXPANSIVE POSSIBLE
20    DEFINITION.  THERE, THE COURT WROTE ON PAGE 796 OF ITS
21    OPINION, "THE DEVELOPMENT IS NOT RESTRICTED TO PHYSICAL
22    ALTERATION OF LAND."
23              THE COURT ITSELF ANALYZED A LONG SERIES
24    OF CASES THAT HAVE HELD THAT, UNDER THE DEFINITION OF
25    "DEVELOPMENT" UNDER SECTION 3016 OF THE COASTAL ACT,
26    THAT DEVELOPMENT INCLUDES ANY CHANGE IN THE INTENSITY
27    OF USE OF WATER OR ACCESS THERETO.  THE RELEVANT TERMS
28    HERE BEING "ACCESS TO WATER" AND "ACCESS TO THE COAST."
```

8

1     THAT'S PRECISELY WHAT WE HAVE IN THIS CASE.

2                 HERE, WE HAVE A LONG AND WELL-ESTABLISHED

3     PRACTICE OF THE BAY BOYS AND CITY POLICE OFFICERS

4     ACTING IN CONCERT TO DETER ACCESS TO THE COAST.

5                 HERE, IN FACT, WE KNOW THAT DEFENDANT

6     BLAKEMAN THEN USED A CITY-OWNED CELL PHONE TO WORK IN

7     CONJUNCTION WITH OTHER BAY BOYS AND MEMBERS OF THE CITY

8     TO KEEP MEMBERS OF THE PUBLIC AWAY FROM LUNADA BAY.

9     THAT IS, BY ITS VERY DEFINITION, A VIOLATION OF THE

10    COASTAL ACT.

11                AND SIMILAR EXAMPLES CAN BE FOUND IN

12    OTHER CASE LAW AS WELL.  FOR EXAMPLE, IN THE FIRST

13    SURFRIDER CASE, THERE, THE COURT HELD THAT PAYING A FEE

14    TO ACCESS THE BEACH WAS THE RELEVANT FACTOR IN

15    DETERMINING THAT THERE WAS DEVELOPMENTS SUBJECT TO THE

16    COASTAL ACT.

17                IT DIDN'T MATTER FOR THE COURT THAT THERE

18    WERE PHYSICAL BARRIERS.  THE MERE FACT OF PAYING A FEE

19    WAS ITSELF A METAPHORICAL GATE BLOCKING ACCESS TO THE

20    COAST.

21                AND THAT'S WHAT WE HAVE HERE.  EVEN

22    THOUGH THERE'S NO PHYSICAL GATE BLOCKING ACCESS DOWN TO

23    LUNADA BAY, THROUGH THE ACTIONS OF THE CITY AND THE

24    LUNADA BAY BOYS, THEY HAVE FORMED A, FOR ALL INTENTS

25    AND PURPOSES, GATE BLOCKING ACCESS TO THE COAST.

26                BUT A GATE ITSELF ISN'T EVEN NEEDED.  FOR

27    EXAMPLE, IN THE SECOND SURFRIDER CASE, THE MARTINS

28    BEACH CASE, THERE, THE COURT NOTED THAT SECURITY GUARDS

9

```
 1    WERE HIRED TO KEEP PEOPLE OUT OF THE BEACH.

 2                 AND THAT'S ESSENTIALLY WHAT HAPPENED HERE

 3    WHERE PEOPLE -- HERE, THE DEFENDANTS TOOK DIRECT ACTION

 4    TO BLOCK ACCESS TO THE COAST.

 5                 AND WE'D BE HAPPY TO GO INTO THE CASES IN

 6    MORE DEPTH, IF THE COURT WOULD LIKE.  BUT, AGAIN, WE

 7    RESPECTFULLY SUBMIT THAT WELL-ESTABLISHED CASE LAW

 8    MAKES IT CLEAR THAT THE TERM "DEVELOPMENT" SHOULD BE

 9    GIVEN AN EXPANSIVE DEFINITION.  AND IT INCLUDES ALL

10    FORMS OF BLOCKING ACCESS TO THE PUBLIC COAST.

11             THE COURT:  I APPRECIATE THAT.

12                 DID YOU WANT TO RESPOND, MS. HEWITT?

13             MS. HEWITT:  YOUR HONOR, ONLY TO SAY THAT THE

14    COURT VERY THOROUGHLY ITSELF EXAMINED THOSE CASES IN

15    ITS TENTATIVE.  AND I'M HAPPY TO RECITE WHAT WE THOUGHT

16    WERE EXCELLENT POINTS, BUT I'M NOT INCLINED TO DO SO

17    UNLESS THE COURT WOULD LIKE US TO GO INTO MORE DETAIL.

18             THE COURT:  ALL RIGHT.  SO I DID TRY TO LOOK

19    AT EVERY SINGLE CASE CITED.  AND I THINK ALL OF US ARE

20    IN A LITTLE BIT OF UNCHARTERED WATERS HERE BECAUSE

21    THERE IS NO CASE THAT, TO MY THINKING, IS ANALOGOUS TO

22    THE PLAINTIFF'S CASE HERE.

23                 BUT I THINK THE SENSIBLE THING IS FOR THE

24    COURT TO TAKE ANOTHER LOOK AT THE CASES THAT YOU HAVE

25    IDENTIFIED, MR. RASKIN, AND SATISFY MYSELF ONE WAY OR

26    ANOTHER WHETHER THEY WOULD SUGGEST A DIFFERENT RESULT.

27                 I KNOW I DISCUSSED BOTH SURFRIDER CASES.

28    YES.  LET'S JUST SEE.  AND YOU ADDRESSED IT REALLY
```

Exhibit C, Page 46

10

1    BECAUSE MY POINT WAS, THIS WASN'T A CASE ABOUT

2    DEVELOPMENT, PER SE.

3              SO I'LL TAKE IT UNDER SUBMISSION.

4         MR. GROCHOW:  KEVIN GROWCHOW ON BEHALF OF THE

5    CITY.

6              JUST TO QUICKLY ADDRESS THE PACIFIC

7    PALISADES CASE THAT MR. RASKIN WAS JUST TALKING ABOUT.

8         THE COURT:  CAN YOU GIVE ME THE CITE?

9         MR. GROCHOW:  YES.  THAT IS 55 CAL.4TH 783.

10        THE COURT:  THANK YOU.

11        MR. GROCHOW:  THE REASON WHY -- WELL,

12   MR. RASKIN QUOTED THAT TO -- FOR THE PREMISE THAT

13   DEVELOPMENT IS NOT RESTRICTED TO PHYSICAL ALTERATION OF

14   THE LAND.  THAT HAS TO BE TAKEN IN THE CONTEXT OF THE

15   CASE, WHICH IS A SUBDIVISION ISSUE.  AND SUBDIVISIONS,

16   WHILE NOT PHYSICALLY ALTERING LAND, ARE SPECIFICALLY

17   CONTEMPLATED WITHIN THE COASTAL ACT.  AND YOU MADE THAT

18   POINT IN YOUR TENTATIVE VERY CLEARLY.

19        THE COURT:  THANK YOU.

20             AND THAT NOTION THAT IT DOESN'T REQUIRE A

21   PHYSICAL ALTERATION OF THE LAND IS NOT SOMETHING NEW.

22   WE HAVE SEEN THAT IN A NUMBER OF CASES ALONG THE WAY.

23   AND, OF COURSE, I AGREE WITH THAT BECAUSE IF YOU -- YOU

24   CAN HAVE A BARRIER THAT IS NOT A PHYSICAL ALTERATION OF

25   THE LAND.

26             AND EVEN THE GUALALA CASE, I MEAN,

27   OBVIOUSLY, DEBRIS FALLING DOWN FROM FIREWORKS IS NOT A

28   PHYSICAL ALTERATION OF THE LAND.  IT MAY BE A POLLUTION

11

1    OF THE LAND.  SO I APPRECIATE THAT.

2              BUT I THINK THAT WHAT I SHOULD DO IS,

3    TAKE A LOOK AT THE CASES YOU HAVE CITED, THE FEDUNIAK

4    CASE, WHICH I PULLED UP HERE, THE PACIFIC PALISADES,

5    LESLIE SALT AND THE FIRST SURFRIDER CASE.

6              MR. RASKIN:  YOUR HONOR, I THINK ALSO THE

7    SECOND SURFRIDER CASE IS DIRECTLY ON POINT AS WELL AND

8    CERTAINLY IS NOT UNCHARTERED TERRITORY, AS YOUR HONOR

9    SUGGESTED.  IN THE SECOND SURFRIDER CASE, PAGE 248 OF

10   THAT OPINION, THAT'S 14 CAL.APP. 5TH 238 AT PAGE 248,

11   THERE, THERE'S THE EXACT EXAMPLE OF SECURITY GUARDS

12   BLOCKING ACCESS.

13              BUT, INDEED, THIS TYPE OF BEHAVIOR

14   HAPPENS ALL THE TIME.  INDEED, COASTAL PERMITS ARE

15   GRANTED FOR ALL SORTS OF NON-PHYSICAL DEVELOPMENTS,

16   WHETHER IT BE BEACH VOLLEYBALL TOURNAMENTS, SWIM MEETS.

17   FOR EXAMPLE, THE CITY OF REDONDO BEACH WILL BE HOSTING

18   THE OPEN WATER SWIM OLYMPICS WHEN THE OLYMPICS COME TO

19   LOS ANGELES.  THERE, THE CITY IS TALKING ABOUT ITS NEED

20   TO GET COASTAL DEVELOPMENT PERMITS FOR THE SWIM

21   COMPETITION.

22              BY THIS COURT'S VERY LOGIC, THE EXACT

23   CONDUCT THAT'S ALLEGED HERE GIVES RISE TO A COASTAL ACT

24   VIOLATION.

25              AND, IF I MAY, WE SHOULD ALSO EMPHASIZE

26   THAT WHAT THE COURT IS ASKING US TO DO HERE, TO SHOW

27   THAT THE CITY EMPLOYEES ACTUALLY CONSTRUCTED PHYSICAL

28   STRUCTURES ON THE BEACH OR FORMED AGREEMENTS TO DO SO,

12

1    THAT'S SOMETHING THAT, WELL, ONE, WE DON'T NEED TO

2    PROVE.  AND, SECOND, THAT WE CAN'T PROVE.

3              AND WE WOULD RESPECTFULLY ASK THAT, IF

4    THIS COURT IS INCLINED TO STICK TO THE TENTATIVE, THAT

5    THE COURT SIMPLY STAY THE PROCEEDINGS WITH RESPECT TO

6    THE REMAINING DEFENDANTS SO THAT WE CAN ADJUDICATE THIS

7    ISSUE ON APPEAL.

8              THE COURT:  I'M NOT ADVERSE TO THAT.  I MIGHT

9    EVEN BE WILLING TO CERTIFY IT.  ALTHOUGH, MY EXPERIENCE

10   WHEN I'VE CERTIFIED SOMETHING ON APPEAL, I DON'T THINK

11   THE COURT OF APPEALS PAYS ANY ATTENTION, BUT WE CAN

12   TRY.  I'M NOT ADVERSE TO THAT AT ALL.

13             MS. HEWITT:  YOUR HONOR, I WANTED TO ALSO

14   EMPHASIZE, THE LESLIE SALT CASE WAS ALSO ADDRESSED AT

15   LENGTH IN THE CITY'S MOVING PAPERS.  SO THERE IS A LONG

16   DISCUSSION IN THERE, YOUR HONOR, ABOUT THAT.  AND IT IS

17   NOT MENTIONED IN THE OPPOSITION FOR PLAINTIFF.

18             AND THE REASON -- LET ME JUST ADD THAT

19   THE REASON WE DISCUSSED THE FEDUNIAK AND LESLIE SALT IS

20   BECAUSE THAT WAS (TECHNICAL ISSUES) PLAINTIFF CITED IN

21   THE COMPLAINT.  SO WE WERE TRYING TO BE FORWARD

22   THINKING AND ADDRESS THAT IN OUR MOVING PAPERS.  THE

23   FACT THAT THEY DID NOT ADDRESS THAT IN THEIR OPPOSING

24   PAPERS, PERHAPS IT'S NOT ON POINT.

25             BUT, AGAIN, GIVEN -- LOOKING AT YOUR

26   HONOR'S DISCUSSION IN THE TENTATIVE THAT THIS IS

27   UNCHARTERED WATERS, IT'S NOT ONLY REALLY SORT OF

28   UNCHARTERED WATERS, BUT IT'S A HUGE EXTENSION OF THE

13

1    ACT'S INTENT BECAUSE THESE PIECES THAT WE'RE DISCUSSING

2    HERE DO NOT CONTEMPLATE PLACING THIS SORT OF LIABILITY

3    ON THE CITY FOR ACTION THAT IS JUST NOT TAKEN, WHICH

4    IS, AGAIN, A POINT THAT YOUR HONOR DISCUSSED AT LENGTH

5    IN THE TENTATIVE.

6              (TECHNICAL ISSUES) -- SO, THEREFORE, THE

7    CASE LAW THAT WE'RE TALKING ABOUT HERE IS JUST NOT ON

8    POINT BECAUSE I DON'T BELIEVE, YOUR HONOR, ANYBODY HAS

9    CONTEMPLATED IMPOSING LIABILITY ON A CITY MERELY FOR

10   HOW IT IMPLEMENTS ITS LOCAL COASTAL ACT PLAN.  AND I

11   KNOW YOUR HONOR HAS EXTENSIVE EXPERIENCE WITH THE

12   COASTAL ACT.  AND THAT WAS -- I BELIEVE THAT CAME OUT

13   VERY CLEARLY IN THE TENTATIVE RULING, YOUR HONOR.

14        THE COURT:  IT'S AN INTERESTING QUESTION

15   BECAUSE, YOU KNOW, I'M TAKING THE POINT OF VIEW THAT

16   "USE" IS A TERM OF ART IN THE ACT.  BUT YOU COULD

17   ARGUE, AS THE PLAINTIFFS DO, THE PLAIN LANGUAGE USE OF

18   WATER, IT'S JUST THE PLAIN LANGUAGE SENSE OF USE THAT

19   WE MIGHT USE IN EVERYDAY CONVERSATION.  SO THAT'S WHY

20   IT MAY BE SOMETHING THAT THE COURT OF APPEALS FINDS

21   INTERESTING AND MIGHT EVEN TAKE UP EARLY.

22             BUT LET'S JUST THINK THIS THROUGH,

23   MR. RASKIN, FOR A MINUTE.  UNDER MY TENTATIVE WHERE

24   I'VE GIVEN YOU JUST SUCH A NARROW BASIS FOR AMENDING,

25   YOU'RE BASICALLY SAYING, WE CAN'T ALLEGE THAT THE CITY

26   TOOK ACTION BEFOREHAND OR ACTUALLY PARTICIPATED.  THEN

27   THE JUDGMENT OR THEN THE DEMURER WOULD BE SUSTAINED.

28   AND THERE WOULD BE A JUDGMENT ENTERED AGAINST THE CITY,

14

1    WHICH WOULD BE AN APPEALABLE ORDER.  SO I THINK YOU

2    WOULD BE IN GOOD SHAPE, ACTUALLY.

3            AND AS FOR THE REST OF THE CASE, IT'S UP

4    TO YOU HOW YOU WANT TO PROCEED.

5        MR. RASKIN:  I THINK THAT'S RIGHT.  AND WE

6    WOULD RESPECTFULLY REQUEST A STAY WITH RESPECT TO THE

7    OTHER INDIVIDUAL DEFENDANTS.

8            BUT I THINK IT ALSO BEARS EMPHASIS THAT,

9    WE NARROWED THE COMPLAINT DOWN TO ONLY 25 PAGES AT YOUR

10   HONOR'S REQUEST.  THERE ARE PREVIOUS VERSIONS OF OUR

11   COMPLAINT THAT INCLUDE MUCH MORE DETAILED FACTUAL

12   ALLEGATIONS.  AND SO, TO SOME EXTENT, WE'VE BEEN

13   HAMSTRUNG BY THE COURT'S OWN REQUEST THAT WE LIMIT THE

14   LENGTH AND EXTENT OF OUR PLEADINGS HERE.

15           BUT I WOULD LIKE TO GO BACK TO ONE OF THE

16   SUBSTANTIVE POINTS THAT WAS ADDRESSED EARLIER.  THIS

17   ISN'T A CASE ABOUT THE IMPLEMENTATION WITH RESPECT TO

18   DESIGNING A LOCAL COASTAL PROGRAM OR IMPLEMENTING

19   ORDINANCE.  AND, IN THAT SENSE, THE YOST CASE IS

20   DISTINGUISHABLE BECAUSE, THERE, THAT WAS SIMPLY A CASE

21   ABOUT THE CITY DESIGNING ZONING FOR AN AREA.

22           HERE, THIS IS A SEPARATE ISSUE.  THIS IS

23   ABOUT STRICT REQUIREMENTS TO GRANT PERMITS WHENEVER

24   THERE IS ACTIVITY THAT FITS THE DEFINITION OF

25   "DEVELOPMENT."

26           AND IT BEARS EMPHASIS TOO THAT THE

27   DEFINITION OF "DEVELOPMENT" INCLUDES A FAR MORE

28   EXPANSIVE CONSTRUCTION OF ACTIONS THAN SIMPLY USE OF

15

1    LAND.  THAT'S ONLY ONE NARROW PART OF SECTION 3016.  IT

2    ALSO INCLUDES ACTIVITIES THAT IMPACT ACCESS TO WATER

3    SEPARATE FROM THE TERM "USE."  AND THAT'S THE PORTION

4    OF THE DEFINITION THAT THE SUPREME COURT RELIED ON IN

5    PACIFIC PALISADES BOWL AND OTHER CASES IN DETERMINING

6    THAT THE TERM "DEVELOPMENT" SHOULD BE GIVEN A RATHER

7    EXPANSIVE DEFINITION.

8            AND, RESPECTFULLY, THE TENTATIVE'S FOCUS

9    ON THE TERM "USE" IS INCORRECT BECAUSE, HERE, WE HAVE

10   SHOWN THAT CITY POLICE ACTIVITY OF TARGETING PEOPLE

11   COMING TO THE COAST, OF SELECTED ENFORCEMENT OF LAWS

12   AND THE CITY POLICE WORKING IN CONJUNCTION WITH THE

13   LUNADA BAY BOYS IS EXACTLY THE TYPE OF ACTIVITY THAT

14   FITS THE DEFINITION OF IMPACTING PUBLIC ACCESS TO

15   WATER.

16           THE COURT:  THAT'S THE RUB, SO I HEAR YOU.

17   AND I THINK THAT'S THE MOST DIFFICULT, PROBABLY, ISSUE

18   IN MY TENTATIVE.

19            BUT, AGAIN, I THINK IF YOU LOOK AT THE

20   COASTAL ACT IN ITS HISTORICAL CONTEXT, IT'S REALLY

21   ABOUT LAND USE, WATER USE AND USE OF LAND, USE OF

22   RESOURCES, NOT ABOUT THE PERSONAL CONDUCT THAT COULD

23   BE, ARGUABLY, CRIMINAL CONDUCT OR FAILURE TO ENFORCE

24   LAWS.

25            THERE ARE MANY OTHER LAWS THAT CAN BE

26   ENFORCED THAT PREVENT THAT CONDUCT.  IF THERE WERE

27   ASSAULTS HAPPENING, THEY COULD BE PROSECUTED CRIMINALLY

28   OR CIVILLY.

Exhibit C, Page 52

16

1      BUT THE QUESTION IS, DOES THE COASTAL ACT

2  REACH THIS CONDUCT OR ARE THERE OTHER LAWS THAT PROVIDE

3  A REMEDY FOR PEOPLE WHO HAVE BEEN WRONGED?

4      MR. RASKIN:  I WOULD RESPECTFULLY SUBMIT, YOUR

5  HONOR, THAT IF WE TAKE THE TENTATIVE'S CONCLUSION TO

6  ITS LOGICAL CONCLUSION, WE WOULD READOUT THE LANGUAGE

7  OF ACCESS TO WATER OUT OF THE STATUTE.  AND THAT'S

8  CLEARLY NOT WHAT THE LEGISLATURE INTENDED.

9      AND, FOR THAT MATTER, THERE ARE OTHER

10 CASES THAT DO SUPPORT ACTIVITIES BEING ACTIONABLE UNDER

11 THE COASTAL ACT.  THE MARTINS BEACH CASE IS ONE

12 EXAMPLE.  GREENFIELD VERSUS MANDALAY SHORES IS ANOTHER

13 WHERE, THERE, THE COURT LOOKED AT CITY ACTION THAT

14 PREVENTED PEOPLE FROM STAYING IN SHORT-TERM RENTALS.

15     SO THERE ARE PLENTY OF CASE LAW EXAMPLES

16 TO SUPPORT THE EXPANSIVE DEFINITION OF "ACCESS" AS

17 BEING ACTIONABLE UNDER THE COASTAL ACT.

18     MR. HEWITT:  AGAIN, THE COURT ADDRESSED

19 GREENFIELD AT LENGTH IN ITS TENTATIVE.  AGAIN, I'M NOT

20 SURPRISED.  I'M NOT SURPRISED BASED ON THE COURT'S

21 INTIMATE KNOWLEDGE OF THE COASTAL ACT.

22     I THINK THAT IT MAY NOT BE -- I DON'T

23 BELIEVE IT'S CORRECT THAT YOU CAN READOUT THE USE OF

24 WATER IF THE TENTATIVE WERE TO BECOME THE ORDER.  AS WE

25 DISCUSSED IN THE MOTION AND IN THE EXTENSIVE

26 LEGISLATIVE HISTORY OF THIS PARTICULAR ACT, THERE WERE

27 VERY SPECIFIC SITUATIONS THAT WERE BEING IMAGINED AT

28 THE TIME.  USE OF WATER, ACCESS TO WATER AT THE TIME

17

1    MEANT BARRING PEOPLE FROM BEING ABLE TO GET TO THE

2    WATER DUE TO SOME PHYSICAL EASEMENT.

3              PUTTING THE GATE, THE GATE IN --

4    (TECHNICAL ISSUE) -- ACTION, THE GATE CAME DOWN.  A

5    PRIVATE OWNER OF PROPERTY THEN TOOK OFF THE -- PUT ON A

6    SIGN THAT SAID, "NO MORE FREE PARKING" LITERALLY AND

7    FIGURATIVELY BECAUSE THE PREVIOUS OWNER ALLOWED

8    PARKING, ALLOWED PEOPLE TO USE THAT ROAD.  AND THEN

9    WHEN HE BOUGHT IT, HE SAID, "NO MORE."

10             SO WHAT IS -- I THINK WHAT'S IMPORTANT IN

11   ALL THESE CASES WE'RE DISCUSSING, ESPECIALLY THESE

12   CASES WE ALL ADMIT ARE GENERALLY PRIVATE OWNERS OF

13   PROPERTY.  IN NO PLACE HAS THERE BEEN AN EFFORT TO THEN

14   BRING THE CITY INTO THE CASE, EITHER BY THE COMMISSION

15   OR BY OTHER PRIVATE CITIZENS TO BRING THE CITY INTO THE

16   CASE MERELY FOR NOT DOING SOMETHING ABOUT PRIVATE

17   CONDUCT THAT THEY SEE GOING ON OUT THERE.  THERE JUST

18   ISN'T THAT THERE.  AND I THINK THAT SPEAKS VOLUMES

19   HERE.

20             THERE ARE A MYRIAD OF CASES THAT ARE

21   GOING ON, I'M SURE.  I READ (TECHNICAL ISSUES)

22   LOW-INCOME HOUSING -- (TECHNICAL ISSUES).

23             SO I THINK, AS IT AFFECTS THE MOTION, TO

24   BRING THIS CASE TO WHAT THE PLAINTIFFS ARE LOOKING AT

25   WOULD OPEN UP A CAN OF WORMS THAT FAR EXCEEDS WHAT THE

26   ACT WAS MEANT TO -- (TECHNICAL ISSUES).

27             THE COURT:  OKAY.

28             MR. RASKIN:  IF I MAY, YOUR HONOR?

Exhibit C, Page 54

18

1          THIS IS THE CITY'S LAND.  IT'S THE CITY'S

2  PROPERTY WHERE THIS VIOLATION IS OCCURRING.  AND THAT'S

3  PARTLY WHY WE BROUGHT IN THE DISCUSSION ABOUT STRICT

4  LIABILITY HERE.

5          THERE'S NO NEED TO GET TO LEGISLATIVE

6  HISTORY HERE BECAUSE THE PLAIN LANGUAGE OF THE STATUTE

7  USES THE TERM "ACCESS TO WATER."  AND SO THE CASE LAW

8  IS CLEAR THAT LEGISLATIVE HISTORY IS NOT NECESSARY WHEN

9  THE PLAIN LANGUAGE OF THE STATUTE IS CLEAR, AS IS THE

10 CASE HERE.

11          AND SO FOR THAT MATTER, THERE ARE CASES,

12 INDEED, WHERE CITIES ARE REQUIRED TO GET COASTAL

13 DEVELOPMENT PERMITS FOR THEIR ACTION.  THE GREENFIELD

14 CASE IS ONE EXAMPLE WHERE THE COURT OF APPEAL SAID THAT

15 YOU NEED A CDP TO CHANGE A SYSTEM THAT IMPACTS ACCESS

16 TO WATER.

17          SO, AGAIN, WE WOULD SUBMIT THAT THIS IS

18 NOT UNCHARTERED TERRITORY.  THE LANGUAGE OF THE STATUTE

19 IS CLEAR.  AND THE ALLEGATIONS THAT WE HAVE SHOWN

20 CLEARLY SUPPORT THE CITY IS IN FACT LIABLE UNDER THE

21 PLAIN TERMS OF THE COASTAL ACT.

22     THE COURT:  I DIDN'T THINK THAT CITIES OWNED

23 THE BEACH.

24          WHO OWNS THE BEACH?

25     MR. RASKIN:  THE CITY DOES.  IT'S CITY

26 PROPERTY.

27     THE COURT:  MS. HEWITT, CAN YOU HEAR US?

28          SHE CAN'T HEAR US.

19

1           MR. RASKIN:  IT'S ALLEGED THAT IN THE

2    COMPLAINT THAT IT'S CITY-OWNED PROPERTY.  IT'S TRUE AND

3    IT'S ALSO ALLEGED IN THE COMPLAINT.

4           THE COURT:  OKAY.  MS. HEWITT?

5               ALFREDO, ONE OF THE ATTORNEYS CAN NO

6    LONGER HEAR US.

7           MR. RASKIN:  IF I MAY, YOUR HONOR?

8               THE BEACH WAS GRANTED TO THE CITY OF

9    PALOS VERDES ESTATES PUBLIC TRUST.  IT WAS GRANTED BY

10   THE STATE LAND COMMISSION, I BELIEVE, NEARLY A HUNDRED

11   YEARS AGO.  IT IS HELD IN TRUST BY THE CITY FOR THE

12   PUBLIC'S BENEFIT.

13          THE COURT:  OKAY.  THAT'S GOOD TO KNOW.  I'M

14   JUST CONCERNED WE'RE HAVING AN EX PARTE CONVERSATION.

15          MR. RASKIN:  MR. GROCHOW IS HERE.  HE

16   REPRESENTS THE CITY AS WELL.  SO IT WOULDN'T BE EX

17   PARTE.

18          THE COURT:  OKAY.

19          MR. GROCHOW:  THAT'S CORRECT, YOUR HONOR.

20              HOWEVER, THAT DOES NOT PUT IT INTO

21   CONTEXT WITH GREENFIELD AT ALL.  GREENFIELD INVOLVED A

22   PERMIT THAT NEEDED TO BE ACTED ON.  AND THE COURT

23   MERELY HELD THAT THE CITY AND THE COASTAL COMMISSION

24   NEEDS TO ADDRESS THAT PERMIT APPLICATION.  AND THAT'S

25   WHERE YOU DISTINGUISH THAT IN THIS TENTATIVE, YOUR

26   HONOR.  THERE'S BEEN NO PERMIT APPLICATION FOR THE ROCK

27   FORT OR ANY OF THE OTHER DEVELOPMENTS.  IT'S CLEARLY

28   DISTINGUISHABLE ON THAT GROUND.

20

1          THE COURT:  WILL YOU E-MAIL MS. HEWITT AND

2     TELL HER WE THINK THE PROBLEM IS ON HER END, AND SHE

3     MIGHT WANT TO GO OUT AND COME BACK AGAIN?

4               WE HAVE AN ORANGE FLAG NEXT TO HER NAME

5     THAT SAYS "LOW," SO WE THINK SHE HAS A BAD CONNECTION.

6          MR. GROCHOW:  I WILL LET HER KNOW.

7          THE COURT:  OKAY.

8          MR. GROCHOW:  SHE'S TRYING TO RECONNECT.

9          THE COURT:  IS THAT RIGHT THAT, BASICALLY, THE

10    CITY DOES OWN THE BEACH IN TRUST FOR THE PUBLIC, ET

11    CETERA AND SO ON?

12         MR. GROCHOW:  THAT'S RIGHT.

13              THERE'S A FOUR-AND-A-HALF MILE STRETCH OF

14    COASTLINE THAT THE CITY OWNS.  IT COMBINED THE TITLE

15    LAND GRANT AND THE SHORELINE PRESERVE TOGETHER.  AND

16    SO, YEAH, THAT IS CORRECT.

17         THE COURT:  SO IS IT JUST PATCH WORK?  I WAS

18    THINKING ABOUT WILL ROGERS STATE PARK, WHICH IS A BEACH

19    PARK.  SO IT MUST JUST BE A PATCH WORK OF CITY-STATE

20    OWNERSHIP, I SUPPOSE.

21         MR. GROCHOW:  THE COASTLINE ITSELF, THERE

22    MIGHT BE SOME STATE LAND MIXED IN.  I'M NOT FAMILIAR

23    ABOUT THAT.

24              BUT THE COASTLINE ITSELF IS PRETTY

25    CONTINUOUS AND NON-BROKEN UP TO THE BORDER OF THE

26    SHORELINE PRESERVE, WHICH BY IN LARGE MATCHES THE

27    COASTAL ZONE, BUT NOT EXACTLY.

28         THE COURT:  OKAY.  THIS IS WAY TOO DEEP INTO

21

1    THE LAND USE FOR ME, BUT IT'S INTERESTING.

2            MR. RASKIN:  BY WAY OF BACKGROUND, NEARLY

3    EVERY COASTLINE HAS BEEN GRANTED TO LOCAL GOVERNMENT BY

4    THE STATE LAND COMMISSION.

5            THE COURT:  OKAY.  HAVING GROWN UP IN A

6    LAND-LOCKED STATE BACK EAST, I JUST DON'T KNOW ABOUT

7    THESE THINGS.

8                ALL RIGHT.  MS. HEWITT, CAN YOU HEAR US?

9                I CAN'T HEAR YOU.

10               I THINK SHE'S GOT A BAD CONNECTION.

11               WELL, I THINK, MR. GROCHOW, WITH YOU

12   PRESENT, WE'RE OKAY.

13               MY SUGGESTION IS AS FOLLOWS:  THAT I'M

14   GOING TO TAKE IT UNDER SUBMISSION.  AND I'M GOING TO

15   SET A STATUS CONFERENCE IN ABOUT A MONTH, AND WE'LL SEE

16   WHERE WE ARE.

17               WE MAY HAVE A NOTICE OF APPEAL OR A

18   PETITION FOR WRIT OF MANDATE.  BUT IF I GRANT LEAVE TO

19   AMEND IN 30 DAYS AND WE GET BACK TOGETHER IN 40 DAYS,

20   WE'LL KNOW WHAT THE PLAINTIFFS HAVE ELECTED TO DO.

21               DOES THAT MAKE SENSE TO EVERYBODY?

22           MR. FRANKLIN:  IT DOES, YOUR HONOR.  THIS IS

23   KURT FRANKLIN.

24               AND WE CAN RAISE IT AT THE TIME.  BUT

25   BECAUSE THERE ARE COASTAL ACT CLAIMS AGAINST THE

26   INDIVIDUALS, DEPENDING ON WHAT YOU DO, I WOULDN'T BE

27   SURPRISED IF WE RECEIVE SIMILAR MOTIONS, WHICH WOULD

28   MAKE SENSE FOR US TO APPEAL IT.

22

1          THE COURT:  WE WILL HAVE TO THINK ALL OF THAT

2     THROUGH AS A WAY TO MANAGE THE CASE MOST EFFICIENTLY.

3               SO THE COURT WILL TAKE IT UNDER

4     SUBMISSION.  WE'LL SET A FURTHER STATUS CONFERENCE.

5               ALFREDO, CAN YOU GIVE ME A DATE IN

6     MID-AUGUST, PLEASE?

7          THE CLERK:  AUGUST 26 AT 11:00.

8          THE COURT:  AUGUST 26TH AT 11:00 OKAY?

9               THAT'LL JUST BE A FURTHER STATUS

10    CONFERENCE.  I WILL HAVE RULED ON THIS BY THEN.

11              AND IF I STAY WITH THE TENTATIVE RULING,

12    IT LARGELY MOOTS THE DISCOVERY DISPUTES WITH THE CITY.

13    SO WE'LL HAVE TO TALK ABOUT WHAT ELSE IS NEEDED TO

14    MANAGE THE CASE FORWARD.

15          MR. FRANKLIN:  IF YOU STAY WITH THE TENTATIVE,

16    PLAINTIFFS ARE UNABLE TO AMEND TO ALLEGE THAT THE CITY

17    WAS ACTIVELY INVOLVED IN THE CONSTRUCTION OF THE ROCK

18    FORT.

19          THE COURT:  DID SOMEONE TRY TO SPEAK?

20          MR. COOPER:  ROBERT COOPER ON BEHALF OF

21    DEFENDANT BRANT BLAKEMAN.

22              WE WERE GOING TO HAVE A CMC TODAY.  AND I

23    TAKE IT THAT WE'RE GOING TO KICK THAT AND HAVE IT ON

24    AUGUST 26, WHICH IS FINE.

25              BUT WE HAVE A TRIAL DATE SITTING OUT

26    THERE.  WE HAVE AN MSJ DATE SITTING OUT THERE.  AND WE

27    WROTE SOME NOTES, AND YOU REPLIED IMMEDIATELY EVERY

28    TIME WE DID THAT.  WE KNOW THOSE DATES ARE SORT OF NOT

23

```
 1    REALLY EXISTING ANYMORE.  BUT MAYBE YOU SHOULD
 2    OFFICIALLY VACATE THEM FOR RESETTING SO WE'RE NOT --
 3    THERE WAS A SUMMARY JUDGMENT DATE.  WE ALL AGREED,
 4    PLAINTIFFS AND DEFENDANTS, TO VACATE IT AND GET A NEW
 5    DATE WITH ALL THE STUFF GOING ON AND, OF COURSE, THE
 6    FACT THAT WE HAD NO ACCESS TO THE COURT.  MAYBE VACATE
 7    THE TRIAL DATE AND MSJ DATE THAT ARE PENDING SO THAT WE
 8    CAN SET THEM ON AUGUST 26TH.
 9            THE COURT:  OKAY.  ALFREDO, I CAN'T PULL UP
10    E-COURT.
11                WHAT IS THE TRIAL DATE THAT WE HAVE SET?
12            THE CLERK:  I SHOW DECEMBER 14TH, YOUR HONOR.
13    I DON'T SEE ANY OTHER DATES, UNLESS IT'S A RESERVED
14    DATE.
15            THE COURT:  UNFORTUNATELY, I CAN'T HEAR YOU.
16                NOVEMBER 14TH?
17            MR. COOPER:  SEPTEMBER 14TH.
18            THE COURT:  SEPTEMBER 14TH.  AND THERE'S
19    PROBABLY AN FSC DATE RIGHT BEFORE IT.
20                SO I AGREE WITH YOU.  I THINK I SHOULD
21    VACATE THOSE DATES.  AND LET'S CALL THE AUGUST 26
22    STATUS CONFERENCE A TRIAL SETTING CONFERENCE TO REMIND
23    US TO THINK ABOUT WHAT WE'RE GOING TO DO.
24                THE MSJ DATE WAS A HEARING DATE OR
25    DEADLINE-FOR-FILING DATE?
26            MR. COOPER:  YOUR HONOR, I THINK I'M THINKING
27    OF THE FACT THAT WE HAD 75 DAYS PRIOR TO THAT AS A DATE
28    THAT WAS COMING AND GOING WHEN WE WERE LAST WRITING YOU
```

24

1    A NOTE.  SO WE ALL AGREED THAT DATE SHOULDN'T BIND

2    ANYBODY, BUT IT WASN'T A DATE ON THE COURT'S CALENDAR,

3    PER SE.  IT WAS JUST IN ACCORD WITH THE TRIAL DATE.

4            MR. RASKIN:  WE AGREE.

5            THE COURT:  I'VE VACATED THE TRIAL DATE, SO

6    YOU SHOULD BE GOOD.

7            MR. COOPER:  THAT SHOULD COVER IT.

8            THE CLERK:  I SHOW THAT WE HAVE A RESERVED MSJ

9    DATE AUGUST 4, AUGUST 6 AND AUGUST 12.

10               DO YOU WANT TO REMOVE THAT FROM OUR

11   INFORMAL CALENDAR?

12           THE COURT:  VACATE ALL OF THOSE RESERVED

13   DATES.

14           THE CLERK:  OKAY.

15           THE COURT:  YES, PLEASE.  THANK YOU.

16               SO IS NOTICE WAIVED THAT I'VE TAKEN IT

17   UNDER SUBMISSION, AND WE HAVE SET FURTHER STATUS

18   CONFERENCE, AND WE VACATED SOME DATES?

19           MR. RASKIN:  NOTICE WAIVED.

20           MR. GROCHOW:  THE STAY ON DISCOVERY TO THE

21   CITY, THAT REMAINS IN PLACE WHILE THIS IS UNDER

22   SUBMISSION; CORRECT?

23           THE COURT:  CORRECT.  I THINK THAT'S FAIR.

24               SINCE I DON'T KNOW THAT I HAVE EVERYBODY

25   ON THE LINE, I THINK I BETTER HAVE PLAINTIFFS GIVE

26   NOTICE, ACTUALLY, BECAUSE I JUST CAN'T BE CERTAIN WITH

27   THE TECHNOLOGY.

28           MR. RASKIN:  WE'LL DO SO, YOUR HONOR.

25

1          ON THE STAY AT LEAST, VIS-A-VIS THE CITY,

2    MAY IT BE RECIPROCAL?

3          THE COURT:  YES.  WE'RE GOING TO TREAD WATER

4    UNTIL AUGUST 26TH AS TO ANY PROCEEDINGS BETWEEN THE

5    CITY AND THE PLAINTIFFS FOR SURE.

6          OKAY.  WELL, I APPRECIATE EVERYBODY'S

7    BRIEFING ON IT.  AND YOU MADE SOME GOOD POINTS,

8    MR. RASKIN.  I'M GOING TO THINK ABOUT IT.

9          AND MS. HEWITT AS WELL, OF COURSE.

10          THANK YOU VERY MUCH.

11          MR. RASKIN:  THE TIME OF THE STATUS

12    CONFERENCE, YOUR HONOR?

13          THE COURT:  11:00 O'CLOCK IS THE DATE FOR THE

14    STATUS CONFERENCE.

15          EVERYBODY GOT THAT?

16          THANK YOU.

17          MR. RASKIN:  THANK YOU, YOUR HONOR.

18          THE COURT:  THANK YOU.

19          (END OF PROCEEDINGS)

20

21

22

23

24

25

26

27

28

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2              FOR THE COUNTY OF LOS ANGELES

 3

 4     DEPARTMENT SSC7  HON. AMY D. HOGUE, JUDGE PRESIDING

 5

 6     CORY SPENCER, ET AL.,              )
                                          )
 7                      PLAINTIFFS,       )
                                          )
 8                  V.                    ) NO. BC629596
                                          )
 9     LUNADA BAY BOYS,                   )
       ET AL.,                            )
10                                        )
                        DEFENDANTS.       )
11     _____)

12

13

14

15

16          I, ALEXANDER T. JOKO, COURT REPORTER PRO TEM,

17     OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR

18     THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

19     FOREGOING PAGES COMPRISE A FULL, TRUE, AND CORRECT

20     TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

21     ABOVE-ENTITLED MATTER ON JULY 9, 2020.

22

23          DATED THIS 13TH DAY OF JULY, 2020.

24

25

26

27          ALEXANDER T. JOKO

28          CSR NO. 12272
```

1

## CERTIFICATE/PROOF OF SERVICE

2

*Spencer, et al. v. Lunada Bay Boys, et al.*

3

USDC Central District Case No. 2:16-cv-02129-MWF-RAO

I, Joanne Kenney, declare:

4

5

I am a citizen of the United States and employed in Orange County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 5 Park Plaza, Suite 1500, Irvine, California 92614-8595.

6

7

On **July 15, 2020,** I electronically filed the attached document:

8

**SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS CITY OF PALOS VERDES ESTATES AND CHIEF OF POLICE JEFF KEPLEY'S SUR-REPLY TO PLAINTIFFS' MOTION TO STAY ENFORCEMENT OF COSTS JUDGMENT**

9

10

with the Clerk of the court using the CM/ECF system which will then send a notification of such filing to the following:

11

12

| | |
|---|---|
| Alison Kathleen Hurley | ahurley@bremerwhyte.com |
| Candice P. Shih | cshih@hansonbridgett.com |
| Courtney Marie Serrato | cserrato@bremerwhyte.com |
| Dana Alden Fox | dana.fox@lewisbrisbois.com |
| Daniel Michael Crowley | dmcrowley@boothmitchel.com |
| Edward E. Ward, Jr. | edward.ward@lewisbrisbois.com |
| J. Patrick Carey | pat@patcareylaw.com |
| John Peter Worgul | jworgul@veatchfirm.com |
| Kavita Tekchandani | kavita@ottenlawpc.com |
| Kurt A. Franklin | kfranklin@hansonbridgett.com |
| Lisa M. Pooley | lpooley@hansonbridgett.com |
| Mark Fields | fields@markfields.com |
| Peter H. Crossin | pcrossin@veatchfirm.com |
| Peter T. Haven | peter@havenlaw.com |
| Richard Paul Dieffenbach | rdieffenbach@veatchfirm.com |
| Robert Scott Cooper | rcooper@buchalter.com |
| Samantha D. Wolff | swolff@hansonbridgett.com |
| Serena Lee Nervez | snervez@veatchfirm.com |
| Thomas M. Phillips | tphillips@thephillipsfirm.com |
| Tyson M. Shower | tshower@hansonbridgett.com |
| Victor J. Otten | vic@ottenlawpc.com |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

I hereby certify that I deposited such envelope in the mail at Irvine, California.  The envelope was mailed with postage thereon fully prepaid.  I am readily familiar with the firm's practice for collection and processing documents for

28

KUTAK ROCK LLP
ATTORNEYS AT LAW
IRVINE

CERTIFICATE/PROOF OF SERVICE
2:16-cv-02129

4839-6980-7299.1

mailing.  Under that practice, this(these) document(s) will be deposited with the U.S. Postal Service on this date with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

     I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on **July 15, 2020**, at Irvine, California.

_____
Margo Reyes

KUTAK ROCK LLP
ATTORNEYS AT LAW
IRVINE

4839-6980-7299.1

CERTIFICATE/PROOF OF SERVICE
2:16-cv-02129

## <u>SERVICE LIST</u>

*Spencer, et al. v. Lunada Bay Boys, et al.*

USDC Central District Case No. 2:16-cv-02129-MWF-RAO

Tera A. Lutz, Esq.
Lewis Brisbois Bisgaard and Smith LLP
633 West 5th Street, Suite 4000
Los Angeles, CA 90071

KUTAK ROCK LLP
ATTORNEYS AT LAW
IRVINE

- 6 -

SERVICE LIST
2:16-cv-02129

4839-6980-7299.1